**ORIGINAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STARR INTERNATIONAL COMPANY,
INC., Individually and on Behalf of All Others :
Similarly Situated, and derivatively on behalf
of AMERICAN INTERNATIONAL GROUP, :
INC.,

                 Plaintiff,           :

       v.                    :

THE UNITED STATES OF AMERICA,   :

           Defendant,      :

and AMERICAN INTERNATIONAL
GROUP, INC., a Delaware corporation,   :

        Nominal Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FILED**

**NOV 2 1 2011**

U.S. COURT OF
FEDERAL CLAIMS

No. **11-779 C**

## VERIFIED CLASS ACTION COMPLAINT

       Plaintiff Starr International Company, Inc. ("Starr International"), individually

and on behalf of a class of all others similarly situated, and derivatively on behalf of nominal

defendant American International Group, Inc. ("AIG" or the "Company"), alleges for its

complaint with knowledge as to its own acts and status and events taking place in its presence,

and upon information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

    1.      In September of 2008, in the midst of the worst financial crisis in more than half

a century, many large financial institutions were imperiled by a severe lack of required liquidity.

One of those institutions was American International Group.

2.      In the chaos that resulted from the bankruptcy of Lehman Brothers, the Defendant, including the Department of the Treasury and its agents acting at its direction (the "Government"), concluded that survival of the United States economy and financial system required avoiding further bankruptcy filings by major financial institutions.  At the same time, the Government recognized that the bailout of large companies, particularly companies associated with creating the financial crisis, was politically unpopular.

3.      In a number of cases, the Government provided loan guarantees and access to federal funds.  AIG was a particularly good candidate for such liquidity support because its assets substantially exceeded its liabilities; its problem was not one of solvency but of temporary liquidity.  In addition, a bankruptcy filing by AIG would have severely worsened the finances of many other financial institutions.

4.      However, rather than providing AIG with the liquidity support offered to comparable firms, the Government in September 2008 began a series of steps that eventually resulted in the Government taking control of AIG away from its shareholders and thereafter taking approximately 80% of such shareholders' equity, all without just compensation.

5.      The discriminatory treatment of AIG and its shareholders by the Government is emphasized by the Government's contemporaneous treatment of comparable financial institutions.  The Government loaned billions of dollars to numerous other financial institutions without taking any ownership in those institutions; when the Government did take an equity interest, its interest was limited; it loaned billions of dollars to domestic and foreign institutions at interest rates that were a fraction of those charged to AIG; and it guaranteed hundreds of billions of dollars in loans to various institutions, including Citigroup, Inc. AIG and its

Common Stock shareholders, by contrast, were singled out for differential – and far more punitive – treatment.

6.    The Government's taking of an approximately 80% equity stake in AIG, and ultimately the complete control over AIG that the Government sought, depended on the authorization of additional shares of AIG's common stock.  This is so because there was not sufficient common stock authorized under AIG's Charter to transfer the nearly 80% equity stake that the Government intended to take.

7.    The Government fully understood that in order to implement its proposed takeover of AIG and the rights of the Common Stock shareholders, the clear legal rights of existing Common Stock shareholders required that they be entitled to an independent vote to decide whether their Company should increase the number of authorized common shares sufficiently to enable the Government to obtain the nearly 80% interest in the issued and outstanding common stock that the Government sought.  Indeed, in a Delaware Court of Chancery proceeding considering the Government's actions, AIG expressly represented that this vote would take place.  Consistent with AIG's express representations to the Delaware Court, all subsequent securities filings by AIG and the applicable Stock Purchase Agreement, explicitly stated the holders of the Common Stock of AIG, by a separate class vote, would vote on whether or not to amend the AIG Certificate of Incorporation to increase the authorized shares of the Company in order to permit the Government to obtain a nearly 80% interest in the Common Stock of AIG.

8.    As set forth in more detail below, not only did the Common Stock shareholders of AIG not agree to the proposed taking of their property and rights through an amendment of

3

the Charter of their Company, but when the Common Stock shareholders voted to reject the increase in authorized shares, the Government deliberately ignored and evaded that vote.

9.      Providing guarantees to back-up AIG's obligations, as the Government did with other comparable financial institutions, would have been less costly and more efficient (and more fair) than the course the Government took with AIG.  However, the unprecedented approach the Government took with AIG enabled the Government to use AIG as a vehicle to covertly funnel billions of dollars to other preferred financial institutions, including billions of dollars to foreign entities, in a now well-documented "backdoor bailout" of these financial institutions.  In so doing, the Government discriminatorily took AIG's property without due process or just compensation.

10.     The Government is not empowered to trample shareholder and property rights even in the midst of a financial emergency.  The Fifth Amendment of the United States Constitution directs that the Federal Government shall not deprive any person of "property without due process of law" and forbids the Government from appropriating private property "for public use, without just compensation."  U.S. Const. amend. V.  Financial emergencies do not eviscerate this Constitutional protection.

11.     To the contrary, although public policy goals may justify the taking of private property to serve public ends, when the Government does so it is required by the Constitution to ensure that the property is acquired in accordance with law, that the burdens associated with the taking are not imposed in a disparate and unfair manner, and that just compensation is paid.  "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a

4

whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  As Justice Holmes long ago

admonished, "a strong public desire to improve the public condition is not enough to warrant

achieving the result by a shorter cut than the constitutional way of paying for the change." *Pa.*

*Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

12.     In violation of these fundamental principles, and without valid legal authority,

the Government took the property and rights of AIG's common shareholders without just

compensation, in a discriminatory manner, and by means of an intentional and knowing

violation of the established requirements of law designed to protect the rights of those

shareholders.

13.     The Government's actions were ostensibly designed to protect the United States

economy and rescue the country's financial system.  Although this might be a laudable goal, as

a matter of basic law, the ends could not and did not justify the unlawful means employed by

the Government to achieve that goal.  Even in exigent times, and perhaps most especially then,

the Government may not ignore basic protections afforded under the United States Constitution

or disregard established legal rights.  Yet beginning in 2008 and continuing through at least

January 2011, the Government ignored the Constitution and singled out AIG Common Stock

shareholders for discriminatory and unlawful treatment in clear violation of the Takings, Due

Process, and Equal Protection Clauses of the United States Constitution.

14.     This lawsuit seeks redress for these Constitutional violations.

15.     In connection with the transactions in September 2008 described above, the

Federal Reserve Bank of New York (the "FRBNY") assumed control of AIG.  As described in

more detail in litigation that Plaintiff intends to file against the FRBNY in the United States

District Court for the Southern District of New York, FRBNY exercised its control over AIG to

further harm AIG and its shareholders and further deprive them of their property and property rights. FRBNY has asserted that in exercising its control over AIG after September 17, 2008, FRBNY was not acting in a governmental capacity or at the direction of the Department of Treasury. However, if the proof at or prior to trial establishes that FRBNY was in fact acting in a governmental capacity or at the direction of the Department of Treasury, then the conduct by which FRBNY's control damaged AIG and its shareholders and deprived them of property and property rights would represent a further discriminatory taking by Defendant without due process or just compensation for which Plaintiff and AIG would be entitled to relief pursuant to the Equal Protection, Due Process, and Takings Clauses of the United States Constitution.

## THE PARTIES

16.     Plaintiff Starr International Company, Inc. ("Starr International") is a privately held Panama Corporation with its principal place of business in Switzerland. The sole common stockholder of Starr International is a charity that provides millions of dollars of support to humanitarian, educational, and medical causes. It is currently and was at all relevant times, a shareholder of Common Stock in American International Group, Inc. At the time of the conduct at issue in this action, Starr International was the largest shareholder of AIG Common Stock.

17.     Defendant United States of America includes the Department of the Treasury and its agents acting at its direction (collectively, "the Government").

18.     Nominal Party AIG is a Delaware corporation with its principal executive offices located at 180 Maiden Lane, New York, New York. AIG was founded in 1967. Under the leadership of Maurice R. "Hank" Greenberg, who took over as CEO in 1968, AIG became a publicly held company in 1969 and grew into the world's largest group of insurance and financial services companies. When Mr. Greenberg retired as CEO in March 2005 AIG's

market capitalization was more than $130 billion.  In early 2008, AIG's market capitalization was also more than $130 billion.

19.     This is a direct and shareholder derivative action brought by Starr International on behalf of itself and on behalf of a class of all others similarly situated and on behalf of nominal party AIG against the United States of America.

## JURISDICTION

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1491(a).

## CONSTITUTIONAL PROVISION

21.     Plaintiff's claim is governed by the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation" and which incorporates the protections of the Equal Protection Clause.

## FACTUAL ALLEGATIONS

**I.    Background of AIG**

22.     By the turn of the millennium, AIG was the leading international insurance organization, comprised of a holding company with subsidiaries that served commercial, institutional, and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer, as well as subsidiaries that were leading providers of retirement services, financial services and asset management around the world.  By the end of 2005, AIG and its subsidiaries employed more than 97,000 people worldwide; it wrote more than $41.87 billion in net premiums; and it had more than 65 million customers worldwide.

## II.     AIGFP and Credit Default Swaps

23.     One of AIG's businesses, beginning in the 1980s, was entering into contracts called "derivatives," in which one party in effect paid the other party a fee to take on the risk of business transaction.  This business was conducted by AIG Financial Products ("AIGFP").

24.     In 1998, at the request of J.P. Morgan Chase & Co. ("JPM"), AIGFP expanded the business of taking on risk in financial transactions entered into by AIG's clients (called "counterparties") in exchange for periodic payments to include writing a type of financial insurance on a structured debt offering JPM was assembling.  The insurance provided that if the underlying debt securities JPM was offering failed to perform as expected and did not generate sufficient cash to allow the securities to meet their interest payment obligations, AIGFP would, in effect, buy the securities from the holders at the initial offering price, thereby taking on the risk that the securities would not perform.  This was an early form of what came to be known as a "credit default swap" (or "CDS").

25.     CDSs are contracts that function much like insurance policies for debt securities instruments.  In exchange for payments made over a period of time by a counterparty, the party writing the CDS is obligated to pay the counterparty the par value of the referenced debt instrument in the event that instrument defaults.  The party writing the CDS then succeeds to the counterparty's interest in the referenced debt instrument.

26.     Between the time AIGFP began writing CDSs in 1998 and the time Mr. Greenberg retired as AIG's CEO in March 2005, AIGFP had written a total of about 200 CDSs totaling approximately $200 billion in notional amount.  Most of these CDSs were based on underlying corporate debt.

27.     Until Mr. Greenberg retired as CEO in March 2005, AIG carefully scrutinized each CDS transaction entered into by AIGFP to limit and manage the risks assumed. From 1987 through 2004, AIGFP earned approximately $5 billion in profits.

28.     After Mr. Greenberg retired, AIGFP increasingly began to enter into credit default swaps on securities that included subprime residential mortgages.

29.     Between March 2005 and December 2005, for example, AIGFP wrote approximately another 220 CDSs – more than in the entire period before Mr. Greenberg left AIG. Moreover, most of these new CDSs referenced, not corporate debt, but subprime mortgage debt.

30.     The securities that were referenced by the CDSs written by AIGFP included "collateralized debt obligations" ("CDOs"). A CDO is a complex type of structured investment product that is typically backed by a pool of fixed-income assets. The collateral backing of a CDO can consist of various types of assets, including asset-backed securities ("ABSs"). The CDO then essentially repackages the income stream of those assets into separate securities that are tiered by "tranche," that is, arranged in a hierarchy of subordinated payment priority from senior to junior. Each tranche has its own risk profile, with each more senior tranche being less risky than those subordinated to it. Each tranche is purportedly designed to pay an interest rate commensurate with the level of risk assigned to it, which permits each tranche to be rated independently from the other tranches. Thus, an investor in a CDO may choose from among differently rated securities relating to the CDO, each paying an interest rate purportedly commensurate with the level of risk that the investor will be taking on. CDOs are derivatives, meaning their value is derived from events related to a defined set of reference securities that may or may not be owned by the parties involved.

31.     One common type of ABS used to form CDOs was mortgage-backed securities ("MBSs"), usually residential mortgage-backed securities ("RMBSs"), which are securities backed by pools of residential mortgages, often from diverse geographic areas.  CDOs can be backed by other types of securities also, and when the flow of new subprime mortgages was insufficient to generate new RMBSs to package together into new CDOs, CDO collateral managers sometimes used securities issued by other CDOs as the asset pool for new CDOs. This type of CDO is sometimes called a "CDO squared" or "synthetic" CDO.

32.     In technical terms, a synthetic CDO is a form of collateralized debt obligation in which the underlying credit exposures are taken on using a credit default swap rather than by having a vehicle buy assets such as bonds.  A synthetic CDO is a complex financial security used to speculate or manage the risk that an obligation will not be paid (i.e., credit risk).  A synthetic CDO is typically negotiated between two or more counterparties that have different viewpoints about what will ultimately happen with respect to the underlying reference securities.  Various financial intermediaries, such as investment banks and hedge funds, may be involved in selecting the reference securities and finding the counterparties.  Synthetic CDO securities are not typically traded on stock exchanges.

33.     In late 2005, senior executives at AIGFP concluded that writing CDSs on CDOs dependent on subprime mortgage debt was unacceptably risky, and in December 2005, AIGFP decided to stop writing new CDSs for CDOs backed by subprime mortgage debt.  However, the CDS contracts AIGFP had already written remained on its books.  As written by AIG in the period after Mr. Greenberg left AIG, these CDSs presented at least two types of risk: credit risk and collateral risk.

34.     The par value, or "notional" amount, of the CDOs underlying the CDSs written by AIGFP was important because if any of those CDOs defaulted – meaning the CDO could no longer meet its obligations to pay interest to holders of the securities – under the CDS's terms AIG was responsible for paying whatever portion of the obligations to the holders of the securities was not met by the defaulted CDO.  In the worst case, AIG would be required in effect to purchase the CDO at full value.  If the CDO had no value, this could result in a 100% loss to AIG.  This was the "credit risk."

35.     "Collateral risk" is the risk that AIG would have to post collateral in connection with a CDS.  Because a CDS contract is a form of guarantee, which under certain conditions can require the swap issuer to pay the counterparty up to the notional amount of the CDO, the swap contracts sometimes contain provisions requiring the swap issuer to post collateral as an assurance that the issuer of the swap will be able to perform its obligation in the event of a default.  Many of AIGFP's CDS contracts written after Mr. Greenberg left AIG contained a provision requiring AIGFP to post collateral if AIGFP's credit rating fell or if the valuation or rating of the CDOs underlying the CDSs fell below a certain threshold.

## III.    The Liquidity Issues Facing AIG in 2008

36.     As has been widely documented, in or about 2007, the previously high-flying housing market began to falter, leading to a cascade of economic problems that precipitated a global financial crisis that reached a flash point in September 2008.  These severe problems included rising mortgage default rates, falling home values, failures of hedge funds that had long positions in the mortgage market, and bankruptcies of many subprime mortgage lenders and servicers.  These events, which continued throughout 2007 and 2008, increasingly exposed AIG to heightened risk, particularly collateral risk, on its CDS portfolio, and ultimately contributed to AIG's liquidity crisis in 2008.

37.     Beginning in 2007, growing global financial problems – and in particular subprime mortgage issues – caused AIGFP's CDS counterparties to claim that the value of the underlying CDOs was falling precipitously and to make increasingly large collateral calls on AIGFP.  Those claims by AIGFP's counterparties increased in the Spring and Summer of 2008. It was the collateral risk, not the credit risk, that primarily fueled AIG's liquidity problems. Significantly, as discussed in more detail below, even the troubled CDOs transferred to Maiden Lane III (*see infra* paragraph 110)  have proved ultimately to have substantial value.

38.     In addition, beginning around the same time, the securities lending program operated by AIG insurance subsidiaries also began to exert liquidity pressure on AIG.  Under that program, those subsidiaries lent securities to counterparties in exchange for cash collateral, which, after Mr. Greenberg's retirement, the AIG subsidiaries then used to purchase RMBS and other assets.  In 2007, AIG began to experience a growing differential between its liability to return that cash collateral to the counterparties and the fair value of the RMBS and other assets the subsidiaries purchased with that cash collateral.

39.     Despite AIG's diverse holdings, with assets more than sufficient to meet AIG's obligations to its counterparties, many of AIG's assets were relatively illiquid and would have been difficult to sell quickly, or to sell quickly at prices reflecting their value.  AIG's liquidity was also being pressured because of the impact of the crisis on its securities lending program.

40.     Although AIG posted substantial amounts of collateral in or around the summer of 2008 – approximately $14.8 billion in total – AIG did not have liquid assets sufficient to cover these increasing collateral calls.  As a result, AIG faced a liquidity squeeze in or around July 2008 and continuing into September 2008.

41.    In or around July 2008, AIG's then-Chief Executive Officer, Robert B. Willumstad, expressed concern to AIG's Board of Directors regarding a potential liquidity crisis, telling them the only source from which the Company could secure enough liquidity if such a crisis occurred was the government.

## IV.    The United States Government Refused to Provide AIG Loans, Loan Guarantees, or Access to the Discount Window on the Same Basis Provided to Other Institutions, Including Foreign Companies.

### A.    The Government Opened the Section 13(3) Discount Window to Various Institutions Without Requiring Any Appropriation of the Common Shares of Those Institutions.

42.    To allow AIG to address its liquidity situation, and consistent with the manner in which the Government was addressing related liquidity issues of other institutions, it would have been appropriate for the Government to provide AIG access to the Federal Reserve's discount window on terms corresponding to those being provided to various other institutions. AIG repeatedly sought, but was denied, such access.

43.    Throughout the global financial crisis, the Government allowed many domestic and foreign institutions access to the discount window. Indeed, the biggest borrowers from the Federal Reserve's discount window during the crisis were foreign banks, which routinely received loans exceeding $30 billion.

44.    Notably, on March 31, 2011, after losing an appeal of a Freedom of Information Act request, the Federal Reserve Board was required to release records revealing the nature and extent of its discount window loans during the crisis. Those records show that the discount window loans peaked at about $110 billion at the end of October 2008. Foreign banks borrowed approximately 70% of that amount; for example Dexia SA of Belgium borrowed about $33 billion; Dublin-based Depfa Bank, Plc, subsequently taken over by the German government, received approximately $25 billion; Bank of Scotland borrowed $11 billion; and

Arab Banking Corp., 29% owned by the Libyan Central Bank at the time, received 73 different loans. Wachovia also borrowed $15 billion, and numerous investment banks were also granted access. At no time did the Federal Reserve Board require that it be given control of, or an equity stake in, these institutions.

45.     The Government also permitted other insurance companies to gain access without punitive funding terms (*e.g.*, The Hartford Financial Services Group, Inc. which was permitted to acquire a small local bank (for approximately $10 million) in order to gain access to approximately $3.4 billion in Troubled Asset Relief Program ("TARP") funds).

46.     If AIG had been given similar access to the Federal Reserve's discount window or other sources of liquidity like these other institutions, AIG would easily have met its liquidity needs.

**B.      The Government Also Provided Loans and Loan Guarantees to Numerous Foreign and Domestic Institutions on Terms Denied AIG.**

47.     The Government could also have granted AIG access to the Term Auction Facility ("TAF"). In fact, at the height of the crisis, TAF loaned about $493 billion to numerous foreign and domestic counterparties. These loans were made at reasonable interest rates without the Government appropriating control of the institutions at issue. If such loans had been made available to AIG, AIG would have easily met its liquidity needs.

48.     Alternatively, or in combination with the other options available (*e.g.*, purchasing CDOs directly), the Government could have guaranteed AIG's obligations in a manner similar to the $300 billion in guarantees given to Citigroup Inc. If such a guaranty had been given, there would have been no further collateral calls on AIG, its liquidity needs would have been satisfied and, in fact, collateral previously posted by AIG could have been released for other uses.

**C.  The Government Repeatedly Rebuffed AIG's Requests for Discount Window Access on Equivalent Terms to Those Provided to Other Institutions.**

49.     Over the weekend of September 13-14, 2008, while AIG was still attempting to obtain discount window access, it was also making efforts to identify a private-sector solution, which attempts included assembling private equity investors, strategic buyers, and sovereign wealth funds to discuss funding and investment options, as well as considering a possible bankruptcy filing.  The Government discouraged sovereign wealth funds and other non-United States investors from participating in a private-sector solution to AIG's liquidity needs.

50.     The morning of Monday, September 15, 2008, Lehman Brothers Holding, Inc. filed for bankruptcy protection, materially worsening the global financial crisis.

51.     On September 15, 2008, the Government also brokered talks among a consortium of banks led by J.P. Morgan, Morgan Stanley, and Goldman Sachs aimed at arranging private financing for a loan to address AIG's liquidity situation.  Officers from Plaintiff, AIG's largest shareholder at the time, requested to attend these meetings.  Plaintiff's requests were denied.

52.     Later in the afternoon of September 15, 2008, the three largest rating agencies, Moody's, S&P, and Fitch Ratings Services, sharply downgraded the long-term credit rating of AIG.

53.     These ratings downgrades, combined with a steep drop in AIG's common stock price, prevented AIG from accessing money in the short-term lending markets, and, without outside intervention, AIG did not have sufficient cash to post collateral to AIGFP's counterparties.

54.     Rather than granting AIG the same access to liquidity assistance that it granted to numerous other institutions, including various foreign companies, the Government instead

chose to use the difficulties faced by AIG to implement a takeover of the Company without just compensation and to thereafter use AIG as a vehicle to provide covert, "backdoor bailouts" to numerous institutions on terms vastly disparate from those imposed on AIG and its Common Stock shareholders.  The Government's takeover of AIG commenced with the acquisition of control in mid-September 2008, continued with the deprivation of shareholders' rights in June 2009, and culminated in the completion of the taking without just compensation of over 562 million shares of AIG's Common Stock on January 14, 2011.

> **D.**      **On September 16, the Government Offered, Pursuant to Section 13(3) of the Federal Reserve Act, to Provide Discount Window Access To AIG; However in a Wholly Unprecedented Manner and Without Valid Basis, Just Compensation, or Required Shareholder Approval, the Government Took Control of the Company and Required AIG to Agree to Provide the Government with an Approximately 80% Equity Stake in AIG.**

> > **1.**      **The Government Did Not Undertake Any Independent Analysis To Support the Appropriation of an Approximately 80% Equity Stake.**

55.      Seven weeks after AIG first approached the Government to request discount window access, the Government finally took action in the form of an unprecedented and rushed demand that AIG grant the Government control of the Company and a nearly 80% interest in AIG's Common Stock.  On the Tuesday afternoon of September 16, 2008, the Government provided AIG with a three-page term sheet.  The Government's terms included (i) a Federal Reserve Bank of New York ("FRBNY") credit facility to AIG of $85 billion secured by all of AIG's assets at an above-market interest rate of 8.5% over LIBOR, which with fees resulted in a cost to AIG of approximately 14.5% per annum, (ii) a requirment that the Government be given control of AIG and (iii) a promise that the Government would receive a nearly 80% equity stake in AIG.  Thus, loans made pursuant to the Credit Agreement (as defined below) were secured by assets of AIG that, according to a September 2011 Government Accountability Office Report, in the words of FRBNY officials, "fully secured the Federal Reserve System."

56.     Access to the discount window conditioned on a Government takeover and the taking of a controlling interest in the Common Stock of a Company was unprecedented.  In accordance with the express terms of Section 13(3) of the Federal Reserve Act then in effect, and in accordance with the standard means by which access to the discount window is provided, such loans are to be predicated upon (1) "rates established in accordance with the provisions of section 357" of the Act, and (2) "fully secured to the satisfaction of the Federal Reserve Bank." The extraordinarily high interest rate being charged to AIG, and the securing of the loan with the assets of the Company, was more than sufficient consideration for access to the discount window under these traditional and authorized measures.  The term sheet did not set forth any independent purpose, justification, or basis for the proposed takeover of the Company and the taking of nearly 80% of the Common Stock of the Company.

57.     The Government did not conduct any independent analysis justifying the taking of approximately 80% of the equity of AIG in connection with providing access to the discount window, nor did the Government undertake any analysis of the "just compensation" required for such a taking.  Moreover, Section 13(3) of the Federal Reserve Act had never been interpreted or invoked in any prior circumstance to provide a basis for the takeover of a corporation or as a basis for the taking of a controlling interest in the common shares of a corporation.

**2.     The Government Required AIG to Agree to Convey an Approximately 80% Equity Stake Without Providing Any Compensation to the Common Stock Shareholders.**

58.     After delivering the September 16 term sheet, the Government advised Mr. Willumstad that this was "the only proposal you're going to get".

59.     The AIG directors' acceptance of the Government's terms was announced publicly before the opening of the next trading day, September 17, 2008.  As a result of the

provisions of the Credit Agreement, AIG's shareholders and those directors selected independently of the Government had lost the ability to control AIG, protect its interests, or remedy acts that damaged it.

60.     The following day, the Government unilaterally fired AIG's CEO and replaced him with a new CEO (Edward M. Liddy) who would be under the FRBNY's control.

61.     Neither AIG nor its shareholders had any say in the selection of Mr. Liddy as CEO. At all relevant times, Mr. Liddy was under the control of the FRBNY.

62.     Rather than acting in the best interests of AIG and its stockholders, Mr. Liddy was required to focus exclusively on the interests of the Government. For example, shortly after September 18, 2008, Treasury Secretary, Henry M. Paulson, announced on television that AIG was to be liquidated. Mr. Liddy promptly began to sell off valuable AIG assets (*e.g.*, HSB Group, Inc. and 21st Century Insurance) often at fire-sale prices. The prematurely announced liquidation of AIG resulted both in the rushed sale at fire-sale prices of valuable assets and in the severe damage to AIG's on-going businesses, costing AIG customers, creditors, and employees.

63.     On September 22, 2008, after being authorized by the Federal Reserve Board pursuant to Section 13(3) of the Federal Reserve Act, the FRBNY entered into a Credit Agreement with AIG ("Credit Agreement") in which it agreed to extend up to $85 billion in credit to AIG on a revolving basis to be used by AIG for "general corporate purposes", including "as a source of liquidity to pay principal, interest and other amounts under Indebtedness and other obligations as and when they become due and payable."

64.     The Credit Agreement was signed on behalf of AIG by Mr. Liddy.  Despite government allegations to the contrary, the Credit Agreement was imposed upon, and not voluntarily agreed to, by the AIG board.

65.     In addition to requiring AIG to "fully secure" the loan with AIG's assets, and in addition to the excessive interest rate imposed, the Credit Agreement also required AIG to agree to issue to a trust created "for the sole benefit of the United States Treasury" 79.9% of AIG's equity, all at the expense of AIG's existing shareholders.

66.     The Credit Agreement provided that the Series C Preferred Shares "will vote with the common stock on all matters submitted to AIG's stockholders" and "will be entitled to an aggregate number of votes equal to the Initial Number of Shares," defined to be "a number of shares of common stock equal to 79.9% of that number plus the sum of the common stock then outstanding and the maximum number of shares then reserved for issuance with respect to AIG's Equity Units."

67.     According to AIG's 2008 third quarter and 2009 first quarter Form 10-Q filings made while the FRBNY was in control of AIG, an ownership interest in 79.9% of AIG's Common Stock was then valued at $23 billion.  Yet, the Trust was required to pay nothing more than $500,000 for the Series C Preferred Shares with the purported "understanding that additional and independently sufficient consideration was also furnished by FRBNY in the form of its lending commitment under the Credit Agreement."  Contrary to that self-serving statement, however, no "additional and independently sufficient consideration" was provided for the taking of approximately 80% of the Common Stock of AIG.  To the contrary, the loan provided under the Credit Agreement was fully and adequately secured by AIG assets, and the Government was compensated for any risk associated with that loan by imposing an annual

cost of 14.5% to AIG, which was significantly higher than market rates and significantly higher than the discount rates the Government extended to other institutions.

### 3. The Trust Agreement Established to Control the Government's Approximately 80% Interest

68.     The Trust established to hold the Government's Series C Preferred Shares and intended to hold and dispose of the Government's approximately 80% interest in the Common Stock of AIG is governed by the AIG Credit Facility Trust Agreement dated as of January 16, 2009 ("Trust Agreement").

69.     According to the Trust Agreement, the Trust was created "for the sole benefit of the United States Treasury."

70.     The corpus of the Trust consisted entirely of the Series C Preferred Shares.

71.     The Trust Agreement itself directs that "in exercising their discretion" the Trustees "are advised that it is the FRBNY's view that (x) maximizing the Company's ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department and (y) the Company being managed in a manner that will not disrupt financial conditions, are both consistent with maximizing the value of the Trust Stock."

72.     In addition, under the "Standard of Care" articulated in the Trust Agreement, the Trustees are indemnified from liability so long as each Trustee "(i) acted in good faith in a manner the Trustee reasonably believed to be in accordance with the provisions of this Trust Agreement and in or not opposed to the best interests of the Treasury and (ii) had no reasonable cause to believe his or her conduct was unlawful."

73.     The Series C Preferred Shares held by the Trust as its sole asset provide the Trust with the voting power equivalent to an approximately 80% interest in AIG, which it exercised for the benefit and to further the interests of the Treasury.

4.     **Plaintiff and the Class Had a Reasonable, Investment-Backed Expectation That the Government Could Not and Would Not Appropriate Approximately 80% of the Equity of AIG.**

74.     The Common Stock shareholders had a reasonable, investment-backed expectation that the Government would act lawfully, fairly, and Constitutionally with respect to their private property rights.  By destroying the value of their Common Stock through actions that were unlawful, discriminatory, and irrational, the Government violated the reasonable, investment-backed expectations of Plaintiff and the Class.

75.     As justification for its authorization of the Credit Agreement, the Federal Reserve Board invoked Section 13(3) of the Federal Reserve Act.

76.     However, Section 13(3) provides no authorization for the Federal Reserve Board to condition access to the Federal Reserve discount window upon a Government takeover of a corporation or the appropriation of a controlling interest in the Common Stock of a publicly traded corporation.

77.     The Federal Reserve Board did not assemble any meaningful analysis of its legal authority under Section 13(3) to take the unprecedented measures it imposed with respect to AIG, nor did it maintain appropriate documentation of its decision to condition its actions under Section 13(3) upon a takeover of AIG and an appropriation of the property and interests of AIG Common Stock shareholders.  No Congressional authority vested the Federal Reserve Board with the authority or power to take over an American corporation pursuant to Section 13(3) or to appropriate the property and interests of Common Stock shareholders of a publicly traded United States issuer under that provision.

78.     Moreover, no independent analysis was undertaken to evaluate and support the decision to require a "79.9 percent" interest in the Common Stock of AIG in order to "satisfy" the requirements and standards of Section 13(3).  The "79.9 percent" figure bears no relation to

Section 13(3) or any ascertainable security requirements.  The Credit Agreement was fully secured by more than sufficient assets of AIG, and the excessive interest rate imposed provided sufficient consideration for the credit offered by the Federal Reserve.  Indeed, according to the GAO Report, the AIG assets securing the loans made pursuant to the Security Agreement "fully secured the Federal Reserve System to its satisfaction, a condition of section 13(3) emergency lending."  Even if the loan was repaid in full without default, the Government would nonetheless independently retain, with no consideration, an approximately 80% interest in the Company.

V.    **The Government Fully Understood That a Shareholder Vote By Those Holding the Common Stock of AIG Would Be Required To Implement the Appropriation of an Approximately 80% Interest in AIG Common Stock.**

79.    The Government fully understood and was aware that the approval of AIG's Common Stock shareholders would be required before the Series C Preferred Shares appropriated pursuant to the Government proposed takeover of AIG could be converted into approximately 80% of AIG's Common Stock.

80.    Under AIG's then-governing Restated Certificate of Incorporation (the "Charter"), AIG's Charter did not authorize a sufficient number of shares of Common Stock to permit AIG to simply hand over to the Government an approximately 80% interest in the Common Stock of the Company.  Specifically, the Charter provided that the number of authorized shares of Common Stock was 5 billion shares, of which more than 3 billion shares had previously been issued or reserved.  Accordingly, in order for the Government to convert its Series C Preferred Shares into approximately 80% of the Common Stock of AIG, it was necessary to amend the Charter to dramatically increase the number of authorized shares of Common Stock.

81.     Delaware law, which governs the Charter, is unequivocal that an amendment of a certificate of incorporation to increase the number of authorized shares in a class of stock can be accomplished only through a majority vote of the then-existing outstanding shares in that class. The very purpose of this requirement of corporate law is to protect the property rights and interests of the corporation's shareholders.

82.     The Government fully understood that its appropriation of approximately 80% of the Common Stock of AIG could only properly be accomplished with an increase in the number of authorized shares of Common Stock approved by an independent vote of the existing shareholders of Common Stock in AIG.

83.     Thus, AIG was required to agree in the Credit Agreement to call a shareholder meeting "as soon as practicable" after the issuance of Preferred Shares to the Government where shareholders would vote on, among other things, "(i) amendment to AIG's certificate of incorporation to (a) reduce the par value of AIG's common stock . . . (b) increase the number of authorized shares of common stock . . . and (ii) any other measures deemed by the NY Fed to be necessary for the conversion of" the Government's Preferred Shares.

84.     Similarly, the January 16, 2009 Trust Agreement states that the Trustees agree to take any and all reasonable actions to, among other things, amend the Charter to increase the number of authorized shares.

### A.     The Delaware Consent Order Protects the Rights of AIG Shareholders

85.     On November 4, 2008, a lawsuit was filed in the Delaware Court of Chancery on this very issue to ensure that the rights of the Common Stock shareholders of AIG were respected with regard to the Government's takeover of the Company. *Walker, et al.  v. AIG, et al.*, CA No. 4142-CC. That lawsuit, which included breach of fiduciary duty claims against Mr. Liddy and the Company's then Directors and Officers (the "AIG defendants"), sought, among

other things, compliance with Delaware law and an order declaring that the Government's Super Voting Preferred stock "is not convertible into common stock absent a class vote by the common stock to increase the number of authorized shares, as well as all relief appropriate in light of the Board of Directors' failure to call a class vote and failure to act in the interests of the common stockholders who are entitled to reject the dilution of their shares."

86.     On February 5, 2009, the Delaware Court of Chancery entered a Stipulation and Order of Dismissal finding the request for this relief to be moot in light of the representation and agreements of Mr. Liddy and the AIG defendants that there would be a shareholder vote in which "holders of the common stock will be entitled to vote as a class separate from the holders of the Series C Preferred Stock on any amendment to AIG's Restated Certificate of Incorporation that increases the number of authorized common shares and decreases the par value of the common shares."

**B.     The Representations of AIG and the Government in Securities Filings**

87.     All representations and disclosures made by AIG and the Government in required securities filings were consistent with the Delaware Court Consent Order and the representations upon which that Order was based.  These representations and disclosures made clear that the Government's proposed takeover of AIG, and the conversion of its Preferred Shares to an approximately 80% interest in the Common Stock of AIG would require a proper vote of the existing Common Stock shareholders to permit an increase in the authorized number of shares of AIG Common Stock.

88.     For instance, in its Form 10-Q for the third quarter of 2008 (filed with SEC on November 10, 2008), AIG stated:  "Under the terms of Fed Credit Agreement . . . After the Series C Preferred Stock is issued, AIG will be required to hold a special shareholders' meeting to amend its restated certificate of incorporation to increase the number of authorized shares of

common stock to 19 billion and to reduce the par value per share. The holders of common stock will be entitled to vote as a class separate from the holders of the Series C Preferred Stock on these changes to AIG's Restated Certificate of Incorporation. If the increase in the number of authorized shares and change in par value is approved, the Series C Preferred Stock will become convertible into common stock."

89.     In its 2009 Form 10-K (filed with SEC on February 26, 2010), AIG again confirmed that the Series C Preferred Shares "will become convertible into common stock upon the subsequent amendment of AIG's Amended and Restated Certificate of Incorporation, which amendment will need to be approved by a separate class vote of the holders of AIG Common Stock. Upon such amendment, the AIG Series C Preferred Stock will be convertible into a number of shares of AIG Common Stock representing its voting power at that time."

90.     All filings and disclosures by AIG and the Government to the Common Stock shareholders of AIG were consistent with the representation that the Government would not complete its proposed appropriation of nearly 80% of the Common Stock of AIG <u>unless</u> the existing Common Stock shareholders, voting as a separate class, approved an increase in the authorized shares of AIG Common Stock to "19 billion."

**C.      The Express Terms of the Stock Purchase Agreement**

91.     Consistent with Delaware law, the Delaware Consent Order and AIG's representation upon which the Consent Order was based, and the representations made in various securities filings, the Stock Purchase Agreement entered between the Trust and AIG on March 1, 2009 ("Series C SPA"), *expressly* and unequivocally provides that the Defendants and its agents would be permitted to convert the Series C Preferred Shares to a nearly 80% interest in the Common Stock of AIG only upon a valid vote by the existing Common Stock shareholders to "approve the Charter Amendment" that would "reduce the par value of the

25

Common Stock to $0.000001 per share and increase the number of authorized shares of Common Stock to 19 billion."

92.    AIG also covenanted in the Series C SPA to adopt several Board resolutions pursuant to Delaware law, including an amendment to the Charter increasing the number of authorized shares, as to which the Series C SPA specifically stated would require "the holders of the Common Stock voting as a separate class in the case of the Common Stock Amendment Proposal" and that if not obtained, "the Company shall include a proposal to approve such proposals at each subsequent annual meeting of its shareholders."

93.    In connection with the shareholder meeting at which such vote was to take place, AIG further covenanted in the Series C SPA to file with the SEC "a preliminary proxy statement *reasonably acceptable to the Trust*."  Moreover, under that Agreement, none "of the information . . . in any proxy statement . . . will . . . contain any untrue statement of material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading."

**VI.    The Government's Taking of an Approximately 80% Interest in the Common Stock of AIG Through a "Backdoor" Conversion is Contrary to (i) Delaware Law, (ii) the Express Representation Made to the Delaware Chancery Court, (iii) Repeated Representations In Securities Filings, and (iv) the Terms of the Series C Stock Purchase Agreement.**

94.    On or around June 5, 2009, AIG submitted its 2009 proxy statement and materials, which were the subject of review and approval by the Government, in advance of the June 30, 2009 annual shareholder meeting.  The statement and materials included a proposal ("Proposal 3") to amend the Charter to increase the number of authorized shares of Common Stock.

95.    According to the proxy statement, Proposal 3 required a "for" vote of a majority of the voting power of the then-outstanding shares of Common Stock and Series C Preferred

Stock "plus a 'for' vote of a majority of the outstanding shares of AIG Common Stock, voting as a separate class."

96.     At AIG's annual shareholder meeting on June 30, 2009, this proposal to increase the authorized shares of AIG Common Stock, which was the *only* proposal for approval in which the then-existing Common Stock shareholders of AIG were entitled to vote as a separate class from the Government's controlling vote exercised by the Trust, "*Failed.*"  That is, the vote required under (i) Delaware law, (ii) the Delaware Court Order, (iii) all securities filings by AIG and Defendants, and (iv) the Series C SPA itself, and the only vote in which AIG Common Stock shareholders were entitled to a separate vote to protect their property and interests with respect to the Government takeover, *failed*.

97.     However, anticipating the possibility that the class vote on Proposal 3 would fail, the proxy materials also included a mechanism that would enable the conversion of the Series C Preferred Shares into approximately 80% of the Common Stock of the Company despite the failure of the required *independent* vote of existing Common Shareholders.  Thus, AIG's 2009 proxy materials also included a proposal ("Proposal 4") to amend the Charter to effectuate a reverse 20:1 stock split.  This reverse stock split, with respect to which the Government's controlling vote was permitted to be included, was specifically and expressly engineered to *guarantee* that sufficient authorized shares of AIG Common Stock were available to allow the Government to convert its Series C Preferred Shares into approximately 80% of the Common Stock, *regardless* of the independent vote of the Common Stock shareholders regarding the number of authorized shares.  Indeed, the reverse stock split vote was engineered to proportionately decrease the authorized and issued Common Stock shares of AIG *only if* the increase in the number of authorized shares was independently approved by the Common Stock

shareholders.  Specifically, if the Common Stock shareholders rejected an increase in the authorized shares of AIG common stock (as they did), then the 20:1 reverse stock split would *only* apply to issued, but not authorized shares.  As a result, the approximately 3 billion of outstanding Common Stock shares would be reduced in number to slightly more than 150 million shares; but the number of authorized shares would remain at 5 billion.  Through these machinations, the number of authorized, but unissued, shares of AIG Common Stock available for conversion of the Trust's Preferred Stock would move from less than 40% of the outstanding Common Stock to more than 90% of the outstanding Common Stock.

98.     The section of the proxy materials explaining Proposal 4 did not mention the Series C SPA or relate the stock split in any manner to the Government takeover and intended taking of approximately 80% of the Common Stock of the Company.  As part of the scheme, *no* proposal was presented that would have allowed the existing Common Stock shareholders of AIG to vote as a separate class for a reverse stock split that would apply to *both* issued and authorized (but unissued) Common Stock.

99.     At AIG's annual shareholder meeting on June 30, 2009, Proposal 3 (voted upon by the separate class of AIG Common Stock shareholders) failed and Proposal 4, in which the Trust's controlling voting interest was permitted to participate, passed.

100.     Pursuant to this "backdoor" scheme, the Government was able to convert its Series C Preferred Shares to Common Stock of AIG even though the vote on that issue had failed.  In September 2010, AIG and the Government announced an "exit plan" that was designed to repay all of AIG's obligations to the Government and required AIG, among other things, to sell two of its valuable operating units – namely, American Life Insurance Company (ALICO) and American International Assurance Company, Ltd. (AIA).

101.    On January 14, 2011, upon completion of the exit plan, the Series C Preferred Shares were converted into approximately 80% of the Common Stock of AIG.  This completed the taking of AIG shareholders' interests by the Government.

102.    Neither the Government nor AIG has offered any explanation as to why this scheme was engineered to intentionally evade the requirement of a Charter Amendment vote by the class of existing Common Stock shareholders to increase the authorized shares of AIG Common Stock to 19 billion as specified by (i) the Delaware Court representations, (ii) all securities filings by AIG and Defendants and (iii) the Series C SPA itself.  The deliberate and knowing scheme to circumvent the vote of existing Common Stock shareholders to not allow an increase in the authorized shares of AIG Common Stock was contrary to law and a flagrant disregard for the rights and interests of AIG Common Stock shareholders.

## VII.    The Government Used AIG as a Vehicle to Provide Covert, Inequitable "Backdoor Bailouts" to Other Institutions, Including Foreign Corporations.

103.    The purpose of the Government taking control of AIG, and of nearly 80% of the equity of AIG, was to enable the use of AIG as a vehicle to provide discriminatory, non-public "backdoor bailouts" to other institutions, including foreign institutions.

104.    Former Treasury Secretary Paulson testified before Congress in January 2010 that the rationale for the AIG takeover was that "If AIG collapsed, it would have buckled our financial system and wrought economic havoc on the lives of millions of our citizens."

105.    Testifying before Congress in March 2009, Federal Reserve Chairman Ben Bernanke explained the AIG takeover was "a difficult but necessary step to protect our economy and stabilize our financial system" and that "Federal Reserve and the Treasury agreed that AIG's failure under the conditions then prevailing would have posed unacceptable risks for the global financial system and for our economy."  Mr. Bernanke added that AIG's "failure

could have resulted in a 1930s-style global financial and economic meltdown, with catastrophic implications for production, income, and jobs."

106.    Treasury Secretary Geithner similarly testified before Congress in January 2010: "The steps the government took to rescue AIG were motivated solely by what we believed to be in the best interests of the American people.  We did not act because AIG asked for assistance.  We did not act to protect the financial interests of individual institutions.  We did not act to help foreign banks.  We acted because the consequences of AIG failing at that time, in those circumstances, would have been catastrophic for our economy and for American families and businesses."

107.    Mr. Liddy testified in Congress on March 18, 2009, that "the U.S. Government determined that a collapse of AIG and the consequent blows to our counterparties and customers around the world posed too great a risk to the global economy, particularly in the context of the near or actual failure of other financial institutions."  An Addendum to his testimony states: "Because of its size and substantial interconnection with financial markets and institutions around the world, the federal government and financial industry immediately recognized that an uncontrolled failure of AIG would have had severe ramifications.  In addition to being the world's largest insurer, AIG was providing more than $400 billion of credit protection to banks and other clients around the world through its credit default swap business.  AIG also provides credit support to municipal transit systems and is a major participant in foreign exchange and interest rate markets."

108.    Even if the Government's takeover of AIG was pursuant to a "public purpose," it is now clear that the Government took control over AIG to use AIG as a vehicle to undertake covert, "backdoor bailouts" to various other favored institutions on terms that were

disproportionately, inequitably, and unjustly more favorable to those institutions, including various foreign companies, and without just compensations to AIG or its shareholders.

109.    Like AIG, the AIGFP counterparties were also experiencing increasing collateral calls that were materially impacting their financial condition and further negatively impacting global credit markets.

110.    In early November 2008, FRBNY decided to create a special purpose vehicle ("SPV") designated Maiden Lane III ("ML III") ostensibly to resolve AIG's obligations to CDS counterparties.  FRBNY shared its decision with AIG only after consulting and previously reviewing its proposal with the Federal Reserve Board and the Department of the Treasury.

111.    The significance of the facts regarding ML III to Plaintiffs' claims against Defendant is that they further (a) show the purpose for the Government's taking of the control and equity of AIG; and (b) show the discriminatory nature of the punitive terms the Government imposed on AIG and its shareholders and the extent to which those terms and their consequences were contrary to the reasonable expectations of investors.  These facts also establish the claims under the Equal Protection, Due Process, and Takings Clause of the United States Constitution for which Defendant would be liable if, contrary to FRBNY's assertions, it is established at or prior to trial that FRBNY was acting in a governmental capacity or at the direction of the Department of the Treasury.

### A.    Creation of Maiden Lane III

112.    On November 25, 2008, Maiden Lane III LLC ("ML III") was created and purchased approximately $46.1 billion in notional CDO assets.  On December 18 and 22, 2008, ML III engaged in a second round of CDO asset purchases totaling approximately $16 billion in notional value.

113.    Prior to the formation of ML III, AIG had recently posted approximately $35 billion in collateral to secure the CDO obligations later purchased by ML III.  At the time ML III was formed, AIG was required to make an additional $5 billion equity investment.  Based on AIG's equity contribution of $40 billion, FRBNY agreed to lend up to $30 billion to ML III.

114.    Although AIG was the only party contributing material equity to ML III, FRBNY is the controlling party and managing member of ML III.  Through its control over AIG, FRBNY required AIG to use this vehicle to fund the purchase of CDSs from the counterparties.

115.    ML III ultimately borrowed approximately $24.3 billion from FRBNY, which together with an equity funding of $5.0 billion provided by AIG and approximately $32.5 billion in collateral previously contributed by AIG, were used by ML III to purchase from certain third-party counterparties of AIGFP certain U.S. dollar denominated CDOs.

**B.    FRBNY Permitted the AIGFP Counterparties to Retain the Entire $32.5 Billion in Collateral AIG Posted Prior to ML III, Which Together with What Was Paid by ML III Resulted in the AIGFP Counterparties Receiving Par Value, Which Was Far Higher than Market Value for Those Investments.**

116.    Under ML III, the AIGFP counterparties received essentially par value – that is, the notional, or face, value – for their CDOs (or close to par value after certain expenses) through a combination of receiving payments from ML III plus retaining collateral AIG had previously posted to collateralize its CDS contracts.  In return, the counterparties agreed to cancel their CDS contracts with AIG.

117.    The purchase payments the counterparties received from ML III, together with the prior collateral provided by AIG, paid the AIGFP counterparties approximately $62 billion, even though AIG's obligations could have been compromised for substantially less.

**C.    FRBNY's Self-Dealing Appropriated Two-Thirds of the Value of the**

**Collateral Posted by AIG to the FRBNY.**

118.   Under the priority of payments (also known as the payment "waterfall") in the ML III transaction, the proceeds ML III received – either in the form of cash from the liquidation of CDOs or the principal and interest payments from retained CDOs – after payment of ML III's fees and expenses were paid first and exclusively to satisfy the FRBNY's $24.3 billion loan to ML III.  Any proceeds remaining after the FRBNY's loan was satisfied would then be used to redeem AIG's equity contribution in ML III.

119.   Any ML III proceeds remaining after the FRBNY's loan and AIG's equity contribution were satisfied are known as "residual interests" and, under the terms of ML III, split between FRBNY, which receives approximately two-thirds of the residual interests, and AIG, which receives approximately one-third of the interests.  This was so even though by definition FRBNY had already received back its entire contribution with interest and even though the "residual interests" were funded entirely by the collateral that AIG alone had furnished.

120.   Not only did FRBNY's self-dealing appropriate two-thirds of those residual interests despite having virtually no risk in the ML III transaction after its loan is paid off, FRBNY also refused to use any residual interest proceeds to pay down AIG's outstanding balance under the Credit Agreement.

121.   First, FRBNY forced AIG to fund approximately 60% of the par value purchase price ($5 billon in new equity, plus $32.5 billion in previously posted collateral compared to FRBNY's last-in-first-out loan of $24.3 billion), which price far exceeded the market value. Second, and without justification, FRBNY appropriated the majority of the returns resulting from the collateral AIG had posted, and without a reduction in AIG's debt to Defendant.

D.     **FRBNY Paid the ML III Counterparties Par Value Despite the Expectation – by Even Some of the Counterparties – that FRBNY Would Obtain Discounts from Those Counterparties.**

122.    At the time ML III was formed, it was expected that concessions, or discounts, would be obtained on the par value of AIGFP counterparties' CDOs purchased for the ML III portfolio.

123.    Securing such concessions or discounts would have provided more loan security to FRBNY in connection with the Credit Agreement and lowered the size of Defendant's overall lending commitment to AIG.

124.    Nevertheless, FRBNY made no effort to demand or negotiate concessions and only limited, inconsistent efforts to give counterparties the opportunity to volunteer concessions.

125.    Of the 16 AIGFP counterparties involved in ML III, FRBNY apparently contacted only 8 of them regarding concessions or discounts.  Moreover, those contacts were made on or around November 5 and 6, 2008, and FRBNY only gave those counterparties until the close of business Friday, November 7, 2008, to make an offer with respect to concessions or discounts.

126.    If FRBNY had diligently sought concessions, FRBNY would have been able to compromise AIG's obligations for billions of dollars less than what ML III paid.

127.    Despite FRBNY's failure to diligently seek concessions, at least one counterparty expressed a willingness to accept concessions or discounts saying that it was only right and what the counterparties were expecting.  Another counterparty indicated to FRBNY it was considering a range of discounts.  However, FRBNY indicated to those counterparties that it had decided against concessions and that FRBNY would instead pay all counterparties essentially 100 cents on the dollar, literally turning away counterparties' offers of concessions.

128.   Not pursuing (and even refusing to accept) concessions from AIG's CDS counterparties, damaged AIG and its shareholders – and reduced the Government's security for its loans to AIG.

**E.     Not Only did FRBNY Require that the Counterparties Receive Par Value, It Also Required that they Receive a Release of All Claims that AIG Could have Asserted Against Them Relating to the CDOs Purchased by ML III.**

129.   Even though the counterparties were already receiving 100 cents on the dollar, FRBNY also required AIG to execute releases waiving all claims (known or unknown) against the counterparties arising out of the credit default swaps that were canceled through the Maiden Lane vehicle.

130.   FRBNY used ML III to secure the cancellation of the CDS contracts by immediately paying to the counterparties, through cash payments and by granting the counterparties ownership rights over collateral, everything they could conceivably have received in the event that all of the securities covered by the swaps ever defaulted.  Those terms were already generous enough to the counterparties and damaging enough to AIG; FRBNY had no rational economic or policy reason to, in addition, require AIG to provide releases on claims concerning AIG's effectively selling insurance on the CDOs.  Doing so again harmed AIG and its shareholders and adversely affected the Government's security for its loans to AIG.

**F.     Paying the ML III Counterparties Par Value on Assets Worth Far Less Effectuated a "Backdoor Bailout" of AIG's Counterparties at AIG's Expense.**

131.   Even though it is filled with, and to a large extent based on, the self-serving assertions of the FRBNY and other participants in the process, a November 17, 2009 report by the Office of the Special Inspector General for TARP ("SIG-TARP") entitled *Factors Affecting Efforts to Limit Payments to AIG Counterparties* (the "SIG-TARP Report") acknowledged that

FRBNY may have effectuated a "backdoor bailout" of ML III counterparties and that "by providing AIG with the capital to make these payments, Federal Reserve officials provided AIG's counterparties with tens of billions of dollars they likely would have not otherwise received had AIG gone into bankruptcy." The SIG-TARP Report also concluded that "the structure and effect of FRBNY's assistance to AIG, both initially through loans to AIG, and through asset purchases in connection with ML III effectively transferred tens of billions of dollars of cash from Defendant to AIG's counterparties, even though senior policy makers contend that assistance to AIG's counterparties was not a relevant consideration in fashioning the assistance to AIG."

132.    A January 25, 2010 Report issued by the U.S. House of Representatives Committee on Oversight and Government Reform likewise suggested that FRBNY had engaged in a "backdoor bailout of AIG's counterparties" through AIG and then attempted to cover it up. The Report reached this conclusion despite again relying on assertions supplied by FRBNY and other participants in the process.

> **G.    The Failure to Disclose and the Misrepresentations Concerning The "Backdoor Bailouts" Undertaken at the Expense, and to the Detriment of, AIG Shareholders.**

133.    In a September 2011 Report entitled *Review of Federal Reserve System Financial Assistance to American International Group, Inc.*, the GAO found that the Government's explanations as to why it could not secure concessions from AIG's CDS counterparties were both inconsistent and misleading.

134.    The GAO Report found that despite FRBNY's representation to the GAO and Congress that it approached 16 counterparties about concessions, 9 of the 16 counterparties the GAO spoke to "indicated that FRBNY did not seek concessions from them."

135.   The GAO Report found that although FRBNY officials stated that the counterparties initially had a negative response to FRBNY's request for concessions, the counterparties the GAO spoke to "provided a different account of FRBNY's effort to obtain concessions."

136.   The GAO Report found that counterparties FRBNY approached for concessions only agreed to par value after "FRBNY dropped the request for a discount."

137.   The GAO Report found that although FRBNY officials indicated to the GAO and Congress that, with respect to the French AIGFP counterparties, the French banking regulator "unequivocally told FRBNY that under French law . . . the French institutions were prohibited from voluntarily agreeing to accept less than par value," a French banking official the GAO spoke to "offered a different view."

138.   The GAO Report found that despite the claims by FRBNY officials that the "French opposition effectively prevented concessions," Mr. Geithner, then-President of FRBNY, testified to Congress that legal issues faced by French institutions were not the deciding factor.

139.   As described more fully in paragraph 131, the SIG-TARP Report further details the "backdoor bailout."

140.   As noted above, a January 25, 2010 Report issued by the U.S. House of Representatives Committee on Oversight and Government Reform likewise suggested the Government had engaged in a "backdoor bailout of AIG's counterparties" through AIG and then attempted to cover it up.

141.   The Government undertook extensive efforts to conceal the fact that it was using the takeover of AIG as a vehicle to provide covert, backdoor bailouts to other entities.

142.    For instance, in December 2008 and following consultation with FRBNY, AIG filed two Form 8-K statements with SEC related to ML III.  At FRBNY's request, AIG omitted the sentence (which AIG had included in its draft) disclosing that: "As a result of this transaction, the AIGFP counterparties received 100 percent of the par value of the Multi-Sector CDOs sold and the related CDS have been terminated."

143.    Also, at FRBNY's insistence, the actual filings did not include Schedule A to the Shortfall Agreement, which set forth information regarding the ML III counterparties and the breakdown of payments funneled to those institutions.

144.    Shortly after the filing, the SEC noted the Schedule A omission and told AIG that under agency rules, it must include the schedule for public disclosure or request confidential treatment.

145.    In response, AIG, in consultation with FRBNY, filed a confidential treatment request with SEC to conceal from the public the information in Schedule A.

146.    AIG officers were also directed that they could not address with members of Congress or others matters concerning the "backdoor bailout," purportedly because any such disclosures would violate a "temporary moratorium" on what were defined as "federal lobbying activities" contained in a "Policy on Lobbying, Government Ethics, and Political Activity" at AIG.  This direction was without basis and was intended to conceal from the public information regarding the "backdoor bailout."

147.    Although AIG and FRBNY refused to make Schedule A public, continued pressure from government agencies and Congress prompted AIG to ultimately disclose certain CDS counterparty information in a March 15, 2009 press release.

148.   According to that press release, the following amounts were paid to the following AIGFP counterparties, including the ML III counterparties, in connection with CDO purchases and collateral postings relating to the CDSs (in ($ bn)):

| Counterparty | Collateral Posted | ML III Payments | Total |
|---|---|---|---|
| Societe Generale | 4.1 | 6.9 | 11.0 |
| Deutsche Bank | 2.6 | 2.8 | 5.4 |
| Goldman Sachs | 2.5 | 5.6 | 8.1 |
| Merrill Lynch | 1.8 | 3.1 | 4.9 |
| Calyon | 1.1 | 1.2 | 2.3 |
| Barclays | 0.9 | 0.6 | 1.5 |
| UBS | 0.8 | 2.5 | 3.3 |
| DZ Bank | 0.7 | 1.0 | 1.7 |
| Wachovia | 0.7 | 0.8 | 1.5 |
| Rabobank | 0.5 | 0.3 | 0.8 |
| KFW | 0.5 | 0.0 | 0.5 |
| J.P. Morgan | 0.4 | 0.0 | 0.4 |
| Banco Santander | 0.3 | 0.0 | 0.3 |
| Danske | 0.2 | 0.0 | 0.2 |
| Reconstruction Finance Corp | 0.2 | 0.0 | 0.2 |
| HSBC Bank | 0.2 | 0.0 | 0.2 |
| Morgan Stanley | 0.2 | 0.0 | 0.2 |
| Bank of America | 0.2 | 0.5 | 0.7 |
| Bank of Montreal | 0.2 | 0.9 | 1.1 |
| Royal Bank of Scotland | 0.2 | 0.5 | 0.7 |
| Landesbank Baden-Wuerttemberg | 0.0 | 0.1 | 0.1 |
| Dresdner Bank AG | 0.0 | 0.4 | 0.4 |
| Other | 4.1 | 0.0 | 4.1 |
| **Totals** | **$22.4** | **$27.1** | **49.6** |

149.    Based on Schedule A and the SIG-TARP Report, the actual total amounts paid

to AIGFP's counterparties were actually as follows (in ($ bn)):

| AIG Counterparty | Collateral Posted (as of 11/7) | ML III Payment | Total |
|---|---|---|---|
| Societe Generale | 9.6 | 6.9 | 16.5 |
| Goldman Sachs | 8.4 | 5.6 | 14.0 |
| Merrill Lynch | 3.1 | 3.1 | 6.2 |
| Deutsche Bank | 5.7 | 2.8 | 8.5 |
| UBS | 1.3 | 2.5 | 3.8 |
| Calyon | 3.1 | 1.2 | 4.3 |
| Deutsche Zentral-Genossenschaftsbank | 0.8 | 1.0 | 1.8 |
| Bank of Montreal | 0.5 | 0.9 | 1.4 |
| Wachovia | 0.2 | 0.8 | 1.0 |
| Barclays | 0.9 | 0.6 | 1.5 |
| Bank of America | 0.3 | 0.5 | 0.8 |
| The Royal Bank of Scotland | 0.6 | 0.5 | 1.1 |
| Dresdner Bank AG | 0.0 | 0.4 | 0.4 |
| Rabobank | 0.3 | 0.3 | 0.6 |
| Landesbank Baden-Wuerttemberg | 0.0 | 0.1 | 0.1 |
| HSBC Bank, USA | 0.2 | 0.0[*] | 0.2 |
| **Totals** | **$35.0** | **$27.1** | **$62.1** |

---

[*] Amount rounded down to $0.

150.    The Government's takeover and appropriation of AIG to use it as a vehicle to provide "backdoor bailouts" to these other entities, on disparately more favorable terms, was in violation of the Constitutional rights of AIG Common Stock shareholders.

## CLASS ALLEGATIONS

151.    Pursuant to Rule 23, Plaintiff brings this action on behalf of all persons who were registered and beneficial owners of the Common Stock of AIG at any time between September 17, 2008 and January 14, 2011 (the "Class").

152.    The requirements of Rule 23(a) are satisfied.

153.    Members of the Class are so numerous that joinder of all members is impracticable.  As of September 17, 2008, AIG had issued almost 3 billion shares of common stock owned by thousands of Class members.  The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained from books and records maintained by Defendant, AIG, or their agents.

154.    Common questions of law and fact exist as to all Class members.  These questions predominate over any questions unique to any individual shareholder and include, without limitation:

      (a)    Whether the Government had any legal basis to appropriate Class members' property;

      (b)    Whether the Government appropriated Class members' property without just compensation in violation of the United States Constitution;

      (c)    Whether the Government's appropriation and subsequent control of AIG was exercised in a manner that deprived Class members of Due Process and Equal Protection of law in violation of the United States Constitution; and

(d)     Whether the Government's actions had a discriminatory or disparate impact on Class members compared to shareholders in similarly situated companies.

155.    Plaintiff's claims are typical of those of other Class members.  The Government's actions alleged herein have impacted Class members equally because such actions have been directed at the Common Stock shareholders as a whole.  Accordingly, Plaintiff's claims against the Government based on the conduct alleged herein would be identical to the claims of other Class members.

156.    Plaintiff will fairly and adequately protect the interests of Class members. During the time of the conduct at issue, Plaintiff was the largest shareholder of the Common Stock of AIG and is uniquely positioned to fairly and adequately protect the interests of the Class.

157.    Plaintiff is committed to prosecuting this action to a final resolution and, in furtherance thereof, has retained experienced and competent class counsel.

158.    Plaintiff seeks class certification under Rule 23(b)(3) because as described above, common questions of fact and law predominate over any individual issues and a class action is superior to other methods of adjudicating the controversy.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

159.    Plaintiff brings Claim II as a shareholder's derivative action pursuant to Rule 23.1.

160.    Plaintiff brings this action derivatively in the right and for the benefit of AIG to redress injuries suffered, and to be suffered, by AIG as a direct result of the violations described herein.  AIG is named as a nominal defendant solely in a derivative capacity.

161.    Plaintiff will adequately and fairly represent the interests of AIG and its shareholders in enforcing and prosecuting its rights.

162.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.    Plaintiff was a shareholder of AIG at the time of the actions complained of herein and remains a shareholder.

164.    Since the facts concerning Defendant's actions began to be revealed, Plaintiff repeatedly requested that AIG institute proceedings against the Defendant and its affiliates to recover for the wrongs alleged in this complaint.  Any further request or demand would be futile, and AIG has so acknowledged.

165.    Moreover, under the applicable "Standard of Care" set forth in section 3.03(a) of the January 16, 2009 Trust holding the voting rights which AIG was required to give up, the trustees may only take actions that are "in or not opposed to the best interests of the Treasury". Section 2.04(d) in turn provides that the Trustees "shall exercise all such Voting and other similar rights with respect to the Trust Stock in accordance with the Applicable Standard of Care (as defined in Section 3.03(a) hereof)."  The Trustees are therefore duty bound to elect only Board members who similarly will act only "in or not opposed to the best interests of the

Treasury." The Department of the Treasury continues to control approximately 77% of the equity of AIG.

166.    The Trustees, under the control and direction of the Government, have exercised their voting rights to install all 14 members of the current Board – all consistent with the applicable "standard of care" discussed above. Further, 11 of the 14 members of the current Board became AIG Board members for the first time after the formation of the Trust.

167.    Plaintiff has not made a demand on other shareholders to bring this lawsuit. Such an act would be futile and useless because the vast majority of outstanding voting shares are held by the Trust. Further, AIG is a publicly traded company with millions of shares outstanding that are not controlled by the Trust and thousands of shareholders. Making demand on such a number of shareholders would be impossible for Plaintiff, which has no way of finding out the names, addresses or phone numbers of shareholders. Moreover, making a demand on all shareholders would force Plaintiff to incur huge expenses, even assuming all shareholders could be individually identified.

## CLAIM I – CONSTITUTIONAL CLAIMS (DIRECT)

168.    Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-167, as though fully set forth herein.

169.    With respect to the unprecedented takeover of AIG and in taking an approximately 80% interest in the Common Stock of AIG, the Government destroyed the value of the Common Stock held by Plaintiff and the Class, nullified their reasonable, investment-backed expectations, and violated fundamental principles of the Due Process, Takings and Equal Protection Clauses of the United States Constitution.

170.    The Government is required, in taking private property, to adhere to due process of law and to respect the legal rights of affected parties.

171.    The Government violated the statutory, contractual, and Constitutional rights of

Plaintiff and the Class in taking an approximately 80% interest in the Common Stock of AIG.

Section 13(3) of the Federal Reserve Act did not authorize the Government to take over AIG

and to take an approximately 80% interest in the Common Stock of AIG.

172.    Moreover, the Government, in undertaking a "backdoor" conversion of the

Series C Preferred Shares to an approximately 80% interest in the Common Stock of AIG,

violated (i) the requirements of Delaware law, (ii) the Consent Order of the Delaware Court –

based on AIG's representations – protecting the rights of AIG common shareholders, (iii) the

repeated representations by AIG and the Government in required securities filings, and (iv) the

governing provisions of the Series C SPA.  The 79.9% interest in the Common Stock of AIG

was obtained in violation of due process of law and in violation of the Due Process rights of the

common shareholders of AIG.

173.    To the extent private property is taken by the Government to serve public

purposes, the Constitution requires the payment of "just compensation."

174.    The Government did not pay just compensation to AIG Common Stock

shareholders for the taking of an approximately 80% interest in the Common Stock of AIG.

The actions of the Government triggered an obligation for Defendant to pay Just Compensation

to Plaintiff and the Class under the Takings Clause of the United States Constitution.

175.    The Equal Protection, Due Process, and Takings Clause of the United States

Constitution protect companies and shareholders from having their property and property rights

taken by the Government, in a discriminatory manner, without due process or without just

compensation.

176.   The Government's taking of control over AIG and of AIG equity was deliberately disparate and discriminatory to the Government's treatment of others similarly situated.  In addition, after obtaining control of AIG, the Government used AIG as a vehicle to funnel funds to other institutions and to provide "backdoor bailouts" on disparate terms far more favorable to those institutions, including foreign companies.  By deliberately and systematically treating the Common Stock shareholders differently from others similarly situated without a rational basis for the difference in treatment, the Government also acted in violation of the Equal Protection rights of AIG Common Stock shareholders.  The "backdoor bailouts" executed by the Government also constituted the taking of the property of AIG Common Stock shareholders without just compensation and without due process in violation of the Constitution.

177.   As a direct result of the Government's violations of the United States Constitution, Plaintiff and the Class suffered harm, including monetary damage, as a direct and proximate cause of the Government's taking of billions of dollars of property interests and voting rights relating to their holdings of AIG Common Stock.  Defendant is liable to Plaintiff and the class and they are entitled to relief.

178.   The harm suffered by Plaintiff and the Class is separate and distinct from the harm suffered by AIG.

## CLAIM II – CONSTITUTIONAL CLAIMS (DERIVATIVE)

179.   Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-178, as though fully set forth herein.

180.   AIG was harmed by the conduct of FRBNY beginning September 17, 2008 after FRBNY assumed control over AIG.

181.    The FRBNY has asserted that in exercising its control over, and acting on behalf of, AIG as it has since at least September 17, 2008, it did not act in an official, governmental capacity or at the direction of the United States Treasury.

182.    To the extent the proof at or prior to trial shows that the FRBNY did in fact act in a governmental capacity or at the direction of the United States Treasury, the improper conduct described above constitutes the discriminatory takings of the property and property rights of AIG without due process or just compensation.

183.    AIG has suffered injury as a direct and proximate result of such takings, including but not limited to monetary damage.  As a result of the conduct alleged herein, Defendant is liable to AIG and AIG is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Starr International demands judgment in its favor, and in favor of the Class, against Defendant United States of America as follows:

A. Finding that Plaintiff may maintain this action on behalf of AIG and that Plaintiff is an adequate representative of AIG;

B. Finding that the Defendant has taken the property of  AIG and Plaintiff in violation of the Due Process, Equal Protection, and Takings Clauses of the United States Constitution;

C. Determining and awarding to AIG the damages sustained by it as a result of the violations set forth above from Defendant;

D. Awarding AIG the costs and disbursements of this action attributable to the claims brought on behalf of AIG, including reasonable attorneys' and experts' fees, costs and expenses;

E. Determining that this action may be maintained as a class action.

F. Finding that Plaintiff has met the requirements of a class representative and may maintain this action as a representative of the Class.

G. Certifying a Class of all persons who were registered and beneficial owners of the Common Stock of AIG at any time between September 17, 2008 and January 14, 2011 (the "Class"), excluding Defendant, any directors, officers, political appointees, and affiliates thereof, as well as the members of the immediate families of Jill M. Considine, Chester B. Feldberg, Douglas L. Foshee, and Peter A. Langerman.

H. Awarding damages to Plaintiff and the Class in an amount to be determined at trial, but in no event less than $25 billion, which includes an amount equal to the market value of the 562,868,096 shares of Common Stock the Government received pursuant to the conversion of the Series C Preferred Shares based on the market value of such shares as of January 14, 2011 (closing price of $45.24 per share).

I. Pre-judgment and post-judgment interest, together with any and all further costs, disbursements and reasonable attorney's and expert fees;

J. Granting such other relief, including equitable and injunctive relief, as this Court may deem just and proper.

Dated:  Washington, D.C.
        November 21, 2011

                              BOIES, SCHILLER & FLEXNER LLP

                        By      *David Boies*
                                  David Boies
                                  Attorney of Record
                                  333 Main Street
                                  Armonk, NY 10504
                                  Tel. (914) 749-8200

Fax (914) 749-8300
Email: dboies@bsfllp.com

Robert J. Dwyer
Nicholas A. Gravante Jr.
Duane L. Loft
Julia C. Hamilton
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300

Hamish P. M. Hume
Samuel C. Kaplan
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000

*Attorneys for Plaintiff Starr International Company, Inc.*

## VERIFICATION

I, Edward E. Matthews, hereby verify as follows:

1.      I am a Director of Starr International Company, Inc. ("Starr").  I make this Verification in connection with the filing of the foregoing shareholder-derivative complaint.

2.      I am authorized to make this Verification on Starr's behalf.

3.      Starr currently holds shares of American International Group, Inc. and has held such shares continuously at all times relevant to the complaint.

4.      I have reviewed the complaint and know the contents thereof.  I verify that the allegations as to Starr and allegations as to which I have personal knowledge are true.  With respect to the remaining allegations, I am familiar with the factual basis for those allegations and verify them to be true to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of November 2011 at Princeton, New Jersey.

Edward E. Matthews