## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-779C |
| | ) | (Judge Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
|   a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### DEFENDANT'S MOTION TO DISMISS

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:
SHALOM BRILLIANT
TIMOTHY P. MCILMAIL
BRIAN A. MIZOGUCHI
JOHN ROBERSON
Senior Trial Counsel

CHRISTOPHER A. BOWEN
KAREN V. GOFF
MICHAEL S. MACKO
JOHN J. TODOR
AMANDA TANTUM
JACOB A. SCHUNK
Trial Attorneys

BRIAN M. SIMKIN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tele: (202) 616-8239
Fax: (202) 514-7969
Email: brian.simkin@usdoj.gov

March 1, 2012

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................. i

TABLE OF AUTHORITIES............................................................ iii

INTRODUCTION........................................................................ 1

QUESTIONS PRESENTED............................................................ 5

STATEMENT OF THE CASE......................................................... 5

    I.    Nature Of The Case............................................................ 5

    II.    Statement Of Facts............................................................. 6

        A.    American International Group, Inc................................. 6

        B.    AIG's Financial Distress......................................... 7

        C.    The FRBNY's Assistance. ...................................... 8

            1.    The FRBNY's $85 Billion Credit Facility.................... 8

                a.    Credit Agreement.................................. 9

                b.    Stock Purchase Agreement ......................... 9

            2.    Maiden Lane III. ....................................... 9

            3.    The Recapitalization. ................................... 10

ARGUMENT............................................................................ 11

    I.    Standards Of Review.......................................................... 11

    II.    The Court Should Dismiss This Action Pursuant To 28 U.S.C. § 1500 Because Starr Has Filed The Same Claims In Federal District Court.......... 12

    III.    The Court Lacks Jurisdiction To Entertain Starr's Equal Protection, Due Process, And Wrongful Conduct Claims............................. 14

    IV.    Starr Lacks Standing To Bring Its Direct Claim (Claim I) Because It Did Not Own The Property Allegedly Taken.................... 15

V.      The Court Should Dismiss The Amended Complaint For Failure
        To Make Demand Upon AIG's Board Or To Plead Adequately
        Why Demand Is Excused............................................. 18

VI.     The Court Should Dismiss This Action Because Starr Fails
        To State A Takings Claim ........................................... 23

        A.      Starr's Allegations That Government Actions "Completed"
                A Taking Do Not State A Takings Claim ......................... 23

        B.      Starr's Allegations That The FRBNY's Actions
                Were Unauthorized And Unlawful Do Not State A Takings Claim. . . . . 24

        C.      Starr Fails To Allege The Type Of Government Action
                Necessary To State A Takings Claim ........................... 26

                1.      AIG Freely Agreed To Accept The $85 Billion Loan. ........ 26

                2.      Even If The FRBNY Loan Transaction Were
                        Not Voluntary, It Would Not Constitute A Taking
                        Because It Was A Rescue Of AIG From The Consequences
                        Of Its Own Business Risks................................ 31

                3.      The Acquisition Of Shares In 2011 Was Not A Taking
                        Because Those Shares Were Received In Exchange
                        For Other Shares. ..................................... 32

                4.      The ML III Transactions Subsequent To The $85 Billion
                        Loan Did Not Involve A Government Appropriation. ......... 32

        D.      Neither Starr Nor AIG Lost Property Or A Property Interest. ........ 33

                1.      Neither Starr Nor AIG Possessed A Cognizable
                        Property Interest In A Loan From The FRBNY,
                        Or A Loan Upon Particular Terms......................... 34

                2.      Starr's Rights In AIG Common Stock Are Intact. ............ 36

                3.      No Property Interest Of AIG Was Taken
                        In Connection With ML III  ........................... 38

CONCLUSION. ...................................................... 40

INDEX FOR APPENDIX

Amended Verified Complaint, *Starr Int'l Co. v. Fed. Reserve Bank of New York
and Am. Int'l Group, Inc.*, S.D.N.Y. No. 11-cv-8422 PAE, Doc. No. 17
(Filed Feb. 1, 2012)........................................................................................................................1

## TABLE OF AUTHORITIES

### CASES

*Abbe* v. *Goss*,
    411 F. Supp. 923 (S.D.N.Y. 1975)........................................................................ 22

*Acadia Tech., Inc.* v. *United States*,
    458 F.3d 1327 (Fed. Cir. 2006).............................................................................. 24

*Acceptance Ins. Cos.* v. *United States*,
    583 F.3d 849 (Fed. Cir. 2009)........................................................................... 24, 37

*Adams* v. *United States*,
    391 F.3d 1212 (Fed. Cir. 2004)............................................................................... 39

*Advanced Cardiovascular Sys., Inc.* v. *SciMed Life Sys., Inc.*,
    988 F.2d 1157 (Fed. Cir. 1993)............................................................................... 12

*Air Pegasus of D.C., Inc.* v. *United States*,
    424 F.3d 1206 (Fed. Cir. 2005)......................................................................... 18, 38

*Am. Pelagic Fishing Co.* v. *United States*,
    379 F.3d 1363 (Fed. Cir. 2004)................................................................... 33, *passim*

*Armstrong* v. *United States*,
    364 U.S. 40 (1960)................................................................................................. 31

*Aronson* v. *Lewis*,
    473 A.2d 805 (Del. 1984), *overruled on other grounds by*
    *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). ........................................... 19, *passim*

*Artwohl* v. *United States*,
    434 F.2d 1319 (Ct. Cl.  1970). ........................................................................... 29-30

*Ashcroft* v. *Iqbal*,
    129 S. Ct. 1937 (2009)...................................................................................... 11, 33

*Bd. of Regents of State Colls.* v. *Roth*,
    408 U.S. 564 (1972)............................................................................................... 36

*Beam* v. *Stewart*,
    845 A.2d 1040 (Del. 2004). .............................................................................. 20, 21

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)............................................................................... 11, 33

*Board Mach., Inc.* v. *United States*,
    49 Fed. Cl. 325 (2001), *aff'd*, 125 F.3d 1475 (Fed. Cir. 1997)............................ 24

*Branch* v. *United States*,
    69 F.3d 1571 (Fed. Cir. 1995)................................................................. 24

*Broad* v. *Sealaska Corp.*,
    85 F.3d 422 (9th Cir. 1996). ................................................................. 37

*Cal. Hous. Sec., Inc.* v. *United States*,
    959 F.2d 955 (Fed. Cir. 1992)............................................................... 27

*Carfagno* v. *Schnitzer*,
    591 F. Supp. 2d 630 (S.D.N.Y. 2008)...................................................... 18

*Carruth* v. *United States*,
    627 F.2d 1068 (Ct. Cl. 1980). ............................................................ 15, 32

*Chancellor Manor* v. *United States*,
    331 F.3d 891 (Fed. Cir. 2003)............................................................... 33

*Colo. Springs Prod. Credit Ass'n* v. *Farm Credit Admin.*,
    967 F.2d 648 (D.C. Cir. 1992). ........................................................ 27, 31, 32

*Colvin Cattle Co.* v. *United States*,
    468 F.3d 803 (Fed. Cir. 2006)........................................................... 36-37, 40

*Commonwealth Edison Co.* v. *United States*,
    271 F.3d 1327 (Fed. Cir. 2001)............................................................. 39

*Conti* v. *United States*,
    291 F.3d 1334 (Fed. Cir. 2002)......................................................... 33, 35, 38

*Cottrell* v. *United States*,
    42 Fed. Cl. 144 (1998). .................................................................. 15

*Crocker* v. *United States*,
    37 Fed. Cl. 191 (1997). .................................................................. 24

*CRV Enters., Inc.* v. *United States*,
    626 F.3d 1241 (Fed. Cir. 2010) ............................................................ 15

iv

*Daily Income Fund, Inc.* v. *Fox,*
464 U.S. 523 (1984)............................................................................ 19

*De  Tom Enters., Inc.* v. *United States,*
552 F.2d 337 (Ct. Cl. 1977). ............................................................ 15, 29

*Del-Rio Drilling Programs, Inc.* v. *United States,*
146 F.3d 1358 (Fed. Cir. 1998)............................................................. 25

*Dow Chem. Co. Deriv. Litig.,*
No. 4349-C 2010 WL 66769 (Del. Ch. Jan. 11, 2010)............................................20

*Evans* v. *United States,*
74 Fed. Cl. 554 (2006), *aff'd,* 250 Fed. App'x 321 (Fed. Cir. 2007)................................ 27-28

*Feldman* v. *Cutaia,*
951 A.2d 727 (Del. 2008). .......................................................... 17, 18

*Fisher* v. *United States,*
402 F.3d 1167 (Fed. Cir. 2005).......................................................... 14-15

*Fruhauf Sw. Garment Co.* v. *United States,*
11 F. Supp. 945 (Ct. Cl. 953). ............................................................ 30

*Gaubert* v. *United States,*
885 F.2d 1284 (5th Cir. 1989), *rev'd on other grounds,* 111 S. Ct. 1267 (1991)................. 16

*Gentile* v. *Rossette,*
906 A.2d 91 (Del. 2006). .................................................................. 17

*Hearts Bluff Game Ranch, Inc.* v. *United States,*
No. 2010-5164, - F.3d -, 2012 WL 148692 (Fed. Cir. Jan. 19, 2012). ...................... 34, 35, 36

*Henke* v. *United States,*
60 F.3d 795 (Fed. Cir. 1995)............................................................... 5

*Huntleigh USA Corp.* v. *United States,*
525 F.3d 1370 (Fed. Cir. 2008)............................................................. 26

*Indium Corp. of Am.* v. *Semi-Alloys, Inc.,*
781 F.2d 879 (Fed. Cir. 1985)............................................................. 11

*In re Chrysler LLC,*
405 B.R. 84 (Bankr. S.D.N.Y. 2009). .................................................... 30

*In re Dow Chem. Co. Deriv. Litig.*,
    No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) ................................. 22

*In re Gen. Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009). ................................. 30

*In re KDI Holdings, Inc.*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999). ................................. 30

*In re Motors Liquidation*,
    430 B.R. 65 (S.D.N.Y. 2010)................................. 30

*Kaplan* v. *Peat Marwick, Mitchell & Co.*,
    540 A.2d 726 (Del. 1988). ................................. 22

*Karuk Tribe of Cal.* v. *Ammon*,
    209 F.3d 1366 (Fed. Cir. 2000)................................. 33

*Kaster* v. *Modification Sys., Inc.*,
    731 F.2d 1014 (2d Cir. 1984)................................. 19, 21

*Kaw Nation of Oklahoma*,
    Fed. Cl.  , 2012 WL 639928 (Feb. 29, 2012). ................................. 14

*Lindsay* v. *United States*,
    295 F.3d 1252 (Fed. Cir. 2002)................................. 11

*Lion Raisins, Inc.* v. *United States*,
    416 F.3d 1356 (Fed. Cir. 2005)................................. 24, 25-26

*Lou* v. *Belzberg*,
    728 F. Supp. 1010 (S.D.N.Y. 1990)................................. 22-23

*Lucas* v. *S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................. 36, 40

*MCG Capital Corp.* v. *Maginn*,
    No. 4521-CC, 2010 WL 1782271 (Del. Ch.  May 5, 2010)................................. 20

*Maritrans Inc.* v. *United States*,
    342 F.3d 1344 (Fed. Cir. 2003)................................. 33

*McCauley* v. *United States*,
    38 Fed. Cl. 250 (1997), *aff'd*, 152 F.3d 948
    (Fed. Cir. 1998) (unpublished table decision)................................. 15

*McPadden* v. *Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008)........................................................................ 22

*Members of the Peanut Quota Holders Ass'n* v. *United States*,
    421 F.3d 1323 (Fed. Cir. 2005)........................................................................ 38

*Mills* v. *Green*,
    159 U.S. 651 (1895)........................................................................................ 14

*Mitchell Arms, Inc.* v. *United States*,
    7 F.3d 212 (Fed. Cir. 1993)................................................................. 18, 37, 38

*Nat'l Bd. of Young Men's Christian Ass'ns* v. *United States*,
    395 U.S. 85 (1969).......................................................................................... 31

*Neitzke* v. *Williams*,
    490 U.S. 319 (1989)........................................................................................ 12

*Norman* v. *United States*,
    429 F.3d 1081 (Fed. Cir. 2005)................................................................. 26, 32

*Oliver* v. *Boston Univ.*,
    No. 16570-NC, 2006 WL 1064169 (Del. Ch. Apr. 14, 2006). ........................ 17

*Otay Mesa Prop. L.P.* v. *United States*,
    93 Fed. Cl. 476 (2010), *vacated in part on other grounds*,
      F.3d   , 2012 WL 206142 (Fed. Cir. Jan. 25, 2012). ............................... 26

*Passamaquoddy Tribe* v. *United States*,
    82 Fed. Cl. 256 (2008). ................................................................................... 12

*Paxson Commc'n Corp. S'holders Litig.*,
    No. 17568, 2001 WL 812028 (Del. Ch. Jul. 12, 2001)................................... 21

*Pittsburg Cnty. Rural Water Dist. No. 7* v. *City of McAlester*,
    358 F.3d 694 (10th Cir. 2004). ....................................................................... 30

*Preseault* v. *United States*,
    100 F.3d 1525 (Fed. Cir. 1996)....................................................................... 34

*Rales* v. *Blasband*,
    634 A.2d 927 (Del. 1993). ............................................................................... 20

*Rick's Mushroom Serv., Inc.* v. *United States*,
    521 F.3d 1338 (Fed. Cir. 2008)....................................................................... 15

*Rith Energy, Inc.* v. *United States,*
  247 F.3d 1355 (Fed. Cir. 2001)......................................................... 24-24

*Robo Wash, Inc. v. United States,*
  223 Ct. Cl. 693, 696 (1980). ............................................................. 16

*Rogers Truck Line, Inc. v. United States,*
  14 Cl. Ct. 108, 114 (1987). ............................................................... 36

*Ruckelshaus* v. *Monsanto Co.,*
  467 U.S.986 (1984)........................................................................... 37

*Rutman Wine Co.* v. *E. & J. Gallo Winery,*
  829 F.2d 729 (9th Cir. 1987). ........................................................... 12

*Schooner Harbor Ventures, Inc.* v. *United States,*
  81 Fed. Cl. 404 (2008). ..................................................................... 18

*Shell Petroleum, N.V.* v. *Graves,*
  709 F.2d 593 (9th Cir. 1983). ........................................................... 16

*Simanonok* v. *Simanonok,*
  918 F.2d 947 (Fed. Cir. 1990)........................................................... 14

*Smith* v. *United States,*
  58 Fed. Cl. 374 (2003). ..................................................................... 16

*Starr Int'l Co. v. Fed. Reserve Bd. of NY,*
  No. 11-cv-8422, Doc. No. 1 (S.D.N.Y. Filed Nov. 21, 2011). ...................... 12-13

*Steffen* v. *Thompson,*
  415 U.S. 452 (1974)........................................................................... 14

*Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.,*
  845 A.2d 1031 (Del. 2004). ............................................................... 17

*Turntable Fishery & Moorage Corp.* v. *United States,*
  52 Fed. Cl. 256 (2002). ..................................................................... 28

*Ultra-Precision Mfg., Ltd.* v. *Ford Motor Co.,*
  338 F.3d 1353 (Fed. Cir. 2003)......................................................... 11

*United Keetoowah Band of Cheroke Indians* v. *United States,*
  86 Fed. Cl. 183 (2009). ..................................................................... 13

*United States* v. *Causby*,
    328 U.S. 256 (1945)............................................................................ 34

*United States* v. *Gen. Motors Corp.*,
    323 U.S. 373 (1945)............................................................................ 38

*United States* v. *Tohono O'Odham Nation*,
    131 S. Ct. 1723 (2011)........................................................ 12, 13, 14

*Wyatt* v. *United States*,
    271 F.3d 1090 (Fed. Cir. 2001)....................................................... 33

*Yee* v. *City of Escondido*,
    503 U.S. 519 (1992)...................................................................... 26, 27

## STATUTES

12 U.S.C. § 343 (2006). .................................................................... 35

28 U.S.C. § 1491(a) "Tucker Act"..................................................... 14

28 U.S.C. § 1500................................................................... 5, *passim*

Pub. L. No. 110-343, 122 Stat. 3765 (2008)
    "Emergency Economic Stabilization Act of 2008"
    12 U.S.C. §§ 5201, *et seq*.............................................................11

Section 13(3) of the Federal Reserve Act...............................8, *passim*

## RULES

Rule 12(b) of the Rules of the United States Court of Federal Claims ("RCFC")...................1, 11

RCFC 23.1.............................................................................................19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STARR INTERNATIONAL COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 11-779C |
| ) | (Judge Wheeler) |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN INTERNATIONAL GROUP, INC., ) | |
| a Delaware corporation, ) | |
| ) | |
| Nominal Defendant. ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss the amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. In support of this motion, we rely upon the amended complaint and the following brief.

## INTRODUCTION

Plaintiff, Starr International Company, Inc. ("Starr"), is a shareholder of American International Group, Inc. ("AIG"). AIG is the multinational insurer whose speculation upon financial derivatives brought it to the brink of bankruptcy in 2008. After other banks declined to do so, the Federal Reserve Bank of New York ("the FRBNY") rescued AIG, providing $85 billion in financing on terms accepted by AIG's board of directors. As demonstrated below, Starr's claims that the rescue of AIG was really a "discriminatory taking" under the Fifth Amendment to the United States Constitution are meritless, and must be dismissed.

By September 2008, AIG determined that it would not be able to pay its obligations as they came due, and contemplated filing for bankruptcy.  A consortium of private banks considered financing AIG in exchange for consideration including 79.9 percent of AIG's equity, but did not do so.  AIG then turned to the FRBNY and asked for an $85 billion line of credit. The FRBNY offered to provide this financing and, on September 16, 2008, AIG's board of directors accepted the FRBNY's rescue, agreeing to convey 79.9 percent of AIG's equity as part of the transaction.  Following AIG's acceptance, the FRBNY immediately began extending credit to AIG through a credit facility.  This critical and extraordinary assistance was followed in several stages by billions of dollars in additional and restructured loans from the FRBNY and the United States Department of the Treasury ("Treasury").

Over the course of the next six months, the FRBNY restructured the AIG $85 billion credit facility twice, and created a special purpose vehicle, Maiden Lane III, that purchased certain illiquid assets from AIG and moved them to the balance sheet of the FRBNY.  Maiden Lane III facilitated the negotiated termination of credit default swap ("CDS") contracts that were threatening AIG's liquidity.  Using funds loaned to it by the FRBNY, Maiden Lane III purchased collateralized debt obligations ("CDOs") from certain AIG counterparties and moved those CDOs to the FRBNY's balance sheet.  In connection with the CDO purchases, the counterparties agreed to terminate the related CDS contracts with AIG.

Not content with the rescue of AIG, Starr alleges that the Government violated AIG's and Starr's due process and equal protection rights, and took private property for public use, asserting a direct claim individually and on behalf of a putative class of all others similarly situated ("Claim I"), and a derivative claim on behalf of nominal defendant AIG ("Claim II").  In effect,

Starr demands that the Court second guess AIG and rewrite the rescue agreement by making American taxpayers pay an additional $25 billion, based upon a market valuation of AIG *after* the rescue.  Although Starr may disagree with the terms to which AIG agreed, any burdens resulting from that agreement should be borne by AIG and its shareholders, not the public.

As a threshold matter, the Court should dismiss this action for lack of jurisdiction.  First, 28 U.S.C. § 1500 bars this action because Starr has pending in a district court an action alleging substantially the same claims alleged before this Court.  Second, Starr invokes the Equal Protection and Due Process clauses (and alleges wrongful conduct), but the Court lacks Tucker Act jurisdiction to entertain such claims because those constitutional provisions are not money-mandating (or because the Court does not possess tort jurisdiction).  Third, Starr lacks standing to maintain Claim I (the direct claim) because the interests alleged in Claim I belong to AIG, not Starr or any other shareholder.  Fourth, Starr lacks standing to maintain Claim II (the derivative claim), for failure to plead adequately demand upon AIG's board or futility of demand.

Even if the Court determines that it possesses jurisdiction and that Starr has standing, the Court should dismiss this action for failure to state a claim upon which relief may be granted.  Starr's claims rely upon allegations that the FRBNY's actions were unauthorized and unlawful; but such actions cannot support a takings claim.  Even if the FRBNY's actions are assumed to have been authorized, Starr's claims fail because loaning money in exchange for equity precisely what private banks considered doing   is not a taking.  AIG asked and agreed to be rescued by the FRBNY, electing to save itself from a failure of its own making.

Claim I fails, first, because Starr does not   and cannot   assert that the Government seized Starr's common stock shares.  Starr contends that 562,868,096 shares of AIG common

stock were taken, but does not allege that it or any other AIG shareholder owned any of those shares before the Government received them from AIG in exchange for consideration.  That agreed-upon exchange is not a taking.  Starr also asserts that the Government took voting rights related to AIG common stock; however, Starr does not identify any AIG shareholder whose voting rights the Government appropriated to itself.  Consequently, Starr fails to state a takings claim with respect to shareholder voting rights.

Next, Starr asserts that payments by Maiden Lane III to AIG counterparties was a taking of the property of AIG shareholders.  However, Starr does not allege that it or any other AIG shareholder owned any of the funds paid to AIG counterparties.  Moreover, neither AIG nor Starr either alleges or possesses a property right to take money from AIG's customers by defaulting upon AIG's contractual obligations.  Consequently, Starr fails to state a takings claim with respect to Maiden Lane III.

With respect to Claim II, the derivative action, Starr fails to identify any specific property of AIG that the Government allegedly took.  Rather, Starr alleges that "the improper conduct" of the FRBNY "constitutes the discriminatory takings of the property and property rights of AIG." Because Claim II is premised upon an allegation of improper conduct    and not the identification of specific, appropriated property    Claim II fails to state a takings claim.  If Starr's contention in Claim II is that the Government took from AIG common stock, voting rights, or Maiden Lane III funds, to the extent the Government is alleged to have received any of those items it did so pursuant to AIG's agreement.  AIG, like its shareholders such as Starr, possessed no constitutional or other right to a Government rescue, much less a Government rescue upon any particular terms.  To the extent AIG exchanged any property with the FRBNY, it agreed to do so

for consideration, and was rescued from the consequences of its own actions.  That exchange was not a taking.  Claim II, like Claim I, fails to state a claim upon which relief may be granted.  Accordingly, the amended complaint should be dismissed.

## QUESTIONS PRESENTED

1.      Whether, pursuant to 28 U.S.C. § 1500, the Court possesses jurisdiction to entertain this action, where this action and a suit pending in a district court against an alleged agent of the United States are based upon the same operative facts.

2.      Whether the Court possesses jurisdiction to entertain Starr's Equal Protection, Due Process, and wrongful conduct claims.

3.      Whether Starr lacks standing to bring its direct claim (Claim I) because the AIG corporate share-related interests allegedly taken belong to AIG, not Starr.

4.      Whether Starr possesses standing to assert a derivative claim on behalf of AIG (Claim II) when it has failed to adequately plead demand or futility of demand.

5.      Whether Starr fails to state a takings claim upon which relief may be granted on behalf of either Starr (Claim I) or AIG (Claim II).

## STATEMENT OF THE CASE[1]

## I.      Nature Of The Case

This case arises from the global financial crisis that reached a critical stage in September

---

[1] Our Statement of the Case is based upon the factual allegations contained in the amended complaint.  Although we do not concur with the entirety of those allegations (and although we would contest many of the characterizations set forth among the allegations), those allegations are assumed to be true for purposes of this motion to dismiss.  *See, e.g., Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

2008, when multiple financial institutions failed or were on the brink of failure.  Amended

Verified Class Action Complaint ("Am. Compl.") ¶ 1.  One of those institutions was AIG.  Am.

Compl. ¶ 1.  Starr, a shareholder of AIG Common Stock at all relevant times (Am. Compl. ¶ 16),

brings this action alleging various violations of the Due Process, Takings, and Equal Protection

Clauses of the United States Constitution arising out of the rescue of AIG.  Am. Compl. ¶¶ 169,

172-174, 177.

## II.     Statement Of Facts

### A.     American International Group, Inc.

AIG is a Delaware corporation.  Am. Compl. ¶ 18.  In 2008, it was one of the world's

largest and most complex insurance and financial services companies.  Am. Compl. ¶ 22.

Beginning in the 1980s, AIG Financial Products ("AIGFP"), an AIG subsidiary, began

entering into complex contracts that were well outside the realm of life insurance and property-

casualty insurance.  *See* Am. Compl. ¶ 23.  These contracts, referred to as "derivatives," were

used to speculate on certain business transactions.  Am. Compl. ¶ 23.  One type of derivative

contract offered by AIGFP was a CDS, a contract that functions like an insurance policy upon

securities covered by the CDS against the risk of default.  Am. Compl. ¶ 25.  The securities

referenced in AIGFP's CDSs included CDOs.  Am. Compl. ¶¶ 28-29.  A CDO is a complex

product that is typically backed by a pool of fixed-income assets, such as mortgages.  Am.

Compl. ¶ 30.

Under the terms of its CDS contracts, AIGFP received regular payments from

counterparties in return for AIGFP's promise to pay the referenced securities' value in the event

that security had a credit event or default.  *See* Am. Compl. ¶¶ 25, 34.  In many cases, the CDSs

required AIGFP to post cash collateral as assurance to the counterparty that AIGFP could meet its obligations. Am. Compl. ¶ 35. The amount of cash collateral AIGFP was required to post was based upon, among other things, AIGFP's credit rating, and the underlying security's market value. *See* Am. Compl. ¶ 35. This "collateral risk" contributed to AIG's near collapse in 2008. *See* Am. Compl. ¶ 37.

### B.    AIG's Financial Distress

Beginning in late 2007, and continuing through 2008, AIG's financial condition deteriorated. Am. Compl. ¶ 36. AIG's financial condition was vulnerable principally due to two separate issues. First, the erosion of the subprime mortgage market caused the value of CDOs covered by AIGFP to fall precipitously, resulting in increasingly large collateral demands upon AIGFP by its CDS counterparties. Am. Compl. ¶ 37. Second, AIG was under extreme financial pressure from its securities lending program. Am. Compl. ¶ 39. Under this program, AIG's insurance subsidiaries lent their assets  securities  to counterparties in exchange for collateral. *Id.* Rather than holding the collateral, AIG subsidiaries used it to speculate upon securities that it purchased using the collateral. *Id.* AIG's speculation failed, producing a gap between AIG's liability to return the collateral and the fair value of assets purchased with the collateral. Am. Compl. ¶ 40. AIG faced liquidity shortfalls from the securities lending program as well. Am. Compl. ¶ 40.

In mid-2008, AIG faced a severe liquidity squeeze. Am. Compl. ¶ 40. By September 2008, AIG was on the verge of collapse. *See* Am. Compl. ¶¶ 49, 55. Over the weekend of September 13-14, 2008, AIG attempted to obtain a private-sector solution, including investment from private equity investors, strategic buyers, and sovereign wealth funds. Am. Compl. ¶ 49.

AIG also considered filing for bankruptcy.  *See* Am. Compl. ¶ 49.   On September 15, 2008,

Lehman Brothers Holdings, Inc., filed for bankruptcy.  Am. Compl. ¶ 50.  On the same day, the

Government encouraged talks among a consortium of banks aimed at arranging private financing

for a loan to address AIG's liquidity situation.  *See* Am. Compl. ¶ 51.  On the afternoon of

September 15, 2008, all three large rating agencies    Moody's, Standard & Poor's, and Fitch

Ratings Services    sharply downgraded AIG's long-term credit rating.  Am. Compl. ¶ 52.  The

ratings downgrades, along with a steep drop in AIG's common stock price, prevented AIG from

accessing any money in short-term, lending markets.  Am. Compl. ¶ 53.  At that point, the

attempt to find a private-sector solution also failed, and AIG faced imminent bankruptcy.  Am.

Compl. ¶¶ 53, 55.

### C.      The FRBNY's Assistance

#### 1.      The FRBNY's $85 Billion Credit Facility

Allowing AIG to fail and enter bankruptcy could have, in the words of Federal Reserve

Chairman Ben Bernanke, "triggered a 1930's-style global financial and economic meltdown."

Am. Compl. ¶ 58.  Accordingly, on September 16, 2008, after AIG failed to attract any private

sector lenders, the FRBNY agreed to assist AIG using its emergency authority under

section 13(3) of the Federal Reserve Act.  *See* Am. Compl. ¶¶ 55-56.  The FRBNY provided AIG

a term sheet detailing the terms of a potential $85 billion credit facility.  Am. Compl. ¶ 55(a), (d).

The term sheet was based upon the terms that had been developed by private banks, and provided

a package of consideration including 79.9 percent of AIG's equity.  Am. Compl. ¶ 55(b)-(d).

AIG's directors accepted the deal, as described in the term sheet, on the evening of

September 16, 2008, and the FRBNY, in turn, immediately began providing AIG with the cash

that it needed to meet its obligations.  *See* Am. Compl. ¶¶ 56(c), 59.

### a.      Credit Agreement

On September 22, 2008, the FRBNY entered into a Credit Agreement with AIG in which the FRBNY agreed to extend up to $85 billion in credit to AIG on a revolving basis to be used by AIG for general corporate purposes.  Am. Compl. ¶ 63.  The Credit Agreement implemented the September 16 term sheet's equity promise by providing that AIG would issue stock to a trust (the "Trust") created for the benefit of the United States Treasury convertible to 79.9 percent of AIG's equity.  Am. Compl. ¶ 65.

### b.      Stock Purchase Agreement

Several months later, on March 1, 2009, AIG and the Trust entered into a Stock Purchase Agreement, which provided for the issuance of Series C Preferred Shares.  *See* Am. Compl. ¶ 91.  The agreement provided that the Trust's shares had voting rights and a conversion right to common stock.  *See* Am. Compl. ¶¶ 65-66, 91.  The agreement provided that the Trust would pay $500,000.00 for the stock, and additional consideration was provided in the form of the FRBNY's $85 billion credit facility.  *See* Am. Compl. ¶ 67.

### 2.      Maiden Lane III

In addition to the $85 billion credit facility, in November 2008, the FRBNY agreed to assist in funding a special purpose vehicle designated Maiden Lane III, LLC ("ML III").  Am. Compl. ¶¶ 110, 112.  Despite the $85 billion credit facility, AIG faced liquidity problems from its obligations under certain swap agreements.  Am. Compl. ¶ 110.  The purpose of ML III was to resolve this liquidity crisis.  *See id.*  The FRBNY funded ML III with a $24.3 billion loan, and AIG contributed $5 billion in equity.  Am. Compl. ¶ 115.  In November and December 2008,

ML III purchased some of the CDOs underlying AIGFP's CDS portfolio.  Am. Compl. ¶ 112.  In

total, ML III purchased approximately $62 billion in CDOs from counterparties through a

combination of payments from ML III and permitting the counterparties to retain $35 billion in

cash collateral posted by AIGFP pursuant to its CDS contracts.[2]  Am. Compl. ¶¶ 116-17.  In

return, the counterparties agreed to terminate all CDSs with AIG, thereby eliminating the need

for AIG to post further collateral.  *See* Am. Compl. ¶ 116.  The proceeds received by ML III as a

result of the liquidation of the CDOs or the principal and interest payments from retained CDOs

will be distributed to the FRBNY and AIG.  Am. Compl. ¶ 118.  Under the priority of payments,

the FRBNY first recovers its loan plus interest.  Am. Compl. ¶ 119.  Then, AIG will recover its

equity contribution plus interest.  *See* Am. Compl. ¶ 119.  Any additional proceeds will be split

between the FRBNY and AIG with the FRBNY receiving two-thirds of the proceeds and AIG

receiving one-third of the proceeds.  Am. Compl. ¶ 119.

### 3.  The Recapitalization

In September 2010, AIG and the FRBNY announced a plan for AIG to repay its

obligations under the credit facility.  Am. Compl. ¶ 100.  On January 14, 2011, through a

recapitalization, the Series C Preferred Shares, owned by the Trust, were exchanged for

562,868,096 newly-issued common shares, or approximately 31.2 percent, of AIG's Common

Stock.  Am. Compl. ¶ 101.  Under the recapitalization, shares of Series E Preferred Stock and

Series F Preferred Stock, which were obtained by Treasury in exchange for additional cash

---

[2]  In connection with the transaction, AIG entered into a Shortfall Agreement with the
FRBNY under which $2.5 billion was later returned to AIG.  Am. Compl. ¶ 113.

infusions to AIG pursuant to the Troubled Asset Relief Program,[3] were also exchanged for AIG Common Stock.  Am. Compl. ¶¶ 100-01.

## ARGUMENT

### I.   Standards Of Review

Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits.  *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

A complaint should be dismissed for failure to state a claim upon which relief can be granted "when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  Labels, conclusions, and conclusory allegations are not entitled to the assumption of truth.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court should dismiss where the complaint fails to "state a claim to relief that is plausible on its face."  *Iqbal*, 129 S. Ct. at 1949 (citation omitted).  Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not suffice.  *Id.* (citation omitted).

The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of

---

[3]  *See* Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified at 12 U.S.C. §§ 5201, *et seq.*).

unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citation omitted). Indeed, a dismissal for failure to state a claim "streamlines litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). For this reason, the idea that discovery should be permitted before the Court decides a motion to dismiss is unsupported and "defies common sense," because the "purpose of [Rule] 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (citation omitted).

## II.     The Court Should Dismiss This Action Pursuant To 28 U.S.C. § 1500 Because Starr Has Filed The Same Claims In Federal District Court

Section 1500, Title 28, United States Code, deprives this Court of jurisdiction when the plaintiff "has pending in any other court any suit or process against the United States or any person who . . . was . . . acting or professing to act, directly or indirectly, under the authority of the United States." The purpose of section 1500 is "to save the Government from burdens of redundant litigation." *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1730 (2011). For section 1500 to apply, the two complaints must share an overlap of operative facts. *Id.* at 1728-29.

Same-day filings in this Court and a district court are *per se* pending for purposes of section 1500; the order of filing is of no consequence. *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 268-69 (2008) (interpreting cases). On November 21, 2011, the same day the present lawsuit was filed, Starr filed suit against the FRBNY, along with AIG as a nominal defendant, in the United States District Court for the Southern District of New York ("SDNY"). *Starr Int'l Co. v. Fed. Reserve Bd. of NY*, S.D.N.Y. No. 11-cv-8422, Doc. No. 1 (Filed Nov. 21,

2011) ("SDNY Compl."). In the SDNY suit, Starr alleges direct and derivative claims, including

takings claims (*see* SDNY Am. Compl. Counts V and VI (A 45-47[4]) premised upon the notion

that at or before trial, Starr will prove that the FRBNY was either acting "in a governmental

capacity" or as an agent of the United States. In both this and the SDNY actions, Starr alleges

that AIG was in financial distress (*compare* SDNY Am. Compl. ¶¶ 37-38 (A11) *with* Am.

Compl. ¶¶ 38-39), that AIG entered into an agreement with the FRBNY for $85 billion in

financing in exchange for terms that included a 79.9 percent equity interest (*compare* SDNY Am.

Compl. ¶¶ 2, 50-52 (A2, A13-17) *with* Am. Compl. ¶¶ 4, 53-55), and that the Government

controlled AIG (*compare* SDNY Am. Compl. ¶¶ 4, 5, 16, 51(a) (A2-3, A5, A14-15) *with* Am.

Compl. ¶¶ 4, 15, 54). Starr even refers this Court to the SDNY action (*see* Am. Compl. ¶ 15),

and the SDNY to this action (SDNY Am. Compl. ¶ 2 (A2)). Consequently, this action and the

SDNY action are based upon the same operative facts. Because Starr has pending in the SDNY a

suit asserting Fifth Amendment takings and other claims based upon the same operative facts

alleged in this case, Starr's complaint in this Court must be dismissed pursuant to section 1500.

We acknowledge that, in *United Keetoowah Band of Cheroke Indians v. United States*,

86 Fed. Cl. 183, 191 (2009), this Court held that "whether a district court claim filed on the same

day is pending within the meaning of Section 1500 is an evidentiary issue to be resolved by

determining which complaint Plaintiff filed first." However, at the time of its decision in *United*

*Keetoowah Band*, this Court did not have the benefit of the intervening decision in *Tohono*, in

which the United States Supreme Court described section 1500's "broad prohibition" as a

---

[4] "A ___ " refers to a page of the appendix to this motion.

"robust response" to duplicate lawsuits.[5]  131 S. Ct. at 1728.  Indeed, after identifying a Court of

Claims decision endorsing the first-filed rule as an example of "precedent that left the statute

without meaningful force," the Court emphasized that "[c]ourts should not render statutes

nugatory through construction."  *Id.* at 1729-30.  Looking to whether a district court action was

filed first conflicts with the principle that jurisdiction must be present throughout the entirety of

the case, not simply at the outset.  *See Simanonok v. Simanonok*, 918 F.2d 947, 950 (Fed. Cir.

1990) (district courts lose Little Tucker Act jurisdiction when amount owed accrues to more than

$10,000, even though jurisdiction was initially proper); *see also Steffen v. Thompson*, 415 U.S.

452, 459 n.10 (1974); *Mills v. Green*, 159 U.S. 651, 653 (1895).  Possessing jurisdiction at the

time of filing does not mean that subsequent events cannot later divest jurisdiction; another

pending action is such an event.  Because Starr has pending a district court action based upon the

same operative facts as this action, the Court should dismiss this action.

## III.   The Court Lacks Jurisdiction To Entertain Starr's Equal Protection, Due Process, And Wrongful Conduct Claims

Starr requests that the Court find that the United States violated the Due Process and

Equal Protection clauses of the United States Constitution.  Am. Compl. at 57 ¶ B.  However,

Starr invokes the Tucker Act, 28 U.S.C. § 1491(a), as the source of the Court's jurisdiction to

entertain this action.  Am. Compl. ¶ 20.  A Tucker Act plaintiff must identify a

"money-mandating" source of substantive law that creates the right to money damages in order to

establish Tucker Act jurisdiction.  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)

---

[5]  We acknowledge that, since *Tohono*, the Court has, in other cases, adhered to the "order-of-filing" rule.  *See, e.g., Kaw Nation of Oklahoma*,    Fed. Cl.   , 2012 WL 639928, at *1-4 (Feb. 29, 2012) (citing cases).

(*en banc*).  The Court does not possess jurisdiction to entertain Due Process and Equal Protection claims, because those provisions do not obligate the Federal Government to pay money damages. *Carruth v. United States,* 627 F.2d 1068, 1081 (Ct. Cl. 1980).  Consequently, the Court should dismiss those claims.

In addition, Starr's wrongful conduct claims, such as coercion (Am. Compl. ¶¶ 49(a), 54, 56, 58(a)), interference with AIG's business relationships (*id.* ¶¶ 53, 58(a)), misrepresentation (*id.* ¶¶ 46, 53, 58(a)), and failure to conduct proper analyses (*id.* ¶ 55(d)), sound in tort and should be dismissed for lack of jurisdiction.  *Cf. Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (no jurisdiction over professional negligence claim); *De Tom Enters., Inc. v. United States*, 552 F.2d 337, 339 (Ct. Cl. 1977) (no jurisdiction over wrongful influence claim; takings case); *McCauley v. United States*, 38 Fed. Cl. 250, 265 (1997) (no jurisdiction over claims of negligent and wrongful conduct), *aff'd*, 152 F.3d 948 (Fed. Cir. 1998) (unpublished table decision); *see generally Cottrell v. United States*, 42 Fed. Cl. 144, 149 (1998) (collecting cases).  In particular, the Court does not possess jurisdiction to entertain any claim that the Government acquired property by wrongfully influencing AIG or others.  *See De Tom*, 552 F.2d at 339.

## IV.    Starr Lacks Standing To Bring Its Direct Claim (Claim I) Because It Did Not Own The Property Allegedly Taken

To possess standing to assert a takings claim, a plaintiff must have owned the property at the time of the alleged taking.  *CRV Enters., Inc. v. United States*, 626 F.3d 1241, 1249 (Fed. Cir. 2010).  The amended complaint fails to establish that Starr has standing to bring its direct shareholder takings claim because the property allegedly taken belonged to AIG.

15

In Claim I, Starr alleges that the Government took 562,868,096 shares of AIG common stock.  Am. Compl. ¶¶ 169, 174.  However, Starr does not allege that it ever owned those shares.  Consequently, Starr does not possess standing to bring a direct claim for the alleged taking of those shares.  Starr also alleges in Claim I that the payments made to AIG's counterparties in the Maiden Lane III transactions were a taking.  Am. Compl. ¶ 176.  However, Starr does not allege that it owned the funds that were allegedly the subject of what Starr characterizes as "backdoor bailouts."  Consequently, Starr does not possess standing to bring a direct claim for the alleged taking of those so-called "backdoor bailout" funds.

Indeed, the only property that Starr alleges to have owned is its own shares in AIG.  *See* Am. Compl. ¶ 16.  Starr does not allege that the Government took those shares; rather, Starr alleges that it continues to be an AIG common stock shareholder.  *See* Am. Compl. ¶ 16.  Because Starr does not establish that it owned any property that was taken, the Court should dismiss Claim I for lack of standing.  *Cf. Smith v. United States*, 58 Fed. Cl. 374, 388 (2003) (rejecting plaintiff's "takings arguments because the Smiths, as shareholders, simply have no standing to bring a takings claim" where the property taken was a contractual right belonging to the thrift), *aff'd*, 110 F. App'x. 898 (Fed. Cir. 2004) (unpublished table decision); *Robo Wash, Inc. v. United States*, 223 Ct. Cl. 693, 696-97 (1980) (holding that shareholders lacked standing to sue where the only injury alleged is the loss of value to their stock resulting from defendant's alleged breach of contract with the plaintiff's corporation); *accord Gaubert v. United States*, 885 F.2d 1284, 1291 (5th Cir. 1989), *rev'd on other grounds*, 111 S. Ct. 1267 (1991); *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983).

Furthermore, to the extent that Starr complains that its stake in AIG was diluted as a result of the shares issued by AIG to the Government, Starr lacks standing to assert this claim directly because AIG is the proper plaintiff to bring such a claim.  Whether a claim is direct or derivative is not dependent upon a plaintiff's categorization, but on (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1038-39 (Del. 2004).  As is the case alleged here, "[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature" and any purported direct claim should be dismissed.  *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

Claims of equity dilution   where a plaintiff shareholder alleges harm as a result of the issuance of additional shares, which reduces the plaintiff shareholder's proportionate ownership interest   are derivative rather than direct*.  See generally Oliver v. Boston Univ.*, No. 16570-NC, 2006 WL 1064169, at *16-17 (Del. Ch. Apr. 14, 2006) (collecting cases).  Such claims are derivative because it is the corporation that suffers the alleged injury (reduction in its equity value) and that would receive the benefit of the remedy (a restoration of the improperly reduced value).  *See Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).  Such claims are not considered direct because any dilution in value of the corporation's stock is a byproduct of the harm to the entire corporate entity, instead of harm to specific shareholders individually.  *Id.*

The core allegations of Starr's dilution claim relate to the assertion that AIG overpaid for the initial $85 billion Government rescue by agreeing to issue preferred shares representing

17

79.9 percent equity of a company on the brink of bankruptcy.  Am. Compl. ¶ 55.  Assuming that

these allegations are true, the party that lost property because of inadequate consideration is AIG,

not Starr or other shareholders.  Thus, it is no surprise that Delaware law instructs that Starr's

claim be treated as derivative and not direct.  *See Carfagno v. Schnitzer*, 591 F. Supp. 2d 630,

634 (S.D.N.Y. 2008) (holding that plaintiff shareholder lacked standing to bring claim based on

defendant's alleged unlawful dilution of plaintiff's equity interest); *Feldman*, 951 A.2d at 732-

33.  Any alleged loss of value to the common shareholders' stock was, at most, the indirect and

collateral result of the bargain that AIG made with its own property.[6]  Because Starr's claims are

derivative, Starr does not have standing to assert them as direct claims.

## V.    The Court Should Dismiss The Amended Complaint For Failure to Make Demand Upon AIG's Board Or To Plead Adequately Why Demand Is Excused

Starr purports to bring a derivative claim on behalf of AIG (Claim II).  The decision

whether and upon what basis claims on behalf of AIG should be brought against third parties

rests with the AIG directors.  Starr cannot maintain its derivative claims without pleading

detailed facts describing its demand to AIG's board to bring an action or setting forth legally

sustainable reasons why its failure to make such a demand should be excused.  Because Starr

fails to satisfy those requirements, the Court should dismiss Claim II.

---

[6]  Similarly, there is a distinction between a plaintiff's actual property and its assertions of an indirect or collateral interest.  *See, e.g., Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1215 (Fed. Cir. 2005) (rejecting plaintiff's takings claim because the "economic injury" to plaintiff's heliport business resulted not from "the government taking [its] property, but [was] the more attenuated result of the government's purported taking of other people's property"); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993); *Schooner Harbor Ventures, Inc. v. United States*, 81 Fed. Cl. 404, 412-13 (2008).

It is a "fundamental precept that directors manage the business and affairs of corporations." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).  Allowing an individual minority shareholder of a company to bring a claim on behalf of the company "could, if unconstrained, undermine the basic principle of corporate governance that the decisions of a corporation including the decision to initiate litigation    should be made by the board of directors or the majority of shareholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984).  To protect against individual shareholders' maintaining derivative claims on behalf of a corporation except when extraordinary circumstances warrant divesting the board of its authority, RCFC 23.1 provides that a purported derivative plaintiff shareholder must "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  RCFC 23.1(b)(3).  Failure to satisfy this requirement should lead to dismissal of the complaint.  *See, e.g.*, *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1017 (2d Cir. 1984) (dismissing complaint when it did not "supply any information on the timing, circumstances, or manner of the alleged demands or on the response of the directors").

Starr does not allege that it made a demand upon AIG's board, but only that it "inquired of AIG representatives whether AIG would institute proceedings against the Defendant to recover for the wrongs alleged in the complaint [and] [t]hose inquiries demonstrated that any demand on the AIG Board of Directors would be futile."  Am. Compl. ¶ 164.  More is required, particularly because the demand requirement is intended to preserve the power of the board to

exercise its business judgment in determining both whether the proposed action is unfounded or would not be in the interest of the company or its shareholders. *See Aronson,* 473 A.2d at 813.

The burden of demonstrating that demand is excused is particularly high where, as in this case, the asserted wrongdoer is not a member of the board, because directors are presumed to be independent in considering whether the company should make claims against outside entities. To avoid the demand requirement in these circumstances, the plaintiff must plead particularized facts supporting a conclusion that "at least half of the board is not disinterested and independent" regarding the proposed claims. *Dow Chem. Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769, at *7 n.31 (Del. Ch. Jan. 11, 2010); *Beam v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004). To show that a director lacks independence, the plaintiff must plead facts that show that the director is "beholden" to the proposed defendant or "so under [its] influence that [his] discretion would be sterilized," or that the director's decision would be based on "extraneous considerations or influences" rather than "the corporate merits of the subject before the board." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (citation omitted). To show that a director is interested, a plaintiff must plead facts that show the director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or that "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id*.

Starr fails to satisfy these requirements. The complaint does not allege any particularized facts from which the Court could infer that the Board, as currently constituted, lacks the ability to independently evaluate whether Starr's claims against the United States are in the best interest of AIG. *MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 WL 1782271, at *20 & n.21 (Del. Ch.

May 5, 2010) (citing *Heineman v. Datapoint Corp.*, 611 A.2d 950, 955 (Del. 1992)); *In re Paxson Commc'n Corp. S'holders Litig.*, No. 17568, 2001 WL 812028, at *9 & n.52 (Del. Ch. Jul. 12, 2001).

 Starr does not allege that the directors have any personal interest different from those of other shareholders, and its sole factual allegation regarding the Board's lack of independence is that a majority of the current members of AIG's board were elected by the Trustees of the January 16, 2009 Trust.  Am. Compl. ¶ 166.  Starr alleges, in a conclusory fashion, that those board members are "under the control and direction of the Government" because the Trustees who elected them undertook to act in a manner "not opposed to the best interests of Treasury," and that Treasury later re-elected those directors after the Trust dissolved.  Am. Compl. ¶¶ 165-66.  However, to show a lack of independence, "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director."  *Aronson*, 473 A.2d at 816.  In the absence of particularized facts showing lack of independence or personal "interest" in the dispute by the AIG directors, Starr has not shown that demand would be futile.  *See also Beam*, 845 A.2d at 1054 (allegation that defendant stockholder possessed "overwhelming voting control" of corporation was insufficient to make demand futile); *Paxson*, 2001 WL 812028, at *9 (shareholder's power to elect all of company's directors and appoint all officers was insufficient to show that demand was futile); *Kaster*, 731 F.2d at 1017-20 (demand not futile when majority shareholder owned 71 percent of shares and thus allegedly controlled the board).

 Not only a defendant corporation or defendant officers and directors, but also defendants not affiliated with the corporation (like the United States in this case) have standing to challenge

individual shareholders' entitlement to bring an action against them on behalf of the corporation,

because of the important public policy interests in not adjudicating corporate claims that the

corporation has not elected to bring, and because pre-suit demand "is an objective burden which

must be met in order for the shareholder to have capacity to sue on behalf of the corporation."

*Kaplan v. Peat Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).  While a corporation

can elect to surrender its control over an action brought on its behalf by authorizing the

shareholder's claim to proceed absent a showing of demand futility, AIG has not done so here.

Indeed, as the Delaware Supreme Court held in *Kaplan*, it is only "*when* a corporation chooses to

take a position in regards to a derivative action asserted on its behalf" that it can "affirmatively

object to or support the continuation of the litigation." *Id.* at 731 (emphasis added).  Here, AIG

has not chosen to take a position,[7] so Starr (which has made no demand) must either make a

threshold showing that demand would be futile or suffer dismissal of its derivative claim.  *See id.*

at 730 ("The right to bring a derivative action does not come into existence until the plaintiff

shareholder has made a demand on the corporation to institute such an action or until the

shareholder has demonstrated that demand would be futile."); *see also, e.g., Abbe v. Goss,* 411 F.

Supp. 923, 924-25 (S.D.N.Y. 1975); *Aronson,* 473 A.2d at 811-12; *In re Dow Chem. Co. Deriv.*

*Litig.*, No. 4349-CC, 2010 WL 66769, at *1 n.1 (Del. Ch. Jan. 11, 2010); *McPadden v. Sidhu*,

964 A.2d 1262, 1269 (Del. Ch. 2008); *cf. Lou v. Belzberg,* 728 F. Supp. 1010, 1019 (S.D.N.Y.

1990) (before shareholders may assert derivative claims against a third party, the corporation's

---

[7]  Instead, AIG has entered a stipulation with plaintiff in which they agree that AIG can postpone responding to the complaint until after the Court has decided this motion to dismiss, apparently so that AIG can learn before it asserts any position on the demand issue whether the Court will save it the trouble by dismissing the complaint.

directors, "who necessarily have superior knowledge of the facts and circumstances of the underlying events," "should be required to determine whether the litigation was proper and in the best interest for the corporation unless some facts are alleged beyond the action adopted which gives rise to the claim"). Starr's failure to present adequate pleadings that it has made the required demand on AIG's board or that such demand is excused should lead to dismissal of Claim II.

Additionally, as explained in section IV above, Starr's Claim I, which it styled as a direct claim, should be considered to be derivative in nature by the Court. As with Claim II, Starr's complaint fails to plead either demand or demand futility for Claim I. Accordingly, the Court should dismiss the entirety of Starr's complaint.

## VI. The Court Should Dismiss This Action Because Starr Fails To State A Takings Claim

Starr's Claim I alleges a taking from Starr and other shareholders relating to their AIG common stock. Am. Compl. ¶ 177. Starr's Claim II action relies upon the same allegations of Claim I, but instead asserts them derivatively as a taking from AIG. Am. Compl. ¶¶ 179-80, 182. As we demonstrate, Starr's claims that the rescue of AIG was a taking, from either Starr or AIG, are implausible and should be dismissed for failure to state a claim upon which relief may be granted.

### A. Starr's Allegations That Government Actions "Completed" A Taking Do Not State A Takings Claim

Starr alleges that several Government actions "completed the taking of AIG shareholders' interests" (Am. Compl. ¶ 101(a)), and that a series of events spanning nearly three years "*culminated* in the completion of the acquisition of 1,655,037,962 shares of AIG's Common

Stock on January 14, 2011, of which 562,868,096 shares were taken without just compensation." Am. Compl. ¶ 54 (emphasis added).  However, a takings plaintiff must "pinpoint what step in the sequence of events . . . constituted conduct that the government could not engage in without paying compensation."  *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Characterizing an alleged taking as consisting of several distinct actions viewed collectively is "too broad."  *See Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009). Because Starr's "taking in the aggregate" allegations fail to pinpoint the specific act for which the Government allegedly owes just compensation, those allegations fail to state a takings claim.

### B.   Starr's Allegations That The FRBNY's Actions Were Unauthorized And Unlawful Do Not State A Takings Claim

Starr contends that the taking it alleges resulted from unlawful and unauthorized action. *E.g.*, Am. Compl. ¶¶ 12-13.  However, a taking can result only from authorized actions.[8]  *See Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1330-31 (Fed. Cir. 2006).  Moreover, a takings plaintiff must concede the lawfulness of the actions of the Government that resulted in the alleged taking.  *Crocker,* 37 Fed. Cl. at 195-96 (citing *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed. Cir. 1986)).  Assertions that Government actions run afoul of a statute, for example, do not form the basis for a claim under the Takings Clause of the Fifth Amendment.  *See Acadia Tech.*, 458 F.3d at 1331; *see also Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1369 (Fed. Cir. 2005) ("a claim premised on a regulatory violation does not state a claim for a taking"); *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365-66 (Fed.

---

[8]  Claims of unauthorized Government acts may sound in tort, and, therefore, be outside the Court's jurisdiction.  *See Board Mach., Inc. v. United States,* 49 Fed. Cl. 325, 333 n.9 (2001); *Crocker v. United States,* 37 Fed. Cl. 191, 196 n.3 (1997), *aff'd*, 125 F.3d 1475 (Fed. Cir. 1997).

Cir. 2001); *Del-Rio Drilling Progrs., Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998).

Starr alleges that section 13(3) of the Federal Reserve Act, the statutory source of authority for extending $85 billion in credit to AIG, did not authorize the Government to demand a controlling interest in AIG's equity as part of the consideration for the loan.[9]  *See* Am. Compl. ¶ 57 ("Section 13(3) of the Federal Reserve Act had never been interpreted or invoked in any prior circumstance . . . as a basis for the taking of a controlling interest in the common shares of a corporation"); Am. Compl. ¶ 58(a) (alleging that the Government "demand[ed] consideration it was not legally authorized (by statute or otherwise) to demand"); Am. Compl. ¶ 76 ("Section 13(3) provides no authorization for the Federal Reserve Board to condition access to the Federal Reserve discount window upon a Government takeover of a corporation or the appropriation of a controlling interest in the Common Stock of a publicly traded corporation"); Am. Compl. ¶ 77 ("No Congressional authority vested the Federal Reserve Board with the authority or power to take over an American corporation pursuant to Section 13(3) or to appropriate the property and interests of Common Stock shareholders of a publicly traded United States issuer under that provision").  However, to maintain a takings claim, Starr must, at a minimum, concede that the actions that it alleges constitute takings were authorized and lawful. Yet, Starr's takings claims are premised upon allegations that the Government violated section 13(3) of the Federal Reserve Act; Claim II, in particular, alleges that "improper conduct" of the Government constitutes the taking.  Am. Compl. ¶ 182.  Consequently, the Court should dismiss this action for failure to state a takings claim.  *Cf. Lion Raisins,* 416 F.3d at 1370, 1373

---

[9]  Our use of the term "Government" when it appears to relate to the FRBNY does so only to correspond with Starr's contentions; we neither imply nor concede that the FRBNY is "the Government."

(affirming dismissal of takings claim premised upon allegations of statutory and regulatory violations).

**C.**     **Starr Fails To Allege The Type Of Government Action Necessary To State A Takings Claim**

There are only two types of takings:  (1) physical takings caused by the Government's physical invasion or appropriation of private property, and (2) regulatory takings resulting from Government regulations that unduly burden private property interests.  *Otay Mesa Prop. L.P. v. United States*, 93 Fed. Cl. 476, 484 (2010) (citing *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992), and *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008)), *vacated in part on other grounds*,   F.3d  , 2012 WL 206142 (Fed. Cir. Jan. 25, 2012).  Starr does not allege a regulatory taking; indeed, it mentions no Government regulations that burden its or AIG's private property interests.  Rather, Starr alleges that the Government appropriated its and AIG's property.  Am. Compl. ¶¶ 55, 76, 77, 79, 82, 90, 120, 121, 150.  As we have demonstrated, the property alleged to have been taken was never owned by Starr, and what was allegedly taken was acquired from AIG in an agreed-upon transaction.  But, apart from any question as to who owned the property that was allegedly taken, the Court should dismiss this action because Starr fails to allege the type of Government action necessary to state a takings claim.

**1.**     **AIG Freely Agreed To Accept The $85 Billion Loan**

Starr alleges that the Government coerced AIG "to agree to a takeover of the Company without just compensation."  Am. Compl. ¶ 54.  However, a voluntary transfer is not a proper basis upon which to premise a takings claim.  *See Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005).  For there to be a physical taking, the conduct claimed to be a taking must

involve compulsion by the Government or "required acquiescence."  *Yee*, 503 U.S. at 527.

Required acquiescence means that "the owner is forced to surrender the property under threat of

legal sanction."  *Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.*, 967 F.2d 648, 656-57

(D.C. Cir. 1992).  Acquiescence cannot be deemed required or compelled merely because refusal

would involve a substantial sacrifice or disadvantage for the owner.  *Cf. Yee*, 503 U.S. at 527-28

(mobile home park owners' claim that local rent control ordinance amounted to physical

occupation of owners' property rejected because owners "voluntarily rented their land to mobile

home owners . . . [and] neither the city nor the State compels petitioners, once they have rented

their property to tenants, to continue doing so").

Conversely, where a claimant has elected to receive a benefit offered pursuant to a

program, the acceptance of the program's terms by the claimant does not give rise to a taking.

*See Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 959 (Fed. Cir. 1992) (receivership and

seizure of savings and loan institution held not to constitute a physical taking, where "[i]n

exchange for the benefit of federal deposit insurance, Saratoga gave the government the right,

among other rights, to place Saratoga in conservatorship or receivership when warranted.  The

conservatorship and receivership actions . . . arose out of this voluntary agreement from which

Saratoga benefitted for six years."); *Evans v. United States*, 74 Fed. Cl. 554, 558-64 (2006)

(agricultural marketing order restricting the amount of raisins from a given crop year that

producers could sell on the open market did not constitute a physical taking of "reserve tonnage"

raisins transferred to Raisin Administrative Committee for sale in secondary, non-competitive

markets, because "[t]he government does not force plaintiffs to grow raisins or to market the

raisins; rather, it directs that *if* they grow and market raisins, then passing title to their 'reserve

27

tonnage' raisins to the RAC is their admission ticket") (emphasis in original), *aff'd*, 250 Fed. App'x 321 (Fed. Cir. 2007); *Turntable Fishery & Moorage Corp. v. United States*, 52 Fed. Cl. 256, 263 (2002) (no taking where plaintiff voluntarily transferred common facilities to Government in exchange for continued use of marina).  Because the Government acquired its interest as part of the consideration that AIG agreed to exchange for its receipt of financing, there has been no governmental action *appropriating* property, and thus no taking.

Although Starr characterizes the Government's conduct as having compelled AIG to agree to the terms of the September 16, 2008 loan, its allegations do not support that characterization.  Starr does not allege that either the Government or the FRBNY took any action relating to the property of AIG or its shareholders until September 15, 2008, when the Government "brokered talks among a consortium of banks . . . aimed at arranging private financing for a loan to address AIG's liquidity situation" (Am. Comp. ¶ 51), and September 16, 2008, when the FRBNY responded to AIG's request for a loan from the Federal Reserve discount window (Am. Compl. ¶ 55).  Starr alleges that the Government responded with a term sheet offering to lend AIG $85 billion in exchange for a specified interest rate and "a promise that the Government would receive a nearly 80 percent equity stake in AIG."  Am. Compl. ¶ 55.  Starr further alleges that AIG's board approved the September 16 term sheet, and then the Credit Agreement.  Am. Compl. ¶¶ 58, 64.  Although Starr characterizes that approval as "coerced," it does not allege that it or AIG faced any adverse *Government* action should it have rejected those terms, or that any governmental power was invoked or even existed to compel acceptance of

these terms.[10]  Rather, the allegations demonstrate that AIG voluntarily transferred equity in exchange for a loan.

Indeed, Starr does not allege that the Government demanded anything that a private lender could not have demanded in exchange for the loan.  To the contrary, Starr alleges that the equity transfer term was among the terms that were developed by the consortium of private banks involved in the prior, unsuccessful effort to arrange a private-sector loan to AIG.  *See* Am. Compl. ¶ 55(b).  Insistence upon such terms in return for a loan of the kind sought by AIG does not constitute a taking.  *Cf. De Tom*, 552 F.2d at 339 (no taking where "neither Congress nor a federal agency puts any regulatory burden on the owner" but, rather, an agency acts "in the same way as might any other" person).

To the extent that AIG's management would have preferred not to accept the credit facility on the terms offered but felt "compelled" by circumstances to do so, that was the result of business risks taken by AIG and developments in the financial sector of the economy, not any action taken by the Government.  Am. Compl. ¶¶ 23-41.  "'It has become settled law that the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances.'"  *Artwohl v. United States*, 434 F.2d 1319, 1326 (Ct. Cl.

_____

[10]  Starr alleges various events that it characterizes as a usurpation of control over AIG by the Government.  Yet, according to the allegations, those events flowed from what AIG's board of directors agreed to, before the alleged loss of control.  Starr alleges that "[a]s a *result of the provisions of the Credit Agreement . . .* AIG's shareholders and those directors selected independently of the Government had lost the ability to control AIG" (Am. Compl. ¶ 59 (emphasis added)), and that the Credit Agreement was signed on September 22, 2008 (Am. Compl.¶ 63).  But Starr's allegation acknowledges that the FRBNY did not possess any control of AIG when AIG executed the Credit Agreement.  Moreover, before the execution of the Credit Agreement, AIG had already agreed on September 16, 2008, to a term sheet that included an exchange of 79.9 percent of AIG equity for the financing that AIG received upon its directors' acceptance of the term sheet.

29

1970) (quoting *Fruhauf Sw. Garment Co. v. United States*, 11 F. Supp. 945, 951 (Ct. Cl. 953)).

Even if it is assumed that the Government advised that AIG should take the FRBNY's financing

on the terms offered, and that it was the only offer that would be made, a lender does not control

a potential borrower when it offers advice to the borrower's management, "even where the lender

threatens to withhold future loans should the advice not be taken." *In re KDI Holdings, Inc.*,

277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999), *aff'd*, 576 F.3d 108 (2d Cir. June 5, 2009) (summary

order), quoted in *In re Chrysler LLC,* 405 B.R. 84, 107-08 (Bankr. S.D.N.Y. 2009).  AIG's

management accepted the proposed terms for the same reason any borrower accepts terms

offered by a lender    because it believed that if it refused, AIG would not obtain the loan, and

because in the judgment of management, AIG and its shareholders would be better off obtaining

the loan on these terms than not obtaining the loan.[11]

        That was an exercise of business judgment, not an involuntary action*.  See In re Chrysler*,

405 B.R. at 107-08; *In re Gen. Motors Corp.*, 407 B.R. 463, 495 n.62 (Bankr. S.D.N.Y. 2009),

*aff'd*, *In re Motors Liquidation*, 430 B.R. 65 (S.D.N.Y. 2010).  Because AIG was free to reject

both the FRBNY's conditions and its funding, no matter how hard that choice may have been,

the Court should reject Starr's claim that the rescue of AIG was a taking.  *Cf. Pittsburg Cnty.*

*Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 718 (10th Cir. 2004) (rejecting

takings claim where State of Oklahoma was ultimately free to reject both the conditions and the

funding, no matter how hard that choice may have been).

---

        [11]  Starr alleges, in conclusory fashion, that the Credit Agreement reflecting the
challenged terms "was imposed upon, and not voluntarily agreed to by, the AIG board."  Am.
Compl. ¶ 64.  However, Starr does not allege any particular acts constituting imposition of the
agreement.

**2.     Even If The FRBNY Loan Transaction Were Not Voluntary, It Would Not Constitute A Taking Because It Was A Rescue Of AIG From The Consequences Of Its Own Business Risks**

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  That does not describe this case. The allegations demonstrate that the September 16, 2008 loan transaction was an effort to rescue AIG from the liquidity crisis that AIG's own business risks had created.[12]  Any burden involved in accomplishing this goal was a burden which, in all fairness and justice, should be borne by AIG and the shareholders on whose behalf AIG acted, and not by the public as a whole.  AIG's excessive risk taking on behalf of itself and its shareholders created the company's problem. AIG and its shareholders, not the public, should rightfully bear the cost of the solution.

The rescue of AIG cannot be distorted into a taking.  "[W]here, as here, the private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public." *Nat'l Bd. of Young Men's Christian Ass'ns v. United States*, 395 U.S. 85, 92 (1969).  In particular, even where the Government imposes the terms of a Government rescue, those terms do not constitute a taking where the recipient of the rescue might have voluntarily contracted for those terms.  *See Colo. Springs*, 967 F.2d at 657-58.  In *Colorado Springs*, the Government imposed a mandatory

---

[12]  By September 16, 2008, as a result of the business risks that it took, AIG was facing bankruptcy.  *See* Am. Compl. ¶¶ 23-41, 53, 55.  Despite Starr's displeasure with the terms of the September 16, 2008 loan, the allegations demonstrate that the loan saved AIG from bankruptcy.

Federal "bailout" of the Farm Credit System, to which the plaintiff Production Credit Association did not want to contribute. *Id.* at 657-58. The court held that because the terms of the bailout were not unconscionably unfair, there was no taking; rather, the bailout was a deal that plaintiffs "might well have contracted voluntarily for" because it ensured they would survive over the long term. *Id.* at 657-58. Here, there is no need to speculate whether AIG "might well have contracted voluntarily" for the terms of the Government rescue; AIG did contract for those terms. Am. Compl. ¶ 59. Consequently, there was no taking.

### 3.    The Acquisition Of Shares In 2011 Was Not A Taking Because Those Shares Were Received In Exchange For Other Shares

Starr alleges that the Government took 562,868,096 shares of AIG common stock. Am. Compl. ¶¶ 169, 174. However, a voluntary transfer is not a proper basis upon which to premise a takings claim. *See Norman*, 429 F.3d at 1089. Starr explains that the Government received those 562,868,096 shares in exchange for Series C Preferred Stock. Am. Compl. ¶ 172. Starr does not allege that the Government seized or otherwise confiscated those common stock shares. Consequently, Starr fails to state a takings claim with respect to those shares. *Carruth,* 627 F.2d at 1081 (rejecting "forced sale" takings claim where "property was not confiscated or appropriated by the Government").

### 4.    The ML III Transactions Subsequent To The $85 Billion Loan Did Not Involve A Government Appropriation

Starr alleges that a series of transactions between AIG, ML III, and various counterparties in connection with CDOs and CDS contracts amounted to a taking of AIG's property. However, the allegations demonstrate that those transactions resulted from AIG's negotiated agreements

32

with its counterparties. Starr does not allege that the Government seized any property in the course of those transactions, or that the Government otherwise appropriated AIG's property. Rather, the allegations demonstrate merely that AIG agreed to create ML III and took the FRBNY's financing to enable ML III to discharge AIG's obligations to its counterparties, on terms Starr argues were less favorable to AIG than Starr believes they should have been. Am. Compl. ¶ 130. Further, despite a wealth of conclusory characterizations and insinuations suggesting that the FRBNY forced AIG to dispose of its property in the manner complained of, Starr fails to allege what the FRBNY did to bring about these results. Conclusory allegations as to an element of a claim, unsupported by allegations of fact that support the conclusions alleged, are grounds for dismissal for failure to state a claim. *Iqbal*, 129 S. Ct. at 1949-51; *Twombly*, 550 U.S. at 555.

### D.   Neither Starr Nor AIG Lost Property Or A Property Interest

The Court should dismiss the amended complaint because neither Starr nor AIG possessed a property interest that was taken by Government action. "It is axiomatic that only persons with a *valid* property interest at the time of the taking are entitled to compensation." *Chancellor Manor v. United States*, 331 F.3d 891, 901 (Fed. Cir. 2003) (emphasis added); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001); *see also Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (to state a valid takings claim, a claimant must show that it possessed a property interest in the subject of the alleged taking). Thus, the Court must determine whether the claimant established a property interest for purposes of the Fifth Amendment. *See Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003); *Conti v. United*

*States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002).  Precise identification of the alleged property

interest taken is therefore essential.  *See United States v. Causby*, 328 U.S. 256, 267 (1945)

("[A]n accurate description of the property taken is essential, since that interest vests in the

United States."); *Preseault v. United States*, 100 F.3d 1525, 1532-33 (Fed. Cir. 1996) (*en banc*)

(discussing importance of determining the precise nature of property interests at issue).  If the

claimant fails to demonstrate the predicate of a legally cognizable property interest, the Court's

task is at an end.  *Am. Pelagic*, 379 F.3d at 1372.

### 1.     Neither Starr Nor AIG Possessed A Cognizable Property Interest In A Loan From The FRBNY, Or A Loan Upon Particular Terms

Neither Starr or AIG had any right to obtain a loan from the Government, nor did they

have a right to a loan based upon any particular terms.  Starr complains that AIG agreed to

provide the Government a 79.9 percent equity interest in exchange for the FRBNY's $85 billion

loan.  *See* Am. Compl. ¶¶ 54-55.  Starr also complains that AIG was not, instead, provided

liquidity assistance on the same terms as were made available to different companies, and that

were authorized under different programs.  *See* Am. Compl. ¶¶ 43-48, 54, 57, 74-77.  However,

Starr's claim fails because there is no property right to a Government rescue, let alone any right

to a Government rescue upon terms offered to other entities.

Because the FRBNY had no obligation to loan AIG money, the FRBNY's offer of a loan

on terms including the condition that the Trust receive a 79.9 percent equity interest did not in

any way diminish any rights that Starr or AIG possessed.  Where the Government has

discretionary authority to deny access to a program, there is no cognizable property interest in a

benefit available from the program.  *Hearts Bluff Game Ranch, Inc. v. United States,* No. 2010-

5164,    F.3d   , 2012 WL 148692, at *1-2 (Fed. Cir. Jan. 19, 2012).  In *Hearts Bluff*, the United

States Court of Appeals for the Federal Circuit recently considered whether an interest in

obtaining a "mitigation banking instrument" is a cognizable property interest. *Id.* The Federal

Circuit found that the Army Corps of Engineers' ("Corps") denial of a "mitigation banking

permit" did not diminish in any way the rights that Hearts Bluff possessed. *Id.* at *4. The court

noted that the Corps had discretionary authority to deny access to the mitigation program

entirely; thus, Hearts Bluff did not have a property interest in access to the program or the

benefits of the program. *Id.* at *11; *see also Am. Pelagic*, 379 F.3d at 1374 (no property interest

in fishing permit because, among other reasons, the Government had discretion to deny or

sanction the permit); *Conti*, 291 F.3d at 1341-42 (no property interest in fishing permit because

Government retained right to revoke, suspend, or modify the permit).

Similarly, AIG had no right to obtain a loan because the FRBNY had discretionary

authority to deny access to such a loan entirely. Section 13(3) of the Federal Reserve Act

provided that the Federal Reserve Board could authorize, and the Federal Reserve Banks could

make, loans to corporations such as AIG in exceptional circumstances and subject to certain

conditions. 12 U.S.C. § 343 (2006); Am. Compl. ¶ 56. Nothing in section 13(3), however,

required that a loan be made in any particular circumstances. AIG's access to funding under

section 13(3) was therefore discretionary, and neither AIG nor its shareholders had any property

interest in AIG obtaining funds from the Federal Reserve, and certainly no right to demand terms

similar to those provided to other institutions. *See* Am. Compl. ¶ 54 (alleging that the FRBNY

did not grant access to liquidity assistance that it granted to numerous other institutions, and

instead conditioned its loan on an interest in AIG Common Stock). Additionally, even assuming

section 13(3) had never been interpreted to provide a basis for the FRBNY to require a

79.9 percent interest in a company, that does not give rise to a takings claim; any expectation AIG or its shareholders may have had related to the terms of such a loan was not a cognizable property interest. *See Hearts Bluff*, 2012 WL 148692, at *6 (holding that hopes and expectations are not cognizable property interests).

### 2.   Starr's Rights In AIG Common Stock Are Intact

Starr does not allege that it no longer owns AIG common stock because its shares were taken by the Government. To the contrary, Starr retains its shares. *See* Am. Compl. ¶ 16. Instead, Starr appears to allege that a property interest associated with its common stock ownership was taken because the Government purportedly destroyed the value of the common stock held by Starr and the alleged class (Am. Compl. ¶ 169), and that AIG's September 2008 loan agreement with the FRBNY gave the Government control of AIG at the expense of the shareholders (Am. Compl. ¶¶ 4, 176). Starr has alleged no valid property interest because Starr's interest in AIG Common Stock did not entitle it to a fixed value or percentage of equity, or to otherwise control AIG.

Property interests are created and their dimensions are defined by existing rules and understandings. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029-30 (1992); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (the Constitution itself neither creates nor defines the property interests that if taken by the Government are compensable under the Fifth Amendment). "[A] taking claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed." *Rogers Truck Line, Inc. v. United States*, 14 Cl. Ct. 108, 114 (1987); *see also Hearts Bluff*, 2012 WL 148692, at *11 (finding no taking in part because an ownership interest in land did not give rise to a right

36

to participate in a mitigation banking program); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808 (Fed. Cir. 2006) (because "grazing is not a stick in the bundle of rights that it has ever acquired" with plaintiff's water rights, it cannot be taken by a governmental action).  In other words, where a plaintiff possesses no more or no less of a property interest than it did prior to the governmental action at issue, there can be no taking.  *See Acceptance Ins.*, 583 F.3d at 858; *Mitchell Arms*, 7 F.3d at 217 (noting that the right to import rifles was always subject to ATF regulatory power so there was no reasonable expectation of a property interest in importing the rifles).

None of the rights that Starr possessed as a holder of AIG Common Stock was taken. Starr alleges that the Government destroyed the value of its common stock (Am. Compl. ¶ 169), but not that AIG Common Stock included a right to any specific value.  Common stock comes with no guarantees or rights to proceeds, and share value is therefore not a protected property interest.  *See Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996) (shareholder equity does not constitute a property interest).  Furthermore, Starr's allegation that the value of its common stock was "destroyed" fails to recognize that if the FRBNY had not loaned AIG billions of dollars, AIG would have been forced into bankruptcy.  Am. Compl. ¶¶ 53, 55.

Likewise, Starr alleges that the Government took control of AIG (Am. Compl. ¶ 176), but not that its stock included a right to a particular percentage of equity or voting control in AIG. Stated differently, because Starr's interest in its common stock did not include a right to exclude others from entering the pool of AIG Common Stock    thereby allegedly diluting the value of Starr's stock    its interest was not a protected property interest under the Fifth Amendment.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) (with respect to a trade secret, the right

to exclude others is central to the very definition of the property interest) *Am. Pelagic*, 379 F.3d

at 1374 (no protected property interest in fishing permit in part because the legal instrument did

not entitle plaintiff to exclusive privileges to fish); *Conti*, 291 F.3d at 1339 (no property interest

where swordfish permit holder lacked authority to exclude others from the Atlantic Swordfish

Fishery); *cf. Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1333-

34 (Fed. Cir. 2005) (finding a property interest because peanut quota holders were not subject to

dilution with additional peanut quota holders entering the market).

Finally, any interest Starr may allege in a business expectation regarding the value or

proportion of equity related to its common stock is a non-compensable collateral interest.  The

Fifth Amendment concerns itself solely with property, and not with other collateral interests that

may be incident to ownership.  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

Business expectations are collateral interests.  *See Air Pegasus*, 424 F.3d at 1206, 1215

(frustration of helicopter company's business expectations due to Federal air traffic restrictions

did not constitute a taking); *Mitchell Arms*, 7 F.3d at 217 (Fifth Amendment does not protect

plaintiff's collateral interest in realizing an expectation by selling rifles, noting plaintiff "retained

complete control over the rifles").  Thus, even if Starr's business expectations were harmed by

some Government action, those business expectations are not cognizable property interests.

### 3.    No Property Interest Of AIG Was Taken In Connection With ML III

Starr alleges that the FRBNY appropriated two-thirds of the "residual interests" of

ML III.  Am. Compl. ¶¶ 119-20.  To the extent that is a specific takings allegation, it fails to state

a takings claim.  Starr explains that those residual interests consisted of "ML III proceeds."  Am.

Compl. ¶¶ 119-20.  Consequently, Starr fails to allege that it or AIG owned any of the ML III

proceeds that the FRBNY acquired.  Nor does Starr allege that the Government acquired any of the one-third interest that AIG had in those ML III proceeds.

In addition, Starr's allegations with respect to the FRBNY's interest in ML III proceeds otherwise fail to identify a property interest.  ML III is an entity funded by both the FRBNY and AIG that purchased certain CDOs upon which AIG had offered insurance in the form of credit default swaps.  *See* Am. Compl. ¶¶ 110, 112.  With respect to the funding of ML III, Starr, in effect, complains about an obligation to pay money, rather than a direct appropriation or seizure of property.  It is well settled, however, that the mere imposition of an obligation to pay money does not implicate a Fifth Amendment property interest.  *See Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1314 (Fed. Cir. 2001) (*en banc*) (*citing E. Enters. v. Apfel*, 524 U.S. 498, 555 (1998)).  The "residual interests" from ML III are the anticipated balance of the proceeds from the CDOs held in ML III; they have not yet been determined, and may never exist.  *See* Am. Compl. ¶ 118.  As such, they are merely an abstract sum of money potentially capable of being counted, and not property interests.  *See Adams v. United States*, 391 F.3d 1212, 1224-25 (Fed. Cir. 2004).

Additionally, because any rights in the "residual interests" of ML III were created when ML III was created, AIG never received a property interest in more than one-third of the residual interests (and Starr and other AIG shareholders never held any interest in ML III or its residuals).  Indeed, the ML III transaction contracts - the documents that provided AIG with a right to proceeds from ML III - only provided AIG with one-third of the residual interests.  *See* Am. Compl. ¶ 119 (explaining the priority of payments under the ML III contracts).  Starr does not allege that any rule or other source, such as state, Federal, or common law, entitles AIG or its

39

shareholders to more than one-third of the residual interests in ML III.  *See Lucas*, 505 U.S. at 1029-30; *cf. Colvin Cattle*, 468 F.3d at 808 (plaintiff's water rights did not have an attendant right to graze; therefore, "grazing is not a stick in the bundle of rights that it has ever acquired" and cannot be taken by a governmental action).  Because AIG's residual interest in ML III remains untouched, the Government could not have taken that interest.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court dismiss this action.

<div style="margin-left: 40%;">

Respectfully submitted,

TONY WEST
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tele: (202) 616-8239
Fax: (202) 514-7969
Email: brian.simkin@usdoj.gov

</div>

OF COUNSEL:
SHALOM BRILLIANT
TIMOTHY P. MCILMAIL
BRIAN A. MIZOGUCHI
JOHN ROBERSON
Senior Trial Counsel

CHRISTOPHER A. BOWEN
KAREN V. GOFF
MICHAEL S. MACKO
JOHN J. TODOR
AMANDA TANTUM
JACOB A. SCHUNK
Trial Attorneys