## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STARR INTERNATIONAL COMPANY,
INC., Individually and on Behalf of All          :
Others Similarly Situated, and derivatively on
behalf of AMERICAN INTERNATIONAL          :
GROUP, INC.,

                              :

                 Plaintiff,

                              :

       v.                               No. 11-00779C (TCW)

                              :

THE UNITED STATES OF AMERICA,

                              :

               Defendant,

                              :

and AMERICAN INTERNATIONAL
GROUP, INC., a Delaware corporation,          :

              Nominal Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

OF COUNSEL:

BOIES, SCHILLER & FLEXNER LLP
Robert J. Dwyer
Nicholas A. Gravante Jr.
Hamish P. M. Hume
Samuel C. Kaplan
Duane L. Loft
Julia C. Hamilton
Luke Thara

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
John L. Gardiner

March 29, 2012

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

*Attorneys for Starr International
Company, Inc.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

QUESTIONS PRESENTED ..................................................................................... 6

STATEMENT OF THE CASE ................................................................................ 7

    I.  Nature of The Case ............................................................................ 7

    II.  Statement of Facts ............................................................................ 7

        A.  The Government's Acquisition of Voting Power and
            562,868,096 AIG Common Shares ...................................... 10

        B.  The Maiden Lane III Transaction ....................................... 12

ARGUMENT ......................................................................................................... 13

    I.     Standards of Review .................................................................. 13

    II.    Based on Well Established Precedent, 28 U.S.C. § 1500 Does Not
         Deprive This Court of Jurisdiction over the Action. ................................ 14

    III.   Starr Has Adequately Alleged Cognizable Property Interests That
         Are Protected by the Fifth Amendment's Takings Clause. ...................... 15

        A.  Starr Has a Cognizable Property Interest in the Equity and
            Voting Power Inherent in Its Shares of AIG Common Stock. ............ 16

        B.  AIG Has a Property Interest in Its Contribution to Maiden Lane
            III. ..................................................................................... 20

    IV.   Starr Has Standing to Assert Both Direct and Derivative Claims. ............ 21

        A.  Under Settled Principles of Delaware Law, Starr Has Standing
            to Assert A Direct Takings Claim for the Government's
            Expropriation of Its Legally Protected Property Interests. ................. 21

        B.  The Amended Complaint Adequately Pleads Demand Futility
            With Respect to Starr's Derivative Claims. .......................................... 23

    V.    The Government's Appropriation of a Nearly 80 Percent Voting
         Interest in AIG and of Common Shareholders' Equity,
          562,868,096 Shares of AIG Common Stock, and $32.5 Billion in
         AIG Collateral Constituted a Taking Without Just Compensation. .......... 29

A. The Government Cannot Claim Consent As a Defense When It Nullified the Shareholders' Right to Withhold Consent and, In Any Event, AIG Did Not Voluntarily Agree to Let the Government "Steal the Business"........................................................30

   1. AIG Common Shareholders Did Not Consent to the Government's Taking of Their Property Because the Government Circumvented Shareholder Voting Rights Protected Under State Law. ....................................................30

   2. The Government Compelled the AIG Board to Agree to the Original Credit Agreement. ...............................................31

   3. The Government Coerced AIG Into Transferring $32.5 Billion in AIG Collateral to Advance the Government's "Backdoor Bailout". .................................................................34

B. The Government Unconstitutionally Conditioned the Availability of a Fully Secured Government Loan With an Extraordinarily High Interest Rate on the Appropriation of a Nearly 80 Percent Stake in AIG. ........................................................35

   1. The Government's Actions Are Not Immune From Scrutiny..................................................................................35

   2. The Government Has Not Argued And Cannot Establish As a Matter of Law That the Required Dedication Was Reasonably Proportionate to the Government's Legitimate Interests. .......................................40

C. The Government's Remaining Takings Arguments Lack Merit. ........44

   1. Starr's Claim Does Not Fail for Lack of Authorized Action. ....................................................................................44

VI. The Court Has Jurisdiction over Starr's Due Process Claim Because the Government Deprived AIG and Its Common Shareholders of 562,868,096 Shares of AIG Common Stock In Excess of Its Statutory Authority. ............................................................46

VII. The Unprecedented and Sweeping Nature of the Government's Actions, the Fact-Specific Nature of the Takings Inquiry and This Dispute, and the Absence of a "Set Formula" For Evaluating Such Claims Further Confirm that the Government's Motion Should Be Denied...................................................................................................52

CONCLUSION ..............................................................................................54

# TABLE OF AUTHORITIES

## Cases

*120 Delaware Ave., LLC v. United States,*
  95 Fed. Cl. 627 (2010) ................................................................................................45

*Acadia Tech., Inc. v. United States,*
  458 F.3d 1327 (Fed. Cir. 2006) ...................................................................................46

*Acceptance Ins. Cos. v. United States,*
  583 F.3d 849 (Fed. Cir. 2009) .....................................................................................44

*Adams v. United States,*
  391 F.3d 1212 (Fed. Cir. 2004) ...................................................................................21

*Aerolineas Argentinas v. United States,*
  77 F.3d 1564 (Fed. Cir. 1996) .....................................................................................46

*Arctic King Fisheries, Inc. v. United States,*
  59 Fed. Cl. 360 (2004) .................................................................................................42

*Armstrong v. United States,*
  364 U.S. 40 (1960) .......................................................................................................52

*Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984) ................................................................................25, 26, 28

*Artwohl v. United States,*
  434 F.2d 1319 (Ct. Cl. 1970) .......................................................................................34

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009) .........................................................................14

*Berry v. United States,*
  86 Fed. Cl. 24 (2009) ...................................................................................................14

*Bilski v. Kappos,*
  130 S. Ct. 3218 (2010) .................................................................................................50

*Boyle v. United States,*
  200 F.3d 1369 (Fed. Cir. 2000) .......................................................................13, 32, 35

*Branch v. United States,*
  69 F.3d 1571 (Fed. Cir. 1995) .....................................................................................44

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) .............................................................................................25

*Cal. Hous. Sec., Inc. v. United States,*
   959 F.2d 955 (Fed. Cir. 1992) .................................................................38

*Cal. Nat. Bank v. Kennedy,*
   167 U.S. 362 (1897) ...............................................................................49

*Carfagno ex rel. Centerline Holding Co. v. Schnitzer,*
   591 F. Supp. 2d 630 (S.D.N.Y. 2008) .......................................................23

*Carruth v. United States,*
   224 Ct. Cl. 422 (1980)............................................................................38

*Casa de Cambio Comdiv S.A. de C.V. v. United States,*
   48 Fed. Cl. 137 (2000)............................................................................47

*City of Monterey v. Del Monte Dunes at Monterey Ltd.,*
   526 U.S. 687 (1999) ...............................................................................39

*Clapp v. United States,*
   127 Ct. Cl. 505 (1954)............................................................................36

*Colonial Chevrolet Co., Inc. v. United States,*
   No. 10-647C, 2012 WL 668593 (Fed. Cl. Feb. 27, 2012)............................4, 14, 29, 54

*Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.,*
   967 F.2d 648 (D.C. Cir. 1992)..................................................................38

*Crocker v. United States,*
   37 Fed. Cl. 191 (1997)............................................................................46

*In re Cysive, Inc. S'holders Litig.,*
   836 A.2d 531 (Del. Ch. 2003) ..................................................................26

*David Nassif Assocs. v. United States,*
   226 Ct. Cl. 372 (1981)............................................................................34

*In re Delphi Fin. Grp. S'holder Litig.,*
   No. 7144-VCG, 2012 WL 729232 (Del. Ch. Mar. 6, 2012)..........................19

*De-Tom Enters., Inc. v. United States,*
   213 Ct. Cl. 362 (1977)............................................................................41

*Del-Rio Drilling Programs, Inc. v. United States,*
   146 F.3d 1358 (Fed. Cir. 1998) ................................................................44, 45

*Dolan v. City of Tigard,*
   512 U.S. 374 (1994) .........................................................................*passim*

*Dubroff v. Wren Holdings, LLC*,
   Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) .....16, 22, 23

*Eastport S.S. Corp. v. United States*,
   157 Ct. Cl. 802 (1962) ................................................................................................47

*El-Shifa Pharm. Indus. Co. v. United States*,
   378 F.3d 1346 (Fed. Cir. 2004) ................................................................................45

*Evans v. United States*,
   74 Fed. Cl. 554 (2006) ..............................................................................................38

*Feldman v. Cutaia*,
   951 A.2d 727 (Del. 2008) ..........................................................................................23

*Figueroa v. United States*,
   57 Fed. Cl. 488 (2003) .........................................................................................45, 47

*Gatz v. Ponsoldt*,
   925 A.2d 1265 (Del. 2007) ...................................................................16, 19, 22, 23

*Gentile v. Rossette*,
   906 A.2d 91 (Del. 2006) ........................................................................16, 22, 23

*Goss v. City of Little Rock*,
   151 F.3d 861 (8th Cir. 1998) ....................................................................................37

*Harris v. Carter*,
   582 A.2d 222 (Del. Ch. 1990) ..................................................................................28

*Hedrick v. United States*,
   No. 99-5022, 1999 WL 633432 (Fed. Cir. Aug. 19, 1999) ..........................................45

*Hudson Farms, Inc. v. McGrellis*,
   620 A.2d 215 (Del. 1993) ..........................................................................................18

*IMS Eng'rs-Architects, P.C. v. United States*,
   92 Fed. Cl. 52 (2010) ................................................................................................33

*In re Johnson & Johnson Deriv. Litig.*,
   No. 10-2033 (FLW), 2011 WL 4526040 (D.N.J. Sept. 29, 2011) ...............................28

*Janowsky v. United States*,
   133 F.3d 888 (Fed. Cir. 1998) .............................................................................31, 34

*Kahn v. Lynch Commc'n Sys.*,
   638 A.2d 1110 (Del. 1994) ........................................................................................26

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
  540 A.2d 726, 730 (Del. 1988) .................................................................................24

*Kaw Nation of Oklahoma v. United States*,
  -- Fed. Cl. --, No. 06-0934L, 2012 WL 639928, (Fed. Cl. Feb. 29, 2012).............14, 15

*Laudes Corp. v. United States*,
  86 Fed. Cl. 152 (2009)...............................................................................................13

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) ..................................................................................................39

*Lion Raisins, Inc. v. United States*,
  416 F.3d 1356 (Fed. Cir. 2005) .................................................................................46

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ................................................................................................42

*Mannatt v. United States*,
  48 Fed. Cl. 148 (2000)...............................................................................................45

*Mastrolia v. United States*,
  91 Fed. Cl. 369 (2010)...............................................................................................13

*Nollan v. Cal. Coastal Comm'n*,
  483 U.S. 825 (1987) ........................................................................................39, 42, 43

*Norman v. United States*,
  429 F.3d 1081 (Fed. Cir. 2005) .................................................................................46

*O'Bryan v. United States*,
  93 Fed. Cl. 57 (2010).................................................................................................47

*O'Connor v. Pierson*,
  426 F.3d 187 (2d Cir. 2005) ......................................................................................36

*Oliver v. Boston Univ.*,
  No. 16570-NC, 2006 WL 1064169 (Del. Ch. Apr. 14, 2006)......................................23

*Orman v. Cullman*,
  794 A.2d 5 (Del. Ch. 2002) .......................................................................................28

*Paramount Commc'ns Inc. v. QVC Network Inc.*,
  637 A.2d 34, 42 (Del. 1994).......................................................................................19

*Passamoquoddy Tribe v. United States*,
  82 Fed. Cl. 256 (2008)...............................................................................................14

*Penn Cent. Transp. Co. v. City of New York*,
　438 U.S. 104 (1978) ............................................................................................30

*Pennoni v. United States*,
　79 Fed. Cl. 552 (2007)........................................................................................46

*Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*,
　358 F.3d 694 (10th Cir. 2004) ...........................................................................38

*In re Primedia Inc. Deriv. Litig.*,
　910 A.2d 248 (Del. Ch. 2006) ............................................................................26

*Rales v. Blasband*,
　634 A.2d 927 (Del. 1993)....................................................................................25

*Rith Energy, Inc. v. United States*,
　247 F.3d 1355 (Fed. Cir. 2001) ....................................................................45, 46

*Ruckelshaus v. Monsanto Co.*,
　467 U.S. 986 (1984) ............................................................................................16

*Sellers v. Joseph Bancroft & Sons Co.*,
　2 A.2d 108 (Del. Ch. 1938) ................................................................................18

*SKF USA, Inc. v. U.S. Customs & Border Prot.*,
　556 F.3d 1337 (Fed. Cir. 2009) ..........................................................................25

*Stephens v. Albemarle*,
　No. 3:04-00081, 2005 WL 3533428 (W.D. Va. Dec. 22, 2005) ...................36

*SUFI Network Servs., Inc. v. United States*,
　No. 11–453C, 2012 WL 171908 (Fed. Cl. Jan. 17, 2012)............................13

*Suwanee S.S. Co. v. United States*,
　150 Ct. Cl. 331 (1960)........................................................................................51

*Tecon Eng'rs, Inc. v. United States*,
　343 F.2d 943 (Ct.Cl.1965), *cert. denied*, 382 U.S. 976 (1966) ..............14, 15

*Tohono O'odham v. United States*,
　131 S. Ct. 1723 (2011) ..................................................................................14, 15

*Tooley v. Donaldson, Luftkin & Jenrette, Inc.*,
　845 A.2d 1031 (Del. 2004)................................................................................23

*Town of Flower Mound v. Stafford Estates Ltd. P'ship*,
　135 S.W.3d 620 (Tex. 2004) ..............................................................................36

*Turntable Fishery & Moorage Corp. v. United States*,
    52 Fed. Cl. 256 (2002)................................................................................38

*United Keetoowah Band of Cherokee Indians v. United States*,
    86 Fed. Cl. 183 (2009)................................................................................15

*United States v. Scott*,
    450 F.3d 863 (9th Cir. 2006) ......................................................................36

*Vance v. Barrett*,
    345 F.3d 1083 (9th Cir. 2003) ....................................................................37

*Vignolo v. Miller*,
    120 F.3d 1075 (9th Cir. 1997) ....................................................................37

*VonFeldt v. Stifel Fin. Corp.*,
    714 A.2d 79 (Del. 1998)..............................................................................18

*Webster v. Doe*,
    486 U.S. 592 (1988) ....................................................................................25

*Yee v. City of Escondido*,
    503 U.S. 519 (1992) ....................................................................................38

## Constitutional Provisions

U.S. Const. amend. V. ......................................................................................30

## Federal Statutes

12 U.S.C. § 341 .........................................................................................47, 48

12 U.S.C. § 343 .....................................................................................*passim*

12 U.S.C. § 357 ..............................................................................................48

12 U.S.C. § 5223(d)(2)(F) ..............................................................................18

28 U.S.C. § 1500 ...............................................................................6, 14, 15

Emergency Relief and Construction Act of 1932
    Pub. L. No. 72-301, ch. 520, sec. 210, 47 Stat. 709 (1932) .........................50

National Bank Act of 1864,
    ch. 106, sec. 8, 13 Stat. 99 (1864) ..............................................................49

## State Statutes

Del. Code tit. 8, § 159 (2011) .........................................................................16

Del. Code tit. 8, § 242 ................................................................................................17, 18

## Rules

RCFC 23.1 .................................................................................................................25

## Other Authorities

18 Fed. Reserve Bulletin 473 (Aug. 1932) ........................................................50

22 Fed. Reserve Bulletin 71 (Feb. 1936) ...........................................................50

75 Cong. Rec. 15040 (July 11, 1932) ................................................................51

Bd. of Governors of the Fed. Reserve Sys.,
Fed. Reserve Bulletin (Mar. 1958) ...........................................................48

*Black's Law Dictionary* (8th ed. 2004) ...........................................................17

Howard B. Hackley, Bd. of Governors of the Fed. Reserve Sys.,
*Lending Functions of the Federal Reserve Banks* (May 1973) .....................41

Model Business Corporations Act,
Section 10.04(a)(4), (b) .............................................................................18

Restatement (Second) of Contracts § 176 ........................................................32

David Small & James Clouse, *The Limits the Federal Reserve Act Places on the
Monetary Policy Actions of the Federal Reserve*, 19 Ann. Rev. Banking L.
553 (2000) ...................................................................................................49

Plaintiff Starr International Company, Inc. ("Starr") respectfully opposes defendant United States' (the "Government") motion to dismiss the amended complaint.

## PRELIMINARY STATEMENT

This lawsuit seeks just compensation for the Government's taking of property from American International Group ("AIG") and its shareholders to effect a "backdoor bailout" of domestic and foreign financial institutions during the 2008 financial crisis. *First*, plaintiff brings a direct takings claim based on the Government's expropriation of the voting power and economic value associated with the shares of AIG Common Stock owned by plaintiff and the plaintiff class. *Second*, plaintiff separately advances derivative claims to recover just compensation for AIG property expropriated by the Government. The amended complaint also alleges that the Government's actions violated the Due Process Clause by exacting AIG Common Stock in excess of statutory and regulatory authority.

The Government in its motion asks the Court to immunize it as a matter of law and preclude scrutiny of the many fact issues presented, even though the Government engineered these violations of the rights of plaintiff, the plaintiff class, and AIG by engaging in (among others) the following actions:

- The Government extracted a massive voting and equity interest in AIG in return for a *loan*, and did so even though the loan was *already* admittedly fully secured and *already* subject to an extraordinarily high interest rate, and even though the transfer was based on a pre-existing, private-entity-created term sheet that the Government's own representative said was an attempt to "*steal the business*".

- Notwithstanding the Government's newly acquired voting control, anti-dilution protections under Delaware law forbade the Government from increasing the number of authorized common shares without a separate vote of common stockholders. The Government thus could not issue itself sufficient common shares to give it a majority of that class without such a

vote.  The Government evaded and nullified those shareholder protections through an improper reverse stock split.

- Based on this evasion of shareholder protections, the Government arranged to exchange its Series C Preferred Stock, for which it had paid only $500,000, for more than 562 million shares of AIG Common Stock worth $25 billion. The Government did not obtain a fairness opinion for this transaction even though it did obtain such opinions for its simultaneous exchanges of its Series E and F AIG Preferred Stock for AIG Common Stock.

- The Government transferred $32.5 billion of company assets to bail out AIG counterparties through the purchase of securities that were worth far less at the time than the par value paid, and the Government claimed a two-thirds interest in any profits from those transactions without first reimbursing AIG for *any* of its $32.5 billion in forfeited collateral.

- The Government could have simply guaranteed those same obligations, a measure the Government does not even try to argue was unavailable as a matter of law.  A guarantee would have avoided the need for the collateral posting that created much of AIG's liquidity pressure and would have fully protected any legitimate interest of the counterparties.  But it would not have permitted the Government to use AIG assets to subsidize those private counterparties, nor would it have given the Government the same pretext for "stealing the business".

These unprecedented actions represented an extraordinary exercise of governmental power and stood in stark contrast to the Government's far more favorable treatment of similarly situated entities.  In no other instance did the Government: (1) demand a controlling stake in the company in exchange for any form of aid, let alone for a loan at an already high rate of interest that the Government admits was fully secured; (2) use the assets of one company to bail out other companies; or (3) violate basic shareholder protections to acquire substantial shareholder equity.  Other companies (including ones that took at least as much, if not more, risk and that had less security to offer) received guarantees or loans at far more favorable interest rates, either of which would have addressed AIG's liquidity problems without the massive wealth transfers mandated by the Government.  These forms of disparate treatment demonstrate the

alternatives available and thus further confirm that the Government demanded disproportionate consideration in violation of the Takings Clause.

In addition to the Government's many other fact-specific arguments, such as its disputed assertion that it has merely required AIG to bear the burdens that AIG created, see *infra* Section VII, the Government asserts that its actions should be insulated from scrutiny at this early stage because they were "voluntarily" accepted. The Government is not correct. *First*, this argument fails entirely to account for the fact that AIG's common shareholders' consent was required to effect the massive dilution of their shares that occurred, and the Government-engineered reverse stock split bypassed the only mechanism by which the common shareholders could have consented. *Second*, with respect to the forced transfer of $32.5 billion of AIG assets to serve its "backdoor bailout", the Government's motion does no more than question the allegations, while simultaneously asking the Court to preclude all fact development. *Third*, with respect to the 2008 Credit Agreement, the Government ignores the allegations in the amended complaint that it coerced the Board by preventing it from making an informed decision on which alternatives were better for AIG's shareholders. For example, the Government prevented the Board from obtaining the same liquidity assistance that the Government provided to similarly situated parties and then forced the Board to choose between terms that the Board (and the Government) believed were outrageous or personal responsibility for disrupting the world economy. As the amended complaint alleges, the Government *had* to do everything it could to exert maximum pressure because it was seeking to compel an arrangement that its own representative stated amounted to "stealing the business".

Moreover, the Government's "voluntariness" argument is simply *legally irrelevant* as applied to the 2008 Credit Agreement.  The unconstitutional conditions doctrine prohibits the Government from attaching disproportionate conditions to discretionary government benefits to achieve indirectly what it cannot achieve directly in a manner consistent with the Constitution.  This doctrine applies, and indeed is specifically designed to apply, even assuming that the victim "freely" accepts the deal.  In this case, the Government's expropriation of $25 billion in stock is grossly disproportionate to the discretionary benefit at issue: a high-interest, fully secured loan.

The Government's efforts to shut down further factual development at this early stage overlook the allegations in the amended complaint.  Such efforts should fail in any case, but are especially inappropriate (and thus should be rejected) under Takings Clause jurisprudence, which emphasizes the need for fact-specific inquiries.  The Takings Clause jurisprudence does so, in part, to ensure that constitutional principles can be enforced even when unprecedented, and indeed unique, circumstances arise.  Indeed, Judge Hodges' opinion in *Colonial Chevrolet Co.*, *Inc. v. United States*, No. 10-647C, 2012 WL 668593 (Fed. Cl. Feb. 27, 2012), reconfirms the fact-specific nature of the takings inquiry; it was on that basis that the Court denied the Government's motion to dismiss a financial crisis takings claim in which the Government made arguments similar in key respects to those it advances here.

Further, although it does not challenge AIG's property interest in the stock taken or the over $32 billion in collateral that the Government forced AIG to forfeit, the Government errs in arguing that Starr lacks standing to bring its direct takings claim and, relatedly, that Starr has no property interest in the voting power and equity taken.  Starr

4

does not allege that the Government took its physical shares of common stock; Starr alleges that the Government engineered a transaction that accomplished precisely the same result in economic substance. As discussed further below, Delaware law and well understood attributes of stock ownership establish the common shareholders' property interests in their rights and equity. Delaware law recognizes a direct claim where, as here, a party with control over a corporation forces the transfer of equity to itself.

In addition, when it contends that this Court generally lacks jurisdiction over Starr's due process claim, the Government overlooks the well established exception for claims that seek the return of property or its monetary value acquired by the Government pursuant to a mistaken assertion of statutory authority. The Government's due process argument fails to account for the allegations in the amended complaint that the statutory authority invoked by the Government – Section 13(3) – does not provide a basis for the Government to demand a controlling stake in AIG.

The Government's additional technical objections likewise fail. The Government's jurisdictional argument concerning the timing of filings is one that this Court has already expressly and repeatedly rejected. Further, when it argues that a demand on AIG's Board to sue the Government for the taking would not have been futile, the Government overlooks, among other things, not just that it is the company's controlling shareholder, but also that the Board was appointed based on the Government trustees' judgment that *it would not take actions contrary to the interests of the U.S. Treasury*. In sum, there is no basis for dismissing this case at this preliminary stage, and the Government's motion should be denied.

## QUESTIONS PRESENTED

1.     Whether 28 U.S.C. § 1500 bars this Court from exercising jurisdiction over this action when no related action was pending in any other court when it was filed.

2.     Whether Starr and similarly situated common stock shareholders have standing to bring a direct takings claim based on the Government's expropriation of their voting power and a substantial portion of their equity interest in AIG.

3.     Whether the amended complaint establishes a "reasonable doubt" as to the AIG Board's ability to independently consider a demand to file a multi-billion dollar lawsuit against the United States, when specific allegations establish that (i) the Government controls AIG and (ii) the AIG Board was selected based on the Government trustees' judgment that the Board would never act contrary to the interests of the U.S. Treasury and elected by the defendant, AIG's controlling shareholder.

4.     Whether the amended complaint states a takings claim based on (a) the Government's acquisition of AIG Series C Preferred Stock, accompanied by a nearly 80 percent voting interest, as additional consideration for a loan for which sufficient consideration had admittedly been provided; (b) the government-engineered reverse stock split; (c) the resulting exchange of the Series C Preferred Stock for over 562 million shares in AIG; and/or (d) the availability of a guarantee mechanism that would have obviated the need for much of the secured loan.

5.     Whether the amended complaint states a claim under the Due Process Clause based on the allegations that the Government lacked statutory authority to condition a fully secured loan on the receipt of stock in a private company or on any other disproportionate consideration.

6.     Whether the amended complaint states a derivative takings claim based on the transfer, accomplished while the Government controlled the company, of $32.5 billion in AIG property to AIG counterparties in order to serve governmental purposes unrelated to the best interests of AIG and/or its shareholders.

## STATEMENT OF THE CASE

### I.     Nature of The Case

Plaintiff brings this action to recover for the Government's violations of the Takings and Due Process Clauses of the United States Constitution arising from its actions concerning AIG during the 2008 global financial crisis.[1]  The amended complaint alleges that the Government expropriated most of the common stockholders' voting power and equity for virtually nothing and used its control over the corporation to circumvent key shareholder protections and force AIG and its shareholders to bear a disproportionate burden of the costs of bailing out financial institutions other than AIG. (Am. Compl. ¶¶ 168-83.)

### II.     Statement of Facts[2]

In 2008, AIG was the world's leading international insurance organization, with an extensive, diverse set of high-quality assets that were more than sufficient to meet any claimed contractual obligations.  (*Id.* ¶¶ 3, 22, 38.)  However, these assets were by nature, and for reasons unrelated to the financial crisis, relatively illiquid.  (*Id.* ¶ 38.)  As a result, AIG was imperiled during the financial crisis by a severe lack of required liquidity.  (*Id.* ¶ 1.)

---

[1]  *See also infra* n. 21 (discussing the relevance of the Equal Protection Clause).

[2]  The relevant facts are alleged in the amended complaint in full detail.  Plaintiff focuses herein on the key allegations that the Government's brief did not address.

By the end of the summer of 2008, the urgency of AIG's liquidity crisis was apparent.  (*Id.* ¶ 40.)  However, the Government refused to provide aid to AIG that it provided to similarly situated institutions and demanded more from AIG than was demanded from any other institution, including an interest rate far higher than those provided to investment banks facing similar liquidity problems.  (*Id.* ¶¶ 42-49.)  As a result, AIG's liquidity problems rapidly worsened.  (*Id.* ¶¶ 42-49, 53, 58(a).)

The Government's refusal was coercive and seemingly irrational when viewed from the perspective of AIG's needs.[3]  The Government refused to guarantee AIG's obligations in the same way that it guaranteed Citigroup's assets, despite the fact that those guarantees were for low-quality assets that Citigroup had decided to self-insure, and created at least as much, if not far more, exposure for the Government than a similar guarantee for AIG would have created.  (*Id.* ¶¶ 48, 56(a), 56(c), 116-17.)  Guaranteeing AIG's assets would have solved AIG's liquidity problem by preventing further collateral calls and releasing collateral already posted for other uses – in addition to being far less costly to taxpayers than the terms the Government ultimately imposed.  (*Id.* ¶¶ 53, 56(a).)  The Government's rejection of such alternatives, and its refusal to reconsider them after coercing AIG into approving the original agreement, reflected the Government's policy of protecting other financial institutions from their liquidity problems or risky behavior at the expense of AIG and its shareholders.  (*Id.* ¶ 56(c).)

After considerable delay, the Government made unprecedented demands in connection with its proposed loan.  Specifically, the extension of credit to AIG was

---

[3]  As discussed *infra* in pages 12-13 and 20-21, the Government's actions were rational only when viewed in light of its motivation to use AIG as a vehicle to fund a covert backdoor bailout of numerous other financial institutions.

conditioned on (i) the loan being secured by all assets of AIG; (ii) payment by AIG of interest and costs at an initial rate of 14.5 percent; and (iii) the Government's acquisition of a right to a nearly 80 percent voting interest and nearly 80 percent of the company's equity. (*Id.* ¶ 55(a).) The terms of this offer originated from a private-sector proposal that the Government adopted without any independent analysis, and which its own representative had earlier described as an effort to "steal the business". (*Id.* ¶ 53.) Left with no other choice after the Government instructed it to "undo" any efforts to find an alternative solution, and faced with the prospect of being blamed for causing a public catastrophe if it did not accept the Government's purportedly "non-negotiable" demands, the Board was forced to accept the Government's terms on September 16, 2008. (*Id*. ¶¶ 55, 58(a).) The Government continued to control AIG through its unilaterally appointed CEO and began to sell off valuable assets, including two insurance companies, often at fire-sale prices that severely damaged AIG's ongoing businesses. (*Id.* ¶¶ 59-62.)

On September 22, 2008, the Government's handpicked CEO executed a Credit Agreement between AIG and the Federal Reserve Bank of New York ("FRBNY"). The Credit Agreement required AIG to issue to a trust, held for the benefit of the U.S. Treasury, shares of "Series C Preferred Stock" that carried a 79.9 percent voting interest and were convertible into just under 80 percent of AIG's Common Stock (subject to a requirement of shareholder consent that the Government would ultimately disregard). (*Id.* ¶¶ 63-66.) The Government paid only $500,000 for the Series C Preferred Stock. (*Id.* ¶ 67.) The Series C Preferred Stock also was unrelated to repayment of the $85 billion loan; under the terms of the Credit Agreement, the Government would retain that

stock or any common stock into which it was converted, even when AIG repaid the loan in full.  (*Id.* ¶ 78.)

A.      **The Government's Acquisition of Voting Power and 562,868,096 AIG Common Shares**

Pursuant to the Credit Agreement, AIG issued the Series C Preferred Stock to the trust on March 1, 2009.  (*Id.* ¶ 91.)  As a result, the Government automatically acquired a voting power equivalent to an approximately 80 percent interest in AIG, at the expense of the relative voting power of the existing AIG common stockholders.  (*Id.* ¶ 73.)  The Credit Agreement required AIG to call a shareholder meeting "as soon as practicable" to vote on, among other things, "(i) amendments to AIG's certificate of incorporation to (a) reduce the par value of AIG's common stock", "(b) increase the number of authorized shares of common stock to 19 billion, and (ii) any other measures deemed by the NY Fed to be necessary for the conversion of" the Series C shares.  (*Id.* ¶ 83.)

Further, as detailed in the amended complaint, Delaware law required approval by AIG's existing shareholders of common stock before the Government could receive its nearly 80 percent stake in AIG because AIG's then-governing Restated Certificate of Incorporation did not authorize a sufficient number of shares of Common Stock to permit the Government to convert or exchange its Series C Preferred Stock into a 79.9 percent common stock interest in the company.  (*Id.* ¶ 80.)  Nevertheless, the Government circumvented this requirement through a deceptive 20:1 reverse stock split.  (*Id.* ¶¶ 79-99.)  The reverse stock split reduced the nearly three billion shares of issued common stock by 95 percent to approximately 150 million, while leaving the number of overall authorized shares at five billion.  (*Id.* ¶¶ 83-92, 97-99.)  Through this scheme, the Government created sufficient "room" to exchange its Series C Preferred Stock for AIG

Common Shares.  The Government also ensured that the reverse stock split would be coercive for those who understood its implications.  Applying the reverse stock split only to issued shares, and not to authorized but unissued shares, did not further any legitimate purpose beyond what a reverse stock split that applied to both issued and authorized shares could have accomplished.  However, this approach meant that even those shareholders who were aware that the reverse stock split could enable the Government takeover of the connection to the Government's takeover would nevertheless have been coerced into voting for the proposal based on the need to raise share price to avoid delisting, among other reasons.  (*Id.* ¶¶ 79-99.)  As to those who did not understand its implications, the proxy statement misleadingly stated that AIG "has no plans for these authorized but unissued shares of common stock".  (Am. Compl. ¶ 98); *see also* American International Group, Inc., Proxy Statement (Schedule 14A) (June 5, 2009), *available at* http://www.sec.gov/Archives/ edgar/data/5272/000093041309003116/ c57286_def14a.htmat at 65-66.

Thus, on January 14, 2011, the Government exchanged its Series C Preferred Stock, together with preferred shares obtained pursuant to the Government's Troubled Asset Relief Program (Series E and F Preferred Stock), for a 92.1 percent stake in AIG Common Stock (or 1,655,037,962 common shares).  (*Id.* ¶ 100.)  562,868,096 of these shares (nearly four times the number held by common stockholders after the government-engineered reverse stock split), were exchanged for the Series C Preferred Stock, for which the Government had paid virtually nothing.  In contrast, the Government acquired the 1,092,169,866 AIG Common Shares it received for the Series E and F Preferred Stock (for which it had paid approximately $49 billion) through an exchange at the

11

market price ($45.25 per share).  (*Id.* ¶ 101(c).)  Unsurprisingly, in light of the unfairness

of the original deal and the Series C exchange, while the Government received fairness

opinions for the Series E and F exchange, it did not for the Series C exchange.[4]  (*Id.* ¶

101(b).)  In addition, upon the closing of the Recapitalization Plan, the Government

inexplicably obtained nearly 11 million more shares of AIG Common Stock, with a

market value of approximately $500 million, than would have been due even under the

Credit Agreement.  (*Id.* ¶ 101.)

> **B.    The Maiden Lane III Transaction**

In the fall of 2008, the Government separately established a special purpose

vehicle, designated Maiden Lane III ("ML III"),[5] which it used to funnel AIG funds and

assets to AIG's CDS counterparties, literally turning away concessions and instead

paying par value for these counterparties' collateralized debt obligations ("CDOs").  (*Id.*

¶¶ 109-16, 127.)  As a result of the settlements negotiated by the Government, the

counterparties kept approximately $32.5 billion in cash collateral previously posted by

AIG.  The only beneficiaries of this arrangement were the counterparties, who received

full credit protection as if all of the instruments insured by the CDSs defaulted, as well as

a waiver and release of any claims (known or unknown) AIG had relating to the issuance

---

[4] It is not yet known whether the Government – in light of the unfairness of the Series C exchange – failed to seek such an opinion or whether the investment banks that gave the Series E and F opinions refused to opine that the Series C exchange, unlike the Series E and F exchanges, was "fair."

[5] The Government posits that "[d]espite the $85 billion credit facility, AIG faced liquidity problems from its obligations under certain swap agreements" and that the purpose of ML III was to "resolve this liquidity crisis."  Def. Mot. at 9.  The cited paragraph in the amended complaint, however, alleges only that ML III was created "ostensibly to resolve AIG's obligations to CDS counterparties."  (Am. Compl. ¶ 110.)  The Government's factual assertions are inappropriate in a motion to dismiss, including because, as alleged, a guarantee would have eliminated the collateral obligations.

of those securities.  (*Id.* ¶¶ 123, 128, 130.)  The Government also appropriated a

disproportionately high share of the "residual interests" – *i.e.*, the proceeds from the

underlying CDOs (either through payment of the principal and interest from the retained

CDOs or through their liquidation) that remained after the parties' equity contributions

were paid back.  (*Id.* ¶¶ 118-121.)  None of the residual interests received by the

Government reduced AIG's debt, and no portion of the interests went to compensate AIG

for the loss of more than $32.5 billion in previously posted cash collateral.  (*Id.*)  The

Government thus appropriated AIG assets to engineer a windfall for the counterparties

when it could have addressed their legitimate interests without such a windfall and when,

if it wished to confer such a benefit, it could have done so directly and endeavored to

justify that action publicly.

## ARGUMENT

### I.      Standards of Review

When considering a motion to dismiss for lack of subject matter jurisdiction, the

court must accept as true the undisputed allegations in the complaint and draw all

reasonable inferences for the plaintiff.  *Laudes Corp. v. United States*, 86 Fed. Cl. 152,

159 (2009).  The plaintiff "need only make a *prima facie* showing of jurisdictional facts

in order to survive a motion to dismiss."  *Mastrolia v. United States*, 91 Fed. Cl. 369, 376

(2010).  Unless "it appears beyond a doubt that the plaintiff can prove no set of facts in

support of its claim that would entitle plaintiff to relief", the motion should be denied.  *Id.*

In reviewing a motion to dismiss for failure to state a claim, the Court "'must

accept all well-pleaded factual allegations as true and draw all reasonable inferences'" in

the plaintiff's favor.  *SUFI Network Servs., Inc. v. United States*, No. 11–453C, 2012 WL

171908, at *3 (Fed. Cl. Jan. 17, 2012) (quoting *Boyle v. United States,* 200 F.3d 1369,

1372 (Fed. Cir. 2000)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. The "burden of moving forward" on such a motion is "minimal." *Colonial Chevrolet*, 2012 WL 668593, at *3.

## II.     Based on Well Established Precedent, 28 U.S.C. § 1500 Does Not Deprive This Court of Jurisdiction over the Action.

In arguing that 28 U.S.C. § 1500 bars this Court's jurisdiction, the Government relies entirely on mere *dicta* in a single case asserting that same-day filings are *per se* pending under Section 1500. *See* Def. Mot. at 12-14 (relying on *Passamoquoddy Tribe v. United States*, 82 Fed. Cl. 256 (2008)); *see also Berry v. United States*, 86 Fed. Cl. 24, 28 (2009) (*Passamaquoddy*'s "*per se* bright-line pending rule was not necessary to the ultimate result in the case and can be read as mere dicta"). *Passamoquoddy Tribe* is the *only* case ever to have adopted a *per se* same-day filing rule, while a "fleet" of decisions "flatly reject" the rule. *Kaw Nation of Oklahoma v. United States*, -- Fed. Cl. --, No. 06-0934L, 2012 WL 639928, at *17 (Fed. Cl. Feb. 29, 2012). *Every other court* to consider the issue has *held* that it must apply the "order-of-filing rule," which states that a later-filed district court suit does not deprive this Court of jurisdiction to hear a prior-filed lawsuit, whether the suits were filed days or merely hours apart. *See Tecon Eng'rs, Inc. v. United States*, 170 Ct. Cl. 389 (1965), *cert. denied*, 382 U.S. 976 (1966).

Indeed, after an extensive review of the statutory language and cases interpreting Section 1500, this Court itself explicitly rejected *Passamoquoddy Tribe*'s same-day filing

rule and upheld *Tecon*'s order-of-filing rule.  *See United Keetoowah Band of Cherokee Indians in Oklahoma v. United States*, 86 Fed. Cl. 183, 185 (2009) (Wheeler, J.) (the "Court concludes that time of filing is relevant to whether a claim is pending in another court and rejects Defendant's *per se* rule").  The Government urges this Court to depart from its considered opinion based on *Tohono O'odham v. United States*, 131 S. Ct. 1723 (2011).[6]  *See* Def. Mot. at 13-14.  However, *Tohono* "unambiguously stated that '[t]he *Tecon* holding is not presented in this case because the [Court of Federal Claims] action here was filed after the District Court suit.'"  *Kaw Nation*, 2012 WL 639928, at *3 (quoting *Tohono*, 131 S. Ct. at 1729-30) (brackets in original).  Thus, "*Tecon* remains good law, even after *Tohono*, and, therefore controls this case."  *See id.* at *5.

While the order of filing of the two complaints alone precludes the Government's argument, it is worth noting that this argument also depends on the same issue of fact that justified the filing of two complaints in the first place: whether FRBNY, the defendant in the Southern District of New York, was "acting or professing to act, directly or indirectly under the authority of the United States."  28 U.S.C. § 1500.  The Government, which has not taken a position on that issue, may not *both* reserve the right to contend that FRBNY acted as an *independent* entity *and* argue that the two lawsuits are against the *same* entity.

III.  **Starr Has Adequately Alleged Cognizable Property Interests That Are Protected by the Fifth Amendment's Takings Clause.**

While the Government's motion does not dispute that AIG has a property interest in the stock taken by the Government, as alleged in Starr's derivative takings claim, the

---

[6] The logical stopping point of the Government's arguments concerning *Tohono* is not simply resurrection of *Passamaquoddy Tribe*'s *per se* same-day filing rule, but a complete overruling of the *Tecon* order-of-filing rule.  As *Kaw Nation* persuasively reasons, such a reversal is unwarranted.  *Kaw Nation*, 2012 WL 639928, at *2-3.

Government argues that Starr fails to state a direct takings claim because Starr has no cognizable property interest in the equity and voting power inherent in its shares of AIG Common Stock.  The Government further argues that Starr's derivative takings claim based on the ML III transaction fails because AIG has no interest in the property taken. As shown below, the Government's arguments fail.

### A. Starr Has a Cognizable Property Interest in the Equity and Voting Power Inherent in Its Shares of AIG Common Stock.

The Government incorrectly asserts that Starr did not lose a property interest as a result of the Government's actions because Starr's rights in AIG common stock are "intact".  Def. Mot. at 36.  The Supreme Court has established that cognizable property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (internal quotations omitted).[7]  Although the Government acknowledges that state law, among other sources, defines cognizable property interests, *see* Def. Mot. at 36, the Government ignores settled Delaware law that protects against "expropriation" of the "economic value and voting power" of public shareholders' stock through the exercise of a party's control.  *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1281 (Del. 2007); *see also Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006); *Dubroff v. Wren Holdings, LLC*, Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175, at *8 (Del. Ch. Oct. 28, 2011).  *See also infra* at 17-20, 21-23.

---

[7]  Thus, for example, various intangible interests, including trade secrets, materialmen's and real estate liens, and valid contracts, are cognizable property interests under the Takings Clause.  *Ruckelshaus*, 467 U.S. at 1003.  Stock has the same characteristics that led the Supreme Court in *Ruckelshaus* to conclude that trade secrets are cognizable property interests.

These cases provide one illustration of, and thereby reinforce, the more general understanding that stock is not a mere "expectancy" interest, as the Government claims, nor is stock simply a piece of paper.  Rather, stock is an instrument representing "an equity or ownership interest in the corporation," accompanied here by a set of legally protected voting and other rights.  *See Black's Law Dictionary* 1408 (8th ed. 2004); *id.* at 1456 (defining stock as a "proportional part of a corporation's capital represented by the number of equal units (or shares) owned"); *see also* Del. Code tit. 8, § 159 ("The shares of stock in every corporation shall be deemed personal property and transferable").

Indeed, what happened here is no different in effect than if the Government *had* required Starr and similarly situated shareholders physically to hand over most of their stock certificates directly to the Government.  If a shareholder owns all 100 shares of a company, the Government effects the same uncompensated taking of that shareholder's property regardless of whether it (a) requires the shareholder to convey 50 of those shares directly to the Government for no compensation, or (b) engineers a 2:1 reverse stock split reducing the shareholder's 100 shares to 50 shares (leaving 50 authorized but unissued shares) and forces the 50 newly available shares to be issued to itself for no consideration.  In either case, regardless of the corporation's value at any point, the Government has appropriated half of the shareholder's property without compensation.

Moreover, the Government's assertion that Starr did not have the "right to exclude others from entering the pool of AIG Common Stock", Def. Mot. at 37, overlooks, among other things, established legal protections provided by Delaware law against the dilution of shareholder interests or other changes to the powers and preferences of existing shareholders without their consent.  The Government does not –

and cannot – deny that it acquired the equity interests of AIG shareholders by circumventing these protections. Under Del. Code tit. 8, § 242(b)(2), AIG's shareholders were "entitled to vote as a class upon a proposed amendment" that would, among other things, "increase or decrease the aggregate number of authorized shares of such class". *See Sellers v. Joseph Bancroft & Sons Co.*, 2 A.2d 108, 112-13 (Del. Ch. 1938) (recognizing that this provision and similar corporation charter provisions protect the right of classes to vote collectively, rather than simply protecting the individual voting power of each share). In this way, the law enables shareholders to protect themselves from dilution and redistribution of their equity.[8] The Government circumvented this requirement through a reverse stock split on which AIG's common shareholders were neither permitted to vote separately and which would have been inherently coercive for

---

[8] Two other sources demonstrate the general understanding that reverse stock splits are not appropriately used to circumvent the requirement of a separate class vote to increase the number of authorized shares. *First*, the Model Business Corporations Act § 10.04(a)(4), (b) (2010) requires that reverse stock splits be subject to a separate class vote of the holders of the outstanding stock of a class where, as here, a corporation has more than one class or series of stock. *Id.*, *available at* http://www.americanbar.org/content /dam/aba/administrative/business_law /2011_corporatelaws_mbca_w-o-comments.authcheckdam.doc. The Supreme Court of Delaware has held that it is appropriate to turn to such sources to construe ambiguous statutes on the same subject. *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 85 n.26 (Del. 1998) (relying on MBCA in interpreting a Delaware statute); *Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218 (Del. 1993) ("preexisting law and similar statutes from other jurisdictions", including the Model Business Corporations Act, "which deal with comparable situations can be used as extrinsic aids in construing the legislature's intent").

*Second*, Congress in the Emergency Economic Stabilization Act ("EESA"), which authorized the Troubled Asset Relief Program ("TARP"), provided that the Government was to respect, not circumvent, the refusal of shareholders to approve an increase in the number of authorized shares. *See* 12 U.S.C. § 5223(d)(2)(F) ("Should the financial institution not have sufficient authorized shares, including preferred shares that may carry dividend rights equal to a multiple number of common shares, the Secretary may, to the extent necessary, accept a senior debt note in an amount, and on such terms as will compensate the Secretary with equivalent value, in the event that a sufficient shareholder vote to authorize the necessary additional shares cannot be obtained").

such shareholders even if a separate class vote had been permitted.[9]   (Am. Compl. ¶¶ 98-101.)

Delaware law prohibits the use of stratagems that are designed (as this one was) to deprive shareholders of their voting rights.[10]   Moreover, as noted below, a complementary line of Delaware cases holds that a party may not exercise its control to increase its interest at the expense of the minority.  *See*, *e.g.*, *Gatz*, 925 A.2d 1265 (upholding direct claim for breach of fiduciary duty against a controlling shareholder who used his control to increase his share of the corporation and then sell the shares to a third

---

[9]   As stated above, the reverse stock split applied only to issued shares, and not to authorized but unissued shares.  That did not further any legitimate purpose beyond what a reverse stock split that applied to both issued and authorized shares could have accomplished.  Limiting the reverse stock split only to issued shares meant that even if a class vote had been held, shareholders not misled by the proxy materials would nevertheless have been coerced into voting for the dilution of their own shares by the Government's exploitation of the threat of delisting and other reasons to increase share price that the Government misleadingly identified in the proxy statement as "the primary purpose" of the split; at the same time, the Government misleadingly stated that AIG "has no plans for these authorized but unissued shares of common stock").  *See In re Delphi Fin. Grp. S'holder Litig.*, No. 7144-VCG, 2012 WL 729232 (Del. Ch. Mar. 6, 2012) (recognizing that that it was coercive to tie a shareholder vote on a desirable merger to a vote to amend the corporate charter to permit the owner to receive a control premium); (Am. Compl. ¶ 98); *see also* American International Group, Inc., Proxy Statement (Schedule 14A) (June 5, 2009), *available at* http://www.sec.gov/Archives/edgar/data/5272/000093041309003116/c57286_def14a.htmat at 65-66..

[10]   As the Delaware Supreme Court held in *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994),

> Under the statutory framework of the General Corporation Law, many of the most fundamental corporate changes can be implemented only if they are approved by a majority vote of the stockholders. Such actions include elections of directors, amendments to the certificate of incorporation, mergers, consolidations, sales of all or substantially all of the assets of the corporation, and dissolution. 8 Del.C. §§ 211, 242, 251–258, 263, 271, 275.  Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights.

*See also id*. at 45 (recognizing "the traditional concern of Delaware courts for actions which impair or impede stockholder voting rights").

party).  There could be no clearer example of such self-dealing than a stockholder with majority voting rights – or controlling influence of any kind – to use that control to obtain a majority equity interest in violation of the minority's voting rights.

Finally, even apart from the express statutory protections that were circumvented, the Government still cannot establish that AIG shareholders lacked a property interest in the equity and voting rights inherent in their shares of AIG Common Stock.  Stock can only be issued by a Board elected by shareholders to act in their best interests according to the Board's independent judgment.  The cases cited by the Government at pages 37-38 of its brief that find no property interest based on the lack of a right to exclude govern situations where the scope of the property interest was within the control of the *Government*, not an independent corporate Board.  Thus, in addition to the specific voting rights that Delaware law grants to shareholders to protect their interests, stockholders had a legitimate right (and certainly an investment-backed expectation) to expect under any circumstances that the Board's decisions would be made through established corporate procedures as a result of its independent judgment – not due to unconstitutional conditions, coercion, Government control, or an illegal exaction.

### B.    AIG Has a Property Interest in Its Contribution to Maiden Lane III.

In asserting that plaintiff has failed to point to a property interest that was taken as a result of the Maiden Lane III transaction, the Government focuses on the wrong property interest.  *See* Def. Mot. at 38-40.  The property that was taken without just compensation in connection with Maiden Lane III was the $32.5 billion in collateral provided by AIG prior to the transactions at issue that the Government used its control over the company to force AIG to forfeit in its entirety.  The residual interest split further

reflects the absence of just compensation for what AIG was forced to relinquish in order to serve the Government's goal of achieving a "backdoor bailout."

The Government does not and cannot deny that the $32.5 billion represents a cognizable property interest. (Am. Compl. ¶¶ 113-117.) The authority cited by the Government related to statutory obligations to pay money specifically distinguishes between such obligations and "specific funds," which constitute "legitimate property interests." *See Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004) (cited in Def. Mot. at 39). Given the Government's control over AIG, see *infra* at 26-29, arguments as to what AIG received for forfeiting its collateral relate not to the existence of a property interest or taking, but rather to the issue of just compensation, including given the available guarantee option. (*See* Am. Compl. ¶¶ 46-48.)

## IV.    **Starr Has Standing to Assert Both Direct and Derivative Claims.**

### A.    **Under Settled Principles of Delaware Law, Starr Has Standing to Assert A Direct Takings Claim for the Government's Expropriation of Its Legally Protected Property Interests.**

The Government argues that Starr lacks standing to bring its direct takings claim because it does not allege that it owned either the 562,868,096 shares of AIG Common Stock the Government ultimately received in exchange for its Series C Preferred Stock, or the funds used in the backdoor bailout of AIG's CDO counterparties. Def. Mot. at 16. The Government also asserts that only "AIG is the proper plaintiff" to claim that Starr's "stake in AIG was diluted as a result of the shares issued by AIG to the Government". Def. Mot. at 17. Neither assertion is correct.

Delaware law is clear that minority public shareholders have the legal right to advance direct claims where, as here, there has been "an improper transfer – or expropriation – of economic value and voting power from the public shareholders to the

majority or controlling stockholder." *See Gentile*, 906 A.2d at 100; *Gatz*, 925 A.2d at 1281 (when a claim is based on the exercise of "control over the corporate machinery to cause an expropriation of economic value and voting power from the public shareholders," "a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action"); *Dubroff*, 2011 WL 5137175, at *8.

Indeed, not only did the Government use its power at the outset to secure the Credit Agreement, but the Government deliberately structured the transaction – again, at the outset – so that it would first gain controlling shareholder status and then use that status to vote on the issuance of common shares to itself.  (Am. Compl. ¶¶ 4, 6, 7, 58-59, 63-73, 100-01.)  Thus, from the very start there was an express "agreement" to engage in precisely the kind of conduct that Delaware law creates direct claims to constrain and remedy.  Moreover, that same agreement expressly contemplated action that Delaware shareholder protections forbade, and in fact the Government used its controlling shareholder status to circumvent that Delaware law.  (*Id.* ¶¶ 7, 8, 79-86.)  Indeed, as AIG itself thereafter acknowledged before a Delaware court, that law protected the direct interests of the existing common shareholders (including Starr and the Class) by allowing them *alone* to vote on the increase in authorized common shares.  The reverse stock split affected *only* the issued shares of existing common shareholders like Starr, not the total number of authorized shares, and thereby allowed the Government to appropriate most of Starr's equity (and that of the public shareholders generally) in the corporation.  (*Id.* ¶ 98.)  This consequence was not disclosed in the proxy materials relating to the reverse stock split and was coercive.  (*Id.*)  *See supra* n. 9.  Further, as the controlling shareholder

of AIG, the Government caused AIG to issue "excessive" shares of stock to itself (over half a billion common shares, including an extra 11 million shares apparently issued for free) in exchange "for assets of the controlling stockholder that have a lesser value" (the Series C Preferred Stock). *See Gatz*, 925 A.2d at 1278. (*See also* Am. Compl. ¶¶ 100-01.)

In short, just as in *Gatz*, the economic and voting interests owned by Starr and the other minority shareholders were uniquely affected by the Government's actions, and thus, just as in *Gatz*, Starr and the other minority shareholders have a direct claim against the controlling entity – *i.e.*, the Government. *See Gatz*, 925 A.2d at 1281; *Dubroff*, 2011 WL 5137175, at *8 ("A corporation's minority shareholders should not be denied a direct equity dilution claim where a controller expropriates, from them, a large percentage of the corporation's equity.").[11]

B.     **The Amended Complaint Adequately Pleads Demand Futility With Respect to Starr's Derivative Claims.**

The Government also moves to dismiss Starr's derivative claims for failure adequately to plead either that it made a demand on AIG's Board or that demand is

---

[11]  The Government's cases do not apply because they do not involve an improper transfer of economic value and voting power to an entity exercising control at the expense of minority stockholders such as occurred in this case. Indeed, as the court in *Gentile* noted, the fact that minority shareholders have direct claims in such circumstances "fits comfortably within the analytical framework mandated by" *Tooley v. Donaldson, Luftkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), because the minority shareholders suffered injury that was independent of the corporation's injury. *See Gentile*, 906 A.2d at 102-03. In fact, the Courts in *Feldman v. Cutaia*, 951 A.2d 727 (Del. 2008), and *Carfagno ex rel. Centerline Holding Co. v. Schnitzer*, 591 F. Supp. 2d 630 (S.D.N.Y. 2008), held that *Gentile* did not apply because, unlike here and but as in *Gentile*, there was exercise of control. *See Carfagno*, 591 F. Supp. 2d at 635-36; *Feldman*, 951 A.2d at 732 & n. 26. Finally, *Oliver v. Boston Univ.*, No. 16570-NC, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006), an unpublished case decided before *Gentile*, actually supports Starr's arguments because it applied *Tooley* to hold that claims involving a dilution of voting power can be brought directly.

excused in accordance with Rule 23.1 of the Rules of the United States Federal Court of Claims.  Def. Mot. at 18-23.  As an initial matter, Starr agrees with AIG that the Court should defer its ruling on whether demand was excused.[12]

Delaware precedent relied on by the Government establishes that, whatever position the corporation ultimately takes, the Government will no longer have any role to play in asserting the defense.  *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).  As a prudential matter, there is no reason for the Court to address an issue of state law at this time when the party the defense is meant to protect has requested that the Court not do so.

Even if the Government's demand argument is considered, its extraordinary substantive impact helps illustrate why it cannot be correct.  As detailed below, the Government asks the Court to conclude somehow that there is no "reasonable doubt" as to the Board's ability impartially to consider a demand to sue the United States government for tens of billions of dollars when, among other things, the United States Government is the controlling shareholder and the Board was elected based on a standard that ***it would not take actions contrary to the Government's interests***.  When this argument is combined with the Government's position that a claim to redress Starr's constitutional injuries may only be brought by the corporation – which the Government controls – it becomes clear that the Government effectively is seeking immunity from what (for purposes of evaluating its procedural argument) must be assumed to be

---

[12]  AIG, in its March 26, 2012 response to the Government's motion, "respectfully asks that the demand issues be deferred until after the Government's motion to dismiss has been resolved" because AIG "will then be best able to determine whether it will seek to enforce its right to a demand, or whether AIG, with the benefit of the Court's rulings" "will allow plaintiff to proceed in AIG's name on any derivative claims remaining in the case at that time."  (Dkt. No. 40 at 3.)

meritorious takings claims related to the takeover of one of the world's largest insurance companies.  The Government thus seeks the benefits of the control that it demanded and repeatedly exercised while seeking to avoid the implications of that control. Allowing such an extreme result would not only misapply state law, but would do so in a way that itself raises the gravest constitutional concerns.[13]

It is plain under state law that demand is excused in this case.  Under Rule 23.1, a plaintiff must "state with particularity" "any effort by the plaintiff to obtain the desired action from the directors or comparable authority" "and the reasons for not obtaining the action or not making the effort" consistent with the law of the State of incorporation.  R. Ct. Fed. Cl. 23.1.  Under Delaware law, demand is excused where "a ***reasonable doubt*** is created" by "the particularized facts alleged" that "(1) the directors are disinterested or independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984) (emphasis added); *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000) (holding that demand is excused if either prong is satisfied).[14]  Under *Aronson* and its progeny, demand

---

[13]  *Cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) (explaining in response to a claim of unreviewability that it was requiring a "heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"); *see also SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1349-50 (Fed. Cir. 2009) (referring to the court's "well established obligation to construe statutes to avoid constitutional difficulties" that "lies at the heart of" the court's "obligation as a reviewing court").

[14]  Even when the decision challenged in a derivative suit was not made by the board, the board nevertheless must be able to "impartially consider" the "merits" of the demand "without being influenced by improper considerations."  *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).  Thus, if there is "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand," demand is excused.  *Id.* at 934.  Starr has adequately pled demand futility under either *Aronson* or *Rales*.

is excused if a majority of the directors lack independence, where independence means

that "a director's decision is based on the corporate merits of the subject before the board

rather than extraneous considerations or influences." *Aronson*, 472 A.2d at 816.  Here,

Starr has alleged particularized facts demonstrating more than the required reasonable

doubt that AIG's Board is neither independent nor disinterested because, among other

things, it was elected to make decisions based on the interests of the Government, not

AIG and its stockholders.

Under Delaware law, a stockholder that owns a majority of a corporation's stock,

as the Government does here, is *per se* a controlling stockholder.  *See Kahn v. Lynch

Commc'n Sys.*, 638 A.2d 1110, 1113 (Del. 1994).  The Government's managerial

authority and control over AIG actions also establish its status as controlling shareholder.

*See In re Cysive, Inc., S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (combination

of stock voting power and managerial authority may establish shareholder's control over

corporation); *see also In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257-58 (Del. Ch.

2006) (holding that shareholder is controlling when it is an "influential force" behind a

particular transaction, and that allegations of day-to-day oversight of corporation's

operations not necessary).  As discussed above, the Government took immediate control

over AIG in September 2008, held nearly 80 percent of AIG's voting power from March

1, 2009 through the January 14, 2011 Recapitalization, elected the AIG Board, and still

owns a majority of AIG Common Stock.  (*See, e.g.*, Am. Compl. ¶¶ 4, 6-7, 55-73, 91,

101, 165-66.)

The Government elected each current Board member based on its understanding

that the Board it elected would act only "in or not opposed to the best interests of the

Treasury."  (Am. Compl. ¶¶ 165-66.)  Indeed, the Trust that elected the Board on the

Government's behalf was duty-bound never to act contrary to the interests of the U.S.

Treasury and to elect Board members who would act according to the same standard.  *Id.*

The reasonable assumption that the Trust did the job it was appointed to do, and under

the standards by which it was required to perform, by itself creates more than a

reasonable doubt that the Board could impartially consider a demand to sue the U.S.

Treasury for tens of billions of dollars.  None of the cases cited by the Government

involved this scenario, and the Government has no response other than to label these facts

"conclusory" – an unusual argument given that its own characterization is literally

conclusory, based as it is on overlooking the specific, concrete, compelling facts alleged.

*See* Def. Mot. at 21.

The Credit Agreement, moreover, required AIG to "use all reasonable efforts to

cause the composition of the board of directors" of AIG "to be, on or prior to the date that

is ten days after the formation of the Trust, satisfactory to the Trust in its sole discretion."

See Sept. 22, 2008 Credit Agreement.  This requirement, combined with the standard that

the Government adopted at the first opportunity to govern the Trust's performance of its

duties, only further demonstrate the Government's understanding and intent from the

outset that the Board would always act consistent with the interests of the U.S. Treasury.

The amended complaint further describes in detail the various ways in which the

Government has dominated and controlled AIG under the guise of actions ostensibly

designed to protect the United States economy and rescue the country's financial system,

rather than advance the interests of AIG and its shareholders, including (i) the

Government's appointment of Edward Liddy as AIG's CEO, (ii) the Government's

failure to provide AIG with a guarantee mechanism (as it did with similarly situated institutions) that would have obviated the need for much of the secured loan, (iii) the sale of AIG assets at fire-sale prices, and (iv) the "backdoor bailout" and related failure to negotiate counterparty concessions in Maiden Lane III.  (Am. Compl. ¶¶ 54-56, 60-62, 85-93, 100-02, 108, 116-17, 122-28, 139-41, 165-66.)  *See Orman v. Cullman*, 794 A.2d 5, 23-24 (Del. Ch. 2002) (independence of board member called into question by allegations showing "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or person) doing the controlling").  These allegations readily establish a controlling stockholder's self-interested control of the corporation through the Board.  *See Aronson*, 473 A.2d at 812; *see also In re Johnson & Johnson Deriv. Litig.*, No. 10-2033, 2011 WL 4526040, at *12-13 (D.N.J. Sept. 29, 2011) (collecting cases decided under Delaware's demand futility standard and finding consideration of "allegations in the aggregate" to be proper).

The amended complaint also sets forth at length, Am. Compl. ¶¶ 79-102, and the Government's opening brief does not address, how existing requirements and obligations to AIG's public shareholders were disregarded in order to effect the expropriation of the economic value and voting power of those stockholders in favor of the Government.  *See supra* Sections III.A, IV.A.  These actions further demonstrate the Government's influence over corporate affairs and the consequent futility of demand.  *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) (circumstances in which controlling stockholder acquired its controlling interest "and immediately achieved board approval for a series of very complex transactions that are alleged to have been wasteful, and indeed fraudulent, itself is sufficient" to excuse demand).

V.     **The Government's Appropriation of a Nearly 80 Percent Voting Interest in AIG and of Common Shareholders' Equity, 562,868,096 Shares of AIG Common Stock, and $32.5 Billion in AIG Collateral Constituted a Taking Without Just Compensation.**

The Fifth Amendment proscribes the taking of private property "for public use, without just compensation."  U.S. Const. amend. V.  The amended complaint asserts (i) a direct takings claim based on the Government's expropriation of the economic value and voting power associated with plaintiff's shares of AIG Common Stock, and (ii) derivative takings claims to recover just compensation for – among other things – the Government's appropriation of $25 billion of AIG Common Stock and $32.5 billion in cash collateral transferred to certain favored financial institutions as part of the Government's "backdoor bailout" of those institutions.  Aside from incorrectly asserting that Starr's direct takings claim fails to allege a cognizable property interest in the equity and voting power expropriated by the Government, as addressed above, the Government also argues that all takings claims asserted in this case fail because any interest acquired by the Government was "freely agreed" to by AIG.  *See* Def. Mot. at 26.  The Government's argument is contrary to the facts alleged, the governing law, and even basic standards of pleading in the takings context as reflected, for example, in Judge Hodges' recent opinion in *Colonial Chevrolet*, 2012 WL 668593.

In *Colonial Chevrolet*, as here, the plaintiffs challenged the Government's placement of conditions on the financial assistance it gave during the financial crisis as an uncompensated taking.  In that case, the Government similarly argued that the plaintiffs lacked a property interest and that no taking had occurred because the challenged actions resulted from the voluntary actions of others (in that case, GM and Chrysler).  The Court denied the Government's motion:  "Neither the Supreme Court nor the Court of Appeals

for the Federal Circuit has limited takings cases to strict or formulaic theories at the pleading stage." *Id.* at *4.  Instead, the existence of a taking "'depends largely upon the particular circumstances'" of the case and there is no "'set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government'". *Id.* (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123-24 (1978)).  As a result, "a trial court's review of taking complaints may disclose unique allegations, and in turn, unique findings." *Id.*  For the foregoing reasons, and for the reasons detailed below, each of the Government's challenges to Starr's takings claims lacks merit.

> **A.     The Government Cannot Claim Consent As a Defense When It Nullified the Shareholders' Right to Withhold Consent and, In Any Event, AIG Did Not Voluntarily Agree to Let the Government "Steal the Business".**

> > **1.     AIG Common Shareholders Did Not Consent to the Government's Taking of Their Property Because the Government Circumvented Shareholder Voting Rights Protected Under State Law.**

The Government asserts that Starr's takings claims should be dismissed because AIG "voluntarily transferred equity in exchange for a loan."  Def. Mot. at 29.  This argument, however, overlooks (among other things) the amended complaint's extensive allegations demonstrating the opposite: that the Government never obtained the required consent of AIG common shareholders.  The Government instead circumvented the class vote requirement through a reverse stock split.  (Am. Compl. ¶¶ 79-102, 172.)  *See also supra* at 10-11, 17-20, n. 9.  The Government should not be heard to suggest that Starr and the other common shareholders somehow consented to the expropriation of their property when the Government circumvented legally required shareholder approval requirements designed to protect that property.  Because the Government ignores these

allegations and does not address the requirement of shareholder consent at all, its

voluntariness argument and motion to dismiss with respect to Starr's direct claim must be

rejected.[15]

**2.      The Government Compelled the AIG Board to Agree to the
         Original Credit Agreement.**

A plaintiff may state a takings claim based upon an ostensible agreement to

transfer property to the Government where, as here, the "facts bespeak coercion." *See*

*Janowsky v. United States*, 133 F.3d 888, 892 (Fed. Cir. 1998) (reversing dismissal of a

takings claim when the Government benefit – protection against organized crime – was

conditioned on plaintiffs' agreement to permit the FBI to use their business in an

investigation).  A property owner's lack of a right to the Government benefit exchanged

for the property does not make the agreement voluntary.  *Id.*  ("Although the Janowskys

may have lacked a right to the benefit of FBI protection, they possessed a constitutionally

protected property right in Geno's Vending.").  Nor does the agreement's voluntariness

depend, as the Government suggests without support, on whether AIG faced adverse

Government action if it declined the Government's terms; the threat in *Janowsky*, for

example, came from criminals, not the Government.  *See id.*; Def. Mot. at 28.

In this case, the Government contends that the agreement was voluntary because

any pressure was the result of "business risks taken by AIG and developments in the

---

[15]   The Government asserts generally that the events alleged as "a usurpation of
control over AIG" by the Government "flowed from what AIG's board of directors
agreed to, before the alleged loss of control."  Def. Mot. at 29 n.10.  The Government and
AIG's Board, however, could not have agreed to waive the statutory voting rights of
AIG's shareholders, as was acknowledged in the Credit Agreement, various public
filings, and the Delaware action.  Nor can the Government suggest that its acquisition of
a 79.9 percent voting interest exempted it from the strictures of the Takings Clause in its
use of that voting interest.

financial sector of the economy, not any action taken by the Government."  Def. Mot. at 29.  However, this argument contradicts key allegations concerning the Government's coercive conduct in the amended complaint, the truth of which must be assumed on a motion to dismiss.  *Boyle*, 200 F.3d at 1372.

Specifically, the Government had decided it could not allow AIG to fail, knew that the loan was fully secured and that its terms were so grossly imbalanced they amounted to an attempt to "steal the company", and was willing to offer more favorable terms than those offered.  (Am. Compl. ¶¶ 58, 58(a).)  The Government thus knew that withholding aid to AIG if the AIG Board did not meet its extreme and unnecessary demands would be contrary to the interests of both AIG and the Government itself.  *See* Restatement (Second) of Contracts § 176 ("A threat is improper if the resulting exchange is not on fair terms, and (a) the threatened act would harm the recipient and would not significantly benefit the party making the threat" or "(c) what is threatened is otherwise a use of power for illegitimate ends").  The Government compounded the problem by misleading the Board into believing that the offer was the only one the Board would receive and by pressuring the Board to decide within hours.  (Am. Compl. ¶ 58(a).)  The Government offered terms that were objectively grossly overreaching and much more extreme than alternatives that the Government could have rationally accepted and would have accepted.  This strategy forced the AIG Board into an unnecessary game of "chicken" with the global economy, leaving the Board with no choice but to yield.

The statute under which the Government operated further highlights the unfairness of the Government's actions.  Regardless of the Government's ultimate authority to impose conditions, the obviously disproportionate conditions that it did

impose at a minimum went well beyond the presumptive statutory conditions as well as the purpose of the statute. *See infra* at Section VI. That purpose is to extend credit in exigent circumstances, not to hold back terms that the Government was and should have been willing to offer as a means of extracting maximum profit (in fact, "stealing the business") and/or to use a private company to achieve public ends by using its assets to subsidize other private firms.

Various other allegations further refute the Government's attempted portrayal of the Credit Agreement as the inevitable result of AIG's business risks and of developments in the financial sector. For example, the Government forced the agreement on AIG by denying AIG assistance on the far more favorable terms that were afforded to similarly situated institutions whose property the Government did not wish to appropriate and which were allowed to obtain aid on favorable terms with lower quality collateral than AIG was capable of providing. (Am. Compl. ¶¶ 42-48.) In addition, the Government contributed to AIG's credit downgrade – which exacerbated AIG's liquidity issues by making AIG unable to access short-term capital markets and simultaneously increasing collateral calls on AIG – by continuously and inaccurately maintaining publicly that it would not provide assistance to AIG, and by waiting until after AIG's credit downgrade to offer the assistance AIG had sought seven weeks before. (*Id.* ¶¶ 49-55.) The Government addresses none of these allegations.[16]

---

[16] *See also IMS Eng'rs-Architects, P.C. v. United States*, 92 Fed. Cl. 52, 66 (2010) ("'To render an agreement voidable on grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree . . . . [This includes] threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the

The Government elsewhere in its motion attempts to avoid the impact of some of these allegations by asserting that claims for wrongful coercion, fraud, and other claims are not actionable in the Federal Circuit. Def. Mot. at 15. Starr, however, does not rely on these allegations as freestanding torts. Instead, allegations concerning coercion, misrepresentation, and discrimination are relevant to the Government's effort to somehow portray the signature of the Government-appointed CEO, Edward Liddy, on the Credit Agreement as a purely voluntary act uninfluenced by the Government. Finally, the Government may not invoke a standard for involuntariness that requires a showing of unfair dealing while attempting to foreclose consideration of the facts that make it unfair. *See* Def. Mot. at 29 (citing *Artwohl v. United States*, 193 Ct. Cl. 372, 385 (1970); *see also Janowsky*, 133 F.3d at 892 (finding an issue of material fact concerning voluntariness based on the Government's alleged coercive interference with plaintiff's property rights).

### 3. The Government Coerced AIG Into Transferring $32.5 Billion in AIG Collateral to Advance the Government's "Backdoor Bailout".

The amended complaint further establishes that the Government used its control over AIG to engineer what the SIG-TARP report called a "backdoor bailout" of AIG counterparties using $32.5 billion of AIG collateral. (*See* Am. Compl. ¶¶ 108-150.) The Government asserts that the amended complaint's allegations "demonstrate" that the ML III transactions "resulted from AIG's negotiated agreements", not Government action, and that Starr fails to allege what the Government "did to bring about these results." Def. Mot. at 32-33. The Government ignores the basic requirements of notice pleading as well as the numerous specific allegations in the complaint establishing the Government's

---

threat.'") (quoting *David Nassif Assocs. v. United States*, 226 Ct. Cl. 372, 385 (1981)) (ellipses and brackets in original).

control over AIG, including: (1) the Government's appointment of AIG's new CEO without any input from shareholders or the Board of Directors (Am. Compl. ¶¶ 60-61), (2) the new CEO's immediate, premature sell-off at fire-sale prices of key AIG assets after an announcement by the Government that AIG would do so, (*id.* ¶ 62), (3) the Government's acquisition of a 79.9 percent voting interest in AIG, (*id.* ¶ 66), (4) the unreasonableness and lack of necessity of the ML III terms for AIG, (*id.* ¶¶ 122-130), (5) the conclusions of government agencies that FRBNY used AIG to engineer a backdoor bailout of AIG counterparties (*id.* ¶¶ 131-140); and (6) the availability of a guarantee mechanism that would have benefited the Government and AIG, with its only downside for the Government being that it would not facilitate the use of AIG's assets to subsidize other private firms (*id.* ¶ 48).  Starr is entitled at this stage to all reasonable inferences, *Boyle,* 200 F.3d at 1372, and it is more than reasonable to conclude from the foregoing that the Government controlled AIG with respect to all major transactions.

> **B.    The Government Unconstitutionally Conditioned the Availability of a Fully Secured Government Loan With an Extraordinarily High Interest Rate on the Appropriation of a Nearly 80 Percent Stake in AIG.**

> **1.    The Government's Actions Are Not Immune From Scrutiny.**

Independent of the Government's coercion, the unconstitutional conditions doctrine on its own prohibits the Government from using discretionary benefits to secure relinquishment of constitutional protections – in this case, the right to receive just compensation for property taken by the Government.  The doctrine, moreover, applies regardless of whether the condition is accepted prior to bringing suit:  "*The mere fact that one agrees to the challenged condition*, even in a settlement, cannot by itself render the bargain constitutional because the unconstitutional conditions doctrine focuses on the

propriety of the condition, not the fact that the claimant agreed to it.  Many cases, after

all, involve a challenge to a condition to which the claimant has already agreed."

*Stephens v. Albemarle*, No. 3:04-00081, 2005 WL 3533428, at *6 (W.D. Va. Dec. 22,

2005) (internal citation omitted) (citing cases) (emphasis added).[17]

"It is settled law that the government may not, as a general rule, grant even a

gratuitous benefit on condition that the beneficiary relinquish a constitutional right."

*O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) (citation omitted) (denying

summary judgment where teacher alleged that required release of medical records

imposed an unconstitutional condition on his return to work).  "Giving the government

free rein to grant conditional benefits creates the risk that the government will abuse its

power by attaching strings strategically, striking lopsided deals and gradually eroding

constitutional protections."  *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006).

The doctrine "limits the government's ability to exact waivers of rights as a condition of

benefits, even when those benefits are fully discretionary."  *Id.* (holding that the

government could not condition pretrial release on waiver of Fourth Amendment rights).

---

[17]  *See also Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d
620, 628-29 (Tex. 2004) (rejecting a standard, in the context of a case applying *Dolan,*
that would require a lawsuit prior to acceptance); *compare also Clapp v. United States*,
127 Ct. Cl. 505, 515 (1954) (characterizing the defense that the Government could retain
improperly exacted money because the plaintiff agreed to it as "*beneath the dignity of the
Government*") (emphasis added).  These principles even more readily apply where, as
here (1) the accepted benefit (*i.e.*, the loan) is fully secured and must be paid back with
interest regardless of the outcome of the lawsuit, (2) it was obvious from the outset that
the terms are disproportionate; (3) the Government was willing to offer more favorable
terms to others (as well as to AIG), (4) events that were necessary for the loss of equity to
happen such as the bypassing of the shareholder vote requirement did not occur until after
the purported "acceptance", and (5) a pre-acceptance lawsuit was impossible given the
threats to the global economy at the time and coercive actions by the Government.

This doctrine applies where, as here, the Government unconstitutionally requires an uncompensated dedication of property in exchange for the conferral of government benefits.  As the Court held in *Dolan v. City of Tigard*, 512 U.S. 374, 386 (1994):

> Under the well-settled doctrine of "unconstitutional conditions," the government may not require a person to give up a constitutional right – here the right to receive just compensation when property is taken for a public use – in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property.

*Dolan* established a "rough proportionality" test under which the government "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."  *Dolan*, 512 U.S. at 391; *Vance v. Barrett*, 345 F.3d 1083, 1092 (9th Cir. 2003) (noting that "the Supreme Court has articulated an essential nexus/rough proportionality test to determine whether the conditioned waiver is unconstitutional"); *Goss v. City of Little Rock*, 151 F.3d 861, 863 (8th Cir. 1998) (finding that the government's failure to demonstrate proportionality warranted upholding district court's judgment that the government had failed to demonstrate proportionality of a required dedication of property in exchange for approval of a rezoning application constituted a taking); *Vignolo v. Miller*, 120 F.3d 1075 (9th Cir. 1997) (denying motion to dismiss inmate's claim challenging termination of prison employment for refusal to sign an agreement waiving any right to interest on money in the inmate's prison account).

The two concerns that led the Court to apply a form of heightened scrutiny in *Dolan* are present in this case.  *First*, the Court emphasized the difference between the "adjudicative decision" concerning one's individual property at issue in *Dolan* and the "essentially legislative determinations" that were generally applicable to "entire areas of

the city." *Dolan*, 512 U.S. at 385.  In the former case, the checks and deliberation

provided by the political process are absent, and the accompanying risk of singling out a

property owner to bear disproportionate burdens is greater.  This case presents that same

factor in more acute form because the decision to exact a controlling interest in AIG in

exchange for a fully secured loan was not only made without the protections inherent in

the legislative process, but was also an unprecedented exercise of government power

made on an entirely *ad hoc* basis by unelected officials operating without guidelines and

without conducting any independent assessment as to the appropriate terms.[18]

   *Second*, the Court emphasized that the condition imposed was a required

dedication of property.  *See Dolan*, 512 U.S. at 385 (finding an unconstitutional condition

where "the conditions imposed were not simply a limitation on the use petitioner might

make of her own parcel, but a requirement that she deed portions of the property to the

---

[18]  The Government's cases on voluntariness, *see* Def. Mot. at 27-28, 32, are inapposite.  Six cases involved conditions imposed by generally applicable regulatory schemes rather than, as here, an individualized determination applicable *only* to one corporation singled out by the Government.  *See Yee v. City of Escondido*, 503 U.S. 519, 523-32 (1992) (addressing a generally applicable rent-control ordinance and not the acquisition of property); *Cal. Hous. Secs., Inc. v. United States*, 959 F.2d 955, 959 (Fed. Cir. 1992) (generally applicable condition for receipt of federal deposit insurance that bank could be placed in conservatorship in the event of insolvency); *Evans v. United States*, 74 Fed. Cl. 554 (2006) (generally applicable condition that plaintiff transfer raisins to the Government under program designed to stabilize supply and prices); *Carruth v. United States*, 224 Ct. Cl. 422 (1980) (generally applicable condition for participation in a peanut price-support program that contaminated peanuts subject to sale at lower price); *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 718-19 (10th Cir. 2004) (addressing generally applicable condition imposed by federal statute as part of a federal loan program that involved "preferable loan terms" at an "attractive fixed interest rate" and where the complained-of restriction could be eliminated by paying back the loan with no dedication of property required).  *Turntable Fishery & Moorage Corporation v. United States*, 52 Fed. Cl. 256, 262 (2002), involved plaintiffs who never possessed the "unfettered right" to the property in the first place, and in *Colorado Springs Production Credit Association v. Farm Credit Administration*, 967 F.2d 648, 653-55 (D.C. Cir. 1992), the Court found the required dedication of property proportional only *after* fact discovery on a motion for summary judgment.

city").[19]  Under such circumstances, there is "heightened risk that the purpose is

avoidance of the compensation requirement, rather than the stated police-power

objective."  *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 841 (1987).  This factor is

met here, where the Government required the transfer of a nearly 80 percent interest in

the world's largest insurance company before granting a loan.

Indeed, various factors present here but absent in *Dolan* further heighten the risk

of abuse and justify even more searching scrutiny.  *Dolan* involved the power to use

development conditions to acquire additional parcels of land to mitigate the effects of

development.  As significant and dangerous as this power is, it pales in comparison with

the risks posed by the unchecked power to acquire the world's largest companies during

times of crisis without paying for them, and then use them to subsidize other private firms

as a means of avoiding legislative scrutiny.

---

[19]  The Court subsequently emphasized the importance of this factor in two cases
that declined to extend *Dolan* and its predecessor, *Nollan v. California Coastal
Commission*, 483 U.S. 825 (1987), beyond the unconstitutional conditions context to
regulations that limit the use of property but do not require the dedication of property.
*See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 547-48 (2005) (declining to adopt a test
requiring that all restrictions that affect property must "substantially advance" legitimate
state interests); *City of Monterey v. Del Monte Dunes at Monterey Ltd.*, 526 U.S. 687,
702-03 (1999) (declining to apply *Dolan*'s proportionality requirement to a general denial
of development with no exaction required).  The Court in *City of Monterey* stated that the
Court had "not extended the rough-proportionality test of *Dolan* beyond the special
context of exactions – land-use decisions conditioning approval of development on the
dedication of property to public use."  *Id*. at 702.  The purpose of this sentence was to
differentiate exactions from refusals to permit development, not to differentiate land-use
exactions from other types of required dedications, an issue that was not before the Court.
*See id*. at 703 (stating that *Dolan* "was not designed to address, and is not readily
applicable to, the much different questions arising where, as here, the landowner's
challenge is based not on excessive exactions but on denial of development").

**2.    The Government Has Not Argued And Cannot Establish As a Matter of Law That the Required Dedication Was Reasonably Proportionate to the Government's Legitimate Interests.**

As discussed above, where the Government conditions the availability of a discretionary benefit on the dedication of property, the Government has the burden to establish that the dedication is roughly proportional in nature and extent to the impact of the benefit.  The Government does not contend that it can satisfy this standard under any level of scrutiny.  Instead, its sole argument is that its actions are immune from scrutiny because of the supposedly voluntary nature of the transaction, an argument already refuted in Sections V.A and V.B.1 above.  In any event, the facts alleged in the amended complaint demonstrate why, at a minimum, further factual development is warranted: whether the conditions that the Government imposed upon AIG were disproportionate to the benefits conferred is an issue of fact that cannot be resolved on a motion to dismiss.

*First*, as the Government's own representatives have conceded, the loan to AIG was fully secured and thus did not require dedication of nearly 80 percent of the company's voting rights and equity interest to secure repayment.  (Am. Compl. ¶¶ 55(e), 78.)  This allegation must be assumed true in considering defendant's motion to dismiss.

*Second*, AIG was required to pay an initial rate in interest and fees of 14.5 percent on the loan, which was far above the market rate and far above the rate charged to similarly situated entities with similar liquidity problems.  There is no basis for concluding on a motion to dismiss that this high rate was insufficient to compensate the Government for the loan.  (*Id.* ¶¶ 49(a), 55(a), 67.)

*Third*, the Government made no independent determination as to the proportionality of AIG's required dedication and the Government's legitimate interests, which confirms that there was no such proportionality.  *See Dolan*, 512 U.S. at 391

(requiring "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development"). The Government instead based the terms of its loan on a private-sector term sheet proposed by bankers with severe conflicts of interest who were attempting to extract maximum profit from AIG's temporary liquidity problems. Those terms were so severe that the Government's own representative characterized them as "*stealing the business*" – an admission that itself precludes the Government's position here. (Am. Compl. ¶ 55(b)-(e) (emphasis added).)

The Government appears to assert that it may demand anything that the private sector could have demanded.[20]  *See* Def. Mot. at 15. To the contrary, the Government is bound by obligations of proportionality and just compensation that do not apply to the private sector. *See* Howard B. Hackley, Bd. of Governors of the Fed. Reserve Sys., *Lending Functions of the Federal Reserve Banks* at 2 (May 1973) ("Commercial banks make loans for profit – to all comers and for all conceivable purposes. Although loans made by the Federal Reserve bear interest, they are made not for profit but for a public purpose"). The Government's reliance on terms devised by the private sector was particularly inappropriate because the private banks' own liquidity problems and capital shortages ensured that the terms they envisioned would be extreme. Put differently, only the most extreme terms could have justified the private banks' expenditure of the capital required to address AIG's liquidity problems, *regardless* of the private banks'

---

[20]  For this proposition the Government cites one inapposite case where the Government did not acquire property but merely influenced a county to take a "proper and lawful regulatory stance" – denial of a rezoning petition – where "there was neither a taking nor improper regulatory action by the County entity which refused plaintiff's zoning application". *See De-Tom Enters.*, *Inc. v. United States*, 213 Ct. Cl. 362, 364 (1977) (holding that the claim was "extraordinary" and "could not be correct").

expectations concerning the security of the loan, the interest rate, or long-term profits. Thus, even apart from the fact that it was inappropriate for the Government to profit from AIG's liquidity crisis as the private sector sought to, the Government – which obviously was not faced with the same liquidity problems facing private-sector banks – could not have properly relied on the private-sector term sheet (that would "steal the business") as a model for proportionate terms.

*Fourth*, there is a more than substantial basis for challenging any Government justifications as pretextual and disproportionate at this stage, including given its far more favorable treatment of similarly situated parties.[21]  The Government loaned money at low interest rates to similarly situated companies with liquidity problems (many of whom could not offer remotely comparable security) without demanding any equity interest as compensation for a loan.  (Am. Compl. ¶¶ 49(a), 67.)  The Government also guaranteed over $225 billion in low-quality assets for Citigroup, but refused to use a guarantee mechanism for AIG.

---

[21]  Thus, the Equal Protection Clause's analysis of disparate treatment supports plaintiff's takings claim, although it is not necessary to its decision.  The *Dolan* proportionality analysis, for example, does not depend upon the Government's treatment of others, but the disproportionate nature of the Government's terms is underscored not just by the alternatives available (itself an independent ground), but also by the fact that its disparate treatment of AIG cannot satisfy even the most deferential standard of review under the Equal Protection Clause.  (*See* Am. Compl. ¶ 176).  *See also Nollan*, 483 U.S. at 836 (recognizing that the standard for evaluating Takings claims in the exactions context is stricter than the standards under the Equal Protection Clause); *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1027 n.14 (1992) (rejecting the view that the Takings Clause is "little more than a particularized restatement of the Equal Protection Clause"); *see also Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 373 n.30 (2004) (citing *Nollan* and *Lucas*) ("While the arbitrariness of a statutory or regulatory distinction might bear on the nature of the governmental action under the *Penn Central* analysis, indicating, for example, that a particular claimant has been singled out, that inquiry is not performed with the varying degrees of deference and assumptions of validity characteristic of the equal protection analysis").

*Fifth*, by conditioning its liquidity support on a fully secured loan at a high rate of interest rather than using a guarantee that would have been far less burdensome to taxpayers and AIG, the Government violated the Takings Clause by using disproportionate means to address its legitimate interest in resolving the financial crisis. Both *Dolan* and *Nollan* demonstrate that one way of establishing the required nexus between the state's interest and the condition is to identify an alternative that more directly satisfies the state's interest. *See Dolan*, 512 U.S. at 393; *Nollan*, 483 U.S. at 836-37. In the case at hand, the Government could have most directly addressed the problem by guaranteeing AIG's CDS obligations, which would have freed up AIG's collateral and thereby resolved AIG's liquidity problems while protecting counterparties. If the Government had issued a guarantee, it would not have exposed itself to as much potential liability and therefore would have had difficulty justifying even the high interest rate, let alone the transfer of AIG equity. The Government's treatment of other financial institutions that faced liquidity problems (such as the guarantees provided to Citigroup without any requirement that it cede a controlling interest to the Government) demonstrates the viability of that alternative. (Am. Compl. ¶¶ 42-48.)

Instead, the Government imposed an indirect and disproportionate condition on the liquidity support provided to AIG: an unnecessarily large, fully secured loan with a high interest rate and a transfer of equity and voting power, coupled with a requirement that AIG pay for the benefits that its counterparties received. As in *Nollan*, in AIG's case the Government tried to resolve the financial crisis "through gimmickry, which converted a valid regulation" into an "'an out-and-out plan of extortion.'" *Nollan*, 483 U.S. at 837.

### C.     The Government's Remaining Takings Arguments Lack Merit. [22]

#### 1.     Starr's Claim Does Not Fail for Lack of Authorized Action.

The Government likewise errs when it contends that Starr's takings claim is

"premised upon allegations that the Government violated section 13(3) of the Federal

Reserve Act" and that the claim should therefore be dismissed because Starr "must, at a

minimum, concede that the actions that it alleges constitute takings were authorized and

lawful." Def. Mot. at 25. Ultimately, "lack of authority" will preclude a takings claim

only when the challenged conduct "was either explicitly prohibited or was outside the

normal scope of the government officials' duties." *Del-Rio Drilling Programs*, *Inc. v.*

*United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998). Here, Section 13(3) did not

expressly prohibit the Government's actions, and the amended complaint does not allege

that the relevant officials were not "acting within the scope of their statutorily authorized

duties" in interpreting the statute and managing the financial crisis. *Id.* Far from

involving rogue officials uninvolved with government lending or unauthorized to bind

---

[22]   The Government asserts that Starr has failed to state a takings claim because it has failed "to pinpoint the specific act for which the Government allegedly owes just compensation" and because Starr has supposedly made "'taking in the aggregate' allegations". Def. Mot. at 24. The fact that the Government committed multiple acts for which just compensation is required, however, is hardly a basis for asserting that it should pay *no* compensation. If the Government ultimately has defenses to the allegations that the credit agreement contained such disproportionate terms that it amounted to an effort to "steal the business", that it coerced the AIG Board, that it nullified shareholder protections, and that it used AIG assets to effect a "backdoor bailout", all without providing just compensation, it is free to develop the facts of those defenses. It cannot credibly claim, however, that it does not understand the basis for Starr's claim that the Government owes just compensation.

The cases cited by the Government in support of this argument merely stand for the principle that takings analysis requires identification of the action or actions that require just compensation. *See* Def. Mot. at 23-24 (relying on *Acceptance Ins. Cos. v. United States*, 583 F.3d 849 , 856-57 (Fed. Cir. 2009); *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995)). As noted, Starr has done so.

the Government , the takings here were approved by senior Government officials, including the Secretary of the Treasury, and the U.S. Treasury continues to retain its shares.  (Am. Compl. ¶¶ 58, 62, 104-106.)  The amended complaint therefore does not allege the actions were "unauthorized" as that term is used to preclude takings claims in the case law. [23]

Moreover, it simply is not accurate that Starr must "concede" the legality of the Government's conduct for all purposes to maintain a takings claim.  *First*, Starr may properly plead a takings claim and an unlawful exactions claim.  *See Figueroa v. United States*, 57 Fed. Cl. 488, 495 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006) (construing pleading as alleging both a takings claim and an illegal exaction claim); *see also infra* Section VI.  *Second*, as the Government's cases reflect, a "takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground."  *Rith Energy*, *Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001); *see Acadia Tech.*, *Inc. v. United States*, 458 F.3d 1327, 1330-31 (Fed. Cir. 2006) (considering takings claim notwithstanding plaintiffs' allegations of unlawful conduct because plaintiffs explained that agency acted "under

---

[23] *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1353-54 (Fed. Cir. 2004) (relying on *Del-Rio* to hold that the tortious and thus illegal nature of the challenged conduct did not preclude a takings claim); *Hedrick v. United States*, No. 99-5022, 1999 WL 633432, at *3 (Fed. Cir. Aug. 19, 1999) (unpublished opinion) (relying on *Del-Rio* to reject motion to dismiss while emphasizing that "the complaint references the conduct as emanating from an authorized government official"); *120 Delaware Ave., LLC v. United States*, 95 Fed. Cl. 627, 630-31 (2010) (relying on *Del-Rio* to hold that "allegations might also give rise to a claim for tortious interference" but "that does not preclude these same allegations from establishing the jurisdictional predicates for a takings claim"); *Mannatt v. United States*, 48 Fed. Cl. 148, 153-54 (2000) (relying on *Del-Rio* to hold that allegation that government action was unlawful did not "divest the court of jurisdiction" because plaintiffs did not claim that government's actions were outside the scope of the agent's official role, only that they were "improperly executed, resulting in unlawful action that caused the takings at issue").

color of law"). The takings claim here does not depend on successfully establishing that the Government lacked authority under Section 13(3). By contrast, the takings claims in the Government's cases depended on proof of illegal conduct. *See*, *e.g.*, *Lion Raisins*, *Inc. v. United States*, 416 F.3d 1356, 1368-72 (Fed. Cir. 2005) (plaintiff made clear it did not challenge the operation of the regulatory scheme but rather relied on the illegality of the government's actions under that scheme); *Crocker v. United States*, 37 Fed. Cl. 191, 196 (1997) ("To concede the validity of the forfeiture in this case would concede the merits of the claim as well.").

**VI.** **The Court Has Jurisdiction over Starr's Due Process Claim Because the Government Deprived AIG and Its Common Shareholders of 562,868,096 Shares of AIG Common Stock In Excess of Its Statutory Authority.**

Finally, the Government argues that the Court lacks Tucker Act jurisdiction over plaintiff's Due Process claim because such claims are generally not money-mandating. Def. Mot. at 14-15. However, the Tucker Act extends jurisdiction to illegal exaction claims, defined as claims for a "'deprivation of property without due process of law'". *Pennoni v. United States*, 79 Fed. Cl. 552, 561 (2007) (quoting *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)). This Court, the Federal Circuit, and the former Court of Claims have exercised Tucker Act jurisdiction over claims that challenge the Government's exaction and retention of property in excess of statutory and regulatory authority.[24] *See*, *e.g.*, *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1574-78

---

[24]   In addition to permitting claims for exactions of money, "under the illegal exaction doctrine, a plaintiff may seek the return of the monetary value of property seized or otherwise obtained by the government." *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 48 Fed. Cl. 137, 145-46 (2000) (citing cases). Thus, this Court has jurisdiction over plaintiff's Due Process claim, which challenges, *inter alia*, the Government's unlawful acquisition and retention of 562,868,096 shares of AIG Common Stock.

(Fed. Cir. 1996) (misapplication of regulations and forms governing the cost of detention and maintenance of excludable aliens); *O'Bryan v. United States*, 93 Fed. Cl. 57, 66 (2010) (improper application of regulations governing grazing fees); *Eastport S.S. Corp. v. United States*, 157 Ct. Cl. 802, 802 (1962) (citing cases) (improper conditioning of right to transfer vessel to foreign ownership on payment of $10,000).

"To properly plead an illegal exaction, plaintiff must have alleged that he 'paid money over to the government, directly or in effect, and seeks return of all or part of that sum . . . .'" *Figueroa*, 57 Fed. Cl. at 495 (ellipsis in original) (quoting *Eastport*, 178 Ct. Cl. at 605). A plaintiff need not "expressly use the term 'illegal exaction' or 'wrongful exaction'" in the pleading, even if the term is not used "until its opposition to defendant's motion to dismiss," so long as the pleading contains "all the material elements necessary to sustain a recovery." *Id.* (internal quotations and citations omitted). The amended complaint alleges that no "Congressional authority vested the Federal Reserve Board with the authority or power to take over an American corporation" or "to appropriate the property and interests of Common Stock shareholders", and seeks the monetary value of the property and interests taken. (*See* Am. Compl. ¶ 77.) As set forth below, these allegations state an illegal exactions claim.

The Government claims that Section 13(3) of the Federal Reserve Act, 12 U.S.C. §§ 341 (Seventh) and 343, gave it the authority to sell AIG the right to a fully secured loan at a high interest rate in exchange for a controlling interest in the company. Def. Mot. at 35. Section 343 authorizes the Federal Reserve in "unusual and exigent circumstances" and "at rates established in accordance with" 12 U.S.C. § 357 to discount "notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are

indorsed or otherwise secured to the satisfaction of the Federal reserve bank".  12 U.S.C. § 343.  It further provides that all such discounts "shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe."  *Id.*  Section 341 (Seventh) provides that a Federal Reserve Bank may exercise by its board of directors "all powers specifically granted by the provisions" of Title 12, Chapter 3 of the U.S. Code and "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by the chapter."  12 U.S.C. § 341.  As set forth below, these provisions did not authorize the Government's conditioning of a loan on a majority stake in the company.

*First*, Section 343's express grant of power to discount "notes, drafts, and bills of exchange" did not authorize the Government to acquire stock for two reasons.  Stock is not a "note, draft, or bill of exchange", and it cannot be "discounted."  To the contrary, as the Federal Reserve itself has explained, "bank discounts as commonly understood do not apply 'to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures.'"  Bd. of Governors of the Fed. Reserve Sys., Fed. Reserve Bulletin, at 269 (Mar. 1958), *available at* http://fraser. stlouisfed.org/docs/publications/FRB/1950s/frb_031958.pdf (quoting approvingly Hearing Examiner's Report and Recommendation (Sept. 12, 1957)).  Moreover, the stock did not "secure" the Government's loan to AIG as collateral because the Government retains the stock even if AIG pays off the loan with interest.  (Am. Compl. ¶ 78.)

*Second*, Section 341's grant of "incidental powers" to the Federal Reserve, or the Federal Reserve's power to set restrictions and limitations on the loan, did not provide the necessary authority.  Section 13(3) authorizes the Federal Reserve to purchase only a

limited list of categories of assets,[25] which notably does not include stock in private companies or other private assets.  The Federal Reserve understood that limitation: instead of holding AIG securities, it directed AIG to transfer them to a trust held for the benefit of the United States Treasury.  (Am. Compl. ¶ 65.)

*Third*, it has long been held in the analogous context of national banks that, while stock may be accepted as collateral for a loan or as settlement of a disputed debt, the ability to purchase stocks is not "incidental" to the business of banking.  *See Cal. Nat. Bank v. Kennedy*, 167 U.S. 362, 369 (1897) ("The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred."). [26]

*Fourth*, the text of Section 13(3), its historical background, and basic principles of statutory interpretation also demonstrate that the Federal Reserve may not sell a loan for consideration other than interest.  The only consideration for a loan prescribed by Section 343 is an interest rate subject to the determination of the Board of Governors. [27]

---

[25]  *See* David Small and James Clouse, *The Limits the Federal Reserve Act Places on the Monetary Policy Actions of the Federal Reserve*, 19 Ann. Rev. Banking L. 553, 574, 579 (2000) (listing the types of assets that may and may not be purchased by the Federal Reserve and identifying "equities" as "ineligible for purchase").

[26]  The incidental powers provision of the National Bank Act at the time of the Supreme Court's opinion in *Kennedy* is functionally identical to that of the Federal Reserve Act, except that the latter is if anything even more narrowly circumscribed.  *Compare* National Bank Act of 1864, ch. 106, sec. 8, 13 Stat. 99, 101-102 (1864) (authorizing the exercise of "all such incidental powers as shall be necessary to carry on the business of banking," including "by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt"), *with* 12 U.S.C. § 341 (Seventh) (authorizing the exercise of "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter").

[27]  The types of consideration contemplated by the provision are illustrated by a Federal Reserve circular issued just one month after its enactment, which established regulations related to ensuring the satisfaction of the statutory requirements.  The circular

Construing Section 341's grant of "incidental powers" "within the limitations prescribed by this chapter" to impliedly include broader authority to demand any form of consideration would violate a fundamental canon of statutory construction by rendering the interest-rate provision superfluous.  *See Bilski v. Kappos*, 130 S. Ct. 3218, 3228 (2010) (relying on "canon against interpreting any statutory provision in a manner that would render another provision superfluous").

Moreover, such an implied authority could not be reconciled with Section 343's requirements that the loan be adequately secured and that the borrower be unable to obtain credit elsewhere.  The former requirement makes clear that no additional consideration should be necessary,[28] while the latter requirement creates the risk that creditworthy borrowers who qualify for Section 13(3) loans, for example due to liquidity problems, would be particularly vulnerable to exploitation by the Government.  Reading Section 13(3) as granting the Government broad authority to demand additional consideration would transform a power intended by Congress and the President to address the Great Depression (as part of a remedial statute entitled the Emergency Relief and Construction Act of 1932) into an unchecked power to exploit economic crisis, as in this case, by using its discounting and lending authority to extract maximum profit from vulnerable but creditworthy borrowers, to purchase assets that it could not otherwise

did not suggest that it would be appropriate to sell the right to a discount for additional consideration beyond the discount rate.  *See* 18 Fed. Reserve Bulletin 473, 518-20 (Aug. 1932), *available at* http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_081932.pdf; *see also* 22 Fed. Reserve Bulletin 71, 123-24 (Feb. 1936), *available at* http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_021936.pdf.

[28]  Indeed, the original statute, in which the limitations provision also appeared, required discounted paper to be both secured to the satisfaction of the Federal Reserve Bank *and* properly indorsed.  *See* Emergency Relief and Construction Act, Pub. L. No. 72-301, ch. 520, sec. 210, 47 Stat. 709, 715 (1932), *available at* lexisnexis.com.

acquire, and even to nationalize companies.  Congress and the President, in the midst of

the Great Depression, did not intend such a result.  To the contrary, in vetoing a less

circumscribed direct-lending law ten days earlier, President Hoover explained that merely

allowing the Reconstruction Corporation to engage in direct lending "would place the

Government in private business in such fashion as to violate the very principle of public

relations upon which we have builded our Nation, and render insecure its very

foundations."  75 Cong. Rec. 15040 (July 11, 1932).

The Court of Claims rejected a similarly expansive construction of a statute

governing foreign sales of ships previously purchased from the United States that

required, as a prerequisite to sale, the Government's approval "either absolutely or upon

such conditions as the Commission (Administration) prescribes."  *Suwanee S.S. Co. v.*

*United States*, 150 Ct. Cl. 331, 336 (1960).  The Court held that the Government's

statutory authority to impose conditions did not authorize it to exact a fee in exchange for

its approval of the sale.  Thus, the exaction of the fee was an illegal exaction.  More

broadly, the Court suggested "that no statute should be read as subjecting citizens to the

uncontrolled caprice of officials, unless the statute has to do with the powers of the

President in dealing with foreign relations, the powers of a military commander in the

field, or some comparable situation."  *Id*. at 876.  The statutory language could not be

read as granting officials the authority to add to their functions "the supererogatory

function of picking up a few dollars for the public treasury."  *Id.*

As noted above, the Government's motion does not address the illegal exactions

doctrine at all, let alone the legal basis for its application described here.  The

Government's motion to dismiss Starr's Due Process claim should therefore be denied.

**VII.** **The Unprecedented and Sweeping Nature of the Government's Actions, the Fact-Specific Nature of the Takings Inquiry and This Dispute, and the Absence of a "Set Formula" For Evaluating Such Claims Further Confirm that the Government's Motion Should Be Denied.**

Unprecedented actions call for extreme caution when, as here, the Government seeks to insulate its conduct from scrutiny at the earliest possible stage. This is particularly true in a case as fact-specific as this one and an area as fact-dependent and insusceptible to rigid formulations as the Takings Clause.

The Government advocates that the Court take the opposite approach and assume a key disputed fact in its favor. According to the Government, the Court should dismiss the amended complaint even if the transactions were involuntary because, it asserts, this is not a case where AIG is being forced to bear "'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Def. Mot. at 31 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Instead, it argues, because "AIG's excessive risk taking on behalf of itself and its shareholders created the company's problem", "AIG and its shareholders, not the public, should rightfully bear the cost of the solution." *Id.*

But Starr does *not* contend that the public should be forced to bear the costs of problems AIG created. Instead, Starr contends that the Government has required Starr to bear far *more* than those costs and also used AIG's assets to save other companies from the consequences of *those companies*' business decisions. Nor does the Government even try to explain why, if private firms "should rightfully bear" the costs of their "risk-taking", the Government measured those costs as being so much lower when other institutions took risk (including, as factual development will show, much more risk); why it used AIG assets to subsidize "risk-taking" firms that wanted help; or why it

gratuitously burdened AIG with loan amounts that a guarantee would have avoided, when a guarantee itself would have lowered any "public burden".

The Government may not avoid the existence of what are at least material factual disputes by disregarding certain issues entirely while demanding unnecessary, additional factual detail on others at the pleading stage.  Similarly, the Government does not dispute that the terms imposed upon AIG were disproportionate, but appears to assert (incorrectly) that there are simply no limits to the conditions the Government may impose on financial assistance.  At the same time, the Government both ignores and seeks to preclude factual development of plaintiff's detailed allegations that it contributed to AIG's difficulties through coercive threats and pressure, inaccurate public statements, disparate treatment that further illustrates the gross lack of proportionality, and unnecessary delay; that its continued decision to offer AIG a loan rather than a guarantee was irrational other than as a means of subsidizing other firms; that it controlled AIG and its Board; that it violated AIG common shareholders' rights through the reverse stock split; and that it inexplicably took, without any compensation, 11 million more common shares than called for even by the confiscatory terms of the Credit Agreement.  In short, the Government's arguments fail to defeat Starr's claims as a matter of law because they do not – and, indeed, cannot – provide a basis for foreclosing development of the facts alleged at this stage of the litigation.

While overlooking both basic pleading standards and the many fact issues involved, the Government has made no serious effort to address the unprecedented nature of its actions as they relate to plaintiff's takings claim.  Instead, the Government relies on inapposite precedent to support sweeping and extreme propositions, such as its use of the

*De-Tom* case to assert that the Government may always act as a private party would have acted.  Def. Mot. at 29.  The Government declines to mention even the most directly relevant doctrine and lines of authority, such as *Dolan* and the unconstitutional conditions doctrine, and disregards facts that undermine its position, including the facts surrounding the reverse stock split and the fact that the loan for which the Government demanded a nearly 80 percent stake was fully secured and carried a very high interest rate.

The Government's approach would arrogate to itself enormous, unfettered power that it does not need and that creates intolerable dangers, all based on a view of the law that asks the Court to reject the fact-specific nature of the inquiry mandated when the Government endeavors to take property in order to gain at the expense of isolated, vulnerable private parties.  That approach is inconsistent with basic standards of pleading in the takings context, as reflected in *Colonial Chevrolet*, 2012 WL 668593.  Like the plaintiffs in *Colonial Chevrolet*, Starr should "have the opportunity to develop a case that may turn out to be unique."  *Id*. at *4.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that this Court deny the Government's Motion to Dismiss.

Dated:  Washington, D.C.
    March 29, 2012

       BOIES, SCHILLER & FLEXNER LLP


      By    _/s/ David Boies_____
        David Boies
        Attorney of Record
        333 Main Street
        Armonk, NY 10504
        Tel. (914) 749-8200

Fax (914) 749-8300
Email: dboies@bsfllp.com

Robert J. Dwyer
Nicholas A. Gravante Jr.
Duane L. Loft
Julia C. Hamilton
Luke Thara
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300

Hamish P. M. Hume
Samuel C. Kaplan
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000

*Attorneys for Plaintiff Starr International
Company, Inc.*