## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-779C |
| | ) | (Judge Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### <u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:                          BRIAN M. SIMKIN
SHALOM BRILLIANT                     Assistant Director
TIMOTHY P. MCILMAIL                  Commercial Litigation Branch
BRIAN A. MIZOGUCHI                   Civil Division
JOHN ROBERSON                        Department of Justice
Senior Trial Counsel                 P.O. Box 480
                                     Ben Franklin Station
CHRISTOPHER A. BOWEN                 Washington, D.C.  20044
RENEE A. GERBER                      Tele: (202) 616-8239
KAREN V. GOFF                        Fax: (202) 514-7969
MICHAEL S. MACKO
JOHN J. TODOR                        Email: brian.simkin@usdoj.gov
AMANDA L. TANTUM
VINCENT D. PHILLIPS
Trial Attorneys

                                     Attorneys for Defendant

                                     April 26, 2012

## TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................... i

TABLE OF AUTHORITIES...................................................... iii

ARGUMENT.................................................................. 3

I.     The Court Should Dismiss This Action Pursuant To 28 U.S.C. § 1500
       Because Starr Has Filed The Same Claims In Federal District Court........... 3

II.    Starr's Claims Of Share Dilution Are Not Direct Claims, Because
       The United States Was Not A Controlling Shareholder At The Time
       Of The September 2008 Contract, The March 2009 Issuance Of
       Preferred Shares, Or The June 2009 Shareholder Vote...................... 4

III.   The Court Should Dismiss The Amended Complaint For Failure
       To Make Demand Upon AIG's Board Or To Plead Adequately
       Why Demand Is Excused ............................................. 6

IV.    The Court Should Dismiss Starr's Takings Claim For Failure
       To State A Claim Upon Which Relief Can Be Granted. .................... 11

       A.     Starr Fails To Allege The Type Of Government Action
              Necessary To State A Takings Claim. ........................... 11

              1.     Starr's Allegations Do Not Demonstrate That The
                     Challenged Transactions Were Involuntary.................. 11

                     a.     Shareholder Consent To The Terms
                            Of The Credit Agreement Was Unnecessary
                            And Is Irrelevant. ............................... 11

                     b.     Starr's Allegations Do Not Demonstrate That
                            The Government Compelled The AIG Board
                            To Agree To The Credit Agreement ................. 12

                     c.     Starr's Allegations Do Not Demonstrate That The
                            Government Coerced AIG Into Transferring
                            $32.5 Billion In AIG Collateral..................... 16

              2.     The Inclusion Of A 79.9 Percent Equity Participation
                     Term As Part Of The Price For Extending $85 Billion
                     In Credit To AIG Was Not An Unconstitutional Condition. ..... 18

B.      Starr's Takings Claim Fails Because It Depends Upon
        Allegations That The FRBNY's Actions Were Unauthorized
        And Unlawful.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.      Starr's Takings Claim Fails Because Starr Fails To Specify
        Which Of The Alleged Government Actions Required
        Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.      Starr Fails To Identify A Property Interest.. . . . . . . . . . . . . . . . . . . . . . . 23

V.      Starr's Illegal Exaction Claim Should Be Dismissed. . . . . . . . . . . . . . . . . . . . . . 27

A.      Starr Failed To Plead A Tucker Act Illegal Exaction Claim. . . . . . . . . . . 28

B.      AIG's Agreement To Exchange Consideration Is Not An "Exaction". . . 28

C.      AIG's Agreement To Transfer An Equity Interest Was Not Illegal.. . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

### CASES

*Acceptance Insurance Cos. v. United States,*
   583 F.3d 849 (Fed. Cir. 2009).......................................................... 22

*Adams v. United States,*
   391 F.3d 1212 (Fed. Cir. 2004).......................................................... 26

*Aerolineas Argentinas v. United States,*
   77 F.3d 1564 (Fed. Cir. 1996).......................................................... 29, 33

*Air Pegasus of D.C., Inc. v. United States,*
   424 F.3d 1206 (Fed. Cir. 2005).......................................................... 24

*Albrecht v. United States,*
   329 U.S. 599 (1947).......................................................... 13

*American Pelagic Fishing Co. v. United States,*
   379 F.3d 1363 (Fed. Cir. 2004).......................................................... 24, 25

*Arnold Tours, Inc. v. Camp,*
   472 F.2d 427 (1st Cir. 1972).......................................................... 31

*Aronson v. Lewis,*
   473 A.2d 805 (Del. Sup. Ct. 1984), *overruled in part upon other grounds
   by Brehm v. Eisner,* 746 A.2d 244 (Del. Sup. Ct. 2000)...................................... 8, *passim*

*Artwohl v. United States,*
   434 F.2d 1319 (Ct. Cl. 1970).......................................................... 16

*Beam v. Stewart,*
   833 A.2d 961 (Del. Ch. 2003), *aff'd,* 845 A.2d 1040 (Del. Sup. Ct. 2004). ...................... 9

*Bowman v. United States,*
   35 Fed. Cl. 397 (1996).......................................................... 28

*Branch v. United States,*
   69 F.3d 1571 (Fed. Cir. 1995).......................................................... 22

*Broad v. Sealaska Corp.,*
   85 A.2d 422 (9th Cir. 1996).......................................................... 24-25

*California National Bank v. Kennedy*,
   167 U.S. 362 (1897)................................................................................. 31

*Carruth v. United States*,
   627 F.2d 1068 (Ct. Cl. 1980). ................................................................... 13

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999).................................................................................. 20

*Clajon Products Corp. v. Petera*,
   70 F.3d 1566 (10th Cir. 1995). .................................................................. 20

*Clapp v. United States*,
   117 F. Supp. 576 (Ct. Cl. 1954)................................................................. 29

*Commonwealth Edison Co. v. United States*,
   271 F.3d 1327 (Fed. Cir. 2001).................................................................. 26

*Conti v. United States*,
   291 F.3d 1334 (Fed. Cir. 2002)............................................................ 24, 25

*In re Cysive, Inc. Shareholders Litigation*,
   836 A.2d 531 (Del. Ch. 2003)...................................................................... 9

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984).................................................................................... 6

*Davis v. Countrywide Home Loans*,
   2010 WL 3219306 (S.D.N.Y. July 23, 2010). ........................................... 28

*Del-Rio Drilling Programs, Inc. v. United States*,
   146 F.3d 1358 (Fed. Cir. 1998).................................................................. 21

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994)............................................................................ 18, 19

*Dore v. United States*,
   97 F. Supp. 239 (Ct. Cl. 1951)................................................................... 13

*Dow Chemical Co. Derivative Litigation*,
   No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........................... 6-7

*Eastport S.S. Corp. v. United States*,
   157 Ct. Cl. 802 (1962). .............................................................................. 29

iv

*East of Cascades, Inc. v. Federal Deposit Insurance Corp.*,
    2011 WL 647704 (W.D. Wash. Feb. 18, 2011). ........................................ 28

*Eastern Enterprises v. Apfel*,
    524 U.S. 498 (1998). ........................................................................ 26

*Federal Reserve Bank of Richmond v. Duffy*,
    188 S.E. 82 (N.C. Sup. Ct. 1936). .......................................................... 28

*Feldman v. Cutaia*,
    956 A.2d 644 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. Sup. Ct. 2008). ................... 5-6

*Figueroa v. United States*,
    57 Fed. Cl. 488 (2003). ...................................................................... 27

*Fruhauf Southwest Garment Co. v. United States*,
    111 F. Supp. 945 (Ct. Cl. 1953). ...................................................... 14-15, 16

*Gatz v. Ponsoldt*,
    925 A.2d 1265 (Del. Sup. Ct. 2007). ...................................................... 4, 5

*Gatz v. Ponsoldt*,
    No. 174-N, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004). ................................... 24

*Gentile v. Rossette*,
    906 A.2d 91 (Del. 2006). ................................................................. 4, 5

*Hearts Bluff Game Ranch, Inc. v. United States*,
    669 F.3d 1326 (Fed. Cir. 2012)........................................................ 25, 26, 27

*Heineman v. Datapoint Corp.*,
    611 A.2d 950 (Del. Sup. Ct. 1992),
    *overruled in part upon other grounds by Brehm v. Eisner*,
    746 A.2d 244 (Del. Sup. Ct. 2000). ........................................................ 10

*Honolulu Rapid Transit Co. v. Dolim*,
    459 F.2d 551 (9th Cir. 1972). .............................................................. 18

*Huntleigh USA Corp. v. United States*,
    525 F.3d 1370 (Fed. Cir. 2008)............................................................. 24

*Janowsky v. United States*,
    133 F.3d 888 (Fed. Cir. 1998)............................................................. 14

v

*Kahn v. Lynch Communications Systems, Inc.*,
    638 A.2d 1110 (Del. Sup. Ct. 1994). ............................................................ 9

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
    540 A.2d 726 (Del. Sup. Ct. 1988). ............................................................ 7

*King v. VeriFone Holdings, Inc.*,
    12 A.3d 1140 (Del. Sup. Ct. 2011). ............................................................ 7

*Lingle v. Chevron U.S.A., Inc.*,
    544 U.S. 528 (2005)........................................................................... 20, 25

*Lucas v. Fed. Reserve Bank of Richmond*,
    59 F.2d 617 (4th Cir. 1932). ............................................................ 28, 30, 32

*McPadden v. Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008)................................................................ 6

*Members of Peanut Quota Holders Association Inc. v. United States*,
    421 F.3d 1323 (Fed. Cir. 2005)................................................................ 25

*Minneapolis Taxi Owners Coalition v. City of Minneapolis*,
    572 F.3d 502 (8th Cir. 2009). ................................................................ 24

*Mitchell Arms, Inc. v. United States*,
    7 F.3d 212 (Fed. Cir. 1993)................................................................... 24

*NationsBank of N.C., N.A. v. Variable Annuity Life Insurance Co.*,
    513 U.S. 251 (1995)...................................................................... 31, 32-33

*Nicholson v. United States*,
    77 Fed. Cl. 605 (2007). ................................................................ 12, 13

*Nollan v. California Coastal Commission*,
    483 U.S. 825 (1987)...................................................................... 18, 19

*Norman v. United States*,
    429 F.3d 1081 (Fed. Cir. 2005)........................................................... 28, 29

*New York, New Haven & Hartford Railroad Co. v. United States*,
    53 Ct. Cl. 222 (1918). ................................................................ 13, 16

*Office of the Comptroller of the Currency Interpretive Letter*,
    1992 WL 486905 (Jul. 15, 1992). ............................................................ 31

*Office of the Comptroller of the Currency Interpretive Letter No. 992,*
    2004 WL 1563358 (May 10, 2004) ............................................................................ 31

*Office of the Comptroller of the Currency Interpretive Letter No. 1007,*
    2004 WL 3465754 (Sept. 7, 2004) ............................................................................ 31

*Orman v. Cullman,*
    794 A.2d 5 (Del. Ch. 2002)........................................................................................ 10

*Passamaquoddy Tribe v. United States,*
    82 Fed. Cl. 256 (2008), *aff'd*, 426 Fed. App'x 916
    (Fed. Cir. Aug. 17, 2011). ............................................................................................ 4

*In re Paxson Communications Corp. Shareholders Litigation,*
    No. Civ. A 17568, 2001 WL 812028 (Del. Ch. July 12, 2001). ...................................... 9

*In re Primedia Inc. Derivative Litigation,*
    910 A.2d 248 (Del. Ch. 2006)....................................................................................... 9

*Rales v. Blasband,*
    634 A.2d 927 (Del. Sup. Ct. 1993). ........................................................................ 8, 10

*Rith Energy, Inc. v. United States,*
    247 F.3d 1355 (Fed. Cir. 2001)................................................................................... 21

*Rith Energy, Inc. v. United States,*
    270 F.3d 1347 (Fed. Cir. 2001)............................................................................. 21, 22

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984).............................................................................................. 20, 25

*Safeway Stores, Inc. v. United States,*
    93 F. Supp. 900 (Ct. Cl. 1950).............................................................................. 13, 14

*Sagarra Inversions, S.L. v. Cementos Portland Valderrivas, S.A.,*
    34 A.3d 1074 (Del. Sup. Ct. 2011). ............................................................................. 7

*San Remo Hotel, L.P. v. San Francisco City & County,*
    364 F.3d 1088 (9th Cir. 2004). .................................................................................. 20

*Shannon v. United States,*
    512 U.S. 573 (1994)................................................................................................... 30

*Suwannee S.S. Co. v. United States,*
    279 F.2d 874 (Ct. Cl. 1960). ..................................................................................... 29

*Tecon Engineers Inc. v. United States*,
    170 Ct. Cl. 389 (1965). ................................................................. 4

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. Sup. Ct. 2004). .............................................. 5

*Turney v. United States*,
    115 F. Supp. 457 (Ct. Cl. 1953). .................................................... 14

*Uni-Marts, Inc. v. Stein*,
    Nos. 14713, 14893, 1996 WL 466961 (Del. Ch. Aug. 12, 1996). .................. 26

*United States v. General Motors Corp.*,
    323 U.S. 373 (1945). .................................................................... 25

*United States v. Sperry Corp.*,
    493 U.S. 52 (1989). ...................................................................... 26

*United States v. Tohono O'Odham Nation*,
    131 S. Ct. 1732 (2011). ................................................................. 3

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
    449 U.S. 155 (1980). .................................................................... 27

*Yuba Natural Resources, Inc. v. United States*,
    904 F.2d 1577 (Fed. Cir. 1990). ..................................................... 23

## STATUTES

12 U.S.C. § 24 (Seventh). ............................................................... 31

12 U.S.C. § 341 ............................................................... 28, 30, 32

12 U.S.C. § 343 (Section 13 (3) of the Federal Reserve Act) ........................ 15, passim

28 U.S.C. § 1500 ............................................................... 3, 4

## REGULATIONS

12 C.F.R. § 7.1006 ............................................................... 31

MISCELLANEOUS

18 Federal Reserve Bulletin 473 (Aug. 1932) *available at*
    http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_0813932.pdf...................  30

22 Federal Reserve Bulletin 71 (Feb. 1936) *available at*
    http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_021936.pdf.....................  30

Del. Code Ann. tit. 8, § 242(a)(3). ..................................................................  12, 25, 26

Del. Code Ann. tit. 8, § 242(b)(2)....................................................................  12, 25, 26

Small & Clouse, *The Limits the Federal Reserve Act Places on the Monetary Policy*
    *Actions of the Federal Reserve*, 19 ANN. REV. BANKING L. 553 (2000). ..................  30

Rule 23.1. .........................................................................................................................  7

Rule 12(b)(1), (6). ...........................................................................................................  1

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-779C |
| | ) | (Judge Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### <u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully replies to the responses of plaintiff, Starr International Company, Inc. (Starr), and nominal defendant, American International Group, Inc. (AIG), to our motion to dismiss.

More than three years after AIG sought and accepted from the Federal Reserve Bank of New York (FRBNY) the largest federally supported rescue of a failing institution in history, Starr, an AIG shareholder purporting to sue derivatively on behalf of AIG and directly for itself, seeks tens of billions of additional taxpayer dollars in damages based upon the remarkable theory that the FRBNY's massive financial assistance did not rescue AIG from an imminent bankruptcy of its own making but, rather, improperly harmed AIG and its shareholders.

The amended complaint should be dismissed. The FRBNY acted as the statutory lender of last resort to AIG to protect the economy and the national interest. AIG sought and freely accepted the FRBNY's rescue, and AIG owes its current corporate existence as a going concern

to that decision.  No cognizable cause of action arises from the FRBNY's decisions regarding specific proposed terms for the rescue or from the AIG board's decision to accept those terms.

Starr's response fails to rebut our demonstrations that its case should be dismissed because it has filed the same claims in district court; that its claims are derivative, rather than direct, in nature; and that it has failed to demonstrate that a demand on AIG's board would have been futile.

With respect to Starr's takings claim, the Court should note what is not at issue.  Starr does not assert that the Government physically took tangible property, or restricted the use of any property through a regulatory taking.  Starr also does not assert that AIG was under the control of the Government when it agreed to the terms of the rescue on September 16, 2008.  Finally, Starr does not assert that the Government played any role in AIG's having entered into, and posted $32.5 billion in cash collateral for, the risky credit default swaps (CDS) that were later terminated.  Rather, Starr complains that AIG was not given a better rescue than the one to which it agreed in September 2008.  However, that does not state a takings claim, or any other claim. Contrary to Starr's contentions in its response, the amended complaint establishes that AIG voluntarily agreed to the terms of its rescue by the Government and that the subsequent transactions about which Starr now complains resulted from AIG's own conduct, not Government compulsion.

Starr also argues that AIG was "coerced" into agreeing to the terms of the rescue because the Government did not shift even greater cost and risk onto the public in order to avoid a global economic catastrophe threatened by AIG's own risk-taking.  But the failure to offer more favorable contractual terms is not a taking; otherwise, every Government contract would be a

2

taking.  For this reason, Starr's takings claims (as well as its newly-articulated illegal exaction claim) fail, because the conveyance of an equity interest in AIG was part of the consideration for the rescue.  While Starr also argues that it was a taking for AIG to fulfill its contractual obligations to its CDS counterparties, AIG voluntarily assumed those obligations, including the need to post $32.5 billion of cash collateral, well before the rescue, and neither Starr nor AIG has any constitutionally-protected property interest in the possibility that the Government could have helped AIG avoid its obligations.  AIG also voluntarily agreed to the ML III transactions that Starr now challenges.

In response to our demonstration that Starr's due process and equal protection claims are beyond this Court's jurisdiction, Starr responds by restyling its due process claim as an illegal exaction claim, a formulation absent from its amended complaint.  Even construing Starr's amended complaint to assert an illegal exaction claim, such a claim fails because Starr does not demonstrate that any statute or provision mandates the return of money to it or AIG, as is required for such a claim, and because AIG's agreement to an exchange of consideration was neither an "exaction" nor "illegal."

## ARGUMENT

### I.      The Court Should Dismiss This Action Pursuant To 28 U.S.C. § 1500 Because Starr Has Filed The Same Claims In Federal District Court

Starr's position that it has successfully avoided the proscription against duplicative litigation in 28 U.S.C. § 1500 by filing this suit minutes after filing a suit also claiming unconstitutional takings in the United States District Court for the Southern District of New York (SDNY) affords insufficient weight to the Supreme Court's admonition in *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1732, 1728-30 (2011), that courts should not render that

statute "nugatory through construction," and should let Section 1500 serve its purpose of providing a "robust response" and a "broad prohibition" to the problem of plaintiffs inundating the Government with duplicative litigation.  At a minimum, the Court should regard this and the SDNY actions as filed simultaneously, and dismiss this action pursuant to Section 1500.  *See Tecon Eng'rs, Inc. v. United States*, 170 Ct. Cl. 389, 401 n.4 (1965); *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 270-73 (2008), *aff'd*, 426 Fed. App'x 916, 916 (Fed. Cir. Aug. 17, 2011) (unpublished).

Starr's suggestion that its SDNY complaint is not duplicative because it was not brought against a person "who . . .  was . . .  acting or professing to act, directly or indirectly under the authority of the United States" (Plaintiff's Opposition to Defendant's Motion to Dismiss (Pl. Opp.) 15), ignores that the SDNY amended complaint alleges that the FRBNY was acting "in a governmental capacity" and that "the improper conduct described above constitutes the discriminatory taking of property . . . ."  *Starr Int'l Co. v. Fed. Reserve Bd. of NY*, S.D.N.Y. No. 11-cv-8422, Amended Complaint ¶ 169.  Therefore, Starr's two actions meet the requirements of 28 U.S.C. § 1500.

## II.     Starr's Claims Of Share Dilution Are Not Direct Claims, Because The United States Was Not A Controlling Shareholder At The Time Of The September 2008 Contract, The March 2009 Issuance Of Preferred Shares, Or The June 2009 Shareholder Vote

While acknowledging that its other takings claims are all derivative (Pl. Opp. 29), Starr contends that it possesses a direct claim for the alleged "expropriation of the economic value and voting power associated with plaintiff's shares of AIG Common Stock."  Pl. Opp. 29, 21-23 (citing *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) and *Gatz v. Ponsoldt*, 925 A.2d 1265 (Del. 2007)).  Direct claims are those where specific shareholders individually were harmed in ways

unique to them and not the corporation, and where a recovery would specifically benefit the specific shareholders, not the corporation. Delaware law recognizes that claims of equity dilution are generally derivative, not direct. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1038-39 (Del. 2004); *Gatz*, 925 A.2d at 1278-81; *Gentile*, 906 A.2d at 99-100.

Starr's assertions that it has a direct claim for the dilution of its shares as a result of the rescue appears to be based upon the erroneous premise that the alleged dilution of its interests occurred in January 2011, when the Trust held majority voting power. Pl. Opp. 22. That premise is essential, since Starr is relying for its assertion of a direct claim on the *Gentile* and *Gatz* cases recognizing that ordinarily derivative claims for dilution can become direct if the plaintiff sustainably alleges that the dilution was accomplished by a controlling shareholder that used its majority power discriminatorily to dilute minority shareholders. However, the amended complaint demonstrates that any dilution occurred on September 16, 2008, when AIG agreed to provide equity corresponding with a 79.9 economic and voting interest to the Trust as part of the consideration for the FRBNY's rescue loan. *See* Am. Compl. ¶ 4. Neither the United States nor the FRBNY is alleged to have been "a stockholder having majority or effective control," *Gentile*, 906 A.2d at 100, in September 2008, when the terms of rescue were agreed upon and the Credit Agreement was signed, or in March 2009, prior to AIG's issuance of the Series C preferred shares to the Trust for the benefit of the United States Treasury, because neither the United States nor the FRBNY was a common shareholder. *See* Am. Compl. ¶¶ 52-54. Therefore, Starr cannot assert that its takings claim based upon dilution is direct, rather than derivative, because "it is clear from [*Gentile* and *Gatz*] that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists." *Feldman v. Cutaia*,

956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).

### III.   The Court Should Dismiss The Amended Complaint For Failure To Make Demand Upon AIG's Board Or To Plead Adequately Why Demand Is Excused

In our motion to dismiss, we demonstrated that Starr failed to plead that it made a demand upon AIG's board of directors or to establish a reasonable doubt that AIG's board was capable of making an independent judgment regarding whether maintenance of this lawsuit would serve AIG's interests.  In response, Starr, citing its stipulation with AIG, contends that the Court should defer its ruling concerning whether demand was excused and, further, asserts that the amended complaint adequately pleads demand futility.  Pl. Opp. 25-28.  Neither of Starr's arguments is valid, and its purported derivative claims   like its purported direct claims   should be dismissed.

As an initial matter, this Court should decline Starr's proposal   also advanced by AIG that the Court postpone deciding the threshold issue of Starr's standing to assert a claim on behalf of AIG.  Starr's proposal to address first the merits of Starr's claims would reverse proper procedure and waste judicial resources by requiring the Court to decide issues it need not consider.  "[T]he issue of whether demand is futile so as to be excused is logically antecedent to whether plaintiff states a claim because, if demand is not made or is not otherwise excused, the complaint will be dismissed without any further inquiry into the merits of the complaint." *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984) (noting that the requirements for derivative suits "were designed to limit the use of the device to situations in which, due to an unjustified failure of the corporation to act for itself, it was appropriate to permit a shareholder 'to institute and conduct a litigation which usually belongs to the corporation'"); *see also Dow Chem. Co. Deriv. Litig.*, No. 4349-

6

CC, 2010 WL 66769, at *1 n.1 (Del. Ch. Jan. 11, 2010) (agreeing that demand is "logically the first issue").

Delaware law is clear (as confirmed in the decision upon which Starr relies, *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988)) that a defendant other than the corporation "has standing to raise as a defense Plaintiffs' failure to make a demand," because the shareholder has no legal entitlement to maintain a derivative claim unless it has satisfied Rule 23.1. Starr's reliance upon *Kaplan* (Pl. Opp. 24) is misplaced because in that case the board's explicit statement of neutrality equaled approval of the derivative suit. 540 A.2d at 731-32. Here, instead of professing neutrality, AIG has not yet taken any position upon whether Starr can proceed upon its behalf, but has merely obtained permission to delay doing so. Permitting Starr to prosecute AIG's claims where Starr does not have AIG's consent and has not satisfied Rule 23.1 would violate the requirement that a plaintiff possess standing. *Cf. Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1080-83 (Del. 2011) (failure to satisfy demand requirements deprives shareholder of standing); *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1148 & 1148 n.47 (Del. 2011) (taking steps to adequately plead futility gives derivative plaintiffs standing).

Substantively, Starr has failed to demonstrate that demand would be futile, or that the AIG board is interested in the challenged transactions; its sole allegation is that the board is not independent. Pl. Opp. 24-28. Starr does not allege that it made a demand on AIG's board. The controlling standard for excusing demand when the complaint challenges decisions made by the directors who would be considering the demand, as Starr acknowledges, requires that the complaint plead particularized facts establishing a reasonable doubt either (i) that a majority of

the directors are disinterested and independent, or (ii) that the transaction was the product of the board's good faith, informed business judgment. *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984), *overruled in part upon other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *see* Pl. Opp. 25-26. By contrast, "a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged by the derivative suit. . . . Instead, it is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993). The *Rales* standard, which looks only to whether the board that would evaluate the demand satisfies the first part of the *Aronson* test, applies to Starr's challenges to the terms of the 2008 rescue loan and ML III transactions, because the vast majority of current directors who would evaluate a demand did not join the board until after January 2009 (Am. Compl. ¶ 166). *Id.* at 933-34 & 934 n.8 (finding that the proper inquiry is not whether the board that approved the challenged transactions was or was not interested or independent but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation).

Starr satisfies neither of these tests. It does not allege that AIG's board as currently constituted is interested, and does not plead particularized facts establishing a reasonable doubt that the directors have the capacity to evaluate a demand if Starr made one today. Starr does not even identify any individual directors, much less any "personal financial benefit" or "extraneous considerations or influences" that will control the "director's decision," rather than "the corporate merits of the subject before the board." *Id.* at 936. The amended complaint thus fails to establish

demand futility.

Starr's contention that AIG's board is not independent because the Government "is the controlling shareholder" of AIG is insufficient to excuse demand, and its contention that "the Board was elected based on a standard that it would not take actions contrary to the Government's interests" (Pl. Opp. 24 (emphasis removed)), mischaracterizes the facts even as alleged in the complaint.  Starr contends that "a stockholder that owns a majority of a corporation's stock . . . is *per se* a controlling stockholder" (Pl. Opp. 26), but a controlling shareholder's power to elect all of the directors does not by itself raise a reasonable doubt that the directors are independent for purposes of establishing demand futility.[1]  None of the cases cited by Starr involved application of the demand futility test; rather, each addressed the standard of review applicable to a substantive claim that a majority shareholder breached a fiduciary duty to the corporation and its other stockholders.[2]

_____

[1] *See Aronson*, 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director."); *Beam v. Stewart*, 833 A.2d 961, 978 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (defendant's voting power to "remove or replace any or all of the directors" did not establish that directors lacked independence with respect to a demand involving defendant); *In re Paxson Commc'n Corp. S'holders Litig.*, No. Civ. A 17568, 2001 WL 812028, at *9 & *9 n.52 (Del. Ch. July 12, 2001) (power to select all directors and officers insufficient to make demand futile).

[2] *See Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1115-17 (Del. 1994) (controlling shareholder must prove entire fairness of merger with controlled corporation when shareholder controlled board decision-making through specific conduct at board meeting); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257-58 (Del. Ch. 2006) (finding that allegations that board was dominated by controlling shareholder's associates were sufficiently specific to support application of entire fairness standard rather than business judgment rule on motion to dismiss claims relating to alleged self-dealing transaction, but defendants' "nomination of its associates to Primedia's board, without more, does not establish actual domination"); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 533 (Del. Ch. 2003) (entire fairness rule applied to evaluating buy-out proposal by controlling shareholder).

There is no basis for Starr's assertion that "[t]he Government elected each current Board member based on its understanding that the Board it elected would act only 'in or not opposed to the best interests of the Treasury.'"  Pl. Opp. 26-27.  This "Standard of Care" was applicable to the Trustees of the Trust, not the directors of AIG.  Am. Compl. ¶ 165.  Moreover, by definition, controlling shareholders elect directors "satisfactory" to themselves, but that is insufficient to establish that the directors could not independently consider a demand.  Delaware law presumes that directors are independent and that "their acts have been taken in good faith and in the best interests of the corporation."  *Aronson*, 473 A.2d at 815.  Starr cites no provision of any document that relieved these AIG directors of the duty to act in the best interest of AIG, and Starr alleges no basis for its claim of an "understanding" that the directors would not act in accordance with their duties to AIG.

Starr's recitation of actions purportedly showing that "the Government has dominated and controlled AIG" (Pl. Opp. 27-28) misconceives the independence test for demand futility.  A plaintiff cannot raise a reasonable doubt about a director's independence simply by listing the transactions plaintiff challenges as improper, but must "plead[] facts that establish 'that the directors are 'beholden' to [controlling persons] or so under their influence that their discretion would be sterilized.'"  *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (*quoting Rales*, 634 A.2d at 936); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 955 (Del. 1992), *overruled in part upon other grounds by Brehm*, 746 A.2d at 253 n.13, 254.

Even if Starr had adequately pleaded that the Government controlled AIG's board in September and November 2008 (Pl. Opp. 27-28), those allegations would have no bearing upon the current Board's ability to evaluate a demand challenging those transactions.  That the current

board approved the challenged January 2011 Recapitalization Plan also does not excuse demand, because mere "board approval of a challenged transaction" does not support an inference of lack of independence; "[w]ere that so, the demand requirements would be meaningless[.]" *Aronson*, 473 A.2d at 814. Starr does not allege that the individuals who comprise AIG's current board have any interest or obligation to the United States, outside of their obligations to all shareholders, or that they failed to inform themselves sufficiently to make a reasonable business judgment regarding the 2011 exchange transaction before approving it. Consequently, Starr has pled no facts demonstrating that AIG's board was incapable of evaluating the demand that Starr failed to make.

**IV.   The Court Should Dismiss Starr's Takings Claim For Failure To State A Claim Upon Which Relief Can Be Granted**

    **A.   Starr Fails To Allege The Type Of Government Action Necessary To State A Takings Claim**

        **1.   Starr's Allegations Do Not Demonstrate That The Challenged Transactions Were Involuntary**

            **a.   Shareholder Consent To The Terms Of The Credit Agreement Was Unnecessary And Is Irrelevant**

We demonstrated in our motion that AIG voluntarily transferred equity in exchange for a loan. Starr responds that this "overlooks . . . the amended complaint's extensive allegations . . . that the Government never obtained the required consent of AIG common shareholders," and that "[t]he Government instead circumvented the class vote requirement through a reverse stock split." Pl. Opp. 30. This allegation both jumbles the time sequence and misstates the requirements of Delaware law. Starr does not and could not contend that shareholder approval was required for AIG's agreement in September 2008, to provide a 79.9 percent preferred equity

interest.  The vote Starr is complaining (erroneously) about being denied related only to the exchange of preferred shares for common shares, which occurred more than two years after AIG agreed to provide equity voting interests in return for the rescue loan.  Starr concedes that it was "[p]ursuant to the Credit Agreement," the terms of which AIG agreed to on September 16, 2008, that the Treasury acquired "a voting power equivalent to an approximately 80 percent interest in AIG, at the expense of the relative voting power of the existing AIG common shareholders."  Pl. Opp. 10; Am. Compl. ¶ 91.  The shareholder vote rejecting an increase in the number of authorized common shares but approving the reverse stock split did not occur until June 2009. Am. Compl. ¶¶ 96-99.  That vote could not have retroactively transformed the September 2008 Credit Agreement between AIG and the FRBNY into a taking.

In addition, Starr's characterization of AIG's actions, which Starr imputes to the Government, as having "circumvented the class vote requirement through a reverse stock split" impliedly concedes that there was no *violation* of any applicable class vote requirement, because the referenced reverse stock split did not require such a vote under Delaware law.  *See* Del. Code Ann. tit. 8, §§ 242(a)(3), (b)(2) (permitting reverse stock splits without a separate class vote).

> **b.** **Starr's Allegations Do Not Demonstrate That The Government Compelled The AIG Board To Agree To The Credit Agreement**

Starr also insists that the original deal AIG made with the Government was not voluntary.[3]  However, AIG entered into a contract with the FRBNY, in which AIG promised to

---

[3]  Starr contends that its allegations of wrongful coercion, fraud, misrepresentation, and discrimination, which it apparently concedes the Court does not possess jurisdiction to entertain as "freestanding torts," are relevant to whether AIG voluntarily agreed to the September 2008 rescue.  *See* Pl. Opp. 34.  However, in a takings context, the Court determines "whether admittedly *legitimate* conduct of the Government resulted in a taking of private property for public benefit."  *Nicholson v. United States*, 77 Fed. Cl. 605, 615 (2007) (emphasis added).  Starr

convey equity as part of the consideration for a loan.  That contract, without more, defeats Starr's direct and derivative takings claims; a property owner and the Government may agree upon the price the Government will pay for the property without implicating the Fifth Amendment.  *Cf. Albrecht v. United States*, 329 U.S. 599, 603 (1947) (rejecting property owners' claim for interest pursuant to the Just Compensation Clause where owners agreed to the purchase price pursuant to contracts "they are not willing to abandon"); *N.Y., New Haven & Hartford R. Co. v. United States*, 53 Ct. Cl. 222, 237 (1918) ("[W]e have never examined a case in any court where property voluntarily given up and paid for under contract has been claimed as taken under the Fifth Amendment.").  Even if a party to a contract with the Government chooses to take less or pay more than it thinks reasonable because refusal would work an intolerable hardship, that does not state a claim that it was compelled to agree by duress.  *See id.*  Rather, there must be some affirmative, compulsory act by the Government, or threat of Government action to obtain the property, to convert a contract for the conveyance of property to the Government into a taking of that property.  *Compare Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980) (rejecting "forced sale" takings claim where "property was not confiscated or appropriated") *with Dore v. United States*, 97 F. Supp. 239, 242 (Ct. Cl. 1951) (taking where seller faced threat of requisition and penalties); *Safeway Stores, Inc. v. United States*, 93 F. Supp. 900, 901 (Ct. Cl. 1950) (taking where Government set-aside orders required owner to hold meat for Government use or face civil and criminal penalties).

The property owner must also immediately protest the terms of an allegedly coerced

---

does not explain how allegations of *wrongful* conduct are part of such a takings inquiry, where it must "concede the *propriety* of the governmental interference with [its] property interests."  *Id.* at 614 (emphasis added).

agreement to state a takings claim.  *Cf. Turney v. United States*, 115 F. Supp. 457, 464 (Ct. Cl. 1953) (taking where agreement with Government included plaintiff's reservation of the right to sue for value of property conveyed to Government); *Safeway*, 93 F. Supp. at 901 (in case of wartime meat set-aside orders, finding a taking where Government meat owner did not consent to and protested Government purchase orders).  Here, Starr does not allege any threat of Government requisition or penalty, and no contemporaneous protest by AIG (or Starr) to the terms of the agreement.  Rather, if AIG's business decision to accept terms with which Starr now disagrees was "compelled," it was compelled by the business environment, not by the Government.

Starr cites *Janowsky v. United States*, 133 F.3d 888, 892 (Fed. Cir. 1998), for the proposition that "[a] plaintiff may state a takings claim based upon an ostensible agreement to transfer property to the Government where, as here, the 'facts bespeak coercion,'" and that "[a] property owner's lack of a right to the Government benefit exchanged for the property does not make the agreement voluntary."  Pl. Opp. 31.  In *Janowsky*, the plaintiffs' acquiescence in the use of their property by the Federal Bureau of Investigation (FBI) could be viewed as involuntary because acquiescence was necessary in order to obtain continued protection of plaintiffs' family.  However, the FBI created the need for that protection, by exposing one of the plaintiffs as an informant.  *Id*. at 890.  The threat in *Janowsky* may have come from criminals, but the FBI exposed the plaintiffs to that threat.  In contrast, Starr's allegations fail to "bespeak" coercion as a matter of law because unlike in *Janowsky*, Starr does not allege that the FRBNY caused the dire economic circumstances that confronted AIG on September 16, 2008.  *See Fruhauf Sw. Garment Co. v. United States*, 111 F. Supp. 945, 951 (Ct. Cl. 1953) (duress requires "(1) that one

14

side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party").

The Government did not create the threat of bankruptcy that AIG faced in September 2008. Starr attempts to paint the Government as having contributed to this threat through inaction. Pl. Opp. 32-33. However, Starr's allegations depict nothing more than that the FRBNY, with no regulatory power over AIG and no authority to act except as statutory lender of last resort, expressed no willingness to extend credit to AIG until all efforts to obtain private financing were exhausted (as required by Section 13(3)), and that the FRBNY did not inform AIG that it might not rule out more generous terms than those in the September 16, 2008 term sheet, if necessary to avoid a global economic disaster. According to Starr, "[t]his strategy forced the AIG Board into an unnecessary game of 'chicken' with the global economy, leaving the Board with no choice but to yield." Pl. Opp. 32. However, even if, as Starr asserts without any supporting allegations, the FRBNY might have ultimately offered different terms to avert a global economic calamity, the FRBNY had no legal obligation to empower AIG to extract its rescue more cheaply.

Starr's allegations demonstrate that it was AIG that endangered not only itself but the global economy. AIG presented this danger to the FRBNY. Confronted with the economic consequences of the threat of AIG's failure, the FRBNY was not free to allow AIG to suffer the consequences of its own actions. AIG, in effect, forced the FRBNY to put a massive amount of public funds at risk to avert this danger, and the FRBNY attempted to do this on terms as favorable to the public fisc as those demanded by the private lenders with whom AIG had

previously been negotiating (terms those private lenders ultimately found inadequate and with which those lenders were unwilling to proceed).  Am. Compl. ¶ 55(b).

Starr also asserts that "the Government forced the agreement on AIG by denying AIG assistance on the far more favorable terms that were afforded to similarly situated institutions . . . which were allowed to obtain aid on favorable terms with lower quality collateral than AIG was capable of providing."  Pl. Opp. 33.  Apart from identifying no facts supporting the assertion that any of the recipients of emergency lending was similarly situated to AIG (and ignoring that Lehman Brothers was denied the rescue funding it urgently requested in the same time period), Starr does not explain how the FRBNY's allegedly unique treatment of AIG consequently became coercive or a taking.  If Starr means that by not offering more favorable terms the FRBNY "forced" AIG to accept the terms offered, then, under Starr's reasoning, every contract would be "forced."  AIG's dire economic circumstances may have made AIG's board feel economically compelled to agree to the loan with its proposed terms, but this does not mean that the transaction was a result of duress, or was a taking.  *See N.Y., New Haven & Hartford R.*, 53 Ct. Cl. at 237; *see also Artwohl v. United States*, 434 F.2d 1319, 1326 (Ct. Cl. 1970); *Fruhauf*, 111 F. Supp. at 951.

### c.   Starr's Allegations Do Not Demonstrate That The Government Coerced AIG Into Transferring $32.5 Billion In AIG Collateral

Starr asserts that the Government "appropriat[ed]" $32.5 billion in AIG collateral for purposes of what Starr calls a "backdoor bailout" of AIG's CDS counterparties.  Pl. Opp. 29, 34. Starr also asserts that the Government "coerced" AIG into "transferring" this collateral.  *Id.* at 34. However, the collateral was posted "[p]rior to the formation of ML III," to secure AIG's own

16

contractual obligations.  Am. Compl. ¶ 113.  Once this collateral was posted, any property interest AIG had in it became subject to the secured party's right to recover the value of the underlying obligation through the collateral.  Starr does not allege that the collateral was used other than to discharge the obligations that it secured, or that the collateral or any other AIG property was used to pay more than the amount of these obligations.  Rather, Starr complains that "AIG's obligations could have been compromised for substantially less."  Am. Compl. ¶ 117.  But even assuming that AIG had some basis upon which to hope that it might avoid complete fulfillment of its obligations, it had no constitutionally-protected property interest in such avoidance.

Furthermore, we demonstrated in our motion that Starr alleged no facts indicating that the Government forced AIG to agree to the ML III arrangement.  In response, Starr points to what it describes as "the numerous specific allegations in the complaint establishing the Government's control over AIG, . . . ."  Pl. Opp. 34-35.  However, those allegations do not establish the Government's control over the decisions by AIG's board to agree to the transaction, much less that the Government forced AIG's board to agree to the ML III arrangement.

Finally, when AIG's board agreed to the ML III arrangement, the Government owned no shares in AIG and thus held no voting power.  Am. Compl. ¶¶ 91, 112-15.  In addition, the shares required to be issued under the terms of the Credit Agreement were to be issued in the future to a trust for the benefit of the United States Treasury (Am. Compl. ¶ 65)   not to the FRBNY, the Department of the Treasury, or any Government agency.  The trustees of that Trust (who were not appointed until 2009) could not have played any role in the challenged November 2008 ML III, which Starr attributes to the FRBNY.  Am. Compl. ¶ 110.

17

### 2.     The Inclusion Of A 79.9 Percent Equity Participation Term As Part Of The Price For Extending $85 Billion In Credit To AIG Was Not An Unconstitutional Condition

Starr alleges that the 79.9 percent equity interest in AIG which was agreed to as consideration for the loan from the FRBNY constitutes an unconstitutional condition for AIG's acceptance of that loan.  However, none of the "unconstitutional conditions" cases that Starr cites involved an essentially commercial transaction, such as a loan, in which the Government does not exercise state police powers but, rather, merely gives something of value in return for valuable consideration.  The Government's acquisition of property in such an exchange does not constitute the imposition of an unconstitutional condition.  As the Ninth Circuit held in *Honolulu Rapid Transit Co. v. Dolim*, 459 F.2d 551, 552 (9th Cir. 1972), "[a]n exchange of economic benefits . . . underlies every commercial contract and the Supreme Court has left no doubt that the Federal Government enjoys power to conclude commercial bargains. . . .  The doctrine of unconstitutional conditions does not strip state and federal governments of this indispensable and long acknowledged power."

In the cases upon which Starr relies   *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994)   the plaintiffs' consent to public use of their property was the condition for obtaining a required building permit.  *Nollan*, 483 U.S. at 828; *Dolan*, 512 U.S. at 377.  In both cases, the imposition of the condition was a compensable taking even though the withholding of the permit might not have been.  *Nollan*, 483 U.S. at 835.  However, governmental compulsion was involved in the exercise of state police power to regulate land use and subject such use to permit requirements; if the plaintiffs rejected the condition, they would not only have given up a benefit, they would have given up the right to

18

build on their property.  Specifically, the *Nollan* Court recognized that a state may legitimately impose its regulatory power over land use by restricting an owner's right to build or by imposing conditions on that right if the conditions bear a sufficient nexus to the purpose of the restrictions, but held that the state may not exploit its power simply to obtain the use of the property without compensation:  "In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.'"  483 U.S. at 837.

Here, however, there is nothing analogous to a right to build on one's property, a restriction imposed on that right, and a condition imposed for the removal of that restriction.  The Government did not impose any restriction upon AIG's right to borrow money or to do anything else, much less demand property from AIG as a condition for lifting such a restriction.  Rather, the FRBNY merely required stock in AIG as part of the consideration for a loan *from the FRBNY*.  Had AIG refused this condition, it would not have been subjected to any governmental restriction or other action.  It simply would not have received a loan from the FRBNY.

Absent any exercise of governmental power, the Government's acquisition of property in return for something of value to the owner is not an *appropriation*, and thus not a taking, of property.  This is implicit in the *Dolan* Court's formulation of the unconstitutional conditions doctrine in the context of takings cases:  that "the government may not *require* a person to give up a constitutional right   here the right to receive just compensation when property is taken for a public use   in exchange for a discretionary benefit conferred by the government where the benefit has little or no relationship to the property."  512 U.S. at 385 (emphasis added).  The Court did not state that the Government may not offer whatever it wishes to offer (even if the

19

offer is lower than what the counterparty would have liked) in return for property. Indeed, Government contracts typically involve the Government's obtaining property or services it wants in return for the money the contractor wants. That the contractor would rather get more money for the property or services does not make the receipt of the property or services a taking. The *Dolan* Court's formulation of the unconstitutional conditions doctrine applies, by its terms, only where the Government in some way *requires* the person to enter into this exchange.[4]

The Government compels an exchange when it exploits its regulatory power to induce the exchange (for instance, by prohibiting an owner from building on his property unless he enters into the exchange), or when it otherwise affirmatively makes it unfeasible for the owner to reject the exchange (for instance, by endangering the owner and then requiring property in exchange for protection, as in *Janowsky*). Only if the exchange is required in this sense (and aside from the limitation of the doctrine to land exaction cases), may it be necessary for the Government to meet the applicable test under the doctrine of unconstitutional conditions. That is not the case here.[5]

**B.      Starr's Takings Claim Fails Because It Depends Upon Allegations That The FRBNY's Actions Were Unauthorized And Unlawful**

Starr's takings claims are premised upon allegations that Section 13(3) of the Federal Reserve Act cannot authorize the FRBNY to receive equity as part of the consideration for a

---

[4]  Moreover, the *Nollan/Dolan* test applies only to land-use exaction cases. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999); *San Remo Hotel, L.P. v. San Francisco City and County*, 364 F.3d 1088, 1098 (9th Cir. 2004); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1579 n.21 (10th Cir. 1995) (citing commentators). Because this case does not involve land, *Nollan* and *Dolan* are inapplicable.

[5]  Starr cites *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) (Pl. Opp. 16), but does not assert that the "rational relation" test set forth there, *id.* at 1007, applies to this case.

loan, and thus must fail, because a compensable taking can only result from authorized

Government actions.  Starr responds (1) that "[u]ltimately, 'lack of authority' will preclude a

takings claim only when the challenged conduct 'was either explicitly prohibited or was outside

the normal scope of the government officials' duties'" (Pl. Opp. 44 (quoting *Del-Rio Drilling*

*Programs*, *Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998)); (2) that "[h]ere,

Section 13(3) did not expressly prohibit the Government's actions, and the amended complaint

does not allege that, the relevant officials were not "acting within the scope of their statutorily

authorized duties in interpreting the statute and managing the financial crisis" (Pl. Opp. 44); and

(3) that "[t]he takings claim here does not depend on successfully establishing that the

Government lacked authority under Section 13(3)" (Pl. Opp. 46).

However, Starr misstates the kinds of alleged illegality and lack of authority that can

defeat a takings claim.  Explaining its earlier *Del-Rio* decision, the Court of Appeals for the

Federal Circuit in *Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001), observed:

> [I]f the plaintiff claims that its property was taken *regardless* of
> whether the agency acted consistently with its statutory and
> regulatory mandate, *Del-Rio* stands for the proposition that the
> takings claim can be litigated in the Court of Federal Claims
> without the need first to litigate the issue of lawfulness in
> administrative proceedings before the agency.  On the other hand,
> to the extent that the plaintiff claims it is entitled to prevail *because*
> the agency acted in violation of statute or regulation, *Del-Rio* does
> not give the plaintiff a right to litigate that issue in a takings action
> rather than in the congressionally mandated administrative review
> proceeding.

*Id.* at 1365-66 (emphasis in original).  A plaintiff "is thus required to litigate its takings claim on

the assumption that the administrative action was both authorized and lawful."  *Id.* at 1366; *see*

*also Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (on petition for

rehearing) ("[I]n a takings case we assume that the underlying governmental action was lawful, and we decide only whether the governmental action in question constituted a taking for which compensation must be paid.").

Perhaps in tacit acknowledgment of these principles, Starr asserts that "[t]he takings claim here does not depend on successfully establishing that the Government lacked authority under Section 13(3)." Pl. Opp. 46. But it does. The alleged lack of authority to demand a controlling interest in AIG's equity as part of the consideration for the $85 billion line of credit is a predicate of Starr's takings claim. If "we assume that the underlying governmental action was lawful and we decide only whether the governmental action in question constituted a taking for which compensation must be paid," *Rith*, 270 F.3d at 1352, it follows that the Government's receipt of a 79.9 percent equity interest in AIG as part of the consideration for the rescue loan was valid and therefore was not a compensable taking. If we assume that the receipt of an equity interest was unlawful, then the remedy is not a takings claim.

### C. Starr's Takings Claim Fails Because Starr Fails To Specify Which Of The Alleged Government Actions Required Compensation

In our motion, we demonstrated that the amended complaint does not "pinpoint what step in the sequence of events . . . constituted conduct that the government could not engage in without paying compensation." *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Characterizing an alleged taking as "consisting of several distinct actions" viewed collectively is "too broad." *See Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009). Yet that is what Starr has done here, alleging that several Government actions "completed the taking of AIG shareholders' interests" (Am. Compl. ¶ 101(a)), and that a series of events spanning nearly three years "*culminated* in the completion of the acquisition of 1,655,037,962 shares of

AIG's Common Stock on January 14, 2011, of which 562,868,096 shares were taken without just compensation" (Am. Compl. ¶ 54 (emphasis added)).

In response, Starr argues that it must merely place the Government on notice of the actions that require just compensation, and that it has done so.  Pl. Opp. 44 n.22.  But the inconsistent allegations in the amended complaint reveal Starr's failure to state a takings claim precisely because they point to different Government actions that allegedly amount to the same taking.  In particular, Starr contends that the FRBNY's September 2008 demand for a 79.9 percent equity stake in return for the $85 billion loan was a taking.  *See* Am. Compl. ¶ 4.  At the same time, Starr alleges that the Government owes compensation measured by the market value of certain equity shares on January 14, 2011.  Am. Compl. at 57 ¶ H.  That implies that the Government took equity on January 14, 2011, and no other date, because, normally, the proper measure of just compensation for the Government's permanent taking of private property is "the fair market value of [the] property at the time of the taking."  *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1580 (Fed. Cir. 1990).  But Starr cannot contend that the subsequent exchange of the preferred shares acquired by the Treasury under the Credit Agreement for common shares issued in the January 2011 recapitalization was a taking, because the same equity interest cannot have been taken twice.  Because Starr continues to rely upon a "takings in the aggregate" claim, the Court should dismiss Starr's takings claims for failure to state a claim upon which relief may be granted.

## D.    Starr Fails To Identify A Property Interest

In our motion, we demonstrated that Starr fails to identify a property interest that was taken from it, as required to state a takings claim, because Starr retained its shares of AIG stock.

*See Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Starr fails

to refute that demonstration. First, Starr asserts that the Government took shareholders'

"economic value and voting power" by acquiring new shares of AIG stock, claiming that a taking

of value is akin to a physical appropriation of property by the Government. Pl. Opp. 16.

However, Starr admits that no such physical appropriation occurred, and for purposes of a

Takings Clause property interest analysis, the distinction between an indirect appropriation of

value and a direct appropriation of property is dispositive. Starr's assertion is, at most, a claim

that Government action indirectly affected the value of property; a claim that is not compensable

pursuant to the Takings Clause. *See, e.g., Air Pegasus of D.C., Inc. v. United States*, 424 F.3d

1206, 1215 (Fed. Cir. 2005). Indeed, collateral interests, such as the ability to realize an

expectation in the market disposition of property, are not property protected by the Takings

Clause. *See Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993); *Huntleigh*

*USA Corp. v. United States*, 525 F.3d 1370, 1380 (Fed. Cir. 2008).

Moreover, Starr does not and could not allege that its common stock conferred a right to

an unalterable proportion of AIG stock, because dilution is a natural and necessary risk of

investing in a corporation. *See Gatz v. Ponsoldt*, No. 174-N, 2004 WL 3029868, at *7 (Del. Ch.

Nov. 5, 2004). Likewise, Starr's common stock did not confer a property interest in the value of

that stock because it did not include a right to exclude others from the pool of AIG equity. *Cf.*

*Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002) (holding that plaintiffs had no

property interest in fishing licenses because the number of licenses to be issued was not fixed);

*Am. Pelagic*, 379 F.3d at 1374; *see also Minneapolis Taxi Owners Coalition v. City of*

*Minneapolis*, 572 F.3d 502, 508-09 (8th Cir. 2009); *Broad v. Sealaska Corp.*, 85 F.3d 422, 430

(9th Cir. 1996) (shareholders have no property interest in a corporation's assets or their value).

Starr asserts that its common stock is distinguishable from the property at issue in *Conti* and

*American Pelagic* because the scope of the property interest in those cases was within the control

of the Government.  Pl. Opp. 20.  However, whether property is subject to alteration or

elimination by the Government is distinct from whether property confers a right to exclude.  *See*

*Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1333-34 (Fed.

Cir. 2005); *see also Am. Pelagic*, 379 F.3d at 1374; *Conti*, 291 F.3d at 1341-42.  Because Starr's

interest did not include a right to exclude, Starr had no property interest in a proportionate share

value.  *See Lingle*, 544 U.S. at 539.

Second, Starr suggests that the Government took its voting rights under Delaware state

law by "circumventing" those rights.  Pl. Opp. 17-19.  However, voting rights are not property

for purposes of the Takings Clause; they are, at most, collateral interests incident to stock

ownership.  *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945); *Hearts Bluff*

*Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1332 (Fed. Cir. 2012).  Additionally, no such

rights were taken.  Starr complains that the reverse stock split was engineered to circumvent a

class vote (Pl. Opp. 18-19; Am. Compl. ¶¶ 101-102); however, Starr does not and cannot allege

that the common stock shareholders had a right to vote as a separate class upon a reverse stock

split, or otherwise to prevent a reverse stock split.  See Del. Code Ann. tit. 8, § 242(a)(3), (b)(2).

Starr concedes that cognizable property interests are limited by "existing rules or

understandings that stem from an independent source such as state law."  Pl. Opp. 16 (quoting

*Monsanto*, 467 U.S. at 1002).  This concession undermines Starr's assertion that the stock split

deprived it of property, because under Delaware law, the reverse stock split did not require a

25

separate class vote.  *See* Del. Code Ann. tit. 8, § 242(a)(3), (b)(2).  Moreover, AIG had no

obligation to seek a vote to increase the number of authorized shares if there was another lawful

way to issue those shares.  *See Uni-Marts, Inc. v. Stein*, Nos. 14713, 14893, 1996 WL 466961,

at *9 (Del. Ch. Aug. 12, 1996).  And any expectations Starr may have had about preventing a

reverse stock split do not create a property interest.  *See Hearts Bluff*, 669 F.3d at 1332.

Third, Starr fails to identify a property interest at issue in its derivative claim upon behalf

of AIG.  Starr asserts that the FRBNY appropriated $32.5 billion in collateral provided by AIG to

certain counterparties prior to the formation of ML III by requiring that the collateral be used to

fund ML III (Pl. Opp. 20), but that did not implicate a property interest.  AIG's cash payment to

ML III was, at most, an obligation to pay money.[6]  Even if the Government required that

payment, a generalized monetary liability imposed by the Government does not implicate a

property interest.  *See E. Enters. v. Apfel*, 524 U.S. 498, 538 (1998); *Commonwealth Edison Co.

v. United States*, 271 F.3d 1327, 1339-40 (Fed. Cir. 2001) (*en banc*).  That a portion of AIG's

funding for ML III came from "specific funds" of collateral posted by AIG is constitutionally

irrelevant because money is fungible.  *See United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9

(1989).  Likewise, the alleged obligation to contribute to ML III in exchange for a proportion of

the residual interests generated from the ML III portfolio is an "abstract sum of money," which is

not property.  *See Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004).

In addition, AIG had no property interest in the collateral that it posted prior to the

formation of ML III.  AIG had to post cash collateral to its CDS counterparties because of the fall

---

[6]  We disagree that the FRBNY imposed any obligations upon AIG.  However, for
purposes of this motion, we assume the allegations in the amended complaint to be true.

of the value of the obligations underlying those contracts, as well as the fall of AIG's credit rating. *See* Am. Compl. ¶¶ 35, 37, 52. Once the collateral was posted, AIG did not have a property interest in the cash collateral as it did not have a right to use, sell, assign, or otherwise transfer the cash collateral. *See, e.g.*, Am. Compl. ¶ 48; *see also Hearts Bluff*, 669 F.3d at 1330. Indeed, any interest AIG had in the cash collateral became subject to the counterparty's right to recover the face value of the underlying obligation through the collateral.

Starr does not allege that the collateral was used other than to discharge the obligations that it secured. Nor does Starr allege that this collateral, or any other property of AIG, was used to pay more than the amount of such obligations. Rather, Starr complains that "AIG's obligations could have been compromised for substantially less." Am. Compl. ¶ 78. However, even assuming that AIG had reason to hope that it might avoid fulfilling its obligations, it had no constitutionally-protected property interest in such avoidance. At most, AIG had a "unilateral expectation" that its counterparties would accept less than par value for the underlying obligations. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980). Finally, neither Starr nor AIG had a property interest in a loan on terms that did not include an equity component. *See Hearts Bluff*, 669 F.3d at 1330-31.

## V.     **Starr's Illegal Exaction Claim Should Be Dismissed**

Starr asserts that it alleges in addition to its taking claim an illegal exaction (Pl. Opp. 45, 47), a claim that must be construed as an alternative to its taking claim.[7] The Court should dismiss Starr's illegal exaction claim.

---

[7] An illegal exaction claim and a takings claim are mutually exclusive because if the Government action complained of were unauthorized, "plaintiff's takings claim would fail on that basis." *See Figueroa v. United States*, 57 Fed. Cl. 488, 495 (2003).

## A.      Starr Failed To Plead A Tucker Act Illegal Exaction Claim

Starr fails to satisfy the jurisdictional prerequisites of an exaction claim.  For Starr "[t]o invoke Tucker Act jurisdiction over an illegal exaction claim" it "must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (internal quotations omitted).[8] Starr does not demonstrate that any statute or provision mandates the return of money to it or AIG.[9]

## B.      AIG's Agreement To Exchange Consideration Is Not An "Exaction"

Starr's claim should also be dismissed because AIG's agreement to take $85 billion of Federal Reserve financing in exchange for consideration including an equity interest   a term originally sought by private banks before they declined to finance AIG   is not, in any plausible sense of the word, an "exaction."  "The classic illegal exaction claim is a tax refund suit alleging

---

[8]  Starr's assertion that this Court may entertain illegal exaction claims founded upon the seizure of property (Pl. Opp. 46 n.24), is mistakenly incomplete.  In the property seizure context, the Court found that it possessed jurisdiction because "[a]lthough the Government actually took property from Plaintiff, it proceeded to sell this property and received money in return." *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996).

[9]  To the extent that Starr relies upon the Federal Reserve Act provisions it cites (Sections 4 and 13(3) [12 U.S.C. §§ 341 and 343]), those provisions do not expressly or impliedly provide for a return of money.  Cases decided outside of the illegal exactions context suggest that Section 13(3) does not provide for the return of funds to borrowers; courts have been reluctant to imply remedies for private litigants for actions of the Federal Reserve banks and of national banks that were allegedly beyond the authorization of the Federal Reserve Act and National Bank Act, respectively.  *See Lucas v. Fed. Reserve Bank of Richmond*, 59 F.2d 617, 621 (4th Cir. 1932) (Federal Reserve Act); *see also Fed. Reserve Bank of Richmond v. Duffy*, 188 S.E. 82, 84 (N.C. 1936) (same); *Davis v. Countrywide Home Loans*, 2010 WL 3219306, at *8 (S.D.N.Y. July 23, 2010) (National Bank Act); *E. of Cascades, Inc. v. Fed. Deposit Ins. Corp.*, 2011 WL 647704, at *4 (W.D. Wash. Feb. 18, 2011) (same).

that taxes have been improperly collected or withheld by the government." *Norman*, 429 F.3d

at 1095.  In such a case, the Government compels the payment of money in an amount the private

party has not agreed is owed.  In other cases that Starr relies upon, payment was made to avoid a

constraint imposed by prior governmental action.  *E.g.*, *Eastport S.S. Corp. v. United States*,

157 Ct. Cl. 802, 802 (1962) (legislative constraint upon selling a ship; citing cases including

*Suwannee S.S. Co. v. United States*, 279 F.2d 874 (Ct. Cl. 1960), and *Clapp v. United States,*

117 F. Supp. 576 (Ct. Cl. 1954)); *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1576

(Fed. Cir. 1996) (requirement that an airline pay for the cost of detaining and maintaining

excludable aliens).  In contrast, Starr does not allege that the Government made AIG agree to

take a loan from the Federal Reserve.  AIG was free to seek financing elsewhere    as it did    or

not at all.  AIG was free not to agree to provide consideration for a loan that in part took the form

of an equity interest.  But AIG agreed to the exchange, which, some three years later, Starr

contends was an "exaction."  Starr's claim that AIG's voluntary agreement is an exaction is

implausible and should be dismissed.

### C.    AIG's Agreement To Transfer An Equity Interest Was Not Illegal

The FRBNY did not exceed its statutory authority in accepting AIG's offer and causing

the transfer of equity to a trust as consideration.  The FRBNY never acquired any AIG stock, and

thus did not violate any restriction upon its acquisition of stock.  Preferred stock was acquired by

the Trust for the benefit of the Treasury, and Starr does not contend that any statute prohibited

such an acquisition of stock.  No provision of Section 13(3) of the Federal Reserve Act prohibits

the transfer of equity as part of the consideration for a loan, and Starr cites no authority

prohibiting such a transfer.[10]

Starr's contention that the absence of specific authorization for transfers of equity as consideration for loans means that such transfers are impermissible is irreconcilable with Section 4 of the Act, which authorizes the Federal Reserve banks' exercise of not only "all powers specifically granted by the provisions of this chapter," but also "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter." 12 U.S.C. § 341. The FRBNY did not exceed its authority in accepting AIG's transfer of an equity interest to the Trust. *See Lucas*, 59 F.2d at 619-20 (incidental authority permits taking security in addition to collateral eligible for discounting; incidental powers of Federal Reserve banks practically the same as national banks). Incidental powers relating to the business

_____

[10]  The 1932 and 1936 Federal Reserve circulars that Starr cites also do not support its claim that interest is the only form of consideration the FRBNY can obtain for its Section 13(3) lending. *See* Pl. Opp. 49 n.27. Although both circulars discuss generally the statutory requirements for and limitations upon Section 13(3) lending, neither circular states or implies that accepting consideration other than interest is inappropriate. *See* 18 Fed. Reserve Bulletin 473, 518-20 (Aug. 1932), *available at* http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_081932.pdf.; 22 Fed. Reserve Bulletin 71, 123-24 (Feb. 1936), *available at* http://fraser.stlouisfed.org/docs/publications/FRB/1930s/frb_021936.pdf. Starr's attempt to invoke the "historical background" of the Federal Reserve Act in support of its position (Pl. Opp. 51) is similarly misguided. President Hoover's veto of a different law is irrelevant to the interpretation of Section 13(3) of the Federal Reserve Act, and even if it were relevant, "courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." *Shannon v. United States*, 512 U.S. 573, 583-84 (1994) (internal quotations omitted) (alterations in original).

Starr also misplaces its reliance upon an article published in 2000 in the *Annual Review of Banking Law* to assert that the Federal Reserve may not purchase equities as part of its incidental authority. Pl. Opp. 49 n.25 (citing Small & Clouse, *The Limits the Federal Reserve Act Places on the Monetary Policy Actions of the Federal Reserve*, 19 ANN. REV. BANKING L. 553, 574, 579 (2000)). To the contrary, as the article explains, purchasing equities is not *expressly* enumerated among the Federal Reserve's powers. Small & Clouse, 19 ANN. REV. BANKING L. at 571, 579 App'x C. A lack of express authority is not the same as no authority.

of banking are to be broadly construed, and an incidental power is valid where, as here, it is

"convenient or useful in connection with the performance of" an established activity pursuant to

an express power.  *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972); *NationsBank*

*of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995).

Starr misplaces its reliance upon national bank incidental powers in characterizing

Federal Reserve bank authority.  As Starr points out, it has been held that a national bank may

not purchase stock for itself as an incidental power relating to the "business of banking."  Pl.

Opp. 49 (citing *Cal. Nat'l Bank v. Kennedy*, 167 U.S. 362, 369 (1897)).  But a national bank's

limitation on acquisition of the stock of its borrower's businesses results from, and is cabined by,

12 U.S.C. § 24 (Seventh), which modifies national banks' incidental powers regarding the

business of banking by limiting a bank to buying or selling stocks for customers, and not "for its

own account."  And even with this limitation, national banks have nonetheless been permitted to

take equity interests in borrowers in a variety of circumstances.[11]

---

[11] *See, e.g.*, 12 C.F.R. § 7.1006 (permitting a national bank to "take as consideration for a
loan a share in the profit, income, or earnings from a business enterprise of a borrower,"
including a "stock warrant . . . taken in addition to, or in lieu of, interest"); O.C.C. Inter. Ltr.,
1992 WL 486905 (Jul. 15, 1992) (recognizing the validity of the "aspect of a lending
arrangement . . . sometimes referred to as an 'equity kicker'"); O.C.C. Inter. Ltr. No. 992,
2004 WL 1563358 (May 10, 2004) (national bank may exercise stock warrants for purpose of
immediate transfer of stock to third parties; Glass-Steagall Act's prohibition on dealing in stock
was designed to prevent national banks from engaging in speculative activity and not to bar
banks from all acquisitions of an equity interest in connection with lending activities); O.C.C.
Inter. Ltr. No. 1007, 2004 WL 3465754 (Sept. 7, 2004) (national bank may take equity in
satisfaction of debt previously contracted; "[n]ational banks may acquire and hold equity
securities in order to improve the prospects for recovery on loans that are in default, are
nonperforming, or otherwise have a history of poor performance"); *Cal. Nat'l Bank v. Kennedy*,
167 U.S. 362, 366-67 (1897) (while national banks may not purchase stock for the purpose of
investment or trading, they may, "incidental to the power to loan money on personal security,"
accept stock as collateral and become owners of that stock by enforcing their rights as lenders).
Such acquisitions of equity interests all fall within incidental powers to take steps "necessary to

No corresponding prohibition relating to Federal Reserve banks' involvement with equity positions appears in the 'incidental powers' provision of 12 U.S.C. § 341; even if such a limitation had been enacted, it would not be applicable in this case because the FRBNY did not obtain any equity position for its own account.  Thus, Starr is incorrect in stating that "the Federal Reserve may not sell a loan for consideration other than interest." Pl. Opp. 49.  The FRBNY is authorized to receive and retain consideration, and to take steps necessary to protect itself when lending pursuant to the exigent and unusual authority of Section 13(3).  *See Lucas*, 59 F.2d at 620.  This form of protection for the value of the FRBNY's loan was particularly appropriate given the mammoth scale and riskiness of the emergency lending AIG was seeking, as potential private lenders to AIG made clear by insisting upon the same proposed transfer of AIG equity before concluding that this transfer plus the other consideration proposed from AIG was insufficient to support the extraordinary loan AIG was seeking.

Here, the FRBNY was not dealing in stock.  Rather, incidental to its banking business, the FRBNY received an offer by AIG to transfer an equity interest as part of the consideration for a Section 13(3) loan.  The Board of Governors authorized the FRBNY to accept AIG's offer under banking authority that exists for unusual and exigent circumstances; that authorization by the agency charged with determining the scope of the FRBNY's authority was permissible and should be accorded deference.  *Cf. NationsBank*, 513 U.S. at 256-57 (affording *Chevron* deference to Comptroller of the Currency's interpretation of incidental powers under the National

---

carry on the business of banking"; as the Supreme Court has recognized, Glass-Steagall's express prohibition against national banks' dealing in stock for their own accounts "makes sense only if banks already had [incidental] authority . . . encompassed within the 'business of banking'" to obtain equity in this way. *NationsBank*, 513 U.S. at 258.

Bank Act); *Aerolineas Argentinas*, 77 F.3d at 1574 (applying *Chevron* deference in illegal

exaction case).  Starr's allegation that the Federal Reserve's authority could not extend to an

agreed-upon exchange of consideration that included an equity interest of the same sort sought by

private lenders is not plausible, and its claim of illegality should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in our motion, the United States

respectfully requests that the Court dismiss this action.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

/s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

/s/ Brian M. Simkin
OF COUNSEL:                     BRIAN M. SIMKIN
SHALOM BRILLIANT               Assistant Director
TIMOTHY P. MCILMAIL            Commercial Litigation Branch
BRIAN A. MIZOGUCHI             Civil Division
JOHN ROBERSON                  Department of Justice
Senior Trial Counsel           P.O. Box 480
                               Ben Franklin Station
CHRISTOPHER A. BOWEN           Washington, D.C.  20044
RENEE A. GERBER                Tele: (202) 616-8239
KAREN V. GOFF                  Fax: (202) 514-7969
MICHAEL S. MACKO
JOHN J. TODOR                  Email: brian.simkin@usdoj.gov
AMANDA L. TANTUM
VINCENT D. PHILLIPS
Trial Attorneys

                               Attorneys for Defendant

                               April 26, 2012