# In the United States Court of Federal Claims

No. 11-779C

(Filed:  July 2, 2012)

```
*************************************  *
                                       *
STARR INTERNATIONAL COMPANY,           *
INC.,                                  *
                                       *
                    Plaintiff,         *
                                       *
v.                                     *
                                       *
THE UNITED STATES,                     *
                                       *
                    Defendant,         *
                                       *
 and                                   *
                                       *
AMERICAN INTERNATIONAL GROUP,          *
INC.,                                  *
                                       *
                Nominal Defendant.  *
                                       *
*************************************  *
```

Shareholder Direct and Derivative Claims Arising From Government Bailout of Distressed Entity; Fifth Amendment Takings Claims; Government's Motion to Dismiss Pursuant to RCFC 12(b)(1) and 12(b)(6); 28 U.S.C. § 1500; Equal Protection and Due Process Claims; Standing; Unconstitutional Condition Claim; Illegal Exaction Claim.

*David Boies*, with whom were *Robert J. Dwyer*, *Nicholas A. Gravante Jr.*, *Hamish P. M. Hume*, *Samuel C. Kaplan*, *Duane L. Loft*, *Julia C. Hamilton*, and *Luke Thara*, Boies, Schiller & Flexner LLP, Armonk, New York, and *John L. Gardiner*, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Plaintiff, Starr International Company, Inc.

*Brian M. Simkin*, Assistant Director, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Shalom Brilliant*, *Timothy P. McIlmail*, *Brian A. Mizoguchi*, *John Roberson*, Senior Trial Counsel, *Christopher A. Bowen*, *Renee A. Gerber*, *Karen V. Goff*, *Michael S. Macko*, *John J. Todor*, *Amanda L. Tantum*, *Jacob A. Schunk*, and *Vincent D. Phillips*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.

*Joseph S. Allerhand*, *Stephen A. Radin*, and *Jamie L. Hoxie*, Weil, Gotshal & Manges LLP, New York, New York, for Nominal Defendant, American International Group, Inc.

OPINION AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

This case arises from the Government's bailout of American International Group, Inc. ("AIG") in September 2008 as AIG faced a liquidity crisis. At that time, Plaintiff, Starr International Company, Inc. ("Starr") was one of the largest shareholders of AIG common stock. Starr alleges that rather than providing the liquidity support it offered to comparable financial institutions, Defendant ("the Government")[1] exploited AIG's vulnerable financial position by becoming a controlling lender and controlling shareholder of AIG in September 2008. According to Starr, the Government took control of AIG so that it could use the corporation and its assets to provide a "backdoor bailout" to other financial institutions. In so doing, Starr alleges that the Government took AIG's property, including 562,868,096 shares of AIG common stock, without due process or just compensation.

On November 21, 2011, Starr filed a complaint in this Court against the United States, as well as a complaint in the U.S. District Court for the Southern District of New York against the Federal Reserve Bank of New York ("FRBNY"). See 1:11-cv-08422 (PAE). Starr subsequently filed an amended complaint in this Court on January 31, 2012, alleging violations of the Due Process, Equal Protection, and Takings Clauses of the United States Constitution, as well as an illegal exaction claim.[2] Starr asserts allegations of coercion, misrepresentation, and discrimination in support of its constitutional and illegal exaction claims, but not as free-standing tort allegations. Starr seeks damages from the Government of at least $25 billion based upon the alleged market value of the 562,868,096 shares of AIG common stock as of January 14, 2011, the date on which the Government ultimately received the shares.

Starr brings its claims individually and on behalf of a class of others similarly situated, pursuant to Rule of the Court ("RCFC") 23, and derivatively on behalf of AIG, pursuant to RCFC 23.1. Starr is a privately held Panama corporation, which is, and was at all relevant times, a shareholder of AIG common stock. AIG is a Delaware corporation. In an order dated February 10, 2012, the Court joined Nominal Defendant,

---

[1] Throughout this opinion the Court refers to Defendant, the United States as "the Government," which Starr defines as "the [U.S.] Department of the Treasury and its agents acting at its direction." Compl. ¶ 2. In so doing, the Court takes no position on the issue of who may have been acting under the control of the federal government at the time of the incidents alleged.

[2] When referencing "Starr's Complaint" or citing to "Compl.," the Court is referring to Starr's amended complaint filed January 31, 2012.

AIG as a necessary party pursuant to RCFC 19(a).[3]  See Starr Int'l Co. v. United States, 103 Fed. Cl. 287 (2012).

On March 1, 2012, counsel for the Government filed a motion pursuant to RCFC 12(b)(1) and 12(b)(6), requesting the Court to dismiss Starr's Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  Counsel for AIG and Starr filed briefs in response on March 26, 2012 and March 29, 2012, respectively, and counsel for the Government filed a reply on April 26, 2012.  The Court held oral argument on the Government's motion to dismiss on June 1, 2012 at the National Courts Building in Washington, DC.[4]

After considering the parties' filings and oral presentations, the Court grants in part and denies in part the Government's motion to dismiss.  The Court grants the Government's RCFC 12(b)(1) motion as to: (i) any Due Process claims not characterized as illegal exactions; and (ii) any Equal Protection claims.  For the time being, the Court defers the issue of whether Starr adequately pled its demand on AIG's board or the futility of such a demand, as required by RCFC 23.1.  The Court denies the remainder of the Government's motion challenging subject matter jurisdiction.  The Court grants the Government's RCFC 12(b)(6) motion as to:  (i) Starr's takings claim based on the Government's conversion of its preferred stock to common stock, insofar as Starr alleges the taking of the same equity interest more than once; and (ii) Starr's use of the rough proportionality test articulated in Dolan v. City of Tigard, 512 U.S. 374 (1994).  The Court denies the Government's RCFC 12(b)(6) motion in all other respects.

FACTUAL BACKGROUND

The Government actions at issue arose because AIG found itself in a liquidity crisis in the summer of 2008.  To understand the cause of AIG's liquidity issues—and the Government's alleged contribution to those issues—the Court provides background regarding AIG's business related to derivatives, and, in particular, credit default swaps ("CDSs").  The following facts, including the background on AIG's CDS business, are drawn from Starr's Complaint.  For purposes of this motion to dismiss, the Court accepts as true all of the allegations in Starr's Complaint.

---

[3] In a notice and order dated January 31, 2012, the Court advised AIG that as a party to this case, it would be bound by the Court's final judgment and may participate in this case to any extent it deems appropriate.  See Dkt. No. 23.

[4] The Court cites to the Government's March 1, 2012 motion to dismiss as "Def.'s Mot. __"; AIG's March 26, 2012 response as "AIG Resp. __"; Starr's March 29, 2012 opposition as "Pl.'s Opp. __"; the Government's April 26, 2012 reply as "Def.'s Rep. __"; and the transcript of the June 1, 2012 oral argument as "Tr. __ (Name of counsel)."

I.     AIG's CDS Business

Starting in the 1980s, a wholly-owned subsidiary of AIG, AIG Financial Products ("AIGFP") began entering into contracts called derivatives, whereby one party in effect paid a fee to the other party to take on the risk of a business transaction.  In 1998, AIGFP expanded this business to include an early form of what has become known as a "credit default swap."   A CDS is a contract that functions like an insurance policy for debt securities instruments.   In exchange for payments over time by a client, or "counterparty," the party writing the CDS is obligated to pay the counterparty the par value of the debt instrument in the event the instrument defaults.  The party writing the CDS then succeeds to the counterparty's interest in the debt instrument.

The securities referenced by the CDSs written by AIGFP included collateralized debt obligations ("CDOs").  A CDO is a complex investment product typically backed by a pool of fixed-income assets.  The collateral backing of a CDO can consist of various types of assets, including asset-backed securities ("ABSs").   Residential mortgage-backed securities were a common type of ABS used to form CDOs.  In December 2005, AIGFP executives determined that writing CDSs on CDOs backed by subprime mortgage debt was too risky, and AIGFP stopped writing such CDSs; however, the CDSs AIGFP had already written remained on its books.

In writing CDSs referencing CDOs, AIGFP took on two types of risk:  credit risk and collateral risk.  If any CDO defaulted, i.e., could no longer meet its obligation to pay interest to holders of the securities, AIG was responsible for paying the remainder of the CDO's obligation.  This was the credit risk.  In some cases, AIG was required to post collateral in connection with a CDS as an assurance that it would be able to perform its obligation in the event of a default.   Many of AIGFP's CDS contracts contained provisions requiring AIGFP to post cash collateral if AIGFP's credit rating fell or if the valuation of the underlying CDO fell below a certain threshold.  This was the collateral risk.

II.    AIG's Liquidity Issues In 2008 And The Government's Response

Beginning in 2007, AIGFP's CDS counterparties started to claim that the value of the underlying CDOs was falling precipitously and to make increasingly large collateral calls on AIGFP.  Those calls increased in the spring and summer of 2008.  At the same time, many of AIG's assets were relatively illiquid and difficult to sell quickly.  Due to the confluence of increased collateral calls and AIG's inability to sell certain assets, AIG faced a "liquidity squeeze" beginning in July 2008 and continuing into September 2008. Compl. ¶ 40.  The following is the account, as alleged by Starr, of the Government's discriminatory response to AIG's financial difficulties.

To address its liquidity issues, Starr "repeatedly" sought access to the Federal Reserve's discount window.[5]  Id. ¶ 42.  While the Government provided such access to other domestic and foreign institutions, it withheld access to the discount window, as well as other forms of liquidity assistance, from AIG.  Over the weekend of September 13-14, 2008, in addition to continuing to seek access to the discount window, AIG attempted to identify a private-sector solution to its liquidity issues.  During that time, the Government "discouraged" non-U.S. investors from participating in a private-sector solution to AIG's liquidity needs.  Id. ¶ 49.

On September 15, 2008, Lehman Brothers Holdings Inc. filed for bankruptcy.  That same day, the Government brokered talks among a consortium of banks in an attempt to arrange private financing for AIG.  Those talks ultimately failed.  Later that afternoon, the three largest rating agencies, Moody's, S&P, and Fitch Ratings Services, downgraded AIG's long-term credit rating.  At that point, AIG faced possible bankruptcy as it would no longer have liquidity sufficient to meet the cash collateral demands of AIGFP's counterparties.

Starr claims that by engaging in the discriminatory treatment recounted above, the Government contributed to AIG's financial difficulties.  According to Starr, the Government interfered with AIG's ability to raise capital and contributed to the decision to downgrade AIG's credit rating by denying AIG access to financial assistance given to other institutions and "insisting inaccurately" that it would not provide any assistance to AIG.  Id. ¶ 53.  The Government's actions and inaction also maximized the leverage of the private-sector consortium, putting the banks in a position to demand "oppressive terms" that the Government itself would later demand from AIG.  Id.  Two of the banks in the consortium had "severe conflicts of interest," as they would be among the largest beneficiaries of the Government's eventual bailout of AIG.  Id.

Moreover, Starr alleges that the Government used AIG's financial difficulties to "coerce" it to agree to a government takeover of the corporation, thereby allowing the Government to use the corporation and its assets to bail out other financial institutions.  Compl. ¶ 54.  As explained below, Starr maintains that the Government takeover commenced in September 2008 when the Government took control of AIG; continued in June 2009 when the Government circumvented shareholder rights; and culminated in January 2011 when the Government acquired over 90% of AIG's common stock, of which 562,868,096 shares were taken without just compensation.

---

[5] The Federal Reserve discount window is a means by which eligible institutions can borrow money from a Federal Reserve bank in order to meet temporary liquidity needs.

III.    September 2008:  The Loan Transaction Between The FRBNY And AIG

A.  The Term Sheet

Pursuant to its authority under Section 13(3) of the Federal Reserve Act ("FRA") (hereinafter "Section 13(3)"), Pub. L. No. 63-43, § 13(3) (1913) (codified as amended at 12 U.S.C. § 343 (2006)), the Government offered AIG access to the discount window on specific terms provided in a "term sheet."  Compl. ¶ 55(a).  The offer included the following terms:  "(i) an FRBNY credit facility to AIG of $85 billion secured by all of AIG's assets . . . [with] an initial annual cost to AIG of approximately 14.5% per annum, (ii) a requirement that the Government be given control of AIG as controlling lender and controlling shareholder, and (iii) a promise that the Government would receive a nearly 80% equity stake in AIG."  Id.  According to Starr, the Government's offer was based on a term sheet formulated by the private-sector consortium the Government had assembled. Id. ¶ 55(b).

After delivering the term sheet to AIG, Starr claims the Government "falsely advised" AIG's CEO that it would be the only offer AIG would get, "pressured" AIG's Board of Directors (the "AIG board") to make a decision within hours, and "falsely and irresponsibly represent[ed] that it was willing to risk destroying the global economy" if AIG did not accept the Government's demands.  Id. ¶¶ 58, 58(a).  According to Starr, AIG's board accepted the Government's terms before the opening of the next trading day, September 17, 2008.  Id. ¶¶ 58(a), 59.  Also on September 17, 2008, Starr submits that the Government fired AIG's CEO and replaced him with Edward M. Liddy, who acted at all relevant times as if he were under the control of the FRBNY and the Government.  Id. ¶¶ 60-61.

B.  The Credit Agreement and Subsequent Agreements

On September 22, 2008, the FRBNY and AIG entered into an agreement ("the Credit Agreement"), under which the FRBNY agreed to extend up to $85 billion in credit to AIG on a revolving basis.  The Credit Agreement required AIG to fully secure the loan with AIG assets, pay the interest rate specified in the September 16, 2008 term sheet, and issue to a trust ("the Trust") Series C Preferred Stock convertible to 79.9% of AIG's common stock.

To implement the terms of the Credit Agreement, the parties subsequently entered into three related agreements.  On January 16, 2009, the parties entered into the AIG Credit Facility Trust Agreement (the "Trust Agreement"), which established the Trust to hold the Government's Series C Preferred Stock.  According to Starr, the Trust "was created 'for the sole benefit of the United States Treasury'" and consisted entirely of the Series C Preferred Stock.  Compl. ¶¶ 69-70 (quoting the Trust Agreement). The Series C Preferred Stock provided the Trust with voting power equivalent to a 79.9% interest in

AIG.  In addition, on March 1, 2009, the parties entered into the "Stock Purchase Agreement" to facilitate the conversion of the Government's preferred stock into common stock.  Id. ¶ 91.  Ultimately, upon the closing of the "Recapitalization Plan" on January 14, 2011, the Government converted its preferred stock into 562,868,096 shares of common stock.  Id. ¶ 101.

At the time of the Credit Agreement, Starr maintains that a 79.9% ownership interest in AIG common stock was valued at $23 billion.  Id. ¶ 67.  Yet, according to Starr, the Trust "was required to pay nothing more than $500,000 for the Series C Preferred Stock with the purported 'understanding that additional and independently sufficient consideration was also furnished to AIG by the [FRBNY] in the form of its lending commitment . . . under the Credit Agreement.'"  Id.

What Starr calls the "grossly disproportionate" terms of the loan transaction form the basis of Starr's takings claims.  Id. ¶ 55(d).  Starr asserts that AIG compensated the Government for its lending commitment by fully securing the loan with AIG assets and offsetting any risk by agreeing to a 14.5% interest rate on the loan.  By also demanding a 79.9% interest in AIG, Starr claims the Government acted in excess of its authority under Section 13(3) and took the property of AIG and its shareholders without just compensation.  See Compl. ¶ 171.

IV.   June 2009:  The AIG Shareholder Meeting And Reverse Stock Split

Starr maintains that the Credit Agreement gave the Government the "contractual right" to receive the Series C Preferred Stock convertible to 79.9% of AIG common stock.  Tr. 53, 109 (Boies); see also Compl. ¶ 65.  As Starr explains, however, AIG's then-governing Restated Certificate of Incorporation (AIG's "Charter") did not authorize a sufficient number of common shares to allow the Government to acquire a 79.9% interest in AIG.  The Charter provided for 5 billion shares of authorized common stock, of which more than 3 billion had been issued or reserved, leaving less than 40% available for conversion.  To enable the Government to acquire a 79.9% interest in AIG, the Government needed to amend the Charter to increase the number of authorized shares of common stock.

To increase the number of authorized shares, Starr contends that Delaware law required the Government to obtain approval from a majority of the then-existing common shareholders voting as a separate class.  Id. ¶ 81 (citing Del. Code Ann. tit. 8, § 242 (2012)).  Consistent with Delaware law, Starr maintains that the Government represented in the Delaware Court of Chancery, in its securities filings, and in the Stock Purchase Agreement, that it would not convert its preferred stock into common stock without an independent vote of the then-existing common shareholders to increase the number of authorized shares.

According to Starr, at AIG's annual shareholder meeting on June 30, 2009, the Government "circumvent[ed]" the requisite vote of the common stock shareholders by means of a reverse stock split. Id. ¶ 102. The meeting materials included two proposals (relevant here), which Starr calls "Proposal 3" and "Proposal 4." Id. ¶¶ 94, 97. Proposal 3 sought to amend the Charter to increase the number of authorized common shares. With the then-existing common shareholders voting as a separate class, Proposal 3 failed. Anticipating that Proposal 3 would fail, the meeting materials also included Proposal 4, which sought to implement a reverse 20:1 stock split that would apply to issued, but not authorized, shares. With the Government's controlling vote participating, Proposal 4 passed.

By means of the reverse stock split, the Government reduced the number of issued common shares from approximately 3 billion to 150 million, while leaving the number of authorized common shares at 5 billion. Correspondingly, the Government increased the percentage of authorized but unissued shares from less than 40% of the outstanding common stock to more than 90% of the outstanding common stock. This enabled the Government to convert its preferred stock into a majority share of AIG common stock, which it did on January 14, 2011, upon the closing of the Recapitalization Plan.

According to Starr, the conversion "completed" the Government's taking of the AIG shareholders' interests. Id. ¶ 101(a). Starr contends that the Government obtained the common shares for "virtually nothing" ($500,000, i.e., what the Government allegedly paid for the Series C Preferred Stock), given that the shares had a market value in excess of $25 billion as of January 14, 2011. Id. ¶¶ 101(a), (c).

V.     The Maiden Lane III Transactions

In addition to the Government's alleged taking of over 562 million shares of AIG common stock, Starr contends that the Government took cash collateral posted by AIG to effect a "backdoor bailout" of AIG's counterparties.

Starr explains that in the summer of 2008, AIG was receiving collateral calls from its counterparties due to the counterparties' own collateral calls. At that time, the FRBNY created a special purpose vehicle designated Maiden Lane III ("ML III"), ostensibly to resolve AIG's obligations to its CDS counterparties. According to Starr, AIG and the FRBNY funded ML III, with AIG ultimately posting $32.5 billion in cash collateral, along with an additional $5 billion equity investment, and the FRBNY lending ML III $24.3 billion.

Starr maintains that "[t]hrough its control over AIG," the FRBNY "required AIG" to use ML III to purchase CDO assets from AIGFP counterparties. Compl. ¶ 114. In a series of transactions executed in November and December 2008, ML III purchased approximately $62.1 billion worth of notional CDO assets from AIGFP counterparties.

As part of the purchase price, the counterparties retained the cash collateral that AIG had posted prior to ML III's formation.

Starr contends that the FRBNY paid the AIGFP counterparties near face value for their CDOs in exchange for their agreement to cancel their CDS contracts with AIG. The FRBNY also required AIG to execute releases waiving all claims against the counterparties arising out of the contracts cancelled through ML III. Starr asserts a taking of AIG's collateral based upon its position that AIG's obligations could have been compromised for substantially less than face value.

DISCUSSION

Based on the foregoing facts, Starr seeks just compensation for the Government's taking of the property of AIG and AIG shareholders to engineer a "backdoor bailout" of AIG's counterparties during the financial crisis in 2008. First, Starr brings a direct takings claim based on the Government's alleged expropriation of the economic value and voting power associated with the shares of AIG common stock owned by Starr and the class. Second, Starr advances derivative claims to recover just compensation for the Government's alleged taking of a 79.9% equity interest in AIG, as well as a portion of the collateral posted by AIG prior to the formation of ML III. Finally, Starr brings an illegal exaction claim, asserting that the Government exacted and retained AIG's property in excess of the Government's statutory and regulatory authority.

The Government urges the Court to dismiss this action pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. First, the Government contends that 28 U.S.C. § 1500 bars this action because Starr has pending in district court an action advancing substantially the same claims as alleged here. Second, according to the Government, this Court lacks jurisdiction to hear Starr's Equal Protection and Due Process claims because those Constitutional provisions are not money-mandating. Third, the Government argues that Starr lacks standing to maintain its direct claim because the interests forming the basis of that claim belong to AIG, not Starr or any other shareholder. Fourth, the Government contends that Starr lacks standing to advance its derivative claims because Starr failed to plead adequately a demand on AIG's board or the futility of such a demand.

Even if the Court were to find that it possesses jurisdiction, the Government urges the Court to dismiss Starr's takings and illegal exaction claims under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The Government urges dismissal of Starr's takings claims based on the following five allegations: (1) Starr fails to pinpoint the action(s) for which the Government allegedly owes just compensation; (2) Starr relies upon allegations that the FRBNY's actions were unlawful and unauthorized; (3) Starr fails to demonstrate that the challenged transactions were involuntary; (4) Starr

fails to identify legally cognizable property interests taken from it or AIG; and (5) Starr relies, in part, on a "rough proportionality" test that is inapplicable here.

As to Starr's illegal exaction claim, the Government contends that Starr does not satisfy the jurisdictional prerequisites for such a claim because Starr fails to demonstrate that any statute mandates the return of money to it or AIG.  Moreover, as with Starr's takings claims, the Government maintains that AIG voluntarily entered into the loan agreement, and, as such, AIG's agreement to transfer equity in exchange for a loan was not an "exaction."  Likewise, neither was the transaction "illegal," according to the Government, because the FRBNY did not exceed its authority under Section 13(3) of the FRA when it caused the transfer of AIG equity to the Trust in consideration for the loan. The Court addresses each of the Government's arguments in turn.

I.     Standard Of Review

To survive a motion to dismiss, a plaintiff need only "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A well-pleaded complaint may proceed even if it appears on the face of the pleadings that "recovery is very remote and unlikely."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). In sum, the Court considers the Government's motion to dismiss keeping in mind that Starr's burden at this phase is "minimal."  Colonial Chevrolet Co. v. United States, 103 Fed. Cl. 570, 574 (2012).  Although the facts of this case are vigorously contested, the Court must accept all well-pleaded allegations in Starr's Complaint and construe the facts in the light most favorable to Starr.

II.    Whether The Court Lacks Subject Matter Jurisdiction To Hear Plaintiffs' Claims

Subject matter jurisdiction is a threshold issue to be considered before proceeding to the merits of a case.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Where subject matter jurisdiction over a claim is at issue, the plaintiff must establish jurisdiction by a preponderance of the evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (internal citations omitted).   In "determining whether a motion to dismiss should be granted, the . . . Court may find it necessary to inquire into jurisdictional facts that are disputed."  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).  If subject matter jurisdiction is lacking, the Court must dismiss the action.  RCFC 12(h)(3).

A. Whether the Court Possesses Subject Matter Jurisdiction In Light of 28 U.S.C. § 1500 and Starr's Pending Action in District Court

The Government contends that 28 U.S.C. § 1500 bars this action because Starr has

pending in district court an action advancing substantially the same claims as alleged here. By operation of Section 1500, this Court "has no jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents." United States v. Tohono O'odham Nation, 131 S. Ct. 1723, 1727 (2011). As the U.S. Supreme Court explained in Tohono O'odham, "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in [this Court], if they are based on substantially the same operative facts, regardless of the relief sought in each suit." Id. at 1731. Section 1500 deprives this Court of jurisdiction, however, only where a plaintiff commences a suit in the other court before filing in this Court. Tecon Eng'rs, Inc. v. United States, 343 F.2d 943, 949 (Ct. Cl. 1965).

The Government argues that the sequence of filing rule, stated in Tecon, is no longer controlling authority in light of dicta from Tohono O'odham. See Def.'s Mot. 13-14. The Court recently addressed this same argument in United Keetoowah Band of Cherokee Indians in Okla. v. United States, holding that dicta from Tohono O'odham does not supersede otherwise binding precedent from Tecon. ___ Fed. Cl. ___, 2012 WL 1005907 at *10 (Mar. 27, 2012). The Court also concluded that the *per se* rule from Passamaquoddy Tribe v. United States, is limited to circumstances "'when evidence is lacking as to which of the two complaints was filed first.'" 82 Fed. Cl. 256 (2008), aff'd, 426 F. App'x 916 (2011) (non-precedential) (quoting Kaw Nation of Okla. v. United States, 103 Fed. Cl. 613, 634 (2012)).

Here, it is undisputed that Starr filed its complaint in this Court prior to filing in the U.S. District Court for the Southern District of New York. See Tr. 9 (Todor). Consequently, the *per se* rule from Passamaquoddy Tribe is inapplicable, and the rule articulated in Tecon dictates that Section 1500 does not deprive this Court of subject matter jurisdiction.

Further, the Court is not convinced that the district court action naming the FRBNY as Defendant would trigger application of Section 1500 in the first place. Starr could not have sued the FRBNY in the Court of Federal Claims. The Court is skeptical of an interpretation of Section 1500 that would require Starr to forgo one of its two actions, which it could not have filed in the same court based upon the named Defendants.

### B. Whether the Court Possesses Jurisdiction Over Claims Starr Characterizes As Due Process and Equal Protection Violations

The Government next argues that the Court does not have subject matter jurisdiction over Starr's Due Process and Equal Protection claims. See Def.'s Mot. 14. The Tucker Act, 28 U.S.C. § 1491(a)(1), operates as a grant of subject matter jurisdiction for "specified types of claims against the United States" and as "a waiver of sovereign immunity with respect to those claims." United States v. Mitchell, 463 U.S. 206, 212

(1983) (internal footnote omitted).  The Act does not, however, create a substantive right to recover against the Government.  United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, that substantive right must stem from either a "money-mandating" source of positive law or an "illegal exaction" under the color of positive law.  Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007-09 (Ct. Cl. 1967), abrogated in part on other grounds by Malone v. United States, 849 F.2d 1441, 1444-45 (Fed. Cir. 1988).

These two types of permissible Tucker Act claims can be thought of as complements.  Crocker v. United States, 37 Fed. Cl. 191, 197 (1997), aff'd per curiam, 125 F.3d 1475 (Fed. Cir. 1997).  The first type of claim seeks to recover affirmative damages from the Government pursuant to a statutory, regulatory, or constitutional provision.  Id.  The second type of claim seeks to recover funds already paid to the Government pursuant to a statutory, regulatory, or constitutional provision.  Id.  The U.S. Court of Appeals for the Federal Circuit has indicated that even in the case of an illegal exaction, a claimant must satisfy the usual money-mandating requirement of the Tucker Act.  See Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005).[6]  Specifically, the "claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  Norman, 429 F.3d at 1095 (quoting Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).

An illegal exaction also may be conceptualized as "a deprivation of property without due process of law."  Id.  In that sense, it is an exception to the general rule that the Due Process Clause of the Fifth Amendment is not money-mandating.  Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (internal citation omitted).  Neither is the Equal Protection Clause money-mandating.  Carruth v. United States, 627 F.2d 1068, 1081 (Ct. Cl. 1980) (internal citation omitted).  Based on the foregoing, Starr may maintain its Due Process claim in this Court only insofar as it is based on an illegal exaction theory.  Starr may not maintain an Equal Protection claim as a stand-alone claim in this Court.

C.  Whether Starr Has Standing To Bring Its Direct Claim[7]

Starr brings a direct takings claim for the Government's alleged "expropriation of

---

[6] But see Figueroa v. United States, 57 Fed. Cl. 488, 499 (2003) ("In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language." (citing Bowman v. United States, 35 Fed. Cl. 397, 401 (1996))), aff'd, 466 F.3d 1023 (Fed. Cir. 2006).

[7] This Court has jurisdiction over takings claims against the U.S. Government pursuant to the Tucker Act.  Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1362 (Fed. Cir. 2005) (quoting 28 U.S.C. § 1491(a)(1) (2006)) (noting that this Court's jurisdiction "includes on its face all takings claims against the United States").  The parties dispute, however, whether Starr can bring such a claim directly.

the economic value and voting power associated with plaintiff's shares of AIG common stock." Pl.'s Opp. 29. The Government contends that Starr lacks standing to assert its expropriation claim[8] directly because, under Delaware law, such claims are generally derivative only and Starr's claim does not fall within the exception to that general rule. See Def.'s Rep. 4-5. As set forth below, the Court finds that Starr has pled facts sufficiently alleging a harm to the suing stockholders independent of any harm to AIG and as such, has standing to advance its expropriation claim directly.

       1.  Applicable law

In Tooley v. Donaldson, 845 A.2d 1031 (Del. 2004), the Supreme Court of Delaware clarified the test for determining whether a claim is derivative or direct. The determination, it said, turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Id. at 1033 (emphasis in original). In other words, "a court should look to the nature of the wrong and to whom the relief should go." Id. at 1039. The court explained that "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Id.

Central to Starr's claims is its assertion that the Government forced AIG to issue to the Government over 562 million shares of AIG common stock worth over $20 billion[9]

---

[8] While Starr labels its direct claim as one for "expropriation," Pl.'s Opp. 29, the Supreme Court of Delaware has at times called such claims "dilution" claims, In re Tri-Star Pictures, 634 A.2d 319, 330 (Del. 1993), and has used the terms "expropriation" and "dilution" interchangeably, see Gatz v. Ponsoldt, 925 A.2d 1265, 1278 (Del. 2007) (stating that a recapitalization resulted in "a dilution or expropriation of value and voting power"); see also Gentile v. Rossette, 906 A.2d 91, 102 n.26 (Del. 2006) ("In *Tri-Star*, this Court articulated the harm to the minority in terms of a "dilution" of the economic value and voting power of the stock held by the minority. In this case, we adopt a more blunt characterization—extraction or expropriation—because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power . . . and the uniqueness of the resulting harm to the minority shareholders individually."). Likewise, in addressing Starr's direct claim, this opinion refers to it interchangeably as Starr's "expropriation" or "dilution" claim.

[9] In its prayer for relief, Starr requests damages in an amount "no . . . less than $25 billion," which it maintains was the market value for the 562,868,096 shares of AIG common stock as of January 14, 2011, the date upon which the Government exchanged its Series C Preferred Stock for common stock. Compl. at 57, ¶ H. As set forth below, infra Part III.A.1, the Court finds that Starr ultimately places the Government's taking of a 79.9% equity interest in AIG at September 22, 2008, when the Government allegedly "imposed" the Credit Agreement upon AIG's board, see Compl. ¶¶ 63-64, 67; Tr. 51-52, 100-01, 105 (Boies). Around the time of the Credit Agreement, Starr maintains that an ownership interest in 79.9% of AIG's common stock was valued at $23 billion. Compl. ¶ 67. At this stage of the case, the Court does not seek to approximate any potential damages but merely explains the reason for its imprecise reference to "over $20 billion."

in exchange for the Series C Preferred Stock, "for which the Government paid virtually nothing" ($500,000).  Pl.'s Opp. 11; Compl. ¶¶ 67, 174.  Such "corporate overpayment" claims[10] are "premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable." Feldman, 956 A.2d at 655.  The Supreme Court of Delaware has said that such claims are normally regarded as exclusively derivative.  Rossette, 906 A.2d at 99.  This is because, in Tooley terms, the corporation is "the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow."  Id.

The Supreme Court of Delaware has recognized, however, "a species of corporate overpayment claim" that is "both derivative and direct in character."  Id.; In re Tri-Star Pictures, 634 A.2d 319; Gatz, 925 A.2d 1265.  In Rossette, 906 A.2d at 100, and subsequently in Gatz, 925 A.2d at 1278, the court explained that such a claim arises where:

> (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.

Where such a transaction occurs, the court held that in addition to having a derivative claim, the public shareholders also have a direct claim for the expropriation, or dilution, of their economic value and voting power.  Rossette, 906 A.2d at 100.

In so holding, the court was careful to point out that this type of corporate overpayment claim has two independent aspects, despite arising from the same transaction.  See id. at 99.  The first aspect is that the corporation was forced to overpay for an asset (here, the $85 billion loan) in the exchange (here, for the 79.9% stake in AIG).  Id.  This aspect is the basis for the derivative claim because "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."  Id.  "[S]uch equal 'injury,'" said the court, "is not viewed as, or equated with, harm to specific shareholders individually."  Id.

The second aspect is that, by means of the overpayment (in the form of excessive shares), the minority shareholders lost a portion of the economic value and voting power

---

[10] The Delaware Court of Chancery has referred to such "corporate overpayment" claims as "wrongful dilution" claims.  Feldman v. Cutaia, 956 A.2d 644, 655 (Del. Ch. 2007).

of their stock interest.  Id.  This aspect is the basis for the direct claim because the harm "is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares," i.e., the basis for the derivative claim.  Rossette, 906 A.2d at 99.  Rather, "[a] separate harm also results:"

> an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.  As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.

Id.  In such a case, the court held that public shareholders are entitled to bring a direct claim "to recover the value represented by the overpayment."  Id.

### 2.  The parties' arguments

Relying in part on the framework set forth in Gatz and Rossette, Starr asserts that it has standing to bring a direct claim because the Government first took control of AIG and then used that control to expropriate a 79.9% interest in AIG from the minority shareholders.[11]  See Pl.'s Opp. 22-23.  Specifically, Starr claims that the Government gained control of AIG on September 16, 2008 pursuant to the term sheet.  See Tr. 78, 106, 109 (Boies).  As stated in Starr's Complaint, one of the terms "demanded" by the Government, ¶ 55(d), was "a requirement that the Government be given control of AIG as controlling lender and controlling shareholder," ¶ 55(b).  In addition, Starr claims that the next day, September 17, 2008, "the Government unilaterally fired AIG's CEO and replaced him with a new CEO (Edward M. Liddy) who would be under FRBNY's control."  Id. ¶ 60; see also Tr. 57, 67, 106, 109 (Boies).  Starr alleges that "[a]t all relevant times, Mr. Liddy acted as if he were under the control of and the agent of FRBNY and the Government."  Compl. ¶ 61.

Thereafter, Starr asserts that the Government used its control of AIG to expropriate the economic and voting interests of the then-existing common stock shareholders.  See Pl.'s Opp. 22-23.  Starr alleges that pursuant to the Credit Agreement,

---

[11] "Minority" shareholders refers to the AIG common shareholders at the time of the alleged expropriations.  The Court refers to them as "minority" shareholders in the sense that, according to Starr's allegations, they no longer controlled AIG after September 16, 2008.  Tr. 78 (Boies).  The Court does not refer to them as minority shareholders because of the percentage of their ownership interest in AIG common stock.  See In re PNB Holding Co. S'holders Litig., No. Civ. A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (Under Delaware law, "a controlling shareholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation." (citing Kahn v. Lynch Comm. Sys., Inc., 638 A.2d 1110, 1113-14 (Del. 1994))).

signed September 22, 2008, the Government took 79.9% of the minority shareholders' "equity interest," consisting of dividends and liquidation value, as well as 79.9% of their "first voting interest," consisting of dividend and shareholder voting rights (but not yet common stock only voting rights).  Tr. 101 (Boies); see also Slide 20.[12]  Subsequently, Starr alleges that the Government took 79.9% of the minority shareholders' common stock only voting rights by means of the reverse stock split on June 30, 2009 and the conversion of the Series C Preferred Stock into over 562 million shares of common stock on January 14, 2011.  Tr. 101 (Boies); see also Slide 16.

The Government concedes that the Gatz-Rossette line of cases recognize the right of a plaintiff to bring a direct claim where a stockholder uses its "'majority or effective control'" to dilute minority shares.[13]  See Def.'s Rep. 5 (quoting Rossette, 906 A.2d at 100).  The Government contends, however, that Starr's claim does not fall within that Gatz-Rossette framework because the Government was not a stockholder, nor did it have majority or effective control of AIG, when the purported dilution occurred.  Id.

Key to the Government's position is its assertion that any alleged dilution occurred on September 16, 2008, when AIG agreed to transfer a 79.9% equity interest to the Government in exchange for the $85 billion loan.  Id. (citing Compl. ¶ 4); Tr. 17 (Todor). In the Government's view, the subsequent events—the issuance of the Series C Preferred Stock to the Trust, the reverse stock split, and the conversion of the preferred stock into common stock—were merely implementations of the September 16 agreement.  See Tr. 17-18 (Todor).  On September 16, 2008, however, the Government notes that "neither the United States nor the FRBNY was a common shareholder," as AIG did not issue the Series C Preferred Stock to the Trust until March 1, 2009 and the Government did not acquire AIG common stock until January 14, 2011.  See Def.'s Rep. 5 (citing Compl. ¶¶ 52-54); Tr. 17-18 (Todor).  Moreover, the Government asserts that it could not have used its majority or effective control to increase its share at the expense of the minority because it acquired control at the same time it acquired its 79.9% share:  on September 16, 2008.  See Tr. 17-18 (Todor).

---

[12] During the oral argument held on June 1, 2012, counsel for Starr provided the Court with a binder consisting of copies of power point slides, which Starr used to support its argument.  Upon request by the Government, the Court agreed to consider only those slides to which counsel for Starr referred during his presentation.  This opinion refers to those slides as "Slide __."

[13] Initially, in its motion to dismiss, the Government failed to address Gatz or Rossette and contended that Starr's dilution claim was solely derivative and not direct because AIG suffered the alleged harm and would receive the benefit of any recovery.  Def.'s Mot. 17.  In its reply, however, the Government conceded that "the [Rossette] and Gatz cases recognize[e] that ordinarily derivative claims for dilution can become direct if the plaintiff sustainably alleges that the dilution was accomplished by a controlling shareholder that used its majority power discriminatorily to dilute minority shareholders."  Def.'s Rep. 5.

### 3.  Analysis

In determining whether Starr has standing to advance its direct claim, the Court notes that the question of when the purported dilution occurred is a factual one that cannot be decided definitively at this time.  The Court does not have before it the September 16, 2008 term sheet or the September 22, 2008 Credit Agreement and cannot make any conclusive determinations as to what rights the Government obtained pursuant to either agreement.  While the Government maintains that any purported dilution occurred on the same date the Government acquired control of AIG, the Court must accept as true Starr's position to the contrary.

The Court notes that it is unclear why, if Starr's position is to be believed, the term sheet was binding as to control but not as to the transfer of the 79.9% interest in AIG (or why the former was not simply the result of the latter).  As stated in Starr's Complaint, the term sheet consisted of three terms, including "a requirement that the Government be given control of AIG" and "a promise that the Government would receive a nearly 80% equity stake in AIG."  ¶ 55(a).  Starr's position appears to be that while the term sheet was sufficient to establish the Government's control over AIG, it was not sufficient to give the Government the "contractual right" to a 79.9% interest in AIG.  Tr. 53, 109 (Boies).  Regardless, insofar as Starr claims that the Government first acquired control of AIG (on September 16, 2008) and then used that control to expropriate a 79.9% interest in AIG from the minority shareholders, <u>Gatz</u> and <u>Rossette</u> can be read to support the right of the minority shareholders to bring a direct claim for the expropriation of a portion of the economic value and voting power embodied in their interests.

The Court acknowledges that the circumstances in <u>Gatz</u> and <u>Rossette</u> are distinguishable from those here.  Both <u>Gatz</u> and <u>Rossette</u> involved breach of fiduciary duty claims rather than takings claims.  Moreover, even under Starr's rendition of the facts, the Government was not a stockholder when the initial dilution purportedly occurred, as the parties agree that stock was not issued to the Trust until March 1, 2009.  <u>See</u> Tr. 25 (Simkin), 101 (Boies).

Nevertheless, the Court is persuaded that the facts alleged here are sufficiently analogous to those in <u>Gatz</u> and <u>Rossette</u> to support Starr's right to maintain a direct claim for the taking of its equity and voting interests.  Whether styled as a takings claim or a breach of fiduciary duty claim, the Plaintiffs here, like those in <u>Gatz</u> and <u>Rossette</u>, seek compensation for the improper extraction of the economic value and voting power associated with their shares of stock.  In <u>Gatz</u> and <u>Rossette</u>, it was important that a controlling shareholder existed because only then did a fiduciary duty to the minority shareholders arise.  As stated in <u>Dubroff v. Wren Holdings, LLC</u>, <u>Rossette</u>'s "linkage of equity dilution claims to a controlling shareholder grows out of the principle that a controlling shareholder owes fiduciary duties to the shareholders of the corporation she controls."  C.A. No. 3940-VCN, 2009 Del. Ch. LEXIS 89, at *11 (May 22, 2009).  Here,

however, the Government has a preexisting duty under the Fifth Amendment not to take private property for public use without paying just compensation. As in <u>Gatz</u> and <u>Rossette</u>, the Government had an obligation not to appropriate the minority shareholders' property interests[14]—irrespective of whether the Government was a stockholder when the purported dilution occurred.

Given the Government's preexisting duty not to take property without paying just compensation, the Court looks to <u>Gatz</u> and <u>Rossette</u> to determine *who* has the right to maintain a takings claim against the Government: AIG or the shareholders individually. As in <u>Gatz</u> and <u>Rossette</u>, Starr claims that AIG was forced to overpay (ultimately in the form of over 562 million shares of common stock) for an asset of lesser value (the Series C Preferred Stock). As in <u>Rossette</u>, Starr's claim falls comfortably within the framework articulated in <u>Tooley</u>. <u>See</u> 906 A.2d at 102. First, assuming the truth of Starr's allegations, the Government extracted from the public shareholders, and redistributed to itself, "a portion of the economic value and voting power embodied in the minority interest." <u>Id.</u> at 100. As a result, AIG's shareholders were harmed "uniquely and individually" to the same extent that the Government benefited. <u>Id.</u> Second, counsel for AIG represented at oral argument that the Government continues to own 61% of AIG today. Tr. 82 (Allerhand). If Starr were to prevail on its derivative claim only, any recovery would go to AIG, with the Government receiving an amount corresponding to its ownership percentage. Because the party that suffers the alleged harm should be the beneficiary of any recovery, the Government's continuing ownership interest in AIG provides further support for the view that Plaintiffs have standing to bring a direct claim. For the foregoing reasons, the Court concludes that Starr has standing to advance its direct claim.

    D. Whether Starr Has Adequately Pled Demand on AIG's Board or Excusal of
       Demand for Purposes of Its Derivative Claim

The Government next argues that the Court should dismiss Starr's derivative claims under RCFC 23.1 because Starr failed to make a demand on AIG's board or to plead adequately why such a demand should be excused.[15] Def.'s Mot. 18. In response, both Starr and Nominal Defendant, AIG have asked the Court to defer ruling on the

---

[14] This conclusion presupposes that the shareholders have a legally cognizable property interest in the economic value and voting power associated with their shares of common stock. At this stage of the proceedings, the Court finds that they do. <u>See</u> Discussion, p. 31.

[15] RCFC 23.1(b)(3) provides that the complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."

demand issue until after the Government's motion to dismiss has been resolved.[16]  See AIG Resp. 3; Pl.'s Opp. 24.  The Government opposes the proposal to defer ruling on the demand issue, contending that doing so would "reverse proper procedure," "waste judicial resources," and "violate the requirement that a plaintiff possess standing."  Def.'s Rep. 6-7.

In light of the purpose underlying the demand requirement, the Court finds no reason to address the demand issue at this time.  The purpose of the demand requirement is to protect the "directors' power to manage the affairs of the corporation."  Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 730 (Del. 1988) (citing Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984)).  As the Supreme Court of Delaware explained in Aronson:

> By its very nature the derivative action impinges on the managerial freedom of directors.  Hence, the demand requirement . . . exists at the threshold, first to insure that a stockholder exhausts his intercorporate remedies, and then to provide a safeguard against strike suits.  Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

473 A.2d at 811-12.  Here, AIG—the party the demand requirement was meant to protect—has not sought to enforce its right to a demand but instead, has requested that the Court defer ruling on the issue.  Under such circumstances, the Court is not compelled to address the demand issue at this time.

Moreover, deferring the demand issue will preserve judicial resources.  In an order dated March 13, 2012, the Court stated that "in the event that [it] denies the Government's March 12, 2012 motion to dismiss, AIG may file an answer . . . or dispositive motion within twenty days after the Government's filing of its answer."  Dkt. No. 35.  If the Court were to decide the demand issue now, based upon the parties' filings to date, it is conceivable that it would need to do so again upon receiving the pending filing from AIG.  The Government concedes as much.  Therefore, in the interest of judicial economy, the Court will rule on the demand issue after it receives AIG's upcoming filing.  Once AIG has made its filing, the Court will have all of the parties' views before it and will be in the best position to decide the demand issue definitively.

---

[16] In its opposition to the Government's motion to dismiss, Starr argued in the alternative that, should the Court decide to rule on the demand issue now, its Complaint satisfies the demand requirement because it adequately demonstrates that demand is excused in this case.  Pl.'s Opp. 25.

In sum, concerning the Government's motion to dismiss pursuant to RCFC 12(b)(1), the Court concludes that: (i) 28 U.S.C. § 1500 does not deprive the Court of jurisdiction over this action; (ii) the Court has jurisdiction over Starr's illegal exaction claim; (iii) the Court does not otherwise have jurisdiction over any Due Process claims or any Equal Protection claims; and (iv) Starr has standing to bring its direct claim. In addition, the Court defers the demand issue for the time being. The Court now turns to the Government's motion to dismiss pursuant to RCFC 12(b)(6).

III.    Whether Starr Has Failed To State A Claim Upon Which Relief Can Be Granted

In addition to its jurisdictional arguments, the Government urges the Court to dismiss Starr's takings claims, as well as its illegal exaction claim, pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

To survive a 12(b)(6) motion, a plaintiff must provide "'a short and plain statement of the claim showing that [it] is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The plaintiff must provide more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). A court should assume the truthfulness of all well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

In asserting that Starr fails to state a takings claim, the Government makes five primary arguments. The Court addresses each one in turn.

A.  Review of Starr's Takings Claims

1.  Whether Starr fails to state a takings claim because it has not pinpointed adequately the government action(s) requiring just compensation

a.  The parties' arguments

The Government argues that Starr fails to state a takings claim because it does not "pinpoint the specific act for which the Government allegedly owes just compensation." Def.'s Mot. 24. Starr concedes that a "takings analysis requires identification of the action or actions that require just compensation." Pl.'s Opp. 44 n.22. In response to the Government's argument, however, Starr merely states that the Government "cannot credibly claim . . . that it does not understand the basis for Starr's claim that the

Government owes just compensation." Id.  Like the Government, the Court has not found Starr's filings to be a model of clarity on this issue.  Nevertheless, for purposes of a motion to dismiss, the Court finds that Starr has identified sufficiently the government actions allegedly requiring just compensation.

### b.  Applicable law

The Federal Circuit has stated that where a plaintiff alleges a taking consisting of "several distinct actions viewed in concert," its "'characterization . . . is too broad.'"  Acceptance Ins. Co. v. United States, 583 F.3d 849, 855 (Fed. Cir. 2009) (quoting Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995)).  Instead, a plaintiff must "pinpoint what step in the sequence of events . . . constituted conduct that the government could not engage in without paying compensation."  Branch, 69 F.3d at 1575.  In Branch, the plaintiff characterized its takings claim as consisting of the Government's "assessment and . . . consequent seizure and closure of the Maine National Bank."  Id.  The Federal Circuit held that the plaintiff's characterization was "too broad."  Id.  The court noted that the bank's insolvency, which led to its seizure and closure, was the "direct result" of the Government's assessment of liability.  Id.  Consequently, the court pinpointed the assessment as the action to be examined for a Fifth Amendment taking.  Id.

### c.  Analysis

During oral argument on the Government's motion to dismiss, Starr characterized the alleged taking of a 79.9% equity interest in AIG as occurring in three steps, including the signing of the Credit Agreement, the reverse stock split, and the conversion of the Series C Preferred Stock into over 562 million shares of common stock.  Tr. 52-56 (Boies); Slide 18.  As in Acceptance and Branch, the Court finds that Starr's characterization is too broad.  Instead, the Court must determine the precise event that fixed any potential government liability.  Creppel v. United States, 41 F.3d 627, 634 (Fed. Cir. 1994) (internal citation omitted).

Notwithstanding Starr's characterization at oral argument, Starr's Complaint, opposition brief, and other statements to the Court serve to pinpoint the precise government actions that it contends require just compensation.  There are three such actions.  First, in its Complaint and statements during oral argument, Starr consistently alleges that the Government took a 79.9% equity interest in AIG when it "imposed" the Credit Agreement on AIG's board, Compl. ¶ 64, thereby obtaining a "contractual right" to the Series C Preferred Stock convertible into 79.9% of AIG's common stock, Tr. 53 (Boies); see also Compl. ¶¶ 63, 65; Tr. 51-52, 100-01, 105 (Boies).  Moreover, in response to the Government's argument that it had not identified adequately the government conduct requiring just compensation, Starr highlighted its allegations that "the credit agreement contained . . . disproportionate terms" and that the Government "coerced the AIG Board."  Pl.'s Opp. 44 n.22.  Starr's response supports the view that it

alleges the first taking occurred when the Government imposed the Credit Agreement on AIG's board.  This view also comports with Starr's direct claim, whereby Starr maintains that the Government took 79.9% of the minority shareholders' "equity interest" and "first voting interest" by means of the Credit Agreement.  Tr. 100-01 (Boies); see also Slide 20.  The actual issuance of the preferred stock to the Trust was simply the "direct result," Branch, 69 F.3d at 1575, or "implement[ation]," as Starr puts it, Tr. 101 (Boies), of the provisions of the Credit Agreement.

Second, in its Complaint, statements during oral argument, and opposition brief, Starr alleges that pursuant to the reverse stock split on June 30, 2009, the Government took the remaining voting rights (the voting rights for the common stock only votes) of the then-existing common stock shareholders.  Compl. ¶¶ 100, 102, 177; Tr. 54-55, 105 (Boies); Slide 16; Pl.'s Opp. 44 n.22 (citing the Government's "nullifi[cation] [of] shareholder protections" as an action requiring just compensation).  To be precise, Starr claims that the Government took the common stock shareholders' "right to exclude [the] Government (or anyone) from diluting [the] pool of Common Stock by more than 40%," Slide 21, by eliminating the majority control the common stock shareholders had when voting as a separate class, see Compl. ¶¶ 81, 95-97.

To address Starr's claim, the Court recaps the relevant events that occurred during the June 2009 AIG shareholder meeting.  As noted, pursuant to the Credit Agreement, the Government received the right to the Series C Preferred Stock convertible to 79.9% of AIG common stock.  See Compl. ¶¶ 65-66, 79.  Prior to the June 30, 2009 shareholder meeting, however, over 60% of AIG's common stock was issued or reserved, such that the Government could not convert its preferred shares into 79.9% of AIG common stock.  See id. ¶¶ 79-80.  With over 60% of all authorized common stock, the common stock shareholders possessed majority voting power when voting as a separate class.  See id. ¶¶ 79-83, 95-97; Slide 21.

By means of the reverse stock split on June 30, 2009, the Government decreased the number of issued shares from approximately 3 billion to approximately 150 million, while leaving the number of authorized shares at 5 billion.  See Compl. ¶ 97.  "Through these machinations," id., the Government increased the percentage of authorized shares available for conversion, thereby enabling the Government ultimately to obtain an approximate 90% interest in AIG common stock, see id. ¶¶ 94-101.  Correspondingly, the common shareholders lost their ability to prevent anyone from diluting the pool of common stock by more than 40% and ultimately, lost their majority vote when voting as a separate class.  Slide 21.  Even if the Government had the contractual right under the Credit Agreement to convert its preferred stock into 79.9% of AIG common stock, see id. ¶ 65; Tr. 53 (Boies), it was unable to do so prior to the reverse stock split, and the then-existing common shareholders retained their majority in a separate class vote.  Thus, the second taking accrued, if at all, when the Government effected the reverse stock split on June 30, 2009.

Third, Starr has maintained throughout this litigation that the Government effected a taking in November and December 2008 when it used the $32.5 billion in cash collateral posted by AIG to purchase certain CDOs from AIGFP counterparties. Compl. ¶¶ 108, 112-115; Tr. 106 (Boies); see also Pl.'s Opp. 29, 44 n.22 (citing the Government's use of AIG assets "to effect a 'backdoor bailout'" as an action requiring just compensation).

Finally, Starr also alleges that the Government effected a taking when it converted its Series C Preferred Stock to 562,868,096 shares of AIG common stock on January 14, 2011. Tr. 52-56 (Boies); Slide 18. In its Complaint, Starr points to different government actions as amounting to the same taking. Compare Compl. ¶¶ 66-67 (indicating that the Government took a 79.9% equity interest in AIG on September 22, 2008 pursuant to the Credit Agreement), with id. ¶¶ 101, 101(a) (indicating that the Government took the same interest on January 14, 2011 pursuant to the conversion of its preferred stock into common stock). Moreover, in other filings with the Court, Starr specifically states that the January 14, 2011 conversion was a taking "independent[]" of the alleged taking on September 22, 2008. Slide 18.

As the Government points out, however, "the same equity interest cannot have been taken twice." Def.'s Rep. 23. If Starr's claims are to be believed, on September 22, 2008, the Government obtained a "contractual right" to the "Series C Preferred Stock convertible to 79.9% of AIG's equity." Compl. ¶ 65; Tr. 53 (Boies). If the Government, in fact, "took" the 79.9% equity interest in AIG on September 22, 2008, it could not have taken that interest again on January 14, 2011. Instead, after September 22, 2008, the Government held the property interest in the preferred stock and the right to convert it into common stock. Under such circumstances, the Government's conversion of its preferred stock into over 562 million shares of common stock could not have been an additional taking.

In sum, Starr's filings and representations allege that the actions the Government could not carry out without paying just compensation were: (1) the imposition of the Credit Agreement on September 22, 2008; (2) the reverse stock split on June 30, 2009; and (3) the Government's use of AIG collateral to purchase certain CDOs from AIG counterparties in November and December of 2008. The Court emphasizes that it makes no determinations as to the ultimate merit of Starr's claims. Nevertheless, for purposes of this motion to dismiss, the Court concludes that Starr has sufficiently identified the government actions allegedly requiring just compensation.

  2. Whether Starr fails to state a takings claim because it alleges the FRBNY's actions were unauthorized or unlawful

The Government next argues that "to maintain a takings claim, Starr must, at a minimum, concede that the actions that it alleges constitute takings were authorized and

lawful."   Def.'s Mot. 25.    The Government characterizes Starr's takings claims as "premised upon allegations that the Government violated Section 13(3) of the Federal Reserve Act."   Id.   As such, the Government urges the Court to dismiss Starr's action for failure to state a takings claim.   Id.   In response, Starr denies asserting that the Government's actions were "unauthorized" as the term is used in the case law to preclude a takings claim.  Pl.'s Opp. 45.  Starr also rejects the Government's position that it must concede the legality of the government action for all purposes to maintain a takings claim.  Id.

To state a cognizable takings claim, a plaintiff must allege:   (1) that "the government conduct at issue was 'authorized,' i.e., . . . chargeable to the government"; and (2) "a *Fifth Amendment* taking for which just compensation is sought, rather than a separate statutory or regulatory violation for which damages or equitable relief is sought."  Del-Rio Drilling Programs Inc. v. United States, 146 F.3d 1358, 1362 (Fed. Cir. 1998).  As explained below, the Court finds that Starr has satisfied both of the Del-Rio requirements to state a takings claim.

### a.  Authorization

The Federal Circuit has made clear that "[a] compensable taking arises only if the government action in question is authorized."   Del-Rio, 146 F.3d at 1362.   This is because "when a government official engages in *ultra vires* conduct, the official 'will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government founded upon the Constitution.'"  Id. (quoting Hooe v. United States, 218 U.S. 322, 335 (1910)).  Government conduct is *ultra vires*, or unauthorized, if it is "either explicitly prohibited or . . . outside the normal scope of the government officials' duties." Id.

Here, while Starr alleges that the Government acted in *excess* of its statutory authority under Section 13(3), see Compl. ¶¶ 12, 58(a), 76-77, 171, Starr does not allege that Section 13(3) explicitly prohibited the government actions, see Pl.'s Opp. 44. Moreover, Starr does not allege that in acting to manage the 2008 financial crisis, government officials acted outside the normal scope of their duties, see Pl.'s Opp. 44, and the Government certainly does not maintain that its actions were *ultra vires*, see Def.'s Mot. 8 (stating that "the FRBNY agreed to assist AIG using its emergency authority under section 13(3) of the Federal Reserve Act").   Instead, Starr alleges that the government actions were "authorized" at the highest levels.  Pl.'s Opp. 44-45 ("[T]he takings here were approved by senior Government officials, including the Secretary of the Treasury.");  Compl. ¶¶ 104-06.   As such, the issue of authorization does not bar Starr's takings claims.

b. Lawfulness

Regarding the lawfulness of a governmental action in the takings context, the Federal Circuit has been careful to emphasize two related points. As an initial matter, a plaintiff is not barred from advancing a takings claim simply because it alleges that the government conduct was unlawful on other grounds. See Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1330-31 (Fed. Cir. 2006); Del-Rio, 146 F.3d at 1362. In Del-Rio, the Federal Circuit noted that in the takings context, courts have distinguished between unauthorized conduct and conduct that is authorized but nonetheless unlawful. 146 F.3d at 1362. The court noted that "a government official may act within his authority even if his conduct is later determined to have been contrary to law" and held that it is no barrier to a takings claim that "the government's action was legally flawed in some respect." Id. at 1362-63.

In evaluating a takings claim, however, courts assume that the government conduct at issue was lawful and look to whether that action constituted a taking in violation of the Fifth Amendment. Acadia Tech., 458 F.3d at 1331; Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001). Again, the Federal Circuit has been careful to distinguish between its valid exercise of jurisdiction where a plaintiff claims the government action constituted a taking *regardless* of whether the action was unlawful, and its lack of jurisdiction where a plaintiff claims the government action constituted a taking *because* the action was unlawful. Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1369 (Fed. Cir. 2005) (internal citation omitted). In Lion Raisins, the plaintiff alleged that the agency action constituted a taking *because* the action was unlawful. Id. The Federal Circuit held that under those circumstances, the plaintiff did not have a right to litigate the issue as a takings claim but instead should have used the mandated administrative review proceeding. Id. at 1369-70.

In addition to its takings claims, Starr maintains that the Government exceeded its authority under Section 13(3) of the FRA to illegally exact a 79.9% interest in AIG. Pl.'s Opp. 46. Under the Federal Circuit's reasoning from Acadia Tech., 458 F.3d at 1330, and Del-Rio, 146 F.3d at 1362, Starr's allegation that the Government acted unlawfully does not bar Starr from advancing its takings claims. In fact, the Court of Federal Claims has held specifically that a plaintiff may advance a takings claim and an unlawful exaction claim concurrently. See Figueroa, 57 Fed. Cl. at 496.[17]

---

[17] In the event future factual development shows that the Government's actions were not authorized under Section 13(3) of the FRA, Starr could advance its illegal exaction claim to recover just compensation for the value of the property at issue. As in asset forfeiture cases, where a plaintiff seeks the value of wrongly-forfeited assets that may have been sold, damaged, or destroyed, see e.g., Casa de Cambio Comdiv S.A. de C.V. v. United States, 48 Fed. Cl. 137 (2000); Bowman v. United States, 35 Fed. Cl. 397 (Fed. Cl. 1996), the Government here cannot simply restore Plaintiffs' voting power or proportional equity stake. "The egg has been scrambled and there is no apparent way to restore the status quo ante." Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 97 (D.C. Cir. 2002).

Further, Starr asserts that its takings claim "does not depend on successfully establishing that the Government lacked authority under Section 13(3)." Pl.'s Opp. 46. Starr maintains that even if the Government acted lawfully under Section 13(3) in demanding a 79.9% interest in AIG, the Government's actions still constituted a taking under the unconstitutional conditions doctrine. Tr. 102 (Boies) ("[I]t is either illegal exaction because it's illegal or it's an unconstitutional condition if it is pursuant to an authorized condition . . . that is disproportionate."). This demonstrates that unlike the plaintiff in Lion Raisins, Starr is not merely restating a statutory violation as a takings claim. This conclusion is supported by the fact that Starr seeks just compensation corresponding to the value of the property allegedly taken by the Government, rather than damages based upon a statutory violation. See Compl. at 57, ¶ H. The Court concludes that Starr has stated a takings claim insofar as it concedes that the government actions at issue were authorized and constituted a taking irrespective of their lawfulness.

      3.   Whether Starr fails to state a takings claim because it has not shown that it or AIG lost a legally cognizable property interest

The Government also contends that Starr fails to state a takings claim because it has not identified a legally cognizable property interest taken by the Government. To establish a takings claim, a plaintiff must demonstrate as a threshold matter the existence of a legally cognizable property interest. See Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003)). If the plaintiff fails to do so, the court's takings inquiry ends. Id. (citing Maritrans, 342 F.3d at 1352).

Starr identifies at least three property interests allegedly taken by the Government: (1) the "economic value and voting power" associated with the Plaintiffs' shares of AIG common stock; (2) the 79.9% equity interest in AIG, ultimately represented by 562,868,096 shares of AIG common stock;[18] and (3) the $32.5 billion of collateral posted by AIG prior to the formation of ML III. See Pl.'s Opp. 29. For purposes of Starr's derivative claim, it is not in dispute that the 79.9% equity interest in AIG is a legally cognizable property interest. Tr. 39 (Simkin).[19] The question remains, however, whether Starr has a legally cognizable property interest in: (1) the equity and voting power associated with the Plaintiffs' shares of AIG common stock for purposes of Starr's direct

---

[18] Whether stated as a 79.9% equity interest or 562,868,096 shares of AIG common stock, it is undisputed that the equity interest in AIG is a protectable property interest. As explained above, however, Starr cannot maintain that the Government took the same property interest more than once. Thus, while Starr identifies both the 79.9% equity interest and the over 562 million shares of AIG common stock as protectable property interests, the Court views the taking of AIG equity as occurring, if at all, on September 22, 2008.

[19] The Government nevertheless denies that it "took" the 79.9% equity interest in AIG, as it maintains that it paid $85 billion in consideration for the 79.9% interest. Tr. 39 (Simkin).

claim; and (2) the $32.5 billion of collateral posted by AIG for purposes of Starr's derivative claim.

        a.   The equity and voting power associated with Plaintiffs' shares of AIG common stock

              i.   The parties' arguments

The Government contends that Starr does not have a cognizable property interest in the economic value and voting power associated with its shares of AIG common stock. Def.'s Rep. 23-24. It emphasizes that Starr and the other AIG shareholders retain their shares of AIG common stock and do not have a cognizable property interest in either a fixed value or a particular percentage of equity or voting control in AIG. Def.'s Mot. 36-37. According to the Government, "[c]ommon stock comes with no guarantees or rights to proceeds, and share value is therefore not a protected property interest." Id. at 37. In addition, the Government maintains that Starr's common stock did not carry with it "a right to exclude others from entering the pool of AIG Common Stock," and thus, the stock did not include "a right to a particular percentage of equity or voting control in AIG." Id. The Government avers specifically that "voting rights are not property for purposes of the Takings Clause" but are, "at most, collateral interests" not protectable under the Fifth Amendment. Def.'s Rep. 25.

By contrast, Starr contends that it has a cognizable property interest in the equity and voting power associated with its shares of AIG common stock. Pl.'s Opp. 16. Starr cites Gatz, 925 A.2d at 1281, Rossette, 906 A.2d at 100, and Dubroff v. Wren Holdings, LLC, Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175, at *8 (Del. Ch. Oct. 28, 2011), for its position that "settled Delaware law . . . protects against 'expropriation' of the 'economic value and voting power' of public shareholders' stock through the exercise of a party's control." Id. While Starr concedes that the Government did not physically take Plaintiffs' common shares, it asserts that the Government "engineered a transaction [the reverse stock split] that accomplished precisely the same result in economic substance." Id. at 5, 17; Tr. 110 (Boies) ("[T]he substance of what happened here was that [the Government] took 80 percent of the stock rights . . . Starr had, 80 percent of the dividend rights, 80 percent of the liquidation rights, 80 percent of the voting rights."). According to Starr, Delaware law "prohibits the use of [such] stratagems" by entitling common shareholders to vote as a class on any proposal that would serve to dilute the shareholders' interests. Pl.'s Opp. 19; Tr. 105 (Boies).

              ii.   Applicable law

While the Fifth Amendment protects against the taking of private property for public use without just compensation, the U.S. Constitution does not "create or define the scope of the 'property' interests protected." Air Pegasus of D.C., Inc. v. United States,

424 F.3d 1206, 1213 (Fed. Cir. 2005). Instead, courts look to "background principles" and "'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth" Amendment. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992) (quoting Bd. of Regents of State Colleges. v. Roth, 408 U.S. 564, 577 (1972)). "These 'background principles' and 'rules and understandings' focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property." Members of the Peanut Quota Holders Ass'n v. United States ("Peanut Quota"), 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing United States v. Gen. Motors, 323 U.S. 373, 378 (1945)). Courts have long-recognized that the protections of the Takings Clause apply to intangible property, in addition to real and personal property. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003 (1984) ("That intangible property rights protected by state law are deserving of the protection of the Taking Clause has long been implicit in the thinking of this Court.").

To determine whether an intangible interest constitutes a property interest protected by the Fifth Amendment, the Federal Circuit has noted that "express statutory language can prevent the formation of a protectable property interest." Peanut Quota, 421 F.3d at 1330 (citing United States v. Fuller, 409 U.S. 488, 494 (1973)). Absent such language, courts look to whether the alleged property interest includes the right to transfer and the right to exclude, which "indicia are part of an individual's bundle of property rights." Id. (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435-36 (1982)). The Court thus looks to whether the equity and voting power associated with the Plaintiffs' shares of AIG common stock include the right to transfer and the right to exclude.

iii.    Analysis

Transferability

"The right to transfer is a traditional hallmark of property." Id. at 1332 (citing Loretto, 458 U.S. at 435-36). It is undisputed that stock is personal property and transferable under Delaware law. See Del. C. Ann. tit. 8, § 159 ("The shares of stock in every corporation shall be deemed personal property and transferable."). In addition, Delaware law recognizes the right of shareholders to transfer the voting rights associated with their stock. See Del. C. Ann. tit. 8, § 218. As stated by the Delaware Court of Chancery, "[s]hareholders are free to do whatever they want with their votes, including selling them to the highest bidder." Hewlett v. Hewlett-Packard Co., C.A. No. 19513-NC, 2002 Del. Ch. LEXIS 44 at *11 (Apr. 8, 2002); see also Schreiber v. Carney, 447 A.2d 17, 25 (Del. Ch. 1982) ("Delaware law has for quite some time permitted stockholders wide latitude in decisions affecting the restriction or transfer of voting rights."). The transferability of shareholder equity and voting rights under Delaware law supports the view that they constitute protected property under the Fifth Amendment.

See Peanut Quota, 421 F.3d at 1333; see also Am. Pelagic, 379 F.3d at 1374 (noting that the authority to assign, sell, or transfer indicates a protectable property interest). The Court therefore turns to the question of excludability.

Excludability

The U.S. Supreme Court has called the right to exclude "perhaps the most fundamental of all property interests." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005) (internal citations omitted). As the Federal Circuit stated in Mitchell Arms, Inc. v. United States, "[t]he chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession – the right to *exclude* strangers, or for that matter friends, but especially the Government.'" 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991) (emphasis original)).

Here, the Government maintains that Starr did not have a property interest in a specific value or particular percentage of voting control in AIG because Plaintiffs' common stock did not include the "right to exclude." Def.'s Mot. 37; Def.'s Rep. 24-25. In the Government's view, Delaware law did not entitle the common shareholders to prevent, through a separate class vote or otherwise, the reverse stock split that allowed the Government to exchange its preferred shares for common stock and thereby dilute the minority shareholders' interests. Def.'s Rep. 25-26. While Starr concedes that Delaware *statutory* law did not entitle the common shareholders to vote as a class on the reverse stock split, Starr submits that the common shareholders were entitled to such a vote due to AIG's past representations to the Delaware Court of Chancery. Tr. 105 (Boies). Assuming the truth of the allegations in Starr's Complaint, the Court agrees with Starr.

According to Starr, a lawsuit was filed in the Delaware Court of Chancery on November 4, 2008 (Walker v. AIG, CA No. 4142-CC) "to ensure that the rights of the Common Stock shareholders of AIG were respected with regard to the Government's acquisition of a controlling interest in the Company." Compl. ¶ 85. The lawsuit allegedly "sought . . . 'an order declaring that . . . [the Series C Preferred Stock] is not convertible into common stock absent a class vote by the common stock to increase the number of authorized common shares, as well as all relief appropriate in light of the Board of Directors' . . . failure to act in the interests of the common stockholders who are entitled to reject the dilution of their shares." Id. The Delaware Court of Chancery found the request for relief moot, however, in light of AIG's representation that there would be a separate vote of the common shareholders on any proposal "'that increases the number of authorized common shares and decreases the par value of the common shares.'" Id. ¶ 86 (quoting the Delaware court's February 5, 2009 "Consent Order").

Although the Consent Order required a separate vote to "*increase* the number of *authorized* common shares," (emphasis added) as opposed to *decrease* the number of

*issued* shares (what allegedly occurred here), the order should be read in light of the fact that the lawsuit also requested appropriate relief based upon the common shareholders' right "'to reject the dilution of their shares.'" Id. ¶ 85.  In finding the request for relief moot due to AIG's representations, the Delaware Court of Chancery appears to have sought not only to protect the common shareholders' right to a class vote on any proposal to *increase* the number of authorized shares, but also to protect the common shareholders from the dilution of their shares generally.  While the Government may have complied technically with the Consent Order by allowing the common shareholders to vote as a class on Proposal 3, the Government appears to have violated the spirit, if not the letter, of the order by not holding a common shareholder vote on the reverse stock split, which led to the dilution of the common shareholders' equity and voting interests.

The Court does not have before it the entirety of the filings in the Delaware Court of Chancery and makes no definitive determination at this time as to whether the common shareholders were entitled to a separate class vote on the reverse stock split. Assuming the truth of the allegations in Starr's Complaint, however, it appears that the common shareholders were entitled to such a vote under the Consent Order; they appear to have had a right to exclude at least the holders of the Series C Preferred Stock from diluting their shares of common stock.  The potential existence of that right to exclude further supports Starr's view that the common shareholders had a cognizable property interest in the equity and voting power associated with their shares.

<u>Delaware case law</u>

In addition to the issues of transferability and excludability, there is significant Delaware case law to support the view that the equity and voting power associated with the common shareholders' stock is a property interest protectable under the Fifth Amendment.  Delaware courts have consistently protected the economic and voting power embodied in public shareholders' stock by entitling them to recover when that power is expropriated from them by a controlling party.  Feldman, 951 A.2d 727 (Del. 2008); Gatz, 925 A.2d 1265 (2007); Rossette, 906 A.2d 91 (2006); Tri-Star, 634 A.2d 319 (1993).  The right to recover is not premised on the *physical* expropriation of a shareholder's stock; instead, it is "premised on the theory that the corporation, by issuing additional stock for inadequate consideration, made the complaining stockholder's investment less valuable." Feldman, 951 A.2d at 732.

The Government argues that any claim that it "indirectly affected the value of property . . . is not compensable pursuant to the Takings Clause." Def.'s Rep. 24. However, the authority cited by the Government to support this principle is distinguishable from the instant case.  In Air Pegasus, the plaintiff did not have a protectable property interest because the "economic injury [was] not the result of the government taking [the plaintiff]'s property, but [was] the more attenuated result of the government's purported taking of other people's property." 424 F.3d at 1212.  Unlike in

Air Pegasus, the alleged harm here can be said to have resulted from a direct appropriation of the common shareholders' property rather than that of a third party.

The common shares ultimately issued to the Government did not belong to the minority shareholders. Nonetheless, Starr asserts that the taking of its equity and first voting interest occurred pursuant to the Credit Agreement when the Government obtained the contractual right to a 79.9% share of AIG common stock. Insofar as the then-existing common shareholders held 60% of AIG's authorized common stock, the Government, in obtaining the contractual right to 79.9% of it, by necessity "took" (or at least acquired the authority to take) a portion of the shareholders' equity and voting interests. Moreover, in effecting the reverse stock split on June 30, 2009, the Government allegedly reduced the number of shares that each shareholder held by a 20:1 ratio. In Starr's view, the reverse stock split was akin to the Government appropriating directly 79.9% of the shareholders' stock. Starr claims that through these "machinations," the Government "destroyed" the value of the common shareholders' stock. Compl. ¶¶ 97, 169. The actual mechanics and effect of the Credit Agreement, reverse stock split, and issuance of common stock are factual questions to be considered at a later stage. For purposes of the Government's motion to dismiss, however, Starr has sufficiently alleged the destruction of a property interest protected under Delaware law.[20]

Finally, the Government's argument that voting rights are not property under the Fifth Amendment ignores Delaware case law specifically protecting voting interests. Delaware courts have observed that voting is a fundamental shareholder right, In re Gaylord Container Corp. S'holders Litig., 747 A.2d 71, 81 (Del. Ch. 1999) (internal citation omitted), and have recognized the right of shareholders to bring a direct claim for the dilution of their voting power, see id.; Oliver v. Boston Univ., C.A. No. 16570-NC, 2006 Del. Ch. LEXIS 75 at *76 (2006). Based on the foregoing, the Court concludes that Starr has identified, at this stage, a protectable property interest in the equity and voting power associated with the Plaintiffs' shares of common stock.

> b. The $32.5 billion of collateral posted by AIG prior to the formation of ML III

Finally, the Government maintains that AIG did not have a property interest in the $32.5 billion in collateral AIG posted prior to the formation of ML III. Def.'s Rep. 26. In the Government's view, "AIG had to post cash collateral to its CDS counterparties because of the fall of the value of the [underlying CDOs], as well as the fall of AIG's credit rating." Id. at 26-27. Once AIG posted the collateral, it no longer had a property interest in it. Id. at 27. Moreover, even if AIG had reason to expect that its obligations

---

[20] The U.S. Supreme Court has stated expressly that "destruction is tantamount to taking." United States v. Gen. Motors Corp., 323 U.S. 373, 384 (1945).

could be compromised for less than face value, "it had no constitutionally-protected property interest" in that expectation.  Id.

At the outset, the Court wishes to clarify the precise property interest allegedly taken by the Government.  Starr has maintained that the Government effected a taking of AIG property in connection with the ML III transactions in November and December 2008.  Starr's Complaint is unclear, however, as to whether Starr seeks just compensation for the alleged taking of AIG's $32.5 billion in cash collateral; $5 billion equity investment in ML III; or residual interests in the CDO assets purchased by ML III.  Read together, however, Starr's Complaint, opposition brief, and statements during oral argument indicate that Starr specifically claims a taking of a portion of the $32.5 billion in cash collateral AIG posted prior to the formation of ML III.

Starr claims that AIGFP's CDS counterparties received close to face value through the ML III transactions but that AIG's obligations could have been compromised for "substantially less."  Compl. ¶¶ 116-17.  Specifically, during oral argument, counsel for Starr averred that the CDOs purchased by ML III "were worth, at most . . . 60 cents on the dollar" and that "some of the counter[]parties offered to compromise."  Tr. 65 (Boies).  "Given the Government's control of AIG," however, AIG was made to forfeit the collateral "in its entirety."  Pl.'s Opp. 20-21.  Given these representations, the Court concludes that the property interest Starr alleges the Government took pursuant to the ML III transactions is the portion of the $32.5 billion in cash collateral retained by AIGFP's counterparties in excess of the compromise amount the counterparties might have accepted.  The relevant question for the Court therefore, is whether AIG has a legally cognizable property interest in the portion of the $32.5 billion in collateral that might have been preserved by compromise.

Again, the Court does not have before it the documents giving rise to AIG's obligations to post collateral or those underlying the ML III transactions.  Accordingly, the Court finds it premature to rule definitively on the rights held by the relevant parties and hence, the existence of AIG's property interest in the ML III collateral.  Nonetheless, the Court concludes that the collateral itself would be a protectable property interest under the Fifth Amendment.

The Federal Circuit has held that generalized statutory obligations to pay money do not constitute unconstitutional takings of private property.  See Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1339-40 (Fed. Cir. 2001) (en banc) (internal citation omitted).  However, a specific sum of money, "derived from ownership of particular deposits in an established account," is a protectable property interest under the Fifth Amendment.  Adams v. United States, 391 F.3d 1212, 1224-25 (Fed. Cir. 2004) (recognizing a depositor's property right in the interest accruing in a custodial account).

Here, the $32.5 billion in collateral posted by AIG is more akin to the property described in <u>Adams</u> than that invoked in <u>Commonwealth Edison</u>.  AIG did not make an outlay to the Government pursuant to any industry-wide statutory scheme.  Rather, according to Starr, AIG posted cash collateral to AIGFP counterparties to secure specific CDO assets.  The counterparties merely held AIG's money, pending fluctuations in AIG's credit rating and in the value of the underlying CDOs.  In this sense, the counterparties held AIG's cash collateral in constructive accounts pending events in the financial markets.  The collateral is thus comparable to the "deposits in an established account" found to be protectable property interests in <u>Adams</u>.

Moreover, as noted in <u>Hearts Bluff Game Ranch, Inc. v. United States</u>, a key indicator of a property right is the "ability to sell, assign, transfer, or exclude."  669 F.3d 1326, 1330 (Fed. Cir. 2012).  Here, pursuant to the ML III transactions in November and December 2008, the AIGFP counterparties retained all of AIG's collateral in exchange for their CDOs.  <u>See</u> Compl. ¶ 116.  These transactions illustrate that the collateral was capable of "sale," "assignment," or "transfer."  Based on the foregoing, the Court concludes that Starr has adequately alleged a property interest in the disputed portion of the $32.5 billion in collateral posted by AIG prior to the formation of ML III.

> 4.  Whether Starr fails to state a takings claim because its allegations do not demonstrate that the challenged transactions were involuntary

The Government next asserts that Starr fails to allege the type of government action necessary to state a takings claim because the property allegedly taken was acquired through "agreed-upon transaction[s]."  Def.'s Mot. 26.  In particular, the Government cites four transactions allegedly constituting takings and argues that they were carried out with the requisite consent from AIG:  (1) the reverse stock split; (2) the loan agreement; (3) the Government's conversion of its preferred stock into common stock; and (4) the ML III transactions.  The Court addresses the voluntariness of each of the four transactions in turn.

> a.  The reverse stock split

As explained above, Starr brings a direct claim for the Government's alleged expropriation of the shareholders' equity and voting power, expropriated in part by means of the reverse stock split on June 30, 2009.  For purposes of its direct claim, Starr maintains that the Government cannot assert consent as a defense to the reverse stock split because the Government "nullified the shareholders' right to withhold consent" by "circumvent[ing] the class vote requirement through a reverse stock split."  Pl.'s Opp. 30.  The Government rejects Starr's position, contending that Delaware law did not entitle the common shareholders to a separate class vote on the reverse split.  Def.'s Rep. 12 (citing Del. C. Ann. tit. 8, §§ 242(a)(3), (b)(2)).

As a preliminary matter, the Court notes that the voluntariness (or not) of the reverse stock split goes only to the alleged taking of what Starr calls "the voting rights for [the] class-specific, common-stock only votes." Slide 20. As explained above, supra Part II.C.2, these are the only rights that Starr has alleged the Government took by means of the reverse split for purposes of its direct claim. See Tr. 101 (Boies). In addition, the voluntariness (or not) of the reverse stock split in June 2009 has no bearing on whether AIG's board voluntarily accepted the loan agreement in September 2008. Insofar as Starr's opposition brief indicates that it does, the Court rejects its position. There have been no allegations that any form of shareholder approval was necessary to enter into the loan agreement; only that certain shareholder approvals were required to effect the reverse stock split. See Tr. 105 (Boies). With the above in mind, the Court turns to whether the Government effected the reverse stock split in contravention of any necessary shareholder approvals.

During oral argument, counsel for Starr conceded that Delaware *statutory* law did not entitle the common shareholders to vote as a separate class on the reverse stock split. Id. Nevertheless, Starr maintains that the reverse stock split "was done in contravention of the [Government's] earlier representation in the Delaware court." Id. As discussed above, the facts alleged in Starr's Complaint indicate that the Consent Order, issued by the Delaware Court of Chancery on February 5, 2009, entitled the common shareholders to vote as a separate class on the reverse stock split. The parties agree that such a vote by the common shareholders did not, in fact, occur. In light of that fact, the Court rejects the Government's consent argument as to the reverse stock split.

      b. The loan agreement

          i. Whether AIG freely agreed to accept the $85 billion loan

<u>The parties' arguments</u>

The Government contends that Starr fails to state a takings claim because Starr's allegations do not support its assertion that the Government "compelled" AIG to agree to the loan terms offered on September 16, 2008. Def.'s Mot. 28. According to the Government, Starr "does not allege that it or AIG faced any adverse *Government* action should it have rejected those terms, or that any governmental power was invoked or even existed to compel acceptance of these terms." Id. at 28-29 (emphasis in original). "Rather," says the Government, "the allegations demonstrate that AIG voluntarily transferred equity in exchange for a loan." Id. at 29.

In Starr's view, its Complaint demonstrates that the Government "[c]ompelled" AIG to accept the Credit Agreement by employing a "strategy [that] forced the AIG Board into an unnecessary game of 'chicken' with the global economy, leaving the Board with no choice but to yield." Pl.'s Opp. 31-32. In the weeks leading up to the loan

agreement, Starr alleges the Government "contributed to AIG's credit downgrade," thereby "exacerbat[ing] AIG's liquidity issues." Id. at 33.  Regarding the loan transaction specifically, Starr claims that the Government offered AIG "grossly" unfair terms and improperly threatened AIG's board by "misleading" it into believing the offer was the only one it would receive and "pressuring" it to decide whether to accept the loan agreement within hours. Id. at 32.

Applicable law

To establish coercion or duress, a plaintiff must show that:  (1) it "involuntarily accepted" the other party's terms; (2) "circumstances permitted no other alternative"; and (3) "said circumstances were the result of coercive acts of" the other party.[21]  Fruhauf Sw. Garment Co. v. United States, 126 Ct. Cl. 51, 62 (1953).  A coercive act is one that is "wrongful," but need not be illegal.  Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed. Cir. 2003).  For example, an act may be wrongful and hence, coercive if it "violates notions of fair dealing."  Id. (quoting Sys. Tech. Assocs., Inc. v. United States, 699 F.2d 1383, 1387-88 (Fed. Cir. 1983)).

This Court's jurisprudence has shown that the bar for establishing duress is a high one.  To substantiate a claim of duress, a plaintiff "must go beyond the mere showing of a reluctance to accept and of financial embarrassment.  There must be a showing of acts on the part of the defendant which produced these two factors."  Fruhauf, 126 Ct. Cl. at 52.  In other words, "[t]he assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities."  Id.  Moreover, "[a]bsent wrongful conduct, economic pressure and the threat of considerable financial loss do not constitute duress."  IMS Eng'rs-Architects, P.C. v. United States, 92 Fed. Cl. 52, 66 (2010) (internal citations omitted).  Instead, it must be shown that the plaintiff's assent "was induced by an improper threat which left the recipient no reasonable alternative save to agree."  David Nassif Assocs. v. United States, 644 F.2d 4, 12 (Ct. Cl. 1981).  Such threats include those that "would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat."  Id. (internal citation omitted).

Analysis

Starr alleges that the Government coerced AIG's board both to accept the terms offered on September 16, 2008, see ¶ 49(a), 58(a), and to accept the Credit Agreement on

---

[21]  The Court notes that Starr does not rely on its allegations of coercion and misrepresentation as freestanding torts, see Pl.'s Opp. 34, as "tort cases are outside the jurisdiction of the Court of Federal Claims," Keene Corp. v. United States, 508 U.S. 200, 214 (1993) (internal footnote omitted).  Instead, Starr asserts ancillary tort allegations, including coercion and misrepresentation, in support of its position that AIG did not voluntarily enter into the Credit Agreement.  See Pl.'s Opp. 34.

September 22, 2008, see ¶ 64 (stating that the Credit Agreement was "imposed upon, and not voluntarily agreed to by, the AIG board"). In light of Starr's allegation that the Government acquired control of AIG on September 16, 2008, see id. ¶ 55(a); Tr. 109 (Boies), the Court views that date as the relevant one for determining whether AIG voluntarily agreed to the terms of the loan transaction. If AIG voluntarily agreed to the terms offered on September 16, 2008, giving the Government control of AIG, it is untenable to maintain that the Government's use of that control rendered AIG's subsequent actions involuntary. Those actions would be, for all intents and purposes, Government actions, acquiesced in by AIG beforehand pursuant to the September 16, 2008 term sheet.[22] Therefore, to determine whether Starr has stated a cognizable takings claim, the relevant question is whether AIG voluntarily agreed to the terms proposed on September 16, 2008.

Starr has alleged repeatedly that AIG's board involuntarily accepted the Government's term sheet on September 16, 2008, see Compl. ¶¶ 49(a), 58(a); Pl.'s Opp. 31, and that the circumstances surrounding its acceptance led to no other alternative, see Compl. ¶ 58(a). Importantly, Starr also has alleged that the circumstances leading the board to accept the Government's unfair terms were the result of the Government's wrongful conduct. As noted above, Starr alleges that the Government's actions and inaction in the weeks leading up to the loan agreement contributed to AIG's dire financial situation. Pl.'s Opp. 33. Specifically, Starr claims that prior to September 16, 2008, "[t]he Government discouraged sovereign wealth funds and other non-United States investors from participating in a private-sector solution to AIG's liquidity needs." Compl. ¶ 49. Starr also asserts that "the Government interfered with AIG's ability to raise capital and contributed to the decision to downgrade AIG's credit rating, which itself triggered collateral calls that imposed pressure on AIG to declare bankruptcy within 24 hours." Id. ¶ 53.

Moreover, Starr indicates that the Government induced AIG's assent to the "grossly" unfair terms by an improper threat, whereby the Government misled AIG's board into believing that the September 16, 2008 offer was the only one it would get and pressured the board to decide within hours. Pl.'s Opp. 32. Starr attempts to portray the Government as having engaged in unfair practices leading up to the loan agreement, thereby enabling the Government to exploit the situation in which AIG found itself on September 16, 2008. See Compl. ¶ 58(a) ("By irrationally relying on loans in lieu of guarantees, consistently declining to grant AIG liquidity access on the same terms as

---

[22] Even if AIG's board gave the Government control of the corporation on September 16, 2008, thereby acquiescing in the Government's subsequent running of the corporation, AIG/the Government appears to have tied its own hands as to the reverse stock split by seemingly representing to the Delaware Court of Chancery that it would "act in the interests of the common stockholders who are entitled to reject the dilution of their shares." Compl. ¶ 85. In the Court's view, AIG/the Government's obligation to allow the common stockholders to vote as a class on the reverse stock split arose, if at all, from the Delaware Consent Order.

other similarly situated entities with lower quality collateral, contributing to a credit downgrade and interfering with AIG's ability to raise capital and the general ability to secure private sector support by repeatedly and inaccurately representing that there would be no Government assistance to AIG, organizing a private-sector effort at a critical time led by two banks with severe conflicts of interest that the Government did not believe had a significant chance of success . . . demanding consideration it was not legally authorized (by statute or otherwise) to demand, ensuring through its actions and representations that the Board would have only hours to make the decision to avoid a global economic meltdown, instructing AIG to undo its plans for bankruptcy without first informing AIG of its intentions, and falsely and irresponsibly representing that it was willing to risk destroying the global economy if the AIG Board did not accept its extortionate demands, the Government coerced the Board into accepting the Government's demands.").

The Court acknowledges that the Government vigorously disputes Starr's characterization of the voluntariness of the loan agreement, see e.g., Def.'s Mot. 29-30 (contending that AIG's acceptance of the loan agreement was the result of its business judgment and not an involuntary action); the circumstances surrounding AIG's acceptance of the loan agreement, id. at 30 (asserting that "AIG was free to reject both the FRBNY's conditions and its funding, no matter how hard that choice may have been"); and the cause of those circumstances, id. at 29 (arguing that "[t]o the extent that AIG's management . . . felt 'compelled'" to accept the terms, "that was the result of business risks taken by AIG and developments in the financial sector of the economy, not any action taken by the Government."). On a motion to dismiss, however, the Court must assume the truth of the plaintiffs' allegations and leave the determination as to their merit for a later stage. At this point, Starr has alleged sufficiently that the Government coerced AIG's board into accepting the terms of the September 16, 2008 loan agreement. Accordingly, the Court rejects the Government's consent argument with regard to the loan agreement.

ii. Whether the loan transaction was a rescue of AIG from the consequences of its own business risks

In the alternative, the Government argues that even if AIG's board did not accept the loan agreement voluntarily, the loan transaction would not constitute a taking because it was a rescue of AIG from the consequences of its own business risks. Def.'s Mot. 31. In support of its position, the Government notes that the central underpinning of the Takings Clause is "'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Id. (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). The Government contends that this is not a case where the public should be made to shoulder the costs of the loan transaction because AIG's own risky business practices created the crisis, which necessitated the transaction. Id.

Furthermore, the Government emphasizes that AIG was the intended beneficiary of the loan agreement.  The Government states that "[b]y September 16, 2008, as a result of the business risks that it took, AIG was facing bankruptcy."  Id. at n.12.  At that point, according to the Government, the loan transaction was not a taking but a governmental "rescue."  Id. at 31.  The Government points out that where a private party "'is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public.'"  Id. (quoting Nat'l Bd. of YMCAs v. United States, 395 U.S. 85, 92 (1969)).  As the particular beneficiary of the loan agreement, the Government maintains that "AIG and its shareholders, not the public," should bear the costs associated with the agreement.  Id.

Whatever may be the merit of the Government's position, it is not the position alleged in Starr's Complaint.  As discussed above, Starr sets forth a very different account of the causes of its financial situation, placing significant blame on specific government actions and inaction prior to September 16, 2008.  See Compl. ¶¶ 49, 53, 58(a).  Whether AIG or the Government caused or contributed to the dire financial situation of AIG in September 2008, and whether AIG was the particular intended beneficiary of the loan agreement, are factual issues to be considered at a later stage. Given the existing factual disputes on these issues, the Court denies the Government's request to dismiss Starr's takings claim on the basis that the loan agreement was a rescue of AIG from the consequences of its own business risks.

### c.  The Government's acquisition of AIG common stock in January 2011

The Government next argues that Starr has failed to state a takings claim with respect to the 562,868,096 shares of common stock the Government received in exchange for its preferred stock on January 14, 2011.  Def.'s Mot. 32.  According to the Government, Starr's Complaint demonstrates that the Government received the common stock through a voluntary exchange of its preferred stock, id. (citing Compl. ¶ 172), and "does not allege that the Government seized or otherwise confiscated those common stock shares," id.

As set forth above, it is a contested factual issue whether the Government coerced AIG into accepting the terms of the loan agreement on September 16, 2008.  If the Court assumes the truth of Starr's allegations, however, the Government gained control of AIG on September 16, 2008 and used that control to extract a 79.9% equity interest in AIG pursuant to the Credit Agreement on September 22, 2008.  See Pl.'s Opp. 22-23.  As the Court explained above, Starr cannot advance multiple takings claims based upon the same equity interest.  Insofar as the Government's acquisition of the 562,868,096 shares of common stock resulted from the Credit Agreement, which gave the Government the "right" to 79.9% of AIG's common stock, Tr. 53, 105 (Boies), the Court reads Starr's allegations as stating that any taking of AIG equity occurred on September 22, 2008, see

Compl. ¶ 65 (stating that "the Credit Agreement . . . required AIG ultimately to issue to a trust . . . Series C Preferred Stock convertible to 79.9% of AIG's equity").  Because Starr cannot maintain a claim for the taking of the same property interest more than once, the Court need not address the voluntariness of the January 14, 2011 conversion.

### d.  The use of AIG collateral in the ML III transactions

The Government also contends that Starr fails to state a takings claim with regard to the transactions among AIG, ML III, and specific AIG counterparties.  Def.'s Mot. 32. In the Government's view, Starr's allegations demonstrate that the transactions resulted from "AIG's negotiated agreements with its counterparties."  Id. at 32-33.  In other words, Starr's allegations show that "AIG agreed to create ML III and took the FRBNY's financing to enable ML III to discharge AIG's obligations to counterparties."  Id. at 33. The Government posits that while Starr argues that the terms of the agreements were less favorable to AIG than they should have been, Starr does not allege that the Government did anything to appropriate AIG's property.  Id.

By contrast, Starr maintains that it has made "numerous specific allegations" showing that "the Government controlled AIG with respect to all major transactions." Pl.'s Opp. 34-35.  Starr contends that the Government "used its control" to pay off AIG counterparties "using $32.5 billion of AIG collateral."  Id. at 34.  In reply, the Government maintains that Starr's allegations "do not establish the Government's control over the decisions by AIG's board to agree to the [ML III] transaction."  Def.'s Rep. 17.

The parties' positions are decidedly at odds on a factual issue that cannot be resolved at this stage.  For purposes of the Government's motion to dismiss, Starr has pled sufficiently that the Government obtained control of AIG and then used that control to engineer the ML III transactions.  See Compl. ¶¶ 112-15 (specifically alleging that the "FRBNY is the controlling party and managing member of ML III" and through that control required AIG to use ML III "to fund the purchase of CDOs from the counterparties").  The Court notes that the issue of whether AIG voluntarily agreed to the ML III transactions may turn on whether AIG voluntarily entered into the initial loan transaction, allegedly giving the Government control of AIG.  Both issues, however, are factual ones that the Court defers until a later stage.

### 5.  Whether Starr may recover based upon the rough proportionality test established in Dolan

Starr contends that irrespective of whether the Government coerced AIG's board into accepting the loan agreement, the Government owes just compensation because "the conditions that the Government imposed upon AIG were disproportionate to the benefits conferred" in violation of the unconstitutional conditions doctrine.  Pl.'s Opp. 40. Specifically, Starr alleges that the Government violated the "rough proportionality" test

established in <u>Dolan v. City of Tigard</u>, 512 U.S. 374 (1994), by requiring a 79.9% interest in AIG in exchange for a fully-secured, high interest loan, <u>see</u> Pl.'s Opp. 35.

        a.  Applicable law

"Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right – here the right to receive just compensation when property is taken for public use – in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." <u>Dolan</u>, 512 U.S. at 385 (internal citations omitted).[23] In <u>Dolan</u>, the landowner, Florence Dolan had applied to the City of Tigard for a permit to redevelop her property. <u>Id.</u> at 379. The City Planning Commission granted a permit to Ms. Dolan on the conditions that she dedicate portions of her property for improvement of a storm drainage system and for a pedestrian/bicycle pathway. <u>Id.</u> at 380. Ms. Dolan contended that in so doing, the City "forced her to choose between the building permit and her right under the Fifth Amendment to just compensation for the public easements." <u>Id.</u> at 385-86.

In evaluating Ms. Dolan's claim, the Supreme Court expanded upon its test, partially articulated in <u>Nollan v. Cal. Coastal Comm'n</u>, 483 U.S. 825 (1987), for determining whether a condition upon land use constitutes an unconstitutional condition in violation of the Fifth Amendment, <u>Dolan</u>, 512 U.S. at 391. The Court stated that first, it must determine "whether the 'essential nexus' exists between the 'legitimate state interest'" and the condition imposed by the Government. <u>Dolan</u>, 512 U.S. at 386 (quoting <u>Nollan</u>, 483 U.S. at 837). If such a nexus exists, then the Court must decide whether the Government has shown a "rough proportionality" between "the required dedication" and "the projected impacts of the proposed development." <u>Id.</u> at 386, 391.

---

[23] In <u>Frost & Frost Trucking Co. v. R.R. Comm'n</u>, 271 U.S. 583, 593-94 (1926), Justice Sutherland explained the justification for the doctrine of unconstitutional conditions as follows:

> It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence.

The Court ultimately remanded the case for further proceedings, concluding that the City had not made sufficient findings regarding the impact of the proposed development to support its land use requirement.  Id. at 396.

　　　b.　Analysis

Starr argues that the Government's conditions under the loan agreement were disproportionate to the benefits conferred in violation of Dolan's rough proportionality test. Pl's Opp. 40.  In so doing, Starr maintains that the issue of proportionality is a factual one not capable of being resolved on a motion to dismiss.  Id.  The Court disagrees.  As explained below, the Court finds that, as a matter of law, Dolan's rough proportionality test is inapplicable to the case at hand.

　　　　i.　Dolan's rough proportionality test applies only to land use exactions.

From the time of Dolan, there has been ample indication that the rough proportionality test applies only in the context of land use exactions.[24]  In City of Monterey v. Del Monte Dunes, the U.S. Supreme Court noted that while "concerns for proportionality animate the Takings Clause . . . we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions – land-use decisions conditioning approval of development on the dedication of property to public use."  526 U.S. 687, 702 (1999) (internal citations omitted).  Del Monte Dunes had brought a claim for a regulatory taking where "the city, in a series of repeated rejections, denied its proposals to develop a parcel of land, each time imposing more rigorous demands on the developers."  Id. at 693-94.  In that context the Court explained that the rule applied in Dolan "was not designed to address . . . the much different questions arising where . . . the landowner's claim is based not on excessive exactions but on denial of development."  Id. at 703.  Thereafter, in Lingle v. Chevron, the Supreme Court observed that "[b]oth *Nollan* and *Dolan* involved *Fifth Amendment* takings challenges to adjudicative land-use exactions" and quoted positively its statement that "[the Court] ha[s] not extended this standard 'beyond the special context of [land-use] exactions.'"  544 U.S. 528, 546-47 (2005) (quoting Del Monte Dunes, 526 U.S. at 702).

The circuit courts of appeals have followed suit.  For example, in Clajon Prod. Corp., the Tenth Circuit took the view that "both *Nollan* and *Dolan* follow from takings jurisprudence's traditional concern that an individual cannot be forced to dedicate his or

---

[24] In Clajon Prod. Corp. v. Petera, the U.S. Court of Appeals for the Tenth Circuit explained that "'[d]evelopment exactions' are where a governmental agency requires that a property owner dedicate some of his or her land for public use before granting that property owner a permit to develop the land. This 'exaction' of land often involves the actual deeding of some of the property to the public—either in the form of an easement or an outright transfer of the land."  70 F.3d 1566, 1578 n.20 (10th Cir.1995).

her *land* to a public use without just compensation."  70 F.3d at 1578 (emphasis added). The court went on to conclude that "the 'essential nexus' and 'rough proportionality' tests are properly limited to the context of development exactions."  Id. at 1579. Likewise, the U.S. Court of Appeals for the Ninth Circuit declined to extend the rough proportionality test to a case involving monetary exactions.  See San Remo Hotel L.P. v. San Francisco City & Cnty., 364 F.3d 1088, 1098 (9th Cir. 2004).  In light of the Supreme Court's reluctance to apply the Nollan/Dolan test "beyond the special context" of land use exactions—even in a case involving land restrictions, Del Monte Dunes, 526 U.S. at 702—and the repeated clear statements that the test is meant to apply only in cases involving land use exactions, the Court declines to extend the test to the unique facts of this case.

          ii.    The factual predicates for using Dolan's rough proportionality test are not alleged here.

Even if the Nollan/Dolan test were to be applied outside the context of land use exactions, the factual predicate for using the test is not alleged here.  In Nollan and Dolan, local commissions granted the landowners building permits to develop their properties only on the conditions that the landowners dedicate portions of their properties to public easements.  Nollan, 483 U.S. at 828; Dolan, 512 U.S. at 377.  In both cases, if the landowners rejected the conditions, they would have given up not only the permits, but also the right to develop their properties.  In that way, the localities were in a position to exploit their police power to obtain the easements without paying just compensation.

Here, in placing certain conditions on AIG's receipt of the $85 billion loan, the Government was not exercising preexisting regulatory authority, or anything akin to a state or locality's police powers.  In Nollan and Dolan, the landowners were restricted from building on their land, and the localities would lift those restrictions only if the landowners agreed to certain conditions.  By contrast, here, if AIG had refused the conditions of the loan agreement, AIG would not have been subject to any ongoing restrictions; AIG simply would not have obtained the loan.  In this way, the Government was not in a position to exploit any existing regulatory power to induce the loan transaction.  Because Starr has not alleged the occasion for coercion that was present in Nollan and Dolan, the Court finds the test articulated in those cases inapplicable here.

In sum, concerning the Government's motion to dismiss pursuant to RCFC 12(b)(6), the Court concludes that:  (i) Starr cannot maintain a claim for the taking of AIG equity based upon the Government's conversion of its preferred shares to common shares while also maintaining a claim for the taking of that same property interest pursuant to the Credit Agreement; and (ii) Starr cannot maintain a takings claim based upon Dolan's rough proportionality test.  In all other respects, the Court denies the Government's RCFC 12(b)(6) motion as it pertains to Starr's takings claims.

B.  Review of Starr's Illegal Exaction Claim

Finally, Starr advances an illegal exaction claim under the color of Section 13(3) of the FRA.  Starr claims that the Government, in conditioning the loan on its acquisition of a controlling equity interest in AIG, exceeded its authority under Section 13(3).  Pl.'s Opp. 48.  Starr concedes that Section 13(3) did not expressly prohibit the Government's actions.  Starr asserts, however, that the strict purpose of Section 13(3) is to extend credit to financial institutions in exigent circumstances and that the FRA does not provide, either expressly or impliedly, authority to the FRBNY to purchase equities.  Id. at 48-50.

The Government urges the Court to dismiss Starr's illegal exaction claim.  First, the Government contends that Starr does not satisfy the jurisdictional prerequisites for such a claim because Starr fails to demonstrate that any statute mandates the return of money to it or AIG.  Def.'s Rep. 28.  Second, as with Starr's takings claims, the Government submits that AIG voluntarily entered into the loan agreement, and, as such, AIG's agreement to transfer equity in exchange for a loan was not an "exaction."  Id. at 28-29.  Third, the Government denies that the FRBNY exceeded its statutory authority in conditioning its loan on a transfer of AIG equity to the Trust and therefore, denies that the transaction was "illegal."  Id. at 29-33.

As explained above, the Court finds that existing factual disputes make it inappropriate at this time to resolve the question of whether AIG voluntarily entered into the loan transaction with the Government.  Accordingly, the Court rejects the Government's position that it should dismiss Starr's illegal exaction claim because the parties entered into a voluntary agreement such that there was no "exaction."  The Court addresses the Government's remaining arguments below.

1.  Whether Starr, or any other private litigant, has standing to bring claims to enforce the FRBNY's compliance with Section 13(3)

Before turning to the Government's two remaining arguments, the Court addresses whether Starr has standing to enforce the FRBNY's compliance with Section 13(3).  In Lucas v. Fed. Reserve Bank of Richmond, the U.S. Court of Appeals for the Fourth Circuit determined that only "the government, the sovereign which created and limited its powers," has standing to enforce a Federal Reserve bank's compliance with Section 13(3).  59 F.2d 617, 621 (4th Cir. 1932) (internal citations omitted).  The Fourth Circuit reached this conclusion by extending the U.S. Supreme Court's ruling in Kerfoot v. Farmers' & Merchs.' Bank, 218 U.S. 281, 287 (1910), which stated that "[w]here a corporation is incompetent by its charter to take a title . . . a conveyance to it is not void, but only voidable, and the sovereign alone can object."

At issue here is whether the Court should apply Lucas to the instant facts.  While persuasive, Lucas is not controlling precedent.  Its reliance on the text of The National

Bank Act ("NBA"), 13 Stat. 99, 101 (1864), as amended by Section 16 of the Glass-Steagall Act, 48 Stat. 162, 184-85 (1933) (codified as amended at 12 U.S.C.A. § 24 Seventh (West 2008)), and NBA jurisprudence, such as Kerfoot, is sensible outside the standing context; however, a national bank and a Federal Reserve bank differ in important respects, which bear directly upon standing. Private national banks and public Federal Reserve banks serve different customers—private businesses and consumers, in the case of the former, and member banks and associated financial institutions, in the case of the latter. A national bank operates by virtue of a national charter, which the Government provides at its grace. Whereas the Government is the natural regulator of a national bank, its licensee, there is no obvious regulator of a Federal Reserve bank other than the member banks and associated financial institutions that it serves.

Member banks and associated financial institutions, and their appropriate representatives, ought to have standing to ensure a Federal Reserve bank's compliance with the rule of law.[25] In light of the considerable financial requirements that Starr alleges the FRBNY imposed upon AIG, and the lack of an alternative public regulator, Starr has standing to challenge the FRBNY's compliance with Section 13(3) of the FRA.

    2.   Whether Starr fails to plead an illegal exaction claim because Section 13(3) is not a money-mandating statute

The Government next contends that Starr fails to satisfy the jurisdictional prerequisites of an illegal exaction claim because it does not demonstrate that any statute mandates the return of money to it or AIG. Def.'s Rep. 28. Specifically, the Government maintains that neither Section 13(3) nor Section 4 of the FRA expressly or impliedly provides for the return of money.[26] Id. at n.9. In support of its argument, the Government asks the Court to analogize to cases decided outside the illegal exactions context, which purportedly illustrate that Section 13(3) is not money-mandating. Id.

As noted above, the Federal Circuit has indicated that an illegal exaction claim requires a showing that the statute causing the exaction is either expressly or implicitly money-mandating. See Norman, 429 F.3d at 1095; Cyprus Amax, 205 F.3d at 1373. But see Figueroa, 57 Fed. Cl. at 499; Bowman, 35 Fed. Cl. at 401. As this case involves novel applications of Section 13(3), the question of whether that section is money-mandating is also a novel one. While the Government maintains that case law "suggest[s]" that Section 13(3) is not money-mandating, the cases it cites—in a footnote—were admittedly decided outside the illegal exactions context and come from

---

[25] Starr still must show that it is an appropriate representative of AIG, a question not addressed in this opinion.

[26] A claim under Section 13(3) of the FRA necessarily implicates Section 4 of the FRA as well, which enumerates the statutory powers of the various Federal Reserve banks. See 12 U.S.C. § 341 Seventh (2006).

non-controlling jurisdictions. See Def.'s Rep. 28 n.9. Given the limited briefing the parties have provided on the money-mandating issue, the Court concludes that it is premature at this stage to rule decisively on the issue, let alone treat it as dispositive for purposes of Starr's illegal exaction claim.

> 3.   Whether Starr fails to plead an illegal exaction claim because the FRBNY did not exceed its authority under Section 13(3) of the FRA

Finally, the Government contends that Starr fails to state an illegal exaction claim because the FRBNY did not exceed its authority under Section 13(3) in causing the transfer of AIG equity to the Trust as consideration for the loan.

The Court's analysis of this issue depends largely upon whether the parties' exchange under the Stock Purchase Agreement was a "purchase of," or a "security interest in," the Series C Preferred Stock by the FRBNY. A Federal Reserve bank unquestionably can, and indeed must, take a security interest in the collateral of a corporation to which it discounts commercial paper. Bd. of Governors of the Fed. Reserve Sys. ("1936 Circular"), 22 Fed. Reserve Bulletin 71, 124 (Feb. 1936) ("[A] Federal Reserve bank shall ascertain to its satisfaction by such means as it may deem necessary . . . [t]hat the indorsement or security offered is adequate to protect the Federal Reserve bank against loss."); Fed. Reserve Bd. ("1932 Circular"), 18 Fed. Reserve Bulletin 473, 519 (Aug. 1932). Moreover, that security interest may be in corporate stock. Lucas, 59 F.2d at 619-21 (internal citations omitted); see also Cal. Nat'l Bank v. Kennedy, 167 U.S. 362, 369 (1897). The law regulating a Federal Reserve bank's purchases, however, is much less settled.

Pursuant to the loan agreement and the Stock Purchase Agreement, the FRBNY agreed to provide AIG up to $85 billion in emergency revolving credit conditioned upon: (1) a security interest in all of AIG's assets; (2) an approximate 14.5% interest rate; and (3) AIG's issuance of the Series C Preferred Stock to the Trust in exchange for $500,000. See Compl. ¶¶ 55(a), 58-59, 63-67, 69, 73. Several aspects of the agreements indicate that the FRBNY purchased, rather than merely took a security interest in, the preferred shares.

First, as Starr emphasizes, the preferred shares do not appear to have "'secure[d]' the Government's loan to AIG as collateral because the Government retains the stock even if AIG pays off the loan with interest." Pl.'s Opp. 48; Compl. ¶ 78. Moreover, according to Starr, the Credit Agreement already provided for a security interest in all of AIG's assets, in addition to the 14.5% interest rate on the loan. Based upon the information currently before the Court, there does not appear to have been anything more for the preferred stock to secure. Lastly, the Court observes that the parties' use of the label "Stock *Purchase* Agreement" is much more suggestive of a "purchase" than a "security interest." Gov. Mot. 9 (emphasis added).

Based on the foregoing, and for purposes of ruling on the Government's motion to dismiss, the Court will treat the parties' exchange as a "purchase of" the Series C Preferred Stock for $500,000. Accordingly, the relatively straightforward law governing the security interests of a Federal Reserve bank does not control. Instead, the Court looks to the less-settled law governing a Federal Reserve bank's purchases.

      a.   Whether the FRBNY had express authority under Section 13(3) to condition its loan to AIG on the issuance of stock to the Trust

As the Court's analysis of the FRBNY's express authority under Section 13(3) is dependent upon the text of the relevant statutes and regulations, the Court excerpts them in pertinent part:

> Every Federal reserve bank shall have power to establish from time to time, subject to review and determination of the Board of Governors . . . rates of discount to be charged by the Federal reserve bank for each class of paper, which shall be fixed with a view of accommodating commerce and business.

12 U.S.C. § 357 (2006).

> In unusual and exigent circumstances, the Board of Governors of the Federal Reserve System . . . may authorize any Federal reserve bank, during such periods as the said board may determine, at rates established in accordance with the provisions of [12 U.S.C. § 357 (2006)], to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank. . . . All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe.

Section 13(3) of the Federal Reserve Act, 12 U.S.C. § 343 (2006).

Starr contends that the provisions set forth above did not expressly authorize the Government to condition its loan to AIG on receiving a majority stake in the corporation. Pl.'s Opp. 48. Instead, Starr maintains that the "only consideration for a loan prescribed by" Section 13(3) "is an interest rate subject to the determination of the Board of Governors." Id. at 49. The Court agrees.

The plain text of Section 13(3) does not expressly authorize a Federal Reserve bank to demand stock in a corporation in return for discounted paper. Moreover, Starr's view is supported by Federal Reserve circulars explaining the Federal Reserve banks' powers under Section 13(3) to discount commercial paper for corporations in exigent circumstances. One such circular states that "bank discounts as commonly understood do not apply to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures." Bd. of Governors of the Fed. Reserve Sys., 44 Fed. Reserve Bulletin 241, 269 (Mar. 1958) (internal quotation omitted). Another states that "[s]uch discounts may be made only at rates established by the Federal Reserve banks, subject to review and determination by the Board of Governors of the Federal Reserve System." 1936 Circular, 22 Fed. Reserve Bulletin at 123; 1932 Circular, 18 Fed. Reserve Bulletin at 518; see also 12 U.S.C. § 357 (2006).

Based on the plain text of Section 13(3) and the Federal Reserve circulars quoted above, the Court concurs with commentary concluding that there simply "is no express authority for the Federal Reserve to purchase . . . equities." David Small & James Clouse, Limits the Federal Reserve Act Places on Monetary Policy, 19 Ann. Rev. Banking L. 553, 579 (2000). The Court turns to whether the FRBNY had implied authority under Section 13(3) to require an equity interest in AIG in exchange for exigent financing.

> b. Whether the FRBNY had implied authority under the FRA to condition its loan to AIG on the issuance of stock to the Trust

Section 4 of the FRA, which enumerates the statutory powers of the Federal Reserve banks, provides:

> [A] Federal Reserve bank . . . shall have power . . . [t]o exercise . . . all powers specifically granted by the provisions of this chapter and such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter.

12 U.S.C. § 341 Seventh (2006). The question is whether a Federal Reserve bank's "incidental powers" under the FRA include the power to purchase corporate stock. This question is one of first impression. To address it, the Court analogizes to jurisprudence interpreting a national bank's authority within the meaning of the NBA, 12 U.S.C.A. § 24 Seventh (West 2008). As both parties acknowledge in their briefs, see Def.'s Rep. 28-33; Pl.'s Opp. 49, the relevant portions of the FRA and the NBA are similarly phrased. Compare FRA, 12 U.S.C. § 341 Seventh (2006), with NBA, 12 U.S.C.A. § 24 Seventh (West 2008); see also Lucas, 59 F.2d at 620 ("The section of the Federal Reserve Act

granting incidental powers to the Federal Reserve Banks is practically the same as the section granting incidental powers to national banking associations.").

In Cal. Nat'l Bank v. Kennedy, 167 U.S. 362, 369 (1897) ("California National"), the U.S. Supreme Court stated that the "power to purchase or deal in stock of another corporation . . . is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred." The Government attempts to "cabin" California National, an opinion from 1897 that pre-dates Congress's 1933 passage of the Glass-Steagall Act. Def.'s Rep. 31. According to the Government, Section 16 of the Glass-Steagall Act "modifie[d]" California National, "by limiting a [national] bank to buying or selling stocks for customers, and not 'for its own account.'" Id. The Government emphasizes that no corresponding prohibition appears in the incidental powers provision of 12 U.S.C. § 341 relating to Federal Reserve banks. Id. at 32.

Even if the Glass-Steagall Act could be read as limiting the prohibition in California-National only to a national bank purchasing or dealing in corporate stock "for its own account," requiring the issuance of the Series C Preferred Stock to the Trust seems to qualify as the FRBNY dealing for its own account. The Government attempts to distinguish between ownership of AIG stock by the FRBNY and acquisition of the stock by the Trust concededly structured to benefit the Treasury Department. See Def.'s Rep. 29 ("The FRBNY never acquired any AIG stock, and thus did not violate any restriction upon its acquisition of stock. Preferred stock was acquired by the Trust for the benefit of the Treasury, and Starr does not contend that any statute prohibited such an acquisition of stock."). Without greater factual development, the Court is disinclined to indulge the Government's distinction.

Indeed, according to Starr, the Trust controlled the selection of AIG board members under the terms of the Credit Agreement. Pl.'s Opp. 27; see also Compl. ¶ 166. The Trust was subject to a standard of care (1) not to act contrary to the Government's interests, and (2) to elect Directors who would uphold the same standard. Pl.'s Opp. 27; see also Compl. ¶ 165. "According to the Trust Agreement, the Trust . . . was created 'for the sole benefit of the United States Treasury.'" Compl. ¶ 69.

Based on the facts currently before the Court, it is not clear why the Government would use a trust procedure unless to circumvent the Supreme Court's holding in California National. Presumably, the Government does not have the typical concerns of private sector entities when creating trusts, such as estate and tax planning. Thus, at this stage, the Court perceives no meaningful legal distinction between FRBNY and Trust ownership of the Series C Preferred Stock. For purposes of the Government's motion to dismiss, the Court rules that the FRBNY's incidental powers under Section 4 of the FRA did not authorize it to condition the provision of exigent financing on AIG's issuance of

stock to the Trust.  Based on the foregoing, the Court denies the Government's 12(b)(6) motion in its entirety as it pertains to Starr's illegal exaction claim.

## CONCLUSION

In sum, the Court GRANTS the Government's RCFC 12(b)(1) motion as to:  (i) any Due Process claims not characterized as illegal exactions; and (ii) any Equal Protection claims.  For the time being, the Court defers the issue of whether Starr adequately pled a demand on AIG's board or the futility of such a demand.  The Court DENIES the remainder of the Government's RCFC 12(b)(1) motion.

The Court GRANTS the Government's RCFC 12(b)(6) motion as to:  (i) Starr's takings claim based on the Government's conversion of its preferred stock to common stock, insofar as Starr alleges the taking of the same equity interest more than once; and (ii) Starr's use of Dolan's rough proportionality test to assert a takings claim.  The Court DENIES the Government's RCFC 12(b)(6) motion in all other respects.

Pursuant to RCFC 12(a)(4), the Government shall file its Answer to Starr's Complaint within 14 days of this opinion, on or before July 16, 2012.  Counsel for the parties shall conduct an Early Meeting of Counsel as required by Appendix A of the Court's rules within 14 days of the Government's Answer.  Discovery, including RCFC 26 disclosures, may commence after the Early Meeting of Counsel.  In addition, counsel for the parties shall submit to the Court the Joint Preliminary Status Report ("JPSR") required by Appendix A within 28 days of the Government's Answer, on or before August 13, 2012.  Upon receiving the parties' JPSR, the Court will arrange a preliminary scheduling conference.

As stated in the Court's March 13, 2012 order, AIG may file an answer or other response to Starr's Complaint within 20 days of the Government's filing of its Answer, see Dkt. No. 35, on or before August 6, 2012.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge