# In the United States Court of Federal Claims

No. 11-779C

(Filed:  June 26, 2013)

```
************************************   *
                                       *
STARR INTERNATIONAL COMPANY,           *
INC., on its behalf and on behalf of a class   *
of others similarly situated,          *
                                       *     Fifth Amendment Taking and Illegal
                                       *     Exaction Claims; Motions to Dismiss
                       Plaintiff,      *     Shareholder Derivative Action Due to
                                       *     Corporation's Refusal of Plaintiff's
                                       *     Demand Under RCFC 23.1; Application
  v.                                   *     of Business Judgment Rule Under
                                       *     Delaware Law; Waiver of Demand
THE UNITED STATES,                     *     Futility Argument by Making Demand;
                                       *     Independence of Board Members
                       Defendant,      *     Appointed During Government Control;
                                       *     Whether Counsel Advising Corporation
  and                                  *     Had Conflict of Interest; Standing to
                                       *     Bring Direct Claims.
AMERICAN INTERNATIONAL GROUP,          *
INC.,                                  *
                                       *
                Nominal Defendant.     *
                                       *
************************************   *
```

*David Boies*, with whom were *Robert J. Dwyer*, *Nicholas A. Gravante, Jr.*, *Alanna C. Rutherford*, *Julia C. Hamilton*, *Hamish P. M. Hume*, and *Samuel C. Kaplan*, Boies, Schiller & Flexner LLP, Armonk, New York, and *John L. Gardiner*, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Plaintiff, Starr International Company, Inc.

*Brian A. Mizoguchi*, Assistant Director, with whom were *Joyce R. Branda*, Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Scott D. Austin*, Assistant Director, *Timothy P. McIlmail* and *John J. Todor*, Senior Trial Counsel, *David D'Alessandris*, *Renee Gerber*, *Vincent D. Phillips*, and *Matthew F. Scarlato*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

*Joseph S. Allerhand*, with whom were *Stephen A. Radin*, and *Jamie L. Hoxie*, Weil, Gotshal & Manges LLP, New York, New York, for Nominal Defendant, American International Group, Inc.

OPINION AND ORDER ON
MOTIONS TO DISMISS

WHEELER, Judge.

Plaintiff Starr International Company, Inc. ("Starr") commenced this lawsuit against the United States in November 2011, challenging the Government's economic bailout of American International Group, Inc. ("AIG") that began in September 2008. During the time periods relevant to this case, Starr was one of the largest shareholders of AIG common stock. Starr alleges that the Government's actions in acquiring control of AIG constituted a taking without just compensation and an illegal exaction in violation of the Fifth Amendment. Starr's claims consist of shareholder derivative claims brought on behalf of AIG, and direct claims brought on behalf of Starr and two classes of AIG shareholders.[1]

Under Rule 23.1 of this Court, one of the requirements to maintain a shareholder derivative action is to show that a demand has been made on the board of directors of the corporation. Rules of the Court of Federal Claims ("RCFC") 23.1(b)(3)(A). Alternatively, a plaintiff must demonstrate "the reasons for not obtaining the action or not making the effort," RCFC 23.1(b)(3)(B), such as a showing that a demand on the board of directors would have been futile.

When Starr commenced this action on November 21, 2011, the United States owned a majority of AIG's voting stock. In addressing the requirements of RCFC 23.1, Starr alleged that a demand on AIG's Board of Directors at that time would have been futile because of the improbability that a government-controlled AIG would agree to sue the United States. However, during the next ten months, the Government sold its stock in AIG, and by September 2012, the Government had significantly reduced its ownership shares of the corporation.

With the Government no longer in control of AIG's voting stock, Starr made a demand on AIG's Board of Directors on September 21, 2012, requesting the corporation to participate in Starr's lawsuit against the United States. After an extensive process of informing the AIG Board members about the lawsuit through written and oral presentations, the AIG Board unanimously refused Starr's demand on January 9, 2013.

---

[1] Thus far, the Court has issued four published opinions in this case, all captioned as <u>Starr International Company, Inc. v. United States</u>: (1) 103 Fed. Cl. 287 (2012), joining nominal defendant AIG as a necessary party; (2) 106 Fed. Cl. 50 (2012), ruling upon the Government's first motion to dismiss; (3) 107 Fed. Cl. 374 (2012), denying the Government's motion for reconsideration; and (4) 109 Fed. Cl. 628 (2013), certifying classes for purposes of a class action, and appointing class counsel.

The AIG Board's decision not to allow pursuit of its corporate claims has triggered a new round of motions. On April 5, 2013, AIG, in its role as nominal defendant, filed a motion to dismiss Starr's shareholder derivative claims for lack of standing. AIG, a Delaware corporation, maintains that the decision of its Board of Directors to refuse Starr's demand is entitled to great deference through the application of Delaware's "business judgment rule," and therefore the shareholder derivative claims must be dismissed. The business judgment rule embodies a presumption that directors are "faithful to their fiduciary duties." Beam v. Stewart, 845 A.2d 1040, 1048 (Del. 2004). The rule respects a board's decision to refuse a shareholder demand unless the decision "cannot be 'attributed to any rational business purpose.'" In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 74 (Del. 2006) (quoting Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)). "[F]ew, if any, plaintiffs surmount this obstacle." RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1328 (2d Cir. 1991).

Also on April 5, 2013, the Government filed a motion to dismiss both the direct and derivative claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Starr filed an opposition brief to these motions on April 26, 2013, and AIG and the Government filed reply briefs on May 8, 2013. The Court heard oral argument in Washington, D.C. on May 17, 2013.

After carefully reviewing the parties' positions, the Court grants AIG's and the Government's motions to dismiss Starr's shareholder derivative claims, but denies the Government's motion to dismiss the direct claims. Although the derivative claims are dismissed, the Court notes that Starr has raised some concerns worthy of thoughtful consideration. First, the Court is troubled that counsel for the Treasury Department (the defendant agency), made threatening statements to AIG's Board members when the Board was fulfilling its legal obligation to consider entry into this lawsuit.[2]

Further, AIG attached to its motion a host of articles indicating a "media frenzy" in reaction to the proposition that AIG would join this lawsuit against the United States. These articles carried titles such as "Lawsuit Fiasco Mars AIG 'Thank You' Campaign," "Washington's Jaw Drops at Possibility of AIG Lawsuit," and "How About Charging AIG With Treason?" AIG Mot., Exs. 3-5. The articles contain inflammatory quotations from a number of public figures and elected officials who apparently lacked any understanding that AIG was *required* to consider entry into the lawsuit under the demand process of Delaware law. It is unfortunate that AIG's Board members had to deal with this misplaced pressure and public outcry.

---

[2] Outside counsel for the Treasury Department, Frances E. Bivens of Davis Polk & Wardwell LLP, informed the AIG Board in her January 9, 2013 presentation that, if AIG decides to join the lawsuit, "AIG will be terminated . . . . A decision [to join the suit] could also lead to another wave of congressional investigations, and AIG employees and AIG Board members could be called to testify before Congress and justify the decision to pursue a lawsuit asking the U.S. taxpayers to return billions of dollars to AIG." Jan. 9, 2013 AIG Board Tr. at 61-62.

Also of concern to the Court is the low evaluation of Starr's potential success on the merits, presented to the Board by its advising counsel. AIG retained some of the finest counsel and expert consultants available to weigh the strengths and weaknesses of Starr's case. Some of these persons assessed the case as having a very low probability of success, even placing small percentages on Starr's likelihood of prevailing. These counsel and consultants then shared their assessments with AIG's Board. Although professionals surely can opine on the pros and cons of a lawsuit, the Court cannot see how anyone could have made a precise assessment of this fact-dependent case without knowing what all of the evidence ultimately will show. To be sure, the Court's ultimate disposition of this case will be based upon the evidence admitted at trial, not upon someone else's assessment of the merits. The granting of AIG's motion does not mean that the Court endorses any of the information presented to AIG's Board.

Overall, however, AIG's Board employed a rigorous review process and reached a reasonable decision, well explained in filings with the Court. In the circumstances presented, Delaware law requires the Court to give deference to AIG's Board under the business judgment rule. The Board was free to consider all relevant factors, including business factors unrelated to the merits of the lawsuit, and it did so. Not only did AIG reach an informed and reasonable decision, its Board members fulfilled their fiduciary duty while dealing with difficult outside pressures. Set forth below is a detailed explanation of the Court's ruling on the pending motions.

## SHAREHOLDER DERIVATIVE CLAIMS

Starr alleges that AIG was harmed by Government conduct beginning on September 16, 2008, after the Government took over AIG as a controlling shareholder and lender. Specifically, Starr alleges that the Government took or illegally exacted a 79.9% equity and voting interest from AIG in September 2008, and gave away to AIG counterparties AIG's legal rights and $32.5 billion of its collateral through the Maiden Lane III ("ML III") transactions in November 2008. These government actions, Starr claims, constitute a taking and illegal exaction of the property and property rights of AIG without due process or just compensation. Both AIG and the Government assert that Starr's complaint does not satisfy the particularized pleading requirements of Rule 23.1, and therefore must be dismissed.

I.      Summary of Relevant Facts

Beginning in July 2008 and continuing into September 2008, AIG faced a liquidity crisis. On September 22, 2008, the Federal Reserve Bank of New York ("FRBNY") and AIG entered into an agreement ("the Credit Agreement"), under which the FRBNY agreed to extend up to $85 billion in credit to AIG on a revolving basis. Starr Int'l, 106 Fed. Cl. at 57. The Credit Agreement required AIG to issue to a trust ("the Trust") Series

C Preferred Stock convertible to 79.9% of AIG's common stock. Id. To implement this requirement, on January 16, 2009, the parties entered into the AIG Credit Facility Trust Agreement ("the Trust Agreement"), which established the Trust to hold the Government's Series C Preferred Stock. Id.; 2d Am. Compl. ¶ 83. According to Starr, the Trust "was created 'for the sole benefit of the United States Treasury'" and consisted entirely of the Series C Preferred Stock. 2d Am. Compl. ¶¶ 84-85 (quoting the Trust Agreement). The Series C Preferred Stock provided the Trust with voting power equivalent to a 79.9% interest in AIG. Id. at ¶ 88.

As of November 2011, through exercise of its voting control, the Board of Trustees had appointed eight of the twelve members to the AIG Board of Directors. Id. at ¶ 183. Of the remaining four positions, one member was appointed directly by the Treasury Department, and the other three "were holdovers at the time of the Government takeover and continued on the Board thereafter." Id. AIG's filings with the Securities and Exchange Commission ("SEC") reflect that there have been no changes to the Board of Directors' composition since May 11, 2011. AIG Mot. 7 (citing Apr. 5, 2012 AIG Proxy Statement at 12-18).

Since the time of its initial Complaint on November 21, 2011, which was superseded by a First Amended Complaint, filed on January 31, 2012, Starr has alleged that it was futile to make a demand on the AIG Board. In their filings regarding the Government's motion to dismiss the First Amended Complaint, both Starr and AIG asked the Court to defer ruling on the demand issue until the Government's March 1, 2012 motion to dismiss had been resolved. Starr Int'l, 106 Fed. Cl. at 65-66. In the interest of judicial economy, the Court granted this request. Id. at 66.

After the Court ruled upon the Government's motion to dismiss, Starr and AIG entered into an agreement in which Starr agreed to make a demand on the AIG Board with respect to all derivative claims. Dkt. No. 64-1 at 2 (Demand Agreement). The Government was not a party to this agreement. The agreement outlined the contemplated demand process and stipulated to each party's rights after the Board reached a determination, including as follows:

> If the Board refuses the demand, Starr International may seek to pursue derivative claims in the CFC and SDNY Actions by challenging the Board's decision to refuse the demand by filing amended complaints alleging that the demand was wrongfully refused and/or not required as a matter of law. AIG may respond with any and all arguments.

Id. at 3. Starr subsequently made a demand on the AIG Board, which the Board refused on January 9, 2013.

a. Starr's Demand and the Board's Refusal

On January 23, 2013, AIG sent a letter to Starr's counsel setting forth the process by which the Board considered the demand and the rationale for its refusal. Dkt. No. 87-1 ("Demand Refusal Letter"). On the same day, AIG's counsel filed this letter and the accompanying exhibits with the Court. Given that the continued viability of Starr's derivative claims centers on the propriety of the AIG Board's demand refusal, the Court addresses the demand refusal in detail below.

The AIG Board's Regulatory, Compliance and Public Policy Committee (the "Committee") assisted the Board in its consideration of Starr's demand. Id. at 2. The Committee retained attorneys from the law firms of Simpson Thacher & Bartlett LLP ("Simpson") and Seitz Ross Aronstam & Moritz LLP ("Seitz Ross") to serve as counsel to the Board in its consideration of the demand. Id. Simpson has served as independent counsel to the Board for many years. Id. Weil, Gotshal & Manges LLP ("Weil"), counsel for AIG, also assisted the Board in its consideration. Id. at 5.

The Board and the Committee provided the parties with a set of protocols in the months leading up to the Board's decision. Id. at 2. From November 2, 2012 through December 5, 2012, the AIG Board received three rounds of briefing from Starr, the Department of Justice, the Treasury Department, and the FRBNY. Id. These submissions totaled 184 pages, and were submitted to all members of the Board as they were received. Id. The Committee met at four separate intervals to discuss the parties' written submissions and to determine what additional information and materials would assist the Board members in their consideration of Starr's demand, which resulted in the circulation of additional protocols concerning the January 9, 2013 oral presentations. Id.

On December 21, 2012, the Seitz Ross law firm provided a package of materials to the Board, consisting of a chronology of events, a chart summary of the parties' respective positions, and a presentation entitled "Summary of Underlying Legal Claims, Defenses, Facts and Rulings." Id. The same day, Seitz Ross provided the presenting parties with specific questions on behalf of the Committee, and asked them to devote attention to these questions during their oral presentations. Id. at 3. The Board previously had received copies of this Court's July 2, 2012 and September 17, 2012 rulings, and the November 19, 2012 ruling from the United States District Court for the Southern District of New York involving Starr's companion claims against the FRBNY. Id. at 2. In that case, the District Court granted the FRBNY's motion to dismiss. Starr has appealed the District Court's decision to the United States Court of Appeals for the Second Circuit.

On January 4, 2013, AIG received presentation materials from Starr and the Treasury Department, which were made available to the Board. Id. The Department of Justice provided a letter to AIG in which counsel for the Government declined AIG's

invitation to appear before the Board.  Id.  The Department of Justice explained that it had "decided . . . not [to] address the substantive merits of this matter outside of the litigation."  Id. at Ex. 21.

The day before the oral presentations, the Board[3] met to discuss the demand and the submitted materials, and to prepare for the January 9, 2013 meeting.  Id. at 3.  During this meeting, Mr. Paul Curnin, an attorney from Simpson, discussed and answered questions concerning the demand, the merits of the claims, and other contextual matters.  Id. at 3-5.  Mr. Curnin reviewed the factors that the Board was permitted to consider in addressing the demand:

> Starr's likelihood of success, potential damages, potential costs to AIG, such as attorneys' fees, indemnification obligations, the impact the suit might have on other litigation, relations with regulators and elected officials, potential harm to AIG's corporate brand and image, and any other factor the Board deems relevant.

Id. at 3.  Mr. Curnin reported the view of the multiple advising attorneys that Starr's claims "had a low likelihood of success," which he quantified to be around twenty percent, with a five percent margin of error.  Id. at 3-4.

Mr. Joseph S. Allerhand, as well as knowledgeable members of AIG's management, addressed the ML III transactions pertaining to Starr's claims.  Id. at 5.  Mr. Allerhand also discussed and answered questions concerning AIG's indemnification obligations and the "Government's contention that AIG would lose billions of dollars in net operating losses if Starr prevailed."  Id.

The members of the Board then discussed their views of the demand based on the submissions and briefings of the parties along with the advice of the Board's counsel.  Id.  The members concluded that they would carefully consider the parties' presentations the

---

[3]  In addition to the Board of Directors, the minutes from the January 8, 2013 meeting reflect the presence of the following persons: Michael R. Cowan, Executive Vice President and Chief Administrative Officer; Peter D. Hancock, Executive Vice President – Property and Casualty Insurance; David L. Herzog, Executive Vice President and Chief Financial Officer; Jeffrey J. Hurd, Executive Vice President – Human Resources and Communications; Thomas A. Russo, Executive Vice President and General Counsel; Sid Sankaran, Executive Vice President and Chief Risk Officer; Brian T. Schreiber, Executive Vice President and Treasurer; Jay S. Wintrob, Executive Vice President – Life and Retirement; Tal S. Kaissar, Vice President – Tax; Michael W. Leahy, Vice President and Deputy General Counsel; Eric N. Litzky, Vice President – Corporate Governance; Jeffrey A. Welikson, Vice President, Corporate Security and Deputy General Counsel; Messrs. Joseph S. Allerhand and Stephen A. Radin of Weil; Messrs. Paul C. Curnin, Michael J. Garvey and Michael D. Nathan of Simpson; Mr. Henry E. Gallagher, Jr. of Connolly Gallagher LLP; and Messrs. Bradley R. Aronstam and Collins J. Seitz, Jr. of Seitz Ross.  See AIG Board Mtg. Minutes (Jan. 8, 2013).

next day and would announce their determination on the demand as promptly as possible. Id. at 6.

On January 9, 2013, the Board met with representatives of Starr, the Treasury Department, and the FRBNY. Counsel for each party made initial presentations, Starr's counsel was permitted to reply, and then each party presented closing statements. Id. The presenters left the room, during which time the Board conferred and formulated follow-up questions. Id. The presenters reentered the meeting, answered questions from the Board for approximately 40 minutes, and were given a final opportunity to make further comments. Id. The presenters then left the meeting, and the Board deliberated. Id. Board members inquired of counsel whether the presentations had altered their previous opinions of Starr's claims, to which they replied in the negative. Id. Each director then spoke and offered his or her view that Starr's demand should be refused, for a variety of reasons, including:

> [T]he low likelihood of success on the merits, the realistic potential damages, the uncertainty in allocating any potential damages among the direct and derivative claims, the potential harm to AIG's goodwill and the positive image that AIG worked so hard to restore since September 2008 (consistent with the negative reaction by the public, media, regulators and elected officials even to the Board's consideration of the Demand), the fact that "a deal is a deal," and AIG's potential indemnification obligations.

Id. at 7. The Board then took two votes, one including the full Board, and one excepting the three members who had served on the Board in September 2008. Id. Both votes resulted in a unanimous determination to refuse Starr's demand. Id. AIG issued a press release later the same day, reflecting the Board's determination. Id.

b. Starr's Second Amended Complaint

On March 11, 2013, Starr filed its Second Amended Verified Class Action Complaint. In this complaint, Starr maintains its argument of demand futility, despite the fact that Starr made a demand on the Board. 2d Am. Compl. ¶¶ 180, 191. Starr contends that it reserved the right to argue demand futility through the September 5, 2012 agreement with AIG, in which Starr agreed to make a demand on the Board "provided that Plaintiff could still assert that 'the demand was wrongfully refused and/or not required as a matter of law.'" Id. at ¶ 190 (citing Demand Agreement at 3).

In addition to its demand futility argument, Starr alleges that the demand was wrongfully refused, as "the Board did not objectively and disinterestedly exercise its business judgment or due care in considering the demand." Id. at ¶ 191. Starr alleges

other grounds for its assertion that the Board wrongfully refused its demand: the strength of Starr's case, the Board's reliance on "conflicted counsel," the personal and reputational interests of individual members, and Government threats and intimidation. Id. at ¶¶ 192, 205-09. Starr further argues that the Board's decision was flawed because the Board failed to give deference to legal decisions already made in this case and disregarded evidence of significant damage to AIG as a result of the Government's taking. Id. at ¶¶ 211-13. Additionally, Starr alleges that the Board made a predetermined decision to refuse the demand, evidenced by the issuance of its decisional press release only three hours after presentations were complete. Id. at ¶ 216.

II.    Standard of Review

Under RCFC 23.1, a shareholder plaintiff bringing a derivative action must "state with particularity" in its complaint "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members," and if applicable, "the reasons for not obtaining the action or not making the effort." Rule 23.1 does not create the demand requirement, but merely outlines the procedural framework for alleging a derivative claim. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991). The requirement to make a demand, and the adequacy thereof, is a substantive obligation to be evaluated under the law of the state of the company's incorporation. Id. at 97. Here, AIG is a Delaware corporation, and therefore Delaware law governs the extent of the demand requirement and the circumstances under which Starr may proceed derivatively. Derivative suits are "an extraordinary procedural device," and thus such complaints are subject to a heightened pleading standard, namely, the requirements of Rule 23.1. Stepak v. Addison, 20 F.3d 398, 402 (11th Cir. 1994). The Court will evaluate Starr's complaint under this standard.

Discussion

In its Second Amended Complaint, Starr brings derivative claims on AIG's behalf for damages resulting from the Government's alleged taking or illegal exaction of a 79.9% interest in AIG, as well as damages related to the Maiden Lane III transactions. 2d Am. Compl. ¶ 235. Starr argues that it has raised a reasonable doubt that the AIG Board conducted a reasonable investigation in good faith because of the Board's (1) reliance on conflicted counsel, (2) lack of independence, and (3) failure to consider the merits of Starr's claims and the material facts relevant to the claims. AIG and the Government contend that Starr lacks standing to assert these derivative claims, as Starr waived any demand futility argument by making a demand on the Board, and Starr has failed to allege facts creating a reasonable doubt that the Board's decision is entitled to the presumption of the business judgment rule, a requirement to establish wrongful refusal. As set forth below, the Court finds that Starr has not demonstrated a reasonable doubt that the Board's decision is entitled to the presumption of the business judgment rule, and therefore has no standing to advance derivative claims on behalf of AIG.

I.    Applicable Law

        If a claim belongs to a corporation, it is the corporation itself, acting through its board of directors, which determines whether or not to assert the claim.  Grimes v. Donald, 673 A.2d 1207, 1215 (Del. 1996) *overruled in part on other grounds by* Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000).  A derivative form of action is "an extraordinary procedural device," Stepak, 20 F.3d at 402, which allows an individual shareholder to bring "suit to enforce a *corporate* cause of action against officers, directors, and third parties," Kamen, 500 U.S. at 95 (quoting Ross v. Bernhard, 396 U.S. 531, 534 (1970)).  An individual shareholder's ability to advance such a claim, however, is tempered by the demand requirement, calling for a shareholder to show that the board wrongfully refused his pre-suit demand on the board to assert the corporation's claim (wrongful refusal), or to establish that pre-suit demand is excused because the directors are incapable of making an impartial decision regarding the pursuit of the litigation (demand futility).  See Wood v. Baum, 953 A.2d 136, 140 (Del. 2008).  "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of the corporation."  Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) *overruled in part on other grounds by* Brehm, 746 A.2d at 254.  "[R]eceipt of demand makes it crystal clear to the directors of a Delaware corporation that the decision whether to commit the corporation to litigation lies solely in their discretion."  Kamen, 500 U.S. at 105.

        If a demand is made and refused, the shareholder has spent an "'arrow' in the 'quiver.'  The spent 'arrow' is the right to claim that demand is excused."  Grimes, 673 A.2d at 1218-19 (citing Spiegel v. Buntrock, 571 A.2d 767, 775 (Del. 1990) ("[a] shareholder who makes a demand can no longer argue that demand is excused.")); see also FLI Deep Marine LLC v. McKim, 2009 WL 1204363, *3 (Del Ch. 2009) ("Delaware law could hardly be clearer" in holding that shareholders may not invoke the futility exception after submitting a demand to the board).

        A board that refuses a shareholder's demand is entitled to the presumption of the business judgment rule, which "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," Aronson, 473 A.2d at 812 (citations omitted); see also Beam, 845 A.2d at 1048 (business judgment rule is a presumption that directors were faithful to their fiduciary duties).  The presumption is determinative, unless the shareholder can allege facts with particularity creating a reasonable doubt that the board is not entitled to the benefit of the presumption.  Grimes, 673 A.2d at 1219 (citing Levine v. Smith, 591 A.2d 194, 212 (Del. 1991)).  "[W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'"  In re Walt Disney, 906 A.2d 74 (quoting Sinclair Oil, 280 A.2d at 720).

In making a demand on the board, a shareholder "not only tacitly concedes [the] lack of self-interest and independence of a majority of the Board, but expressly concedes both issues." Levine, 591 A.2d at 212. Therefore, where a shareholder's complaint is predicated on wrongful refusal, the only issue for a trial court to determine is the application of the business judgment rule to the board's refusal of demand. Levine, 591 A.2d at 212; Spiegel, 571 A.2d at 778 ("The ultimate conclusion of the [board] . . . is *not* subject to judicial review.") (quoting Zapata Corp. v. Maldonado, 430 A.2d 779, 787 (Del. 1981)). The burden is on the shareholder to rebut the presumption of the business judgment rule by alleging facts with particularity that create a reasonable doubt as to the good faith and reasonableness of the board's investigation. Levine, 591 A.2d at 212 (citing Spiegel, 571 A.2d at 778); Aronson, 473 A.2d at 812; see also Scattered Corp. v. Chi. Stock Exch., Inc., 701 A.2d 70, 75 (Del. 1997) ("This [principle] is completely consistent with the Grimes teaching that a board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting a demand."), *overruled in part on other grounds by* Brehm, 746 A.2d at 254.

"Reasonableness implicates the business judgment rule's requirement of procedural due care"; that is, whether the board acted on an informed basis in rejecting the demand. Levine, 591 A.2d at 213 (citations omitted). Although a board of directors has a duty to act on an informed basis in responding to a demand, "there is obviously no prescribed procedure that a board must follow." Id. at 214 ("[A] determination of what matters will (and will not) be considered must necessarily fall within the board's discretion."). The directors have the discretion to determine "the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand." Rales v. Blasband, 634 A.2d 927, 935 (Del. 1993); Levine, 591 A.2d at 212, 214 (upholding refusal and finding that board had no obligation "to permit a demanding shareholder to make an oral presentation at a meeting"). Accordingly, a board need not be informed of *every* fact, but "is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach." Brehm, 746 A.2d at 259; see also Rales, 634 A.2d at 935 ("If a factual investigation is required, it must be conducted reasonably and in good faith.").

As an initial matter, the Court rejects Starr's claim of demand futility. Starr submitted a demand to the Board, which, according to long-standing corporate law precedent, conclusively waives any right to assert demand futility. See, e.g., Grimes, 673 A.2d at 1218-19; Spiegel, 571 A.2d at 775. Starr's September 5, 2012 agreement with AIG, in which Starr purportedly reserved "the right to assert that demand was . . . excused," Opp'n 1, is insufficient to overcome binding black letter law. Thus, with respect to the derivative claims, the only issue for the Court to determine is whether Starr has sufficiently alleged particularized facts creating a reasonable doubt that the Board conducted a reasonable investigation in good faith.

II.     Conflicted Counsel

    a.  The Parties' Arguments

    Starr contends that the AIG Board's decision was flawed because the Board was
advised by conflicted law firms that dominated the demand process.  Starr alleges that
because the Board "allowed the very advisers who had advised in favor of the challenged
transactions to advise them on whether to challenge the transactions[,]"  2d Am. Compl.
¶ 205, there is reason to doubt whether the Board informed itself of all material
information reasonably available prior to making a business decision, Opp'n 15-16.  In
particular, Starr argues that "the[se] law firms were active participants charged with
examining the transactions and advising the Company and the Board as to their propriety
and legality," and therefore "are inherently biased in favor of defending the advice that
they had previously rendered and avoiding a judicial decision to the contrary."  Opp'n 17.
Starr predominantly relies upon Stepak, a case applying Delaware law and holding that
corporate counsel's prior representation of individual directors regarding the same
transactions created a reasonable doubt as to the board's investigation and consideration
of a shareholder demand, which the court found to be dominated by conflicted counsel.
See Stepak, 20 F.3d at 410-11.  Here, Starr claims that the Simpson and Weil law firms
were conflicted and dominated the Board's evaluation of the demand, thereby preventing
the Board from making a truly informed decision.  Opp'n 18.  Although AIG retained a
third law firm, Seitz Ross, as independent counsel, Starr posits that, in light of Simpson
and Weil's "domination," the participation of Seitz Ross had no "cleansing effect."  Id. at
22 (quoting Stepak, 20 F.3d at 409).[4]

    Regarding the participation of the Simpson law firm, Starr argues that the AIG
Board unjustifiably relied on Mr. Curnin's counsel and opinions evaluating Starr's
claims.  Id.  In alleging that Simpson dominated the process, Starr highlights Simpson's
role in communicating with the Board and presenting evidence:  Mr. Curnin outlined
various options the Board could pursue, listed factors the members could consider in
evaluating the demand, and summarized the legal claims at issue.  Id. at 18.  Further, Mr.
Curnin shared with the Board his "view that Starr had a low likelihood of success on the
merits and the damages were far below the damages claimed by Starr."  Id. (quoting AIG
Comm. Mtg. Minutes (Jan. 5, 2012)).  Similarly, Starr alleges that the Board unjustifiably
relied on the opinion of Mr. Allerhand from Weil "as to the validity and value of the ML
III derivative claims" because of Weil's advisory role to AIG in 2008.  Id. at 19.

    Starr further argues that the Board erroneously relied on the opinions of two
experts that were selected by conflicted counsel, Professor John C. Coates and Dean

---

[4]  Starr does not allege that Seitz Ross had any disabling conflict.

Erwin Chemerinsky.  Id. at 20-22.  As an extension of counsel's desire to defend the propriety of their 2008 advice, Starr alleges that "conflicted counsel controlled both the interaction with the experts and the presentation of their opinions."  Id. at 20 ("Plaintiff was not given the opportunity to review or comment on these opinions or even made aware of their existence until after demand was denied.").  Moreover, Starr suggests that these selected experts were biased advisers themselves:  "Prof. Coates had government contacts and thus may have a bias in the Government's favor"; "the limited amount Dean Chemerinsky has published on th[e relevant] subjects reveals a bias in favor of the Government and against property owners, and thus, a likely bias against Starr's claim." Id. at 21-22.

AIG and the Government vigorously dispute Starr's characterization of the Board's counsel as "conflicted," arguing that such allegations are not only illogical and unsubstantiated, but also irrelevant.  Preliminarily, the moving parties both point out that Starr was aware of the involvement of all three law firms before, during, and after the demand process, but Starr did not voice any concerns about conflict until the Second Amended Complaint, after receiving an outcome with which it disagreed.[5]  Def.'s Reply 15; Tr. 40 (Allerhand).

AIG and the Government argue that the basic premise for Starr's conflicted counsel argument is critically flawed.  As they point out, Starr alleges that the wrongdoer who caused its injury was the United States Government – not AIG or any of the Board members.  The Department of Justice represents the United States Government, and the Simpson and Weil law firms represent AIG and the Board.  AIG Reply 3-4.  Given that Starr does not allege harm to the corporation at the hands of AIG or its Board of Directors, the moving parties argue, there is no conflict presented by Simpson or Weil advising the Board.  Id. at 3; Def.'s Reply at 13-14.  The moving parties contend that Stepak, the predominant case on which Starr relies, is inapposite, because the corporation's advising attorneys in that case had represented individual directors in criminal proceedings relating to the same subject matter as the demand.  AIG Reply 4-5; Def.'s Reply 15-16.

Additionally, AIG points to Starr's assertions that its taking and illegal exaction claims do not implicate the directors' fulfillment of their fiduciary duties.  AIG Reply 5 (citing Demand Refusal Letter, Ex. 3 at 5, 6 (Starr's Nov. 2, 2012 Submission to the Board)).  Therefore, given that Simpson and Weil advised the directors in 2008, and the directors' conduct in 2008 is not being challenged, the attorney-client relationship presents no conflict within a suit where a shareholder of a corporation is suing the United States.  Id.

---

[5] The Government states that the Court should reject Starr's conflicted counsel argument as untimely, analogizing to "a person who is aware of a patent error in a Government contracting process [who] chooses to 'sit on its rights' and 'roll the dice and see' if it receives [the] award before filing a challenge." Def.'s Reply 15 (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1314 (Fed. Cir. 2007)).

AIG specifically denies that the Board erroneously "reli[ed] on conflicted counsel to shape the process and control the information provided to the Board with regard to demand" by emphasizing the depth of Seitz Ross's involvement in the demand process. Id. at 6. The Board's letter refusing Starr's demand, as well as the Board minutes submitted by Starr, demonstrate that:

> [T]wo partners from Seitz Ross, upon being engaged in November 2012, participated in every meeting at which Starr's demand was considered, advised the Board regarding the merits of the claims, co-authored and distributed work product to the Board regarding Starr's demand, and co-authored the letter to Starr refusing the demand. See Jan. 5, 8 and 9, 2013 Minutes (Dkt. Nos. 121-1, 121-2, 121-4); Dec. 21, 2012 and Jan. 23, 2013 Letters (Dkt. Nos. 87-1, 87-20).

Id. To that contention, the Government adds that the Board was not "dependent on" the legal opinions of their retained firms, as the Board received extensive written submissions, Powerpoint presentations, and oral presentations from other competent entities, including counsel for Starr. Def.'s Reply 16.

Finally, regarding the expert opinions received by the Board, AIG argues that "Starr alleges no facts that even begin to suggest that AIG's board's reliance on Professor Coates and Dean Chemerinsky was not reasonable," highlighting the experts' "impeccable credentials." AIG Reply 6-7 (citing McPadden v. Sidhu, 964 A.2d 1262, 1270-71 (Del. Ch. 2008), for the principle that a plaintiff must allege particularized facts showing that reliance on an expert's advice "was grossly negligent"). Similarly, the Government contends that "Starr's unsubstantiated second-guessing of the independent experts' qualifications or alleged biases . . . fails to support its contentions." Def.'s Reply 16.

   b. Analysis

In Stepak, the plaintiff claimed his demand was wrongfully refused, alleging that the board's investigation was dominated by counsel with an irreconcilable conflict of interest. See 20 F.3d at 403. This conflict, the plaintiff argued, arose from corporate counsel's representation of officers and directors in criminal proceedings involving the same subject matter of the demand. Id. at 403-04. After a careful review of the evidence, the court found that the plaintiff had alleged specific facts to rebut the presumption of the business judgment rule:

> Selection of a law firm that has *actually represented the alleged wrongdoers* in proceedings related to the very subject

> matter that the law firm is now asked to neutrally investigate
> reaches, in our opinion, the level of gross negligence and is
> incompatible with a board's fiduciary duty to inform itself of
> all material information reasonably available prior to making
> a business decision. Such a shortcoming strips a board's
> rejection of a shareholder demand of the protection of the
> business judgment rule.

Id. at 405 (internal citations omitted) (emphasis added). The court discussed the important role of the demand requirement in preserving the directors' independence, and explained "to properly distinguish between meritorious and frivolous shareholder allegations, corporate counsel must be able to exercise independent professional judgment, free of any bias in favor of his individual clients." Id. at 404-05 (citations omitted).[6] Thus, counsel's representation of the alleged wrongdoers compromised their ability to exercise independent judgment, and therefore undermined the independence of the board. Id.

Here, as Starr itself has asserted, the alleged wrongdoer is the United States Government – not AIG, and not any of the individual directors. See Tr. 64 (Boies)[7]; see generally 2d Am. Compl. ¶¶ 220-237 (Starr's claims for relief, no directors named). Starr offers no facts alleging that either Simpson or Weil represent, or have represented the Government in any relevant capacity. Thus, the underlying premise of conflict in Stepak is not present in this case, and the Court finds no indication that either Simpson or Weil had any disabling conflict regarding Starr's demand.

Additionally, even if the Simpson or Weil law firms were considered to be conflicted, the Court finds, based on the thorough documentation of the demand process, that their roles in the investigation and presentation process did not amount to domination of the directors' consideration of demand. In Stepak, the court found the plaintiff had alleged with sufficient particularity that conflicted counsel had dominated the consideration of his demand. The court noted the allegations that conflicted counsel: (1) served as the defendant's general counsel when plaintiff's demand was received, considered, and rejected; (2) conducted the investigation of the demand and presented the demand to the directors; (3) drafted the board's demand refusal letter; and (4) was present

---

[6] The court also noted that corporate counsel's prior representation of the alleged wrongdoer-directors burdened counsel with confidentiality duties towards the individual wrongdoer-directors. Stepak, 20 F.3d at 406. Given the law firm's ethical obligation of confidentiality, "a board's selection of that firm as the primary investigator is tantamount to a decision to forego 'material information reasonably available.'" Id. (quoting Aronson, 473 A.2d at 812).

[7] "We don't have to prove that [the members of the board] breached their fiduciary duty. That's not part of our takings case. It's not part of our illegal exaction case. We don't have to prove that." Tr. 64 (Boies).

at and participated in a subsequent board meeting to discuss the demand, at which independent counsel was not present. Stepak, 20 F.3d at 407-08. The court noted that independent counsel's "lone presentation" at a preliminary board meeting was insufficient "to remove any taint associated with [conflicted counsel's] involvement." Id. at 409.

Again, Starr's reliance on Stepak is misplaced, as its facts are easily distinguishable from those present before the Court. Initially, AIG exceeded its investigatory duties by hiring the independent firm of Seitz Ross, "even though not required." AIG Comm. Mtg. Minutes (Nov. 1, 2012). AIG also had its own office of corporate counsel, representatives of which were present at the relevant board and committee meetings. See id. (listing attendance of General Counsel representatives); AIG Comm. Mtg. Minutes (Jan. 5, 2013) (same); AIG Board Mtg. Minutes (Jan. 8, 2013) (same); AIG Board Mtg. Minutes (Jan. 9, 2013) (same). Unlike the "lone presentation" of independent counsel at a single board meeting, Stepak, 20 F.3d at 409, Seitz Ross was present at each of the Board's meetings regarding Starr's demand, as well as the Committee's January 5, 2013 meeting. Seitz Ross also co-authored work product to inform and advise the Board on Starr's demand, and co-authored the demand refusal letter. Additionally, the AIG Board was not "dependent on" the legal opinions of purportedly conflicted counsel, Opp'n 20, as the Board received extensive written submissions from Starr, the Department of Justice, the Treasury Department, and the FRBNY, as well as oral presentations from Starr, the Treasury Department, and the FRBNY. Demand Refusal Letter at 2-3. In contrast to the flawed process conducted by the board in Stepak, AIG took the extra step of hiring a third firm as counsel, received the work product and advice of three law firms, and made an informed decision to refuse Starr's demand.

Starr relies upon two other cases that discuss the need for independent counsel when a board delegates its decision-making power to a special litigation committee. See Brinckerhoff v. JAC Holding Corp., 263 A.D.2d 352, 353 (N.Y. 1st Dep't 1999); In re Par Pharm., Inc. Derivative Litig., 750 F. Supp. 641, 647 (S.D.N.Y. 1990). In both Brinckerhoff and In re Par Pharmaceutical, the board of directors appointed a special litigation committee to investigate and advise it on the plaintiff's derivative claims, which included allegations that the individual directors breached their fiduciary duties. 263 A.D.2d at 352-53; 750 F. Supp. at 642, 646-47. The court in Brinckerhoff harbored a reasonable doubt as to the adequacy of the committee's investigation because the committee was not advised by independent counsel and its report "was a mere two pages in length with respect to the subject transaction, and failed to document the special committee's procedures, reasoning and conclusions, thus effectively insulating its investigation from scrutiny by the courts." 263 A.D.2d at 353 (citing In re Par Pharm., 750 F. Supp. at 647). The court based its two-paragraph slip opinion on the analysis set forth in In re Par Pharmaceutical, where the district court found that the special litigation committee's failure to retain independent counsel or "document in any manner its

procedures, reasoning or conclusions" resulted in an impermissibly flawed review process.  In re Par Pharm., 750 F. Supp. at 646-47.

Here, the AIG Board did not create or delegate its decision to a special litigation committee, as the Board members were not compromised by self-interest or lack of independence.  Moreover, as Starr itself points out, its complaint does not allege that the individual directors breached their fiduciary duties, Tr. 64 (Boies), and therefore, the directors are not named as defendants in the current action.  Thus, Brinckerhoff and In re Par Pharmaceutical are not applicable to the AIG Board's procedure in considering Starr's demand, and have no bearing on the case at bar.[8]  The Court finds no fault with the Board retaining and relying on the Simpson, Weil, and Seitz Ross law firms, and accordingly, cannot say that the Board's choice of counsel undermines the reasonableness of the Board's investigation.  Moreover, the extensive documentation of the Board's procedures, reasoning, and conclusions has enabled this Court to conduct a thorough, informed review of the Board's process.

Furthermore, Starr has not alleged facts that plausibly suggest the bias of Professor Coates or Dean Chemerinsky, which Starr itself concedes is speculative.  Opp'n 21-22.  Starr's assertion that "Prof. Coates had government contacts and thus may have a bias in the Government's favor," Opp'n 21, is far from colorable evidence of a bias against Starr.  Similarly, Starr's attempt to link a phrase in one of Dean Chemerinsky's publications to "a bias in favor of the Government and against property owners, and thus, a likely bias against Starr's claim," id. at 22, is a bridge too far.  The presumption that board members properly exercise their business judgment also extends to their reliance on experts, Brehm, 746 A.2d at 261, and Starr has not alleged particularized facts to rebut this presumption.

The Court finds Starr's allegations of conflicted counsel to be without merit, and insufficient to raise a reasonable doubt that the AIG Board is entitled to the presumption of the business judgment rule.

III.    The Board's Independence

    a.    The Parties' Arguments

Next, Starr alleges that the "members of the Board [that] participated in the decision to reject Starr's demand . . . could not be expected to pass objective judgment on their own action and inaction."  2d Am. Compl. ¶ 183.  Preliminarily, Starr argues that by

---

[8] The existence of the Committee to assist the AIG Board in its consideration of the demand does not alter the inapplicability of these cases, as "[t]he use of a committee of the board formed to respond to a demand or to advise the board on its duty in responding to a demand is not the same as the SLC [special litigation committee] process[.]  It is important that these discrete and quite different processes not be confused."  Grimes, 673 A.2d at 1216 n.13.

making a demand, it did not concede the independence of the AIG Board, as a board "may appear to be independent, but may not always act independently."  Opp'n 26 (quoting <u>Grimes</u>, 673 A.2d at 1219).  The Court distills Starr's grounds for the Board's lack of independence into three primary allegations: (1) the directors were elected by the Government while it held a majority stake in AIG; (2) the directors appointed by the Trustees were obligated to act in the best interests of the Treasury Department; and (3) the directors faced potential harm to their professional reputations and relationships with the federal government in the event they allowed this suit to go forward.  <u>Id.</u> at 26-30.

Starr argues that because the Department of Treasury elected all twelve members of the current Board, those Board members "could not be expected to authorize a lawsuit against the Government[.]"   2d Am. Compl. ¶ 188.  Starr emphasizes the fact that eight of the Board's twelve members "were first elected to the Board by the Trustees of the Government's Trust exercising their voting control to elect members of the Board[.]"  <u>Id.</u> at ¶ 183; Opp'n 29.   Starr suggests that the Trust functioned as an agent of the Government, as it was run by former Government officials, under the Government's advice and instructions, and for the Government's best interests.  2d Am. Compl. ¶ 184. The Trustees themselves, under the Trust Agreement, "could only take actions that are 'in or not opposed to the best interests of the Treasury.'"  <u>Id.</u> at ¶ 187 (quoting § 3.03(a) of the Trust Agreement).  This "standard of care," Starr argues, necessarily dictated that the Trustees were "duty bound to elect only Board members who similarly will act only 'in or not opposed to the best interests of the Treasury.'"  <u>Id.</u>  Accordingly, Starr argues, the Trustees' duty to the Treasury was transposed onto the Board members who were elected by the Trustees, thereby establishing the AIG Board's lack of independence to consider Starr's demand.

Finally, Starr argues that the governmental pressure and public outcry against AIG prevented the Board from exercising independent, objective judgment.  Starr highlights threats made by outside counsel for the Treasury Department in arguing that "[t]he directors were well aware that the risk of harm to their professional reputation and relationship with the federal government from authorizing the derivative claims to proceed exceeded any risk that would result from rejecting the demand."  Opp'n 27. Starr points to the <u>Oracle</u> case, in which a special litigation committee was established to evaluate a shareholder's demand to bring action against directors for insider trading.  <u>In re Oracle Corp. Derivative Litig.</u>, 824 A.2d 917, 920-21 (Del. 2003).  In finding that the independence of the special litigation committee was compromised, the court noted that a decision to allow the derivative suit to proceed "would have potentially huge negative consequences for the Trading Defendants, not only by exposing them to the possibility of a large damage award but also by subjecting them to great reputational harm."  <u>Id.</u> at 940- 41.  Starr relies on <u>Oracle</u> for its statement that courts "cannot assume – absent some proof of the point – that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk."  <u>Id.</u> at 938.  Here, Starr argues, the government pressure and the "media

frenzy" surrounding Starr's demand created "exactly the kind of position when a board is in that it's not able to make the kind of independent judgment that needs to be made for the benefit of the shareholders." Tr. 58 (Boies). Starr contends that this argument is bolstered by the fact that the Board "rush[ed] to judgment," issuing its decisional press release three hours after the presentations had concluded. Opp'n 29.

In response, AIG and the Government first assert that by virtue of making a demand, Starr conceded the independence and disinterestedness of the Board. AIG Mot. 24-25; Def.'s Mot. 15. Regardless of whether or not this argument was waived, the moving parties further contend that Starr alleges no facts showing that the Board lacked independence. In addressing the relevant case law, AIG and the Government argue that the election of directors by a majority shareholder does not strip directors of the presumption of independence, nor does director approval or participation in a challenged wrongdoing establish lack of independence. AIG Mot. 26-33; Def.'s Mot. 18-20. Furthermore, the moving parties argue that the directors elected by Trustees were not bound to act in the best interests of the Treasury Department, but instead had fiduciary obligations to AIG, breaches of which are not alleged by Starr. AIG Mot. 30-31; Def.'s Mot. 19. Finally, they contend that the Board properly considered all relevant facts surrounding Starr's demand, and that "AIG's directors had every right to decide, in the exercise of their business judgment, that suing the Government for its rescue of AIG is not the right thing for AIG to do, and that AIG's interests are better served by focusing on the future and not joining litigation concerning the past." AIG Mot. 3-4.

b. Analysis

The Court first addresses whether, by making a demand on the Board, Starr conceded the independence of the directors. Levine explains that in making a demand, a shareholder "not only tacitly concedes [the] lack of self-interest and independence of a majority of the Board, but expressly concedes both issues." 591 A.2d at 212. The Delaware Supreme Court in Scattered Corp. more recently stated that the "[f]ailure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation. Such failure could constitute wrongful refusal." 701 A.2d at 75. The Court views the intersection of these and other cases as standing for the following proposition: when a demand is made on a board, the demanding shareholder concedes the independence of its members, absent particularized allegations creating a reasonable doubt that the demand was properly refused. Accordingly, the Court proceeds to evaluate Starr's allegations of lack of independence under the reasonable doubt standard.

i. Election of Board Members During Government's Control Period

It is well established under Delaware law that "in the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of

independence, and that their acts have been taken in good faith and in the best interests of the corporation." <u>Aronson</u>, 473 A.2d at 815; <u>see also, e.g.</u>, <u>Beam</u>, 845 A.2d at 1054 n.37 (quoting <u>Aronson</u>). "The mere nomination of a director by a majority shareholder . . . is insufficient to demonstrate lack of independence." <u>S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.</u>, 2011 WL 863007, at *10 (Del. Ch. Mar. 9, 2011) (citing <u>Aronson</u>, 473 A.2d at 816). Election at the behest of a controlling shareholder "is the usual way a person becomes a corporate director." <u>Aronson</u>, 473 A.2d at 816. Thus, the fact that the twelve Board members were elected when the Government controlled a majority equity interest in AIG is insufficient to create a reasonable doubt as to their independence.

Additionally, Starr's contention that three of the directors served on AIG's Board during the challenged transactions and therefore "have a personal interest in defending conduct attacked in this litigation," 2d Am. Compl. ¶ 206, is conclusory and without merit. As AIG explained in its motion, even when individual directors are sued, "mere directorial approval of a transaction" is insufficient to show lack of independence. <u>See</u> AIG Mot. 32-33 (quoting <u>Aronson</u>, 473 A.2d at 817). Therefore in this case, where the individual directors are not being sued, participation and approval of the challenged transaction can hardly serve to disqualify those directors, or cast a shadow of doubt on the reasonableness of the Board's consideration of Starr's demand.

### ii. Election of Board Members by Trustees

Starr argues that because the Trustees had a fiduciary obligation to only take actions that are "in or not opposed to the best interests of the Treasury," any directors elected by the Trustees also could only take actions that are "in or not opposed to the best interests of the Treasury." 2d Am. Compl. ¶ 187. This transposition of duty, however, is the cog in the fiduciary wheel. Whatever the Trustees' obligations to the Treasury may have been, such duties could not be imposed on persons without any legal relationship to the Trust. Thus, the Board members elected by the Trustees had no legal fiduciary duty to the Trust, and by virtue of that premise, no legal fiduciary duty to the Treasury Department.

Even under the hypothetical premise that some of the AIG directors had a duty to act in the best interests of the Treasury Department, such a duty could not displace the fiduciary obligations to AIG that the directors acquired upon their election. <u>See Cede & Co. v. Technicolor, Inc.</u>, 634 A.2d 345, 361 (Del. 1993) ("[T]he best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."). Moreover, the Trust was dissolved on January 14, 2011, 2d Am. Compl. ¶ 84, nine months before Starr filed its initial complaint and twenty months before Starr decided to make a demand on the Board. <u>See</u> AIG Mot. 29. Therefore, at the time of Starr's demand, it was impossible for Board members elected by the Trustees to have any obligations pursuant to a non-existent Trust Agreement.

### iii. Public and Governmental Pressure on the Board

Finally, Starr's allegations that public and governmental pressure compromised the Board's independence and rushed it to make an uninformed decision do not serve to create a reasonable doubt that the Board is entitled to the presumption of the business judgment rule. Starr does not allege any facts that directly call into question the acts of any individual director. Nowhere in its Second Amended Complaint does Starr allege that any individual director personally acted without honesty and good faith or that any particular director was beholden to the Government so as to value his or her reputation higher than his or her fiduciary duties. See In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 824-25 (Del. 2005) (finding plaintiffs' allegations of the directors' financial, charitable, or personal relationship to the alleged wrongdoer were insufficient to show that directors were beholden to the alleged wrongdoer).

Starr's general allegations that the Board's objectivity and independence were compromised by media and government attention does not place this case within the ambit of Oracle. As in Brinckerhoff and In re Par Pharmaceutical, the court in Oracle assessed the independence of a special litigation committee. Oracle, 824 A.2d at 937. The Delaware Supreme Court has explained that "[u]nlike the demand-excusal context, where the board is presumed to be independent, the SLC [special litigation committee] has the burden of establishing its own independence by a yardstick that must be 'like Caesar's wife' – 'above reproach.'" Beam, 845 A.2d at 1055 (quoting Lewis v. Fuqua, 502 A.2d 962, 967 (Del. Ch. 1985)). Here, the AIG Board did not appoint a special litigation committee, and the burden remains on Starr to rebut the presumption, with particularized facts, that the Board acted in good faith and in the best interest of the corporation.[9]

Moreover, it may well have been the case that "the public and governmental outcry . . . confirmed to the Board that reputational considerations favored denial of the demand," Opp'n 27-28, but if so, that fact is of no moment to the Court's consideration of whether the Board was reasonably informed in making its decision. The Court has received many filings that attest to the so-called "media frenzy" sparked by this case, and the Court finds the Government's observation regarding the attendant circumstances to be astute: Starr "mistakenly conflates public reaction to AIG's actions with the directors' personal reputation." Def.'s Reply 19. As AIG points out, "[n]o responsible board could possibly consider suing the Government without also considering the impact the suit was expected to have on the corporation's name, image and relationships with shareholders, customers, regulators and elected officials." AIG Reply 7. This is especially true in the

---

[9] Additional facts demonstrate the inapplicability of Oracle to Starr's argument. The shareholders of Oracle brought a derivative action alleging that four individual directors engaged in insider trading, in violation of criminal law. Oracle, 824 A.2d at 921. Once again, Starr does not allege any wrongdoing on the part of the individual directors, criminal or otherwise.

circumstances here, where "AIG is in the business of selling insurance and financial products, and its reputation with its customers, with its regulators, does matter." Tr. 35 (Allerhand). The Board's consideration of this reputational harm in making its business decision was eminently rational, and indeed the failure to consider such potential harm would have been plainly irrational. Given the mounting scrutiny that AIG was receiving regarding the demand, and the depth of knowledge and information possessed by the Board both leading up to the January 9, 2013 presentations and directly after the presentations, the Court cannot say that the Board's same-day refusal of Starr's demand was irrational.

Finally, while the Court has noted its displeasure with the Treasury Department's outside counsel threatening the AIG Board of Directors at the January 9, 2013 presentation, there is no evidence that these statements caused the Board to alter the final outcome. These Board members have been under the public microscope for the past five years, and are accustomed to making difficult decisions under scrutiny. They have weathered the storm well, and are now seemingly beyond the crisis of 2008. The Board did not need to hear anything from the Treasury Department to figure out that the corporation should weigh the risk of having the Government as an adversary. The issue of governmental relations was destined to be a major factor for the Board members regardless of what the Treasury Department's counsel told them on January 9, 2013.

Reviewing all of the evidence, the Court finds that the Board is entitled to the presumption that it made a good faith, rational business decision in the best interest of the corporation.

IV.    Merits and Material Facts

    a. The Parties' Arguments

Starr alleges that there is reason to doubt the reasonableness of the Board's investigation because it disregarded the following key factors: (1) the merits of Starr's underlying allegations; (2) this Court's previous rulings; and (3) the potential recoverable damages for AIG. Starr alleges that "[t]he AIG Board's wrongful refusal of Starr's demand is evidenced by the strength of Starr's case," 2d Am. Compl. ¶ 192, and the Board "could not have engaged in an objective assessment of the demand without fair and disinterested consideration of the validity and value of Plaintiff's claims," Opp'n 24. In its complaint, Starr highlights evidence obtained through discovery, as well as evidence presented as part of the Board's January 9, 2013 meeting and public facts, to demonstrate the Board's awareness of the strength of Starr's taking and illegal exaction claims. Id. at ¶¶ 192-204. Tied to this assertion is Starr's claim that the Board disregarded this Court's previous rulings, which included an "analysis of critical issues of law" relevant to the merits of Starr's case. Opp'n 24. Additionally, Starr argues that "[i]n evaluating possible damages, the Board ignored AIG's own prior contemporaneous

determination . . . that valued the 79.9% interest taken and/or illegally exacted at $23 billion." Id. at 25. Starr claims that the Board erroneously relied upon conflicted counsel's view that the value of the equity interest was "far below the value claimed by Starr." Id. (quoting Demand Refusal Letter at 5).

AIG and the Government counter that these arguments amount to mere disagreement with the Board's decision, and "Delaware law does not permit a plaintiff to overcome the business judgment rule simply by asserting that the substance of a board of director's decision was wrong." AIG Mot. 17 (quoting cases); see also Def.'s Mot. 21. Moreover, the moving parties assert that the merits of the case and the relevant judicial decisions were indeed considered by the Board, along with a variety of other permissible factors, in making a rational business decision in the best interests of AIG. Finally, regarding damages, AIG highlights that AIG's "'own prior contemporaneous valuation' was a *post*-rescue valuation, not a pre-rescue valuation." AIG Reply 12 (citing Nov. 10, 2008 AIG Form 10-Q at 25-26).

  b. Analysis

Once a demand has been made on a board, the directors have the discretion to determine "the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to a demand." Rales, 634 A.2d at 935. When determining whether to advance a particular lawsuit, a board must balance many factors: "ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal." Zapata, 430 A.2d at 788. Given that the board must act to serve the best interests of the corporation, "[i]t is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests." In re InfoUSA, Inc. S'holders Litig., 953 A.2d 963, 986 (Del. Ch. 2007); see also Burks v. Lasker, 441 U.S. 471, 485 (1979) ("There may well be situations in which the independent directors could reasonably believe that the best interests of the shareholders call for a decision not to sue[.]").

Here, the Board considered the likelihood of success of Starr's claims on the merits as a factor when it made its decision. The Board compared this factor along with "the substantial harm AIG might suffer pursuing the action, including damage to AIG's corporate brand and image," as well as its "relationships with shareholders, customers, regulators, and elected officials[.]" AIG Mot. 19 (citing Demand Refusal Letter at 5-6). Regardless of the merits underlying Starr's claim, the claim belongs to the corporation, see Grimes, 673 A.2d at 1215, and the Board acted within its discretion by choosing not to advance it. Even if this Court viewed the potential merit of Starr's claims favorably,[10]

---

[10] The Court again emphasizes the statement made in the July 2012 opinion, that "it makes no determinations as to the ultimate merit of Starr's claims." Starr Int'l, 106 Fed. Cl. at 69.

it is not the province of the courts to compel corporate directors to advance lawsuits. At this juncture, the Court's inquiry is limited to evaluating the process with which the Board considered Starr's demand.

During the entire demand process, AIG's Board conducted itself in an exemplary fashion, with an eye towards thoroughness and transparency. AIG's demand refusal letter and the exhibits are replete with references to this Court's prior rulings and opinions, which belies Starr's assertion that the Board "disregarded the Court's rulings." Opp'n 24; see also 2d Am. Compl. ¶ 213 (noting "[t]he failure of the Board and those who were advising it to give any meaningful consideration to the Court's Opinion"). The letter itself states that "[t]he Board had previously received copies of the rulings in the two actions," Demand Refusal Letter at 2, and the rulings were extensively cited and discussed in Starr's written submissions to the Board, Starr's oral presentation to the Board, the minutes of the Board's meetings, and the presentation materials prepared by counsel for AIG, id. at Exs. 3, 7, 11, 24. To be sure, the Court's rulings are "material facts that are reasonably available," Brehm, 746 A.2d at 259, and the record amply supports the fact that the Board fulfilled its duty to be informed of them in considering Starr's demand.

Starr's argument regarding damages valuation similarly is without merit. In evaluating potential damages, the Board considered its own evidence and the opinion of independent experts retained to advise the Board. See AIG Reply 12; Demand Refusal Letter at 5. The Board was aware of AIG's filings with the SEC and the differing interpretations of the fair market value of the equity interest. See Demand Refusal Letter, Ex. 18 at 14 (Simpson & Seitz Ross presentation slide discussing 10-Q Form and competing valuation positions). The Board was not required, however, to expressly "acknowledge AIG's own statements on the issue." Opp'n 25; see Levine, 591 A.2d at 214 ("[I]n responding to a demand . . . there is obviously no prescribed procedure that a board must follow."); FLI Deep Marine LLC, 2009 WL 1204363, at *4 ("To allow Plaintiffs the ability to dictate the manner in which the Board . . . investigates their allegations would 'be an unwarranted intrusion' upon the authority our law confers on a board of directors to manage the business and affairs of the corporation.") (quoting Levine, 591 A.2d at 214).

The AIG Board conducted a reasonable investigation, was aware of all material facts reasonably available, and did not disregard any key factors. The Court concludes that in considering and balancing all of the competing factors, the Board made a rational business decision, in the good faith belief that its decision was in the best interests of the corporation. Accordingly, Starr has failed to create a reasonable doubt that the Board's demand refusal is entitled to the presumption of the business judgment rule.

V.    Conclusion

For the foregoing reasons, the Court holds that Starr has failed to allege particularized facts that create a reasonable doubt as to the good faith or reasonableness of the Board's investigation of Starr's demand.  To the contrary, the Court finds that AIG, its Board of Directors, and its advising counsel conducted the demand process in an informed, transparent, rational, and exemplary fashion.  The Board's decision to refuse Starr's demand is entitled to the presumption of the business judgment rule, and will not be disturbed by this Court.[11]   Accordingly, AIG's and the Government's motions to dismiss Starr's derivative claims are GRANTED.

## DIRECT CLAIMS

In its Second Amended Complaint, Starr asserts two direct claims: first, that the Government's September 2008 acquisition of a 79.9% equity and voting interest in AIG constituted a taking or an illegal exaction of the property of AIG and its shareholders;[12] and second, that the June 30, 2009 stock split, by which shareholders were denied a separate vote, constituted a taking and illegal exaction of the property of the shareholders. In the July 2012 opinion on Defendant's motion to dismiss, the Court ruled that Starr had standing to advance a direct claim against the Government for the alleged appropriation of its equity interest and voting power.  Starr Int'l, 106 Fed. Cl. at 65-66.  The Court stated that "the Government has a preexisting duty under the Fifth Amendment not to take private property for public use without paying just compensation," and therefore, the Government had an obligation not to appropriate minority shareholders' property interests, "irrespective of whether the Government was a stockholder when the purported dilution occurred."  Id. at 65.  The Court observed, based upon Starr's allegations, that "AIG's shareholders were harmed uniquely and individually to the same extent that the Government benefited."  Id. (internal quotations omitted).

## Discussion

In now urging the Court to dismiss Starr's direct claims, the Government points to "new material facts" demonstrating that Starr's direct claims are in fact solely derivative. Additionally, the Government argues that Starr's illegal exaction complaint is not legally viable, as the Government never dealt with Starr or other shareholders directly.  Starr rejects the Government's contention that new material facts have arisen, and argues that the Government is merely trying to re-litigate the same arguments presented in its initial

---

[11] The Court notes that despite this opinion's organization of Starr's allegations within separate headings, the Court does not regard any of Starr's allegations as exclusive to the others.  When viewed both individually and as a whole, Starr's arguments are insufficient to raise a reasonable doubt that the AIG Board is entitled to the benefit of deference under the business judgment rule.

[12] The first claim also is a shareholder derivative claim.

motion to dismiss and its motion for reconsideration.  For the reasons set forth below, the Court agrees with Starr, and the Government's motion to dismiss Starr's direct claims is DENIED.

I.      Standard of Review

To survive a motion to dismiss, a plaintiff need only "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A well-pleaded complaint may proceed even if it appears on the face of the pleadings that "recovery is very remote and unlikely."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). In sum, the Court considers the Government's motion to dismiss keeping in mind that Starr's burden at this phase is "minimal."  Colonial Chevrolet Co. v. United States, 103 Fed. Cl. 570, 574 (2012).

II.     New Material Facts

The Government asserts that two new material facts demonstrate the derivative nature of Starr's purported direct claims:   (1) Starr's admission that the harm to shareholders was shared on a pro rata basis; and (2) the Treasury Department no longer has any ownership interest in AIG.

In its memorandum in support of class certification, Starr asserted that the harm suffered by shareholders was "shared across all of the common stock on a ratable basis, share for share."  Def.'s Mot. 8 (quoting Rausser Decl. ¶ 19; Pl.'s Mot. for Class Cert. 10).  The Government contends this concession of the harm is dispositive of Starr's purported direct claims, as "[i]t is black letter law that, if 'all of a corporation's stockholders are harmed and would recover pro rata in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.'"  Id. (quoting Feldman v. Cutaia, 951 A.2d 727, 735 (Del. 2008)).

In making the argument that Starr's class definitions reveal solely derivative claims, the Government selectively quotes the Court's July 2012 opinion and neglects to mention the overarching point to which the selected quotations lead:  when shares are diluted on a pro rata basis, the claim is typically derivative; however, in the genus of corporate overpayment claims, Starr's claim is of the "species" considered "both derivative and direct in character."  Starr Int'l, 106 Fed. Cl. at 62 (quoting Gentile v. Rossette, 906 A.2d 91, 99 (Del. 2006)).  Although "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation," a claim is not per se derivative if it affects all stockholders equally.  Tooley v. Donaldson, 845 A.2d 1031, 1039 (Del. 2004) ("[W]e expressly disapprove . . . the concept that a claim is necessarily derivative if it affects all stockholders equally.").  Thus, the mere fact that AIG

shareholders were injured on a ratable, share-by-share basis does not dictate the derivative nature of their claims. Accordingly, the definition of the class does not alter the Court's July 2012 determination "that Starr has pled facts sufficiently alleging a harm to the suing stockholders independent of any harm to AIG and as such, has standing to advance its expropriation claim directly." Starr Int'l, 106 Fed. Cl. at 62.

In finding that Starr's claim fell within the Tooley framework, the Court noted that "the Government's continuing ownership interest in AIG provide[d] *further* support for the view" that Starr had standing to bring a direct claim. Starr Int'l, 106 Fed. Cl. at 65 (emphasis added). The Government's ownership interest in AIG in July 2012 merely bolstered the Court's conclusion that, assuming the truth of Starr's allegations, the appropriation of a 79.9% interest at the expense of the minority shareholders gave rise to a direct claim. Thus, because the Government's ownership was not a necessary component to establish standing, the Treasury Department's subsequent divestment does not "vitiate[]" the "basis for the Court's earlier opinion." Def.'s Mot. 9. Although the Treasury Department's divestment is a new fact, it is not material to the Court's determination that Starr has standing to advance its direct claim.

III.     Illegal Exaction

Alternatively, the Government argues that even if the Court finds Starr to have pled a valid direct takings claim, Starr's allegations of a direct illegal exaction claim are unavailing. The Government argues that Starr's illegal exaction claim should be dismissed for three reasons: (1) Starr never paid money or conveyed stock to the United States; (2) the alleged diminution in stock value did not have a direct and substantial impact on the shareholders; and (3) because the Government was not a controlling shareholder at the time of the alleged exaction, the claim is solely derivative.

As stated above, the Court previously has held that, assuming the truth of Starr's allegations, Starr may maintain a direct claim for the taking of its equity and voting interests, because "the Government extracted from the public shareholders, and redistributed to itself, a portion of the economic value and voting power embodied in the minority interest." Starr Int'l, 106 Fed. Cl. at 65 (internal citations omitted). In essence, the minority shareholders have adequately alleged that they conveyed a portion of the economic value and voting power to the Government, and as a result, suffered a direct and substantial impact to their own property rights. See Norman v. United States, 429 F.3d 1081, 1096 (Fed. Cir. 2005) ("[A] plaintiff has a claim for an illegal exaction only where the government [action] has direct and substantial impact on the plaintiff asserting the claim.") (internal quotations omitted).

Moreover, the United States had an obligation not to appropriate minority shareholders' property interests, "irrespective of whether the Government was a stockholder." Starr Int'l, 106 Fed. Cl. at 65. The Court has found that this constitutional

obligation, applied to the facts alleged by Starr, is sufficient to maintain a direct takings claim. Id. Given that the test for whether a plaintiff may advance an illegal exaction claim "is identical to the Takings test," Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1364 (Fed. Cir. 2002), the Court repeats its previous ruling that Starr has standing to pursue its illegal exaction claim.

For the foregoing reasons, the Government's motion to dismiss Starr's direct claims is DENIED.

CONCLUSION

In summary, the Court GRANTS AIG's and the Government's motions to dismiss Starr's shareholder derivative claims, and DENIES the Government's motion to dismiss Starr's direct claims. AIG is hereby dismissed as a party to this action. Pursuant to RCFC 12(a)(4), the Government shall file its Answer to Starr's Second Amended Complaint within 20 days of this opinion, on or before July 16, 2013. As stated in the Court's April 17, 2013 order, the Court will conduct the next quarterly discovery conference on Tuesday, July 9, 2013 at 10:00 AM (EDT). The Court expects that trial dates will be established at this conference.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
 Judge