**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STARR INTERNATIONAL COMPANY,
INC., Individually and on Behalf of All   :
Others Similarly Situated,

                         :

              Plaintiff,

                         :

        v.

                         :

UNITED STATES,                       No.  11-00779C (TCW)

                         :

Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## JOINT STATUS REPORT ON DISCOVERY

In accordance with the Court's proposal at the December 14, 2012 Status Conference that the parties raise any discovery issues through a joint report to the Court, Plaintiff Starr International Company, Inc. ("Starr"), individually and on behalf of the Credit Agreement and Stock Split Classes, and Defendant the United States respectfully submit the following joint status report on discovery.

Starr raises the following disputes that the parties have been unable to otherwise resolve: (1) the inadequacy of the Government's responses to the Requests for Admission served on January 24, 2014; (2) the Government's overly broad assertion of the deliberative process privilege and its failure to adequately comply with the guidance provided in Discovery Order Number 6, Nov. 6, 2013, ECF No. 182 ("Discovery Order 6"); (3) the Government's failure to adequately collect and produce documents; and (4) the parties' agreement, subject to the Court's approval, to permit Plaintiff to supplement the list of disclosed potential witnesses based on post-December 1, 2013 discovery.

I.      **The Government's Responses to Starr's Requests for Admission**

*Plaintiff's Position*

## THE COURT SHOULD ORDER THE UNITED STATES TO CORRECT

## ITS RESPONSES TO STARR'S REQUESTS FOR ADMISSION

Although Starr and Defendant have engaged in discussions concerning inadequacies in Defendant's Responses to Starr's Requests for Admission, a number of issues remain unresolved. After Defendant served its Responses to Starr's Requests on January 24, 2014, on February 18, 2014, Starr informed Defendant of deficiencies in Defendant's Responses. *See* Ex. 1, Letter from R. Dwyer to B. Mizoguchi (Feb. 18, 2014), at 1-5. Defendant provided Amended Responses to Starr on March 19, 2014. While those amendments resolved some of the issues raised by Starr, many of Defendant's Amended Responses remained deficient. *See* Ex. 2, Letter from R. Dwyer to B. Mizoguchi (Mar. 25, 2014), at 1-7. On April 1, 2014, Defendant provided Starr with its Second Amended Responses to Starr's Requests, which resolved some (but not all) of the remaining issues. On April 7, 2014, the parties participated in a meet and confer in which Defendant would not agree to amend many of the Responses.  On April 11, 2014, Defendant provided Starr with its Third Amended Responses to Starr's Requests, which revised four of its Responses. Despite the narrowing of the issues, many of the deficiencies still remain and could not be resolved by the parties.

Many of Defendant's Responses to Starr's Requests for Admission continue to frustrate Starr's attempt to use the Rule 36 Requests "to secure the just, speedy and inexpensive determination of actions by avoiding the time, trouble and expense required to prove undisputed facts which should be admitted." *LaForte v. Horner*, 833 F.2d 977, 982 (Fed. Cir. 1987). As stated in the Advisory Committee Notes, Proposed Amendments to the Federal Rules of Civil

Procedure, "Rule 36 serves two vital purposes, both of which are designed to reduce trial time. Admissions are sought, first to facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that can be." 48 F.R.D. 487, 534 (1970); *see* 7 Moore's Federal Practice § 36.02[1] (3d ed. 2013); 8B Wright, Miller & Marcus, Federal Practice & Procedure § 2252 (2010).

Defendant incorrectly characterizes Starr's challenges to Defendant's Responses as challenges to their "accuracy" as opposed to "sufficiency." Def. Resp. at 2. Starr's challenges properly identify different categories of deficiencies in Defendant's Responses, including, in certain instances, Defendant's failure to admit Requests that it cannot credibly deny. In other instances, however, the deficiencies identified by Starr do not concern "accuracy" but rather take issue with the form of or basis for the Response. These include (i) those Requests that Defendant denies on the apparent basis that the statements quoted in the Requests "removed them from their necessary context such that the resulting requests were inaccurate," Def. Resp. at 13, or (ii) those Requests that Defendant claims it has insufficient information to admit or deny but has not conducted the type of inquiry required under Rule 36. Defendant's claim that it "provided admissions or qualified admissions to 868 RFAs—approximately three out of every four of Starr's requests", Def. Resp. at 1, is misleading because Defendant improperly includes over 500 qualified admissions, after which Defendant otherwise denies the request.

The particular deficiencies in Defendant's Responses are summarized below and described in more detail in Starr's Exhibit 3, which quotes each of the Requests and Responses at issue, and specifies why Starr considers each of those Responses to be deficient.

A.     **The United States Fails to Admit the Truth of Statements, Including Sworn Testimony, by Senior Government Officials**

As this Court has observed, "[t]ypically, courts have ordered matters admitted . . . when the evidence shows that it should have been admitted." *JZ Buckingham Investments LLC v. United States*, 77 Fed. Cl. 37, 45 (2007) (citing *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 304-05 (M.D.N.C. 1998) (deeming matter admitted when deposition testimony confirmed the authenticity of document)). The respondent to a Rule 36 Request for Admission must consider the evidence in the record, including but not limited to any evidence cited in support of the Request, and admit the Request in the absence of contradictory evidence in the record. If a witness has been deposed in the litigation, a party responding to a Rule 36 Request "must consider their deposition testimony in responding to the requests." *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 28, 44 (S.D.N.Y. 1997). In *T. Rowe Price*, the Court explained that, when a party is requested to admit the truthfulness of deposition testimony, in the absence of contradictory information it is not appropriate to deny those requests for admission. *Id.* at 44-45 ("The absence of contradictory information in the record as it now stands simply means that Oppenheimer is unable to deny the truthfulness of what various deponents testified occurred in their areas of the Bank—and Oppenheimer has appropriately not denied the truthfulness of those statements."). If the Respondent continues to deny the Request, the Court may order the Request admitted if the evidence shows it should have been admitted. *See JZ Buckingham*, 77 Fed. Cl. at 45.

This issue affects Defendant's Responses to Request Nos. 95, 106, 125, 278, 310, 311, 407, 572, 598, 600, 608, 610, 611, 915, and 1139. An illustration is Defendant's denial of the truth of statements contained in Treasury Secretary Henry Paulson's uncontroverted sworn testimony. Although Secretary Paulson testified in his deposition that "FRBNY ███████

███████████████████████████████████████████", Paulson Dep. at 174:1-10,[1]

and that "██████████████████████████████████████████████

████████████████████████ Paulson Dep. at 308:5-10, Defendant denies Request Nos.

106 and 608, which ask Defendant to admit the truth of those sworn statements.

Similarly, Defendant continues to deny several of Starr's Requests that ask Defendant to

admit the truth of statements contained in the sworn testimony of other senior Government

officials, including Federal Reserve Chairman Ben Bernanke and FRBNY President and

Treasury Secretary Timothy Geithner. For example:

- Request No. 278: Defendant denies that, "On September 9, 2008, FRBNY
  President Timothy Geithner discouraged AIG CEO Robert Willumstad's idea of
  AIG's becoming a primary dealer with access to the primary dealer credit
  facility", despite President Geithner's deposition testimony and the conclusions in
  the Government Accountability Office's September, 2011 Report to Congress.
  Geithner Dep. at 70:16-71:2; PX 21 at 25–27.[2]

- Request No. 610: Defendant denies that, "To mitigate concerns that this action
  would exacerbate moral hazard and encourage inappropriate risk-taking in the
  future, the Federal Reserve ensured that the terms of the credit extended to AIG
  imposed significant costs and constraints on the firm's owners, managers, and
  creditors," which is a quote from Chairman Bernanke's testimony before the Joint
  Economic Committee of the Congress on September 24, 2008. PX 110 at 1.[3]

- Request No. 1139: Defendant denies that, ████████████████████████
  ███████████████████████████████████████████████████████████"
  despite President Geithner's deposition testimony and statutory requirements.
  Geithner Dep. at 205:12-17.

---

[1] A copy of each of the deposition transcript pages cited in this submission is attached as
Ex. 4.

[2] A copy of each of the documents cited in this submission is attached as Ex. 5.

[3] Defendant also mischaracterizes Chairman Bernanke's submission to Congress as a
"statement," when in fact it is sworn testimony made under penalty of perjury. PX 110 at 1.

Defendant mischaracterizes Starr's position as requiring admission of all Requests that are based on evidence cited in the Request. Def. Resp. at 1. To the contrary, Starr's position is that Defendant continues to deny Requests that are supported by uncontradicted evidence. *See T. Rowe*, 174 F.R.D. at 44 ("The absence of contradictory information in the record as it now stands simply means that Oppenheimer is unable to deny the truthfulness of what various deponents testified occurred in their areas of the Bank—and Oppenheimer has appropriately not denied the truthfulness of those statements."). Starr cannot understand how Defendant can credibly claim it intends to produce contrary evidence to the Requests identified by Starr, such as:

- <u>Request Nos. 310-311</u>: Defendant denies Starr's Requests to admit that Rodgin Cohen made certain statements to Government officials, despite Mr. Cohen's deposition testimony that he did so, in the absence of any evidence to the contrary.

- <u>Request No. 407</u>: Defendant denies Starr's Request to admit a quotation from FRBNY President Timothy Geithner's sworn testimony before the House Committee on Financial Services that Edward Liddy agreed to become AIG's CEO "in response to a request by the Government of the United States, to work to restructure the company and help" the Government "get back the assistance provided by the taxpayer," PX 387 at 13, in the absence of any evidence to the contrary.

Contrary to Defendant's characterization, Starr does not request, or desire, "mini-trials" on the Responses Starr alleges to be deficient. Instead, Starr contends that, for the Requests at issue, Defendant has no credible basis to deny Starr's Request and cannot plausibly claim Defendant intends to produce contrary evidence at trial, in the event Starr attempts to establish the Request as a fact at trial. Furthermore, several of Defendant's qualified admissions confirm that Starr's Requests should be admitted. This Court's opinion in *JZ Buckingham*, which dealt with a number of deficiencies in the United States' Rule 36 Responses raised by the plaintiff in that case, contemplates the Order Starr requests. *See JZ Buckingham*, 77 Fed. Cl. at 45

(explaining that courts have deemed matters admitted due to confirmation by deposition testimony, or "when qualified answer implied that admission was appropriate").

Defendant's attempt to distinguish *Uniden America Corp.*, cited in *JZ Buckingham Investments*, on the basis that, in that case, the matter the Court deemed admitted was the authenticity of a document, not the truth of a statement, Def. Resp. at 5-6, is arbitrary and without merit. In *Uniden*, the Court ordered the responding party to admit to the authenticity of a document when the evidence, the author's admitting to writing the document, demonstrated that the request should have been admitted. *Uniden*, 181 F.R.D. at 304-05. Neither *JZ Buckingham*, nor *Uniden* limit their findings to Requests concerning the authenticity of documents. Rather, they stand for the proposition that the Court *may* deem a matter admitted if the evidence demonstrates that it should have been admitted. *See Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1246 (9th Cir. 1981) ("Instead of making an evasive or meritless denial, *which clearly would result in the matter being deemed admitted*, a party could comply with the Rule merely by having his attorney submit the language of the Rule in response to the request.") (emphasis added). Thus, the Court may order a Request admitted when, in view of the evidence in the record and/or the responding party's qualified admissions, the Court finds that Defendant has no credible basis to deny the Request.

Defendant attempts to trivialize the deficiencies in its Responses by characterizing its denials of the statements of senior Government officials, including its denials of verbatim quotations from the sworn testimony of those officials, as disagreements with "employees or former employees." Def. Resp. at 8-12. As Defendant acknowledges, however, a denial of a Request serves as an indication that the responding party will introduce contrary evidence at trial. It is difficult to credit Defendant's denials of the truth of sworn statements by the most

senior of Government officials, including former officials Federal Reserve Chairman Bernanke, Treasury Secretary Paulson, and FRBNY President Geithner made under oath before Congress. Indeed, if this were true, Starr would have expected Defendant to have corrected these supposed inaccuracies in statements made under oath to Congress by these senior Government officials.

Defendant cites case law that cautions that courts should be hesitant to attribute to Government agencies statements of individual Government employees that "represent their personal views, rather than the official position of the agency." Def. Resp. at 14 (citing *Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001)). This case law is inapplicable in the Requests highlighted by Starr. For example, the statement at issue in Request No. 95 is a statement concerning FRBNY's position, made by FRBNY President Geithner during his confirmation hearings for Treasury Secretary.

In fact, in several instances Defendant continues to deny Requests that do *not* ask Defendant to admit the *truth* of the statement in the Request, but only that the person making the statements, some of which were under oath, *believed* the statement was true, or, in other cases, *that a statement was actually made. See, e.g.*, Response to Request No. 600 (denying that Chairman Bernanke believed a quoted portion of his testimony before the Senate Banking Committee on March 3, 2009)[4]; Responses to Request Nos. 310-311 (denying that a statement was made despite deposition testimony of the speaker that he made the statement).

---

[4] Defendant contends that the testimony cited in Request No. 600 was "unrelated to AIG", despite the fact that Chairman Bernanke's testimony specifically mentions AIG. PX 671 at 50-51. Defendant also incorrectly contends that Chairman Bernanke's testimony in this case "required us to deny the request." Def. Resp. at 11 n.3. Chairman Bernanke admitted that he so testified before Congress, and claimed that he was ███████████████████████. Bernanke Dep. at 351:22-352:2. That Chairman Bernanke testified about his belief about what his testimony may have *implied* is irrelevant; Chairman Bernanke did *not* deny the truth of this sworn testimony.

Defendant's objection to admitting quoted statements on the basis that they were "taken out of context" is both contrary to law and incorrect. *See, e.g.*, Request Nos. 278, 310, 311, 407, 572, 598, 600, 915, and 1139. As an initial matter, there is no such thing as a "context objection" to a Rule 36 Request. Furthermore, Defendant's unilateral belief that the statements quoted in Starr's Requests, many of which are direct quotations from the sworn testimony of senior Government officials, are taken out of context, is not a ground for denial if the statement is in fact true. Defendant appears to be using "context" as an excuse to avoid admitting these statements. For example Defendant's makes a "context" objection to quoted statements by Chairman Bernanke in Defendant's Response to Request No. 600:

- Request No. 600 states that, "As of March 2009, Federal Reserve Chairman Ben Bernanke believed that AIG was 'effectively under our control. We are breaking it up. We are doing it to repay. But we are doing it within the legal context of an ongoing firm because bankruptcy is just not a good option given how complex and international this company is.'" PX 671 at 50–51.

Request No. 600 contains a complete, direct quote, made under oath by Chairman Bernanke when he testified before the Senate Banking Committee on March 3, 2009. The Request also asks Defendant to admit truth as to Chairman Bernanke's *belief*, not the truth of the *statement*. This Request cannot be "vague and misleading" because "the quoted language has been removed from its original context" because the quoted language expresses a complete thought. Moreover, Defendant cannot credibly deny the Request, which asks Defendant to admit that Chairman Bernanke *believed the words he stated under oath* before the Senate Banking Committee.

Defendant commits similar errors in its attempt to justify its denial of Request No. 95, which asks Defendant to admit that, "Under Section 13(3) of the Federal Reserve Act, the Fed is prohibited from taking equity or unsecured debt positions in a firm", a verbatim quotation from

President Geithner's responses to Senator Snowe during his confirmation hearings for Treasury Secretary. *See* Def. Resp. at 12-13. Defendant claims that it denied the request because it "arose in the context of a discussion of FRBNY's authority to inject capital into a failing firm, not its incidental authority to hold equity or condition its lending on the provision of equity." *Id.* at 13. Defendant's "context-based denial" is unjustified. Defendant makes a similar error with respect to Request No. 106.

In addition, Starr disagrees with Defendant's objection to Request Nos. 95, 106, and 107 on the basis that those Requests "call[] for a purely legal conclusion, and [are] accordingly beyond the scope of RCFC 36(a)(1)(A)." These Requests do not "call for a purely legal conclusion," but instead properly request admissions regarding the application of law to fact. Thus, Defendant's objection on this basis should be overruled. "A request for admission is 'not objectionable even if it requires opinions or conclusions of law, as long as the legal conclusions relate to the facts of the case.'" *Anaheim Gardens v. United States*, No. 93-665C, 2008 WL 1992133, at *4 (Fed. Cl. Feb. 29, 2008) (quoting *Ransom v. United States*, 8 Cl. Ct. 646, 648 (1985)). For example, in *Ransom*, the Claims Court overruled most of the defendant's objections on this ground to the plaintiff's requests for admissions, such as the defendant's objection to a request to admit "that there existed a privity of contract between plaintiffs, and each of them, and the air force." 8 Cl. Ct. at 648. The Court stated that this request "asks for a conclusion of law, but it is necessarily related to the stated facts." *Id.* As explained by the Court in *Ransom*, the Advisory Committee Notes to the 1970 Amendment to Rule 36(a) specifically cite requests seeking admissions about whether employees and agents were acting within the course and scope of their authority as examples of permissible requests concerning a mixed question of law and fact. *Id.* at 648.

**B.     The United States Fails to Admit the Truth of Statements Contained in the Government's Own Documents and in Legal Decisions**

As discussed in the previous section, the Respondent to a Rule 36 Request has a duty to admit the Request if the evidence shows it should be admitted. Defendant has a duty under Rule 36 to admit Starr's Requests that are supported by its own documents, the statements of Government officials, and the decisions of this Court, especially where the evidence cited in support of the Requests is not contradicted. This issue affects Defendant's Responses to Request Nos. 107, 181, 297, 493, 495, 513, 548, and 681. Defendant's denials of the following Requests illustrate that deficiency in Defendant's Responses:

- Request No. 297: Defendant denies that, "Around 10:00 pm on September 14, 2008, AIG CEO Robert Willumstad and AIG Vice Chairman Jacob Frenkel told Federal Reserve Vice Chairman Donald Kohn that credit from the Federal Reserve System was ███████████████████████████ despite admitting that Vice Chairman Kohn sent an email containing the quoted language on September 14, 2008. PX 64.

- Request No. 493: Defendant denies that, "In the fall of 2008, Treasury Secretary Hank Paulson ███████████████████████████ despite Secretary Paulson's statement to that effect in his interview of Taiya Smith, a Treasury employee. PX 180 at 16-17; Paulson Dep. at 184:1-15.

Defendant's position with respect to Requests based on statements made by former Treasury Secretary Henry Paulson in his interview of Taiya Smith is perplexing. Def. Resp. at 19; Request Nos. 493, 513. Defendant claims that "[w]e have not, however, denied the statements, but, rather, qualified the request to provide a full quote from the interview transcript and explain the context of Secretary Paulson's statement." Def. Resp. at 19. Defendant's Responses, however, only admit that PX 180 contains the interview transcript, and that "the transcript states" the language quoted in the Request. Defendant now claims that it does not deny the statements. As Defendant is aware, Starr's Requests ask Defendant to admit Secretary

Paulson made that statement and took those actions, not just the fact that the statements are contained in the transcript. In light of this ambiguity, the Court should deem Defendant's evasive Responses admissions to Starr's Requests.

**C.     The United States Has Not Conducted an Adequate Investigation and Inquiry in Response to Several Requests that it Claims it Cannot Answer**

The "reasonable inquiry" required by Rule 36 may include third parties, including former employees of the responding party. "A reasonable inquiry may encompass inquiry of a third party if there is an 'identity of interest' between the responding party and the third party—i.e., when they are both parties to, or actively cooperating, in the litigation, or when they have a present or prior relationship of mutual concern." *JZ Buckingham*, 77 Fed. Cl. at 47 (citing *Uniden*, 181 F.R.D. at 204 (reasonable inquiry may include inquiry of party cooperating in the litigation)); *A. Farber & Partners, Inc. v. Garber*, 237 F.R.D. 250, 254 (C.D. Cal. 2006) (reasonable inquiry includes inquiry of co-defendants represented by the same counsel); *T. Rowe*, 174 F.R.D. at 44 (reasonable inquiry may require inquiry of information readily available from non-hostile third party)).

As this Court explained in *JZ Buckingham*, "[s]uch reasonable inquiry includes an investigation and inquiry of employees, agents, and others, who conceivably, but in realistic terms, may have information which may lead to or furnish the necessary and appropriate response. The inquiry may require venturing beyond the parties to the litigation and include, under certain limited circumstances, non-parties, but surely not strangers." *Id.* at 47 (quotations and citations omitted); *accord* 8B Wright & Miller, Federal Practice & Procedure § 2261 (3d ed. 2013); *see also In re Gulf Oil/Cities Serv. Tender Offer Litig.*, Nos. 82 Civ. 5253, 87 Civ. 8982 (MBM), 1990 WL 657537, at *3-4 (S.D.N.Y. May 2, 1990) (citing *Brown v. Arlen Management Corp.*, 663 F.2d 575, 578-80 (5th Cir. 1981) (corporation obliged to interview former

employees)); *Securities & Exch. Comm'n v. Thrasher*, No. 92-CIV-6987, 1996 WL 507318, at *5 (S.D.N.Y. Sept. 6, 1996).

In several instances, although Defendant admits that the document cited by Starr in support of Starr's Request (such as meeting minutes) is authentic, and contains the statement cited in the Request, Defendant asserts that "it has made a reasonable inquiry, and that the information it knows or can readily obtain is insufficient to admit or deny the remainder of the request." *See* Responses to Request Nos. 103, 152, 201, 245, 246, 247, 298, 321, 378, 379, 425, 448, 476, 496, 497, 498, 499, 647, 682, 1024, and 1039. Most of the documents cited in support of Starr's Request name specific current and former Government employees. At the very least, Defendant is obligated to ask these personnel to confirm the truth or falsity of Starr's Requests. The following Requests illustrate instances for which the Defendant should be asked to make further inquiries and amend its Responses:

- Request No. 152: Defendant claims it lacks sufficient information to admit or deny that, "On September 16, 2008, there were sufficient good assets at AIG that FRBNY could fully secure a loan for $85 billion against those assets", despite the testimony of Government officials that the loan was fully secured. Defendant's inquiry is inadequate if Defendant did not conduct a records search and interview of at least these officials who have testified to this fact. *See, e.g.*, U.S. 30(b)(6) Dep. (Millstein) at 80:21-81:4; PX 600, Testimony of Ben Bernanke Before the Financial Crisis Inquiry Commission (Sept. 2, 2010) at 37; PX 19, Testimony of Thomas Baxter Before the Financial Crisis Inquiry Commission (Sept. 1, 2010) at 11.

- Request No. 201: Defendant claims it lacks sufficient information to admit or deny that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 288 at 2. Defendant's inquiry is inadequate if Defendant did not conduct a records search and interview of at least FRBNY employee Michael Patrick, Sarah Dahlgren (who served for many months as the head of FRBNY's AIG monitoring team), Marshall Huebner (lead counsel for FRBNY and Treasury), and Meg McConnell, who are cited in PX 288 as participants in the GAO FRBNY Bankruptcy Matters Interview.

- Request No. 247: Defendant claims it lacks sufficient information to admit or deny that, "On September 15, 2008, the New York State Insurance Department told FRBNY employees that, if the AIG parent company ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████ PX 35 at 2. Defendant's inquiry is inadequate if Defendant did not conduct a records search and interview of current FRBNY employees Richard Carlton and Elise Liebers, both of whom are listed in the meeting minutes (PX 35 at 1) as participants on that call. This point also applies to Request Nos. 245 and 246.

- Request No. 476: Defendant claims it lacks sufficient information to admit or deny that, "On September 17, 2008, United States Senator Hillary Clinton called Treasury Secretary Henry Paulson 'on behalf of Mickey Kantor, who had served as Commerce secretary in the Clinton administration and now represented a group of Middle Eastern investors. These investors, Hillary said, wanted to buy AIG. 'Maybe the government doesn't have to do anything,' she said.'" PX 150 at 47. Defendant's inquiry is inadequate if Defendant did not conduct a records search or ask Senator Clinton or Secretary Paulson whether this conversation occurred and whether the description quoted is accurate.

- Request No. 499: Defendant claims it lacks sufficient information to admit or deny that, "Treasury Secretary Paulson believed, ████████████████ ██████████████████████████████████ PX 180 at 22. Defendant's inquiry is inadequate if Defendant did not conduct a records search or ask former Secretary Paulson and Taiya Smith, a Treasury employee, since the statement quoted in the Request is contained in a February 10, 2009 interview of Ms. Smith by Mr. Paulson (PX 180 at 22). This point also applies to Request Nos. 496, 497 and 498.

- Request No. 682: Defendant claims it lacks sufficient information to admit or deny that ████████████████████████████████████████████████ ████████████████████████████████████████████████ PX 813. Defendant's inquiry is inadequate if Defendant did not conduct a records search or ask current FRBNY employees Michael Silva, Sandy Krieger, William Dudley, William Rutledge, and Terrence Checki, all of whom were listed as recipients of the September 20, 2008[5] email from Mr. Silva (PX 813).

---

[5] Starr acknowledges that this Request uses September 19, 2008 as the relevant date while the documents cited in support of this Request are dated September 20, 2008. While this may entitled Defendant to make a qualified admission (that Goldman's statements were made on September 20, not September 19), it does not entitle Defendant to make a general denial in light of the documentary evidence and deposition testimony cited in the Request.

Defendant selectively cites case law regarding the scope of Defendant's duty to make a reasonable inquiry in response to a Rule 36 Request. Def. Resp. at 21-22. However, as stated by this Court in *JZ Buckingham*, cited above, the Rule 36 respondent's inquiry duty may extend to third parties including former employees. 77 Fed. Cl. at 47.

The Court should reject Defendant's claim that it has insufficient information to admit or deny certain of Starr's Requests based on the apparent theory that Defendant can never be absolutely certain that a particular event did not occur.  Def. Resp. at 20-21 (citing Request Nos. 103, 298, 353, 378, and 379). For example, with respect to Request No. 103, if Defendant actually conducted a search of "the historical records of the Federal Reserve System" and found no instance in which a Federal Reserve Bank held or owed equity in a company, that is sufficient for Defendant to admit the Request. A similar issue arises with respect to Request Nos. 378 and 379. Defendant claims that "no amount of reasonable inquiry could enable the United States to admit or deny these requests as a factual matter." Def. Resp. at 20. However, these Requests are based directly on statements from FRBNY General Counsel Thomas Baxter, who was also deposed as a Rule 30(b)(6) witness for the United States in this litigation, in an interview with the Government Accountability Office on March 11, 2011. If Defendant inquired of current FRBNY employee Mr. Baxter about these Requests, and Mr. Baxter does not now claim these statements are inaccurate, that is sufficient for Defendant to admit these Requests.

**D.     The United States Erroneously Fails to Admit that Certain Documents "Were Prepared in the Normal Course of Business"**

Starr asks Defendant to admit that certain documents "were prepared in the normal course of business." Despite the clear implication that these Requests are an effort to establish the basis for the business records exception to the hearsay rule—in order to save time and expense during trial—Defendant has not responded to the Requests but has instead admitted that

the identified documents "were prepared" in the author's "professional capacity." *See* Responses to Request Nos. 8, 117, 119, 130, 132, 137, 139, 145, 169, 171, 173, 176, 178, 184, 186, 191, 193, 196, 219, 220, 244, 259, 260, 330, 335, 375, 376, 396, 434, 441, 444, 452, 595, 624, 640, 649, 703, 706, 708, 762, 775, 794, 820, 821, 823, 828, 830, 834, 837, 841, 871, 874, 879, 886, 889, 893, 896, 899, 902, 920, 928, 945, 963, 967, 974, 977, 999, 1071, and 1084. Starr requests that Defendant either be made to respond with a clear admission or state for the record that its statement concerning the documents were "prepared in a professional capacity" is the equivalent to stating that the documents were "prepared in the normal course of business."

"The general standard for the business records exception for hearsay in Fed. R. Evid. 803(6) is satisfied if the document was 'prepared in the normal course of business, was made at or near the time of the events it records and was based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant.'" *Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 333, 338-39 (Fed. Cl. 2003) (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[1] (2d ed. 2003)). That these communications occurred during the financial crisis of 2008 is not a reason to deny that it was normal course of business for Government office to record their activities. *See Columbia First Bank*, 58 Fed. Cl. at 339 ("The court agrees that the routineness or repetitiveness with which a record is prepared is not the touchstone of admissibility under the business records exception. Regularity is determined less by repetitiveness than by ordinariness." (quotations and citation omitted)). Defendant cannot in good faith identify specific facts to put the trustworthiness of such records into question and must admit that the documents "were prepared in the normal course of business."

**CONCLUSION**

Starr seeks an Order of the Court compelling Defendant to correct the deficiencies in Defendant's Responses to Request Nos. 8, 95, 103, 106, 107, 117, 119, 125, 130, 132, 137, 139, 145, 152, 169, 171, 173, 176, 178, 181, 184, 186, 191, 193, 196, 201, 219, 220, 244, 245, 246, 247, 259, 260, 278, 297, 298, 310, 311, 321, 330, 335, 375, 376, 378, 379, 396, 407, 425, 434, 441, 444, 448, 452, 476, 493, 495, 497, 498, 499, 513, 548, 572, 595, 598, 600, 608, 610, 611, 624, 640, 647, 649, 681, 682, 703, 706, 708, 762, 775, 794, 820, 821, 823, 828, 830, 834, 837, 841, 871, 874, 879, 886, 889, 893, 896, 899, 902, 915, 920, 928, 945, 963, 967, 974, 977, 999, 1024, 1039, 1071, 1084, and 1139, and to provide such Amended Responses no later than 20 days after the Court hears and determines this application.

*__Defendant's Position__*

The United States respectfully submits that Starr's contentions that the Court should order us to revise certain of our responses to plaintiffs' Second Set of Requests for Admission (RFAs) are unsupported by legal authority and meritless.  The Court should reject Starr's attempt to distort the proper use of Rule 36 of the Rules of the Court of Federal Claims (RCFC) and evade the Court's well-established process for fact-finding and evidentiary rulings.  As applicable caselaw demonstrates, Starr is misusing the status report process and RCFC 36(a)(6) to request that the Court order us to revise our responses to admit matters that we have denied. Starr's request is erroneous, and its requested relief contrary to law.

Starr does not, and cannot, dispute that the United States responded in good faith to all of Starr's RFAs.  The United States devoted an extraordinary amount of time, effort, and resources to respond fairly to Starr's 1,174 requests for admissions, spending thousands of hours to provide responses and, subsequently, to meet and confer and attempt to resolve Starr's contentions

without needlessly burdening the Court.  We provided admissions or qualified admissions to 868 RFAs – approximately three out of every four of Starr's requests.

Starr, nonetheless, contends that our responses somehow "frustrate" RCFC 36's purposes because the United States in some instances does not simply admit propositions Starr requested be admitted.  On the whole, Starr's RFAs reflect an improper attempt to take snippets of documents or testimony out of context and use them in a way that is incorrect and often misleading.  For example, Starr mischaracterizes testimony by Secretary Paulson and others to suggest that the terms of FRBNY's rescue loan were illegal or intended to punish AIG's shareholders – neither of which Starr will be able to prove at trial.  Indeed, the vast evidentiary record in this case, compiled through scores of depositions and the production of millions of pages of documents, and the law, simply does not support many of the contentions of fact and law that Starr makes in its RFAs.  That is why the United States denied them.

Nothing about our responses frustrates the purposes of the Court's rules.  Starr's claim that the United States must take the position of admitting requests if they are based upon excerpted portions of testimony, documents, or legal opinions, is unsupported by law.  As we demonstrate, the United States has responded appropriately to assert the positions that *the United State*s is taking, with respect to the requests Starr has made.

Indeed, as we demonstrate below, Starr's complaints do not take the form of true challenges to the *sufficiency* of our responses; rather, Starr is challenging their *accuracy* and erroneously requesting that the Court adjudicate them now, on the merits.  Such challenges are contrary to law.  A requesting party's ability under Rule 36 to move to determine the sufficiency of answers and objections "does not entitle [that party] to request that a court determine the

accuracy of a denial." *United States v. Operation Rescue Nat'l*, 111 F. Supp. 2d 948, 968 (S.D. Ohio 1999) (citations omitted).

Without waiving the United States' right to stand on its denials, as we demonstrate in more detail below, Starr misapplies RCFC 36 by requesting that the Court engage in what amounts to a premature trial of facts and determination of legal issues, in the guise of a challenge to RFA responses.  Starr, however, cannot properly so engage the Court under Rule 36.

A.      **Starr's Assertion That The United States Must Revise Its Responses To Admit Disputed Matters Is Unsupported**

Starr's contentions ignore the purposes and limitations of RCFC 36(a) and requests for admissions.  The Court should reject Starr's assertion that, prior to fact-finding by the Court, the United States should be forced to revise requests that we appropriately denied or admitted with qualifications (Request Nos. 95, 106, 125, 278, 310, 311, 407, 570, 572, 598, 600, 608, 610, 611, 915, and 1139).  *See* Pl. JSR § A.

1.      **Rule 36(a) Does Not Authorize Starr To Obtain Judicial Evaluation Of Its Disputed Requests**

Starr contends that the Court should order us to revise certain of our responses – which deny Starr's requests or admit as much of the request as possible by qualifying it – simply based on Starr's view of the evidence.  Starr asserts that "[t]ypically, courts have ordered matters admitted . . . when the evidence shows that it should have been admitted."  *See* Pl. JSR § A, *supra*.  Starr's argument is at odds with well-established caselaw and the purposes of Rule 36.  Courts will not evaluate denials using the evidence in a form of "mini-trial."  The Court should reject Starr's effort to force the United States to revise its responses to accept Starr's view of

disputed issues and Starr's underlying design to bypass the Court's review of such issues on motions for summary judgment or at trial.

The requesting party "may move to determine the *sufficiency* of an answer or objection." RCFC 36(a)(6) (emphasis added). As noted above, however, a requesting party's ability under RCFC 36 to move to determine the sufficiency of answers and objections "does not entitle [that party] to request that a court determine the *accuracy* of a denial." *Operation Rescue Nat'l*, 111 F. Supp. 2d at 968 (emphasis added); *see also Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, No. L 742657, 2011 WL 742657, at *4-5 (S.D. Fla. Feb. 24, 2011) (explaining that Rule 36(a)(6) "clearly speaks to the *form* of the answer or objection, not to its *substance*, and therefore does not authorize a Court to inquire into the substantive accuracy of the denial") (emphasis in original). "A response can be sufficient, even if it is not ultimately determined to have been accurate." *Wiwa v. Royal Dutch Petroleum Co*., Nos. 96 Civ. 8386(KMW)(HBP), 01 Civ.1909(KMW)(HBP), 2009 WL 1457142, at *5 (S.D.N.Y. May 26, 2009) (citing *Operation Rescue Nat'l*, 111 F. Supp. 2d at 968). Starr incorrectly claims that it is challenging the sufficiency, rather than the accuracy, of our responses. *See* Pl. JSR Introduction. This assertion is not borne out by Starr's complaints, which assert that we cannot credibly deny, *i.e.,* our denials are simply factually incorrect – plainly, an unauthorized challenge to the substance of our answers, not the way in which we provided them. *Point Blank*, 2011 WL 742657, at *4-5.

Contrary to Starr's contentions, "there is simply no provision of the Federal Rules allowing a party to litigate a denied request for an admission" on a motion to compel; "this matter is more properly addressed and, if possible, resolved" on a motion for summary judgment. *Foretich v. Chung*, 151 F.R.D. 3, 5 (D.D.C. 1993). "[T]he common law has never required one party to stipulate to any fact," as Starr, in essence, claims. *Nat'l Semiconductor Corp. v.*

*Ramtron Int'l Corp.*, 265 F. Supp. 2d 71, 74 (D.D.C. 2003).  The validity of a denial or qualified answer must await the trial to see if the party forced to prove what was not admitted can meet the requirements of Rule 37(c)(2), which, in some cases, shifts the costs of making such proof to the responding party.[6]  *Id.* at 74-75 (citation omitted).  If Starr were correct that a challenge to "the sufficiency of an answer or objection" under RCFC 36(a)(6) envisioned court review of the factual correctness of denials and qualified admissions on a status report or motion, RCFC 37(c)(2), which provides the requesting party the opportunity to prove its view of the facts at trial or on motions for summary judgment, would be superfluous, and its limitations would be rendered moot.  Starr's interpretation is, thus, at odds with the structure of the Federal Rules and, as discussed below, is unsupported by caselaw.

Contrary to Starr's claims, therefore, RCFC 36(a) does not authorize the Court to determine the factual accuracy of a denial of a request for admission, or to order that a responding party must revise its responses to admit the subject matter of the request simply because the requesting party believes the denial to be unsupported by the evidence.  *Lakehead Pipe Line Co. v. American Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) (citing *Foretich*, 151 F.R.D. at 4-5; *Moore v. Daniel Enters., Inc.*, No. 04 CV 4081, 2006 WL 753147 (W.D. Ark. Mar. 22, 2006) (courts should not "prospectively render determinations concerning the accuracy of a denial to a request for admission, or to order that the subject matter of the

---

[6]  RCFC 37(c)(2) provides:

If a party fails to admit what is requested under RCFC 36 and if the requesting party later proves a document to be genuine, or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof.  The court must so order unless:
(A) the request was held objectionable under RCFC 36(a);
(B) the admission sought was of no substantial importance;
(C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
(D) there was other good reason for the failure to admit.

request be admitted because the opposing party's unequivocal denial is asserted to be unsupported by the evidence").  Requests for admission under Rule 36 "are not designed to obtain discovery of the existence of facts," but, instead, "are intended to eliminate issues that are not in dispute between the parties by establishing the admission of facts about which there is no real dispute, thus narrowing the issues for trial."  *Stockdale v. Stockdale*, No. 4:08-cv-1773 CAS, 2009 WL 5217001, at *1 (E.D. Mo. 2009) (citing 7 James Wm. Moore, *et al.*, Moore's Federal Practice, § 36.02[1] (3d ed. 2009)).  The parties plainly may disagree regarding the facts and the weight to be afforded particular evidence, and Starr's attempt to bind the United States to Starr's views of the facts is contrary to Rule 36's purposes.

Starr's incorrect contention that Rule 36(a)(6) allows a party to litigate a denied request for admission would open the courts to requests "to decide each and every factual issue presented by a request for an admission."  *Foretich*, 151 F.R.D. at 5.  Courts have rejected parties' claims, like Starr's, that the responding party "'falsely' denied" a request because "[i]n order to evaluate the veracity of [the requesting party's] claim," courts would have to review documents and testimony and, in essence, "conduct a mini-trial and resolve disputed factual issues that are ordinarily resolved before the fact-finder during dispositive proceedings," in effect, rendering a summary judgment on such facts.  *Point Blank*, 2011 WL 742657, at *4-5 (emphasis removed).

Starr fails to make any reply to our demonstration that we cannot be forced to admit requests that we have denied or to which we have provided qualified answers.  Further, contrary to Starr's claim that it does not desire a "mini-trial" on the evidence, Starr is plainly requesting that the Court do just that analysis (in Starr's very next sentence), by asserting that "Defendant has no *credible basis* to deny Starr's Request" and by arguing that it "cannot understand how

Defendant can credibly claim it intends to produce contrary evidence to the Requests identified by Starr[.]"  Pl. JSR § A (emphasis added).  Starr is asking the Court to review the purported evidence cited by Starr to reach a factual conclusion that the United States cannot "produce contrary evidence" at trial or on motions for summary judgment.[7]  *Id.*  As we previously explained, and Starr does not refute, such an inquiry is properly conducted at trial or on motions for summary judgment, not at the premature phase of a RCFC 36(a)(6) motion.  *Foretich*, 151 F.R.D. at 5; *Point Blank*, 2011 WL 742657, at *4-5.  Thus, the responding party, after denying a request or providing a qualified admission, has no obligation to produce evidence to support its response; such a showing may be made at trial or on motions for summary judgment.  In asserting that the Court can and should conclude that our denials are factually incorrect, Starr fundamentally mischaracterizes the purpose and proper use of RCFC 36(a) and ignores RCFC 37(c)(2).[8]

Unlike Starr, we do not erroneously challenge the reasons for Starr's denials or our requests for admission and are not asking the Court to try Starr's responses in the RFA process

---

[7]   Likewise, Starr's assertion that we "mischaracterize[] Starr's position as requiring admission of all Requests that are based on evidence cited in the Request" makes no sense.  Pl. JSR § A.  The "evidence cited in the Request" *is* the purportedly "uncontradicted evidence" that Starr now claims supports its arguments in favor of deemed admissions.  *Id.*  Our response to Starr's initial arguments in support of its report's RCFC 36(a)(6) contentions correctly explained that we cannot be forced to admit a request based on Starr's claim that its recitation or view of some statement or document is preclusive of any other conclusion upon a matter.

[8]   In support of its position, Starr twists a single off-hand comment in *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co. Inc.*, 174 F.R.D. 38, 42-44 (S.D.N.Y.1997) – that a responding party appropriately does not deny the truthfulness of a request when there is no "contradictory evidence in the record as it now stands" – to imply that a denial cannot stand any time the requesting party asserts that no "contradictory evidence" exists.  Pl. JSR § A (citing *T. Rowe*, 174 F.R.D. at 44).  Contrary to Starr's implication, however, *T. Rowe*, as explained further below, involved a party's inability to admit or deny based upon insufficient evidence – in which case the party appropriately did not deny the request.  When read in the context of the entire decision and the purposes of RCFC 36(a)(6) and 37(c)(2), *T. Rowe*'s statement is plainly inapplicable to the denials and qualified admissions at issue here.

and force Starr to revise them.  For example, although Starr  questions whether the United States

may deny  propositions based upon individual statements, Starr denies our Requests for

Admission numbered 155-60, which request that Starr admit to requests that are based on

statements by its CEO, Maurice R. Greenberg.  *See* Ex. 48 at 46-48 (Pls.' Amended Responses to

Def. RFAs, Responses to Def. RFAs 155-60).  Although we do not agree with Starr's denials, as

well-established caselaw requires, we are not, in this RFA process, erroneously requesting the

Court to order those denials be converted to admissions.  We can, in any event, prove Starr's

claims wrong at the proper time – when briefing motions for summary judgment or at trial.

The Court should, thus, decline Starr's demand that we revise our denials or qualified

admissions simply based upon Starr's views of the evidence prior to a full evaluation by the

Court of disputed facts and evidence on motions for summary judgment or a trial.

## 2.    The Cases On Which Starr Relies Do Not Support Its Position

Starr's attempt to evade the well-established applications and limitations of Rule 36 is

founded on its threadbare analysis of three decisions, each of which Starr misconstrues.  By

quoting a single sentence from *JZ Buckingham Investments LLC v. United States*, 77 Fed. Cl. 37

(2007), without explanation, Starr ignores important distinctions between that case and the

present one that demonstrate that the approach discussed in that sentence cannot apply here.

Both *JZ Buckingham* and *Uniden America Corp. v. Ericsson Inc.*, 181 F.R.D. 302

(M.D.N.C. 1998), cited in *JZ Buckingham*, concerned requests to admit the authenticity of

documents, which is not the issue in any of the requests whose response Starr challenges.  In

*Uniden*, for example, the court found that the responding party's statement that it lacked

sufficient information regarding a document's authenticity was untrue when the requesting party

showed that a third party had actually provided the responding party with information

demonstrating the document's authenticity, prior to the responding party's drafting of its responses. 181 F.R.D. at 304-05. Here, in contrast, Starr has requested that the United States admit the truth of various propositions and contends that the United States must admit their truth based upon the statements of individuals. But regardless of whether an individual made a statement or opined upon the matter, Starr may ultimately fail to carry its burden to prove the proposition, once the Court has evaluated these statements at the proper time (on motions for summary judgment or at trial) and determined the weight that it should afford them.

In reply to our response to Starr's contention, Starr argues that any effort to distinguish *JZ Buckingham* and *Uniden* "is arbitrary and without merit." Pl. JSR § A. Starr misses the point entirely. A party's attempt to authenticate documents does not present the difficulties of proof inherent when considering disputed substantive facts, opinions and legal conclusions like those in Starr's RFAs. *Uniden*, for example, involved the simple question of the authenticity of a document whose author had informed the responding party, during the course of the litigation, that he had written the document. 181 F.R.D. at 304. Because no other information beyond the author's statement was necessary, his statement provided the responding party with all the information it could need to respond to the RFA concerning the document's authenticity. *See id.* The responding party, therefore, had no basis to assert that it lacked sufficient information to admit the request related to authenticity. *See id.* Starr's RFAs, however, do not involve simple questions that a single individual's personal knowledge, belief, or opinion can resolve or that we should be forced to accept as the single, objective truth. *See id.* (concluding that a party "is not compelled to be bound by a version of events presented by third parties") (quoting *T. Rowe*, 174 F.R.D. at 42-44).

Most importantly, neither *JZ Buckingham* nor *Uniden* concerned denials or qualified admissions, like those challenged by Starr, but instead only involved refusals to admit or deny based upon the responding party's claim of insufficient information.  *See Uniden*, 181 F.R.D. at 303; *JZ Buckingham*, 77 Fed. Cl. at 40-41; *id.* at 47 ("In each of the responses to the requests for admission, [the responding party] stated that it could not admit or deny the request.").  Likewise, *Asea, Inc. v. Southern Pacific Transportation Co.*, 669 F.2d 1242, 1244-45 (9th Cir. 1981), cited by *JZ Buckingham*, only considered a failure to answer based upon insufficient information – not a denial – and converted this response into an admission when the court found that evidence available to the responding party should have enabled it to respond, *id.*, and an extreme disregard for the discovery process, *Point Blank*, 2011 WL 742657, at *4.  Thus, the reasoning and holdings of caselaw cited by Starr are inapplicable to our denials and qualified admissions.

In reply to our responses, Starr continues to rely on *JZ Buckingham, Uniden*, and *T. Rowe* – and, for the first time, *Asea* – but continues to mischaracterize their holdings.  Starr has no response because it is simply not the case that any of these decisions involve denials or qualified admissions like those challenged by Starr.  Starr, thus, provides no caselaw support for its demand that the Court deem admitted the requests listed in Sections A, B, and D (all denials or qualified admissions) and thereby concedes that these decisions cannot support its demand.

Even if Starr's cited caselaw could apply to denials or qualified admissions (a conclusion with which we disagree), *JZ Buckingham*, like *Asea*, explained that courts have only ordered requests to be admitted when the "court *finds a lack of good faith* on the part of the responding party."  *JZ Buckingham*, 77 Fed. Cl. at 45 (emphasis added).  Indeed, Starr has made no allegation that we acted in bad faith when we denied the cited requests, even in reply to our response explaining this aspect of the caselaw upon which Starr relies.  Further, *JZ Buckingham*

explains that, to deem a request admitted, the Court would have to "determine, based on the evidence before it, that there is no possibility that Plaintiff may ultimately fail to prove" the truth of the matters asserted in its requests.  77 Fed. Cl. at 48.  Both *JZ Buckingham* and *Uniden* concerned requests simply related to the authenticity of documents, a matter much more easily resolved than the relatively complex disputed issues in Starr's requests, which frequently involved legal opinions.  Here, in contrast, Starr has propounded requests for admission by the United States of various propositions not limited to authenticity of a document, and disputes the position of the United States based upon Starr's contention that we must admit to a proposition based upon the statements of individuals.  But regardless of whether an individual made a statement or opined upon the matter, Starr may ultimately fail to carry its burden to prove the proposition, once the Court has evaluated these statements at the proper time (on motions for summary judgment or at trial) and determined the weight that it should afford them.

In any event, Starr ignores the fact that *JZ Buckingham* does not simply conclude that "[t]ypically, courts have ordered matters admitted . . . when the evidence shows that it should have been admitted."  77 Fed. Cl. at 45.  Instead, the Court clarifies this description of the caselaw by noting that "*[m]ore typically*, when the responding party's answer to requests for admission is deemed to be noncompliant with Rule 36, federal courts order the responding party to serve a supplemental answer," *id.* at 45 (emphasis added), and that "deeming a matter admitted is not ordinarily the first course of action the court should pursue and not one to be taken lightly," *id.* at 46 (citing *Asea*, 669 F.2d at 1247).  The Court further noted that the Federal Rules Advisory Committee's "contemplated sanction for failure to make a reasonable inquiry is the cost to prove the matter at trial, pursuant to Rule 37(c)."  *Id.* at 47 (citing Fed. R. Civ. P. 36, Advisory Committee Notes, 1970 Amendment (2005)).  In fact, after summarizing relevant

caselaw, the *JZ Buckingham* court held that the defendant's failure to admit or deny the authenticity of certain documents – because it lacked sufficient knowledge – was not unreasonable, 77 Fed. Cl. at 48; thus, this decision does *not* support any demand for deemed admissions.

### 3. A Responding Party Need Not Agree With Statements Made By Third Parties, Including Its Employees Or Former Employees

Contrary to Starr's arguments, a party is not precluded from objecting and responding accurately to requests for admission merely because individuals including employees or former employees have made statements that seem to endorse the propositions stated in the requests.

Inconsistencies between a responding party's responses and deposition testimony, "to the extent that they exist, cast doubt on the accuracy, not the sufficiency, of [the] responses" and "[a]ccordingly, these contradictions do not provide the basis for granting a Rule 36(a)(6) motion regarding the sufficiency of RFA responses." *Wiwa*, 2009 WL 1457142, at *6 (emphasis removed). Starr apparently asserts that, even if deposition testimony is inaccurate, the United States must admit its truth. *See* Pl. JSR § A, *supra*. The *Wiwa* court rejected this argument, explaining that such a "contention is not germane to the Court's Rule 36 analysis." 2009 WL 1457142, at *6 n.9. As another court has opined, when a party is asked to admit or deny another individual's statements, the responding party "is being asked to admit the objective truth of the statements made." *Lewis v. Michaels Stores, Inc.*, No. 3:05-cv-1323-J-33HTS, 2007 WL 2021833, at *3 (M.D. Fla. 2007). Thus, we are responding, upon behalf of a party, to statements Starr has excerpted and presented as requests for admission.

Starr misreads the decisions it cites in an attempt to support its desired "mini-trial" on the evidence. *T. Rowe* merely states – as Starr acknowledges – that "a party responding to a Rule 36

Request 'must *consider* [witnesses'] deposition testimony in responding to the requests."[9]  *See*

Pl. JSR § A, *supra* (quoting *T. Rowe*, 174 F.R.D. at 44) (emphasis added).  *T. Rowe*'s other

conclusions contradict Starr's position.  The *T. Rowe* court noted that it could not "accept . . .

plaintiff's position that defendant must admit as true the statements of former [third-party]

employees about [third-party] matters . . . as to which *there may be other evidence*, either in the

form of documents or testimony of other [third-party] employees."  174 F.R.D. at 44 (emphasis

added).  As Starr's own caselaw explains, if third parties, including employees or former

employees, speak to a matter in a deposition, the responding party can only "be compelled via

Rule 36 to admit or deny, that is, to indicate whether it will introduce contrary evidence."

*Uniden*, 181 F.R.D. at 304.  The United States considered the deposition testimony in preparing

its responses, and Starr has not claimed otherwise.  The *T. Rowe* court also correctly noted that a

proceeding related to the sufficiency of responses to requests for admission is *not* the proper time

to weigh witnesses' testimony:

> In the absence of an admission, the trial judge will be
> required to determine what weight to give the deponents'
> testimony, with respect to several discrete factual issues. There is
> very little burden on plaintiff in having to submit the relevant
> deposition testimony at trial and, if it is uncontroverted, the burden
> on the court in deciding whether to credit the testimony is
> insignificant. Thus, the goal of efficiency underlying Rule 36 is not
> frustrated in any meaningful way by defendant's responses [which
> did not admit the truth of the deposition testimony]. Indeed, far

---

[9]   Similarly, the court in *Dubin v E.F. Hutton Group, Inc.*, 125 F.R.D. 372 (S.D.N.Y. 1989), considered requests for admissions seeking admissions as to matters within the sole personal knowledge of a former employee of the defendant.  *Id.* at 374.  The court explained that a former employee's recollection is not necessarily binding upon his former employer.  *Id.*  Thus, even if the former employer did interview the former employee, "the most they could gain would be his personal recollection . . . of what transpired.  This is an insufficient basis upon which to require [the responding party] affirmatively to admit or to deny the truth of [the requesting party's] characterizations of these conversations[.]"  *Id.*  The *Dubin* court, like the *T. Rowe* court, noted that a responding party should consider a former employee's sworn deposition testimony in drafting responses.  *See id.*

> more time appears to have been spent litigating this dispute than
> will be required to put before the court the relevant deposition
> testimony.

174 F.R.D. at 45.  Starr made no reply to our explanations of *T. Rowe*; that case, for the

reasons we state, does not support Starr's contentions.

 The fact that Starr's requests use certain statements made by former or even current

employees does not require the United States to respond by admitting as true Starr's requests

citing those statements.  Courts have explained, in the context of FOIA requests, that, when an

agency receives reports or memoranda from its divisions and employees prepared as an aid to the

agency's deliberations, the agency "[i]s in no way bound by the reports' recommendations, nor

the reasoning contained therein," even when it agrees with the conclusion of a report.  *Nat'l*

*Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 359 (2d Cir. 2005) (citing *Renegotiation*

*Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 177 (1975)).  The deliberations and

personal opinions of agency employees also cannot be considered a final agency decision.

Where an agency, "having reviewed a subordinate's non-binding recommendation, makes a 'yes

or no' determination without providing any reasoning at all, a court may not infer that the agency

is relying on the reasoning contained in the subordinate's report."  *Id.* (quoting *Casad v. United*

*States Dep't of Health and Human Servs.*, 301 F.3d 1247, 1252-53 (10th Cir. 2002)).

 In its reply to our explanations, Starr cites no caselaw in support of its position, but

merely notes its own "expect[ation]" that the United States would somehow correct an individual

employee's inaccurate statements and Starr's personal view that "it is difficult to credit" our

denials of employee statements.  Pl. JSR § A.  Starr's claim that it is not asking us to "admit the

*truth* of the statement in the Request, but only that the person making the statements, some of

which were under oath, *believed* the statement was true" does not assist Starr's arguments.  Pl.

JSR § A (emphasis in original).  *T. Rowe*, which Starr cites as authority, concluded even when a third party "testifies at his deposition about what he believed at some time in the past," the responding party "need not admit to that person's state of mind[.]"  174  F.R.D. at 46.  The court also noted that it "d[id] not believe that requests of this nature in any way serve the goals of Rule 36."  *Id.*

Starr also contends that we must admit RFA No. 95 because it purportedly "is a statement concerning FRBNY's position, made by FRBNY President Geithner during his confirmation hearings for Treasury Secretary."  Pl. JSR § A.  RFA 95 quotes then-FRBNY President Geithner's response to a congressional inquiry concerning Lehman Brothers and unrelated to AIG, *see* Pl. JSR Exhibit 5 (PX 599 at 177), and improperly asks us to admit that it is "true" as a matter of law, even though – as discussed in Section A.4 below – Starr's request is inaccurate because Starr has removed Mr. Geithner's statement from its necessary context.[10]  In any event, Starr's characterization of former FRBNY President Geithner's testimony as binding on the United States is simply incorrect.  As the predecessor of the United States Court of Appeals for the Federal Circuit recognized, FRBNY is a third party.  *Armand Schmoll, Inc v. United States*, 37 C.C.P.A. 56, 1949 WL 4893 (1949) (treating FRBNY as a separate party and assuming that a subpoena *duces tecum* was necessary to obtain documents from FRBNY).  The United States, therefore, cannot be forced to admit Starr's request, as Starr's own caselaw concludes.  *T. Rowe*, 174 F.R.D. at 44 (noting that a party "is not compelled to be bound by a version of events presented by third parties").

---

[10]   In addition, as we demonstrate in section A.4, we properly objected to, and cannot be compelled to admit, requests for legal conclusions.

Other responses selected by Starr likewise are baseless.  Although we have no obligation to explain or litigate our denials or qualified admissions and RCFC 36 and 37 do not authorize Starr's requested "mini-trial" on such responses, without waiving our rights we provide the following illustrations of the baseless nature of Starr's contentions.

As an example, although Starr contends that we should be forced to admit that Chairman Bernanke believed a particular statement that he made before the Senate Committee on the Budget at the time he made it, *see* Pl. JSR § A (citing RFA 600, quoting testimony stating "AIG is effectively under our control.  We are breaking it up.  We are doing it to repay"[11]), [12] Chairman Bernanke's subsequent testimony in this case required us to deny the request. In response to questions about this cited statement, Chairman Bernanke testified at this deposition that he had been ███████████████████████████████████████████████████████ ███████████████████████████████████████████████"[13]  Pl. JSR Exhibit 4 (Bernanke Dep. Tr. 350:21-351:4).  Our response to RFA 600 properly admitted that the quoted language appeared in the congressional testimony, but otherwise denied Starr's request.

---

[11]   This testimony is found at Pl. JSR Exhibit 5 (PX 671 at 50).

[12]   Starr notes that we asserted that this congressional testimony was unrelated to AIG and disputes our statement.  Pl. JSR § A.  Our draft should have cited RFA 95 (not RFA 600) as unrelated to AIG.

[13]   The uncorrected transcript of Chairman Bernanke's testimony includes the statement, referring to this Congressional testimony, that:  "I was misstating the facts if I implied that decisions lay with the directors and the management of AIG."  Pl. JSR § A n.4; Pl. JSR Exhibit 5 (Bernanke Dep. Tr. 351:22-352:2).  In his errata to this testimony, Chairman Bernanke corrected his statement to be that he "was misstating the facts if I implied that decisions did not lie with the directors and management of AIG."  Exhibit 49 (Bernanke Dep. Errata, Tr. 352:1).  The corrected testimony is therefore consistent with the testimony quoted above, that "the decisions were still being made by AIG management and the board."  Starr had not received Chairman Bernanke's errata at the time it prepared its section of the Joint Status Report, so it was not aware of this specific point, but, as noted above, other testimony in the deposition makes clear that the United States could not have simply admitted RFA 600.

In addition, Starr also complains we deny RFA 610 despite its use of certain testimony of Chairman Bernanke.  Pl. JSR § A.  Starr appears to have overlooked our amended RFA response that provides an extensive and precise admission that does not simply agree with the more colloquial language of the request, and otherwise denied what the United States properly declined to admit.  Exhibit 50 at 263-64 (Def. Third Am. Responses to Starr's Second Set of RFAs, Revised Response to RFA 610).

In its reply to our response, Starr raised a new specific challenge to RFA 278.  Starr contends that Mr. Geithner "discouraged" what Starr characterizes as Mr. Willumstad's "idea of AIG's becoming a primary dealer with access to the primary dealer credit facility."  Pl. JSR § A.  The GAO report cited by Starr states that Mr. Geithner's response was that "he had not considered this option and would need to respond later."  Pl. JSR Exhibit 5 (PX 21 at 26).  Although Mr. Geithner believed that he may have been "discouraging" when he met with Mr. Willumstad on September 9, 2008, he also testified that he did not recall what he actually said to Mr. Willumstad.  Pl. JSR Exhibit 4 (Geithner Dep. Tr. 70:17-71:2).  Mr. Willumstad testified that Mr. Geithner's only response to him was that Mr. Geithner was uncertain what the process was to become a primary dealer, and so would have to look into that process.  Exhibit 51 (Willumstad Dep. Tr. 97:1-97:24, 171:21-172:13 (Oct. 15, 2013)).  Even if it were not improper for Starr to seek a mini-trial of an RFA denial, each of these statements, on its face, establishes there is no merit to Starr's challenge.

In its discussion of RFA 407, Starr claims that there is no evidence contrary to "FRBNY President Timothy Geithner's sworn testimony before the House Committee on Financial Services that Edward Liddy agreed to become AIG's CEO 'in response to a request by the Government of the United States, to work to restructure the company and help' the Government

'get back the assistance provided by the taxpayer.'"  Pl. JSR § C (citing PX 387 at 13).  Again, although Starr cannot properly seek to try an RFA response, the statement excerpted by Starr conveys an individual's opinion concerning Mr. Liddy's actions or motives, and the United States is not bound to respond with an admission.

For these reasons, we respectfully submit that the Court should reject Starr's assertion that we must revise our responses to admit Starr's requests because they use statements of individuals and third parties.

### 4.      Starr Is Not Entitled To Admissions Of Legal Conclusions

We have properly objected to Starr's requests that call for legal conclusions.  Requests "call for a legal conclusion when [they] purport[] to require a party to admit, for example, that a statute or regulation imposes a particular obligation" or does not allow a particular action, *Miller v. Holzmann*, 240 F.R.D. 1, 5 (D.D.C. 2006), or that a defendant was or was not subject to particular statutes, *English v. Cowell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986).  Although Starr asserts that its requests involve application of law to fact, Starr is wrong.  *See*, *e.g.*, Pl. JSR Exhibit 3 at 1 (RFA 95) (seeking an admission that "[u]nder section 13(3) of the Federal Reserve Act, the Fed is prohibited from taking equity or unsecured debt positions in a firm.").  These requests improperly call for abstract legal interpretations of statutes, regulations, and New York Stock Exchange rules, not an application of those statutes, regulations, and rules to the facts of this case, and "therefore [are] beyond the scope of a request for admissions." *English*, 117 F.R.D. at 135; 8B Charles A. Wright, Arthur R. Miller, *et al.*, Fed. Practice & Procedure § 2167.

Moreover, despite our objections and despite the fact that the disputed nature of the matters addressed in the requests makes them inappropriate subjects for requests for admission, as discussed above, we nonetheless, in each case, provided responses on the merits based upon

our understanding of the issue.  Starr's contention that our resulting denials contradict the

positions taken by particular officials is incorrect, because Starr's requests inaccurately

characterized and distorted those statements or removed them from their necessary context such

that the resulting requests were inaccurate.  For example, RFA 95 asks for an admission of the

pure legal conclusion that ██████████████████████████████████████████

██████████████████████████████████████████   *See* Pl. JSR Exhibit 3 at 1

(RFA 95 (quoting PX 599 at 177)).  However, this statement was made concerning Mr.

Geithner's statement of his belief as to what should have been done in the Lehman Brothers case

or "now" – and arose in the context of a discussion of FRBNY's authority to inject capital into

Lehman, a failing firm, not its authority to hold equity or condition its lending on the provision

of equity.  While this statement was truthful and accurate in the context in which it arose, we

properly denied the contention in RFA 95 that FRBNY is more broadly "prohibited from taking

equity . . . in a firm." We properly objected to, and denied, the legal conclusions presented in

Starr's RFA 95.[14]  Similarly, RFA 106 demands an admission that ██████████████████

██████████████████████████████████████████   *See* Pl. JSR Exhibit 3 at 2 (RFA

106 (citing Paulson Dep. Tr. 174:1-10)).  Starr omitted the testimony immediately following this

statement, which makes clear that it similarly arose in the context of FRBNY's authority to make

capital injections, not its ability to hold equity.  Paulson Dep. Tr. 174:11-19 ██████████████

██████████████████████████████████████████

---

[14]  Starr asserts in reply to our explanations related to RFA 95 that the request
"specifically refers to the Federal Reserve's authority to take equity or unsecured debt positions
in a firm, and does not concern anything related to the Fed's authority to hold equity or condition
its lending on the provision of equity."  Pl. JSR § A (emphasis added).  It is not clear, however,
from the RFA's text that the word "take" is limited in the manner Starr now asserts it is.  In any
event, we properly objected to and denied Starr's request.

██████████████████████████████████████████████████████

███████████████████████████████████████████ , attached in Pl. JSR Exhibit

4.  As such, we properly objected to and denied the contention in RFA 106, which presented

Secretary Paulson's testimony in a way that made the request inaccurate.

In a revision to its section prompted by our response, Starr improperly revives a

complaint made in correspondence with counsel for the United States prior to our meet-and-

confer, then discarded  – that our "objection to admitted quoted statements on the basis that they

were 'taken out of context' is both contrary to law and incorrect."[15]  Pl. JSR § A.  Although

Starr's February 18 letter complained about our context objections, following our March 19

response addressing Starr's contention, Starr dropped this complaint in its next letter, dated

March 25, listing the remaining unresolved issues, which no longer included what had been a

section about context objections.  *Compare* Exhibit 52 at 2 (Feb. 18, 2014 Letter from Dwyer to

Mizoguchi) *with* Exhibit 53 (March 25, 2014 Letter from Dwyer to Mizoguchi).

Even if Starr's renewed challenge to our context objections was proper, our objections

were properly stated, and we nonetheless provided Starr with a response to its requests.  Starr's

contention that we cannot provide necessary context in a qualified admission is still incorrect.

*See Diederich v. Dep't of Army*, 132 F.R.D. 614, 619 (S.D.N.Y. 1990) ("[g]enerally,

qualification is permitted if the [RFA's] statement, although containing some truth, '. . . standing

alone out of context of the whole truth . . . convey[s] unwarranted and unfair inferences.'"),

quoting *Flanders v. Claydon*, 115 F.R.D. 70, 71-72 (D. Mass. 1987) (citation omitted)).  Starr

---

[15]   The fact that Starr has revised its JSR sections to include a reply to our sections
highlights a deficiency of joint status reports in handling motions – the inability of the Court to
determine what arguments were waived in the initial briefing, as would be clear in sequential
briefing on motions to compel.  The Court should deem such an assertion waived because Starr
did not raise it in Starr's initial briefing on this issue provided to us as Starr's Joint Status Report
section.

provides no caselaw to establish that our objection is "contrary to law." Indeed, Starr has relied upon context in responding to our requests. See Exhibit 48 at 64-65 (Pl. Am. Responses to Def. RFAs, Starr's Response to Def. RFA 223) ("refer[ring] to the actual Credit Agreement for context"). Starr's challenge is, therefore, meritless.

In any event, even if Starr's RFAs accurately reflected the opinions held by particular individuals – which they do not, as illustrated above – the United States cannot be forced to admit legal conclusions at the heart of the case based on those opinions if it has a different interpretation of the law. *See Evergreen Trading, LLC ex rel. Nussdorf v. United States*, 75 Fed. Cl. 730, 730-31 (2007) (quoting *Conn. Gen. Life Ins. Co. v. Comm'r of Internal Revenue*, 177 F.3d 136, 145 (3d Cir. 1999), *cert. denied*, 528 U.S. 1003 (1999)) ("[R]eliance upon remembered details from officials who lacked the ultimate authority to issue any proposed regulation has little support in the law."); *see also Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001) ("[T]his court [should be] extraordinarily hesitant to attribute to the IRS or the Treasury Department interpretations of a revenue ruling made by individual IRS employees that represent their personal views, rather than the official position of the agency."). A responding party need not admit the truth of statements made by its employees or former employees. *See* Def. JSR § A.3, *supra*.

For these reasons, we respectfully submit that the Court should reject Starr's request that the United States be ordered to amend its responses.[16]

---

[16] Starr concludes its section by stating that it "seeks an Order of the Court compelling Defendant to *correct* the [alleged] deficiencies" in our responses "and to provide such Amended Responses no later than 20 days after the Court hears and determines this application," Pl. JSR at 10 (emphasis supplied). We note, however, that in the chart attached as Exhibit 3, Starr asks that the Court "order Defendant to *admit*" certain requests (Pl. JSR Exhibit 3 at 1 (RFA 95)), or that the United States' responses be "deemed an admission" (Pl. JSR Exhibit 3 at 3 (RFA 125). To the extent Starr intends its chart to convey a different or alternative request for relief from what

**B.      The Government Is Not Required To Admit RFAs Because They Are Based On Statements In Documents**

Starr challenges certain of our denials that it claims contradict the Government's own documents and statements.  Starr's claim that the United States' denials "contradict" certain documents or testimony appears to be predicated on an erroneous reading of those materials or on Starr having overlooked or ignored other inconsistent evidence.  In any event, as stated above, a party may respond to requests notwithstanding any prior statements made by individuals or made in documents.  *See* Def. JSR § A, *supra*.  We appropriately did so.

Contrary to Starr's claim, Pl. JSR § B, the United States did not simply deny all of the cited requests, but, rather, provided qualified admissions to certain of them.  In our responses to RFAs 297, 493, 495, 513, and 548, we provided additional context to explain the snippet of text in the request.  *See* Pl. JSR Exhibit 3 at 9-12.

These qualifications to our responses are appropriate because Starr's requests are often "sweeping, multi-part, involve[] sharply contested issues, or go[] to the heart of a defendant's liability."[17]  *Wiwa*, 2009 WL 1457142, at *4 (citing *Byung v. Campbell*, No. 07 Civ. 471, 2008

---

Starr has attempted to justify in the text of the JSR, as explained above in the United States' Section A.1, the Court cannot properly order the United States to convert its denials or qualified admissions into unqualified admissions, nor should any Requests be "deemed admitted" by the Court – a drastic remedy that is clearly inappropriate here, *see JZ Buckingham*, 77 Fed. Cl. at 46.

[17]    Starr confusingly contends that we "improperly include[] over 500 qualified admissions" in our tally of  868 "admissions *or qualified admissions*."  Pl. JSR Introduction (emphasis added).  Starr appears to assert that qualified admissions, which permit admission where a request may otherwise be denied, are improper, despite Starr's own qualification of numerous responses to our RFAs.  *See*, *e.g.*, Def. Ex. 48 at 15 (Response to Def. RFA 44), 20 (Response to Def. RFA 64), 38-39 (Response to Def. RFA 130), 39-40 (Response to Def. RFA 134).  As we explained, and Starr did not refute, numerous courts – and RCFC 36 itself – encourage qualification of answers when a responding party otherwise cannot admit or deny a request as written.  Indeed, Starr acknowledges that qualified admissions are proper.  Pl. JSR Exhibit 3 at 12 (RFA 681).

WL 4662349, at *4 (N.D.N.Y. Oct. 20, 2008); *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06 Civ. 6198, 2008 WL 3823858, at *19 (S.D.N.Y. Aug. 14, 2008)).  Indeed, Starr's requests violate the command of Rule 36 that a request for admission "must be direct, simple and limited to singular relevant facts, so that it can be admitted or denied without explanation," and instead improperly "state half a fact or half-truths which require the answering party to qualify responses."  *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992) (citations omitted).

A party "should be able to explain its position and not be bullied into an admission it does not want to make."  *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 138 (D.D.C. 2005).  Courts have normally declined to compel any further response where the responding party has provided a qualified denial or admission to a Request for Admission. *Lakehead*, 177 F.R.D. at 457.  It is entirely proper to include, in a response, additional language necessary to understand the context of a snippet of text found in an RFA:  "[g]enerally, qualification is permitted if the [RFA's] statement, although containing some truth, '. . . standing alone out of context of the whole truth . . . convey[s] unwarranted and unfair inferences.'" *Diederich*, 132 F.R.D. at 619, quoting *Flanders v. Claydon*, 115 F.R.D. 70, 71-72 (D. Mass. 1987) (citation omitted).  Addition or removal of language permitted us to provide a qualified admission; otherwise we would have denied.  Courts rarely find a qualified response to be insufficient as it "should be deemed sufficient if it reasonably informs the requesting party what is being admitted or denied."  *Wiwa*, 2009 WL 1457142, at *5 (citing *JP Morgan Chase Bank v. Liberty Mutual Ins. Co.*, No. 01 Civ. 11523, 2002 WL 31159139, at *1 (S.D.N .Y. Sept. 27, 2002)).

Our complete or partial denials and qualifications of Starr's cited requests often stem from Starr's mischaracterizations of Government documents and statements of current or former

Government employees, which distortions render the requests impossible to admit.  RFA 297, for

example, asks us to admit that "AIG CEO Robert Willumstad and AIG Vice Chairman Jacob

Frenkel told Federal Reserve Vice Chairman Donald Kohn that credit from the Federal Reserve

System was ███████████████████████████████████ Pl. JSR § B; Pl. JSR

Exhibit 3 at 9 (RFA 297 (citing PX 64)).  Starr asserts that our qualified admission is incorrect

and that we must admit the request as written because an email from Vice Chairman Kohn

"contain[s] the quoted language."  Pl. JSR § B (discussing RFA 297).  Starr's argument,

however, ignores the context of that snippet of quoted language.  In PX 64, the cited email, Vice

Chairman Kohn summarizes a conversation with Messrs. Willumstad and Frenkel, in which they

discussed proposals from private investors (including the J.C. Flowers proposal) and Messrs.

Willumstad and Frenkel reported ████████████████████████████

███████████████████████████████████████ *See*

Pl. JSR Exhibit 5 (PX 64).  The email, therefore, does not indicate whether Vice Chairman Kohn

is stating Messrs. Willumstad and Frenkel's views about ███████████ or whether he is

passing on what Messrs. Willumstad and Frenkel reported ██████ told them.  Our response

properly provided the text of the entire email to explain Vice Chairman Kohn's statement and

otherwise denied the request.

    Similarly, in RFA 181, Starr requests that we admit that "On September 13, 14, and 15,

2008, members of the Federal Reserve Board of Governors staff concluded that AIG appeared

████████████████████ *See* Pl. JSR Exhibit 3 at 9 (RFA 181 (citing PX 611; PX 614;

PX 615)).  However, the cited documents are draft memoranda that do not reflect a "conclusion."

*See* Pl. JSR Exhibit 5 (PX 611, PX 614, PX 615)  In addition, the analyses in the memoranda

were based on uncertain and changing information, and Starr selectively cites certain documents

but ignores other substantial evidence that there was in fact great uncertainty as to AIG's solvency.

Further, Starr has pointed to no authority for the novel proposition that a party is required, and can be forced, to admit legal conclusions with which the party disagrees.  If Starr's unsupported contention were correct, the deemed admissions Starr seeks could bind us on appeal to positions that we might challenge there, as parties' admissions constitute the law of the case for all legal purposes and bind them on appeal and on summary judgment.  *See*, *e.g.*, *An-Port, Inc. v. MBR Indus., Inc.*, 772 F. Supp. 1301, 1305 (D.P.R. 1991).  Starr's attempt to force us to admit legal conclusions is also at odds with the purposes of RCFC 36(a), as it could not eliminate undisputed factual issues and, thus, narrow the issues for trial.  *Stockdale*, 2009 WL 5217001, at *1.

Starr's challenge to our response to Request 548 is similarly flawed.  The request asks us to admit that the "Federal Reserve Board took no position on the structure of the loan FRBNY would use with AIG," citing testimony given in a different case by a former Board employee.  Pl. JSR Exhibit 3 at 11 (RFA 548).  Our response quotes verbatim the transcript from which this statement is taken, and adds that the Board's authorization of FRBNY's lending specifically authorized FRBNY to ███████████████████████████████████████ ███████ before specifically denying the language of the request.  *Id.*  Given the fact that the Board of Governors' authorization did in fact "take a position on the structure of the loan FRBNY would use with AIG," by authorizing a loan with conditions such as those in the term sheet, the United States clearly could not simply admit the request.

Finally, Requests 493 and 513 requested that we admit the truth of statements that Secretary Paulson made during a February 10, 2009 interview, summarizing comments he made

six months earlier.  Starr asserts that we cannot "credibly deny" the requests. See Pl. JSR Exhibit 3 at 10, 11.  First, Starr's complaint is a legally impermissible challenge to the accuracy of a denial.  *Operation Rescue Nat'l*, 111 F. Supp. 2d at 968; *Point Blank*, 2011 WL 742657, at *4-5.  Second, former Secretary Paulson testified at his deposition that he did not have any recollection of these statements; and so he did not confirm that they were correct.  *See* Pl. JSR Exhibit 3 at 10 (RFA 493 (citing Paulson Dep. Tr. 199:5-21)).  We properly admitted that the interview transcript contains the words quoted in Starr's requests – and otherwise denied the remainder of the requests, including the truth of the matter asserted in the requests, *Lewis*, 2007 WL 2021833, at *2.

In reply to our explanations, Starr asserts that our responses to RFA Nos. 493 and 513 should be deemed admissions, based not upon the actual text of our RFA responses, but upon Starr's reading of our briefing of this issue.  Our response to Starr's initial briefing on the JSR explains that we have not simply "denied the statements, but, rather, qualified the request to provide a full quote from the interview transcript and explain the context of Secretary Paulson's statements" then conclude our response by "otherwise den[ying]" the remainder of Starr's request."  Starr's characterization of our response as being so limited that the "Defendant now claims that it does not deny the statements" – is, therefore, incorrect.  The remaining portion of the request – that we admit the truth of Starr's characterization or that Secretary Paulson "took these actions" – is plainly "the remainder of Starr's request," which our response "otherwise denie[d]."

The Court should, therefore, reject Starr's contention that it should order us to revise our responses or admit without qualification Starr's requests.

**C.      The United States Has Made A Reasonable Inquiry And Should Not Be Forced To**

**Re-Investigate Issues Related To Requests For Admissions That It Lacks Sufficient**

**Information To Admit Or Deny**

Starr's claim that the United States has failed to conduct an adequate investigation in

responding to Starr's Requests is unfounded, and its unsupported assertion that it "does not

credit" the United States' responses is simply baseless.  The United States undertook an

extremely thorough and comprehensive investigation in the course of responding to Starr's 1,174

RFAs, including reviewing deposition transcripts and records and making inquiries of witnesses

and third parties.  However, despite its extensive, good-faith investigation, the United States

remains unable to admit or deny certain of Starr's requests.

Many of these Requests ask the United States to admit the specific dates and times of

meetings or conversations that took place more than five years ago, or to admit that language

later used to recount, summarize, or paraphrase those discussions was literally used in those

meetings or conversations at the time.  It is simply not reasonable to assume that any witness

could recall, five and a half years later, the words used in a specific meeting or the time such a

meeting occurred.  Other requests ask the United States to admit beliefs held by third parties, or

to admit the truth of hypothetical, counterfactual scenarios.  Still others are so overly broad that

the United States is unable to deny the Requests in their entirety.  No amount of reasonable

inquiry could enable the United States to admit or deny these requests as a factual matter.  For

example:

- RFA 152 asks us to admit that on September 16, 2008, "there were sufficient
  good assets at AIG that FRBNY could fully secure a loan for $85 billion against
  those assets."  *See* Pl. JSR Exhibit 3 at 15.  Starr asserts that, in light of
  congressional testimony and Treasury 30(b)(6) deposition testimony (none of
  which was cited in Starr's RFA), we needed to conduct a "records search and
  interview of at least these officials who have testified to this fact."  Pl. JSR § C

(citing RFA 152).  The cited testimony, however, does not support Starr's contention.  James Millstein's statements on pages 80-81 of the Treasury 30(b)(6) deposition transcript do not refer to AIG assets available to secure a loan; in fact, Mr. Millstein repeatedly rejected the implication by Starr's counsel that he had stated that the loan was fully secured.  Exhibit 54 (Treasury 30(b)(6) (Millstein) Dep. Tr. 65:10-18, 72:18-73:5).  In addition, Chairman Bernanke's cited testimony to the Financial Crisis Inquiry Commission (FCIC) (PX 600) in fact reads: "AIG had a very substantial business, a huge business, more than a trillion dollars in assets and a large insurance business that *could be used* as collateral to borrow the cash needed to meet Financial Products' liquidity demands."  *See* Pl. JSR Exhibit 5 (PX 600 at 37, Tr. 37:14-18).  Contrary to Starr's assertion, Chairman Bernanke's comments cannot be read to testify to the request's alleged fact that "[o]n September 16, 2008, there *were* sufficient good assets at AIG that FRBNY could fully secure a loan for $85 billion against those assets."  *See* Pl. JSR Exhibit 3 at 15.  Mr. Baxter did not testify that there were sufficient assets to fully secure an $85 billion loan on September 16; rather, he testified that the value of the collateral pledged to FRBNY exceeded the amount of AIG's borrowing on that day, but the amount of that borrowing was $14 billion, not $85 billion.  Def. Exhibit 55 (Baxter Dep. Tr. 126:4-126:10); Pl. JSR Exhibit 5 (PX 19 at 11).  In addition to the significant uncertainty and ambiguity of what "good assets" means in Starr's request, the value of AIG's assets on September 16, 2008 was not an objective fixed amount that, in the event of default, would be known to have been in all potential circumstances sufficient to fully secure $85 billion in debt.  Given that AIG nearly went bankrupt even after September 16, 2008, and required far more than $85 billion of financial assistance to be stabilized, there is no basis for Starr's request that we revise our response.


- RFA 201 cites a GAO report (numbered PX 288) for the proposition that "[i]n 2008, most of AIG's subsidiaries were insurance companies, which could not be put into bankruptcy under existing state regulation," and Starr contends a reasonable inquiry requires us to inquire of everyone who spoke to GAO as part of its inquiry.  The United States has no obligation to conduct an unreasonable and unduly burdensome inquiry into AIG's potentially thousands of  subsidiaries to determine which were insurance companies; which of those insurance companies were located in which states (and which were foreign); and whether the particular state regulations existing in each state or foreign country prohibited putting "most" of AIG's subsidiaries into bankruptcy.


- RFA 103 asks the United States to admit that "[p]rior to the assistance provided to AIG, no federal reserve bank had held or owned equity in a company."  Pl. JSR Exhibit 3 at 14.  As the United States has repeatedly informed Starr, the historical records of the Federal Reserve System are insufficient to enable the United States to determine whether any Federal Reserve banks held or owned equity in a company dating back to the inception of the Federal Reserve System a century

ago.  In reply to our explanation, Starr contends that "if Defendant actually conducted a search of 'the historical records of the Federal Reserve System' and found no instance in which a Federal Reserve Bank held or owed equity in a company, that is sufficient for Defendant to admit the Request."  This assertion is supported by no authority whatsoever, misconstrues RCFC 36's "reasonable inquiry" requirement, and makes no sense.  If all of a company's records were lost, the fact that the company could not locate any records that show that something happened would not compel the conclusion that the event had not, in fact, happened, such that the company would be obliged to admit for all times that the event had not happened.  The absence of records might mean that it had not happened, or it might just mean the company no longer has records showing that it did happen.  Here, where the RFA asks for us to make a factual statement about something that might or might not have occurred sometime between 1913 and 2008, in any of the multiple Reserve Banks, there is no basis to order us to revise our response.

- RFA 298 asks the United States to admit that "no official, employee or representative of the Federal Reserve System or of any Federal Reserve Bank informed AIG" of what the Request characterizes as a "conditional willingness to consider lending to AIG" on the part of Chairman Bernanke.  Pl. JSR Exhibit 3 at 21.  Following a reasonable inquiry, the United States is not aware of anyone within the Federal Reserve or FRBNY having conveyed Chairman Bernanke's views to AIG, but given the breadth of the Request the United States is unable to affirmatively admit or deny that <u>no one</u> within the entire Federal Reserve System did so.

- RFA 378 asks the United States to admit that "[h]ad Lehman not filed for bankruptcy, private sector financing for AIG could have been secured."  Pl. JSR Exhibit 3 at 18.  The United States responded properly that it was unable to admit or deny the truth of this counterfactual scenario, which requires us to speculate what third parties might have done, and no amount of further inquiry would provide a basis for admission of this counterfactual scenario.

- RFA 379 asks the United States to admit that private lenders did not lend to AIG because they "wanted to protect their own balance sheets."  Pl. JSR Exhibit 3 at 19.  Again, no amount of additional inquiry could possibly provide any basis for the United States to admit the mental states and motivations of various third parties.  *See also* RFA 425, Pl. JSR Exhibit at 23 (asking the United States to admit that AIG was "terrified" after it agreed to the terms contained in the September 16, 2008 term sheet).

- RFA 476 asks the United States to admit the accuracy of a quotation attributed to then-Senator Hillary Clinton in former Secretary Paulson's book – specifically, to admit that during a September 17, 2008 phone conversation with Secretary Paulson regarding Middle Eastern investors' purported interest in "buying" AIG, Senator Clinton said, "Maybe the government doesn't have to do anything."  Pl. JSR Exhibit 3 at 20.  We have undertaken a reasonable document search and are unable to verify the words used by Senator Clinton in that phone conversation.  Starr had an opportunity during Secretary Paulson's deposition to explore whether the quotation attributed to Senator Clinton in Secretary Paulson's book was accurate.  RCFC 36 does not require the United States to ask either the former Treasury Secretary or the former Senator to confirm the exact words spoken during a five-year-old phone conversation, which neither party could reasonably be expected to remember at that level of detail.

The obligation to conduct a reasonable inquiry generally does not extend to seeking information from third parties.  *See Diederich*, 132 F.R.D. at 620 (Rule 36(a)'s requirement of "reasonable inquiry" does not extend to third parties); *Dubin*, 125 F.R.D. at 374-75 (same).  Starr itself has recognized this principle, having responded that it was unable to admit or deny requests relating to AIG's financials or records.  *See* Exhibit 56 at 2 (Mar. 19, 2014 Letter from Dwyer to Mizoguchi).

Nor does the obligation to conduct a reasonable inquiry normally require making inquiries of former employees.  *See Diederich*, 132 F.R.D. at 620.  With respect to former employees, the *Dubin* court noted that their recollection of the facts "is not necessarily binding upon [their former employers]" and, "[t]hus, even if [former employers] did interview [a former employee], the most they could gain would be his personal recollection – as one participant in the alleged discussions – of what transpired."  125 F.R.D. at 374.  The court concluded that obtaining the former employee's personal recollection was an insufficient basis upon which to require the former employer affirmatively to admit or to deny the truth of the requesting party's

characterizations of these conversations.[18]  *Id.*  Nonetheless, we went above and beyond our

obligation of reasonable inquiry by making inquiries of third parties, including FRBNY, and

former employees in responding to Starr's 1,174 requests.

Starr, in replying to our arguments, claims that we "selectively cite[] case law regarding

the scope of Defendant's duty to make a reasonable inquiry in response to a Rule 26 Request."

Pl. JSR § C.  Starr's claim is without merit.  Our response provides a number of decisions that

consider the scope of the duty to make a reasonable inquiry and conclude that a responding party

need not seek out and interview former employees.  We acknowledge that courts have differed in

their interpretation of this duty, including whether it extends to seeking out former employees,

and that courts have concluded that the question requires a case-by-case factual analysis,

including in the *T. Rowe* decision relied upon by Starr.  174 F.R.D. at 43 ("What constitutes

'reasonable inquiry' and what material is 'readily obtainable' is a relative matter that depends

upon the facts of each case.") (citing cases).  Contrary to Starr's apparent assertion, this Court is

not bound by the recitation of caselaw in a decision by another judge of the Court of Federal

Claims in *JZ Buckingham*, let alone its holding.  *See, e.g.*, *W. Coast Gen. Corp. v. Dalton*, 39

F.3d 312, 315 (Fed. Cir. 1994).

Requests for admissions are not intended for factual discovery that should be conducted

through interrogatories and depositions.  *Russo v. Baxter Healthcare Corp.*, 51 F. Supp. 2d 70,

79 (D.R.I. 1999).  Starr has taken the depositions of many third parties and of many former and

current Government employees, and has asked or has had the opportunity to ask those witnesses

---

[18]   As noted in Section A above, if the former employee had provided sworn deposition testimony, the former employer would only be required to *consider* it in drafting a response to a request for admission (as we have done), not accept the truth of the statements.  *See* Def. JSR § A.3, *supra* (quoting *T. Rowe*, 174 F.R.D. at 44); *cf. Wiwa*, 2009 WL 1457142, at *6 & 6 n.9.

precisely the same questions as contained in Starr's requests for admissions.  Those witnesses'

answers demonstrated the limits of those individuals' recollections, particularly as to the details

of or particular language used in conversations that took place more than five years ago, and it is

unrealistic for Starr to contend that these or other witnesses should remember these details.  *See*

*JZ Buckingham*, 77 Fed. Cl. at 47 (reasonable inquiry extends to individuals who "in realistic

terms" might be able to answer the requests, not individuals who just "conceivably" could do

so).

The Court should reject Starr's assertion that we should be asked to make further

inquiries and amend our responses to the Requests cited by Starr.

**D.     The United States Responded Appropriately To Starr's Requests That Drafts,**
**Emails and Other Documents About AIG Or The Financial Crisis Were "Normal**
**Course" When It Provided A Qualified Admission And Otherwise Denied Such**
**Requests**

Starr complains that we did not respond to requests to admit that draft memoranda,

emails, and other documents or communications were prepared, created, written, or sent in the

"normal course of business" or that email accounts were used in the "normal course of business."

Pl. JSR § D, *supra*.  Starr is mistaken.  We did respond to such requests, by denying them.  In

general, our responses included a qualified admission that a person created a document in his

professional capacity, when we were able to make that admission, and otherwise denied the

requests.[19]  Our responses, therefore, admit as much as possible by qualifying the admission, and

---

[19]   In some cases, we did not admit Starr's requests because the documents at issue
appear to have been prepared by an employee of an unrelated entity whose business processes
are as unknown to us as they are to Starr.

the residual "otherwise denies" make clear that we are not admitting any inference or other matter that we do not expressly admit, that is, we denied any remaining request.

Starr requests that we be forced to change these qualified admissions and residual denials to unqualified admissions.  However, Starr is not entitled to litigate the basis for our denials that particular documents were "prepared in the normal course of business," nor does it have any right to require us to "identify specific facts to put the trustworthiness of such records into question."  Pl. JSR § D, *supra*.  Rule 36(a) does not authorize the Court to prospectively determine the accuracy of our denials that particular documents were created or communications were sent in the normal course of business, particularly in the absence of any facts in front of the Court concerning the business practices of the entities in question.  *See, e.g.*, *Lakehead*, 177 F.R.D. at 458; *Foretich*, 151 F.R.D. at 4-5.  RCFC 36 was not intended to supply the evidentiary determination that Starr's requests seek – whether the business records exception applies to the cited documents and communications; rather, such a disputed question is properly one for the Court's evaluation through briefing on summary judgment motions or at trial.  *Cf. Foretich*, 151 F.R.D. at 5.

Nor does Starr have any right to force us to state that our qualified admission is "equivalent" to stating that a document was "prepared in the normal course of business."  Pl. JSR § D, *supra*.  We are not willing to do so because our qualified admission that a document was prepared "in a professional capacity" is not equivalent to Starr's request that a document was "prepared in the normal course of business," particularly in light of the fact that Starr has taken the position that its request was intended to address some or all elements of FRE 803(6) (even though none of these elements are in fact present in Starr's requests).

CONCLUSION

For these reasons, we respectfully submit that the United States has sufficiently responded to Starr's RFAs.  The Court should reject Starr's demand that the United States be ordered to amend its responses, and deny any demand Starr may have intended to make that our responses be overridden by the Court and ordered or deemed admitted.

## II.    The Government's Privilege Assertions

### *Plaintiff's Position*

The United States continues to improperly assert the deliberative process privilege over documents to which no privilege attaches.  Starr requests that the United States be compelled to produce these documents by April 30, 2014 (or one week following the Court's ruling on this request, whichever is later) and that the Court impose monetary sanctions for each day thereafter that the United States fails to do so.  If any documents remain in dispute after that date, Starr respectfully requests that the Court be permitted to review those documents *in camera*.

Even though Discovery Order 6 provided guidance to the United States concerning the proper scope of the deliberative process privilege (which the Court noted may have been excessively asserted in this matter, *see* Discovery Order 6 at 8-9), the United States did not commence a review of its deliberative process assertions until Starr asked it to confirm that it had done so on February 19, 2014.  Letter from M. Scarlato to D. Boies (Feb. 25, 2014) (Ex. 6).  The United States completed this review two months later, on April 8, 2014, and as a result produced or re-produced fewer than 200 documents.[20]  This review did not result in compliance with the Court's guidance.

---

[20] Although the Government revised its privilege assertions, it did not provide a revised privilege log.  *See infra* at 52.  Eighty-five of the documents produced as a result of this review are documents produced for the first time and cannot be matched to an entry on the Treasury privilege log.

The Government continues to redact or withhold documents that are not pre-decisional. For instance, the Government asserts the deliberative process privilege over a document which it has redacted and described as "Draft of talking points in preparation for November 2008 interview concerning Treasury's investments in SSFI, and Treasury policy responses to financial crisis and systemic risk." Treasury Log (Ex. 7) at 613, entry for TREAS00231159; *see also* TREAS00231159 (Ex. 8). Even if some parts of this document prepared for Secretary Paulson's use in an interview with the *Washington Post* are privileged, the portions describing, *in retrospect*, actions taken on Sunday September 14, 2008 are not pre-decisional and not protected by a privilege. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-52 (1975) ("However, it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed. Accordingly, the lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not.") (citations omitted). Similarly, a draft GAO report on TARP activities *in the previous quarter* is not pre-decisional. Treasury Log (Ex. 7) at 446, entry for UST_PRIV_0002795.[21] Documents described as a "draft response to letters from members of Congress concerning recipients of TARP funding, including AIG" is also unlikely to contain pre-decisional material, but rather material deciding how to explain and justify a decision *already made*. *See* Treasury Log (Ex. 7) at 288, entries for TREAS00197149 –

---

[21] It is also unlikely that such a document would "make[] recommendations or express[] opinions on legal or policy matters." Discovery Order 6 at 8. This document is, by its nature, backwards looking. Any Treasury opinions contained in the "preliminary edits suggested by Michael Hsu," would similarly be reactive, not prescriptive.

TREAS00197158.  The Government's "review" clearly did not take into account the guidance offered by the Court in Discovery Order 6 and must be redone.

The Government's response to these points is two-fold: (1) the Government simply states that Starr should trust it when it says the documents are privileged; and (2) it states that these challenges are brought too late.  Both these retorts are in error.  First, as the Court is aware, Plaintiff first raised the issue of the Government's overly broad assertions of privilege on October 16, 2013, after spending months corresponding with the Government in attempt to resolve the disputes.  *See* Joint Status Reports on Discovery (Sept. 16, 2013 and Sept. 17, 2013), ECF Nos. 165 and 167.  After the issuance of Discovery Order No. 6 and attempting to resolve the issues between the parties, several issues still remained which were raised with the Government repeatedly.  One primary reason it has taken months to identify and crystallize the remaining disputes is that, as the Government revised its privilege assertions in light of Discovery Order 6, the Government failed to identify the privilege log entries to which those documents corresponded or to issue a revised log that would alert Plaintiff as to what documents had been subsequently produced.  This confusion was compounded by the Government's decision to maintain the documents which it produced subject to the parties' Rule 502(d) agreement as entries on the privilege log, although the Government did not identify which entries corresponded to documents it had produced subject to that agreement.  *See* Letter from R. Dwyer to M. Scarlato (Jan. 10, 2014) (Ex. 9).  Indeed, even today, Starr has to review multiple logs created at different times from each relevant agency to identify the documents over which the United States continues to assert privilege.  Moreover, the Government continues to produce "revised" or "updated" privilege logs, including most recently an April 11, 2014 BOG log.  However, even the most recently produced logs fail to end the confusion of the Government's

assertions of privilege, as the April 11 BOG log refers Starr to the Treasury Department for justification for BOG's withholding of certain documents on the basis of the deliberative process privilege.  Starr has yet to receive Treasury's log concerning these new BOG documents or any information that would lead Starr to believe that Treasury was within its rights to assert privilege over BOG documents.

In the end, despite the rolling provision of privilege logs, Starr has consistently raised questions about the Government's privilege assertions.  *See, e.g.*, Letter from A. Rutherford to M. Scarlato (Feb. 19, 2014) (Ex. 10); Letter from A. Rutherford to M. Scarlato (March 14, 2014) (Ex. 11); Letter from A. Rutherford to M. Scarlato (March 28, 2014) (Ex. 12).  Nothing about this history suggests that Starr has been untimely in its scrutiny of the Government's privilege assertions.

Given the ongoing obstruction and delay, Starr respectfully requests that this Court compel the Government to either produce or provide clarifying descriptions of the documents over which it continues to assert the deliberative process privilege by April 30, 2014, or one week after the Court rules on this application, whichever is later.  Starr further requests that the Court impose sanctions for ever day thereafter in which the Government has failed to comply with the requested order.  If the parties still have remaining disputes following that date, Starr requests that the Court conduct an *in camera* review of the remaining disputed documents.[22]

### *Defendant's Position*

---

[22] On April 16, 2014 the parties agreed that Starr would withdraw a portion of the Joint Status report concerning the Government's assertion of attorney-client privilege over documents Starr believes may be subject to the waiver identified in Discovery Order 6.  In exchange, the United States will provide by April 30, 2014 additional information about those documents, which may narrow or eliminate any remaining dispute.

Starr asserts that "[t]he United States continues to assert deliberative process privilege over documents which are neither deliberative nor predecisional," and requests an order directing the United States to "clarify[] descriptions of . . . documents over which [the United States] continues to assert the deliberative process privilege."  JSR at 53.  As explained below, Starr's assertions lack merit, and, in fact, this Court already has rejected the relief Starr seeks.

Starr first complains that "the United States did not commence a review of its deliberative process assertions until Starr asked it to confirm that it had done so on February 19, 2014."  JSR at 50.  Starr should know that claim is not correct.  Discovery Order 6 contemplated that the parties would agree on a process for resolving disputes.  *See* Discovery Order 6, at 1-2 ("the Court is providing guidance on the disputes raised by the parties with the intention that the parties will be able to reach agreement on most disputed documents"); *id.* at 13 ("the parties and FRBNY should determine whether any privileged document disputes remain").  Starr never previously asked the United States to review and provide revised descriptions of every document withheld on the ground of the deliberative process privilege.[23]  Instead, on November 11, 2013, Starr sent a letter jointly to the United States and the FRBNY asking that we and the FRBNY re-review assertions of privilege, including the deliberative process privilege, over thousands of documents to ensure compliance with the Court's rulings relating to waiver.  Letter from A. Rutherford to M. Scarlato and J. Spain & Exs. A-B (Nov. 11, 2013) (Ex. 13).  The United States promptly began to act on Starr's request.  In December 2013, the United States completed the agreed-upon review in response to Discovery Order 6 and included in its production numerous documents previously withheld or redacted on the basis of the deliberative process privilege.  *See, e.g.*, Letter from M. Scarlato to D. Boies (Dec. 20, 2013) (Ex. 14) (enclosing two DVDs

---

[23]    Indeed, the Court rejected most of Starr's arguments about the United States' assertions of the deliberative process privilege in Discovery Order 6.  *See* Discovery Order 6 at 6-12.

containing, *inter alia*, documents from the U.S. Department of the Treasury that the United

States previously withheld or redacted for privilege).  Starr has no basis to claim that the United

States did not re-review assertions of the deliberative process privilege until receiving Starr's

letter of February 19, 2014.

Instead, Starr's February 19, 2014 letter requested for the first time – long after the

review process agreed to by the parties in November and December 2013 was complete – that

the United States review documents described as "talking points" or "Q&A" documents on its

logs.  Letter from A. Rutherford to M. Scarlato, at 2 (Feb. 19, 2014) (Ex. 10).  Although this

request was late and extremely burdensome, the United States agreed, in the spirit of

cooperation, to undertake the review.  The United States produced or re-produced approximately

165 documents on April 8, 2014, in response to Starr's request.

In short, the United States has complied in utmost good faith with all of Starr's requests

that it re-review documents subject to the deliberative process privilege and has produced

documents consistent with the Court's guidance in Discovery Order 6.  Starr now seeks an order

compelling the United States to do far more than the parties ever agreed to do in resolving

disputes under Discovery Order 6.  That belated request is neither fair nor reasonable.

Moreover, Starr's assertion that "[t]he Government continues to redact or withhold

documents that are not pre-decisional," JSR at 51, is based on pure speculation.  None of the

documents that Starr identifies supports a conclusion that the United States' prior review of its

assertions of the deliberative process privilege under Discovery Order 6 was deficient.  *First*,

Starr argues that the portions of TREAS00231159 that describe, "in retrospect, actions taken on

Sunday[,] September 14, 2008," should be produced.  JSR at 51.  But that is precisely what the

United States produced; the portions of this document that concern actions taken with respect to

AIG on September 14, 2008 *are* unredacted. *Second*, the redactions to TREAS00197149, TREAS00197154, and TREAS00197158 protect real-time discussions of ongoing and evolving policy questions, not "how to explain and justify a decision *already made*," JSR at 51 (emphasis in original).

*Third*, Starr has never before asked the United States to re-review UST_PRIV_0002795, which was not included on the lengthy list of documents Starr asked the United States to re-review in November 2013 and which is not a "Q&A" or "talking points" document. *See* Letter from A. Rutherford to M. Scarlato and J. Spain & Exs. A-B (Nov. 11, 2013) (Ex. 13). There is no basis for Starr to ask the United States to re-review this document for the first time now. Nonetheless, in the interest of cooperation, the United States has reviewed UST_PRIV_0002795 and will unredact it to the extent it describes past agency actions regarding AIG.

Separately, Starr takes issue with the formatting of the United States' privilege logs. *See* JSR at 52. Starr claims to have been confused when the United States produced hundreds of documents in December 2013 without revising its privilege logs to show which documents had been produced for the first time or re-produced in light of Discovery Order 6. This issue was mooted months ago, when the United States sent Starr "a table identifying, by production number and privilege log row number, the documents that have been produced in response to Discovery Order 6," and "a table identifying, by production number and privilege log row number, the documents that have been fully or partially unredacted in response to Discovery Order 6." Letter from M. Scarlato to D. Boies, at 1 & App'xs A-C (Jan. 29, 2014) (Ex. 15).[24]

---

[24] Starr also notes that a number of the documents the United States produced on April 8, 2014 "are documents produced for the first time." JSR at 50 n.20. The United States transmitted an appendix matching these documents to entries on the Treasury privilege log on April 16, 2014. *See* Letter from M. Scarlato to D. Boies & Ex. A (Apr. 16, 2014) (Ex. 16).

The United States has produced millions of pages of documents from multiple sources – at great burden and cost – and it is not surprising or unreasonable for the United States to have served more than one privilege log covering those documents; in any event, the United States has been thoroughly cooperative in every instance in which Starr has claimed an inability to match produced documents to the privilege logs.[25]

Finally, Starr's request that the Court order the United States to "provide clarifying descriptions of . . . documents over which it continues to assert the deliberative process privilege," JSR at 53, ignores the fact that Starr already requested this relief and that the Court denied it. Specifically, Starr argued in the October 17, 2013 Joint Status Report that the Government had provided insufficient detail about the deliberative process privilege on its logs. Joint Status Report, Dkt. 166, at 3-4 (Oct. 17, 2013). The Court disagreed, instead holding that "taken together," the Treasury privilege logs and deliberative process privilege declarations "provide sufficient detail (the date, source, recipient, subject matter and nature of each document) to permit Starr to argue effectively against the privilege, and for the Court to assess the applicability of the privilege." Discovery Order 6 at 7-8. Starr has not provided any basis for the Court to revisit this determination.

In sum, Starr's requests for relief related to the United States' proper assertions of the deliberative process privilege are without merit and should be denied.

---

[25]     In light of the new complaints raised in Starr's JSR, the United States will, however, revise the April 11, 2014 BOG privilege log to remove inadvertent assertions of the deliberative process privilege. The log still will reflect that six documents will be withheld, and two documents redacted, on the basis of the deliberative process privilege. FRB018-00575320, FRB018-00577324, FRB018-00575328, and FRB018-00575337 contain the same content as FRB018-00575313 and will be withheld on the same basis; FRB018-00408054 and FRB018-00408095 contain the same content as FRB018-00408059 and will be withheld on the same basis; FRB018-00410155 contains the same content as TRE005-00004734 (Brookfield 006240) and will be redacted on the same basis; and FRB018-00545934 contains the same content as FRB029-00039636 and will be redacted on the same basis.

**III.     The Government's Collection and Production of Documents**

<u>*Plaintiff's Position*</u>

The inadequacy of the Government's document preservation, collection and production efforts has been the subject of numerous letters between the parties and submissions to the Court. Recent deposition testimony and review of newly produced documents confirm that Starr's concerns were well founded.  Starr requests that the Government be compelled to immediately produce the missing documents and undertake a complete audit of its collection and production efforts to determine conclusively what other documents have not been produced and what other evidence has been destroyed.

### A.  Documents Drafted Or Discussed By Former Federal Reserve Chairman Bernanke

Chairman Bernanke testified about the existence of numerous records which have not been produced in this litigation.  *First*, Chairman Bernanke testified that the Government calculated the costs and return on the Revolving Credit Facility made available to AIG in September 2008 as well as the costs and return on subsequent changes to the Credit Facility. Bernanke Dep. at 172:7-11, 173:14-174:15 (Ex. 17).  No document containing those calculations was ever produced in this litigation.  *See* Letter from A. Rutherford to B. Mizoguchi (Feb. 28, 2014) (Ex. 18).  Such documents would have been clearly responsive to Starr's November 2011 Document Request for "All documents concerning the cost to the Government and/or United States taxpayers of assisting AIG."  Starr's First Request for the Production of Documents, Request 7(f) (Ex. 39).  Starr's request that the Government produce *clearly responsive* documents in light of testimony from the Chairman of the Federal Reserve System that such documents exist was not a request that the Government go "beyond [its] discovery obligations," but rather a request that seeks compliance with those obligations.  Letter from M. Scarlato to D.

Boies (Apr. 11, 2014) (Ex. 19); JSR at XX.  These documents should have been produced

months ago, and Starr requests the Court order the Government to produce them within seven

days of its ruling on this request.

      *Second*, documents produced shortly before Chairman Bernanke's deposition confirmed

that, despite the Government's previous representations to the contrary, the Board of Governors

met several times in September 2010 to discuss AIG and the upcoming Recapitalization of AIG,

a transaction which was executed in January 2011.  Letter from A. Rutherford to B. Mizoguchi

(Feb. 28, 2014) (Ex. 18); PX 1374 (Ex. 20) at 52-60; FRB032-00000418 (Ex. 21).  The parties

had previously agreed, based on the Government's representation that the Board of Governors

had no involvement in the 2011 Recapitalization of AIG, that the Government would not search

for BOG documents related to that transaction.  Letter from A. Rutherford to B. Mizoguchi (Feb.

28, 2014) (Ex. 18).  However, testimony and documents produced from BOG have established

that this representation was inaccurate and that the Board of Governors and/or BOG staff met on

several occasions in September 2010 to discuss AIG and the upcoming recapitalization

transaction.  *Id.*  The Government is incorrect that this request is "untimely" or "unduly

burdensome."  Letter from M. Scarlato to D. Boies (Apr. 11, 2014) (Ex. 19).  To the contrary, the

request is responsive to Plaintiff's initial document requests, is narrowly tailored to documents

related to meetings that took place during a single month, and is necessarily coming at this point

in time now that discovery has revealed those meetings took place.  To be clear, Starr does not

demand that the Government run a search against all documents using the full litany of search

terms relevant to the 2011 Recapitalization, but a tailored search for documents related to the

September 2010 meetings of which the parties are now aware.  Given this, the Government is

obligated to produce at least the documents related to meetings which occurred, and should be ordered to do so within seven days.

*Third,* the Government has yet to produce drafts and notes from Mr. Bernanke's speeches, writings, and testimony, which it claimed it only just discovered minutes before the commencement of Mr. Bernanke's deposition.[26]  Letter from A. Rutherford to B. Mizoguchi (Feb. 28, 2014) (Ex. 18).  The parties agreed at the deposition that once these documents were produced there may be additional testimonial discovery needed from Mr. Bernanke but the Government has yet to produce the relevant documents.

*Fourth,* Chairman Bernanke testified that his assistant kept a log of all of his telephone calls, which was never produced in this litigation despite being clearly responsive to Starr's document requests.  *See* Letter from A. Rutherford to B. Mizoguchi (Feb. 28, 2014) (Ex. 18); Bernanke Dep. at 216:20-219:14 (Ex. 17).  The United States subsequently produced select pages of the Chairman's daily telephone log reflecting calls that were "clearly AIG-related" or "potentially AIG-related," but cannot articulate any methodology it used to make that determination.  *See* Letter from M. Scarlato to D. Boies (Apr. 11, 2014) (Ex. 19).  Without an appropriate procedure to determine which phone calls were in fact related to AIG, the Government has no justification for withholding the complete handwritten telephone logs and should produce the logs in their entirety.

*Finally*, the Government has never produced transcripts, audiotapes, documents, notes, or other materials related to Federal Open Market Committee ("FOMC") meetings and phone calls in this litigation.  The recently released transcript of the September 16, 2008 meeting confirms

---

[26] In response to the subpoena served on Chairman Bernanke, the Government has produced documents related to Chairman Bernanke's forthcoming book, but nothing related to the speeches collected in his previous book, his Congressional testimony, or any other written or oral presentation Mr. Bernanke made.

that the FOMC discussed AIG at that meeting.[27]  *See* PX 1350 (Sept. 16, 2008 FOMC Tr.) at 5-6

(Ex. 23) (discussing the "AIG problem" and expanding the PDCF and TSLF).  Notwithstanding

the Government's argument to the contrary, the transcript is clearly relevant to this litigation and

there is no justification for the Government's failure to produce the transcript.

Defendant has been on notice for months that Plaintiff sought audiotapes and/or

transcripts of relevant meetings.  Letter from A. Rutherford to M. Scarlato (Nov. 15, 2013) (Ex.

24) (noting that document collection 30(b)(6) witnesses were unprepared to testify whether "any

audiotapes of Board of Governors meetings were collected in Project Collect").  The

Government only now asserts extreme secrecy as justification for withholding transcripts from

the FOMC, which it admits is part of the Federal Reserve System.  That belated excuse does not

explain why transcripts from 2008 and 2009 have not been released or were only released

belatedly, and is wholly unconvincing when deployed to justify withholding documents which

will be publicly released by the end of this calendar year.  Most troubling about the

Government's excuse is that it reveals the Government did not even review potentially relevant

materials until 2014 when prompted by Starr.

If there is a record of any other FOMC conversation from 2009 – 2011 in which the

FOMC discusses AIG or assistance to other institutions,[28] it should have been produced and

must now be produced as soon as possible as responsive to Starr's requests for the production of

documents related to AIG, the United States' policies on emergency lending, assistance to other

---

[27] All FOMC meetings and phone calls are recorded, transcribed, and released five years later.
Bernanke Dep. (Ex. 17) at 222:4-21.  The September 16, 2008 transcript accordingly should have
been released in September 2013 but was only released in February 2014.  Jon Hilsenrath, *New
View into Fed's Response to Crisis*, Wall Street Journal, Feb. 21, 2014,
http://online.wsj.com/news/articles/SB10001424052702303775504579396803024281322 (Ex.
22).
[28] Since the Government nonsensically attempts to draw a distinction between a "policy call" and
a "briefing," Starr uses the broadest language here to ensure it receives *all* relevant records.

financial institutions, or its interpretation of its authority under the Federal Reserve Act.  These too should be produced within seven days.

### B. Chairman Bernanke's Deposition Also Revealed Violations of Document Collect And Production Procedures.

In addition to the failure to produce the above records, Chairman Bernanke's deposition testimony confirmed that the United States failed to comply with other basic discovery obligations.  His testimony referred to slides prepared in connection with lectures he gave in March 2012, and notes he wrote on some version of those slides which he later destroyed.  Bernanke Dep. (Ex. 17) at 50:11-51:5.  Chairman Bernanke also testified that he personally received no instruction on the preservation of documents relevant to this litigation.  Bernanke Dep. at 51:6-12 (Ex. 17) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The Government's response to this and the other aforementioned failures is simply "no harm no foul" or a claim that Mr. Bernanke misspoke.  Letter from M. Scarlato to D. Boies (Apr. 11, 2014) (Ex. 19).  Both of these responses are belied by the facts and testimony.

The Government's baseline failure to ensure proper preservation of responsive or relevant documents included the obligation to provide preservation instructions to key custodians.  The Government's failure to issue a litigation hold notice to the BOG until November 2012, one year after this litigation was filed was itself a failure of the obligation to preserve. *Micron Technology, Inc. v. Rambus, Inc.,* 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("The duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'")

(quoting and citing *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001).

Chairman Bernanke's testimony revealed that this failure was compounded by the Government's

failure to ensure compliance with the duty to preserve through, among other things,

communication with key custodians such as Chairman Bernanke. *See Zubulake v. UBS Warburg

LLC (Zubulake V),* 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *see also E.I. du Pont de Nemours &

Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 500–01, 05 (E.D. Va. 2011) (finding breach of

duty where "company failed to stress the importance of preservation to certain key employees

with highly relevant information" leading to intentional destruction of relevant documents).

There is no evidence that Chairman Bernanke misspoke.  This testimony confirms that the

Government failed to fulfill its obligation to preserve and collect potentially relevant documents

and information and that Starr has been deprived of that evidence.  Moreover, there is significant

evidence that relevant documents have not been produced.

### C.  Deficiencies In the Congressional Oversight Panel Production

Lapses in the Government's compliance with its discovery obligations are not limited to

the BOG.  There are significant gaps in the production of documents from the Congressional

Oversight Panel ("COP").  In July 2013 Starr noted that documents produced from the COP

consisted almost entirely of wholly irrelevant documents and were notably devoid of documents

related to the 17 reports produced by the COP.  *See* Letter from A. Rutherford to M. Scarlato

(July 19, 2013) (Ex. 25).  Subsequent production of additional documents from the COP did not

cure the deficiency.  COP staff prepared notes and memoranda of their interviews with relevant

actors, which were cited as source material in the COP's June 10, 2010 Oversight Report on AIG

(the "Report"), but were not all produced in this litigation.  *See, e.g.*, COP031-00039958 (Ex. 26)

(record of May 25, 2010 COP staff interview of Warren Buffet); PX 20 at 60, n. 182 (Ex. 27)

(citing Warren Buffet interview).  For instance, there is no memorandum summarizing the May 11, 2010 COP staff interview of senior FRBNY officials, even though it is cited in the Report, PX 20 at 63, n. 202 (Ex. 27), and FRBNY notes of the meeting exist.  FRBNY-STARR(CFC)-0479062 (Ex. 28).  All such memoranda should have been archived in accordance with the COP's plan to preserve its records, *see* COP031-00039550 (Ex. 29), and all such memoranda should have been produced – not just a select few.  It seems highly unlikely that the records of a Congressional investigative panel were haphazardly preserved in such a way that documents cited as source material in the panel's report are not preserved with all of the panel's files.

### D.  The Government's Most Recent Document Production

On April 1, 2014, the Government requested a meet and confer with Starr in which it revealed that it had "recently discovered" additional non-duplicative BOG documents that it had failed to produce due to a "technical error."  Those documents were produced to Starr on April 10, 2014 and a supplemental privilege log followed on April 11, 2014.  Because this is at least the fourth such "discovery" of documents and due to the host of collection and production deficiencies discussed in previous JSRs, Starr wants to ensure that there is some finality to the Government's document production and that Starr is not still receiving documents on the eve of trial.  As a result, Starr requested that the Government undertake a full review of its document collection and production practices and provide a written description of its endeavors to ensure that the Government's collection and production efforts have been complete and thorough. Letter from A. Rutherford to M. Scarlato (Apr. 10, 2014) (Ex. 30).  The Government refused Starr's request. Letter from M. Scarlato to D. Boies (Apr. 15, 2014) (Ex. 31).

The Government is incorrect in characterizing a routine document collection Rule 30(b)(6) deposition as equivalent to a comprehensive audit of the mechanisms and procedures

put in place to ensure the preservation, collection, and production of relevant documents.  JSR at

XX.  This is a particularly inappropriate comparison where, as here, the deponents were

unprepared to answer questions about their document collection efforts and production efforts.

For instance, at that deposition, the witnesses could not describe the process any agency used to

review relevant documents.  *See, e.g.,* U.S. 30(b)(6) (Gonzalez) Dep. at 50:2–14; 52:8–20 (Ex.

32) ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████  U.S. 30(b)(6) (Foster) Dep. at 53:2–9 (Ex. 32) ███████  Moreover, that

deposition confirmed that the Government failed to adhere to basic document discovery

standards.  Starr learned for the first time through this deposition that the vast majority of

documents produced by the BOG in connection with this litigation were collected for a different

purpose before this case was commenced between April 2009 and February 2011 as part of

"Project Collect."  U.S. 30(b)(6) (Gonzalez) Dep. at 19:13-21:13, 25:6-26:7 (Ex. 32) ██████

████████████████████████████████████████

████████████████████.[29]  Starr agreed not to file a motion for

_____

[29] Project Collect was not conducted in a manner that would meet the standards of civil

sanctions based on testimony of various discovery deficiencies in exchange for the Government's assurances that the deficiencies would be rectified.  Four months later, however, the Government continues to "discover" or "locate" relevant material which was inadvertently excluded from review and production.

In light of these lapses (in addition to those Starr has previously noted to the Government and to the Court), it is imperative that the Government fully audit its collection and production efforts to confirm whether any evidence was destroyed and to ensure that Starr received all evidence to which it is entitled.[30]  *See, e.g., Wingnut Films, Ltd. v. Katja Motion Pictures Corp.*, No. 05-1516, 2007 WL 2758571, at *18-19 (C.D. Cal. Sept. 18, 2007) (party which repeatedly certified purported compliance with discovery orders and did not conduct a diligent search for electronic documents was required to retain an outside vendor to collect and search documents).

### ***Defendant's Position***

discovery



---

[30] The United States is similarly incorrect to argue that its good faith efforts preclude the entry of an order compelling an audit of its preservation, collection, and production procedures.  *See, e.g., Linde v. Arab Bank PLC*, 269 F.R.D. 186, 2010) (noting that "a court may impose sanctions" "even if it does not find bad faith or willful conduct"); *In re Seroquel Prods. Liability Litig.*, 244 F.R.D. 650, 655 (M.D. Fla. 2007) (Sanctions may be granted against a party under Rule 37(b)(2) if there is noncompliance with a court order, notwithstanding a lack of wilfulness or bad faith, although such factors 'are relevant ... to the sanction to be imposed for the failure.'").

Fact discovery closed about four months ago.  Nevertheless, Starr persists in its pattern and practice of relying upon exaggeration and speculation to cast aspersions on the United States' extraordinary, good faith efforts to satisfy its enormous document discovery burdens in this case (burdens that dwarf Starr's).  Indeed, Starr's latest challenges play at the fringes by attempting to bootstrap the recent deposition of Dr. Ben Bernanke to lodge mostly *new* requests *after* the close of fact discovery.  This is a misuse of the discovery process that should not be allowed.

Furthermore, Starr seeks the extraordinary, if not unprecedented, relief that the United States conduct a "full review" of its document production efforts to date – efforts that have resulted in the production of millions of pages of documents from numerous Governmental entities.

As explained below, Starr's latest complaints are unfounded, and, in fact, demonstrate that the United States has gone above and beyond its obligations under the RCFC to accommodate Starr's requests and seek a fair and efficient resolution to fact discovery.  Yet Starr's persistence on these issues has wasted the parties' limited resources, and now the Court's.  We respectfully submit that the Court should put an end to any further document discovery sideshows and permit the parties' focus to remain on an upcoming trial on the merits.

A.      **Ben Bernanke's Testimony Does Not Support Any New Document Production**

Starr erroneously relies upon testimony from Dr. Bernanke to persist in seeking several categories of additional documents from the United States.

*First*, Starr asserts that Dr. Bernanke testified that the United States "calculated the costs and return on the Revolving Credit Facility."  JSR at 58.  Dr. Bernanke never confirmed the existence of documents calculating the costs and return of the AIG Revolving Credit Facility;

when asked, if he had ever seen ██████████████████████████████ he testified

██████████████████████ Bernanke Tr. 173:14-16 (Ex. 17).  Despite the tentative nature of this

testimony, Starr requested that we produce such documents.  Although document discovery had

concluded, we conducted a new search of BOG documents, *and* we went beyond our discovery

obligations and made inquiries of BOG officials who would be best positioned to know if such

documents existed, but no such documents were located.  In addition, Starr had asked similar

questions in interrogatories, to which we have responded.  *See* Def. Resp. & Obj. Pl. Third

Interrogs., No. 18 (Ex. 34).  Based upon our reasonable efforts outside of the discovery period to

locate such documents, this Court should lend no weight to Starr's continued complaint.

*Second*, Starr complains that we misrepresented that "the Board of Governors had no

involvement in the 2011 Recapitalization of AIG."  JSR at 59.  Starr misconstrues our prior

statements regarding the BOG's involvement in the January 2011 recapitalization of AIG

(Recapitalization).  When negotiating the parties' search-term agreement limiting a search

regarding the Recapitalization to exclude BOG, we explained that BOG was not a "principal" in

the Recapitalization, and had no "substantive involvement" in the recapitalization -- not that

BOG had absolutely no knowledge of awareness of it.  *See* Email from M. Scarlato to A.

Rutherford (June 25, 2013) (Ex. 35).  Now that we have developed a voluminous evidentiary

record in this case, that statement still holds true.  Indeed, all Starr raises now is a few documents

reflecting meetings in which BOG officials may have discussed the Recapitalization.  Yet those

meetings were with – or in preparation for meetings with - the principal entities involved –

Treasury and FRBNY – and Starr has had a full opportunity to obtain documents regarding the

Recapitalization from these entities, as well as from AIG.[31]   In addition, the BOG has produced

documents reflecting its one vote relating to the Recapitalization, which was pursuant to a

*Treasury* proposal that required a certain limited authorization from BOG to permit *FRBNY* to

carry out the Recapitalization.   *See* FRB044-0000001 (Ex. 36).   Thus, at this time, Starr raises no

basis to justify the reopening of the parties' search-term agreement.

     *Third*, Starr overstates its claims that the United States "just discovered" documents from

Dr. Bernanke, and that there are additional documents that we have yet to produce.   JSR at 60.

The "just discovered" documents to which Starr refers consist of documents relating to his book-

in-progress that Dr. Bernanke *just created* days before his deposition – a fact of which Starr

should be aware.   Nor are there additional documents from Dr. Bernanke that we have yet to

produce; we informed Starr over a month ago that we had produced the documents we obtained

from Dr. Bernanke.   *See* Ltr. from M. Scarlato to D. Boies (Mar. 11, 2014) (Ex. 37).   Thus, not

only should Starr not be permitted to continue to seek documents from Dr. Bernanke, but Starr

should be precluded from any attempt to seek further testimonial evidence from Dr. Bernanke at

this time.[32]

     *Fourth*, Starr incorrectly notes that we have not "articulate[d] any methodology" by

which we produced Dr. Bernanke's telephone log.   JSR at 60.   As we previously explained, we

---

[31] These meetings were not, as Starr claims, meetings of "the Board of Governors."   With
the exception of the September 29, 2010 Board of Governors meeting on the Recapitalization,
the minutes of which Starr has received, the records reflect two meetings with Chairman
Bernanke and Board of Governors staff, and one meeting at Treasury attended by Chairman
Bernanke and Board Staff.   PX 1374 at 52-60 (Ex. 20).

[32]     Moreover, to the extent Starr suggests that the United States has not produced documents
relating to Dr. Bernanke's speeches, writings, and testimony, we can affirm that BOG has, in
fact, produced such documents (or claimed privilege) to the extent they were within the agreed-
upon universe of our production of documents in this case.   Indeed, we have already identified
numerous such documents for Starr.   *See* Ltr. from M. Scarlato to D. Boies, at 2 & Ex. A (Feb.
26, 2014) (Ex. 38).

produced Dr. Bernanke's telephone log "for any entry that was clearly AIG-related based upon either identified subject matter or the individual contacted, or even potentially AIG-related based on the fact that they occurred in the critical September 2008 timeframe." Ltr. from M. Scarlato to D. Boies, at 4 (Apr. 11, 2014) (Ex. 19) (emphasis added).[33] We fail to see how that standard is unclear.

Moreover, in so doing, we again went beyond the bounds of our discovery obligations. Starr's document requests, as limited by our objections, did *not* call for Dr. Bernanke's telephone logs. *See* Def. Resp. & Obj. Pl. First Req. Prod. Doc., No. 6 (Ex. 39) (objecting to Starr's request for "*all* communications regarding AIG" as vague, overbroad, and unduly burdensome and thus we would "respond to this request only on the basis of the [13] individual subparts (as limited by the general introductory language") (emphasis added). Starr never challenged this objection, nor did Starr make any request for Dr. Bernanke's telephone logs until the eve of Dr. Bernanke's deposition. *See* Ltr. from A. Rutherford to B. Mizoguchi (Feb. 24, 2014) (Ex. 40). Nevertheless, in an attempt to avoid further discovery disputes that might require additional testimonial evidence from Dr. Bernanke, we exercised our discretion and produced Dr. Bernanke's telephone logs and other documents. Thus, once again, Starr's complaints show only our good-faith compromises to resolve document disputes that should now be settled, and Starr has no basis to burden the United States or this Court with its untimely requests for more.[34]

---

[33]    Starr appears to have taken a similar, and seemingly less broad, approach in its production of similar documents from Starr employees, producing only pages that appear to reflect AIG-related information.

[34] Our efforts to go above and beyond to settle all document disputes also includes other issues Starr does not raise before the Court. For example, after the close of fact discovery, Starr requested two memoranda cited in another document produced in discovery that dated back to the 1960s. *See* Ltr. from A. Rutherford to M. Scarlato (Feb. 26, 2014) (Ex. 41). Despite being clearly outside the relevant time period of discovery as well as after the close of fact discovery,

**B.      Starr's Request For Documents From The FOMC Is Untimely And Unduly Burdensome**

The United States respectfully requests that this Court reject Starr's request to obtain

documents from the Federal Open Market Committee (FOMC).  As explained below, Starr's

request is untimely, irrelevant, unduly burdensome, and would undermine the strict

confidentiality of FOMC deliberations.

*First, Starr's request for FOMC transcripts is untimely*.  From the outset of discovery,

the United States has been clear as to the entities from which it would be producing documents.

Our responses to Starr's first document requests specifically limited the scope of Starr's

definitions of the "defendant" and "Government" "to the extent that it includes any Government

agencies, offices, bodies, affiliates, contractors, consultants, or individuals other than the

Department of the Treasury and the Board of Governors."   *See* Resp. to Pl. First Req. Prod.

Doc., Gen. Obj. 1 (Oct. 9, 2012) (Ex. 39).   After further disputes with Starr regarding our

various objections, we agreed to include additional entities, but we never agreed that we would

produce documents from the FOMC.  *See, e.g.,* Ltr. from J. Roberson to R. Dwyer, at 4 (Dec. 11,

2012) (Ex. 43) (stating that "we are not going to contact every Federal agency with your

document requests," identifying organizations provided with Starr's requests, none of which

were the FOMC, and requesting that "[i]f you believe that there are other Federal executive

branch agencies that are likely to have documents related to this litigation please let us know as

soon as possible").  Starr never further challenged our position.

In addition, the FOMC is a highly visible Federal agency that Starr should have been

aware of since the outset of discovery.  If there were any doubt, the FOMC was also discussed at

we produced these two memoranda in the interests of compromise.  *See* Ltr. from M. Scarlato to
A. Rutherford (Mar. 7, 2014) (Ex. 42).

the August 16, 2013 deposition of Donald Kohn, Vice-Chairman of the BOG in 2008.  *See* Kohn

Tr. at 233:3-14 (Ex. 44).  Yet Starr never raised any issue relating to the FOMC at that time.

It was not until the FOMC's 2008 transcripts were publicly released on February 24,

2014 in accordance with the FOMC's regular practice – over two months after the close of fact

discovery –that Starr first requested transcripts of FOMC meetings.  See Ltr. From A. Rutherford

to B. Mizoguchi (Feb. 24, 2014) (Ex. 40).  However, given our long-standing objection to Starr's

definitions of "defendant" and "Government," and that Starr was on notice of the FOMC since

August 2013 – if not earlier – the public release of the FOMC's 2008 transcripts is not a

legitimate basis for Starr to seek FOMC documents after the close of fact discovery.

*Second, Starr's request is unduly burdensome and irrelevant*.  The FOMC is part of the

Federal Reserve System along with BOG and FRBNY, but the FOMC is a separate Federal

agency whose function – to regulate monetary policy, *see* 12 U.S.C. § 263 – bears no relevance

to this litigation.  Starr's takings and illegal exaction claims concern actions by two Federal

agencies, the BOG and Treasury, which, along with the FRBNY, took actions to rescue AIG

beginning in September 2008.  In contrast to these entities, the FOMC had no authority to take

any action with respect to AIG, and it was not involved in the decision making regarding any

aspect of the AIG rescue.  Simply, the FOMC has no authority pursuant to Section 13(3) of the

Federal Reserve Act.  That was a BOG function.[35]

---

[35]    Starr further attempts to confuse the issue by alleging that that "[d]efendant has been on
notice for months that Plaintiff sought audiotapes and/or transcripts of relevant meetings."  JSR
at XX.  However, Starr cites to a letter regarding audiotapes of BOG meetings, not meetings of
the FOMC.  Letter from A. Rutherford to M. Scarlato (Nov. 15, 2013) (Ex. 24)The FOMC was
*not* subject to the November 30(b)(6) deposition concerning document collection and production
issues, and Starr is simply conflating the FOMC with the BOG, which is a *different Federal
agency*.  Moreover, we have already explained to Starr that the BOG does not make audiotapes
or transcripts of potentially relevant meetings on several occasions – including in the errata to
BOG's testimony – because such discussions are exempt from the recording requirements of the

Testimony from BOG officials demonstrates this distinction.  Coincidentally, the FOMC held a meeting on the morning of September 16, 2008 – the day the BOG authorized and the FRBNY extended the rescue to AIG – and Mr. Kohn testified that he had to *leave* that FOMC meeting to meet with other BOG members to discuss the possibility of a loan to AIG.  Kohn Tr. 16:14-18 (Ex. 44).  Similarly, Dr. Bernanke, then BOG Chairman, testified that the BOG voted to authorize the loan to AIG *after* the FOMC meeting.  Bernanke Tr. 17:2-7 (Ex. 17).

The separateness and irrelevance to this case of the FOMC is also corroborated by the recently released transcript of the September 16, 2008 FOMC meeting.  Despite the fact that it occurred only hours before the BOG authorized and the FRBNY extended the rescue to AIG, the transcript reveals that Federal Reserve Board governors and staff attending the FOMC meeting never so much as alluded to the possibility that the BOG would be authorizing a loan to AIG that very day.  *See* Sept. 16, 2008 FOMC Transcript.[36]

Starr's contrary position is that the FOMC is relevant simply because AIG was generally "discussed" at FOMC meetings to a limited extent.  JSR at 61.  The September 16, 2008 FOMC meeting transcript; however, reveals that AIG was discussed in the context of updating the Committee on a number of stresses in the financial markets that were occurring at the time.  *See* Sept. 16, 2008 FOMC Transcript at 5.  By that standard of "relevance," almost every Federal agency may have been included in discovery in this case.  Indeed, given the magnitude of AIG's role in the global economy during the relevant period, it is likely that numerous other irrelevant Federal agencies had discussions about AIG in the course of carrying out their responsibilities.

---

Government in the Sunshine Act, 5 U.S.C.  552b.  *See* Ltr. M. Scarlato to D. Boies (Apr. 11, 2014) at 2-3 (Ex. XX).  Yet, again, Starr persists in ignoring our explanations and bringing baseless arguments before this Court.

[36]     *Available at* http://www.federalreserve.gov/monetarypolicy/files/FOMC20080916meeting.pdf (last visited on April 16, 2014).

Yet even assuming such discussions occurred at such an agency, or even that many such discussions occurred, that agency would remain irrelevant to this litigation because it had no responsibility or oversight of AIG for the events at issue in this case.  The same holds true for the FOMC.

Accordingly, Starr fails to demonstrate any reason that it is entitled to FOMC materials.

*Third, any claimed tangential relevance of the FOMC is outweighed by the strict confidentiality of the FOMC's deliberations.*  When a party seeks confidential information in discovery, the Federal courts weigh a claim of secrecy against the need for disclosure.  *See, e.g., FOMC v. Merrill,* 443 U.S. 340, 362 (1979).  The FOMC has a strict protocol for the dissemination of FOMC materials, given the commercially sensitive nature of the FOMC's deliberations.  Indeed, the FOMC is charged with setting U.S. monetary policy, including adjusting short-term interest rates in response to economic conditions.  These actions have an enormous impact upon global markets, and in reaching these decisions, the FOMC must consider highly sensitive commercial information that must be closely guarded from the marketplace.

Accordingly, the FOMC has strict protocols requiring that most FOMC material be held confidential for "about five years," after which it is either released publicly or determined to remain too sensitive to be released.  *See* Program for Security of FOMC Information, § V.[37] Prior to that time, FOMC material may not even be shared within the Federal Reserve System absent explicit authorization.  *Id.* § IV.  Given the highly sensitive nature of FOMC material, this Court should weigh Starr's need to obtain FOMC material against the FOMC's great need to maintain confidentiality over sensitive deliberations.  As demonstrated above, Starr has proffered

---

[37] *Available at*
http://www.federalreserve.gov/monetarypolicy/files/FOMC_InformationSecurityProgram.pdf.

*no* reason to obtain such materials, which starkly contrasts with the FOMC's need to maintain secrecy over its deliberations.

Furthermore, the FOMC has consistently maintained that its transcripts and other materials are protected by the deliberative process privilege.  Thus, even if subject to discovery, counsel for the FOMC has affirmed that the FOMC would assert privilege over all substantive discussions in FOMC documents.   Such assertions should therefore result in Starr receiving little, if any, substantive information from the FOMC.

Accordingly, we respectfully submit that the Court should deny Starr's attempts to belatedly seek FOMC material.

**C.    Chairman Bernanke's Deposition Did Not Reveal Any "Violations" Of Document Collection And Production Procedures.**

Starr next argues that Dr. Bernanke's deposition confirms that the United States failed to comply with our "basic discovery obligations."  JSR at 62.  Not so.  The BOG has taken reasonable efforts to ensure the preservation of potentially relevant materials for this case.  Like other potentially relevant BOG custodians, Dr. Bernanke did, in fact, receive the BOG's litigation hold notice for this case, as did his assistant who maintained his files; the fact that he evidently forgot this in the intervening time before his deposition is hardly surprising.  Furthermore, Dr. Bernanke was subject to the same existing retention policies as other BOG employees that required documents relating to AIG and the financial crisis generally to be retained since *2009*.  Indeed, Dr. Bernanke testified that ███████████████████  Bernanke Dep., Tr. 51:8-12 (Ex. 17).

As its only evidence to the contrary, Starr relies on Dr. Bernanke's testimony that he ███████████████ on slides relating to a wide-ranging, four-day lecture he gave to college students in March 2012 regarding the full history of the Federal Reserve and its response to the

financial crisis.  Bernanke Dep., Tr. 50:20-21 (Ex. 17).[38]  It is not clear that such notes ever

existed, and even if they did, there is no evidence that they would have been relevant or

responsive to Starr's requests given the wide scope of Dr. Bernanke's lectures.   Moreover, any

such notes would not have been discoverable because they were created outside the relevant date

range of discovery in this case, which ended over a year earlier in January 2011.

Similarly, Starr's broader complaint about the BOG's preservation efforts are without

merit.  As we have previously explained, the BOG began preserving and collecting documents

relating to AIG and the financial crisis generally in *2009* – years before Starr filed its complaint.

*See* Joint Status Report, Dkt. 208, at 13 (Jan. 15, 2014) (citing Jason Gonzalez RCFC 30(b)(6)

Dep, Tr. 36:2-14).  Thus, that Dr. Bernanke *may* have scribbled a few notes that *may* have related

to AIG, and that *were* outside the relevant timeframe, does not undermine the BOG's wide-

ranging efforts to preserve, collect, and produce hundreds of thousands of pages of documents in

accordance with its discovery obligations in this case.

Furthermore, Starr does not, and cannot, make any claim of prejudice – which, as

supported by the authority Starr cites, is an essential element to requesting any relief based upon

an allegation that a party failed to meet its discovery obligations.  *See, e.g., Silverstri v. Gen.*

*Motors Corp.,* 271 F.3d 583, 593 (Fed. Cir. 2011); *Zubulake v. UBS Warburg LLC*, 229 F.R.D.

422, 439 (S.D.N.Y. 2004); *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 803 F. Supp. 2d 469,

499-500 (E.D. Va. 2011).  Nor does Starr acknowledge that the authority it cites considers the

level of culpability involved, and the United States has *never* intentionally concealed any

relevant evidence.  *See, e.g., Zubulake*, 229 F.R.D. at 430.  Indeed, as explained to the Court

above and in responding to Starr's numerous other accusations throughout discovery, the United

---

[38]    *See* http://www.federalreserve.gov/newsevents/lectures/about.htm (last visited on April
16, 2014)

States has diligently worked in good faith to produce all relevant evidence to Starr while facing enormous burdens posed by discovery in this litigation.  All of these factors weigh heavily against Starr's claims that it deserves any relief at this time.

### D.      There Are No "Significant Gaps" In Our Production Of COP Documents

The United States first became aware of Starr's latest complaint regarding alleged deficiencies in our production of COP documents upon receiving Starr's draft JSR on April 14, 2014.  It is unclear why Starr chose not to first contact the United States to discuss any such concerns.  Starr claims that the United States failed to produce "notes and memoranda" of COP interviews with relevant actors.  In so doing, Starr cites a document *we did, in fact produce*.  JSR at 63 (citing COP031-0039958).  Yet Starr further speculates that other notes and memoranda may exist, citing but a single document that is referenced in the COP's June 10, 2010 Oversight Report.

After receiving this belated complaint, we researched our production of COP documents, and found 10 documents – most of which were not memoranda to which Starr refers – that were inadvertently not produced in the course of our processing of COP documents for production. We produced the 10 documents on April 16, 2014 – two days after learning of Starr's complaint. Letter from M. Scarlato to D. Boies (Apr. 16, 2014) (Ex. 45).  We also contacted officials at the National Archives and Records Administration (NARA), who confirmed that that we received all COP electronic files, as well as paper files identified by COP as AIG-related that COP sent to NARA for archiving in April 2011.

In addition, Starr is incorrect that the COP production consists of "wholly irrelevant" documents.  We produced the responsive documents that COP sent to NARA, which totaled

nearly 25,000 pages.  That production contains various documents reflecting the COP's

investigation of AIG, including the document Starr cites.[39]

### E.  Our Most Recent Document Production of BOG Documents, or Any Other Circumstance, Does Not Warrant a "Full Review" of the United States' Document Production Practices

Finally, Starr complains about the United States' recent production and logging of

roughly 12,000 pages of documents from the BOG and seeks "some finality" in our document

production by requesting that the United States undertake "a full review of its document

collection and production practices and provide a written description of its endeavors to ensure

that that the Government's collection and production efforts have been complete and thorough."

JSR at 64.  We decline Starr's request, and this Court should reject Starr's claim for such relief.

Although we recently discovered a technical error in our document de-duplication

processes for BOG email and electronic documents, the scope of this error was readily

identifiable and did not affect any other document production.  We acted swiftly to correct the

problem, which has now been resolved.[40]  In addition, we exercised great caution and worked

with our document vendor to conduct a re-review of our production process for electronic BOG

and email documents, and we have conducted a reasonable inquiry and determined that all

responsive, non-privileged BOG documents have been produced in accordance with our

discovery obligations.  This process constituted the very type of "full review" that Starr requests.

Furthermore, in response to Starr's recent complaints about our COP documents, we conducted a

---

[39]   Even excluding the documents previously complained about by Starr as irrelevant, the COP production consisted of over 17,000 pages of documents.

[40]   It is also noteworthy that this production and logging process involved a very small fraction of the total documents we produced or logged from the BOG.  In addition, given the nature of the technical error, many of these documents are similar to, if not identical to, documents we had already produced and/or similar to one another.

similar review, and, after a reasonable inquiry, have confirmed that we have produced all responsive COP documents. This is all that RCFC 26(g)(1) requires. *See, e.g., Moore v. Publicis Groupe & MSL*, 287 F.R.D. 182, 188 (S.D.N.Y. 2012) ("In large-data cases like this, . . . no lawyer using any search method could honestly certify that its production is 'complete' -- but more importantly, Rule 26(g)(1) does not require that.")

In addition, Starr has *already* conducted a very extensive review of the entirety of our document production processes. Most notably, in November 2013, each relevant entity submitted to a wide-ranging RCFC 30(b)(6) deposition covering these very topics. Starr had every opportunity during those depositions to ask questions about our document production processes. Starr has also persistently raised various document-related issues in letters among counsel, and we have been steadfastly transparent and open in addressing the issues Starr raises. Starr also agreed not to further challenge any prior complaints about our methods in our document review and production processes as part of the parties' December 11, 2013 Rule 502(d) agreement, Dkt. No. 191, which was approved by this Court. Dkt. No. 192.[41]

Given these efforts, we believe that our document collection and production processes have already been subject to extraordinary – if not unprecedented – scrutiny. We therefore fail

---

[41] Starr alleges, without basis, that its document 30(b)(6) deposition did not provide any of the benefits of its requested discovery audit because the Government's 30(b)(6) witnesses were purportedly unprepared. That is patently false, as we explained in full in several letters following the deposition. *See* Letter from M. Scarlato to D. Boies (Nov. 22, 2013) (Ex. 33), Letter from B. Mizoguchi to D. Boies (Dec. 5, 2013) (Ex. 47). Between the testimony provided by the Government witnesses at the 30(b)(6) deposition and the additional responses provided by letters following the deposition (and otherwise), the Government fully responded to all of Starr's questions and demonstrated an extraordinary level of cooperation. Further, if there were any remaining lack of clarity, Starr could have sent letters to counsel at that time, but it instead chose to resolve all disputes pursuant to the parties' December 11, 2013 Rule 502(d) agreement. Yet at this time, Starr seeks to rehash, once again, the purported failings of the Government witnesses during Starr's document deposition. We respectfully submit that any further nitpicking is baseless and untimely.

to see how Starr's request for a "full review" of the entirety of the United States' document

production efforts is warranted.  This is an extraordinary request that the Federal courts rarely, if

ever, have allowed.  *See, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No.

09-7666, 2013 WL 791432, at *5 (N.D. Ill. Mar. 4, 2013) (denying discovery audit request and

holding that an audit "is appropriate only in egregious cases") (citing *Multifeeder Tech., Inc. v.*

*British Confectionary Co.*, No. 09-1090, 2012 WL 4135848, at *1 (D. Minn. Sept. 28, 2012)).

At the same time, it is quite common for document production issues to arise, particularly

in complex cases involving wide-ranging document discovery from numerous sources.  Indeed,

the Federal courts have widely acknowledged that "the discovery process relies upon the good

faith and professional obligations of counsel to reasonably and diligently search for and produce

responsive documents."  *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal.

2013) (quoting *Smith v. Life Investors Ins. Co.*, No. 07-681, 2009 WL 2045197, at *5 (W.D. Pa.

July 9, 2009)).  In carrying out this process,

> [t]he rules of discovery do not demand perfection, clairvoyance, or
> miracle workings in the production of documents.  Crying foul and
> casting aspersions whenever there's a hole in defendant's
> document productions or whenever some small number of
> documents (even crucial documents) are found relatively late in the
> process does not advance plaintiffs' cause and is not conducive to
> the timely, efficient resolution of this litigation.

*Reinsdorf*, 296 F.R.D. at 615 (quoting *Fisher v. Ciba Specialty Chem. Corp.*, No. 2007 WL

987457, at *3 (S.D. Ala. Mar. 30, 2007)).  *See also Reinsdorf*, 296 F.R.D. at 615 (collecting

cases).  From the outset of discovery, the United States has engaged in a reasonable and good

faith effort to satisfy its extraordinary – if not unparalleled – discovery obligations in this case.

All told, the United States has conducted an enormously burdensome document collection,

review and production that has resulted in the production of nearly 12.5 million pages of

documents from numerous sources, including BOG, Treasury, OTS, COP, FCIC, DOJ,

SIGTARP, and the SEC.  In addition, we have been exceedingly transparent in our document

productions.  Given these circumstances, Starr's attempts to cast aspersions and demand a further

and unnecessary "review" of our processes is unwarranted.  Rather, the United States

respectfully requests that this Court deny all of Starr's requests for further document discovery

and permit the parties to focus on preparing for upcoming trial in September.

**IV.     Adding Additional Potential Witnesses To Starr's Initial Disclosures**

Starr seeks to amend its initial disclosures list to add 25 additional individuals listed in

Exhibit 46 to its initial disclosure of potential witnesses.   Counsel for the parties conferred, and,

on the understanding that (1) Starr is seeking nothing more than to add to its initial disclosures,

and (2) the Defendant, the United States, makes no concession as to the justification for or

relevance of Starr's additions to its initial disclosures, defendant does not oppose Starr's

amending its initial disclosure list to add the 25 individuals listed in Exhibit 46.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

  /s/                                              JOYCE R. BRANDA
David Boies                                     Deputy Assistant Attorney  General
Attorney of Record
333 Main Street
Armonk, NY 10504                            /s/
Tel. (914) 749-8200                        JEANNE E. DAVIDSON
Fax (914) 749-8300                          Director
Email: dboies@bsfllp.com


Robert J. Dwyer                              /s/
Alanna C. Rutherford                       BRIAN A. MIZOGUCHI
Julia C. Hamilton                            Assistant Director
575 Lexington Avenue                       Commercial Litigation Branch
New York, NY 10022                         Civil Division, Department of Justice
Telephone: (212) 446-2300                  P.O. Box 480
                                           Ben Franklin Station
SKADDEN, ARPS, SLATE, MEAGHER &            Washington, D.C.  20044
FLOM LLP                                   Tel.: (202) 305-3319
John L. Gardiner                           Fax: (202) 514-7969
Four Times Square                          Email:brian.mizoguchi@usdoj.gov
New York, NY 10036
Telephone: (212) 735-3000                  Attorneys for Defendant
Attorneys for Plaintiff Starr International Co.,
Inc.


April 21, 2014

# APPENDIX WITHHELD PURSUANT TO CONFIDENTIALITY ORDER