IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY, INC.,    )
on its behalf and on behalf of a class of    )
others similarly situated    )
    )
        Plaintiff,    )
    )
    )
        v.    )    No. 11-779C
    )    (Judge Thomas C. Wheeler)
UNITED STATES,    )
    )
        Defendant,    )
    )

## <u>CORRECTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

 

JOYCE R. BRANDA
Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:
KENNETH M. DINTZER
Acting Deputy Director

BRIAN A. MIZOGUCHI
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tele: (202) 305-3319
Fax: (202) 514-7969
Email: brian.mizoguchi@usdoj.gov

RENEE GERBER
VINCENT D. PHILLIPS
AMANDA L. TANTUM
Trial Attorneys

July 10, 2014

Attorneys for Defendant

TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………………………….. ii

TABLE OF AUTHORITIES ……………………………………………… .......v

INTRODUCTION ………………………………………………………….. 1

STATEMENT OF THE ISSUES …………………………………………………...4

    THE EQUITY CLAIM ………………………………………………... …4

        STATEMENT OF UNDISPUTED FACTS ………………………….. …4

    I.      In September 2008, AIG Sought A Lifeline From The
           Private Sector And From FRBNY …………………...…………….....4

    II.     On September 16, 2008, FRBNY Offered And AIG
           Accepted The Rescue Terms ………………………………….…... 6

    III.    AIG And Its Directors Voluntarily Agreed To The
           Rescue Terms ……………………………………………… …9

    IV.    The AIG Credit Facility Trust …………………………………...11

    ARGUMENT …….…………………………...………………………13

    I.      Standard Of Review …………………………………………..13

    II.     No Taking Or Illegal Exaction Occurred Because AIG
           Voluntarily Agreed To The Terms Of The Rescue
           Given To AIG …………………………………………………...14

        A.    Legal Framework …………………………………………..14

        B.    There Was No Taking Or Illegal Exaction Because
             The AIG Board Voluntarily Agreed To The Rescue
             Offer As An Alternative To Bankruptcy …………………..…….17

            1.    AIG's Board Exercised Its Will In Deciding
                  To Take The Offered $85 Billion Rescue As
                  An Alternative To Bankruptcy ……………….………....17

2. AIG Was Free To Reject FRBNY's Offer And Had The Alternative Of Filing For Bankruptcy Protection …………………………….…….… ...19

3. Neither FRBNY Nor The Government "Coerced" AIG To Agree To The Terms Of The Rescue ……..…. .20

4. Ratification Of The Rescue Agreement Precludes Any Finding Of Duress ………………………………... 22

III. The Equity Claim Fails Because There Is No Evidence Of Economic Loss ……………………………………………………….....23

IV. Starr's Exaction Claim Is Legally Unsustainable ……………………. .. 26

A. The Board Of Governors Had Legal Power To Authorize The Loan Terms ………………………………..26

1. Congress Granted The Board Of Governors The Power To Authorize Loans Conditioned On Equity In The Last Sentence Of Section 13(3)..…......26

2. Congress Confirmed That The Board Of Governors Could Validly Authorize Rescue Lending Conditioned On AIG's Agreement To Provide Equity ……………………………….......…..31

3. Even If Not Expressly Authorized, The Challenged Loan Terms Are Within FRBNY's Incidental Powers …………………………………........ 33

4. The Equity Was Properly Held By An Independent Trust ……………………….……....…. ...37

B. Starr Cannot Prevail On Its Illegal Exaction Claim Even If The Equity Interest Exceeded FRBNY's And The Board Of Governors' Statutory Authority ……………….…..… ....39

1. Starr Cannot Establish That All Economically Equivalent Alternatives To The Series C Preferred Stock Would Be Invalid ………………………..……….. 39

iii

2.      Starr Waived Its Right To Assert That The
        Equity Interest Was Invalid By Waiting To
        Challenge It Until After Starr Had Benefitted
        From The Rescue ………………………………..……. ..39

3.      Starr Cannot Recover On Its Claim For Exaction
        Because Section 13(3) Is Not Money-Mandating ……… ..41

THE REVERSE STOCK SPLIT CLAIM …………………………………………......42

    STATEMENT OF UNDISPUTED FACTS …………………………………......43

    I.      No One Represented To The Court In The *Walker*
            Litigation That Common Shareholders Would Have
            A Separate Class Vote On A Reverse Stock Split Or
            Before The Trust Disposed Of Its Preferred Shares …………………... 43

    II.     AIG – Not The Government, FRBNY, Or The
            Trust – Decided To Propose The Reverse Stock Split
            And Decided The Split's Terms ………………………………….… .45

    III.    The Common Shareholders Were Aware Of The
            Potential Effects Of The Reverse Stock Split And
            Voted In Favor Of It ……………………………………….……. ...47

    ARGUMENT …..……………………………………………………… ..48

    I.      Starr Has Not Identified A Property Right Because The
            Common Shareholders Had No Right To A Class-Only Vote …………...48

            A.      No Right To A Separate Class Vote On The Reverse
                    Stock Split Was Created By The *Walker* Consent Order …...… ..49

            B.      The Reverse Stock Split Was Not A "Backdoor Scheme"
                    To Circumvent Any Separate Class Vote …………...…………...50

    II.     The Evidence Does Not Support A Finding Of
            Government Action ………………………………………………...52

    III.    The Evidence Cannot Establish An Economic Impact
            Because The Majority Of Common Shareholders Voted
            For The Reverse Stock Split …………………………………… .......54

CONCLUSION ……………………………………………………………………... 55

iv

TABLE OF AUTHORITIES

CASES

*A&D Auto Sales, Inc. v. United States,*
748 F.3d 1142  (Fed. Cir. Apr. 7, 2014) …………………………………… …...2, 15, 16, 23, 24

*ABF Freight System Inc. v. NLRB,*
510 U.S. 317 (1994) …………………………………………………………..….. 27

*Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.,*
337 B.R. 475 (S.D.N.Y. 2006) …………………………………………….…………….. …..21

*Adirondack Med. Ctr. v. Sebelius,*
740 F.3d 692 (D.C. Cir. 2014) …………………………………………….……………..30, 31

*Air Pegasus of D.C., Inc.* v. *United States,*
424 F.3d 1206 (Fed. Cir. 2005)...............................................................................................48

*Am. Pelagic Fishing Co.* v. *United States,*
379 F.3d 1363 (Fed. Cir. 2004).............................................................................................48

*Arnold Tours, Inc. v. Camp,*
472 F.2d 427 (1st Cir. 1972) ……………………………….…………………………………..33

*Astoria Federal Savings and Loan Assoc., v. Solimino,*
501 U.S. 112 (1991) ……………………………………………………………………… 34

*AT&T v. United States,*
307 F.3d 1374 (Fed. Cir. 2002) …………………………………………………………… 40

*A-Transport Northwest Co., Inc. v. United States,*
36 F.3d 1576 (Fed. Cir. 1994) ……………………………………………….…………………… 21

*B&G Enters. v. United States,*
220 F.3d 1318 (Fed. Cir. 2000) ……………………………………….………………… 16, 20, 53

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,*
731 F.2d 831, 836 (Fed. Cir. 1984) ……………………………………………….…….. 13, 55

*Bergman v. United States,*
28 Fed.Cl. 580 (1993) ……………………………………………………….…………….. 15

v

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ………………………………………………………….. 53, 54

*Brown v. Legal Foundation of Wash.,*
538 U.S. 216 (2003) ……………………………………………….………………23

*C.F.T.C. v. Schor,*
478 U.S. 833 (1986) ………………………………………………………….. 31, 35

*Cal. Nat'l Bank v. Kennedy,*
167 U.S. 362 (1897) …………………………………………………………...35, 36, 42

*Caldwell & Santmyer, Inc. v. Glickman,*
55 F.3d 1578 (Fed. Cir. 1995) ……………………..……………..………………...…… 21

*Casa de Cambio Comdiv S.A., de C.V. v. United States,*
291 F.3d 1356 (2002) ………………………………………………………..………… 53

*Cienega Gardens v. United States,*
503 F.3d 1266 (Fed. Cir. 2007) ……………………………………..……………… 23

*Clevenger Roofing & Sheet Metal Co. v. United States,*
8 Cl. Ct. 346 (Cl. Ct. 1985) ………………………………………………..………… 41

*Cmty. Action of Laramie Cnty. Inc. v. Bowen,*
866 F.2d 347 (10th Cir. 1989) ……………………………………………………..29

*Collins v. United States,*
67 F.3d 284, n.56 (Fed. Cir. 1995) ……………………………..………………………… 23

*Corbin v. Federal Reserve Bank of N.Y.,*
475 F. Supp. 1060 (S.D.N.Y. 1979),
*aff'd,* 629 F.2d 233 (2d Cir. 1980) …………………………………….……………. 41

*David Nassif Assocs. v. United States,*
644 F.2d 4 (1981) ………………………………………………………………… 20

*Douglas v. Ind. Living Ctr. of S. Cal., Inc.,*
132 S.Ct. 1204 (2012) …………………………………………………………….. 29

*Emerald Int'l Corp. v. United States,*
54 Fed.Cl. 674 (2002) ……………………………..…………………….…………...53

vi

*Employers Ins. of Wausau v. United States,*
764 F.2d 1572 (Fed. Cir. 1985) …………………………………………………………… 15

*Erica P. John Fund, Inc. v. Halliburton Co.,*
131 S.Ct. 2179 (2011) ……………………….………………………………………… 55

*Fallini v. United States,*
56 F.3d 1378 (Fed. Cir. 1995) ……………………………………………………….. 52

*F.D.A. v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) …………………………………………….……………… 33

*FDIC v. Linn,*
671 F.Supp. 547 (N.D. Ill. 1987) ……………………..……….……………..……………. 19

*Field v. Allyn,*
457 A.2d 1089 (Del. Ch. 1983),
*aff'd,* 467 A.2d 1274 (Del. 1983) ……………………..……………………………….. 51

*First Nat'l Bank of Charlotte v. Nat'l Exch. Bank of Baltimore,*
92 U.S. 122 (1875) ………………………………………………………… 36, 42

*Forest Props., Inc. v. United States,*
177 F.3d 1360 (Fed. Cir. 1999) ……………………………………….…………… 55

*Freedlander, Inc. Mortg. People v. NCNB Nat'l Bank of N.C.,*
706 F.Supp. 1211 (E.D. Va. 1988),
*aff'd,* 921 F.2d 272 (4th Cir. 1990)……………………………………….……… 19

*Fruhauf SW Garment Co.* v. *United States,*
11 F.Supp. 945 (Ct. Cl. 953) ……………………………………………………………15, 16

*Henderson Cty. Drainage Dist. No. 3 v. United States,*
53 Fed.Cl. 48 (2002) …………………….…………………………………….……………. 18

*Hendler v. United States,*
175 F.3d 1374 (Fed. Cir. 1999) ……………………………………………… 23

*In re Franklin Nat'l Bank Secs. Litig.,*
478 F.Supp. 210 (E.D.N.Y. 1979) …………………….………………………………… 41

*John Arborio, Inc. v. United States,*
76 F.Supp. 113 (Ct. Cl. 1948) ……………………………………….……………… 22

vii

*Johnson, Drake & Piper v. United States*,
531 F.2d 1037 (Ct. Cl. 1976) …………………………………………….………………………….. 22

*Keene Corp. v. United States*,
508 U.S. 200 (1993) ………………………………………………..…………………………….. 55

*L.L. Nelson Enters. v. County of St. Louis, Mo.*,
673 F.3d 799 (8th Cir. 2012) …………………………………………..……………………… 15

*Langenegger v. United States*,
756 F.2d 1565 (Fed. Cir. 1985) …………………………………………………..…………… 16

*Lucas v. Federal Reserve Bank of Richmond*,
59 F.2d 617 (4th Cir. 1932) …………………………………………………………….………… 42

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992) ..................................................................................... 48

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ………………………………………………………………… 24, 53

*M & M Leasing Corp. v. Seattle First Nat'l Bank*,
563 F.2d 1377 (9th Cir. 1977) ……………………………..……………………………… 33

*Madey v. Duke Univ.*,
307 F.3d 1351 (Fed. Cir. 2002) …………………………………………………………… 25

*Madison-Hughes v. Shalala*,
80 F.3d 1121, n.59 (6th Cir. 1996) …………………………………………………….. 29

*Malone v. Bricat*,
722 A.2d 5 (Del. 1998) ……………………………………………..…………………….. 55

*Nat'l Ass'n of Mfrs. v. Secs. & Exchange Comm'n*,
748 F.3d 359 (D.C. Cir. 2014) …………………………………………………….………… 33

*NationsBank of N.C. v. Variable Annuity Life Ins. Co.*,
513 U.S. 251 (1995) ……………………………………………..……………………… 33, 34

*Navajo Nation v. United States*,
631 F.3d 1268 (Fed. Cir. 2011) …………………………………..………………………52, 53

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005)...............................................................14, 41

*North Haven Board of Education v. Bell*,
456 U.S. 512 (1982) ……………………………………………………………………… 32

*North Star Steel Co., v. United States*,
477 F.3d 1324 (2007) ………………………….…………………………………….. 21

*Olson v. United States*,
292 U.S. 246 (1934) …………………………………………..………………………….. 23

*Pauley v. Beth Energy Mines, Inc.*,
501 U.S. 680 (1991) ……………………………………………………………………..29

*Plechner v. Widener College, Inc.*,
569 F.2d 1250 (3d Cir. 1977) ……………………………………….…..……………...…… 17

*Red Lion Broadcasting Co. v. F.C.C.*,
395 U.S. 367 (1969) ……………………………………………………………………… 32

*Rumsfeld v. Freedom NY, Inc.*,
329 F.3d 1320 (2003) ……………………………………………………………..…… 21

*Schmidt v. Shah*,
696 F.Supp. 2d 44 (D.D.C. 2010) ……………….……………………………………… 22, 23

*Sec. Indus. Ass'n v. Clarke*,
885 F.2d 1034 (2d Cir. 1989) ……………………………………………………...……… 33

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir. 2004) ……………………….………………..……………………… 55

*Simon v. Eastern Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ……………………………………………………………………..53

*Sinclair v. United States*,
66 Fed.Cl. 487 (2005) ……………….……………………………………………..…… 17

*Starr Int'l Co. v. Federal Reserve Bank of New York*,
906 F.Supp. 2d 202, (S.D.N.Y. 2012) …………………………..………..…………..19, 20, 36

*Starr Int'l Co. v. Federal Reserve Bank of New York*,
742 F.3d 37 (2d Cir. 2014) ………………………………………………………..…… 19, 41

ix

*Starr Int'l Co. v. Federal Reserve Bank of New York*,
*cert. denied*, 2014 WL 1714488 (U.S. June 30, 2014) (No. 13-1316) ...............................19

*Starr Int'l Co. v. United States*,
106 Fed. Cl. 50 (2012) ..............................................................................................*passim*

*Starr Int'l Co. v. United States*,
107 Fed. Cl. 374 (Fed. Cl. 2012) ...................................................................…...…...28, 30

*Stueve Bros. Farms, LLC v. United States*,
737 F.3d 750 (Fed. Cir. 2013) ........................................................................... 54

*System Tech. Assocs., Inc. v. United States*,
699 F.2d 1383 (Fed. Cir. 1983) ................................................................…. 17, 21

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994) ............................................................................... 29

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
374 F.3d 1151 (Fed. Cir. 2004) ............................................................... 14

*United States v. Armour & Co.*,
402 U.S. 673 (1971) .......................................................…............................ 50

*United States v. Binghamton Contr. Co.*,
347 U.S. 171 (1954) ....................................................................................41

*United States v. Board of Comm'rs of Sheffield, Ala.*,
435 U.S. 110 (1978) ......................................................................….......... 31

*United States v. Edmondston*,
181 U.S. 500 (1901) .............................................................…....................... 15

*Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) ............................................................... 13

*VKK Corp. v. Nat'l Football League*,
244 F.3d 114 (2d Cir. 2001) ............................................................... 22, 40

*Warner Communications Inc., v. Chris-Craft Indus., Inc.*,
583 A.2d 962 (Del. Ch. 1989),
*aff'd*, *Chris-Craft Indus., Inc., v. Warner Comm'n*, 567 A.2d 419 (Del. 1989)................... 51

x

*Whittaker v. Elec. Systems v. Dalton*,
124 F.3d 1443 (Fed. Cir. 1997) ……………………………………………………………… 40

## LEGAL AUTHORITIES

U.S.C.A. Const. amend. V ……………….…………………………………..………………14

5 U.S.C. § 701(a)(2) …………………………………………………………………………...29

12 U.S.C. § 248 …………………………………………………………………………………34

12 U.S.C. § 341 (Seventh) …………………………………………………………………... 33

12 U.S.C. § 343

(2008)………………………………………………………………………………..*passim*

12 U.S.C. § 343……….. ..…………………………………………………………………… 26

12 U.S.C. § 343(B)(i) …………………………………………………………………….…… 32

12 U.S.C. § 343(C)(ii)(II) …………………………………………………………..…….. 32

12 U.S.C. § 5235(a)(2) (October 3, 2008) …………………………………..………… 31

12 C.F.R. § 7.1006 …………………………………………………………………...36

12 C.F.R. § 201.4(d) …………………………………………………………………42

8 Del. Gen. Corp. Law § 242(b)(2) ………………………………………..………...49

Pub. L. No. 110-343, 122 Stat. 3765 (2008) Emergency Economic Stabilization Act of 2008
12 U.S.C. §§ 5201, *et seq* ………………………………………………………… 31

Rule 56(a) of the Rules of the United States Court of Federal Claims ……..………. …..1, 13

18 Federal Reserve Bulletin
1932 Circular ………………………………………………………………27, 28, 42

22 Federal Reserve Bulletin
1936 Circular …………………………………………..……………………………27, 28

44 Federal Reserve Bulletin
1958    Circular……………………………..………………………………………...28

O.C.C. Interpretive Letter,
1992 WL 486905 (July 15, 1992)  ……………………………………..…………………. 36

O.C.C. Interpretive Letter,
2004 WL 1563358  (May 10, 2004) ………………………………………………………36

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY, INC.,  )
on its behalf and on behalf of a class of others  )
similarly situated,  )
  )
      Plaintiff,  )
  )
     v.  )     No. 11-779C
  )     (Judge Thomas C. Wheeler)
UNITED STATES,  )
  )
      Defendant.  )
  )

## CORRECTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the United States, respectfully requests that the Court grant summary

judgment pursuant to Rule 56(a) of the Rules of the United States Court of Federal Claims

(RCFC) denying the class claims asserted by plaintiffs Starr International Company, Inc., *et al.*

(Starr).  In support of this motion, we rely upon this brief, the pleadings, and the appendix filed

concurrently with this motion.

## INTRODUCTION

Discovery in this case has caused the United States and more than 35 non-parties to

produce more than 36 million pages of documents.  More than 70 fact witnesses were deposed.

Starr served more than 1300 requests for admission.  This is in addition to the voluminous

publicly available materials.  Despite the extensive record, Starr cannot support its claims

because American International Group, Inc. (AIG) voluntarily agreed to the terms of the

challenged rescue and, in any event, Starr experienced no economic loss.  Starr's illegal exaction

claim further fails because the loan terms were legal, as Congress both delegated broad authority

and then statutorily confirmed that equity may be required under Section 13(3) of the Federal

Reserve Act.

In September 2008, AIG suffered a liquidity crisis that threatened its survival.  AIG requested financial assistance from the Federal Reserve Bank of New York (FRBNY).  FRBNY responded by offering an $85 billion rescue loan conditioned on AIG's agreement to provide a 79.9 percent equity participation in AIG, and AIG accepted the offer.  Starr has attempted to cast that emergency life support as a taking or illegal exaction under the Fifth Amendment (the equity claim), but the uncontested evidence has debunked Starr's allegations.

As AIG and its directors uniformly testified, AIG voluntarily agreed to the rescue.  In declining to dismiss Starr's claim on the pleadings, this Court held that the claim rests, as a threshold matter, on "whether AIG voluntarily agreed to the terms proposed on September 16, 2008."  *Starr Int'l Co., Inc. v. United States*, 106 Fed. Cl. 50, 78 (2012).  After massive discovery, the undisputed material facts show that AIG's agreement to the terms was voluntary.  On September 16, AIG's Board — men and women chosen by AIG's shareholders months or years before, and who were independent of FRBNY and the Government — voted to accept FRBNY's offer.  AIG's directors have uniformly testified that they voluntarily agreed to provide equity in exchange for a rescue because they believed it was in the best interests of AIG and its shareholders.  Because the very actors whom Starr alleges were coerced have uniformly testified that, in fact, they were not, there is no triable issue as to whether AIG voluntarily accepted the rescue.  This is fatal to Starr's equity claim.

Moreover, there is no evidence that AIG shareholders, including Starr, lost any value that would have existed *but for* the September 2008 rescue.  *See A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157-58 (Fed. Cir. 2014).  AIG's only alternative to a massive government rescue indisputably was bankruptcy, but Starr can point to no evidence that AIG's common shares would have been worth more in bankruptcy than they were as a result of the

rescue.  Starr's inability to prove economic loss is independently fatal to the equity claim.

The illegal exaction theory of the equity claim fails for additional reasons.  As Congress has confirmed, the predicate for Starr's illegal exaction theory — that FRBNY and the Board of Governors of the Federal Reserve System (Board of Governors) exceeded their statutory authority in conditioning the rescue loan on AIG's agreement to provide the equity term — is legally unsustainable.  Congress expressly provided the Board of Governors with broad discretionary authority to set the terms and conditions of individual rescue loans.  Shortly after the Board of Governors authorized the rescue, Congress confirmed that a grant of equity is a proper condition for a Section 13(3) loan.

Even assuming, *arguendo*, that the Board of Governors and FRBNY exceeded their statutory authority in rescuing AIG, Starr has no viable exaction theory for its equity claim, because AIG agreed in the September 22, 2008 Credit Agreement to replace any loan terms later found to be invalid with economically equivalent terms.  Starr also waived its right to challenge the validity of the equity term by failing to object to its legality for years while accepting the benefits of the rescue.  Moreover, the statutory provisions that Starr alleges were violated were not enacted for the benefit of borrowers or their shareholders and so are not money-mandating.

Starr's claim that the AIG common shareholders' alleged right to vote as a separate class on the June 30, 2009 reverse stock split was taken or illegally exacted (the reverse stock split claim) also is fundamentally flawed.  AIG's common shareholders possessed no right to a separate class vote on the reverse stock split, nor did the Government act in any way to advance the reverse stock split.  In addition, Starr cannot claim any economic loss because a majority of AIG common shareholders, including Starr, voted in favor of the reverse stock split.

3

In short, Starr's claims seeking billions of dollars more from the Government — in addition to the benefit of the $182 billion in financial assistance that FRBNY and the Government previously provided to AIG and its shareholders — are baseless. This Court should grant summary judgment in favor of the United States.

## STATEMENT OF THE ISSUES

(1)     Whether the United States is entitled to summary judgment on the equity claim because (a) AIG's board voluntarily agreed to the 79.9 percent equity term in return for being given a financial rescue; and (b) Starr has produced no evidence that demonstrates the class members suffered an economic loss compared to what would have happened without the rescue.

(2)     Whether the United States is entitled to summary judgment on the illegal exaction portion of the equity claim for the additional reasons that (a) the Government and FRBNY possessed the statutory authority to condition the rescue loan on AIG's agreement to the challenged term; and (b) even if the Government and FRBNY exceeded their statutory authority, Starr was not harmed because AIG agreed to convey the economic equivalent to any term deemed invalid; Starr waived its right to challenge the loan terms; and Section 13(3) is not money-mandating.

(3)     Whether the United States is entitled to summary judgment on the reverse stock split claim because no evidence exists to support necessary elements of the claim, namely: (a) that the shareholder class had the right to a class-only vote on the reverse stock split; (b) that the proposed reverse stock split was caused by a Government act; and (c) that the absence of a separate class vote on the reverse stock split caused economic loss to Starr and other class members.

## THE EQUITY CLAIM

## STATEMENT OF UNDISPUTED FACTS

**I.     In September 2008, AIG Sought A Lifeline From
        The Private Sector And From FRBNY**

In September 2008, AIG suffered a severe liquidity crisis due to its obligations to post billions of dollars in collateral on credit default swaps, and to return billions of dollars of cash

collateral to securities lending counterparties.[1]  AIG sought financing from private firms and requested assistance from FRBNY.

FRBNY encouraged major financial institutions to arrange a private sector rescue for AIG.[2]  On September 15, 2008, JPMorgan drafted a term sheet for a potential $75 billion loan, syndicated among 15 large lenders.[3]  AIG understood that if those firms offered credit to AIG, the banks would "ultimately be paid in some form of equity."[4]

On the morning of September 16, 2008, JPMorgan informed FRBNY that it was unable to assemble a consortium of lenders to satisfy AIG's financial needs.[5]  JPMorgan had concluded that AIG's liquidity needs far exceeded its value.[6]  At this point, FRBNY President Timothy Geithner, Ben Bernanke, Chairman of the Board of Governors, and Henry Paulson, Secretary of the United States Department of the Treasury (Treasury), concluded that AIG would not be able to obtain sufficient funding from the private sector.[7]

---

[1] AIG Form 10-K for the year ending December 31, 2008, at 40; AIG Form 10-Q for the quarterly period ending September 30, 2008 (Nov. 10, 2008) ("AIG Form 10-Q"), at 49-50.

[2] Geithner Tr. at 16:4-16.

[3] AIG Form 10-Q at 50.  The private sector term sheet called for interest at a rate of LIBOR plus 650 bps, and for the lenders to receive penny warrants for 79.9 percent of the equity of AIG.  PX 849, Email from James Lee to Marshall Huebner (Sept. 16, 2008) at JPM00066733-34.

[4] PX 222, Minutes of Meeting of the Board of Directors of American International Group, Inc. held September 16, 2008 ("AIG 9/16 Board Minutes") at 2.

[5] See Geithner Tr. at 73:20-23.

[6] Lee Tr. at 21:8-23:9; see Geithner Tr. at 73:20-23.

[7] Geithner Tr. at 73:10-74:2; Paulson Tr. at 45:19-21; Bernanke Tr. at 23:1-20.

## II.   On September 16, 2008, FRBNY Offered And AIG Accepted The Rescue Terms

On September 16, 2008, the Board of Governors authorized FRBNY to offer AIG an $85 billion loan pursuant to Section 13(3) of the Federal Reserve Act.[8]  At about 4:00 p.m., the proposed loan terms were provided to AIG's counsel, Sullivan & Cromwell LLP (S&C).[9]  Those terms included: "Equity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis.  Form to be determined."[10]  At about 4:40 p.m., President Geithner and Secretary Paulson called AIG CEO Robert Willumstad and informed him that another condition of FRBNY's offer was Mr. Willumstad's replacement by Edward Liddy.[11]

At about 5:00 p.m. on September 16, all ten AIG directors, none of whom had any affiliation with the Government or FRBNY, met to consider FRBNY's offer.[12]  AIG's top management and its legal and financial advisers also attended.[13]  Counsel to the AIG Board "discussed with the Board various aspects of the $85 billion loan facility and the 80 percent equity interest in AIG proposed" by FRBNY.[14]  Mr. Willumstad explained that the loan was

---

[8] PX 69, Minutes of the Bd. of Governors of the Fed. Reserve Sys. (Sept. 16, 2008), at FRB032 00000371-74, 82.

[9] TREAS00072017, Email and attachment from Dan Jester to Tanshel Pointer (Sept. 17, 2008).

[10] *Id.* at TREAS00072017, 19.

[11] Willumstad Tr. at 282:23-283:25, 285:5-11.

[12] AIG's Responses & Objections to Def.'s Am. First Set of Requests for Admission ("AIG Responses to RFAs"), at Response Nos. 11-13 (May 10, 2013).

[13] AIG 9/16 Board Minutes at 1.

[14] AIG 9/16 Board Minutes at 3.

conditioned on his resignation as CEO.[15]  S&C advised the AIG Board that "extensive

negotiations" with private parties "had not produced a plan that would provide sufficient

liquidity to AIG," and that filing for bankruptcy was "the only available alternative" to the rescue

offered by FRBNY.[16]

With input from legal counsel, financial advisers, and AIG management, AIG's directors

then discussed at length their duties to the company, its shareholders and its creditors;[17] the value

of AIG's assets and AIG's liquidity needs;[18] the rescue offer;[19] and the alternative of

bankruptcy.[20]  Each director individually expressed his or her views regarding AIG's

alternatives.  Director Stephen Bollenbach stated that "AIG should attempt to work out its

problems in a bankruptcy."[21]  All the other directors opined "that despite the unfavorable terms

of the Government Facility, the Government Facility was the better alternative to bankruptcy."[22]

---

[15] AIG 9/16 Board Minutes at 3-4; AIG Responses to RFA at Response No. 16; AIG RCFC 30(b)(6) (Reeder) Tr. at 316:2-12; Feldstein Tr. at 91:10-21; Miles Tr. at 24:3-20; Offit Tr. at 117:13-20.

[16] AIG 9/16 Board Minutes at 4; Feldstein Tr. at 107:8-20; Offit Tr. at 198:18-199:10, 202:14-21; *see also* AIG Response to RFA 14; Offit 10/3 Tr. at 121:1-6, 121:20-122:4; Herzog Tr. at 114:8-115:16.

[17] AIG 9/16 Board Minutes at 5; Miles Tr. at 131:20-22; Offit Tr. at 199:11-202:21; Willumstad 10/15 Tr. at 279:23-281:11.

[18] AIG 9/16 Board Minutes at 6-8; *see* Feldstein Tr. at 92:20-94:23.

[19] AIG 9/16 Board Minutes at 4.

[20] AIG 9/16 Board Minutes at 5-6, 9; Feldstein Tr. at 108:16-24; Johnson Tr. at 71:6-72:8, 73:6-17; Miles Tr. at 131:20-22; Offit Tr. at 199:11-202:21; Willumstad 10/15 Tr. at 279:23-281:21.

[21] AIG 9/16 Board Minutes at 11.

[22] AIG 9/16 Board Minutes at 11; *see also id* ("Offit said that AIG, as a financial institution based on trust, cannot survive in bankruptcy," and "Sutton said he essentially reached the same conclusion [as Offit]."); Offit Tr. at 149:1-15, 170:5-24, 201:23-202:3.

After "further discussion of the terms of the proposed transaction, including the 80 percent equity interest," the Board instructed its advisers "to negotiate for better terms."[23] Mr. Willumstad and AIG's attorneys called President Geithner, who declined to negotiate a reduction of the percentage of equity to be provided or the interest rate of the loan.[24]

Nevertheless, the AIG Board voted to accept FRBNY's rescue offer.[25] The Board expressly authorized AIG to accept FRBNY's proposal "to provide a revolving credit facility of up to $85 billion on terms consistent with those described at this meeting, including equity participation equivalent to 79.9 percent of the common stock of the Corporation on a fully-diluted basis (the 'Credit Facility')," and authorized AIG's officers "to execute and deliver all documents, contracts and instruments evidencing or representing the Credit Facility and any arrangements related thereto."[26] Mr. Willumstad executed a signature page stating that AIG "hereby agrees to and accepts the summary of terms for the Senior Bridge Facility presented to AIG by [FRBNY]," which AIG faxed to FRBNY at 8:44 p.m.[27]

AIG and FRBNY immediately began to implement the deal. That night, FRBNY wired $14 billion to AIG.[28] The next day, AIG drew down another $14 billion.[29] On September 18,

---

[23] AIG 9/16 Board Minutes at 11.

[24] *Id.* at 11-12.

[25] *Id.* at 14.

[26] *Id.* at 13-14.

[27] PX 5, Summary of Terms for Senior Bridge Facility, Sept. 16, 2008, at 7; AIG Responses to RFAs at Response No. 4.

[28] FRBNY-STARR(CFC)-0233036; *see also* AIG's Activity in the Fed Facility, attachment to email from Julie Burke to Teri Watson (Sept. 24, 2008), at FITCH-DOJ-STARR011457-59.

2008, the AIG Board elected Edward Liddy as CEO, "in accordance with its duties to formally implement [the September 16] agreement."[30]   By September 19, 2008, AIG had already drawn $37 billion in funding.[31]

## III.    AIG And Its Directors Voluntarily Agreed To The Rescue Terms

AIG has stated categorically that "on September 16, 2008, the members of AIG's Board were not directed, instructed, or otherwise required to vote in favor of the . . . Term Sheet by the FRBNY or the Government."[32]   All the AIG directors deposed in this case uniformly testified to that fact.[33]   AIG's directors carefully considered all options presented to them, including bankruptcy, and voted to approve the FRBNY rescue because they believed it was in the best interests of AIG and its shareholders.[34]   The directors also considered a variety of factors,

---

[29] *See* AIG's Activity in the Fed Facility, at FITCH-DOJ-STARR011459.

[30] PX 221, Minutes of Meeting of the Board of Directors of American International Group, Inc. held Sept. 18, 2008 ("AIG 9/18 Board Minutes") at 2-3; Bollenbach Tr. at 123:7-21; Offit Tr. at 172:5-16, 174:15-18; Miles Tr. at 32:9-33:21; Johnson Tr. at 110:15-111:22.

[31] PX 235, Minutes of a Meeting of Directors American International Group, Inc. held September 21, 2008 ("AIG 9/21 Board Minutes") at 4; AIG's Activity in the Fed Facility, at FITCH-DOJ-STARR011459.

[32] AIG Responses to RFAs at Response No. 19; *see also* AIG RCFC 30(b)(6) (Reeder) Tr. at 320:20-21 (testifying that it is "absolutely correct" that "[t]he Board acted independently" when voting to approve the Term Sheet on September 16).

[33] *See* Feldstein Tr. at 71:2-15; Miles Tr. at 29:18-22; Offit Tr. at 30:2-19, 147:25-148:21 (testifying that the Board had a "free and willing" choice to accept or reject either the Term Sheet or a decision to file for bankruptcy); Bollenbach Tr. at 34:3-35:11 (confirming that no one instructed him that "you had to vote in favor of the agreement on September 16, 2008").

[34] *See* Offit Tr. at 146:16-147:4 (testifying that the Board considered the alternatives available to AIG "very carefully" and that they had been "very well advised and had the appropriate materials" available to them to make an informed decision); Bollenbach 12/4 Tr. at 83:12-16 (testifying that the Board had a choice between three alternatives, to "take the government deal, file a bankruptcy yourself or, hopefully, default and begin negotiating with the people who experienced the default"); Johnson Tr. at 71:24-72:2 (testifying that "for the whole board

9

including their informed belief that bankruptcy would "result in a decrease in the value of [AIG's] assets."[35]  AIG and its directors also "understood that the terms of the FRBNY assistance . . . included, and were conditioned on, AIG providing an '[e]quity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis,' with the '[f]orm' of the equity participation 'to be determined.'"[36]  They concluded that the rescue package was in the shareholders' best interest.[37]

     This conclusion was reaffirmed at a September 21 meeting, when the AIG Board voted to approve the final Credit Agreement, which provided that the 79.9 percent share of AIG equity would be issued to a trust for the benefit of the United States Treasury (the Trust) in the form of

---

discussion, we talked about the pros and cons of both alternatives"); *see also* Willumstad 10/15 Tr. at 281:20-21, 10/16 Tr. at 41:11-20; Feldstein Tr. at 66:13-17, 70:15-25, 108:7-15; Miles Tr. at 21:2-12.

[35] Johnson Tr. at 72:3-73:17.

[36] AIG Responses to RFAs at Response No. 17.  *See* AIG RCFC 30(b)(6) (Reeder) Tr. at 351:25-352:7, 353:15-354:11; Bollenbach Tr. at 31:12-18, 119:10-22, 120:4-21, 157:8-158:3 (testifying that he was voting on September 16, 2008 for the "agreement with the government," including transferring a 79.9 percent equity stake in AIG); Johnson Tr. at 90:2-11 (testifying that she had agreed to the 79.9 percent equity term when she voted to accept the Term Sheet); Miles Tr. at 76:23-77:3, 91:15-16 (testifying that he understood that the approval of the Term Sheet meant "that FRBNY would obtain the right to an equity participation equivalent to 79.9 percent of the common stock of AIG," and that "once we signed off on the Government facility [on September 16], it was done"); Offit Tr. at 26:4-11, 163:7-21, 171:1-21 (testifying that he believed the Term Sheet granted the Government equity participation in AIG equivalent to 79.9 percent of the common stock); Willumstad 10/16 Tr. at 7:16-22 (testifying that "on September 16th, AIG committed to provide the government an equity equivalent to 79.9 percent of the common stock of AIG in exchange for an $85 billion credit facility"); Feldstein Tr. at 245:25-246:3 (testifying that "[w]hat mattered [in the September 16 vote] was 79.9% was going to be transferred; and that we would have a viable company because of the line of credit that we would get").

[37] Bollenbach Tr. at 31:12-25; Feldstein Tr. at 108:7-15, 109:8-15; *see* Johnson Tr. at 136:24-137:5; Miles Tr. at 143:22-25; Offit Tr. at 170:5-14, 201:18-202:3.

preferred shares convertible into common shares (the Series C preferred shares).[38] The AIG

Board, consisting of the same directors who voted on September 16 (other than Mr. Willumstad,

who had been replaced by Mr. Liddy) and advised by the same advisers who had provided

counsel on September 16, "approved the 'Credit Agreement dated as of September 22, 2008 . . .'

because they believed it was in the best interest of AIG in light of all the circumstances."[39] This

approval was consistent with the rescue terms that the directors had agreed to on September 16,

2008.[40]  AIG and FRBNY executed the Credit Agreement on September 22, 2008.[41]

## IV.    The AIG Credit Facility Trust

Because the Credit Agreement provided for the establishment of the Trust to hold the

Series C preferred shares, which were issued directly from AIG to the Trust, FRBNY never held

even any AIG stock.[42]  FRBNY general counsel Tom Baxter, Board of Governors general

counsel Scott Alvarez, and others were concerned about potential conflicts of interest issues if

---

[38] AIG 9/21 Board Minutes at 1, 7-10; *see also* TREAS00068820, Email from Ethan James to Dan Jester (Sept. 21, 2008) *and* TREAS00068817, Email from Marshall Huebner to Dan Jester and Jeremiah Norton (Sept. 21, 2008) (drafts of the equity term sheet for the Credit Agreement which were provided to AIG's counsel prior to the board meeting).

[39] AIG Responses to RFAs at Response No. 18; *see* Liddy Tr. at 524:3-525:7, 556:13-557:11 (agreeing to the terms of the Credit Agreement was "the best opportunity available to [AIG]" on September 22, 2008 and testifying that the directors were not coerced "by anyone, in any way"); Miles Tr. at 27:14-29-3; Offit Tr. at 26:14-27:16; Feldstein Tr. at 69:25-70:13.

[40] Liddy Tr. at 258:17-24, 320:9-16, 322:12-323:7; *see* Offit Tr. at 180:14-181:2, 182:10-13, 192:16-25; Bollenbach 12/4 Tr. at 157:8-158:3; Feldstein Tr. at 245:22-246:3; *see also* Herzog Tr. at 258:11-24 (Herzog was not focused on the "legal . . . technical form" of the Government's 79.9 percent equity stake because the "economic substance" of the term had already been decided).

[41] PX 11, Credit Agreement between AIG, as Borrower, and FRBNY, as Lender, Sept. 22, 2008.

[42] *Id.* at Ex. D, Summary of Terms of Preferred Stock and Related Issues; AIG Credit Facility Trust Agreement (Jan. 16, 2009); PX 465, Series C Perpetual, Convertible, Participating Preferred Stock Purchase Agreement (Mar. 1, 2009).

FRBNY held a majority economic or voting interest in AIG, arising from FRBNY's knowledge

of highly sensitive, material non-public information about companies, markets, economic trends,

and market policies.[43]  These potential problems were avoided by having independent trustees

without access to this sensitive information hold and vote the shares.  While the creation of the

Trust also had the collateral benefit of obviating the need to confirm FRBNY's or Treasury's

legal authority to hold the AIG equity interest themselves — a separate question from whether

FRBNY could condition its rescue loan on having equity be part of the loan consideration —

there is no evidence that the Trust was established primarily for this reason.  Nor is there

evidence that the Trust was a mere sham created to wrongfully circumvent any conclusion about

the illegality of holding equity consideration — a conclusion that none of the Board of

Governors, FRBNY, or Treasury ever reached.[44]

There is also no evidence that the three trustees charged with voting the Series C shares

interfered with AIG's business decisions or required AIG to enter into any of the transactions

challenged here.  The AIG Credit Facility Trust Agreement, which set forth the trustees' rights

and powers, expressly provided that the Trustees would "leave the day-to-day management of

the Company to the persons charged with such management" and "limit their involvement in the

corporate governance of the Company"[45] to voting the Series C shares, and that "[i]n no event

shall the Trustees become directors of the Company or otherwise become responsible for

---

[43]  United States RCFC 30(b)(6) (Baxter) Tr. at 96:14-97:23, 103:12-15; Baxter Tr. at 171:23-172:24; United States RCFC 30(b)(6) (Alvarez) at 156:15-158:1, 159:21-161:1.

[44]  Alvarez Tr. at 224:19-225:4; Davis Polk RCFC 30(b)(6) (Huebner) Tr. at 88:24-90:5, 117:3-118:7; Albrecht Tr. at 51:4-15, 86:21-87:20, 96:16-97:13, 109:12-113:15.

[45]  AIG Credit Facility Trust Agreement at 2.

directing or managing the day-to-day operations of the Company or any of its subsidiaries."[46] The trustees have testified without contradiction that they appropriately left the day-to-day management of AIG to its officers and board of directors.[47]

Nor is there any evidence that the trustees were controlled by FRBNY or the Government.  While the trustees consulted with FRBNY and the Government, they also met regularly with AIG's officers, directors, and outside advisors, and have testified without contradiction that they applied their independent judgment to every decision they made.[48]

## ARGUMENT

### I.     Standard Of Review

The court should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  Because Starr would bear the burden of proof at trial, the Government should prevail on summary judgment if it either provides "evidence that negates an essential element of [Starr's] case" or demonstrates "that the evidence on file (such as pleadings, depositions, and admissions) establishes no material issue of fact and that [Starr] will not be able to prove an essential element of its case." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999).

Starr cannot defeat a summary judgment motion with "[m]ere denials or conclusory statements."  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984).  "Summary judgment should not be denied simply because the opposing party

---

[46]  *Id.* § 2.04(f).

[47]  May 13, 2009 Statement of the Trustees of the AIG Credit Facility Trust Before the Committee on Oversight and Government Reform, *available at* http://oversight.house.gov/wp-content/uploads/2012/02/20090513AIGTrust.pdf.

[48]  *Id.*

asserts that the movant[']s witnesses are not to be believed." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004).

## II.   No Taking Or Illegal Exaction Occurred Because AIG Voluntarily Agreed To The Terms Of The Rescue Given To AIG

The Court should grant the United States summary judgment because AIG voluntarily agreed to the terms of the rescue.  Confronted with AIG's agreement to these terms, including the company's promise to grant equity, Starr argues that the Government coerced AIG into accepting the rescue.  2d Am. Compl. ¶ 72.  Starr's argument fails because (1) the allegedly coerced persons — AIG's directors — uniformly and dispositively testified that they acted voluntarily, (2) AIG indisputably had the alternative of filing for bankruptcy, and (3) there is no evidence that FRBNY and the Government acted, or failed to act, in bad faith in order to coerce AIG into accepting the rescue deal.  Starr cannot clear the high bar for establishing duress.

### A.   Legal Framework

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  Property is not "taken" when it is conveyed voluntarily by agreement.  *See Starr*, 106 Fed. Cl. at 78 ("to determine whether Starr has stated a cognizable taking claim, the relevant question is whether AIG voluntarily agreed to the terms proposed on September 16, 2008"); *see also*, *e.g.*, *Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005) (holding that a voluntary transfer of property is "not a proper basis on which to premise a takings claim").

Similarly, the Government cannot unlawfully exact property voluntarily given.  *See Starr*, 106 Fed. Cl. at 83 (declining to dismiss Starr's illegal exaction claim at the pleadings stage because "whether AIG voluntarily entered into the loan transaction with the Government" presented a question of fact).  "[M]oney . . . voluntarily paid to the government cannot be

14

recovered" through an exaction claim, absent specific indication of Congressional intent to the

contrary. *United States v. Edmondston*, 181 U.S. 500, 511 (1901). Accordingly, "[a] 'voluntary'

payment in response to an illegal demand is not recoverable" in the absence of a "suitable

protest" or express Congressional waiver of the protest requirement. *Employers Ins. of Wausau*

*v. United States*, 764 F.2d 1572, 1575 (Fed. Cir. 1985); *see also L.L. Nelson Enters. v. Cnty. of*

*St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) ("When a person voluntarily surrenders liberty

or property, the State has not deprived the person of a constitutionally-protected interest" under

the Takings Clause or the Due Process Clause.).

Therefore, as this Court has held, Starr's takings and illegal exaction claims both turn

upon "whether AIG voluntarily agreed to the terms proposed on September 16, 2008." *Starr*,

106 Fed. Cl. at 78. Voluntarily contracting with another party can be negated only by satisfying

the well-established standard for duress. To prove duress, "a plaintiff must show that: (1) it

'involuntarily accepted' the other party's terms; (2) 'circumstances permitted no other

alternative'; and (3) 'said circumstances were the result of coercive acts of' the other party."

*Starr*, 106 Fed. Cl. at 77 (quoting *Fruhauf Sw. Garment Co. v. United States*, 126 Ct. Cl. 51, 62

(1953)) (footnote omitted). To establish duress, a plaintiff must prove each of these elements.

*Bergman v. United States*, 28 Fed. Cl. 580, 585-86 (1993).

In *A&D Auto Sales*, the United States Court of Appeals for the Federal Circuit addressed

whether takings claims could survive a motion to dismiss when the plaintiffs alleged that a third

party was coerced into taking the plaintiffs' property. *A&D Auto Sales*, 748 F.3d at 1149.

Plaintiff auto dealers alleged that the Government was liable for GM's and Chrysler's

terminations of the plaintiffs' franchise agreements because "the government required the

terminations as a condition of financial assistance, and that that action was coercive because the

15

automakers could not survive without financing." *Id.* at 1154.  The Court declined to decide at

the pleading stage whether the Government's actions were in fact coercive.  *Id.* at 1156.  In so

doing, the Court presented an illustrative but non-exclusive list of circumstances that could bear

on whether "the government's influence over the third party was coercive rather than merely

persuasive." *Id.* at 1154.  That inquiry, which is consistent with the standard for contractual

coercion or duress that applies to the loan agreement allegedly coerced here, *Starr*, 106 Fed. Cl.

at 77, is intended to determine whether government conduct was "designed to *compel* specific

actions" by an involuntary third party.  *A&D Auto Sales*, 748 F.3d at 1155 (emphasis added).

Indeed, the Federal Circuit made clear that when a party has a choice to accept or reject a

proposal by the government — even if that choice is a very hard one — there can be no

"coercion" sufficient to attribute that party's chosen action to the United States.  For instance, in

a case where Congress conditioned Federal funding of States on restricting cigarette sales to

minors, "Congress may have provided the bait, but California decided to bite," and "coercion

was not established" precisely because "it was California's decision." *Id.* at 1155 (quoting *B&G

Enters. v. United States*, 220 F.3d 1318, 1325 (Fed. Cir. 2000)).  The Federal Circuit further

noted that coercion is not established where the government persuades, rather than compels, a

party to act, "however difficult refusal may be as a practical matter" for the party.  *Id.* (quoting

*Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985)).  Under Federal Circuit

precedent, Starr, must satisfy an extremely high burden to prevail.  *Starr*, 106 Fed. Cl. at 77 ("the

bar for establishing duress is a high one") (citing *Fruhauf*).  In light of the undisputed facts, Starr

cannot prevail because no circumstances overcome that high bar.

16

B.    There Was No Taking Or Illegal Exaction Because The AIG Board Voluntarily
      Agreed To The Rescue Offer As An Alternative to Bankruptcy

On September 16, 2008, AIG's Board, acting independently of FRBNY and the

Government, (1) consulted advisers about FRBNY's rescue offer and the alternative of filing for

bankruptcy protection, (2) sought to obtain alternative terms, and then (3) elected to agree to

accept FRBNY's terms, including the equity term.  The parties immediately began performance

of the agreement, and memorialized the agreement in further detail in the September 22, 2008

Credit Agreement — which was also voluntarily agreed to by AIG.  Accordingly, FRBNY's

offered deal was not a taking or exaction.

1.    AIG's Board Exercised Its Will In Deciding To Take The Offered
      $85 Billion Rescue As An Alternative To Bankruptcy

Starr cannot establish, as the first element of duress requires, that AIG involuntarily

accepted the rescue deal.  AIG's directors have uniformly testified that they voluntarily agreed to

the offered terms because, after carefully considering the alternative of bankruptcy, they believed

the rescue offer to be in the best interest of AIG and its shareholders.  No evidence exists that the

Government broke the will of AIG's directors.  That alone defeats Starr's claim.

"The standard [for duress] now looks more closely at the defeat of the will of the party

coerced."  *Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed. Cir. 1983); *see

also Sinclair v. United States*, 66 Fed. Cl. 487, 493 (2005) (plaintiff's resignation was not

involuntary, as a matter of law, where his resignation letter "admits that he was not subject to

coercion" and where plaintiff "does not claim that he submitted his resignation against his

wishes"); *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1260 (3d Cir. 1977) (law school

trustees did not act under duress where "trustee witnesses denied that they were coerced," and

were "experienced in making difficult and important decisions under pressure").  This Court has

17

also rejected claims of duress when a plaintiff had consulted with its attorneys before agreeing to the terms and was advised by its attorneys to agree. *Henderson Cty. Drainage Dist. No. 3 v. United States*, 53 Fed. Cl. 48, 56-57 (2002).

AIG's board was composed of sophisticated directors, each an accomplished leader in business, government, or academia.[49] In deciding whether to accept FRBNY's rescue terms, the directors sought information, analysis, and advice from preeminent legal counsel and financial advisers.[50] They examined their duties to the company, its shareholders, and its creditors; the value of AIG assets and AIG's liquidity needs; and the rescue offer.[51] The directors understood that accepting FRBNY's rescue deal meant that AIG would provide equity participation equivalent to 79.9 percent of AIG's common stock. The directors nonetheless agreed to the deal because they believed it was in the best interest of AIG and its shareholders.[52]

As Director Morris Offit testified, "there was nobody commanding any director to make the decision one way or another. It was an independent judgment on the part of each director. So, it was free and willing. Nothing coercive about that."[53] Rather, AIG's directors determined that accepting the deal offered by FRBNY was in the best interests of AIG. As AIG director

---

[49] AIG Proxy Statement (Schedule 14A), at 7-9 (Apr. 4, 2008), *available at* http://www.sec.gov/Archives/edgar/data/5272/000093041308002228/c52434_def14a.htm.

[50] *See, e.g.*, Offit Tr. 91:12-25, 107:24-108:2 (describing Blackstone's role); *id.* Tr. 90:3-91:11 (describing the roles of counsel to the nonmanagement directors (Simpson Thacher) and AIG's counsel (Sullivan & Cromwell and Weil Gotschal & Manges)).

[51] AIG 9/16 Board Minutes at 4-7; Feldstein Tr. 92:20-94:23, 108:16-24; Johnson Tr. 71:6-72:8, 73:6-17; Miles Tr. 131:20-22; Offit Tr. 199:11-202:21.

[52] *See, e.g.*, Offit Tr. 149:1-20.

[53] *Id.* at 148:15-19.

Martin Feldstein, a Harvard economist and former Chairman of the Council of Economic

Advisers, explained:

> "[I]f we accepted the credit facility, while we would have given up
> 80% of our equit[y] [t]he shareholders would continue to have an
> equity position.  We would be given the credit facility, which
> would keep the company operating.  And there would therefore be
> the potential to rebuild the company after selling off assets to deal
> with our obligations to the Fed or to the Treasury."[54]

### 2.   AIG Was Free To Reject FRBNY's Offer And Had The Alternative Of Filing For Bankruptcy Protection

Starr cannot establish the second element of duress — that "circumstances permitted no

other alternative" to AIG's acceptance of FRBNY's rescue terms.  *Starr*, 106 Fed. Cl. at 77.

AIG unquestionably had the alternative of bankruptcy.[55]

Courts have held — including in the context of AIG's acceptance of FRBNY's rescue

offer — that the availability of bankruptcy as an alternative negates duress as a matter of law.

*See Freedlander, Inc. Mortg. People v. NCNB Nat'l Bank of N.C.*, 706 F. Supp. 1211, 1220 (E.D.

Va. 1988) ("[F]iling a petition in bankruptcy has been held to be a legal option defeating a claim

of economic duress."), *aff'd*, 921 F.2d 272 (table), 1990 WL 2098601990 at *1 (4th Cir. 1990);

*FDIC v. Linn*, 671 F. Supp. 547, 560 (N.D. Ill. 1987) (holding that "[t]hreatened bankruptcy is

insufficient to create economic duress").  Indeed, as the district court observed in *Starr Int'l Co.

v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 219 n.13 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37

(2d Cir. 2014), *cert. denied*, 2014 WL 1714488 (U.S. June 30, 2014) (No. 13-1316):

> [C]ontrary to Starr's rhetoric, . . . AIG's predicament does not describe a
> situation in which AIG was devoid of choice:  According to Starr's own

---

[54] Feldstein Tr. at 108:7-15.

[55] Willumstad 10/15 Tr. at 279:23-281:21 (bankruptcy was a "viable option" for AIG); Feldstein Tr. 107:8-109:15, 165:14-17; Johnson Tr. 71:6-72:8, 73:6-17; Miles Tr. 131:20-22; Offit Tr. 199:11-202:21.

> pleadings, on September 16, 2008, AIG's Board had, and was actively
> considering, the alternative choice of bankruptcy. . . . FRBNY's term
> sheet presented an alternative course for the Board to consider, and the
> Board chose that course.  Even a choice between a rock and a hard place is
> still a choice.

*Id.* (citations omitted).

Plaintiffs cannot dispute that bankruptcy was an option to AIG.  AIG's directors

considered bankruptcy, deliberated about their choices, and accepted FRBNY's offer.  Under

these circumstances, AIG's directors exercised free will in agreeing to the rescue terms.

Accordingly, Starr's claim fails because it does not overcome the high bar of establishing duress.

> 3.      Neither FRBNY Nor The Government "Coerced" AIG To Agree
>         To The Terms Of The Rescue

Finally, Starr cannot establish the third element of duress: "that [AIG's] assent 'was

induced by an improper threat'" by the United States, such as threats "that 'would breach a duty

of good faith and fair dealing under a contract as well as threats which, though lawful in

themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they

exploit prior unfair dealing on the part of the party making the threat.'"  *Starr*, 106 Fed. Cl. at 78

(quoting *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981)).  There is no

evidence that the United States issued any threat to AIG or its directors, let alone an improper

threat.  To the contrary, the AIG directors uniformly testified that no representative of FRBNY

or the United States attempted to influence or interfere in any way with their decision.

Offering a monetary benefit — even if it is enticing to the accepting party — is not, in

and of itself, coercive.  *B & G Enters.*, 220 F.3d at 1325.  AIG approached FRBNY and asked

for help, and in response, FRBNY offered a specific deal which AIG's Board was free to either

accept or reject in favor of bankruptcy.

That choice, though it may have been difficult, does not and cannot amount to coercion. For example, in *Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006), the Government encouraged Adelphia to enter into settlements by offering substantial benefits — including the elimination of the threat of criminal prosecution and of any claim by the Securities and Exchange Commission (SEC) for disgorgement and civil penalties — in exchange for Adelphia's agreement to the settlements. The court noted that, "[w]hile the alternatives presented all were unpleasant, that does not render the situation coercive in any legally relevant sense." *Id.*

No evidence supports Starr's allegation that FRBNY and the Government took, or refrained from taking, any action as a negotiating strategy for the purpose of worsening AIG's bargaining position. *E.g.*, 2d Am. Compl. ¶ 72.[56] This absence of proof extinguishes Starr's coercion theory. *Compare N. Star Steel v. United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (third prong of test for duress not met because "no showing of evidence to support a finding of bad faith"), *and Sys. Tech. Assocs.*, 699 F.2d at 1388 (no duress where there was no evidence of "acts taken in bad faith, or with malice, or with unconscionable motives"), *with Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1331 (Fed. Cir. 2003) (finding coercion where "the government withheld [a] payment, for the sole purpose of pressuring the contractor into signing" an amendment giving up rights under a contract).

---

[56] Certainly the record lacks the "well-nigh irrefragable proof necessary" to overcome the presumption of good faith. *See, e.g., Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (recognizing strong presumption that public officials act in good faith); *A-Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1585 (Fed. Cir. 1994) (same).

4.      Ratification Of The Rescue Agreement Precludes Any Finding Of
        Duress

Because Starr cannot meet any of the independent requirements for establishing duress,

the Court should deny the equity claim.  Further, the Court should do so for the additional reason

that AIG and its shareholders ratified the rescue deal by accepting all of its benefits without

seeking to disaffirm the deal as the alleged product of duress.

Economic duress renders a contract voidable, not void, and a party "who accepts the

benefits of the contract entered into under economic duress cannot later seek to have the contract

rescinded."  *Schmidt v. Shah*, 696 F. Supp. 2d 44, 64 & n.14 (D.D.C. 2010) (internal quotation

marks omitted); *see also Johnson, Drake & Piper v. United States*, 531 F.2d 1037, 1043 (Ct. Cl.

1976) ("failure to raise a claim of duress soon after fear of its consequences had been removed is

compelling evidence that there was no duress in fact"); *John Arborio, Inc. v. United States*, 76 F.

Supp. 113, 119 (Ct. Cl. 1948) ("silence and inaction constitute . . . clear proof negativing

duress").

Thus, even if AIG agreed to the rescue deal under duress — and it did not — the

company and its shareholders nonetheless ratified the deal through their silent acceptance of

benefits.  Indeed, Starr did not claim that AIG had acted under duress until after AIG and its

shareholders had accepted all the benefits of the rescue deal ($85 billion in credit from FRBNY

in September 2008, plus another approximately $97 billion in Federal assistance subsequently),

and after AIG's common stock appreciated as a result.  The law does not countenance a "heads I

win, tails you lose" approach "of waiting to see how the arrangement works out and then

deciding whether to seek to undo it."  *VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001).  A

litigant who pursues such a strategy, as a matter of law, cannot claim duress.  *See, e.g., Schmidt*,

22

696 F. Supp. 2d at 64 (holding that even if duress could be shown, the plaintiff was "precluded from attacking the validity" of an agreement where he sought to retain its benefits).

### III.   The Equity Claim Fails Because There Is No Evidence Of Economic Loss

Starr's equity claim fails for the additional reason that there is no evidence that AIG's common stock would have been more valuable absent the rescue and, thus, no proof of any destruction of value because of a government taking.  Starr seeks to recover just compensation for both its claims related to the September 2008 rescue.  2d. Am. Compl. ¶ 226 ("Even where private property is taken and/or illegally exacted by the Government to serve public purposes, the Constitution requires the payment of 'just compensation.'").  Starr's inability to prove economic loss, however, is fatal to the equity claim.  *See A&D Auto Sales*, 748 F.3d at 1158.

A plaintiff is entitled to just compensation for a taking only when it has suffered economic loss.[57]  That is, "just compensation for a net loss of zero is zero."  *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 n.11 (2003); *A&D Auto Sales*, 748 F.3d at 1157 (same).  If Government appropriation of a plaintiff's property has left the plaintiff in "as good a position pecuniarily as if his property had not been taken," *Olson v. United States*, 292 U.S. 246, 255 (1934), then the plaintiff is not entitled to just compensation.  *See Brown*, 538 U.S. at 240; *see also Cienega Gardens v. United States*, 503 F.3d 1266, 1282-83 (Fed. Cir. 2007) (offsetting benefits must be considered as part of the takings analysis itself and whether there is economic loss, not only part of a just compensation calculation); *Hendler v. United States*, 175 F.3d 1374,

---

[57] We do not concede that Starr can recover anything in an illegal exaction claim based upon Section 13(3).  *See, e.g.*, Section IV.B.3, *infra*.  Damages are not available on the illegal exaction claim under the well-established rule that "the due process clause does not obligate the government to pay money damages."  *Collins v. United States*, 67 F.3d 284, 288 (Fed. Cir. 1995) (collecting authority).  However, if the Court applies a just compensation analysis to Starr's illegal exaction claim, that claim falls just as its takings claim falls.

1385 (Fed. Cir. 1999) (concluding that, without a "negative economic impact on the property, there is no regulatory taking").  Indeed, an injury in fact is required for standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Federal Circuit recently considered whether plaintiffs adequately pleaded economic impact in *A&D Auto Sales*, in which the plaintiff auto dealers alleged that the Government conditioned the rescue on termination of the dealers' franchise agreements in bankruptcy, thereby taking their property interests in the agreements.  The Government moved to dismiss the complaints, arguing that the dealers failed to plausibly allege that their franchises would have had any value but for the rescue.  The Federal Circuit held that the dealers' complaints failed to state a takings claim without "allegations regarding the but-for economic loss of value of the plaintiffs' franchises."  *A&D Auto Sales*, 748 F.3d at 1158.  The Court reasoned:

> Absent an allegation that GM and Chrysler would have avoided
> bankruptcy *but for the government's intervention* and that the
> franchises would have had value in that scenario, or that such
> bankruptcies would have preserved some value for the plaintiffs'
> franchises, the terminations actually had no net negative economic
> impact on the plaintiffs *because their franchises would have lost
> all value regardless of the government action.*

*Id.* (emphases added).  The Federal Circuit concluded that the dealers thus had failed to plead any economic loss.

The same reasoning demonstrates that Starr cannot meet its burden of proving economic loss, which dooms its equity claim.  Fact discovery is closed, all of Starr's expert reports have been served and the experts deposed, and there is no evidence that, but for FRBNY and the Government's intervention, AIG's common stock would have been worth more than it was worth after the rescue.  The undisputed facts show that bankruptcy was the only alternative to the Federal rescue, *see, e.g.,* Spatt Report ¶ 135, and there is no evidence that AIG's common

shareholders would have been better off had AIG chosen the alternative of bankruptcy protection.

Starr's proffered experts insist that "predictions about the outcome of an AIG bankruptcy have no basis other than rank speculation," Babbel Report ¶ 91, and that it is "impossible to reliably conclude" whether AIG's insurance subsidiaries "would have been better or worse off" in bankruptcy, Csiszar Tr. at 64:11-20.  Starr's experts fail to address the fate of AIG's common stock in a bankruptcy.  Rather, Starr's bankruptcy expert, Mr. William Murphy, stated only that "AIG *may have been* a Chapter 11 case in which creditors received full recovery and pre-petition equity holders *could possibly have* retained a significant equity interest in the corporation." Murphy Report ¶ 15 (emphases added).  He then testified that he believed it was too speculative to say whether AIG's shareholders would have lost value in bankruptcy.  Murphy Tr. 73:19-23, 75:8-78:8.  Starr's proffered evidence falls far short of establishing that the supposed "significant equity interest" would have been worth more than the billions of dollars that AIG's common stock actually was worth after the rescue.  *See, e.g.*, *Madey v. Duke Univ.*, 307 F.3d 1351, 1363 (Fed. Cir. 2002) (holding that speculation is insufficient to defeat summary judgment).[58]

---

[58] To the contrary, the uncontradicted evidence shows that AIG's shareholders benefitted from a market price for the company's common shares that was higher at the end of the class period, and after the announcement of the terms of the Credit Agreement, than at the opening of the class period.  *See, e.g.*, Kothari Report Ex. IV.B-2 (setting forth publicly available stock market price data showing that AIG's common stock was worth more on September 22, 2008 and on September 24, 2008, after the Credit Agreement was signed, than when the market opened on September 16, 2008, before any rescue was proposed).  There is no dispute that AIG's promise to grant 79.9 percent of its equity did not change the number of common shares outstanding or held by any shareholder; thus, *Starr benefited from the increase in its shares' market price during the class period*.  Indeed, the common shareholders' 20.1 percent stake in AIG after the rescue was worth more than their 100 percent stake in AIG  on September 16. Saunders Report ¶¶ 19-23; Mordecai Report ¶¶ 137-39.  *See also* Kothari Report Ex. IV.B-2.

Because there is no record evidence from which this Court could conclude that AIG's common shares would have had *any* economic value — let alone enhanced economic value — had AIG gone bankrupt, Starr's equity claim fails as a matter of law.

**IV.    Starr's Exaction Claim Is Legally Unsustainable**

      A.     The Board Of Governors Had Legal Power To Authorize The Loan Terms

Starr's illegal exaction theory of its equity claim is predicated on the proposition that the terms of FRBNY's September 16, 2008 rescue loan to AIG — and in particular the conveyance of 79.9 percent of AIG's equity as part of the consideration for the loan — were beyond FRBNY's legal power to propose and the Board of Governors' legal power to authorize under section 13(3) of the Federal Reserve Act, 12 U.S.C. § 343. That proposition is unsustainable as a matter of law. Congress, in the Federal Reserve Act, provided full authority for FRBNY to propose these terms and for the Board of Governors to authorize them, and by subsequently ratifying the agency's understanding that Section 13(3) granted those powers, Congress clearly endorsed the agency's legal authority, which is binding on this Court, as discussed below.

           1.     Congress Granted The Board Of Governors The Power To Authorize
                   Loans Conditioned On Equity In The Last Sentence of Section 13(3)

By its terms, Section 13(3) is meant to address extraordinary events: when, because of "unusual and exigent circumstances," Federal reserve banks could provide rescue loans to maintain the stability of the financial system. *Id.* Given the exceptional nature of such loans, Congress took the extra step of vesting the Board of Governors with specific authority beyond the Board of Governors' general authority under the Federal Reserve Act to tailor the terms of particular rescue loans based on policy judgments about the public interest. The last sentence of Section 13(3), providing this specific authority solely for loans under that section, states that "[a]ll such discounts for individuals, partnerships, or corporations shall be subject to *such*

*limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe*." 12 U.S.C. § 343 (2008) (emphasis added).[59] That sentence is an unambiguous grant of authority to prescribe "restrictions" and "limitations" on the terms of individual rescue loans.

The Board of Governors applied just such "restrictions" and "limitations" on its grant of discretionary authority to FRBNY, prescribing that the loan include conditions  "such as those described in the proposed Summary of Terms," including the requirement of 79.9 percent equity.[60] The application of this restriction or limitation was within the Board of Governors' explicit statutory authorization, and the policy judgments underlying that decision were statutorily placed within the Board of Governors' province. *Cf.*, *e.g.*, *ABF Freight Sys. Inc. v. NLRB*, 510 U.S. 317, 324–25 (1994) ("When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute.") (quotation marks omitted).

Starr has previously suggested that the proper meaning of "limitations, restrictions, and regulations" embraces only limitations such as those set forth in Federal Reserve bulletins circulated in the 1930s requiring that any Section 13(3) lending be limited to no more than one percent of a reserve bank's paid-in capital stock and surplus. *See* Aug. 1932 Circular, 18 Fed. Reserve Bulletin no. 8 at 518-20; *see also* Feb. 1936 Circular, 22 Fed. Reserve Bulletin no. 2 at 123-25. Neither the language of the bulletins nor the language of Section 13(3) supports that

---

[59] Although Section 13(3) was amended in 2010, this language remains in the amended version. 12 U.S.C. § 343(3)(A).

[60] PX 69, Minutes of the Bd. of Governors of the Fed. Reserve Sys. (Sept. 16, 2008), at FRB032 00000373, 374, 376, 382.

cramped interpretation.  While these bulletins stated that Section 13(3) loans "may be made only at rates established by the Federal Reserve Banks, subject to review and determination by the Board of Governors," they did not state or suggest that these interest rates constituted the only "limitations" or "restrictions" the Board of Governor could prescribe.  Feb. 1936 Circular, 22 Fed. Reserve Bulletin no. 2 at 123.  To the contrary, they expressly recognized that all discounts were also "subject to such limitations, restrictions, and regulations as the Federal Reserve Board may prescribe," and that "[a]ny Federal reserve bank may prescribe *such additional requirements and procedures* respecting discounts hereunder *as it may deem necessary or advisable*."  *Id.* at 123, 124 (emphasis added); Aug. 1932 Circular, 18 Fed. Reserve Bulletin no. 8 at 520.  As one bulletin explained: "In view of the fact that the power conferred by this provision can be exercised only in 'unusual and exigent circumstances,' the Federal Reserve Board has not prescribed any formal regulations governing the exercise of this power . . . ."  Aug. 1932 Fed. Reserve Bulletin no. 8 at 518. [61]

---

[61] The Court's initial decision also considered discussion in a 1958 bulletin that "bank discounts as commonly understood do not apply to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures." *Starr*, 106 Fed. Cl. at 85-86.  This language, however, concerned the meaning of the term "discount" within the context of Section 6(a)(4) of the Bank Holding Company Act (BHCA), which prohibits a subsidiary bank from making any "loan, discount, or extension of credit" to its bank holding company or to a fellow subsidiary bank.  As such, it merely distinguished the purchase of equity as falling outside Section 6(a)(4)'s prohibition on intra-company lending.  *See* 44 Fed. Reserve Bulletin 241, 260-69 (Mar. 1958).  The bulletin did not purport to define the permissible scope of lending activities pursuant to Section 13(3) of the Federal Reserve Act.  In addition, even if this language were applicable to Section 13(3), it would address only the types of assets eligible for discount.  It does not even address, much less prohibit, conditioning the discount of eligible assets on the conveyance of "other assets" such as equity as partial consideration.

The Court's earlier analysis further cited commentary to the effect that there "is no express authority for the Federal Reserve to purchase . . . equities." *Starr*, 106 Fed. Cl. at 86 (quoting David Small & James Clouse, Limits the Federal Reserve Act Places on Monetary Policy, 19 Ann. Rev. Banking L. 553, 579 (2000)); *Starr Int'l Co. v. United States*, 107 Fed. Cl. 374, 378 (Fed. Cl. 2012) (same).  However, the quoted commentary expressly concerned only

Congress empowered the Board of Governors to address the particular circumstances of individual requests for rescue loans by allowing it to prescribe limitations or restrictions on those loans in accordance with its policy judgments, as to which the statute presented no constraints that would prevent consideration of taxpayer interests, moral hazard, scale or riskiness of the loan, surrounding market conditions or other factors that might affect the Board of Governors' judgment.  This express delegation of authority reflects Congress' intent that the agency, not the courts, have the necessary expertise to craft appropriate policy and devise terms for specific loans, and that the agency's judgments with respect to "unusual and exigent circumstances" not be second-guessed by the courts.  *See Douglas v. Ind. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1210 (2012) ("[T]he agency is comparatively expert in the statute's subject matter.  And the language of the particular provision at issue here is broad and general, suggesting that the agency's expertise is relevant in determining its application."); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agencies' determinations should be respected when the administration of a statute "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns" (quoting *Pauley v. Beth Energy Mines, Inc.*, 501 U.S. 680, 697 (1991)).[62]

---

the purchase of equities as part of the Federal Reserve's open market operations to implement general monetary policy pursuant to Section 14 of the Federal Reserve Act, not any limitation on conditioning Section 13(3) rescue lending on the provision of equity as partial consideration to offset credit risk and to take into account moral hazard costs.  *See* Small & Clouse, 19 Ann. Rev. Banking L. at 556, 570-74 & n.79.

[62] Courts have similarly recognized, in the context of challenges to agency action under the Administrative Procedure Act, that judicial review will not be available to second-guess agency decisions that are "committed to agency discretion by law" because "the applicable law is so broadly drawn that the Court has no standard or substantive priorities by which to measure an agency's discretion."  *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996) (quoting 5 U.S.C. § 701(a)(2) and *Cmty. Action of Laramie Cnty. Inc. v. Bowen*, 866 F.2d 347, 353 (10th Cir. 1989)).

On the United States' motion for reconsideration of its motion to dismiss, the Court recognized the distinction between "purchasing" equity and requiring the provision of equity as consideration for a rescue loan,  after having concluded that "[f]or purposes of ruling on the Government's motion to dismiss" FRBNY had purchased the Series C preferred stock, but nonetheless did not revise its determination at that stage that FRBNY could not condition its lending on the provision of equity because "interest rates are the only permissible form of consideration for a loan under the [Federal Reserve Act]." *See Starr*, 107 Fed. Cl. at 378.  The Court's analysis — predating this motion's presentation of the authority conferred by the last sentence of section 13(3) and Congress' statutory confirmation of the Board's authority to prescribe equity under section 13(3) following the AIG transaction — focused on Section 13(3)'s specific reference to interest rates but not to other forms of consideration (a conclusion that appeared implicitly to rely upon the so-called "expressio unius est exclusio alteribus" canon of construction).  Congress, however, in no sense limited the consideration for rescue loans when it specifically authorized the Board of Governors in the last sentence of that section to prescribe such "limitations" and "restrictions" on particular emergency rescue loans as it considered appropriate. *See Starr*, 106 Fed. Cl. at 85; 107 Fed. Cl. at 378.

Courts have generally recognized that "[t]he expressio unius canon is a feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696–97 (D.C. Cir. 2014).  Particularly "when countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress' intent." *Id.*  Here, Section 13(3) ends with a broad grant of authority to prescribe limitations and

restrictions on loans.  Nothing in Section 13(3)'s reference to interest rates "unambiguously

suggests Congress intended to strip [that] broad grant of authority."  *Id.* at 696-97.

2.      Congress Confirmed That The Board Of Governors
Could Validly Authorize Rescue Lending Conditioned
On AIG's Agreement To Provide Equity

Subsequent statutory enactments confirm that Section 13(3)'s broad scope of authority

includes the power to condition a loan on a grant of equity.  Since October 2008, Congress has

twice endorsed the interpretation that a Section 13(3) loan may be conditioned on equity.  Just

two weeks after the rescue of AIG, Congress enacted and the President signed the Emergency

Economic Stabilization Act of 2008 (EESA).  Congress ratified the Board of Governors'

authorization of a Section 13(3) loan conditioned on the receipt of equity, by requiring, for the

AIG loan and all future loans under Section 13(3), that the Board of Governors report upon the

recipients of such consideration.  12 U.S.C. § 5235(a), (d).  In particular, Section 129(a) of

EESA provides that the Board of Governors must thereafter report the terms and conditions of all

Section 13(3) lending assistance, including information as to "the recipient of *warrants or any*

*other potential equity in exchange for*" that assistance.  12 U.S.C. § 5235(a)(2) (October 3, 2008)

(emphasis added).

Statutory ratification of the Board of Governors' interpretation of Section 13(3) is

binding on the Court.  As the Supreme Court has repeatedly confirmed, Congress' express or

implied endorsement through legislative action of a statutory interpretation amounts to a binding

adoption of that interpretation.  *See C.F.T.C. v. Schor*, 478 U.S. 833, 846 (1986) (where

Congress has endorsed an "administrative construction" of a statute, courts "cannot but deem

that construction virtually conclusive"); *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435

U.S. 110, 134 (1978) (when Congress "voices its approval" of an administrative interpretation,

31

"Congress is treated as having adopted that interpretation, and this Court is bound thereby"); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 380–81 (1969) (subsequent legislative action demonstrating Congress' approval of an existing interpretation of a statute "is entitled to great weight").  Courts are not empowered to second-guess agency interpretations of their statutory authority that Congress has accepted.

Congress further endorsed the Board of Governors' conclusion that consideration for a Section 13(3) rescue loan is not limited to interest when it amended Section 13(3) in 2010, based in part on legislators' adverse reactions to AIG's having been "bailed out."  In providing that future rescue lending must be directed exclusively to "providing liquidity to the financial system, and not to aid a failing financial company," 12 U.S.C. § 343(B)(i), thereby precluding any future loans to a single entity facing failure like AIG, Congress once again declined to preclude the Board of Governors from requiring conveyance of an equity interest in connection with Section 13(3) lending.  Instead, it reaffirmed the Board of Governors' authority to condition lending on the provision of consideration other than interest, by requiring further reporting of "the amount of interest, fees, *and other revenue or items of value* received in exchange for [Section 13(3)] assistance." *See* 12 U.S.C. § 343(C)(ii)(II).

This amendment, following Congress' prior recognition in EESA that these "other . . . items of value" could include "warrants or any other potential equity," provided "additional evidence of the intended scope of" the Board of Governors' authority to prescribe limitations and restrictions on individual loans.  *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 530-31 (1982). "Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly

discerned." *Bell*, 456 U.S. at 535. "Under these circumstances, it is evident that Congress[] . . . effectively ratified" the determination that the Board of Governors could authorize Section 13(3) lending conditioned on the provision of equity. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000).

### 3. Even If Not Expressly Authorized, The Challenged Loan Terms Are Within FRBNY's Incidental Powers

Even apart from the Board's statutorily enumerated authority to set loan conditions under the last sentence of Section 13(3), conditioning lending on AIG's agreement to grant equity was also a valid exercise of FRBNY's incidental powers under Section 4(4) of the Federal Reserve Act, which authorizes FRBNY to exercise "all powers specifically granted by the provisions of this Chapter and *such incidental powers as shall be necessary to carry on the business of banking* within the limitations prescribed by this Chapter." 12 U.S.C. § 341 (Seventh) (emphasis added). This reference to "incidental powers" inherently contemplates the recognition of authority to act in ways not specifically enumerated in the statute. *Cf. Sec. Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1044, 1049 (2d Cir. 1989); *M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977); *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972) (all interpreting the National Bank Act, the model for the Federal Reserve Act).

Absent a statutory restriction of the Board of Governors' authority, which Starr cannot identify because it does not exist, the Federal Reserve Act's "incidental powers" authorization also inherently extends the scope of permissible terms and conditions on rescue loans beyond the terms expressly enumerated in the text of Section 13(3). *See NationsBank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995) ("incidental powers" provision gave the Comptroller of the Currency "discretion to authorize activities beyond those specifically enumerated" in the National Bank Act); *see also Nat'l Ass'n of Mfrs. v. Secs. & Exchange*

33

*Comm'n*, 748 F.3d 359, 366 (D.C. Cir. 2014) ("[D]iscretion may be exercised to regulate

circumstances or parties beyond those explicated in a statute.").  Interpreting the scope of

permissible terms of rescue loans to include only interest would read the last sentence of Section

13(3) and the incidental powers provision of Section 4(4) out of the Federal Reserve Act and

improperly render them mere surplusage.  *See Astoria Federal Sav. and Loan Ass'n v. Solimino*,

501 U.S. 104, 112 (1991) (statutory provisions should not be rendered superfluous).

 While the Court's earlier provisional ruling regarding the scope of FRBNY's incidental

powers expressed a need for further factual development, the record establishes that the Board of

Governors authorized FRBNY's rescue loan consistent with its determination that conditioning

the AIG loan on the provision of equity was a valid exercise of incidental powers.[63]  In

*NationsBank*, the Supreme Court confirmed the authoritativeness of a determination by the

Comptroller of the Currency regarding the scope of banks' "incidental powers" under an

analogous provision of the National Bank Act.  513 U.S. at 258 n.2.  As the Court explained, "If

the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the

legislature's revealed design, we give the administrator's judgment 'controlling weight.'"  *Id.*

Because the Comptroller was "charged with enforcement" of this provision, the "incidental

powers" provision gave him "discretion to authorize activities beyond those specifically

enumerated" if the exercise of that discretion remained within "reasonable bounds."  *Id.*

 The Board of Governors is similarly charged with the interpretation and enforcement of

section 4(4) of the Federal Reserve Act as the supervisor of the Reserve Banks.  12 U.S.C. § 248.

This is confirmed by Congress' provision in Section 13(3) that the Reserve Banks may extend

emergency credit only as authorized by the Board of Governors including such restrictions and

---

[63] FRB018-01228070 (September 17, 2008 Alvarez memorandum); Alvarez Tr. 204:15-207:7,
212:22-213:16.

limitations as the Board of Governors may prescribe.  Thus, the Board of Governors'

determination that conditioning lending on AIG's agreement to provide equity was useful to

achieve the goals of protecting taxpayer interests and mitigating moral hazard was clearly within

the Board's authority under the incidental powers clause.  The Board of Governors and FRBNY

were best positioned to assess whether requiring AIG to provide equity as a condition of

FRBNY's unprecedented support of AIG was useful to the exercise of FRBNY's rescue lending

function and therefore incidental to the business of banking.  *See C.F.T.C. v. Schor*, 478 U.S.

833, 845 (1986) ("An agency's expertise is superior to that of a court when a dispute centers on

whether a particular regulation is 'reasonably necessary to effectuate any of the provisions or to

accomplish any of the purposes' of the Act the agency is charged with enforcing; the agency's

position . . . is therefore due substantial deference.").

    In contending that the equity terms of the rescue loan were beyond the limits of

FRBNY's enumerated or incidental power, Starr conflates the issue of FRBNY's power to

condition a Section 13(3) loan on a grant of equity with the separate issue of FRBNY's power to

hold equity.  In EESA, Congress confirmed that the equity on which a Section 13(3) loan is

conditioned can be held by an entity other than the reserve bank extending the loan.  In

particular, Congress required the Board of Governors to identify "the recipient of warrants or any

other potential equity in exchange for the loan" — a requirement that would be superfluous if

only the reserve bank extending the loan could receive the equity.  Thus, whether or not a reserve

bank can hold equity has no bearing on whether it can condition as Section 13(3) loan on equity.

    Further, Starr's contention is predicated on a misreading of a 19th-century Supreme

Court decision addressing national banks' power to "deal in" stock under the National Bank Act.

*Cal. Nat'l Bank v. Kennedy*, 167 U.S. 362 (1897).  *Kennedy* merely held that national banks

lacked the power to "deal in" stock as speculative purchasers, while expressly recognizing that

national banks could acquire stock as an incident of their lending activities. *Id.* at 366-67, 369,

relying on *First Nat'l Bank of Charlotte v. Nat'l Exch. Bank of Baltimore*, 92 U.S. 122 (1875).

As the Supreme Court explained in *First National Bank of Charlotte*, the statutory "prohibition

against trading and dealing [equities] was nothing more than a prohibition against engaging in

the ordinary business of buying and selling [stock] for profit, and did not include purchases

resulting from ordinary banking transactions."  92 U.S. at 128; *see also Starr Int'l Co. v. Fed.*

*Reserve Bank of New York*, 906 F. Supp. 2d 202, 241 (S.D.N.Y. 2012) ("Starr misreads

*Kennedy* . . . . *Kennedy* held that national banks could not engage in the speculative purchase of

stock.  But it absolutely did not hold that such banks were prohibited from *holding* stock at all.

Quite the contrary…") (emphasis in original). *Cf.* O.C.C. Inter. Ltr. (May 10, 2004), 2004 WL

1563358 (ruling that the receipt of warrants as partial consideration for a loan did not amount to

forbidden speculative behavior).[64]

The case for reserve banks acquiring equity as an incident to Section 13(3) lending is

even stronger than the case for national banks acquiring equity as an incident to routine lending.

*Kennedy* concerned the scope of powers incidental to routine banking transactions rather than

rescue loans expressly limited to "unusual and exigent circumstances" under the Federal Reserve

---

[64] Regulations and opinions construing the scope of national banks' incidental powers provide
further support for FRBNY's authority to condition its lending on the provision of equity to the
Trust.  *See* 12 C.F.R. § 7.1006 ("A national bank may take as consideration for a loan a share in
the profit, income, or earnings from a business enterprise of a borrower."); O.C.C. Inter. Ltr.
(July 15, 1992), 1992 WL 486905 ("[The OCC] recognizes the authority of a national bank to
take a share in the profit, income or earnings of a business enterprise as a full or partial substitute
for interest.  This aspect of a lending arrangement is sometimes referred to as an 'equity
kicker.'"); O.C.C. Inter. Ltr. (May 10, 2004), 2004 WL 1563358 at 2 (allowing a bank that had
obtained warrants as partial consideration for a loan to exercise them and thereby briefly to own
stock in the borrower before selling it to a third party, and finding that such ownership was not
improperly "investment-driven").

Act, where credit risk and moral hazard concerns are heightened.  *Kennedy* also did not interpret the last sentence of Section 13(3) of the Federal Reserve Act, which was promulgated more than thirty years later and was a grant of express authority.  The ruling in *Kennedy* was predicated on an absence of authority, not an affirmative prohibition; Congress' grant of authority in the last sentence of Section 13(3) provides an additional source of authority not present in *Kennedy*.

4.    <u>The Equity Was Properly Held By An Independent Trust</u>

In arguing that the Trust holding the equity was a "sham" intended to circumvent FRBNY's supposed inability to hold equity, Starr conflates the issue of FRBNY's power to condition a Section 13(3) loan on a grant of equity with the separate issue of FRBNY's power to hold equity.  Following the AIG rescue, Congress confirmed in EESA that equity properly may be a condition of Section 13(3) financing, and Starr's separate question of who may hold the equity — which need not be reached in light of Congress' confirmation — provides no basis to hold illegal the conditioning of a Section 13(3) loan on equity.  Indeed, Starr lacks standing to complain about the identity of the holder of the equity because, once the equity was granted, the identity of the particular entity holding it had no relationship to any harm alleged by Starr.

Even if FRBNY was not authorized to hold equity received as a condition of a Section 13(3) loan (and it was), and even if that issue had any bearing on Starr's exaction claim (and it does not), there was no illegality, because FRBNY never acquired any equity interest in AIG. Instead, AIG agreed to cause all economic and voting interests in AIG's Series C preferred stock to reside solely in the "AIG Credit Facility Trust, a new trust established for the benefit of the United States Treasury."[65]

---

[65] PX 11, Credit Agreement at Ex. D.

The Court, in denying the United States' motion to dismiss, indicated a sense of need for further factual development of the reasons for creating the Trust. *See Starr*, 106 Fed. Cl. at 87. Discovery has shown that the Trust was established to resolve policy concerns associated with FRBNY's holding an economic or controlling voting interest in a public company while also having the capacity to affect markets and possessing non-public knowledge about companies, markets, moves in the economy and monetary policies.[66] With the Trust holding the AIG Series C preferred shares, shareholder votes with those shares were cast by trustees without FRBNY's special knowledge, and with the Trust holding all economic interests for the benefit of taxpayers, FRBNY had no economic stake in the value of those shares. The creation of the Trust also had the collateral benefit of obviating the need for further consideration of whether FRBNY or Treasury could hold the equity themselves — in a context where the Board of Governors, FRBNY and Treasury never concluded that they actually lacked such authority.[67]

Starr cannot point to any provision of the Trust Agreement or action by the Trustees indicating that they were mere puppets of the Board of Governors or FRBNY and failed to exercise independent judgment. The Trustees have testified that they considered information and perspectives obtained from each of FRBNY, the Board of Governors, and AIG management and staff in exercising their responsibilities as holders of the nearly 80 percent equity interest in AIG, but made their decisions (which principally consisted of finding new directors and casting votes as shareholders, and specifically did not involve day-to-day management of AIG) entirely

---

[66] United States RCFC 30(b)(6) (Baxter) Tr. 96:14-97:23, 103:12-15; Baxter Tr. 171:23-172:24; United States RCFC 30(b)(6) (Alvarez) Tr. 156:15-158:1, 159:21-161:1.

[67] *See* Alvarez Tr. 224:19-225:4; Davis Polk RCFC 30(b)(6) (Huebner) Tr. 88:24-90:5, 117:3-118:7; Albrecht Tr. 51:4-15, 86:21-87:20, 96:16-97:13, 109:12-113:15.

independently.[68]  There is no basis in these circumstances for treating the Trust as a sham

designed only to evade prohibited ownership of stock or for disregarding the Trust's status as a

legally separate and independent entity from FRBNY and the Government.

> **B.   Starr Cannot Prevail On Its Illegal Exaction Claim Even If The Equity Interest Exceeded FRBNY's And The Board Of Governors' Statutory Authority**

> > **1.   Starr Cannot Establish That All Economically Equivalent Alternatives To The Series C Preferred Stock Would Be Invalid**

Starr cannot prevail upon its exaction claim under any circumstance, because the Credit

Agreement requires replacement of any illegal term with the closest economic equivalent that is

not illegal.  Section 8.12 of the Credit Agreement provides:  "[i]n the event that any one or more

of the provisions contained in this Agreement . . .  should be held invalid, illegal or

unenforceable in any respect . . . [t]he parties shall endeavor in good faith negotiations to replace

the invalid, illegal or unenforceable provisions with valid provisions the economic effect of

which comes as close as possible to that of the invalid, illegal or unenforceable provisions."  In

short, AIG agreed, in return for its rescue, that it would convey the economic equivalent of what

it agreed to, in the event any term proved to be invalid, illegal or unenforceable.

Thus, even if the Board of Governors and FRBNY had exceeded their legal authority,

Starr would not have suffered any compensable injury because AIG was contractually bound to

provide the economically equivalent alternative to 79.9 percent of AIG's common stock.

> > **2.   Starr Waived Its Right To Assert That The Equity Interest Was Invalid By Waiting To Challenge It Until After Starr Had Benefitted From The Rescue**

In addition, Starr's failure to timely challenge the legality of the equity interest precludes

Starr from doing so now.  While Starr now claims that FRBNY exceeded its statutory authority,

---

[68] May 13, 2009 Statement of the Trustees of the AIG Credit Facility Trust Before the
Committee on Oversight and Government Reform, at 6-8, 11; Feldberg Tr. 63:2-18; *see also*
AIG Credit Facility Trust Agreement at 2 and § 2.04(f), (g).

it made no such claim for more than three years while it benefited enormously from FRBNY's rescue of AIG and later assistance from Treasury. It was only after Starr had enjoyed the benefit of these rescues, when AIG no longer needed government support to survive, that Starr contended for the first time that the equity interest was invalid.

The Federal Circuit has made clear that a plaintiff that does not promptly challenge an allegedly illegal agreement waives its right to later seek to undo that agreement on the grounds that the Government exceeded its authority. *See AT&T v. United States*, 307 F.3d 1374, 1380-81 (Fed. Cir. 2002) ("*AT&T V*") ("[T]he proper time for AT&T to have raised the issues that it now presents was at the time of contract negotiation . . . . [E]ven were AT&T to have stated a valid claim . . . this court's case law would require a finding that AT&T waived that claim."); *Whittaker v. Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed. Cir. 1997) (contractor that failed to timely object to allegedly illegal contractual term waived its right to challenge the agreement's validity); *see also, e.g., VKK Corp.*, 244 F.3d at 123. Starr rested silently for years while it enjoyed repeated rescues that FRBNY and the United States might not have provided or might have provided on different terms (including direct purchases of equity, expressly permitted as part of rescues by the TARP legislation enacted in October 2008) if Starr had asserted that the equity interest was invalid. Between September 2008 and January 2011, while FRBNY and the United States collectively provided about $182 billion in support to AIG, Starr never took any action to challenge the equity interest as legally invalid.[69] Starr's strategic election to forego complaint should preclude its belated attempt to extract billions more of taxpayer dollars now.

---

[69] To the contrary, Starr repeatedly asked the United States to reduce voluntarily the size of the equity interest to facilitate potential private capital raises by AIG, never asserting that the equity interest was legally invalid. *See, e.g.*, STARR-CFC-022569, Notes entitled "Comments for Meeting w/ Tim Geithner" (Nov. 14, 2008); STARR-CFC-045748, Email from Mona Benedetto to Larry Summers (Feb. 2, 2009); STARR-CFC-009954, Letter from Hank Greenberg to

3.     Starr Cannot Recover On Its Claim For Exaction Because Section 13(3) Is Not Money-Mandating

At the motion to dismiss stage, the Court reserved judgment on whether Section 13(3) was money-mandating.  *See Starr*, 106 Fed. Cl. at 84 ("[T]he Court concludes that it is premature at this stage to rule decisively on the issue.").  Now, having had the opportunity to fully develop the issue, Starr still cannot demonstrate that Section 13(3) "provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted."  *Norman*, 429 F.3d at  1095.

Section 13(3) does not expressly provide a monetary remedy, and it is not implicitly money-mandating because its provisions were not drafted to protect borrowers or their shareholders.  *Cf. Clevenger Roofing & Sheet Metal Co. v. United States*, 8 Cl. Ct. 346, 353-54 (1985) (statute setting minimum wage requirements on Federal construction projects was not money-mandating because it was not "enacted to benefit contractors") (quoting *United States v. Binghamton Contr. Co.*, 347 U.S. 171, 176-77 (1954)).  Every case that has considered the purpose of FRBNY's rescue lending has recognized that it is meant to advance the public interest in a stable financial system, not to protect individual borrowers or their shareholders.  *See Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 42 (2d Cir. 2014) (noting that FRBNY has an "obligation to act in the public interest as a fiscal agent of the United States" when acting under Section 13(3)); *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060, 1068 (S.D.N.Y. 1979) ("Loans made by the Federal Reserve are made for a public purpose[;] they are not intended to serve private interests."), *aff'd*, 629 F.2d 233 (2d Cir. 1980); *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 210, 217–19 (E.D.N.Y. 1979) (emergency lending is intended to

---

Timothy Geithner (Feb. 6, 2009); STARR-CFC-025716, Correspondence from Maurice Greenberg to Timothy Geithner (Dec. 20, 2010).

"preserve the stability of the banking system, to minimize the losses to the public, and to reduce the possibility of grave national and international financial repercussions"); *see also Lucas v. Fed. Reserve Bank of Richmond*, 59 F.2d 617, 620–21 (4th Cir. 1932) ("no one can complain of" a Federal reserve bank's allegedly exceeding its authority "'except the government', the sovereign which created and limited its powers").

The provisions of Section 13(3) were enacted to protect the public interest in the integrity and soundness of the economy and to guard against excessive risks to taxpayers.  As the Board of Governors recognized in a bulletin promulgated just months after the enactment of Section 13(3), the requirements of the statute were "safeguards" intended to "protect the liquidity of the assets of the Federal reserve banks."  Fed. Reserve Bull. (Aug. 1932), at 474.  *See also* 12 C.F.R. § 201.4(d) (prohibiting loans under Section 13(3) absent a finding that "failure to obtain such a credit would adversely affect the economy").  *Kennedy* similarly reinforces that any limitations on FRBNY's authority were intended to protect the Federal Reserve System itself, not borrowers and their shareholders.  *Kennedy*'s prohibition on "dealing in" stocks was intended to preserve the soundness of banks' balance sheets by preventing them from engaging in speculative stock trading, *see First Nat'l Bank of Charlotte*, 92 U.S. at 128, not to shield borrowers from giving up equity as consideration for loans.

Because Section 13(3) is not explicitly or implicitly money-mandating, the Court should grant summary judgment on Starr's illegal exaction claims for that reason, as well.

## THE REVERSE STOCK SPLIT CLAIM

No right was taken or illegally exacted from the reverse stock split class.  The undisputed evidence demonstrates the common shareholders had no right to a separate class vote on the reverse stock split; that AIG, not the United States, proposed the reverse stock split; and that a

42

majority of the common shareholders approved the reverse stock split.  For any one of these reasons, the Court should grant summary judgment on the reverse stock split claims.

## STATEMENT OF UNDISPUTED FACTS

I.    **No One Represented To The Court In The *Walker* Litigation That Common Shareholders Would Have A Separate Class Vote On A Reverse Stock Split Or Before The Trust Disposed Of Its Preferred Shares**

On November 4, 2008, AIG shareholder Wilma Walker sued AIG and its directors in the Delaware Court of Chancery, seeking a declaration that the preferred shares AIG agreed to issue to the Trust were not convertible unless the common stockholders had a class-only vote to increase the number of authorized shares.  Ms. Walker claimed the directors had breached their fiduciary duty to protect the common stockholders' right "to reject the dilution of their shares."[70]

On a November 7, 2008 teleconference with the Court of Chancery, counsel for AIG confirmed that, as Delaware law required, "any amendment to its certificate of incorporation to increase the number of authorized shares of common stock or to change the par value of that stock requires a class vote of holders of record of a majority of the shares of common stock outstanding on the record date of that vote," and that "to the extent the separate class vote is required, [the Series C preferred shares] do not get to vote on that class vote."[71]  Ms. Walker's counsel agreed that AIG's statements mooted her request for declaratory relief on the issue.[72]

_____

[70] Compl., *Walker et al. v. AIG, et. al.*, CA No. 4142-CC (Del. Ct. Chancery, Nov. 4. 2008) ¶ 6.

[71]  STARR-CFC-023514, Hearing Transcript, *Walker et al. v. AIG, et. al.*, CA No. 4142-CC, dated November 7, 2008 ("*Walker* Transcript") at STARR-CFC-023520, -25. *See also* AIG Form 10-Q at 29 (describing these representations).

[72]  *Walker* Transcript at STARR-CFC-023523.

On January 22, 2009, Ms. Walker's counsel submitted "a proposed Stipulation and Order of Dismissal" on behalf of all parties,[73] which the court signed on February 5, 2009.[74]  That order recited that "based on" AIG's representation that any proposal "to increase the number of authorized common shares or to decrease the par value of the common shares would be the subject of a class vote by the holders of the common stock," "plaintiff's counsel agreed that the plaintiff's request for an order granting this relief is moot." [75]  The order also stated that "Plaintiff is voluntarily dismissing its breach of fiduciary duty claim without prejudice."[76]

At no point did AIG — or the Government, FRBNY, or the Trust —  represent that there would be a separate class vote on any proposed amendment to its certificate of incorporation to change the number of AIG's outstanding common shares, or to allow the Series C preferred shares to be traded for common shares.  AIG represented only that it would adhere to its statutory obligations if it proposed an amendment — not that it would propose any particular amendment, or that it would afford shareholders any other voting rights not provided for by Delaware law.[77] Because the reverse stock split proposal would not change the number of authorized shares, it was not subject to the requirement of a separate class vote under Delaware statute, and thus was not subject to AIG's representation.

---

[73]  Pl.'s Letter to Chancellor Chandler in *Walker v. AIG*, CA No. 4142-CC (Jan. 22, 2008).

[74] STARR-CFC-023131-34 (Stipulation and Order of Dismissal, 2/5/2009) (hereinafter "*Walker* Stipulation").

[75] *Id.* at STARR-CFC-023132.

[76] *Id.*

[77] *Id.*

**II.    AIG — Not The Government, FRBNY, Or The Trust — Decided To Propose The Reverse Stock Split And Decided The Split's Terms**

There is no evidence that the Government, FRBNY, or the Trust had any involvement in (1) the decision to propose a reverse stock split, (2) the split's ratio, or (3) whether the split would apply only to issued shares.  Rather, the evidence unequivocally demonstrates that AIG itself made those decisions for its own reasons.  There is no evidence that the Government, FRBNY, or the Trust initiated, orchestrated, or pressed for those decisions.  Rather, their involvement was limited to reviewing drafts of the proxy statement that AIG sent them, but neither the Government, nor FRBNY, nor the Trust provided substantive comments or proposed changes concerning the reverse stock split.[78]

On October 22, 2008, the New York Stock Exchange (NYSE) sent AIG a letter warning that because the company's common shares were trading at a low price per share, they were at risk of being delisted under NYSE rules.  NYSE "noted that [AIG's] common stock has recently been trading at levels below $5.00 per share," and "[a]ccordingly, [NYSE] wanted to draw [AIG's] attention to" the requirement that NSYE-listed companies have an "[a]verage closing share price of not less than $1.00 over a 30 day trading period."[79]  AIG decided to propose a reverse stock split because it wanted to raise its share price and avoid the adverse consequences of delisting.[80]  Based on its internal analysis and external advice, AIG determined to propose a

---

[78] *See* PX 616, Email and attachments from Kathleen Shannon to Sarah Dahlgren et al. (Mar. 17, 2009); PX 617, Email and attachments from Peter Bazos to Stephen Albrecht (Mar. 27, 2009).

[79] AIGSTARR00358438, Letter from Glenn W Tyranski to Edward Liddy (Oct. 14, 2008).

[80] *See* Herzog Tr. 196:12-25; Offit Tr. 307:5-12; Liddy Tr. 342:8-343:5; Kelly Tr. 164:20-25; Shannon Tr. 212:20-213:3; 256:2-5.

45

stock split ratio of 20:1 in order to achieve a desired price range for its common stock.[81]  AIG

decided to apply the reverse stock split only to issued shares in order to make as few changes as

possible to the charter, due to the already complex nature of the June 2009 proxy statement.[82]

On May 20, 2009, AIG's board of directors approved the proxy statement, which was

filed on June 5, 2009.[83]  In the proxy statement, AIG explained:

> The primary purpose of the reverse stock split is to increase the per share
> trading price of AIG Common Stock . . . . and thus allow a broader range of
> institutional investors to invest in AIG Common Stock, increase other investor
> interest in AIG Common Stock and help ensure the continued listing of AIG
> Common Stock on the NYSE.[84]

The proxy statement also expressly disclosed:

> An overall effect of the reverse stock split of the outstanding AIG Common
> Stock will be a reduction of the total number of outstanding shares of AIG
> Common Stock approximately in proportion to the one-for-twenty reverse
> stock split ratio and therefore an increase in authorized but unissued shares of
> AIG Common Stock.  ***AIG currently has no plans for these authorized but
> unissued shares of AIG Common Stock*** other than those shares previously
> reserved for issuance under AIG's Equity Units, the Warrants and AIG's
> employee benefit plans.[85]

AIG's Rule 30(b)(6) witness testified without contradiction that AIG had no intention in

June 2009 to issue these shares, and that the plan to exchange Series C shares for common did

---

[81] AIG RCFC 30(b)(6) (Reeder) Tr. 326:2-327:3; AIGSTARR00298704.

[82] AIG RCFC 30(b)(6) (Reeder) Tr. 226:17-227:2, 230:16-17.

[83] PWC_STARR_US02543584, Minutes of a Meeting of Directors American International
Group, Inc. held May 20, 2009; Proxy Statement Notice of Annual Meeting of Shareholders,
(June 5, 2009) ("AIG June 5, 2009 proxy statement").

[84] AIG June 5, 2009 proxy statement at 66-67; *see also, e.g.*, Offit Tr. 306:24-307:23; Liddy Tr.
342:8-343:5; Kelly Tr. 164:20-25; Shannon Tr. 212:20-213:3, 256:2-5; AIG RCFC 30(b)(6)
(Reeder) Tr. 325:12-327:3; AIGSTARR00298704, Email from Jordan Kovler to Kathleen
Shannon (Jan. 21, 2009).

[85] AIG June 5, 2009 proxy statement at 67 (emphasis added).

not emerge for more than a year after the June 2009 shareholders meeting.[86]

### III.   The Common Shareholders Were Aware Of The Potential Effects Of The Reverse Stock Split And Voted In Favor Of It

The proxy statement contained a table disclosing the number of common shares that would

be authorized, issued, and unissued if the reverse stock split (Proposal 4) was approved:[87]

| Number of shares of AIG Common Stock | If Proposal 3 is approved, but Proposal 4 is not | If Proposal 4 is approved, but Proposal 3 is not | If Proposals 3 and 4 are both approved |
|---|---|---|---|
| Authorized | 9,225,000,000 | 5,000,000,000 | 5,211,250,000 |
| Issued | 2,948,018,614 | 147,400,931 | 147,400,931 |
| Reserved but unissued | 395,343,040 | 19,767,152 | 19,767,152 |
| Authorized but unissued and unreserved | 5,881,638,346 | 4,832,831,917 | 5,044,081,917 |

These disclosures clearly informed common shareholders that, although the reverse split

would not change their current percentage ownership of AIG common stock, approving the split

would have the effect of making available for future issuance nearly 5 billion shares of common

stock, nearly 97 percent of the total number of authorized shares.

The proxy statement also explained that, if the reverse stock split passed, "[i]n the future,

these [authorized but unissued] shares may be issued by AIG's Board of Directors in its sole

discretion. *Any future issuance will have the effect of diluting the percentage of stock

ownership and voting rights of the present holders of AIG Common Stock*."[88]

The preferred and common shareholders voted to approve the reverse stock split on

June 30, 2009.  Although the common shareholders did not vote as a separate class, a majority of

common shareholders, including Starr itself, voted for the reverse stock split.[89]

---

[86]  AIG RCFC 30(b)(6) (Reeder) Tr. 327:18 -330:10.

[87]  AIG June 5, 2009 proxy statement at 65.

[88]  *Id.* at 67 (emphasis added).

[89]  Pl.'s Am. Responses & Objections to Def.'s Requests for Admission ("Starr Responses to RFAs"), at Response Nos. 213 and 214.

## ARGUMENT

I.   **Starr Has Not Identified A Property Right Because The Common Shareholders Had No Right To A Class-Only Vote**

"[A]s a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  Cognizable property interests are limited by "existing rules or understandings" that stem from a source independent of the Fifth Amendment. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992); *see also Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

Starr's reverse stock split claim turns on "whether the common shareholders were entitled to a separate class vote on the reverse stock split." *Starr*, 106 Fed. Cl. at 74.  Starr has conceded that its rights as a common shareholder, as defined by Delaware law, did not include a right to a separate class vote on the reverse stock split. *Id.* at 73 (citing Tr. 105 (Boies)).  Rather, Starr has argued that a right to a separate vote of the common shareholders on the split arose either from statements allegedly made to the Delaware court in the *Walker* litigation, or because the split allegedly was engineered to circumvent the requirement of a separate class vote on increasing the number of authorized shares.  *See id.* ("Starr submits that the common shareholders were entitled to such a vote due to AIG's past representations in the Delaware Court of Chancery."); 2d Am. Compl. ¶ 115 (calling the reverse stock split a "'backdoor' scheme to effectively increase the number of authorized shares without a class vote").  Now that the parties have completed discovery, the uncontroverted evidence disproves those arguments.

A.     No Right To A Separate Class Vote On The Reverse
       Stock Split Was Created by the *Walker* Consent Order

Under Delaware law, common shareholders have a right to a separate class vote before a

Delaware corporation can change the number of authorized common shares or change their par

value.  8 Del. Code § 242(b)(2).  Nothing in the *Walker* litigation expanded that right.

Specifically, there is no evidence that AIG — much less the Government, FRBNY, or the

Trust, none of which participated in that litigation[90] — represented to the Court of Chancery that

common shareholders would have a separate class vote on anything other than what Delaware

law already required.[91]  Instead, AIG represented only that if the company proposed to increase

the number of authorized common shares or reduce their par value, then it would comply with

Section 242(b)(2)'s requirement of a class vote.  AIG did not represent that its common

shareholders would have a class vote on any other proposal with the potential effect of

permitting potential "dilution" of common shares, including the reverse stock split that AIG

eventually proposed.  Accordingly, in expressly identifying the representations on which it

rested, the stipulated order dismissing the *Walker* lawsuit recited only AIG's representation to

comply with Section 242(b)(2).[92]

Given these facts, the Consent Order did not create any right to a separate class vote

---

[90] AIG has acknowledged that "neither FRBNY nor the Government was a party to, made an
appearance in, or made any representation to the Court" during the *Walker* lawsuit.  AIG
Responses to RFAs at Response No. 20.

[91] *See Walker* Transcript; Defs.' Br. Opposing Pls.' Application for Att'ys' Fee Award, CA No.
4142-CC, at 6-7 (Del. Ct. Chancery, Feb. 25, 2009).

[92] *Walker* Stipulation (reciting AIG's representation that that "any amendment to the Restated
Certificate of Incorporation to increase the number of authorized common shares or to decrease
the par value of the common shares would be the subject of a class vote by the holders of the
common stock").  The order also quoted AIG's 10-Q filing which reiterated the same
representation.

beyond that granted by Section 242(b)(2).  As the United States Supreme Court has explained, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it," because "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms."  *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).  Nothing within the "four corners" of the *Walker* Consent Order granted AIG's common shareholders any right to a separate class vote on the reverse stock split, or a general right to exclude others from diluting the common stock.[93]

The Delaware court granted no additional property rights to the common shareholders, and the shareholder class members had no right under Delaware law to a class-only vote on the reverse stock split specifically, or to prevent the dilution of their shares generally.  Therefore, nothing of theirs can be said to be "taken" or "exacted."

B.     The Reverse Stock Split Was Not A "Backdoor Scheme"
        To Circumvent Any Separate Class Vote

There is no evidence to support Starr's allegation that the reverse stock split was "deliberately engineered to ***guarantee*** that sufficient authorized shares of AIG Common Stock were available to allow the Government to convert or exchange its Series C Preferred Stock." 2d Am. Compl. ¶ 112 (emphasis in original).  AIG proposed the reverse stock split to avoid de-listing of its common shares and to increase institutional investment.  The record also shows why Starr's allegation is nonsensical.  The reverse split could not have been intended to allow conversion of the Series C preferred shares, because it did nothing to reduce the par value of the common shares, which remained an obstacle to conversion.  And the reverse split could not have

---

[93]   Further, no individual member of the Stock Split Class was deprived of a majority in any separate class vote, and there is no evidence that the members of the Stock Split Class collectively owned a majority of AIG's common shares during the relevant class period.

been intended to allow exchange of the Series C preferred shares, because there was no plan in 2009 to issue shares of common stock, to the Trust or anyone else,[94] and no exchange of the Series C preferred shares was considered until long after the reverse split.

Moreover, there was nothing impermissible about AIG exchanging its common shares for the Trust's preferred shares without a separate class vote, even if that achieved a result similar to a conversion.[95]  Under Delaware's doctrine of independent legal significance, if two provisions of Delaware law authorize alternative paths to the same result, a corporate action validly taken under one provision need not also satisfy the other.  *See*, *e.g.*, *Field v. Allyn*, 457 A.2d 1089, 1098 (Del. Ch. 1983) ("[I]t is not a valid basis for challenging an act taken under one section to contend that another method of achieving the same economic end is precluded by another section."), *aff'd*, 467 A.2d 1274 (Del. 1983) (per curiam).  Delaware courts have expressly held that a corporation may validly accomplish a transaction in a way that does not require a separate vote of a class of shareholders even if another means of accomplishing the same result would have required such a vote.  *See Warner Commc'ns Inc. v. Chris-Craft Ind., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) ("[T]he language of 242(b)(2) . . . does not entitle the holders of a class of preferred stock to a class vote in a merger, even if (as we assume here) the interests of the class will be adversely affected by the merger."), *aff'd*, 567 A.2d 419 (Del. 1989) (table).

Regardless, the January 2011 exchange of the Series C preferred shares did not achieve the "same economic end" as a conversion of those shares as of right.  Unlike conversion, the exchange of the Series C preferred shares had to be negotiated with AIG, and approved by AIG

---

[94] AIG RCFC 30(b)(6) (Reeder) Tr. at 328:25-329:12; *id.* at 254:14-19 (testifying that "in 2009, there was no intent to do an exchange for the series C").

[95] The parties dispute whether the exchange was economically equivalent to a conversion, but there can be no dispute that they are different legal mechanisms.

management and directors.[96]  Those negotiations took place as part of broader negotiations among AIG, the Government, FRBNY and the Trust over recapitalizing AIG, which began in earnest in March 2010.  Witnesses for both AIG and the Government described these negotiations as significant, extensive, and hard-fought.[97]  AIG used its leverage to extract additional consideration, including warrants for AIG's public shareholders.[98]

Because Starr has failed to establish a property right that could have been taken or exacted by anyone, the Court should grant summary judgment for the Government on the reverse stock split claim.

## II.    The Evidence Does Not Support A Finding Of Government Action

The Court should enter judgment for the Government on the reverse stock split claim because the Government did not act to deprive the shareholder class of any class-only vote on the reverse stock split.  For a takings or illegal exaction claim, "a plaintiff 'may challenge under the Fifth Amendment is what the government has done, not what [third parties] have done.'"  *Navajo Nation v. United States*, 631 F.3d 1268, 1274 (Fed. Cir. 2011) (quoting *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995)) (alteration in original).  Starr alleges that the Government engaged in "machinations" to "increas[e] the percentage of authorized shares available for conversion" through the reverse stock split, *Starr*, 106 Fed. Cl. at 68 (citing Am. Compl. ¶¶ 94-101), but there is no evidence to support Starr's allegation.

---

[96] *See* AIG RCFC 30(b)(6) (Reeder) Tr. at 333:2-337:22); Treasury RCFC 30(b)(6) (Millstein) Tr. at 222:15-225:2.

[97] AIG RCFC 30(b)(6) (Reeder) Tr. at 329:16-18, 344:12-14; Treasury RCFC 30(b)(6) (Millstein) Tr. at 235:10-14.

[98] *See* AIG RCFC 30(b)(6) (Reeder) Tr. at 333:2-337:22; Treasury RCFC 30(b)(6) (Millstein) Tr. at 222:15-225:2.

There can be no taking through the actions of a third party where, as here, there is no evidence that the Government caused, required, or even requested the action by the third party that allegedly effected the taking.  *See Navajo Nation*, 631 F.3d at 1276.  *Cf. Lujan*, 504 U.S. at 560-61 (no standing when injuries alleged are "the result [of] the independent action of some third party not before the court") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (alterations in original) (internal quotation marks omitted).  Nor can there be a taking when the third party did not act for the benefit of the Government.  *See B&G Enters.*, 220 F.3d at 1324 (California did not act as an agent of the United States when it enacted a law because the legislation "was not enacted for the benefit of the federal government").

Similarly, there can be no illegal exaction when the Government does not directly cause the exaction.  *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1364 (Fed. Cir. 2002) ("[A] plaintiff has a claim for an illegal exaction only where the government has direct and substantial impact on the plaintiff asserting the claim.").  For example, a purchaser cannot allege an illegal exaction based upon an excise tax whose cost is passed along to the purchaser from a producer, because the money was not "even extracted by the . . . producers from plaintiff at the direction of the [Government]."  *Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 684 (2002) (granting summary judgment for Government).

The undisputed facts show that AIG, not the Government, proposed the reverse stock split to increase the trading price of the company's common shares, and that the Government, FRBNY, and the Trust did not suggest, seek, or shape the proposal.  The Government did not oppose AIG's pursuit of the reverse stock split, but "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [Government] responsible for those initiatives."  *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982) (discussing state action under

the Due Process Clause of the Fourteenth Amendment); *cf. Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 758 (Fed. Cir. 2013) ("cooperation" is not sufficient to hold the government responsible for the actions of another).

Similarly, the Trust's ownership of the Series C Preferred Shares does not make the Government legally responsible for AIG's decision to pursue the reverse stock split, even leaving aside that the Trust was separate from and independent of the Government.  The Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of" the Government.  *Blum*, 457 U.S. at 1004.

Discovery has revealed no proof that there was any Government "scheme" to "circumvent" anything.  Instead, the undisputed evidence debunks Starr's conspiracy theory. The Court should grant summary judgment for the Government on the reverse stock split claim.

III. **The Evidence Cannot Establish An Economic Impact Because The Majority Of Common Shareholders Voted For The Reverse Stock Split**

Finally, the Court should grant our motion for summary judgment because Starr cannot demonstrate that the shareholder class suffered any harm from not being afforded the class-only vote to which they claim they were entitled.

Starr cannot demonstrate that *anything* would have been different if the common shareholders had been granted the class-only vote Starr alleges they should have received.  There was no harm to common shareholders from not holding a formal separate class vote because any such separate vote would not have changed the outcome.  As Starr has admitted, a majority of AIG's common shareholders, including Starr, voted in favor of the reverse stock split.[99] Therefore, Starr cannot establish either a taking or an illegal exaction.  The Court should reject

---

[99] Starr Responses to RFAs, at Response Nos. 213 and 214.

the class's claims of deprivation of property under the Fifth Amendment.  *See*, *e.g.*, *Seiber v. United States*, 364 F.3d 1356, 1371–72 (Fed. Cir. 2004); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999).

Starr appears to suggest that the common shareholders' vote in favor of the reverse stock split should be disregarded because Starr contends that the proxy statement was misleading when it stated that AIG had no current plans for the authorized but unissued shares that would exist after the reverse stock split.  2d Am. Compl. ¶113; Pl. Resp. to Mot. to Dismiss (Dkt. 41) at 11. No evidence supports Starr's allegation, and Starr's unsupported conjecture cannot defeat summary judgment.  *Barmag Barmer Maschinenfabrik AG,* 731 F.2d at 836.

Regardless, even if some aspect of the proxy statement were misleading, that would still not give rise to a taking or illegal exaction claim.  A misleading proxy statement might be a basis for a tort claim under the Federal securities laws or under state law, but any such claim lies outside this Court's jurisdiction.  *See e.g.*, *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) (holding that the Court of Federal Claims lacks jurisdiction over tort claims); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011) (describing private right of action for material misrepresentation or omission in Federal securities filings); *Malone v. Bricat*, 722 A.2d 5, 11 (Del. 1998) (describing cause of action arising from directors' duty "to provide shareholders with all information that is material to the action being requested").

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant the United States' motion for summary judgment.

Respectfully submitted,

JOYCE R. BRANDA
Deputy Assistant Attorney General

|                          | /s/ Robert E. Kirschman, Jr. |
|                          | ROBERT E. KIRSCHMAN, JR. |
| OF COUNSEL:              | Director |
|                          | |
| KENNETH M. DINTZER       | /s/ Brian A. Mizoguchi |
| Acting Deputy Director   | BRIAN A. MIZOGUCHI |
|                          | Assistant Director |
| RENEE GERBER             | Commercial Litigation Branch |
| VINCENT D. PHILLIPS      | Civil Division |
| AMANDA L. TANTUM         | Department of Justice |
| Trial Attorneys          | P.O. Box 480 |
|                          | Ben Franklin Station |
|                          | Washington, D.C.  20044 |
|                          | Tele: (202) 305-3319 |
|                          | Fax: (202) 514-7969 |
|                          | Email: brian.mizoguchi@usdoj.gov |
|                          | |
| July 10, 2014            | Attorneys for Defendant |