IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY,
INC., on its behalf and on behalf of a class of
others similarly situated,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

No. 11-00779C (TCW)

**PLAINTIFF'S CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BOIES, SCHILLER & FLEXNER LLP
Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Tricia J. Bloomer
Julia C. Hamilton
Ilana Miller
John Nicolaou
Mathew Schutzer
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Samuel C. Kaplan
Amy J. Mauser
Scott E. Gant
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

July 30, 2014

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
John L. Gardiner
Ryan Stoll
Greg Bailey

*Attorneys for Starr International Company,
Inc. and for the Plaintiff Classes*

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    STATEMENT OF FACTS ............................................................................. 2

    A.    The Origin And Purpose Of 13(3) Loans ............................................. 2

    B.    In 2008, "Unusual and Exigent Circumstances" Threatened Virtually
        Every Financial Firm, Including AIG ..................................................... 3

    C.    AIG Met All Of The Requirements For A 13(3) Loan .......................... 4

        1.    The loan to AIG was "fully secured" ........................................ 5

        2.    The Government concluded that it could not allow AIG to fail ................ 5

    D.    Unlike All Other 13(3) Loans The AIG Loan Required The Surrender Of
        79.9% Of The Shareholders' Equity ..................................................... 7

        1.    The terms of the AIG Loan were intentionally "punitive". ........................ 7

        2.    Exacting 79.9% of the AIG shareholders' equity to punish them for
             their company's alleged mistakes was unauthorized and
             unconstitutional. ....................................................................... 8

        3.    Exacting punitive consideration from AIG was inconsistent with
             Defendant's treatment of other financial institutions. ................................. 9

        4.    Exacting punitive consideration from AIG alone was particularly
             unjustified since Defendant itself had materially contributed to
             AIG's distress. ......................................................................... 9

    E.    Defendant's September 16 Non-Negotiable Demand. .......................... 10

    F.    Defendant Assumed Control Of AIG On September 16, And Then
        Unilaterally Changed The Terms Of The Loan ..................................... 11

III.   LEGAL STANDARD FOR SUMMARY JUDGMENT ................................. 12

IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE CREDIT
    AGREEMENT CLASS'S TAKINGS CLAIM SHOULD BE DENIED. ......... 12

    A.    Plaintiffs Did Not Voluntarily Agree To Defendant's Terms And Were
        Not Given An Opportunity To Vote On Those Terms. ......................... 12

    B.    Moreover, The AIG Board's Acceptance Of The Credit Agreement Terms
        Was Under Duress. ............................................................................. 14

1.  Defendant Ignores the Legal Criteria for Duress ...................................... 15

2.  The Circumstances Required to Authorize Section 13(3) Loans By Definition Greatly Heighten the Risk of Duress. ................................... 16

3.  Defendant's Regulatory Failures Contributed Significantly to the Financial Crisis and to AIG's Distress. ................................... 16

4.  Defendant Contributed to AIG's Liquidity Crisis by Refusing AIG Access to Programs and Assistance Offered to Other Financial Institutions ................................................................................. 17

5.  Defendant Affirmatively Acted to Close Off AIG's Options Other Than The Revolving Credit Facility Before Making Its "Take-It-Or-Leave-It" Offer ................................................................ 18

6.  The Fact That Defendant Targeted AIG Shareholders For Punishment and Exploited Its Monopoly Power as Lender of Last Resort to Obtain a Benefit to Which It Was Not Entitled, Also Evidences Duress. ................................................................ 20

7.  Defendant Further Pressured AIG by Giving AIG an Unreasonably (And Unnecessarily) Short Time to Accept or Reject the Offer .............. 21

8.  Between September 16 and September 22 Defendant Unilaterally Changed the Terms of the Deal After AIG was in a Position Where Bankruptcy was Clearly Not an Option. ................................. 21

9.  AIG Had No "Reasonable" Alternative. ................................. 22

V.  THE COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CREDIT AGREEMENT CLASS'S ILLEGAL EXACTIONS CLAIM. ........................................................ 24

A.  The Defendant Lacked Legal Authority Under Section 13(3) To Demand Stock In AIG As A Condition For Providing A Fully Secured Interest-Bearing Loan ................................................................ 24

1.  Defendant Lacked Express Power To Demand Equity. .......................... 24

2.  Defendant Lacked Incidental Power To Demand Equity. . .................... 26

3.  Defendant Is Not Entitled To Deference In Its Interpretation.  . .............. 29

4.  Later Congressional Action Did Not And Could Not Ratify The Defendant's Illicit Conduct.  .................................................. 31

       5.      The Creation Of The Trust Did Not Alter The Illegality Of Defendant's Actions. ............................................................ 33

    B.    The "Economic Equivalent" Provision Does Not Change the Result .................. 36

    C.    The Money-Mandating Requirement Does Not Bar Plaintiffs' Claim ................ 37

    D.    "Voluntary Agreement" Is Not A Defense To Plaintiff's Illegal Exaction Claim. ........................................................................ 38

    E.    Defendant In Particular Lacked Authority To Exact 79.9% Of Plaintiffs' Equity As Punishment. ......................................................... 41

VI.    DEFENDANT CANNOT ESTABLISH LACK OF ECONOMIC LOSS AS A MATTER OF LAW .......................................................... 41

VII.    PLAINTIFFS DID NOT "WAIVE" THEIR CLAIMS OR RATIFY DEFENDANT'S TAKINGS OR ILLEGAL EXACTION. ............................. 44

VIII.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' REVERSE STOCK SPLIT CLAIM SHOULD BE DENIED. ............... 45

    A.    The Stock Split Class Has A Cognizable Property Interest .................................. 46

    B.    The Walker Consent Decree Not Only Reaffirmed Common Shareholders Rights Under Delaware Law But Also Established A Right To A Separate Class Vote. ................................................................. 47

    C.    Delaware Law Protects Common Shareholders Rights To Vote As A Class From Any Measure Specifically Designed To Circumvent The Separate Class Vote Requirement. ................................................... 49

    D.    The Doctrine Of Independent Legal Significance Does Not Override Delaware Law That Prohibits The Use Of Stratagems Designed To Deprive Shareholders Of Their Voting Rights. ..................................... 51

    E.    Defendant's Control Over AIG At The Time of The Reverse Stock Split Is Sufficient To Satisfy Any Purported "Government Action" Requirement For A Takings Or Illegal Exaction Claim. ............................................ 52

    F.    The Manner In Which Common Shareholders Voted On The Proposal Presented To Them Does Not Translate Into A Lack Of Economic Impact Of The Deprivation Of Their Voting Rights. ........................................ 53

IX.    CONCLUSION ................................................................ 55

# TABLE OF AUTHORITIES

## Cases

*A&D Auto Sales, Inc. v. United States,*
   748 F.3d 1142 (Fed. Cir. 2014)................................................................ 20, 41, 42

*Aerolineas Argentinas v. United States,*
   77 F.3d 1564 (Fed. Cir. 1996)........................................................................ 29

*Aircraft Assocs. & Mfg. Co. v. United States,*
   174 Ct. Cl. 886 (1966) ................................................................................. 15

*Alcoa, Inc. v. United States,*
   509 F.3d 173 (3d Cir. 2007)........................................................................... 30

*Amalgamated Sugar Co. v. Vilsack,*
   563 F.3d 822 (9th Cir. 2009) ......................................................................... 30

*American Airlines, Inc. v. United States,*
   551 F.3d 1294 (Fed. Cir. 2008)..................................................................... 37, 45

*American Airlines, Inc. v. United States,*
   77 Fed. Cl. 672 (2007) ............................................................................. 44, 45

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..................................................................................... 12

*ATP Tour, Inc. v. Deutscher Tennis Bund,*
   91 A.3d 554 (Del. 2014) ................................................................................ 51

*Auto Club Ins. Ass'n v. United States,*
   103 Fed. Cl. 268 (Fed. Cl. 2012) .................................................................... 37

*Bilski v. Kappos,*
   130 S. Ct. 3218 (2010) ............................................................................. 25, 31

*Bowman v. United States,*
   35 Fed. Cl. 397 (1996) ................................................................................. 37

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001)..................................................................................... 52

*Brilliant Instruments, Inc. v. GuideTech, LLC,*
   707 F.3d 1342 (Fed. Cir. 2013)....................................................................... 12

*Brody v. Zaucha,*
   697 A.2d 749 (Del. 1997) .............................................................................. 51

*Brookhart v. Janis,*
    384 U.S. 1 (1966)..................................................................................................44

*California National Bank v. Kennedy,*
    167 U.S. 362 (1897)..........................................................................................27, 28

*Casa de Cambio Comdiv S.A. v. United States,*
    291 F.3d 1356 (Fed. Cir. 2002)..................................................................................37

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,*
    400 F.3d 1352 (Fed. Cir. 2005)..................................................................................25

*Catskill Mountains Chapter of Trout Unltd v. City of New York,*
    273 F.3d 481 (2d Cir. 2001)......................................................................................30

*CCA Assocs. v. United States,*
    667 F.3d 1239 (Fed. Cir. 2011)..................................................................................43

*Century Exploration New Orleans LLC v. United States,*
    110 Fed. Cl. 148 (2013) .........................................................................................43

*CFTC v. Schor,*
    478 U.S. 833 (1986)..................................................................................................31

*Chevron U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984)..........................................................................................29, 30

*Colautti v. Franklin,*
    439 U.S. 379 (1979)..................................................................................................25

*Commc'ns Workers of Am. v. Beck,*
    487 U.S. 735 (1988)..................................................................................................26

*Copelands' Enterprises, Inc. v. CNV, Inc.,*
    945 F.2d 1563 (Fed. Cir. 1991)..................................................................................51

*Eldredge v. Dep't of the Interior,*
    451 F.3d 1337 (Fed. Cir. 2006)..................................................................................30

*Eversharp, Inc. v. United States,*
    125 F. Supp. 244 (Ct. Cl. 1954)..................................................................................37

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)..................................................................................................31

*Fed. Reserve Bank of Richmond v. Malloy,*
    264 U.S. 160 (1924)..........................................................................................27, 41

*Field v. Allyn*,
   457 A.2d 1089 (Del. Ch. 1983) ........................................................................ 51

*Figueroa v. United States*,
   57 Fed. Cl. 488 (2003) .................................................................................... 37

*First Nat'l Bank v. Missouri*,
   263 U.S. 640 (1924) ........................................................................................ 27

*Freedlander, Inc. v. Nat'l Bank of North Carolina*,
   706 F. Supp. 1211 (E.D. Va. 1988) ................................................................. 21

*Freeman v. Quicken Loans*,
   626 F.3d 799 (5th Cir. 2010) .......................................................................... 30

*Frost & Frost Trucking v. R.R. Comm'n*,
   271 U.S. 583 (1926) ........................................................................................ 38

*GMO Niehaus & Co. v. United States*,
   153 F. Supp. 428 (Ct. Cl. 1957) ...................................................................... 37

*Hawkins v. United States*,
   30 F.3d 1077 (9th Cir. 1994) .......................................................................... 31

*Hillair Capital Inv., L.P. v. Integrated Freight Corp.*,
   963 F. Supp. 2d 336 (S.D.N.Y. 2013) ............................................................. 37

*Hudson Farms, Inc. v. McGrellis*,
   620 A.2d 215 (Del. 1993) ................................................................................ 49

*In re Pure Resources, Inc. Shareholders Litigation*,
   808 A.2d 421 (Del. Ch. 2002) ......................................................................... 52

*Johnson v. Zerbst*,
   304 U.S. 458 (1938) ........................................................................................ 14

*Kirby Forest Indus. v. United States*,
   467 U.S. 1 (1984) ............................................................................................ 42

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   133 S. Ct. 2586 (2013) .................................................................................... 40

*Langenegger v. United States*,
   756 F.2d 1565 (Fed. Cir. 1985) ....................................................................... 52

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995) ........................................................................................ 26

vi

*Mack v. United States*,
   814 F.2d 120 (2d Cir. 1998)..................................................................... 43

*Mallow v. United States*,
   161 Ct. Cl. 446 (1963) ........................................................................... 37

*Marvin M. Brandt v. United States*,
   134 S. Ct. 1257 (2014)........................................................................... 31

*Morton v. Mancari*,
   417 U.S. 535 (1974)............................................................................... 25

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982)............................................................................... 31

*Nat'l Food & Beverage Co., Inc. v. United States*,
   103 Fed. Cl. 63 (2012) ........................................................................... 42

*Nat'l Bd. of YMCA v. United States*,
   395 U.S. 85 (1969)................................................................................. 52

*NationsBank of N.C. v. Variable Annuity Life Ins. Co.*,
   513 U.S. 251 (1995).......................................................................... 30, 31

*Norman v. United States*,
   429 F.3d 1081 (Fed. Cir. 2005)............................................................... 38

*Osanitsch v. Marconi PLC*,
   2009 WL 5125821 (N.D. Cal. 2009) ....................................................... 23

*O'Bryan v. United States*
   35 Fed. Cl. 397 (1996) ........................................................................... 37

*Paramount Communications, Inc. v. QVC Network Inc.*,
   637 A.2d 34 (Del. 1994) .................................................................... 49, 52

*Parker v. Office of Personnel Mgmt*,
   974 F.2d 164 (Fed. Cir. 1992)................................................................. 30

*Petters Co. Inc. v. BLS Sales Inc.*,
   2005 WL 2072109 (N.D. Cal. 2005) ....................................................... 23

*Prof'l Serv. Network, Inc., v. Am. Alliance Holding Co.*,
   238 F.3d 897 (7th Cir. 2001) .................................................................. 15

*Rainwater v. United States*,
   356 U.S. 590 (1958)............................................................................... 31

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969) .................................................................................................... 31

*Reis v. Hazelett Strip-Casting Corp.*,
   28 A.3d 442 (Del. Ch. 2011) ....................................................................................... 49

*Roswell Capital Partners LLC v. Alt. Const. Techs.*,
   2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ............................................................... 37

*Schreiber v. Carney*,
   447 A.2d 17 (Del. Ch. 1982) ....................................................................................... 46

*Simsbury Fund, Inc. v. New St. Louis Assocs.*,
   204 A.D.2d 182 (N.Y. App. Div. 1994) ..................................................................... 37

*Soc. Sec'y Bd. v. Nierotko*,
   327 U.S. 358 (1946) .................................................................................................... 29

*Sprague S.S. Co. v. United States*,
   145 Ct. Cl. 642 (1959) ................................................................................................ 41

*Starr Int'l Co. v. United States*,
   106 Fed. Cl. 50 (2012) ......................................................................................... passim

*Starr Int'l Co. v. United States*,
   107 Fed. Cl. 374 (2012) ............................................................................ 24, 25, 27, 37

*Stumph v. Thomas & Skinner, Inc.*,
   770 F.2d 93 (7th Cir. 1985) ........................................................................................ 51

*Suwannee Steamship Co. v. United States*,
   279 F.2d 874 (Cl. Ct. 1960) .................................................................................. 39, 40

*Swift & Courtney & Beecher Co. v. United States*,
   111 U.S. 22 (1884) ...................................................................................................... 45

*Trompler, Inc. v. N.L.R.B.*,
   338 F.3d 747 (7th Cir. 2003) ...................................................................................... 15

*Uni-Marts, Inc. v. Stein*,
   Nos. 14713, 14893, 1996 WL 466961 (Del. Ch. Aug. 12, 1996) ............................... 52

*United States v. Bd. of Comm'rs of Sheffield, Ala.*,
   435 U.S. 110 (1978) .................................................................................................... 31

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) .................................................................................................... 30

*United States v. SCS Bus. & Tech. Institute*, Inc.,
　173 F.3d 870 (D.C. Cir. 1999) .................................................................. 31

*Urban Plumbing & Heating Co. v. United States*,
　408 F.2d 382 (Ct. Cl. 1969) .................................................................... 23

*Walther v. Sec'y of Health & Human Servs.*,
　485 F.3d 1146 (Fed. Cir.2007).................................................................. 25

*White Motor Co. v. United States*,
　372 U.S. 253 (1963) ................................................................................ 51

## **Statutes**

8 Del. C. § 153(a)........................................................................................ 22

8 Del. C. § 242(a)(3)................................................................................... 22

8 Del. C. § 242(b)(2)............................................................................ 22, 46

12 C.F.R. § 201.4(d) ................................................................................... 27

12 C.F.R. § 7.1006 ...................................................................................... 28

12 U.S.C. § 24 ............................................................................................. 29

12 U.S.C. § 29 ............................................................................................. 30

12 U.S.C. § 84 ............................................................................................. 28

12 U.S.C. § 101 ........................................................................................... 26

12 U.S.C. § 341 ..................................................................................... 28, 30

12 U.S.C. § 343 ................................................................................. 2, 21, 33

12 U.S.C. § 357 ..................................................................................... 3, 21

12 U.S.C. § 5235(a) ..................................................................................... 32

12 U.S.C. § 5235(d) ..................................................................................... 32

12 U.S.C. § 5223(d)(1) ................................................................................ 32

12 U.S.C. § 5223(d)(2)(F)............................................................................ 32

31 U.S.C. § 9102 ......................................................................................... 26

Del. C. Ann. tit. 8, § 159 ............................................................................. 46

Del. C. Ann. tit. 8, § 218 .................................................................................................... 46

Federal Reserve Act,
Pub. L. No. 63-43 § 13, 38 Stat. 251 (1913) ......................................................... 25

Pub. L. No. 64-270, 39 Stat. 752 (1916) ................................................................... 26

## **Other Authorities**

Howard B. Hackley, Bd. of Governors of the Fed. Reserve Sys.,
Lending Functions of the Federal Reserve Banks (May 1973) ........................................ 25, 28

Model Business Corporations Act
§10.04(a)(4), (b)  (2010) ......................................................................................... 49

O.C.C. Inter. Ltr.,
No. 992, 2004 WL 1563358, (May 10, 2004 ......................................................... 28

O.C.C. Inter. Ltr.,
1992 WL 486905 (July 15, 1992) ......................................................................... 28

## **Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 12

## I.      PRELIMINARY STATEMENT

Defendant's Brief in Support of its Motion for Summary Judgment ("Def. Br.") repeatedly makes three fundamental mistakes.  It ignores prior legal rulings of the Court and applicable precedent (including cases previously emphasized by Plaintiffs and cited by the Court); it ignores key facts previously emphasized by Plaintiffs and admitted by Defendant during discovery; and it assumes the answer to a critical disputed issue — whether Defendant properly required the surrender of 79.9% of the shareholders' equity as consideration for a 13(3) loan.

With respect to Plaintiffs' illegal exaction claim, Defendant ignores settled precedent, emphasized by Plaintiffs throughout, that where the Government conditions the conferring of a benefit on a citizen surrendering property the Government is not authorized to demand, the citizen's agreement is not a defense to an illegal exaction claim (*see* pp. 38-41 below).

With respect to Plaintiffs' Takings Claim (and if voluntary agreement were a defense to an illegal exaction that claim as well), Defendant concedes (as it must) that there is no voluntary agreement if the surrender of equity was the result of duress.  However, Defendant both ignores the settled law and rulings from the Court as to what constitutes duress under the "unusual and exigent circumstances" of a 13(3) loan (*see* p. 15 below), and ignores the evidence of duress relied on by Plaintiffs and admitted by Defendant during discovery (*see* pp. 16-23 below).

Defendant also necessarily assumes that it was proper to tie a 13(3) loan to a surrender of 79.9% of the shareholders' equity.  If, as Plaintiffs show below, it was not proper, that tying by itself constitutes extraordinary coercion and duress.  In asserting that the Fed was authorized without limitation to demand equity as consideration for a 13(3) loan, Defendant replays legal arguments twice rejected by this Court and contrary to the plain language of 13(3) (*see* pp. 24-29 below).  In an effort to describe the purpose of the demand for equity, Defendant:

(a)  wholly ignores the consistent evidence that it was intended to publically punish AIG's shareholders (*see* pp. 7-9 below); and

(b)  suggests, without support and contrary to Defendant's repeated admissions that the AIG loan was fully secured (*see* p. 5 below), that somehow the equity demand was related to "credit risk" (a suggestion that also ignores the fact that the equity was not demanded as collateral but was instead retained by Defendant after the loan and all interest were fully paid).

Defendant also argues that Plaintiffs suffered no damage from surrendering 79.9% of their equity because if they had not, Defendant would have refused the loan AIG needed, AIG would have had to file for bankruptcy, and the shareholders would have been even worse off.  As a legal matter, Defendant's argument assumes the question at issue – whether Defendant had the right to demand 79.9% of Plaintiffs' equity as consideration for a 13(3) loan; if it did not, Plaintiffs were entitled to whatever benefit that loan provided without any illegal exaction.  As a factual matter, Defendant wholly ignores the evidence, including its own admissions, that Defendant would not have permitted AIG to file for bankruptcy because of the catastrophic consequences such a bankruptcy would have had.

## II.   STATEMENT OF FACTS

### A.   The Origin And Purpose Of 13(3) Loans

In financial crises, the viability of individual firms and the stability of the economy depends on the Government "serving as liquidity provider of last resort to stressed financial firms" (Bernanke: PX 1501 at 2), and by doing so "a central bank … can stop financial panics" (Bernanke: PX 662 at 14).  In 1932 Congress amended the Federal Reserve Act to give the Federal Reserve as the lender of last resort in financial crises the power to loan money to any "individual, partnership, or corporation."  There were only four requirements of a 13(3) loan: the existence of "unusual and exigent circumstances"; the borrower's ability to provide security for the loan; the absence of private sources of liquidity (12 U.S.C. § 343); and consideration in the

form of an interest rate "subject to the review and determination of the Board of Governors" which was to be "fixed with a view of accommodating commerce and business" (12 U.S.C. § 357).

The history of the Federal Reserve Act confirms that its purpose was to protect borrowers and the economy, and that the Federal Reserve is not authorized to use its authority to exact whatever interest or consideration would be most profitable to the Government, or to express favor or disfavor toward any particular borrower (*see* pp. 23-28, 41 below). As Paul M. Warburg (a drafter of the 1913 legislation who was appointed to the Board in 1914) reports, at the time the Federal Reserve Board was created in 1913 it was clear that:

> the framers of the law had constantly to bear in mind that, unless they could satisfy the country that the system proposed would be safe from abuse – by "interests," large or small, East, South, or West, or from paper befriended by the politicians – the prejudice against any kind of a central banking system could not, and should not, be overcome. (PX 1603 at 287-288).

**B.      In 2008, "Unusual and Exigent Circumstances" Threatened Virtually Every Financial Firm, Including AIG.**

In September of 2008 the country was in the midst of what Chairman Bernanke describes as "the worst financial crisis in global history" (PX 1600 at 24). As a result of a series of related events driven by the crash of the market for subprime mortgages and securities based on them, and culminating in the Lehman bankruptcy in the early hours of September 15, 2008, the credit markets froze and many solvent companies, including virtually every financial company, found that they required government assistance to survive (PX 662 at 89-91; PX 1601 at 20, 41). Of the 13 "most important financial institutions in the United States, 12 were at risk of failure within a period of a week or two" (Bernanke: PX 1600 at 24).

The Government had identified the danger of a liquidity crisis much earlier and, beginning in March 2008 with loans to support Bear Stearns and loans to support key investment

banks through the Primary Dealer Credit Facility ("PDCF"), the Federal Reserve had begun to use its 13(3) authority for the first time since the 1930s (Def.'s Resp. to 2nd RFAs No. 78).  The Government also recognized in March 2008 that the prices of securities based on subprime mortgages were being driven not by the intrinsic value of those securities but by fear and uncertainty.  As Donald Kohn, Vice-Chairman of the Federal Reserve Board of Governors, reported on March 10, 2008: "There was no price discovery.  The prices out there were just being driven by fear" (PX 1477 at 22).

These two market forces, lack of liquidity and artificially depressed prices, had a powerful effect on a number of financial institutions, including AIG (PX 662 at 78-79; PX 573 at 2-3; Geithner Dep. 109:24-110:3; Dudley Dep. 62:2-63:12).  The company could not replace maturing obligations (including commercial paper) because new liquidity was not available from private sources, and the depressed prices for subprime-backed securities resulting from highly illiquid market conditions were used by AIG's counterparties to demand increased collateral from AIG – further aggravating the company's unmet liquidity needs (PX 573 at 2-3; Habayeb (Brookfield v. AIG) Dep. 72:13-23; *see also* Herzog Dep. 203:12-18, 203:24-204:18).

C.    **AIG Met All Of The Requirements For A 13(3) Loan.**

In September 2008 the Government concluded that even though solvent, AIG faced a liquidity crisis (Geithner Dep. 7:5-12, 7:24-8:7; PX 1492 at 3; Alvarez Dep. 148:19-149:12; PX 959 at 1, 5; Paulson Dep. 73:10-17; PX 205), that private lenders were not available, and that it would be required to file for bankruptcy in the absence of government assistance (Geithner Dep. 7:24-8:7; PX 69 at 2; PX 1478 at 193; PX 212 at 15; Paulson Dep. 28:6-24).

1.      __The loan to AIG was "fully secured".__  As the Government has repeatedly

admitted, the AIG loan was "fully secured" by the pledge of the stock of AIG's valuable

insurance subsidiaries and other assets.

(a)   FRBNY General Counsel Baxter and Sarah Dahlgren, head of FRBNY's AIG Monitoring Team:  "To be clear, we were not making an investment in AIG; we were making a fully secured loan."  PX 112 at 3.  (*See also* PX 19 at 11; PX 112 at 2).

(b)   Bernanke: "The credit facility was fully secured by assets that AIG was able to pledge under the associated Guarantee and Pledge Agreement that had an estimated value in excess of the maximum size of the credit facility." (PX 1502 at 5).

(c)   Defendant's Rule 30(b)(6) witness James Millstein: the AIG loan "was secured by collateral that had value in excess of the loan amount" (Millstein (12/18/12) Dep. 81:1-4).

(d)   Bernanke: "AIG had a very substantial business, a huge business, more than a trillion dollars in assets and a large insurance business that could be used as collateral to borrow the cash needed to meet Financial Products' liquidity demands…the Federal Reserve will absolutely be paid back by AIG." (PX 600 at 37).  "And so it was our assessment that they had plenty of collateral to repay our loan--because it was in a separate business that did have a lot of going-concern value and did have a lot of assets." (PX 600 at 60).

(e)   Federal Reserve Vice Chairman Kohn: "the loan was secured to the satisfaction of the reserve bank…it was secured by all those assets and those assets were enough to secure the loan." (Kohn Dep. 256:1-13; *see also id*. at 252:22-253:7).

(f)   Federal Reserve Board member Elizabeth Dukes: "the Board expects that the Revolving Credit Facility will not result in any net loss to the Federal Reserve or taxpayers." (PX 532 at 4).

(g)   Federal Reserve Counsel Scott Alvarez: "the credits were each fully secured at the time they were made….We expect the Federal Reserve will be fully repaid on each extension of credit involving AIG." (PX 113 at 25).

(Defendant's Brief wholly ignores this evidence, and never acknowledges, let alone deals with,

the fact that the AIG loan was fully secured.)

2.      __The Government concluded that it could not allow AIG to fail.__  As

Defendant's recognized, failure to make the loan would have had "catastrophic" consequences

for the country.  For example:

(a)  Bernanke:  AIG's "failure could have resulted in a 1930s-style global financial and economic meltdown, with catastrophic implications for production, income, and jobs."  (PX 387 at 16).

(b)  Geithner:  "We did not have the option of bankruptcy; we did not have the option of defaults; we did not have the option of selective haircuts.  It would have been catastrophic to let the institution fail." (PX 299 at 139).

(c)  FRBNY General Counsel Thomas Baxter:  "At no point did we believe we should let AIG file" for bankruptcy. (PX 1485 at 12).

(d)  On September 15, 2008, Treasury Secretary Henry Paulson told President George W. Bush, "if AIG went down, we faced a real disaster" and "more than almost any financial firm you could think of, AIG was entwined in every part of the global system, touching businesses and consumers alike in many different and critical ways." (Paulson Dep. 31:18-32:6).

(e)  Paulson:  AIG's collapse "would have buckled our financial system and wrought economic havoc on the lives of millions of our citizens." (PX 299 at 142).

(f)  During a September 16, 2008 morning conference call, FRBNY President Timothy Geithner told Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke, "in his personal view, we needed to make this loan to avoid the systemic consequences that would result from an AIG [bankruptcy] filing."  (United States 30(b)(6) (Baxter) Dep. 53:13-53:24).

(g)  Geithner (PX 212 at 3) and Paulson (Dep. 29:1-11): "AIG faced the prospect of default and bankruptcy, which would have had catastrophic consequences for the economy."

(h)  Geithner (PX 212 at 15) and Paulson (Dep. 27:17-28:6):  "The Federal Reserve and the Treasury determined that it was in the best interests of the United States to rescue AIG in order to stop the panic and prevent further damage to the economy."

(i)  Geithner (PX 212 at 15) and Paulson (Dep. 28:6-24):  "Without assistance, AIG would have been forced to file for bankruptcy protection, resulting in default of over $100 billion of debt, as well as trillions of dollars of derivative contracts.  The failure of AIG would have been catastrophic for a financial system already in free fall."

(Although Defendant's "economic loss" argument depends on the assumption that if AIG had not surrendered its shareholders' equity the Government would not have made a 13(3) loan and AIG would have had to file for bankruptcy, Defendant's Brief deals with none of this evidence.)

### D.     Unlike All Other 13(3) Loans The AIG Loan Required The Surrender Of 79.9% Of The Shareholders' Equity.

The loan to AIG was unique in a number of respects.  First, it carried by far the highest interest rate ever charged by the Federal Reserve to any 13(3) borrower (initially 14%, more than five times the rate charged other 13(3) borrowers in 2008).  Second, for the first and only time, the Federal Reserve required the additional consideration of 79.9% of the AIG shareholders' equity.

### 1.     The terms of the AIG Loan were intentionally "punitive".  Government

officials worried that a perceived "bailout" of AIG would be harshly criticized.  As Henry Paulson, Defendant's Secretary of the Treasury from 2006 to 2009, admitted in his deposition: "AIG was incredibly unpopular.  If there was … a political scapegoat, it was AIG." (Paulson Dep. 253:4-6). There is evidence that this led Defendant to conclude that any assistance to AIG had to appear to the public that AIG was being punished not rescued (*e.g.*, PX 171 at 14-16; Paulson Dep. 123:8-124:17).  Whatever the reason for the punitive terms, two facts are clear.

First, it is clear that the terms of the Fed's loan to AIG were intended "as a punitive condition" (*e.g.,* Paulson Dep. 308:5-10; *see also* PX 1154 at 3).  In fact, Defendant's Secretary of Treasury admitted, "as a matter of fact we were too punitive" (PX 171 at 14).

(a)     Geithner: "We forced losses on the shareholders proportionate to the mistakes of the firm."  (Geithner Dep. 266:10-24, 267:21-268:2 (discussing PX 217 at 5)).

(b)     FRBNY September 14, 2008 draft "AIG Discount Window Access Trade-Offs" memorandum:  "access to liquidity should be tied to punative [sic] terms."  (PX 91 at 4; *see also* PX 887 at 4).

(c)     Scott Alvarez's handwritten notes of the September 16, 2008 Board of Governors meeting, state, under the heading "TG":  "conditions need to be punitive." (PX 1492 at 2).  Alvarez testified that he did not recall if Geithner used the word "punitive" "but that was the concept" (Alvarez Dep. 147:5-11).

(d)     Paulson: the Government "nationalized AIG" (PX 172 at 3:5-7).

(e)   Geithner: the Government put AIG "into a type of conservatorship or quasi nationalization" and "effectively wiped out equity holders" (PX 218 at 15; PX 305 at 19:7-11).

Second, it is clear that no one did any investigation, made any findings, or held any hearing concerning whether AIG or its shareholders had or had not engaged in excessive risk taking and deserved to be punished – let alone what that punishment should be.

(a)   "Q. Was any of the consideration that you had in terms of how much compensation to require for the AIG loan a function of a conclusion you or the Fed reached that AIG had somehow mismanaged its business or taken on excessive risks?

A. No." (Bernanke Dep. 199:20 – 200:12)

(b)   Geithner: "we had no basis of having any direct knowledge of the nature of the risks they were taking" (Geithner Dep. 108:11-15).

(Defendant's Brief never acknowledges, let alone deals with, the proof that the purpose of its equity demand was punishment without basis.)

## 2.   Exacting 79.9% of the AIG shareholders' equity to punish them for their company's alleged mistakes was unauthorized and unconstitutional. First, the Federal Reserve plainly lacked any authority to demand equity as consideration for a 13(3) loan (*see* pp. 24-29 below).  Second, even if the Federal Reserve had the authority to exact equity as a condition of a 13(3) loan, there is no authority for the Federal Reserve to use whatever power it has to punish companies, let alone their shareholders, for perceived mistakes (*see* p. 41).  Third, even less could the Fed have been authorized to punish without any investigation, hearing, or findings (*see* p. 41).[1]

---

[1] Indeed, if as Secretary Geithner admits the Government in regulating Citigroup itself "vastly underestimated the riskiness of its AAA-rated mortgage assets" and "super-senior tranches" as late as 2007 (PX 1478 at 135), what was the basis for faulting AIG who exited much earlier? A recent settlement between DOJ and Citigroup penalized Citigroup $7 billion for the misrepresentations it made related to their 2006 and 2007 RMBS issuances. According to Government statements, the DOJ's "teams found that the misconduct in Citigroup's deals devastated the nation and the world's economies, touching everyone," and that the "bank's

**3.   Exacting punitive consideration from AIG was inconsistent with Defendant's treatment of other financial institutions.**[2]   None of the other recipients of Government loans or assistance suffered either the extraordinarily high interest rate or the equity surrender imposed on AIG.  AIG suffered from the same national financial crisis, and AIG was not more culpable, indeed, considerably less so than many other firms.  AIG's exposure came not because AIG itself was an issuer of subprime mortgage backed securities, but because, believing the representations of issuers and rating agencies concerning such AAA-rated securities, AIG provided protection against default at very low premiums.  AIG had made a decision in late 2005 to stop offering such protection, but in 2008 continued to have substantial exposure due to protection issued in 2005.

**4.   Exacting punitive consideration from AIG alone was particularly unjustified since Defendant itself had materially contributed to AIG's distress.**   Recognizing that AIG faced a looming liquidity crisis, no later than August 2008 AIG sought participation in government programs including access to the PDCF and becoming a bank holding company. Each time AIG's CEO was rebuffed.  Even after Lehman filed for bankruptcy on September 15,

---

activities contributed mightily to the financial crisis that devastated our economy in 2008." (DOJ Press Release, "Justice Department, Federal and State Partners Secure Record $7 Billion Global Settlement with Citigroup for Misleading Investors About Securities Containing Toxic Mortgages").  Nevertheless, the Citigroup settlement amounted to just *5 percent* of Citigroup's current shareholder equity, as opposed to the 79.9% taken from AIG's shareholders. As further described below unlike Citigroup, AIG was not given due process and the 79.9% penalty was admittedly imposed without investigation or analysis. AIG was never found to have done anything wrong, far less the sweepingly destructive and illegal description of Citi's conduct as described by the DOJ. (Virtually all of which occurred while Secretary Geithner was Citigroup's most important regulator, and after AIG had stopped committing to sell CDS for super-senior tranches of CDOs with subprime exposure).

[2] Although discriminatory treatment may not constitute an independent claim, it may be an element of duress.  For example, while the Court may not have jurisdiction to award relief for an Equal Protection violation, such a violation (or, indeed, discrimination not rising to the level of an Equal Protection violation) would be "wrongful" and an element of duress.

2008, and liquidity markets froze, the Government continued to assert both publically and to AIG that AIG would not be permitted to participate in any government programs designed to stabilize the economy and increase liquidity. This both deprived AIG of the liquidity such programs offered and discouraged private parties from providing liquidity to a company that the Government seemed determined to let fail.

Defendant also discouraged sovereign wealth funds from investing in AIG, including an offer during the day of September 16 to provide "a little bit more than the total amount of money required for AIG" (PX 180 at 16; *see also* pp. 18-19 below).  (Again, Defendant's Brief does not acknowledge, let alone deal with, any of this evidence.)

### E.   Defendant's September 16 Non-Negotiable Demand.

On September 16 at about 9:00am AIG's CEO Robert Willumstad informed FRBNY President Geithner that AIG would be filing bankruptcy.  Geithner asked that AIG not file for bankruptcy and to await a Government offer.  Willumstad did not hear again from Geithner until about 5:00pm.  Willumstad eventually was told that the Defendant had a loan offer, was given the terms previously approved by the Federal Reserve (PX 69; PX 1177), was told that this was the only offer AIG was going to get (PX 637 at 1; Baxter Dep. 142:22-24; Cohen Dep. 119:15-120:10), and was told that AIG only had until 8:00pm to accept the offer (PX 809 at 12).

After reviewing what Geithner had said with the AIG Board, Willumstad called Geithner to try to negotiate the offer's terms, particularly the demand for a 79.9% equity interest, which the AIG Board initially considered "unacceptable" (PX 209 at 9; *see also* PX 809 at 11-12). Even though Bernanke, Geithner, and Paulson had concluded that it was appropriate to make a 13(3) loan to AIG, that the loan was fully secured, and that the Government could not permit AIG to file for bankruptcy, Geithner told Willumstad that the offer was non-negotiable (PX 809 at 12; Baxter Dep. 142:22-24) and that if AIG did not then accept the terms offered by the

Government AIG would have to file for bankruptcy.  FRBNY President Geithner concluded that

AIG had "no option" but to accept Defendant's demand (PX 1491 at 24:21).  Faced with the

Government's ultimatum, the AIG Board passed two resolutions authorizing the negotiation of a

credit agreement and authorizing immediately borrowing money from the Government on a

secured demand note basis (PX 809 at 13-14).

> **F.     Defendant Assumed Control Of AIG On September 16, And Then
> Unilaterally Changed The Terms Of The Loan.**

The Government immediately assumed control of AIG.  For example:

(a)     FRBNY Vice President Calabia on September 16: "we own AIG, essentially" (PX 47 at 1).

(b)     On September 16, Defendant forced Willumstad to resign and offered the position to Edward Liddy without any prior consultation with AIG's Board (PX 150 at 35). (Mr. Liddy was Chairman of the Goldman Sachs Audit Committee and knew Secretary Paulson from the time Paulson was Goldman Sachs' CEO.)

(c)     The Defendant immediately installed a monitoring team at AIG's offices (Def. Resp. to 2nd RFAs No. 416; PX 776).

(d)     Geithner's Chief of Staff Silva in declining a meeting with Mr. Maurice Greenberg of Starr on September 17: Greenberg "WAS one of the largest shareholders" in AIG but the "Federal Reserve is now the largest shareholder" (PX 210 at 1).

(e)     Mr. Liddy commenced work on September 17, meeting with senior AIG executives and the Government's monitoring team before he even met with the AIG Board (Dahlgren Dep. 36:12-37:10).

(f)     On September 19 the Government required AIG to change an SEC 8-K filing it had made on September 18 describing the terms of the Government loan (*Compare* PX1 *with* PX 1-A; PX 724 at 1).

(g)     Also on September 19, AIG agreed that in the future "all securities filings, press releases, and any other significant releases or communications would be run past" Defendant's lawyers before issuance (PX 831 at 1; Dahlgren Dep. 182:18-183:12, 208:8-210:18).

After September 16, the Government drafted a binding Credit Agreement that was

presented to the AIG Board the evening of September 21.  In drafting the Credit Agreement,

Defendant unilaterally changed the terms it had promised on September 16 – all to AIG's

detriment – including changing its equity participation from non-voting warrants to voting

convertible preferred stock; reducing the price it would have to pay from more than $30 billion to $500,000; and eliminating an initial shareholder vote. (*See* pp. 12-14, 21-22 below.) Defendant did not tell the Board about the changes until the evening of September 21, and even then did not give the Board a complete copy of the Credit Agreement. The Government again told AIG that it was a take-it-or-leave-it offer, and that unless AIG accepted the provisions as drafted by the Government, the Government would call its $37 billion in outstanding demand loans and force AIG into bankruptcy (PX 1053 at 3). (*See* pp. 18-19, 21 below.)

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brilliant Instr., Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "At the summary judgment stage, we credit all of the nonmovant's evidence and draw all justifiable inferences in its favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE CREDIT AGREEMENT CLASS'S TAKINGS CLAIM SHOULD BE DENIED.

Defendant's primary defense to Plaintiffs' Takings Claim is that it is barred by the "voluntary agreement" of the AIG Board to Defendant's terms.

### A.    Plaintiffs Did Not Voluntarily Agree To Defendant's Terms And Were Not Given An Opportunity To Vote On Those Terms.

Defendant's reliance on the actions of AIG's Board to show voluntary agreement ignores the fact that what is at issue here is Plaintiffs' direct claim for Defendant's taking of 79.9% of their equity and voting rights. Defendant cites no case where Board action voided shareholders' direct claims for dilution. Moreover, AIG's common shareholders never approved (and were never given the opportunity to approve or disapprove) the transaction. In fact it was Defendant's

actions that prevented the very parties against whom it now asserts a voluntary agreement defense from having the opportunity to make any decision, much less a voluntary one.

On September 16, both the Federal Reserve Board of Governors ("BOG") and AIG understood that the form of equity under any agreement would be non-voting warrants (*see* pp. 21-22). Because AIG lacked a sufficient number of authorized shares to allow for the exercise of warrants for a 79.9% equity interest in the Company a vote by AIG common shareholders would be required to permit an increase in the number of shares – as AIG reported to shareholders in a September 18 SEC filing (PX 1 at 2). After September 16, Defendant became concerned that warrants did not give Defendant control of AIG and that, when given the opportunity, AIG shareholders would reject the terms of Defendant's offer:

(a) FRBNY General Counsel Thomas Baxter: "The difficulty was with warrants, that you couldn't exercise the power to vote, that would be a problem" (Baxter Dep. 212:21-23).

(b) Marshall Huebner at Davis Polk emailed FRBNY's General Counsel on September 19: "I learned that the board is not staggered and has only 1 year terms. I don't see how we leave this asset at risk of minority shareholder takeover" (PX 1300 at 2).

(c) In the morning, on September 21, FRBNY's Charles Gray emailed FRBNY's Sarah Dahlgren: "***Rich Charlton just came up and shared with Tom your concern about whether the terms of the equity investment will adequately protect us against shareholder activism among minority shareholders at AIG***." (PX 1204 at 1). Also on September 21 Mr. Baxter wrote: "***I am trying to keep this moving because of a concern there will be shareholder action***" (PX 496 at 1).

These concerns led the Government to unilaterally revise the deal between September 16 and 21. First, the Government substituted voting preferred for non-voting warrants. Treasury lawyer Stephen Albrecht admits the Government "pushed for voting rights to fend off the shareholder attempts to 'reclaim' the company" (PX 1190 at 1).

Second, even issuance of convertible preferred shares was subject to a New York Stock Exchange ("NYSE") rule requiring a shareholder vote to approve the issuance of shares that would provide voting power greater than 20 percent of the outstanding stock of the issuer (PX

1497 at 9).  To prevent AIG shareholders from exercising their rights under the rule, Defendant also added a requirement that, as a condition of the Credit Agreement, AIG invoke a limited exception under the rule applicable only when delay in the issuance of the shares would "seriously jeopardize the financial viability" of the company (PX 1497 at 10).  Reliance on the NYSE exception was entirely pretextual; the shares were not actually issued until six months later in 2009 (PX 465).  Moreover, even when the exception to the NYSE rule is invoked, a company "must mail to all shareholders not later than 10 days before the issuance of the securities a letter alerting them to its omission to seek the shareholder approval" (PX 1497 at 10). In commenting on AIG's draft letter to shareholders, Defendant told AIG not to mention the 10-day waiting period because it did not "***want to give a roadmap for someone to seek an injunction***" (PX 430 at 4).  (After the preferred stock was issued, Defendant circumvented the shareholders' right to approve its conversion to common stock (*see* pp. 46-51 below) to again prevent Plaintiffs from having an opportunity to vote on the transaction.)

Having acted with the express intent and effect of depriving AIG common shareholders of any opportunity to agree or disagree (voluntarily or otherwise) with Defendant's demand for equity, Defendant may not now preclude the Court from reviewing the merits of Plaintiffs' taking and illegal exaction claims on the theory that AIG common shareholders "voluntarily agreed" to the transaction.  Certainly there was no "intentional relinquishment or abandonment of a known right or privilege."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  AIG's common shareholders never agreed, much less voluntarily, to dilute their equity interests and voting rights – and Defendant offers no evidence that they did.

**B.    Moreover, The AIG Board's Acceptance Of The Credit Agreement Terms Was Under Duress.**

14

As explained above, it is not necessary to reach the issue of duress to deny Defendant's motion because Plaintiffs, AIG shareholders, were deprived of any opportunity to agree or disagree, voluntarily or otherwise, to the equity component of the loan to AIG. However, Defendant's attempt to rely on the AIG Board's acceptance of its terms also fails because of the duress to which the company was subjected.

**1.  Defendant Ignores the Legal Criteria for Duress.** In its July 2, 2012 Order, the Court held:

> To establish coercion or duress, a plaintiff must show that: (1) it "involuntarily accepted" the other party's terms; (2) "circumstances permitted no other alternative"; and (3) "said circumstances were the result of coercive acts of" the other party. A coercive act is one that is "wrongful", but need not be illegal. For example, an act may be wrongful and hence, coercive, if it "violates notions of fair dealing." (*Starr Int'l Co. v. United States*, 106 Fed. Cl. 50, 77 (2012) (citations omitted)).

A Defendant's wrongful, coercive conduct may be either participation in the creation of a plaintiff's distress, or in some circumstances the exploitation of such distress in a manner that violates notions of fair dealing.[3] Defendant here did both.

The Defendant's wrongful conduct need not be the sole cause of AIG's financial distress – only a substantial contributing cause. *See, e.g., Aircraft Assocs. & Mfg. Co. v. United States,* 174 Ct. Cl. 886, 889, 896 (1966) (noting that the plaintiff aluminum-smelter's difficulties were caused by (1) "a drop in the aluminum market", (2) the plaintiff's "highly optimistic guess as to the amount of aluminum that could be obtained from" the property identified in the contract, and (3) "the removal by personnel of defendant" of a substantial amount of aluminum from the property at issue, ***but nonetheless finding duress*** because "the ***Government's*** wrongful removal of the parts ***contributed substantially*** to plaintiff's financial distress") (emphasis added).

---

[3] "Duress, understood most concretely, is the situation in which one person obtains a temporary monopoly that it tries to use to obtain a benefit to which it is not entitled." *Prof'l Serv. Network, Inc., v. Am. Alliance Holding Co.*, 238 F.3d 897, 900 (7th Cir. 2001) (Posner, J.); *see also Trompler, Inc. v. N.L.R.B.*, 338 F.3d 747, 751-52 (7th Cir. 2003).

**2.   The Circumstances Required to Authorize Section 13(3) Loans By Definition Greatly Heighten the Risk of Duress.**   To be eligible for a 13(3) loan the borrower must lack access to private credit.   Moreover, the market environment must be one where the market denies credit to solvent credit-worthy entities, placing them in dire need of liquidity and the prospect of imminent failure without it (Dudley Dep. 62:2-63:12).   The "unusual and exigent circumstances" that trigger Section 13(3) thus create a power imbalance between the Government and potential borrowers of such severity – where the stakes are so high and the private party so unusually vulnerable – that the threat of duress is radically greater than the usual case.   The lender of last resort is given the extraordinary monopoly power it wields because its duty is to help preserve solvent companies and stabilize the economy.

**3.   Defendant's Regulatory Failures Contributed Significantly to the Financial Crisis and to AIG's Distress.**   AIG stopped making commitments related to subprime mortgage-backed securities at the end of 2005, but it continued to be exposed for commitments made earlier.   In November 2007, PwC, AIG's auditor, wrote that AIG had successfully stress tested the safety of the CDS commitments at issue using the worst recession scenarios dating back to World War II (PX 1498 at 2).   However, regulators as well as rating agencies and other private market participants continued to underestimate the potential credit and liquidity risks arising from multi-sector CDOs backed, in part, by securities exposed to sub-prime mortgages. *See* Dinallo Dep. 67:3-69:13; Dudley Dep. 16:16-17:2.

Notwithstanding AIGFP's withdrawal, issuers of subprime-backed securities sharply increased market volume, with one of the most heavily regulated firms – Citigroup – increasing its origination of such securities by 85% in 2006 compared to 2005 (PX 1605 at 189 (Cragg Report App'x 5)).   These increases occurred even as quality declined.   Eventually the quality of

these later vintage securities so deteriorated that they caused a general loss of confidence.  This

fear and uncertainty led to liquidity flight and panic market conditions.  By March 2008, the

Federal Reserve recognized that valuations of securities exposed to subprime mortgages

involved panic and thus no longer reflected ordinary market activity that would reveal their

expected value (a feature of markets known as "price discovery"): "prices that were out there

were just being driven by fear" (PX 1477 at 22).  The Federal Reserve understood that without

Government intervention, such panic conditions would lead to liquidity flight and resulting

artificially depressed pricing and valuations, in turn forcing fire sales that would further depress

prices across a broader set of asset classes, driving what becomes a vicious cycle capable of

threatening even strong and solvent firms with failure (Dudley Dep. 62:2-63:12).

It was inevitable that this dynamic would affect AIG, given its counterparties' use of

market valuations (even when there are no transactions except a few fire-sales) to mark down the

value of the AIG-protected securities and on that basis demand additional collateral.

**4.    Defendant Contributed to AIG's Liquidity Crisis by Refusing AIG Access to
Programs and Assistance Offered to Other Financial Institutions.** Although as a general

proposition FRBNY recognized the need "to reduce the risk of a margin spiral in which forced

liquidation of illiquid collateral leads to lower prices, higher volatility, and higher haircuts,

which, in turn, provoke further liquidation" (PX 1499 at 5), Defendant repeatedly rebuffed AIG's

efforts to obtain access to programs and assistance made available to others (including access to

the PDCF, approval as a bank holding company, and government guarantees) that were required

to avoid that "margin spiral". In circumstances where the lender of last resort will eventually

intervene, mere delay in doing so inexorably heightens the pressure on the increasingly

weakened prospective borrower. Defendant ignored AIG's increasing liquidity needs during the

summer of 2008, even though it monitored AIG (PX 80 at 4), recognized AIG's exposure (PX 113 at 104; PX 879 at 1), and recognized that it was "obvious" AIG would benefit from the PDCF and other assistance provided to broker-dealers (PX 799 at 1).

Even though the cause of AIG's liquidity problem was the same "fear pricing" that caused the liquidity problems of other recipients of 13(3) assistance, and notwithstanding the fact that the entities that *issued* the CDOs and made AIG's CDS collateral calls received PDCF 13(3) loans on non-punitive terms (*see* Saunders Dep. 84:7-15; Paulson Dep. 331:9-333:23; PX 720 at 1), AIG was denied PDCF access. As to those other entities, Defendant fulfilled its lender of last resort role and, only when the panic was over did the DOJ proceed consistent with due process protections to investigate whether their conduct warranted the imposition of any penalty.

Similarly, Defendant agreed over a weekend to approve Morgan Stanley and Goldman Sachs as bank holding companies (PX 516) after being informed on Friday, September 19, that the two firms would otherwise fail (PX 207; PX 385; Geithner Dep. 118:6-12). As Geithner described it, Morgan Stanley and Goldman Sachs "transformed their business structure to avoid failure" (PX 1478 at 255-256). AIG had been previously refused such assistance, and Defendant concealed from AIG's Board the approval of Morgan Stanley and Goldman Sachs as bank holding companies until after the AIG Board had approved the Credit Agreement the evening of September 21. On September 20 and 21, Defendant's hand-picked CEO Mr. Liddy was fully aware of Goldman Sachs' application and approval since he was still serving on the Goldman Board and its Audit Committee (PX 1421 at 1) – but he never shared his information with his fellow AIG directors.

**5. Defendant Affirmatively Acted to Close Off AIG's Options Other Than The Revolving Credit Facility Before Making Its "Take-It-Or-Leave-It" Offer.** Given the panic

market conditions, Defendant knew prior to September 16 that it would be impossible for AIG to secure a private solution without some showing of Government support (*see* Cohen Dep. 69:21-70:1; PX 20 at 141). Nevertheless, Defendant repeatedly told the private sector there would be no assistance to AIG. *See, e.g.*, Dinallo Dep. 90:18-91:2, 136:5-17; Cohen Dep. 39:11-21, 41:3-21, 42:15-21, 67:9-68:3, 113:16-24.

Defendant also discouraged sovereign wealth funds from providing liquidity to AIG.  For example, on September 16 before Defendant made its loan offer to AIG, Secretary Paulson's chief of staff was informed that the Chinese Investment Corporation "is prepared to make a big investment in AIG" (PX 899). Secretary Paulson's deputy chief of staff reported that the Chinese "were actually willing to put up a little bit more than the total amount of money required for AIG" (PX 180 at 16:17-19). However, Paulson told the Chinese that he "did not want the Chinese coming at this point in time on AIG" (PX 180 at 16:20-17:11), and Defendant never told AIG about CIC's expression of interest. Defendant also dismissed and concealed Senator Hillary Clinton's call on September 17 concerning a group of Middle Eastern investors who were interested in providing liquidity to AIG (PX 150 at 47; Def.'s Resp. to 2nd RFAs No. 481). Defendant also refused AIG's request on September 16 for a provision that would allow it to unwind any loan transaction should it be able to secure private funding unless the private sector participant could completely stand in the shoes of the Government (PX 809 at 12), which it knew was not possible given overall market conditions.[4]  Chairman Bernanke claims he would have been "shocked" if the Government discouraged other liquidity providers from assisting AIG (Bernanke Dep. 116:11-20), but that is precisely what occurred.

---

[4] Defendant also closed off other options such as the upstreaming of $20 billion in funds from AIG's insurance subsidiaries to the AIG parent, telling the New York Insurance Superintendent that the upstreaming of funds would not be part of the "fix" (Dinallo Dep. 213:24-216:2).

**6.   The Fact That Defendant Targeted AIG Shareholders For Punishment and Exploited Its Monopoly Power as Lender of Last Resort to Obtain a Benefit to Which It Was Not Entitled, Also Evidences Duress.**   A relevant factor in analyzing whether Defendant engaged in coercive and wrongful conduct is whether, in imposing punitive conditions on its 13(3) loan to AIG, it targeted AIG and its shareholders for punishment.   *See, e.g., A&D Auto Sales Inc. v United States,* 748 F.3d 1142, 1154-55 (Fed. Cir. 2014) (including in non-exhaustive list of "circumstances relevant to the issue of coercion" "whether the government targeted the dealers for termination").   The imposition of punishment without any investigation, notice of the intent to impose a penalty, findings, or an opportunity to be heard – with severe time pressure being applied and backed by drastic threats – is inherently coercive.

Section 13(3) of the Federal Reserve Act provides Defendant the power during times of "unusual and exigent circumstances", where credit is not otherwise reasonably available, to make loans to "any individual, partnership, or corporation…at rates established in accordance with" the provisions of Section 14(d).   12 U.S.C. § 343.   Section 14(d) of the Act provides that rate for such a loan "shall be fixed with a view of accommodating commerce and business."   12 U.S.C. § 357.   Here Defendant told AIG that it would only agree to provide an admittedly fully secured 13(3) loan if AIG agreed to also provide the Government 79.9% of AIG's equity.   Aside from the Credit Agreement, no other Section 13(3) loan in history has required equity as consideration the borrower's equity.   *See* Def.'s Resp. to 1st RFAs Nos. 18.3, 18.4.

Defendant's punitive demand for 79.9% of Plaintiffs' equity was made notwithstanding its admitted lack of knowledge of facts that could indicate fault of any kind, and its recognition of the unreliable panic market dynamics affecting AIG (see pp. 7-8 above).   The punitive condition was imposed even though there was no authority to penalize non-banks in the

governing statute, nor were there any standards that could have provided notice or any of the other elements of due process. It was, in short, imposed by simple *fiat*.

When the Government entered into the Credit Agreement, its rationale for taking a 79.9% equity interest in AIG was to *punish* AIG and its shareholders (s*ee* pp. 7-8 above).  But it did not impose a punishment on any other entity as a condition of receiving a loan.  AIG was treated differently because, in the words of Secretary Paulson, it was "incredibly unpopular" and a "political scapegoat" (Paulson Dep. 253:3-6).

**7.   Defendant Further Pressured AIG by Giving AIG an Unreasonably (And Unnecessarily) Short Time to Accept or Reject the Offer.**  On both September 16 and 21 Defendant waited until AIG was on the brink of bankruptcy, gave it a take-it-or-leave-it offer, refused to engage in negotiation, threatened absent agreement to cut off all funding to AIG, gave AIG only hours to make a decision, and (on September 21) threatened to call its secured demand notes.  *See* PX 235 at 4; PX 1053 at 3; *see also* p.12.  Forcing a party, as Defendant did here, to decide on an offer within an unreasonably short period of time – here in a matter of hours – can itself be evidence of duress.  *Freedlander, Inc. v. Nat'l Bank of North Carolina*, 706 F. Supp. 1211, 1217 (E.D. Va. 1988) ("duress is usually marked by immediacy" where the "non-consenting party must make an immediate decision to agree to the terms of the contract or face the threatened harm").

**8.   Between September 16 and September 22 Defendant Unilaterally Changed the Terms of the Deal After AIG was in a Position Where Bankruptcy was Clearly Not an Option.**  The September 16 offer entailed shareholder approval, non-voting warrants, and an

exercise price in excess of $30 billion.[5]   The evening of September 21, the Government

demanded that AIG substitute voting preferred for non-voting warrants (*see* pp. 12-14), accept a

price of $500,000 compared to more than $30 billion, and adopt procedures to prevent a

shareholder vote (*see* pp. 12-14).

The Government refused to negotiate and threatened that it would put AIG into

bankruptcy by calling the secured demand notes it had received from AIG on September 16 and

18 (PX 235 at 4; PX 1053 at 3; AIG 30(b)(6) (Reeder) Dep. 111:6-13) if AIG did not

immediately accept Defendant's demands.  Faced with this threat, AIG's outside counsel, who

on September 16 had given the Board an opinion that choosing bankruptcy would be protected

by the business judgment rule (PX 809 at 5), refused to give that opinion in light of changed

conditions (PX 235 at 5-6; Cohen Dep. 107:3-108:7; Bollenbach Dep. 164:19-165:25).

**9.  AIG Had No "Reasonable" Alternative.**  As the cases make clear, and as this Court

has held, for an agreement to be "voluntary" there must be a "reasonable" alternative.  While

the Defendant claims that "the availability of bankruptcy as an alternative negates duress as a

matter of law" (Def. Br. at 19), that contention ignores what this Court had made clear: the test

is not whether bankruptcy was "*an* alternative", but rather whether the Defendant's wrongful

conduct left AIG "no *reasonable* alternative save to agree."  *Starr*, 106 Fed Cl. at 78 (citation

---

[5] The only term sheet that the Board of Governors approved stated that the form of equity would
be warrants.  PX 69 at 6, 10; PX 1177 at 3.  AIG shared this understanding as evidenced by audit
committee minutes from September 16, 2008 approving the issuance of warrants (PX 811), an 8-
K issued on September 18, 2008 stating that it would issue warrants (PX 1), and the September
21 AIG Board minutes stating that "the Board had originally been led to believe that the form of
equity participation by the Treasury Department would be warrants" (PX 235).  Delaware law (8
Del. C. § 153(a)) provides that common shares cannot be issued for less than their par value
($2.50 per share for AIG), and that changes to par value require amendment of a company's
certificate of incorporation (8 Del. C. § 242(a)(3)), which requires a vote of common
shareholders (8 Del. C. § 242(b)(2)).

omitted) (emphasis added)).[6]  While Defendant now asserts bankruptcy as a practical choice,

Defendant's experts assert that bankruptcy would have entailed a "death spiral of negative

consequences" for AIG (Hershman Dep. 85:21-86:8).  In fact, Geithner has said that the AIG

Board "had no option" but to accept the Government's terms (PX 1491 at 24-25).[7]  Moreover,

as discussed above (pp. 21-22), certainly by September 21, bankruptcy was not an option – and

AIG's counsel so advised the Board.

      Because AIG had no reasonable and viable alternative for obtaining liquidity, it had no

reasonable choice to which it could "voluntarily" agree.  It is true that in one sense, a person's

choices are "voluntary" so long as they have not lost the capacity to understand what it is doing:

thus, even a person accosted by a gunman in a sense makes a "voluntary" choice between giving

up his money or getting shot.  This is precisely the circumstance the AIG Board faced.  On

September 22, 2008, AIG Vice-Chairman Jacob Frenkel wrote that the approval of the terms

"should not be confused with approval of the robbery – the government stole at a gunpoint 80

percent of the company" (PX 1229 at 1).  The law makes plain that choice in this sense is not

voluntary for purposes of the duress doctrine.[8]

---

[6] *See also, Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 391 (Ct. Cl. 1969).
("The appellant had no choice. The only alternative was to submit to an illegal exaction *or
discontinue its business*") (citation omitted) (emphasis added); *Petters Co. Inc. v. BLS Sales Inc.*,
2005 WL 2072109, *8 (N.D. Cal. 2005) ("financial ruin or bankruptcy is not a reasonable
alternative") (citation omitted); *Osanitsch v. Marconi PLC*, 2009 WL 5125821, *7 (N.D. Cal.
2009) (duress may be found if "bankruptcy or financial ruin" are the only options).

[7] The minutes of the September 21 AIG Board meeting report: "Several of the directors
commented that they did not feel as though they had any choice" (PX 235 at 5) and notes of the
meeting state "GM [George Miller] doesn't think we had choice" and "VR [Virginia Rometty]:
don't have choice" (PX 1053 at 4).

[8] Defendant's contrary view defeats the purpose of the duress doctrine and ensures that every
defendant automatically prevails on duress, regardless of how egregious its conduct and the
circumstances, so long as defendant has not, for example, hypnotized plaintiff or given it mind-
altering drugs.  That is why Defendant's reliance on quotes from AIG board members saying

**V.     THE COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CREDIT AGREEMENT CLASS'S ILLEGAL EXACTIONS CLAIM.**

**A.     The Defendant Lacked Legal Authority Under Section 13(3) To Demand Stock In AIG As A Condition For Providing A Fully Secured Interest-Bearing Loan.**

The Court already has twice rejected Defendant's claim that Defendant was permitted to require equity as consideration for a 13(3) loan.  *See Starr*, 106 Fed. Cl. at 84-87; *Starr Int'l Co. v. United States*, 107 Fed. Cl. 374, 378-79 (2012).  Defendant nevertheless continues to reargue that Section 13(3) gave it unlimited power to require any percentage of a borrower's equity, picked for whatever reason, as a condition of providing liquidity assistance, even where the loan was fully secured and admittedly critical to fulfilling its statutory role and public responsibility as lender of last resort.

**1.   Defendant Lacked Express Power To Demand Equity.**  The plain language of Section 13(3) provides that the only consideration for a 13(3) loan is an interest rate set pursuant to Section 14(d) of the Act.

After the initial briefing in this case, Defendant raised for the first time in the history of the Federal Reserve Act the contention that the last sentence of Section 13(3) ("All such discounts for individuals, partnerships or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe.") somehow provided it with authority to acquire a borrower's equity as a condition of a 13(3) loan.  Presumably because, as Defendant admits (Def. Br. 28), the Fed never issued any regulations supporting Defendant's argument, Defendant relies on the assertion that an equity requirement is a "restriction" or "limitation".  As a matter of plain language, a "restriction" or

they made a "voluntary" choice on September 16 is irrelevant. *Compare* Def. Br. at 9 *with* note 7 above.

"limitation" on a discount or interest rate cannot plausibly be read as an authorization to require transfer of ownership and control of the solvent borrower as consideration in exchange for a loan.  Instead, as this Court held, the "only consideration for a loan prescribed by Section 13(3) is an interest rate subject to the determination of the Board of Governors" (*Starr*, 107 Fed. Cl. at 378).  These requirements would be superfluous and contradicted if the Federal Reserve could override them to punish solvent borrowers by demanding unlimited consideration or transfers of control.[9]

Defendant also is wrong in asserting that Congress used the "limitations, restrictions, and regulations" language "solely for loans" under Section 13(3) to give the Board "specific authority" to "tailor the terms of particular rescue loans based on policy judgments about the public interest" (Def. Br. at 27).  To the contrary, Congress used the *same language* to apply to the rediscounting of paper for member banks under Section 13 of the original Federal Reserve Act (*see* Federal Reserve Act, Pub. L. No. 63-43 § 13, 38 Stat. 251, 264 (1913), and in 1916 to apply to the "discount and rediscount" of paper for member banks (Pub. L. No. 64-270, 39 Stat. 752, 753 (1916)).  *See also* Howard B. Hackley, Bd. of Governors of the Fed. Reserve Sys., Lending Functions of the Federal Reserve Banks (May 1973) at 9 ("*All* discounts were made subject to such regulations, limitations, and restrictions as might be prescribed by the Federal Reserve Board") (emphasis added).

Congress also could not have intended to confer the power to selectively punish when it

---

[9]  *See Bilski v. Kappos*, 130 S. Ct. 3218, 3228 (2010) (applying "the canon against interpreting any statutory provision in a manner that would render another provision superfluous"); *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1150 (Fed. Cir. 2007) (holding that "'a statute should be interpreted so as not to render one part inoperative'") (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)); *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1368 (Fed. Cir. 2005) (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)) ("it is our task to construe the two statutes in a way that best resolves any possible conflict between them").

required no procedures for determining who should be punished or for what or by how much, given the significant due process, equal protection, and delegation concerns that would result from such unconstrained authority.  *See Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988) ("federal statutes are to be construed so as to avoid serious doubts as to their constitutionality").

The Federal Reserve's own prior interpretations likewise preclude the Government's argument.  The regulation governing the "terms of credit" for 13(3) loans that was in place in September of 2008 authorized only the charging of interest with no authorization to acquire equity or additional consideration.  *See* 12 C.F.R. § 201.4(d).  Similarly, while disputing the relevance of the contemporaneous circulars issued by the Federal Reserve, the Government concedes (Def. Br. at 28) that the circulars provided that "*by the express terms of the law*," Section 13(3) loans "'may be made *only* at rates established by the Federal Reserve Bank, subject to review and determination by the Board of Governors.'"  Aug. 1932 Circular, 18 Fed. Reserve Bulletin no. 8 at 518-20 (emphasis added); Feb. 1936 Circular, 22 Fed. Reserve Bulletin no. 2 at 123.  The regulation and circulars also contain no procedures for *punishing* borrowers or any suggestion that FRBNY could require equity or consideration beyond the interest rate. [10]

**2.  Defendant Lacked Incidental Power To Demand Equity.**  As the plain language of 13(3) makes clear, and as the Court has held, once the Federal Reserve decides to make a 13(3) loan the "only consideration for a loan prescribed by Section 13(3) is an interest rate subject to

---

[10]  Congress reinforced the Federal Reserve banks' lack of authority in 1945 with enactment of the Government Corporation Control Act, which prohibited government entities from acquiring a controlling equity stake in a corporation without express Congressional authorization.  31 U.S.C. § 9102 ("An agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action."); *id.* § 101 (defining "agency" to include federal instrumentalities); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 388-90 (1995).

the determination of the Board of Governors" (*Starr*, 106 Fed. Cl. at 85).

Defendant nevertheless continues to contend that the claimed power to take equity or otherwise demand unlimited consideration from borrowers can be discovered in FRBNY's "incidental powers" because it purportedly was "useful to achieve the goals of protecting taxpayer interests and mitigating moral hazard." Def. Br. at 33-37. This argument is incorrect, first, because, as this Court previously recognized:

> Although the FRA does indeed confer incidental powers upon Federal Reserve banks, it grants only such powers that "shall be necessary to carry on the business of banking *within the limitations prescribed by this chapter*." Thus, because the FRA only permits the Board to demand consideration in the form of interest rates, the Board did not have implied authority to demand the transfer of equity as consideration for the loan to AIG.

*Starr*, 107 Fed. Cl. at 378 (quoting 12 U.S.C. § 341) (emphasis in original). Defendant proffers no reasonable basis for revisiting this ruling, which adhered to longstanding Supreme Court precedent that a federal entity's incidental powers cannot be greater than the powers otherwise delegated to it by Congress. *See Fed. Reserve Bank of Richmond v. Malloy*, 264 U.S. 160, 167 (1924) ("authority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized—not to do another and separate thing, since that would be, not to carry the authority granted into effect, but to add an authority beyond the terms of the grant."); *First Nat'l Bank v. Missouri*, 263 U.S. 640, 659 (1924).

The law governing national banks similarly confirms that the Federal Reserve lacks the incidental authority to acquire equity in exchange for a discount under Section 13(3). As the Supreme Court held in *California National Bank v. Kennedy*, 167 U.S. 362 (1897): "The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, *nor is it an act which may be exercised as incidental to the powers*

27

*expressly conferred.*"[11]  *Id.* at 369 (emphasis added). This limitation applies with even greater

force to the Federal Reserve Banks given the comparatively greater power that national banks

have to set the consideration for a loan.  Defendant's contrary claim that Federal Reserve banks

enjoy greater authority ignores that whereas interest rates under Section 13(3) must be "fixed

with a view of accommodating commerce and business," there is no specification as to how the

rates should be set by national banks.[12]  Moreover, a certain percentage of national bank loans

need not even be fully secured.  *See* 12 U.S.C. § 84.

Equally as significant is a comparison of 12 U.S.C. § 341 (granting Reserve Banks "such

incidental powers as shall be necessary to carry on the business of banking *within the limitations*

---

[11]  Defendant misleadingly asserts that the Court in *California Nat'l Bank* held that national banks could acquire stock as an incident of their "lending activities."  Def. Br. at 36.  The Court referred only to the ability to "accept stock of another corporation as *collateral*" or "as security for a previous indebtedness" – not the use of loans to purchase stock in a private corporation. 167 U.S. at 366-67.  Banks unquestionably have the power to accept collateral and settle defaulted loans.  *See Starr*, 106 Fed. Cl. at 84.  By contrast, there is no express power to purchase stock or demand consideration for a Section 13(3) loan beyond an interest rate fixed with a view of accommodating commerce and business.  Thus, the acquisition of stock here was not incidental to any power; it would be a new power.

[12]  *See* Hackley at 2 ("Commercial banks make loans for profit – to all comers and for all conceivable purposes. Although loans made by the Federal Reserve bear interest, they are made not for profit but for a public purpose").  The Government's reliance on opinions authorizing national banks to acquire warrants as consideration for a loan thus ignores (1) the different and greater statutory power of national banks to set the consideration for loans, as well as (2) critical language in those opinions that makes clear that even national banks may only acquire warrants so long as they do not exercise them.  Otherwise, the Office of the Comptroller of the Currency treats equity acquired by national banks as consideration for a loan as a prohibited purchase.  *See* 12 C.F.R. § 7.1006 ("A national bank also may take as consideration for a loan a stock warrant issued by a business enterprise of a borrower, *provided that the bank does not exercise the warrant*.") (emphasis added); O.C.C. Inter. Ltr., 1992 WL 486905, at *2 (July 15, 1992) ("Further, in keeping with the provisions of 12 U.S.C. §§ 24(7) and 29, *a national bank can have no possessory or ownership interest in a borrower's business or real estate*.") (emphasis added); O.C.C. Inter. Ltr. No. 992, 2004 WL 1563358, at *2 (May 10, 2004) ("*The OCC has prohibited banks from exercising such warrants* – and thereby converting them into shares of the borrower's stock – on the theory that doing so would be tantamount to a purchase of stock for its own account.") (emphasis added).

*prescribed by this chapter*") with 12 U.S.C. § 24 (granting national banks "all such incidental

powers as shall be necessary to carry on the business of banking" without the limiting language).

The contemporaneous admissions of government officials confirms the Government's

understanding in 2008 that it lacked authority to acquire equity in AIG.  For example:

> (a)   Treasury Secretary Geithner to Senator Snowe:  "Under section 13(3) of the Federal
> Reserve Act, the Fed is prohibited from taking equity or unsecured debt positions in
> a firm" (PX 599 at 177).
>
> (b)   Chairman Bernanke to Secretary Paulson: "The Federal Reserve is authorized under
> the Federal Reserve Act to extend credit in various forms, but is not authorized to
> purchase equity securities of financial institutions" (PX 622 at 2).
>
> (c)   The Legal Division of the Board of Governors in November 2008: "The Federal
> Reserve believes that the Preferred Shares of AIG that would be issued as a
> condition of our loan to AIG cannot have full voting rights with common shares
> while this interest is held by a trust for the benefit of the Treasury", and "the
> Federal Reserve is also subject to the same legal constraints because we also are
> prohibited from acquiring and holding stock as an equity kicker in connection with
> a loan made by the Bank, as are commercial banks"  (PX 1494 at 2-3).

(Defendant's Brief does not acknowledge, let alone deal with any of this evidence.)

**3.   Defendant Is Not Entitled To Deference In Its Interpretation.**  Defendant's

contention that it is entitled to deference in its interpretation (Def. Br. at 34) fails, first, because,

as discussed above, its interpretation is contrary to the plain language, structure, and legislative

history of section 13(3).  *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984)

(deference is afforded only to reasonable interpretations of ambiguous statutory provisions); *Soc.*

*Sec'y Bd. v. Nierotko*, 327 U.S. 358, 369 (1946) ("An agency may not finally decide the limits of

its statutory power.  That is a judicial function."); *Aerolineas Argentinas v. United States*, 77

F.3d 1564, 1574 (Fed. Cir. 1996) (*Chevron* deference "does not permit abdication of the judicial

responsibility to determine whether the challenged regulation is contrary to statute or devoid of

administrative authority").

Moreover, the Board of Governors, the only governmental entity with authority to

approve a Section 13(3) loan, did not vote on or approve either the form of equity established in the Credit Agreement, or creation of the Trust (PX 69) – key terms of the loan agreement provided by FRBNY.

Further, Defendant's acquisition of 79.9 percent of shareholder equity was not the type of deliberative decision intended to have "the force of law" that is entitled to deference under *Chevron. See United States v. Mead Corp.*, 533 U.S. 218, 232 (2001) (rejecting *Chevron* deference for tariff classifications that did not "bind more than the parties to the ruling"). It was an ad hoc and admittedly unprecedented decision applying only to AIG with no public or formal legal analysis; it was also contrary to the Federal Reserve's prior interpretations and transferred enormous financial benefit to Defendant in response to public pressure.[13]  *See* Paulson Dep. 253:3-6 ("AIG was incredibly unpopular.  If there was a political scapegoat, it was AIG.").  For all of these reasons, the decision lacked a procedure "tending to foster the fairness and deliberation that should underlie a pronouncement" having the force of law.  *Mead*, 533 U.S. at 230.  It was therefore wholly unlike the notice-and-comment rulemaking or formal adjudication present in the "overwhelming number of" Supreme Court cases applying *Chevron* deference, *see id.* at 230, as well as the opinion letter in *NationsBank of N.C. v. Variable Annuity Life Ins. Co.*,

---

[13] *See Eldredge v. Dep't of the Interior*, 451 F.3d 1337, 1342 (Fed. Cir. 2006) (no deference to opinion that was not "binding on other parties"); *Parker v. Office of Personnel Mgmt*, 974 F.2d 164, 166 (Fed. Cir. 1992) ("post-hoc rationalizations will not create a statutory interpretation deserving of deference."); *Amalgamated Sugar Co. v. Vilsack*, 563 F.3d 822, 824 (9th Cir. 2009) ("Chevron deference may be inappropriate where, as here, (1) the agency has a self-serving or pecuniary interest in advancing a particular interpretation of a statute, *and* (2) the construction advanced by the agency is arguably inconsistent with Congressional intent."); *Freeman v. Quicken Loans*, 626 F.3d 799, 805 (5th Cir. 2010) ("Where the agency has not used a deliberative process such as notice-and-comment rulemaking, or where the process by which the agency reached its interpretation is unclear, the court cannot presume Congress intended to grant the interpretation the force of law."); *Alcoa, Inc. v. United States*, 509 F.3d 173, 183 n.9 (3d Cir. 2007) (quoting *Catskill Mountains Chapter of Trout Unltd v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001) (A "'position adopted in the course of litigation lacks the indicia of *expertise, regularity, rigorous consideration, and public scrutiny* that justify *Chevron* deference.'").

513 U.S. 251, 257 (1995) (applying *Chevron* deference to an opinion letter by the Comptroller of the Currency addressing the authority of national banks generally to sell annuities).

### 4. Later Congressional Action Did Not And Could Not Ratify The Defendant's Illicit Conduct.

Defendant also relies (Def. Br. at 31-33) on two congressional acts that post-dated the AIG loan and (by more than 75 years) the enactment of 13(3). This argument fails first because the Supreme Court has made clear that a later congressional statute cannot reliably establish the intent of an earlier Congress, particularly for legislation enacted decades before.[14]

---

[14] *See Marvin M. Brandt v. United States*, 134 S. Ct. 1257, 1268 (2014) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (citation and quotations omitted); *Bilski*, 130 S. Ct. at 3250 (2010) (Stevens, J., concurring in the judgment) ("When a later statute is offered as 'an expression of how the Congress interpreted a statute passed by another Congress a half century before,' 'such an interpretation has very little, if any, significance'") (*quoting Rainwater v. United States*, 356 U.S. 590, 593 (1958)). *See also United States v. SCS Bus. & Tech. Institute*, Inc., 173 F.3d 870, 881 n.15 (D.C. Cir. 1999) (holding that "we are unaware of any Supreme Court holding in which a subsequent declaration has been used, not to discern the current meaning of a statute post-declaration, but instead to interpret the meaning of a statute prior to the declaration." and rejecting a theory that would have required the Court "quite illogically, to interpret the 1986 legislative action as a declaration of what a Congress over a century earlier intended"); *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994) (the "interpretive value of an amendment to a statute is particularly dubious where, as here, the amendment was enacted long after the original provision"). Each of the cases cited by Defendant involved a longstanding interpretation and/or clear evidence that Congress both considered and intended to ratify the interpretation at issue. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143-44 (2000) (enactment of six different statutes regulating tobacco against the backdrop of the FDA's longstanding position that it lacked authority to regulate it); *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (express authorization of the CFTC's authority "to promulgate such rules, regulations and orders" governing counterclaims); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531-33 (1982) (upholding Title IX regulations that were specifically submitted to Congress for legislative review and that were reviewed and discussed in six days of hearings to determine their consistency with the law); *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 133-35 (1978) (interpreting Congress' reauthorization of the Voting Rights Act in 1975 in light of a longstanding administrative interpretation and ample legislative history that made clear that the interpretation "was widely shared and unchallenged"); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380 (1969) (confirmation of the FCC's decades old fairness doctrine through express recognition of the obligation of broadcasters to "to afford reasonable opportunity for the discussion of conflicting views on issues of public importance").

Further, even if Congress's view as to the meaning of the prior legislation were relevant, it cannot be reliably discerned from the statutes cited by Defendant.  Defendant first relies on certain requirements in the EESA (TARP) legislation for the Federal Reserve reports to Congress and the Congressional Oversight Panel that included "the specific terms of the actions of the Board," including "the value of any collateral" and the "recipient of warrants or any other potential equity in exchange for the loan."  *See* 12 U.S.C. § 5235(a), (d).  This statute, dealing with the Treasury's TARP program and the Federal Reserve's reporting of what it held did not and could not affect what the Federal Reserve was authorized to acquire or Congress's original intent in 1932 in enacting Section 13(3).

In fact, EESA strictly limited the Government's authority to take equity in exchange for capital under the TARP program. EESA authorized the Secretary of Treasury to acquire stock or warrants in exchange for assistance provided pursuant to EESA, but directed that the Secretary "receive nonvoting common stock or preferred stock" or "voting stock with respect to which, the Secretary agrees not to exercise voting power" (12 U.S.C. §5223(d)(1)). Congress moreover specifically instructed the Government to respect, not circumvent, shareholder refusal to approve increases to the number of authorized shares of a financial institution, directing that the Government acquire senior debt instead of equity if there was insufficient authorized equity available (12 U.S.C. §5223(d)(2)(F)). The Government's litigation position that EESA authorized the taking of full voting control of a private corporation is contradicted by its own contemporaneous understanding that Congress in fact "precluded the Secretary of the Treasury from receiving any immediately voting equity interests" and that: "In the past lending programs, the Government's equity interest has always been nonvoting or limited voting while in the hands of the Government" (PX 1494 at 2).

32

The other provision the Defendant relies on similarly provides no guidance as to what Congress intended in 1932 when it enacted Section 13(3).  Instead, as part of the Dodd-Frank Act which was enacted two years after the loan in this case, Congress imposed reporting requirements on future Section 13(3) discounts while limiting such discounts only to participants in a "program or facility with broad-based eligibility" established with "the prior approval of the Secretary of the Treasury" and only according to "policies and procedures" that the Board must establish "in consultation with the Secretary of the Treasury."  12 U.S.C. § 343(3)(A), (B)(i), (iv).  Nothing in Dodd-Frank remotely supports the unconstrained authority claimed by Defendant to make individual, ad hoc decisions to punish the shareholders of a particular company by requiring 79.9% of their equity as a condition of a 13(3) loan.[15]

**5.   The Creation Of The Trust Did Not Alter The Illegality Of Defendant's Actions.**

Defendant's motion argues that even if it lacked the authority to *hold* equity, its conduct was still legal because it had the power to *acquire* equity in exchange for a Section 13(3) loan and then place it in a trust.  Def. Br. at 37-39.  In denying Defendant's motion to dismiss, this Court observed, "it is not clear why the Government would use a trust procedure unless to circumvent the Supreme Court's holding in *California National*," and perceived "no meaningful legal distinction between FRBNY and Trust ownership of the Series C Preferred Stock."  *Starr*, 106 Fed. Cl. at 87.  Discovery has only confirmed the Court's analysis.

*First*, as already discussed, regardless of which entity held the equity, Defendant lacked the power to demand it.  The statute does not authorize Defendant to deprive shareholders of their equity as a condition of a Section 13(3) loan, regardless of what is subsequently done with

---

[15] None of the broad-based eligibility programs established during the financial crisis required participants to provide equity to the Federal Reserve except as collateral, which was returned when the loan was required. Def.'s Resp. to 1st RFAs Nos. 18.1, 18.3, 18.4, 19.0, 19.2, 19.3.

that equity.  *See* pp. 23-28 above.

*Second*, as also already discussed, the Federal Reserve Board of Governors *never approved* the trust or the acquisition of voting preferred stock in connection with the Section 13(3) to AIG.  *See* pp. 29-30 above.

*Third*, there is ample evidence that the Trust was created because the relevant decision-makers knew that Defendant lacked authority to hold equity.  A November 10, 2008 memorandum from Fed General Counsel Scott Alvarez states: "The creation of the Trust is necessary to implement this condition on the Board's authorization *because neither the Reserve Bank nor the Treasury Department has the legal authority to hold the equity in the form of preferred or common stock directly*."  (PX 950 at 3).  FRBNY General Counsel Baxter told the Congressional Oversight Panel that "Neither the Fed nor the treasury had authority to hold the shares" and that they contemplated striking the equity condition but instead decided to "put shares in trust" (PX 1485 at 10).  The evidence is consistent. [16]  Defendant points to *no* contemporaneous document supporting its explanation in this litigation that the Trust was created, as it argues in this litigation, "to resolve policy concerns associated with" FRBNY's influence over the markets and knowledge of non-public information.  Def. Br. at 38.

As the preceding points demonstrate, the Trust could not cure the problem with Defendant's illegal exaction of Plaintiffs' equity regardless of whether the Trust was

---

[16] In response to the question, "Why would the Federal Reserve Bank of New York assign the beneficial interest of the Series C preferred shares to the treasury if it was providing its funds to AIG?" the 30(b)(6) designee for the Federal Reserve Board of Governors testified: "the Federal Reserve Bank of New York nor [sic] the other Federal Reserve banks cannot hold equity interest in an organization."  PX 246 at 86 (US 30(b)(6) (Greenlee) Murray v. Geithner Dep. 86:16-18). An October 3, 2008 draft of the Trust Agreement sent by FRBNY Assistant General Counsel Stephanie Heller similarly states: "DPW provided this language except that it had the property going to FRBNY.  Not sure why FRBNY and not Treasury (*neither of us can take stock so we both have the same problem*)."  PX 249 at 20 (emphasis added).

"independent" as Defendant contends.  Moreover, the Trust was not independent.  Through the Trust Agreement, FRBNY specifically required the Trustees to vote the stock in certain ways on particular topics and otherwise to vote the stock in favor of the Government according to a "standard of care" established by FRBNY.  PX 12 at §§ 2.04(c), (d), 3.03(a).  FRBNY further had the right under the Trust Agreement to enforce those requirements, and other requirements of the Trust Agreement, through an action for specific performance.  PX 12 at § 6.07(b); *see also Starr*, 106 Fed. Cl. at 86 (declining "to indulge the Government's distinction" between "ownership of AIG stock by the FRBNY and acquisition of the stock by the Trust concededly structured to benefit the Treasury Department").

Other evidence further establishes that the Trust was, as FRBNY and BOG auditor Deloitte & Touche observed, nothing more than "a legal shell" that was "inserted into the transaction structure." PX 451 at 16.  Further, FRBNY hand-picked individuals with close ties to the Fed and FRBNY to serve as Trustees, including a former FRBNY employee of 35 years, a former FRBNY Board Member, and a former Board member of the Houston branch of the Dallas Fed.  *See* Def.'s Resp. to 2nd RFA Nos. 765, 772; Foshee Dep. 43:11-16; Baxter Dep. 223:11-227:6; Def.'s Resp. to 1st RFA, Nos. 25.0, 25.1.

Predictably, the Trustees also were dependent upon Defendant and acted consistently with its wishes.  The Trustees could not recall taking any action over the Government's objection (Feldberg Dep. 140:10-24, 225:7-21; Foshee Dep. 195:7-13, 211:2-19), and both sought and received direction from Defendant (PX 559 at 2; PX 76; PX 846; Feldberg Dep. at 131:5-20; Baxter Dep. at 236:10-13).  FRBNY also managed the Trust's communications with AIG's regulators. (PX 568 at 44; PX 1500; PX 1488; PX 1486).  The Trust also did not engage its own staff or advisors prior to 2010 and relied instead on the Government for information about AIG.

PX 495 at 84, 139, 206; *see also* PX 846 at 2-4; PX 560; PX 561; PX 563; PX 568; PX 1487;

U.S. 30(b)(6) (Millstein) (December 18, 2012) Dep. 162:9-22; Silva Dep. 210:24-211:9.  The

Trustees were also wholly unaware of basic facts that were core to their duties (*see, e.g.*,

Feldberg Dep. 168:22-169:15, 220:20-221:6; Foshee Dep. 90:14-23, 101:11-15, 102:3-5, 210:4-

20).  Such evidence demonstrates that the Trust was not independent and, at minimum,

establishes a disputed issue for trial.

**B.      The "Economic Equivalent" Provision Does Not Change the Result.**

Defendant argues that even if the demand for 79.9 percent of shareholders' equity was

illegal, Starr "would not have suffered any legally compensable injury" because under Section

8.12 of the Credit Agreement, in the event that any provision is declared illegal, the parties "shall

endeavor in good faith negotiations" to replace that provision with "provisions the economic

effect of which comes as close as possible to that of the invalid, illegal or unenforceable

provisions."  Def. Br. at 39.

*First*, for the reasons discussed above, Defendant lacked authority to demand the

economic equivalent of a 79.9 percent equity interest.  Defendant never even tries to explain how

if it were illegal to demand 79.9% of the shareholders' equity as a condition of a loan it could

possibly be legal to demand the "economic equivalent" of that equity interest – or what that

"economic equivalent" might be.

*Second*, the application or implementation of this provision is not part of this proceeding.

The provision contemplates that negotiations over a replacement would occur (1) only *after* a

provision was declared illegal and (2) only between AIG and Defendant.  AIG is not a party to

this proceeding, and indeed, Defendant deliberately sought to exclude it from participating.  If

Defendant attempts to negotiate a replacement in response to a finding of illegality, AIG may

choose to raise various defenses, including the illegality of the economic equivalent provision.[17]

Speculation about future negotiations and/or litigation with AIG is particularly inappropriate

here where Plaintiffs are entitled to the benefit of all reasonable inferences.

**C.      The Money-Mandating Requirement Does Not Bar Plaintiffs' Claim.**

Defendant reargues its contentions that Plaintiffs cannot recover because Section 13(3) is

not "money-mandating", asserting that the Court reserved the question at the motion to dismiss

stage (Def. Br. at 41).  Defendant fails to note that as this Court previously held, and as the cases

make clear, in "'the context of an illegal exaction, the court has jurisdiction regardless of

whether the provision relied upon can be reasonably construed to contain money-mandating

language.'"  *Starr*, 107 Fed. Cl. at 378.

Courts have repeatedly confirmed the Court's conclusion that illegal exaction claims do

not require proof of a money-mandating provision.[18]  By contrast, Defendant has not identified a

---

[17] A court also could potentially invalidate the claim as analogous to usury avoidance clauses, which provide that if an interest rate is declared usurious, the borrower must pay the maximum rate allowable by law.  *See Simsbury Fund, Inc. v. New St. Louis Assocs.*, 204 A.D.2d 182, 182 (N.Y. App. Div. 1994) (holding that "language therein purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do not make the subject agreements nonusurious."); *see also Hillair Capital Inv., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 338 n.1 (S.D.N.Y. 2013); *Roswell Capital Partners LLC v. Alt. Const. Techs.*, 2009 WL 222348, at *15 n.13 (S.D.N.Y. Jan. 30, 2009) (both applying *Simsbury Fund*).

[18] *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006); *Casa de Cambio Comdiv S.A. v. United States*, 291 F.3d 1356, 1363 (Fed. Cir. 2002); *see also Am. Airlines v. United States*, 551 F.3d 1294 (Fed. Cir. 2008) (upholding illegal exaction claim based on the unauthorized collection of fees without requiring a showing that the statute and regulations in question established a private right of action); *Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273 (Fed. Cl. 2012) (where an illegal exaction is alleged, the Tucker Act "enables suit even in the absence of a money-mandating statute"); *O'Bryan v. United States*, 93 Fed. Cl. 57, 66 (2010); *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996) ("In illegal exaction cases, in contrast to other actions for money damages, jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language."); *see also Mallow v. United States*, 161 Ct. Cl. 446, 454 (1963); *Suwanee S.S. Co. v. United States*, 279 F.2d 874, 877 (Ct. Cl. 1960); *GMO Niehaus & Co. v. United States*, 153 F. Supp. 428, 431-32 (Ct. Cl. 1957); *Eversharp, Inc. v. United States*, 125 F. Supp. 244, 247 (Ct. Cl. 1954) (all

single illegal exaction case where a court declined to order the return of money or property

obtained for lack of a money-mandating provision.  The lone case that it cites involved an

inapposite claim for monetary damages purportedly caused by Defendant's violation of an

appropriations statute where the Court found the illegal exaction claim failed for lack of a "direct

and substantial impact" on the Plaintiff.  *See Norman v. United States*, 429 F.3d 1081, 1096 (Fed.

Cir. 2005).  Defendant has offered no basis for reconsidering the Court's prior decision or

departing from the ample precedent rejecting Defendant's position.

**D.**     **"Voluntary Agreement" Is Not A Defense To Plaintiff's Illegal Exaction Claim.**

As noted in connection with Plaintiffs' Takings Claim (pp. 12-14 above), Plaintiffs never

agreed (or were given the opportunity to agree) to anything, and in any event the AIG Board's

acceptance of Defendant's demands was under duress.  Moreover, the law is clear that where the

Government demands consideration for conferring a benefit that it is not authorized to demand,

the fact that a citizen agrees to the demand in order to secure the benefit is not a defense to an

illegal exaction claim.  Defendant's singular focus on voluntary agreement fails to address the

core constitutional issues raised by the Government's conduct with respect to AIG and its

common shareholders under the auspices of Section 13(3).  Neither consent nor voluntariness by

AIG's Board – had they been present—can absolve the Government of liability for

unconstitutional conduct. Constitutional rights should not be construed as private rights which

can be bargained or conditioned away.  As the Supreme Court said in *Frost & Frost Trucking v.*

*R.R. Comm'n*, 271 U.S. 583, 594 (1926):  "If the state may compel the surrender of one

constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It

is inconceivable that guaranties embedded in the Constitution of the United States may thus be

upholding right to recover funds paid to the Government that the Government lacked legal
authority to obtain without requiring a showing of a money-mandating statute).

manipulated out of existence."  The central question is not agreement, but whether, as a lender of last resort under Section 13(3), the Government can impose any demand it so desires in exchange for statutorily authorized loans.  The Government's motion for summary judgment suggests 'YES' – but there must be and are clear constitutional limits on what the Government can exact, particularly given the extraordinary position of power in which it finds itself when an "individual, partnership or corporation" seeks Section 13(3) from the Government lender of last resort.

When presented with analogous (though far less extreme) circumstances, this court in *Suwannee Steamship Co. v. United States*, 279 F.2d 874 (Ct. Cl. 1960), held that the law does not require any inquiry into whether acceptance of the condition was "voluntary" and eliminates "voluntariness" as a defense to an illegal exaction.  Although Plaintiffs have repeatedly relied on *Suwanee* in prior briefs, Defendant ignores the ruling in its motion.

In *Suwannee*, pursuant to the Merchant Marine Act, the plaintiff sought from the Maritime Administrator permission to sell two of its ships to a foreign purchaser (*Id.* at 874-75).  The plaintiff needed such permission by law and it could come only from the Administrator (*Id.*).  The Administrator agreed to the sale, if plaintiff paid it $20,000 (*Id.* at 875-76).  The plaintiff accepted the terms proposed by the Administrator, paid the $20,000, and subsequently sued the United States, claiming that "Maritime had no legal authority to condition its approval of the requested transfer upon the payment of $20,000" (*Id.* at 876).

In response to the plaintiff's claim in *Suwannee*, the Government made two arguments (closely tracking Defendant's key arguments here).  The first was that it "had the power to deny the plaintiff permission to make the desired transfer" and that, under the statute, it had "complete freedom to impose conditions upon any permission granted."  *Id.*  The second was that the

plaintiff, by entering into a contract to pay the $20,000, had voluntarily agreed to the payment.

*Id.* at 877.  The Court rejected both of the Government's arguments.  In rejecting the first

argument, it stated:

> We suggest that no statute should be read *as subjecting citizens to the
> uncontrolled caprice of officials*, unless the statute has to do with the powers of
> the President in dealing with foreign relations, the powers of a military
> commander in the field, or some comparable situation …officials have no
> authority to add to their function of determining the compatibility of the
> application with the public interest, the supererogatory function of picking up a
> few dollars for the public treasury. (*Id.* at 876, 877) (emphasis added).

Having thus described why impermissible dangers arise when an official vested with

monopoly power is allowed to demand consideration for its exercise of discretion not authorized

by Congress, the court went on to rule that because of the lack of authorization to tie a payment to

the approval sought "the doctrine of voluntary payment should not be applied" (*Id.* at 877).

The fact pattern in this case is far more extreme than that in *Suwannee* because, in a

market panic, where pricing is based on "fear" not "price discovery" and liquidity becomes

scarce, potential Section 13(3) borrowers are subject to special vulnerabilities that increase as

time passes and the dynamic persists unabated (PX 1477 at 22; PX 1478 at 138-139).[19]

Accordingly, much more than in *Suwannee,* the market dynamics in a financial panic create the

risk that the Government can use its monopoly power to require consideration not authorized by

Congress.  Where Congress has legislated the requirements for conferring a discretionary benefit

as it did in Section 13(3), it did not intend for government officials to create ad hoc, and impose

---

[19] The fact pattern here is also more extreme than the one in *Koontz v. St. Johns River Water
Mgmt. Dist.*, 133 S. Ct. 2586 (2013), which recognized the "special vulnerability of land use
permit applicants to extortionate demands for money" by permitting authorities, and held even
though the government was authorized to "choose whether and how a permit applicant is
required to mitigate the impacts of a proposed development," the Government "may not leverage
its legitimate interest in mitigation to pursue governmental ends that lack an essential and rough
proportionality to those impacts." *Id*. at 2595, 2603.  In the instant case AIG had a very special
vulnerability, and the Government was *not* authorized to demand equity at all.

by fiat, conditions beyond those set forth in the statute.  *See Sprague S.S. Co. v. United States*,

145 Ct. Cl. 642, 645-46 (1959); *see Malloy*, 264 U.S. at 167 ("authority to do a specific thing

carries with it by implication the power to do whatever is necessary to effectuate the thing

authorized—not to do another and separate thing, since that would be, not to carry the authority

granted into effect, but to add an authority beyond the terms of the grant").  Where such

conditions are imposed, allowing the defendant to assert voluntariness as a defense has the effect

of allowing the "uncontrolled caprice of officials" to evade review.  Congress cannot be

presumed to have been indifferent to the prospect that officials in whom it vests great, even

monopoly, power, will be free to use it to advance any agenda, goal, or view they wish.

Congress must control the exercise of such power and confine it to the goals and procedures it

specifies.  In these circumstances therefore, and as *Suwannee* holds, voluntariness cannot be a

defense.

**E.    Defendant In Particular Lacked Authority To Exact 79.9% Of Plaintiffs' Equity As Punishment.**

It is clear that Defendant's exaction of Plaintiffs' equity was punitive (*see* pp. 7-9 above).

Defendant has not (yet) argued, and Plaintiffs are aware of no basis to argue, that there was any

congressional authorization to use 13(3) to punish borrowers disfavored by the Fed – particularly

without any investigation, hearing, or findings, and without any substantive or procedural

standards or criteria.  Indeed, had there been any such blanket and unbounded authorization it

would raise severe constitutional issues.

**VI.    DEFENDANT CANNOT ESTABLISH LACK OF ECONOMIC LOSS AS A MATTER OF LAW**

Relying on *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014),

Defendant argues that Starr must show that it would have been better off in a "but-for world" in

which AIG shareholders did not have to transfer 79.9 % of their equity (Def. Br. at 24).

41

Defendant contends that Starr cannot make this showing, because in such a "but-for world" Defendant would have withheld its fully secured loan and forced a bankruptcy, and Starr has no evidence that AIG shareholders would have been better off in that scenario.

Defendant's position fails for several reasons.  *First*, in relying on *A&D Auto Sales*, Defendant overlooks a fundamental difference between that case and this one:  In *A&D Auto Sales*, the Government did not directly appropriate or receive anything of value, while here Plaintiffs challenge as an uncompensated taking or exaction the undisputed Government receipt of 79.9% of the Plaintiffs' equity.  Where the Government receives nothing (as in *A&D Auto Sales*), even the fact of damage is sufficiently uncertain that "a showing of but-for economic use or value is a necessary element" of the claim.  *Id.* at 1157.  But that approach is not used where (as here) the Government has received property belonging to the claimant.  *See Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984) (just compensation "means in most cases the fair market value of the property on the date it is appropriated"); *Nat'l Food & Beverage Co., Inc. v. United States*, 103 Fed. Cl. 63, 70 (2012).[20]

*Second*, Defendant's position fails even if one accepts the "but-for world" test on which it relies. That is so because Defendant depends on the assumption that in the "but-for" world it would provide no assistance and force a bankruptcy. That assumption, however, contradicts Defendant's repeated, uniform admissions that it would never have permitted a bankruptcy because of its unacceptable and catastrophic impact on the financial system world-wide.  (*See* pp. 5-6 above).  Defendant's argument thus fails because it assumes a but-for world that it has

---

[20] Significantly, before deciding to try to rely on *A&D Auto Sales,* Defendant itself took the position that Plaintiffs' case involved a taking where the Government received Plaintiffs' property.  Def.'s Motion to Dismiss (Doc. 30) at 26 ("Starr does not allege a regulatory taking." "Rather, Starr alleges that the Government appropriated its and AIG's property."). These prior assertions by Defendant themselves demonstrate why its reliance on *A&D Auto Sales* is misplaced and thus why the "but-for world" test used by that case does not apply here.

repeatedly admitted could never have existed.  If Defendant cannot simply contradict sworn testimony of senior officials to *defeat* summary judgment, *see Mack v. United States*, 814 F.2d 120, 124-25 (2d Cir. 1998), it certainly cannot do so to *obtain* summary judgment.

Third, while Starr has the burden of proving a taking, to the extent Defendant contends offsetting benefits, Defendant has the burden of proof.  Defendant's argument thus fails because Defendant has failed to demonstrate what, if anything, Plaintiffs would have lost in a bankruptcy. "Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case."  *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011).  Defendant's experts, however, have not met their burden; they have testified that what would have happened in a hypothetical AIG bankruptcy is uncertain or speculative.  Corcoran Dep. 94:3-14, 105:7-106:7; Greenspan Dep. 258:12-259:6.  At this stage, of course, all reasonable inferences must be drawn in Plaintiffs', not Defendant's, favor.  *Century Exploration New Orleans LLC v. United States,* 110 Fed. Cl. 148, 162 (2013).

The Government's contention independently fails due to a fundamental legal flaw.  The issue of loss or damages does not arise unless liability (for an uncompensated taking or illegal exaction) is first established and the Government is found to have acted contrary to law in appropriating the 79.9% equity interest.  The Government may not avoid responsibility for providing a remedy by arguing that, had it been prevented from committing that wrong, it would have refused to provide the 13(3) assistance already found to be appropriate, and thus destroyed the value of what it illegally exacted or took without compensation.  In virtually every illegal exaction case the approval or other benefit the Government offered is greater than what it demands in return.  That may, in fact, be what enables the exaction.  Defendant asks this Court to imagine that if AIG had refused Defendant's equity demand Defendant would have abdicated its

43

responsibility to make a 13(3) loan and let the economy descend into chaos.  Even if the Court

were to credit that threat, it would not be a defense to Plaintiffs' claims.

### VII.    PLAINTIFFS DID NOT "WAIVE" THEIR CLAIMS OR RATIFY DEFENDANT'S TAKINGS OR ILLEGAL EXACTION.

In a thinly disguised attempt to reargue the Court's dismissal of its "laches" defense,

Defendant asserts that Plaintiffs "waived" or ratified Defendant's illegal conduct because they

did not "promptly challenge" it (Def. Br. at 39-40).  But as the Court held in its November 8,

2013 Order, "there was no unreasonable delay" and Defendant suffered no prejudice (Order

(Doc. 183) at 4).  Moreover, unlike the plaintiffs in each case cited by Defendant, Starr and the

Credit Agreement Class had no effective opportunity to object to the provision as illegal until it

was too late.  Instead, Defendant deliberately worked to deprive Plaintiffs of the only potentially

effective means they had of opposing the transaction by deliberately structuring the transaction

to avoid a shareholder vote (*see* pp. 12-14 above).

Moreover, Defendant concedes (Def. Br. 40) that Starr repeatedly attempted to get

Defendant to reduce its equity stake in the company voluntarily without litigation, something for

which Starr should be commended not penalized.[21]  Accordingly, even if the waiver defense

were otherwise applicable, there would be no basis for asserting a knowing and voluntary waiver

by Plaintiffs.  *See American Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 680 (2007) ("For a

waiver to be effective, 'it must be clearly established that there was an intentional relinquishment

or abandonment of a known right or privilege'") (quoting *Brookhart v. Janis*, 384 U.S. 1, 4

(1966)).

---

[21] Defendant's suggestion that it might have taken materially different actions had Starr also expressed the view that Defendant's conduct was illegal is fundamentally implausible and also irrelevant for the reasons discussed in the text.  The argument also is offered without evidentiary support and thus cannot support a motion for summary judgment on an affirmative defense where the Government bears the burden of proof.

44

In any event, neither waiver nor ratification principles permit Defendant to retain property it has obtained pursuant to an illegal exaction. The failure "to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation." *Am. Airlines v. United States*, 551 F.3d 1294, 1302 (Fed. Cir. 2008) (citing *Swift & Courtney & Beecher Co. v. United States*, 111 U.S. 22, 29 (1884)). Thus, in *Am. Airlines*, the Federal Circuit rejected Defendant's argument that American waived the right to seek the return of fees unlawfully collected by the Government by failing to object "for some years" to the collection of the fees. *Id.*; *see also Am. Airlines*, 77 Fed. Cl. at 681 (constructive notice of relevant statute and regulations did not amount to knowing waiver of illegal exactions claim). Defendant's cases involve attempts to seek equitable adjustment or contract reformation, not claims of illegal exaction.

With respect to both its Takings and Illegal Exaction claims: (1) Plaintiff and AIG common shareholders had no contract with Defendant; accordingly, there was no contract for them to repudiate or renounce; (2) Plaintiff did object to the equity term, claiming it was "outrageous" and made its objection known to Defendant numerous times on "almost a daily basis" (Greenberg Dep. 249:9-16); and (3) insofar as AIG's own conduct is concerned prior to the commencement of this lawsuit AIG was under the control of Defendant, and it could not challenge the Credit Agreement terms, absent Defendant's approval. The cases cited by the Government do not alter the relevant analysis: none of them involve a contract provision that was illegal; none of them involve waiver or ratification being asserted against a non-party to a contract; in none of them was the party claiming waiver or ratification exercising control over the other party to the contract.

## VIII.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' REVERSE STOCK SPLIT CLAIM SHOULD BE DENIED.

45

Plaintiff and the Stock Split Class seek compensation for the taking or exaction of their equity and voting rights in connection with a reverse stock split (the "RSS") that occurred on June 30, 2009.  For this claim, Defendant concedes, as it must, that under Delaware law, "common shareholders have a right to a separate class vote before a Delaware corporation can change the number of authorized common shares or change their par value."  Def. Br. at 49 (citing 8 Del. C. § 242(b)(2)).  Defendant also concedes that the *Walker* Stipulation and Order of Dismissal was based on "AIG's representation that any proposal 'to increase the number of authorized common shares or to decrease the par value of the common shares would be the subject of a class vote by the holders of the common stock'" (Def. Br. at 44 (*quoting* PX 1507 at 6)).

The dispute centers on whether the RSS injured Plaintiff and the Stock Split Class by depriving them of the right to prevent further dilution of their equity interests and the role Defendant played in the RSS.

## A.        The Stock Split Class Has A Cognizable Property Interest

Defendant begins its argument concerning the RSS by arguing for the fourth time that the Stock Split Class has no cognizable property interest (Def. Br. at 48).  But, as the Court has previously recognized, the equity and voting rights embodied in common shares of a company represent cognizable property interests.[22]  The crux of the RSS claims is that the RSS Class had a right, pursuant to the *Walker* Consent Order and Delaware Law, to a separate class vote on any

---

[22] "It is undisputed that stock is personal property and transferable under Delaware law." *Starr*, 106 Fed. Cl. at 72 (citing Del. C. Ann. tit. 8, § 159 ("The shares of stock in every corporation shall be deemed personal property and transferable.")).  "Delaware law recognizes the right of shareholders to transfer the voting rights associated with their stock." *Starr*, 106 Fed. Cl. at 73 (citing Del. C. Ann. tit. 8, § 218); *Schreiber v. Carney*, 447 A.2d 17, 25 (Del. Ch. 1982) ("Delaware law has for quite some time permitted stockholders wide latitude in decisions affecting the restriction or transfer of voting rights.").

measure that enabled the Government to transform its Preferred Shares into common stock, thereby diluting the common shareholders' stock, and that this right was taken from it by means of the RSS and the subsequent exchange. *See Starr,* 106 Fed. Cl. at 73 (citing 6/1/12 Hearing Tr. at 105).

**B.      The Walker Consent Decree Not Only Reaffirmed Common Shareholders Rights Under Delaware Law But Also Established A Right To A Separate Class Vote.**

Defendant accurately describes the *Walker* Consent Decree as applying to efforts to "increase the number of authorized common shares or to decrease the par value of the common shares" (Def. Br. at 44, 49 n.92).  However, relying on form and circumvention over substance, Defendant contends that because the number of shares needed to enable the Government to transform its equity interest in AIG from Preferred Shares to Common Shares came not directly but through a reverse stock split that affected issued but not authorized shares, no shareholder right was violated (Def. Br. at 49-50).

The *Walker* Complaint sought "an order declaring invalid and unenforceable the provision of the Super Voting Preferred calling for the Super Voting Preferred to vote with the common stock" (*Walker* Compl. ¶ 53 (PX 228 at 19)), as the Credit Agreement initially required (*Compare* PX 11 at 137 *with* PX 22 at 192).  In addition, the Complaint broadly sought "an order declaring that the Super Voting Preferred is not convertible into common stock absent a class vote by the common stock to increase the number of authorized common shares" (PX 228 at 6 ¶ 6; *see also id.* at 19 ¶ 54).  The Delaware Chancery Court relied heavily upon these allegations, as well as AIG counsel's affirmative representations, in ultimately issuing the Consent Decree in the *Walker* litigation (*See* PX 1507 at 6, referencing PX 592 at 6:24–7:9).

AIG fully understood that the *Walker* Complaint sought more than simply an assurance that Plaintiffs would be allowed to vote on any proposed increase in the number of authorized

47

shares. *See, e.g.*, PX 228 at 1 (explaining that the relief sought in the *Walker* litigation included

"A declaration <u>that the conversion</u> of the Super Voting Preferred into common stock <u>without a</u>

<u>class vote of the common stockholders is invalid</u>") (emphasis added); PX 1507 at 5 (AIG's

2/12/09 Form 8-K (explaining that the *Walker* complaint "sought, among other things, an order

declaring that the Series C Preferred Stock <u>is not convertible into common stock absent a class</u>

<u>vote</u> by the holders of the common stock to amend AIG's Restated Certificate of Incorporation to

increase the number of authorized common shares and decrease the par value of the common

shares") (emphasis added)); *see also Starr,* 106 Fed Cl. at 73-74. Defendant's current

contentions are flatly contradicted by AIG's representations to the Court in *Walker* (PX 592 at 6-

7) and by AIG's November 10, 2008 10-Q SEC filing issued following a hearing with the

Chancery Court which clearly states:

> After the Series C Preferred Stock is issued, ***AIG will be required*** to hold a
> special shareholders' meeting to amend its restated certificate of incorporation to
> increase the number of authorized shares of common stock to 19 billion and to
> reduce the par value per share. ***The holders of the common stock will be entitled***
> ***to vote as a class separate from the holders of the Series C Preferred Stock on***
> ***these changes*** to AIG's Restated Certificate of Incorporation. (PX 22 at 29)
> (emphasis added).

Significantly, the *Walker* Consent Decree references AIG's representations in the November 10,

2008 Form 10-Q as a primary basis for dismissal of the case (PX 1507 at 6). *See also* Answer ¶¶

102-104; PX 531 at 16 (representing to international regulators that a separate class vote would

occur).

    As the record evidence also makes clear, and as will be further established at trial,

Defendant not only participated in discussions concerning the *Walker* litigation,[23] but also

reviewed and approved all public messaging, including the various SEC filings that referenced

---

[23] *See* PX 228 at 1; PX 11 at 43, § 5.05; Def.'s Resp. to 1st RFAs No. 30.0; Def.'s Resp. to 2nd
Interrogatories No. 9; Def.'s Resp. to 2nd RFAs No. 1016.

requirements for a separate RSS Class vote.[24]  Furthermore, on November 9, 2008, Defendant

amended the Credit Agreement to explicitly provide that owners of common stock will vote as a

separate class on the Charter Amendments (PX 1505 at 9), requiring AIG's board to "call a

meeting of stockholders as soon as practicable after the issuance of the Preferred Stock" for a

separate class vote.

**C.     Delaware Law Protects Common Shareholders Rights To Vote As A Class From Any Measure Specifically Designed To Circumvent The Separate Class Vote Requirement.**

Defendant never addresses the fact that Delaware law prohibits the use of stratagems that

are designed to circumvent shareholders' voting rights.[25]  *See Paramount Commc'ns, Inc. v.*

*QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994).[26]  However, perhaps recognizing that that is the

law, Defendant asserts "[t]here is no evidence to support Starr's allegation that the reverse stock

split was 'deliberately engineered to guarantee that sufficient authorized shares of AIG Common

---

[24] *See* PX 1504 at 1; PX 836 at 1-2; PX 837 at 1-4; PX 838 at 1; Dahlgren Dep. 208:12-210:15; PX 578 at 2.

[25] Defendant's failure to address this point of law repeatedly raised by Plaintiff suggests that no such response exists.  *See, e.g.,* Pl. Opp. to Mot. to Dismiss (Doc. 41) at 19; Pl. Opp. to Mot. for Reconsideration (Doc. 60) at 19-20.

[26] "[M]any of the most fundamental corporate changes can be implemented only if they are approved by a majority vote of the stockholders," and "this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights." *Paramount*, 637 A.2d at 42.  If a fiduciary could use a reverse stock split to bypass the shareholder vote requirement of Section 242(b)(2), its protections would effectively be rendered useless.  *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) (reverse stock split reviewed for entire fairness because the split under these "circumstances is the 'functional equivalent' of a cash-out merger").  The general understanding that reverse stock splits are not appropriately used to circumvent the requirement of a separate class vote to increase the number of authorized shares is also reflected in the Model Business Corporations Act § 10.04(a)(4), (b) (2010), which requires that reverse stock splits be subject to a separate class vote of the holders of the outstanding stock of a class where, as here, a corporation has more than one class or series of stock. The Supreme Court of Delaware has held that it is appropriate to turn to such sources to construe ambiguous statutes on the same subject.  *See Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218 (Del. 1993).

Stock were available to allow the Government to convert or exchange its Series C Preferred Stock'" (Def. Br. at 50).   The facts discussed above and below thoroughly refute Defendant's unsupported assertion.

The evidence shows that both Defendant and AIG knew that: (1) the number of authorized shares of AIG common stock was insufficient to permit the conversion of the preferred shares into common shares absent a change in the number of available authorized shares;[27] and (2) the common shareholder vote required to effectuate such a change would likely fail.[28]   As a result, it was decided to propose a RSS that would provide the number of shares necessary to transform the Government's AIG preferred shares to AIG common shares.[29]

Perhaps most troubling, is the evidence that Defendant engaged in a deliberate and intentional plan to undermine the RSS Class's rights.   Without telling the *Walker* court or the other parties to that litigation, **the day before** the Consent Decree was signed, Defendant and

---

[27] *See, e.g.*, PX 11 at 137; PX 583 at 1-2; PX 602 at 1 (Email from David Herzog of AIG to Brian Schreiber of AIG (Feb. 16, 2009) (referring to the contemplated increase in the number of authorized shares as a measure intended "to accommodate the Fed's 79.9% ownership")); PX 696 at 4; Def.'s Resp. to 3rd Interrogatories No. 11.

[28] AIG 30(b)(6) (Reeder) Dep. 176:6-13 ("At this point in time . . . , management of AIG would have believed that the shareholders may not have wanted to permit the government to convert to the common stock. Yes -- that that could have been economic disadvantageous to them because it would cause dilution."); *id.* at 193:25- 194:3 ("one of the reasons that they raised about why they were not going to require a meeting was concern that they would not be able to get the shareholder vote."); PX 977 at 1 ("We now understand the common stockholders must also approve the amendment in order for it to pass. Accordingly, it is not a forgone conclusion that the amendment will pass and, in fact, it may never pass."); DPW 30(b)(6) (Brandow) Dep. 145:20-23 ("Q. Wasn't there, in fact, a concern that the proposal would not be approved by the shareholders?  A. I think there was that concern, too.").

[29] *See* Def.'s Resp. to 1st RFAs Nos. 32.4 ("the United States admits that representatives of the United States and of FRBNY reviewed the proxy statement for Proposal 4 before its distribution to shareholders."); 32.3 (The United States "admits that the ratification of Proposal 4 made available for issuance enough authorized but unissued shares of Common Stock to constitute an equity interest in AIG equal to that held by the AIG Trust in Series C Preferred Stock"); Def.'s Resp. to 3rd Interrogs. No. 11; PX 696 at 4 ("the Preferred Stock only becomes convertible AFTER the shareholders vote to increase authorized shares").

AIG decided not to put the conversion amendments to a vote and to amend the Credit Agreement for a third time not to require one. *See* PX 608 at 1 ("We all continue to believe that it makes sense for a multitude of good reasons not to have a separate class vote on 'conversion' now at the annual meeting. And it also makes sense to amend the relevant agreements to change the provision requiring AIG to call a special meeting . . . for the class vote on 'conversion.'"); *see also* PX 1206 and PX 237 at 4 (recognizing that omitting the shareholder vote might run afoul of the *Walker* court); PX 1506 at 13-14. Defendant and AIG never told the *Walker* Court about that decision and – contrary to its real intentions – publicly indicated that such a vote would occur. *See* PX 1507 at 5; PX 1508 at 293.[30]

### D. The Doctrine Of Independent Legal Significance Does Not Override Delaware Law That Prohibits The Use Of Stratagems Designed To Deprive Shareholders Of Their Voting Rights.

The Government's contention that the doctrine of independent legal significance protects its use of the RSS in place of a shareholder vote (Def. Br. at 51) ignores settled Delaware law that on the doctrine of independent legal significance recognizes that "inequitable action does not become permissible simply because it is legally possible." *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Brody v. Zaucha*, 697 A.2d 749, 755 (Del. 1997) (same).[31] As such cases make clear, the doctrine of independent legal significance "stands only for the

---

[30] The Government's reliance on self-serving testimony professing an innocuous intent is insufficient to support a grant of summary judgment as a matter of law. *See Copelands' Enterprises, Inc. v. CNV, Inc.*, 945 F.2d 1563, 1566 (Fed. Cir. 1991); *White Motor Co. v. United States,* 372 U.S. 253, 259 (1963) (summary judgment inappropriate "where motive and intent play leading roles"); *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) ("summary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent.").

[31] The *Field* case, on which the Government relies in support of its "independent legal significance" argument, expressly recognizes the equitable limitations on that doctrine. *Field v. Allyn*, 457 A.2d 1089, 1097-99 (Del. Ch. 1983) (recognizing the doctrine but nevertheless going on to consider whether the challenged actions were undertaken in violation of fiduciary duties of loyalty or in self-interested transactions in order to determine their propriety).

proposition that the mere fact that a transaction cannot be accomplished under one statutory provision does not invalidate it if a different statutory method of consummation exists." *In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002). Nothing about that doctrine immunizes "inequitable actions in technical conformity with statutory law" *Id.* For this reason, the doctrine of independent legal significance does not apply when litigants "properly invoke the equitable obligation of corporate fiduciaries (i.e., plausible claims of self-dealing in its many guises)." *Uni-Marts, Inc. v. Stein*, Nos. 14713, 14893, 1996 WL 466961 (Del. Ch. Aug. 12, 1996), at *9-10. As *Paramount* makes clear, a measure undertaken by corporate fiduciaries to deprive shareholders of their voting rights is subject to "enhanced scrutiny", and "is therefore not entitled to protection under the doctrine of independent legal significance." *See* 637 A.2d at 42 n.11.

### E. Defendant's Control Over AIG At The Time of The Reverse Stock Split Is Sufficient To Satisfy Any Purported "Government Action" Requirement For A Takings Or Illegal Exaction Claim.

Despite the evidence, discussed above, of the Government's RSS role, Defendant contends that it is entitled to summary judgment on the RSS claim because it was AIG – not the Government – that acted to deprive the shareholder class of any class-only vote on the RSS. Def. Br. at 52-54. The Government altogether ignores the substantial evidence demonstrating its control over AIG as both a lender and shareholder. *See Langenegger v. United States*, 756 F.2d 1565, 1570 (Fed. Cir. 1985) ("In any case where government action is causally related to private misconduct which leads to property damage—*a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment*.") (quoting *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 93 (1969)) (emphasis in original); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("We have treated a nominally private

entity as a state actor when it is controlled by an 'agency of the State,' when it has been

delegated a public function by the State, when it is 'entwined with governmental policies,' or

when government is 'entwined in [its] management or control.'") (citations omitted).

The established facts demonstrate that, during the entire time the RSS was conceived,

proposed, and voted upon, the Government exerted substantial control over AIG's management.

*See* PX 1607 at 25-40. As the Government-installed CEO, Mr. Liddy, explained in sworn

testimony to Congress: AIG did "not do a single thing of strategic import without making certain

that we have talked to the Federal Reserve about it and we have given them an opportunity to

weigh in on it."  PX 477 at 75; *see also* PX 241 at 3 ("We wish to emphasize that we view the

Fed as our partner in this process, and we intend to cooperate fully with their request.").  In

addition, Defendant attended all Board meetings, reviewed all SEC filings and public statements,

chose AIG's Board members, and had a monitoring team at AIG involved in monitoring AIG's

day-to-day affairs.  *See* Dahlgren Dep. 46:3-7 (On September 17, 2008, as head of FRBNY's

AIG Monitoring Team, Ms. Dahlgren was giving AIG executives "the message that the New

York Fed was here and you're going to cooperate.").[32]

**F.      The Manner In Which Common Shareholders Voted On The Proposal Presented To Them Does Not Translate Into A Lack Of Economic Impact Of The Deprivation Of Their Voting Rights.**

Disregarding discovery in this case, Defendant concludes that the RSS Class was not

harmed by the lack of a separate class vote and suggests that no analysis could establish

---

[32] The document pursuant to which the Trust was created further confirms the level of
Government control over AIG.  Although FRBNY gave supposedly "nonbinding" advice
embodied in the Trust Agreement, it expressly *required* the Trustees to exercise their voting
rights according to a "best interests of the Treasury" standard of care imposed by FRBNY.
Further, it specifically retained the right to enforce that standard of care through an action for
specific performance.  The Government even asserted in February 2009 that the Trust
"functioned as an instrumentality of the United States" (Def. Resp. to 2nd RFAs Nos. 728, 729).

otherwise because a majority of shareholders voted for the RSS.  Def. Br. at 54-55.

The common shareholders' vote on the RSS cannot fairly be understood as an indication that they approved of the increase in the number of available authorized shares, the conversion, or the resulting dilution of their shares.  The evidence shows that AIG and the Government knew from the outset that the common shareholders would reject a proposal to increase the number of authorized shares due to the dilutive effect it would have on their own shares.  *See, e.g.,* PX 583 at 1 (email between FRBNY and Treasury: AIG "doesn't want the Securities Purchase Agreement for either the TARP preferred or the convertible preferred to require the Board to recommend to shareholders that they vote in favor of the charter amendments…. It's primarily an issue for the convertible preferred SPA, because the only vote the Trust or Treasury doesn't control is the class vote of the common stockholders that's required to permit the convertible preferred to convert into common stock"); *see also* PX 977 at 3. Moreover, at the same annual meeting, when given the opportunity to vote separately as a class to amend AIG's charter to increase the number of authorized share (Proposal 3), common shareholders rejected the proposal – a point lost on no one.  *See, e.g*., PX 621 at 1 (email from Chuck Chai to James Millstein of Treasury: "A longer term issue is whether or not the failure of this proposition would have a negative effect on Treasury's ability to get shareholder approval to convert its Series C preferred to common stock").

By contrast, the common shareholders needed to ***support*** a measure (Proposal 4) which would avoid delisting AIG's stock by the NYSE, and the reverse stock split was the only measure made available to the shareholders to avoid such a delisting (*see* PX 604 at 68-69).  It is undisputed, however, that the goal of preventing delisting could have been avoided through other means  (*see* Shannon Dep. 255:22-256:20; Daines Dep. 260:8-22), including by a normal reverse

split that affected both issued and authorized shares.  Avoiding a shareholder vote on dilution

was not merely a "side effect" of Proposal 4, it was the result deliberately intended and

accomplished by a reverse split of issued but not of authorized shares.  To avoid delisting,

shareholders had no option but to approve the proposal.[33]  Equally important, the proxy

statement misleadingly represented that "AIG currently has no plans for these authorized but

unissued shares" (PX 604 at 69).

On these facts, the common shareholders' vote on the reverse stock split cannot fairly be

understood to reflect a voluntary choice on their part to approve the misleadingly concealed "side

effect" that resulted from approval of the RSS (enabling the Government to further dilute their

equity interests).

## IX.   CONCLUSION

For all of the foregoing reasons, Defendant's motion should be denied.

Dated: August 6, 2014
       Armonk, New York

Respectfully submitted,
BOIES, SCHILLER & FLEXNER LLP

By   /s/ David Boies
     David Boies
     Attorney of Record
     333 Main Street

---

[33] It is undisputed that AIG shareholders had no means of voting against the ratio without also risking that AIG common stock would be delisted.  Moreover, although AIG was informed that it was in danger of being delisted from the NYSE in October 2008 (PX 1509 at 2-3), and AIG repeatedly prepared proxy statements calling for meetings to amend the charter beginning in October (e.g., PX 591 at 5; PX 1064 at 5-6; PX 616 at 2), each time the Government insisted on delaying the meeting (PX 1287 at 1-2; PX 1206; PX 608 at 1).  In conformance with the Government's demands, AIG took no action to increase the trading price of AIG common stock until sending its proxy statement on June 5, 2009, leaving only 25 days to complete the RSS in time to avoid a possible delisting.  *See* PX 1510 at 1. The effect of these delays was to preclude additional proposals to the proxy (which could have included a proposal to apply the split to authorized as well as issued shares, or to do the split at a different ratio – one low enough that it would not have the side-effect of enabling the conversion).

Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 794-8300
Email: dboies@bsfllp.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
John L. Gardiner
Ryan Stoll
Greg Bailey
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000


BOIES, SCHILLER & FLEXNER LLP

Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Tricia J. Bloomer
Julia C. Hamilton
Ilana Miller
John Nicolaou
Mathew Schutzer
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Samuel C. Kaplan
Amy J. Mauser
Scott E. Gant
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727


*Counsel for Plaintiff Starr International Company,
Inc. and for the Plaintiff Classes*