IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY,
INC., on its behalf and on behalf of a class of
others similarly situated,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

No. 11-00779C (TCW)

**PLAINTIFFS' TRIAL BRIEF**

BOIES, SCHILLER & FLEXNER LLP
Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Tricia J. Bloomer
Julia C. Hamilton
Ilana Miller
John Nicolaou
Mathew Schutzer
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
Samuel C. Kaplan
Scott E. Gant
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
John L. Gardiner
Ryan Stoll
Greg Bailey
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000

*Attorneys for Starr International Company, Inc.
and for the Plaintiff Classes*

August 6, 2014

1

## PRELIMINARY STATEMENT

Defendant's approach in this litigation has been to try to create a version of what happened in 2008 and 2009 for purposes of this case that is at odds with the contemporaneous facts, documents, and statements of everyone involved in the events at the time – including Defendant's own officials.  The result is a large number of disputed facts, document objections, and witnesses that under other circumstances would have been unnecessary.

While the papers the parties are submitting address numerous legal and factual issues,  it is worth noting at the outset that Plaintiffs believe the claims of the Credit Agreement Class come down to one legal and one factual question, neither of which after discovery is subject to dispute.  The critical legal question is:  Was Defendant authorized to demand 79.9% of the AIG shareholders' equity and voting control as a condition of a 13(3) loan?  The critical factual question is:  Did the Federal Reserve demand 79.9% of the AIG shareholders' equity and voting control as a condition of a 13(3) loan?

If Defendant demanded, without authorization, the surrender of Plaintiffs' equity and voting control as a condition of a 13(3) loan, that would represent both an illegal exaction and an uncompensated Taking.  It would be an Illegal Exaction (Plaintiffs' Proposed Conclusions of Law ("Pl. Concl.") ¶¶ 53, 55, 59) because Defendant would have exacted property it was not authorized to demand (Pl. Concl. ¶¶ 61-70, 72-75, 77-78) in return for the doing of an act committed to the Government's discretion, and an act which the Government had determined was necessary to fulfill its public responsibility (Plaintiff's Proposed Findings ("Pl. Findings") ¶¶ 1.0, 4.0, 5.0, 8.0).  It would be an uncompensated Taking because Defendant's exploitation of AIG's need for a 13(3) loan to take property to which Defendant had no right would be "wrongful", "violates notions of fair dealings", and the use of "a temporary monopoly power …

2

to obtain a benefit to which it is not entitled" (Pl. Concl. ¶¶ 13, 127-142, 145-152).

Defendant's lack of authorization to demand equity and voting control as a condition for a 13(3) loan has always been clear from the plain language of Section 13(3) (Pl. Concl. ¶¶ 1, 4, 66-67), from this Court's prior rulings (Pl. Concl. ¶ 62), and from Defendant's own statements prior to this litigation (Pl. Concl. ¶¶ 64, 88). Discovery has now confirmed, as Starr initially alleged, that Defendant did in fact demand (without ambiguity or qualification) the surrender of 79.9% of Plaintiffs' equity and voting control as a condition of the 13(3) loan that AIG desperately needed (Pl. Findings ¶¶ 9.0, 11.0, 14.0, 17.0).

If Plaintiffs are correct, the only remaining issues are whether Plaintiffs somehow waived or ratified Defendant's Taking and Illegal Exaction (*see* Pl. Concl. ¶¶ 242-253 and Pl. Findings ¶¶ 28.0, 29.0), and what Plaintiffs' damages are (*see* Pl. Concl. ¶¶ 39, 41, 43, 45-46, 96-97, 273-278 and Pl. Findings ¶¶ 30.0-32.1.3).

The other legal and factual issues discussed in the parties' papers would be relevant only if Defendant were authorized to demand equity and voting control as a condition of a 13(3) loan.

For example, if the Federal Reserve were authorized to demand equity and voting control as a condition of a 13(3) loan, the Illegal Exaction claim would raise such legal issues as:

(a)     Was approval by the Federal Reserve Board of Governors required to authorize the equity and voting control taken in the Credit Agreement? (Plaintiffs say yes – *see* Pl. Concl. ¶¶ 6-11, 76-78);

(b)     Was the Federal Reserve authorized to demand equity and voting control to penalize AIG shareholders? (Plaintiffs say no – *see* Pl. Concl. ¶¶ 102-08);

(c)     Was the Federal Reserve authorized to penalize AIG shareholders without any investigation, analysis, hearing, or findings concerning whether punishment was justified and, if so, what punishment was appropriate? (Plaintiffs say no – *see* Pl. Concl. ¶¶ 109-10); and

(d)     If the Federal Reserve were authorized to condition a loan on terms intended to penalize a company or its shareholders, was approval by the Board of Governors

of the basis for the penalty required?  (Plaintiffs say yes – *see* Pl. Concl. ¶¶ 6-11, 76-78, 102-10).

and such factual issues as:

(a)     Did the Federal Reserve Board of Governors approve the equity and voting control terms in the September 22 Credit Agreement?  (Plaintiffs say no – *see* Pl. Findings ¶¶ 15.0, 16.0);

(b)     Did Defendant demand Plaintiffs' equity and voting control to penalize AIG or its shareholders (Plaintiffs say yes – *see* Pl. Findings ¶ 23.0);

(c)     Prior to September 22, 2008, did Defendant undertake any investigation, analysis, hearing, or findings concerning whether (or how) AIG's shareholders should be punished; (Plaintiffs say no – *see* Pl. Findings ¶¶ 20.0, 24.0); and

(d)     Did the Board of Governors ever consider or approve any basis for penalizing AIG or its shareholders?  (Plaintiffs say no – *see* Pl. Findings ¶¶ 20.0, 24.0).

If Defendant were authorized to demand equity and voting control for a 13(3) loan, the

Credit Agreement Takings claim would raise such legal issues as:

(a)     Under what circumstances, if any, can the approval of the Credit Agreement by the AIG Board constitute the agreement of AIG's shareholders to the taking of their equity and voting control? (Plaintiffs say none – *see* Pl. Concl. ¶¶ 117-21, 240-44, 254-63);

(b)     If the voluntary agreement of an AIG Board could bar Plaintiffs' taking claim, what are the legal criteria for proof of duress?  (*See* Pl. Concl. ¶¶ 126-70); and

(c)     What are the legal criteria for proof that Defendant controlled AIG (*see* Pl. Concl. ¶¶ 122-25).

and such factual issues as:

(a)     Were the AIG common shareholders ever given an opportunity to vote on approving or disapproving the Credit Agreement or any of its terms: (Plaintiffs say no – *see* Pl. Findings ¶¶ 28.0, 29.0);

(b)     Did Defendant intentionally act to prevent Plaintiffs from having an opportunity to approve or disapprove Defendant's acquisition of 79.9% of their equity and voting control?  (Plaintiffs say yes – *see* Pl. Findings ¶¶ 28.0, 29.0);

(c)     Did AIG have a reasonable choice other than to accept Defendant's loan on Defendant's terms?  (Plaintiffs say no – *see* Pl. Findings ¶¶ 11.0, 17.0, 18.0);

(d)     Did Defendant's acts and omissions, including what Defendant did and said with respect to AIG in particular, contribute to the liquidity crisis that gave AIG no choice but to accept Defendant's loan on Defendant's terms?  (Plaintiffs say yes – *see* Pl. Findings ¶¶ 6.0, 7.0, 17.0); and

(e)     Did Defendant control AIG on September 21, 2008?  (Plaintiffs say yes—*see* Pl. Findings ¶ 13.0; *see also* 27.0).

The change in terms between September 16 and September 21 raises such additional

legal questions as whether Defendant controlled AIG on September 21:

(a)     Was it necessary for the Board of Governors of the Federal Reserve to consider and approve the consideration required for a 13(3) loan in order to authorize the loan?  (Plaintiffs say yes – *see* Pl. Concl. ¶¶ 6-10, 76-78).

and such additional factual questions as

(a)     Did the Board of Governors consider and approve the Credit Agreement's charged consideration for AIG's 13(3) loan (e.g., from non-voting warrants to voting convertible preferred stock representing 79.9% of AIG's stockholders' equity and voting control; from warrants which would have cost $29.433 billion to exercise to preferred stock costing $500,000)?  (Plaintiffs say no – *see* Pl. Findings ¶¶ 15.0, 16.0).

The Reverse Stock Split ("RSS") and) Defendant's exchange of its Series C, E, and F

Preferred Stock for Common Stock raises such legal issues as:

(a)     Was the Board of Governors approval of the Series C Preferred necessary to authorize it?  (Plaintiffs say yes – *see* Pl. Concl. ¶¶ 6-10, 76-78); and

(b)     Were AIG's common shareholders entitled to vote as a class on the exchange of Defendant's preferred stock for common stock?  (Plaintiffs say yes – *see* Pl. Concl. ¶¶ 211-34).

and such factual issues as:

(a)     Did the Board of Governors approve the Series C Preferred Stock?  (Plaintiffs say no – *see* Pl. Findings ¶ 16.0); and

(b)     Was Defendant a controlling shareholder or controlling lender at the time of the RSS and the exchange of Defendant's Series C, E, and F preferred stock for common stock?  (Plaintiffs say yes – *see* Pl. Findings ¶¶ 27.0, 29.0).

The extent of the subsidiary legal and factual issues in the parties' current papers reflects

the failure of the parties to be able to stipulate to any significant applicable legal principle or significant relevant fact. Except for the first Disputed Issue of Fact (with respect to which Defendant has agreed to the first sentence), Defendant has been unwilling to stipulate to any of the 31 primary Facts, or any of the numerous supporting facts, listed in Plaintiff's Proposed Findings – even though most of these facts come directly from testimony by Defendant's top officials, Defendant's submissions to Congress, and Defendant's prior admissions.

Defendant has also refused to agree to the admissibility of (a) most of the documents that come from its files, including Government reports that would be admissible even against a private party in litigation not involving the Government, and responses to Congressional questions, and (b) numerous documents authenticated at deposition.

Defendant, of course, has the right to put Plaintiffs to their proof.  However, the need to prove facts that should be agreed, and to establish a foundation for documents where admissibility should have been stipulated, have resulted in the need to list far more witnesses than, in Plaintiffs' view, should have been necessary.

## SUMMARY OF PROPOSED FINDINGS OF FACT

1.0   In September 2008 the United States faced the most severe financial crisis since (and perhaps including) the Great Depression.  Credit markets froze and even solvent companies were unable to borrow from private sources to meet their liquidity needs.

2.0   In September 2008 the freezing of credit markets and panic pricing for subprime related securities resulted in an absence of reliable market prices, the inability to receive fair market value for those securities, and demands for collateral based on artificially low marks.

3.0   On September 16, 2008 AIG, like many other financial institutions, faced a severe liquidity crisis, and was unable to meet its liquidity needs by borrowing from private lenders.

4.0   On September 16, 2008 Defendant concluded that in the absence of a 13(3) loan from the Federal Reserve AIG would have to file for bankruptcy.

5.0    On September 16, 2008 and through September 22, Defendant was not prepared to let AIG file for bankruptcy because of the "catastrophic" consequences an AIG bankruptcy would have had for other financial institutions and the economy.

6.0    Defendant's regulatory failings and related policies contributed to the 2008 financial crisis.

7.0    Defendant took a number of actions and made a number of statements that directly disadvantaged AIG compared to other financial institutions and contributed to AIG having no reasonable choice other than to accept a loan from Defendant.

8.0    On the afternoon of September 16, 2008 the Federal Reserve concluded that it was in the national interest to provide an $85 billion 13(3) credit to AIG, and AIG was offered such a credit later that day.

9.0    As a condition of an $85 billion 13(3) loan, Defendant on September 16 demanded warrants exercisable for 79.9% of AIG's shareholders' equity.

10.0   On September 16, 2008 through January 2011, Defendant concluded that AIG had sufficient assets to fully secure an $85 billion loan.

11.0   On September 16, 2008 Defendant told AIG that Defendant's demand for 79.9% of the AIG shareholders' equity was non-negotiable and that if AIG did not agree, AIG would not receive any loan or other assistance from Defendant and would have to file for bankruptcy.

12.0   The evening of September 16, 2008 AIG's Board passed two resolutions – a resolution authorizing the negotiation of a Credit Agreement between AIG and the Federal Reserve based on the terms of Defendant's offer, and a resolution authorizing AIG to immediately borrow money from the Federal Reserve on a secured demand note basis.

13.0   Upon the AIG Board's passing of its September 16 resolutions, Defendant assumed control of AIG.

14.0   During September 17 through September 22 Defendant drafted a binding Credit Agreement a summary of terms of which was presented to the AIG Board for the first time the evening of September 21.

15.0   The terms of the Credit Agreement were materially worse for AIG shareholders than the terms Defendant had offered, and which the Federal Reserve Board of Governors had approved, on September 16.

16.0   The Board of Governors of the Federal Reserve never approved the Credit Agreement nor the changes made to the terms of the $85 billion 13(3) loan to AIG as approved by the Board of Governors on September 16.

17.0   On September 21, 2008, Defendant told AIG's officers and directors that if they did not approve the Credit Agreement as proposed by Defendant, including with the changes Defendant had unilaterally made, Defendant would call its secured demand notes and AIG would be required to file for bankruptcy.

18.0   Faced with Defendant's non-negotiable demands, its threat to call its secured demand notes, and the opinion of AIG counsel that a decision to file for bankruptcy would no longer be protected by the business judgment rule, AIG had no choice but to accept Defendant's loan on Defendant's terms.

19.0   AIG was the only 13(3) borrower in history whose shareholders were required to surrender 79.9% of their equity and voting control as consideration for a 13(3) loan.

20.0   Prior to the execution of the Credit Agreement, neither the Board of Governors nor any other Government official undertook any investigation or analysis, or made any findings, or allowed AIG or Plaintiffs any meaningful opportunity to be heard as to what the percentage of equity or voting control was appropriate to demand.

21.0   Neither the Federal Reserve nor Treasury had the authority to acquire equity and voting control as condition for making a 13(3) loan.

22.0   The AIG Credit Facility Trust did not cure Defendant's lack of authority.

23.0   The terms of the Credit Agreement, including the requirement that AIG's shareholders surrender 79.9% of their equity had the purpose and effect of penalizing AIG shareholders.

24.0   Prior to the execution of the Credit Agreement on September 22, 2008, Defendant did not undertake any investigation or analysis, make any findings, or hold any hearing concerning whether AIG or its shareholders should be penalized and, if so, how.

25.0   Many financial institutions engaged in much riskier and more culpable conduct than AIG.

26.0   Many financial institutions who engaged in much riskier and more culpable conduct than AIG received Government assistance without the punitive equity confiscation terms required of AIG.

27.0   Defendant continued to control AIG through the time of the Reverse Stock Split, and through commencement of this action.

28.0   AIG's common shareholders were never given an opportunity to vote to approve or disapprove Defendant's receipt of an equity interest in AIG, and Defendant acted to avoid such a vote.

29.0   Because defendants' preferred shares could not be converted into common stock without a shareholder vote that Defendant knew it would lose, Defendant attempted to circumvent a shareholder vote by having AIG "exchange" the preferred stock for common stock.

30.0   The fair value of the 79.9% of Plaintiffs' equity and voting control Defendant acquired September 22, 2008 was a minimum of approximately $35 billion.

31.0   The fair value of the right to exchange of Defendant's Series C convertible voting preferred stock for common stock was a minimum of approximately $340 million.

32.0   The fair value of the exchange of Defendants' non-convertible, non-voting Series E and Series F preferred stock for common was a minimum of approximately $4.33 billion.

33.0   Relevant entities and personnel.


## SUMMARY OF PROPOSED CONCLUSIONS OF LAW

I.   Section 13(3) Authorizes the Federal Reserve in "Unusual and Exigent Circumstances" to Serve as Lender of Last Resort and Loan Money to "Any Individual, Partnership, or Corporation," That Does Not Have Private Sources of Liquidity But Has the Ability to Provide Security for the Loan.

II.   The Only Consideration Authorized by Congress for a 13(3) Loan Is An Interest Rate Determined by the Board of Governors Which Shall Be "Fixed with A View of Accommodating Commerce and Business."

III.   Defendant's Conduct Constituted A Taking of the Property of AIG Common Shareholders Without Just Compensation.

    A.   The Equity and Voting Rights of AIG Common Shareholders Constitute Cognizable Fifth Amendment Property Interests.

    B.   Defendant's Appropriation of Plaintiffs' Equity and Voting Rights Constitute Compensable Takings.

    C.   Plaintiffs Are Entitled to "Just Compensation".

        1.   "Just Compensation" for a Taking is Based on the "Fair Market Value of the Property" Taken by the Defendant.

        2.   "Fair Market Value" Is the Price that Would be Set by a Willing Buyer and a Willing Seller, Neither of which Was under any Compulsion to Buy or Sell.

        3.   There Are No Special Benefits Conferred by Defendant's Taking.

9

IV.   Defendant's Acquisition through the Credit Agreement of Voting Preferred Stock Representing 79.9% of Plaintiffs' Equity and Voting Control Was An Illegal Exaction.

    A.   Defendant's Conduct Constitutes An Illegal Exaction If It Exacts Money or Property "In Contravention of the Constitution, A Statute or A Regulation."

    B.   The Federal Reserve Act Does Not Expressly Authorize Defendant to Demand Equity as a Condition of a Section 13(3) Loan.

    C.   The Federal Reserve Act Does Not Implicitly Authorize Defendant to Demand Equity as a Condition of a Section 13(3) Loan.

    D.   There Was No Authorization to Demand Any Consideration for a 13(3) Loan Without the Approval of the Board of Governors.

    E.   Defendant Is Not Entitled to Deference for Its Statutory Interpretation, Which Is Contrary to the Plain Language and Its Prior Understanding of the Act, And Is an Ad Hoc Argument to Justify Action Already Taken.

    F.   At the Time of the Credit Agreement Exaction in September 2008, Treasury Also Had No Statutory or Regulatory Authority to Demand or Hold Stock in a Private Entity.

    G.   Plaintiffs Are Entitled to Receive the Value of Their Exacted Equity and Voting Rights.

V.   Defendant Was Not Authorized To Include Terms in the Credit Agreement with the Purpose or Effect of Punishing AIG Shareholders.

    A.   Defendant's Plain Lack of Authority to Impose a Penalty Is Made Plainer Still by the Lack of Any Necessity for Defendant to Do So Given Defendant's Ability to Retain the Option of Pursuing a Penalty, If Appropriate, in a Manner Consistent with Due Process and the Rule of Law.

    B.   Defendant Was Especially Not Authorized to Take "Punitive" Action Without Any Analysis, Investigation, and Findings, or Any Notice or an Opportunity to Be Heard, or Any Criteria for When to Take Punitive Action.

VI.   There Was No Voluntary Agreement that Bars Defendant's Credit Agreement Claims.

    A.   Voluntary Agreement Is Not A Defense to Plaintiffs' Illegal Exaction Claims.

    B.   Unless Plaintiffs Were Parties to the Credit Agreement or Given An Opportunity to Approve or Disapprove the Agreement or Its Terms, They Could Not Have Voluntarily Agreed to Defendant's Taking or Exaction of Their Equity and Voting Control.

      C.      There Was No Voluntary Agreement by AIG Because Defendant Controlled AIG.

      D.      In Any Event, There Was No Voluntary Agreement Even By AIG Because AIG Was Under Duress.

          1.      The Circumstances Required to Activate Section 13(3), By Definition, Make the Existence of Duress More Likely.

          2.      Duress Exists If There Was Not A Reasonable Alternative and Defendant Contributed to the Lack of A Reasonable Alternative by Acting Wrongfully (Whether or Not Illegally).

              a.      To Establish Duress, Defendant's Wrongful Conduct Need Only Contribute Substantially to AIG's Financial Distress and Lack of Reasonable Alternatives.

              b.      Defendant Acted Wrongfully If It Misused Its Monopoly Power as Lender of Last Resort By Acting to Exploit the Artificial Market Conditions It Was Obligated to Correct, and Thereby Gained A Benefit to Which It Was Not Entitled and That It Could Never Have Obtained But for Market Failure.

              c.      Defendant Acted Wrongfully If It Discouraged Other Sources of Liquidity from Providing Liquidity to AIG.

              d.      Defendant Acted Wrongfully If It Increased Pressure on AIG by Giving the AIG Board Only an Unreasonably Short Period of Time to Consider Defendant's "Offer."

              e.      Defendant Acted Wrongfully If It Imposed A Penalty on Plaintiffs Without Authority to Do So.

              f.      Defendant Acted Wrongfully If It Imposed a Penalty Without Any Analysis, Investigation, and Findings, or Any Notice or an Opportunity to Be Heard, or Any Criteria for When to Take Punitive Action.

              g.      Defendant Acted Wrongfully If It Discriminated Against AIG.

              h.      Defendant Acted Wrongfully If It Withheld Access to Federal Reserve Loans and Assistance for Political Purposes.

VII.      The Trust Did Not Cure the Unconstitutional and Illegal Exaction of Plaintiffs' Equity or Voting Control.

      A.      Defendant Cannot Accomplish Through a Trust That Which Congress Has Denied It Authority to Accomplish Directly.

B. Defendant Necessarily Had to Acquire the Right to AIG's Equity in Order to Provide the Equity to the Trust.

C. Defendant Was AIG's Controlling Shareholder Upon Execution of the Credit Agreement.

D. Defendant Was AIG's Controlling Lender upon Secure Demand Note Lending on September 16.

E. Defendant Lacked Authority to Create a Trust Under the Federal Reserve Act.

F. The Trust Violated New York Trust Law If It Was Created to or Sought to Be Used to Circumvent Defendant's Inability to Acquire Equity in AIG.

G. The Trust Was a Sham That Created No Real Separation from Defendant.

    1. The Trust Was Not Independent.

    2. The Trust Was an Instrumentality of Defendant.

VIII. The Reverse Stock Split Was An Independent and Additional Wrong That Appropriated Equity And Voting Rights from the Stock Split Class.

A. The Doctrine of "Independent Legal Significance" Does Not Defeat the Reverse Stock Split Class's Claims.

    1. Defendant Is Responsible for the Reverse Stock Split.

B. The Reverse Stock Split Represented an Incremental Economic Taking and Illegal Exaction of the Rights of the Reverse Stock Split Class.

IX. Defendant's Contract Affirmative Defenses Apply Solely to AIG and Thus Do Not Limit Plaintiffs' Recovery.

A. Plaintiffs Did Not Ratify or Waive Defendant's Takings or Illegal Exaction.

    1. For Waiver to Apply, Plaintiffs Would Have Had to Have Acted with Full Knowledge of the Facts to Knowingly and Intentionally Give Up Rights.

    2. In any Event, Ratification and Waiver Do Not Apply Where a Contract Provision Is Unlawful.

    3. Ratification Does Not Apply Because Defendant Controlled AIG.

    4. Ratification and Waiver Do Not Apply Because Defendant Has Unclean Hands.

B.      The Contract Based Affirmative Defenses of Payment, Contingent Offset/Recoupment, Hold Harmless, and Severability Are All Limited to AIG and Do Not Apply to Plaintiffs.

C.      The Equitable Estoppel Affirmative Defense Is Likewise Limited to AIG and Does Not Apply to Plaintiffs.

D.      Defendant May Not Avoid the Illegality of Its Exaction by Relying on an "Economic Equivalence" Contract Term that Would Provide It with Precisely the Benefit the Law Precludes It from Acquiring.

X.      Plaintiffs Are Entitled to Prejudgment Interest and Attorneys' Fees.

Dated: August 6, 2014
      Armonk, New York

                           Respectfully submitted,
                           BOIES, SCHILLER & FLEXNER LLP

By  /s/ David Boies
                David Boies
                Attorney of Record
                333 Main Street
                Armonk, NY 10504
                Telephone: (914) 749-8200
                Fax: (914) 794-8300
                Email: dboies@bsfllp.com

                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                John L. Gardiner
                Ryan Stoll
                Greg Bailey
                Four Times Square
                New York, NY 10036
                Telephone: (212) 735-3000

                BOIES, SCHILLER & FLEXNER LLP

                Robert B. Silver
                Robert J. Dwyer
                Alanna C. Rutherford
                Tricia J. Bloomer
                Julia C. Hamilton
                Ilana Miller

13

John Nicolaou
Mathew Schutzer
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Hamish P.M. Hume
Samuel C. Kaplan
Scott E. Gant
Amy J. Mauser
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

*Counsel for Plaintiff Starr International Company,
Inc. and for the Plaintiff Classes*