IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STARR INTERNATIONAL COMPANY, INC., on its behalf and on behalf of a class of others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant.* | No. 11-00779C (TCW) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF REQUEST TO KEEP THE RECORD OPEN FOR A LIMITED TIME AND PURPOSE AFTER PLAINTIFFS' REBUTTAL CASE**

The documents previously withheld on privilege grounds that we have received and reviewed go to the heart of several issues that have been the focus of the trial. Because the production of these documents is continuing, and because Plaintiffs' review of documents already produced is continuing, Plaintiffs ask the Court to consider keeping the record open for a period of two weeks solely for purposes of offering these newly produced exhibits.

To enable the Court to understand the context of our request, Plaintiffs illustrate below examples of what has been produced and their relevance.

1. **Authority To Take Equity**

Although we had believed that all documents concerning the Defendant's authority to take equity as consideration for a 13(3) loan had already been produced, and that Davis Polk had not been involved in that issue (see representation at Tr. 3548:13-20), a number of recently produced documents (including from Davis Polk) address this issue. For example:

1

(a)    PTX 3214 (9/16/08 at 10:26 p.m.) at 1, Davis Polk partner Ethan James to Marshall Huebner and others: "I have consulted Arthur and Randy on the Fed ownership issue and will continue to coordinate w/them."

(b)    PTX 3153 (Notes of FRBNY attorney Greg Cavanaugh of 9/17/08 "Call w/DPW") at 8: "Fed can't hold warrants."

(c)    PTX 3283 (9/17/08) at 1, Davis Polk partner Randall Guynn writes Davis Polk partners Arthur Long and James: "There is no express authority . . . ." Guynn continues: "Maybe it's an implied power of setting the conditions for lending money under 13(3) of the federal reserve act, but the govt is on thin ice and they know it. But who's going to challenge them on this ground?"

(d)    PTX 3288 (9/18/08 at 10:18 a.m.) at 2, Guynn to Scott Alvarez (copying Davis Polk colleagues James and Long) regarding a noon call about "whether the Fed's power to make advances under Section 13(3) of the Federal Reserve Act includes the power to acquire an equity interest in AIG as an incident to the lending power." (*See also* PTX 3280 at 2).

   (i)    At 10:23 a.m. Guynn writes Tom Baxter asking Baxter "to clarify what DOJ is saying about limits on the Fed's power to acquire an equity interest in AIG." (PTX 3288 at 1; PTX 3280 at 1-2).

   (ii)   At 10:27 a.m. Guynn writes James and Long together with Davis Polk litigation partner Jennifer Newstead: "I think they may be talking about Youngstown Sheet & Tube Co v. Sawyer (the Steel Seizure Cases), where the Supreme Court affirmed an injunction against President Truman's executive order seizing control of the steel mills throughout the country on

national security grounds, without any express Congressional authorization. I am copying Jennifer Newstead in case she is in a position to help us out on this analysis if it requires some heavy litigation lifting." (PTX 3288 at 1).

Plaintiffs have not yet identified any record of the September 18 noon call or any written statement from DOJ of its position.

(e) PTX 3230 at 1: "Board staff have interpreted the language of 13(3) . . . to restrict what we can "discount" (i.e., advance against) to debt instruments."

Issues relating to authority continued after the Credit Agreement was signed in connection with the drafting of the Trust Agreement and subsequent dilution.

(a) PTX 3284 (11/12/08) at 2, FRBNY attorney Stephanie Heller to Davis Polk partner Jeffrey Schwartz, with copies to Baxter and Huebner among others: "I look forward to our discussion tomorrow. Perhaps you should not explore this issue with AIG until we talk tomorrow as I think we need to explore whether the FRBNY has the legal authority to have this stock issued directly to it even if only for a moment. One of the reasons we set up that the shares would be issued to the trust was an authority concern (at least that is my understanding)."

(b) PTX 3159 (2/25/09), Federal Reserve attorney Rich Ashton: "We are trying to do some quick legal research to see if there are possible takings problems with further dilution."

## 2. **Purpose of the Change From Warrants to Preferred Stock**

Plaintiffs have contended that the purpose of Defendant's requiring preferred stock was to give it immediate control of AIG without the delay inherent in a shareholder vote, and that the right to control was highly valued by Defendant.

(a) PTX 3249 (9/22/08) at 1, Huebner: "This is of course a reach, but let's ask. I would give a lot to find a way to take the stock before the shareholder war machine moves."

(b) PTX 3129 (11/15/08) at 7, Davis Polk partner John Brandow: "We succeeded in finding a structure that allows the trust to gain control of the company without a shareholder vote."

(c) PTX 3211 (11/9/2008) at 1-2, Brandow to Huebner and Baxter among others: "My focus from the start of this transaction was to find a way for the trust to acquire the power to control the company without having to get the consent of the common stockholders."

(d) In drafting the Credit Agreement, Davis Polk understood that "avoiding a SH vote we don't control is a primary goal" (PTX 3272).

(e) PTX 3242 (9/19/08), Ethan James: "Form 8K Item 1.01 requires the disclosure of material contracts, but it does not require that the actual contract be filed with the form. We should consider going this route, particularly to show less of a hand to Greenberg on the equity issuance (ideally we should have the pref issued before they realize that we are going to do it w/out a SH vote). The contract will need to be filed with the next 10Q, but that won't be until early November."

### 3. The Importance of the *Walker* Lawsuit

Defendant previously asserted that the *Walker* lawsuit was not an important development because everyone always knew that a class vote of common shareholders was necessary to convert its preferred shares to common (Huebner: Tr. (11/4/2014) 6120:1-6122:23).

(a) PTX 3219 (9/16/08 at 11:38 p.m.), at 2, Davis Polk partner Ethan James: the voting rights of convertible preferred "should be sufficient to control any SH vote . . . we could amend the par value of the common stock . . . and the number of authorized shares."

(b) James on September 20, 2008: "The preferred will be able to vote to fix the charter." (PTX 3248 at 2; *see also* PTX 3254 at 1-2).

(c) PTX 3225 (12/20/08) at 1: "The way it was initially, the common holders and the preferred holders voted together on whether to increase the number of common shares, so that the preferred holders could dictate the result."

(d) PTX 3221 (11/6/08) at 2-3: even after the *Walker* lawsuit Davis Polk initially told the Fed that it had "reviewed the lawsuit and is confident" that the trust would be able "to vote the preferred shares to increase the number of authorized common shares and decrease their par value."

As AIG had to concede in the Walker lawsuit, contrary to Davis Polk's advice, and Defendant's expectation when the RCF was signed, Delaware law did require a class vote to amend the charter to authorize additional shares or lower par value (PTX 3119).

### 4. Defendant's Involvement in the *Walker* Lawsuit.

Defendant's witnesses have asserted that they had no involvement in the *Walker* lawsuit.

5

> "Q. To your knowledge, to what extent were individuals at the New York Fed or Treasury involved in the Walker litigation?
>
> A. I don't believe they were involved at all." (Huebner: Tr. (11/4/2014) 6125:14-17; *see also* Huebner: Tr. (11/4/2014) 6124:19-6125:10; Brandow: Tr. (11/3/2014) 5894:6-15).

They have also said they were unaware anyone thought it was potentially "serious."

> "Q. Just so the record is clear, you do not recall ever learning what she [Ms. Beamon] believed the potentially serious ramifications of the Walker lawsuit were, correct?
>
> A. That's correct." (Huebner: Tr. (11/5/2014) 6315:21-24).

(a) Davis Polk received the *Walker* complaint on November 5, 2008 at 9:36 a.m. (PTX 3259 at 1).

(b) At 10:09 a.m. Ethan James wrote Huebner and other Davis Polk partners, Martine Beamon and Scott Muller, saying: "In light of the subject matter we will have to stay involved in this one." (*Id.*).

(c) At 10:14 a.m. Huebner replied: "Martine – this is potentially serious. Please also copy tom baxter, jim h, sarah and me and ethan." (*Id.*).

(d) It was in response to Mr. Huebner's recently produced email that Ms. Beamon wrote PTX 343 to Mr. Baxter (copying numerous FRBNY officials and Davis Polk partners) warning that the *Walker* complaint "has some potentially serious ramifications" – an assertion about which Mr. Huebner in his testimony denied any knowledge (Huebner: Tr. (11/5/2014) 6314:9-6315:24).

6

(e) PTX 3221 (11/6/08) at 4: FRBNY's legal staff "asked Davis Polk if it has a written analysis of this issue so that we can better assess the strength of the allegations in the lawsuit."

(f) PTX 3119 (11/9/08) at 1: The Fed concluded Davis Polk had "made a mistake"[1], and AIG agreed to a class vote. (PTX 3222).

(g) PTX 3223 (11/20/08) at 1, Huebner to Baxter: "AIG certainly should not (incorrectly) admit that they were going to violate Delaware law but for being caught by the plaintiffs."

**5.  Defendant's Efforts to Avoid A Common Shareholder Class Vote**

Defendant has asserted that after the *Walker* lawsuit AIG itself decided without any influence from Defendant not to hold a shareholder vote and instead proceed without a RSS and "exchange".

(a) PTX 3232 (11/6/08) at 1: "Not to complicate anyone's life given where we've gotten to, but Louis Goldberg has come up with a way to avoid the separate common stockholders' vote. He's confirmed this approach on a no names basis with Richards Layton."[2]

(b) PTX 3224 (11/21/08) at 1: "I get the impression (including from these e-mails) that Davis Polk wants this vote to happen right off the bat. This appears to be somewhat of a scramble to cope with the fact that (contrary to the original understanding they gave us) we might lose the vote on increasing the authorized

---

[1] *See also* PTX 3233 at 1 ("DPW is covering their asses and revising history and giving self-interested advice"); PTX 3119 at 1 ("we have not received great counsel from DPW"); PTX 3226 ("we have been unhappy with the advice to date from DPW on these issues").

[2] Goldberg's plan, which Huebner described as "Sneaky but legal" was to create a shell corporation with sufficient authorized shares and then merge AIG into it (PTX 3232 at 1).

7

common. Obviously this present scramble undercuts the line we have heard a more than a few times that this whole scenario was contemplated all along, but there's no sense in beating that dead horse."

(c) PTX 3118 (2/10/08): "As we have discussed, the ultimate passage of that charter amendment is complicated by the need for a class vote of existing common (i.e., Greenberg et al.) on this issue. As we discussed at our meeting last week, Davis Polk is advising that this proposal should not be put up for a vote at the upcoming shareholder meeting."

    (i) The Walker lawsuit was dismissed February 5, 2009 (JX 176).

    (ii) Davis Polk was aware that AIG had represented to the Walker Court that there would be no increase in the number of authorized shares without a class vote of common shareholders. (Brandow: Tr. 5861:3-14; PTX 3164 at 2).

(d) Plaintiffs have not yet identified any document showing when it was first proposed to use the reverse stock split to avoid a class vote of common shareholders. However, as the evidence at trial showed, it was in February 2009 that AIG and FRBNY agreed that the Series D preferred stock would be exchanged for Series E in order "to avoid an amendment to the AIG charter (which would require a board resolution and shareholder vote)." (PTX 2038 at 2 n. 1).

6. **Whether AIG reasonably expected concessions from ML3 counterparties**

(a) PTX 3212 (10/30/08 BlackRock markup of Davis Polk draft of ML3 term sheet) at 5: "BRS: This is not correct – it does not account for concessions in price that

will be negotiated with each counterparty. It is unclear whether the concessions will be consistent across deals or individually negotiated with counterparties. Let's leave that bit open."

(b) PTX 3251 (11/5/08):

(i) Huebner to Davis Polk partner Bjorn Bjerke: "Does aig have the ml ii and iii docs?"

(ii) Bjerke to Huebner: "No. They have not seen any on ML III (nor has mliii been explained to them in full detail)."

7. **Duties of Trustees**

Mr. Baxter testified that the Trust language requiring the Trustees to act "in or not opposed to the best interests of the Treasury" was "intended to say to the trustees, if they acted in the best interests of all shareholders" (Baxter: Tr. (10/3/2014) 1152:5-1153:5).

(a) PTX 3286 (10/28/08) at 1, Baxter to Huebner regarding the drafting of the Trust agreement: "The trustees should not care about the AIG minority shareholders – they have no interest in the trust."

## CONCLUSION

Because of the relevance to issues and testimony at trial of the documents Defendant is currently producing, and has recently produced, it is appropriate to keep the trial record open for a limited time for the limited purpose of permitting Plaintiffs an opportunity to offer selected documents. In deciding whether to permit the trial record to remain open, Plaintiffs believe the Court may also consider the extent to which certain of the documents withheld as privileged now appear not to have been privileged.

Dated: November 24, 2014
Washington, DC

BOIES, SCHILLER & FLEXNER LLP

By: _____/s/_____
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

Robert Silver
Robert J. Dwyer
Alanna C. Rutherford
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy Mauser
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000

*Attorneys for Plaintiff Starr International Company, Inc.*