IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY, INC., on its behalf and on behalf of a class of others similarly situated,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

No. 11-00779C (TCW)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF REQUEST TO SUPPLEMENT THE EVIDENTIARY RECORD**

BOIES, SCHILLER & FLEXNER LLP
Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
John L. Gardiner

*Attorneys for Plaintiff Starr International
Company, Inc. and for the Plaintiff Classes*

December 8, 2014

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................. 5

I.   There Remains Good Cause To Admit The Newly Produced Documents Offered During
     Plaintiffs' Rebuttal Case To Supplement The Record ........................................................ 5

     A.   Newly Produced Documents Offered During Plaintiffs' Rebuttal Case: Government
          Communications ..................................................................................... 6

     B.   Newly Produced Documents Offered During Plaintiffs' Rebuttal Case: Internal Davis
          Polk Communications .............................................................................. 7

II.  There Exists Equally Good Cause To Supplement The Record With Defendant's Newly
     Produced Documents That Plaintiffs Have Reviewed
     Since Trial Has Ended ................................................................................. 12

III. Core Issues In the Case Are Addressed By The Documents For Which Plaintiffs Seek
     Supplementation Of The Record ....................................................................... 12

IV.  The Four Documents Discussed, Cited, And Relied Upon By Plaintiffs' Rebuttal Experts
     At Trial Should Be Admitted .......................................................................... 19

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

## Cases

*DiBella v. Hopkins*,
  403 F.3d 102 (2d Cir. 2005) ................................................................................. 9

*First Heights Bank, FSB v. United States*,
  46 Fed. Cl. 312 (2000) ........................................................................................... 9

*Totten v. Merkle*,
  137 F.3d 1172 (9th Cir. 1998) ............................................................................... 8

*United States v. Margiotta*,
  662 F.2d 131 (2d Cir. 1981) ................................................................................... 8

*Wisc. Elec. Power Co. v. United States*,
  90 Fed. Cl. 714 (2009) ........................................................................................... 5

*Zenith Radio Corp. v. Hazeltine Res. Co.*,
  401 U.S. 321 (1971) ............................................................................................... 5

## Rules

RCFC 59(a)(2) ............................................................................................................. 5

Fed. R. Evidence 801(d)(2)(D) ................................................................................... 8

## Treatises

2 Attorney-Client Privilege in the United States § 9:32 (2014) ................................. 9

5-801 Weinstein's Federal Evidence § 801.33 ........................................................... 8

Pursuant to this Court's Order of November 25, 2014 (Dkt. 392), Plaintiffs respectfully submit this memorandum in support of their request to supplement the evidentiary record in this matter to introduce (i) 84 documents they offered for admission on the last day of trial that were produced during the last two weeks of trial as a result of Defendant's privilege waiver;[1] (ii) an additional 45 newly produced documents that Plaintiffs did not have an opportunity to review until after the completion of trial; and (iii) four exhibits referenced, discussed, and/or relied upon by Plaintiffs' rebuttal witnesses during their testimony but that in the rush to complete the final day of trial were inadvertently not moved for admission prior to the conclusion of trial—PTX 98-U, 191, 1630, and 3125.

As explained in Plaintiffs' Memorandum in Support of Request to Keep the Record Open (Dkt. 373) and set forth in this memorandum, the documents at issue directly bear on critical issues in this case, including, among others, the authority to take equity, the change from warrants to preferred stock, and Defendant's efforts to avoid a common shareholder vote.  A number of the documents also contradict testimony given by Defendant's witnesses at trial.

## BACKGROUND

As this Court is aware, during Defendant's examination of Marshall Huebner, a partner at Davis Polk & Wardwell LLP ("Davis Polk"), Defendant knowingly chose to waive attorney-client privilege.  *See* Trial Tr. 6248:20-6251:1, 6251:25-6252:6, 6654:4-13.  Defendant's waiver occurred during the sixth week of trial—*after* Plaintiffs had rested their case and over a month *after* the testimony of Federal Reserve General Counsel Scott Alvarez and Federal Reserve Bank of New York ("FRBNY") General Counsel Thomas Baxter.  Balancing Plaintiffs' need for

---

[1]     Although Plaintiffs identified 88 documents on November 24, 2014 (Trial Tr. 8692:2-10), four of those documents, PTX 3238, PTX 3248, PTX 3259, and PTX 3290, were admitted through other means during the last two days of trial.

additional discovery following Defendant's broad, affirmative subject-matter waiver and a desire to maintain the trial schedule as set, this Court ordered the immediate production of all documents on the privilege logs of the Department of the Treasury ("Treasury"), the Federal Reserve Board of Governors ("BOG"), and FRBNY and all previously redacted documents on the parties' exhibit lists, while preserving the right of Plaintiffs to seek additional internal documents from Davis Polk.  Trial Tr. 6654:24-6656:4, 6252:7-11.  The Court noted that the additional discovery may require the Court "to leave the record open to allow for the submittal of additional exhibits possibly."  Trial Tr. 6656:5-10.

Defendant began producing documents pursuant to this Court's order on November 10, 2014, completing the majority of its production late in the evening of November 21, 2014, following the close of Defendant's case and on the eve of Plaintiffs' one-day rebuttal case.[2] With respect to Davis Polk, Plaintiffs had agreed to a narrow, targeted production of documents from seven custodians over four discrete time periods to accommodate both the trial schedule and concerns raised by Davis Polk regarding undue burden and the time required for document collection, review, and production.  *See* Trial Tr. (Bivens) 7229:16-7230:10; *id.* at 7232:18-7233:25; Ex. 1 (Email from A. Rutherford to F. Bivens (11/15/2014)).  Accompanying its final

---

[2]     Close to 200 documents that were previously withheld or not produced in their entirety due to technical glitches in the production were provided on December 5, 6, and 8, 2014.  In one case, a production error took until well after close of business on December 8, 2014 to resolve, when one of the disks received from the DOJ on Saturday, December 6, 2014 that contained 26,000 pages of images without explanation or cover note, was only resolved as being almost entirely duplicative of over 3,000 documents in previously received productions after teleconferences with the DOJ and later with technical personnel late in the evening on December 8, shortly before this motion was filed.

document productions, Davis Polk enclosed a letter curtailing the discovery to which Plaintiffs

and Davis Polk initially agreed.  *Compare* Ex. 1 *with* Ex. 2 (Ltr. from F. Bivens (11/21/2014)).[3]

All told, Defendant and Davis Polk produced over 30,000 documents to Plaintiffs in the

last two weeks of trial.  Plaintiffs' counsel worked diligently to review the documents during that

time period, and ultimately admitted several during Defendant's case.  *See, e.g.*, PTX 3120 and

3121 (admitted November 13, 2014); PTX 3228 (admitted November 20, 2014); PTX 3129,

3211, 3232, 3248, and 3259 (admitted November 21, 2014).

Plaintiffs moved for the admission of 88 documents prior to the examination of one of

their rebuttal witnesses, Dr. Michael Cragg, on November 24, 2014, the last day of trial.  Trial

Tr. 8692:2-10.  All of these documents had previously been identified by Plaintiffs to Defendant

the prior weekend as exhibits Plaintiffs would offer.  Defendant asked for time over the lunch

break to review the proffered documents, to which Plaintiffs agreed.  Trial Tr. 8692:11-18.

After Plaintiffs' proffer, the Court addressed Plaintiffs' request to leave the record open

to allow them to complete their review of the privileged documents produced by Defendant and

its counsel Davis Polk, and to identify any important documents they wanted to admit into the

record.  The Court adopted Defendant's proposed approach regarding the documents that

---

[3]     Davis Polk's productions also included a number of redacted documents.  Although counsel has claimed the redactions protect the privilege of other clients (*see* Ex. 3 (email from A. Rutherford (11/19/14))), there are a few documents for which Plaintiffs have questioned such redactions without response.  For example, PTX 3235, an internal Davis Polk email regarding the "Voting Trust Agreement", contains an email that asks the question "Does a 79.9 percent shareholder of a Delaware corp have any duties to the other shareholders or company in normal circumstances?"  Among the responses received is the following: "I'm happy to defer but I just didn't want to have a provision that later could be said to have our trustees violate a fiduciary duty, [redacted]. Dropping in 'and applicable law' after shareholders would solve the issue above __ that's a better drafting solution than the original proposition."  PTX 3235 at 1; *see also* PTX 3283, PTX 3272.

3

Plaintiffs had not yet reviewed, allowing Plaintiffs to move to reopen the record to seek the admission of any important documents they first reviewed after trial:

> I think what I would like to do is to follow Mr. Dintzer's approach. I would like to close the record when we finish today, but then if you come across some documents you haven't reviewed yet and you think they really matter to the outcome of the case, they're really super important, that you would have certainly offered them earlier if you had seen them, I would certainly entertain a motion to reopen the record for that limited purpose.

Trial Tr. 8696:21-8697:4.

At the close of Plaintiffs' rebuttal case, this Court raised the issue of the newly produced documents proffered by Plaintiffs earlier. Trial Tr. 8789:19-20. Despite Plaintiffs' advance notice and identification of documents to Defendant over the weekend of November 22-23, 2014, counsel for Defendant indicated that Defendant had not completed its review of the documents offered for admission and raised objections to the admission of internal Davis Polk documents. Trial Tr. 8789:21-8790:17. Defendant requested the Court take the following approach:

> What we would suggest is that to the extent that any of these documents -- perhaps Plaintiffs' counsel knows this -- are completely within -- internal communications within Davis Polk, that those be withdrawn from their offer and that the others be kept in their offer -- *we won't object to those coming in* -- and that they then, for the ones that are wholly internal to Davis Polk, those would be subject to the procedure that we've described, where they could ask for their admission, and that gives us a chance to review them, offer counter-designations, and to vet those properly.

Trial Tr. 8790:23-8791:9 (emphasis added). This Court then set forth the following approach with respect to the internal Davis Polk documents:

> I think what I'd like to do is to go ahead and close the record today and so that we can have one procedure that I think will apply and sort of simplify what we're doing. The Plaintiff can include any of these documents in a motion to supplement the record. So, it would be this category of documents, plus the ones that you haven't had time to review yet.

4

Trial Tr. 8792:9-15.

A few minutes later, just prior to the close of the record, Plaintiffs' counsel noted that a majority of the documents offered were documents to or from the Treasury or Federal Reserve Bank, "so we would like to offer those now as opposed to waiting to make a motion on those." Trial Tr. 8798:4-11.  Plaintiffs' counsel offered to identify these documents.  Trial Tr. 8798:14. Again, despite Plaintiffs' advance notice—and also despite Defendant's counsel's prior representation that Defendant would not object to the admission of these documents— Defendant's counsel indicated that he would "hate saying 'no objection' without actually looking at the documents."  Trial Tr. 8798:19-20.  This Court noted that it was "likely to admit them," but requested that these documents also be included in the motion to supplement the record. Trial Tr. 8799:7-8, 8799:13-14.

## ARGUMENT

After a trial, the "court may, on motion" "take additional testimony."  RCFC 59(a)(2). This additional testimony can include documentary evidence.  *See, e.g., Wisc. Elec. Power Co. v. United States*, 90 Fed. Cl. 714, 769 (2009) (allowing admission of supplemental expert reports). A "motion to reopen to submit additional proof is addressed to [the trial court's] sound discretion."  *Zenith Radio Corp. v. Hazeltine Res. Co.*, 401 U.S. 321, 331 (1971); *accord Wisc. Elec. Power Co.*, 90 Fed. Cl. at 769.

### I.    There Remains Good Cause To Admit The Newly Produced Documents Offered During Plaintiffs' Rebuttal Case To Supplement The Record

During Plaintiffs' rebuttal case, Plaintiffs offered for admission 84 documents produced to Plaintiffs during the trial as a result of Defendant's waivers of attorney-client privilege, which are identified in Appendices A and B.  *See* Trial Tr. 8691:17-8692:10.  There is still good cause for the record to be supplemented with these documents.  As explained during the last day of

trial, many of these documents were reviewed and relied upon by Plaintiffs' experts in

formulating their rebuttal opinions and testimony as cited in the demonstratives.  Others are a

necessary supplementation to the record because they directly rebut the testimony of Defendant's

witnesses, in particular Davis Polk partners Marshall Huebner and John Brandow.  It was their

testimony that resulted in Defendant's privilege waiver; however, the document production by

Defendant occurred after Plaintiffs completed their cross-examination of Messrs. Brandow and

Huebner.  Had Plaintiffs had access to the documents prior to the completion of their cross-

examination, they could have confronted Messrs. Brandow and Huebner with contemporaneous

documents that directly refuted their testimony on core issues at trial.

### A.  Newly Produced Documents Offered During Plaintiffs' Rebuttal Case: Government Communications

As indicated in Appendix A and as represented by Plaintiffs' counsel at trial, the majority

of these documents are those to which Defendant initially stated "we won't object to those

coming in" (Trial Tr. 8791:3-4): communications to and from the Treasury, BOG, and FRBNY,

which are all admissible as party admissions.  *See* Trial Tr. 8799:8 ("I'm likely to admit them").

Thus, Plaintiffs seek admission of the 49 newly produced communications with Government

personnel identified in Appendix A not only as admissions of a party opponent but also as

authenticated business records of Defendant under the same standards as all the documents on

the parties' respective exhibit lists and based on counsel's additional assertion at trial.  *See* Joint

Status Report at 2 (Dkt. 298) (Sept. 8, 2014); Discovery Order No. 9 at 2 (Dkt. 230) (May 12,

2014) (noting that the "general standard for the business records exception is satisfied if a

document was prepared in the normal course of business, was made at or near the time of the

events it records, and was made by a person with knowledge of the underlying matter" and

ordering Defendant to respond to RFAs regarding specific application of business records

exception to documents and emails sent by its officials and employees); Def.'s Resp. to Pls.' 2d

Set of RFAs Nos. 6-8, 17-23, 26-27 (Defendant's officials and employees used their official

emails in their professional capacities).

### B.   Newly Produced Documents Offered During Plaintiffs' Rebuttal Case: Internal Davis Polk Communications

The vast majority of the remaining 35 documents offered the last day of trial listed in

Appendix B are internal Davis Polk documents for which Defendant has not agreed to stipulate

to admissibility.[4]  These documents, however, bear on the most central issues in this case:

Defendant's authority to take equity as consideration for a 13(3) loan; the form of equity

discussed on September 16, 2008; the purpose of Defendant's change from warrants to preferred

stock (specifically, to provide Defendant with immediate control of AIG without the delay

inherent in a shareholder vote); the importance and significance of, and Defendant's involvement

in, the *Walker* lawsuit; and other of Defendant's efforts to avoid a shareholder vote leading up to

the Reverse Stock Split and "exchange."  They also establish that it was reasonable of AIG to

expect concessions in Maiden Lane III, and disprove Defendant's assertion that the Trust's duties

ran to all AIG shareholders, including minority shareholders, as opposed to just the Treasury.

*See generally* Pls.' Memorandum in Support of Request to Keep the Record Open (Dkt. 373)

(Nov. 24, 2014).

During the proceedings on November 24, 2014, Defendant suggested that these internal

Davis Polk documents may not be admissible because "they wouldn't qualify for adoptive

---

[4] Although Defendant objected only to the admission of internal Davis Polk documents, two of the exhibits offered by Plaintiffs on the last day of trial, PTX 3219 and PTX 3278, are internal to the law firm of Wachtell, Lipton, Rosen, & Katz ("Wachtell").  Wachtell "represented Treasury and performed legal services for Treasury relating to AIG" in the same manner as Davis Polk. *See* Def.'s Revised Resp. to Pls.' 3d Set of Interrogatories No. 25 at 58.  Thus, the same analysis that applies to the Davis Polk documents applies to the Wachtell documents.

admissions, that people in the Government never saw them." Trial Tr. 8790:3-5.  But Plaintiffs

are not offering these documents as adoptive admissions pursuant to Federal Rule of Evidence

801(d)(2)(B).  Rather, they are admissible, pursuant to Rule 801(d)(2)(D), as statements made by

the agent of a party opponent on a matter within the scope of that relationship.  *See* 5-801

Weinstein's Federal Evidence § 801.33 (Rule 801(d)(2)(D) "is based in part on the view that

persons who speak on matters within the scope of their employment are unlikely to make

damaging statements about their employers unless the statements are true.  Thus, there is no

additional requirement that the proponent show that the statement is trustworthy, or that the

declarant had personal knowledge of the facts underlying the statement").

Davis Polk, which was specifically retained as outside counsel by both Treasury and

FRBNY for the purpose of providing legal advice on the events at issue in this lawsuit,

indisputably qualifies as Defendant's agent.[5]  *Cf. Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir.

1998) ("Under the federal rules, a statement made by an attorney is generally admissible against

the client."); *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981) ("Statements made by

an attorney concerning a matter within his employment may be admissible against the party

retaining the attorney.").  The documents Plaintiffs seek to admit were plainly created within the

scope of Davis Polk's engagement as Defendant's counsel.

Admission of these documents is necessary to neutralize the unfair advantage that

Defendant gained in relying on attorney-client privilege as both a sword and a shield.  *See First*

---

[5]      A number of contemporaneous documents, in addition to the on-record statements of Ms.
Bivens of Davis Polk and the Government's interrogatory responses, confirm Davis Polk's
representation of both FRBNY and Treasury on these issues.  *See* Trial Tr. (Bivens) 7231:11-17
("Command.DPW is actually the client distribution list, so it goes -- the people on Command, the
members of that, were three Treasury people and three Fed people"); PTX 154 at 2 (9/19/08
email from Huebner to Jester and Norton (of Treasury) and  Baxter and Hansen (of FRBNY):
"Clients: The choice is of course yours . . . ."); *see also* PTX 3120 at 2; PTX 3227 at 1-2; PTX
235-U at 1; Def.'s Revised Resp. to Pls.' 3d Set of Interrogatories No. 25 at 55-56.

*Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 317 (2000).  Defendant selectively

disclosed privileged information only when beneficial—through its direct examination of its

attorneys, Messrs. Brandow and Huebner.  In cases, like this one, where a motion to reopen the

record is intended to remedy the strategic misuse of the attorney-client privilege by a party

during trial, courts have liberally allowed the opposing party to supplement the record to ensure

the fact finder can judge the case based on a full record.  *See, e.g.*, *DiBella v. Hopkins*, 403 F.3d

102, 119 (2d Cir. 2005) (affirming trial court's decision to interrupt closing arguments to the jury

to correct party's prior misleading use of document redacted for claimed attorney-client privilege

by allowing opposing party to reopen the record to introduce the unredacted document).

Because Plaintiffs were unable to cross-examine either Mr. Huebner or Mr. Brandow

regarding the substance of these not-yet produced documents, their admission into the record as

rebuttal documents is particularly appropriate.  *See* 2 Attorney-Client Privilege in the United

States § 9:32 (2014) ("when the client calls his attorney to testify at trial, the resulting waiver

will be broad because of the advantages gained by the privilege holder and the corresponding

need this creates for the opposing party to test the reliability of the disclosed information")

(citing *First Heights Bank*, 46 Fed. Cl. at 317).

For example, Davis Polk partner Marshall Huebner testified at trial:

Q. To your knowledge, to what extent were individuals at the New York Fed or
Treasury involved in the Walker litigation?

A. I don't believe they were involved at all.

Trial Tr. 6125:14-17; *see also id.* 6124:19-6125:10; *id.* at 7233:13-14 (Bivens: "Martine Beamon

is a litigation lawyer who was involved for about two weeks on the Walker lawsuit").  However,

the newly produced documents reflect that not only did Mr. Huebner and his colleagues at Davis

Polk participate in the *Walker* litigation on behalf of Defendant, but they were significantly

involved in formulating a strategy and implementing a plan to avoid the very shareholder vote that the *Walker* litigation sought to ensure.

1. Davis Polk had initially advised Defendant that it could avoid a separate vote of all common shareholders.

   – Brandow: "My focus from the start of this transaction was to find a way for the trust to acquire the power to control the company without having to get the consent of the common stockholders."  PTX 3211 at 1-2.

   – Brandow: "We succeeded in finding a structure that allows the trust to gain control of the company without a shareholder vote."  PTX 3129 at 7.

2. Davis Polk reviewed the *Walker* complaint on November 5, 2008 at 9:36 a.m.  PTX 3259 at 1.  They advised and updated FRBNY on the emergency relief proceedings on a daily basis throughout the week.  PTX 3164.

3. Although initially Davis Polk "reviewed the lawsuit and is confident" that Defendant would be able "to vote the preferred shares to increase the number of authorized common shares and decrease their par value" (PTX 3221 at 2-3), it soon became clear Davis Polk had "made a mistake".  PTX 3119 at 1.

   – BOG attorney Stephen Meyer to Sara Stainback on November 10, 2008: "you were so right about the lawsuit." "Exhibit D was changed to reflect explicitly that the common shareholders vote as a class for increasing the number of authorized shares, etc.  Davis Polk is apparently claiming that the documents were previously ambiguous and that this was always foreseen!"  PTX 3222.

   – FRBNY attorney Charles Gray on November 21, 2008: "(contrary to the original understanding they [Davis Polk] gave us) we might lose the vote on increasing the authorized common."  PTX 3224 at 1.

4. Davis Polk and the Fed eventually amended the Credit Agreement with AIG to include new language in Exhibit D regarding the voting rights of the preferred stock to state: "Except where a class vote is required by law, the Preferred Stock will vote with the common stock on all matters submitted to AIG's stockholders".  PTX 3341 at 1.  In a handwritten note Stephen Albrecht, counsel to Treasury's General Counsel, wrote to Rich Charlton, FRBNY counsel "This is the revised Exhibit D to the Credit Agrmt.  Some frivolous lawsuit."  *Id.*

5. Amid the Fed's concerns "that DPW is covering their asses and revising history and giving self interested advice" (PTX 3233 at 1; *see also* PTX 3226 at 1), Davis Polk scrambled to come up with other stratagems to transform preferred shares into common without a class vote of common shareholders.  PTX 3224 at 1; PTX 3232 at 1.

6.   At the very time Davis Polk and the Fed knew that AIG was representing to the Delaware court that there would be no increase in authorized shares without a common shareholder class vote (Trial Tr. (Brandow) 5856:25-5857:14), and Davis Polk was advising AIG what to say and not say to the Delaware court (PTX 3223 at 1-2), Davis Polk and the Fed were trying to figure out how to do just that.  PTX 3232 at 1; PTX 3221 at 3.

7.   The advice provided to Defendant (and passed along to AIG) by Davis Polk was that a shareholder vote then tentatively scheduled for March 2009 should be postponed.

–   FRBNY attorney Charles Gray on February 10, 2009: "the ultimate passage of that charter amendment is complicated by the need for a class vote of existing common (i.e., Greenberg et al.) on this issue. As we discussed at our meeting last week, Davis Polk is advising that this proposal should not be put up for a vote at the upcoming shareholder meeting."  PTX 3118.

8.   The Fed later authorized AIG to settle the *Walker* litigation for $175,000 in attorneys' fees.  PTX 3128; PTX 3223.

Based on the *Walker* lawsuit, Defendant and AIG changed the Credit Agreement and the Trust Agreement to require a prompt shareholder vote on amending the AIG charter to permit Defendant to obtain AIG common stock for its Series C preferred.  Defendant has asserted that the delay in (and ultimate abandonment of) such a vote was made by AIG without Defendant's influence. The recently produced documents show as of January 29, 2009 (a week before the Walker lawsuit was dismissed as moot) FRBNY's internal counsel reported that:

This morning I had an hour-long call with John Brandow on the shareholder-vote issue, which seems potentially close to a resolution once we (and Treasury) have reached consensus on DPW's favored approach which, as we discussed yesterday, involved delaying the vote on the Series-C related charter amendments until such time as disposition appears likely.

PTX 3342 at 1.

Because these newly produced documents directly contradict Defendant's affirmatively solicited testimony during the presentation of their case by its witnesses as well as the representations of counsel on the record during trial, and Plaintiffs had no opportunity to cross-

11

examine the relevant witnesses with these documents, Plaintiffs should be permitted to supplement the record with the aforementioned documents as set forth in Appendix B.

## II. There Exists Equally Good Cause To Supplement The Record With Defendant's Newly Produced Documents That Plaintiffs Have Reviewed Since Trial Has Ended

As part of its review of Defendant's final production of documents following the close of the record, Plaintiffs have identified, and now seek to admit, an additional 45 previously unreviewed documents produced to Plaintiffs during the final days of trial as a result of Defendant's waivers of attorney-client privilege. These 45 documents are an attempt to supplement rather than simply duplicate the existing record evidence. With that goal in mind and pursuant to this Court's ruling, Plaintiffs offer these documents for admission because they are significant documents for this case's resolution and would have been offered by Plaintiffs during the trial had they been produced sooner. Plaintiffs have identified these documents in Appendix C.

## III. Core Issues In the Case Are Addressed By The Documents For Which Plaintiffs Seek Supplementation Of The Record

All of the aforementioned categories of documents for which Plaintiffs seek admission touch on critical issues in this case or assist in rebutting the testimony proffered by Defendant that resulted in the privilege waiver.

For example, Defendant has consistently tried to separate the Trust from other parts of the Government. Since for present purposes there is only "one Government", the distinction is legally irrelevant. However, the recently produced documents confirm that such a distinction is not factually supportable in any event. FRBNY:

(a) Contemporaneously recognized that "the trust will be a federal government instrumentality". PTX 3359;

(b)     Contemporaneously recognized that the Trustees could not be given voting stock under TARP because TARP prohibited Treasury from taking voting stock and

> "I do not take comfort in Steve's response below as I do not see how the use of the stock works unless the argument is that the fact that Treasury turned over its right to vote to the trustees satisfies the requirement that for voting shares Treasury gives up its right to vote. I am concerned about relying on such an argument because in this case Treasury is giving the right to vote to trustees who are obligated to vote in the interest of the Treasury and acting in a fiduciary capacity to the Treasury." PTX 3360 at 1;

(c)     Rewrote the Trustees' testimony to Congress.  PTX 3352;

(d)     Told the Trustees what to share with AIG, and when.  PTX 3131; and

(e)     Directed that "The trustees should not care about the AIG minority shareholders" and that the Trust Agreement should reflect that "core point".  PTX 3286 at 1.

Defendant has also asserted that it believed, contrary to the Trust's documentation, that the Trustees were intended to protect the interests of minority shareholders as well as the interest of the Government.  Recently produced documents make clear Defendant rewrote that documentation for the express purpose "To further clarify no duties to minority shareholders". PTX 3336 at 1.

Continuing on the "one government" theme, in a discussion on the issuance of 2% warrants to Treasury that occurred as a result of the November 2008 refinancing, Davis Polk personnel characterized the transaction as having no effect on Defendant: "Its really a reduction of the feds and a new issuance for treasury.  Net to the usg is a wash." PTX 3340.

Five months after TARP was passed and more than six months after Defendant had first intervened in AIG, internally there was still no dispute amongst Defendant's counsel that neither the Federal Reserve nor Treasury had authority to take equity.  In March 2009, in response to a letter from Congressman Barney Frank that stated: "I understand that at present neither the Federal Reserve nor Treasury can exercise any direct rights in the 79.9% interest held in AIG,"

13

PTX 3350 at 3, lawyers from the Federal Reserve discussing the letter directed to then Secretary of the Treasury Geithner and Federal Reserve Chairman Bernanke make clear "that under the TARP legislation Treasury is prohibited from getting voting rights."  PTX 3350 at 1; *see also* PTX 3351 ("perhaps Congress should have passed a law that actually allowed the Treasury to get voting rights in connection with TARP money").

In an attempt to minimize the significance of the *Walker* lawsuit and of the representation made to the *Walker* court, Defendant has asserted that everyone always knew that a shareholder vote of common shareholders would be necessary to permit the conversion of the Government's Series C preferred stock into AIG common stock.  In fact, when asked during trial what his colleague Martine Beamon meant by the "potentially serious ramifications" that the lawsuit posed, Mr. Huebner could not recall any.  Trial Tr. 6315:7-24 (discussing PTX 343).  However, it was Mr. Huebner himself who initially noted about the complaint: "Martine - this is potentially serious."  PTX 3259 at 1.  Recently produced documents show that Davis Polk initially made "a mistake" (PTX 3119 at 1) and had advised Defendant that Defendant's preferred stock could control the vote on the necessary charter amendments:

(a)     Fed General Counsel Scott Alvarez to Federal Reserve lawyers Steve Myer and Rich Ashton on March 2, 2009:

> "As you may recall, shortly after the TARP-related warrants were issued, it was learned that only the common shareholders are entitled to vote on the proposed charter amendments that increase the amount of authorized common stock and greatly lower the par value." PTX 3348 at 2.

Moreover, there is significant evidence that even after it was decided to delay the vote and substitute a reverse stock split which would allow the preferred shares to vote with the common, Defendant continued to be the driving force behind the plan without the input of AIG. When AIG in-house counsel Kathy Shannon points out on April 3, 2009 that continuing to delay the vote and proxy might require the company to notify the New York Stock Exchange (PTX

14

3330 at 2), the Davis Polk lawyers in a discussion amongst themselves note that Ms. Shannon

seems to be concerned about something that is no longer an issue:

> I would only point out in addition that I don't think we need to be unduly
> concerned about setting a new record date because we don't really care what
> population of public shareholders is entitled to vote at the meeting (I don't think)
> because the trustees will control the outcome of any vote. **It may be that since
> she isn't aware of the rationale for possibly delaying the meeting into the
> summer** she's simply pointing out that if the delay is intended to be for only a
> few days we should try to avoid the ministerial irritation of setting a new record
> date if possible by pushing the meeting date back no more than a week or so.

*Id.* at 1 (emphasis added).  Later that night, Mr. Huebner points out to Tom Baxter and Sarah

Dahlgren, among others that it may actually be time to tell AIG what the plan is now: "Given

that there is now a board meeting scheduled for Wednesday at 5 to approve the proxy, you/the

trustees may want to consider telling them of the new plan on either Monday or, at the latest,

Tuesday."  PTX 3131 at 1.

 As the newly produced documents confirm, Defendant's goal of avoiding a separate

shareholder vote pre-dates the *Walker* litigation and influenced Defendant's handling of AIG's

SEC filings, press releases and other various control issues.  *See, e.g.*, PTX 3242 (9/19/08: Ethan

James: "Form 8K Item 1.01 requires the disclosure of material contracts, but it does not require

that the actual contract be filed with the form.  We should consider going this route, particularly

to show less of a hand to Greenberg on the equity issuance (ideally we should have the pref

issued before they realize that we are going to do it w/out a SH vote)."); PTX 3249 at 1 (9/22/08:

Huebner: "I would give a lot to find a way to take the stock before the shareholder war machine

moves"); PTX 3246 at 3 (9/23/08: Ethan James: "The one piece I'd like to leave out is the

specific reference to the nyse provisions that highlight the path to no SH vote.").

The Reverse Stock Split ("RSS") approved June 30, 2009 enabled the Defendant to

engage in the Recapitalization approved September 30, 2010 in which Defendant "exchanged"

not only the Series C preferred stock but also its Series E and F preferred for a total of 92% of

AIG's common stock.  Defendant has asserted that the idea for a Series E and F preferred

exchange did not occur to anyone until after the RSS, and that it was AIG, and not the

Government, which drove the process. Recently produced documents show:

(a)     Defendant was considering an increase of its equity in AIG to 92% (at the time by
        issuing more Series C Preferred) as of February 26, 2009 (PTX 3328); shortly
        after the *Walker* lawsuit had been dismissed as moot; and

(b)     Four days earlier on February 22, 2009, Davis Polk and FRBNY had internally
        discussed the exchange of Series D preferred for Series E preferred concluding:

        "In order to avoid an amendment to the AIG Charter (which would
        require a board resolution and shareholder vote) that would be required
        to amend the Series D Certificate of Designations (which is part of the
        AIG Charter) this would be done as an exchange and not as an
        amendment."  PTX 3343 at 2.

The portion of the February 2009 draft term sheet prepared by the Government relating to

the possible increase in the Government's equity percentage to 92% is headed: "THIS SECTION

TO BE REMOVED PRIOR TO DISTRIBUTION OF TERM SHEET TO AIG."  PTX 3343 at 5.

Although Defendant has repeatedly and vociferously denied its involvement in the

*Walker* litigation, the reverse stock split, or AIG common shareholder's right to vote as a

separate class more generally, these documents clearly establish otherwise.[6]

---

[6] *See, e.g.*, Trial Tr. (Dintzer) 68:7-15 ("Now, Your Honor, there is a second class, AIG's reverse
stock split class, and they seek compensation based on alleged taking or exaction associated with
the 2009 reverse stock split. Now, Your Honor, that claim is based on a false premise, that the
Government -- that the reverse stock split was adopted by the Government-led effort to avoid a
shareholder vote, but, in fact, Your Honor, the facts represent that it was an AIG initiative to deal
with a very specific problem."); Def.'s Corrected Motion for Summary Judgment at 48 (Dkt.
248-1) (July 10, 2014) ("Starr has argued that a right to a separate vote of the common
shareholders on the split arose either from statements allegedly made to the Delaware court in
the *Walker* litigation, or because the split allegedly was engineered to circumvent the
requirement of a separate class vote on increasing the number of authorized shares.  Now that the
parties have completed discovery, the uncontroverted evidence disproves those arguments.").

Furthermore, contrary to representations made before this Court that "Davis Polk was not asked for and did not provide any advice or do any research or analysis regarding [the Government's Section 13(3)] authority" (Trial Tr. (Boies) 3548:16-20), newly produced documents indicate otherwise.  On September 18, 2008, Randall Guynn, a Davis Polk partner, wrote to Thomas Baxter and Scott Alvarez requesting that one of them call him "before the noon call to clarify what DOJ is saying about limits on the Fed's power to acquire an equity interest in AIG."  Mr. Guynn then writes to other Davis Polk colleagues and asks that one of them be available to do "some heavy litigation lifting".  PTX 3288 at 1.  Following a discussion of the authority issue with Wachtell and Morgan Stanley, Mr. Guynn in an internal Davis Polk email summarizes the key "AIG equity issues" on September 17, 2008 as:

> There is no express authority, which is one of the reasons Treasury and the Fed discussed their actions with congressional leaders of both parties.  Maybe it's an implied power of setting the conditions for lending money under 13(3) of the federal reserve act, but the govt is on thin ice and they know it.  But who's going to challenge them on this ground?

PTX 3263 at 1; *see also, e.g.*, PTX 3214 at 1 (Ethan James to Marshall Huebner and others on 9/16/08: "I have consulted Arthur and Randy on the Fed ownership issue and will continue to coordinate w/them.").

In addition, Defendant has asserted that the November 2008 restructuring, including the ML II and ML III transactions were unplanned additional assistance requested by AIG because of its deteriorating financial conditions.  Recently produced documents show:

(a)     Defendant's recognition at the time of the restructuring (11/10/08) that "Today's comprehensive set of solutions has been in process literally since the morning of September 17."  PTX 3347 at 1; and

(b)     Defendant's contemporaneous expectation was that "We fully intend to make money on those transactions" and "in the interim, we are, appropriately, earning billions of dollars a year in interest and fees".  PTX 3347 at 2.

Moreover, the most recent set of documents demonstrate that the Government Accountability Office was also perplexed by the split of residuals for Maiden Lane III, and asked a similar question to that posed by Plaintiffs at trial: "Based on our reviews, we noted that FRBNY asked BlackRock to see how much the ML III residuals could be stretched prior to breaching consolidation issues.  BlackRock came back with a 55%/45% (Fed/AIG) split.  Why did FRBNY choose the 67%/33% split, when there was the other split presented?"  PTX 3362 at 3.

Despite the evidence to the contrary, Defendant has continued to deny that it controlled AIG.  The recently produced documents show:

(a)     Defendant's contemporaneous recognition that its initial acquisition of the Series C preferred stock by itself "will trip change of control provisions."  PTX 3234;

(b)     Defendant's control over the content of AIG's proxies.  PTX 3274 at 1;

(c)     Defendant's control over AIG's public positions (PTX 3344) and submissions to Congress regarding TARP.  PTX 3345;

(d)     Defendant's control over AIG's asset sales, even extending to the approval of the sale of a single 1989 aircraft by ILFC.  PTX 3333 at 1;

(e)     Defendant's contemporaneous recognition that the AIG's Board's September 18, 2008 decision to agree to Defendant's requirement for a new dividend policy was "A step forward on financial control".  PTX 3334 at 1;

(f)     The contemporaneous recognition that the government was in effective control of AIG:

> "Davis Polk is saying that the Senior Preferred investment that Treasury is making through the TARP cannot have any provisions allowing it to be redeemed early by AIG. The reason AIG's redemption right has to be stricken is that the E&Y accountants are basically viewing the Treasury as having control over AIG's decision to redeem the Senior Preferred through the actions of the Trust and the influence that the FRBNY exerts as lender."  PTX 3346 at 1;

> "do we want to correct message that there is no way to stop us from taking control-- 80% is already given."  PTX 3218 at 1; and

(g)    Defendant's decision "to track and manage" AIG's compensation (PTX 3353 at 1) and the specific role Defendant played in designing the compensation and incentive package for Ed Liddy, its hand-picked CEO for AIG.  PTX 3363.

Indeed, it was "**a condition** to each borrowing that the Reserve Bank be reasonably satisfied in all respects with the corporate governance of the Borrower after giving effect to the Transactions then consummated.  In other words, the Reserve Bank does not have to lend any more funds, if AIG's corporate governance is not satisfactory."  PTX 3160 at 2.  AIG could not "engage in material new business activities without Reserve Bank approval."  *Id.* at 3.

Finally, at trial, Defendant's witnesses repeatedly called into question the value of AIG as a company and suggested that Series C Preferred Stock had little value.  However, Marshall Huebner drafted a memorandum to his "Clients" indicating that following the announcement of the term sheet between Defendant and AIG that one potential option still left on the table for the Government was a potential public-private solution with JP Morgan syndicating parts of the loan.  PTX 3227 at 3 ("Jimmy Lee called last week to ask whether we would be interested in syndicating.").

These represent just some illustrative examples culled from the over 30,000 documents produced over the last three and half weeks that have resulted in Plaintiffs seeking to supplement the record with 133 documents.

### IV.    The Four Documents Discussed, Cited, And Relied Upon By Plaintiffs' Rebuttal Experts At Trial Should Be Admitted

In addition, Plaintiffs have identified a limited number of previously marked exhibits for which admission to the record should be granted.  First, Plaintiffs offer three exhibits (PTX 98-U, PTX 191, and PTX 3125) that were cited and relied upon by Plaintiffs' expert Prof. Zingales

19

in his rebuttal testimony and demonstratives.  PTX 98-U and PTX 191 are cited in demonstrative

exhibit PTX 5511.  PTX 98-U is email correspondence from September 16, 2008 between

attorneys for the Department of Treasury and its lawyers at Wachtell Lipton Rosen & Katz,

outlining the issues with respect to taking warrants versus preferred stock.  Among the issues

mentioned in the previously redacted portion of the email is an explanation that:

> Warrant confers no governance rights or vote - a third party could try to
> accumulate existing common and hold up the vote to authorize additional
> common, perhaps demanding compensation or concessions in exchange for the
> vote. Third party accumulating common (or running proxy fight) could also take
> control of the board and generally be a wild card (e.g., change management and
> run company in a financially risky manner, threaten bankruptcy, threaten a
> lowball sale of the company, attempt to subvert the warrant).

PTX 98-U at 1.  PTX 191 is an email dated September 21, 2008 from Gregory Evans (BOG) to

Scott Alvarez (GC of Federal Reserve) asking "Are you aware that AIG 'Warrants' are turning

into preferred shares?"  PTX 3125 is an AIG press release from November 2010 announcing the

results of AIG's offer to exchange Equity Units into common stock and cash, which Prof.

Zingales relied on and cited in his calculations of the effect of Defendant's chosen structure for

the Recapitalization in demonstrative exhibits PTX 5503 and PTX 5504.

Second, Plaintiffs offer PTX 1630 pursuant to Federal Rule of Evidence 703, as an

exhibit cited and discussed by Dr. Cragg during his rebuttal testimony and in one of his

demonstrative slides, PTX 5519.  Trial Tr. 8715:13-8716:4.  PTX 1630 contains analyst reports

from Buckingham Research Group, JPMorgan, and William Blair & Company from September

22, 2008 concerning the announcement of Morgan Stanley and Goldman Sachs's conversion to

bank holding companies on September 21, 2008.  Reporting on the prior day's announcement,

Buckingham Research summarized that: "Conversion to bank holding co. will allow MS to swap

tighter oversight for permanent access to the Fed window – and the liquidity and funding

advantages that brings." PTX 1630 at 1. "The benefits are clear in that it brings permanent

access to the Fed discount window – and the liquidity and funding advantages that brings." *Id.* at

2. Similarly, the William Blair report summarized that: "Both companies will . . . have

permanent access to the Federal Reserve Bank Discount window, and have expanded

opportunities for funding. . . . The major change is that the Fed now sits behind Goldman Sachs,

thus improving financial flexibility and sending a stronger sense of stability to the market." *Id.*

at 17.

## CONCLUSION

For the aforementioned reasons and for the reasons established at trial, Plaintiffs

respectfully request to supplement the evidentiary record in this matter to admit: (i) 84

documents offered on the last day of trial that were part of Defendant's waiver production of the

last two weeks of trial as set forth in Appendices A and B (attached); (ii) 45 additional newly

produced documents that Plaintiffs did not have an opportunity to review until after the

completion of trial as set forth in Appendix C (attached); and (iii) the four exhibits referenced,

discussed, and/or relied upon by Plaintiffs' rebuttal witnesses during their testimony that in the

rush to complete the final day of trial were inadvertently not moved in for admission—PTX 98-

U, 191, 1630, and 3125.

Dated: December 8, 2014

BOIES, SCHILLER & FLEXNER LLP

By:

_____/s/_____

David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504

21

Tel. (914) 749-8200
Fax (914) 749-8300
Email: dboies@bsfllp.com

Robert Silver
Robert J. Dwyer
Alanna C. Rutherford
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300

Amy Mauser
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000

*Attorneys for Plaintiff Starr International Company,
Inc. and for the Plaintiff Classes*