# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., | ) | |
| on its behalf and on behalf of a class of | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11-779C |
| | ) | (Judge Thomas C. Wheeler) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S POST-TRIAL PROPOSED CONCLUSIONS OF LAW

JOYCE R. BRANDA
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:
SCOTT D. AUSTIN
CLAUDIA BURKE                    KENNETH M. DINTZER
JOSHUA E. GARDNER                Deputy Director
Assistant Directors

BRIAN A. MIZOGUCHI
JOHN ROBERSON                    Assistant Director
JOHN J. TODOR                    Commercial Litigation Branch
Senior Trial Counsels            Civil Division
                                 Department of Justice
RENEE GERBER                     P.O. Box 480
MATTHEW F. SCARLATO              Ben Franklin Station
MARIANA T. ACEVEDO               Washington, D.C. 20044
DAVID D'ALESSANDRIS              Tele: (202) 305-3319
VINCENT D. PHILLIPS              Fax: (202) 514-7969
ZACHARY J. SULLIVAN              Email: brian.mizoguchi@usdoj.gov
Trial Attorneys


February 19, 2015                Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... viii

Preliminary Statement.................................................................................................. 1

Equity Claim ................................................................................................................ 7

    I.   Starr Has Failed To Prove Its Claim That The Equity Term Took Shareholder Property Without Just Compensation ........................................................... 7

        A.  Starr's Takings Claim Is A Regulatory Takings Claim, Not A *Per Se* Takings Claim ............................................................ 8

        B.  No Taking Occurred Because AIG Voluntarily And Independently Agreed To The Equity Term........................................................... 10

            1.  Legal Standards.................................................................. 12

                a.  Duress Is The Proper Standard For Evaluating Whether AIG Voluntarily Accepted The Rescue Deal........... 12

                b.  Starr's Argument That Effective Economic Control, Rather Than Duress, Disproves Voluntariness Has No Basis In Law Or Logic ............................................................ 13

                    i.  Under Delaware Law, Demonstrating Control Over A Corporate Board's Decision Requires Proof Of The Exercise Of Actual Control ................. 13

                    ii.  Starr's Proposed Standard Of Effective Economic Control Has No Basis In Law And Would Result In Perverse Outcomes ................................................. 17

            2.  The AIG Board Voluntarily And Independently Accepted The Rescue Offer On September 16, 2008........................................ 20

                a.  The AIG Board Was Not Coerced Into Accepting The September 16, 2008 Rescue Offer ................................... 21

                    i.  AIG's Directors Exercised Their Free Will In Accepting FRBNY's Rescue Offer, Including The Equity Term ....................................................... 21

   ii. The AIG Board Had An Alternative To
    FRBNY's Rescue Offer .............................................. 25

   iii. Neither The Government Nor FRBNY Induced
    AIG's Acceptance Of FRBNY's Rescue Terms
    By Wrongful Conduct .................................................. 27

  b. The Government Did Not Exercise Actual Control Over
   The AIG Board's Acceptance Of The FRBNY Rescue
   Offer On September 16, 2008 .................................. 32

3. Starr's Theory That The Government Acquired Control
 On September 16, 2008, But Did Not Acquire Any Right
 To Equity Until September 22, 2008, Lacks Merit ............................ 38

  a. AIG's Board's Decision On September 21, 2008, Is Not
   Relevant Because AIG And FRBNY Formed A Contract
   On September 16, 2008, Which Bound AIG To Provide
   Equity Participation Equivalent To 79.9 Percent Of Its
   Common Stock ...................................................... 40

  b. In Any Event, AIG's Board Voluntarily And Independently
   Approved The Credit Agreement On September 21, 2008 ..... 45

   i. AIG's Board Was Not Coerced Into Approving
    The Credit Agreement On September 21, 2008 .......... 45

    1. AIG's Directors Exercised Their Free Will
     In Accepting The Credit Agreement ............... 45

    2. AIG's Board Had An Alternative To
     Authorizing AIG's Entry Into The Credit
     Agreement ...................................................... 47

    3. Neither The Government Nor FRBNY
     Induced AIG's Authorization Of The
     Credit Agreement By Wrongful Conduct ....... 49

   ii. The Government Did Not Control AIG's Decision
    To Enter Into The Credit Agreement ......................... 52

4. Starr Waived Its Right To Challenge The Rescue By Failing
 To Immediately Assert Duress ......................................... 55

5. AIG's Voluntary Agreement Is Dispositive Of Starr's Claims
 Because No Separate Agreement By Shareholders Was Required .... 56

C. The Absence Of Economic Loss Forecloses Starr's Claim For Compensation ...................................................... 58

    1. Starr Has Not Established That Class Members Suffered Any Economic Loss From The Alleged Taking ......................... 59

        a. Starr Is Not Entitled To Value Created By The Government Rescue ................................................. 61

        b. Starr Cannot Avoid Showing Economic Loss Even If Starr Could Show That FRBNY Would Not Have Let AIG Fail .... 63

    2. Starr Cannot Shift Its Burden Of Proving Economic Loss .................. 64

D. Starr Has Failed To Establish That The Equity Term Deprived It Of A Legally Cognizable Property Interest .................................... 65

    1. Starr Was Not Deprived Of Any Property Interest It Possessed Under Delaware Law ........................................ 66

    2. Starr Cannot Establish A Property Interest Based Upon Alternative Or Hypothetical Forms Of Assistance ............................ 69

    3. Starr Cannot Establish A Property Interest Premised On A Delaware Corporate Overpayment Theory .................................... 71

E. Starr Has Abandoned A Regulatory Takings Claim And Cannot Otherwise Meet The Requirements Of Such A Claim.................................. 73

II. Starr Has Failed To Prove Its Claim That The Equity Term Was An Illegal Exaction ........................................................... 77

A. The Equity Term Was Legal .......................................................... 78

    1. The Federal Reserve Had Statutory Authority To Condition Lending On The Equity Term ............................................ 79

        a. Congress Granted The Board Of Governors The Power To Authorize Loans Conditioned On Equity In The Last Sentence Of Section 13(3) ...................................... 80

        b. Conditioning Lending On A Borrower's Agreement To Convey Equity Was Also A Valid Exercise Of Incidental Powers Pursuant To Section 4(4) Of The Federal Reserve Act...................................... 85

        c.   Congress Repeatedly Confirmed That Rescue Lending
Could Be Conditioned On A Borrower's Agreement
To Provide Equity ................................................................... 91

    2.   Starr's Contentions Concerning FRBNY's And The Treasury
Department's Authority To Hold Equity Interests Are Irrelevant
And Incorrect .................................................................................. 93

        a.   FRBNY's And The Treasury Department's Authority To
Hold The Equity Interest Is Irrelevant To Starr's Claims ....... 94

        b.   FRBNY And The Treasury Department Could Hold Equity
Conveyed As Consideration For A Section 13(3) Loan ......... 94

    3.   Starr's Contentions Concerning The Independent Trust That
Held The Equity Interest Are Irrelevant And Incorrect ..................... 96

        a.   It Was Not Illegal Or Improper For The Trust
To Hold The Equity Interest ................................................... 97

        b.   The Independence Of The Trust Is Irrelevant To
Starr's Illegal Exaction Claims .............................................. 99

    4.   Starr's Remaining Claims Concerning The Legality
Of The Loan Terms Are Equally Meritless ..................................... 100

        a.   Starr's Claim Of "Punishment" Misconstrues The Federal
Reserve's Authority To Set The Terms Of Section 13(3)
Loans To Reflect The Policy Implications And Risks Of
Lending ................................................................................. 101

        b.   Starr's Policy Critiques Of The Terms On Which The
Federal Reserve Agreed To Save AIG From Failure
Cannot Establish An Illegal Exaction ................................... 102

        c.   Section 14(d) Of The Federal Reserve Act Is Not A Viable
Basis For Starr's Illegal Exaction Claim .............................. 103

B.  AIG's Voluntary Acceptance Of The Equity Term Precludes
Starr's Illegal Exaction Claim ...................................................... 105

C.  Starr's Illegal Exaction Claim Fails Because Section 13(3) Does Not
Mandate The Payment Of Money Based On The Violation Alleged .......... 109

D.  The Equity Term Did Not Exact Any Legally Cognizable Property
From Starr ................................................................................... 111

E. This Court Cannot Make An Award Based On A Hypothetical Re-Writing Of AIG's Agreement With FRBNY That Excises The Equity Term ............................................................ 111

    1. Starr Has Not Proved That FRBNY Would Have Made The Same Loan Without The Equity Term ...................................... 113

    2. Starr Has Not Shown That It Would Have Enjoyed An Increased Value For Its Shares If The Parties Had Contracted Without The Equity Term But On Economically Equivalent Terms .................... 116

F. The Court Should Deny Starr's Illegal Exaction Claim Because Starr Retained The Benefits Of The Government's Rescue For Years ................ 117

III. Starr Lacks Standing To Assert Its Equity Claim .................................................... 119

A. Starr Has Not Established Harm To Shareholders Separate And Distinct From Harm To AIG ........................................................ 120

B. Starr Has Not Established The Elements Of A Simultaneously Direct And Derivative Claim .................................................... 122

    1. AIG Did Not Issue "Excessive" Shares ........................................... 124

    2. The Government Was Not A Shareholder Of AIG At The Time Of The Challenged Transactions ....................................... 126

    3. The Government Did Not Cause AIG To Agree To The Equity Term Through The Exercise Of Control Over That Corporate Decision .......................................... 127

The Reverse Stock Split Claim .................................................... 127

IV. Starr Has Failed To Establish Its Claims With Respect To The Reverse Stock Split .................................................... 127

A. Starr Has Not Identified A Property Right That Was Taken Or Exacted Because The Common Shareholders Had No Right To A Class-Only Vote Before Monetization Of The Trust's Shares ........................................ 129

    1. Starr Fails To Identify Any Source For Its Claimed Property Right .................................................... 129

        a. No Property Right Exists Under Delaware Statutory Law ... 130

     b.  No Property Right Exists Under The *Walker* Stipulation
And Order Of Dismissal ...................................................... 130

     c.  No Property Right Was Created Through Alleged
"Misrepresentations" to the *Walker* Court ............................ 134

     d.  No Property Right Was Created Through The
Government's Views Concerning The *Walker* Action ......... 137

   2.  The Doctrine Of Independent Legal Significance Undermines
Any Claimed Property Right To Avoid Share Dilution.................... 138

   3.  The Stock Split Class Does Not Have A Cognizable Property
Interest In The Dilution Suffered By A Group Of Different
Shareholders In 2011 ...................................................... 140

B.  Starr's Claim That The Reverse Stock Split Was Proposed By The
Government For The Purpose Of Monetizing Its Shares Is Not
Supported By The Evidence ...................................................... 142

   1.  AIG, Not The Government, Proposed The Reverse Stock Split....... 143

   2.  Starr's Contention That the Reverse Stock Split Was Developed
To "Circumvent The Shareholder Vote Requirement" Is
Factually Unsupportable And Implausible ...................................... 144

   3.  The Government's Interaction With AIG, And The Trust's
Ownership Of AIG Stock, Do Not Establish That AIG's Actions
Are Attributable To The Government................................................ 145

   4.  Starr's Expert's Opinions Do Not Overcome Starr's Failure
To Come Forward With Fact Evidence ........................................... 146

C.  Starr's Claim Fails For The Additional Reason That The Reverse
Stock Split Caused No Economic Harm...................................... 147

   1.  The Reverse Stock Split Had No Effect On Starr's
Claimed Property Right ...................................................... 148

   2.  The Court Should Deny Starr's Claim Because The Shareholders
Approved The Reverse Stock Split And Accepted Its Benefits ....... 150

   3.  Starr Cannot Establish Harm Based Upon An Improper Reliance
On The January 2011 Recapitalization ........................................... 151

D. Because Starr Has Neither Identified A Violation Of Any Statute Nor Identified A Thing Of Value That Was Allegedly Exacted, Starr's Illegal Exaction Claim Fails............................................................................. 154

    1. No Statute Or Other Law Was Violated ........................................... 154

    2. Nothing Of Value Belonging To The Stock Split Class Ended Up In The Government's Possession..................................... 155

E. Any Claim That AIG's 2009 Annual Proxy Statement Was Misleading Is Not A Viable Basis For A Takings Or Illegal Exaction Claim................ 156

Additional Arguments............................................................................................. 157

V. Not All Class Members Have Established That They Can Pursue Remedies In This Court ............................................................................. 157

VI. Prejudgment Interest Is Not Available For Illegal Exaction Claims And Is Limited In Takings Claims To Compensation For The Time Value Of Money ...... 158

A. Prejudgment Interest Only Applies To Starr's Takings Claims ................... 158

B. An Award Of Prejudgment Interest May Only Serve To Make Plaintiff Indifferent To The Timing Of The Award And May Not Award Hypothetical "Lost Profits"............................................................... 159

# TABLE OF AUTHORITIES

## CASES

*A & D Auto Sales, Inc. v. United States*,
  748 F.3d 1142 (Fed. Cir. 2014).................................................................... passim

*ABF Freight Sys. Inc. v. NLRB*,
  510 U.S. 317 (1994).................................................................... 80, 101

*Abrahim-Youri v. United States*,
  36 Fed. Cl. 482 (1996) .................................................................... 9, 10

*Acadia Tech., Inc. v. United States*,
  458 F.3d 1327 (Fed. Cir. 2006).................................................................... 9

*Acceptance Ins. Co. v. United States*,
  84 Fed. Cl. 111 (2008) .................................................................... 68

*Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.*,
  337 B.R. 475 (S.D.N.Y. 2006).................................................................... 28

*Adirondack Med. Ctr. v. Sebelius*,
  740 F.3d 692 (D.C. Cir. 2014) .................................................................... 83

*Aerolineas Argentinas v. United States*,
  77 F.3d 1564 (Fed. Cir. 1996).................................................................... 152

*Alyeska Pipeline Serv. Co. v. United States*,
  624 F.2d 1005 (Ct. Cl. 1980) .................................................................... 105

*Am. Meat Institute v. U.S. Dept. of Agriculture*,
  760 F.3d 18 (D.C. Cir. 2014) .................................................................... 84

*Am. Pelagic Fishing Co., L.P. v. United States*,
  379 F.3d 1363 (Fed. Cir. 2004).................................................................... 127

*Andersen Consulting v. United States*,
  959 F.2d 929 (Fed. Cir.1992).................................................................... 43

*Anderson v. Abbott*,
  321 U.S. 349 (1944).................................................................... 55

*Animal Legal Def. Fund v. Quigg*,
  932 F.2d 920 (Fed. Cir. 1991).................................................................... 138

*Appolo Fuels, Inc. v. United States*,
    381 F.3d 1338 (Fed. Cir. 2004).................................................................... 74

*Arctic King Fisheries Inc. v. United States*,
    59 Fed. Cl. 360 (2004) ............................................................................... 69

*Arnold Tours, Inc. v. Camp*,
    472 F.2d 427 (1st Cir. 1972) ................................................................ 85, 87

*\*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) .......................................................... 16, 33, 34, 36

*Astoria Federal Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991) .................................................................................... 81

*\*AT&T Co. v. United States*,
    307 F.3d 1374, 1380 (Fed. Cir. 2002)................................... 111, 112, 113, 116

*Atamirzayeva v. United States*,
    524 F.3d 1320 (Fed. Cir. 2008).................................................................. 154

*A-Transport Northwest Co. v. United States*,
    36 F.3d 1576 (Fed. Cir. 1994).................................................................... 30

*\*B&G Enters. v. United States*,
    220 F.3d 1318 (Fed. Cir. 2000)....................................................... 10, 24, 28

*Balt. & Ohio R.R. v. United States*,
    261 U.S. 592 (1923).................................................................................... 40

*Barksdale v. United States*,
    582 F. App'x 890 (Fed. Cir. Nov. 10, 2014) .............................................. 100

*Bay View, Inc. v. United States*,
    278 F.3d 1259 (Fed. Cir. 2001).................................................................. 43

*\*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) .................................................................. 16, 36

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    891 A.2d 150 (Del. Ch. 2005)..................................................................... 36

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    906 A.2d 114 (Del. 2006) ........................................................................... 16

*Bergman v. United States*,
 28 Fed. Cl. 580 (1993) ............................................................................... 12

*Berkman v. United States*,
 250 U.S. 114 (1919) .................................................................................. 100

*Bienville Quarters, LLC v. E. Feliciana Parish Police Jury*,
 Civ. Action No. 07-158-JJB-DLD, 2010 WL 2653317 (M.D. La. June 25, 2010) .......... 69

*Blaustein v. Lord Baltimore Capital Corp.*,
 84 A.3d 954 (Del. 2014) ............................................................................. 16

*Bluebonnet Savings Bank v. United States*,
 339 F.3d 1341 (Fed. Cir. 2003) ................................................................ 74, PFOF 206[1]

*Blum v. Yaretsky*,
 457 U.S. 991 (1982) .............................................................................. 142, 143

*Board of Regents v. Roth*,
 408 U.S. 564 (1972) ................................................................................. 127

*Boland v. Engle*,
 113 F.3d 706 (7th Cir. 1997) ...................................................................... 121

*Bos. Chamber of Commerce v. Boston*,
 217 U.S. 189 (1910) ............................................................................. 59, 149

*Brehm v. Eisner*,
 746 A.2d 244 (Del. 2000) ........................................................................ 16, 32

*Bowman v. United States*,
 35 Fed. Cl. 397 (1996) ......................................................................... 108, 155

*\*Brown v. Legal Found. of Wash.*,
 538 U.S. 216 (2003) ........................................................................... passim

*C.F.T.C. v. Schor*,
 478 U.S. 833 (1986) ......................................................................... 86, 90, 92

*Caldwell & Santmyer, Inc. v. Glickman*,
 55 F.3d 1578 (Fed. Cir. 1995) ...................................................................... 30

*California National Bank v. Kennedy*,
 167 U.S. 362 (1897) .......................................................................... 87, 88, 94

---

[1] We have included all cited authorities in our post-trial filings in this table of authorities. We use "PFOF__" to signal the pages on which citations appear in our proposed findings of fact.

*Casa de Cambio Comdiv S.A., de C.V. v. United States*,
  291 F.3d 1356 (Fed. Cir. 2002) ............................................ 10, 108, 140

*CCA Assocs. v. United States*,
  667 F.3d 1239 (Fed. Cir. 2011) ........................................................ 63, 72

*Cessna Aircraft Co. v. Dalton*,
  126 F.3d 1442 (Fed. Cir. 1997) ............................................................ 105

*Chevron USA Inc. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984) .............................................................................. 101

*Chi. & N.W. Railway Co. v. United States*,
  104 U.S. 680 (1881) .............................................................................. 104

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003) .............................................................. 72

*\*Cienega Gardens v. United States*,
  503 F.3d 1266 (Fed. Cir. 2007) ................................................... 59, 72, 73

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) ...................................................................... 33

*Citron v. Fairchild Camera & Instrument Corp.*,
  569 A.2d 53 (Del. 1989) .......................................................................... 14

*Clapp v. United States*,
  117 F. Supp. 576 (Ct. Cl. 1954) ........................................... 114, 151, 152, 153

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) .......................................................................... 64, 127

*Cmty. Bank & Trust v. United States*,
  54 Fed. Cl. 352 (Fed. Cl. 2002) ............................................................ 127

*Collins v. United States*,
  67 F.3d 284 (Fed. Cir. 1995) ................................................................ 108

*Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.*,
  967 F.2d 648 (D.C. Cir. 1992) ................................................................ 69

*Colvin Cattle Co. v. United States*,
  468 F.3d 803 (Fed. Cir. 2006) ................................................................ 68

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013) ................................................................................................. 139

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
508 U.S. 602 (1993) ....................................................................................................... 73

*Corbin v. Fed. Reserve Bank of N.Y.*,
475 F. Supp. 1060 (S.D.N.Y. 1979), ................................................................... 106, 109

*CTS Corp. v. Dynamics Corp. of Amer.*,
481 U.S. 69 (1987) .................................................................................................. 65, 121

*Custis v. United States*,
511 U.S. 485 (1994) ....................................................................................................... 83

*Cyprus Amax Coal Co. v. United States*,
205 F.3d 1369 (Fed. Cir. 2000) ................................................................................... 109

*David Nassif Assocs. v. United States*,
644 F.2d 4 (Ct. Cl. 1981) ........................................................................................ 27, 48

*Douglas v. Ind. Living Ctr. of S. Cal., Inc.*,
132 S. Ct. 1204 (2012) ................................................................................................... 80

*E. Walters & Co., Inc. v. United States*,
576 F.2d 362 (Ct. Cl. 1978) ........................................................................................ 117

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) .......................................................................... 76, 116, 152

*Eden Isles Marina, Inc. v. United States*,
113 Fed. Cl. 372 (Fed. Cl. 2013) ................................................................................. 110

*Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.*,
68 A.3d 197 (Del. Ch. 2013) .......................................................................................... 34

*Ellamae Phillips Co. v. United States*,
No. 04-1544L, 2014 WL 6900838 (Fed. Cl. Dec. 9, 2014) ............................................ 57

*Emp'rs Ins. of Wausau v. United States*,
764 F.2d 1572 (Fed. Cir. 1985) ................................................................................... 104

*Energy Recovery, Inc. v. Hauge*,
745 F.3d 1353 (Fed. Cir. 2014) ................................................................................... 129

*Epic Metals Corp. v. H.H. Robertson Co.*,
870 F.2d 1574 (Fed. Cir. 1989)..................................................................... 129

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011) ................................................................................. 153

*Estate of Hage v. United States*,
687 F.3d 1281 (Fed. Cir. 2012),..................................................................... 64

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................................................ 91

*Fallini v. United States*,
56 F.3d 1378 (Fed. Cir. 1995)....................................................................... 140

*FDIC v. Linn*,
671 F. Supp. 547 (N.D. Ill. 1987) .................................................................. 25

*Feldman v. Cutaia*,
951 A.2d 727 (Del. 2008) ..................................................................... 119, 123

*\*Feldman v. Cutaia*,
956 A.2d 644 (Del. Ch. 2007)................................................ 67, 70, 74, 125

*Ferreiro v. United States*,
350 F.3d 1318 (Fed. Cir. 2003)..................................................................... 154

*Field v. Allyn*,
457 A.2d 1089 (Del. Ch. 1983)..................................................................... 137

*Figueroa v. United States*,
57 Fed. Cl. 488 (2003) .............................................................................. 9, 108

*First Nat'l Bank in St. Louis v. Missouri*,
263 U.S. 640 (1924)........................................................................................ 96

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005)..................................................................... 108

*Fla. Rock Indus., Inc. v. United States*,
18 F.3d 1560 (Fed. Cir. 1994)......................................................................... 72

*Ford v. United States*,
273 U.S. 593 (1927)........................................................................................ 83

*Freedlander, Inc. Mortg. People v. NCNB Nat'l Bank of N.C.*,
706 F. Supp. 1211 (E.D. Va. 1988) ............................................... 25

*\*Fruhauf Sw. Garment Co. v. United States*,
111 F. Supp. 945 (Ct. Cl. 1953) .............................................. 12, 21, 27

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009) ............................................................ 16

*Garelick v. Sullivan*,
987 F.2d 913 (2d Cir. 1993) ........................................................ 25

*\*Gatz v. Ponsoldt*,
925 A.2d 1265 (Del. 2007) ......................................... 117, 118, 122

*\*Gentile v. Rossette*,
906 A.2d 91 (Del. 2006) ............................................. 121, 122, 123

*Gilbert v. El Paso Co.*,
490 A.2d 1050 (Del. 1984) ........................................... 14, 38, 53

*Gradient OC Master, Ltd. v. NBC Universal, Inc.*,
930 A.2d 104 (Del. Ch. 2007) .................................................... 17

*Grimes v. Alteon, Inc.*,
804 A.2d 256 (Del. 2002) ............................................................ 66

*Halebian v. Berv*,
590 F.3d 195 (2d Cir. 2009) ...................................................... 121

*Hall v. Bed Bath & Beyond, Inc.*,
705 F.3d 1357 (Fed. Cir. 2013) .................................................. 98

*Hamlet v. United States*,
873 F.2d 1414 (Fed. Cir. 1989) ................................................ 108

*Hanlin v. United States*,
316 F.3d 1325 (Fed. Cir. 2003) .................................................. 39

*Hearts Bluff Game Ranch, Inc. v. United States*,
669 F.3d 1326 (Fed. Cir. 2012) .................................................. 68

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................. 103

*Henderson Cty. Drainage Dist. No. 3 v. United States*,
 53 Fed. Cl. 48 (2002) ................................................... 22

*Hendler v. United States*,
 175 F.3d 1374 (Fed. Cir. 1999)................................. 59, 72

*Hercules, Inc. v. United States*,
 516 U.S. 417 (1996)................................................ 40, 42

*Herman B. Taylor Constr. Co. v. Barram*,
 203 F.3d 808 (Fed. Cir. 2000) ..................................... 129

*Hildreth v. Castle Dental Ctrs., Inc.*,
 939 A.2d 1281 (Del. 2007) .......................................... 150

*Holmes v. United States*,
 657 F.3d 1303 (Fed. Cir. 2011)..................................... 129

*Home Sav. of Amer., FSB v. United States*,
 399 F.3d 1341 (Fed. Cir. 2005)...................................... 39

*Huntleigh USA Corp. v. United States*,
 525 F.3d 1370 (Fed. Cir. 2008)....................................... 8

*In re Bear Stearns Litig.*,
 870 N.Y.S.2d 709 (Sup. Ct. N.Y. County 2008) .................... 15, 35

*In re CompuCom Sys., Inc. S'holders Litig.*,
 No. Civ. A. 499-N, 2005 WL 2481325 (Del. Ch. Sept. 29, 2005) ................... 33

*In re Dow Chem. Co. Derivative Litig.*,
 Civil Action No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........... 36

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
 906 A.2d 766 (Del. 2006) ............................................ 119

*In re Loral Space & Commc'ns Inc.*,
 Nos. 2808-VCS, 33022-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ................. 17

*In re Lukens Inc. S'holders Litig.*,
 757 A.2d 720 (Del. Ch. 1999)........................................ 147

*In re Malasky*,
 290 A.D.2d 631 (N.Y. App. Div. 2002) .............................. 97

*In re Paxson Commc'n Corp. S'holders Litig.*,
No. Civil. A. 17568, 2001 WL 812028 (Del. Ch. July 12, 2001) ..................................... 14

*In re PNB Hldg. Co. S'holders Litig.*,
No. Civ. A. 28-N, 2006 WL 2403999 (Del. Ch. Aug. 18, 2006) .................................... 147

*In Re Sea-Land Corp. Shareholders Litig.*,
1987 WL 11283 (Del.Ch. May 22, 1987) ....................................................... 15

*In Re Sea-Land Corp. Shareholders Litig.*,
1988 WL 49126 (Del. Ch. May 13, 1988) ..................................................... 35

*In re Sunrise Sec. Litig.*,
916 F.2d 874 (3d Cir. 1990) ............................................................... 121

*In re Western Nat'l Corp. S'holders Litig.*,
No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) .................................... 33

*Indep. Ins. Agents of Am., Inc. v. Hawke*,
211 F.3d 638 (D.C. Cir. 2000) ............................................................. 87

*Jentgen v. United States*,
657 F.2d 1210 (Ct. Cl. 1981) .............................................................. 73

*John Arborio, Inc. v. United States*,
76 F. Supp. 113 (Ct. Cl. 1948) ............................................................ 54

*Johnson, Drake & Piper v. United States*,
531 F.2d 1037 (Ct. Cl. 1976) ............................................................. 54

*Kahn v. Lynch Commc'n Sys., Inc.*,
638 A.2d 1110 (Del. 1994) ...................................................... 15, 17, 33, 34

*\*Kahn v. M&F Worldwide Corp.*,
88 A.3d 635 (Del. 2014) ............................................................. 32, 33

*Kalageorgi v. Victor Kamkin, Inc.*,
750 A.2d 531 (Del. Ch. 1999) ............................................................. 67

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991) ..................................................................... 121

*Keene Corp. v. United States*,
508 U.S. 200 (1993) .................................................................... 153

*Kimball Laundry Co. v. United States*,
   338 U.S. 1 (1949) ................................................................................ 59, 149

*Kirby Forest Indus., Inc. v. United States*,
   467 U.S. 1 (1984) .............................................................................. 156, 159

*Klaassen v. Allegro Dev. Corp.*,
   No. 583, 2014 WL 996375 (Del. Mar 14, 2014) ........................................ 146

*L.L. Nelson Enters. v. Cnty. of St. Louis, Mo.*,
   673 F.3d 799 (8th Cir. 2012) ............................................................... 11, 104

*LaMirage, Inc. v. United States*,
   44 Fed. Cl. 192 (1999) ............................................................................ 43

*Langenegger v. United States*,
   756 F.2d 1565 (Fed. Cir. 1985) ............................................................ 10, 13

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) ................................................................... 121

*Lehman Brothers Hldgs. Inc. v. Spanish Broad. Sys., Inc.*,
   Civ. Action No. 8321-VCG, 2014 WL 718430 (Del. Ch. Feb. 25, 2014) ............. 146, 147

*Library of Congress v. Shaw*,
   478 U.S. 310 (1986) ............................................................................... 155

*Lingle v. Chevron U.S.A., Inc.*,
   544 U.S. 528 (2005) ............................................................................ 69, 75

*Lion Raisins, Inc. v. United States*,
   416 F.3d 1356 (Fed. Cir. 2005) ............................................................ 10, 56

*Loretto v. Teleprompter Manhattan CA TV Corp.*,
   458 U.S. 419 (1982) ............................................................................ 10, 66

*Lucas v. Fed. Reserve Bank of Richmond*,
   59 F.2d 617 (4th Cir. 1932) ..................................................................... 106

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992) ............................................................................... 73

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................... 92, 120, 144

*M & M Leasing Corp. v. Seattle First Nat'l Bank*,
563 F.2d 1377 (9th Cir. 1977) ...................................................... 85

*\*Maher v. United States*,
314 F.3d 600 (Fed. Cir. 2002) .................................................. 39, 42

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998) ................................................................ 153

*Malone v. United States*,
849 F.2d 1441 (Fed. Cir. 1988) .............................................. 76, 77

*Maritrans Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) ............................................... 73, 75

*Miller v. United States*,
620 F.2d 812 (Ct. Cl. 1980) ................................................. 157, 158

*Nat'l Ass'n of Mfrs. v. Secs. & Exchange Comm'n*,
748 F.3d 359 (D.C. Cir. 2014) ................................................... 84

*Nat'l Bank of Charlotte v. Nat'l Exch. Bank of Baltimore*,
92 U.S. 122 (1875) ................................................................ 88, 94

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
513 U.S. 251 (1995) ..................................... 84, 86, 87, PFOF 99

*Navajo Nation v. United States*,
631 F.3d 1268 (Fed. Cir. 2011) ........................................... 139, 140

*N.Y. City Employees' Ret. Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010) ................................................... 121

*Norberg v. Sec. Storage Co. of Wash.*,
No. 12885, 2000 WL 1375868 (Del. Ch. Sept. 19, 2000) ............ 147

*\*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) ............................................. passim

*North Haven Bd. of Ed. v. Bell*,
456 U.S. 512 (1982) ................................................................... 91

*North Star Steel v. United States*,
477 F.3d 1324 (Fed. Cir. 2007) ............................................ 32, 42

*Northrop Grumman Corp. v. United States,*
    47 Fed. Cl. 20 (2000) ................................................................ 111, 112, 114

*Odyssey Partners, L.P. v. Fleming Cos.,*
    735 A.2d 386 (Del. Ch. 1999) .................................................................... 15

*Oliver v. Boston Univ.,*
    2006 WL 1064169 (Del. Ch. Apr. 14, 2006) ........................................ 67, 139

*Olson v. United States,*
    292 U.S. 246 (1934) .................................................................................... 57

*Orman v. Cullman,*
    794 A.2d 5 (Dec. Ch. 2002) ....................................................................... 33

*Otay Mesa Prop., L.P. v. United States,*
    670 F.3d 1358 (Fed. Cir. 2012) .................................................................... 9

*Otay Mesa Prop.,  L.P. v. United States,*
    93 Fed. Cl. 476 (Fed. Cl. 2010) ................................................................... 8

*Otay Mesa Prop., L.P. v. United States,*
    111 Fed. Cl. 422 (2013) ............................................................................ 158

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) .................................................................................... 74

*Palmyra Pac. Seafoods, L.L.C. v. United States,*
    561 F.3d 1361 (Fed. Cir. 2009) ............................................... 64, 68, 71, 109

*Paradise Creations, Inc. v. UV Sales, Inc.,*
    315 F.3d 1304 (Fed. Cir. 2003) ................................................................ 121

*Pauley v. BethEnergy Mines, Inc.,*
    501 U.S. 680 (1991) .................................................................................. 101

*Penn Central Transportation Co. v. New York City,*
    438 U.S. 104 (1978) ....................................................................... 72, 73, 75

*Petrick v. United States,*
    12 Cl. Ct. 700 (1987) .................................................................................. 26

*Phelps Dodge Corp. v. NLRB,*
    313 U.S. 177 (1941) .................................................................................. 101

*Phillips v. Wash. Legal Found.*,
524 U.S. 156 (1998)..........................................................64, 65, 71, 109

*Platt v. Union Pacific R. Co.*,
99 U.S. 48 (1879)............................................................................81

*Plechner v. Widener College, Inc.*,
569 F.2d 1250 (3d Cir. 1977)..........................................................22

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004)............................................................64

*Raichle v. Fed. Reserve Bank of New York*,
34 F.2d 910 (2d Cir. 1929)....................................................102, 103

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) ..........................................................16, 32

*Red Lion Broadcasting Co. v. F.C.C.*,
395 U.S. 367 (1969)........................................................................90

*Res-Care, Inc. v. United States*,
735 F.3d 1384 (Fed. Cir. 2013)........................................................81

*Reservation Ranch v. United States*,
39 Fed. Cl. 696 (1997) ....................................................................28

*Rogers Truck Line, Inc. v. United States*,
14 Cl. Ct. 108 (1987) ...............................................................65, 127

*Rose Acre Farms, Inc. v. United States*,
373 F.3d 1177 (Fed. Cir. 2004).................................................72, 73

*Rose Acre Farms, Inc. v. United States*,
559 F.3d 1260 (Fed. Cir. 2009)......................................................75

*Rough Diamond Co. v. United States*,
351 F.2d 636 (Ct. Cl. 1965) ..................................................105, 106

*Rumsfeld v. Freedom NY, Inc.*,
329 F.3d 1320 (Fed. Cir. 2003)......................................................32

*Savin Bus. Machs. Corp. v. Rapifax Corp.*,
No. 5331, 1978 WL 2498 (Del. Ch. Feb. 15, 1978) ................67, 74

*Schmidt v. Shah*,
 696 F. Supp. 2d 44 (D.D.C. 2010) ................................................................. 54

*Seaboard Lumber Co. v. United States*,
 903 F.2d 1560 (Fed. Cir. 1990) .................................................................... 28

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
 444 U.S. 572 (1980) ........................................................................................ 91

*Sec. Indus. Ass'n v. Clarke*,
 885 F.2d 1034 (2d Cir. 1989) ....................................................................... 85

*Seiber v. United States*,
 364 F.3d 1356 (Fed. Cir. 2004) ................................................................... 72

*Shann v. Dunk*,
 84 F.3d 73 (2d Cir. 1996) .............................................................................. 43

*Shoshone Tribe of Indians of Wind River Reservation in Wyo. v. United States*,
 299 U.S. 476 (1937) ...................................................................................... 155

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ...................................................................................... 105

*Sinclair v. United States*,
 66 Fed. Cl. 487 (2005) ............................................................................ 21, 45

*Singer v. Xipto, Inc.*,
 852 F. Supp. 2d 416 (S.D.N.Y. 2012) ........................................................ 43

*Speiser v. Randall*,
 357 U.S. 513 (1958) ................................................................................. 96, 97

*Sprague S.S. Co. v. United States*,
 172 F. Supp. 674, 675 (Ct. Cl. 1959) ........................................................ 114

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*,
 906 F. Supp. 2d 202, 217 (S.D.N.Y. 2012) .......................................... passim

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*,
 742 F.3d 37 (2d Cir. 2014) .................................................................... 85, 106

*Starr Int'l Co.  v. United States*,
 106 Fed. Cl. 50 (2012) ........................................................................... passim

*Starr Int'l Co. v. United States,
    109 Fed. Cl. 628 (2013) ......................................................... PFOF 200, PFOF 220

*Starr Int'l Co. v. United States,
    111 Fed. Cl. 459 (2013) ........................................................................ passim

*Starr Int'l Co. v. United States,
    112 Fed. Cl. 601 (2013) ........................................................................ passim

Stone Forest Indus., Inc. v. United States,
    973 F.2d 1548 (Fed. Cir. 1992) ................................................................... 110

Strougo v. Bassini,
    282 F.3d 162 (2d. Cir. 2002) ...................................................................... 121

Stueve Bros. Farms, LLC v. United States,
    737 F.3d 750 (Fed. Cir. 2013) ..................................................................... 142

Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.,
    No. Civ. A. 1668-N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) ................................ 14

Suwannee Steamship Co. v. United States,
    279 F.2d 874 (Ct. Cl. 1960) ................................................................ 106, 107

Swift & Courtney & Beecher Co. v. United States,
    111 U.S. 22 (1884) ......................................................................... 26, 104

*Sys. Tech. Assocs., Inc. v. United States,
    699 F.2d 1383 (Fed. Cir. 1983) .................................................................. passim

Tex. State Bank v. United States,
    423 F.3d 1370 (Fed. Cir. 2005) ........................................................... 10, 56, 109

Textainer Equipment Mgmt. Ltd. v. United States,
    99 Fed. Cl. 211 (2011) .................................................................... 156, 157

Thatcher v. Kohl's Dept. Stores, Inc.,
    397 F.3d 1370 (Fed. Cir. 2005) ................................................................... 131

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) ......................................................................... 80, 101

Tooley v. Donaldson, Lufkin & Jenrette, Inc.,
    845 A.2d 1031 (Del. 2004) ............................................................ 117, 118, 124

*Trauma Serv. Group v. United States,*
104 F.3d 1321 (Fed. Cir. 1997)..................................................................... 39

*U.S. Shoe Corp. v. United States,*
296 F.3d 1378 (Fed. Cir. 2002)..................................................................... 155

*United Int'l Investigative Servs. v. United States,*
109 F.3d 734 (Fed. Cir. 1997)....................................................................... 117

*United States v. Armour & Co.,*
402 U.S. 673 (1971).................................................................................... 129

*United States v. BCCI Holdings (Luxembourg) S.A.,*
69 F. Supp. 2d 36 (D.D.C. 1999)...................................... PFOF 115, PFOF 116

*United States v. Bd. of Comm'rs of Sheffield, Ala.,*
435 U.S. 110 (1978)................................................................................ 90, 92

*United States v. Cors,*
337 U.S. 325 (1949)........................................................... 60, 61, 150, 153

*United States v. Edmonston,*
181 U.S. 500 (1901)............................................................................. 103, 104

*United States v. Henszen,*
206 U.S. 370 (1907)..................................................................................... 92

*United States v. Miller,*
317 U.S. 369 (1943)................................................................... 59, 61, 149

*United States v. Rutherford,*
442 U.S. 544 (1979)..................................................................................... 91

*United States v. Va. Elec. & Power Co.,*
365 U.S. 624 (1961)..................................................................................... 60

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,*
454 U.S. 464 (1982).................................................................................... 138

*VKK Corp. v. NFL,*
244 F.3d 114 (2d Cir. 2001).......................................................................... 54

*Walcek v. United States,*
49 Fed. Cl. 248 (2001), ................................................................................. 73

*Walker v. AIG,*
    No. 4142-CC (Del. Ch.) ............................................................................ passim

*Warner Commc'ns Inc. v. Chris-Craft Ind., Inc.,*
    583 A.2d 962 (Del. Ch. 1989) ...................................................................... 137

*Wells Fargo Bank N.A. v. Boutris,*
    419 F.3d 949 (9th Cir. 2005) ......................................................................... 87

*Whittaker Elec. Sys. v. Dalton,*
    124 F.3d 1443 (Fed. Cir. 1997) .................................................................... 117

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ....................................................................................... 30

*Williams v. Geier,*
    671 A.2d 1368 (Del. 1996) ............................................................................ 16

*Williamson v. Cox Communications, Inc.,*
    No. Civ. A. 1663-N, 2006 WL 1586375 (Del. Ch. 2006) ......................... 15, 36

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,*
    473 U.S. 172 (2003) ....................................................................................... 63

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ......................................................................................... 8

*Zimmerman v. Crothall,*
    No. 6001-VCP, 2012 WL 707238 (Del. Ch. Mar. 5, 2012) .................. 15, 67, 74

*Zinermon v. Burch,*
    494 U.S. 113 (1990) ..................................................................................... 104

## STATUTES

12 U.S.C. § 1841(a)(1) ............................................................................. PFOF 153
12 U.S.C. § 248 ............................................................................................... 87
*12 U.S.C. § 341 ............................................................................... 84, PFOF 103
*12 U.S.C. § 343 (2008) .................................................................. 78, 79, 91, 99
12 U.S.C. § 343 (2010) .................................................................................. 106
12 U.S.C. § 357 ......................................................................................... 81, 101
12 U.S.C. § 5211 .............................................................. PFOF 88, PFOF 105, PFOF 107
12 U.S.C. § 5212 ...................................................................................... PFOF 165
12 U.S.C. § 5323 ...................................................................................... PFOF 161
12 U.S.C. § 5235 ...................................................................................... 90, 97

28 U.S.C. § 2501 ............................................................................................ 120
28 U.S.C. § 2502 ............................................................................................ 154
40 U.S.C. §§ 1114, 1116 ................................................................................. 157
8 Del. C. § 102 ........................................................................................... 67, 75
*8 Del. C. § 141(a) ...................................................................................... 13, 14
8 Del. C. §§ 151-53, 157, 161, 166 ............................................................. 66, 67
8 Del. C. § 160 ................................................................................................... 66
8 Del. C. § 242(b)(2) ................................................................... 128, 130, 150
*U.S. Const. amend. V ................................................................................ 8, 63
McKinney's N.Y. Est. Powers & Trusts Law § 7-1.4 ....................................... 96
McKinney's N.Y. Est. Powers & Trusts Law §§ 1 *et seq* .............................. 96

## RULES

Fed. R. Evid. 701(b) ................................................................................... 43, 77
Fed. R. Evid. 704 ....................................................................................... 43, 77

## REGULATIONS

12 C.F.R. § 201.4(d) ..............................................................79, 103, PFOF 60
12 C.F.R. § 7.1006 ........................................................................................... 88

## MISCELLANEOUS

18A Am. Jur. 2d Corporations § 612 ............................................................... 56
18A Am. Jur. 2d Corporations § 640 ............................................................... 56
1932 Circular, 18 Fed. Reserve Bulletin ......................................................... 81
1936 Circular, 22 Fed. Reserve Bulletin .................................................... 81, 82
Aug. 1932 Circular, 18 Fed. Reserve Bulletin no. 8 ....................................... 82
Am. Heritage Dictionary (4th ed., 2009) ...................................................... 79
Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1821 .......................... 121
Limits the Federal Reserve Act Places on Monetary Policy,
       19 Ann. Rev. Banking L. 553 (2000) .................................................... 82
John Cibinic, Jr., *Formation of Government Contracts* 270 (4th ed. 2011) ............................ 110
O.C.C. Inter. Ltr., 1992 WL 486905 (July 15, 1992) .............................. 88, 89
O.C.C. Inter. Ltr. No. 992, 2004 WL 1563358 (May 10, 2004) ...................... 85

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., on its behalf and on behalf of a class of others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-779C |
| | ) | (Judge Thomas C. Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S POST-TRIAL PROPOSED CONCLUSIONS OF LAW

Pursuant to this Court's November 25, 2014 Order, defendant, the United States, respectfully submits the following Proposed Conclusions of Law (Def. Law Br.).

## INTRODUCTION

After years of discovery, an eight-week trial, 37 trial witnesses, and more than 1,600 trial exhibits, Starr International Company, Inc. (Starr) failed to establish that the Federal Reserve or the United States violated Starr's Fifth Amendment rights by taking or exacting property from AIG's shareholders.

Starr's conspiracy theories and complaints about unequal treatment have been aired and debunked by the simple, immutable truths of this case: facing imminent bankruptcy, and unable to convince the private sector to take on its enormous risks, AIG asked FRBNY for a rescue loan; in response, FRBNY offered AIG an $85 billion loan conditioned on a 79.9 percent stake in the company; AIG's board voluntarily agreed to the loan's conditions because it recognized that the rescue was the best choice for shareholders and for the company, which otherwise faced bankruptcy; the equity term was legal and authorized under the Federal Reserve Act; and the rescue benefited AIG's shareholders. These conclusions mean that Starr can neither satisfy the

threshold requirements for a Fifth Amendment claim, nor establish the conduct necessary to prove a taking or an exaction. Accordingly, Starr cannot recover on its equity claim.

Starr fails to satisfy the threshold requirements for a Fifth Amendment claim for three reasons. First, the Fifth Amendment does not address voluntary agreements between willing parties. For both taking and exaction claims, Starr must prove that, when AIG's board accepted the rescue loan, it acted under Government-caused duress. Starr fell far short of meeting its burden. Instead, AIG's board members testified that they voted for the loan of their own free will because it was in the best interest of AIG's shareholders. AIG's voluntary participation defeats Starr's equity claim.

Second, under either a takings or illegal exaction theory, the Fifth Amendment requires proof of actual, economic harm arising from the Government's conduct. It is undisputed that, without the rescue loan, AIG faced a devastating, wealth-destroying bankruptcy. The company's shareholders benefited from the rescue and saw the company's share price rise after public reports that the Government would rescue AIG. Economic loss is properly measured as the difference between the actual loan and a world in which the Government did not extend a loan at all. Starr did not – could not – show that it would have been better off absent the Government's involvement. Recognizing this fatal hole in its case, Starr presented alternative theories of harm based on hypothetical rescues Starr suggests the Government could and should have offered. Starr never established entitlement to a more generous rescue and never sought to quantify these alternative theories, so they are both legally insufficient and factually incomplete.

Third, to recover under the Fifth Amendment, a claim must be based on a property interest that was initially owned by the plaintiff, and either legally (taking) or illegally (exaction) acquired by the United States. The only cognizable property interest that Starr has is its shares of

AIG common stock. Starr, however, held the same shares before and after the rescue; AIG's issuance of new preferred stock to the Trust did not affect Starr's ownership of its shares, and the Government never took ownership of Starr's property. The absence of a cognizable property interest dooms Starr's constitutional claims.

Even if Starr had satisfied these threshold requirements for a Fifth Amendment claim, it still had to prove the existence of a taking or an exaction. Starr did not prove either.

Starr failed to prove either a regulatory or a physical taking under the Fifth Amendment. Although Starr's contentions that Government conduct reduced the value of Starr's stock (which it owned both before and after the alleged taking) and the power of its voting rights (which were still associated with Starr's stock) appear to assert a regulatory taking rather than a physical taking, Starr abandoned a regulatory taking claim in its pretrial filings and could not satisfy the recognized test for establishing a regulatory taking in any event. Instead, Starr demands the *per se* analysis applied exclusively to physical takings. But takings law does not recognize the concept of a partial, physical appropriation of an intangible right. Starr thus fails to prove a taking as a matter of law.

Starr's claim that the equity term in the loan offered to AIG constituted an illegal exaction fares no better. Congress, recognizing the exceptional nature of rescue loans under section 13(3), expressly provided the Board of Governors with discretion to condition the availability of individual section 13(3) loans on such "restrictions" and "limitations" as the Board deems appropriate. In formulating the rescue loan's terms, the Board of Governors exercised its discretion (a) to moderate the windfall that the rescue was providing to shareholders of a company that had managed itself to the brink of bankruptcy, (b) to compensate American taxpayers for the substantial risks associated with the loan by providing them with a share of any

upside the loan made possible, and (c) to mitigate the concern that other industry participants would be encouraged to make risky business decisions. The equity term also fell within the "incidental powers" conferred by section 4(4) of the Federal Reserve Act, because the term was reasonably necessary to effectuate FRBNY's section 13(3) lending. Indeed, Congress legislatively endorsed the Federal Reserve's determination that it had authority to condition lending on the provision of equity. In the absence of any statutory violation, Starr's illegal exaction claim must fail.

Unable to alter these conclusions, Starr has opted to bury them underneath irrelevant arguments about central banking theory, alternative arrangements made for other borrowers, the Maiden Lane III transaction that took place six weeks after the Credit Agreement was signed, and AIG's (alleged) lack of responsibility for its own dire financial situation. These are distractions, not proof: Starr's arguments are both factually misplaced and legally irrelevant to whether the United States has taken or exacted a protected property interest from Starr that resulted in economic loss.

Similarly, Starr challenges the legality of the Trust created to hold the AIG equity, and contends that the Trust was a sham to side-step limits on FRBNY's authority to hold the equity. First, Starr lacks standing to challenge the Trust because Starr can identify no harm that it suffered as a direct result of the Trust holding the shares. Second, extensive testimony – backed up by the Trust's terms – established that the Federal Reserve designed the Trust to address policy concerns with the United States holding the equity interest; that the Trust was a separate, lawful entity; and that the Trust exercised independence from both FRBNY and the Treasury Department. An independent, decision-making entity, the Trust was not a sham but a responsible minder of the equity held for the benefit of the American taxpayers.

Starr also has failed (1) to establish that its equity claims are direct rather than derivative claims, and (2) to provide a basis for claiming an exaction under section 13(3), a provision that is not money-mandating. Further, Starr has not overcome the waiver and estoppel defenses that resolve its takings and exaction claims – a result of Starr's decision to accept the benefits of multiple, successive AIG rescues over the course of several years, while postponing any complaint until after AIG no longer needed Government support.

Because Starr has failed to prove a taking or exaction relating to the rescue loan, the Court should reject the Credit Agreement Class's claims.

Similarly, Starr's allegations relating to the reverse stock split cannot satisfy the simple logic of cause and effect, let alone establish a legally cognizable claim. Starr argues that the common shareholders were deprived of a class-only vote to prevent any dilution to common stock, but the shareholders were not entitled to any such vote. Starr concedes that Delaware law, under which AIG was chartered, does not provide such an entitlement. As a result, Starr is left to argue that a statement made by a third party (AIG), in another case (*Walker*), in another court (Delaware Chancery Court), has created a multi-billion dollar property right for Starr and the other shareholders. Yet, Starr cannot explain how a Delaware Chancery Court's stipulated dismissal order created property rights beyond the scope of Delaware law. Put simply, there is no *Walker* court-created property right to a class-only vote. Moreover, if the reverse stock split had been voted on separately by the common shareholders, the result would have been the same. A majority of the common shareholders – including Starr itself – voted for the stock split.

Starr's Stock Split Claim also fails to identify any Government action that resulted in a taking or exaction. Responding to the NYSE's threat to delist AIG because of its low share price, the company devised the reverse stock split solution, AIG's board authorized a shareholder

vote upon whether the company's stock should be split, and a majority of AIG's shareholders approved of the split. Starr failed at trial to provide any evidence that FRBNY or the United States had any involvement in the proposal or development of the reverse stock split and, accordingly, Starr's Fifth Amendment claims fail as a matter of law.

Beyond Starr's failure to identify a property right or Government action for the Stock Split Class, Starr also cannot establish harm. On the day of the reverse stock split, AIG's share price reflected none of the injury Starr alleges. In response, and without explanation, Starr's expert reaches 18 months beyond the stock split and measures the harm based on a different transaction: AIG's January 2011 recapitalization. Starr offers neither factual nor legal support for using a 2011 calculation of harm to compensate a 2009 class of shareholders. Indeed, not a single document or witness at trial connected the June 2009 reverse stock split and the January 2011 exchange.

Because Starr cannot prove any element of its Stock Split Claims, the Court should deny that class any award.

<div align="center">***</div>

This brief addresses, in turn, each of Starr's legal theories for its equity claim; first takings, then illegal exaction. Because a proper takings claim requires that the claimant concede the validity of the Government action, Section I assumes the legality of the rescue loan under section 13(3) of the Federal Reserve Act in its explanation of why Starr's takings theory of its equity claim fails. Section II establishes that there was no illegal exaction because the loan was legal and authorized, and because of other independently sufficient reasons to reject Starr's claim. Section III demonstrates why Starr has no standing to maintain a direct claim for either a taking or an illegal exaction for the September 2008 rescue. Section IV explains why the Stock

Split Class's claim fails, both under takings law and illegal exaction law.  Sections V and VI address questions that arise only if the Court determines that either class should receive compensation:  not all class members may be eligible for an award, and prejudgment interest should reflect the time value of money, not hypothetical lost profits.

<div align="center">**EQUITY CLAIM**</div>

**I.      Starr Has Failed To Prove Its Claim That The Equity Term Took Shareholder Property Without Just Compensation**

The Court should reject Starr's assertion of a physical appropriation and, instead, evaluate Starr's takings claim pursuant to a regulatory takings framework.  Because the shareholders still owned the same shares both before and after the alleged taking, the shareholders could not have suffered a physical appropriation of a protected property interest.

In any event, regardless of the framework, Starr's takings claim for the Equity Claim fails for three reasons, each independently sufficient to extinguish Starr's claim.  First, as a matter of law, no taking occurs if the property at issue was voluntarily conveyed.  The evidence demonstrates that AIG's board voluntarily agreed to the equity term as part of the Government rescue, and the Government did not control AIG's decision to accept that offer.  AIG acted voluntarily on both September 16, 2008, when it agreed to the rescue loan, and on September 21, 2008, when it authorized the Credit Agreement implementing the rescue deal.  Moreover, AIG and its shareholders ratified the rescue loan's terms, including the equity term, because they accepted all of the benefits associated with FRBNY's loan.

Second, the rescue economically benefitted AIG's shareholders, substantially increasing the value of their shares.  This fact, by itself, defeats Starr's claim.  To recover for a taking, Starr must prove some legally cognizable economic loss, which Starr did not do.

Third, Starr has not established that the equity term deprived shareholders of any property interest; the preferred shares that AIG issued to the AIG Credit Facility Trust (Trust) for the benefit of taxpayers belonged to the company, not to its shareholders.

For these reasons, Starr cannot establish a taking under any legal framework. If the Court applies the appropriate analysis of regulatory takings, Starr's claim fails for the additional reason that Starr cannot establish any of the requirements unique to regulatory takings. Indeed, Starr has abandoned a regulatory takings claim. The Credit Agreement Class cannot establish: (1) the significant economic impact necessary to establish a regulatory taking, because the shareholders were not harmed at all; (2) interference with distinct investment-backed expectations, because Starr presented no evidence that *any* shareholder invested with the expectation that the Government would rescue AIG if it ever faced severe financial difficulty; or (3) that the character of the Government action suggests that a taking occurred, because Starr has not shown that the shareholders were unfairly forced to bear a burden that should be borne by the public.

## A. Starr's Takings Claim Is A Regulatory Takings Claim, Not A *Per Se* Takings Claim

The Fifth Amendment's Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. Courts generally recognize two types of takings: (1) physical takings caused by the Government's direct appropriation or physical invasion of private property, and (2) regulatory takings resulting from Government regulations that unduly burden private property interests. *Otay Mesa Prop. L.P. v. United States*, 93 Fed. Cl. 476, 484 (Fed. Cl. 2010) (citing *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992), and *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir.

2008)), *vacated and remanded on other grounds by Otay Mesa Prop. v. United States*, 670 F.3d 1358 (Fed. Cir. 2012).[1]

Although Starr claims to have suffered a *per se* physical taking as a result of the Government's "direct appropriation" of its property interests, *see* Pl. Pretrial Corrected Proposed Concl. of Law, Dkt. 274-1, (Pl. Pretrial Concl. of Law), ¶¶ 14, 14, 35, Starr's characterization is untenable. Shareholders still owned the exact same shares after the September 2008 rescue as before the rescue. The Government did *not* receive property belonging to the shareholders. Indeed, Starr does not claim that the Government took its shares. *Starr Int'l Co. Inc. v. United States*, 106 Fed. Cl. 50, 72 (2012) (*Starr*). Rather, Starr claims that the Government's actions diminished the economic value and voting power of the plaintiffs' shares by 79.9 percent. *See, e.g.*, Pl. Corrected Opp. to Mot. Summ. J. at 12 ("what is at issue here is Plaintiffs' direct claim for Defendant's taking of 79.9% of their equity and voting rights"); Pl. Pretrial Concl. of Law ¶ 14.

Because the shareholders did not lose all their property rights in their shares, Starr cannot establish a direct appropriation that could constitute a *per se* taking as a matter of law. "A *per se* taking involves a displacement, by Government action, of the incidents of property ownership *so complete* in its character as to leave an owner *without any possessory interests* in the property."

---

[1] In addition, a takings claim requires that the taking occurred as a result of an *authorized* exercise of sovereign Government power. *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1330-31 (Fed. Cir. 2006) (claimant must concede the validity of the government action for a takings claim). If the Government action complained of is unauthorized, "plaintiff's takings claim would fail on that basis." *See Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003). Conversely, a successful illegal exaction claim requires a determination that the United States' action was unlawful. Takings claims and illegal exaction claims, therefore, are mutually exclusive.

*Abrahim-Youri v. United States*, 36 Fed. Cl. 482, 487 n.10 (1996) (rejecting the argument that plaintiff was alleging a *per se* taking) (citations omitted) (emphases added).[2]

Starr cannot avoid the requirements of a regulatory takings claim by simply stating its property was physically appropriated when it clearly was not. The Court should, therefore, apply the regulatory takings framework to Starr's takings claims.

**B.     No Taking Occurred Because AIG Voluntarily And Independently Agreed To The Equity Term**

Whether analyzed as a regulatory or a *per se* claim, Starr's takings claim fails because AIG voluntarily agreed to the equity term as part of the rescue loan. Starr's claims turn upon whether AIG's actions can fairly be imputed to the Government – that is, if AIG's acceptance of the rescue loan effected a taking or exaction of shareholders' property because AIG was acting under the Government's compulsion or coercive influence. *See Tex. State Bank v. United States*, 423 F.3d 1370, 1376–77 (Fed. Cir. 2005); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362–63 (Fed. Cir. 2005); *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1361–62 (Fed. Cir. 2002); *B&G Enters. v. United States*, 220 F.3d 1318, 1323–25 (Fed. Cir. 2000); *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985).

---

[2] To the extent Starr argues that it suffered a direct appropriation of 79.9 percent of its "voting and equity interests," such an allegation is without basis. *See* Pl. Pretrial Concl. of Law ¶ 14. If a plaintiff could establish a *per se* taking by arguing that it lost 100 percent of 80 percent of the value of its property, *all* alleged takings could be characterized as *per se* takings, rather than regulatory takings. Although courts recognize that, in the real property context, a *per se* taking can occur when a property owner suffers a permanent physical invasion of only part of its real property, *see, e.g.*, *Loretto v. Teleprompter Manhattan CA TV Corp.*, 458 U.S. 419, 436-37 (1982), a *per se* taking of part of an intangible right (such as voting rights) is nonsensical. Indeed, every regulatory taking can be framed as a partial taking of an intangible right. The exception Starr seeks would overcome the rule.

No taking exists when an owner conveys its property voluntarily by agreement. *See Starr*, 106 Fed. Cl. at 78; *see also*, *e.g.*, *Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005) (holding that a voluntary transfer of property is "not a proper basis on which to premise a takings claim"); *L.L. Nelson Enters. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) ("When a person voluntarily surrenders liberty or property, the State has not deprived the person of a constitutionally-protected interest[]" under the Takings Clause or the Due Process Clause.) (citation and emphasis omitted). Thus, as this Court previously held, "to determine whether Starr has stated a cognizable takings claim, the relevant question is whether AIG voluntarily agreed to the terms proposed on September 16, 2008." *Starr*, 106 Fed. Cl. at 78.

AIG's board acted voluntarily and independently when it promised to convey an equity participation in the company equivalent to 79.9 percent of AIG's common stock as consideration for FRBNY's $85 billion rescue loan. Confronted with the indisputable fact that AIG's board voted to accept the rescue offer on September 16, 2008, Starr argues that the Government coerced AIG into accepting the rescue offer, and that the Government controlled AIG when it accepted the rescue offer. *See* Pl. Opening Statement, Tr. 29, Line 17-Tr. 30, Line 4; Tr. 31, Line 16-Tr. 32, Line 14; Starr's Pretrial Concl. of Law at 37. In two months of trial, Starr failed to meet its burden of producing evidence to satisfy the high standards for establishing coercion or control.

The Court has already correctly identified the duress standard as the means for analyzing AIG's voluntariness. Starr seeks to avoid the fatal defects in its duress argument by urging that the issue is not whether AIG was subject to duress but whether the Government had market power that allowed it to insist on certain terms of the rescue package, a standard that Starr has characterized as "effective economic control." The Court should reject Starr's proposed

standard, which has no basis in law, because it would produce perverse outcomes. Indeed, Starr's expert who sponsored that standard conceded that it is irrelevant to voluntariness.

AIG's board voluntarily and independently accepted FRBNY's rescue offer on September 16, 2008. AIG's board also voluntarily and independently accepted the Credit Agreement on September 21, 2008. Although AIG's voluntariness on September 16 should end the Court's inquiry because AIG and FRBNY agreed on that date that AIG would provide 79.9 percent of AIG's equity in exchange for an $85 billion loan, AIG's board voluntarily agreed – again – to the equity term on September 21, 2008. Even apart from AIG's two voluntary undertakings, Starr's claim is foreclosed because AIG and its shareholders did not claim duress immediately and instead accepted the benefits of the rescue loan for years.

### 1. Legal Standards

#### a. Duress Is The Proper Standard For Evaluating Whether AIG Voluntarily Accepted The Rescue Deal

Proving that a contract was not entered voluntarily requires satisfying the well-established standard for duress. *See Starr*, 106 Fed. Cl. at 77. To prove duress, "a plaintiff must show that: (1) it 'involuntarily accepted' the other party's terms; (2) 'circumstances permitted no other alternative'; and (3) 'said circumstances were the result of coercive acts of' the other party." *Id.* (quoting *Fruhauf Sw. Garment Co. v. United States*, 111 F. Supp. 945, 951 (Ct. Cl. 1953)) (footnote omitted). Establishing duress requires that the plaintiff prove each of these elements. *See Bergman v. United States*, 28 Fed. Cl. 580, 585-86 (1993).

As this Court has explained, "'the bar for establishing duress is a high one.'" *Starr*, 106 Fed. Cl. at 77 (quoting *Fruhauf*, 111 F. Supp. at 951). Indeed, the Federal Circuit recently reaffirmed the high bar necessary to prevail on a duress claim. In *A & D Auto Sales*, the Federal Circuit addressed whether takings claims could survive a motion to dismiss when the plaintiffs

alleged that, as a condition of financial assistance, the Government coerced third party automakers into taking the plaintiffs' property. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154-58 (Fed. Cir. 2014). The Court declined to resolve the coercion claim at the pleading stage, but listed a non-exclusive set of circumstances that could bear on whether "the government's influence over the third party was coercive rather than merely persuasive." *Id.* at 1154. That inquiry – which is consistent with the standard for contractual coercion or duress, *Starr*, 106 Fed. Cl. at 77 – considers whether Government conduct was "designed to compel specific actions" involuntarily by a third party. *A & D Auto Sales*, 748 F.3d at 1155.

When a party has a choice to accept or reject a Government proposal – even if that choice is difficult – there can be no "coercion." There is no coercion where the Government persuades, rather than compels, a party to act, "however difficult refusal may be as a practical matter" for the party. *See id.* (quoting *Langenegger*, 756 F.2d at 1572). Starr has failed to prove that the AIG board was coerced into agreeing to the rescue offer.

### b. Starr's Argument That Effective Economic Control, Rather Than Duress, Disproves Voluntariness Has No Basis In Law Or Logic

Starr attempts to evade the duress standard by arguing that, because no private lender was willing to offer financial assistance to AIG, the Government controlled the company through "effective economic control." *See* Pl. Pretrial Concl. of Law ¶¶ 122-131. This proposition lacks support from either law or common sense.

### i. Under Delaware Law, Demonstrating Control Over A Corporate Board's Decision Requires Proof Of The Exercise Of Actual Control

Because AIG is a Delaware corporation, Delaware law dictates how to evaluate whether an outsider controlled a corporate decision. Under Delaware law, a corporation's "business and affairs" are "managed by or under the direction of [its] board of directors." Del. Code tit. 8,

§ 141(a).  "[Q]uestions of control," therefore, "should be assessed at the board level in terms of whether the board's capacity to exercise its judgment independently has been impaired." *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. Civ. A. 1668-N, 2006 WL 2521426, at *4 n.38 (Del. Ch. Aug. 25, 2006).

Here, AIG's board voted to accept FRBNY's loan offer.  Therefore, the Court should assess whether the Government controlled AIG's board members when they decided to accept the rescue loan.  *See Starr Int'l Co. v. FRBNY*, 906 F. Supp. 2d 202, 217 (S.D.N.Y. 2012) (*Starr v. FRBNY*) (in conducting an analysis of any FRBNY or Government control over AIG under Delaware law, "it is centrally important that [the decisions at issue] were made by AIG's Board").  The undisputed evidence demonstrates that neither FRBNY nor the Government controlled AIG's board.  *See* Def. Post-trial Proposed Findings of Fact (Feb. 19, 2015) (PFOF) §§ II.A.3, II.B.3.

To prove that the Government controlled a particular AIG action, Starr "must show 'domination [by the Government] through *actual* exercise of direction over corporate conduct.'" *Starr v. FRBNY*, 906 F. Supp. 2d at 216 (quoting *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) and citing other Delaware cases) (emphasis added); *see Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 65 (Del. 1989) (no control where the alleged controlling party "did not in fact control or dominate the board so as to interfere with the independent exercise of its business judgment").  Indeed, courts require evidence of the *actual exercise* of control, even when there is a controlling shareholder.  *See, e.g.*, *In re Paxson Commc'n Corp. S'holders Litig.*, No. Civ. A. 17568, 2001 WL 812028, at *9 & n.52 (Del. Ch. July 12, 2001) (dismissing control claim where a controlling shareholder existed but the plaintiff failed to charge particularized allegations that would support an inference of domination or

control). "'The *potential* ability to exercise control' does not suffice, as it 'is not equivalent to the actual exercise of that ability.'" *Starr v. FRBNY*, 906 F. Supp. 2d at 221 (quoting *In Re Sea-Land Corp. S'holders Litig. (In Re Sea-Land Corp.)*, Civ. A. No. 8453, 1987 WL 11283, at *54 (Del.Ch. May 22, 1987)) (emphasis in original); *see also*, *e.g.*, *In re Bear Stearns Litig.*, 870 N.Y.S.2d 709, 740 (Sup. Ct. N.Y. County 2008) ("Merely showing that a shareholder had the potential to exercise domination and control is insufficient.") (internal citations omitted).

Thus, Starr bears the burden of proving that the Government "d[id], in fact, exercise actual control over the board of directors during the course of" the September 16, 2008 AIG board meeting. *Starr v. FRBNY*, 906 F. Supp. 2d at 221 (quotation omitted); *see also*, *e.g.*, *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 407 (Del. Ch. 1999) (equating control of the company with actual control of decisions by directors). Starr has not, and cannot, prove such control.

When the allegedly controlling actor does not hold a majority of the company's stock (which is undisputedly the case here), the test for actual control "'is not an easy one to satisfy.'" *Starr v. FRBNY*, 906 F. Supp. 2d at 221 (quoting *Zimmerman v. Crothall*, C.A. No. 6001-VCP, 2012 WL 707238, at *11 (Del. Ch. Mar. 5, 2012)). Delaware courts have found that a person exerts actual control over a corporate decision only where (1) the directors making the decision were not independent of that person, and (2) the decision benefitted that person rather than the other shareholders to whom the directors owned fiduciary duties. *See, e.g.*, *Williamson v. Cox Commc'ns, Inc.*, No. Civ. A. 1663-N, 2006 WL 1586375, at *4-5 (Del. Ch. 2006) (finding control properly alleged where all the directors approving the challenged decision were the controlling party's designees and the transaction was self-dealing rather than benefitting shareholders); *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1114 (Del. 1994) (control

adequately pleaded by allegations that directors were not independent of minority shareholders and the directors agreed to a transaction to benefit those minority shareholders rather than the interests of the other shareholders); *cf. Starr v. FRBNY*, 906 F. Supp. 2d at 218 (no control where complaint failed to allege that directors were not independent or that they were motivated by anything other than exercising their fiduciary obligations for the benefit of the company and its shareholders). Delaware law defines independence to mean "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *accord*, *e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

Under the "business judgment rule," Delaware law presumes that a corporate board "acted independently, with due care, in good faith and in the honest belief that its actions were in the stockholders' best interests." *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996); *see also*, *e.g.*, *Starr Int'l Co., Inc. v. United States*, 111 Fed. Cl. 459, 470 (2013) (*Starr II*) ("[T]he business judgment rule . . . is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006). Under the rule, "directors are entitled to a *presumption* that they were faithful to their fiduciary duties." *Beam*, 845 A.2d at 1048-49 (emphasis added).

To rebut the business judgment presumption, a plaintiff must prove "that a majority of the board lacks independence or is otherwise incapable of validly exercising its business judgment." *Blaustein v. Lord Balt. Capital Corp.*, 84 A.3d 954, 958 (Del. 2014). Thus, to find

actual control of a board's decision, there must be "concrete . . . evidence – that a majority of directors was under the [alleged controlling person's] sway." *Starr v. FRBNY*, 906 F. Supp. 2d at 224 (citing *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104 (Del. Ch. 2007) and other cases).

Typically, courts have found that a party exercised actual control over a board's decision only when the party owns a significant proportion of the company's shares and exerts influence over directors that are beholden to it. *See*, *e.g.*, *Kahn*, 638 A.2d at 1114-15 (control of a company by 43 percent equity holder whose managers were members of company board, and where evidence of board's operations, including testimony by remaining directors themselves, confirmed that remaining directors deferred to 43 percent equity holder-affiliated directors for reasons other than an exercise of business judgment); *In re Loral Space & Commc'ns Inc.*, C.A. Nos. 2808-VCS, 33022-VCS, 2008 WL 4293781, at *4, *20 (Del. Ch. Sept. 19, 2008) (control by a less-than-majority bondholder where evidence demonstrated that five of the company's eight board members were either "directly controlled" by or "affiliated" with the bondholder).

### ii. Starr's Proposed Standard Of Effective Economic Control Has No Basis In Law And Would Result In Perverse Outcomes

Starr's argument reduces to the proposition that the Government had considerable bargaining leverage because AIG was in desperate straits and no private corporation was willing to sink its resources into AIG even if the investor could obtain an equity stake by doing so. The argument ignores the choice AIG presented to the Government: put taxpayers' money at risk in a rescue package, or accept the economic impact of AIG's imminent failure.

Moreover, it is irrelevant whether the Government was, from Starr's viewpoint, in a superior bargaining position. There is no evidence that suggests AIG's board members lacked independence when they accepted FRBNY's offer. Indeed, all of the fact testimony supports the

opposite conclusion. Instead, Starr provided testimony from Professor Luigi Zingales, presumably to argue that the business judgment rule was vitiated under Professor Zingales's standard of "effective economic control." That theory, however, provides no insight for assessing voluntariness and corporate control. Indeed, applying the "effective economic control" standard to overcome the presumption of corporate independence would produce perverse outcomes.

Instead of focusing on the proper considerations relevant to an assessment of control under Delaware law, the theory of "effective economic control" merely recognizes that a lender of last resort "control[s] some crucial resources," which gives the lender leverage to "extract some surplus" from the corporation. *See* Zingales, Tr. 3805, Lines 9-11; Tr. 3802, Lines 6-13; *see also* Daines, Tr. 8458, Lines 14-20 (testifying that Professor Zingales's theory of "effective economic control" uses the term "control" merely "as a way to describe why the government had some bargaining leverage," in other words, "why it might have been able to ask a lot of AIG as a result"). Professor Zingales's concept of "control[ling] some crucial resources" and "extract[ing] some surplus" has no relevance to whether a party controls a corporation under Delaware law.

The Government was a "lender of last resort" only in the sense that no private corporation would give AIG an alternative to bankruptcy. But the Government had no legal obligation to provide AIG with an alternative, and any assistance to the beleaguered company placed Federal funds at risk.

Starr's theory of effective economic control finds no support in takings law or in Delaware law. Indeed, Professor Zingales's theory produces ridiculous conclusions. For example, the Government may be a monopoly seller of wireless spectrum, but it does not follow that the Government controls the decision of wireless phone companies to bid on that spectrum –

much less that the Government is potentially liable to those companies (or their shareholders) for "taking" the money they pay for the spectrum. Similarly, the Government may be a monopoly buyer of aircraft carriers, but it does not follow that the Government controls the decisions of suppliers to contract to build carriers for the Navy, much less that the Government is potentially liable to those contractors (or their shareholders) for "taking" the carriers pursuant to those contracts. Indeed, under Starr's theory, had JP Morgan been able to attract private sector interest in a syndicated loan to AIG, and had AIG accepted such a loan, JP Morgan's position as a private lender of last resort would have resulted in a lack of independence on the part of AIG's board.

Simply put, Professor Zingales's theory ignores the very actors that courts must analyze to assess control under Delaware law: the board of directors. Professor Zingales's conclusion that the Government had "effective economic control" over AIG on September 16, 2008, and September 22, 2008, treats director independence – the crucial legal inquiry – as irrelevant:

> [Q:] Your analysis of economic control has no relationship to whether these board members were actually independent of the New York Fed. Is that right?
>
> A: My analysis does not touch this point because it considers it irrelevant as far as this point is concerned.

Zingales, Tr. 3894, Line 20-Tr. 3895, Line 1; *see also* PFOF ¶ 114 n.13. This admission renders the "effective economic control" analysis legally irrelevant because it cannot aid the Court's inquiry regarding whether AIG's board was *in fact* controlled or coerced.

To the extent that Professor Zingales's theory considers whether directors acted in the best interests of the corporation and its shareholders, the theory reaches a conclusion directly contrary to Delaware corporate law and common sense. Unlike Delaware law, which protects board decisions that advance the interests of the corporation and its shareholders, Professor

Zingales's theory illogically makes it easier to attack a board decision the more the decision benefits the corporation and its shareholders.

In particular, Professor Zingales posits that a contractual counterparty "controls" a corporation when the counterparty presents a deal that would make the corporation better off. *See* Daines, Tr. 8459, Lines 10-12. Under that theory, the greater the benefit that a counterparty offers to a corporation and its shareholders, the more likely the board's acceptance of the offer would be called into question as coerced by the counterparty's "controlling" influence. Thus, "the more [the board] did what was right for the shareholders, the more they'd be controlled." Daines, Tr. 8460, Lines 1-2. That result would be "criticiz[ing] or set[ting] aside the board's decisions if they were doing what they were supposed to be doing." Daines, Tr. 8460, Lines 6-8.

The absurd results stemming from application of Professor Zingales's theory are apparent in this case. The better the Government's offer was to the alternative of bankruptcy, pursuant to Professor Zingales's theory, the more likely that the Government would be deemed to have had "effective economic control" over AIG, even though it would "make shareholders better off, to have a really good alternative to bankruptcy." Daines, Tr. 8459, Lines 10-16. In other words, "the better off the shareholders are, the more . . . [the Government is] deemed to be in control." Daines, Tr. 8459, Lines 20-23.

Because Professor Zingales's theory of "effective economic control" improperly ignores director independence and upends the best interests of the corporation and its shareholders, the theory fails to rebut the "business judgment" presumption under Delaware law.

## 2. The AIG Board Voluntarily And Independently Accepted The Rescue Offer On September 16, 2008

As the Court has acknowledged, September 16, 2008, is the date on which the Court must assess AIG's voluntary acceptance of the equity term. *Starr*, 106 Fed. Cl. at 78 ("In light of

Starr's allegation that the Government acquired control of AIG on September 16, 2008, . . . the Court views that date as the relevant one for determining whether AIG voluntarily agreed to the terms of the loan transaction.").

The Court should conclude that AIG voluntarily accepted FRBNY's offer on September 16, 2008, including the condition that AIG convey equity equivalent to 79.9 percent of AIG's common stock as partial consideration for the loan.

### a. The AIG Board Was Not Coerced Into Accepting The September 16, 2008 Rescue Offer

The evidence – including both the AIG board minutes and the testimony of AIG directors, management, and the board's outside advisors – proves that (1) AIG's directors exercised free will in accepting the rescue offer on September 16; (2) the directors had an alternative to the rescue offer; and (3) neither the Government nor FRBNY acted, or failed to act, in a bad faith effort to coerce AIG into accepting the rescue deal. Establishing coercion or duress would require the proving exact opposite, that: (1) AIG's board involuntarily accepted the deal; (2) circumstances permitted no alternative; *and* (3) the Government or FRBNY caused those circumstances in bad faith to coerce AIG. *Starr*, 106 Fed. Cl. at 77 (quoting *Fruhauf*, 111 F. Supp. 951). Starr has failed to establish any of the elements of duress, much less all three.

### i. AIG's Directors Exercised Their Free Will In Accepting FRBNY's Rescue Offer, Including The Equity Term

Starr failed to prove the first element of duress – namely, that AIG's acceptance of FRBNY's rescue loan was involuntary.

The standard for duress "looks . . . closely at the defeat of the will of the party coerced." *Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed. Cir. 1983). The courts' assessment of a coercion claim properly focuses on testimony from the individuals who allegedly acted under duress. *See Sinclair v. United States*, 66 Fed. Cl. 487, 493 (2005) (plaintiff's

resignation was not involuntary, as a matter of law, where his resignation letter "admits that he was not subject to coercion" and where plaintiff "does not claim that he submitted his resignation against his wishes"); *Plechner v. Widener Coll., Inc.*, 569 F.2d 1250, 1260 (3d Cir. 1977) (law school trustees did not act under duress where "trustee witnesses denied that they were coerced").  This Court has also rejected claims of duress when a plaintiff consulted with its attorneys before agreeing to the terms and was advised by its attorneys to agree.  *See Henderson Cty. Drainage Dist. No. 3 v. United States*, 53 Fed. Cl. 48, 56-57 (2002).

Typically, the allegedly coerced party argues that its consent was obtained through duress.  Here, by contrast, none of the allegedly coerced persons (the directors) have claimed that their free will was overcome; instead they affirmatively testified that their wills were *not* overcome.  Former AIG director Morris Offit testified that he was "absolutely not" coerced, "absolutely not" directed, and "absolutely not" instructed by FRBNY or the Government to vote in favor of FRBNY's rescue terms on September 16, 2008.  PFOF 78.  Mr. Offit testified that he made an informed decision to voluntarily accept FRBNY's rescue terms, and that AIG's board had the option of bankruptcy rather than FRBNY's rescue facility to the "complete extent."  PFOF ¶¶ 72, 78.  AIG's former CEO and Chairman Robert Willumstad similarly testified that the AIG board, including himself, voluntarily accepted the FRBNY rescue terms on September 16, 2008.  PFOF ¶¶ 67, 77.

Indeed, not a single board member testified that their free will was overcome.  That alone defeats Starr's claim of coercion.  *See Sys. Tech*, 699 F.2d at 1387.

Moreover, even if the firsthand testimony of Messrs. Offit and Willumstad were not enough to disprove coercion – and it is – additional evidence affirms that the AIG board acted voluntarily on September 16, 2008.  In September 2008, the AIG board was composed of

sophisticated directors who had been duly elected by AIG's shareholders or duly appointed, and who owed nothing to the Government or FRBNY.  *See* PFOF ¶¶ 68-69.

AIG's directors, each an accomplished leader in business, the Government, or academia, accepted FRBNY's rescue offer after (1) engaging in a lengthy and thorough discussion about the offered terms – including the equity term – with their independent, expert advisors, and senior management of the firm; and (2) determining that accepting the rescue facility was in the best interests of AIG and its shareholders, because the alternative of bankruptcy would have left the shareholders with little, if any, value.  On September 16, before voting to accept FRBNY's rescue loan, AIG's board was fully apprised of the terms, and understood that accepting FRBNY's rescue meant that AIG would provide the Government with equity equivalent to 79.9 percent of the company's common stock.  *See* PFOF ¶¶ 71, 84 (the Board engaged in a lengthy discussion about the terms of the loan, including the equity term); PFOF ¶ 70 (at the September 16, 2008 AIG board meeting, the AIG board was advised by expert advisors who were leaders in their fields);  PFOF ¶ 72 (the Board engaged in a lengthy discussion of the pros and cons of the FRBNY rescue offer and the alternative of bankruptcy); PFOF ¶ 73 (Resolution approved by AIG's board authorized the company to enter into the rescue deal on terms "including equity participation equivalent to 79.9 percent of the common stock of [AIG] on a fully-diluted basis").[3]

In deciding whether to accept FRBNY's rescue offer, AIG's directors considered their duties to the company, its shareholders, and its creditors.  PFOF ¶¶ 67, 72.  They also assessed

---

[3] No later than September 15, 2008, the AIG board was aware that AIG likely would have to grant equity to any rescuer.  On that date, Mr. Willumstad updated his fellow directors on efforts by JP Morgan and Goldman Sachs to arrange a syndicated loan to AIG, including by informing them that, "the expectation is that the banks [would] ultimately be paid in some form of equity."  PFOF ¶ 46.  Transfer of equity is also a common condition of distressed lending.  *See* Mordecai, Tr. 7550, Lines 5-21.

the value of AIG assets and AIG's liquidity needs.  PFOF ¶ 72.  AIG's board understood that the company faced imminent insolvency, PFOF ¶ 50, and carefully considered the alternative choice of bankruptcy in a lengthy discussion with the board's legal and financial advisors.  PFOF ¶ 72. Expert advisors told AIG's board that bankruptcy would devastate the company and that FRBNY's rescue offer was the better option.  *Id.*  In particular, the AIG board knew and considered that AIG's shareholders likely would be "wiped out" in a bankruptcy.  *Id.*

Ultimately, AIG's board accepted FRBNY's rescue offer because it believed that doing so was in the best interests of AIG and its shareholders.  PFOF ¶¶ 67, 73.  Notably, each AIG director expressed his or her individual view at the September 16, 2008 board meeting before the vote, with all but one director expressing that "the Government Facility was the better alternative to bankruptcy for the Corporation."  PFOF ¶¶ 72-73 (quoting September 16, 2008 AIG board meeting minutes).

As Mr. Offit explained, the benefits of shareholders retaining twenty percent of the company's equity included an opportunity to create some value and that AIG would remain a going concern, which improved the position of the company's shareholders.  PFOF ¶¶ 72, 367. AIG's board ultimately voted to approve the FRBNY rescue to save the company – accepting FRBNY's terms was AIG's "passport . . . to living again."  PFOF ¶ 367.  This choice was, unquestionably, the AIG board's decision to make; when the directors "decided to bite" and accepted the FRBNY rescue offer, there was no coercion.  *See B&G Enters.*, 220 F.3d at 1325.

Because Starr cannot show that the AIG board involuntarily accepted the rescue loan, Starr fails to establish a necessary element of duress and its taking claim fails.  *Starr*, 106 Fed. Cl. at 77-78.

### ii. The AIG Board Had An Alternative To FRBNY's Rescue Offer

Starr also failed at trial to prove the second element of duress – namely, that "circumstances permitted no other alternative" to AIG's acceptance of FRBNY's rescue terms. *Starr*, 106 Fed. Cl. at 77. There is no dispute that AIG's board had a choice between accepting the FRBNY rescue offer and filing for bankruptcy. *See* PFOF ¶ 72; Pl. Pretrial Proposed Findings of Fact §11.0 (on September 16, 2008, AIG was given a choice between FRBNY's offer and bankruptcy).

Courts have held — including in the context of AIG's acceptance of FRBNY's rescue offer — that the availability of bankruptcy as an alternative negates duress as a matter of law. *See Garelick v. Sullivan*, 987 F.2d 913, 917 (2d Cir. 1993) ("[E]conomic hardship is not equivalent to legal compulsion for purposes of takings analysis."); *Freedlander, Inc., Mortg. People v. NCNB Nat'l Bank of N.C.*, 706 F. Supp. 1211, 1220 (E.D. Va. 1988) ("[F]iling a petition in bankruptcy has been held to be a legal option defeating a claim of economic duress."), *aff'd*, 921 F.2d 272 (4th Cir. 1990) (table); *FDIC v. Linn*, 671 F. Supp. 547, 560 (N.D. Ill. 1987) (holding that "[t]hreatened bankruptcy is insufficient to create economic duress"). Indeed, as the district court observed in *Starr v. FRBNY*:

> [C]ontrary to Starr's rhetoric, . . . AIG's predicament does not describe a situation in which AIG was devoid of choice: According to Starr's own pleadings, on September 16, 2008, AIG's Board had, and was actively considering, the alternative choice of bankruptcy. . . . FRBNY's term sheet presented an alternative course for the Board to consider, and the Board chose that course.

906 F. Supp. 2d at 219 n.13 (citations omitted). The court emphasized that "[e]ven a choice between a rock and a hard place is still a choice." *Id.*

Starr's charge that the choice of bankruptcy is "no choice" is legally and factually unsupportable. *See* Pl. Pretrial Concl. of Law ¶ 142. Starr does not – and cannot – dispute that

bankruptcy was an alternative to accepting FRBNY's rescue offer. Indeed, AIG's board and its advisors considered the consequences of bankruptcy, deliberated about their choices, and ultimately accepted the rescue offer. PFOF ¶¶ 71-73.

Starr bases its argument that bankruptcy was not a choice on a mischaracterization of a sentence from *Swift & Courtney & Beecher Co. v. United States*, 111 U.S. 22 (1884), in which the Court explained that a company forced to comply with an Internal Revenue Bureau regulatory regime had no choice because "[t]he only alternative was to submit to an illegal exaction or discontinue its business." *Id.* at 29. Starr lifts this maxim and posits that it applies in all circumstances. *See* Pl. Pretrial Concl. of Law ¶ 142. It does not. Rather, the Court ruled that the presumption of voluntariness disappeared only because, through regulatory or sovereign power, the Government would have affirmatively prevented the company from doing business if it did not submit to the Government's regime.

In contrast to the cases on which Starr has relied, *see* Pl. Pretrial Concl. of Law ¶¶ 137-139, here, there was no threat of the Government acting against AIG at all, much less improperly, if AIG refused to accept FRBNY's offer. PFOF ¶¶ 83, 392. An entity voluntarily chooses between alternatives when facing bankruptcy, and, by offering a rescue, the Government threatens nothing, but merely offers financial assistance to the struggling company. Indeed, it is beyond dispute that the Government could not force AIG into bankruptcy. In this case, therefore, the bankruptcy option negated a claim of duress. The Court should reject as legally unsustainable Starr's argument that any insolvent company that accepts a loan does so "involuntarily" simply because its alternative is bankruptcy.

Further, "[t]he fact that an individual is faced with inherently unpleasant alternatives does not make his or her choice involuntary." *Petrick v. United States*, 12 Cl. Ct. 700, 702 (1987); *see*

*Starr v. FRBNY*, 906 F. Supp. 2d at 219 n.13 ("Even a choice between a rock and a hard place is still a choice"). Having "no choice" is not the same as having no *desired* choice; the latter is precisely the predicament Starr argues that AIG faced on September 16, 2008. The fact that bankruptcy would have left AIG and its shareholders worse off than the terms of the FRBNY rescue in no way means that filing for bankruptcy was not an available alternative.

### iii. Neither The Government Nor FRBNY Induced AIG's Acceptance Of FRBNY's Rescue Terms By Wrongful Conduct

Starr failed to prove the third element of duress: "that [AIG's] assent 'was induced by an improper threat'" from FRBNY or the Government, such as threats "that 'would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat.'" *Starr*, 106 Fed. Cl. at 77-78 (quoting *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981)).

Duress requires an improper threat because "a plaintiff 'must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors.'" *Id.* at 77 (quoting *Fruhauf*, 111 F. Supp. at 951). In other words, "[t]he assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities." *Id.*; *see Fruhauf*, 111 F. Supp. at 951 (it is "settled law that the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances"). Moreover, the conduct that allegedly induced the coerced act must have been wrongful. *Starr*, 106 Fed. Cl. at 77 ("[A]bsent wrongful conduct, economic pressure and the threat of considerable financial loss do not constitute duress.") (quotation omitted). By contrast, offering a monetary benefit — even

if it is enticing to the accepting party — is not, in and of itself, coercive.  *See B&G Enters.*, 220 F.3d at 1325.

There is no evidence that the United States issued any threat to AIG or its directors, let alone an improper threat.  Instead, the evidence establishes that AIG accepted an "enticing" offer.  The parties agree that AIG approached FRBNY and asked for financial assistance.  *See* Pl. Pretrial Proposed Findings of Fact § 7.3.1(e)-(f).  When, in response, FRBNY offered a rescue on particular terms, even ones that were not negotiable, AIG's board was free either to accept or reject the loan in favor of bankruptcy.  A "take it or leave it" offer is not a threat; it is merely a non-negotiable offer that the recipient is free to reject.[4]

AIG had a choice to accept FRBNY's offer or to file for bankruptcy.  That does not and cannot amount to coercion, even though Starr may have preferred to have had other alternatives.  In *Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006), "[t]he Government encouraged Adelphia to enter into settlements by offering substantial benefits — including the elimination of the threat of criminal prosecution and of any [claim by the Securities and Exchange Commission (SEC)] for disgorgement and civil penalties — in exchange for Adelphia's agreement to the settlements."  The court noted that, "[w]hile the alternatives presented all were unpleasant, that does not render the situation coercive in any legally relevant sense."  *Id.*

---

[4] Indeed, it is unremarkable for the Government to contract on a "take it or leave it" basis, and the contract's non-negotiability does not affect the enforceability of its terms.  *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 712 n.14 (1997) ("[t]he bare fact that the contracts in question are 'take it or leave it' offers by the government is not controlling upon the . . . provision's validity") (alteration in original) (quoting *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1564 (Fed. Cir. 1990).

There is no evidence to support Starr's allegation that FRBNY and the Government took any action that was either threatening or inherently wrongful, or took or refrained from taking any action to undermine AIG's bargaining position. Starr claims that FRBNY and the Government acted wrongfully and in bad faith by: (1) "exploit[ing] AIG's need for discretionary benefit" when the company was in crisis, to wrongfully obtain the 79.9 percent equity stake in AIG; (2) discouraging other private sector sources of funding in September 2008; (3) presenting AIG with a non-negotiable offer; and (4) leaving AIG with an "unreasonably short period" to consider the FRBNY loan terms. *See* Starr Opening Statement, Tr. 32, Lines 1-22. These allegations are unfounded and do not constitute wrongful conduct constituting duress.

First, the Court should reject Starr's argument that the Government engaged in coercive conduct by allegedly "exploit[ing] AIG's need for discretionary benefit." As this Court has held, "the assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities." *Starr*, 106 Fed. Cl. at 77 (quotation omitted). Starr's first allegation amounts to nothing more than pointing out AIG's "necessities." That does not establish anything about the propriety of the Government or FRBNY's actions. AIG's "need for discretionary benefit" arose from its business decisions, not circumstances caused by the Government. *See generally* PFOF § I. Moreover, FRBNY and the Board of Governors requested the 79.9 percent equity interest, consistent with what private sector lenders had contemplated: (1) to compensate the taxpayers for the risks of providing the largest Government loan in history to a company that had managed itself to the brink of bankruptcy; (2) to mitigate the risk of this loan; (3) to reduce the windfall to AIG's shareholders; and (4) to address moral hazard – that is, the concern that a loan to AIG on overly favorable terms might encourage other

industry participants to engage in risky decision making. *See generally* PFOF § III.A. These reasons are in no way exploitative, and Starr's first allegation, therefore, is irrelevant.

Second, the Government did not prevent AIG from acquiring financing from other sources. There is a strong presumption that public officials act in good faith. *See, e.g.*, *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (recognizing strong presumption that public officials act in good faith); *A-Transport Nw. Co., Inc. v. United States*, 36 F.3d 1576, 1585 (Fed. Cir. 1994) (same). Starr's attempt to overcome that presumption fails because the argument relies on unsupported assertions that FRBNY or the Government intended to impede AIG's efforts to find private financing. [5]

Indeed, the Government strongly *encouraged* a private sector solution. PFOF ¶¶ 33-40. President Geithner testified that, until he had satisfied himself on September 15 or September 16 that FRBNY could lend against AIG's novel collateral and that there was no hope of a private sector solution, he believed that a FRBNY loan to AIG was not possible. PFOF ¶¶ 39, 56.

As for Starr's third allegation, as a matter of law, it is not wrongful to "drive a hard bargain." *Wilkie v. Robbins*, 551 U.S. 537, 558 (2007). The fact that the rescue loan's terms were non-negotiable simply reflects: (1) the substantial policy decisions that went into the development of the loan terms; (2) the fact that the terms had been approved at the highest levels

---

[5] Starr's assertion that the Government did not act to affirmatively facilitate potential investments by the China Investment Corporation (CIC) or unspecified Middle Eastern investors is contradicted by the record. There is no evidence that the Government prevented any of those entities from providing financing that they otherwise would have provided quickly enough or in an amount sufficient to rescue AIG. To the contrary, the evidence establishes: that Secretary of the Treasury Henry Paulson did not discourage CIC or other sovereign-wealth-fund investment in AIG; and that potential sovereign-wealth-fund investors were independently hesitant to invest in AIG and would not have provided sufficient funding in the time necessary to rescue AIG. Any suggestion that the Government concealed CIC's interest in lending from AIG is undermined by the fact that AIG and its advisors were communicating directly with CIC in September 2008. PFOF ¶¶ 51-54.

of the Government; (3) the fact that AIG needed the loan by the end of the day on September 16, 2008, due to its deteriorating finances; (4) and the untenability, as a policy matter, of letting a company use the threat of societal harm as leverage to demand from the Government rescue terms more to its liking. PFOF § III.A & ¶¶ 50, 59, 71 n.8, 80.

Last, the Government did not manufacture a deadline for AIG's board to consider the rescue loan. The 8:00 p.m. deadline "wasn't a negotiating deadline" imposed by FRBNY. As Mr. Studzinski described, "it was actually a commercial deadline" set to accommodate AIG's own financial exigencies before Asian markets opened for business. PFOF ¶ 71 n.8. AIG informed FRBNY on the afternoon of September 16 that the company needed $14 billion by the end of the day. PFOF ¶ 59. Accordingly, FRBNY informed AIG's board that FRBNY needed an answer on its loan offer by 8:00 p.m. to ensure that FRBNY's money wiring system would be open if AIG's Board decided to accept FRBNY's offer. PFOF ¶ 71 n.8. AIG's financial condition and the pressure of having little time to resolve AIG's crisis on September 16 were the result of AIG's own actions – not the Government's. PFOF ¶ 59; *see generally* PFOF § I. The time AIG had to consider FRBNY's offer, therefore, cannot constitute a coercive act.

In any event, both the September 16, 2008 AIG board minutes and testimony from those present at the AIG board meeting demonstrate that the AIG board engaged in "lengthy" and "extensive" discussions about the loan terms; one of AIG's board members testified that AIG's directors had sufficient time to fully discuss and consider the rescue loan on September 16 and the directors absolutely received all the legal and financial information and advice necessary to make an informed decision on whether to accept FRBNY's terms. PFOF ¶¶ 70-72.

In sum, AIG's board was not coerced into accepting the FRBNY rescue offer, and Starr's inability to demonstrate Governmental wrongdoing extinguishes Starr's coercion theory.

*Compare N. Star Steel Co. v. United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (third prong of

test for duress not met because "no showing of evidence to support a finding of bad faith"), *and*

*Sys. Tech. Assocs.*, 699 F.2d at 1388 (no duress where there was no evidence of "acts taken in

bad faith, or with malice, or with unconscionable motives"), *with Rumsfeld v. Freedom NY, Inc.*,

329 F.3d 1320, 1331 (Fed. Cir. 2003) (coercion where "the government withheld [a] payment, for

the sole purpose of pressuring the contractor into signing" an amendment giving up rights under a

contract).

> **b. The Government Did Not Exercise Actual Control Over The AIG Board's Acceptance Of The FRBNY Rescue Offer On September 16, 2008**

To overcome the presumption of director independence, Starr must prove that a majority

of AIG's board was "incapable" of objective decision-making. *Brehm v. Eisner*, 746 A.2d at

257. Specifically, Starr must demonstrate that, on September 16, 2008, a majority of AIG's

board was "beholden" to FRBNY or the Government or "so under [their] influence" that the

directors' "discretion would be sterilized." *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 648-

49 (Del. 2014) (quoting *Rales*, 634 A.2d at 936). Starr has proved neither.

First, it is undisputed that all of AIG's directors were disinterested and independent of

FRBNY and the Government when they voted to accept FRBNY's rescue offer on September

16, 2008. Starr has never argued that these directors were selected by, or were in any way

individually beholden to, FRBNY or the Government. *See* PFOF ¶ 69. "Particularly relevant" to

the determination that neither FRBNY nor the Government exerted control over AIG's Board,

(1) all of AIG's board members who voted in favor of the FRBNY rescue terms on September 16

were elected or appointed to the board long before any FRBNY or Government involvement

with AIG, PFOF ¶¶ 68-69; and (2) none of AIG's board members were "employed by or directly

under [FRBNY or the Government's] control" on September 16, 2008. *See Starr v. FRBNY*, 906

F. Supp. 2d at 222 (quoting *In re Western Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at *10 (Del. Ch. May 22, 2000)).

Second, there is no evidence that FRBNY or the Government "sterilized" the AIG directors' decision-making capacity. *See Kahn*, 88 A.3d at 648-49. Delaware law applies a subjective, "actual person" standard to the inquiry of whether a director's decision was "based on the corporate merits of the subject matter before the board rather than extraneous considerations or influence." *In re CompuCom Sys., Inc. S'holders Litig.*, No. Civ. A. 499-N, 2005 WL 2481325, at *8 (Del. Ch. Sept. 29, 2005); *see also Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995)). Here, the firsthand evidence shows that AIG's directors exercised independent judgment and acted in the best interests of AIG and its shareholders when voting to accept the FRBNY rescue offer. *See*, *e.g.*, PFOF ¶ 67.

There was no evidence – let alone firsthand evidence from those present at the meeting – that any of AIG's directors faced threats by, or any personal obligation to, FRBNY or the Government. *See, e.g.*, *Kahn*, 638 A.2d at 1114-15 (control where a voting director testified that his "first-hand view of how the board operated" was that the directors' vote was swayed by the domination of a significant shareholder rather than based on the exercise of their business judgment). The circumstances here are the quintessential example of board members who are *not* controlled: "each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues." *Aronson*, 473 A.2d at 816.

Starr has presented no evidence that AIG's board accepted FRBNY's rescue terms for any reason other than to benefit AIG and its stakeholders. Certainly, the mere fact that AIG's board approved the rescue cannot be evidence of Government domination or control. *Id.*

Indeed, because the AIG board's September 16, 2008 vote benefitted shareholders by avoiding imminent bankruptcy, the Court should conclude that the board was not controlled and properly acted in the shareholder's best interests. *See Starr v. FRBNY*, 906 F. Supp. 2d at 218 (the fact that AIG was not "motivated [on the days of their relevant decision-making] by anything other than advancing AIG's well-being" is relevant to finding that AIG's board was not controlled by FRBNY); *see Aronson,* 473 A.2d at 815 ("[E]ven proof of majority ownership of a company does not strip directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation.").

Starr asserts that FRBNY and the Government caused AIG's board to accept the rescue offer, but that argument collapses in the face of contemporaneous evidence and the testimony of those present at the September 16 AIG board meeting. *See, e.g.*, *Aronson*, 473 A.2d at 816 (finding insufficient allegations of control where the "causal link between . . . control and approval of the [transaction at issue] is alluded to, but nowhere specified" and is "[a]t best . . . a conclusion devoid of factual support"); *cf. Kahn*, 638 A.2d at 1114-15 (finding control where there was firsthand testimony from the decision-makers admitting that their decision was not independent).

Moreover, presenting a company with a non-negotiable offer is not legally akin to controlling a board's decision. To the contrary, bargaining leverage is not a recognized means of controlling corporate decisions under Delaware law. *Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.*, 68 A.3d 197, 233 n. 204 (Del. Ch. 2013) ("Even if HIG had substantial bargaining power because of its contractual rights under the Credit Agreement, that leverage does not materially support Edgewater's argument that HIG had de facto controlled Pendum."); *Starr v. FRBNY*, 906 F. Supp. 2d at 225 ("[D]e facto control over a corporate board is not

established by the fact that a savior of the company, or an entity with a contractual right to future control of it, exerted leverage over it."); *In Re Sea-Land Corp. Shareholders Litig. (In Re Sea-Land Corp.)*, 1988 WL 49126, at *3 (Del. Ch. May 13, 1988) (holding that "'leverage' is not actual domination or control," where the plaintiff alleged that a minority shareholder's 38.5% equity stake gave it a "superior bargaining position"). Nor is control evidenced by the fact that bankruptcy would have left AIG and its shareholders worse off than the terms of the FRBNY rescue. "Far from describing actual control of AIG by an outside party," this evidence simply portrays a moment of corporate choice. *Starr v. FRBNY*, 906 F. Supp. 2d at 219.; *accord In re Bear Stearns Litig.*, 870 N.Y.S.2d at 740 ("refusing to lend necessary funds" and even "threatening to place [the] company into bankruptcy" unless deal terms were accepted did "not demonstrate the requisite control").

Starr also wrongly contends that the replacement of Robert Willumstad by Edward Liddy as AIG's CEO demonstrates that the Government had de facto control over AIG on September 16, 2008. *See, e.g.*, Zingales, Tr. 3813, Lines 6-7 (claiming "the ability to fire somebody is really a clear indicator of control"); Zingales, Tr. 3816, Line 24-Tr. 3817, Line 5 (claiming the Government "acts like it is in control" of AIG in connection with Mr. Willumstad's replacement). This argument fails for several reasons, not the least of which is that the contention assumes its own conclusion. The Government did not fire Mr. Willumstad, or "seal [the] deal with the new AIG CEO" on September 16 in the sense of hiring him. Zingales, Tr. 3817, Lines 9-11. *See* PFOF ¶¶ 64, 93, 100 n.10. It is the purview of a corporation's board to elect new directors: here, AIG's independent board knowingly accepted the FRBNY rescue offer understanding that replacing Willumstad as CEO was one condition of such acceptance. PFOF ¶ 64 (the AIG board was aware before it unanimously voted on the FRBNY rescue terms

that replacing Willumstad was a condition of the rescue loan).  AIG's independent board then

implemented that loan term by voting to elect Mr. Liddy as the company's CEO on September

18, 2008, after conducting due diligence and agreeing on Mr. Liddy's qualifications for the

position.  *See* PFOF ¶¶ 93, 100 n.10.

As a result, Starr's argument that FRBNY allegedly "unilaterally" replaced AIG's CEO is

misplaced.  *See Starr v. FRBNY*, 906 F. Supp. 2d at 225.  Nonetheless, even if the Government

did "seal the deal" on Mr. Liddy's appointment by putting forward his name to replace

Mr. Willumstad, "it is not enough to charge that a director was nominated by or elected at the

behest" of the alleged controlling party to overturn the presumption of independence for a

finding of control.  *Aronson*, 473 A.2d at 816; *see also Williamson*, 2006 WL 1586375, at *6

("[d]esignating directors to the board of directors . . . is not sufficient to trigger a finding of

'controlling' status").

To prove control, Starr must establish that a *majority* of AIG's directors were each

individually beholden to the Government with respect to the challenged transactions.  Even if

Starr could overcome the heavy presumption of independence for any *one* AIG director, and it

cannot, a lack of independence on the part of one director does not establish a lack of

independence by the others.  *See*, *e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150,

177 (Del. Ch. 2005) (reasoning that even if the court were to conclude that certain directors were

interested or lacked independence, that "would not vitiate the approval of the [challenged]

transaction by the disinterested and independent majority"); *In re Dow Chem. Co. Derivative

Litig.*, Civil Action No. 4349-CC, 2010 WL 66769, at *7 n.31 (Del. Ch. Jan. 11, 2010)

("Plaintiffs must show that at least half of the board is not disinterested and independent.")

(citing *Beam*, 845 A.2d at 1046).

Starr has failed to demonstrate that, of the eleven directors who voted on the rescue offer, six or more did so for any reason other than the exercise of their informed business judgment that accepting FRBNY's loan was in the best interests of AIG's shareholders. Although Starr identified a number of AIG's directors on its witness list, it decided not to call any AIG directors in its case in chief. Both Mr. Willumstad and Mr. Offit, the only witnesses who were directors on September 16, 2008, provided uncontradicted testimony that they exercised their independent judgment and voted in the best interests of shareholders in casting their votes on September 16, 2008, and that the other directors also exercised their independent judgment. PFOF ¶¶ 67, 77-78.

AIG's directors voluntarily agreed to FRBNY's offer and were independent from the Government when they made that decision on September 16, 2008. Starr's takings claim for the equity term, therefore, fails.

### 3. Starr's Theory That The Government Acquired Control On September 16, 2008, But Did Not Acquire Any Right To Equity Until September 22, 2008, Lacks Merit

As discussed above, the Court has already concluded that the voluntariness of AIG's agreement to the rescue loan turns on AIG's decision on September 16, 2008. *See Starr*, 106 Fed. Cl. at 78. Indeed, Starr alleges that the Government acquired control on that day through "effective economic control." *See* PFOF ¶ 114 n.13. Further, the terms of the Credit Agreement were consistent in all material respects with the rescue offer that the AIG board accepted on September 16, 2008, including the obligation to provide equity participation equivalent to 79.9 percent of AIG's common stock. *See* PFOF ¶¶ 111-14. Nonetheless, Starr has presented an alternative theory that AIG did not agree to the equity term on September 16, 2008, but that FRBNY on that date acquired only "control," which FRBNY allegedly exercised to cause AIG's board to agree to the 79.9 percent equity stake in the Credit Agreement on September 21, 2008.

This Court previously recognized the illogic of Starr's theory, observing that "it is unclear why, if Starr's position is to be believed, the [September 16] term sheet was binding as to control but not as to the transfer of the 79.9% interest in AIG (or why the former was not simply the result of the latter)." *Starr*, 106 Fed. Cl. at 64. Indeed, under Delaware law, a "*right* to future control" does not constitute actual control in the present. *Gilbert*, 490 A.2d at 1055-56 ("[I]t may be said that [a company engaged in taking over another] used its *right* to future control as leverage to fashion a merger agreement more to its benefit … [b]ut its status, however enhanced, remained that of an outsider, free to bargain but not to dictate terms" to management) (emphasis in original). Thus, if the September 16 agreement was not binding, it could not have supplied FRBNY with even a right to *future* voting control over AIG on that date, much less voting control.[6] And if the September 16 agreement *was* binding, then the AIG board's vote on September 21 merely finalized the September 16 agreement, and the vote on September 21 is legally irrelevant to this case.

The Court permitted Starr to try to prove its theory that the Government acquired control on September 16, but that AIG did not promise equity until the Credit Agreement was implemented September 22, 2008. Starr's attempt has failed because (1) on September 16, 2008, AIG and FRBNY formed an agreement on the material terms of the rescue deal, including the equity term, and the Credit Agreement memorialized the remaining details of that agreement; and (2) regardless of whether AIG and FRBNY reached a binding agreement on September 16, 2008, AIG's board was not coerced or controlled by the Government on September 21, 2008, when AIG's board authorized the company's entry into the Credit Agreement. Therefore, Starr's

---

[6] In fact, AIG did not issue a controlling equity stake to the Trust until March 2009. *See* PFOF ¶ 289. Further, the existence of a controlling shareholder does not mean that any particular board decision is involuntary or controlled.

theory that the Government controlled AIG's decision to enter into the Credit Agreement lacks merit.

### a. AIG's Board's Decision On September 21, 2008, Is Not Relevant Because AIG And FRBNY Formed A Contract On September 16, 2008, Which Bound AIG To Provide Equity Participation Equivalent To 79.9 Percent Of Its Common Stock

As an initial matter, the Court should reject Starr's arguments that the Government used its position as lender between September 16 and September 22, 2008, to coerce or control AIG's board's decision to accept the Credit Agreement. AIG's board voluntarily agreed to the material terms of the rescue deal on September 16, 2008, including the equity term, and AIG's entry into the Credit Agreement on September 22, 2008, merely finalized that agreement and filled in open terms. The September 16, 2008 deal constituted an agreement with FRBNY as to the material terms of the contemplated $85 billion credit facility as well as what AIG would provide in consideration for that loan.

The required elements of a contract include "a mutual intent to contract including an offer, an acceptance, and consideration." *Maher v. United States*, 314 F.3d 600, 606 (Fed. Cir. 2002) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)). These elements apply both to express contracts and implied-in-fact contracts. *Id.* An express contract can rest on promises that are set forth in more than one writing or that are oral. *See*, *e.g.*, *Home Sav. of Amer., FSB v. United States*, 399 F.3d 1341, 1349 (Fed. Cir. 2005) (finding an express contract set forth in multiple writings); *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs.") An implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding

circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996) (internal quotation marks omitted) (quoting *Balt. & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923)).

On September 16, 2008, FRBNY and AIG – through offer, acceptance, and consideration – reached a mutual agreement as to the material terms of the rescue deal. Regardless of whether their agreement is characterized as an express contract (reflected in multiple communications) or an implied-in-fact contract, the evidence unmistakably demonstrates those elements of an agreement as to the material terms of the deal, including the equity term.

First, FRBNY made an offer to AIG. PFOF ¶¶ 57, 63-64. That offer included the requirement that, as part of AIG's consideration for the loan, AIG would convey "[e]quity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis. Form to be determined." PFOF ¶ 62. AIG's board knew that the equity term was a required element of FRBNY's offer; AIG's board specifically directed Mr. Willumstad and AIG's attorneys to request a smaller equity term, but Mr. Geithner explained that the terms were not negotiable. PFOF ¶ 79. In addition to the term sheet that FRBNY provided to AIG, FRBNY orally communicated additional terms of the offer. Mr. Geithner explained to Mr. Willumstad that another loan condition was that Mr. Willumstad resign as AIG's CEO and Chairman. PFOF ¶ 64. AIG's board knew of this condition before it voted to accept FRBNY's offer on September 16, 2008. *Id*.

There was agreement among all fact witnesses that FRBNY made an offer to AIG on September 16, 2008. Indeed, Starr's theory of coercion hinges, in part, upon its contention that FRBNY's offer was "take it or leave it." Pl. Pretrial Concl. of Law ¶ 154. A take-it-or-leave-it offer is inherently one to contract, as no further negotiation is anticipated by either side.

Second, AIG's board voluntarily accepted FRBNY's take-it-or-leave-it offer. AIG's board understood the offer's material terms and expressly authorized AIG to enter into an agreement in which AIG would transfer "equity participation equivalent to 79.9 percent of the common stock of [AIG] on a fully-diluted basis." PFOF ¶¶ 73-74, 84-86. The board also understood that the form of the equity (or who would receive it) had not yet been decided. PFOF ¶ 84. AIG's board authorized Mr. Willumstad to sign a signature page that expressly agreed to the terms offered by FRBNY, and that evening, Mr. Willumstad did, in fact, sign a signature page accepting "the summary of terms for the Senior Bridge Facility," which AIG immediately faxed to FRBNY. PFOF ¶ 74. This signature confirmed AIG's intent to accept FRBNY's offer. AIG also orally communicated to FRBNY its acceptance of the rescue offer. PFOF ¶ 74 (Geithner, Tr. 1805, Line 8-Tr. 1806, Line 8).

Third, AIG and FRBNY agreed to exchange, and began exchanging, consideration. FRBNY agreed to provide a two-year, $85 billion credit facility, and AIG agreed to pay interest, fees, and, of course, "equity participation equivalent to 79.9 percent" of AIG's common stock. PFOF ¶¶ 91-92. FRBNY immediately began funding AIG, starting with $14 billion on September 16, and increasing to $37 billion by September 19, and AIG immediately began pledging assets to FRBNY.[7] PFOF ¶ 90, 93. Further, on September 18, AIG's board appointed

---

[7] These borrowings were pursuant to demand notes, *see* PFOF ¶ 90, but FRBNY would have had no authority to lend to AIG – a non-bank – and would not have provided those funds if it had not reached an agreement on September 16 consistent with the Board of Governors' authorization under Section 13(3). *See* PFOF ¶ 91. Further, Starr mischaracterizes the significance of the demand notes, which, rather than substitute for a rescue deal, were an integral part of the deal. As the AIG board's September 16 resolution shows, AIG authorized use of demand notes to begin drawing money "prior to the execution of definitive documentation of the Credit Facility;" the "Credit Facility" defined as the FRBNY's provision of an $85 billion credit facility "on terms consistent with those described at this meeting including equity participation equivalent to 79.9 percent of the common stock of [AIG]." PFOF ¶ 85.

Mr. Liddy as the company's CEO "in accordance with its duties to formally implement [the September 16, 2008] agreement."  PFOF ¶ 93.

The facts as of September 16, 2008, satisfy all the necessary elements of a contract: offer, acceptance, and consideration.  *See Maher*, 314 F.3d at 606.  Moreover, the "surrounding circumstances," including immediate performance by the parties, confirm that AIG and FRBNY formed a contract on September 16.  *See Hercules*, 516 U.S. at 424.  On September 16, 2008, AIG publicly announced that "the Federal Reserve Bank of New York is providing a two-year, $85 billion secured revolving credit facility to AIG" and "[i]n return for providing this essential support, American taxpayers will receive a substantial majority ownership interest in AIG." PFOF ¶¶ 76, 92.  Similarly, the Board of Governors issued a press release the same evening describing the material terms of the rescue deal on which the parties had agreed, including that "[t]he U.S. Government will receive a 79.9 percent equity interest in AIG."  PFOF ¶ 75.

These facts demonstrate that there was a contract.  Because, however, the parties did not finalize the details of the September 16, 2008 agreement until September 22, 2008, the deal on September 16 was an agreement that defined material terms and mandated that the parties finalize the rest of the terms through good faith negotiations.  *See, e.g.*, *North Star Steel Co. v. United States*, 477 F.3d 1324, 1332 (Fed. Cir. 2007) ("This court has recognized that a provision which calls upon the parties to a contract (to agree in the future on a specified point or contract term, often referred to as an 'agreement to agree,' imposes an obligation on the parties to negotiate in good faith.").

Starr places dispositive weight on a single statement in the FRBNY term sheet that it "is not intended to be legally binding."  But Starr errs by considering that language in isolation, rather than in the context of all of the statements and actions by FRBNY and AIG on September

16, 2008, which collectively compel the conclusion that the parties reached an agreement that day as to the rescue deal transaction's material terms. *See*, *e.g.*, *Singer v. Xipto, Inc.*, 852 F. Supp. 2d 416, 424 (S.D.N.Y. 2012) (holding that an expressly "non-binding" term sheet, together with other evidence that the parties intended to be bound, evidenced an enforceable agreement).[8]

Thus, "notwithstanding their intention to sign a more elaborate and formal contract," AIG and FRBNY "viewed themselves as having reached a complete agreement on all significant terms [on September 16, 2008], and intended to be bound." *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996). In these circumstances, the conclusion that the parties' agreement on September 16, 2008, left open certain terms to be finalized does not change the fact that the parties reached agreement as to the material terms of the rescue deal, including the equity term. Indeed, the September 22, 2008 Credit Agreement merely finalized that deal in additional detail, and did not reflect any departure from the terms on which they agreed on September 16, 2008.

---

[8] In addition, Starr elicited opinion testimony about whether the parties formed a contract. The Court should disregard that testimony. Contract formation is a legal question. *Bay View, Inc. v. United States*, 278 F.3d 1259, 1263 (Fed. Cir. 2001) ("In the absence of factual disputes, the question of contract formation is a question of law, reviewable de novo."); *LaMirage, Inc. v. United States*, 44 Fed. Cl., 192, 198 (1999). Although fact witnesses' testimony about the factual circumstances surrounding the possible contract formation is relevant, their opinion testimony about contract formation is not. *See* Fed. R. Evid. 701(b) (permitting fact witness opinion testimony only if it is helpful in determining a fact in issue); Fed. R. Evid. 704 Ad. Comm. Note (Rule 701 should be applied to "exclude opinions phrased in terms of inadequately explored legal criteria"). Moreover, one party's belief about whether a contract has been formed is not relevant evidence. *Cf. Andersen Consulting v. United State*s, 959 F.2d 929, 934 (Fed. Cir.1992) ("'subjective unexpressed intent of one of the parties' to a contract is irrelevant"). Rather, courts look to the actions and communications between the parties. Here, the parties' actions and communications are unequivocal that the parties agreed to the rescue loan on September 16, 2008.

### b. In Any Event, AIG's Board Voluntarily And Independently Approved The Credit Agreement On September 21, 2008

Regardless of whether the Court concludes that FRBNY and AIG formed a contract on September 16, 2008, AIG's board voluntarily and independently approved the Credit Agreement on September 21, 2008, and the terms of the Credit Agreement were materially consistent with the terms of the FRBNY offer that AIG's board accepted on September 16, 2008.

### i. AIG's Board Was Not Coerced Into Approving The Credit Agreement On September 21, 2008

Although Starr argues that the Government coerced AIG's board into approving the Credit Agreement, Starr failed to meet its high burden of establishing any of the three elements of duress discussed above.

### 1. AIG's Directors Exercised Their Free Will In Accepting The Credit Agreement

First, Starr failed to prove that AIG's authorization of the Credit Agreement, including the term finalizing the form of the equity, was involuntary. There is no evidence establishing the "defeat of the will" of any AIG director on September 21, 2008. *Sys. Tech.*, 699 F.2d at 1387. Rather, the individuals who voted to accept the Credit Agreement on September 21 explicitly testified (1) that they accepted the Credit Agreement voluntarily, fully understanding that the 79.9 percent equity participation would take the form of preferred shares, and (2) affirmed that the terms were consistent with those they had approved on September 16, 2008. Mr. Offit stated that "[n]ever was there any iota of . . . coercion" when he decided to agree to the terms of the Credit Agreement on September 21, 2008. PFOF ¶ 106. Mr. Liddy similarly affirmed no one coerced him into voting in favor of the Credit Agreement on September 21, and to his knowledge, no one coerced any member of the AIG board into voting in favor of the Credit Agreement. *Id.* Starr provided no evidence from any other director or any other participant in

the AIG board's deliberations to support its allegation that the Government coerced AIG's board. As with the AIG directors' testimony regarding their agreement to FRBNY's rescue terms on September 16, this alone should quash any suggestion that the AIG board acted involuntarily on September 21, 2008. *See Sinclair*, 66 Fed. Cl. at 493 (plaintiff's resignation was not involuntary, as a matter of law, where his resignation letter "admits that he was not subject to coercion" and where plaintiff "does not claim that he submitted his resignation against his wishes"); *Sys. Tech.*, 699 F.2d at 1387.

As with the evidence of AIG's decision on September 16, no evidence at trial rebutted the AIG board's stated voluntariness on September 21, 2008. Rather, the evidence supports the conclusion that AIG's board acted voluntarily. On September 21, 2008, the AIG board, with the exception of Mr. Liddy, was composed of the same directors who had approved FRBNY's terms on September 16, 2008. *See* PFOF ¶ 100. The board members authorized AIG's entry into the Credit Agreement on September 21, 2008, after being fully apprised of its terms – including the convertible preferred shares carrying 79.9 percent of AIG's voting power – and after engaging in a "very thorough" discussion with their legal and financial advisors about those terms and the alternative of bankruptcy. PFOF ¶ 99, 101, 103. The directors' financial advisor from Blackstone counseled that "20 percent of something is better than a hundred percent of nothing." PFOF ¶ 103. The board members concluded that executing the Credit Agreement would best serve AIG shareholders because the alternative, bankruptcy, likely would wipe out the shareholders. *See* PFOF ¶¶ 97-99, 101-103.

## 2. AIG's Board Had An Alternative To Authorizing AIG's Entry Into The Credit Agreement

Starr also failed to prove the second element necessary to prove AIG's board was under duress when it agreed to the Credit Agreement on September 21, 2008, namely, that "circumstances

permitted no other alternative." *Starr*, 106 Fed. Cl. at 77.  Even though AIG's board had agreed on September 16 to FRBNY's offer, the board still had the alternative on September 21 to refuse to approve the Credit Agreement that implemented the September 16, 2008 agreement. Therefore, AIG's board considered again whether FRBNY's offer was better than bankruptcy, and again decided to accept the loan.

AIG's board and its advisors expressly considered bankruptcy on September 21, deliberated about their choices, and ultimately approved the Credit Agreement after determining that it was the superior choice.  PFOF ¶¶ 99-103.  AIG's advisors told AIG's board members that, if they chose the alternative of bankruptcy on September 21, shareholders would likely be left with "nothing," and that "the value that could be preserved through the Government loan was likely more valuable to current shareholders than retaining 100 percent interest in the bankrupt entity, which might be worth nothing."  PFOF ¶ 103.  The directors who testified at trial confirmed that they had a choice on that day.  PFOF ¶ 106-08.  As Mr. Offit described, even though the board's financial and legal experts generally noted the likely negative effects of bankruptcy on AIG's businesses, the board still had "complete latitude, complete discretion" to choose bankruptcy over the rescue on September 21, 2008.  PFOF ¶ 108.  Although Mr. Offit testified that the choice he faced was "the proverbial between a rock and a hard place," PFOF ¶ 107, he unequivocally stated that the directors "gave it very deliberate thinking" before "c[oming] to the conclusion that accepting the government's facility was certainly much more advantageous to all concerned rather than filing bankruptcy."  PFOF ¶ 108.

Thus, as on September 16, 2008, the AIG directors may not have had a *desirable* choice on September 21, 2008, but that is not the same as having "no choice."  The rock and a hard

place that Mr. Offit described is, indeed, "still a choice." *Starr v. FRBNY*, 906 F. Supp. 2d at 219 n.13.

Starr points to two statements in the September 21, 2008 AIG board meeting minutes as evidence that the AIG board had no alternative, but Starr mischaracterizes these statements. First, the minutes indicate that H. Rodgin Cohen, AIG's legal counsel, was not prepared to opine that letting AIG go bankrupt rather than accepting the Credit Agreement would satisfy the business judgment rule. The essence of this reported absence of advice supports the AIG directors' decision: that the Credit Agreement was so plainly in the best interests of AIG and its shareholders that it seemed uncertain whether a contrary judgment could be reached in good faith. *See* PFOF ¶ 108.[9]

Second, Starr relies on a reference in the minutes indicating that AIG's board had "no choice" but to enter into the Credit Agreement. That statement, however, simply mirrors Mr. Offit's testimony that accepting FRBNY's offer was superior to the alternative of breaching the September 16 agreement and entering bankruptcy, particularly as the markets continued to deteriorate after September 16, and AIG already owed $37 billion to FRBNY. Starr's assertion that no choice existed is contradicted by the firsthand testimony of AIG board members and management, as well as by the September 21, 2008 AIG board meeting minutes, all of which reflect the reality that the AIG board and its advisors considered the alternative of bankruptcy but ultimately believed the Credit Agreement to be a vastly superior option. PFOF ¶¶ 99-103. To the extent the board's choices on September 21 can be viewed as having been constrained, that

---

[9] Although Starr identified Mr. Cohen as a witness it intended to call at trial, it did not call him. When the United States sought to call Mr. Cohen, the Court precluded Mr. Cohen from testifying. *See* Tr. 7739, Lines 1-4. The United States filed a proffer concerning the testimony we expected to receive had Mr. Cohen been allowed to testify. *See* Dkt. No. 354.

constraint was the result of the contractual arrangement – including the 79.9 percent equity component – to which the board had voluntarily agreed on September 16 and publicly announced that same evening, and under which AIG had already borrowed $37 billion. As AIG's board anticipated on September 16, the Credit Agreement was merely the "documentation" that implemented the Credit Facility deal that it understood to provide for borrowing up to $85 billion on terms that included equity participation equivalent to 79.9 percent of AIG's "common stock." PFOF ¶¶ 85, 112.

### 3. Neither The Government Nor FRBNY Induced AIG's Authorization Of The Credit Agreement By Wrongful Conduct

Starr also has not established the third element of duress regarding the Credit Agreement, "that [AIG's] assent 'was induced by an improper threat'" by FRBNY or the Government on September 21, 2008. *Starr*, 106 Fed. Cl. at 78 (quoting *David Nassif Assocs.*, 644 F.2d at 12). Instead, the evidence proves that AIG's directors unanimously voted to approve the Credit Agreement at the September 21, 2008 board meeting based on their determination that doing so allowed the company to survive and was in the best interests of AIG and its shareholders. PFOF ¶¶ 99-103. The AIG board affirmed on September 21 that it "deem[ed] it desirable and in the best interests of the Corporation" to authorize the terms of the Credit Agreement. PFOF ¶ 99. Messrs. Liddy and Offit each confirmed at trial that they chose to approve the Credit Agreement because it was in the company's and the shareholders' best interests. *Id.* Mr. Liddy then voluntarily executed the September 22, 2008 Credit Agreement. PFOF ¶¶ 99, 103, 106, 343.

Starr has presented no evidence that the AIG board voted to approve the Credit Agreement on September 21, 2008, for any reason other than because they believed accepting FRBNY's rescue offer was consistent with the September 16 agreement and in the best interests

of AIG and its shareholders. Starr's attempts to rebut the testimony and overwhelming evidence that AIG's directors acted voluntarily rest on legally and factually deficient arguments.

Starr argues that FRBNY unilaterally "changed" the terms of the rescue between September 16 and 21, 2008, and then caused AIG to involuntarily accept equity participation in the form of convertible preferred stock by giving them little time to review the equity term sheet. AIG and its directors and advisors, however, viewed the Credit Agreement as an implementation of, rather than as a change from, the agreement reached on September 16, 2008. PFOF ¶¶ 111-13.

Moreover, Starr's argument relies on the false premise that the terms to which AIG agreed on September 16 specified warrants. AIG, however, was never presented with an offer specifying the form of equity as warrants. PFOF ¶¶ 65-66. Warrants were theoretically one form of equity that, as of September 16, the 79.9 percent equity term might have eventually taken. PFOF ¶ 84. The AIG board resolution accepting the rescue terms on September 16, 2008, expressly referred to a "revolving credit facility of up to $85 billion on terms consistent with those described at this meeting, including equity participation *equivalent* to 79.9 percent of the *common stock* of the Corporation on a fully-diluted basis." On September 16, 2008, the equity term described to AIG's board was "warrants *or other instruments* that would give the Federal Government an interest in AIG equal to 79.9 percent of its total equity." PFOF ¶¶ 84-85 (emphasis added). Similarly, the term sheet that AIG received on September 16 provided for "[e]quity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis" in a "[f]orm to be determined." PFOF ¶¶ 62-66, 261. AIG's directors understood that the form of the equity remained to be determined when they agreed to the equity term on September 16, 2008. PFOF ¶¶ 84-85. Thus, the contemporaneous evidence is unequivocal that, on September

16, the parties did not specify warrants as the agreed equity term, but instead affirmatively agreed to an equity component equivalent to 79.9 percent of the common stock, in a form to be determined.

Starr similarly disregards the record by arguing that FRBNY intentionally surprised AIG's board with the news that the agreed-upon 79.9 percent equity stake would take the form of preferred stock. There is no evidence of wrongdoing or bad faith in FRBNY's selection of the form the equity should take. Rather, the evidence demonstrates that choosing the form and recipient of the equity raised complicated issues that required careful consideration. PFOF ¶¶ 63, 256-59.[10] Moreover, AIG's management and directors knew before September 21 that the equity's form was not necessarily going to be warrants – just that it would be "equivalent to 79.9 percent of the common stock" of AIG in a form to be determined. PFOF ¶¶ 84-85. Certainly, before voting to accept the Credit Agreement on September 21, the AIG board was fully apprised of all material terms of the agreement – including that the equity would take the form of preferred shares. PFOF ¶ 101. AIG's board discussed those terms with their expert legal and financial advisors, and decided, on the merits, that authorizing AIG's entry into the Credit Agreement was in the shareholders' best interests. *See* PFOF ¶¶ 99, 102-103.

In any event, the equity term in the Credit Agreement was consistent with the equity term that had been agreed to on September 16, 2008. PFOF ¶¶ 111-13. Accordingly, the form of the equity as preferred shares cannot constitute a wrongful "bait and switch" by the Government or FRBNY.

---

[10] AIG also corrected the Form 8-K AIG filed on September 18, 2008, because the form mischaracterized the equity term as "warrants." PFOF ¶¶ 87-88. AIG's management and counsel certainly understood the form of the equity would not necessarily be warrants, which is why the filing was corrected and the reference to warrants removed. PFOF ¶ 88.

Starr implies that the choice between preferred stock and warrants constituted a difference of billions of dollars in payment to AIG because AIG's common stock par value was $2.50 per share. Not a single fact witness's testimony or contemporaneous document, however, indicates that anyone ever contemplated that FRBNY would pay more consideration than providing the lending facility and $500,000. Indeed, the uncontradicted evidence is to the contrary. PFOF ¶ 113 n.12. Starr's implausible and unsubstantiated suggestion does not support Starr's argument that the Credit Agreement constituted a material change from the September 16, 2008 agreement.

### ii. The Government Did Not Control AIG's Decision To Enter Into The Credit Agreement

Neither FRBNY nor the Government controlled AIG's directors between September 16 and September 22, 2008. Starr argues that, during that week, the Government exercised ever-increasing influence over AIG such that the AIG board's decision on September 21 was controlled. The evidence shows, however, that neither FRBNY nor the Government exercised "domination" over AIG's board "through the actual exercise of direction" over the directors' decision-making, voting, or ultimate execution of the Credit Agreement. Just as on September 16, none of the directors had personal or other relationships that rendered them "beholden" to FRBNY or the Government on September 21, 2008. Instead, on that day, the same directors who had authorized AIG to accept the FRBNY rescue terms on September 16 – with the exception of Mr. Liddy replacing Mr. Willumstad – authorized the company to execute the Credit Agreement because they determined that action was in the best interests of the company and its shareholders. *See* PFOF ¶¶ 99-100 (AIG's directors were disinterested and independent from FRBNY and the Government on September 21); PFOF ¶¶ 67-69 (AIG's directors were disinterested and independent from FRBNY and the Government on September 16).

In addition, as on September 16, neither FRBNY nor the Government could control the AIG board's decision to enter into the Credit Agreement. On September 21, 2008, the Government was not a shareholder and had no voting power over AIG. *See* PFOF ¶ 343 (neither FRBNY nor the Government was a shareholder of AIG in September 2008 and neither had voting power). No individual from FRBNY or the Government attended the September 21, 2008 AIG board meeting or had the ability to tell any AIG director how to vote at that meeting. PFOF ¶ 110 n.11 (no FRBNY or Government personnel attended the September 21, 2008 AIG board meeting); PFOF ¶ 110 (neither FRBNY nor the Government could instruct AIG directors on how to vote). Ultimately, no individual from FRBNY or the Government directed, instructed, or otherwise required the AIG board to vote to approve the Credit Agreement. PFOF ¶¶ 106, 110.

There is no evidence that AIG's board voted to accept the Credit Agreement for any reason other than that it was in the best interest of AIG and its shareholders. The vote was not the result of any "extraneous considerations or influences." *Rales*, 634, A.2d at 936. Nor is there any evidence that either FRBNY or the Government directed Mr. Liddy to execute the September 22, 2008 Credit Agreement. PFOF ¶¶ 100 & n.10, 106 (neither FRBNY nor the Government had the power to direct, or ever in fact directed, Mr. Liddy to take any particular action). The fact that Mr. Liddy was initially named by the Government as Mr. Willumstad's intended replacement has no bearing on whether Mr. Liddy acted independently of the Government.

Starr argues that FRBNY's Monitoring Team exerted control over the decision-making capacities of AIG's management and directors, but that argument is both legally and factually erroneous. *See Starr v. FRBNY*, 906 F. Supp. 2d at 224 ("Also insufficient to establish actual control is Starr's claim that FRBNY had an on-site team at AIG to monitor AIG and 'exercise

FRBNY's consent rights under the Credit Agreement.'").  Between September 16 and September 21, 2008, the FRBNY monitoring team exerted no control over the business decisions of AIG's management or directors.  PFOF ¶¶ 109-10.  Further, AIG's management and directors testified that the monitoring team's presence at AIG in no way interfered with the company's business affairs or the exercise of the board's business judgment.  *See id*.  In any event, the monitoring team's sole purpose was to protect FRBNY's interests as a lender.  PFOF ¶ 109.  Protecting this interest does not constitute control.

More to the point, there is no evidence that the monitoring team exercised any actual control of the specific decision at issue:  approving the Credit Agreement.  As indicated above, there is no evidence that any AIG director was "beholden" to FRBNY or the Government for any reason on September 21, 2008, or that FRBNY or Government personnel in any way influenced the AIG directors' decision to unanimously cast their votes in favor of the Credit Agreement.  Because Starr cannot prove that FRBNY or the Government used the monitoring team to direct the AIG's board's authorization of the Credit Agreement, *see Starr v. FRBNY*, 906 F. Supp. 2d at 216; *Gilbert*, 490 A.2d at 1055, the existence of the monitoring team is a red herring.

In short, Starr has failed to meet its burden of proving that FRBNY or the Government controlled AIG's management and directors, causing or compelling AIG to enter the Credit Agreement.

### 4. Starr Waived Its Right To Challenge The Rescue By Failing To Immediately Assert Duress

Because Starr failed to immediately challenge the AIG board's September 16 and September 21 decisions, Starr is now precluded from asserting that the AIG board's actions were

the result of duress. Accordingly, the Court should hold that, as a matter of law, AIG acted voluntarily and, therefore, no taking occurred.[11]

Economic duress renders a contract voidable, not void, and a party "who accepts the benefits of the contract entered into under economic duress cannot later seek to have the contract rescinded." *Schmidt v. Shah*, 696 F. Supp. 2d 44, 64 & n.14 (D.D.C. 2010) (internal quotation marks omitted) (applying District of Columbia law to settlement agreement); *see, e.g.*, *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1043 (Ct. Cl. 1976) ("failure to raise a claim of duress soon after fear of its consequences had been removed is compelling evidence that there was no duress in fact") (citation omitted); *John Arborio, Inc. v. United States*, 76 F. Supp. 113, 119 (Ct. Cl. 1948) ("silence and inaction constitute . . . clear proof negativing duress").

In late 2011, Starr first claimed duress regarding the rescue loan, years after Starr learned that AIG had accepted FRBNY's loan offer. Indeed, Starr did not assert duress until after AIG and its shareholders had accepted all of the rescue's benefits, which kept AIG from bankruptcy. The law does not countenance a "heads I win, tails you lose" approach "of waiting to see how the arrangement works out and then deciding whether to seek to undo it." *VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001) (looking to New York state law to provide the content of Federal law regulating the validity of a release of claims). A litigant who pursues such a strategy, as a matter of law, cannot claim duress. *See, e.g.*, *Schmidt*, 696 F. Supp. 2d at 64 (holding that even if duress could be shown, the plaintiff was "precluded from attacking the validity" of an agreement where he sought to retain its benefits).

---

[11] The Court should deny Starr's takings claim for the additional reason that AIG and its shareholders, including Starr, waived any right to challenge the rescue through their acceptance of the rescue's benefits for years without challenge.

### 5. AIG's Voluntary Agreement Is Dispositive Of Starr's Claims Because No Separate Agreement By Shareholders Was Required

As the Court stated in ruling on the motion to dismiss, Starr's takings claim depends on "whether *AIG* voluntarily agreed to the terms proposed on September 16, 2008." *Starr*, 106 Fed. Cl. at 78 (emphasis added). Starr now, incorrectly, argues that AIG's voluntary agreement to the rescue loan is not dispositive of Starr's claims because the shareholders did not separately "agree" to the terms of the deal. Pl. Pretrial Concl. of Law ¶¶ 117-121. But, it is undisputed that no shareholder approval was required before AIG could agree to the rescue loan. *See Starr*, 106 Fed. Cl. at 76 ("There have been no allegations that any form of shareholder approval was necessary to enter into the loan agreement . . . ."). As discussed above, the decision to enter into the rescue loan and to agree to convey an equity interest as partial consideration for that loan was for AIG's board to make; AIG's charter permitted AIG's board to issue "blank check" preferred stock with unlimited economic and voting rights without separate shareholder approval.

Although Starr complains that shareholders did not approve the AIG board's decision, Pl. Pretrial Concl. of Law ¶ 120, this fact is neither surprising nor relevant. Boards of directors, rather than shareholders, generally make decisions for a publicly held company and the board members are the shareholders' chosen fiduciaries. It is undisputed that no shareholder approval was required before AIG could agree to the rescue loan through its board of directors. *See Starr*, 106 Fed. Cl. at 76 (Starr's takings theory does *not* rest on any "allegations that any form of shareholder approval was necessary to enter into the loan agreement").

AIG's voluntary acceptance of the rescue loan was binding on AIG's shareholders pursuant to bedrock principles of corporate law that (1) a corporation's directors are the shareholders' duly-elected representatives, and (2) shareholders are bound by the board's decisions. *See, e.g.*, *Anderson v. Abbott*, 321 U.S. 349, 361 (1944) ("Banco's stockholders are

bound by the decisions of the directors which determined, within the scope of the corporate

charter, the kind and quality of the corporate undertaking . . . .  A stockholder is so far an integral

part of the corporation of which he is a member, that he may be bound and his rights foreclosed

by authorized corporate action taken without his knowledge or participation.") (citation and

internal quotation marks omitted); 18A Am. Jur. 2d Corporations § 640 ("A corporation

represents its stockholders in all matters within the scope of its powers, and the stockholders are

bound by the corporation's actions to such extent.") (footnote omitted).

When it acquired AIG stock, Starr agreed, consistent with these foundational principles

of corporate law, to be bound by the decisions of AIG's board, within the scope of the board's

authority under AIG's charter.  *See* 8 Del. Gen. Corp. L, § 141(a) ("The business and affairs of

every corporation organized under this chapter shall be managed by or under the direction of a

board of directors, except as may be otherwise provided in this chapter or in its certificate of

incorporation."); 18A Am. Jur. 2d Corporations § 612 ("Each stockholder impliedly agrees, on

becoming a member of the corporation, to the execution of all powers conferred by law on the

corporation . . . .").  Starr had no right under Delaware law to approve or disapprove the AIG

board's decision to accept the rescue loan, and its separate "agreement" was not required.[12]

It has never been the law that a contract, voluntarily entered and performed by a

company, can support a takings claim because the company's shareholders did not separately

_____

[12] Indeed, Starr's argument that AIG's voluntariness is irrelevant misunderstands why
voluntariness is relevant to Starr's takings and exaction claims.  Because it is undisputed that the
Government did not directly seize or regulate Starr's property, Starr's claims turn upon whether
AIG's actions can be imputed to the Government – that is, if AIG's acceptance of the rescue loan
effected a taking or exaction of shareholders' property because AIG was acting under the
Government's coercive influence.  *See, e.g.*, *Tex. State Bank*, 423 F.3d at 1376–77; *Lion Raisins*,
416 F.3d at 1362-63.  Starr has never argued the shareholders acted under the Government's
coercive influence.  Thus, the shareholders' voluntariness is not at issue.

approve the company's conduct. Such a rule would upend corporate law and make all forms of Government contracts traps for the American taxpayers.

## C.    The Absence Of Economic Loss Forecloses Starr's Claim For Compensation

Our demonstration that no taking occurred because AIG voluntarily and independently agreed to the equity term is dispositive of Starr's taking claim. Starr's taking claim also fails for the separate, and fundamental, reason that Starr failed to prove that it suffered any economic loss from the Government's actions. Whether characterized as a *per se* "physical" taking or a regulatory taking, a claim for compensation requires proof that the plaintiff has suffered a net economic loss. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 239 (2003) (*per se* taking); *A & D Auto Sales*, 748 F.3d at 1157 (regulatory taking). The evidence at trial proves that the Government's rescue of AIG, including the equity term, created significant value for Starr and the other AIG shareholders. *See* PFOF ¶¶ 375-76, 381-86. Because the Government's actions did not cause Starr to suffer an economic loss, Starr cannot recover on its equity takings claim.

### 1.    Starr Has Not Established That Class Members Suffered Any Economic Loss From The Alleged Taking

Even when the Government has taken property outright – which it did not do in this case – a claimant must prove that it suffered economic harm to obtain compensation under the Fifth Amendment. *Brown*, 538 U.S. at 235. If the claimant's "net loss was zero, the compensation that is due is also zero." *Id.* at 237. *See also Olson v. United States*, 292 U.S. 246, 255 (1934) (plaintiff is not entitled to more than being in "as good a position pecuniarily as if his property had not been taken"); *Ellamae Phillips Co. v. United States*, No. 04-1544L, 2014 WL 6900838, at *2 (Fed. Cl. Dec. 9, 2014) (a plaintiff establishing a taking "must be 'made whole but is not entitled to more.'") (quoting *Olson*, 292 U.S. at 255).

In applying this rule, courts consider the value of the plaintiff's property but for the challenged Government action. *See Brown*, 538 U.S. at 240-41; *A & D Auto Sales*, 748 F.3d at 1157. In *Brown*, a case involving a *per se* taking, the Supreme Court acknowledged that the plaintiffs had identified private property taken by the Government, namely, the interest generated by the plaintiffs' funds, which the law required be deposited in interest-bearing accounts. *Id.* But the Court observed that the plaintiffs had lost nothing because they would not have received any interest even in the absence of the Government program. *Id.* Compared to this but-for world, the plaintiffs' "pecuniary loss" was zero, and, thus, the plaintiffs were not entitled to compensation. *Brown*, 538 U.S. at 240-41.

The Federal Circuit recently reaffirmed that a plaintiff must establish economic loss to prevail on a takings claim, and that "proving economic loss requires a plaintiff to show what use or value its property would have had but for the government action." *A & D Auto Sales*, 748 F.3d at 1157. In *A & D Auto Sales*, the Federal Circuit considered takings claims raised by auto dealers in connection with the Federal rescue of the domestic automobile industry. The plaintiffs alleged that General Motors, Inc.'s and Chrysler LLC's termination of their dealership agreements "constituted a taking because the government required them as a condition of its providing financial assistance to GM and Chrysler and/or to the companies that succeeded them in the bankruptcies." *Id.* at 1147.

The Federal Circuit held that the dealers' complaints failed to state a takings claim without "allegations regarding the but-for economic loss of value of the plaintiffs' franchises[.]" *Id.* at 1158. The Court reasoned: "Absent an allegation that GM and Chrysler would have avoided bankruptcy *but for the government's intervention* and that the franchises would have had value in that scenario, or that such bankruptcies would have preserved some value for the

plaintiffs' franchises, the terminations actually had no net negative economic impact on the plaintiffs *because their franchises would have lost all value regardless of the government action*." *Id*. (emphases added).

The rule that a plaintiff must demonstrate that the value of its property would have been greater "but for" the Government's actions stems from the bedrock principle — supported by the "consistent and unambiguous" holdings of the Supreme Court — that "the 'just compensation' required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain." *Brown*, 538 U.S. at 235-36; *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) ("Because gain to the taker . . . may be wholly unrelated to the deprivation imposed upon the owner, it must also be rejected as a measure of public obligation to requite for that deprivation.") (citations omitted); *United States v. Miller*, 317 U.S. 369, 375 (1943) ("Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker."); *Bos. Chamber of Commerce v. Boston*, 217 U.S. 189, 194-95 (1910) (in determining whether a taking has occurred, "the question is, What has the owner lost? not, What has the taker gained?").

Starr failed to prove that, but for the Government's assistance to AIG, Starr would have been in a better financial position than had the Government not provided any assistance at all. *See A & D Auto Sales*, 748 F.3d at 1158; *see also Cienega Gardens v. United States*, 503 F.3d 1266, 1282-83 (Fed. Cir. 2007) (offsetting benefits of the challenged actions must be considered as part of the takings analysis itself and whether there is economic loss, not only part of a just compensation calculation); *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999) (concluding that, without a "negative economic impact on the property, there is no regulatory taking"). In the absence of that proof, Starr's claim fails as a matter of law.

The evidence shows that, but for FRBNY's and the Government's actions, the AIG common stock held by Starr and the other members of the Credit Agreement Class likely would have lost all its value. *See* PFOF ¶¶ 350-66. That alone precludes any recovery by Starr on its equity takings claim. Indeed, far from demonstrating harm to Starr, the evidence shows that, in the actual world, Starr and the class members *benefitted* from FRBNY's and the Government's intervention. *See* PFOF ¶¶ 367-72, 381-86. Not only did the rescue save the shareholders from a complete loss of their investment in AIG, the value of their shares immediately increased from its pre-rescue level. *See* PFOF ¶¶ 369-71.

### a. Starr Is Not Entitled To Value Created By The Government Rescue

Starr has not presented any claim of economic loss to the class; instead, it seeks to present a claim for the value created by the Government's rescue. But Starr can only receive compensation for loss; it has no right to recover additional value created by the Government's actions. "[V]alue which the government itself created" is value that it "in fairness should not be required to pay." *United States v. Cors*, 337 U.S. 325, 333-35 (1949) (plaintiff cannot recover the increase in its property's value created by Government's purchasing demands alone); *see also United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 636 (1961).

The rescue incontrovertibly increased the value of Starr's shares. PFOF ¶ 379, 382, 404. Neither AIG nor its shareholders, therefore, were harmed by the rescue loan. On the morning of September 16, 2008, before the announcement of the rescue loan, the common shareholders' 100 percent ownership interest in AIG was worth $5 billion. PFOF ¶¶ 375, 382, 404. The next day, after AIG announced the rescue, the common shareholders' ownership interest in AIG increased to $6.2 billion. PFOF ¶ 375. Indeed, by September 24, 2008, the common shareholders' ownership interest ballooned to $8.9 billion. PFOF ¶ 370. Thus, even though the market knew and expected that the common shareholders would now own only 20.1 percent of AIG's equity,

that 20.1 percent interest in AIG after the rescue was worth substantially *more* than their 100

percent interest in AIG on the morning of September 16, as the company faced bankruptcy.

Such increases in value caused by the Government's actions are not compensable even

when "loss" is measured by the fair market value approach.  *See, e.g.*, *Cors*, 337 U.S. at 333-34

(compensable market value of tugboat taken must be reduced by the increase in market value

attributable to Government's need for tugboats during the war); *Miller*, 317 U.S. at 375 ("[S]trict

adherence to the criterion of market value may involve inclusion of elements which, though they

affect such value, must in fairness be eliminated in a condemnation case. . . . Since the owner is

to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the

taker.").

Under these settled principles, Starr cannot recover because it cannot show that its stock

holdings would have had greater value but for the Government action.  *See, e.g.*, *Brown*, 538

U.S. at 240-41; *see also A & D Auto Sales*, 748 F.3d at 1158.

### b. Starr Cannot Avoid Showing Economic Loss Even If Starr Could Show That FRBNY Would Not Have Let AIG Fail

Starr argues that, because the Government allegedly would not have permitted AIG to

fail, it is immaterial that the Government's intervention increased the value of AIG's stock.  *See*

Pl. Pretrial Concl. of Law ¶ 50(b).  On the basis of this incorrect factual premise, *see* PFOF

¶¶ 80, 390-92, Starr posits a "but-for world" in which the Government provided exactly the same

loan to AIG, without the equity term.  Starr's argument lacks either a factual or legal basis.

As a factual matter, the principal Government actors made clear that the terms were non-

negotiable, meaning that if AIG refused to accept the equity term as a component of the loan it

would have had to file for bankruptcy.  *See* PFOF ¶¶ 390-92.  This fact alone negates the entire

premise of Starr's characterization of the appropriate "but-for world."

As a legal matter, Starr's position collides with binding precedent.  The Federal Circuit in *A & D Auto Sales* rejected the very argument that Starr advances.  The plaintiffs in that case argued that they should not have to allege loss compared to a but-for world of bankruptcy because, they claimed, the Government would not have permitted the automakers to fail.  *See* Oral Argument at 14:32-18:34, *A & D Auto Sales*, 748 F.3d 1142 (Nos. 2013-5019, 2013-5020), *available at* www.cafc.uscourts.gov/oral-argument-recordings/all/ad.html.  The Court held such an allegation to be insufficient – even at the pleading stage – and explained that the appropriate "but-for world" would look to the value of the plaintiffs' property without *any* Government financial assistance.  *A & D Auto Sales*, 748 F.3d at 1158.  There is no meaningful distinction between the argument rejected by the Federal Circuit in *A & D Auto Sales* (that the Government would not have let the automakers fail) and Starr's argument here (that the Government would not have allowed AIG to fail).

Starr argues that *A & D Auto Sales* is inapposite because *A & D Auto Sales* is a regulatory takings case and Starr claims it suffered a "direct appropriation."  Pl. Pretrial Concl. of Law ¶ 50(a).  Starr, of course, cannot avoid the requirements of a regulatory takings claim by simply stating its property was physically appropriated when it clearly was not.  In any event, it does not matter for the purpose of analyzing economic loss whether the Court considers Starr's claim as a regulatory taking or a *per se* taking: *all* takings claims, not just regulatory takings, require proving a loss compared to what would have happened without the Government's actions.  *Brown*, 538 U.S. at 240-41 (*per se* taking); *see also A & D Auto Sales*, 748 F.3d at 1157 (citing *Brown*).  Starr has not made, or even attempted, such a showing.  Its claims, therefore, must fail.

## 2. Starr Cannot Shift Its Burden Of Proving Economic Loss

Starr incorrectly contends that, once the Government is found to have taken private property, a remedy must be provided unless the Government can prove the existence of

offsetting benefits.  *See* Pl. Pretrial Concl. of Law ¶ 14 n.1, ¶ 50(a), (c); Pl. Opp. to Summ. J. at

42-43.  Starr's argument mistakes the traditional common law "damages" analysis for the

analysis of whether a plaintiff has suffered a taking without just compensation.  Although courts

can determine liability and damages separately in the traditional tort or contract analysis, the

analysis is intertwined in the takings context.  The relevant portion of the Fifth Amendment

states:  "nor shall private property be taken for public use, without just compensation."

U.S. Const. amend. V.  That is, the Government has no liability under the Constitution unless

and until such a taking results in an economic loss without just compensation.  Demonstrating

economic loss is not merely a component of the remedy in a takings case; it is a prima facie

element of Starr's takings claim.  *See, e.g.*, *Brown*, 538 U.S. at 240 (finding "no violation of the

Just Compensation Clause of the Fifth Amendment" because "the owner's pecuniary loss" was

"zero").[13]

In *Brown*, for example, even though a taking of property was shown, that did not end the

inquiry.  To recover, the plaintiff had to show that just compensation was due because "[t]he

Fifth Amendment does not proscribe the taking of property; it proscribes taking without just

compensation."  *Id.* at 235 (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank

of Johnson City*, 473 U.S. 172, 194 (2003)).  In this case, as in *Brown*, because the plaintiff's

"net loss was zero, the compensation that is due is also zero."  *Id.* at 237.

---

[13] Starr cannot shift its burden of providing such evidence by claiming that the
Government has to prove "offsetting benefits."  Although the Government has the right to
establish "offsetting benefits" "to rebut the plaintiff's economic impact case," it is always the
plaintiff's burden to "establish economic impact" in the first instance.  *See CCA Assocs. v.
United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011).  Starr fails to present any evidence of
economic loss but for the Government's action.

### D. Starr Has Failed To Establish That The Equity Term Deprived It Of A Legally Cognizable Property Interest

As we have shown, Starr's taking claim fails both because (1) AIG voluntarily and independently agreed to the equity term, and (2) Starr failed to prove it suffered any economic loss from the Government's action. Starr's claim fails for the additional reason that Starr failed to prove that it possessed a cognizable property interest that could be taken. *See Starr*, 106 Fed. Cl. at 71; *Estate of Hage v. United States*, 687 F.3d 1281, 1286 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 2824 (2013); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)).

Starr long ago conceded that the Government did not actually take Starr's shares of AIG common stock. *Starr*, 106 Fed. Cl. at 72. Starr has failed to identify any other cognizable property right owned by Starr and abridged by the rescue loan.

First, the shareholders did not own a cognizable property interest in what Starr alleges was taken: the right to exclude the Government or anyone else from obtaining newly-issued, preferred shares that affected the common shareholders' percentage ownership in AIG. Second, Starr cannot establish a property interest based on what it wishes or hypothesizes the Government could have offered AIG instead of the loan that FRBNY actually offered. Last, Starr cannot establish a property right created by substituting the Fifth Amendment for part of a Delaware corporate overpayment claim.

### 1. Starr Was Not Deprived Of Any Property Interest It Possessed Under Delaware Law

The Fifth Amendment "protects rather than creates property interests." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1364-65 (Fed. Cir. 2009) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)). To determine whether a property interest exists, therefore, courts refer "to 'existing rules or understandings that stem from an independent

source such as state law.'" *Id.* at 1365 (quoting *Phillips*, 524 U.S. at 164). Because AIG is a Delaware corporation, its shares are a creation of Delaware law, and, therefore, the property interests that Starr alleges the Government took must exist under Delaware law. *See*, *e.g.*, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91 (1987) ("It . . . is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."); *id.* at 94 ("The very commodity that is traded in the securities market is one whose characteristics are defined by state law."). A plaintiff cannot support a takings claim by asserting a property interest "that is different and more expansive than the one actually possessed." *Rogers Truck Line, Inc. v. United States*, 14 Cl. Ct. 108, 114 (1987); *see also Colvin Cattle Co. v. United States*, 468 F. 3d 803, 806 (Fed. Cir. 2006).

Starr argues that the "equity and voting rights" of its own shares were taken when AIG promised to issue new, preferred stock to the Trust. Pl. Pretrial Concl. of Law ¶ 14. Because AIG promised equity equivalent to 79.9 percent of AIG's common stock, the preferred shares "diluted" the ownership interest in the common stock: what used to be 100 percent of AIG's equity would become 20.1 percent of AIG's total equity after the Trust received the Series C

Preferred Stock, and common shareholders would correspondingly only possess 20.1 percent of the total voting rights in AIG.[14]

Starr's dilution argument rests on the assertion that AIG's shareholders were denied their "right to exclude." *See* Pl. Pretrial Concl. of Law ¶¶ 20-25. Although the right to exclude is a property right, *see id.* ¶ 20 (quoting *Loretto*, 458 U.S. at 433), that right applies only to the property that the plaintiff actually owns, and it is settled that a shareholder does not possess a right to exclude others from shares he or she does not own.

Starr had no cognizable property interest in preventing the dilution of its "equity and voting rights" because Delaware law does not provide AIG's shareholders any right to control the company's decisions to issue stock or to reject the dilution of economic rights and voting power that might result from a company's decision to issue stock. Instead, Delaware law gives the corporation, not its shareholders, authority to "own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares," 8 Del. C. § 160, including common and preferred stock. *See, e.g.,* 8 Del. C. §§ 151–53, 157, 161, 166. These provisions confirm the AIG board's "*exclusive* authority to issue stock and regulate [the] corporation's capital structure." *Grimes v. Alteon, Inc.,* 804 A.2d 256, 261 (Del. 2002) (emphasis added).

---

[14] Ownership dilution is distinct from economic dilution, in which the existing shares' economic value decreases. PFOF ¶¶ 373-74. If a company worth $1 million has 100 shares and issues 100 more shares for another $1 million, the existing shareholders have suffered ownership dilution – 100 shares used to be 100 percent of the company, but now are only 50 percent. But those shareholders have not suffered any economic dilution – the company is now worth $2 million with 200 shares, so the original 100 shares are still worth $1 million. *See* Saunders, Tr. 8197, Line 12-Tr. 8200, Line 12; DX-2741 (Saunders Demonstrative); Zingales, Tr. 8679-81. As we have already established, the shareholders suffered no decrease in their shares' value; indeed, their shares were more valuable after the rescue than before, when AIG faced bankruptcy.

Nor has Starr shown that AIG's Certificate of Incorporation granted common stockholders any further contractual protection against dilution of their equity interest beyond that provided by Delaware law. As permitted by 8 Del. C. §§ 102(a)(4) & 151, and approved by the company's stockholders, AIG's certificate included a provision expressly authorizing AIG's board to issue "blank check preferred" stock, which could include super voting rights, priority dividend and redemption rights, conversion rights, and rights on liquidation or dilution. *See* PFOF ¶ 104. Starr possessed no property or contractual right to block AIG from issuing these shares, as permitted by AIG's charter.

The Credit Agreement Class members, therefore, had no property interest in not being diluted by AIG's issuance of stock, and no right to exclude others from obtaining an interest in AIG's equity as a result of the corporation issuing new shares. "Clearly a corporation is free to enter into . . . numerous transactions, all of which may result legitimately in the dilution [of present equity holders]. Such a dilution is a natural and necessary consequence of investing in a corporation." *Feldman v. Cutaia*, 956 A.2d 644, 656 (Del. Ch. 2007) (quoting *Oliver v. Boston Univ.*, No. Civ. A. 16570-NC, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006)); *see also Zimmerman v. Crothall*, 201 2 WL 707238, at *17 (citing *Savin Bus. Machs. Corp. v. Rapifax Corp.*, No. 5331, 1978 WL 2498, at *6 (Del. Ch. Feb. 15, 1978); *cf. Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531, 538 (Del. Ch. 1999) (issuing stock is "a firm's fundamental source for raising capital").

Because Starr has no property rights related to AIG's issuance of stock, and because Delaware law provides Starr with no protection against dilution of its ownership interest, Starr cannot claim the loss of a protected property interest simply because AIG chose to issue stock to a third party, nor can Starr claim any right to recover for the simple fact that such a transaction

resulted in a reduction in the percentage of economic rights and voting power associated with Starr's shares.

## 2. Starr Cannot Establish A Property Interest Based Upon Alternative Or Hypothetical Forms Of Assistance

Starr attempts to establish that the Government took shareholders' property interests by arguing shareholders would have been better off if the Government had offered completely different assistance to AIG. Contrary to Starr's position, a plaintiff does not have a property interest in the Government hypothetically acting or not acting in a way that will generate profit or benefits for the plaintiff. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1332 (Fed. Cir. 2012) (plaintiff had no property right in access to government-created mitigation banking program even though plaintiff bought property after seeking assurance the land would be suitable for mitigation banking, because "hopes and expectations" are "not in and of themselves a cognizable property interest"); *Palmyra Pac. Seafoods*, 561 F.3d at 1367 (reduction in value of plaintiffs' license to operate on an island due to a ban on commercial fishing in the waters surrounding the island was "not the result of a compensable taking of any cognizable property interest"); *Colvin Cattle*, 468 F.3d at 808 (rejecting takings claim of lost value of ranch resulting from cancellation of grazing lease on Federal land in which plaintiff had no property right.); *Acceptance Ins. Co. v. United States*, 84 Fed. Cl. 111, 116 (2008) (plaintiff's interest in completing sale transaction without involvement from the Government is a collateral interest, not a protected property right), *aff'd*, 583 F.3d 849 (Fed. Cir. 2009). Starr therefore cannot claim to have had, or to have lost, any right to some hypothetical alternative form of Government assistance that might have benefitted the shareholders even further. Instead, Starr must show – as it cannot – that it would have been better off without the rescue than it was with it. *See A & D Auto Sales*, 748 F.3d at 1157 (economic harm determined based on difference between how the

plaintiff fared under the "government action" and how the plaintiff would have fared absent that action).

Nor can Starr prove a taking by showing that third parties received financial assistance on terms that were better – or worse – than AIG's rescue. *See, e.g., Arctic King Fisheries Inc. v. United States*, 59 Fed. Cl. 360, 372 (2004) (plaintiff has no cognizable property interest in "benefits that [it] might have received" under a statute, and which allegedly similarly situated parties did receive, because "[t]o rule otherwise would be awkwardly to engraft equal protection considerations onto this takings case"); *Bienville Quarters, LLC v. E. Feliciana Parish Police Jury*, Civ. Action No. 07-158-JJB-DLD, 2010 WL 2653317, at *3 (M.D. La. June 25, 2010) ("[T]he right to be free from unequal treatment under the law, granted by the Equal Protection Clause, is not protected by the Takings Clause."). Indeed, this Court has already dismissed Starr's claim that the Government treated AIG and its shareholders differently from other institutions during the financial crisis. *Starr*, 106 Fed. Cl. at 61.

Moreover, second-guessing Government agencies' decisions to provide discretionary benefits to different institutions at different times and under different, shifting, and complex circumstances is a task particularly ill-suited to the judiciary. *See, e.g.*, *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 544 (2005) (The Takings Clause should not "empower . . . courts to substitute their predictive judgments for those of elected legislatures and expert agencies."); *Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.*, 967 F.2d 648, 656 (D.C. Cir. 1992) ("The question is not whether there were other subgroups who could or should have borne a greater share of the burden as a policy matter; the judiciary is not institutionally fitted to undertake such an inquiry.").

### 3. Starr Cannot Establish A Property Interest Premised On A Delaware Corporate Overpayment Theory[15]

As discussed above, Delaware law does not provide Starr, as a holder of AIG common stock, with any categorical right to exclude others from diluting the economic and voting rights associated with Starr's shares. In certain circumstances involving transactions with a controlling shareholder, Delaware law does recognize minority shareholders' rights against a discriminatory loss of economic value as a result of wrongful corporate overpayment. *See Feldman*, 956 A.2d at 656. Based on this protection, Starr alleges that the Government took Starr's property when it allegedly caused AIG to issue shares to the Government for insufficient consideration, leading to the alleged expropriation of economic value and voting rights from Starr. *Starr*, 106 Fed. Cl. at 64; *see also Starr Int'l Co., Inc. v. United States*, 112 Fed. Cl. 601, 604 (2013) (*Starr III*).

This Court concluded that the property interest Starr asserts for its Equity Claim is premised on such a "corporate overpayment" theory. *See Starr*, 106 Fed. Cl. at 62 & n.10; *Starr III*, 112 Fed. Cl. at 604. It is undisputed that the Government was not a majority shareholder at the time AIG agreed to provide the economic equivalent of 79.9 percent of its common stock as consideration for an $85 billion loan from FRBNY. In its decision, however, the Court determined that Starr had properly alleged a taking of shareholders' (as opposed to AIG's) property, for one of two alternative reasons: first, that Starr's claim fit "comfortably" within Delaware law for a shareholder claim (an interpretation with which we respectfully disagree, *see* Section III.B), *Starr*, 106 Fed. Cl. at 65; or second, that "'the Government has a preexisting duty

---

[15] The Court has previously ruled that Starr does possess a property interest based upon substituting a duty under the Fifth Amendment for part of the requirements for a Delaware corporate overpayment claim. *Starr*, 106 Fed. Cl. at 65. We respectfully disagree with this aspect of the Court's decision, and set forth our previously expressed position herein to ensure we have preserved our position for purposes of any further review.

under the Fifth Amendment not to take private property for public use without paying just compensation,'" and therefore, the Government had an obligation identical to a majority shareholder's duty in a corporate overpayment claim "not to appropriate minority shareholders' property interests." *Starr II,* 111 Fed. Cl. at 481 (quoting *Starr*, 106 Fed. Cl. at 65).

We respectfully submit that duties under the Fifth Amendment cannot be substituted for fiduciary duties that exist under Delaware law in defining whether shareholders possess a cognizable property interest subject to the Fifth Amendment. The Fifth Amendment does not give rise to any property interest. *See, e.g., Palmyra Pac. Seafoods*, 561 F.3d at 1364-65 ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (quoting *Phillips*, 524 U.S. at 164). Unlike Delaware law regarding fiduciary duties, the Fifth Amendment does not purport to allocate rights of action among a corporation, its officers and directors, and its majority and minority shareholders. Accordingly, the Fifth Amendment cannot supply a right concerning stock dilution that did not exist under Delaware law.

In sum, Starr has failed prove that it possessed a cognizable property interest subject to a takings claim. Even if, however, the Court determines that Starr had a property right based upon the combination of the Fifth Amendment and the duties of a majority shareholder in a corporate overpayment claim, Starr's takings claim still fails because, as explained above, AIG voluntarily agreed to the rescue loan and because Starr has not established any harm to the shareholders from the Government's actions.

### E. Starr Has Abandoned A Regulatory Takings Claim And Cannot Otherwise Meet The Requirements Of Such A Claim

As we have shown, Starr has failed to demonstrate any type of taking without just compensation even based on its own incorrect assertion that its claim should be analyzed as a *per se* taking. Starr admitted it could not establish a regulatory taking, *see, e.g.*, Pl. Pre-Trial Concl. ¶¶ 15, 50, and its inability to do so is underscored by application of the three factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), for analyzing a regulatory takings claim: (1) economic impact on the plaintiff's property by the Government's action; (2) interference with the plaintiff's "distinct investment-backed expectations"; and (3) the character of the governmental action. Each of the factors confirms that no regulatory taking occurred.

First, as demonstrated above, not only did Starr fail to show economic loss as a result of the Government's assistance, but the evidence at trial established that Starr *benefitted* from the rescue. *See* PFOF ¶¶ 349, 367-72, 379, 381-86, 404. A regulatory takings claim would thus fail because the existence of substantial economic injury is indispensable to demonstrating a regulatory taking. *Seiber v. United States*, 364 F.3d 1356, 1371 (Fed. Cir. 2004); *Hendler*, 175 F.3d at 1385; *see also Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994). Indeed, courts have consistently required a plaintiff to show significant negative economic impact before finding a regulatory taking. "[W]e are aware of no case in which a court has found a taking where diminution in value was less than 50 percent." *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (internal quotation marks omitted). "[W]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Cienega Gardens*, 503 F.3d at 1282 (internal quotation marks omitted) (quoting *Cienega Gardens*, 331 F.3d 1319, 1340 (Fed.

Cir. 2003)); *see also Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1195 (Fed. Cir. 2004) ("courts have traditionally rejected takings claims in the absence of severe economic deprivation."); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (13.1 percent economic impact "weighs against" plaintiff's takings claim); *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (46 percent diminution insufficient for taking); *Jentgen v. United States*, 657 F.2d 1210, 1213 (Ct. Cl. 1981) (50 percent diminution insufficient for taking); *Walcek v. United States*, 49 Fed. Cl. 248, 271-72 (2001), *aff'd*, 303 F.3d 1349 (Fed. Cir. 2002) (59.7 percent diminution insufficient for taking); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992) ("in at least *some* cases the landowner with 95% loss will get nothing") (emphasis in original); *Seiber*, 364 F.3d at 1371 ("Our court has repeatedly made clear that the failure to provide evidence to support the existence of economic injury is fatal to a takings claim.").

Second, Starr has not shown that the challenged Government conduct affected any distinct investment-backed expectations held by plaintiffs. *See Penn Central*, 438 U.S. at 124. In *Cienega Gardens*, 503 F.3d at 1289, the Court laid out a four-step analysis for considering the reasonable expectations factor of *Penn Central*. The first step of the analysis is to determine the actual investment made in the property. The second step is to determine the benefits that the owners reasonably could have expected at the time they entered into the investment. The third step is to determine what expected benefits were denied or restricted by the Government action. Finally, the claimant must establish that it actually made the investment because of its reasonable expectation of receiving the benefits denied or restricted by the Government action, rather than the remaining benefits.

Starr has not demonstrated that the members of the Credit Agreement Class had reasonable, investment-backed expectations that, if the company faced severe financial difficulty, the Government would provide AIG a below-market rescue loan that did not dilute the plaintiffs' equity interests. Indeed, it is clear that, at the time of their investments,[16] shareholders had no such expectations. Starr's vice president – a Credit Agreement Class member – expressly stated that neither he nor Starr had this expectation. PFOF ¶ 412. A reasonable investor certainly could not have expected that, if AIG – a stranger to the Federal Reserve – faced bankruptcy, it would receive a loan under section 13(3) of the Federal Reserve Act, given how rare such loans are, and that a Federal Reserve bank has no obligation to make any loan to a particular company under section 13(3).

Moreover, "equity kickers," which dilute the percentage of ownership interest of existing shareholders, are common features of loans to distressed companies.[17] *See* PFOF ¶ 413. Reasonable investors in AIG thus would have expected the possibility of such dilution. *See Feldman*, 956 A.2d at 656 & n.35 ("Clearly, a corporation is free to enter into … numerous transactions, all of which may result legitimately in the dilution [of present equity holders]. Such a dilution is a natural and necessary consequence of investing in a corporation[.]") (citation omitted) (alterations in original). Under Delaware law, there is no inherent right against dilution of voting power when new equity is issued. *Zimmerman v. Crothall*, No. 6001-VCP, 2012 WL 707238, at *17 n.95 (Del. Ch. Mar. 5, 2012) (citing *Savin*, 1978 WL 2498, at *6 ("In the first

---

[16] Investment-backed expectations are measured at the time the plaintiff acquires the property. *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348-49 (Fed. Cir. 2004).

[17] *See Bluebonnet Sav. Bank F.S.B. v. United States*, 339 F.3d 1341, 1343 (Fed. Cir. 2003) (plaintiff, unable to obtain financing to cover short-term debts, gave lender 49 percent equity interest in plaintiff's profits to obtain long-term loan).

place 8 Del. C. § 102(b)(3) provides that no stockholder of a Delaware corporation shall have any preemptive right to subscribe to additional issues of stock unless the certificate of incorporation expressly so provides.")).

Finally, with respect to the character of the Government action, Starr has not shown that it has "been unfairly forced to bear a burden that should be borne by the public." *See Maritrans*, 342 F.3d at 1358. When considering the character of the Government action, the Court must consider "the actual burden imposed on property rights, or how that burden is allocated." *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009) (quoting *Lingle*, 544 U.S. at 543). "'[T]he *magnitude or character of the burden* a particular regulation imposes upon private property rights' is an important consideration." *Id.* (emphasis in original) (quoting *Lingle*, 544 U.S. at 542). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124 (internal citation omitted).

The evidence showed that the Government required nothing more for the rescue loan than is typically sought when lending to distressed companies and required nothing more than what was sought from AIG by private sector participants. *See* PFOF ¶¶ 120-28, 413. No shares were taken from class members. *See* PFOF ¶¶ 341-46. Rather, AIG issued preferred stock in return for a valuable loan that preserved, and even increased, the value of the common stock. *See* PFOF § V.A.

## II.  Starr Has Failed To Prove Its Claim That The Equity Term Was An Illegal Exaction

As an alternative to its takings claim, Starr contends that the provision of the equity interest as consideration for the $85 billion loan was not permissible under the Federal Reserve

Act and, accordingly, constitutes an illegal exaction.  Starr has failed to prove its illegal exaction

claim, first and foremost, because Starr cannot establish an illegal act.  As a matter of law, the

Federal Reserve acted within its authority under section 13(3) when it conditioned lending to

AIG on AIG's agreement to convey a 79.9 percent equity interest.  Second, even if the equity

term was illegal, AIG's voluntary agreement to the loan's terms vitiates any illegality.  Third,

Starr has failed to identify a statute that expressly or by implication mandates the payment of

money damages to Starr based on the alleged violation.  Fourth, Starr has failed to show that it

had any cognizable interest in property or money paid to the Government.  Fifth, the Court

should reject Starr's request that the Court rewrite the Credit Agreement – a complex bilateral

contract to which Starr is not a party – by simply excising the allegedly illegal equity term.  The

evidence establishes that the Federal Reserve considered the equity term vital to the loan and

that, contrary to Starr's theory, FRBNY would not have loaned to AIG without it.  Moreover, the

Credit Agreement required that if any term was subsequently determined to be illegal, AIG

would provide the economic equivalent of that term in a legally permissible form, and Starr has

not shown that all economically equivalent alternatives to the equity term would be illegal.  Last,

Starr has waived any claim it might have had by accepting the substantial benefits of the rescue

loan (and subsequent Government support) for years before claiming that the equity term was

illegal.

## A.     The Equity Term Was Legal

An illegal exaction is a claim "in which the plaintiff has paid money over to the

Government, directly or in effect, and seeks return of all or part of that sum" and "the value sued

for was improperly paid, exacted, or taken from the claimant in contravention of the

Constitution, a statute, or a regulation."  *Eastport S.S. Corp. v. United States*, 372 F.2d 1002,

1007 (Ct. Cl. 1967), *abrogated in part on other grounds by Malone v. United States*, 849 F.2d

1441, 1444-45 (Fed. Cir.1988). Put another way, illegal exaction cases are "those in which 'the Government has the citizen's money in its pocket' and the claim is 'to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute.'" *Id*. at 1007-08 (citations omitted).

Starr's exaction claim fails because the rescue loan to AIG was legal under the Federal Reserve Act. Congress provided FRBNY full statutory authority to propose, and provided the Board of Governors full statutory authority to authorize, a loan conditioned in part on an equity term; Congress has also endorsed and ratified the Federal Reserve's authority to do so.

Starr's further assertion that FRBNY and the Treasury Department were prohibited from holding the AIG equity interest and that the Federal Reserve created the Trust to "circumvent" this purported prohibition is both legally and factually incorrect, in addition to being irrelevant. In advancing this argument, Starr relies primarily on documents that are legally irrelevant and that, in any event, do not support Starr's position. *See* Fed. R. Evid. 701(b) (permitting fact witness opinion testimony only if it is helpful in determining a fact in issue); Fed. R. Evid. 704 Ad. Comm. Note (Rule 701, among others, should "exclude opinions phrased in terms of inadequately explored legal criteria").

Starr also raises a host of grievances that, even if liberally construed, do not bear on an illegal exaction analysis. First, Starr argues that the loan terms offered to and accepted by AIG constituted improper "punishment" without notice and opportunity to be heard. Pl. Pretrial Concl. of Law ¶¶ 102-110. Any complaint about a lack of notice and opportunity to be heard is a due process claim, separate from an illegal exaction claim, for which this Court does not possess jurisdiction. *Starr*, 106 Fed. Cl. at 61 ("Starr may maintain its Due Process claim in this Court only insofar as it is based on an illegal exaction theory."). This argument, moreover, is

unsupported by the record and misconstrues the nature of the Federal Reserve's authority to set lending terms to reflect the policy implications and risks of lending. Starr also claims that conditioning lending on AIG's grant of equity was not "necessary," or that other institutions received financial assistance on purportedly more favorable terms. These are inappropriate policy critiques of the Federal Reserve's exercise of its discretionary authority and an attempt to resurrect Starr's dismissed equal protection claim. Finally, Starr's apparent view that the interest rate on the AIG loan between September 16 and November 10, 2008, did not "accommodate[] business and commerce," Pl. Pretrial Concl. Of Law ¶¶ 6-11, 66-68, is irrelevant, incorrect, and legally incapable of establishing an illegal exaction claim.

1. **The Federal Reserve Had Statutory Authority To Condition Lending On The Equity Term**

The Federal Reserve acted within its legal authority in conditioning FRBNY's lending on AIG's agreement to convey a 79.9 percent equity interest. In seeking the equity term, the Board of Governors properly exercised its discretionary authority to condition an individual section 13(3) loan on such "restrictions" and "limitations" as it deemed appropriate. Also, because the equity term helped the Federal Reserve effectuate its express, rescue-lending authority, the "incidental powers" conferred by section 4(4) of the Federal Reserve Act also authorized that term. Congress's prompt and repeated ratification of the equity term confirms the legality and appropriateness of the Federal Reserve's interpretation and exercise of its authority.

a. **Congress Granted The Board Of Governors The Power To Authorize Loans Conditioned On Equity In the Last Sentence Of Section 13(3)**

By its terms, section 13(3) addresses extraordinary events: in "unusual and exigent circumstances," Federal Reserve banks may act to provide rescue loans to non-bank "individuals, partnerships, or corporations" to maintain the financial system's stability. 12 U.S.C. § 343

78

(2008);[18] *see* 12 C.F.R. § 201.4(d) (permitting rescue lending when necessary to avoid adverse effects to the broader economy).

Recognizing the exceptional nature of such rescue loans, Congress vested the Board of Governors with broad discretionary authority to tailor rescue loans based on policy judgments about the public interest. The last sentence of section 13(3) provides that "[a]ll such discounts for individuals, partnerships, or corporations shall be subject to *such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe*." 12 U.S.C. § 343 (2008) (emphasis added).

This sentence unambiguously grants to the Board of Governors the authority to set terms and conditions on individual rescue loans – "discounts" in that sentence means loans[19] – as the Board of Governors deems appropriate. The provision reflects Congress's intent that the Board of Governors, not the courts, devise terms for specific section 13(3) loans, and that the Board of Governors' policy judgments with respect to these terms should not be second-guessed. Courts

---

[18] The full text of section 13(3), as in effect in 2008, was:

> In unusual and exigent circumstances, the Board of Governors of the Federal Reserve System, by the affirmative vote of not less than five members, may authorize any Federal reserve bank, during such periods as the said board may determine, at rates established in accordance with the provisions of section 357 of this title, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank: Provided, That before discounting any such note, draft, or bill of exchange for an individual or a partnership or corporation the Federal reserve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions. All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe. 12 U.S.C. § 343 (2008).

[19] In finance, "to discount" means to lend money after the deduction of interest, or the act of discounting, although the term is also sometimes used to mean just the interest deducted. Am. Heritage Dictionary (4th ed., 2009) ("discount").

have given great weight to agencies' interpretations of their statutory authority where, as here, the statutory scheme contemplates the exercise of that authority through informal or individualized determinations laden with policy considerations. *See Douglas v. Ind. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1210 (2012) ("[T]he agency is comparatively expert in the statute's subject matter. And the language of the particular provision at issue here is broad and general, suggesting that the agency's expertise is relevant in determining its application."); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agency determination was respected when the administration of a statute "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns") (internal quotation marks omitted); *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324–25 (1994) (giving "controlling weight" to agency interpretations when Congress expressly delegated "the authority to make specific policy determinations").[20]

Conditioning a section 13(3) loan on a borrower's agreement to convey equity falls comfortably within the plain meaning of a "limitation" or "restriction" on the offering and acceptance of that loan. The Board of Governors applied just such "restrictions" and "limitations" to the AIG loan, conditioning the assistance on AIG's conveying a 79.9 percent equity interest. PFOF ¶¶ 201-209. In imposing this restriction or limitation on the AIG loan, the Board of Governors exercised its discretionary authority explicitly delegated by Congress.

Starr's proposed reading of section 13(3) improperly renders part of that statute meaningless. Starr argues that the Board of Governors may only attach "limitations" or "restrictions" on *interest rates*, saying that the term "discounts" means the interest rates on

---

[20] Determining that section 13(3) permits the Board of Governors to condition lending on a borrower's agreement to convey equity requires only the application of straightforward principles of statutory construction, without any need for resort to *Chevron* deference.

section 13(3) loans, not the loans themselves. Pl. Pretrial Concl. of Law ¶¶ 63, 67. Starr's

reading of "discounts" is incorrect. The Federal Reserve Act uses the term "rate" when it means

interest rates, both in section 13(3) and in section 14(d) (12 U.S.C. § 357), which governs

interest rates. Section 13(3) uses the different term "discount" to mean a different thing entirely:

the loan itself. "A cardinal doctrine of statutory interpretation is the presumption that Congress's

'use of different terms within related statutes generally implies that different meanings were

intended.'" *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1389 (Fed. Cir. 2013) (citations

omitted).

Precluding the Board of Governors from attaching "limitations" or "restrictions" other

than interest rates would render the last sentence of section 13(3) a nullity; the rest of section

13(3) already explains the appropriate method for the Board of Governors to determine interest

rates. Courts should interpret statutory provisions so as not to render portions superfluous. *See*

*Astoria Federal Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991); *Platt v. Union Pacific*

*R. Co.*, 99 U.S. 48, 58 (1879) ("A legislature is presumed to have used no superfluous words.").

By contrast, the Federal Reserve's reading of the last sentence of section 13(3) fits

smoothly with section 13(3)'s reference to interest rates: Congress conferred on the Board of

Governors authority to set terms and conditions on individual rescue loans *in addition to* the

requirement of interest.

Starr also implies that the proper meaning of "limitations, restrictions, and regulations"

embraces only those set forth in Federal Reserve bulletins circulated in the 1930s. Under this

interpretation, any section 13(3) lending would be limited to no more than one percent of a

reserve bank's paid-in capital stock and surplus. Pl. Pretrial Concl. of Law ¶ 64; *see* 1932

Circular, 18 Fed. Reserve Bulletin at 518-20; 1936 Circular, 22 Fed. Reserve Bulletin at 123-25.

These bulletins did not state or suggest, though, that this or any other limitation was the *only* "limitation" or "restriction" the Board of Governors could impose. To the contrary, the bulletins expressly recognized that "[a]ny Federal reserve bank may prescribe such additional requirements and procedures respecting discounts hereunder as it may deem necessary or advisable." 1936 Circular, 22 Fed. Reserve Bulletin at 123-24; Aug. 1932 Circular, 18 Fed. Reserve Bulletin no. 8 at 520. As one bulletin explained: "In view of the fact that the power conferred by this provision can be exercised only in 'unusual and exigent circumstances,' the Federal Reserve Board has not prescribed any formal regulations governing the exercise of this power," plainly contemplating the imposition of additional "limitations" and "restrictions" tailored to individual rescue loans. 18 Fed. Reserve Bulletin no. 8 at 518.

Although this Court's previous decisions cited commentary suggesting that there "is no express authority for the Federal Reserve to purchase . . . equities," that commentary was directed only toward the purchase of equities as part of the Federal Reserve's open market operations to implement general monetary policy pursuant to section 14 of the Federal Reserve Act, an issue not implicated in this case. *Starr*, 106 Fed. Cl. at 86 (citing David Small & James Clouse, *Limits the Federal Reserve Act Places on Monetary Policy*, 19 Ann. Rev. Banking L. 553, 556, 569-74 & n.79, 579 (2000). The commentary did not address any prohibition on conditioning section 13(3) rescue lending on the provision of equity as consideration for the loan. David Small & James Clouse, *Limits the Federal Reserve Act Places on Monetary Policy*, 19 Ann. Rev. Banking L. 553, 556, 569-74 & n.79, 579 (2000). The two are completely different transactions that implicate different legal considerations.

Starr has made no showing that conditioning lending on AIG's agreement to convey equity was not a valid "limitation" or "restriction" on the offering and acceptance of the AIG

loan.  Instead, Starr argues that section 13(3)'s reference to interest rates precludes imposition of any additional lending terms.  This interpretation finds no support in the statute's plain language.  Although section 13(3) refers to interest rates, nothing about that reference indicates that consideration for a loan under section 13(3) is limited to interest.  As discussed in PFOF ¶¶ 185-93, many loans extended under section 13(3) (including some with terms that Starr has alleged should have been extended to AIG) have included at least some consideration other than interest.  Congress expressly mentioned interest to specify the parameters for selection of the interest rate, but that reference does not imply an exclusion of other potential terms about which Congress saw no need to make special provision.

Starr's argument that Congress's inclusion of certain required conditions means that Congress meant to forbid the Board of Governors from imposing any other conditions is an attempted application of the canon of statutory construction "*expressio unius est exclusio alterius*."[21]  Although it is "often a valuable servant," the *expressio unius* maxim is "a dangerous master to follow in the construction of statutes."  *Custis v. United States*, 511 U.S. 485, 501 (1994) (citing *Ford v. United States*, 273 U.S. 593, 612 (1927)) (internal quotation marks and citation omitted).  "It rests on the assumption that all omissions in legislative drafting are deliberate, an assumption we know to be false."  *Id.* at 501-02.  The maxim is a particularly "'feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.'"  *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696-97 (D.C. Cir. 2014).  "[W]hen countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress' intent."  *Id.*

---

[21] "The expression of one thing is the exclusion of another."

Here, section 13(3) ends with a broad grant of authority to prescribe limitations and restrictions on loans, in addition to the Federal Reserve Act's separate provision granting other incidental powers not expressly enumerated. Nothing in section 13(3)'s reference to interest rates and security "unambiguously suggests Congress intended to strip [that] broad grant of authority." *Id.* at 696-97.

### b. Conditioning Lending On A Borrower's Agreement To Convey Equity Was Also A Valid Exercise Of Incidental Powers Pursuant To Section 4(4) Of The Federal Reserve Act

Even apart from the Board of Governors' authority to set loan conditions under section 13(3), conditioning lending on an equity term was also a valid exercise of FRBNY's incidental powers under section 4(4) of the Federal Reserve Act. This section authorizes FRBNY to exercise "all powers specifically granted by the provisions of this chapter *and such incidental powers as shall be necessary to carry on the business of banking* within the limitations prescribed by this chapter." 12 U.S.C. § 341 (Seventh) (emphasis added).

This grant of "incidental powers" necessarily confers authority to act in ways not specifically enumerated in the statute and (if deemed necessary) extends the scope of permissible terms and conditions on rescue loans beyond the terms expressly enumerated in the text of section 13(3). *See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995) ("incidental powers" provision gave the Comptroller of the Currency "discretion to authorize activities beyond those specifically enumerated" in the National Bank Act); *see also Nat'l Ass'n of Mfrs. v. Secs. & Exchange Comm'n*, 748 F.3d 359, 366 (D.C. Cir. 2014) ("[D]iscretion may be exercised to regulate circumstances or parties beyond those explicated in a statute."), *overruled on other grounds by Am. Meat Institute v. U.S. Dept. of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014).

Three circuit courts have considered the scope of permissible incidental powers under either the Federal Reserve Act or the National Bank Act (the model for the Federal Reserve Act); each court concluded that the grant of incidental powers "as shall be necessary to carry on the business of banking" encompasses all "activities convenient and useful in connection with the performance of an express power." *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 41 n.4 (2d Cir. 2014) (*Starr v. FRBNY II*) (quotation omitted); *accord Sec. Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1044, 1049 (2d Cir. 1989); *M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977); *Arnold Tours, Inc. v. Camp,* 472 F.2d 427, 432 (1st Cir. 1972).

Conditioning lending on AIG's agreement to provide equity enabled FRBNY and the Board of Governors to set terms that they believed, in the exercise of their discretionary judgment, would appropriately address the policy goals of (1) compensating the taxpayers for the loan's costs and risk; (2) moderating the windfall to AIG and its shareholders; and (3) mitigating the risky precedent set by lending to AIG on overly favorable terms, because a loan that unfairly rewarded AIG and its shareholders for its financial distress might encourage other industry participants to engage in risky decision making. *See* PFOF ¶¶ 129-138; *see also* §§ III.A-B. It was thereby "convenient or useful" to the exercise of FRBNY's express rescue lending authority, and thus incidental to the business of banking.

Having the ability to condition lending on the provision of equity facilitated FRBNY's exercise of its authority. *See* PFOF ¶¶ 197-200; O.C.C. Inter. Ltr. No. 992, 2004 WL 1563358, at *2 (May 10, 2004) (recognizing that conditioning lending on the provision of equity can appropriately "facilitate . . . participation in permissible activities – making a loan to a borrower and sharing in the profit, income, or earnings of the borrower as a full or partial substitute for interest on such a loan"); *Starr v. FRBNY*, 906 F. Supp. 2d at 240 (recognizing that terms

compensating taxpayers for the policy implications and risks of lending were "convenient or useful in connection with the performance of [FRBNY's] emergency lending power on an unprecedented scale").

Although the Federal Reserve's authority to condition lending on the provision of equity is a legal question and, accordingly, does not turn on evidence concerning the decision-makers' opinions, the record demonstrates that FRBNY and the Board of Governors both concluded that requiring the provision of equity would be incidental to FRBNY's exercise of its rescue lending authority. *See* PFOF ¶¶ 119, 185-200, 201-209.

Congress entrusted the Federal Reserve with making policy judgments about when and on what terms to provide extraordinary rescue loans; the Federal Reserve was best positioned to assess whether requiring AIG to provide equity as a condition of FRBNY's support was "convenient or useful" to the exercise of FRBNY's rescue lending function. The Court should reject Starr's attempt to second-guess this policy-laden judgment. *See C.F.T.C. v. Schor*, 478 U.S. 833, 845 (1986) ("An agency's expertise is superior to that of a court when a dispute centers on whether a particular regulation is reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of the Act the agency is charged with enforcing; the agency's position, in such circumstances, is therefore due substantial deference.") (internal quotation marks and citation omitted).

In *NationsBank*, under an analogous provision of the National Bank Act, the Supreme Court confirmed the authoritativeness of a determination by the Comptroller of the Currency regarding the scope of banks' incidental powers. 513 U.S. at 258 n.2. As the Court explained, "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.'" *Id.*

at 257. Because the Comptroller was charged with enforcement of this provision, the "incidental powers" provision gave him "discretion to authorize activities beyond those specifically enumerated" if the exercise of that discretion remained within "reasonable bounds." *Id.* at 258 n.2. Here, the Board of Governors is charged with the interpretation and enforcement of section 4(4) of the Federal Reserve Act as the supervisor of the Reserve Banks, in the same manner as the Comptroller of the Currency was authorized to interpret the National Bank Act; the Board of Governors' determinations about the appropriate scope of the Reserve Banks' incidental powers should, therefore, receive similar weight. *See* 12 U.S.C. § 248; *Starr v. FRBNY*, 906 F. Supp. 2d at 240 n. 31 ("[T]he Court owes deference to the Federal Reserve's determination that its incidental powers include the ability to take a participatory interest in the AIG rescue.") (citing *NationsBank*, 513 U.S. at 256-57).

Starr incorrectly claims that section 13(3)'s non-exclusive reference to interest rates limits section 4(4)'s broad grant of incidental powers. Pl. Pretrial Concl. of Law ¶¶ 74-75. Reading section 4(4) as limiting the scope of incidental powers to only those powers enumerated in section 13(3) is irreconcilable with section 4(4)'s stated (and only) purpose: incidental powers exist precisely to confer powers incidental to, but separate from, those expressly enumerated. *Arnold Tours,* 472 F.2d at 432 (A power is "incidental" to an enumerated power if it is "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers."); *see also Wells Fargo Bank N.A. v. Boutris,* 419 F.3d 949, 960 (9th Cir. 2005); *Indep. Ins. Agents of Am., Inc. v. Hawke,* 211 F.3d 638, 640 (D.C. Cir. 2000).

Starr also misreads the Supreme Court's decision in *California National Bank v. Kennedy*, 167 U.S. 362 (1897). Starr seeks to portray *Kennedy* as prohibiting FRBNY from

conditioning its lending on AIG's agreement to grant equity, *see e.g.*, Starr Mot. Opp. Summ. J. at 27-28, but *Kennedy* did not even discuss, let alone prohibit, conditioning lending on the provision of equity.  Rather, the Supreme Court's almost 120 year-old decision (issued more than a decade before establishment of the Federal Reserve), found only that "dealing in" stock – that is, "engaging in the ordinary business of buying and selling [stock] for profit," *Nat'l Bank of Charlotte v. Nat'l Exch. Bank of Baltimore*, 92 U.S. 122, 128 (1875) – was a power neither expressly conferred on, nor incidental to, the express powers of national banks.  *See Kennedy*, 167 U.S. at 369 ("The power to purchase or deal in stock of another corporation . . . is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred.").

The *Kennedy* Court said nothing about whether conditioning lending on the provision of equity as part of a loan's consideration – as opposed to acquiring equity through speculative stock trading, as the national bank in *Kennedy* had done – should properly be viewed as incidental to the business of banking.  Starr's argument to the contrary cannot be reconciled with the extensive authority permitting national banks to condition lending on the provision of "equity kickers."  *See, e.g.*, 12 C.F.R. § 7.1006 ("A national bank may take as consideration for a loan a share in the profit, income, or earnings from a business enterprise of a borrower" in the form of warrants); O.C.C. Inter. Ltr. No. 992, 2004 WL 1563358, at *2 (May 10, 2004) ("The OCC has long recognized the authority of national banks to share in the profit, income, or earnings of a borrower as a full or partial substitute for interest on a loan to the borrower. . . .  The OCC repeatedly has found that national banks may purchase shares of stock . . . when the acquisition is not for speculative or investment purposes and the stock ownership is intended to facilitate a bank's participation in an otherwise permissible activity . . . ."); O.C.C. Inter. Ltr., 1992 WL

486905, at *2 (July 15, 1992) ("This aspect of a lending arrangement is sometimes referred to as an 'equity kicker[.]'").

Starr's reliance on *Kennedy* also ignores that what is "incidental" to banking activities is not necessarily the same in every circumstance. *Kennedy* involved national banks; this case involves the Federal Reserve. *Kennedy* reviewed banks' everyday activities; section 13(3) is an emergency power. Congress granted the Federal Reserve broad authority under section 13(3) so that the Federal Reserve could consider complex policy concerns of taxpayer risk and moral hazard. *Kennedy*'s analysis of incidental powers also did not and could not take into account the last sentence of section 13(3) of the Federal Reserve Act, which was enacted 35 years after *Kennedy*. The Supreme Court's ruling in *Kennedy* was predicated on an absence of authority for "dealing in" stock as a speculative investor – long considered a business in which national banks should not engage – not an affirmative prohibition on acquiring equity through other means (including, most commonly, by receiving equity as collateral for a loan and foreclosing on that collateral upon a default). The last sentence of section 13(3) provides an additional grant of express authority not implicated in *Kennedy*. Accordingly, the decision in *Kennedy* has no bearing on the scope of the Federal Reserve's authority under section 13(3) to condition a loan on the provision of equity.

### c. Congress Repeatedly Confirmed That Rescue Lending Could Be Conditioned On A Borrower's Agreement To Provide Equity

Two separate statutory enactments after September 2008 confirm the Federal Reserve's broad discretionary authority to condition section 13(3) rescue lending on the provision of equity. Just weeks after FRBNY's rescue of AIG and in the wake of considerable public attention to that rescue, Congress unequivocally ratified the Federal Reserve's existing authority to condition section 13(3) lending on the provision of equity when it statutorily required the

89

Board of Governors to provide detailed reporting, for the AIG loan and all future loans under section 13(3), as to "the recipient of warrants *or any other potential equity* in exchange for" section 13(3) assistance. Emergency Economic Stabilization Act (EESA), section 129, codified at 12 U.S.C. § 5235(a),(d) (October 3, 2008) (emphasis added). Given the opportunity to consider how the Federal Reserve should approach section 13(3) loans potentially involving the provision of equity, Congress did not take any steps to restrict, limit, or question the Board of Governors' discretionary authority to do so. Instead, Congress chose only to require reporting about those loans' equity provisions.

This implied endorsement of the Board of Governors' authority to seek equity as part of a rescue loan amounted to statutory ratification. As the Supreme Court has repeatedly confirmed, Congress's express or implied endorsement through legislative action of a statutory interpretation amounts to a binding adoption of that interpretation. *See Schor*, 478 U.S. at 846 (where Congress has endorsed an "administrative construction" of a statute, courts "cannot but deem that construction virtually conclusive"); *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 134 (1978) (when Congress "voices its approval" of an administrative interpretation, "Congress is treated as having adopted that interpretation, and this Court is bound thereby"); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 380-81 (1969) (subsequent legislative action demonstrating Congress's approval of an existing interpretation of a statute "is entitled to great weight"). Agency interpretations of their statutory authority, accepted by Congress, should not be second-guessed by the courts.

Further, when Congress amended section 13(3) in 2010 to require further reporting of "the amount of interest, fees, *and other revenue or items of value* received in exchange for [section 13(3)] assistance . . . ," Congress again endorsed the Federal Reserve's judgments

regarding its authority to condition section 13(3) lending on the provision of consideration other than interest.  12 U.S.C. § 343(3)(C)(ii)(II) (emphasis added).

This amendment, following Congress's earlier recognition in section 129 of the EESA that these "other . . . items of value" could include "warrants or any other potential equity," provides "additional evidence of the intended scope of" the Federal Reserve's authority to condition rescue lending on the provision of equity.  *See generally N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 530-31 (1982) (discussing use of post-enactment legislative history).  In affirming the Federal Reserve's authority to condition lending on non-interest consideration, Congress confirmed that the Federal Reserve had "correctly discerned" that conditioning lending on the provision of equity was within its authority.  *Id.* at 535.  "Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned."  *Id.* (internal quotation marks omitted) (quoting *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979)).  Under these circumstances, Congress "effectively ratified" the Federal Reserve's conclusion that it could condition section 13(3) lending on the provision of equity.  *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (finding Congress effectively ratified FDA's position on tobacco regulation).

"[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight . . . ."  *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980) (citations omitted).  Congress's immediate endorsement of the Federal Reserve's interpretation of its delegated authority demonstrated that "Congress both contemplated and authorized" allowing the Board to condition rescue lending on

the borrower's provision of equity. *Schor*, 478 U.S. at 847; *see also Sheffield*, 435 U.S. at 135. Congress's ratification resolves any question about the scope of the Federal Reserve's authority and renders any prior action lawful for purposes of an illegal exaction claim. *See United States v. Heinszen*, 206 U.S. 370, 382 (1907).

### 2. Starr's Contentions Concerning FRBNY's And The Treasury Department's Authority To Hold Equity Interests Are Irrelevant And Incorrect

Beyond Starr's challenge of the Federal Reserve's authority to *condition* lending on AIG's conveyance of equity, Starr also argues that FRBNY and the Treasury Department lacked legal authority to *hold* the AIG equity interest. This authority argument about their authority to hold equity is both irrelevant and incorrect: the question of which entity could hold AIG's shares has no bearing on the harm Starr has alleged, and Starr has not established that FRBNY and the Treasury Department were legally prohibited from holding the shares or that the Trust was a "sham."

### a. FRBNY's And The Treasury Department's Authority To Hold The Equity Interest Is Irrelevant To Starr's Claims

Although Starr argues that FRBNY and the Treasury Department were prohibited from holding the AIG equity interest, this issue is entirely irrelevant to Starr's claims. Whether FRBNY and the Board of Governors permissibly could *condition* lending on an equity term differs from what entity could have *held* the equity interest. The first question is relevant to the alleged illegal exaction; the second question – regarding authority to hold – is far afield from the claimed exaction. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant . . . ."). Starr's alleged harm stems from FRBNY's authority to *condition* a section 13(3) loan on AIG conveying equity to someone,

regardless of who received that equity. Whether those shares were later held by the Government, by a charity, or by the Trust is irrelevant. Starr cannot identify any separate harm that would have resulted from FRBNY's or the Treasury Department's holding those shares; therefore, FRBNY's and the Treasury Department's authority to *hold* the equity is irrelevant. Moreover, any claim that the Federal Reserve could not have conditioned lending on AIG's agreement to provide equity because FRBNY and the Treasury Department allegedly could not hold those shares is a *non sequitur* because neither FRBNY nor the Treasury Department did, in fact, hold the shares. *See Starr v. FRBNY*, 906 F. Supp. 2d at 242 ("[E]ven if Starr were correct that FRBNY cannot legally hold stock, it did not do so here. The Series C shares were held by the Trust, a separate entity, for the benefit of the United States Treasury.").

### b. FRBNY And The Treasury Department Could Hold Equity Conveyed As Consideration For A Section 13(3) Loan

Starr argues that section 13(3) prohibited FRBNY and the Treasury Department from holding the AIG equity interest, but this argument fails. Just as FRBNY and the Board of Governors had authority to condition FRBNY's lending on AIG's agreement to provide an equity interest, FRBNY also had authority to hold that equity interest if so authorized by the Board of Governors. And, just as Congress ratified the Federal Reserve's authority to condition lending on an equity term, Congress also confirmed FRBNY's authority to hold such equity, merely requiring identification of the equity's "recipient." Starr has offered no support for its claim to the contrary, or for its assertion that the Treasury Department was somehow prohibited from holding the equity interest.

Although Starr asserts that FRBNY and the Treasury Department were prohibited from holding the AIG equity interest, Starr bases this position solely on out-of-context comments from FRBNY and Treasury employees that Starr has misconstrued and that do not actually support

Starr's claim. Starr fails to demonstrate that any relevant statute contains these limitations. Starr's interpretation is twice mistaken – both because Starr misreads the employee comments, and because fact evidence on a question of law proves nothing.

The Court should reject Starr's argument that FRBNY cannot hold equity. The Supreme Court decisions relied on by Starr recognize that while lenders may not "deal in" stock as speculative purchasers, they may hold and own equity acquired in other ways properly incidental to their lending activities, such as pursuant to a restructuring of a distressed loan or by foreclosing on equity pledged as collateral. *See Kennedy*, 167 U.S. at 366-67 ("[I]t has been held that, as incidental to the power to loan money on personal security, a bank may, in the usual course of doing such business, accept stock of another corporation as collateral, and, by the enforcement of its rights as pledgee, it may become the owner of the collateral . . . ."); *First Nat'l Bank of Charlotte*, 92 U.S. at 128 ("In the honest exercise of the power to compromise a doubtful debt owing to a bank, it can hardly be doubted that stocks may be accepted in payment and satisfaction, with a view to their subsequent sale or conversion into money so as to make good or reduce an anticipated loss.").

Starr has not identified any sustainable legal theory under which holding equity acquired as partial consideration for an extraordinary rescue loan is not incidental to FRBNY's emergency lending authority, as is holding equity acquired through a debt restructuring or foreclosure on pledged collateral. As discussed above, *Kennedy* only held that equity acquired through speculative trading activities was not incidental to national banks' lending activities, and did not address equity acquired as consideration for a loan. Extensive authority interpreting the analogous National Bank Act has confirmed that national banks can receive and hold, in addition to interest, participatory equity interests conveyed as partial consideration for loans.

> Starr misreads *Kennedy* . . . . *Kennedy* held that national banks could not engage in the *speculative purchase* of stock. But it absolutely did not hold that such banks were prohibited from *holding* stock at all. Quite the contrary . . . . [A] bank's incidental powers 'necessary to carry on the business of banking' . . . have been defined expressly to include the receipt of equity in the borrower as part of the consideration for a loan.

*Starr v. FRBNY*, 906 F. Supp. 2d at 241-42 (emphasis in original).

### 3. Starr's Contentions Concerning The Independent Trust That Held The Equity Interest Are Irrelevant And Incorrect

Starr's claims about FRBNY's and the Treasury Department's authority to hold AIG's equity are particularly irrelevant because the equity interest was held by the Trust, not by FRBNY or the Treasury Department. PFOF ¶¶ 137, 217, 230; *see Starr v. FRBNY*, 906 F. Supp. 2d at 242 ("[E]ven if Starr were correct that FRBNY cannot legally hold stock, it did not do so here. The Series C shares were held by the Trust, a separate entity, for the benefit of the United States Treasury."). There is no dispute that the Trust had the legal authority to hold the AIG shares, and Starr has not identified any sustainable legal theory under which it was legally impermissible for the Trust to do so.

Even if FRBNY or the Treasury Department were prohibited from holding the AIG equity interest – and that is not the case – that would not make the equity transfer Starr has challenged illegal, because neither FRBNY nor the Treasury Department ever acquired an equity interest in AIG. Instead, all economic and voting interests in AIG's Series C preferred stock resided solely in the "AIG Credit Facility Trust, a new trust established for the benefit of the United States Treasury." *See* PFOF ¶ 230.

FRBNY created the Trust to resolve policy concerns that otherwise could arise from direct, governmental ownership of a major public company. PFOF ¶¶ 223-242. The entity holding the AIG equity interest, moreover, has no relationship to Starr's alleged injury.

Starr argues that the Trust's ownership of the equity interest should be treated as ownership by FRBNY because the Trust was not independent. Starr, however, failed to demonstrate that (1) the Court should disregard the Trust's separate legal existence so as to treat FRBNY and the legally distinct Trust as a single entity, or (2) that the Trust's actions in the years after AIG's rescue have any bearing on the Federal Reserve's September 2008 authority to condition lending on an equity stake.

### a. It Was Not Illegal Or Improper For The Trust To Hold The Equity Interest

FRBNY possessed the authority under section 4(4) of the Federal Reserve Act to create a Trust for purposes of holding the equity on behalf of the United States taxpayers. FRBNY created the Trust on January 16, 2009, to acquire, hold, and dispose of the preferred shares that AIG had promised to provide pursuant to the Credit Agreement. JX-172 at 4 (Trust Agreement); *see* McKinney's N.Y. Est. Powers & Trusts Law § 7-1.4 ("An express trust may be created for any lawful purpose."). Creating the Trust to hold that equity was within FRBNY's incidental powers granted by section 4(4) because doing so enabled FRBNY to "carry into effect those [powers] which are granted." *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 659 (1924).

As a trust created under New York law, the Credit Facility Trust could purchase, receive, hold, vote, and/or sell equity. *See generally* N.Y. Est. Powers & Trusts Law §§ 1 *et seq.* The Trust's ability to hold equity, therefore, allowed FRBNY to "carry into effect" its authority under section 13(3) to make a rescue loan conditioned on the company giving up equity.

Starr cites *Speiser v. Randall*, 357 U.S. 513, 526 (1958), to assert that "the government cannot act indirectly to produce a result which it could not command directly." Pl. Pretrial Concl. of Law ¶ 173. But *Speiser* and the other cases Starr cites merely recognize that if the

same harm (in the case of *Speiser*, an impermissible infringement on freedom of speech) prohibited under one course of conduct (directly requiring the swearing of a loyalty oath) still results from an alternative course of conduct (indirectly requiring the swearing of a loyalty oath to receive a tax refund), that alternative conduct should be prohibited. *See* 357 U.S. at 526. It should be beyond dispute that the Government may pursue a legal course of conduct that causes no harm, even if a different course of conduct would be illegal.

Further, Congress's subsequent endorsement conclusively established that it was entirely legal and proper for the Trust to hold the AIG equity. *See* 12 U.S.C. § 5235 (endorsing the conveyance of equity to third-party "recipient[s]"). Congress did not treat the conveyance of equity to third parties such as the Trust as an improper "circumvention" of any purported legal prohibitions, but instead unequivocally endorsed the practice of conveying interest to third party recipients.

### b. The Independence Of The Trust Is Irrelevant To Starr's Illegal Exaction Claims

Starr's claim that the Trust's ownership of the equity interest should be treated as ownership by FRBNY finds no support in the evidence or the law. Also, Starr does not have standing to challenge the Trust's independence because that has no relationship to the harm allegedly resulting from AIG's agreement to provide the equity interest. The Federal Reserve's authority to seek the equity term in 2008 cannot depend on the terms included in the Trust Agreement, signed in January 2009, or the degree to which the Trust acted independently thereafter. Accordingly, the Trustees' relationship with FRBNY cannot affect Starr's exaction claim. Even if that were not the case, as a third party that was neither the settlor of the Trust nor a beneficiary, Starr would not have a pecuniary interest in the subject matter of the Trust sufficient to confer standing to challenge the Trust's operation. *Cf. In re Malasky*, 290 A.D.2d

631, 632 (N.Y. App. Div. 2002) (in applying state trust law, third parties with no pecuniary interest in a trust lack standing to challenge the trust's administration).

In any event, the record demonstrates that the Trust operated as a separate entity independently of FRBNY.  PFOF ¶¶ 267-302.  Although Starr argues that the terms of the Trust Agreement somehow impeded the Trustees' exercise of their independent judgment, Starr has not established that the Trust lacked *any* independence; certainly, Starr failed to demonstrate the "complete domination" necessary to treat the Trust as legally indistinguishable from FRBNY.[22] *See Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1364-65 (Fed. Cir. 2013) (courts may not disregard the separate legal existence of juridically distinct entities absent a showing of "complete domination" by one entity over the other "with respect to the transaction at issue").

### 4. Starr's Remaining Claims Concerning The Legality Of The Loan Terms Are Equally Meritless

Starr's remaining challenges to the rescue loan's terms similarly have no legal merit. Starr's claim that the Federal Reserve's rescue of AIG reflected a "punishment" of AIG without sufficient process (1) mischaracterizes as punishment the conferral of a substantial – but limited

---

[22] The Court should reject Starr's argument that the Trust was a "sham" because the evidence consistently demonstrates the Trustees' independent judgment.  PFOF § III.E.  The Trust Agreement itself, which was heavily negotiated by Trustees' independent counsel, conferred independence on the Trustees in administering the voting and economic rights associated with the Trust's equity interest in AIG.  PFOF ¶¶ 273-88.  The Trust Agreement provided that the Trustees were to have absolute discretion and control over the Trust's stock, including "full discretionary power to vote the Trust Stock."  PFOF ¶ 279.

Moreover, the evidence demonstrates that the Trustees did, in fact, act independently. For example, the Trustees rejected the Treasury Department's proposed slate of directors for AIG's June 2009 annual shareholder meeting and selected a separate slate of directors by themselves, with the assistance of an executive search firm.  PFOF ¶¶ 296-300.  And, during negotiations for AIG's January 2011 recapitalization, the Trustees negotiated on behalf of the Trust separately from the Government.  PFOF ¶¶ 301-02.  Starr's assertion that the Trustees lacked independence is legally unsustainable.

– benefit; (2) misconstrues the Federal Reserve's authority to make policy judgments about loan terms; (3) ignores the Federal Reserve's inability to force a failing company to accept any rescue offer; (4) wrongly assumes that FRBNY's loan offer to AIG was predicated on a desire to punish the company; and (5) disregards the emergency conditions that necessarily exist before section 13(3) can occur. Starr's claim that the Federal Reserve "should have" rescued AIG on different terms raises a legally irrelevant policy disagreement.

### a. Starr's Claim Of "Punishment" Misconstrues The Federal Reserve's Authority To Set The Terms Of Section 13(3) Loans To Reflect The Policy Implications And Risks Of Lending

There is no support for Starr's claim that, by conditioning lending on AIG's agreement to convey equity, the Federal Reserve improperly "punished" AIG and its shareholders interest. President Geithner and Chairman Bernanke explained that the rescue loan terms were not based on a conclusion that AIG deserved "punishment," but rather were (1) modeled on the terms developed by private sector lenders, and (2) deemed appropriate based upon policy considerations. *See* PFOF ¶¶ 115-16, 120, 129, 181-84. Specifically, the equity term reflected the Federal Reserve's exercise of its discretionary policy judgment in exercising its extraordinary section 13(3) lending authority to rescue AIG from bankruptcy. The terms were not selected to "punish" AIG and its shareholders based on a finding of improper conduct. No provision of section 13(3) prevents consideration of taxpayer interests, the scale or riskiness of the loan, surrounding market conditions, fairness, mitigating the windfall to the company and its shareholders, or other factors that might influence the Federal Reserve's discretionary policy judgment. *See* 12 U.S.C. § 343. Moreover, as Chairman Bernanke noted, although he did not consider whether AIG merited "punishment," the Federal Reserve could consider the borrower's conduct when setting the terms of a rescue loan. PFOF ¶ 182.

The terms of the loan were not a "punishment" imposed on AIG and its shareholders for improper conduct, but rather were offered to and voluntarily accepted by AIG's board because AIG's board recognized that the loan conferred an enormous financial benefit on AIG and its shareholders. PFOF ¶¶ 55, 67, 70-73, 181-89; *cf. Berkman v. United States*, 250 U.S. 114, 118 (1919) (when plaintiffs voluntarily availed themselves of Government services, "[o]bviously, nothing was taken from them without due process of law" and "their property was not taken for public use" when the Government retained the agreed-upon compensation for those services).

In any event, this Court has already rejected Starr's stand-alone due process claims. *Starr*, 106 Fed. Cl. at 61 ("Starr may maintain its Due Process claim in this Court *only insofar as it is based on an illegal exaction theory*.") (emphasis added). Starr's "punishment" claim is not a claim of exaction – that is, an assertion that the Federal Reserve lacked statutory authority to include the equity term as a term of the loan offered to and accepted by AIG; the "punishment" claim is, instead, an assertion that the Federal Reserve's loan terms violated due process. In addition to being legally unsustainable, Starr's claim that it allegedly was "punished" without due process of law is not a claim that this Court has jurisdiction to entertain. *Id.*; *see, e.g.*, *Barksdale v. United States*, 582 F. App'x 890, 891-92 (Fed. Cir. 2014) (dismissing due process claims because "the Due Process Clause . . . is not money-mandating.").

### b. Starr's Policy Critiques Of The Terms On Which The Federal Reserve Agreed To Save AIG From Failure Cannot Establish An Illegal Exaction

Starr also argues, erroneously, that including an equity provision in the loan terms was not "necessary" for the Federal Reserve to address policy considerations such as moral hazard or credit risk; that in other lending facilities the Federal Reserve addressed such policy considerations without requiring the conveyance of equity; and that the Federal Reserve "should have" rescued AIG on the same terms as the support provided to certain other institutions.

Starr's disagreements about what constitutes good Federal Reserve policy cannot constitute a proper illegal exaction claim. The Court should reject Starr's invitation to second-guess the policy judgments delegated by Congress and exercised by the Federal Reserve. "When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute." *ABF Freight Sys.*, 510 U.S. at 324 (quoting *Chevron USA Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984) (warning that courts "must not enter the allowable area of the [agency's] discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy" (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941))); *see, e.g.*, *Thomas Jefferson Univ.*, 512 U.S. at 512 ("Our task is not to decide which among several competing interpretations best serves the regulatory purpose."); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696-97 (1991) (courts should defer to agency's policy determinations that "entail the exercise of judgment grounded in policy concerns").

In any event, AIG's insurance and financial operations were unique and differed significantly from other institutions' businesses. PFOF ¶ 130. One cannot compare AIG's rescue with other institutions' assistance on an "apples-to-apples" basis; Starr's argument is not only legally irrelevant, but factually incorrect.

### c. Section 14(d) Of The Federal Reserve Act Is Not A Viable Basis For Starr's Illegal Exaction Claim

Starr argues that the AIG loan's equity term conflicted with section 14(d) of the Federal Reserve Act, 12 U.S.C. § 357, which confers on Federal Reserve banks the power to establish "rates of discount" which are "subject to review and determination of the Board of Governors," and "fixed with a view of accommodating commerce and business." 12 U.S.C. § 357. But

section 14(d), which by its plain and unambiguous terms applies only to "rates of discount" (that is, interest rates), is irrelevant to Starr's claim that the Federal Reserve lacked authority to condition lending on an equity term – the only claim for which Starr has sought damages.[23] Section 14(d) merely addresses interest rates, not the permissibility of other consideration such as the equity interest at issue here. *See id.*

Further, section 14(d) refers only to setting interest rates with a view to accommodating commerce and business generally; it certainly offers no duty to "accommodate" individual borrowers by rescuing them from failure on highly favorable terms. *See id.* Section 14(d) recognizes that lending terms should accommodate business and commerce by affecting general credit conditions in ways consistent with policy goals, such as by setting interest rates that facilitate the availability of and reliance on private credit. *See Raichle v. Fed. Reserve Bank of N.Y.,* 34 F.2d 910, 914-15 (2d Cir. 1929) ("The bank, under the supervision of the board, must determine whether there is danger of financial stringency and whether the credit available for 'commerce and business' is sufficient or insufficient."); PTX-742 at 183 (Hackley, "Lending Functions of the Federal Reserve Banks: A History") ("[T]he philosophy of the original Federal Reserve Act was that Federal Reserve discount rates would serve as a means of stabilizing commercial interest rates and as a safeguard against inflation.").

The Board of Governors fully satisfied section 14(d) on September 16, 2008, when its members determined that the loan's proposed interest rate would accommodate commerce and business by saving AIG from failure, thereby avoiding the market disruptions and effect on the economy as a whole that an AIG bankruptcy would create. *See generally* PFOF § III.A.1, ¶ 193

---

[23]     Moreover, neither Starr's experts nor any fact witness presented any evidence of what Starr contends was the interest rate purportedly legally required by section 14.

n.19.  Also, the rate was consistent with the Board of Governors' Regulation A, which provides for section 13(3) rescue loans to carry a rate of interest higher than for normal discount window lending.  *See* 12 C.F.R. § 201.4(d).  That regulation does not set a maximum interest rate.

Starr argues that the Federal Reserve needed to "accommodate" AIG and its shareholders by providing a loan on more favorable terms.  *See* Pl. Pretrial Concl. of Law ¶ 68.  The supposedly limiting language of section 14(d) on which Starr relies is not subject to judicial review.  As the Court of Appeals for the Second Circuit observed when dismissing a similar claim that the rate of discount charged by FRBNY was allegedly "unreasonably high":

> The remedy sought would make the courts, rather than the Federal Reserve Board, the supervisors of the Federal Reserve System, and would involve a cure worse than the malady.  The bank, under the supervision of the board, must determine whether there is danger of financial stringency and whether the credit available for 'commerce and business' is sufficient or insufficient.  If it proceeds in good faith . . . it commits no legal wrong.

*Raichle,* 34 F.2d at 915.  The Court should reject Starr's attempt to substitute its judgment as to whether the terms offered to and accepted by AIG accommodated business and commerce, a policy judgment committed by law to the Board of Governors.  *Heckler v. Chaney,* 470 U.S. 821, 830 (1985) (an agency's exercise of discretion is not subject to attack where the governing statute provides no meaningful standards defining the limits of that discretion).

### B.    AIG's Voluntary Acceptance Of The Equity Term Precludes Starr's Illegal Exaction Claim

The Court should also deny Starr's illegal exaction claim as to the equity term because, as discussed in Section I.B, AIG voluntarily agreed to FRBNY's rescue terms.  Property cannot be illegally exacted when it is conveyed voluntarily by agreement, absent specific indication of congressional intent to the contrary.  *United States v. Edmonston*, 181 U.S. 500, 511 (1901) ("[M]oney thus voluntarily paid to the government cannot be recovered.").  As this Court has

held, Starr's takings and illegal exaction claims both turn upon "whether AIG voluntarily agreed to the terms proposed on September 16, 2008." *Starr*, 106 Fed. Cl. at 78. AIG acted voluntarily; therefore Starr's illegal exaction claim must be denied. Further, a voluntary payment without protest vitiates the claim, even if the property was conveyed in response to an illegal demand. *See Emp'rs Ins. of Wausau v. United States*, 764 F.2d 1572, 1575 (Fed. Cir. 1985). Ultimately, "[w]hen a person voluntarily surrenders liberty or property, the State has not deprived the person of a constitutionally-protected interest" under the Takings Clause or the Due Process Clause. *L.L. Nelson Enters. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) (emphasis removed) (citing *Zinermon v. Burch*, 494 U.S. 113, 117 n.3 (1990)).

This voluntary payment doctrine embodies the long-standing and well-established maxim *volenti non fit injuria*,[24] which controls the analysis in this case. That maxim asserts that no injury can be done to a willing person, and the Supreme Court has routinely cited this maxim in its illegal exaction jurisprudence. *Chi. & Nw. Ry. Co. v. United States*, 104 U.S. 680, 687 (1881); *Swift*, 111 U.S. at 28-29; *Edmonston*, 181 U.S. at 507-08. In each of these cases, the Court anchors its analyses, which all affirm the voluntariness doctrine, to this principle that a party that voluntarily pays something to the United States has no claim against the Government based on that payment. *Id.*

As set forth in our analysis of Starr's takings claim, (1) the AIG board was not coerced into accepting the rescue offer; (2) the Government did not control the AIG board's acceptance of the FRBNY rescue offer on September 16, 2008; (3) the AIG board voluntarily and independently approved the Credit Agreement on September 21, 2008; and (4) the Government did not control AIG's decision to agree to the Credit Agreement. AIG's voluntary agreement to

---

[24] "To the consenting, no injury is done."

the rescue loan is dispositive of the voluntariness inquiry. Moreover, AIG and its shareholders ratified the rescue, precluding any finding of duress.

A narrow exception to the doctrine of voluntary payment exists in the illegal exaction context where the statute violated was for the benefit and protection of the plaintiff seeking recovery. *Rough Diamond Co. v. United States*, 351 F.2d 636, 639-40 (Ct. Cl. 1965); *see Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451-52 (Fed. Cir. 1997) ("[I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound . . . . However, if the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or regulation. . . ."); *Alyeska Pipeline Serv. Co. v. United States*, 624 F.2d 1005, 1017-18 (Ct. Cl. 1980) ("[A] voluntary payment may be recovered if the statute barring the payment was enacted for the benefit of the person seeking recovery but may not be recovered if enacted for the benefit of another.") (citation omitted). The purpose of this exception is both (1) to reflect "the particular Congressional will . . . in the particular piece of legislation under scrutiny," *Rough Diamond*, 351 F.2d 636 at 640, and (2) to ensure that the plaintiff is the "proper party" to sue to enforce a statute, *see, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 732 & n.3 (1972) (in Administrative Procedures Act case, "[w]here . . . Congress has authorized public officials to perform certain functions according to law, . . . the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff").

The "benefit of the plaintiff" exception does not apply to Starr's exaction claim because Congress did not adopt section 13(3) of the Federal Reserve Act to benefit and protect possible borrowers, like AIG, or its shareholders, like Starr. Instead, Congress enacted section 13(3) to

protect the public interest in the integrity and soundness of the economy and the Federal Reserve System. *Starr v. FRBNY II*, 742 F.3d at 42 (section 13(3) loans do not encompass a duty to advance the interests of borrowers or their shareholders, because recognizing such a "private duty would present a significant and direct conflict with FRBNY's obligation to act in the public interest as a fiscal agent of the United States"); *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060, 1068 (S.D.N.Y. 1979), *aff'd*, 629 F.2d 233 (2d Cir. 1980) ("Loans made by the Federal Reserve are made for a public purpose, they are not intended to serve private interests."); *Lucas v. Fed. Reserve Bank of Richmond*, 59 F.2d 617, 620–21 (4th Cir. 1932) (plaintiff cannot challenge Federal Reserve bank's lending against allegedly ineligible collateral because "no one can complain of such action except the government, the sovereign which created and limited its powers") (citations omitted). This provided the Federal Reserve with a tool to stem runs on non-bank institutions. 12 U.S.C. § 343(3)(B)(i) (2010); *see also* PFOF ¶¶ 131 (AIG received benefit because it was systemically important enough to warrant a rescue), 311 (discussing 12 U.S.C. § 343(3)(B)(i) (2010)). Accordingly, the voluntary payment doctrine applies to – and defeats – Starr's illegal exaction claim.

The steamship cases on which Starr relies, including *Suwannee Steamship Co. v. United States*, 279 F.2d 874 (Ct. Cl. 1960), are consistent with the long-established voluntary payment doctrine because they fall within the congressional intent exception explained above. As this Court's predecessor explained, in the "ship-sale" cases, including *Suwanee*, the rule of *Edmonston* did not apply because to do so would be contrary to congressional intent. *See Rough Diamond*, 351 F.2d at 639-40 ("In the ship-sale cases, we distinguished *Edmonston* by stressing the difference in the underlying legislation," which the court in those cases had interpreted to

intend a non-discretionary "mathematical application of the statutory formula" for approving sales.).

Moreover, AIG's voluntary agreement to the revolving credit facility here is not comparable to the plaintiff's assent to an illegal fee in *Suwannee*. In *Suwannee*, if the plaintiff did not assent, the plaintiff would be subject to the Government's regulatory power and restriction of plaintiff's property rights: namely, the plaintiff would not have been permitted to sell its ship. Here, by contrast,

> the Government was not exercising preexisting regulatory authority, or anything akin to a state or locality's police powers. . . . [I]f AIG had refused the conditions of the loan agreement, AIG would not have been subject to any ongoing restrictions; AIG simply would not have obtained the loan. In this way, the Government was not in a position to exploit any existing regulatory power to induce the loan transaction.

*Starr*, 106 Fed. Cl. at 82-83.

In addition, in *Suwannee,* the Shipping Act of 1916 left no discretion to the Government; indeed, the Shipping Act *required* the Government to allow plaintiff to transfer its ship to a foreign registry if the Government officials "concluded, as they must have done, that the transfer would be consistent with the public interest." 279 F.2d at 877. The Court in *Suwannee* determined that the fee imposed had nothing to do with the purpose of the Shipping Act, stating that "[t]here can hardly be a more serious defect in the carrying on of government than allowing matters which have nothing to do with the case to be dragged in, and to affect decisions." *Id.*

Section 13(3), by contrast, *permits*, rather than *requires*, the Board of Governors to authorize, and a Federal Reserve bank to offer, a rescue loan. Because the exception to the voluntary payment doctrine does not apply, and because AIG voluntarily agreed to the equity term, Starr's illegal exaction claim fails.

## C. Starr's Illegal Exaction Claim Fails Because Section 13(3) Does Not Mandate The Payment Of Money Based On The Violation Alleged

Starr cannot recover on its illegal exaction claim because Starr has failed to prove it possesses a substantive right to compensation under a statute mandating the payment of money to Starr. This Court possesses Tucker Act jurisdiction over claims based upon a constitutional provision, statute, or regulation only if "the Constitutional provision, statute, or regulation is one that is money-mandating." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc*). An illegal exaction claim is based upon the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Casa de Cambio*, 291 F.3d at 1363. By itself, however, the Due Process Clause does not satisfy the Tucker Act's money-mandating requirement. *Collins v. United States*, 67 F.3d 284, 288 (Fed. Cir. 1995).

Therefore, an illegal exaction claim requires the violation of a separate statute or provision that fulfills the "money-mandating" requirement. *See Hamlet v. United States*, 873 F.2d 1414, 1416–17 (Fed. Cir. 1989) (this Court can adjudicate constitutional claims based on non-money-mandating constitutional provisions if they are made in conjunction with a money-mandating source of law). "To invoke Tucker Act jurisdiction over an illegal exaction claim," a plaintiff "must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." *Norman*, 429 F.3d at 1095 (internal quotations omitted). Some Court of Federal Claims cases state that, for illegal exactions, "jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language." *See, e.g.*, *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003) (quoting *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996)). Although the provision need not contain explicit money-mandating language, *Norman* refutes any argument that jurisdiction is so broad that the money-mandating

requirement does not exist for illegal exactions. Rather, the violated provision must be money-mandating "either expressly or by necessary implication." *Norman*, 429 F.3d at 1095; *see also Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (same).

Starr's equity illegal exaction claim fails because section 13(3) of the Federal Reserve Act, the statute Starr claims was violated, does not expressly or by "necessary implication" mandate the payment of money to Starr. Certainly, Starr cannot dispute that section 13(3) contains no *expressly* money-mandating language. Starr has, moreover, failed to show that "by necessary implication" section 13(3) mandates the payment of money damages based on the violation alleged in this case. Because section 13(3) exists for the benefit of the financial system, not for the benefit of borrowers and their shareholders, *see Corbin*, 475 F. Supp. at 1068, the statute does not contain the "necessary implication" that a borrower's shareholders should be paid money for the violation of that statutory provision. The Court, therefore, should dismiss Starr's illegal exaction claim for the additional reason that section 13(3) is not money-mandating and, therefore, the Court does not possess jurisdiction over this claim.

### D. The Equity Term Did Not Exact Any Legally Cognizable Property From Starr

Starr's illegal exaction claim also fails because Starr has not shown that any of its property was exacted as a result of the equity term. "There can be no illegal exaction . . . if the money exacted was never the property of [the plaintiff]." *Tex. State Bank v. United States*, 423 F.3d 1370, 1380-81 (Fed. Cir. 2005).

Property rights are determined "by reference to 'existing rules or understandings that stem from an *independent* source such as state law.'" *Palmyra Pac. Seafoods*, 561 F.3d at 1364-65 (quoting *Phillips*, 524 U.S. at 164) (emphasis added). For the same reasons that Starr has not shown a legally cognizable property right was *taken*, *see* Section I.D, it has not shown that a

legally cognizable property right was *exacted*. Because Starr remained in possession of the same property – and had the same economic and voting rights – before and after the rescue, no monies were directly or in effect paid by class members to the Government. Starr's illegal exaction claim must, therefore, fail.

### E.   This Court Cannot Make An Award Based On A Hypothetical Re-Writing Of AIG's Agreement With FRBNY That Excises The Equity Term

This Court is not empowered to award money to Starr based on a hypothetical re-writing of AIG's agreement with FRBNY so as to excise the equity term. Such an award would not return to Starr property that it paid to the Government; rather, the requested award would improperly transfer to Starr value that the Government created and that Starr would not have had without the Government's assistance. Starr has not established that it ever would have realized the value it claims if there had been no equity term. Starr's theory is ill-conceived and unsupported by the record.

There is a strong presumption that all of a party's consideration in a contract is intended to be given in exchange for all of the other party's consideration. *See Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated."); John Cibinic, Jr., *Formation of Government Contracts* 270 (4th ed. 2011) ("Government contracts involve a number of obligations of or benefits to each party. In general, such contracts are not divided into individual exchanges."); *see also Eden Isles Marina, Inc. v. United States*, 113 Fed. Cl. 472, 490 (2013). Indeed, the Credit Agreement established that the economic balance of AIG's consideration and FRBNY's loan was vital to the agreement; the contract required that the parties restore to each other the economic equivalent of any term eliminated by future litigation. *See* PFOF ¶ 393 (Section 8.12 of the Credit Agreement states

110

that parties shall endeavor to replace any illegal provisions with valid economic equivalent provisions); ¶ 415 (citing Professor Zingales's description of the agreement as "one unified deal").

Simply excising the equity term as Starr requests would drastically and improperly alter the agreed-upon value transfer in this case – and do so exclusively for Starr's benefit. This result would "strike[] to the core of the contract bargain," *AT&T Co. v. United* States, 307 F.3d 1374, 1380 (Fed. Cir. 2002), it would frustrate the intent of the parties regarding the value of the consideration to be exchanged, and it would result in precisely the unjust "windfall" courts must seek to avoid. *See, e.g.*, *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 43–44 (2000).

## 1. Starr Has Not Proved That FRBNY Would Have Made The Same Loan Without The Equity Term

The Government and FRBNY's decision-makers testified that the equity term was a vital consideration in their decision to lend to AIG. PFOF ¶¶ 80, 129, 135, 388-92. Starr must ignore that unrebutted testimony to argue, as it does, that the Government would not have let AIG fail, and that therefore the Court can excise the equity term from the rescue loan. The equity term Starr challenges is a critical term in a complex contract featuring an agreed-upon exchange of consideration between AIG and FRBNY as authorized by the Board of Governors. Where, as here, a plaintiff challenges conduct by an agency with discretionary authority to act through negotiated agreements, courts do not simply excise allegedly illegal terms from a bilateral agreement if doing so would conflict with the parties' intent in entering the bargain. *See, e.g., AT&T*, 307 F.3d at 1380; *Northrop Grumman*, 47 Fed. Cl. at 43–44.

In *AT&T*, for example, the Federal Circuit declined to alter the terms of an allegedly illegal agreement between AT&T and the United States Navy. AT&T, having bargained for and

won a fixed-price contract, later argued that the Navy had illegally entered into the fixed-price contract. *See* 307 F.3d at 1380-81. AT&T sought to reform the contract to be on a cost-reimbursement basis. *Id*. The Federal Circuit refused to alter the agreement's terms to address the asserted illegality, ruling that doing so would "strike[] to the core of the contract bargain" because the Navy might not have agreed to enter into a contract with AT&T on the altered terms. *Id*. The appeals court explained that, "Under a cost-reimbursement scheme . . . the Navy may have refused to assume the risk of AT&T's technical competency. Instead, the Navy might have avoided that risk by awarding the RDA contract to one of AT&T's technically superior competitors . . . . In sum, competition on a cost-reimbursement basis may have taken AT&T out of the game." *Id.*

Similarly, in *Northrop Grumman*, the Court of Federal Claims rejected an attempt to reform an allegedly illegal, fixed-price contract into a cost-reimbursement contract. The court refused to alter the contract to address the alleged illegality because the resulting "arrangement would not reflect the intent of the parties" as to the terms on which they would have been willing to enter into such an agreement. *See* 47 Fed. Cl. at 43-44. The court rested its conclusion on the fundamental concern that unilaterally altering the terms of the negotiated agreement so as to be inconsistent with the intent of the parties "would bring a windfall to which [plaintiff] is not entitled." *Id*. at 44. The court held that "[e]nforcement as written, regardless of the illegality, brings no unjust result." *Id* at 43.

As in *AT&T* and in *Northrop Grumman*, the allegedly illegal term at the heart of this case was an essential and clearly-understood part of a complex transaction involving an agreed-upon exchange of value. Had AIG been unwilling or unable to meet the terms offered by FRBNY, FRBNY would have taken its offer off the table. *See* PFOF § III.A & ¶¶ 80, 388-92. *Cf. AT&T*,

307 F.3d at 1380-81 (if the contract terms had been different, the Government might have awarded the contract to AT&T's competitor).

The testimony at trial was unequivocal: had AIG refused to accept the agreement offered on September 16 – including the equity term – FRBNY would not have extended any financing, and AIG would have declared bankruptcy shortly thereafter. PFOF ¶¶ 50, 79-80, 83, 91, 388-92. FRBNY's insistence on the rescue terms reflected a complex balancing of the concerns at issue. PFOF ¶ 118, 127-35. FRBNY and the Board of Governors concluded that the consequences from an AIG failure would be sufficiently great that financing ought to be extended to AIG, but only if the risks of doing so could be mitigated, and only if the taxpayers could be sufficiently compensated for assuming the risks that should have been borne by AIG's investors. PFOF ¶¶ 136-38. Federal Reserve officials viewed the equity term as an essential element in balancing these concerns: the equity provided (1) a modicum of the control needed to reduce the loan's credit risk, (2) allowed the public, who were the ultimate lenders to AIG, to participate in the rescue's potential upside, and (3) reduced the moral hazard risk by both limiting the shareholders' windfall and ensuring that the terms of the FRBNY loan were not more attractive than the terms developed by the private sector. PFOF ¶¶ 200, 135, 138; *see generally* PFOF §§ III.A, III.C. Federal Reserve decision-makers also believed that, as a policy matter, they could not accede to AIG's requests for more favorable terms once FRBNY had communicated to AIG the terms on which it was willing to lend. PFOF ¶¶ 79-80, 390.

The Credit Agreement Class benefitted handsomely from the rescue, and AIG, despite its efforts, could not find more beneficial terms from any private market participant. Without the loan, class members likely would have lost everything. With it, the pre-rescue value of their shares was preserved and increased. Unilaterally altering the terms of the Credit Agreement as

Starr asks would bring an additional "windfall to which [plaintiff] is not entitled." *Northrop Grumman*, 47 Fed. Cl. at 44.

This case differs from the cases on which Starr relies, in which courts have ordered the return of money paid pursuant to an illegal demand made by an agency; none of Starr's citations reflect instances where the agency had negotiation authority, or where the alleged exacting term was embedded in a bilateral agreement. For example, in *Sprague S.S. Co. v. United States*, the Court ordered the return of money paid by the plaintiff to the Government in excess of a statutorily-prescribed formula for determining ship prices; the Court found that Congress had "by design" denied the agency authority to negotiate pricing agreements. 172 F. Supp. 674, 675 (Ct. Cl. 1959) ("Congress, by [the Ship Sales Act], intended that the prices of these ships should be determined, not by negotiation . . . but by arithmetic. . . . [T]he statutory formula of the Ship Sales Act [is] comparable to a statutory schedule of public utility rates, which may not be legally departed from by design."). In *Clapp v. United States*, 117 F. Supp. 576 (Ct. Cl. 1954), the Government demanded payment from the plaintiff as a condition for the Government approving the sale of a ship. The Court concluded that the agency was not empowered to negotiate the conditions of its consent because the statute granted the agency authority to approve or deny the sale based on an assessment of the national defense and foreign policy implications, not based on a negotiated exchange of consideration. *Id.* at 581.

Unlike *Sprague* and *Clapp*, the terms Starr seeks to excise are not independent, but are an interwoven and integral part of an agreement between AIG and FRBNY. The Court, therefore, should preserve the parties' agreed-upon balance of a complex, negotiated contract and decline to evaluate Starr's claim based upon excising a material term of the agreement.

### 2. Starr Has Not Shown That It Would Have Enjoyed An Increased Value For Its Shares If The Parties Had Contracted Without The Equity Term But On Economically Equivalent Terms

Starr's request for the Court to simply excise the equity term from the Credit Agreement fails for the additional reason that in September 2008, the parties agreed that if any provision of the Credit Agreement were found to be illegal, the term would be replaced with an economically equivalent alternative. Specifically, section 8.12 of the Credit Agreement provides: "[i]n the event that any one or more of the provisions contained in this Agreement . . . should be held invalid, illegal or unenforceable in any respect . . . [t]he parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions." PFOF ¶ 415. The parties' contemporaneous agreement undercuts Starr's argument that the Government obtained value that Starr would have had but for the equity term.

If the equity term were illegal, the parties could have substituted a number of economically equivalent alternatives that would have left Starr in the exact same position. Alternatives could be in the form of paid-in-kind debt (where the borrower defers current, high-interest payment obligations by agreeing to pay an increased rate or an increased amount of principal in the future) or convertible subordinated debt (which would be treated as debt until conveyed to a private buyer and would then become convertible to equity). *See* PFOF ¶ 393. Other potential alternatives were also possible, such as contractual entitlement to a share of AIG's future profits equivalent to the expected value of the equity interest.

Starr has neither argued nor shown that any potential economically equivalent alternatives to the equity term would have exceeded FRBNY's authority. Failure to do so is fatal to Starr's argument that the Government obtained anything of value that Starr had or would have

had but for the equity term.  It is also fatal to Starr's illegal exaction claim because this Court's jurisdiction depends on Starr's showing that it paid something, directly or in effect, to the Government that should be returned.  *See Eastport*, 372 F.2d at 1007.

## F. The Court Should Deny Starr's Illegal Exaction Claim Because Starr Retained The Benefits Of The Government's Rescue For Years

The Court should deny Starr's illegal exaction claim for the additional reason that Starr long retained, without objection, the benefits of FRBNY's and the Government's rescue of AIG. Starr decided not to challenge the allegedly illegal agreement until after Starr received the full benefits of multiple rescues extended to AIG between September 2008 and January 2011; that decision now precludes Starr from now seeking to undo AIG's September 2008 agreement.

Starr's failure to object was not for lack of information or opportunity.  Starr knew the terms of AIG's rescue loan, and was deeply familiar with the Federal Reserve's statutory authority.  President Geithner and Mr. Greenberg had many conversations about AIG and the equity interest in particular, and not once did Mr. Greenberg complain that the equity interest in AIG's agreement was illegal.  PFOF ¶ 482.  Starr never filed suit to stop the performance of the Credit Agreement – choosing instead to enjoy the benefits of that performance.

Starr failed to promptly challenge the allegedly illegal agreement, which would have been the proper time to do so.  *See AT&T*, 307 F.3d at 1381 ("In short, the proper time for AT&T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available.").  Had Starr done so, FRBNY and the Government might not have provided additional assistance, or might have provided subsequent assistance under different terms.

As Starr failed to promptly challenge the allegedly illegal agreement, Starr has waived the opportunity to undo AIG's agreement on the ground that the Federal Reserve exceeded its

statutory authority. *See id.* ("[E]ven were AT&T to have stated a valid claim for reformation, this court's case law would require a finding that AT&T waived that claim.") (citation omitted). "The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed. Cir. 1997) (citing *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed. Cir. 1997); *E. Walters & Co., Inc. v. United States*, 576 F.2d 362, 367-68 (Ct. Cl. 1978)). Accordingly, the Court should deny Starr's illegal exaction claim.

## III. Starr Lacks Standing To Assert Its Equity Claim

Both Starr's takings claim and illegal exaction claim for the September 2008 rescue loan fail for an additional reason: Starr has no standing to assert a direct, rather than derivative, claim. As this Court has previously held, Starr's standing to assert a direct claim depends on "whether under the facts of this case, the Government caused the shareholders to suffer the alleged harm, and whether any damages awarded should go to the shareholders instead of the corporation." *Starr III*, 112 Fed. Cl. at 605; *see also Gatz v. Ponsoldt*, 925 A.2d 1265, 1280-81 (Del. 2007) ("In this case, as in *Tri-Star* and *Rossette*, the fiduciary exercise[d] its stock control to expropriate, for its benefit, economic value and voting power from the public shareholders").

Starr has failed to demonstrate that it possesses standing for two separate reasons. First, Starr has the burden to prove that the equity term resulted in "harm to the suing stockholders independent of any harm to AIG." *Starr*, 106 Fed. Cl. at 62; *accord Starr II*, 111 Fed. Cl. at 482; *Gatz*, 925 A.2d at 1274 (any direct claim must be based on "a separate and distinct harm . . . to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action."); *see also Tooley v. Donaldson, Lufkin &*

*Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) ("[T]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation.").  Starr has failed to prove independent harm and, thus, has failed to meet its burden.

Second, although we recognize that the Court previously concluded that Starr's takings and illegal exaction claims are direct claims based upon a corporate overpayment theory, *Starr*, 106 Fed. Cl. at 65, we respectfully submit that Starr failed at trial to prove the essential elements of standing to establish a direct corporate overpayment claim.

## A.    Starr Has Not Established Harm To Shareholders Separate And Distinct From Harm To AIG

Starr has failed to prove any harm to AIG common shareholders that was "separate and distinct . . . from any harm caused to the corporation."  *Gatz*, 925 A.2d at 1274.  Its failure to do so mandates the conclusion that it has no standing to assert a direct claim.

In moving for class certification, Starr argued that "recovery on the direct claims will not reduce recovery on the derivative claims, or vice versa" and represented to the Court that "AIG and its shareholders each suffered distinct injuries, and the allocation of damages for these injuries will be based on data disclosed during discovery and expert testimony."  Pl. Mem. in Supp. of Mot. for Class Certification (Dec. 3, 2012) (Dkt. 81) at 13; *see also* Dkt. 87-26 at 34-35 (AIG Bd. Mtg. Tr. 129:5-131:10) (argument by Starr's counsel to the AIG board regarding the allocation of direct and derivative damages, concluding that "[w]e cannot have duplicate recovery, so you have to take [the entire value of the stock the Government has] and you have to allocate it.").

Despite that representation, Starr offered no proof at trial bearing on any allocation between injuries allegedly suffered by AIG and any separate injuries allegedly suffered by its

shareholders.  *See* PFOF ¶ 346 (Dr. Kothari did not analyze the value of any claims that could have been brought derivatively by AIG).

To the contrary, the economic harm that Starr claims for its direct Equity Claim – the asserted value of a 79.9 percent equity interest in AIG based on AIG's publicly traded share price – is the same economic harm that Starr alleged impacted AIG.  *Compare* PFOF ¶ 346 (Kothari, Tr. 4529, Lines 20-22 ("I was asked to value the 79.9 percent equity and voting interests taken by or acquired by defendant on September 22 as of September 22, 2008"), *with* 2d Am. Compl. ¶ 235 (alleging in its derivative claim that "FRBNY and its agents took or illegally exacted 79.9% equity and voting interests from AIG in September 2008"), *and Starr*, 106 Fed. Cl. at 62 n.9 ("Around the time of the Credit Agreement, Starr maintains that an ownership interest in 79.9% of AIG's common stock was valued at $23 billion."), *and Starr II*, 111 Fed. Cl. at 479 (quoting Starr's argument that "[i]n evaluating possible damages, the [AIG] Board ignored AIG's own prior contemporaneous determination . . . that valued the 79.9% interest taken and/or illegally exacted at $23 billion").

Under Delaware law, where "the damages allegedly flowing from the purportedly direct claim . . . are exactly the same as those suffered by the corporation in the underlying derivative claim . . . , the injury alleged in the complaint is properly regarded as injury to the corporation and not to the class."  *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).  Correspondingly, the Government is not liable to Starr for any injuries to AIG from the rescue loan, which were the subject of the now-dismissed derivative claim.  *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 776, 773 (Del. 2006) (reasoning that it "simply cannot be" that a defendant

could be "liable to pay both the corporation and its shareholders the same compensatory damages for the same injury").[25]

Because Starr has failed to prove that the equity term caused injury to the common shareholders that was "separate and distinct" from any injury to AIG, Starr lacks standing to assert a direct claim arising from the equity term. Starr has the burden of establishing standing at every stage of the proceedings, and the Court therefore should dismiss Starr's claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (the burden of establishing standing changes at different stages of the litigation; at the summary judgment stage, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true.").

### B. Starr Has Not Established The Elements Of A Simultaneously Direct And Derivative Claim

Starr also lacks standing to bring a direct claim because it has failed to meet the narrow exception to the requirements for a "corporate overpayment" claim necessary for such standing to exist. This Court has found that Starr's Equity Claim is a "corporate overpayment" claim. *See Starr*, 106 Fed. Cl. at 62 & n.10; *Starr II*, 111 Fed. Cl. at 481; *Starr III*, 112 Fed. Cl. at 604. Under Delaware law, corporate overpayment claims generally are exclusively derivative because the corporation is "the party that suffers the injury (a reduction in its assets or their value) as well

---

[25] The AIG board decided not to bring any derivative claim possessed by AIG for any alleged economic harm suffered by the company, and the Court upheld that decision. *See Starr II*, 111 Fed. Cl. at 479. The derivative claim based on the September 2008 equity term no longer is viable, and any injury relating to it no longer can serve as a basis for recovery. In dismissing Starr's derivative claims, this Court recognized that each derivative claim "belongs to the corporation," and concluded that AIG's "Board acted within its discretion in choosing not to advance it." *Starr II*, 111 Fed. Cl. at 479. The Tucker Act's six-year statute of limitations subsequently ran on the derivative claim premised on the September 2008 equity grant. *See* 28 U.S.C. § 2501.

as the party to whom the remedy (a restoration of the improperly reduced value) would flow." *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006). Although Starr's standing to pursue Federal claims in Federal court is a question of Federal law, principles of state law properly inform the Court's analysis, particularly because the standing question here allocates between a corporation and its shareholders the right to pursue a Federal cause of action based on a state-law "corporate overpayment" theory. *See, e.g.*, *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003); *see also CTS Corp. v. Dynamics Corp. of Amer.*, 481 U.S. 69, 91 ("It . . . is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1997) ("The presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.").[26] In applying Delaware law, the Court should conclude that Starr has not established the elements of a simultaneously direct and derivative corporate overpayment claim.

----

[26] Because Starr's takings and illegal exaction claims arise under the Federal rather than state law, Federal law controls whether those claims are direct or derivative in character. *See, e.g.*, Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1821 ("[I]n suits in which the rights being sued upon stem from federal law, federal law will control the issue whether the action is derivative."). Nonetheless, in determining that Federal-law question, courts may properly look to principles of state corporate law, including rules governing whether analogous state-law claims would be direct or derivative in character. *See N.Y. City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010); *Halebian v. Berv*, 590 F.3d 195, 204-05 (2d Cir. 2009); *Strougo v. Bassini*, 282 F.3d 162, 169 (2d. Cir. 2002); *Boland v. Engle*, 113 F.3d 706, 715 (7th Cir. 1997); *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 879-80 (3d Cir. 1990); *cf. Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97-100 (1991). Because AIG is incorporated in Delaware, as the parties have consistently recognized, Delaware law governing "corporate overpayment" claims is instructive in this instance.

In the narrow exception recognized by the Supreme Court of Delaware, both a direct and a derivative corporate overpayment claim may arise where, among other things, "a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value." *Starr*, 106 Fed. Cl. at 62 (quoting *Rossette*, 906 A.2d at 100 (citing *Gatz*, 925 A.2d at 1278)). To establish that the September 2008 rescue loan met this requirement, Starr has to prove *each* of the following elements to maintain a direct claim: (1) as part of the rescue loan, AIG issued shares of its stock in exchange for Government assets of lesser value, (2) the Government was a controlling shareholder of AIG when the company approved the rescue loan, and (3) the Government used its control of AIG to cause or compel AIG to accept the rescue loan. Starr failed to meet its burden on *any* of these three elements.

### 1. AIG Did Not Issue "Excessive" Shares

The 79.9 percent equity stake that AIG issued as partial consideration for the FRBNY rescue loan was not excessive. Starr did not lose any property based on a corporate overpayment theory because AIG did not overpay for the rescue loan.

The Government's actions provided a tremendous *increase* in the economic value of Starr's shares. *See* PFOF ¶¶ 347, 351-54, 364-71. AIG could not have overpaid for the credit facility because Starr's shares *increased* in value as a result of the transaction. PFOF ¶¶ 375-80, 381-86. The increase in the value of Starr's shares defeats any claim that AIG overpaid for the rescue.

AIG's increase in share price means that the value AIG received through access to FRBNY's credit facility exceeded the value conveyed by AIG through issuance of the shares. Indeed, KPMG, an expert consultant to AIG in valuation, determined that the credit facility

increased AIG's income by up to $33.42 billion, and the value of the shares issued by AIG pursuant to its agreement with FRBNY was $23 billion. PFOF ¶¶ 384-85.

AIG's accounting for the rescue loan further demonstrates that AIG received value from the FRBNY loan at least equal to the value of the shares it issued. After the agreement, AIG reported an increase in its shareholder's equity in the amount of $23 billion. *See* PFOF ¶¶ 385-86. The reported increase in shareholder's equity was appropriate because AIG determined, and its auditor PricewaterhouseCoopers concurred, that FRBNY's $85 billion credit facility provided consideration for the preferred stock AIG issued. *See id*. Thus, the 79.9 percent equity stake that AIG issued as consideration for the FRBNY rescue loan was not an excessive overpayment.

Starr's failure to prove that AIG paid more for the rescue loan than AIG received is an independently sufficient ground to conclude that Starr lacks standing to assert a direct, corporate overpayment claim based on the equity term. Even if AIG had issued excessive shares, the overpayment would not render Starr's claim direct. Even if a Delaware corporation "overpays" equity to its counterparty in a transaction, "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal 'injury' to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually." *Rossette*, 906 A.2d at 99; *see also Feldman*, 951 A.2d at 732 ("Where all of a corporation's stockholders are harmed

and would recover pro rata in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.").[27]

### 2. The Government Was Not A Shareholder Of AIG At The Time Of The Challenged Transactions

Starr also cannot establish the second prong of the *Gatz* and *Rossette* test: the existence of a "controlling shareholder" to which the alleged overpayment was made. Neither FRBNY nor the Government was a shareholder of AIG at the time AIG's board agreed to provide a 79.9 percent equity stake in AIG as part of the FRBNY rescue loan. Starr's argument to the contrary is chronologically challenged. Neither FRBNY nor the Government held any shares in or possessed any voting power over AIG on September 16, 2008, when AIG agreed to FRBNY's rescue terms. *See* PFOF ¶ 343. The same is true for September 21, 2008, when AIG's board approved entry into the Credit Agreement. *See id.* Starr's claim, therefore, fails the second element of a direct claim under *Gatz* and *Rossette*.

As discussed in Section I.D.3, we recognize this Court previously held that Starr has standing because the Government's "preexisting duty under the Fifth Amendment not to take private property for public use without paying just compensation" could be substituted for the fiduciary duties of a controlling shareholder necessary to the existence of a direct claim under *Gatz* and *Rossette*. *Starr*, 106 Fed. Cl. at 65. We respectfully submit, however, that duties under the Fifth Amendment cannot be substituted for fiduciary duties under Delaware law in

---

[27] This Court previously quoted the 2004 decision in which the Delaware Supreme Court "'expressly disapprove[d] . . . the concept that a claim is necessarily derivative if it affects all stockholders equally.'" *Starr III*, 111 Fed. Cl. 459, 482 (2012) (quoting *Tooley v. Donaldson*, 845 A.2d 1031, 1039 (Del. 2004)). But *Tooley* did not involve a "corporate overpayment" claim and, while the quoted reasoning survives in other contexts, that reasoning was superseded in the context of corporate overpayment claims by the Delaware Supreme Court's 2006 decision in *Rossette* and its 2008 decision in *Feldman*, as quoted in the text above.

determining who has standing for a corporate overpayment claim. The Fifth Amendment provides no guidance in determining whether a particular claim arising from a corporate transaction belongs to the corporation or its shareholders.

Under Delaware law, Starr's failure to prove that the Government was a shareholder when AIG agreed to the alleged "overpayment" means that Starr lacks standing to assert a direct claim based on the equity term of the loan. *See, e.g.*, *Feldman*, 956 A.2d at 657 ("[I]t is clear from [*Rossette* and *Gatz*] that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists.").

### 3. The Government Did Not Cause AIG To Agree To The Equity Term Through The Exercise Of Control Over That Corporate Decision

Starr's claim also fails the third element of the *Gatz* and *Rossette* requirements. Starr has no standing to assert a direct overpayment claim under Delaware law because neither FRBNY nor the Government controlled AIG's board when it agreed to the rescue loan, nor did they exercise such control to compel AIG's board to act. *See* PFOF ¶ 344. Therefore, the Government did not "caus[e] the shareholders to suffer the alleged harm." *Starr III*, 112 Fed. Cl. at 605.

## THE REVERSE STOCK SPLIT CLAIM

## IV. Starr Has Failed To Establish Its Claims With Respect To The Reverse Stock Split

Starr claims that the Stock Split Class is entitled to compensation because the Government took or exacted the class's equity and voting rights through the June 30, 2009 reverse stock split. *See* Pl. Pretrial Concl. of Law ¶ 229. To accept Starr's Stock Split Claim would require the Court to conclude that (1) even though a reverse stock split was admittedly necessary for AIG's stock to remain on the NYSE, Starr was entitled to a vote on a *different* reverse stock split that, in hindsight, would have given common shareholders more negotiating

leverage for AIG's January 2011 recapitalization; (2) the Government orchestrated the reverse stock split in prescient anticipation of that recapitalization 18 months later; and (3) that the June 2009 reverse stock split harmed the Stock Split Class's property interests by an amount only measurable in January 2011. The Court should not believe Starr's fantastical version of events, much less determine that they constitute a viable takings or illegal exaction claim.

The "crux" of Starr's Stock Split Claim is Starr's contention that AIG's common shareholders "had a right, pursuant to the *Walker* Consent Order and Delaware Law, to a separate class vote on any measure that enables the Government to transform the Preferred Shares into common stock, thereby diluting the common shareholders' stock, and that this right was taken." Aug. 6, 2014 Starr Mem. at 46-47 (Dkt. No. 260). Starr's Stock Split Claim fails for four independent reasons. First, Starr cannot identify a property right that was allegedly taken or exacted from the Stock Split Class. Contrary to Starr's claims, neither Delaware law nor the *Walker* litigation conferred a right to approve any measure that enabled the Government to monetize its AIG equity. Second, Starr failed to identify any Government action that resulted in a taking or illegal exaction of its property. Starr argues that the Government engineered the reverse stock split to monetize the Series C Preferred Shares. The evidence proves exactly the opposite; the decision to propose a reverse stock split, and the terms of that reverse stock split, were made solely by AIG to avoid the potentially disastrous consequences of delisting by the New York Stock Exchange. Third, Starr's takings claim fails because the challenged reverse stock split did not harm Starr. Last, the illegal exaction claim fails because Starr has not identified a statutory violation or an unauthorized act; certainly nothing of value belonging to the Stock Split Class ended up in the Government's pockets as a result of the reverse stock split.

Accordingly, this Court should enter judgment in favor of the United States concerning the Stock Split Class's taking and illegal exaction claims.

A.  **Starr Has Not Identified A Property Right That Was Taken Or Exacted Because The Common Shareholders Had No Right To A Class-Only Vote Before Monetization Of The Trust's Shares**

To assert either a takings or an illegal exaction claim, Starr must identify a cognizable property interest that was obtained by the Government. *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). "[A] taking claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed." *Rogers Truck Line, Inc. v. United States*, 14 Cl. Ct. 108, 114 (1987); *Cmty. Bank & Trust v. United States*, 54 Fed. Cl. 352, 361 (2002) ("As with the takings claim, [the illegal exaction] claim depends on a determination by the court that plaintiff has a property interest" in the property at issue.).

A property interest is not created by the Constitution itself, but it is "created and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

### 1. Starr Fails To Identify Any Source For Its Claimed Property Right

Starr claims that the Stock Split Class had a right to a class-only vote before the Trust could monetize its shares, and that this right was taken or illegally exacted through the reverse stock split. Aug. 6, 2014 Starr Mem. at 46-47 (Dkt. 260). Neither Delaware law nor the *Walker* Order created such a right, so nothing was taken or exacted by the Government.

#### a. No Property Right Exists Under Delaware Statutory Law

Starr long ago conceded, and this Court correctly concluded, that the common shareholders had no right under Delaware statutory law to a class-only vote on AIG's 2009

reverse stock split.  *See Starr*, 106 Fed. Cl. at 73 (citing Tr. 105 (Boies)).  Starr's current

suggestions to the contrary are baseless.[28]

The governing Delaware statute requires a class vote on an amendment to a certificate of

incorporation only "*if* the amendment would increase or decrease the aggregate number of

authorized shares of such class" or "increase or decrease the par value of the shares of such

class."  8 Del. C. § 242(b)(2) (emphasis added).  Starr does not (and cannot) contend (1) that

AIG amended its certificate of incorporation in any way not permitted by section 242(b)(2), or

(2) that the reverse stock split or the subsequent exchange of preferred stock for common stock

changed the aggregate number of authorized shares of AIG common stock or changed the par

value of those shares.  Accordingly, Delaware law cannot be the source of Starr's claimed

property interest.

### b. No Property Right Exists Under The *Walker* Stipulation And Order Of Dismissal

Starr argues that the "Consent Order" in the *Walker* action provided AIG's common

shareholders the right "to a separate class vote on any measure that enabled the Government to

transform its Preferred Shares into common stock, thereby diluting the common shareholders'

stock."  Aug. 6, 2014 Starr Mem. at 46-47 (Dkt. 260).

The *Walker* order does not entitle AIG's common shareholders to such a vote.  Indeed,

Starr misreads this order and misstates its rights under Delaware law.

---

[28] In a footnote to its summary judgment opposition, Starr attempted to withdraw this concession, on the ground that Delaware Code section 242(b)(2) is "ambiguous" (Aug. 6, 2014 Starr Mem. at 49 n.26, Dkt. 260).  Starr merely offers a conclusory observation about the statute's "ambiguity," without explaining what is "ambiguous" about it.  Starr's three complaints in this action, by contrast, characterize the statute as "unequivocal."  Compl. ¶ 81 (Dkt. 1); 1st Am. Compl. ¶ 81 (Dkt. 22); 2d Am. Compl. ¶ 96 (Dkt. No. 101).

As an initial matter, the stipulated order of dismissal – signed by the *Walker* court – is not a "Consent Order," as Starr claims. It is a "Stipulation and Order of Dismissal," meaning that it completely ended the *Walker* litigation and did not require any further action by AIG to comply with it. JX-176 at 1. Consent orders, unlike dismissal orders, provide for the retention of jurisdiction to judicially enforce the parties' obligations. *Holmes v. United States*, 657 F.3d 1303, 1316 (Fed. Cir. 2011). The *Walker* Stipulation and Order of Dismissal did not order AIG to perform any action, and the Court did not retain jurisdiction to enforce any compliance. JX-176 at ¶ 3. Because the *Walker* order did not impose any enforceable obligation on AIG, Starr's claim fails.

Moreover, the meaning of an order "must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971); *see also Herman B. Taylor Constr. Co. v. Barram*, 203 F.3d 808, 813-14 (Fed. Cir. 2000) (quoting *Armour*). Its meaning is not discerned "by reference to what might satisfy the purpose of one of the parties to it" (*Armour*, 402 U.S. at 682), or, in this case, a non-party's characterization of the order. Rights created by an order "cannot be expanded beyond the decree's express terms." *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1577 (Fed. Cir. 1989).

Starr argues that AIG "*violated the spirit*" of the order. *See, e.g.*, Pl. Mem. at 4 (Sept. 19, 2014) (Dkt. 309-4); Aug. 11, 2014 Starr Proposed Conclusions of Law ¶ 216 (Dkt. 274-1) (both quoting 106 Fed. Cl. at 74) (emphasis added in each case). This argument is, in fact, a concession that the plain language of the Delaware court's dismissal order does not contain Starr's claimed protected property right. The Federal Circuit held just last year in *Energy Recovery, Inc. v. Hauge*, 745 F.3d 1353 (Fed. Cir. 2014), that a finding that a party has "violated the letter and spirit" of a consent order decree without a finding that the party has violated a

"provision" of a consent decree is reversible error because "the Supreme Court has explained that a consent decree must be discerned within its four corners." *Id*. at 1359.

An examination of the order and the words within its "four corners" confirms the absence of any violation of the order, much less, as Starr claims, a violation of the order that resulted in a property right taken by the Government. The only relief the *Walker* plaintiff ultimately requested was a declaration regarding the validity of a conversion of the Series C common stock without an affirmative class vote of the common stockholders. *See* PFOF ¶ 440. The *Walker* plaintiff did not seek a declaration requiring a vote on conversion, much less a vote by a specified date. *See id*.

On January 22, 2009, the parties to the *Walker* litigation submitted a stipulated order, which was entered by the Delaware court on February 5, 2009. The portion of the order on which Starr relies simply re-states AIG's representation "during a conference with the Court on November 7, 2008" that "any amendment to the Restated Certificate of Incorporation to increase the number of authorized common shares or to decrease the par value of the common shares would be the subject of a class vote by the holders of the common stock," and concludes that Ms. Walker's request for relief is moot. PFOF ¶ 444. The order also provided for a hearing on an application for attorneys' fees by the plaintiff's counsel in the *Walker* action, for the benefit the plaintiff contended she conferred on AIG's common shareholders. *See id.*

The *Walker* Order thus (1) memorialized the mooting of a claim seeking to make AIG comply with 8 Del. C. § 242(b)(2) because AIG agreed that it would hold a class vote if the company sought to increase the number of common shares or decrease the par value of those shares, and (2) provided a mechanism by which the plaintiff in the *Walker* action could seek a fee award. The order does nothing more. Count I of the *Walker* complaint did not seek, and the

*Walker* Order did not create, rights that did not already exist under section 242(b)(2). *See* PFOF ¶¶ 440, 444.

AIG took no action inconsistent with its representations in the *Walker* Order. AIG represented that "any amendment to the Restated Certificate of Incorporation to increase the number of authorized common shares or to decrease the par value of the common shares would be the subject of a class vote by the holders of the common stock" – that is, that AIG would comply with section 242(b)(2). The *Walker* order says nothing about exchanges of Series C Stock for common stock when the exchange does not involve a change in the number of authorized common shares or the common stock par value. The order does not address the Series E or Series F Stock, which were not the subject of the order and did not exist at the time. Indeed, the order is silent regarding a class vote on any proposal that might result in the dilution of common shares, unless the proposal involved a change in the number of authorized common shares or the par value. In a consent order, "silence is the functional equivalent of the parties' express intent to exclude language." *Thatcher v. Kohl's Dept. Stores, Inc.*, 397 F.3d 1370, 1375 (Fed. Cir. 2005).

The *Walker* Order thus could not have provided AIG's common shareholders with a property right to a class-only vote on any reverse stock split, or on any dilution of their shares. Accordingly, because no property right was created, no property right could have been "taken" or "exacted."

### c. No Property Right Was Created Through Alleged "Misrepresentations" to the *Walker* Court

Starr argues that AIG misled the Delaware Court of Chancery "by not telling the *Walker* court" that AIG and the Government "decided not to put the conversion amendments to a vote."

Aug. 6, 2014 Starr Mem. at 50-51 (Dkt. No. 260). Starr then asks this Court to modify the *Walker* order, an invitation to err the Court should reject for two independent reasons.

First, if AIG had "misled" the *Walker* court, the remedy would be a motion by the *Walker* plaintiff (or any other AIG shareholder who chose to intervene) to modify that order. The remedy would not be, as Starr attempts here, a collateral attack on AIG in this Court in an action in which AIG is not a party, based upon a lawsuit in which Starr was not a party and chose not to intervene. The remedy certainly would not be this Court's modification of the Delaware court order to create some right – and then hold that the Government "took" or "exacted" that right.

Second, even if this Court were the appropriate forum in which to judge a non-party's conduct in another court, Starr has not demonstrated that AIG misrepresented facts to the *Walker* court. Starr's "support" for this claim is: (1) AIG's November 10, 2008 10-Q addressing the shareholder vote (JX-150 at 28); (2) an email from AIG's counsel, Joseph Allerhand of Weil, Gotshal & Manges LLP, to the Government's counsel (PTX-420); and (3) an affidavit by Kathleen Shannon, AIG's Senior Vice President, Secretary and Deputy General Counsel, filed in the *Walker* action to address plaintiff's motion for attorneys' fees (JX-181). None of these supports Starr's allegation of an AIG misrepresentation to the *Walker* court.

AIG's 10-Q does not further Starr's claim. That filing states that "[a]fter the Series C Preferred Stock is issued, AIG will be required to hold a special shareholders' meeting to amend its restated certificate of incorporation to increase the number of authorized shares of common stock to 19 billion and to reduce the par value per share" and "holders of the common stock will be entitled to vote as a class." PFOF ¶ 444 n.48. The November 10, 2008 10-Q, however, was not "a primary basis for the dismissal of the case," as Starr contends. *See* Aug. 6, 2014 Starr Mem. at 48 (Dkt. No. 260). The *Walker* order references no requirement that AIG hold a vote to

increase the number of common shares or decrease par value – only that if there were such a vote it would be a class vote.  PFOF ¶ 444.  The "requirement" referred to in AIG's 10-Q comes from the Credit Agreement's language requiring a vote "as soon as practicable."  PFOF ¶ 444 n.48.  AIG and FRBNY had every right to amend the Credit Agreement – to which Starr concedes it was not a party or an intended beneficiary (Sept. 11, 2013 Starr Motion to Strike at 8 (Dkt. 155)) – to allow the Trust to determine the vote's timing.  *See* PFOF ¶¶ 436 (describing rights under the Credit Agreement), 448 (citing JX-206 at 13-14).

In addition, Mr. Allerhand's email is not evidence that AIG submitted the proposed order "without telling the *Walker* Court or the other parties to that litigation" that AIG and the Government had "decided not to put the conversion amendments to a vote and to amend the Credit Agreement for a third time not to require one."  Aug. 6, 2014 Starr Mem. at 50-51 (Dkt. 260).  Rather, Mr. Allerhand's email explains a consensus view that it made good sense not to hold a stockholder vote *at that time*, for "a multitude of good reasons."  PFOF ¶ 448.  The "good reasons" for this consensus included (i) "the preferred stock hadn't even been issued yet"; (ii) the preferred "already had all the attributes of 79.9 percent common stock equivalent built into it" so "the vote was not imperative" and "may well have never need[ed] to take place"; and (iii) one could not know . . . which way that vote would go if the question was called entirely prematurely with no context."  *Id*.

The *Walker* Order, however, did not require AIG to hold a vote to amend its certificate of incorporation to increase the number of common shares or decrease the par value of shares.  The order simply mooted the claim in Count I of the *Walker* complaint seeking a declaration that *if* there was a vote on increasing the number of common shares or decreasing the par value of shares, *then* any such vote would include a separate class vote.  PFOF ¶ 444.  Count I of the

*Walker* complaint did not seek a declaration requiring a vote; thus, a stipulation mooting that claim would not guarantee a vote. PFOF ¶ 440. The *Walker* Court fully understood the claim in Count I and AIG's commitment when the court mooted the claim; the court explained that "*if there is going to be an increase in the number of authorized shares or in the par value of the shares, that there will be a class vote on that issue.*" PFOF ¶ 441 (emphasis added). Mr. Allerhand's email is entirely consistent with this order.

Finally, Ms. Shannon's affidavit does not show a violation of the *Walker* Order or "a misleading representation to the Delaware Court," as Starr erroneously claims. Tr. 3706 (Boies). Rather, the affidavit contests Walker's assertion that she was entitled to attorneys' fees for an alleged benefit conferred on AIG's common shareholders. *See* PFOF ¶ 442 n.47. Specifically, the affidavit demonstrated that AIG already had determined, before the *Walker* action was filed, that section 242(b)(2) required a class vote on any vote to increase the number of authorized common shares or decrease the par value of those shares; the affidavit thus undermined plaintiff's fee request by explaining that she had not conferred a benefit on AIG's common shareholders. *See id.* The affidavit attached and quoted the draft proxy statement's disclosure that "the authorization of the additional shares of common stock necessary to permit the conversion of the Series C Preferred Stock into common stock would require an affirmative vote of a majority of our outstanding common stock and preferred stock, voting as separate classes." *Id.* The affidavit did not state that such a vote would be held, or when.

Thus, even if modification of the Delaware court's order in *Walker* were a proper remedy in this Court, the Court should decline to order such a change where Starr has not identified any misrepresentation to the *Walker* court.

### d. No Property Right Was Created Through The Government's Views Concerning The *Walker* Action

Starr makes much of emails reflecting the Government's and its counsel's alleged involvement in the *Walker* action and views expressed concerning the issues underlying the *Walker* action. *See* Dec. 8, 2014 Starr Memo to Supplement Record (Dkt. 404); Dec. 29, 2014 Starr Reply Memorandum to Supplement the Record (Dkt. 416). None of this is relevant, legally or factually.

Legally, none of these emails addresses the issue that Starr acknowledges forms the "crux" of the Stock Split Claim: Did the Stock Split Class have "a right, pursuant to the *Walker* Consent Order and Delaware Law, to a separate class vote" on the reverse stock split? Aug. 6, 2014 Starr Mem. at 46-47 (Dkt. No. 260). The answer to this question, as explained above, is no. No email written by any Government official or private attorney recognizes, much less creates, such a right. The fact that the Government's outside counsel asked AIG's counsel whether anything in the *Walker* Order precluded delaying a vote on increasing the number of common shares or decreasing par value suggests a lawyer's normal care and prudence, not a concession that the order required such a vote or that a different course could not be pursued in the future without a class vote.

Indeed, the evidence shows virtually no Government involvement in the *Walker* action. Marshall Huebner's unrebutted testimony explained that Davis Polk and its clients' involvement was limited to receiving email updates and participating in one or two phone calls from AIG's counsel regarding developments in the case. *See* PFOF ¶ 442. FRBNY's General Counsel, Mr. Baxter, testified similarly. *Id.* Emails confirm that AIG alone handled the *Walker* litigation, and AIG independently determined that the common stock was entitled to a class vote in the event of a change in common shares or par value. *See* PFOF ¶ 443. Starr elicited no testimony

from any witness indicating substantive involvement in the *Walker* litigation by FRBNY or the Government.

Thus, the evidence demonstrates that the Government did not participate in the *Walker* litigation and did not make any representations to the Delaware court that could possibly form the basis of a property right.

### 2. The Doctrine Of Independent Legal Significance Undermines Any Claimed Property Right To Avoid Share Dilution

Starr argues the shareholders should have been able to police – and tax – any exit from the preferred stock investments. Specifically, Starr argues that, because the Trust and the Treasury Department could not convert their shares to common stock without a class-only shareholder vote, they should not have been able to exchange their shares for common stock in the January 2011 recapitalization without a similar vote. *See* Pl. Pretrial Concl. of Law. ¶¶ 232-234. That argument fails for two separate reasons.

First, as a factual matter, conversion and exchanges are not identical. The 2011 recapitalization, which includes an exchange, gave AIG the opportunity to bargain for a better outcome for the public shareholders. The Trust ultimately did not convert its shares as of right, but rather negotiated an exchange of the Series C for AIG common stock. The January 2011 exchange of the Series C did not achieve the same economic end as a conversion. Unlike conversion, the exchange of the Series C was a contractual arrangement that had to be negotiated with AIG, and approved by AIG's management and directors. Those negotiations took place as part of broader discussions that began in March 2010 among AIG, the Government, FRBNY and the Trust regarding recapitalizing AIG. *See* PFOF ¶¶ 464-65. AIG used its leverage during these negotiations to extract additional consideration as part of the exchange, including warrants valued at over $1 billion exclusively for AIG's public shareholders. *See* PFOF ¶¶ 437, 464, 467.

In short, the exchange gave shareholders more benefits and rights than they would have received under a conversion.

Second, even if the January 2011 exchange had achieved a similar result as a conversion, under Delaware law, Starr had no right to prevent a lawful transaction that does not require a shareholder vote, even if an alternative would have required such a vote. Delaware's doctrine of independent legal significance states that if two provisions of Delaware law authorize alternative paths to the same result, a corporate action validly taken under one provision makes the action lawful. This is true even if the action would face different requirements through the other path. *See, e.g., Field v. Allyn*, 457 A.2d 1089, 1098 (Del. Ch. 1983) ("[I]t is not a valid basis for challenging an act taken under one section to contend that another method of achieving the same economic end is precluded by another section."), *aff'd*, 467 A.2d 1274 (Del. 1983) (*per curiam*). In particular, Delaware courts have long held that a corporation may validly accomplish a transaction in a way that does not require a separate vote of a class of shareholders even if another means of accomplishing the same result would have required such a vote. *See Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) ("[T]he language of 242(b)(2) . . . does not entitle the holders of a class of preferred stock to a class vote in a merger, even if (as we assume here) the interests of the class will be adversely affected by the merger."), *aff'd*, 567 A.2d 419 (Del. 1989) (table).

### 3. The Stock Split Class Does Not Have A Cognizable Property Interest In The Dilution Suffered By A Group Of Different Shareholders In 2011

Even if the Stock Split Class had a property right protecting it from dilution of its shares, no dilution resulted from the reverse stock split. Recognizing that fact, Starr argues that the Stock Split Class should be able to recover for alleged dilution 18 months later in connection with the 2011 recapitalization. Starr claims the recapitalization could not have occurred as it did

"but for" the reverse stock split. Aug. 11, 2014 Starr Proposed Concl. of Law ¶ 230 (Dkt. 274-1).

The shareholders who would recover under Starr's theory are not the shareholders who allegedly suffered the injury. Between June 2009 and January 2011, the identity of the shareholders changed substantially. PFOF ¶ 458. Thus, Starr claims compensable loss on behalf of the Stock Split Class based on an alleged dilution suffered by different shareholders, *see id.*, on a later date, as agreed to by AIG. Such a novel, attenuated theory cannot be the basis of a taking or illegal exaction. *See Norman*, 429 F.3d at 1088, 1096 (finding no takings or illegal exaction when the "causal relationship" between governmental conduct and the asserted harm was "too attenuated"). This Court properly dismissed Starr's claims alleging that the January 2011 recapitalization was a taking or illegal exaction. *Starr,* 106 Fed. Cl. at 69. The Court should reject Starr's efforts to graft that defeated claim onto Starr's wilting stock split arguments.

Moreover, the Stock Split Class lacks standing to assert claims based on any property rights held by AIG's shareholders in 2011. Therefore, even assuming the terms of the January 2011 exchange *were both* unfair and dilutive — which they were not — the Stock Split Class members would not be entitled to seek compensation for any loss allegedly experienced at a later date by a different group of shareholders as a result of the exchange. *See Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 925 (Fed. Cir. 1991) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)) (A plaintiff does not have standing to assert a claim unless "the injury 'fairly can be traced to the challenged action.'").

The Stock Split Class has no property rights of its own that were affected by the 2011 recapitalization. Under Delaware law, a transaction that creates the *potential* for wrongful

dilution of common stock is not itself actionable; shareholders can only claim loss when and if wrongful dilution in fact occurs. *See Oliver*, 2006 WL 1064169, at *33 (issuance of convertible shares that had the "potential to dilute the voting power of the common shareholders" was insufficient to show that plaintiffs had "suffered any cognizable dilutive harm to their voting rights" when no shares had been converted).

No ownership dilution, let alone economic dilution, occurred as a result of the reverse stock split. *See* PFOF ¶ 452. Common shareholders held the same ownership percentage of the economic value and voting rights of AIG's total equity after the reverse stock split as before. *See id*. Moreover, the reverse stock split did not affect the market value of the shares held by the common stockholders; thus, the common shareholders' stock had the same economic value after the reverse stock split as before. *See id*.

The June 2009 shareholders seek a windfall, not a recovery for harm actually suffered. The Supreme Court has explained that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiffs'] theory [of liability]". *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Starr's compensation model – based on an event affecting a different group of shareholders – fails to meet that standard.

This Court should decline to award a windfall to the Stock Split Class, which suffered neither economic nor ownership dilution.

**B.      Starr's Claim That The Reverse Stock Split Was Proposed By The Government For The Purpose Of Monetizing Its Shares Is Not Supported By The Evidence**

Starr fails to establish the necessary Government action to recover on its constitutional claims. Takings and illegal exaction claims must challenge "what the government has done, not what [third parties] have done." *Navajo Nation v. United States*, 631 F.3d 1268, 1274 (Fed. Cir.

2011) (quoting *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995)); *see also Casa de Cambio*, 291 F.3d at 1364 (in an exaction claim the "test is identical to the Takings test;" "direct action by the United States"). Starr contends that "[a]voiding a shareholder vote on dilution . . . was the result deliberately intended and accomplished by a reverse split of issued but not of authorized shares." Pl. Mem. (Aug. 6, 2014) at 55 (Dkt. 260). Because AIG proposed and carried out the reverse stock split, the Court should find that the reverse stock split cannot constitute a taking or exaction.

The evidence shows that AIG, not the Government, determined the terms of the reverse stock split. No evidence in the record – no testimony, no documents, and no emails, even from privileged communications the Court ordered to be produced – supports Starr's claim that the reverse stock split and its terms were proposed by the Government, much less for the purpose of effectuating a share exchange that would dilute common shareholders 18 months later. There is, indeed, no evidence suggesting that anyone even thought of exchanging the Series C preferred stock at the time the reverse stock split and its terms were proposed and adopted.

## 1. AIG, Not The Government, Proposed The Reverse Stock Split

The reverse stock split arose from the New York Stock Exchange (NYSE)'s threat to delist AIG's common stock based on its low trading price. PFOF ¶ 422. In October 2008, in response to a letter from the NYSE warning that AIG was at risk of delisting, Mr. Liddy asked AIG's management to develop a plan to keep AIG's stock from being delisted. PFOF ¶¶ 422-23. After months of deliberation, AIG's board proposed a 1:20 reverse stock split of issued shares. PFOF ¶ 424-28. On June 30, 2009, AIG's shareholders, including Starr and a majority of the common shareholders, approved the reverse stock split proposal. PFOF ¶¶ 434, 449-50.

Starr presented no evidence that the Government, FRBNY, or the Trust directed or had any role in AIG's decision to propose the reverse stock split or to set its terms. The Government,

FRBNY, and Trust witnesses, consistent with AIG witnesses, explained that AIG alone proposed, designed, and implemented the reverse stock split. PFOF ¶¶ 421 & n.45, 428. The absence of Government action is fatal to Starr's takings and exaction claims.

### 2. Starr's Contention That The Reverse Stock Split Was Developed To "Circumvent The Shareholder Vote Requirement" Is Factually Unsupportable And Implausible

The Court should reject the Stock Split Claims because Starr presented *no* evidence that the action was developed to "circumvent the shareholder vote requirement." Pl. Pretrial Proposed Findings of Fact § 29.3. After trial, Starr admitted that they had "not yet identified any document showing when it was first proposed to use the reverse stock split to avoid a class vote of common shareholders." *See* Dkt. 373, Pl. Memo. in Support of Req. to Keep the Record Open for a Limited Time and Purpose After Plaintiffs' Rebuttal Case, at 8 (Nov. 24, 2014). After years of discovery, eight weeks of trial, and the de-privileging of thousands of documents, Starr's failure to find a single document to support its reverse stock split theory underlines the lacuna in its case.

Starr's conspiracy theory is also implausible: the Trust never needed to convert the Series C to common stock to be able to sell the shares. The Trust could have directly listed the Series C preferred shares on the NYSE. PFOF ¶¶ 459-60; JX-188 at 27 of 553 (AIG 2008 10-K); Saunders, Tr. 8230, Line 16-Tr. 8232, Line 3; JX-185 at 5-6, 9 (Series C Stock Purchase Agreement §§ 6.1(a), 6.2(a) and 6.7). The existence of this alternative to conversion undermines Starr's theory that the United States needed to engineer the reverse stock split to avoid a shareholder vote before disposing of the Series C preferred shares.

### 3. The Government's Interaction With AIG, And The Trust's Ownership Of AIG Stock, Do Not Establish That AIG's Actions Are Attributable To The Government

Starr asserts that the United States' "ownership of and control over AIG is sufficient to characterize the Reverse Stock Split as a Government act." Pl. Pretrial Concl. of Law ¶ 222 (Dkt. 274-1). Not so. At the outset, Starr relies on the false contentions that the Government controlled AIG. As explained above, the Government never controlled the challenged AIG actions, and the ownership interest in AIG was held by the Trust, an independent entity.

Starr's general allegations concerning Government representatives' attendance at AIG board meetings, review of some AIG's SEC filings and proxy statements, and monitoring of AIG's day-to-day affairs do not transform AIG's action into Government action, as Starr claims. Aug. 6, 2014 Mem. at 53 (Dkt. 260-1). As a factual matter, the Government did not control AIG's board or management at any time. The Government's involvement in AIG had "absolutely no[]" effect on the AIG board's ability to exercise independent judgment. *See* PFOF ¶¶ 78, 109-110. AIG board meetings were conducted normally when Government or FRBNY representatives were present, and those representatives did not influence AIG's board's decision-making process. *See* PFOF ¶¶ 109-110. Nor did the Government take control of AIG's management. Throughout the Government's involvement, AIG continued to manage its own day-to-day operations and make decisions as to how it would handle its own financial situation. *See id.*

As a legal matter, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [Government] responsible for those initiatives." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982). Similarly, the Government's "cooperation" with a private party cannot make the Government responsible for the private party's actions. *Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 758 (Fed. Cir. 2013). Thus, for example,

zoning restrictions that affect a landowner's property "do not become takings by the federal government just because the local officials act in cooperation with" or even "at the urging of, federal officials." *Id*. To the contrary, the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of" the Government. *Blum*, 457 U.S. at 1004. There is no evidence that the Government provided "significant encouragement," much less "exercised coercive power," in AIG's decision to implement the reverse stock split on the terms established by AIG. *Id.*

Accordingly, lacking any evidence of the United States' involvement in, much less "coercive power" over, AIG's reverse stock split, this Court should enter judgment in favor of the United States. *See id*.

### 4. Starr's Expert's Opinions Do Not Overcome Starr's Failure To Come Forward With Fact Evidence

Facing an absence of evidence supporting its claim that the Government proposed and controlled the terms of the reverse stock split, Starr proffers the "expert" hypothesis of Professor Zingales that the Government must have controlled the reverse stock split because it is "not explainable in any other way, other than the Government wanted to bypass a vote separate by common shareholders." Zingales, Tr. 3801, Lines 6-13, Tr. 3855, Lines 8-18. Professor Zingales testified that he could not "think of any reason to have a reverse stock split to apply just to the issued shares and not to the authorized and unissued shares." Zingales, Tr. 3801, Lines 6-13; Tr. 3854, Line 19-Tr. 3855, Line 6.

Professor Zingales's admitted speculation cannot fulfill Starr's burden of proof. As Professor Robert Daines explained, "Professor Zingales['s] inability to think of a reason to do one doesn't mean there isn't one" and that, moreover, Professor Zingales is "dead wrong."

Daines Tr. 8488, Lines 2-14; Tr. 8490, Lines 14-24. Professor Daines offered several reasons why a corporation might split issued shares but not authorized-but-unissued shares, including "financial flexibility," "transaction planning," and "simplicity." Daines, Tr. 8506, Lines 2-8. Professor Daines pointed to the "many companies" that "did reverse stock splits like AIG; that is, they did reverse stock splits where they left the number of authorized shares alone and they just did the split to the number of outstanding shares." Daines, Tr. 8486, Line 17-Tr. 8487, Line 2. The record shows that one-third – 19 of 59 – of corporations that undertook reverse stock splits in 2009 split issued shares without also splitting authorized but unissued shares. *See* PFOF ¶ 425.

Plainly, "a lot of companies not controlled by the government" used reverse stock splits in this way, and "it just can't be that the only reason for doing this is because the government is . . . controlling and facilitating a conversion or some other plot to avoid shareholder votes." Daines, Tr. 8490, Lines 19-24. Starr offers nothing more on this subject, and, thus, its Stock Split Claims must fail.

### C. Starr's Claim Fails For The Additional Reason That The Reverse Stock Split Caused No Economic Harm

Starr's Stock Split Claim fails for the independent reason that the Stock Split Class members are not entitled to compensation unless they can show that they suffered a loss as a result of the reverse stock split. *Brown*, 538 U.S. at 240 n.11; *Lujan*, 504 U.S. at 560-61. The evidence at trial precludes any such finding. Just as the lack of economic loss dooms Starr's Equity Claim, so too does it foreclose recovery for the Stock Split Claim.

First, even if Starr possessed the property right it claims, which it did not, the reverse stock split did not affect that alleged property interest. Second, Starr and a majority of common shareholders not only voted in favor of the reverse stock split, but accepted the benefits of the

split. Third, Starr has not established any harm, even based on an improper reliance on AIG's January 2011 recapitalization.

### 1. The Reverse Stock Split Had No Effect On Starr's Claimed Property Right

As discussed above, Delaware law gave common shareholders a cognizable property interest in a separate, class-only vote on any AIG proposal to change the number of authorized common shares or to change the par value of the common shares. It was this statutory right – and this statutory right alone – that was reaffirmed in the *Walker* consent order.

This right, however, was never taken from the Stock Split Class. Class members were *never* denied the right to vote as a separate class on any proposal to change the number of authorized common shares or to change the par value. If, at any point after the reverse stock split, AIG sought to change the number of authorized common shares or the par value, the Stock Split Class members would have retained the right to vote on the proposal as a separate class. Indeed, at the same shareholders meeting in which the reverse stock split was passed, common shareholders voted as a separate class on a proposal to increase the number of authorized common shares. *See* PFOF ¶ 430 n.46.[29]

Moreover, to the extent that Starr argues that AIG common shareholders had a right to a class-only vote on the reverse stock split, the evidence demonstrates that if the common shareholders had voted as a separate class, the reverse stock split proposal still would have passed. On June 30, 2009, AIG's shareholders approved the reverse stock split, with 84 percent

---

[29] Proposal 3, which proposed increasing the number of authorized shares of AIG common stock, was required under the terms of junior subordinated debentures that AIG had issued in May 2008 and was unrelated to conversion of the Series C. *See* PFOF ¶ 430 n.46.

of the voting common shareholders and a majority of all common shareholders – including Starr – voting in favor of the reverse stock split. *See* PFOF ¶ 434.

Before the shareholders voted on the reverse stock split, AIG's common shareholders, including Starr, understood that "[a]n overall effect of the reverse stock split of the outstanding AIG Common Stock will be a reduction of the total number of outstanding shares of AIG Common Stock . . . and therefore an increase in authorized but unissued shares of AIG Common Stock," and that "these shares may be issued by AIG's Board of Directors in its sole discretion . . . hav[ing] the effect of diluting the percentage of stock ownership and voting rights of the present holders of AIG Common Stock." PFOF ¶¶ 432, 450.

AIG's common shareholders also understood the benefits of the reverse stock split: avoiding delisting, and attracting institutional investors. PFOF ¶ 429. An involuntary delisting may cause significant losses to shareholders, as a delisted stock can only be traded on the over-the-counter market, often at a very high discount to a listed share. *See* PFOF ¶ 453. In addition, because some institutional investors are discouraged or prohibited from trading in stocks priced below $5.00 per share, shareholders benefit from owning stocks above $5.00 per share, as that opens the shares to a larger group of investors. *See* PFOF ¶454.

## 2. The Court Should Deny Starr's Claim Because The Shareholders Approved The Reverse Stock Split And Accepted Its Benefits

Having approved the reverse stock split to secure its benefits, Starr and AIG's common shareholders cannot now challenge the reverse stock split as a taking or exaction. *See, e.g., Klaassen v. Allegro Dev. Corp.*, No. 583, 2014 WL 996375, at *8 (Del. Mar 14, 2014) ("A claimant is deemed to have acquiesced in a complained-of act where he has full knowledge of his rights and the material facts and . . . acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved"); *Lehman Bros.*

*Holdings Inc. v. Spanish Broad. Sys., Inc.*, Civ. Action No. 8321-VCG, 2014 WL 718430, at \*9-13 (Del. Ch. Feb. 25, 2014) (finding plaintiffs' claims estopped under the doctrine of acquiescence where plaintiffs did not object to alleged wrongdoing at the time of the alleged wrongdoing and the challenged conduct "arose from actions taken by the board for the benefit of the corporation . . . and from which actions the Plaintiffs therefore received a benefit"), *aff'd on opinion below*, 2014 WL 7010807 (Del. Dec. 11, 2014).

Starr, an "acquiescing shareholder . . . who accepted the pecuniary benefits of a transaction with knowledge of the alleged inequitable conduct," also is estopped from challenging the reverse stock split. *See Norberg v. Sec. Storage Co. of Wash.*, No. 12885, 2000 WL 1375868, at \*5 (Del. Ch. Sept. 19, 2000). "If informed, uncoerced stockholders wish to challenge a transaction, the least that can be expected of them is that they not endorse it through a yes vote in the first instance. That is, if a stockholder says 'yea' in the election, she cannot say 'nay' in court if her vote was informed and uncoerced. The ballot box is the most important place to register opposition, not the courthouse." *In re PNB Holding Co. S'holders Litig.*, No. Civ. A. 28-N, 2006 WL 2403999, at \*21 (Del. Ch. Aug. 18, 2006). *See In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 738 (Del. Ch. 1999) ("a large majority of the putative plaintiff class . . . both voted in favor of the merger and received the benefits of it" and for this reason "plaintiffs would confront substantial obstacles in continuing the action"), *aff'd on opinion below,* 757 A.2d 1278 (Del. 2000).

Accordingly, this Court should enter judgment in favor of the United States on the Stock Split Class's taking and illegal exaction claims because Starr failed to demonstrate any property right implicated by AIG's reverse stock split.

### 3. Starr Cannot Establish Harm Based Upon An Improper Reliance On The January 2011 Recapitalization

No loss from the reverse stock split can be shown where, as here, Starr admits that:

- voting for the reverse stock split proposal was in the common shareholders' interests because it prevented delisting by the New York Stock Exchange, PFOF ¶¶ 434, 453;

- a majority of common shareholders voted in favor of that proposal, PFOF ¶ 449;

- the reverse stock split did not affect the market value of the shares held by the common stockholders, PFOF ¶ 452;

- the common shareholders held the same percentage of the economic value and voting rights of the common stock after the reverse stock split as before, PFOF ¶ 452; and

- the common shareholders held the same percentage of the economic value and voting rights of AIG's total equity after the reverse stock split as before, PFOF ¶ 452.

Recognizing that it cannot show any harm connected to the reverse stock split, Starr argues that alleged harm suffered by common shareholders relates to the 2011 recapitalization.

Specifically, Starr contends that the Government got more than it should have in the exchange of its Series E and F Preferred Stock for common stock. The claim misunderstands the 2011 recapitalization. Under the terms of the Series E and F Preferred Stock, the Government was entitled to receive common stock equal to the amount the Government paid AIG for the Series E and F. *See* PFOF ¶ 472. Because the Government agreed to accept a common stock price greater than the stock's trading price at the time of the September 30, 2010 exchange agreement, the Government actually received fewer shares of common stock than it was entitled to receive. *See* PFOF ¶ 470.

In any event, as a matter of law, Starr cannot establish economic loss for the Stock Split Class members. As discussed above, the "consistent and unambiguous" holdings of the Supreme

Court dictate that the "'just compensation' required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain." *Brown*, 538 U.S. at 235-36; *see also Kimball Laundry Co.*, 338 U.S. at 5 ("Because gain to the taker . . . may be wholly unrelated to the deprivation imposed upon the owner, it must also be rejected as a measure of public obligation to requite for that deprivation."); *Miller*, 317 U.S. at 380 ("Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker."); *Bos. Chamber of Commerce*, 217 U.S. at 195 (in determining whether a taking has occurred, "the question is, What has the owner lost? not, What has the taker gained?"). The 2011 recapitalization did not result in an economic loss to Starr or the other common shareholders.

Starr seeks to show economic loss by arguing that the Stock Split Class could have obtained a benefit from the Government because of its alleged power to block the Trust's ability to monetize the Series C Preferred Stock. Aug. 11, 2014 Starr Proposed Findings of Fact § 31.2.2 (Dkt. 281-1) (Stock Split Class seeks compensation "based on the payment that the Government would have made"). As established at trial, however, alternatives existed for the monetization of the Series C Preferred Stock that would not have required common shareholder approval. *See* PFOF ¶¶ 459-61.

In addition, even if AIG had held a vote to increase the number of common shares and decrease the par value of those shares and the vote failed, the Trust would still have held the Series C Preferred Stock. Nothing would have changed if the common stockholders had been granted a class-only vote to which Starr alleges the common shareholders were entitled. The preferred stock would have remained valuable, as it would have had "every single right of 79.9% of the common" and would have "just s[a]t in a different class" and the Government would "still

[have] control[led] all votes except those very few where class votes are require[d] by law." PTX-3211 at 5. *See Hildreth v. Castle Dental Ctrs., Inc.*, 939 A.2d 1281, 1283 (Del. 2007) ("[t]he only infirmity in Castle's preferred stock was that its conversion rights were not fully enforceable because of the authorized share failure. The Hildreths suggest that this limitation on the preferred stockholders' rights and preferences somehow nullified the original issuance of preferred stock. Their theory is incorrect as a matter of law"). No compensation would, therefore, be due.

Because the Stock Split Class had no ability to block the Series C preferred stock's monetization, the Stock Split Class had little bargaining power to extract any "hold up value" from the Government. In any event, such "hold up value" does not, as a matter of law, reflect compensable economic loss. *Cors*, 337 U.S. at 334 (value based on "speculation as to what the government can be compelled to pay . . . is a hold-up value, not a fair market value.").

Moreover, Starr seeks $4.67 billion in compensation on its Reverse Stock Split Claim. Starr's expert, Dr. Kothari, attributes $339 million of this award (7 percent) to the exchange of Series C preferred shares, and $4.33 billion (93 percent) to the exchange of Series E and Series F preferred shares. PFOF ¶ 455.

Because, as Starr concedes, the source of the alleged property right is the *Walker* order rather than 8 Del. C. § 242(b)(2), the Stock Split Class has no claim relating to the exchange of the Series E or F preferred shares. The *Walker* order only addressed the Series C preferred stock, PFOF ¶ 444; the order did not involve the non-convertible Series E Preferred Stock and Series F preferred stock issued in April 2009 in exchange for $41.5 billion in TARP funding. PFOF ¶¶ 179, 472. That fact, by itself, eliminates 93 percent of the claimed $4.67 billion in damages.

Finally, even if the *Walker* order did somehow create a property right in connection with Class E and Class F Preferred Shares, AIG did not lose any property.  At the closing of the recapitalization, AIG gave the Government the same amount in common stock as the Government had paid AIG for the Series E and F  By granting the concession of valuing the common stock above its trading price, the Government accepted fewer shares than it was entitled to receive.  As Starr concedes, "the Government paid an approximate net amount of $49.15 billion in respect of the Series E Preferred Stock and Series F Preferred Stock, and received AIG common stock worth the same amount at the closing."  2d Am. Compl. ¶116(c) (Dkt. 101).  As Dr. Kothari agreed, "[t]he Government did, by TARP funding, provide those $41.15 billion to AIG."  Kothari, Tr. 4788, Lines 9-14.  The alleged taking or exaction of the Series E and Series F Preferred Shares was simply the repayment of the TARP funding.

## D. Because Starr Has Neither Identified A Violation Of Any Statute Nor Identified A Thing Of Value That Was Allegedly Exacted, Starr's Illegal Exaction Claim Fails

### 1. No Statute Or Other Law Was Violated

The Stock Split Class's illegal exaction claim fails for the additional reason that Starr has never identified what constitutional, statutory, or regulatory provision was violated by the reverse stock split.  This Court's jurisdiction over an illegal exaction claim requires that the Government exact property in excess of the powers conferred by Federal law.  *Norman*, 429 F.3d at 1095; *Clapp*, 117 F. Supp. at 580 ("[A] claim to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute, is a claim 'founded upon any Act of Congress.'").

Starr's failure to identify *any* Federal law upon which it bases the Stock Split Class's exaction claim is grounds to dismiss its claim.  Starr has long conceded that the reverse stock split did not violate Delaware law (if, indeed, a Federal illegal exaction claim could even be

based upon violation of a state statute). *See Starr*, 106 Fed. Cl. at 73 (citing Tr. 105 (Boies)).

Even to the extent Starr's Stock Split Claim attempts to include events that occurred in the 2011

recapitalization (which are not properly part of that claim), Starr has never identified any

unauthorized action it claims occurred through the recapitalization that could give rise to an

illegal exaction claim. Accordingly, the Court should dismiss the illegal exaction part of Starr's

Stock Split Claim.

### 2. Nothing Of Value Belonging To The Stock Split Class Ended Up In The Government's Possession

As discussed above, "an illegal exaction claim may be maintained when 'the plaintiff has

paid money over to the Government, directly or in effect, and seeks return of all or part of that

sum' that 'was improperly paid, exacted, or taken from the claimant[.]'" *Aerolineas Argentinas*

*v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport*, 372 F.2d at 1007).

This court has explained that an "illegal exaction has occurred when the Government has the

citizen's money in its pocket." *Aerolineas Argentinas*, 77 F.3d at 1573 (quoting *Clapp*, 117 F.

Supp. at 580). Starr has failed to show that anything at all was transferred from Starr to the

Government directly or in effect as a result of the reverse stock split. Because Starr cannot point

to any money or property that went from the shareholders' pockets to the pocket of the

Government, the Court should reject Starr's exaction claim.

Starr's nonsensical valuation of the Stock Split Class claim confirms that it is not seeking

the return of any money belonging to Stock Split Class members that was allegedly exacted by

the Government. Although Starr's AIG shares traded at only $1.16 per share before the stock

split took place, Dr. Kothari valued the "property right" lost as a result of the split at $1.74 per

share. *See* PFOF ¶ 457. Any calculation that estimates that the shareholders lost more than 100

percent of their value is clearly not properly measuring whether the Government has the shareholders' "money in its pocket." *See Clapp*, 117 F. Supp. at 580.

Indeed, with respect to Stock Split Claim, Dr. Kothari conceded that he was not measuring any diminution in the value of the shareholders' common shares, but rather valuing the "right to block" the Government's ability to achieve an increase in liquidity in the Government's Series C preferred shares. *See* PFOF ¶¶ 456, 459. Holdup value, however, is not recoverable. *Cors*, 337 U.S. at 334. In any event, any holdup value belonging to common shareholders would already be reflected in the stock price, and thus could not be worth more than the $1.16 per share pre-split stock price.

## E. Any Claim That AIG's 2009 Annual Proxy Statement Was Misleading Is Not A Viable Basis For A Takings Or Illegal Exaction Claim

To the extent Starr argues that some aspect of the 2009 proxy statement prepared by AIG was misleading, that would still not give rise to a taking or illegal exaction claim. A misleading proxy statement might be a basis for a tort claim under Federal securities laws or under state law, but any such claim lies outside this Court's jurisdiction. *See, e.g.*, *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) (the Court of Federal Claims lacks jurisdiction over tort claims); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (describing private right of action under Federal securities laws for material misrepresentation or omission in Federal securities filings); *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) (describing cause of action arising from directors' duty "to provide shareholders with all information that is material to the action being requested").

Even assuming Starr could bring a claim in this Court based upon a misleading proxy, Starr is factually incorrect when it suggests that the proxy statement was "coercive and deceptive." Aug. 11, 2014 Starr Proposed Findings of Fact § 29.4 (Dkt. 270). No evidence supports Starr's

allegation; indeed, the evidence at trial established that the proxy was accurate and not misleading. *See* PFOF ¶¶ 422-33. The proxy properly reflected the reasons for the reverse stock split proposal and disclosed that the ratio of authorized to issued shares would increase as a result of passage of the proposal. The proxy also disclosed that the reverse stock split applied only to issued shares. *See* PFOF ¶¶ 430-32. Accordingly, this Court should enter judgment in favor of the United States on the Stock Split Class's takings and illegal action claims.

## ADDITIONAL ARGUMENTS

### V. Not All Class Members Have Established That They Can Pursue Remedies In This Court

Plaintiff class members who are foreign nationals[30] have failed to establish that they can pursue claims in this Court for takings or illegal exactions. Foreign nationals must affirmatively demonstrate reciprocity for American citizens in the foreign sovereignty to be able to pursue their takings and illegal exaction claims. 28 U.S.C. § 2502 (Reciprocity Act); *Ferreiro v. United States*, 350 F.3d 1318, 1322 (Fed. Cir. 2003) ("Reciprocity will lie between the United States and a foreign nation so long as American citizens may sue the foreign sovereign on the same terms as native citizens."). For the takings claim, foreign class members must also establish a relationship between themselves and the United States sufficient to give rise to a takings claim. *See Atamirzayeva v. United States*, 524 F.3d 1320, 1329 (Fed. Cir. 2008). There is no evidence on record to establish any of these requirements.

---

[30] Starr's witness list, for example, included two foreign national class members. Following the Government's deposition of one of them, Starr chose not to call either.

**VI.    Prejudgment Interest Is Not Available For Illegal Exaction Claims And Is Limited In Takings Claims To Compensation For The Time Value Of Money**

**A.    Prejudgment Interest Only Applies To Starr's Takings Claims**

Starr has failed to prove either a taking or an illegal exaction with respect to either the rescue loan or the reverse stock split.  If, however, the Court determines that an award to plaintiffs should be made, prejudgment interest would be available only if the Court rules that a taking has occurred.  *See Shoshone Tribe of Indians of Wind River Reservation in Wyo. v. United States*, 299 U.S. 476, 497 (1937) (prejudgment interest for takings claims).  Plaintiffs are not entitled to prejudgment interest for illegal exaction claims.  *Bowman*, 35 Fed. Cl. at 401 (in an illegal exaction case, "[p]laintiff could not recover the pre-judgment interest he requests") (citing *Library of Congress v. Shaw*, 478 U.S. 310, 317 (1986) (superseded by statute on other grounds)).

The different application of prejudgment interest to illegal exactions and takings cases occurs because illegal exaction claims do not derive from the Takings Clause of the Fifth Amendment, but rather from that amendment's Due Process Clause.  The Federal Circuit has explained that prejudgment interest is not warranted in non-takings cases in which the Constitution "requires 'a return of money unlawfully exacted'" because "[w]e are unwilling to import the [Supreme] Court's interpretation of 'Compensation' . . . where the word 'compensation' does not appear."  *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1384-85 (Fed. Cir. 2002) (no prejudgment interest on illegal tax which violated the Export Clause) (citations omitted).

**B.** **An Award Of Prejudgment Interest May Only Serve To Make Plaintiff Indifferent To The Timing Of The Award And May Not Award Hypothetical "Lost Profits"**

If the Court does determine that a taking has occurred, an award of prejudgment interest should make plaintiffs indifferent to the timing of the award by restoring them to the economic position they would have occupied had the award been paid on the date of the taking. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10-11 (1984) ("[I]f disbursement of the [compensation for the taking] is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.") (citations omitted). This interest is "compensation for the lost use of the takings award between the date of the taking and the date of the payment." *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211, 222 (2011).

Making plaintiffs indifferent to the timing of the award does not mean that the Court should award hypothetical returns on investments the plaintiffs could potentially have made if they had received an award at the date of the taking. Applying the hypothetical portfolio analysis of Starr's expert, Dr. Paul Wazzan, to all plaintiffs in this case would not make them indifferent to the timing of the award. Awarding hypothetical lost profits would not simply provide compensation for losses due to the delay of an award; it would instead provide plaintiffs with unjustified windfall compensation for risk premiums on stocks, without actually having taken on any such risk. Hypothetical lost profits are not simply compensation for losses due to the delay of an award: they are unjustified compensation for risks that plaintiffs did not bear during the time of the delay, based on the risk premiums for stocks these plaintiffs may or may not have actually invested in if they had received a payment at the time of a taking.

Such an approach also would result in the discriminatory application of interest rates based on the particular risk profiles and hypothetical investing choices of specific individual

plaintiffs, as well as the performance of the stock market (or other investment strategies) during the litigation and would be inconsistent with the class action nature of this case. PFOF ¶¶ 515-524. There is a "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants." *Miller v. United States*, 620 F.2d 812, 838 (Ct. Cl. 1980) (citations omitted). Indeed, the task of individualizing awards would be almost impossible in a class action case such as this one, and in any event Starr has not attempted to establish what investments the class members would have made had they received an award at the time of the taking. *See id.* Moreover, awarding prejudgment interest based on the lost profits of hypothetical investment returns would result in perverse incentives for litigants, such as waiting for the market to make sufficient gains before filing a claim. PFOF ¶ 519.

To make a plaintiff truly indifferent to the timing of an award, prejudgment interest should compensate the plaintiff for the time value of money between the time of the taking and the time of the award. The 52-week Treasury bill rate set forth in the Declarations of Takings Act, 40 U.S.C. §§ 1114, 1116, is an appropriate rate to apply because it approximates the time value of money, PFOF ¶ 525, and "adequately compensates" the plaintiffs for the delay in payment. *Textainer*, 99 Fed. Cl. at 223. "Absent special proof, the statutorily-set rate in the [Declarations of Takings Act] shall apply" and use of this rate "furthers the pursuit of uniform treatment of awardees in takings actions." *Id.* Starr has not proven any such special circumstances to justify a departure from the standard rate.

In this case, the one-year Treasury bill rate averaged 0.5 percent per year after September 22, 2008, through trial, and 0.3 percent per year after June 30, 2009. PFOF ¶ 527. These rates would appropriately compensate the classes for the delay in any award. If the Court determines

that the delay in the award also means that plaintiffs should be compensated for the inflation risk they bore during that period, PFOF ¶ 528, then the five-year Treasury Inflation Protected Securities (TIPS) rate is appropriate. PFOF ¶ 529. The TIPS rate averaged 2.9 percent per year after September 22, 2008, through trial, and 3.2 percent per year after June 30, 2009. PFOF ¶ 530.

If an award ever becomes due, these rates would adequately compensate plaintiffs for their actual loss from the delay in the takings award rather than for some hypothetical lost profits determined in retrospect. By contrast, the interest rate Starr requests compensates plaintiffs not for the harm caused by the delay or for any opportunity cost, but rather for risks not actually borne by the plaintiffs. *See* PFOF ¶¶ 517, 519.

Some courts, including this one, have opined that prejudgment interest should also reflect "the opportunity a plaintiff has lost to earn income on its damages award," that is, the plaintiff's opportunity costs. *Otay Mesa Prop., L.P. v. United States*, 111 Fed. Cl. 422, 424 (2013). This method would attempt to compensate a rational economic actor who, when he has not been compensated for a taking, decides to replace the uncompensated award with his own capital to make the investments he deems wise. We respectfully submit that compensating the plaintiffs for the time value of money is the appropriate methodology, particularly because individual plaintiffs have widely varying costs of raising capital based upon whether they are individuals or companies, or have good credit or bad. Varying interest rates based upon a plaintiff's individual lost opportunities violates the policy against "discrimination among litigants." *See Miller*, 620 F.2d at 838.

In any event, Starr has not even attempted to quantify the class members' opportunity cost caused by the award's delay. PFOF ¶¶ 518, 522-23. Instead, Starr asks the Court to reward

plaintiffs for the gains of a handpicked stock portfolio chosen in 2014 or, alternatively, for an award tied to gains in the stock market as reflected in certain index funds. These approaches do not comport with the established principles of prejudgment interest.

Without any evidence of the class members' opportunity costs, the Court is constrained to award interest either based upon an inappropriate rate derived from lost profits or based upon rates that reflect the considerations of the time value of money articulated in *Kirby*. *See* 467 U.S. at 10. If the Court does grant an award to Starr on its takings claim, the Court should apply the one-year Treasury rate or, in the alternative, the five-year TIPS rate.

<div style="margin-left:50%">

Respectfully submitted,

JOYCE R. BRANDA
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Deputy Director

/s/ Brian A. Mizoguchi
BRIAN A. MIZOGUCHI
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-3319
Fax: (202) 514-7969
Email: brian.mizoguchi@usdoj.gov

</div>

OF COUNSEL:
SCOTT D. AUSTIN
CLAUDIA BURKE
JOSHUA E. GARDNER
Assistant Directors

JOHN ROBERSON
JOHN J. TODOR
Senior Trial Counsels

RENEE GERBER
MATTHEW F. SCARLATO
MARIANA T. ACEVEDO
DAVID D'ALESSANDRIS
VINCENT D. PHILLIPS
ZACHARY J. SULLIVAN
Trial Attorneys

February 19, 2015                                    Attorneys for Defendant