IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY,
INC., on its behalf and on behalf of a class of
others similarly situated,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

No. 11-00779C (TCW)

## PLAINTIFFS' CORRECTED POST-TRIAL PROPOSED CONCLUSIONS OF LAW

BOIES, SCHILLER & FLEXNER LLP
Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Julia C. Hamilton
Laura Harris
Ilana Miller
John Nicolaou
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
Scott E. Gant
Abby Dennis
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

March 2, 2015

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Fax: (914) 749-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
John L. Gardiner
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000

R. Ryan Stoll
Gregory Bailey
155 N. Wacker Drive
Chicago, IL 60606
Telephone: (312) 407-0700

*Attorneys for Starr International Company, Inc.
and for the Plaintiff Classes*

**TABLE OF CONTENTS**

CONCLUSIONS OF LAW .................................................................................................. 1

A.  SECTION 13(3) OF THE FEDERAL RESERVE ACT .................................................. 1

1.0  IN 1932, CONGRESS ADDED AN EMERGENCY RELIEF PROVISION TO THE
     FEDERAL RESERVE ACT THAT PROVIDED "AFFIRMATIVE AUTHORITY OF
     THE FEDERAL RESERVE BOARD, TO DISCOUNT ELIGIBLE PAPER FOR ANY
     INDIVIDUAL, PARTNERSHIP, OR CORPORATION UNABLE TO SECURE
     ADEQUATE CREDIT ACCOMMODATIONS"  PTX 742 at 135-36. ................................... 1

     1.1  Prior to 1932, the Federal Reserve Could Only Lend to Banks.  However, in the 1930s
          Congress Recognized that in a Financial Crisis Any Company Might Need Federal
          Reserve Credit. ............................................................................................................. 1

     1.2  In 1932, Congress Recognized that in a Financial Crisis Any Solvent But Illiquid
          Company May Require Emergency Assistance. ................................................................ 2

     1.3  Congress Expressly Provided the Circumstances Under Which a 13(3) Loan Could Be
          Made. ............................................................................................................................. 2

     1.4  Congress Also Expressly Provided That the Consideration for a 13(3) Loan Must Be
          an Interest Rate "subject to review and determination of the Board of Governors" and
          Must Be "fixed with a view of accommodating commerce and business" (12 U.S.C. §§
          343, 357). ...................................................................................................................... 3

     1.5  Section 13(3)'s Purpose of Assisting a Broad Range of Entities and Persons Is Clear
          from the Statute's Plain Language Which Provides for Loans to "any individual,
          partnership, or corporation" (12 U.S.C. § 343). ........................................................... 3

     1.6  The Federal Reserve's Understanding of the Purpose of Section 13(3) Is Evidenced by
          the Loans Made and Approved Prior to 2008, Particularly in the Years Immediately
          Following the Passage of 13(3). ..................................................................................... 4

     1.7  Section 13(3)'s Purpose of Assisting a Broad Range of Entities and Persons Reflects
          the Bagehot Principle that "during a panic central banks should lend freely to whoever
          comes to their door; as long as they have collateral, give them money." (Bernanke:
          PTX 708 at 14). .............................................................................................................. 4

B.  PLAINTIFFS' ILLEGAL EXACTION CLAIM ............................................................... 7

2.0  AN ILLEGAL EXACTION OCCURS WHEN THE GOVERNMENT REQUIRES A
     CITIZEN TO SURRENDER PROPERTY THE GOVERNMENT IS NOT
     AUTHORIZED TO DEMAND AS CONSIDERATION FOR ACTION THE
     GOVERNMENT IS AUTHORIZED TO TAKE. .................................................................. 7

     2.1  In General, an Illegal Exaction Occurs When "the plaintiff has paid money over to the
          Government, directly or in effect, and seeks return of all or part of that sum that was
          improperly paid, exacted, or taken from the claimant in contravention of the

Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (internal quotation marks omitted); *accord Trayco, Inc. v. United States*, 994 F.2d 832, 837-38 (Fed. Cir. 1993); *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967)............................................7

2.2   An Illegal Exaction May Be of Money or Property. ..............................................7

2.3   One Form of Illegal Exaction Occurs When the Government Demands Consideration It Is Not Authorized to Require for Action the Government Is Authorized to Take.............7

2.4   Even Where the Government Is Free to Deny a Benefit Altogether, It Cannot Tie the Granting of the Benefit to the Surrender of Rights or Property the Government Is Not Authorized to Demand. ............................................................................................9

2.5   This Court has Jurisdiction Over a Claim Alleging Illegal Exaction..................10

3.0   **IT IS UNDISPUTED THAT DEFENDANT REQUIRED THE SURRENDER OF 79.9% OF PLAINTIFFS' EQUITY IN, AND VOTING CONTROL OVER, AIG AS CONSIDERATION FOR A 13(3) LOAN.** ...............................................................11

4.0   **DEFENDANT WAS NOT AUTHORIZED TO DEMAND EQUITY OR VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN.**........................................11

4.1   The Plain Language of Section 13(3) Makes Clear that the Only Authorized Consideration for a 13(3) Loan is an Interest Rate Determined by the Board of Governors and "Fixed with a View of Accommodating Commerce and Business." *See* Def.'s Proposed Pre-Trial Conclusions of Law ¶¶ 123-130. ...............................11

4.2   The Meaning of the Statute's Plain Language Is Confirmed by the Federal Reserve's Official Circulars, Including Circulars Published Soon After Section 13(3)'s Passage. .....12

4.3   Congress Reinforced Federal Reserve Banks' Lack of Authority to Demand Equity As A Condition Of Section 13(3) Extensions Of Credit When It Enacted The Government Corporation Control Act. ....................................................................................12

4.4   Defendant's Argument that Its Demand for Equity and Voting Control May Be a "Limitation" or "Restriction" on a Loan Is Both Contrary to the Statute's Plain Language and Internally Inconsistent. ...................................................................13

4.5   Defendant's Argument that the "Incidental Powers" Provision of the Federal Reserve Act Might Somehow Authorize Its Demand for Equity and Voting Control Is Also Inconsistent with the Plain Language of Section 13(3).........................................15

4.6   The Plain Meaning of Section 13(3) (that the Only Authorized Consideration for a 13(3) Loan Is an Interest Rate Set By the Federal Reserve's Board of Governors) Is Confirmed By the Federal Reserve's Consistent Understanding and Conduct....................19

4.7   The Plain Meaning of Section 13(3) is Further Confirmed by the Statute's Legislative History..................................................................................................................19

**4.8**    Defendant's Interpretation of Section 13(3) for Purposes of this Case Is Not Entitled to Deference. ........................................................................................................................21

**4.9**    Defendant Has Incorrectly Argued that Its Interpretation of Section 13(3) Has Been Ratified by Congress in Subsequent Legislation.  *See* Def.'s Proposed Pre-Trial Conclusions of Law ¶¶ 139-143 ........................................................................................25

**4.10**   The Federal Reserve's Lack of Authority to Demand Equity Is Consistent with the Purpose of a Lender of Last Resort Which Is to Aid Citizens Suffering from a Financial Crisis, Not to Make a Profit. ...............................................................................27

**5.0**    **EVEN IF THE FEDERAL RESERVE BOARD OF GOVERNORS HAD AUTHORITY TO DEMAND EQUITY AS A CONDITION OF EXTENDING CREDIT UNDER SECTON 13(3), FRBNY LACKED AUTHORITY TO CHANGE THE TERMS APPROVED BY THE FEDERAL RESERVE BOARD OF GOVERNORS.** ..................................................................................................................**28**

**5.1**    The Only Consideration Authorized for a Section 13(3) Extension of Credit Is A "Rate," and Such Rate Must Be Approved "by the affirmative vote of not less than five members" of the Board of Governors.  12 U.S.C. § 343; *see also* 12 C.F.R. § 201.4(d). ......................................................................................................................28

**5.2**    The Federal Reserve Board of Governors Is The Only Governmental Entity with Authority to Approve the Terms of a Section 13(3) Extension of Credit.  12 U.S.C. § 343 ..............................................................................................................................28

**5.3**    The Only Term Sheet Approved by the Board of Governors Was Approved on September 16, 2008 and Provided, As A Condition Of Receiving Liquidity Assistance, that Defendant Would Receive "Warrants for the purchase of common stock of AIG representing 79.9% of the common stock of AIG on a fully-diluted basis."  Pls.' Proposed Findings ¶¶ 12.1-12.2. ..........................................................................................29

**5.4**    The Warrants Approved by the Board of Governors Were Materially Different from the Voting Convertible Preferred Shares in the Credit Agreement that FRBNY Presented to AIG.  *See, e.g., Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1360 (Fed. Cir. 2008) (Changes Are "material" If a Reasonable Person "would have considered" Them "important" in Arriving at a Decision). ..................................................29

**6.0**    **IN ANY EVENT, THE FEDERAL RESERVE WAS NOT AUTHORIZED TO DEMAND EQUITY AND VOTING CONTROL FOR PUNITIVE OR POLITICAL PURPOSES** .............................................................................................................**30**

**6.1**    At the Time It Provided Section 13(3) Liquidity Assistance to AIG, Defendant Justified the Taking or Illegal Exaction of Plaintiffs' Equity as a Condition Necessary to Punish AIG Shareholders (Pls.' Proposed Findings ¶¶ 26.2), Concluding It Was Important to be Harsh for Political Purposes to Secure Congress' Passage of the Emergency Economic Stabilization Act.  *Id.* ¶¶ 26.2.2 ....................................................30

**6.2**    There Was, However, No Statutory Authority for Defendant to Take Punitive Actions Against AIG Shareholders. ...................................................................................30

**6.3**  In 2008, Neither the Federal Reserve Board Nor FRBNY Had Any Regulatory or Internal Guidelines for Deciding When Taking Punitive Action Was Appropriate. Pls.' Proposed Findings ¶ 29.0. ........................................................................... 30

**7.0**  **EVEN IF THE FEDERAL RESERVE WERE AUTHORIZED TO DEMAND EQUITY AND VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN, IT WAS NOT AUTHORIZED TO DO SO DISCRIMINATORILY WITHOUT ANY ARTICULATED STANDARDS. ............................................................................ 31**

**7.1**  The Plain Language of 13(3) Requires That the Federal Reserve Treat Borrowers in a Non-Discriminatory Manner. ............................................................................. 31

**7.2**  The Federal Reserve Itself Recognized By Word and Action that Section 13(3) Did Not Authorize It to Discriminate Among Borrowers In the Consideration Required. ......... 31

**7.3**  Because 13(3) Extensions of Credit Are Available Only When A Borrower Is "Unable to Secure Adequate Credit" Elsewhere, The Lender of Last Resort by Definition Has Monopoly Power Over Such Borrowers. ............................................................. 32

**7.4**  Discriminating Among Borrowers in Terms of the Type of Consideration Required for 13(3) Extensions of Credit Is Also Inconsistent with the Accepted Obligations of a Lender of Last Resort Exercising Its Monopoly Power. ................................................ 33

**7.5**  The Legislative Policy and History of the Federal Reserve Act Confirm That the Federal Reserve Is Not Authorized to Single Out A Borrower to Require the Provision of Shareholder Equity As a Condition of a Section 13(3) Extension of Credit. ................ 33

**8.0**  **VOLUNTARINESS IS NOT A DEFENSE WHEN THE GOVERNMENT REQUIRES A CITIZEN TO SURRENDER PROPERTY THE GOVERNMENT IS NOT AUTHORIZED TO DEMAND. ............................................................................... 36**

**8.1**  Voluntariness Has Been Accepted as a Viable Defense Only In A Narrow Set of Exactions Cases Involving A Mutual Mistake of Law With Regard to How Much – Not Whether – the Government Is Entitled to Charge or Take and No Clear Congressional Purpose Would Be Defeated by Permitting the Claim. ............................... 37

**8.2**  Subsequent to Edmonston, Numerous Cases Have Found Illegal Exactions Where Citizens Have Voluntarily Paid Money to the Government as a Result of a Demand the Government Was Not Authorized to Make. ......................................................... 38

**8.3**  No Court Has Ever Rejected an Illegal Exaction Claim on Grounds of "Voluntariness" Where the Government Was Demanding Consideration It Was Not Authorized to Demand, as Opposed to Where There Was Merely a Mistake in Calculating the Amount of a Payment. ........................................................................................ 42

**8.4**  If Voluntariness Were A Defense Where the Government Conditioned the Provision of a Discretionary Benefit on a Citizen's Surrender of Money or Property the Government Was Not Authorized to Demand, Such Unauthorized Conduct Would Evade Review. ....................................................................................................... 42

iv

**8.5**    In Any Event, Plaintiffs Did Not Voluntarily Agree to the Exaction of Their Equity and Voting Control (*see* Pls.' Proposed Conclusions ¶ 12.0 below).................................... 43

**C.**    **TAKINGS CLAIM** ................................................................................................ 44

**9.0**    **THE FIFTH AMENDMENT PROHIBITS THE TAKING OF PRIVATE PROPERTY "FOR PUBLIC USE, WITHOUT JUST COMPENSATION." U.S. CONST., AMEND. V.** ......................................................................................................... 44

**9.1**    "The Fifth Amendment's guarantee that private property shall not be taken for use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *accord Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). ......................................................... 44

**9.2**    "When evaluating whether government action constitutes a taking, a court employs a two-part test. First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that property interest." *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011). ........................................................................................................................ 44

**10.0**    **PLAINTIFFS' EQUITY IN AIG, AND THE RELATED VOTING RIGHTS, CONSTITUTE PROTECTABLE FIFTH AMENDMENT PROPERTY INTERESTS.** ....... 44

**10.1**    Protectable Property Interests Are Determined by Reference to State Law. ...................... 44

**10.2**    The Most Significant Property Rights Are the Rights to Possess, Dispose of, and Exclude...................................................................................................................... 45

**10.3**    The Fifth Amendment Protects Intangible Property Interests............................................. 45

**10.4**    A Public Shareholder's Interest in the Economic Value and Voting Power of the Shareholder's Stock is a Protectable Property Interest. ..................................................... 45

**10.5**    Delaware Law Focuses on the Substance, as Opposed to the Form, of the Transaction in Protecting Shareholders from Dilution of their Economic and Voting Power................. 47

**10.6**    Delaware Law's Protection of Shareholders' Economic Power and Voting Rights Demonstrates that Plaintiffs Have Identified a "protectable property interest in the equity and voting power associated with the Plaintiffs' shares of common stock." *Starr Int'l Co.*, 106 Fed. Cl. at 75. ...................................................................................... 48

**10.7**    "Delaware courts have observed that voting is a fundamental shareholder right." *Starr Int'l Co.*, 106 Fed. Cl. at 75 (citing *In re Gaylord S'holders Litig.*, 747 A.2d 71, 81 (Del. Ch. 1999)). ......................................................................................................... 48

**11.0**    **DEFENDANT'S APPROPRIATION OF PLAINTIFFS' EQUITY CONSTITUTES A COMPENSABLE TAKING.** ................................................................................... 49

**11.1** "Once a court has found that the plaintiff had a compensable property interest, it must 'determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" *Nat'l Food & Beverage Co., Inc. v. United States*, 103 Fed. Cl. 63, 69 (2012). ................................................................................................. 49

**11.2** Defendant Directly Appropriated Plaintiffs' Equity in AIG by Means of the Credit Agreement.  Thus, "the alleged harm here can be said to have resulted from a direct appropriation of the common shareholders' property." *Starr Int'l Co.*, 106 Fed. Cl. at 74 ............................................................................................................................. 49

**11.3** A Physical Taking Involves a "permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). ............................ 50

**11.4** Defendant Here Directly Appropriated the "Possession, Use, and Disposal" of Plaintiffs' Equity and Voting Control (*Boise Cascade*, 296 F.3d at 1353); Accordingly, "the alleged harm here can be said to have resulted from a direct appropriation of the common shareholders' property." (*Starr Int'l Co.*, 106 Fed. Cl. at 74). ............................ 50

**12.0  THERE WAS NO VOLUNTARY AGREEMENT THAT BARS PLAINTIFFS' CREDIT AGREEMENT CLAIMS.** .......................................................................................... 51

**12.1** Because Plaintiffs Were Neither Parties to the Credit Agreement Nor Given An Opportunity to Approve or Disapprove the Agreement or Its Terms, They Could Not, And Did Not, Voluntarily Agree to Defendant's Taking of Their Equity. ......................... 51

**12.2** There Was Not Even Any Voluntary Agreement by AIG Because Defendant Exercised Control Over AIG and the Transactions At Issue. ............................................................... 51

**12.3** There Was No Voluntary Agreement By AIG Because, At All Relevant Times, AIG Was Under Duress. ..................................................................................................................... 54

**12.4** The "Involuntarily Accepted" Prong is Satisfied by Proof of the Other Two Prongs. *Pew Forest Prods. v. United States*, 105 Fed. Cl. 59, 67 (2012) ("Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts"); RESTATEMENT (SECOND) OF CONTRACTS § 175(1) (1981) (contract voidable if "assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative"). ...................................................................................... 54

**12.5** A Party Claiming Duress Need Only Establish that It Had No "Reasonable Alternative" – Not that it Lacked Any Alternatives.  *See Starr Int'l Co.*, 106 Fed. Cl. at 78 ........................................................................................................................................... 54

**12.6** Conduct Is Wrongful or Coercive If It Involves Conduct "in violation of a statute or regulation" (*Rumsfeld*, 329 F.3d at 1330). ........................................................................ 56

**12.7** In Addition, "an act can be coercive without being illegal" (*Rumsfeld*, 329 F.3d at 1330). ....................................................................................................................................... 57

**12.8** Defendant's Wrongful Conduct Need Not Be the Sole Cause – Only a Substantial Contributing Factor – of AIG's Financial Distress and Lack of Reasonable Alternatives. ........................................................................................................58

**12.9** The Circumstances Required to Provide Section 13(3) Liquidity Assistance, By Definition, Make the Existence of Duress More Likely. ......................................58

**12.10** Defendant Acts Wrongfully and Coercively When, As Here, It Conditions the Provision of a Discretionary Benefit on the Forfeiture of Constitutional Rights..............60

**12.11** Defendant Acted Wrongfully and Coercively by Discouraging Other Sources of Liquidity from Providing Liquidity to AIG. ........................................................63

**12.12** Defendant Acted Coercively by Requiring AIG to Accept the Credit Agreement Terms in a Matter of Hours or Face Bankruptcy..............................................................65

**12.13** Defendant Acted Wrongfully by Imposing a Penalty on Plaintiffs Without Any Criteria for Punishment, Without Any Analysis, Investigation or Findings, and Without Any Notice or Any Opportunity to Be Heard. ..........................................66

**12.14** Defendant Acted Wrongfully by Discriminating Against AIG...........................68

**12.15** Each of the Above Examples of Wrongful and Coercive Conduct, Individually and Collectively, Provides An Independent Basis for Satisfying the Requirement of Coercion. .........................................................................................................68

**13.0** **DEFENDANT'S USE OF A TRUST IS IRRELEVANT, EXCEPT AS EVIDENCE OF DEFENDANT'S RECOGNITION OF ITS LACK OF AUTHORITY TO TAKE OR EXACT EQUITY AND VOTING CONTROL. ...........................................................69**

**13.1** Defendant Cannot Use a Trust to Accomplish Indirectly that which Congress Did Not Authorize Defendant to Accomplish Directly...................................................69

**13.2** In Any Event, Defendant Acquired the Right to Plaintiffs' Equity and Defendant Then Provided the Equity to the Trust. ....................................................................69

**13.3** In Addition, the Trust Violated New York Trust Law If It Was Created, or Used, to Circumvent Defendant's Lack of Authority to Acquire Equity in AIG..............................70

**13.4** Moreover, After It Was Created, the Trust Was an Instrumentality of Defendant. ............71

**D.** **REVERSE STOCK SPLIT ...............................................................................75**

**14.0** **THE REVERSE STOCK SPLIT ("RSS") AND RELATED EXCHANGE WAS AN ADDITIONAL TAKING AND ILLEGAL EXACTION OF THE RIGHTS OF THE RSS CLASS. ..............................................................................................75**

**14.1** The Reverse Stock Split Deprived the Stock Split Class of Its Right to Vote on the Further Dilution of Its Shares...........................................................................75

**14.2**   At the Time of the Reverse Stock Split, Defendant Was Clearly in Control of AIG. *See* Pls.' Proposed Findings ¶ 30.0. ..................................................................... 75

**14.3**   Because Defendant Was in Control of AIG, the Reverse Stock Split and Related Exchange is Tested by the Entire Fairness Test Stated in *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011)................................................................. 76

**14.4**   There Was No Legitimate Reason For the Reverse Stock Split to Apply to Issued Shares But Not Authorized Shares........................................................................... 76

**14.5**   The Reverse Stock Split Was a Taking Without Just Compensation Because the Stock Split Class Received No Consideration for the Elimination of Their Right to a Class Vote Before Defendant Was Permitted to Obtain Common Shares for Its Preferred Shares. ..................................................................................................................... 76

**14.6**   Alternatively, the Reverse Stock Split Was An Illegal Exaction Because Defendant Had No Legal Authority Under Federal Law To Exercise Whatever Rights Holders of the Series C Preferred Stock May Have Had In a Manner That Increased Its Securities Holdings.  The Defendant Therefore Acted Unlawfully When It Used the Stocks' Voting Power To Obtain Property From Private Citizens. ................................................. 76

**14.7**   The Reverse Stock Split Deprived the Stock Split Class of Its Right to a Class Vote Pursuant to Delaware Law. ................................................................................. 77

**14.8**   The Defendant was Also Bound by the Representation to the Delaware Court in the *Walker* Lawsuit.  *See* JX 147 at 7; Brandow: Trial Tr. 5856:25-5857:3. ............................ 78

**14.9**   The Reverse Stock Split is a Compensable Taking and/or Illegal Exaction Because the Constitution Constrains Government Action "by whatever instruments or in whatever modes that action may be taken."  *Ex parte Virginia*, 100 U.S. 339, 346-47 (1879)........... 81

**E. DEFENDANT'S AFFIRMATIVE DEFENSES** .............................................................. 82

**15.0    EACH OF DEFENDANT'S AFFIRMATIVE DEFENSES FAILS.** ....................................... 82

**15.1**   Defendant Bears the Burden on Each of Its Affirmative Defenses, and the Only Affirmative Defenses that Defendant Can Advance Are Those That It Pleaded. ................. 82

**15.2**   Defendant's Waiver Defense Fails...................................................................... 83

**15.3**   Ratification Does Not Apply Because There Was No Voluntary Act by Plaintiffs............ 84

**15.4**   Ratification and Waiver Do Not Apply Because Defendant Has Unclean Hands. .............. 85

**15.5**   The Contract-Based Affirmative Defenses of Payment, Contingent Offset/Recoupment, and Severability Are All Limited to AIG and Do Not Apply to Plaintiffs. .................................................................................................................... 86

**15.6**   The Defense of Contingent Offset/Recoupment Also Concerns Potential Offsets or Recoupments Against AIG, Not Plaintiffs.......................................................... 87

**15.7**  Defendant Has Established None of the Elements of Equitable Estoppel. ......................... 88

**16.0  DEFENDANT MAY NOT AVOID THE ILLEGALITY OF ITS EXACTION BY RELYING ON AN "ECONOMIC EQUIVALENCE" CONTRACT TERM THAT WOULD PROVIDE IT WITH PRECISELY THE BENEFIT THE LAW PRECLUDES IT FROM ACQUIRING. ................................................................ 89**

**16.1**  Defendant Has Argued that Even if the Term of the Credit Agreement by which Plaintiffs' Equity and Voting Control Was Taken or Exacted Was Illegal, Plaintiffs Would Not Have Suffered Any Compensable Injury Because Under Section 8.12 of the Credit Agreement, in the Event that any Provision is Declared Illegal, the Parties "shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions." Def.'s Summary Judgment Br. at 39. ........................................................................................... 89

**16.2**  The Purported Economic Equivalence Provision, Like Defendant's Contract-Based Affirmative Defenses, Would Not Bind Plaintiffs Even If It Bound AIG. ......................... 89

**16.3**  Defendant's Economic Equivalence Argument Also Fails Because Defendant Lacked Authority to Demand Any Consideration Beyond an Interest Rate "Fixed with a View of Accommodating Business and Commerce"; and Defendant Received that Consideration (and More); So There Was No Additional Consideration, However Described, that Defendant Could Receive. ........................................................................ 89

**16.4**  In Addition, Because Defendant Could Not Receive Any Compensation Other than that Approved by the Board of Governors, and the Board of Governors Never Approved the Credit Agreement, There Is No "Economic Equivalent" to which Defendant Could Be Entitled. ............................................................................................ 89

**F. DAMAGES** .................................................................................................................. 90

**17.0  WHERE THE GOVERNMENT EXACTS PROPERTY FROM A PLAINTIFF IN CONTRAVENTION OF ITS STATUTORY AUTHORITY, THE PLAINTIFF IS ENTITLED TO RECEIVE THE VALUE OF ITS PROPERTY ILLEGALLY EXACTED.** ................................................................................................................... 90

**17.1**  "Several cases hold that, under the illegal exaction doctrine, a plaintiff may seek the return of the monetary value of property seized or otherwise obtained by the government". *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 48 Fed. Cl. 137, 145 (2000), *aff'd*, 291 F.3d 1356 (Fed. Cir. 2002). .............................................................. 90

**17.2**  The Value of the Equity and Voting Control Defendant Exacted Should Be Calculated As of the Date of the Exaction. ......................................................................................... 90

**17.3**  For the Credit Agreement Class Claims, Fair Value Should Be Calculated as of the Effective Date of the Credit Agreement Because Prior to the Effective Date of the Credit Agreement, There Was No Legally Binding Agreement Between AIG and FRBNY Entitling Defendant to an Equity Interest in and Voting Control of AIG.  Pls.' Proposed Findings ¶ 14.3. ................................................................................................. 90

**17.4** For the Stock Split Claims, Fair Value Should Be Calculated As of the Date of the Reverse Stock Split. ................................................................................ 92

**17.5** The Value of Plaintiffs' Equity and Voting Control that Defendant Exacted on September 21, 2008 Was at Least $35.4 Billion As of the Effective Date of the Credit Agreement. *See* Pls.' Proposed Conclusions ¶18.2 below. ................................... 93

**18.0** **"JUST COMPENSATION" FOR A TAKINGS CLAIM IS BASED ON THE FAIR VALUE OF THE PROPERTY AT THE TIME OF THE TAKING. ................................... 93**

**18.1** "Just Compensation" Means that "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973). ........ 93

**18.2** Because Fair Market Value Assumes Neither Seller Nor Buyer Is "Under Any Compulsion to Buy or Sell", Fair Market Value Must Reflect the Asset's Intrinsic Value and Not an Artificially Depressed Temporary, or Fire Sale, Value. ......................... 94

**19.0** **DEFENDANT'S HYPOTHETICAL "BUT FOR WORLD" ARGUMENTS ARE LEGALLY IRRELEVANT AND FACTUALLY WRONG. ................................................. 94**

**19.1** Defendant's Hypothetical "But For" Analysis Fails as a Matter of Law Because It Depends on Cases Involving Regulatory Takings Where the Government Does Not Actually Acquire Property. ................................................................................ 94

**19.2** Moreover, Even If the "But For Economic Loss" Test Applied to Plaintiffs' Physical Takings Claims, Defendant Has Not Carried Its Burden Of Proving Offsetting Benefits. ................................................................................................. 98

**19.3** Defendant's Hypothetical "But For" Argument Assumes, Contrary to the Facts, that In the Absence of Surrender of 79.9 Percent of Plaintiffs' Equity and Voting Control, Defendant on September 22, 2008 Would Have Pushed AIG into Bankruptcy by Calling Its Demand Notes and Refusing Further Funding Even Though that Funding Would Be Fully Secured. ................................................................................ 98

**19.4** Defendant's Hypothetical "But For" Argument Also Assumes, Contrary to the Law, that It Was Proper for Defendant to Tie the Benefit of a 13(3) Loan to the Surrender of Equity and Voting Control. ................................................................................ 99

**19.5** Defendant's Hypothetical "But For" Argument is Not Applicable to Plaintiffs' Illegal Exaction Claims. ................................................................................ 99

**19.6** Moreover, Defendant's Offsetting Benefits Argument, At Bottom, Rests On A Misleading Comparison of AIG's Stock Price on September 16, 2008 With Its Stock Price On September 22, 2008. ................................................................................ 100

**20.0** **PLAINTIFFS ARE ENTITLED TO PREJUDGMENT INTEREST FOR THEIR TAKINGS CLAIM. ................................................................................................. 101**

**20.1** If the Government Takes Private Property without Paying Just Compensation at the Time of the Taking, the Constitution Requires the Payment of Prejudgment Interest. *Kirby Forest Indus.,* 467 U.S. at 10–11. ........................................................................... 101

**20.2** Prejudgment Interest Accrues from the Date of the Taking................................................ 101

**20.3** When Prejudgment Interest Is Awarded in a Taking Case, the Calculation of Interest Owed is Based on Compound Interest. ............................................................................. 102

**20.4** The Proper Rate of Interest to Achieve Just Compensation is a Question of Fact............. 102

**20.5** Where the Government Has Not Paid Just Compensation at the Time of the Taking the Supreme Court Has Instructed that Prejudgment Interest Should Be Calculated At a Rate "sufficient to ensure that [plaintiff] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus.*, 467 U.S. at 10-11. ................................................................................. 102

**20.6** Contrary to Defendant's Argument at Trial that "a risk-free rate of return would be appropriate" Based on the Defendant's Liquidity Assistance to AIG, Neuberger: Trial Tr. 5572:12-14, Takings Law Does Not Award Compensation "from the perspective of the government's cost of borrowing," But Instead Calculates What a Reasonable Investor in Plaintiffs' Position Would Have Done with Their Money to Seek a Prudent, Diversified Return. *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 630 (2004). ............................................................................................. 102

**20.7** To Calculate a Rate of Interest that Places the Plaintiff in the Position He Would Have Been in Had Payment Been Made at the Time of the Taking, "courts have often relied on a standard referred to as the 'prudent investor rule.' Pursuant to this rule, the appropriate interest rate is calculated based not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how a reasonably prudent person would have invested the funds to produce a reasonable return while maintaining safety of principal." *Tulare Lake Basin Water Storage Dist.*, 61 Fed. Cl. at 626 (internal quotation marks omitted)........................................................................ 103

**20.8** In Determining What a Prudent Investor Would Have Done, Courts Have Held that "the prudent investor rule requires a rate of return that more accurately reflects a diversified investment".  *Tulare Lake Basin Water Storage Dist.*, 61 Fed. Cl. at 630...... 103

**20.9** Applying the Prudent Investor Rule, the Appropriate Compounded and Annualized Prejudgment Interest Rate Is 7% for the Credit Agreement Class Claim and 20% Compounded and Annualized for the Stock Split Class Claims. Pls.' Proposed Findings  Fact ¶¶ 41.0, 41.2. ................................................................................................. 104

**21.0** **PLAINTIFFS ARE ALSO ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEEs, EXPERT WITNESS FEES, DISBURSEMENTS, AND COSTS....104**

**21.1** Plaintiffs Are Entitled to an Award of Reasonable Attorney's Fees, Expert Fees, and Disbursements for Their Takings Claim. ......................................................................... 104

**21.2** Plaintiffs are entitled to an award of costs for their Takings and Illegal Exaction claims.  28 U.S.C. § 2412(a)(1) (costs "may be awarded to the prevailing party in any civil action brought by or against the United States"). ...................................................... 105

**Cases**

*A&D Auto Sales, Inc. v. United States,*
    748 F.3d 1142 (Fed. Cir. 2014) ........................................................................ 95

A.C. Aukerman Co. v. R.L. Chaides Const. Co.,
    960 F.2d 1020 (Fed. Cir. 1992) ....................................................................... 88

*Aerolineas Argentinas v. United States,*
    77 F.3d 1564 (Fed. Cir. 1996) ............................................................. 7, 10, 41

*Aircraft Associates & Manufacturing Co. v. United States,*
    174 Ct. Cl. 866 (1966) .................................................................................... 58

Alaska Packers Ass'n v. Domenico,
    117 F. 99 (1902) ............................................................................................. 60

Almota Farmers Elevator & Warehouse Co. v. United States,
    409 U.S. 470 (1973) ........................................................................................ 93

*Alyeska Pipeline Serv. Co. v. United States,*
    624 F.2d 1005 (Ct. Cl. 1980) .......................................................................... 39

*Am. Airlines, Inc. v. United States,*
    77 Fed. Cl. 672 (2007) .................................................................................... 83

Am. Signature, Inc. v. United States,
    598 F.3d 816 (Fed. Cir. 2010) ........................................................................ 14

Amalgamated Sugar Co. v. Vilsack,
    563 F.3d 822 (9th Cir. 2009) .......................................................................... 23

*Amen v. City of Dearborn,*
    718 F.2d 789 (6th Cir. 1983) .......................................................................... 64

*American Airlines Inc. v. United States,*
    551 F.3d 1294 (Fed. Cir. 2008) ......................................................... 38, 43, 84

Aptix Corp. v. Quickturn Design Sys., Inc., 269 F.3d 1369 (Fed. Cir. 2001) ............................................. 85

Armstrong v. United States,
    364 U.S. 40 (1960) .......................................................................................... 44

Augustine v. Dep't of Veterans Affairs,
    429 F.3d 1334 (Fed. Cir. 2005) ...................................................................... 74

Austin Instrument v. Loral Corp.,
    29 N.Y.2d 124 (1971) ..................................................................................... 65

Austin Instrument, Inc. v. Loral Corp.,
    29 N.Y.2d 124 (1971) ..................................................................................... 60

*Bautista-Perez v. Mukasey,*
   No. C 07-4192 TEH, 2008 WL 314486 (N.D. Cal. Feb. 4, 2008) ...................................... 41

*Bayer AG v. Housey Pharms., Inc.,*
   340 F.3d 1367 (Fed. Cir. 2003) ........................................................................................ 20

*Bershad v. Curtiss-Wright Corp.,*
   535 A.2d 840 (Del. 1987) .................................................................................................. 48

*Biery v. United States,*
   No. 07-693L, 2012 WL 5914521 (Fed. Cl. Nov. 27, 2012) ............................................ 104

*Bilski v. Kappos,*
   561 U.S. 593 (2010) .................................................................................................... 13, 25

*Blasius Indus., Inc. v. Atlas Corp.,*
   564 A.2d 651 (Del. Ch. 1988) .......................................................................................... 81

*Boise Cascade Corp. v. United States,*
   296 F.3d 1339 (Fed. Cir. 2002) ....................................................................................... 50

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ......................................................................................................... 67

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ......................................................................................................... 14

*Bowman v. United States,*
   35 Fed. Cl. 397 (1996) ................................................................................................ 7, 90

*Brentwood Academy v. Tennessee Secondary School Athletic Association*
   531 U.S. 288 (2001) ......................................................................................................... 82

*Brookhart v. Janis,*
   384 U.S. 1 (1966) ............................................................................................................. 83

*Brown v. Femimore,*
   3 Del. J. Corp. L. 552 (Del. Ch. 1977): ........................................................................... 70

*Brown v. Legal Foundation of Washington,*
   538 U.S. 216 (2003) .............................................................................................. 96, 97, 98

*Bull v. United States,*
   479 F.3d 1365 (Fed. Cir. 2007) ....................................................................................... 21

*\*Cal. Nat'l Bank v. Kennedy,*
   167 U.S. 362 (1897) .............................................................................................. 16, 17, 71

*Cal. Or. Power Co. v. Fed. Power Comm'n,*
   239 F.2d 426 (D.C. Cir. 1956) .................................................................................... 43, 84

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ........................................................................... 87

*Carfango v. Schnitzer*,
    591 F. Supp. 2d 630 (S.D.N.Y. 2008) .................................................................. 52

*Caribbean Ispat Ltd. v. United States*,
    450 F.3d 1336 (Fed. Cir. 2006) ........................................................................... 24

*Casa de Cambio Comdiv S.A. de C.V. v. United States*,
    48 Fed. Cl. 137 (2000) ........................................................................... 49, 50, 90

*Casitas Mun. Water Dist. v. United States*,
    556 F.3d 1329 (Fed. Cir. 2009) ........................................................................... 50

*CCA Assocs. v. United States*,
    667 F.3d 1239 (Fed. Cir. 2011) ...................................................................... 96, 98

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004) ........................................................................... 19

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ............................................................................. 21, 22, 23

*\*Chris Berg, Inc. v. United States*,
    426 F.2d 314 (Ct. Cl. 1970) ............................................................................. 3, 39

*Cienga Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007) ........................................................................... 95

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ............................................................................................. 66

*\*Clapp v. United States*,
    117 F. Supp. 576 (Ct. Cl. 1954) .................................................................. 8, 37, 40

*Clark v. United States*,
    19 Cl. Ct. 220 (1990) ........................................................................................ 104

*Colautti v. Franklin*,
    439 U.S. 379 (1979) ........................................................................................... 13

*Comcast of Or. II v. City of Eugene*,
    155 P.3d 99 (Or. 2007) ...................................................................................... 65

*Continental Airlines, Inc. v. United States*,
    77 Fed. Cl. 482 (2007) ...................................................................................... 41

*Costello v. Grundon*,
    651 F.3d 614 (7th Cir. 2011) ............................................................................. 22

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967) ................................................................................................. 83

*David Nassif Assocs. v. United States*,
    644 F.2d 4,12 (Ct. Cl. 1981) ........................................................................... 57, 58

*Dewsnup v. Timm*,
    502 U.S. 410 (1992) ................................................................................................. 20

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994) ................................................................................................. 63

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ........................................................................................... 86, 87

*Dubroff v. Wren Holdings, LLC*,
    C.A. Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) .............................. 47

*Eastport S.S. Corp. v. United States*,
    372 F.2d 1002 (Ct. Cl. 1967) ........................................................................ 7, 10, 39

*Eccles v. Peoples Bank of Lakewood Vill., Cal.*,
    333 U.S. 426 (1948) ........................................................................................... 43, 84

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
    533 F.3d 1353 (Fed. Cir. 2008) ............................................................................. 29

*Ekl v. Knecht*,
    585 N.E.2d 156 (Ill. Ct. App. 1991) ..................................................................... 66

*Eldredge v. Dep't of Interior*,
    451 F.3d 1337 (Fed. Cir. 2006) ............................................................................. 21

*Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*,
    No. Civ. A. 6894-VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013) ................................. 91

*Eversharp Inc. v. United States*,
    129 Ct. Cl. 772 (1954) ............................................................................................ 40

*Ex parte Virginia*,
    100 U.S. 339 (1879) ................................................................................................. 81

*F.C.C. v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012) ............................................................................................ 68

*Farmers' & Ginners Cotton Oil Co. v. United States*,
    76 Ct. Cl. 294 (1932) ......................................................................................... 61, 85

*Fed. Reserve Bank of Boston v. Comm'r. of Corp. & Taxation of Commonwealth of Mass.*,
    499 F.2d 60 (1st Cir. 1974) ..................................................................................... 22

iv

*Fed. Reserve Bank of Richmond v. Malloy*,
  264 U.S. 160 (1924) ............................................................................................ 15, 69

*Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist. No. 1, City of Little Rock, Ark.*,
  657 F.2d 183 (8th Cir. 1981) ....................................................................................... 22

*Feldman v. Cutaia*,
  951 A.2d 727 (Del. 2008) ........................................................................................ 48

*Figueroa v. United States*,
  466 F.3d 1023 (Fed. Cir. 2006) ................................................................................ 10

*Finn v. United States*,
  428 F.2d 828 (Ct. Cl. 1970) ..................................................................................... 39

*First Nat' l Bank of Cincinnati v. Pepper*,
  454 F.2d 626 (2d Cir. 1972) .................................................................................... 61

*First Nat'l Bank in St. Louis v. Missouri*,
  263 U.S. 640 (1924) ............................................................................................ 16, 69

*First National Bank v. Converse*,
  200 U.S. 425 (1906) ............................................................................................... 18

*Fletcher v. United States*,
  392 F.2d 266 (1968) ................................................................................................ 3

*Frank v. Wilson & Co.*,
  32 A.2d 277 (Del. 1943) .......................................................................................... 85

*Freedlander, Inc. v. Nat'l Bank of N.C.*,
  706 F. Supp. 1211 (E.D. Va. 1988) .......................................................................... 65

*Frost v. R.R. Comm'n of State of Cal.*,
  271 U.S. 583 (1926) ............................................................................................ 9, 63

*Fruhauf Sw. Garment Co. v. United States*,
  126 Ct. Cl. 51 (1953) .............................................................................................. 54

*Fuentes v. Shevin*,
  407 U.S. 67 (1972) .................................................................................................. 83

*Ga. Pac. Corp. v. United States*,
  640 F.2d 328 (Ct. Cl. 1980) ............................................................................... 50, 103

*Gatz v. Ponsoldt*,
  925 A.2d 1265 (Del. 2007) .............................................................................. 45, 46, 47

*Gen. Motors Corp. v. Nat'l Highway Traffic Safety Admin.*,
  898 F.2d 165 (D.C. Cir. 1990) ................................................................................. 23

*Genger v. TR Investors, LLC*,
   26 A.3d 180 (Del. 2011) ........................................................................................... 85

*\*Gentile v. Rossette*,
   906 A.2d 91 (Del. 2006) .....................................................................................46, 47

*Giaccio v. Pennsylvania*,
   382 U.S. 399 (1966) ................................................................................................. 66

*Giuricich v. Emtrol Corp.*,
   449 A.2d 232 (Del. 1982) ......................................................................................... 81

*\*Gmo. Niehaus & Co. v. United States*,
   373 F.2d 944 (Ct. Cl. 1967) ................................................................................90, 93

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................................................. 68

*Hazelhurst Oil Mill & Fertilizer Co. v. United States*,
   70 Ct. Cl. 334 (1930) ............................................................................................... 57

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ................................................................................................... 9

*In re Consolidated Pretrial Proceedings in Air West Securities Litig.*,
   436 F. Supp. 1281 (N.D. Cal. 1977) ......................................................................... 56

*In re Gaylord Container Corp. S'holder Litig.*,
   747 A.2d 71 (Del. Ch. 1999) .................................................................................... 48

*In re Matter of Reading Co.*,
   711 F.2d 509 (3d Cir. 1983) ..................................................................................... 53

*In re Orchard Enters., Inc. S'holder Litig.*,
   88 A.3d 1 (Del. Ch. 2014) ........................................................................................ 53

*In re Primedia Inc. Derivative Litig.*,
   910 A.2d 248 (Del. Ch. 2006) .................................................................................. 52

*In re Pure Resources, Inc., S'holders Litig.*,
   808 A.2d 421 (Del. Ch. 2002) .................................................................................. 76

*In re Southern Peru Copper S'holder Derivative Litig.*,
   52 A.3d 761 (Del. Ch. 2011) ...............................................................................53, 54

*In re Tri-Star Pictures, Inc. Litig.*,
   634 A.2d 319 (Del. 1993) ......................................................................................... 46

*James Shewan & Sons v. United States*,
   73 Ct. Cl. 49 (1931) ...............................................................................42, 57, 58, 61

*Janowsky v. United States,*
  133 F.3d 888 (Fed. Cir. 1988) ................................................................. 62, 63

*Jazz Photo Corp. v. Int'l Trade Comm'n,*
  264 F.3d 1094 (Fed. Cir. 2001) ...................................................................... 83

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
  341 U.S. 123 (1951) ....................................................................................... 67

*Kaiser Aetna v. United States,*
  444 U.S. 164 (1979) ....................................................................................... 45

*Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.,*
  749 F. Supp. 794 (E.D. Mich. 1990) ............................................................. 55

*Khan v. Tremont Corp.,*
  694 A.2d 422 (Del. 1997) ......................................................................... 51, 53

*King Broad. Co. v. F.C.C.,*
  860 F.2d 465 (D.C. Cir. 1988) ....................................................................... 23

*Kirby Forest Indus., Inc. v. United States,*
  467 U.S. 1 (1984) ....................................................................... 93, 102, 104

*Klamath Irrigation Dist. v. United States,*
  635 F.3d 505, 511 (Fed. Cir. 2011) ............................................................... 44

*Koontz v. St. Johns River Water Mgmt. Dist.,*
  133 S. Ct. 2586 (2013) .......................................................................... 9, 62, 63

*Lacos Land Co. v. Arden Grp., Inc.,*
  517 A.2d 271 (Del. Ch. 1986) ....................................................................... 75

*Lancashire Shipping Co. v. United States,*
  4 F. Supp. 544 (S.D.N.Y. 1933) .................................................................... 41

*Lebron v. Nat'l R.R. Passenger Corp.,*
  513 U.S. 397 (1995) ....................................................................................... 74

*Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.,*
  971 F.2d 732 (Fed. Cir. 1992) ....................................................................... 88

*Lingle v. Chevron U.S.A., Inc.,*
  544 U.S. 528 (2005) ................................................................................. 50, 96

*Litten v. Jonathan Logan, Inc.,*
  286 A.2d 913 (Pa. Super. 1971) ............................................................... 56, 65

*Loretto v. Teleprompter Manhattan CATV Corp.,*
  458 U.S. 419 (1982) ....................................................................................... 45

*Lucas v. Federal Reserve Bank of Richmond,
   59 F.2d 617 (4th Cir. 1932) ........................................................................ 17, 18, 96

Marvin M. Brandt Revocable Trust v. United States,
   134 S. Ct. 1257 (2014) ........................................................................................ 25

Mathews v. Eldridge,
   424 U.S. 319 (1976) ........................................................................................... 67

McCall v. U.S. Postal Serv.,
   839 F.2d 664 (Fed. Cir. 1988) ............................................................................ 83

Memorial Hospital Maricopa City,
   415 U.S. 250(1974) ............................................................................................. 63

Merchants' Nat'l Bank v. United States,
   101 U.S. 1 (1879) ............................................................................................... 69

Merritt v. Colonial Foods, Inc.,
   505 A.2d 757 (Del. Ch. 1986) ............................................................................ 53

Moore v. City of Tallahassee,
   928 F. Supp. 1140 (N.D. Fla. 1995) .................................................................... 64

N. Pac. R. Co. v. Boyd,
   228 U.S. 482 (1913) ........................................................................................... 88

Nat'l Bd. of Young Men's Christian Ass'n v. United States,
   395 U.S. 85 (1969) ............................................................................................. 81

Nat'l Food & Beverage Co., Inc. v. United States,
   103 Fed. Cl. 63 (2012) ....................................................................................... 49

Ningbo Dafa Chem. Fiber Co. v. United States,
   580 F.3d 1247 (Fed. Cir. 2009) .......................................................................... 21

O'Bryan v. United States,
   93 Fed. Cl. 57 (2010) ......................................................................................... 41

Osanitsch v. Macroni PLC,
   No. CV 05-3988 CRB, 2009 WL 5125821, (N.D. Cal. Dec. 21, 2009) .............. 56

Otay Mesa Prop., L.P. v. United States,
   111 Fed. Cl. 422 (2013) .................................................................................... 102

Pacetti v. United States,
   50 Fed. Cl. 239 (2001) ....................................................................................... 87

Palazzolo v. Rhode Island,
   533 U.S. 606 (2001) ........................................................................................... 44

*Paramount Commc'ns, Inc. v. QVC Network Inc.,
    637 A.2d 34 (Del. 1994) ........................................................................................... 48, 80

Penn Central Transportation Co. v. City of New York,
    438 U.S. 104 (1978) ......................................................................................... 95, 96, 97

Peoples Bank v. Eccles,
    161 F.2d 636 (D.C. Cir. 1947) ................................................................................ 43, 84

Perez v. Pan-American Berry Growers, LLC,
    Nos. 6:12-cv-1474-TC, 6:12-cv-1566-TC, 6:13-cv-1439-TC, 2014 WL 198781 (D. Or. Jan.
    15, 2014) ................................................................................................................... 65

Petters Co. Inc. v. BLS Sales Inc.,
    No. C 04-02160 CRB, 2005 WL 2072109, (N.D. Cal. Aug. 26, 2005) ............................. 56

Pew Forest Prods. v. United States,
    105 Fed. Cl. 59 (2012) ................................................................................................ 54

Phillips v. Insituform of N. Am., Inc.,
    13 Del. J. Corp. L. 774 (Del. Ch. Aug. 27, 1987) ............................................................ 75

Phillips v. Wash. Legal Found.,
    524 U.S. 156 (1998) .................................................................................................... 45

*Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.,
    238 F.3d 897 (7th Cir. 2001) ....................................................................................... 60

PSI Energy Inc. v. United States,
    411 F.3d 1347 (Fed. Cir. 2005) ................................................................................... 41

Rainwater v. United States,
    356 U.S. 590 (1958) .................................................................................................... 25

*Reis v. Hazelett Strip-Casting Corp.,
    28 A.3d 442 (Del. Ch. 2011) .................................................................................. 76, 77

Res. Instruments, Inc. v. United States,
    97 Fed. Cl. 545 (2011) .............................................................................................. 104

Richbell Info. Sys., Inc. v. Jupiter Partners, L.P.,
    309 A.D.2d 288 (N.Y. App. Div. 2003) ......................................................................... 90

*Robertson v. Frank Bros Co.,
    132 U.S. 17 (1889) ............................................................................................... 56, 57

Rose Acre Farms, Inc. v. United States,
    373 F.2d 1177 (Fed. Cir. 2004) ................................................................................... 95

*Rose Acre Farms, Inc. v. United States,*
   559 F.3d 1260 (Fed. Cir. 2009) .................................................................... 98

*Ruckleshaus v. Monsanto Co.,*
   467 U.S. 986, 1001 ........................................................................... 44, 45

*\*Rumsfeld v. Freedom NY, Inc.,*
   329 F.3d 1320 (Fed. Cir. 2003) .............................................................. 54, 57

*Schnell v. Chris-Craft Indus., Inc.,*
   285 A.2d 437 (Del. 1971) ....................................................................... 80

*Sellers v. Joseph Bancroft & Sons Co.,*
   2 A.2d 108 (Del. Ch. 1938) ..................................................................... 80

*Shearson/Am. Express, Inc. v. McMahon,*
   482 U.S. 220 (1987) ............................................................................ 20

*Sheet Metal Workers' Int'l Ass'n v. Lynn,*
   488 U.S. 347 (1989) ............................................................................ 20

*Simmonds Precision Prods., Inc. v. United States,*
   546 F.2d 886 (Ct. Cl. 1976) .................................................................... 88

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ....................................................................... 21, 24

*Sky Transpo, Inc. v. City of Knoxville,*
   703 S.W.2d 126 (Tenn. 1985) ................................................................... 66

*Sonnenschein v. Reliance Ins. Co.,*
   353 F.2d 935 (2d Cir. 1965) .................................................................... 71

*Southern Ry. Co. v. United States,*
   228 Ct. Cl. 712 (1981) ......................................................................... 89

*\*Speiser v. Randall,*
   357 U.S. 513 (1958) ............................................................................ 69

*Sprague S.S. Co. v. United States,*
   145 Ct. Cl. 642 (1959) ......................................................................... 38

*\*Sprague S.S. Co. v. United States,*
   172 F. Supp. 674 (1959) ........................................................................ 40

*Star Motor Co. of Cal. v. United States,*
   71 Ct. Cl. 348 (1930) .......................................................................... 42

*\*Starr Int'l Co. Inc. v. United States,*
   111 Fed. Cl. 459 (2013) ........................................................................ 87

*Starr Int'l Co., Inc. v. United States,
106 Fed. Cl. 50 (2012).............................................................................................................passim

*Starr Int'l Co., Inc. v. United States,
107 Fed. Cl. 374 (2012)............................................................................. 10, 11, 15, 32

State Contracting & Eng'g Corp. v. Condotte Am., Inc.,
346 F.3d 1057 (Fed. Cir. 2003) ................................................................................ 88

Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.,
862 F.2d 1564 (Fed. Cir. 1988) .............................................................................. 102

Suffolk Cty. v. Long Island Lighting Co. v. Equitable Life Assurance Soc'y of U.S.A.
4 A.D.3d 214 (N.Y. App. Div. 2004) ...................................................................... 87

*Suwannee S.S. Co. v. United States,
279 F.2d 874 (Ct. Cl. 1960)..............................................................................passim

Swift & Courtney & Beecher Co. v. United States,
111 U.S. 22 (1884) .............................................................................................. 43, 55

Swiss Fed. Rys. v. United States,
125 Ct. Cl. 444 (1953)............................................................................................. 62

Sys. Tech. Assocs., Inc. v. United States,
699 F.2d 1383 (Fed. Cir. 1983)..........................................................................55, 58

Tahoe-Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency,
535 U.S. 302 (2002) ................................................................................................ 95

*Todd v. United States,
292 F.2d 841 (Ct. Cl. 1961)..................................................................................... 83

Trayco, Inc. v. United States,
994 F.2d 832 (Fed. Cir. 1993) ................................................................................... 7

Trompler, Inc. v. N.L.R.B.,
338 F.3d 747 (7th Cir. 2003) .................................................................................. 60

Tulare Lake Basin Water Storage Dist. v. United States,
61 Fed. Cl. 624 (2004)..................................................................................... 102, 103

Turney v. United States,
115 F. Supp. 457 (Ct. Cl. 1953) ............................................................................. 64

Tuthill Ranch, Inc. v. United States,
381 F.3d 1132 (Fed. Cir. 2004) .............................................................................. 95

Uni-Marts, Inc. v. Stein,
Civ. A. No. 14713, 1996 WL 466961, (Del. Ch. Aug. 12, 1996)........................76

*Union Pacific Railroad Co. v. Public Service Commission of Missouri,
  248 U.S. 67 (1918) ........................................................................................... 60, 61, 62

United States v. 429.59 Acres of Land,
  612 F.2d 459 (9th Cir. 1980) ........................................................................... 103

United States v. Best Foods, Inc.,
  47 C.C.P.A. 163 (1960) ...................................................................................... 40

United States v. Blankinship,
  543 F.2d 1272 (9th Cir. 1976) ......................................................................... 103

United States v. Butler,
  297 U.S. 1 (1936) ............................................................................................... 63

United States v. Buxton Lines,
  165 F.2d 993 (4th Cir. 1948) ............................................................................ 62

United States v. Cartwright,
  411 U.S. 546 (1973) ........................................................................................... 94

United States v. Chicago, M., St. P. & P.R. Co.,
  282 U.S. 311 (1931) ............................................................................................. 9

*United States v. Edmonston,
  181 U.S. 500 (1901) ..................................................................................... 37, 38

United States v. Gen. Motors Corp.,
  323 U.S. 373 (1945) ........................................................................................... 45

United States v. Mead Corp.,
  533 U.S. 218 (2001) ..................................................................................... 21, 24

United States v. Pewee Coal Co.,
  341 U.S. 114 (1951) ........................................................................................... 97

United States v. Price,
  361 U.S. 304 (1960) ........................................................................................... 25

United States v. Reynolds,
  397 U.S. 14 (1970). ........................................................................................... 94

Urban Plumbing & Heating Co. v. United States,
  408 F.2d 382 (Ct. Cl. 1969)............................................................................... 55

Walther v. Sec'y of Health & Human Servs.,
  485 F.3d 1146 (Fed. Cir. 2007) ........................................................................ 13

*Weinberger v. UOP, Inc.,
  457 A.2d 701 (Del. 1983).................................................................................. 53

*White & Case LLP v. United States,*
    89 Fed. Cl. 12 (2009)..............................................................................25

*Whitney Benefits, Inc. v. United States,*
    30 Fed. Cl. 41 (Fed. Cl. 1994)...........................................................102

*Wilson Athletic Goods Mfg. Co. v. United States,*
    161 F.2d 915 (7th Cir. 1947).................................................................62

*Wilson v. New,*
    243 U.S. 332 (1917)...............................................................................10

*Wood v. Milyard,*
    132 S. Ct. 1826 (2012).........................................................................83

*Yee v. Escondido,*
    503 U.S. 519 (1992)..............................................................................97

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)..............................................................................10

## <u>Other Authorities</u>

13 FLETCHER CYC. CORP. § 6213...............................................................86

1932 Circular, 18 Fed. Reserve Bulletin 473 (Aug. 1932) .....................12, 23

1936 Circular, 22 Fed. Reserve Bulletin 71 (Feb. 1936) ........................12, 23

28 WILLISTON ON CONTRACTS § 71:9 (4th ed. 1990) ...............................85

40 Pa. Stat. Ann. § 991.1401 .......................................................................52

51 Cong. Rec. 843 (1913)............................................................................34

Bd. of Governors of the Fed. Reserve Sys., 44 *Fed. Reserve Bulletin* 241 (Mar. 1958) ............................12

BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 211 ...............................71

Cong. Rec. 14981 (1932) .............................................................................36

H.R. Doc. No. 72-360 (1932) .......................................................................35

H.R. Rep. No. 62-1593 (1913).......................................................................33

H.R. Rep. No. 63-69 (1913)...........................................................................28

xiii

H.R. Rep. No. 72-1760 (1932) ........................................................................................ 35

H.R. Rep. No. 72-1777 (1932) .................................................................................... 3, 36

McClintock on Equity § 26 (2d ed. 1948) ..................................................................... 85

Morris R. Cohen, The Basis of Contract,
46 Harv. L. Rev. 553 (1933) ......................................................................................... 55

N.C. Gen. Stat. Ann. § 58-19-5(2) ................................................................................ 52

N.Y. Est. Powers & Trusts Law § 11-1.1 ....................................................................... 73

N.Y. Est. Powers & Trusts Law § 7-1.4 .......................................................................... 71

N.Y. Ins. Law §1501(a)(2) ............................................................................................. 52

Paul M. Warburg, The Federal Reserve System: Its Origin And Growth 287 (1930) ............. 20

Pers. Prop. Law; Cons. Laws, c. 41 § 12–a .................................................................... 71

Regan, 461 U.S. 540, 103 S. Ct. 1997, 76 L.Ed.2d 129 ............................................... 63

Restatement (Second) of Contracts § 380 cmt ............................................................. 85

Restatement (Second) Trusts § 339 (1959) ................................................................... 72

Restatement (Third) Trusts § 65(1) (2003) ................................................................... 72

Restatement (Third) Trusts § 71 (2007) ........................................................................ 73

Restatement (Third) Trusts § 77 .................................................................................... 73

S. Rep. No. 63-133, Pt. 2 (1913) ............................................................................. 33, 34

Tex. Ins. Code Ann § 823.005 ........................................................................................ 52

Uniform Trust Code § 804  (2000) ................................................................................. 73

Uniform Trustee Powers Act (1964) .............................................................................. 73

## Statutes & Regulations

12 C.F.R. § 201.4 ..................................................................................... 12, 28, 29, 32

12 U.S.C. § 24 ................................................................................................................ 17

12 U.S.C. § 248 .............................................................................................................. 28

12 U.S.C. § 341 ......................................................................................................... 15, 17

12 U.S.C. § 343 (2006) ........................................................................................... passim

12 U.S.C. § 357 ...................................................................................................... passim

12 U.S.C. § 5223 ........................................................................................................... 27

12 U.S.C. § 5235 ........................................................................................................... 25

12 U.S.C. § 84 ............................................................................................................... 17

28 U.S.C. § 1491 ........................................................................................................... 10

28 U.S.C. § 2412 ......................................................................................................... 105

31 U.S.C. § 101 ............................................................................................................. 13

31 U.S.C. § 9102 ........................................................................................................... 13

40 U.S.C. § 3114 ......................................................................................................... 103

40 U.S.C. § 3116 ......................................................................................................... 103

42 U.S.C. § 4654 ......................................................................................................... 104

Del. Code Ann. tit. 18, § 5001 ...................................................................................... 51

Del. Code Ann. tit. 8, § 203 .................................................................................... 52, 70

Del. Code Ann. tit. 8, § 218 .......................................................................................... 49

Del. Code Ann. tit. 8, § 242 .................................................................................... 49, 77

Emergency Relief and Construction Act of 1932,
    Pub. L. No. 72-302, § 210, 47 Stat. 709 ................................................................. 2

Merchant Ship Sales Act of 1946,
    60 Stat. 41, 50 U.S.C.A. Appendix, §§ 1735 et seq., ........................................... 40

RESTATEMENT (SECOND) OF CONTRACTS § 175(1) (1981) ....................................... 54, 55, 56, 58

**CONCLUSIONS OF LAW**

**A.  SECTION 13(3) OF THE FEDERAL RESERVE ACT**

**1.0**

**IN 1932, CONGRESS ADDED AN EMERGENCY RELIEF PROVISION TO THE FEDERAL RESERVE ACT THAT PROVIDED "AFFIRMATIVE AUTHORITY OF THE FEDERAL RESERVE BOARD, TO DISCOUNT ELIGIBLE PAPER FOR ANY INDIVIDUAL, PARTNERSHIP, OR CORPORATION UNABLE TO SECURE ADEQUATE CREDIT ACCOMMODATIONS" PTX 742 at 135-36.**

**1.1   Prior to 1932, the Federal Reserve Could Only Lend to Banks.  However, in the 1930s Congress Recognized that in a Financial Crisis Any Company Might Need Federal Reserve Credit.**

**1.1.1**   Prior to 1932, Federal Reserve banks could generally lend only to banks that were members of the Federal Reserve System.  (Hackley: PTX 742 at 135),[1] and it is still true today that Federal Reserve bank credit is generally to be extended only to depository institutions that are members of the Federal Reserve system.  *See*, *e.g.,* 12 U.S.C. § 347b; 12 C.F.R. §§ 201.3, 201.4.

**1.1.2**   In the 1930s, however, Congress recognized that in a financial crisis any solvent but illiquid company may require emergency assistance.  Accordingly, Congress enacted Section 13(3) of the Federal Reserve Act, which authorized the Federal Reserve to discount loans to any "individual, partnership, or corporation" in the "unusual and exigent circumstances" where the borrower was unable to secure adequate credit from private sources but had sufficient assets to

---

[1] After World War I, a temporary exception was made for veterans.

secure the loan.  Emergency Relief and Construction Act of 1932, Pub. L. No. 72-302 § 210, 47

Stat. 709, 715.

## 1.2     In 1932, Congress Recognized that in a Financial Crisis Any Solvent But Illiquid Company May Require Emergency Assistance.

     **1.2.1**     Congress therefore enacted Section 13(3) of the Federal Reserve Act, which

authorized the Federal Reserve to discount loans to *any* "individual, partnership, or corporation"

in the "unusual and exigent circumstances" where the borrower was unable to secure adequate

credit from private sources but had sufficient assets to secure the loan.  Emergency Relief and

Construction Act of 1932, Pub. L. No. 72-302, § 210, 47 Stat. 709, 715.

     (a) The text of Section 13(3) provides:

> In unusual and exigent circumstances, the Board of Governors of the Federal
> Reserve System, by the affirmative vote of not less than five members, may
> authorize any Federal reserve bank, during such periods as the said board may
> determine, at rates established in accordance with the provisions of section 357
> of this title, to discount for any individual, partnership, or corporation, notes, drafts,
> and bills of exchange when such notes, drafts, and bills of exchange are indorsed
> or otherwise secured to the satisfaction of the Federal reserve bank: *Provided*,
> That before discounting any such note, draft, or bill of exchange for an individual
> or a partnership or corporation the Federal reserve bank shall obtain evidence that
> such individual, partnership, or corporation is unable to secure adequate credit
> accommodations from other banking institutions.  All such discounts for
> individuals, partnerships, or corporations shall be subject to such limitations,
> restrictions, and regulations as the Board of Governors of the Federal Reserve
> System may prescribe.  (12 U.S.C. § 343 (2006)).

## 1.3     Congress Expressly Provided the Circumstances Under Which a 13(3) Loan Could Be Made.

     **1.3.1**     There must be "unusual and exigent circumstances" (*i.e.*, the national or regional

unavailability of normal credit) (12 U.S.C. § 343).

     (a) In June 1970, the Federal Reserve concluded that it was authorized to make a 13(3)

loan to a railroad and Federal Reserve counsel noted that "'unusual and exigent circumstances'

2

might be a general and injurious unavailability of credit to creditworthy enterprises (particularly

smaller businesses), or a natural catastrophe giving rise to such extraordinary demands for credit

as to exhaust the usual credit resources of the area or community" (PTX 2814 at 3).

    **1.3.2**   The loan must be authorized "by the affirmative vote of not less than five

members" of the Board of Governors (12 U.S.C. § 343).

    **1.3.3**   The loan must be "secured to the satisfaction of the [lending] Federal reserve

bank" (12 U.S.C. § 343).

    **1.3.4**   The borrower must be "unable to secure adequate credit accommodations from

other banking institutions" (12 U.S.C. § 343).

**1.4**   **Congress Also Expressly Provided That the Consideration for a 13(3) Loan Must Be an Interest Rate "subject to review and determination of the Board of Governors" and Must Be "fixed with a view of accommodating commerce and business" (12 U.S.C. §§ 343, 357).**

**1.5**   **Section 13(3)'s Purpose of Assisting a Broad Range of Entities and Persons Is Clear from the Statute's Plain Language Which Provides for Loans to "any individual, partnership, or corporation" (12 U.S.C. § 343).**

    (a) Recognizing the potentially broad scope of entities that might need access to Federal

Reserve credit, the Conference Committee that reconciled the House and Senate versions of

Section 13(3) "extend[ed] the discount privilege to partnerships as well as to individuals and

corporations," revising the Senate's version of the bill that provided for loans to individuals and

corporations only.  *See* H.R. Rep. No. 72-1777, at 20 (1932) (Conf. Rep.); *see also Chris Berg,*

*Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970) (explaining that where a statutory

provision or regulation defines the class of persons that may receive a benefit, "it is

presumptively intended to benefit those persons") (citing *Fletcher v. United States*, 392 F.2d 266

(Ct. Cl. 1968)).

**1.6    The Federal Reserve's Understanding of the Purpose of Section 13(3) Is Evidenced by the Loans Made and Approved Prior to 2008, Particularly in the Years Immediately Following the Passage of 13(3).**

**1.6.1**    During the 1930s, the Federal Reserve made Section 13(3) loans to a number of "main street" enterprises that satisfied the requirements of 13(3) (*i.e.*, they were solvent and able to provide security for a loan, but unable to obtain adequate credit from other sources).  These loans included loans to a typewriter manufacturer, a vegetable grower, and a marble company, and a loan to pay farmers for grapes.  (PTX 2816 at 5-7)

**1.6.2**    In June 1970, the Federal Reserve concluded with respect to a possible loan to the Penn Central Railroad that "the third paragraph of §13 of the Federal Reserve Act permits the extension of Federal Reserve credit to the transportation company" (PTX 2814 at 2).

**1.7    Section 13(3)'s Purpose of Assisting a Broad Range of Entities and Persons Reflects the Bagehot Principle that "during a panic central banks should lend freely to whoever comes to their door; as long as they have collateral, give them money." (Bernanke: PTX 708 at 14).**

**1.7.1**    Walter Bagehot's description of the responsibility of central banks in financial crises in his book LOMBARD STREET, published in 1873, is widely accepted, including by the Federal Reserve and its officials.

(a) Bernanke: "When the financial system teetered near collapse in 2008 and 2009, we responded as the 19th century British essayist Walter Bagehot advised, by serving as liquidity provider of last resort to stressed financial firms and markets."  (PTX 684 at 2).

(b) Geithner:  LOMBARD STREET is "the bible of central banking" (PTX 709 at 126; Geithner: Trial Tr. 1438:1-10).

(c) Bernanke:  "The notion that a central bank should provide liquidity to the banking system in a crisis has a long intellectual lineage.  Walter Bagehot's LOMBARD STREET, published

4

in 1873, remains one of the classic treatments of the role of the central bank in the management of financial crises."  (PTX 15 at 1; *accord:* Cragg:  Trial Tr. 5421:22-5422:6; Zingales: Trial Tr. 4126:8-4127:1).

(d) Madigan:  "For central bankers, however, the essential principles guiding their actions are long-standing and well established.  In considering the appropriate central bank response to a financial crisis, monetary economists have long appealed to the insights that Walter Bagehot set forth in LOMBARD STREET."  (PTX 537 at 1).

(e) "If a central bank follows Bagehot's rule, it can stop financial panics" (Bernanke: PTX 708 at 14), and "central bankers who fail to act in a crisis could make it exponentially worse."  (Geithner:  PTX 709 at 135).  For a central bank, therefore, "it is very important to get in there aggressively."  (Bernanke: PTX 708 at 15).

**1.7.2**   Bernanke:  "In particular, in the recent episode, central banks around the world followed the dictum set forth by Bagehot in 1873:  To avert or contain panics, central banks should lend freely to solvent institutions, against good collateral."  (PTX 607 at 9).

**1.7.3**   Bernanke: "Bagehot advised central banks—the only institutions that have the power to increase the aggregate liquidity in the system—to respond to panics by lending freely against sound collateral.  Following that advice, from the beginning of the crisis, the Fed, like other major central banks, provided large amounts of short-term liquidity to financial institutions, including primary dealers as well as banks, on a broad range of collateral.  Reflecting the contemporary institutional environment, it also provided backstop liquidity support for components of the shadow banking system, including money market mutual funds, the commercial paper market, and the asset-backed securities markets." (PTX 650 at 14-15).

**1.7.4**   Bernanke: "In the more recent crisis, the Federal Reserve fulfilled the role of liquidity provider, consistent with the classic prescriptions of Walter Bagehot.  The Fed lent not only to banks, but, seeking to stem the panic in wholesale funding markets, it also extended its lender-of-last-resort facilities to support nonbank institutions, such as investment banks and money market funds, and key financial markets, such as those for commercial paper and asset-backed securities."  (PTX 682 at 6).

## B.  PLAINTIFFS' ILLEGAL EXACTION CLAIM

### 2.0

**AN ILLEGAL EXACTION OCCURS WHEN THE GOVERNMENT REQUIRES A CITIZEN TO SURRENDER PROPERTY THE GOVERNMENT IS NOT AUTHORIZED TO DEMAND AS CONSIDERATION FOR ACTION THE GOVERNMENT IS AUTHORIZED TO TAKE.**

**2.1    In General, an Illegal Exaction Occurs When "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (internal quotation marks omitted); *accord Trayco, Inc. v. United States*, 994 F.2d 832, 837-38 (Fed. Cir. 1993); *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967).**

**2.2    An Illegal Exaction May Be of Money or Property.**

(a) "Although property and not actual funds were taken, as stated in *Eastport*, illegal exaction jurisdiction will arise when a claimant has 'paid money over to the Government, directly or in effect.'" *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996) (quoting *Eastport S.S. Corp.*, 372 F.2d at 1007-08).

**2.3    One Form of Illegal Exaction Occurs When the Government Demands Consideration It Is Not Authorized to Require for Action the Government Is Authorized to Take.**

(a) In *Suwannee S.S. Co. v. United States*, 279 F.2d 874 (Ct. Cl. 1960), for example, the Government, through the Maritime Administrator, required a citizen to surrender $20,000 it was not authorized to demand as a condition for receiving the Government's approval to sell two of its ships to a foreign purchaser. *Id.* at 875-76.  Under the Shipping Act, the plaintiff could not sell the ships without the Administrator's permission. *Id.* at 874.  The Administrator agreed to the sale on the condition that the plaintiff pay $20,000 to the Government. *Id.* at 875.  The

plaintiff accepted the terms proposed by the Administrator, paid the $20,000, and subsequently

sued the United States, claiming that "Maritime had no legal authority to condition its approval

of the requested transfer upon the payment of $20,000." *Id.* at 876.

(b) In response to the plaintiff's claim in *Suwannee*, the Government argued that it "had

the power to deny the plaintiff permission to make the desired transfer" and that, under the

statute, it had "complete freedom to impose conditions upon any permission granted." *Id.* at 876.

The Court rejected the Government's argument, stating:

> ***We suggest that no statute should be read as subjecting citizens to the
> uncontrolled caprice of officials***, unless the statute has to do with the
> powers of the President in dealing with foreign relations, the powers of a
> military commander in the field, or some comparable situation. . . .   The
> vice of the $20,000 is its irrelevance.  There can hardly be a more serious
> defect in the carrying on of government than allowing matters which have
> nothing to do with the case to be dragged in, and to affect decisions.  If the
> Government has valuable privileges to award, and if it desires to get
> money for them, it should, as it does in many situations, invite bids or
> negotiation.  If it does not, its ***officials have no authority to add to their
> function of determining the compatibility of the application with the
> public interest, the supererogatory function of picking up a few dollars
> for the public treasury***.  (*Id*. at 876-77 (emphasis added).)

(c) Similarly, in *Clapp v. United States*, 117 F. Supp. 576 (Ct. Cl. 1954), the court held

that a provision in the Shipping Act allowing the Government to provide approval of the sale of a

ship "either absolutely or upon such conditions as the commission (Administration) prescribes,"

*id.* at 578, did not authorize the Government to condition the sale on the payment of a fee

because, if the provision were read to permit such a condition: "Taken literally that section

would permit the Administration to impose any condition whatever, however irrelevant" (*id.* at

581).

**2.4    Even Where the Government Is Free to Deny a Benefit Altogether, It Cannot Tie the Granting of the Benefit to the Surrender of Rights or Property the Government Is Not Authorized to Demand.**

**2.4.1**    The Supreme Court has made clear that even when the Government has no obligation to confer a benefit, if it decides in its discretion to provide the benefit, the Government cannot demand the surrender of rights it lacks authority to demand.

(a) *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2596 (2013):  "we have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights."

(b) *United States v. Chicago, M., St. P. & P.R. Co.*, 282 U.S. 311, 328-29 (1931):  "the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution."

(c) *Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 594 (1926):  "If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all.  It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."

**2.4.2**    The Government's inability to require forfeiture of rights and property in exchange for discretionary benefits is unchanged during times of crisis, when the rule of law is maintained by requiring that Government acts be authorized by statute and the Constitution.

(a) *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-26 (1934):  "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . . 'Although an emergency may not call

into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.'" (quoting *Wilson v. New*, 243 U.S. 332, 348 (1917)).

(b) *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring): "In view of the ease, expedition and safety with which Congress can grant and has granted large emergency powers, certainly ample to embrace this crisis, I am quite unimpressed with the argument that we should affirm possession of them without statute. Such power either has no beginning or it has no end."

## 2.5    This Court has Jurisdiction Over a Claim Alleging Illegal Exaction.

**2.5.1**    The Tucker Act, 28 U.S.C. § 1491(a)(1), provides jurisdiction over illegal exaction claims for the recovery of money or property that was "'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Aerolineas Argentinas*, 77 F.3d at 1572-73 (quoting *Eastport S.S. Corp.*, 372 F.2d at 1007).

**2.5.2**    "'In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language.'"  *Starr Int'l Co., Inc. v. United States*, 107 Fed. Cl. 374, 378 (2012) (quoting *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006)).

(a)  "An illegal exaction also may be conceptualized as 'a deprivation of property without due process of law.'  In that sense, it is an exception to the general rule that the Due Process Clause of the Fifth Amendment is not money-mandating."  *Starr Int'l Co., Inc. v. United States*, 106 Fed. Cl. 50, 61 (2012) (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (internal citation omitted)), *recons. denied*, 107 Fed. Cl. 374 (2012).

**3.0**

**IT IS UNDISPUTED THAT DEFENDANT REQUIRED THE SURRENDER OF 79.9% OF PLAINTIFFS' EQUITY IN, AND VOTING CONTROL OVER, AIG AS CONSIDERATION FOR A 13(3) LOAN.**

**4.0**

**DEFENDANT WAS NOT AUTHORIZED TO DEMAND EQUITY OR VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN.**

**4.1    The Plain Language of Section 13(3) Makes Clear that the Only Authorized Consideration for a 13(3) Loan is an Interest Rate Determined by the Board of Governors and "Fixed with a View of Accommodating Commerce and Business."  *See* Def.'s Proposed Pre-Trial Conclusions of Law ¶¶ 123-130.**

**4.1.1**    As this Court has held, "the 'only consideration for a loan prescribed by' Section 13(3) 'is an interest rate subject to the determination of the Board of Governors.'" *Starr Int'l Co.*, 107 Fed. Cl. at 378 (quoting *Starr Int'l Co.*, 106 Fed. Cl. at 85).

**4.1.2**    Section 13(3) expressly provides that the consideration for a 13(3) loan are

"***rates established in accordance with the provisions of section 357 of this title***, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank."  12 U.S.C. § 343 (emphasis added).

**4.1.3**    Section 14(d) of the Federal Reserve Act (12 U.S.C. § 357) provides that such "rates" shall be "subject to review and determination of the Board of Governors of the Federal Reserve System" and "be fixed with a view of accommodating commerce and business."

**4.1.4**    It is undisputed that "the Federal Reserve Act uses the term 'rate' when it means interest rates related to discounts" (Defendant's Pre-Trial Proposed Conclusions of Law ¶ 128); *see also* Bernanke: Trial Tr. 2005:5-19 ("I normally think of rates as interest rates"); Bernanke:

11

Trial Tr. 2005:1-2 (The equity component was "not a rate on a loan, no.  It was a piece of the compensation, yes.").

**4.2    The Meaning of the Statute's Plain Language Is Confirmed by the Federal Reserve's Official Circulars, Including Circulars Published Soon After Section 13(3)'s Passage.**

(a) "Starr's view is supported by Federal Reserve circulars explaining the Federal Reserve banks' powers under Section 13(3) to discount commercial paper for corporations in exigent circumstances.  One such circular states that 'bank discounts as commonly understood do not apply to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures.'  Bd. of Governors of the Fed. Reserve Sys., 44 *Fed. Reserve Bulletin* 241, 269 (Mar. 1958) (internal quotation omitted).  Another states that '[s]uch discounts may be made only at rates established by the Federal Reserve banks, subject to review and determination by the Board of Governors of the Federal Reserve System.' 1936 Circular, 22 *Fed. Reserve Bulletin* at 123; 1932 Circular, 18 *Fed. Reserve Bulletin* at 518; *see also* 12 U.S.C. § 357 (2006)."  *Starr Int'l Co.*, 106 Fed. Cl. at 85-86.

(b) In addition, the regulation governing "terms of credit" for Section 13(3) extensions of credit in place in September 2008 authorized only the charging of interest and did not authorize the Federal Reserve to acquire equity or seek other consideration.  *See* 12 C.F.R. § 201.4 ("Emergency credit will be extended at a rate above the highest rate in effect for advances to depository institutions.").

**4.3    Congress Reinforced Federal Reserve Banks' Lack of Authority to Demand Equity As A Condition Of Section 13(3) Extensions Of Credit When It Enacted The Government Corporation Control Act.**

(a) The Government Corporation Control Act, enacted in 1945, prohibits government entities from acquiring a controlling stake in a corporation so as to make them an agency of the

Government without express congressional authorization. 31 U.S.C. § 9102 ("An agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action."); *id.* § 101 (defining "agency" to include federal instrumentalities).

## 4.4 Defendant's Argument that Its Demand for Equity and Voting Control May Be a "Limitation" or "Restriction" on a Loan Is Both Contrary to the Statute's Plain Language and Internally Inconsistent.

**4.4.1**   A demand for equity and voting control is in no way a "limitation" or "restriction" on a loan.

**4.4.2**   In addition, the "limitations" and "restrictions" language in the final sentence of Section 13(3) cannot be read as authorization to demand equity consideration because such a reading would render superfluous the language in Section 13(3) providing that the consideration for an extension of credit under Section 13(3) is an interest rate approved by the Board of Governors.

**4.4.3**   If the language relied on by Defendant did, in fact, authorize any form of consideration for a Section 13(3) extension of credit, an interest rate would fall within that language, and the language in 13(3) addressing rates would have no independent meaning.

**4.4.4**   Accepting Defendant's reading of Section 13(3) would therefore violate the "canon against interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010); *see also Walther v. Sec'y of Health & Human Servs.,* 485 F.3d 1146, 1150 (Fed. Cir. 2007) (holding that "'a statute should be interpreted so as not to render one part inoperative'") (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)).

**4.4.5**    Defendant's reliance on the last sentence of Section 13(3) as authorization to demand equity is also inconsistent with the contemporaneous analyses performed by its outside counsel.  As Defendant's outside counsel at Davis Polk stated:  "There is no express authority, which is one of the reasons Treasury and the Fed discussed their actions with congressional leaders of both parties.  Maybe it's an implied power of setting the conditions for lending money under 13(3) of the federal reserve act, but the govt is on thin ice and they know it.  But who's going to challenge them on this ground?"  PTX 3283 at 1; *see also* Pls.' Proposed Findings ¶¶ 23.1.

**4.4.6**    Finally, Defendant's current position – that the "limitations" and "restrictions" language in the final sentence of Section 13(3) authorized it to require the surrender of shareholder equity and voting control as a condition of a Section 13(3) extension of credit – is a position that Defendant did not raise until after briefing on its unsuccessful motion to dismiss in this litigation, and its litigation position is not entitled to deference.

(a)  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988): "We have never applied the principle of [deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice."  *Id.* at 212.  "Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."  *Id.* at 213.

(b)  *Am. Signature, Inc. v. United States*, 598 F.3d 816, 827 (Fed. Cir. 2010):  "Where the agency's interpretation seeks to advance its litigation position, deference is typically not afforded to the agency's position announced in a brief."

**4.5    Defendant's Argument that the "Incidental Powers" Provision of the Federal Reserve Act Might Somehow Authorize Its Demand for Equity and Voting Control Is Also Inconsistent with the Plain Language of Section 13(3).**

**4.5.1**    The "incidental powers" provision of Section 4 of the Federal Reserve Act provides Reserve banks "all powers specifically granted by the provisions of this chapter and such incidental powers as shall be necessary to carry on the business of banking *within the limitations prescribed by this chapter*." 12 U.S.C. § 341 (emphasis added).  On its face, as this Court previously concluded, this provision contemplates that Reserve banks' incidental authority is circumscribed by the express authority provided by the statute.

**4.5.2**    "Although the FRA does indeed confer incidental powers upon Federal Reserve banks, it grants such powers that 'shall be necessary to carry on the business of banking *within the limitations prescribed by this chapter*.'  12 U.S.C. § 341 (emphasis added).  Thus, because the FRA only permits the Board to demand consideration in the form of interest rates, the Board did not have implied authority to demand the transfer of equity as consideration for the loan to AIG." *Starr Int'l Co.*, 107 Fed. Cl. at 378.

**4.5.3**    "FRBNY's incidental powers under Section 4 of the FRA did not authorize it to condition the provision of exigent financing on AIG's issuance of stock to the Trust."  *Starr Int'l Co.*, 106 Fed. Cl. at 87.

**4.5.4**    A federal entity's incidental powers cannot be greater than the powers otherwise delegated to it by Congress.

(a) *Fed. Reserve Bank of Richmond v. Malloy*, 264 U.S. 160, 167 (1924):  "authority to do a specific thing carries with it by implication the power to do whatever is necessary to

effectuate the thing authorized – not to do another and separate thing, since that would be, not to carry the authority granted into effect, but to add an authority beyond the terms of the grant."

(b) *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 659 (1924): "Certainly, an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted."

(c) Because there is no express power to demand consideration for a Section 13(3) extension of credit beyond an interest rate fixed with a view of accommodating commerce and business, the acquisition of equity and voting control here was not incidental to any power; it would be a new power.

**4.5.5**   The law governing national banks confirms that Federal Reserve banks lack incidental authority to acquire shareholder equity in exchange for a Section 13(3) extension of credit.  Even with their broader powers, national banks are not authorized to purchase or deal in the stock of other corporations.

(a) As the Supreme Court held in *California National Bank v. Kennedy*, 167 U.S. 362 (1897): "The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, *nor is it an act which may be exercised as incidental to the powers expressly conferred.*"  *Id.* at 369.

(b)  (emphasis added).  This limitation applies with even greater force to Federal Reserve banks given the comparatively greater power that national banks have to set the consideration for a loan.  *Compare* 12 U.S.C. §§ 343, 357 (requiring Federal Reserve banks to discount only where the extension of credit is fully secured at rates "fixed with a view of accommodating

commerce and business"), *with* 12 U.S.C. § 84 (allowing national banks to lend on an unsecured

basis so long as the total amount of unsecured loans does not exceed 15 percent of the bank's

unimpaired capital and unimpaired surplus).

(c) While interest rates under Section 13(3) must be "fixed with a view of

accommodating commerce and business," there is no such limitation applicable to national banks

in setting interest rates.  This reflects the different purposes that loans by Federal Reserve banks

and commercial banks serve:  "Commercial banks make loans for profit – to all comers and for

all conceivable purposes."  PTX 742 at 18 (HOWARD W. HACKLEY, LENDING FUNCTIONS OF THE

FEDERAL RESERVE BANKS: A HISTORY 2 (1973)).  In contrast, the goal of "accommodating

commerce and business" for Section 13(3) extensions of credit reflects the fact that Federal

Reserve extensions of credit "are made not for profit but for a public purpose" (*Id.*); *see also*

Pls.' Proposed Findings ¶¶ 27.1-27.3.

(d) Federal Reserve banks also have narrower incidental powers than national banks.

While 12 U.S.C. § 341 grants Federal Reserve banks "such incidental powers as shall be

necessary to carry on the business of banking *within the limitations prescribed by this chapter*"

(emphasis added), 12 U.S.C. § 24 grants national banks "all such incidental powers as shall be

necessary to carry on the business of banking."  Yet, even with these greater incidental powers,

the Supreme Court reached its conclusion in *California National Bank* that national banks lack

incidental authority to deal in stock.

(e) *Lucas v. Federal Reserve Bank of Richmond*, 59 F.2d 617 (4th Cir. 1932), relied on by

Defendant, does not support Defendant having incidental authority to deal in stock.  In *Lucas*, the

only question before the Fourth Circuit was whether a reserve bank could take equity *as*

*collateral*.  *See id.* at 620 ("the power to require and accept additional security, either for existing indebtedness or for eligible paper discounted, is a power necessary to carry on properly the business of banking within the limitations of the act, seems too clear to admit of argument.  The fact that the paper taken as additional security is ineligible for discount, ought not and does not preclude its being taken as collateral.").

(f) As *First National Bank v. Converse*, 200 U.S. 425, 438-39 (1906), makes clear, however, the power to take equity as collateral is a distinct power from dealing in equity.  *Id.* at 438-39 ("a national bank may be conceded to possess the incidental power of accepting, in good faith, stock of another corporation as security for a previous indebtedness. It is clear, however, that a national bank does not possess the power to deal in stocks. The prohibition is implied from the failure to grant the power.").  *Lucas*' holding that reserve banks can take equity as collateral therefore has no bearing on whether those banks have the power to deal in stock.  Indeed, the power to deal in stock must be granted independently.  *Id.*

(g) Here, in contrast with *Lucas*, Defendant's conditioning the extension of credit on the provision of shareholder equity and voting control was not for the purpose of providing additional collateral.  Unlike collateral, the equity and voting control were never returned once the loan was paid off, and Defendant retained and profited from its sale of this property (even after its principal amounts outstanding had been fully repaid).  Moreover, the loan was already fully secured by AIG's assets (Pls.' Proposed Findings ¶ 21.0); accordingly, the equity did not provide additional collateral for the loan to AIG and Defendant does not claim otherwise.

(h) As memoranda from the Legal Division of the Board of Governors conclude the Fed "Can't acquire equity" (PTX 336 at 2); "Corporate debt and equity instruments are not included

among in the list of assets that may be acquired under Section 14" of the Federal Reserve Act

(PTX 336 at 1 n.2) and the Federal Reserve is "prohibited from acquiring and holding stock as an

equity kicker in connection with a loan by the Bank, as are commercial banks"  (PTX 370A at 2).

**4.6     The Plain Meaning of Section 13(3) (that the Only Authorized Consideration for a 13(3) Loan Is an Interest Rate Set By the Federal Reserve's Board of Governors) Is Confirmed By the Federal Reserve's Consistent Understanding and Conduct.**

      **4.6.1**     Except for AIG, none of the Federal Reserve's several hundred 13(3) borrowers

has ever been required to surrender equity or voting control.  Pls.' Proposed Findings ¶ 22.0.

      **4.6.2**     Federal Reserve officials and counsel have recognized that Section 13(3)

prescribes an interest rate determined by the Board of Governors as the consideration for a 13(3)

loan.  Pls.' Proposed Findings ¶ 23.2.

**4.7     The Plain Meaning of Section 13(3) is Further Confirmed by the Statute's Legislative History.**

      **4.7.1**     The Court need not go beyond the statute's language.

      (a) Because Section 13(3) unambiguously provides that the only consideration Congress

authorized for a Section 13(3) extension of credit is an interest rate "fixed with a view of

accommodating commerce and business" (12 U.S.C. §§ 343, 357), the Court need not go beyond

that language to discern Congress' intent.  *See, e.g., Chamberlain Grp., Inc. v. Skylink Techs.,*

*Inc.*, 381 F.3d 1178, 1192 (Fed. Cir. 2004) ("If the statute is unambiguous, our inquiry is at an

end; we must enforce the congressional intent embodied in that plain wording.").

      **4.7.2**     If the Court were to go beyond the plain wording of the statute, however, there is

nothing in the legislative history of the Federal Reserve Act or Section 13(3) supporting the

Defendant's broad and unconstrained interpretation of the Federal Reserve's powers.

(a) "In the face of silence in the legislative history, . . . courts are reluctant to broadly interpret the legislation." *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1376 (Fed. Cir. 2003). As the Federal Circuit noted in *Bayer*, the Supreme Court repeatedly has rejected broad interpretations of statutory powers that have no basis in either the text or the legislative history of the statute. *Id.* (citing *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("this Court has been reluctant to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"); *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 356 (1989) (reasoning that "[h]ad Congress contemplated such a result, we would expect to find some discussion of it in the text of the [Act] or its legislative history"); *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 238 (1987) (refusing to adopt an interpretation of a statute, in part, because "[t]here is no hint in these legislative debates that Congress intended" that result)).

**4.7.3**   The Act's legislative history shows that Congress intended the Federal Reserve's powers to be limited, not open ended, and that Congress feared the ability of a powerful central bank to favor or disfavor borrowers at its discretion.

(a) Paul Warburg, one of the architects of the Federal Reserve System and one of the first members of the Federal Reserve Board of Governors, wrote that the

> "framers of the law had constantly to bear in mind that, unless they could satisfy the country that the system proposed would be safe from abuse—by 'interests,' large or small, East, South, or West, or from paper befriended by the politicians— the prejudice against any kind of a central banking system could not, and should not, be overcome. In other words:  the doors to the Reserve System had to be opened wide enough to render the System effective, and closed tight enough to keep danger out." (PAUL M. WARBURG, THE FEDERAL RESERVE SYSTEM: ITS ORIGIN AND GROWTH 287-88 (1930))

**4.8    Defendant's Interpretation of Section 13(3) for Purposes of this Case Is Not Entitled to Deference.**

**4.8.1**    Defendant's interpretation of the Federal Reserve Act as authorizing FRBNY to require that shareholder equity be provided as a condition of a Section 13(3) extension of credit is not entitled to deference under either *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

**4.8.2**    Defendant's interpretation of Section 13(3) as authorizing it to require only AIG to surrender shareholder equity as a condition of receiving an extension of credit during the financial crisis was not the type of deliberative decision intended to have "the force of law" that is entitled to deference under *Chevron*.  *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001).

(a) Defendant's decision was an *ad hoc* decision applicable only to AIG.  *See Eldredge v. Dep't of Interior*, 451 F.3d 1337, 1342 (Fed. Cir. 2006) (no deference to advisory opinion that did not result from delegated authority "to make rules carrying the force of law" and that was not "binding on other parties") (citation omitted).

**4.8.3**    Deference to an administrative interpretation is not applicable where, as here, the statute is clear.

(a) "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009); *see also Bull v. United States*, 479 F.3d 1365, 1376 (Fed. Cir. 2007) (where Congress' intent can be ascertained through "traditional tools of statutory construction," "an agency's alternative interpretation of the statute

21

is not entitled to deference"). Defendant's interpretation – which is contrary to the statute's plain language, structure, and legislative history – is therefore not entitled to deference.

**4.8.4**   Defendant's interpretation of Section 13(3) is not entitled to *Chevron* deference because FRBNY, a governmental instrumentality, not the Board of Governors, determined the form of equity received by Defendant.   Pls.' Proposed Findings ¶¶ 18.1-18.2, 18.6-18.9.

4.8.4.1 FRBNY is a government instrumentality.  *See, e.g., Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist. No. 1, City of Little Rock, Ark.*, 657 F.2d 183, 186 (8th Cir. 1981) ("we hold that the federal reserve banks are instrumentalities of the federal government"), *aff'd*, 455 U.S. 995 (1982); *accord Fed. Reserve Bank of Boston v. Comm'r. of Corp. & Taxation of Commonwealth of Mass.*, 499 F.2d 60, 62 (1st Cir. 1974).

4.8.4.2 Federal instrumentalities are not entitled to *Chevron* deference.

(a) *Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011):  remanding to the district court where "language in its decision implies that it may have deferred to what it believed (mistakenly) was an official opinion of the Federal Reserve Board." *Id.* at 631.  While the Board of Governors may delegate certain of its functions to Federal Reserve banks, nothing in the Federal Reserve Act permits the Board of Governors to delegate to a Reserve bank either the setting of rates or the unprecedented decision to require the surrender of equity.  The "Board and the Federal Reserve Banks are two expressly independent statutory entities" and that the "Board may delegate certain of its functions to Federal Reserve banks, but it may not delegate any of its functions relating to rulemaking or pertaining principally to monetary and credit policies." *Id.* at 632 (internal quotation marks omitted).

**4.8.5**   Defendant's interpretation of Section 13(3) is not entitled to *Chevron* deference because it resulted in the transfer of enormous financial benefit to Defendant.  Pls.' Proposed Findings ¶¶ 37.0-40.0.

(a) "*Chevron* deference may be inappropriate where, as here, (1) the agency has a self-serving or pecuniary interest in advancing a particular interpretation of a statute, *and* (2) the construction by the agency is arguably inconsistent with Congressional intent."  *Amalgamated Sugar Co. v. Vilsack*, 563 F.3d 822, 824 (9th Cir. 2009).

**4.8.6**   Defendant's interpretation of Section 13(3) is not entitled to *Chevron* deference because it is inconsistent with its prior interpretations of Section 13(3).

(a) Defendant's interpretation of the scope of its authority in this litigation is inconsistent with its admissions concerning the scope of its authority at the time it provided a loan to AIG (Pls.' Proposed Findings ¶ 23.1) and the Federal Reserve's prior interpretation of its authority as set forth in the circulars issued just after the enactment of section 13(3).  *See* 1932 Circular, 18 Fed. Reserve Bulletin 473, 518-20 (Aug. 1932) (stating that Section 13(3) loans "may be made only at rates established by the Federal reserve banks, subject to review and determination by the Federal Reserve Board"); 1936 Circular, 22 Fed. Reserve Bulletin 71, 123-25 (Feb. 1936) (same).

(b) "[W]here an agency's 'interpretation is inconsistent with its prior analysis in similar situations without any acknowledgement of the fact, or cogent explanation as to why,' the 'result reached by the agency is impermissible under the second prong of *Chevron*.'"  *Gen. Motors Corp. v. Nat'l Highway Traffic Safety Admin.*, 898 F.2d 165, 174 (D.C. Cir. 1990) (quoting *King Broad. Co. v. F.C.C.*, 860 F.2d 465, 470 (D.C. Cir. 1988)).

**4.8.7**   Defendant's interpretation of Section 13(3) is not entitled to *Skidmore* deference because it was an *ad hoc* decision lacking thoroughness and consistency with prior interpretations.

(a) *Skidmore* deference depends on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

(b) As explained above, Defendant's interpretation of its authority under Section 13(3) was an *ad hoc* decision with no formal analysis and was inconsistent with prior agency interpretations.  In addition, Defendant's decision to take or exact AIG shareholders' equity as a condition of extending credit lacked a procedure "tending to foster the fairness and deliberation that should underlie a pronouncement" having the force of law.  *See Mead*, 533 U.S. at 230 (where there was no procedure "tending to foster the fairness and deliberation that should underlie a pronouncement" having the force of law, no deference to differential treatment would be granted).  Defendant did not, for example, provide notice and solicit comments on its power to take equity in AIG or companies more generally.  In addition, there was no adjudicative body or statutory function that would permit the imposition of a term requiring equity as a condition of providing an extension of credit.   There were likewise no statutory or regulatory guidelines or even internal policy manuals that would ensure the fairness of FRBNY's or the Board of Governors' imposition of punitive measures upon a recipient of a 13(3) extension of credit.

(c) Defendant's interpretation of the scope of its authority is thus not entitled to any deference under *Skidmore*.  *See, e.g., Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1340 (Fed. Cir. 2006) (no *Skidmore* deference where agency interpretation did not reflect a careful

analysis of statutory issue, consistency in interpretation, agency-wide policy, or a reasonable construction of the statute); *White & Case LLP v. United States*, 89 Fed. Cl. 12, 23 (2009) (no *Skidmore* deference to agency opinion that lacked thoroughness and was inconsistent with earlier practice).

**4.9   Defendant Has Incorrectly Argued that Its Interpretation of Section 13(3) Has Been Ratified by Congress in Subsequent Legislation.  *See* Def.'s Proposed Pre-Trial Conclusions of Law ¶¶ 139-143.**

**4.9.1**   Defendant's reliance on legislation enacted more than seventy-five years after the enactment of Section 13(3), and two years after it extended credit to AIG conditioned on the surrender of 79.9 percent of AIG's shareholders' equity, as support for its interpretation of Section 13(3), disregards the Supreme Court's admonition that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."  *Marvin M. Brandt Revocable Trust v. United States*, 134 S. Ct. 1257, 1268 (2014) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)); *see also Bilski*, 561 U.S. at 645 (Stevens, J., concurring in judgment) ("When a later statute is offered as 'an expression of how the . . . Congress interpreted a statute passed by another Congress . . . a half century before,' 'such interpretation has very little, if any, significance'") (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)).

**4.9.2**   Even if legislation enacted by Congress more than seventy-five years after the enactment of Section 13(3) could somehow have a bearing on what a different Congress intended when it enacted Section 13(3), the statutory provisions Defendant cites do not support, let alone ratify, Defendant's interpretation of Section 13(3).

(a) The first provision Defendant relies on is a reporting provision in the Emergency Economic Stabilization Act ("EESA") (12 U.S.C. § 5235(a)); it does not purport to define the

scope of the Federal Reserve's authority, even as to future loans.  By its terms, a mandatory

reporting provision establishes only that Congress wanted reports – not that it authorizes

particular conduct, much less expresses Congress' considered view as to what a prior Congress

intended 75 years earlier when it enacted Section 13(3).  Further, the reporting requirement was a

minor part of emergency legislation enacted on an expedited basis that was focused on defining

the powers of the Secretary of the Treasury, not the Federal Reserve, to deal with the worst

financial crisis since the Great Depression.

(b) The other provisions Defendant relies on, reporting provisions that are part of the

Dodd-Frank Act, likewise provide no guidance as to what Congress intended when it enacted

Section 13(3).  Specifically, Defendant relies on provisions addressing reporting requirements

for Section 13(3) liquidity assistance *after* the passage of Dodd-Frank, which limit assistance

only to participants in a "program or facility with broad-based eligibility" established with "the

prior approval of the Secretary of the Treasury" and only according to "policies and procedures"

that the Board must establish "in consultation with the Secretary of the Treasury."  12 U.S.C. §

343(3)(A), (B)(i), (iv)(2012).  Nothing in these provisions supports the unconstrained authority

claimed by Defendant to make individual, *ad hoc* decisions to punish a borrower's shareholders

as a condition of Section 13(3) liquidity assistance.[2]

**4.9.3**   In fact, the Economic Emergency Stabilization Act ("EESA") strictly limited

Defendant's authority to take equity in exchange for capital under the Troubled Asset Relief

Program ("TARP").  EESA authorized the Secretary of Treasury to acquire stock or warrants in

---

[2] Moreover, none of the broad-based eligibility programs established during the financial crisis required participants to provide equity to the Federal Reserve, except as collateral, which was returned when the loan principal was paid off.  *See* Pls.' Proposed Findings ¶¶ 22.0, 32.2.5.

exchange for assistance provided pursuant to EESA, but directed that the Secretary "receive nonvoting common stock or preferred stock" or "voting stock with respect to which, the Secretary agrees not to exercise voting power." (12 U.S.C. § 5223(d)(1)).

**4.9.4**   In addition, Congress expressly provided that Defendant was to respect refusal by a borrower's shareholders to approve increases to the number of authorized shares, directing that Defendant acquire senior debt instead of equity if insufficient authorized equity was available. (12 U.S.C. § 5223(d)(2)(F)).  Defendant's litigation position that EESA authorized taking full voting control of a private corporation is contradicted by its own contemporaneous understanding that Congress "precluded the Secretary of the Treasury from receiving any immediately voting equity interests" and that: "In the past lending programs, the Government's equity interest has always been nonvoting or limited voting while in the hands of the Government."  (PTX 370 at 2).

## 4.10   The Federal Reserve's Lack of Authority to Demand Equity Is Consistent with the Purpose of a Lender of Last Resort Which Is to Aid Citizens Suffering from a Financial Crisis, Not to Make a Profit.

**4.10.1**   The plain language of Section 13(3) makes clear that its purpose is "accommodating commerce and business" (12 U.S.C. §§ 343, 357), and not earning a profit.

**4.10.2**   The legislative history of the Federal Reserve Act confirms it was the intent of Congress that "because the authorities in charge of it are not hampered by commercial motives . . . , they will be able to do the work without any of the interfering considerations of private profit which frequently prevent the operations of a central banking institution from being carried on solely in the public interest."  Changes in the Bankruptcy and Currency System of the United States, H.R. Rep. No. 63-69, at 30 (1913).

**5.0**

**EVEN IF THE FEDERAL RESERVE BOARD OF GOVERNORS HAD AUTHORITY TO DEMAND EQUITY AS A CONDITION OF EXTENDING CREDIT UNDER SECTON 13(3), FRBNY LACKED AUTHORITY TO CHANGE THE TERMS APPROVED BY THE FEDERAL RESERVE BOARD OF GOVERNORS.**

**5.1   The Only Consideration Authorized for a Section 13(3) Extension of Credit Is A "Rate," and Such Rate Must Be Approved "by the affirmative vote of not less than five members" of the Board of Governors.  12 U.S.C. § 343;** *see also* **12 C.F.R. § 201.4(d).**

**5.1.1**   Here, the requirement of an "affirmative vote of not less than five members" of the Board of Governors meant that the vote had to be unanimous because only five Governors had been appointed (Bernanke: Trial Tr. 2110:23-2112:2).

**5.2   The Federal Reserve Board of Governors Is The Only Governmental Entity with Authority to Approve the Terms of a Section 13(3) Extension of Credit.  12 U.S.C. § 343.**

**5.2.1**   Although the Board of Governors may delegate its authority under certain circumstances (12 U.S.C. § 248(k)), none of those circumstances applied to establishing the terms of the 13(3) loan to AIG.

**5.2.2**   Moreover, delegation of authority can take place only "by published order or rule" (*id.*), and there was no published order or rule delegating authority to FRBNY to determine the form of consideration it receives for a 13(3) extension of credit.

**5.2.3**   12 C.F.R. § 201.4, the published order that addresses FRBNY's use of its 13(3) authority, does not delegate to FRBNY  or any other Federal Reserve bank the authority to determine the form of consideration received for 13(3) extensions of credit.  On the contrary, it specifies that the consideration received will be "a rate above the highest rate in effect for advances to depository institutions."  12 C.F.R. § 201.4 (d).  And any discretion the Federal

28

Reserve banks have to determine what that rate will be is further limited by the requirement that

the banks can only extend 13(3) credit "after consultation with the Board of Governors."  *Id.*

**5.3    The Only Term Sheet Approved by the Board of Governors Was Approved on September 16, 2008 and Provided, As A Condition of Receiving Liquidity Assistance, that Defendant Would Receive "Warrants for the purchase of common stock of AIG representing 79.9% of the common stock of AIG on a fully-diluted basis."  Pls.' Proposed Findings ¶¶ 12.1-12.2.**

**5.4    The Warrants Approved by the Board of Governors Were Materially Different from the Voting Convertible Preferred Shares in the Credit Agreement that FRBNY Presented to AIG.  *See, e.g., Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1360 (Fed. Cir. 2008) (Changes Are "material" If a Reasonable Person "would have considered" Them "important" in Arriving at a Decision).**

 **5.4.1**    The warrants approved by the Board of Governors did not provide Defendant

immediate voting control, were "subject to Shareholder Approval," and required the payment of

an exercise price of at least $29 billion for a 79.9 percent equity interest in AIG.  Pls.' Proposed

Findings ¶¶ 12.2.2-12.2.3.

 **5.4.2**    In contrast, the voting preferred shares contained in the Credit Agreement that

FRBNY presented to AIG provided for immediate voting control on all issues except

amendments to the AIG Charter, did not require shareholder approval, and did not require the

payment of any exercise price.  Pls.' Proposed Findings ¶¶ 17.3-17.4, 17.6-17.9.

 **5.4.3**    A reasonable person would consider such terms materially changed.  Pls.'

Proposed Findings ¶¶ 17.0(a)-(b), 17.2, 17.5.

**6.0**

**IN ANY EVENT, THE FEDERAL RESERVE WAS NOT AUTHORIZED TO DEMAND EQUITY AND VOTING CONTROL FOR PUNITIVE OR POLITICAL PURPOSES.**

**6.1     At the Time It Provided Section 13(3) Liquidity Assistance to AIG, Defendant Justified the Taking or Illegal Exaction of Plaintiffs' Equity as a Condition Necessary to Punish AIG Shareholders (Pls.' Proposed Findings ¶ 26.2), Concluding It Was Important to be Harsh for Political Purposes to Secure Congress' Passage of the Emergency Economic Stabilization Act.  *Id.* ¶ 26.2.2.**

**6.2     There Was, However, No Statutory Authority for Defendant to Take Punitive Actions Against AIG Shareholders.**

     **6.2.1**     The Federal Reserve Act's sole statutory limitation in setting rates for 13(3) extensions of credit is to set such rates "with a view of accommodating commerce and business." 12 U.S.C. § 357.  Setting terms for credit extensions with a view of  punishing the borrower's shareholders rather than "accommodating commerce and business" is contrary to the powers expressly granted by Congress.

     **6.2.2**     While, during the financial crisis, Defendant provided hundreds of financial institutions 13(3) liquidity assistance without imposing punitive conditions on either those institutions or their shareholders, with respect to AIG, Defendant deviated from the powers expressly granted by Congress by imposing terms designed to punish AIG and its shareholders.

**6.3     In 2008, Neither the Federal Reserve Board Nor FRBNY Had Any Regulatory or Internal Guidelines for Deciding When Taking Punitive Action Was Appropriate.  Pls.' Proposed Findings ¶ 29.0.**

**7.0**

**EVEN IF THE FEDERAL RESERVE WERE AUTHORIZED TO DEMAND EQUITY AND VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN, IT WAS NOT AUTHORIZED TO DO SO DISCRIMINATORILY WITHOUT ANY ARTICULATED STANDARDS.**

**7.1    The Plain Language of 13(3) Requires That the Federal Reserve Treat Borrowers in a Non-Discriminatory Manner.**

**7.1.1**    Congress provided that once the Federal Reserve concluded a 13(3) loan was appropriate, the consideration for a 13(3) loan was to be "rates established in accordance with the provisions of section 357" (12 U.S.C. § 343).

**7.1.2**    Section 357 requires that such rates must be for a "class of paper" (12 U.S.C. § 357).  There is no authorization for discriminating based on the identity of the borrowers, the nature of the borrower's business, or whether or not the loan is part of a broad-based program.

**7.1.3**    Section 357 also requires that such rates "shall be fixed with a view of accommodating commerce and business" (12 U.S.C. § 357).  Again, there is no authorization to discriminate based on the identity of the borrower, the nature of the borrower's business, or whether or not the loan is part of a broad-based program.

**7.1.4**    Even assuming that "rates" could somehow include a demand for equity and voting control, there is no congressional authorization to discriminate among borrowers in the consideration required.

**7.2    The Federal Reserve Itself Recognized By Word and Action that Section 13(3) Did Not Authorize It to Discriminate Among Borrowers In the Consideration Required.**

**7.2.1**    None of the 13(3) borrowers during the 1930s, and none of the 13(3) borrowers in 2008-2009, except AIG, was required to surrender its shareholders' equity or voting control as a

condition of gaining access to federal sources of credit.  *See* Pls.' Proposed Findings ¶¶ 22.0, 32.2.5.

**7.2.2**   Federal Reserve officials and counsel have expressly recognized that 13(3) did not authorize it to discriminate among borrowers.

(a) Geithner:  Once a borrower meets the requirements for lending under Section 13(3), "there is no other distinction among potential borrowers."  (Trial Tr. 1888:12-18).

(b) Geithner:  "under Section 13(3), unlike some of its other sections that relate particularly to banking institutions, the Federal Reserve could make credit available to any individual, partnership or corporation" that satisfied the conditions for lending, and "Section 13(3), assuming that the other conditions are satisfied, does not distinguish between what kind of individual, partnership or corporation is being loaned to".  (Trial Tr. 1456:5-18).

**7.3    Because 13(3) Extensions of Credit Are Available Only When A Borrower Is "Unable to Secure Adequate Credit" Elsewhere, The Lender of Last Resort by Definition Has Monopoly Power Over Such Borrowers.**

**7.3.1**   Section 13(3) neutralizes the potential for misuse of the lender of last resort's monopoly power in providing credit to non-banks by limiting the consideration that may be sought by Federal Reserve banks for providing such credit.

(a) As this Court has held, "the 'only consideration for a loan prescribed by' Section 13(3) 'is an interest rate subject to the determination of the Board of Governors.'"  *Starr Int'l Co., Inc.*, 107 Fed. Cl. at 378 (quoting *Starr Int'l Co.*, 106 Fed. Cl. at 85).

(b) In addition, the regulation governing "terms of credit" for Section 13(3) extensions of credit in effect in September 2008 authorized only the charging of interest and did not authorize the Federal Reserve to acquire equity or seek other consideration.  *See* 12 C.F.R. § 201.4.

32

**7.4    Discriminating Among Borrowers in Terms of the Type of Consideration Required for 13(3) Extensions of Credit Is Also Inconsistent with the Accepted Obligations of a Lender of Last Resort Exercising Its Monopoly Power.**

(a) "By accepting good collateral from any source whatsoever, the lender of last resort avoids favoritism and the channeling of aid to privileged borrowers."  (Cragg: Trial Tr. 5467:20 – 5469:15 (internal quotation marks omitted)).

(b) "13(3) is extending the discount window to nonbanks, and the way the discount window works and was intended to work is that collateral was being provided through a frosted glass.  So, you wouldn't know the identity of the borrower.  That was to ensure that there was nondiscrimination that was happening, as well as to remove a process of kind of picking winners and losers and then discriminating across the interest rates that were being charged."  (Cragg: Trial Tr. 5226:19-5227:3).

(c) "So long as collateral is posted, the actual circumstances of a particular borrower shouldn't matter."  (Cragg: Trial Tr. 5467:13-19).

**7.5    The Legislative Policy and History of the Federal Reserve Act Confirm That the Federal Reserve Is Not Authorized to Single Out A Borrower to Require the Provision of Shareholder Equity As a Condition of a Section 13(3) Extension of Credit.**

**7.5.1**    The concern that led to expressly limiting the power of the Federal Reserve was driven by a fear – realized under the prior Second Bank of the United States – that a centralized, unaccountable bank could discriminate amongst borrowers, favoring the politically powerful and abandoning the politically weak.  *See, e.g.,* S. Rep. No. 63-133, Pt. 2, at 106 (1913).

**7.5.2**    One of the purposes of the original Federal Reserve Act was to address the problem of "unjust discrimination" among banks.  *See* H.R. Rep. No. 62-1593, at 109 (1913).

(a) Members of Congress expressed the view that "concerns in this country that were good have been blacklisted, so far as credit was concerned" and that this had "resulted in the financial failure of concerns that were financially sound" (51 Cong. Rec. 843 (1913)).

(b) In order to further "prevent discrimination," a proposal was made in 1913 to have Congress specify how the interest charged for a Federal Reserve loan to banks would be set (S. Rep. No. 63-133, Pt. 3, at 4 (1913)).  This proposal was not adopted in 1913.   However, in 1932, Congress adopted a provision requiring that the consideration for a 13(3) loan be a rate "fixed with a view of accommodating commerce and business" (12 U.S.C. § 357).

(c) Similarly, in 1913, in order to further "prevent favoritism," a proposal was made to have Congress limit loans to a bank "twice its capital stock" (S. Rep. No. 63-133, Pt. 3, at 4 (1913)).  The proposal also was not adopted in 1913.  However, in 1932, Congress did adopt a provision requiring that 13(3) borrowers be able to provide adequate security for their loans (12 U.S.C. § 343).

(d) Here, in requiring the surrender of Plaintiffs' equity as consideration for the extension of credit to AIG, Defendant singled out AIG for punitive treatment. Pls.' Proposed Findings ¶¶ 26.2, 32.0.  This was contrary to the clear congressional intent not to discriminate against particular borrowers.  *See, e.g.*, S. Rep. No. 63-133, Pt. 2, at 106 (1913) ("We condemn the present methods of depositing Governmental funds in a few favored banks, largely situated in or controlled by Wall Street, in return for political favors, and we pledge our party to provide by law for their deposit by competitive bidding in the banking institutions of the country, national and State, without discrimination as to locality, upon approved securities and subject to call by the Government.").

**7.5.3**   The purpose of the 1932 legislation that amended the Federal Reserve Act to add Section 13(3) was to assist individuals and businesses who were "unable to obtain funds upon reasonable terms through banking channels."  H.R. Rep. No. 72-1760, at 3 (1932) (Conf. Rep.).

**7.5.4**   The legislative history of Section 13(3) shows an express rejection of blank check lending authority and adoption of specific requirements for the exercise of the Federal Reserve's lender of last resort lending.

(a) The original act passed by Congress on July 6, 1932 gave the power to make such loans to the Reconstruction Finance Corporation without any limits on the terms of such loans or when such loans could be made other than the requirement that the borrower be unable to obtain funds upon reasonable terms through banking channels (H.R. Rep. No. 72-1760, at 3 (1932) (Conf. Rep.)).

(b) On July 11, 1932, the President vetoed the original act because it gave the Reconstruction Finance Corporation such unlimited discretion that it in effect "would place the Government in private business."  H.R. Doc. No. 72-360, at 3-4 (1932).

(c) Congress then revised the bill to provide that the loans be made by the Federal Reserve and that:

(i)   The loans could only be made where there were "unusual and exigent circumstances," where the borrower could furnish adequate security, where the borrower could not secure adequate credit from other sources, and where five members of the Board of Governors approved the loan (12 U.S.C. § 343); and

(ii)   The consideration for the loans would be limited to an interest rate "fixed with a view of accommodating commerce and business".  12 U.S.C. §§ 343, 357; H.R. Rep. No. 72-1777, at 7 (1932) (Conf. Rep.); 75 Cong. Rec. 14981 (1932).

(d) The specific limitations on the Federal Reserve's authority were the subject of specific negotiations between House and Senate Conference Committee members:

> "The Senate amendment contained a provision permitting the Federal Reserve Board, upon affirmative vote of not less than five members, to authorize the Federal reserve banks to discount for any individual or corporation paper eligible for discount for member banks under the Federal reserve act if such paper was indorsed and otherwise secured to the satisfaction of the Federal reserve banks. This authority was limited to a period of two years and the discounts were to be made only in unusual and exigent circumstances and where the individual or corporation was unable to secure adequate accommodations from other banking institutions.  It was also provided that no paper so discounted should be eligible as collateral security for Federal reserve notes.  There is no similar provision in the House amendment.  The bill as agreed to in conference retains the substance of the Senate provision but extends the discount privilege to partnerships as well as individuals and corporations, removes the two year limitation and eliminates the provision that the paper so discounted should not be eligible as collateral security for Federal reserve notes."  (H.R. Rep. No. 72-1777, at 19-20).

## 8.0

## VOLUNTARINESS IS NOT A DEFENSE WHEN THE GOVERNMENT REQUIRES A CITIZEN TO SURRENDER PROPERTY THE GOVERNMENT IS NOT AUTHORIZED TO DEMAND.

(a) In *Suwannee S.S. Co. v. United States*, 279 F.2d 874 (Ct. Cl. 1960), for example, the Maritime Administrator required payment for a fee it was not authorized to require under the Merchant Marine Act in exchange for the Administrator's approval to sell ships to a foreign purchaser.  The plaintiff agreed to pay the fee in order to receive the permission.  *Id.* at 874-75. When the plaintiff sued the Administrator for requiring the payment of the fee, the Administrator asserted, in response, that the payment of the fee was voluntary.  *Id.* at 877.  The court rejected

the Administrator's voluntary payment defense not because there was a question as to voluntariness but because, under the applicable statutory provision, it was clear that the Administrator lacked authorization to tie the payment of a fee to the approval sought. *Id.*; *see also Clapp*, 117 F. Supp. at 581-82 (holding that a plaintiff was not estopped by its payment of an illegal fee imposed by the Maritime Administration for permission to sell plaintiff's ship to a foreign owner).

(b) Here, the benefit AIG sought was Section 13(3) liquidity assistance. The requirement imposed by Defendant was the surrender of Plaintiffs' equity and voting control. But, as in *Suwannee*, the Board lacked authority to impose this requirement (even had it approved it, which it did not). The Federal Reserve Act expressly sets forth the consideration authorized by Congress for Section 13(3) liquidity assistance: an interest rate determined by the Federal Reserve Board of Governors, which shall be "fixed with a view of accommodating commerce and business." 12 U.S.C. §§ 343, 357 (2006).

**8.1    Voluntariness Has Been Accepted as a Viable Defense Only In A Narrow Set of Exactions Cases Involving A Mutual Mistake of Law With Regard to How Much – Not Whether – the Government Is Entitled to Charge or Take and No Clear Congressional Purpose Would Be Defeated by Permitting the Claim.**

**8.1.1**    In arguing that voluntariness is a defense, Defendant has relied primarily on the Supreme Court's decision in *United States v. Edmonston*, 181 U.S. 500 (1901). But the narrow holding in *Edmonston* establishes voluntariness as a defense only where there is a mutual mistake of law with regard to the calculation of how much – not whether – the Government is entitled to charge or take, *and* where there is no clear congressional purpose that would be defeated by the assertion of such a defense.

37

(a) In *Edmonston* the plaintiff paid the United States $2.50 per acre for land even though the statutory sale price was $1.25 per acre. The Supreme Court held that the plaintiff was not entitled to the amount of overpayment because "the transaction was purely voluntary on [the plaintiff's] part, and that while there was a mistake it was mutual and one of law, a mistake on his part not induced by any attempt to deceive or misrepresentation by the government officials." 181 U.S. at 515.

(b) Additionally: "In the *Edmonston* case, the Supreme Court did not find a Congressional purpose that land should be sold at the prices fixed by statute sufficiently strong to overcome the general legal doctrine relating to voluntary payments made under mistake of law. If it had found such a congressional purpose, it would, no doubt, have given effect to it." *Sprague S.S. Co. v. United States*, 145 Ct. Cl. 642, 647 (1959).

(c) The Court was also concerned that litigating "the mere fact of a supposed mistake in the fees charged or the price collected" by one of the "many thousands of officers" administering the statute would lead to courts being "flooded with a multitude" of actions related to mistaken fees or prices that would overwhelm the docket. *Edmonston*, 181 U.S. at 503-04, 514.

**8.1.2**   In exactions cases like this one, where Plaintiffs argue that the Government lacked any authority to demand the type of consideration sought by the Government as a condition of receiving a discretionary benefit, voluntariness has never been a defense.

**8.2    Subsequent to Edmonston, Numerous Cases Have Found Illegal Exactions Where Citizens Have Voluntarily Paid Money to the Government as a Result of a Demand the Government Was Not Authorized to Make.**

(a) *American Airlines Inc. v. United States*, 551 F.3d 1294, 1302 (Fed. Cir. 2008) (user fees that passengers were supposed to pay but defendant was charging to airline when passengers

38

failed to pay the fee was a recoverable illegal exaction despite airline's failure to protest initial payments of the fee):  "Failure to challenge an improper agency action does not ratify such actions or insulate it from later objections and litigation."

(b) *Alyeska Pipeline Serv. Co. v. United States*, 624 F.2d 1005 (Ct. Cl. 1980) (unauthorized fee imposed on, and paid by, plaintiff as a condition of obtaining a right-of-way agreement for a pipeline permit was an illegal exaction).

(c) *Finn v. United States*, 428 F.2d 828, 831 (Ct. Cl. 1970) (wage garnishments made to recover moving costs of former-FBI agent were an illegal exaction under the relevant statute even though the plaintiff's contract with the FBI permitted recovery of these costs): "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest."

(d) *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970) (permitting recovery of losses suffered by plaintiff from defendant's refusal to consider errors made in plaintiff's initial bid as defendant was required to by regulation although both parties signed and performed the contract with these errors knowing of the bidding mistake): "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest."

(e) *Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967) (imposition of a fee charged to, and paid by, plaintiff to obtain the legally required permission to sell two ships to a foreign purchaser was an illegal exaction even though the payment was made without protest).

(f) *United States v. Best Foods, Inc.*, 47 C.C.P.A. 163, 170 (1960) (determining that an additional fee on imported peanuts imposed by presidential proclamation imposing the fee and quota on peanuts, which the plaintiff paid and complied with, was an illegal exaction).

(g) *Suwannee S.S. Co.* v. *United States*, 279 F.2d 874, 877 (Ct. Cl. 1960) (holding that the imposition of a fee charged to, and paid by, plaintiff  to obtain the legally required permission to sell two ships to a foreign purchaser was an illegal exaction even though the payment was made without protest): "We discussed a similar contention, and the applicability of *Edmonston* to such a situation, in *Sprague Steamship Co. v. United States*, [172 F. Supp. 674 (1959)], and concluded that, in order to give effect to the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A. Appendix, §§ 1735 et seq., the doctrine of voluntary payment should not be applied."

(h) *Sprague S.S. Co. v. United States*, 172 F. Supp. 674 (Ct. Cl. 1959) (permitting recovery for overpayment by plaintiff that occurred as a result of defendant's misapplication of a statutory formula for the price of a ship even though the plaintiff did not protest at the time it paid the bill sent by defendant).

(i) *Eversharp Inc. v. United States*, 129 Ct. Cl. 772 (1954) (plaintiff stated a claim for an illegal exaction where the defendant withheld a tax refund based on an interest rate on taxes owed that was two percent above the permissible rate).

(j) *Clapp v. United States*, 117 F. Supp. 576, 582 (Ct. Cl. 1954) (the imposition of a fee charged to, and paid by, plaintiff to the Maritime Administration for the legally required permission to sell a ship was an illegal exaction): "We find it hard to imagine a case where the Government can take a citizen's money, by refusing him something to which he is entitled, and

then keep the money on the ground of estoppel. This defense is beneath the dignity of the Government."

(k) *O'Bryan v. United States*, 93 Fed. Cl. 57 (2010) (plaintiff stated an illegal exaction claim for the return of grazing fees paid by plaintiff for particular land, where defendant required payment of the fee, even though it also prohibited plaintiff from using the land contrary to the relevant regulation).

(l) *Bautista-Perez v. Mukasey*, No. C 07-4192 TEH, 2008 WL 314486 (N.D. Cal. Feb. 4, 2008) (plaintiffs stated a claim for an illegal exaction for the return of duplicative  biometric services fees paid by defendant to a class of aliens that had paid the fee).

(m) *Continental Airlines, Inc. v. United States*, 77 Fed. Cl. 482 (2007) (user fees that passengers were supposed to pay but defendant was charging to airline when passengers failed to pay the fee was an illegal exaction).

(n) *PSI Energy Inc. v. United States*, 411 F.3d 1347 (Fed. Cir. 2005) (plaintiffs could recover a special assessment imposed on them for enriching uranium to produce electricity even though the plaintiffs had sold their stock of such fuel to other utility companies because the assessment was intended to be paid by the user of the fuel only).

(o) *Aerolineas Argentinas v United* States, 77 F.3d 1564 (Fed. Cir. 1996) (expenses paid by airlines at the direction of immigration authorities for housing aliens seeking political asylum were illegal exactions because the defendant was required by law to pay those expenses).

(p) *Lancashire Shipping Co. v. United States*, 4 F. Supp. 544 (S.D.N.Y. 1933) (plaintiff was entitled to return of a fine imposed on, and paid by, plaintiff that the Government was not

authorized to collect from the plaintiff, notwithstanding the Government's argument that the fine was paid voluntarily).

(q) *James Shewan & Sons v. United States*, 73 Ct. Cl. 49 (1931) (holding that defendant's underpayment of a contract was an unlawful exaction even though the plaintiff had signed a settlement under protest).

(r) *Star Motor Co. of Cal. v. United States*, 71 Ct. Cl. 348 (1930) (an excise tax charged by defendant on plaintiff's cars was unauthorized and thus an illegal exaction).

**8.3    No Court Has Ever Rejected an Illegal Exaction Claim on Grounds of "Voluntariness" Where the Government Was Demanding Consideration It Was Not Authorized to Demand, as Opposed to Where There Was Merely a Mistake in Calculating the Amount of a Payment.**

**8.4    If Voluntariness Were A Defense Where the Government Conditioned the Provision of a Discretionary Benefit on a Citizen's Surrender of Money or Property the Government Was Not Authorized to Demand, Such Unauthorized Conduct Would Evade Review.**

(a) As *Suwannee* shows, illegal exactions occur when the Government has demanded property it is not entitled to demand in exercising statutorily authorized powers, thereby causing recipients of discretionary benefits to surrender money or property that the Government has no authority to demand.  The private party agrees to the condition notwithstanding the absence of government authorization to impose it because of the unequal bargaining power the Government has as the sole provider of the benefit sought (*e.g.,* no one other than the Administrator could give the plaintiffs permission to sell the ships in *Suwannee*).  Consequently, the private party is forced to agree to the Government's demand for money or property it is not otherwise allowed to obtain because, in most if not all cases, the value of the government benefit to the private party exceeds the value of the money or property that the Government demands.

(b) To leave such plaintiffs without recourse would grant the Government a license to demand a citizen's money or property without regard to the legality of such demand.  As the Federal Circuit has held, however, acceptance of a discretionary benefit in these circumstances "does not ratify such action or insulate it from later objection and litigation."  *Am. Airlines, Inc.*, 551 F.3d at 1302 (citing *Swift & Courtney & Beecher Co. v. United States*, 111 U.S. 22, 29 (1884)); *see also Cal. Or. Power Co. v. Fed. Power Comm'n*, 239 F.2d 426, 434 (D.C. Cir. 1956) ("'The regulated corporation, by accepting such an invalid condition imposed by a regulatory authority, does not thereby waive the right to rely on the statute, and the right later to denounce the provision which contravenes it.'") (quoting *Peoples Bank v. Eccles*, 161 F.2d 636, 644 (D.C. Cir. 1947), *rev'd on other grounds*, 333 U.S. 426 (1948)).

**8.5   In Any Event, Plaintiffs Did Not Voluntarily Agree to the Exaction of Their Equity and Voting Control (*see* Pls.' Proposed Conclusions ¶ 12.0 below).**

## C.   TAKINGS CLAIM

### 9.0

### THE FIFTH AMENDMENT PROHIBITS THE TAKING OF PRIVATE PROPERTY "FOR PUBLIC USE, WITHOUT JUST COMPENSATION."   U.S. CONST., AMEND. V.

**9.1**   **"The Fifth Amendment's guarantee that private property shall not be taken for use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *accord Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).**

**9.2**   **"When evaluating whether government action constitutes a taking, a court employs a two-part test.  First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking.  Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that property interest."  *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011).**

### 10.0

### PLAINTIFFS' EQUITY IN AIG, AND THE RELATED VOTING RIGHTS, CONSTITUTE PROTECTABLE FIFTH AMENDMENT PROPERTY INTERESTS.

**10.1  Protectable Property Interests Are Determined by Reference to State Law.**

(a) As the Supreme Court has held, protectable property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (quotations omitted); *see also Klamath Irrigation Dist.*, 635 F.3d at 519 (remanding to trial court for a determination based on Oregon law "on a case-by-case, basis of any outstanding property interest questions").

**10.2   The Most Significant Property Rights Are the Rights to Possess, Dispose of, and Exclude.**

**10.2.1**   Property "consists of 'the group of rights which the so-called owner exercises in his dominion of the physical thing,' such 'as the right to possess, use and dispose of it.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 170 (1998) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (same).

**10.2.2**   The right to exclude is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Loretto*, 458 U.S. at 433 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

**10.3   The Fifth Amendment Protects Intangible Property Interests.**

**10.3.1**   "Courts have long-recognized that the protections of the Takings Clause apply to intangible property, in addition to real and personal property." *Starr Int'l Co.*, 106 Fed. Cl. at 72 (citing *Ruckelshaus*, 467 U.S. at 1003).

**10.3.2**   Courts weigh a variety of factors in determining whether a protectable property interest exists, including whether the interest is assignable or transferable, or can form the *res* of a trust. *Ruckelshaus*, 467 U.S. at 1002.

**10.4   A Public Shareholder's Interest in the Economic Value and Voting Power of the Shareholder's Stock is a Protectable Property Interest.**

**10.4.1**   When a claim is based on the exercise of "control over the corporate machinery to cause an expropriation of economic value and voting power from the public shareholders," "a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action." *Gatz v. Ponsoldt*, 925 A.2d 1265, 1281 (Del. 2007).

(a) *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 330 (Del. 1993):  "a claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim."

(b) *Gentile v. Rossette*, 906 A.2d 91, 102 n.26 (Del. 2006):  "In *Tri-Star*, this Court articulated the harm to the minority in terms of a 'dilution' of the economic value and voting power of the stock held by the minority.  In this case, we adopt a more blunt characterization – extraction or expropriation – because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power . . . and the uniqueness of the resulting harm to the minority shareholders individually."

**10.4.2**  *Gatz* and *Rossette* control to the extent the Government was in control of AIG, either as a controlling lender or otherwise, at the time it acquired the right to the Series C Voting Preferred Stock.

**10.4.3**  Moreover, while *Gatz* and *Rossette* involved breach of fiduciary duty rather than takings claims, and Defendant was not yet a stockholder at the time it obtained the right to the Series C Preferred Stock, as the Court previously held those cases "support Starr's right to maintain a direct claim for the taking of its equity and voting interests" (*Starr Int'l Co.*, 106 Fed. Cl. at 65).  While the controlling status of the shareholders in *Gatz* and *Rossette* is what gave rise to a fiduciary obligation to minority shareholders, here Defendant had a preexisting duty under the Fifth Amendment not to take property for a public purpose without providing just compensation.  As this Court earlier held:

> "[T]he Court is persuaded that the facts alleged here are sufficiently analogous to those in *Gatz* and *Rossette* to support Starr's right to maintain a direct claim for the taking of its equity and voting interests.  Whether styled as a taking claim or a breach of fiduciary duty claim, the Plaintiffs here, like those in *Gatz* and *Rossette*, seek compensation for the improper extraction of the economic value and voting power associated with their shares of stock.  In *Gatz* and *Rossette*, it was

46

important that a controlling shareholder existed because only then did a fiduciary duty to the minority shareholders arise. . . .   Here, however, the Government has a preexisting duty under the Fifth Amendment not to take private property for public use without paying just compensation.  As in *Gatz* and *Rossette*, the Government had an obligation not to appropriate the minority shareholders' property interests – irrespective of whether the Government was a shareholder when the purported dilution occurred."  *Starr*, 106 Fed. Cl. at 65.

**10.5  Delaware Law Focuses on the Substance, as Opposed to the Form, of the Transaction in Protecting Shareholders from Dilution of their Economic and Voting Power.**

(a) In *Gatz*, 925 A.2d at 1279-81, a shareholder who controlled the corporation before the transaction engineered a recapitalization that "overpaid" stock to a third party (in *exchange* for benefits paid from that third party to the controlling shareholder).  As a result of the recapitalization, the third party became the controlling shareholder.  The defendants argued that the minority shareholders had no direct claims because the controlling shareholder before the transaction was not the beneficiary of the unlawful dilution, and the controlling shareholder after the transaction was not the entity that engineered it.  *Id.* at 1279.

(b) The Delaware Supreme Court rejected that argument, holding:  "Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible. . . .  Although this case differs from *Rossette* in transactional form, the underlying concerns and substantive effects that justify recognizing an entitlement to sue directly are the same."  *Id.* at 1280 (internal quotations and citations omitted); *see also Dubroff v. Wren Holdings, LLC*, C.A. Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175, at *8 (Del. Ch. Oct. 28, 2011) ("A corporation's minority shareholders should not be denied a direct equity dilution claim where a controller expropriates, from them, a large percentage of the corporation's equity.").

**10.6  Delaware Law's Protection of Shareholders' Economic Power and Voting Rights Demonstrates that Plaintiffs Have Identified a "protectable property interest in the equity and voting power associated with the Plaintiffs' shares of common stock." *Starr Int'l Co.*, 106 Fed. Cl. at 75.**

**10.6.1**  While Defendant has argued that no property was taken because Plaintiffs held the same stock certificates both before and after AIG entered into the Credit Agreement, that argument disregards the nature of Plaintiffs' claim based on the dilution of the economic and voting power of their stock.  "The right to recover is not premised on the *physical* expropriation of a shareholder's stock; instead, it is 'premised on the theory that the corporation, by issuing additional stock for inadequate consideration, made the complaining stockholder's investment less valuable.'"  *Starr Int'l Co.*, 106 Fed. Cl. at 74 (quoting *Feldman v. Cutaia*, 951 A.2d 727, 732 (2008)) (emphasis in original).

**10.7  "Delaware courts have observed that voting is a fundamental shareholder right." *Starr Int'l Co.*, 106 Fed. Cl. at 75 (citing *In re Gaylord S'holders Litig.*, 747 A.2d 71, 81 (Del. Ch. 1999)).**

**10.7.1**  The right to vote generally is of "overriding importance," and "most fundamental corporate changes can be implemented only if they are approved by a majority vote of the stockholders."  *Paramount Commc'ns, Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994).

(a) *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987):  "Stockholders in Delaware corporations have a right to control and vote their shares in their own interest.  They are limited only by any fiduciary duty owed to other stockholders."

**10.7.2**  If "it is alleged that the directors reduced the voting power of stockholders through inequitable action, that suffices to state a direct claim, *even if such reduction could have been effected by a properly motivated and behaved board*."  *In re Gaylord Container Corp. S'holder Litig.*, 747 A.2d at 79 (citation omitted, emphasis in original).

**10.7.3**  "Delaware law recognizes the right of shareholders to transfer the voting rights associated with their stock." *Starr Int'l Co.*, 106 Fed. Cl. at 73 (citing Del. Code Ann. tit. 8, § 218).

**10.7.4**  Under Delaware law, shareholders likewise have the right to exclude others. *See* Del. Code Ann. tit. 8, § 242 (b)(2) (requiring a separate class vote for charter amendments that increase or decrease the number of authorized shares or the par value of the shares of that class).

## 11.0

### DEFENDANT'S APPROPRIATION OF PLAINTIFFS' EQUITY CONSTITUTES A COMPENSABLE TAKING.

**11.1  "Once a court has found that the plaintiff had a compensable property interest, it must 'determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" *Nat'l Food & Beverage Co., Inc. v. United States*, 103 Fed. Cl. 63, 69 (2012).**

**11.1.1**  A taking can be either a physical taking or a regulatory taking. *See, e.g., Casa de Cambio Comdiv S.A. de C.V. v. United States*, 48 Fed. Cl. 137, 141 (2000) ("The case law has identified two categories of takings – physical and regulatory.").

**11.2  Defendant Directly Appropriated Plaintiffs' Equity in AIG by Means of the Credit Agreement.  Thus, "the alleged harm here can be said to have resulted from a direct appropriation of the common shareholders' property." *Starr Int'l Co.*, 106 Fed. Cl. at 74.**

**11.2.1**  "[I]n placing certain conditions on AIG's receipt of the $85 billion loan, the Government was not exercising preexisting regulatory authority, or anything akin to a state or locality's police power." *Starr Int'l Co.*, 106 Fed. Cl. at 82-83.

**11.2.2**  At the outset of this case, Defendant conceded that, to the extent a taking took place, it involved the direct appropriation of property – not a regulatory taking.

(a) "This is not a regulatory takings case.  There was no regulation.  There were no preexisting use restrictions on any property."  *See* Motion to Dismiss Tr. at 33:3-5.

(b)  "Once again, this is not a regulatory taking.  There was no alleged regulation of AIG or its subsidiaries or Starr or any shareholder."  *Id.* at 34:6-8.

(c)  "We pointed out in our moving brief that Starr doesn't assert a regulatory takings claim . . . . Rather, they characterize all of the various actions here that constitute a taking as an appropriation of various forms of property.  So Starr is relying on the classic sense that the takings clause was initially recognized to apply to."  *Id.* at 20:11-21.

**11.3   A Physical Taking Involves a "permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property."  *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002).**

**11.3.1**  "As the Court explained in *Lingle v. Chevron, USA, Inc.*, a physical takings analysis is appropriate where there is 'direct government appropriation or physical invasion of private property.'"  *Casitas Mun. Water Dist. v. United States*, 556 F.3d 1329, 1332 (Fed. Cir. 2009) (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)).

(a) *Casa de Cambio*, 48 Fed. Cl. at 141:  "A physical taking occurs when the government seizes property."

**11.3.2**  "In circumstances where there is a partial taking of property, just compensation is mandated for any depreciation in value of the remaining property not taken which is occasioned by the partial taking."  *Ga. Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980)

**11.4   Defendant Here Directly Appropriated the "Possession, Use, and Disposal" of Plaintiffs' Equity and Voting Control (*Boise Cascade*, 296 F.3d at 1353); Accordingly, "the alleged harm here can be said to have resulted from a direct appropriation of the common shareholders' property."  (*Starr Int'l Co.*, 106 Fed. Cl. at 74).**

## 12.0

## THERE WAS NO VOLUNTARY AGREEMENT THAT BARS PLAINTIFFS' CREDIT AGREEMENT CLAIMS.

**12.1  Because Plaintiffs Were Neither Parties to the Credit Agreement Nor Given An Opportunity to Approve or Disapprove the Agreement or Its Terms, They Could Not, And Did Not, Voluntarily Agree to Defendant's Taking of Their Equity.**

**12.1.1**  In addition to controlling the terms of the Credit Agreement transaction, Defendant took deliberate actions to prevent Plaintiffs – the very parties against whom Defendant asserts voluntariness – from having the opportunity to make any decision with respect to the terms of the Credit Agreement, much less to voluntarily consent to its terms.  Pls.' Proposed Findings ¶¶ 17.6-17.8, 20.7.

**12.1.2**  Defendant controlled the Credit Agreement transaction, and as the party controlling the transaction, Defendant had an obligation to ensure the outcome of the transaction was consistent with what would have been achieved in an arm's length transaction.  *Khan v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997).  Defendant controlled the transaction because it was not only dictating the terms of the transaction, it was doing so in a way that would benefit Defendant.

**12.2  There Was Not Even Any Voluntary Agreement by AIG Because Defendant Exercised Control Over AIG and the Transactions At Issue.**

**12.2.1**  Under Delaware law, a party is in a controlling position if it has the means or the power to direct, or cause the direction of, the management and policies of a corporation.  *See* Del. Code Ann. tit. 18 § 5001 (defining control for an insurance company as having a 10% ownership interest or having the ability, either directly or indirectly, to "direct or cause the direction of the management and policies of a person, whether through the ownership of voting

stock, by contract or otherwise")[3]; *see also* Del. Code Ann. tit. 8 § 203 (c)(4) (defining "control" in the context of business combinations between a corporation and interested stockholders as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise").

**12.2.2** "Under Delaware law, a controlling shareholder is one who '(1) owns more than 50% of the voting power of the corporation; or (2) exercises control over the business and affairs of the corporation.'" *Carfango v. Schnitzer*, 591 F. Supp. 2d 630, 634 (S.D.N.Y. 2008) (quoting and citing Delaware case law).

**12.2.3** Moreover, for control to exist, control need not exist over all of management's day-to-day decisions, but only over the particular transaction at issue. *See In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("the plaintiffs need not demonstrate that KKR oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough.").

**12.2.4** The exertion of control by one entity over a corporation prevents the corporation from engaging in a voluntary, arm's-length transaction.

**12.2.5** Where an entity that controls a corporation engages in a transaction with the corporation, but fails "to structure this transaction on an arm's length basis," the controlling entity "cannot escape the effects of the conflicts it faced." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

---

[3] The statutory provisions in New York, Texas, Pennsylvania, and North Carolina, where AIG's largest insurance subsidiaries are located, define "control" similarly. *See* N.Y. Ins. Law §1501(a)(2); Tex. Ins. Code Ann § 823.005; 40 Pa. Stat. Ann. § 991.1401; and N.C. Gen. Stat. Ann. § 58-19-5(2).

**12.2.6**  A controlling entity is "required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."  *In re Southern Peru Copper S'holder Derivative Litig.*, 52 A.3d 761, 787 (Del. Ch. 2011) (quotations omitted).

(a) *Khan*, 694 A.2d at 428:  Where, as here, a controlling entity engages in a transaction with the corporation it controls, courts seek to determine "whether the transaction fully approximated what truly independent parties would have achieved in an arm's length negotiation." (internal quotation and citation omitted).

(b) *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 764 (Del. Ch. 1986):  "whenever a controlling shareholder sets out to exercise his power to set the terms of such a transaction [i.e., a self-dealing transaction] and compel its effectuation, he assumes a new and significant responsibility:  the burden of establishing . . . that the transaction is fully fair."

(c) *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 36 (Del. Ch. 2014): A transaction with a controlling entity "of course is the context in which the greatest risk of undetectable bias may be present."

(d) *In re Matter of Reading Co.*, 711 F.2d 509, 518 (3d Cir. 1983):  "Self-dealing occurs when the majority shareholders cause the dominated corporation to act in such a way that the majority shareholders receive something from the corporation to the exclusion and detriment of the minority shareholders."

**12.2.7**  Here, the process by which AIG entered into the Credit Agreement did not reflect a transaction approximating what independent entities would have achieved in an arm's length negotiation.  Defendant used its control to take or exact from AIG onerous terms on a take-it-or-leave-it basis.  Pls.' Proposed Findings ¶ 13.0.  Because the Credit Agreement terms were

provided to AIG on this basis, and Defendant was the monopoly supplier of credit, AIG had no

real choice, and its acceptance of Defendant's terms was not voluntary.

(a) *In re Southern Peru Copper S'holder Derivative Litig.*, 52 A.2d at 763: "Having been

empowered only to evaluate what the controller put on the table and perceiving that other options

were off the menu because of the controller's own objectives, the special committee put itself in

a world where there was only one strategic option to consider, the one proposed by the

controller, and thus entered a dynamic where at best it had two options, either figure out a way to

do the deal the controller wanted or say no."

### 12.3  There Was No Voluntary Agreement By AIG Because, At All Relevant Times, AIG Was Under Duress.

**12.3.1**  "To establish coercion or duress, a plaintiff must show that:  (1) it 'involuntarily

accepted' the other party's terms; (2) 'circumstances permitted no other alternative'; and (3)

'said circumstances were the result of coercive acts of' the other party."  *Starr*, 106 Fed. Cl. at 77

(citing *Fruhauf Sw. Garment Co. v. United States*, 126 Ct. Cl. 51, 62 (1953); *Rumsfeld v.*

*Freedom NY, Inc.*, 329 F.3d 1320, 1329 (Fed. Cir. 2003)).

### 12.4  The "Involuntarily Accepted" Prong is Satisfied by Proof of the Other Two Prongs. *Pew Forest Prods. v. United States*, 105 Fed. Cl. 59, 67 (2012) ("Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts"); RESTATEMENT (SECOND) OF CONTRACTS § 175(1) (1981) (contract voidable if "assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative").

### 12.5  A Party Claiming Duress Need Only Establish that It Had No "Reasonable Alternative" – Not that it Lacked Any Alternatives.  *See Starr Int'l Co.*, 106 Fed. Cl. at 78.

(a) *Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1387-88 (Fed. Cir. 1983):

Court of Federal Claims case law "emphasiz[es] the lack of reasonable alternative".

(b) Morris R. Cohen, The Basis of Contract, 46 HARV. L. REV. 553, 569 (1933): "The extreme form of such duress, the highwayman's pistol, still leaves us with the freedom to accept the terms offered or else take the consequences.  But such choice is surely the very opposite of what men value as freedom."

**12.5.1**  The standard for determining whether an alternative is "reasonable" is "a practical one under which account must be taken of the exigencies in which the victim finds himself, and the mere availability of a legal remedy is not controlling if it will not afford effective relief to one in the victim's circumstances."  RESTATEMENT (SECOND) OF CONTRACTS § 175, cmt. b.

**12.5.2**  An alternative is not reasonable if it would cause large monetary damages, bankruptcy, or jeopardize a party's business.

(a) *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 391 (Ct. Cl. 1969) (quoting *Swift & Courtney & Beecher Co. v. United States*, 111 U.S. 22 (1884)): "'The parties were not on equal terms.  The appellant had no choice.  The only alternative was to submit to an illegal exaction or discontinue its business.'"

(b) *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 798 (E.D. Mich. 1990): alternative is not reasonable if it would likely force plaintiff's major customers to halt production of a product and, as a result, cause plaintiff injury to its business reputation and subject it to a large monetary fine.

(c) *Petters Co. Inc. v. BLS Sales Inc.*, No. C 04-02160 CRB, 2005 WL 2072109, at *8 (N.D. Cal. Aug. 26, 2005): noting that "financial ruin or bankruptcy is not a reasonable alternative."

(d) *Osanitsch v. Macroni PLC*, No. CV 05-3988 CRB, 2009 WL 5125821, at \*7 (N.D. Cal. Dec. 21, 2009): duress may be found if "bankruptcy or financial ruin" were the only options.

(e) *In re Consolidated Pretrial Proceedings in Air West Securities Litig.*, 436 F. Supp. 1281, 1290 (N.D. Cal. 1977): "fear of financial ruin is uniformly recognized as a valid reason for submitting to another party's economic coercion".

(f) *Litten v. Jonathan Logan, Inc.*, 286 A.2d 913, 917 (Pa. Super. 1971): finding duress because "If plaintiffs had refused to sign, bankruptcy would have been the result."

(g) RESTATEMENT (SECOND) OF CONTRACTS § 175, cmt. b, Illustrations 3 and 4 (1981): an alternative is not reasonable if it would cause the plaintiff to incur "heavy financial loss."

## 12.6  Conduct Is Wrongful or Coercive If It Involves Conduct "in violation of a statute or regulation" (*Rumsfeld*, 329 F.3d at 1330).

**12.6.1**  Thus, an unauthorized demand for equity and voting control as a condition for a needed loan would be coercive and wrongful.

(a) In *Robertson v. Frank Bros Co.*, 132 U.S. 17 (1889), the plaintiffs sought to recover unauthorized charges on banana imports.  The appraisers, who were government officials, required the plaintiffs to pay certain transportation and shipping charges as well as commissions for their imports.  The plaintiffs protested those charges, but paid them because, if they did not pay them, they would be assessed a penalty on top of the charges.  *Id.* at 18.  The Government contended that "the payment of the duties complained of was a voluntary payment, inasmuch as the plaintiffs themselves made the additions to the entries and invoices, and that therefore they cannot recover back any part of the money so paid."  *Id.* at 20.  The Court held that giving in to the payment of a fee, even though that fee may have been illegal, is involuntary when the "demand for such an increased appraisal is illegal" and "[t]he payment of the increased duties

56

thus caused was wrongfully imposed on the importer, and was submitted to merely as a choice of two evils." *Id.* at 22.

> In our judgment, ***the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of the penalty might have been illegal, was sufficient to make the payment an involuntary one***.  It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoices; but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment. *Id.* at 23-24 (emphasis added).

Accordingly, the Court affirmed the jury's finding "that they acted under constraint – under moral duress – in making the additions for transportation and labor." *Id.* at 21; *see also Hazelhurst Oil Mill & Fertilizer Co. v. United States*, 70 Ct. Cl. 334, 354 (1930); *James Shewan & Sons, Inc. v. United States*, 73 Ct. Cl. 49, 93-94 (1931) (quoting above language from *Robertson* in explaining what circumstances constitute duress).

**12.7   In Addition, "an act can be coercive without being illegal" (*Rumsfeld*, 329 F.3d at 1330).**

**12.7.1**   As this Court previously held, conduct is "wrongful and hence, coercive if it 'violates notions of fair dealing.'"  *Starr Int'l Co.*, 106 Fed. Cl. at 77 (quoting *Rumsfeld*, 329 F.3d at 1330).

**12.7.2**   Wrongful conduct that is not illegal includes "threats that would breach a duty of good faith and fair dealing under a contract" (*David Nassif Assocs. v. United States*, 644 F.2d 4,12 (Ct. Cl. 1981)); "threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat" (*id.* at 12); or an act that "violates notions of fair dealing." *Sys. Tech. Assocs.*, 699 F.2d at 1387-88.

**12.8  Defendant's Wrongful Conduct Need Not Be the Sole Cause – Only a Substantial Contributing Factor – of AIG's Financial Distress and Lack of Reasonable Alternatives.**

(a) In *Aircraft Associates & Manufacturing Co. v. United States*, 174 Ct. Cl. 886 (1966), for example, the plaintiff successfully bid on the right to demilitarize specified aircrafts.  *Id.* at 888.  The plaintiff hoped to profit from the deal by recovering and selling the aluminum in the plane carcasses.  *Id.* at 889.  Ultimately, however, the plaintiff could not fulfill the contract, and in order to get relief in price, agreed to a release of claims against the Government.  The plaintiff's difficulties were caused by (1) "a drop in the aluminum market"; (2) plaintiff's "highly optimistic guess as to the amount of aluminum that could be obtained from the carcasses"; and (3) "the removal by personnel of defendant of a substantial number of parts from the aircraft between the time the invitation for bids was issued and before title passed to plaintiff."  *Id.* at 889.  The Government was not the only factor causing the plaintiff's assent to the release; the court nonetheless found duress because "the Government's wrongful removal of the parts contributed substantially to plaintiff's financial distress."   *Id.* at 896; *see also James Shewan & Sons, Inc. v. United States*, 73 Ct. Cl. 49, 81-83 (1931) (finding plaintiff's duress caused not only by Government's misconduct, but also plaintiff's tax debt and a post-war slowdown in plaintiff's business); RESTATEMENT (SECOND) CONTRACTS § 175, cmt. c ("A party's manifestation of assent is induced by duress if the duress substantially contributes to his decision to manifest his assent").

**12.9  The Circumstances Required to Provide Section 13(3) Liquidity Assistance, By Definition, Make the Existence of Duress More Likely.**

**12.9.1**  Section 13(3) of the Federal Reserve Act provides Defendant the power to extend credit to solvent non-banks in "unusual and exigent circumstances" when such non-bank "is

unable to secure adequate credit accommodations from other banking institutions" (12 U.S.C. § 343).

**12.9.2**   Whether or not the AIG Board was "independent" is irrelevant where the Board has no realistic alternative.  In a financial panic, the lender of last resort has a monopoly over credit, leaving AIG with no realistic alternative to a 13(3) extension of credit.

(a) Geithner:  "The Federal Reserve was the only fire station in town that you could turn to when things fell apart for liquidity" (Trial Tr. 1444:15-20; PTX 583 at 140; *see also* PTX 715 at 6 ("The ability to act fell solely to the Federal Reserve because Congress had given it unique responsibility and policy tools to protect the stability of the financial system.")).

**12.9.3**   Accordingly, during the financial crisis, firms in need of Section 13(3) assistance were subject to special vulnerabilities that increased over time as long as the panic market conditions persisted.  Conversely, Defendant, as the lender of last resort, had monopoly power, along with leverage that only increased as the panic market conditions persisted.

(a) Defendant's expert Professor Daines: "as lender of last resort to AIG, the government was a monopolist regarding the terms of the loan" (Daines: Trial Tr. 8470:1-8); *see also* Pls.' Proposed Findings ¶ 20.4.

(b) As Professor Zingales explained, if the AIG Board had viable alternatives, there would have been some negotiation with the Federal Reserve over the terms of the loan to AIG, but because of the Federal Reserve's monopoly power, it had control and there was no negotiation over the terms, which the Federal Reserve was able to dictate.  *See* Zingales:  Trial Tr. 4112:8-18 ("So one of the characteristic[s] of effective economic control is to be in a monopoly power.  If you have monopoly power, you dictate the rule.  If you are in a market

transaction, then you negotiate a transaction, unless like it's a fully competitive market where you take prices given.  But in a relationship like this one, in a one-to-one relationship, if you have viable alternative[s], you should see some negotiation taking place.  It is only if you are completely controlled by the other party that you take the terms without even trying to modify them in any way.")

**12.9.4**  "Duress, understood most concretely, is the situation in which one person obtains a temporary monopoly that it tries to use to obtain a benefit to which it is not entitled."  *Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.*, 238 F.3d 897, 900 (7th Cir. 2001).

(a) *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971):  "The existence of economic or business compulsion is demonstrated by proof that immediate possession of needful goods is threatened." (quotation and citation omitted).

**12.9.5**  *Trompler, Inc. v. N.L.R.B.*, 338 F.3d 747, 751 (7th Cir. 2003) (citing *Alaska Packers Ass'n v. Domenico*, 117 F. 99 (1902)):  "the exploitation of temporary monopolies is, as explained in the *Professional Service Network* case, *supra*, 238 F.3d at 900-01, the functional meaning of the legal concept of duress."

**12.10 Defendant Acts Wrongfully and Coercively When, As Here, It Conditions the Provision of a Discretionary Benefit on the Forfeiture of Constitutional Rights.**

(a) In *Union Pacific Railroad Co. v. Public Service Commission of Missouri*, 248 U.S. 67 (1918), the plaintiff challenged the validity of charges by the Public Service Commission of Missouri for a certificate authorizing the issuance of bonds secured by a mortgage.  *Id.* at 68.  Missouri law prohibited, and imposed severe penalties for, the issuance of such bonds without the Commission's authorization.  *Id.*  Plaintiff applied for a certificate in the states where it operated, which the Commission granted provided that the plaintiff paid a fee.  *Id.*  Although the

plaintiff paid the fee, they claimed the fee was an unconstitutional interference with interstate

commerce. *Id.* The Missouri Supreme Court held that "the application to the Commission was

voluntary and hence that the Railroad Company was estopped to decline to pay the statutory

compensation." *Id.* at 69.  The Supreme Court disagreed, explaining:  "Were it otherwise, as

conduct under duress involves a choice, it always would be possible for a State to impose an

unconstitutional burden by the threat of penalties worse than it in case of a failure to accept it,

and then to declare the acceptance voluntary." *Id.* at 69-70.  The Court held that conditioning the

provision of the certificate on payment of a fee was an unconstitutional interference with

interstate commerce, and that the plaintiff paid it under duress because receipt of the certificate

was a "commercial necessity", requiring the plaintiff to choose between "the lesser of two evils."

In so holding, the Court explained:

> On the facts we can have no doubt that the application for a certificate and the
> acceptance of it were made under duress.  The certificate was a commercial
> necessity for the issue of the bonds.  The statutes, if applicable, purported to
> invalidate the bonds and threatened grave penalties if the certificate was not
> obtained.  The Railroad Company and its officials were not bound to take that risk
> of these threats being verified.  Of course, it was for the interest of the Company
> to get the certificate.  It always is for the interest of a party under duress to choose
> the lesser of two evils.  But that fact that a choice was made according to interest
> does not exclude duress.  It is the characteristic of duress properly so called.

*Id.* at 70; *see also First Nat' l Bank of Cincinnati v. Pepper*, 454 F.2d 626, 633 (2d Cir. 1972);

*Farmers' & Ginners Cotton Oil Co. v. United States*, 76 Ct. Cl. 294, 316 (1932); *James Shewan*

*& Sons v. United States*, 73 Ct. Cl. 49, 91-92 (1931) (quoting duress standard in *Union Pacific*

*Railroad Company v. Public Serv. Comm'n of Missouri*); *Janowsky v. United States*, 133 F.3d

888, 892 (Fed. Cir. 1988) (holding that there was a material question of fact as to voluntariness

where the FBI threatened to withhold a government benefit (*i.e.,* FBI protection) unless the plaintiff forfeited his Fifth Amendment rights to his property).

(b) In a line of cases involving war-time price controls, several courts held that the Government could not exploit its monopoly power created by such price controls to take private property for the war effort, without paying just compensation. *See, e.g., Swiss Fed. Rys. v. United States*, 125 Ct. Cl. 444, 451-52 (1953); *United States v. Buxton Lines*, 165 F.2d 993, 996 (4th Cir. 1948); *Wilson Athletic Goods Mfg. Co. v. United States*, 161 F.2d 915, 917-18 (7th Cir. 1947).

(c) More recently, in *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586 (2013), the Supreme Court stated that "land use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take." *Id*. at 2594.

**12.10.2**    A potential 13(3) borrower's special vulnerability to coercion is even more acute than in *Union Pacific Railroad* and *Koontz* because Section 13(3) applies only in the "unusual and exigent circumstances" of a financial panic when the Government has a temporary monopoly over liquidity, and the potential borrower needs access to that liquidity to survive.

**12.10.3**    While the Supreme Court's recent decision in *Koontz* involved conditions imposed on a land use permit, the prohibition against withholding a discretionary benefit "because someone refuses to give up constitutional rights" applies to other discretionary benefits outside the land permitting context. *Id*. at 2596.

(a) *Koontz*, 133 S. Ct. at 2596:  "Virtually all of our unconstitutional conditions cases involve a gratuitous government benefit of some kind.  *See, e.g., Regan*, 461 U.S. 540, 103 S. Ct. 1997, 76 L.Ed.2d 129 (tax benefit); *Memorial Hospital*, 415 U.S. 250, 94 S. Ct. 1076, 39 L.Ed.2d 306 (healthcare); *Perry*, 408 U.S. 593, 92 S. Ct. 2694, 33 L.Ed.2d 570 (public employment); *United States v. Butler*, 297 U.S. 1, 71, 56 S. Ct. 312, 80 L.Ed 477 (1936) (crop payments); *Frost [v. R.R. Comm'n of State of Cal.*, 271 U.S. 583 (1926)] (business license).  Yet we have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights."[4]

(b) "Even if respondent would have been entirely within its right in denying the permit for some other reason, that greater authority does not imply a lesser power to condition permit approval on petitioner's forfeiture of his constitutional rights."  *Koontz*, 133 S. Ct. at 2596.

(c) As the court stated in *Suwannee*:  "We suggest that no statute should be read as subjecting citizens to the uncontrolled caprice of officials, unless that statute has to do with the powers of the President in dealing with foreign relations, the powers of a military commander in the field, or some comparable situation."  279 F.2d at 876; *see also Janowsky*, 133 F.3d at 892 ("[T]he government may not require a person to give up a constitutional right – here the right to receive just compensation when property is taken for a public purpose – in exchange for a discretionary benefit'") (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)).

**12.11 Defendant Acted Wrongfully and Coercively by Discouraging Other Sources of Liquidity from Providing Liquidity to AIG.**

---

[4] Here, the benefit provided by Defendant was not gratuitous, in contrast with virtually all other cases where a government benefit is tied to an unauthorized demand.  Defendant was fully compensated for its extension of credit to AIG; Defendant received the repayment of the principal it loaned to AIG together with interest and fees.  *See* Pls.' Proposed Findings ¶ 37.7.

(a) *Amen v. City of Dearborn*, 718 F.2d 789, 795-97 (6th Cir. 1983):  a city cannot misuse its power to artificially reduce individuals' property values, eliminate other potential buyers, and then refuse to pay anything more than the artificially depressed price.

(b) *Moore v. City of Tallahassee*, 928 F. Supp. 1140, 1145-46 (N.D. Fla. 1995): denying city's summary judgment motion on plaintiff's substantive due process and inverse condemnation claims where plaintiff presented evidence that the city discouraged private citizens from buying plaintiff's property, and then purchased the property for an artificially reduced price.

(c) In *Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953), the plaintiff was in negotiations with a foreign government to sell surplus radar equipment that was being stored in the Philippines.  *Id*. at 459.  The U.S. Government, seeking to block the sale, used its influence over the Philippine Government to convince it to place an export embargo on the radar equipment.  *Id*. at 460.  The plaintiff subsequently agreed to turn over the property to the U.S. Government, in exchange for a reservation of the right to sue.  *Id*. at 463-64.  The court concluded that the U.S. Government had taken the plaintiff's property in violation of the Fifth Amendment, explaining that because of the Government's "instigating the embargo" and "other acts prevent[ing] the property from getting on the market," *id*. at 465, the equipment's "resale had been made impossible," and there "was no real prospect of a favorable sale of the radar equipment, after the embargo upon its exportation", *id.* at 464.

**12.11.2**        As in *Turney*, *Amen*, and *Moore*, Defendant contributed to Plaintiffs' financial vulnerability and lack of options by actively discouraging other potential sources of liquidity.  *See* Pls.' Proposed Findings ¶¶ 11.9, 11.12, 11.13, 15.12.2.

**12.12 Defendant Acted Coercively by Requiring AIG to Accept the Credit Agreement Terms in a Matter of Hours or Face Bankruptcy.**

12.12.1        Forcing a party to decide on an offer within an unreasonably short period of time is generally evidence of duress.

(a)  "[D]uress is usually marked by immediacy" where the "non-consenting party must make an immediate decision to agree to the terms of the contract or face the threatened harm." *Freedlander, Inc. v. Nat'l Bank of N.C.*, 706 F. Supp. 1211, 1217 (E.D. Va. 1988).

(b) "Therefore, a significant factor for courts to consider in determining 'whether reasonable alternatives existed is the immediacy of the threatened financial distress.'" *Perez v. Pan-American Berry Growers, LLC*, Nos. 6:12-cv-1474-TC, 6:12-cv-1566-TC, 6:13-cv-1439-TC, 2014 WL 198781, at *5 (D. Or. Jan. 15, 2014) (quoting *Comcast of Or. II v. City of Eugene*, 155 P.3d 99, 107 (Or. 2007)).  Where the threatened financial distress or harm is immediate, courts have found the conditions for duress present.

(c) A threat to take action that is within the person's legal power can constitute duress if power is used to induce a party, based on an immediate threat, to pay an invalid fee.  *Id.*

(d) *Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130-31 (1971): economic duress established where subcontractor coerced prime contractor to higher contract price by withholding delivery of parts necessary to meet prime contractor's obligations to Navy.

(e) *Litten v. Jonathan Logan, Inc.*, 286 A.2d 913, 916-17 (Pa. Super. 1971):  duress found where defendant promised to pay plaintiff's creditors in return for opportunity to purchase plaintiff's business and, four days after the creditors were to be paid, defendant demanded that plaintiff sign a release by the end of the day or he would refuse to pay the creditors.

(f) *Ekl v. Knecht*, 585 N.E.2d 156, 162-63 (Ill. Ct. App. 1991):  "Defendant contends that Carrie assented to the terms of invoice by signing it and paying defendant the requested amount. The trial court, however, found Carrie's testimony that defendant threatened to undo the work and turn off the water if she did not pay immediately to be credible. . . .  Therefore any agreement by Carrie to pay the amount billed by defendant was void because it was the product of duress."

(g) *Sky Transpo, Inc. v. City of Knoxville*, 703 S.W.2d 126, 131 (Tenn. 1985): "It thus appears that plaintiff was at a serious disadvantage in the assertion of its legal rights, in that it had no reasonable means of immediate relief except by making the payments. . . .  Upon these facts we find that plaintiff's tax payments were compelled by an immediate and urgent necessity."

## 12.13 Defendant Acted Wrongfully by Imposing a Penalty on Plaintiffs Without Any Criteria for Punishment, Without Any Analysis, Investigation or Findings, and Without Any Notice or Any Opportunity to Be Heard.

**12.13.1**     The imposition of punishment without any clear standards for imposing punishment is a due process violation.

(a)  "'It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits.'" *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966)).

**12.13.2**     It is also a due process violation to impose punishment without providing notice and an opportunity to be heard prior to the imposition of punishment.

(a) *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)):  "The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'"

(b) *Boumediene v. Bush*, 553 U.S. 723, 785 (2008):  Due process standards are particularly high where, as here, penalties are imposed on the basis of a "closed and accusatorial" process because "even when all of the parties involved in this process act with diligence and in good faith, there is considerable risk of error" in the determination.

**12.13.3**      While Defendant punished Plaintiffs without any notice or an opportunity to be heard, Defendant did not punish other financial institutions or their shareholders without notice and an opportunity to be heard, consistent with due process standards.

**12.13.4**       Except with respect to AIG, once the financial crisis was over, the Department of Justice pursued investigations, negotiations, and where appropriate, litigation, fines and settlements.  Pls.' Proposed Findings ¶¶ 31.1, 31.4.  Indeed, the vast majority of the collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS") that gave rise to AIG's liquidity needs were issued by institutions that were later the subject of fraud charges by the Department of Justice, and those institutions entered into settlements and paid substantial fines.  *Id.* ¶ 31.4.  But punitive conditions were not attached to the financial assistance received during the financial crisis by the financial institutions that issued these CDOs and RMBS.  *Id.* ¶ 32.0.

**12.13.5**      Rather, the Department of Justice later investigated the conduct of these financial institutions and accorded them due process by providing them "fair notice" of the

charges against them and an opportunity to be heard in response.  *Id.* ¶ 31.1.  The "fair notice"

requirement protects "at least two connected but discrete due process concerns:  first, that

regulated parties should know what is required of them so they may act accordingly; second,

precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or

discriminatory way."  *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012)

(citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

**12.13.6**        Because Defendant imposed punishment on Plaintiffs, without providing

them any of the required due process protections, Defendant acted wrongfully.  Plaintiffs' cause

of action is not a cause of action for a violation of Due Process (except as an illegal exaction

claim is a Due Process claim).  Plaintiffs' cause of action is for a Fifth Amendment taking and

the relevance of the Due Process violation is that it is evidence of the wrongful conduct which

vitiates any voluntariness defense.

## 12.14 Defendant Acted Wrongfully by Discriminating Against AIG.

**12.14.1**        The Federal Reserve has no authority to discriminate among Section 13(3)

borrowers.  *See* Pls.' Proposed Conclusions ¶ 7.0.

**12.14.2**        While Section 13(3) permits Defendant to set interests rates based on the

class of paper (12 U.S.C. § 357), it does not permit Defendant to set terms for the extension of

credit based on the identity or nature of the borrower.  *See* Pls.' Proposed Conclusions ¶ 7.0.

## 12.15 Each of the Above Examples of Wrongful and Coercive Conduct, Individually and Collectively, Provides An Independent Basis for Satisfying the Requirement of Coercion.

**13.0**

**DEFENDANT'S USE OF A TRUST IS IRRELEVANT,
EXCEPT AS EVIDENCE OF DEFENDANT'S
RECOGNITION OF ITS LACK OF AUTHORITY TO TAKE
OR EXACT EQUITY AND VOTING CONTROL.**

**13.1  Defendant Cannot Use a Trust to Accomplish Indirectly that which Congress Did Not Authorize Defendant to Accomplish Directly.**

**13.1.1**  The Government cannot act indirectly to "produce a result which the State could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

(a) *Merchants' Nat'l Bank v. United States*, 101 U.S. 1, 3-4 (1879):  "The contention by the United States that this is not a tax upon the note is to argue that the national government may do indirectly what it cannot do directly.  The argument has been frequently met and answered by this court.  In the case last cited it was admitted that the power of the government to borrow money could not be directly opposed; but a distinction was taken, in argument, between direct opposition and those measures which had ultimately the same effect.  The distinction was promptly repudiated by the court."

**13.1.2**  "Certainly, an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted."  *First Nat'l Bank*, 263 U.S. at 659.

**13.1.3**  "[A]uthority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized – not to do another and separate thing, since that would be, not to carry the authority granted into effect, but to add an authority beyond the terms of the grant".  *Malloy*, 264 U.S. at 167.

**13.2  In Any Event, Defendant Acquired the Right to Plaintiffs' Equity and Defendant Then Provided the Equity to the Trust.**

**13.2.1**  Defendant obtained the right to 79.9% of Plaintiffs' equity and voting interest, and became AIG's controlling shareholder upon execution of the Credit Agreement on September 22 or 23, 2008.  Pls.' Proposed Findings ¶¶ 14.3, 20.3, 20.5.

**13.2.2**  At the time Defendant acquired the right to 79.9% of AIG's equity under Delaware law, it became AIG's controlling shareholder.

(a) *Brown v. Femimore*, 3 Del. J. Corp. L. 552, 555 (Del. Ch. 1977):  "Stockholder status is created" not by issuance of a certificate of stock, but "by a subscription for stock and the acceptance of such subscription by the corporation."

(b) Del. Code Ann. tit. 8 § 203 (c)(9)(ii):  defining "owner" "when used with respect to any stock" as including those with "the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement, or understanding."

(c) On and after September 22, 2008, Defendant understood it was, and was treated as, AIG's controlling shareholder.  Pls.' Proposed Findings ¶¶ 18.9, 33.7.

**13.2.3**  The Trust was not created until January 16, 2009, four months after Defendant entered into the Credit Agreement.  Pls.' Proposed Findings ¶ 25.1.  The Series C Stock, which constituted the entirety of the Trust's corpus, was not issued until March 4, 2009.  *Id.* ¶¶ 25.1.4, 25.6.1.  At the time the Trust was created, Defendant was AIG's controlling shareholder.  *See id.* ¶¶ 15.0, 18.9(c), 25.1, 33.0-34.0.

**13.3  In Addition, the Trust Violated New York Trust Law If It Was Created, or Used, to Circumvent Defendant's Lack of Authority to Acquire Equity in AIG.**

**13.3.1**  The Trust was created pursuant to, and was governed by, New York law.  JX 172 at 21, § 5.03.

(a) *Hutchison v. Ross*, 262 N.Y. 381, 394-95 (1933):  The legislature "has provided that 'Whenever a person being a citizen of the United States, or a citizen or a subject of a foreign country, wherever resident, creates a trust of personal property situated within this state at the time of the creation thereof, and declares in the instrument creating such trust that it shall be construed and regulated by the laws of this state, the validity and effect of such trust shall be determined by such laws.' (Pers. Prop. Law; Cons. Laws, c. 41 § 12–a)."

(b) *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935, 937 n.2 (2d Cir. 1965):  "it is clear that state law governs whether a trust relationship exists."

**13.3.2**  The Trust was expressly created because Defendant knew that it did not have the authority to acquire, or hold, equity.

(a) FRBNY Assistant General Counsel Stephanie Heller stated on November 12, 2008: "One of the reasons we set up that the shares would be issued to the trust was an authority concern".  PTX 3284 at 2; *see also* Pls.' Proposed Findings ¶¶ 25.3; *Starr Int'l Co.*, 106 Fed. Cl. at 87 ("Based on the facts currently before the Court, it is not clear why the Government would use a trust procedure unless to circumvent the Supreme Court's holding in *California National*").

**13.3.3**  The use of the Trust to evade Defendant's lack of authority to acquire or hold equity violated New York Trust law.

(a) A trust may not be created to "evade or violate the law" or to "violate public policy". *See* N.Y. Est. Powers & Trusts Law § 7-1.4, Practice Commentary.

(b) Bogert's The Law of Trusts and Trustees § 211:  explaining that a trust "may be invalid because it is intended to accomplish an illegal purpose."

**13.4  Moreover, After It Was Created, the Trust Was an Instrumentality of Defendant.**

**13.4.1** Provisions of the Trust Agreement ensured that Defendant would control the Trust and thereby control AIG.

(a) The Trust was established "for the sole benefit of the Treasury." JX 172 at 5, § 1.01; *see also* Findings of Fact ¶ 25.4.

(b) Although the Trust's terms provided that the trust was irrevocable, there was an important exception:  the "except" clause allowed the Federal Reserve Board of Governors to terminate or amend the Trust. JX 172 at 6, § 1.03.  Treating FRBNY and Treasury as a common person, the terms of the Trust fall squarely within the rule that "[i]f the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished." RESTATEMENT (SECOND) TRUSTS § 339 (1959); *see also* RESTATEMENT (THIRD) TRUSTS § 65(1) (2003) ("if all the beneficiaries of an irrevocable trust consent, they can compel the termination or modification of the trust").  In addition, apart from the Trust's terms, Treasury had the power to dissolve the Trust and reassert legal title to the shares held by the Trust at any time.  Pls.' Proposed Findings ¶ 25.6(c).

(c) The Trust provided that the trustees, "[i]n exercising their discretion" as to the convertible preferred shares, "are advised that it is FRBNY's view that (x) maximizing the Company's ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department and (y) the Company being managed in a manner that will not disrupt financial market conditions, are both consistent with maximizing the value of the Trust Stock." JX 172 at 10, § 2.04(d).

(d) The Trust's assets could not be disposed of without Defendant's approval. JX 172 at 11, § 2.05(a).

(e) FRBNY had the power, in consultation with Treasury, to appoint the Trust's Trustees, as well as to remove them. JX 172 at 14-15, § 3.02.

(f) Trust law provides trustees with broad transactional powers subject to the duty of prudent administration, which is the ordinary standard of care for trustees. *See* Uniform Trust Code § 804 (2000); N.Y. Est. Powers & Trusts Law § 11-1.1; RESTATEMENT (THIRD) TRUSTS § 77. The Trust Agreement eliminated this ordinary standard of care, providing the Trustees immunity from liability for good faith reliance upon the terms of the Trust (JX 172 at 15-16, § 3.03), and provided that the "duties, responsibilities and obligations of the Trustees shall be limited to those expressly set forth" in the Trust Agreement (JX 172 at 18, § 3.05(a)).

(g) The Trustees were to act "in or not opposed to the best interests of the Treasury." JX 172 at 15, § 3.03(a).

(h) Trust law provides that trustees may seek judicial intervention when "there is reasonable doubt about the powers or duties of the trusteeship or about the proper interpretation of the trust provisions." *See* RESTATEMENT (THIRD) TRUSTS § 71. The Trust Agreement, however, provided that, if the Trustees were uncertain about their obligations, they were to seek guidance from FRBNY – not a court. JX 172 at 19-20, § 3.05(g).

(i) Defendant had the right to seek specific performance from the Trustees with respect to complying with their obligations under the Trust. JX 172 at 23, § 6.07.

**13.4.2** "While there is no bright line rule regarding what constitutes a 'federal instrumentality,' the Supreme Court looked to several factors including: whether the entity was

created by the government; whether it was established to pursue governmental objectives; whether government officials handle and control its operations; and whether the officers of the entity are appointed by the government." *Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1339 n.3 (Fed. Cir. 2005) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 397-98 (1995)).

**13.4.3**  Each of these factors was present with respect to the Trust:  Defendant created the Trust (Pls.' Proposed Findings ¶ 25.1.1); the Trust was created to pursue Government objectives and "for the benefit of the Treasury" (*id.* ¶¶ 25.4.2(a), 27.7(d)); and Defendant recruited and appointed each of the Trustees (*id.* ¶¶ 25.4.2(b), 25.5).  Notably, Defendant acknowledged in a February 2009 letter to the National Association of Insurance Commissioners that the Trust was a "federal instrumentality".  *Id.* ¶ 25.7.1.  In addition, FRBNY's General Counsel agreed that the Trust would be able to avail itself of the defense of sovereign immunity, which is available only to sovereign agencies.  *Id.* ¶ 25.7.1; *see also Lebron*, 513 U.S. at 397-98 (concluding Amtrak was an instrumentality of the United States based on application of these factors).

**13.4.4**  As the Federal Reserve's independent auditor described the Trust, it was simply a "legal shell".  JX 386 at 16.  There was no meaningful distinction between Defendant and the Trust, and therefore no meaningful difference between whether Defendant or the Trust held the Series C Preferred Stock.  *See Starr Int'l Co.*, 106 Fed. Cl. at 87 ("at this stage, the Court perceives no meaningful legal distinction between FRBNY and Trust ownership of the Series C Preferred Stock").

## D.  REVERSE STOCK SPLIT

### 14.0

### THE REVERSE STOCK SPLIT ("RSS") AND RELATED EXCHANGE WAS AN ADDITIONAL TAKING AND ILLEGAL EXACTION OF THE RIGHTS OF THE RSS CLASS.

**14.1  The Reverse Stock Split Deprived the Stock Split Class of Its Right to Vote on the Further Dilution of Its Shares.**

**14.1.1**  The further dilution of the Stock Split Class's shares, and the elimination of the class's right to vote on such dilution, are harms to cognizable property interests for which the class is entitled to recover.  *See* Pls.' Proposed Conclusions ¶¶ 10.3-10.7 *supra*.

(a)  *Lacos Land Co. v. Arden Grp., Inc.*, 517 A.2d 271, 278-79 (Del. Ch. 1986): holding that a vote to approve a recapitalization that gave control to the then-CEO where shareholders were unmistakably told in disclosures that unless they approved the recapitalization, the CEO would oppose transaction "which could be determined by the Board of Directors to be in the best interests of the stockholders," failed "to satisfy the mandate of Section 242(b) of our corporation law requiring shareholder consent to charter amendments."

(b)  *Phillips v. Insituform of N. Am., Inc.*, 13 Del. J. Corp. L. 774, 783 (Del. Ch. Aug. 27, 1987): "the board manipulated the machinery of corporate governance in order to give the directors time to take steps to deprive the receivers of the power that the Ringwood stockholders possessed, by deferring the annual meeting for the admitted reason that the board could not know on April 26th how the receivers would vote."

**14.2  At the Time of the Reverse Stock Split, Defendant Was Clearly in Control of AIG.**  *See* **Pls.' Proposed Findings ¶ 30.0.**

**14.3   Because Defendant Was in Control of AIG, the Reverse Stock Split and Related Exchange is Tested by the Entire Fairness Test Stated in *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011).**

**14.4   There Was No Legitimate Reason For the Reverse Stock Split to Apply to Issued Shares But Not Authorized Shares.**

    **14.4.1**   The ostensible purpose of the Reverse Stock Split, to avoid delisting, could have been accomplished by applying the RSS to both issued and authorized shares.  *See* Pls.' Proposed Findings ¶¶ 36.5.2.1.

    **14.4.2**   AIG officials could not identify a legitimate reason to apply the Reverse Stock Split to issued but not authorized shares.  *See* Pls.' Proposed Findings ¶¶ 36.5.2.2.

    **14.4.3**   Defendant could not identify a legitimate reason to apply the Reverse Stock Split to issued but not authorized shares.  *See* Pls.' Proposed Findings ¶¶ 36.5.2.2.

    **14.4.4**   The only purpose and effect of a Reverse Stock Split applicable to issued but not authorized shares was to create enough authorized but unissued shares to permit Defendant to obtain common shares for its preferred shares without a class vote of common shareholders.

**14.5   The Reverse Stock Split Was a Taking Without Just Compensation Because the Stock Split Class Received No Consideration for the Elimination of Their Right to a Class Vote Before Defendant Was Permitted to Obtain Common Shares for Its Preferred Shares.**

    (a) The Government is not immunized from "inequitable actions in technical conformity with statutory law."  *In re Pure Resources, Inc., S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002); *see also Uni-Marts, Inc. v. Stein*, Civ. A. No. 14713, 1996 WL 466961, at *10 (Del. Ch. Aug. 12, 1996) (finding sufficient allegations that defendants improperly deployed corporate assets "for the purpose of controlling the vote of the corporation's own stock" despite no statutory claim).

**14.6   Alternatively, the Reverse Stock Split Was An Illegal Exaction Because Defendant Had No Legal Authority Under Federal Law To Exercise Whatever Rights Holders of the**

**Series C Preferred Stock May Have Had In a Manner That Increased Its Securities Holdings.  The Defendant Therefore Acted Unlawfully When It Used the Stocks' Voting Power To Obtain Property From Private Citizens.**

**14.6.1**   To the extent Defendant relies on Section 13(3) as the legal basis for its exercise of the Series C Stock rights, that provision does not provide Federal Reserve banks the power to deal in stock.  *See*  Pls.' Proposed Conclusions ¶¶ 4.1-4.7 *supra*; *cf. Cal. Nat'l Bank*, 167 U.S. at 369 ("The power to purchase *or deal* in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an action which may be exercised as incidental to the powers expressly conferred."  (emphasis added)).

**14.6.2**  Because Defendant lacks authority to deal in stock, it was not authorized to use the Series C voting rights to dilute the Stock Split Class and deprive the class of the right to vote on such dilution.

**14.7   The Reverse Stock Split Deprived the Stock Split Class of Its Right to a Class Vote Pursuant to Delaware Law.**

**14.7.1**   Defendant does not dispute that, under Delaware law, "common shareholders have a right to a separate class vote before a Delaware corporation can change the number of authorized common shares or change their par value."  Def.'s Summary Judgment Br. at 49 (citing Del. Code Ann. tit. 8 § 242 (b)(2)).

**14.7.2**   If a controlling entity could use a reverse stock split to bypass the shareholder vote requirement of Section 242 (b)(2) in the Delaware Corporate Code, its protections would effectively be rendered meaningless.

(a)  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) (citations omitted):  awarding damages to plaintiff and finding that when "a controlling stockholder uses a reverse stock split to freeze out minority stockholders without any procedural protections, the

transaction will be reviewed for entire fairness with the burden of proof on the defendant

fiduciaries.  A reverse stock split under these circumstances is the 'functional equivalent' of a

cash-out merger."

**14.8  The Defendant was Also Bound by the Representation to the Delaware Court in the *Walker* Lawsuit.  *See* JX 143 at 7; Brandow: Trial Tr. 5856:25-5857:3. .**

**14.8.1**  In order to secure dismissal of the *Walker* litigation, AIG represented to the

Delaware Court that "It is AIG's position that any amendment of its certificate of incorporation

to increase the number of authorized shares of common stock or to change the par value of that

stock requires a class vote of holders of record of a majority of the shares of common stock

outstanding on the record date for the vote."  JX 143 at 7.

**14.8.2**  Defendant's counsel followed the *Walker* lawsuit closely and monitored its

progress.  PTX 3164 at 1-2 (November 7, 2008 Huebner email to Defendant summarizing

November 7, 2008 hearing in *Walker* litigation).  Two days after making the above

representation, Defendant's attorneys at Davis Polk amended the Credit Agreement "to

implement the representation that had been made to the Delaware court two days

earlier."  (Brandow: Trial Tr. 5861:22-5862:23).

**14.8.3**  Beyond Defendant's control over AIG generally, Defendant participated in the

*Walker* litigation.

(a) Only after obtaining Defendant's consent was AIG able to represent to the *Walker*

Court that there was "no dispute between the parties" (JX 143 at 7).

**14.8.4**  At the time it consented to the representations made in the *Walker* litigation,

Defendant did not realize it would not control the outcome of the common shareholders' class-

only vote on Charter amendments increasing the number of authorized shares.  *Id*. ¶¶ 36.4.1-36.4.2.

**14.8.5**   Once Defendant realized this (after the *Walker* lawsuit was filed), and that it was not in the interest of common shareholders to approve this amendment because of its dilutive impact on them, Defendant determined that a shareholder vote to amend the AIG Corporate Charter should not be held.   *Id. ¶* 36.4.2.

**14.8.6**   Defendant avoided the shareholder vote on the Charter Amendment by relying on a Reverse Stock Split, which it could implement without a class vote of common shareholders.

(a) Common shareholders did not have the right to a class-only vote for a reverse stock split because it did not require an amendment to the AIG Charter to either increase the number of authorized shares or decrease the par value.  As a result, Defendant was able to participate in and control the outcome of the vote on the Reverse Stock Split, guaranteeing that there would be sufficient authorized shares to allow for the exchange of its Series C, E and F preferred shares for more valuable common shares.  Pls.' Proposed Findings ¶¶ 36.5.2.3, 36.7.

**14.8.7**   The Reverse Stock Split created enough unissued shares to allow Defendant to exchange its Series C Preferred Stock for common shares, as well as to exchange its Series E and F preferred shares for AIG common shares.   Pls.' Proposed Findings ¶¶ 36.4.3, 36.7.[5]

---

[5] Defendant might argue that the *Walker* consent order does not technically bar a reverse stock split because it involved the "*decrease* in *issued* shares" rather than the "increase in *authorized* shares." However, although "the Consent Order required a separate class vote to *increase* the number of *authorized* common shares," but not "to *decrease* the number of *issued* shares", which is what happened here, "the order should be read in light of the fact that the lawsuit also requested appropriate relief based upon the common shareholders' right to reject the dilution of their shares."  *Starr Int'l Co.*, 106 Fed. Cl. at 73 (internal quotation marks omitted). Also, as set forth in Paragraph 14.8.1 above, the representation to the Delaware court was broader than the consent order.

**14.8.8**  As a result of the *Walker* representation and the resulting consent order, which must be interpreted in light of that representation, the Stock Split Class "had a right to exclude at least the holders of the Series C Preferred Stock from diluting their shares of common stock" (*Starr Int'l Co.*, 106 Fed. Cl. at 74).

**14.8.9**  The Stock Split Class' property right to exclude the Defendant is further evidenced by Delaware law's prohibition against the use of stratagems to deprive shareholders of their voting rights.

(a) In *Paramount Communications, Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994), the Delaware Supreme Court stated:

> Under the statutory framework of the General Corporation Law, many of the most fundamental corporate changes can be implemented only if they are approved by a majority of the stockholders.  Such actions include election of directors, amendments to the certificate of incorporation mergers, consolidations, sales of all or substantially all of the assets of the corporation, and dissolution.  Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights.

*Id.* at 42 (citation omitted); *see also id.* at 45 (recognizing "the traditional concern of Delaware courts for actions which impair or impede stockholder voting rights"); *Sellers v. Joseph Bancroft & Sons Co.*, 2 A.2d 108, 112-13 (Del. Ch. 1938) (enforcing corporate charter provision relating to transfer of voting rights).

(b) Delaware courts have vigilantly protected the voting rights that shareholders possess. *See, e.g., Paramount*, 637 A.2d at 42 n.11 (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) (holding that actions taken by management to manipulate corporate machinery "for the purpose of obstructing the legitimate efforts of dissident stockholders in the

exercise of their rights to undertake a proxy contest against management" were "contrary to established principles of corporate democracy" and therefore invalid); *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 (Del. 1982) (holding that supermajority voting provisions must be clear and unambiguous because they have the effect of disenfranchising the majority); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 n.2 (Del. Ch. 1988) ("Delaware courts have long exercised a most sensitive and protective regard for the free and effective exercise of voting rights.").

**14.8.10**    As the evidence at trial demonstrates, the reverse stock split was used to avoid a separate class vote to increase the number of authorized shares, because Defendant knew that Plaintiffs would not vote in favor of increasing the number of authorized shares to a level that would permit Defendant to convert its Series C Preferred Shares for common shares.  Pls.' Proposed Findings ¶¶ 36.8-36.11.  This is precisely the type of stratagem to deprive shareholders of voting rights that the Stock Split Class had the right to prohibit under Delaware law.

**14.9   The Reverse Stock Split is a Compensable Taking and/or Illegal Exaction Because the Constitution Constrains Government Action "by whatever instruments or in whatever modes that action may be taken."  *Ex parte Virginia*, 100 U.S. 339, 346-47 (1879).**

**14.9.1**  In "any case where Government action is causally related to private misconduct, which leads to property damage – a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment."  *Nat'l Bd. of Young Men's Christian Ass'n v. United States*, 395 U.S. 85, 93 (1969).

**14.9.2**  While "no one fact can function as a necessary condition across the board for finding state action," courts have identified "a host of facts that can bear on the fairness of such

an attribution," as the Supreme Court explained in *Brentwood Academy v. Tennessee Secondary School Athletic Association*:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents." We have treated a nominally private party as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies," or when government is "entwined with governmental policies," or when government is "entwined in its management or control." 531 U.S. 288, 296 (2001) (citations and brackets omitted).

**14.9.3** Defendant's ownership of, and resulting control over, AIG and its direct involvement in the Reverse Stock Split, are each sufficient to characterize the Reverse Stock Split as a Government act. *See* Pls.' Proposed Findings ¶¶ 33.0, 36.4.

## E. DEFENDANT'S AFFIRMATIVE DEFENSES

## 15.0

## EACH OF DEFENDANT'S AFFIRMATIVE DEFENSES FAILS.

**15.1 Defendant Bears the Burden on Each of Its Affirmative Defenses, and the Only Affirmative Defenses that Defendant Can Advance Are Those That It Pleaded.**

**15.1.1** The only affirmative defenses that Defendant can advance are those that it pleaded in its Answer and that survived Plaintiffs' motion to strike. *See* Def.'s Answer to Pls.' 2d Am. Compl. ¶¶ 240-263 (pleading as affirmative defenses: payment, equitable estoppel, laches, waiver, severability, and contingent offset); Opinion and Order on Motion to Strike Affirmative Defenses at 4 (Nov. 8, 2013) (striking laches defenses); Def.'s Pre-Trial Proposed Conclusions of Law ¶ 242 (withdrawing hold harmless defense).

**15.1.2**  Any affirmative defense not raised in a responsive pleading is waived.  *See Wood v. Milyard*, 132 S. Ct. 1826, 1832 (2012) ("Ordinarily in civil litigation, a[n affirmative defense] is forfeited if not raised in a defendant's answer or in an amendment thereto.  An affirmative defense, once forfeited, is excluded from the case . . . ." (internal quotation marks, citations, brackets, and footnote omitted); *Todd v. United States*, 292 F.2d 841, 845 (Ct. Cl. 1961) ("an affirmative defense . . . must be pleaded or it is considered waived"); RCFC 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

**15.1.3**  Defendant bears the burden on each of its affirmative defenses.  *See, e.g., Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001) ("The burden of establishing an affirmative defense is on the party raising the defense.").

## 15.2  Defendant's Waiver Defense Fails.

**15.2.1**  "For a waiver to be effective, 'it must be clearly established that there was intentional relinquishment of a known right or privilege.'"  *Am. Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 680 (2007) (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)) (internal quotation marks omitted).

**15.2.2**  "Waiver will only be found where it is "knowing and voluntary".  *McCall v. U.S. Postal Serv.,* 839 F.2d 664, 667 (Fed. Cir. 1988).

**15.2.3**  A "waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972).

**15.2.4**  The Supreme Court had been "unwilling to find waiver in circumstances which fall short of being clear and compelling."  *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967).

**15.2.5**  The Credit Agreement Class could not – and did not – voluntarily and knowingly waive their right to just compensation for Defendant's loan condition requiring the surrender of their equity and voting control.  The evidence is undisputed that Plaintiffs were never given an opportunity to consider and object to the surrender of their equity and voting control as a condition of AIG's receipt of liquidity assistance.  *See* Pls.' Proposed Findings ¶ 35.0.  Quite the contrary, Defendant did everything in its power to ensure that shareholders would not be given such opportunity.  *Id.* ¶¶ 34.0-36.0.

**15.2.6**  In any event, ratification and waiver do not apply where a contract provision is unlawful.  As discussed in paragraphs 4.1-4.7 *supra*, Defendant exceeded its authority under Section 13(3) when it conditioned its extension of credit to AIG on the surrender of Plaintiffs' equity and voting control.

**15.2.7**  "Failure to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation."  *Am. Airlines, Inc.,* 551 F.3d at 1302 (citing *Swift & Courtney & Beecher Co.,* 111 U.S. at 29).

(a) "The regulated corporation, by accepting such an invalid condition imposed by a regulatory authority, does not thereby waive the right to rely on the statute, and the right later to denounce the provision which contravenes it."  *Cal. Or. Power Co. v. Fed. Power Comm'n,* 239 F.2d at 434 (quoting *Peoples Bank v. Eccles,* 161 F.2d 636, 644 (D.C. Cir. 1947), *rev'd on other grounds sub nom. Eccles v. Peoples Bank of Lakewood Vill., Cal.*, 333 U.S. 426 (1948)).

**15.3  Ratification Does Not Apply Because There Was No Voluntary Act by Plaintiffs.**

**15.3.1**  Ratification "is always a 'voluntary and positive act.'" *Genger v. TR Investors, LLC*, 26 A.3d 180, 195 (Del. 2011) (quoting *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943)).

**15.3.2**  Plaintiffs were never given the opportunity to vote on the initial loss of their equity and voting control or on the Reverse Stock Split, and therefore did not, and could not, ratify those actions.

**15.3.3**  In addition, "No acts can constitute a ratification, however, that are or were done although the fear or influence that operated to induce the original transaction is still effective." 28 WILLISTON ON CONTRACTS § 71:9 (4th ed. 1990).

(a)  RESTATEMENT (SECOND) OF CONTRACTS § 380 cmt. b: "A party's power of avoidance for incapacity, duress, undue influence or abuse of a fiduciary relation is not lost by conduct while the circumstances that made the contract voidable continue to exist."

(b) *Farmers' & Ginners' Cotton Oil Co. v. United States*, 76 Ct. Cl. 294, 311 (1932): rejecting ratification defense to duress argument where plaintiff accepted the benefits of the illegal contract as the government's position would have required the plaintiff "to make the damages resulting from the coercion far greater and much more injurious than is required by the unlawful contract".

**15.4  Ratification and Waiver Do Not Apply Because Defendant Has Unclean Hands.**

**15.4.1**  In general, "equity will not lend its aid to enable a party to reap the benefits of his misconduct." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1376 (Fed. Cir. 2001) (quoting MCCLINTOCK ON EQUITY § 26 (2d ed. 1948)).

**15.4.2**  Plaintiffs had the right to express disapproval or approval of the Credit Agreement terms through a shareholder vote.  *See* § 10.7 *supra*.

**15.4.3**  Defendant intentionally took affirmative steps to prevent Plaintiffs from having an opportunity to object to the terms of the Credit Agreement (*see* Pls.' Proposed Findings ¶¶ 35.3-35.4).  Accordingly, Defendant should not be permitted to reap the benefits of its misconduct.

**15.5  The Contract-Based Affirmative Defenses of Payment, Contingent Offset/Recoupment, and Severability Are All Limited to AIG and Do Not Apply to Plaintiffs.**

**15.5.1**  "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  Because of the legal distinction between a corporation and its shareholders, courts will not hold shareholders liable for the contractual obligations of a corporation.

**15.5.2**  "Unless the liability is expressly imposed by constitutional or statutory provisions, or by the articles of incorporation, or by special agreement of the shareholder, shareholders are not personally liable for debts or obligations of the corporation either at law or in equity, in the absence of fraud or the necessity or protecting a paramount equity."  13 FLETCHER CYC. CORP. § 6213; *see also Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 433 (Del. 1965) ("A stockholder of a corporation is not personally liable for the corporate debts").[6]

(a) As this Court held, Plaintiffs' takings and illegal exaction claims are direct claims against Defendant for harm to the shareholders, and exist "independent of any harm to AIG."

---

[6] Defendant might argue that *In re Salomon Inc. S'holders' Deriv. Litig.,* No. 91 Civ. 5500 (RPP), 1994 WL 533595, at *4 (S.D.N.Y. Sept. 30, 1994), applied contractual defenses based on a corporation's undertakings to plaintiff shareholders of that corporation.  However, that was a derivative action, not a direct action.

*See Starr Int'l Co.*, 106 Fed. Cl. at 62 ("the Court finds that Starr has pled facts sufficiently alleging a harm to the suing stockholders *independent of any harm to AIG* and as such, has standing to advance its expropriation claim directly") (emphasis added); *accord Starr Int'l Co. v. United States*, 111 Fed. Cl. 459, 465 (2013). Defendant cannot rely on its contractual defenses *with AIG* to block a suit by the shareholders for harm to the *shareholders*.

## 15.6 The Defense of Contingent Offset/Recoupment Also Concerns Potential Offsets or Recoupments Against AIG, Not Plaintiffs.

**15.6.1** Defendant alleges that, but for its own actions, AIG would have either been taken over by a private consortium or gone bankrupt, which would have resulted in AIG losing a tax benefit called net operating loss carryforwards ("NOLs").  But as Defendant states in its affirmative defense, the NOLs belonged *to AIG* – not to Plaintiffs.  Def.'s Answer to Pls.' 2d Am. Compl. ¶ 261. Plaintiffs' direct claims against Defendant are unaffected by any offset/recoupment claim potentially available against AIG.  *See Dole Food Co.*, 538 U.S. at 474; *Suffolk Cty. v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984); *Fernandes v. Equitable Life Assurance Soc'y of U.S.A.*, 4 A.D.3d 214, 215 (N.Y. App. Div. 2004); *Pacetti v. United States*, 50 Fed. Cl. 239, 244-45 (2001).

**15.6.2** In any event, Defendant failed to present any evidence at trial supporting its allegations that AIG would have lost the use of the NOLs.  Accordingly, it has waived its affirmative defense of contingent offset/recoupment.  *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1357 (Fed. Cir. 2009) (holding defendant waived affirmative defense because it "failed to pursue those arguments at trial").

**15.6.3** Moreover, Defendant has failed to establish the predicate of its argument – i.e., that avoiding bankruptcy was causally related to the exaction of 79.9% of Plaintiffs' equity and voting control.

**15.7  Defendant Has Established None of the Elements of Equitable Estoppel.**

**15.7.1**  "[E]quitable estoppel requires misrepresentation by the plaintiff and reliance on the misrepresentation by the [defendant]."  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1065 (Fed. Cir. 2003).

(a)  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1042-43 (Fed. Cir. 1992):  a defendant asserting equitable estoppel must establish that the plaintiff "communicate[d] something in a misleading way" and that the defendant relied upon that misleading communication.

**15.7.2**  "[S]ilence alone will not create an estoppel unless there was a clear duty to speak."  *Id.* at 1043.

**15.7.3**  Defendant failed to present any evidence that Plaintiffs communicated anything to Defendant that was misleading.

**15.7.4**  To assert an equitable estoppel defense, a party "must introduce evidence of some damages or prejudice suffered by it as a direct result of the [alleged delay in asserting a claim]." Simmonds Precision Prods., Inc. v. United States, 546 F.2d 886, 892 (Ct. Cl. 1976) (rejecting affirmative defense of equitable estoppel where party presented no evidence of damage or prejudice suffered by it).

(a) "[U]nless the nonaction of the complainant operated to damage the defendant or to induce it to change its position there is no necessary estoppel arising from the mere lapse of time."  *N. Pac. R. Co. v. Boyd*, 228 U.S. 482, 509 (1913).

(b) "Material prejudice" is a necessary element of equitable estoppel. *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992).

(c) To assert an equitable estoppel defense, a party provided with a false statement or from whom material facts were concealed must establish that it "relied on or acted on [the information] to his prejudice." *Southern Ry. Co. v. United States*, 228 Ct. Cl. 712, 715 n.3 (1981).

**15.7.5**  Defendant presented no evidence of what prejudice, if any, it suffered as the result of anything Plaintiffs said.

## 16.0

**DEFENDANT MAY NOT AVOID THE ILLEGALITY OF ITS EXACTION BY RELYING ON AN "ECONOMIC EQUIVALENCE" CONTRACT TERM THAT WOULD PROVIDE IT WITH PRECISELY THE BENEFIT THE LAW PRECLUDES IT FROM ACQUIRING.**

**16.1  Defendant Has Argued that Even if the Term of the Credit Agreement by which Plaintiffs' Equity and Voting Control Was Taken or Exacted Was Illegal, Plaintiffs Would Not Have Suffered Any Compensable Injury Because Under Section 8.12 of the Credit Agreement, in the Event that any Provision is Declared Illegal, the Parties "shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions."  Def.'s Summary Judgment Br. at 39.**

**16.2  The Purported Economic Equivalence Provision, Like Defendant's Contract-Based Affirmative Defenses, Would Not Bind Plaintiffs Even If It Bound AIG.**

**16.3  Defendant's Economic Equivalence Argument Also Fails Because Defendant Lacked Authority to Demand Any Consideration Beyond an Interest Rate "Fixed with a View of Accommodating Business and Commerce"; and Defendant Received that Consideration (and More); So There Was No Additional Consideration, However Described, that Defendant Could Receive.**

**16.4  In Addition, Because Defendant Could Not Receive Any Compensation Other than Approved by the Board of Governors, and the Board of Governors Never Approved the Credit Agreement, There Is No "Economic Equivalent" to which Defendant Could Be Entitled.**

## F.  DAMAGES

### 17.0

**WHERE THE GOVERNMENT EXACTS PROPERTY FROM A PLAINTIFF IN CONTRAVENTION OF ITS STATUTORY AUTHORITY, THE PLAINTIFF IS ENTITLED TO RECEIVE THE VALUE OF ITS PROPERTY ILLEGALLY EXACTED.**

**17.1  "Several cases hold that, under the illegal exaction doctrine, a plaintiff may seek the return of the monetary value of property seized or otherwise obtained by the government".** *Casa de Cambio Comdiv S.A. de C.V. v. United States***, 48 Fed. Cl. 137, 145 (2000),** *aff'd,* **291 F.3d 1356 (Fed. Cir. 2002).**

(a) "Were an illegal exaction to be found, Plaintiff could receive the value of his forfeited

property".  *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996).

**17.2  The Value of the Equity and Voting Control Defendant Exacted Should Be Calculated As of the Date of the Exaction.**

(a) *Gmo. Niehaus & Co. v. United States*, 373 F.2d 944, 961 (Ct. Cl. 1967): value of

securities at the time of their seizure is the proper measure for calculating damages for their

illegal exaction to the extent calculable, but if not calculable the proper measure is the proceeds

from the sale of the securities.

**17.3  For the Credit Agreement Class Claims, Fair Value Should Be Calculated as of the Effective Date of the Credit Agreement Because Prior to the Effective Date of the Credit Agreement, There Was No Legally Binding Agreement Between AIG and FRBNY Entitling Defendant to an Equity Interest in and Voting Control of AIG.  Pls.' Proposed Findings ¶ 14.3.**

**17.3.1**  The only document addressing potential Credit Facility conditions was a term

sheet (Pls.' Proposed Findings ¶¶ 14.1-14.3), which on its face was legally nonbinding and

unenforceable.  *See, e.g. Richbell Info. Sys., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297

(N.Y. App. Div. 2003) (explaining that a term sheet is a "classic example of an unenforceable

'mere agreement to agree'" and holding that "we recognize that term sheets, such as those used here, will not support a claim of breach of contract or of the duty of good faith").

(a) All versions of the term sheet produced by Defendant and AIG state that the term sheet would be governed by New York law.

**17.3.2**  In addition, before the Credit Agreement terms were presented to the AIG Board on the evening of September 21, 2008, the AIG Board was unaware that Voting Preferred Stock would be conveyed, which means that there could not have been an earlier meeting of the minds on that term.

**17.3.3**  Voting Preferred Stock is materially different from the warrants the Board had understood were contemplated, which were non-voting and required the payment of an exercise price before they can be exercised.  Pls.' Proposed Findings ¶ 17.0.

**17.3.4**  Under Delaware law, the minimum exercise price of a warrant is the par value of a share of stock, which for AIG was $2.50 per share.

(a) *Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, No. Civ. A. 6894-VCP, 2013 WL 1200273, at *11 (Del. Ch. Mar. 26, 2013):  "8 Del. C. § 157 (d) states, in relevant part, 'In case the shares of stock of the corporation to be issued upon the exercise of such rights or options shall be shares having a par value, the consideration to be received therefor shall have a value not less than the par value thereof.'  In other words, Delaware law requires the payment of at least par value 'upon the exercise . . . of options.'" (ellipsis in original).

(b) At the relevant time, the par value of AIG's stock was $2.50 per share (Pls.' Proposed Findings ¶ 17.9).

91

**17.3.5**  To exercise warrants in an amount equal to a 79.9 percent equity interest in AIG would have required a payment of at least $29.34 billion.  Pls.' Proposed Findings ¶ 17.9.

## 17.4  For the Stock Split Claims, Fair Value Should Be Calculated As of the Date of the Reverse Stock Split.

**17.4.1**  The Reverse Stock Split took from Plaintiffs their right to vote as a class on whether to enable Defendant to replace its Series C Preferred shares with common shares.  Based on this right to vote as a class, Plaintiffs had the right to block Defendant's ability to convert its Series C preferred shares into common shares.

(a)  "The reverse stock split enabled defendant to take shareholders' right to block that dilution of their common shares."   Kothari:  Trial Tr. 4593:15-20.

(b) To calculate the damage to the Stock Split Class, Professor Kothari first calculated the liquidation preference in excess of fair value acquired by Defendant to be $23.5 billion.  He then multiplied $23.5 billion by 20% to obtain the value taken or exacted from the Plaintiffs since their common shares reflected a 20% ownership in the company.  *See* Pls.' Proposed Findings ¶ 40.1(d).

**17.4.2**   The fair value of this blocking right was $390 million at the time of the Reverse Stock Split.  Pls.' Proposed Findings  ¶ 39.0.

**17.4.3**  The Reverse Stock Split also enabled Defendant to exchange its Series E and Series F preferred shares for more valuable common shares.  Pls.' Proposed Findings ¶ 40.0. Without the Reverse Stock Split, Defendant would not have been able to exchange its Series E and F preferred shares (worth approximately $26.1 billion) for common shares (worth approximately $41.3 billion).   *Id.* ¶ 40.1(a).  This exchange directly diluted AIG common shareholders and reduced the value of their equity interest in AIG by $4.329 billion.  *Id.*

¶ 40.1(b)-(d).  The fair value of the right taken away from common shareholders – the right to

block dilution from the Series E and F exchange – is $4.329 billion.  *Id.* ¶ 40.1(d).

**17.5  The Value of Plaintiffs' Equity and Voting Control that Defendant Exacted on September 21, 2008 Was at Least $35.4 Billion As of the Effective Date of the Credit Agreement.  *See* Pls.' Proposed Conclusions ¶18.2 below.[7]**

## 18.0

### "JUST COMPENSATION" FOR A TAKINGS CLAIM IS BASED ON THE FAIR VALUE OF THE PROPERTY AT THE TIME OF THE TAKING.

**18.1  "Just Compensation" Means that "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken."  *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973).**

**18.1.1**  In most instances, "just compensation" means the fair market value of the

property on the date it was appropriated.

(a) The Supreme Court has held that "just compensation" "means in most cases the fair

market value of the property on the date it is appropriated."  *Kirby Forest Indus., Inc. v. United*

*States*, 467 U.S. 1, 10 (1984).

---

[7] Defendant might argue that the proper measure of damages is not the value of the exacted property as of the date of exaction but what Defendant realized for the property relying on *Gmo. Niehaus & Co.* where the court awarded the amount for which the property was sold ($18.4 billion according to Defendant's expert Mordecai and $17.6 billion according certain other  statements by Defendant (*see* Pls.' Proposed Findings ¶¶ 37.8-37.9)).  However, *Gmo. Niehaus* was a case where the value of the assets at the time of the exaction was not proven.  179 Ct. Cl. at 261.  Where, as here, the value at the time of exaction is proven, the cases require that that amount be awarded.  Reliance on the proceeds, rather than the value at the time of exaction when the Credit Agreement became effective, also fails to take into account the fact that Defendant's exercise of control over AIG caused damage to AIG's operations and assets and thereby reduced the value of the common shares (*id.* ¶¶ 33.2, 34.0, 37.9), and that the proceeds Defendant received were also determined by when it decided to sell the equity.  *Id.* ¶ 37.8.1.

(b) Further, "just compensation" means "the full monetary equivalent of the property taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

**18.1.2**  "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (internal quotation marks omitted).

**18.2  Because Fair Market Value Assumes Neither Seller Nor Buyer Is "Under Any Compulsion to Buy or Sell", Fair Market Value Must Reflect the Asset's Intrinsic Value and Not an Artificially Depressed Temporary, or Fire Sale, Value.**

**18.2.1**  The fair market value of the equity and voting control Defendant took on September 22 or 23, 2008 was at least $35.4 billion.  Pls.' Proposed Findings ¶ 37.1.

(a) "The 'monetary equivalent' referred to above has found acceptance in the concept of fair market value, which value is normally to be ascertained, with reference to the property in question, from what a willing buyer would pay in cash to a willing seller, neither being under any compulsion to buy or sell and both being fully informed knowledgeable about all relevant matters." *Ga. Pacific Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980).


**19.0**

**DEFENDANT'S HYPOTHETICAL "BUT FOR WORLD" ARGUMENTS ARE LEGALLY IRRELEVANT AND FACTUALLY WRONG.**

**19.1  Defendant's Hypothetical "But For" Analysis Fails as a Matter of Law Because It Depends on Cases Involving Regulatory Takings Where the Government Does Not Actually Acquire Property.**

**19.1.1**  A regulatory taking is subject to a different analysis than a taking involving a direct appropriation.  *Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132, 1135 (Fed. Cir. 2004) (explaining that a taking involving an appropriation of property and a regulatory taking "are subject to different analyses").

**19.1.2**  In regulatory takings cases, the question is not the fair market value of the property acquired by the Government, but whether government action so burdens a citizen's use or enjoyment of property that it constitutes a *de facto* taking.  In contrast with a direct appropriation of property rights, for a regulatory taking, even the fact of damage is sufficiently uncertain that "a showing of but-for economic use or value is a necessary element".  *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014).

**19.1.3**  For a regulatory taking, "the requirement of 'severe economic deprivation' comes from the nature of the regulatory takings claim, which lack 'the "typically obvious and undisputed" predicate of a physical invasion or appropriation of private property by the government' and are 'in essence, a claim that "a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation."'" *Cienga Gardens v. United States*, 503 F.3d 1266, 1282 (Fed. Cir. 2007) (quoting *Rose Acre Farms, Inc. v. United States*, 373 F.2d 1177, 1195 (Fed. Cir. 2004) (quoting *Tahoe-Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 n.17 (2002))).

**19.1.4**  The regulatory taking "but for economic loss" analysis does not apply to takings involving the direct appropriation of property, and thus Defendant incorrectly tries to apply the factors in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), to the damages analysis in this case.  *Penn Central* does not apply here because that case involved the

95

impact of landmark regulations on the plaintiff's property and therefore involved a regulatory taking claim.

(a) "The *Penn Central* factors – though each has given rise to vexing subsidiary questions – have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules."  *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 539 (2005); *see also CCA Assocs. v. United States*, 667 F.3d 1239, 1244 (Fed. Cir. 2011) ("Typically, when considering whether government action constitutes a regulatory taking, we apply factors set forth in *Penn Central*").

**19.1.5**  Based on the Supreme Court's decision in *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), Defendant has argued that a "but for" analysis applies to a physical taking.  (Def.'s Pre-Trial Conclusions of Law ¶ 70).  *Brown* did not so hold.

(a) In *Brown*, the State of Washington required lawyers to create one of two types of trust accounts for their clients' funds:  an account that would accrue interest for the client, or an IOLTA account where the interest earned would be provided to the Legal Foundation of Washington for charitable and educational purposes.  *Id.* at 225-27.  Funds could be deposited in an IOLTA account *only if* the funds would not make a net return for a client, taking into account administrative costs and fees.  The plaintiffs asserted, and the Court agreed, placing their funds in an IOLTA account constituted a Fifth Amendment taking of private property for a public purpose even though the state did not itself secure the interest.

(b) The *Brown* Court notes:

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, *United States v. Pewee Coal Co.*, 341 U.S. 114, 115, 71 S. Ct. 670, 95 L.Ed. 809

(1951), regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."  (*Brown*, 538 U.S. at 233).

The Court then goes on to distinguish physical takings cases from regulatory cases such as *Penn Central*, which the Court observes "does not constitute a categorical taking.  'The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.'" *Id.* at 234 (quoting *Yee v. Escondido*, 503 U.S. 519, 523 (1992)).

(c) The Court held that the *Penn Central ad hoc* analysis did not apply because "the interest earned in the IOLTA accounts is the private property of the owner of the principal" and was therefore a *per se* physical taking.  *Id.* at 235 (quotation omitted).

(d) However, the Court did not end its analysis at whether there was, in fact, a taking because it still needed to determine whether any "just compensation" was due.  The Court held that no "just compensation" was due because, in applying the principle that just compensation is measured by what the owner lost, and the value of the property taken was zero because the relevant law required funds that could generate a net return to be placed in a non-IOLTA account.  *Id.* at 236-37.  Accordingly, where funds were appropriately deposited into an IOLTA account consistent with the applicable law, those funds had zero potential to generate interest. *Id.* at 240.

(e) *Brown* does not, as Defendant contends, require a but-for analysis; it merely extends the principle that where the Government has not itself received the property taken the appropriate measure of compensation is what the plaintiffs lost at the time of the taking.  *Id.* at 236.

**19.1.6**  In any event, *Brown*'s damages test is the fair market value to plaintiffs of what was taken.  In September 2008, Plaintiffs here lost 79.9 percent of their equity and voting control, with a value to them of at least $35.4 billion.

## 19.2  Moreover, Even If the "But For Economic Loss" Test Applied to Plaintiffs' Physical Takings Claims, Defendant Has Not Carried Its Burden Of Proving Offsetting Benefits.

**19.2.1**  "Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case." *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011).

**19.2.2**  Defendant cannot rely on mere speculation to establish its claim of an offsetting benefit.

(a)   *CCA Assocs.*, 667 F.3d at 1245:  affirming the trial court's conclusion that the Government's offset defense failed because the "potential benefits were too speculative to mitigate CCA's proof of economic harm."

(b)   *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1275 (Fed. Cir. 2009): refusing to apply offsetting benefits when the "government points to no economic data in the record to support its assertion of offsetting benefits".

**19.2.3**  Defendant failed to quantify with evidence the offsetting benefits it claims Plaintiffs received and thus has failed to carry its burden.

**19.2.4**  In addition, even if the Government had quantified any offsetting benefits, it would still be necessary to take into account the fact that AIG paid for the benefit that it received.  Pls.' Proposed Finding ¶ 37.7.

## 19.3  Defendant's Hypothetical "But For" Argument Assumes, Contrary to the Facts, that In the Absence of Surrender of 79.9 Percent of Plaintiffs' Equity and Voting Control, Defendant on September 22, 2008 Would Have Pushed AIG into Bankruptcy by Calling Its

**Demand Notes and Refusing Further Funding Even Though that Funding Would Be Fully Secured.**

**19.3.1**   The record is clear that Defendant believed an AIG bankruptcy would be catastrophic for the overall economy.  *See* Pls.' Proposed Findings ¶ 9.0.

**19.3.2**   The record is clear that Defendant believed that any loan to AIG would be fully secured.  *See* Pls.' Proposed Findings ¶ 21.0.

**19.3.3**   Defendant's position in this litigation that it would nevertheless have let AIG file for bankruptcy if it did not receive the onerous and unprecedented 79.9 percent of AIG shareholders' equity and voting control is neither credible nor supported by the record.

**19.4   Defendant's Hypothetical "But For" Argument Also Assumes, Contrary to the Law, that It Was Proper for Defendant to Tie the Benefit of a 13(3) Loan to the Surrender of Equity and Voting Control.**

**19.4.1**   If it were not, there is no basis for netting the benefit of the loan against the value of the equity and voting control taken.

**19.4.2**   Defendant argues that it is entitled for public policy reasons to take from the shareholders of one company 79.9 percent of their equity and voting control as a condition of providing their company with a benefit that every other company receiving the benefit receives without giving up any equity or voting control.  That is flatly contrary to the rule that the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong*, 364 U.S. at 49.

**19.5   Defendant's Hypothetical "But For" Argument is Not Applicable to Plaintiffs' Illegal Exaction Claims.**

**19.5.1**  No case has ever applied Defendant's "but for" argument to an illegal exaction claim.

**19.5.2**  Because Defendant had no legal authority to require the surrender of equity and voting control as consideration for a 13(3) loan, there is no basis for netting or offsetting the asserted value of that loan against the damages resulting from the surrender of Plaintiffs' equity and voting control.

**19.5.3**  Any different result would effectively eliminate a claim for illegal exaction such as the claim by the plaintiff in *Suwannee* because when an agency ties obtaining a benefit from the Government to an illegal condition, the only situation in which the plaintiff would agree is if the cost of the illegal condition is less than the benefit sought.

**19.5.4**  Accordingly, applying an offsetting benefits analysis to exactions, in these circumstances, would permit the Government to avoid liability – and avoid congressionally imposed limitations – because the benefit received would always exceed the cost of the illegal condition imposed on receipt of that benefit.

**19.6  Moreover, Defendant's Offsetting Benefits Argument, At Bottom, Rests On A Misleading Comparison of AIG's Stock Price on September 16, 2008 With Its Stock Price On September 22, 2008.**

**19.6.1**  Defendant argues that because AIG's common stock price increased from September 16, 2008 to September 22, 2008, Plaintiffs did not suffer any diminution of value of their holdings in AIG.  But that argument fails to recognize that the stock price on September 16, 2008 did not reflect AIG's intrinsic enterprise value as a result of the general market panic.  Pls.' Proposed Findings ¶ 37.5.3.  The movement in AIG's stock price simply reflected a correction of

market failure back towards AIG's intrinsic value, once AIG's liquidity was restored.  *Id.*
¶ 37.4.2.

**19.6.2**  AIG's liquidity needs resulted from the general panic market conditions and the
freezing of credit markets that affected AIG and every major financial institution.  Pls.' Proposed
Findings ¶¶ 2.2-2.7, 7.0.  By extending liquidity assistance to AIG, Defendant did not increase
AIG's intrinsic enterprise value; it simply corrected the impact of a negative externality – that is,
the effects of market failure and dysfunction.  *Id.* ¶ 37.4.2.

**19.6.3**  Once the panic and artificial market conditions were partially corrected, the stock
prices and valuations of AIG and other financial institutions, as expected, rebounded.  *Id*.

(a) As demonstrated in Professor Kothari's testimony, when AIG's common stock
rebounded to an enterprise value of $48.6 billion once AIG's liquidity was restored, Defendant
took 79.9 percent of that restored intrinsic value ($35.4 billion).  *See* Pls.' Proposed Findings
¶¶ 37.1, 37.4.

**19.6.4**  Valuing AIG's stock at the temporarily depressed fire sale prices that prevailed at
the low point of the financial crisis is inconsistent with the concept of fair market value.  *See*
Pls.' Proposed Findings ¶ 37.5.3.


## 20.0

## PLAINTIFFS ARE ENTITLED TO PREJUDGMENT INTEREST FOR THEIR TAKINGS CLAIM.

**20.1  If the Government Takes Private Property without Paying Just Compensation at the
Time of the Taking, the Constitution Requires the Payment of Prejudgment Interest.  *Kirby
Forest Indus.,* 467 U.S. at 10–11.**

**20.2  Prejudgment Interest Accrues from the Date of the Taking.**

(a) *Otay Mesa Prop., L.P. v. United States*, 111 Fed. Cl. 422, 423 (2013): "The Court acknowledges the existence of ample case law holding that interest in a Fifth Amendment taking should run from the date of the taking."

**20.3   When Prejudgment Interest Is Awarded in a Taking Case, the Calculation of Interest Owed is Based on Compound Interest.**

(a) *Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 414 (1994): "Where the government delays its payment for 'taken' property, an award of compound interest is appropriate."

**20.4   The Proper Rate of Interest to Achieve Just Compensation is a Question of Fact.**

(a) *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988): "the question of the rate at which such an award should be made is a matter left to the sound discretion of the trier of fact".

**20.5   Where the Government Has Not Paid Just Compensation at the Time of the Taking the Supreme Court Has Instructed that Prejudgment Interest Should Be Calculated At a Rate "sufficient to ensure that [plaintiff] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."   *Kirby Forest Indus.*, 467 U.S. at 10-11.**

**20.5.1**   "This principle recognizes the time value of money and the opportunity a plaintiff has lost to earn income on its damages award.  A delay in payment is also a delay in the use of the money." *Otay Mesa Prop.*, 111 Fed. Cl. at 424 (citation omitted); *see also* Pls.' Proposed Findings ¶ 41.0 (Plaintiffs' calculation of appropriate prejudgment interest rate).

**20.6   Contrary to Defendant's Argument at Trial that "a risk-free rate of return would be appropriate" Based on the Defendant's Liquidity Assistance to AIG, Neuberger: Trial Tr. 5572:12-14, Takings Law Does Not Award Compensation "from the perspective of the government's cost of borrowing," But Instead Calculates What a Reasonable Investor in Plaintiffs' Position Would Have Done with Their Money to Seek a Prudent, Diversified Return.  *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 630 (2004).**

(a) Defendant's expert, Dr. Neuberger, admitted at trial that he did not know of any

takings case applying the risk-free rate to calculate prejudgment interest.  Neuberger: Trial Tr.

5615:23-5616:15.

**20.7   To Calculate a Rate of Interest that Places the Plaintiff in the Position He Would Have Been in Had Payment Been Made at the Time of the Taking, "courts have often relied on a standard referred to as the 'prudent investor rule.'  Pursuant to this rule, the appropriate interest rate is calculated based not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how a reasonably prudent person would have invested the funds to produce a reasonable return while maintaining safety of principal."  *Tulare Lake Basin Water Storage Dist.*, 61 Fed. Cl. at 626 (internal quotation marks omitted).**

**20.8   In Determining What a Prudent Investor Would Have Done, Courts Have Held that "the prudent investor rule requires a rate of return that more accurately reflects a diversified investment".  *Tulare Lake Basin Water Storage Dist.*, 61 Fed. Cl. at 630.**

(a) "Because a reasonably prudent investor would diversify his risk, it is proper to

consider the rate of interest paid on different types of securities with different maturities." *United*

*States v. 429.59 Acres of Land*, 612 F.2d 459, 465 (9th Cir. 1980).[8]

---

[8] Defendant may argue based on its expert Dr. Neuberger's testimony that the Declaration of Takings Act ("DTA") implies that the one-year Treasury bill rate was an appropriate rate of interest.  DX 1880 at 11; Neuberger: Trial Tr. 5622:8-22.  The DTA, however, applies only where the Government deposits just compensation with the Court and the condemnee gets immediate access to the deposited funds.  *See* 40 U.S.C. §§ 3114(a)-(c), 3116.  That is not the case here.

Moreover, the DTA rate is inappropriate to calculate Plaintiffs' prejudgment interest over the substantial time period from the Takings in 2008 and 2009 until now.  *Compare Ga. Pac. Corp. v. United States*, 640 F.2d 328, 365 (Ct. Cl. 1980) (reversing trial court for failing to consider "the economic circumstances prevailing in the years between the date of the taking and the date of payment"), *with United States v. Blankinship*, 543 F.2d 1272, 1275 (9th Cir. 1976) (characterizing the Declaration of Taking Act as designed to "provide a means by which the United States can acquire quickly a fee simple absolute title to land taken 'for the use of the United States'").

In *Biery v. United States*, the Court of Federal Claims rejected the DTA interest rate as inconsistent with the prudent investor rule based on the testimony of Dr. Paul Wazzan, Plaintiffs' expert in this case, who instead calculated an adequate market return.  *Biery v. United States*, No.

**20.9   Applying the Prudent Investor Rule, the Appropriate Compounded and Annualized Prejudgment Interest Rate Is 7% for the Credit Agreement Class Claim and 20.1% Compounded and Annualized for the Stock Split Class Claims.  Pls.' Proposed Findings ¶¶ 41.0, 41.2.**

**21.0**

**PLAINTIFFS ARE ALSO ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEES, EXPERT WITNESS FEES, DISBURSEMENTS, AND COSTS.**

**21.1   Plaintiffs Are Entitled to an Award of Reasonable Attorney's Fees, Expert Fees, and Disbursements for Their Takings Claim.**

**21.1.1**   Plaintiffs who succeed in an action "awarding compensation for the taking of property" shall be reimbursed for his "reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees".  42 U.S.C. § 4654(c).

**21.1.2**   The Supreme Court has explained that the just compensation mandate requires putting property owners in "as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation".   *See Kirby Forest Indus.*, 467 U.S. at 10-11.

(a)  "[U]nder just compensation jurisprudence, a plaintiff is also entitled to interest and attorneys' fees".   *Clark v. United States*, 19 Cl. Ct. 220, 223 (1990).

(b)  "[S]uccessful plaintiffs in a takings case are entitled to all 'reasonable costs, disbursements, and expenses' incurred in connection with their suit, including fees paid to expert witnesses".   *Res. Instruments, Inc. v. United States*, 97 Fed. Cl. 545, 559 (2011).

---

07-693L, 2012 WL 5914521, at *4 (Fed. Cl. Nov. 27, 2012) ("the DTA rate is not an accurate reflection of just compensation in this case where the litigation has taken place through very difficult economic times").

**21.2  Plaintiffs are entitled to an award of costs for their Takings and Illegal Exaction claims.  28 U.S.C. § 2412(a)(1) (costs "may be awarded to the prevailing party in any civil action brought by or against the United States").**

Dated: March 2, 2015
          Armonk, New York

                                        Respectfully submitted,
                                        BOIES, SCHILLER & FLEXNER LLP

                              By    /s/ David Boies
                                    _____
                                        David Boies
                                        Attorney of Record
                                        333 Main Street
                                        Armonk, NY 10504
                                        Telephone: (914) 749-8200
                                        Fax: (914) 794-8300
                                        Email: dboies@bsfllp.com

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        John L. Gardiner
                                        Four Times Square
                                        New York, NY 10036
                                        Telephone: (212) 735-3000

                                        R. Ryan Stoll
                                        Gregory Bailey
                                        155 N. Wacker Drive
                                        Chicago, IL  60606
                                        Telephone:  (312) 407-0700

                              BOIES, SCHILLER & FLEXNER LLP

                                        Robert B. Silver
                                        Robert J. Dwyer
                                        Alanna C. Rutherford
                                        Julia C. Hamilton
                                        Laura Harris
                                        Ilana Miller
                                        John Nicolaou
                                        Matthew R. Shahabian
                                        David L. Simons

                                        105

Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
Scott E. Gant
Abby Dennis
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

*Counsel for Plaintiff Starr International Company,
Inc. and for the Plaintiff Classes*