# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY, INC., )
on its behalf and on behalf of a class of )
others similarly situated, )
            )
         Plaintiff, )     No. 11-779C
            )     (Judge Thomas C. Wheeler)
            )
        v. )
            )
UNITED STATES, )
            )
         Defendant. )
            )

## DEFENDANT'S POST-TRIAL BRIEF IN RESPONSE TO PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

BENJAMIN C. MIZER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:
SCOTT D. AUSTIN
CLAUDIA BURKE          KENNETH M. DINTZER
JOSHUA E. GARDNER      Deputy Director
Assistant Directors

                              BRIAN A. MIZOGUCHI
JOHN ROBERSON          Assistant Director
JOHN J. TODOR            Commercial Litigation Branch
Senior Trial Counsels      Civil Division
                              Department of Justice
RENEE GERBER           P.O. Box 480
MATTHEW F. SCARLATO   Ben Franklin Station
MARIANA T. ACEVEDO    Washington, D.C. 20044
DAVID D'ALESSANDRIS    Tele: (202) 305-3319
VINCENT D. PHILLIPS      Fax: (202) 514-7969
ZACHARY J. SULLIVAN    Email: brian.mizoguchi@usdoj.gov
Trial Attorneys

March 23, 2015                Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION ........................................................................................... 1

I.  The Federal Reserve Acted Within Its Legal Authority In Conditioning Its
    Rescue Loan On AIG's Agreement To Convey Equity ......................................... 6

    A.  Section 13(3)'s Language Demonstrates That Interest Is Not The Only
        Permissible Form Of Consideration For A Rescue Loan .................................. 7

    B.  The Court Should Affirm The Board Of Governors' Exercise Of Its
        Congressionally Authorized Judgment ................................................... 11

    C.  The Challenged Equity Term Also Reflected A Valid Exercise Of
        FRBNY's Incidental Powers ............................................................. 13

    D.  Congress Ratified The Federal Reserve's Authority To Condition Lending
        On The Conveyance Of Equity ........................................................... 15

    E.  In Any Event, Starr's Illegal Exaction Claim Fails Because Section 13(3)
        Is Not Money-Mandating ................................................................ 19

II. Unable To Establish That The Federal Reserve Exceeded Its Authority, Starr
    Asserts Irrelevant And Incorrect Arguments To Support Its Illegal Exaction
    Claim .................................................................................... 20

    A.  Starr's Arguments Regarding Authority To *Hold* Equity And Attacks On
        The Trust Are Irrelevant And Incorrect ................................................ 21

        1.  Neither FRBNY Nor Treasury Ever Held The Series C Preferred
            Shares, Nor Would Any Law Have Prevented Them From Holding
            Equity ............................................................................ 21

        2.  The Credit Agreement Used An Independent Trust To Address Policy
            Considerations .................................................................... 23

        3.  The Trust Was A Valid And Appropriate Owner of AIG's Equity ...................... 26

    B.  Starr's Claim That The Board Of Governors Did Not "Approve" The
        Credit Agreement Misapprehends The Requirements Of Section 13(3) .................... 27

    C.  The AIG Loan's Interest Rate Satisfied Section 13(3) ................................ 29

    D.  Starr's Arguments Concerning "Punishment" Are Irrelevant And Incorrect
        Because The Terms Of The Loan Were Not Punishment For Wrongdoing .................... 31

E. The Loan Terms Were Justified, And The Equity Term Was Not An Extraneous Demand ................................................................................................ 33

    1. The Challenged Loan Terms Were Directly Related To The Risks And Policy Implications Of Lending To AIG .................................................... 33

    2. The Evidence Contradicts Starr's Assertion That The AIG Loan Was Not Risky ................................................................................................... 35

F. Starr's Equal Protection Claim Already Has Been Dismissed, And Section 13(3) Does Not Require Lending On Uniform Terms And Conditions ......................... 38

III. The *Penn Central* Analysis Applies To Starr's Takings Claim ............................................. 39

A. Starr Cannot Claim A Physical Taking Because Starr Has No Property That Was Physically Taken ....................................................................................... 40

B. Starr Cannot Establish An "Unconstitutional Conditions" Taking .................................... 42

    1. The Court Dismissed Starr's Unconstitutional Conditions Claim ............................... 43

    2. Even If The *Nollan/Dolan* Test Applied Outside Of The Land Use Context, Starr's Claim Fails Because The Government's Actions Did Not Impose Any Regulatory Or Police Power Restrictions That Would Affect AIG's Voluntary Choice ................................................................... 45

    3. Even If The "Unconstitutional Conditions" Doctrine Applied, The Equity Term Was Not An Unconstitutional Condition ............................................... 47

IV. No Taking Or Exaction Occurred Because AIG Acted Voluntarily And Without Duress ................................................................................................................ 50

A. AIG's Board Voluntarily Accepted The Rescue, And The Government Did Not Act Wrongfully Or Coercively ...................................................................... 50

    1. The Unrebutted Testimony Of The Allegedly Coerced Individuals Refutes Starr's Argument That AIG's Board Was Coerced ...................................... 51

    2. The Government Did Not Act Wrongfully Or Coercively ......................................... 52

    3. Starr Offers No Evidence That An "Arm's Length" Transaction Would Have Taken Place On Different Terms ...................................................... 54

    4. Starr's Failure To Timely Challenge The AIG's Board's Agreement Precludes A Finding Of Duress ................................................................... 55

B. AIG Voluntarily Promised Equity Equivalent To Common Stock On September 16, 2008, And Implemented That Promise Through The Credit Agreement ............................................................................................................ 56

      1.   On September 16, 2008, FRBNY And AIG's Board Agreed To Equity In A Form To Be Determined, Not Warrants ................................................................. 56

      2.   The Credit Agreement Implemented The September 16, 2008 Agreement ................................................................................................ 59

  C.  It Is Contrary To Precedent And Logic For Starr To Argue That The Government Controlled AIG After AIG's September 16 Resolution But That The Resolution Did Not Create An Obligation For Equity ...................................... 59

  D.  The AIG Shareholders' Consent To The Equity Term Was Not Required ..................... 62

  E.  The AIG Board's Voluntary Agreement Vitiates Starr's Illegal Exaction Claim ................................................................................................ 65

V.  Starr's Failure To Demonstrate Economic Loss Is Fatal To Both Its Takings And Exaction Claims ................................................................................ 68

  A.  Regardless Of How Starr Characterizes Its Takings Claim, Starr Must Demonstrate That The Class's Shares Would Have Had Greater Value In The Absence Of Any Government Rescue ....................................................... 69

  B.  AIG's Post-Rescue Stock Price Does Not Reflect What Was Taken Or Exacted Because It Does Not Measure Any Loss Experienced By The Class Members .................................................................................... 71

      1.   Starr Had No Property Interest In A Rescue Without An Equity Term ..................... 72

      2.   Starr Is Not Entitled To A Recovery Reflecting Value Created By The Rescue ................................................................................................ 73

      3.   Starr Cannot Recover Value Created By The Government By Arguing That The Rescue Merely "Restored" AIG's "Intrinsic Value" .................................. 74

      4.   Starr Cannot Recover The Value Created By The Rescue By Treating The Provision Of Liquidity That Saved AIG As Distinct From The Government's Receipt Of Equity In AIG ............................................... 77

  C.  Starr's Failure To Prove Its Shares Would Have Had Value In The Absence Of The Government Rescue Defeats Its Exaction Claim As Well .................... 78

  D.  Starr Cannot Shift Its Burden Of Proving That The Rescue Loan Harmed The Class ................................................................................................ 81

VI.  Starr Has Failed To Provide The Evidence Identified By The Court As Necessary To Support Standing To Bring A Direct Claim ....................................... 82

  A.  Starr Has Failed to Show That Its Claim Is Not Derivative ............................................. 83

    B.  Even If Starr's Claim Is Both Derivative And Direct, Starr Has Failed To
Allocate Economic Harm To The Claim's Direct Aspect ................................................ 85

VII.   Starr Has Failed To Establish Its Reverse Stock Split Claim ......................................... 86

    A.  Neither Delaware Law Nor The *Walker* Order Granted AIG's Common
Shareholders The Right To Avoid Dilution Of Their Shares .......................................... 86

        1.  Section 242(b)(2) Grants The Right To A Class Vote In Limited
Circumstances And Confers No General Right To Avoid Dilution ......................... 86

        2.  The *Walker* Order Did Not Grant Common Shareholders The Right To
A Separate Class Vote on Dilutive Transactions ....................................................... 88

        3.  Starr Has Not Presented Any Evidence That The Reverse Stock Split
Was Designed To Evade Common Shareholders' Rights ......................................... 89

    B.  Starr's Invocation Of Entire Fairness Review Under Delaware Law Is
Erroneous ...................................................................................................................... 91

    C.  Starr Has Failed To Prove Its Allegation That The Government
"Engineered" The Reverse Stock Split ............................................................................ 92

    D.  Starr Failed To Demonstrate Economic Harm From The Reverse Stock
Split ................................................................................................................................ 94

VIII.  Starr's Contentions Regarding Maiden Lane III Are Irrelevant And
Incorrect ............................................................................................................................. 95

IX. Starr Is Not Entitled To Attorney Fees, Expert Witness Fees, And
Disbursements For An Illegal Exaction ............................................................................. 97

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>PAGE(S)</u>

*A & D Auto Sales, Inc. v. United States,*
    748 F.3d 1142 (Fed. Cir. 2014)................................................................ passim

*Aerolineas Argentinas v. United States,*
    77 F.3d 1564 (Fed. Cir. 1996)........................................................................ 68

*Almota Farmers Elevator & Warehouse Co. v. United States,*
    409 U.S. 470 (1973)........................................................................................ 73

*Alves v. United States,*
    133 F.3d 1454 (Fed. Cir. 1998)..................................................................... 49

*Alyeska Pipeline Serv. Co. v. United States,*
    624 F.2d 1005 (Ct. Cl. 1980) ......................................................................... 65

*Am. Pelagic Fishing Co. v. United States,*
    379 F.3d 1363 (Fed. Cir. 2004)..................................................................... 72

*Am. Smelting & Refining Co. v. United States,*
    259 U.S. 75 (1922)........................................................................................... 65

*American Airlines, Inc. v. United States,*
    551 F.3d 1294 (Fed. Cir. 2008)..................................................................... 67

*Americopters, LLC v. United States,*
    95 Fed. Cl. 224 (2010) ................................................................................... 41

*Applicability of Gov't Corp. Control Act to Gain Sharing Benefit Agreement,*
    2000 WL 34545092 (U.S.A.G. Sept. 18, 2000)............................................. 23

*AT&T Co. v. United States,*
    307 F.3d 1374 (Fed. Cir. 2002)................................................................ 55, 80

*B&G Enters., Ltd. v. United States,*
    220 F.3d 1318 (Fed. Cir. 2000)..................................................................... 64

*Bartz v. United States,*
    633 F.2d 571 (Ct. Cl. 1980) ........................................................................... 92

*Bassett, New Mexico LLC v. United States,*
    55 Fed. Cl. 63 (2002) ..................................................................................... 44

*Bauman v. Ross,*
    167 U.S. 548 (1897) .................................................................................... 44

*Bautista-Perez v. Mukasey,*
    No. C07-4192, 2008 WL 314486 (N.D. Cal. Feb. 4, 2008) ............................ 68

*Bd. of Governors of Fed. Res. Sys. v. First Lincolnwood Corp.,*
    439 U.S. 234 (1978) .................................................................................... 11

*Bd. of Governors of Fed. Res. Sys. v. Investment Co. Institute,*
    450 U.S. 46 (1981) ...................................................................................... 11

*Bd. of Governors v. Agnew,*
    329 U.S. 441 (1947) .................................................................................... 11

*Bergman v. United States,*
    28 Fed. Cl. 580 (1993) ................................................................................ 51

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .................................................................................... 92

*Boise Cascade Corp. v. United States,*
    296 F.3d 1339 (Fed. Cir. 2002) ................................................................... 41

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) .................................................................................... 89

*Brown v. Legal Found. of Wash.,*
    538 U.S. 216 (2003) ............................................................................. passim

*California National Bank v. Kennedy,*
    167 U.S. 362 (1897) .................................................................................... 22

*Carolina Plating Works, Inc. v. United States,*
    102 Fed. Cl. 555 (2011) .............................................................................. 78

*Casa de Cambio Comdiv S.A. de C.V. v. United States,*
    48 Fed. Cl. 137 (2000) ................................................................................ 40

*Casita Mun. Water Dist. v. United States,*
    556 F.3d 1329 (Fed. Cir. 2009) ................................................................... 40

*CCA Assocs. v. United States,*
    667 F.3d 1239 (Fed. Cir. 2011) ................................................................... 81

*Cessna Aircraft Co. v. Dalton*,
    126 F.3d 1442 (Fed Cir. 1997) ...................................................................... 29

*Chris Berg, Inc. v. United States*,
    426 F.2d 314 (Ct. Cl. 1970) ......................................................................... 65

*Clapp v. United States*,
    2005 WL 1630956 (W.D. Va. Jul. 10, 2005) ................................................ 65

*Continental Airlines, Inc. v. United States*,
    77 Fed. Cl. 482 (2007) ................................................................................ 68

*Cookeville Reg. Med. Ctr. v. Leavitt*,
    531 F.3d 844 (D.C. Cir. 2008) ..................................................................... 16

*Corbin v. Fed. Reserve Bank of New York*,
    475 F. Supp. 1060 (S.D.N.Y. 1979), ............................................................ 31

*Daniels v. United States*,
    407 F.2d 1345 (Ct. Cl. 1969) ....................................................................... 11

*Doe v. United States*,
    463 F.3d 1314 (Fed. Cir. 2006) .................................................................... 20

*Dohany v. Rogers*,
    281 U.S. 362 (1930) ..................................................................................... 97

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994) ................................................................... 40, 45, 47, 48

*Douglas v. Ind. Living Ctr. of S. Cal, Inc.*,
    132 S. Ct. 1204 (2012) ................................................................................. 11

*Eastport S. S. Corp. v. United States*,
    372 F.2d 1002 (Ct. Cl. 1967) .................................................................. 68, 78

*Eversharp, Inc. v. United States*,
    125 F. Supp. 244 (Ct. Cl. 1954) ................................................................... 68

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................................... 16

*Feldman v. Cutaia*,
    956 A.2d 644 (Del. Ch. 2007), ................................................................ 82, 86

*Figueroa v. United States*,
    57 Fed. Cl. 488 (2003) ................................................................. 49

*Finn v. United States*,
    428 F.2d 828 (Ct. Cl. 1970) ......................................................... 65

*Fisher v. United States*,
    402 F.3d 1167 (Fed. Cir. 2005)..................................................... 19

*Fruhauf Sw. Garment Co. v. United States*,
    111 F. Supp. 945 (Ct. Cl. 1953)............................................... 50, 51

*Ga. Pac. Corp. v. United States*,
    640 F.2d 328 (Ct. Cl. 1980) ......................................................... 41

*Gentile v. Rossette*,
    906 A.2d 91 (Del. Ch. 2006).......................................................... 82

*Gilbert v. El Paso Co.*,
    490 A.2d 1050 (Del. Ch. 1984)...................................................... 60

*Haig v. Agee*,
    453 U.S. 280 (1981)........................................................................ 8

*Hendler v. United States*,
    38 Fed. Cl. 611 (1997) .................................................................. 44

*Hometown Fin. Inc. v. United States*,
    56 Fed. Cl. 477 (2003) .................................................................. 83

*Huntleigh USA Corp. v. United States*,
    525 F.3d 1370 (Fed. Cir. 2008)..................................................... 41

*In re Franklin Nat'l Bank Secs. Litig.*,
    478 F. Supp. 210 (E.D.N.Y. 1979) ............................................... 31

*Jama v. Immigration and Customs Enforcement*,
    543 U.S. 335 (2005).................................................................. 8, 18

*James Shewan & Sons, Inc. v. United States*,
    73 Ct. Cl. 49 (1931) ...................................................................... 68

*Janowsky v. United States*,
    133 F.3d 888 (Fed. Cir. 1998)....................................................... 45

*Kimball Laundry Co. v. United States,*
    338 U.S. 1 (1949)...................................................................... 71

*Klamath Irrigation Dist. v. United States,*
    635 F.3d 505 (Fed. Cir. 2011)................................................... 91

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    133 S. Ct. 2586 (2013)........................................................ 43, 44

*Lancashire Shipping Co. v. United States,*
    4 F. Supp. 544 (S.D.N.Y. 1933)................................................ 68

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005)................................................................ 44

*Lucas v. Fed. Reserve Bank of Richmond,*
    59 F.2d 617 (4th Cir. 1932) .................................................... 65

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992).............................................................. 42

*McBryde v. United States,*
    299 F.3d 1357 (Fed. Cir. 2002)........................................... 19, 20

*N. Haven Bd. of Ed. v. Bell,*
    456 U.S. 512 (1982)................................................................ 16

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,*
    513 U.S. 251 (1995)................................................................ 13

*Nollan v. California Coastal Com'n,*
    483 U.S. 825 (1987)........................................................... 45, 47

*Norfolk Dredging Co. v. United States,*
    375 F.3d 1106 (Fed. Cir. 2004)............................................... 11

*Norman v. United States,*
    429 F.3d 1081 (Fed. Cir. 2005)............................................... 91

*Northrop Grumman Corp. v. United States,*
    47 Fed. Cl. 20 (Fed. Cl. 2000) ................................................ 80

*O'Bryan v. United States,*
    93 Fed. Cl. 57 (2010) .............................................................. 68

*Oliver v. Boston University,*
    2006 WL 1064169 (Del. Ch. Apr. 14, 2006) ................................................. 86

*Olson v. United States,*
    292 U.S. 246 (1934) ................................................................................. 70

*Orzeck v. Englehart,*
    195 A.2d 375 (Del. Ch. 1963) ................................................................ 88

*Penn Central Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) ................................................................. 39, 42, 44

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ................................................................................ 44

*Price v. Panetta,*
    674 F.3d 1335 (Fed Cir. 2012) .............................................................. 19

*Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.,*
    238 F.3d 897 (7th Cir. 2001) .................................................................. 53

*PSI Energy, Inc. v. United States,*
    411 F.3d 1347 (Fed. Cir. 2005) ............................................................. 68

*Quadrant Structured Prods. Co. v. Vertin,*
    102 A.3d 155 (Del. Ch. 2014) ............................................................... 87

*Reis v. Hazelett Strip-Casting Corp.,*
    28 A.3d 442 (Del. Ch. 2011) ................................................................. 91

*Reoforce, Inc. v. United States,*
    118 Fed. Cl. 632 (2014) ........................................................................ 42

*Robertson v. Frank Bros Co.,*
    132 U.S. 17 (1889) ................................................................................. 52

*Rogers Truck Line, Inc. v. United States,*
    14 Cl. Ct. 108 (1987) ....................................................................... 72, 73

*Rough Diamond Co. v. United States,*
    351 F.2d 636 (Ct. Cl. 1965) .................................................................. 65

*Star Motor Co. of Cal. v. United States,*
    41 F.2d 901 (Ct. Cl. 1930) .................................................................... 68

*Starr Int'l Co. v. Fed. Reserve Bank of New York,*
    906 F. Supp. 2d 202 (S.D.N.Y. 2012) .................................................. 22, 39

*Starr Int'l Co. v. United States,*
    106 Fed. Cl. 50 (2012) ............................................................... passim

*Starr Int'l Co. v. United States,*
    112 Fed. Cl. 601 (2013) .............................................................. 84, 85

*Starr v. Fed. Reserve Bank of New York,*
    742 F.3d 37 (2d Cir. 2014) ................................................................. 31

*Starr v. United States,*
    107 Fed. Cl. 374 (2012) .................................................................. 7, 20

*Stueve Bros. Farms, LLC v. United States,*
    737 F.3d 750 (Fed. Cir. 2013) ........................................................... 92

*Suwannee S.S. Co. v. United States,*
    279 F.2d 874 (Ct. Cl. 1960) ......................................... 33, 34, 49, 79

*Sys. Tech. Assoc., Inc. v. United States,*
    699 F.2d 1383 (Fed. Cir. 1983) ......................................................... 51

*Texas State Bank v. United States,*
    423 F.3d 1370 (Fed. Cir. 2005) .......................................... 64, 71, 72

*U.S. Shoe Corp. v. United States,*
    296 F.3d 1378 (Fed. Cir. 2002) ......................................................... 97

*Union Pacific Railroad Co. v. Public Service Commission of Missouri,*
    248 U.S. 67 (1918) ............................................................................. 46

*United States v. Best Foods, Inc.,*
    47 C.C.P.A. 163 (Cust. & Pat. App. 1960) .................................... 68

*United States v. Bodcaw Co.,*
    440 U.S. 202 (1979) ........................................................................... 97

*United States v. Commodities Trading Corp.,*
    339 U.S. 121 (1950) ........................................................................... 74

*United States v. Cors,*
    337 U.S. 325 (1949) ........................................................................... 73

*United States v. Edmonston,*
181 U.S. 500 (1901) ........................................................................................ 66

*United States v. Fuller,*
409 U.S. 488 (1973) ........................................................................................ 73

*United States v. Land,*
213 F.3d 830 (5th Cir. 2000) .......................................................................... 78

*United States v. Miller,*
317 U.S. 369 (1943) ............................................................................ 76, 77, 78

*United States v. Rands,*
389 U.S. 121 (1967) ........................................................................................ 73

*United States v. Reynolds,*
397 U.S. 14 (1970) .................................................................................... 73, 78

*Walker v. AIG, Inc.,*
No. 4142-CC (Del. Ch. 2009) ................................................................... 86, 88

*Westfed Holdings, Inc. v. United States,*
52 Fed. Cl. 135 (Fed. Cl. 2002) ..................................................................... 79

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,*
473 U.S. 172 (2003) ........................................................................................ 81

*Yee v. City of Escondido,*
503 U.S. 519 (1992) ........................................................................................ 41

## STATUTES

12 U.S.C. § 24 .................................................................................................... 22

12 U.S.C. § 341 ............................................................................................. 13, 14

12 U.S.C. § 343 (2008) ............................................................................... passim

12 U.S.C. § 343(3)(C)(ii) (2010) ...................................................................... 17

12 U.S.C. § 345 .................................................................................................. 14

12 U.S.C. § 347b(b)(1) ....................................................................................... 14

12 U.S.C. § 357 ..................................................................................... 8, 29, 31

12 U.S.C. § 5202(9) ........................................................................................ 17

12 U.S.C. § 5211 ............................................................................................ 18

12 U.S.C. § 5223(d) ....................................................................................... 18

12 U.S.C. § 5235 .............................................................................. 16, 17, 18

12 U.S.C. § 5240 ............................................................................................ 18

28 U.S.C. § 2412(a)(1) ................................................................................... 97

31 U.S.C. § 9102 ............................................................................................ 23

42 U.S.C. § 4654(c) ........................................................................................ 97

8 Del. Code § 152 .......................................................................................... 63

8 Del. Code Ann. § 242(b)(2) ................................................................. 86, 87

<u>REGULATIONS</u>

12 C.F.R. § 201.4 ............................................................................. 12, 31, 39

<u>OTHER</u>

1932 Circular, 18 Fed. Reserve Bulletin no. 8473, 518 (Aug. 1932) ........................................... 13

1936 Circular, 22 Fed. Reserve Bulletin 71, 123 (Feb. 1936) .................................... 13

154 Cong. Rec. H10702, 703 (daily ed. Oct. 3, 2008) ................................................................. 17

*OLC Applicability of Government Corp. Control Act to Gain Sharing Benefit Agreement*,
    2000 WL 34545092 (U.S.A.G. Sep. 18, 2000) ................................................. 23

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., on its behalf and on behalf of a class of others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-779C |
| | ) | (Judge Thomas C. Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S POST-TRIAL BRIEF IN RESPONSE TO PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's November 25, 2014 Order, defendant, the United States, respectfully submits the following response to the post-trial briefs of plaintiff, Starr International Company, Inc. (Starr).

## INTRODUCTION

At trial, and again in its post-trial briefs, Starr failed to establish that the extraordinary assistance provided to AIG caused either a taking or an illegal exaction. Neither the facts nor the law support Starr's claimed entitlement to a better deal. The Federal Reserve acted within its authority when it sought equity as part of the compensation for an $85 billion rescue loan. AIG's board, in turn, represented the company's shareholders when it voluntarily accepted the proposed offer. The Board of Governors only authorized five such rescue loans, with AIG receiving, by far, the largest package of Government assistance. This assistance saved AIG from failing. In contrast, more than 100,000 businesses filed for bankruptcy because they could not weather the financial storm. AIG's only entitlement was to this same bankruptcy process, a process the company avoided only because of the discretionary assistance provided by the Government.

This assistance both preserved AIG's ability to operate as a going concern, and salvaged (indeed, greatly enhanced) the value of Starr's AIG holdings. Because Starr failed to prove the necessary conduct and harm, the Court should reject each of Starr's claims.

First, Starr has failed to show that the Federal Reserve Act (FRA) prohibited the rescue loan's equity term. Congress provided that the Federal Reserve could offer to loan money under section 13(3) subject to such "restrictions" and "limitations" that the Federal Reserve, in its discretion, "may prescribe." This broad language authorizes the Federal Reserve to prescribe loan conditions such as fees and equity. Further, Section 4(4) provided additional authority by granting reserve banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this Act."

Starr argues that reserve banks may only seek interest as consideration for a rescue loan. Section 13(3), however, contains no limitation whatsoever against including other consideration for a loan. Moreover, Starr cannot explain why the express power to impose "restrictions" and "limitations" excludes the power to condition a rescue loan on an equity term, or why requiring equity as consideration for a loan is not incidental to section 13(3)'s express lending power. Starr offers no support for its dubious assumption that Congress intended to foreclose the Federal Reserve from tailoring its lending to the particular circumstances or, indeed, to hamstring the Federal Reserve from making loans that incorporate the same kinds of commercially reasonable provisions that exist in the private marketplace. Indeed, Starr's reading of section 13(3) conflicts with the Federal Reserve's practice in every "comparator rescue" that Starr relies upon, as each of these included consideration beyond interest. Finally, Starr's argument that the Act prohibited equity consideration is further debunked by Congress's review and acceptance of the equity

term.  In two enactments after the AIG rescue, Congress ratified the Federal Reserve's conclusion that it could condition a rescue loan on the receipt of equity.

Second, Starr fails to explain why AIG's entry into the rescue loan – with the equity term – was not voluntary.  Under the Fifth Amendment, a plaintiff claiming a taking or illegal exaction in connection with a contract must demonstrate that the subject property was involuntarily included in the transaction.  Here, AIG's board of directors – duly elected by shareholders and independent from the Government – voluntarily accepted FRBNY's loan offer because it served the shareholders' best interests and was vastly better than the alternative. Starr's initial briefing largely ignores this evidence.

Instead, Starr's economic expert advanced the theory that – contrary to evidence and logic – the Government controlled AIG's board without the Government owning a single share of AIG stock.  Beyond its factual shortcomings, Starr's theory of effective economic control is legally insufficient to prove duress.  Under applicable law, only actual, exercised control could defeat the defense of voluntariness.  The AIG board's independence – both on September 16 and September 21 – defeats any claim by Starr against the United States for a taking or exaction arising out of the rescue.

Starr contends that AIG's voluntary agreement is not dispositive because AIG's *shareholders* did not voluntarily agree to the rescue or its terms.  Although Starr's years-long failure to challenge the loan should be considered acquiescence, the shareholders' approval was never necessary for the loan.  Under Delaware law, AIG's board had the authority to agree to the rescue loan and to issue the promised equity.  Certainly, the Fifth Amendment does not require the Government to obtain the permission of every corporate shareholder before the Government contracts with a corporation, whether to provide emergency lending assistance or otherwise.

Third, Starr's inability to prove economic harm independently dooms all of its claims. Takings and illegal exaction claims require showing that, but for the Government's conduct, the plaintiff's property would have been more valuable. Here, absent any action by the Government, AIG would have entered bankruptcy, and its common stock would have lost all or nearly all its value as a result.

Rather than explain how the rescue injured AIG or its shareholders, Starr seeks to change the subject. Specifically, Starr compares AIG's rescue to those received by others, and to the rescue Starr would have preferred. These analyses are both legally irrelevant and factually incomplete. Starr fails to compare its rescue to the more than 100,000 businesses that – like AIG – faced bankruptcy in 2008 and 2009, and that – like AIG – had no entitlement to taxpayer assistance, but that – unlike AIG – failed without such extraordinary assistance. Such a comparison highlights the fallacy of Starr's claims that AIG was "punished" and confirms why AIG's board was not "coerced" to accept the rescue loan.

In another run at proving harm, Starr demands the return of what was "exacted" by the Government. Starr, however, cannot overcome the fact that no physical shares were taken or "exacted" from anyone – AIG's shareholders owned the same number of shares before and after the rescue. Indeed, the rescue increased the value of those shares by billions of dollars; again, this fact defeats every effort Starr has made at proving injury.

Even if the Court were to find that the Federal Reserve exceeded its authority, that AIG's board was coerced into accepting a rescue loan, and that Starr suffered actual harm, the Court still would have to resolve *all* of the following additional questions in Starr's favor to hold the United States responsible for an illegal exaction: (1) that Congress enacted Section 13(3), not for the public's benefit, but to protect borrowers and their shareholders from providing equity as

consideration for a rescue loan; (2) that Starr has proved that its claims truly are direct and established separate and independent harm to shareholders; (3) that Starr did not waive its exaction claim by waiting to bring it until after enjoying the benefit of multiple rescues; and (4) that even if the equity term was illegal, the proper remedy is to simply excise it from the transaction even though the evidence clearly established that the Federal Reserve would not have rescued AIG in the absence of that term. Starr's inability to satisfy any – let alone all – of these preconditions ends its equity claim.

Starr's Stock Split Claim fares no better. Starr argues that the Government originated, orchestrated, or compelled the stock split transaction but has identified no facts to support this theory. The undisputed evidence shows that AIG's board proposed the transaction to avoid delisting by the NYSE; AIG's common shareholders – including Starr – approved the transaction, presumably for the same reason. That should put an end to Starr's claim. Starr's efforts to tie the 2009 split (and the 2009 Stock Split Class) to the 2011 recapitalization are meritless. As Starr admits, the stock split had no harmful effect in 2009. Similarly, the 2011 recapitalization did not harm any shareholders, let alone the June 2009 shareholders. Certainly, Starr cannot explain why AIG's 2009 shareholders should recover for an economic event that allegedly affected AIG's very different 2011 shareholders.

At bottom, Starr demands that American taxpayers provide an additional $40 billion to AIG's shareholders, on top of the extraordinary and unprecedented assistance that they have already received, because Starr believes itself entitled to be rescued on even more generous terms. This would impose a multi-billion dollar loss upon taxpayers for having saved AIG and its shareholders from catastrophe. As Starr's and AIG's executives acknowledged, AIG's investments placed the company in a position where it would have failed without unprecedented

Federal Reserve financing. Starr was not entitled to any rescue, and nothing Starr alleges or argues can convert the rescue it received into a cognizable harm warranting redress. Starr's claims are erroneous and unjust. The Court should deny Starr's claims and grant judgment in favor of the United States.

## ARGUMENT

**I.     The Federal Reserve Acted Within Its Legal Authority In Conditioning Its Rescue Loan On AIG's Agreement To Convey Equity**

The Federal Reserve properly conditioned its September 2008 rescue loan to AIG on a 79.9 percent equity participation in the company, placed in a trust for the benefit of the taxpayers. Nothing in the text of section 13(3) forbids such equity consideration. To the contrary, by its plain terms, section 13(3) of the FRA empowered the Board of Governors to prescribe "restrictions" and "limitations" on its authorization for FRBNY's proposed rescue loan to AIG. Further, the Act's section 4(4) also gave the Federal Reserve this authority by providing "such incidental powers as shall be necessary or useful to carry on the business of banking within the limitations prescribed by this chapter."

Starr argues that, despite these provisions, section 13(3) "unambiguously" forecloses any form of consideration for a rescue loan other than a charge of interest. Pls. Corrected Post-Trial Proposed Conclusions of Law (Pl. Law Br.) ¶ 4.1.1. In fact, the statute itself does not purport to identify any non-permissible forms of consideration. Indeed, Starr recognizes that section 13(3) loans may include other, non-interest forms of consideration, such as fees. Starr has identified no basis for treating equity any differently than these other terms, nor does Starr support its assumption that Congress intended to disable the Federal Reserve from including commercially reasonable terms in its loans.

Starr's current argument not only lacks support in the actual text of the statute, but it also conflicts with Starr's prior position.  As the Court has noted, Starr already conceded that "Section 13(3) did not expressly prohibit the Government's actions."  *Starr Int'l Co. v. United States*, 106 Fed. Cl. 50, 83 (2012) (*Starr*).  Starr's prior concession was correct:  there is no express, statutory prohibition preventing the Board from conditioning a rescue loan on an equity term.  Although the Court preliminarily accepted Starr's assertion that "the 'only consideration for a loan prescribed by' section 13(3) 'is an interest rate subject to the determination of the Board of Governors,'" the Court did so only "for purposes of the Government's motion to dismiss." *Starr Int'l Co. United States*, 107 Fed. 374, 378 (2012) (quoting *Starr*, 106 Fed. Cl. at 85).  These statements, however, do not end the analysis.  Now, with the context provided by trial testimony, the Court can resolve the question: does the FRA, properly interpreted, provide the Board with the discretion to prescribe an equity term?

Section 13(3) contemplates lending conditions beyond simply an interest rate.  Starr's construction conflicts with the statute's language; recognized rules of construction; uniform lending practice; the considered determinations of the Board of Governors and FRBNY; and Congress's immediate ratification of the equity term.

A.       **Section 13(3)'s Language Demonstrates That Interest Is Not The Only Permissible Form Of Consideration For A Rescue Loan**

Section 13(3) contains two sentences: the first provides the conditions that must be met for a Federal Reserve bank to issue an emergency loan to a non-bank such as AIG; the second vests the Board of Governors with broad discretion in determining the terms and conditions of such loans.

The 2008 version of section 13(3)'s first sentence states:

> In unusual and exigent circumstances, the Board of Governors of the
> Federal Reserve System, by the affirmative vote of not less than five

members, may authorize any Federal reserve bank, during such periods as the said board may determine, at rates established in accordance with the provisions of section 357 of this title, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank: *Provided*, That before discounting any such note, draft, or bill of exchange for an individual or a partnership or corporation the Federal reserve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions.

12 U.S.C. § 343 (2008). That sentence establishes several requirements that must be met before the Board of Governors authorizes – and a reserve bank extends – a loan. These requirements include (1) "unusual and exigent circumstances," (2) the loan being "secured to the satisfaction of the Federal reserve bank," and (3) the lending bank receiving "evidence that [the borrower] is unable to secure adequate credit accommodations from other banking institutions." The sentence also requires that the interest charge on lending be "at rates established in accordance with the provisions of section 357" (also referred to as section 14(d) of the FRA), which is a broad standard that calls for reserve banks to set interest rates "with a view of accommodating commerce and business." 12 U.S.C. § 357.

Congress also provided that, even if section 13(3)'s requirements are met, the decision whether to lend remains discretionary. The first sentence states that the Board "may" authorize lending when the required conditions can be satisfied. In statutory construction, "[t]he word 'may' customarily connotes discretion." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005) (citing *Haig v. Agee*, 453 U.S. 280, 294, n. 26 (1981)). In addition, the provision reflects Congress's expectation that a decision to lend may require difficult policy judgments about which reasonable people might disagree – the statute requires the approval of five members of the Board of Governors, rather than unanimity.

Section 13(3)'s second sentence grants further authority and discretion to the Board of Governors regarding the loan's terms. That sentence states: "All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe." 12 U.S.C. § 343 (2008). This sentence empowers the Board to tailor its loan authorizations based on particular characteristics of the borrower, the proposed loan, the market, policy issues, or other considerations. Under the statute, the tools by which the Board can customize a loan are restrictions or limitations on the authority granted to the Federal Reserve bank, which will ultimately make the loan.

Starr cannot reconcile this statutory language with its contention that "Section 13(3) unambiguously provides that the only consideration Congress authorized for a Section 13(3) extension of credit is an interest rate." Pl. Law Br. ¶ 4.7.1. As part of its list of requirements for a section 13(3) loan, Congress included a general provision about choosing an interest rate, but Congress did not stop there. Congress also authorized the Board to approve loans with features and conditions beyond simply satisfying these threshold requirements. No word or phrase of section 13(3) suggests that the requirement to set interest rates in accordance with section 14(d) identifies the loan's sole permissible consideration for a loan. Section 13(3)'s first sentence does not preclude the Board of Governors from attaching conditions to its loan authorizations, and the section's second sentence expressly empowers the Board of Governors to prescribe those conditions. If Congress had intended to limit the Board's discretion in such a manner, it could have used words to that effect, but it did not.

As a practical matter, loans necessarily provide for consideration in addition to interest. Covenants, default and acceleration provisions, representations and warranties, fee provisions,

and expense reimbursements are typical components of most loans, including rescue loans.  Starr

has not challenged these other components of rescue loans as beyond the Federal Reserve's

statutory authority in section 13(3), even though they are also forms of consideration other than

interest.  In response to the evidence that other section 13(3) rescue loans (including facilities in

which AIG participated) provided for fees in addition to interest, *see* Def. Post-Trial Proposed

Findings of Fact (Def. PFOF) ¶ 193, Starr apparently concedes that fees are a valid form of

consideration even though section 13(3) does not mention fees.  *See* Pl. Law Br. ¶ 12.10.3 n.4

(asserting that FRBNY was "fully compensated" by the payment of "interest and fees.").  Starr

does not explain how an invalid equity stake is materially different from a valid fee.

In section 13(3)'s second sentence, Congress clearly intended that the Board of

Governors tailor loans to reflect the borrower's particular circumstances and the Board's policy

judgments about the appropriate lending conditions.  Quite plainly, a rescue loan authorization

conditioned on an equity term reflects the Board of Governors placing a "limitation" or

"restriction" on the provision of that assistance (just as a fee or covenant would).  And the

discretion afforded by section 13(3)'s second sentence does not render superfluous the first

sentence's requirements, including its provisions for interest.  *See* Def. Post-Trial Proposed

Conclusions of Law (Def. Law Br.) at 79-81.  Nor does the requirement of an interest term in the

first sentence prohibit other, additional terms, which the second sentence specifically

contemplates.  *Id.*  Starr's reading of the statute, however, leaves the second sentence largely

without force, and bars the Federal Reserve from including a wide variety of commercially

reasonable terms in its rescue loans.

### B. The Court Should Affirm The Board Of Governors' Exercise Of Its Congressionally Authorized Judgment

Under section 13(3), Congress provided the Board of Governors the discretion as to whether to lend and on what terms. The Court should not second-guess the Board of Governors' policy decisions within that broad grant of authority. When the administration of a statute "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns," courts should respect the administering agency's judgments, even when *Chevron* deference does not apply. *See, e.g.*, *Douglas v. Ind. Living Ctr. of S. Cal, Inc.*, 132 S. Ct. 1204, 1210 (2012); *Daniels v. United States*, 407 F.2d 1345, 1347 (Ct. Cl. 1969) ("Because of the broad congressional grant of administrative discretion, the scope of this court's review is limited."); *Bd. of Governors of Fed. Res. Sys. v. Investment Co. Institute*, 450 U.S. 46, 56 n.21 (1981) (citing *Bd. of Governors v. Agnew*, 329 U.S. 441, 450 (1947) (Rutledge, J., concurring) (treating the Board's judgment as "conclusive" in any matter on which there could be a reasonable difference of opinion, "because the system itself is a highly specialized and technical one, requiring expert and coordinated management in all its phases … [The Board's] specialized experience gives them an advantage judges cannot possibly have …."); *Bd. of Governors of Fed. Res. Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978); Def. Law Br. at 79-80.

Starr argues that that the Government's reading of section 13(3) is merely a "litigation position." Pl. Law Br. § 4.4.6. The Court should reject this argument as irrelevant and unfounded. First, determining section 13(3)'s breadth raises purely legal questions. *E.g.*, *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1108 (Fed. Cir. 2004) ("statutory construction is a question of law"). The Federal Reserve's past analyses of its authority cannot, of course, affect the statute's meaning or Congress's intent.

In any event, the factual record contradicts Starr. Both before and contemporaneously with its decision to lend to AIG, the Federal Reserve confirmed that section 13(3) conferred authority to require equity as consideration for a rescue loan. In an April 2, 2008 memorandum, the Federal Reserve's General Counsel, Mr. Alvarez, reviewed the Bear Stearns loan, which offered FRBNY upside potential akin to an equity participation in Maiden Lane LLC. Mr. Alvarez concluded that the FRA permitted this type of loan condition because "Section 13(3) allows the Board [of Governors] to authorize any Federal Reserve bank to extend credit … 'subject to such limitations, restrictions and regulations as the Board may prescribe.' The Board, therefore, has complete statutory discretion to determine . . . the conditions of lending under section 13(3)." JX-13 at 12; (April 2, 2008 Board of Governors memorandum); *see* Def. PFOF ¶¶ 192, 206-08. Likewise, in a September 17, 2008 memo addressing the equity consideration for the AIG rescue loan, Mr. Alvarez again cited the last sentence of section 13(3) in concluding the Federal Reserve had "implicit power to condition any section 13(3) extension of credit as it deems appropriate to justify the decision to extend credit." DX-484 at FRB018-01228070-71. These memoranda, by the Board of Governors' chief legal officer, refute Starr's argument that our reading of section 13(3) reflects an after-the-fact rationale developed as a litigating position.

Last, Starr mistakenly seeks support from a regulation and some early circulars about section 13(3). Pl. Law Br. §§ 4.2, 4.8.6. The regulation on which Starr relies directs that section 13(3) rescue loans carry a minimum interest rate but does not purport to set a maximum rate or to preclude other forms of consideration in addition to interest, such as equity. *See* 12 C.F.R. § 201.4. Nor do the circulars invoked by Starr say anything to bar non-interest forms of consideration. Instead, they simply state that section 13(3) loans "may be made only at rates established by the Federal Reserve banks, subject to review and determination by the Federal

Reserve Board." *See* 1932 Circular, 18 Fed. Reserve Bulletin no. 8473, 518 (Aug. 1932). Thus, interest rates will be set in that prescribed manner; the guidance neither states nor suggests that interest is the only form of consideration for a 13(3) loan. *See id.*; 1936 Circular, 22 Fed. Reserve Bulletin 71, 123 (Feb. 1936). To the contrary, those same circulars expressly state that "[a]ny Federal reserve bank may prescribe such additional requirements and procedures respecting discounts hereunder as it may deem necessary or advisable." 1936 Circular at 123-24; 1932 Circular at 520. Those circulars thus confirm the Federal Reserve's longstanding recognition of its authority to seek terms other than interest for section 13(3) loans.

C.    **The Challenged Equity Term Also Reflected A Valid Exercise Of FRBNY's Incidental Powers**

The FRA's grant of "incidental powers" provide still further authority to include equity as a condition for the AIG loan. This term, in Section 4(4), grants Federal Reserve banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter." 12 U.S.C. § 341 (Seventh). Federal Reserve officials testified that the AIG-equity term facilitated the section 13(3) rescue by justifying the loan's extraordinary risks and mitigating the related policy concerns; the equity term was, thus, "convenient or useful" to the exercise of the section 13(3) authority. *See* Def. Law Br. at 84-86; Def. PFOF ¶¶ 119, 185-209; *see generally* Def. PFOF § III.A.

Courts have repeatedly recognized that exercise of an incidental power should be viewed as "necessary" whenever it is "convenient or useful" to the exercise of an existing power, and agencies' judgments on these points are entitled to respect. Def. Law Br. at 86-87; *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995) (upholding agency's "discretion to authorize activities beyond those specifically enumerated" so long as the exercise of that discretion was within "reasonable bounds").

Contrary to Starr's claim, conditioning lending on an equity term does not represent a new and separate power apart from lending itself. *See* Pl. Law Br. § 4.5.4. Instead, the equity term merely helped effectuate the Federal Reserve's undisputed authority to make rescue loans under section 13(3). Equity kickers are incidental to "the business of banking," as evidenced by the 79.9 percent equity terms of the private bankers' term sheet for a potential AIG loan, the testimony of Mr. Lee of JPMorgan Chase, and the Comptroller of the Currency's approval of equity kickers in bank loans. *See* Def. PFOF ¶¶ 120-22; Def. Law Br. at 85, 88-89.

The distinction between powers that help effectuate existing authority and powers that are separate from that authority is illustrated by the difference between providing a loan conditioned on the conveyance of equity as consideration (as in the case of the AIG loan) and providing equity funding by purchasing equity directly. The former helps to effectuate the Federal Reserve's section 13(3) lending authority by enabling the exercise of that authority in circumstances where perceived risks and policy considerations otherwise would preclude lending absent the conveyance of equity, while the latter does not involve lending at all but rather the direct injection of new equity capital, a power not conferred by section 13(3). *See* Def. PFOF ¶¶ 195-96, 210-13, 215-16.

Facing a clear grant of broad, incidental powers, Starr seizes upon section 4(4)'s reference to the exercise of powers "within the limitations set forth in this chapter," 12 U.S.C. § 341 (Seventh); Starr argues that this provision precludes an equity term. *See* Pl. Law Br. §§ 4.5.1-4.5.2. But the "limitations" referenced by section 4(4) are only those that are expressly

"set forth" by statute.[1]  Starr has not identified a single provision of the FRA that prohibits the Federal Reserve from conditioning rescue lending on the conveyance of equity.  Certainly, section 13(3)'s non-exclusive requirement that interest rates be set in accordance with section 357 is not a "limitation" precluding other forms of consideration in addition to interest.

Congress's decision to confer broad incidental powers on the Federal Reserve further demonstrates that Congress did not intend to disable the Board of Governors, when making loans to distressed companies, from incorporating the very kinds of terms that private lenders typically include in an emergency loans.  Indeed, Congress recognized that the Federal Reserve's lending function would implicate elements of the "business of banking" that the statute did not identify. Starr has not – and cannot – reconcile section 4(4)'s express grant of incidental powers *in addition to* those powers already expressly enumerated, with Starr's argument that the scope of FRBNY's enumerated powers "circumscribes" the scope of its incidental powers.  Pl. Law Br. §§ 4.5.1-4.5.2.  Starr's reading improperly renders section 4(4) superfluous, *See* Def. Law Br. at 87, and Starr's arguments do not overcome the court decisions affording national banks and Federal Reserve banks broad discretion to determine what actions are necessary to exercising their enumerated powers in the business of banking.  Def. Law Br. at 86.

### D.  Congress Ratified The Federal Reserve's Authority To Condition Lending On The Conveyance Of Equity

Congress effectively ratified the AIG rescue terms twice, confirming the equity term fell within the Federal Reserve's authority.  Specifically, Congress responded to the AIG loan and its equity provision (1) in October 2008, by enacting a requirement that the Federal Reserve report

---

[1] For example, 12 U.S.C. § 347b(b)(1) limits the period over which a reserve bank may extend credit to certain depository institutions.  Similarly, 12 U.S.C. § 345 restricts the amount the Federal Reserve may rediscount on behalf of member banks.

"warrants or any other potential equity" conveyed by borrowers in section 13(3) loans, and (2) in 2010, when amending section 13(3), by modifying the Federal Reserve's reporting obligations regarding "the amount of interest, fees and other revenue or items of value received in exchange for section 13(3) assistance." *See* Def. Law Br. at 89-90. That congressional ratification confirms that the Federal Reserve "*always had* th[e] discretionary authority" to condition section 13(3) lending on an equity term. *Cookeville Reg. Med. Ctr. v. Leavitt*, 531 F.3d 844, 848-49 (D.C. Cir. 2008) (emphasis added); *see also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 535 (1982) ("Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (internal quotation marks omitted).

Starr's response to these ratifications is illogical. Starr's reading of section 13(3) – indeed, its entire illegal exaction claim – is based on the theory that FRBNY's actions were illegal and clearly contrary to Congress's limits. Yet, when trying to counter Congress's ratification, Starr's argument can be summed up as assumed congressional indifference. Starr disregards history with speculation that, because 12 U.S.C. § 5235 was a "minor part" of the new law, Congress may not have focused on the Federal Reserve's interpretation of its authority when enacting EESA. *See* Pl. Law Br. at 26. The AIG rescue was so highly visible that "it is hardly conceivable that Congress . . . was not abundantly aware" of the equity condition on the AIG loan when, just two weeks later, it passed EESA and decided to include provisions specifically directed at the Federal Reserve's section 13(3) lending. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (internal quotation marks omitted). Representative Louise Slaughter confirmed this during Congress's debate on EESA, stating

"Taxpayers should know that we push to ensure that the government receives shares of any company it provides with aid, and after agreeing to rescue AIG from filing for bankruptcy, the government received nearly an 80 percent share in the company. . . . By making sure the government gets shares of companies we aid, we are working to revitalize this industry in a way that will benefit the taxpayers who are funding this rescue." 154 Cong. Rec. H10702, 703 (daily ed. Oct. 3, 2008).[2]

In EESA, Congress requires the Federal Reserve to report on transactions involving the receipt of equity. Starr argues that any receipt of equity was illegal; thus Starr imagines a world where Congress merely requires the Federal Reserve to self-report the agency's purported illegal conduct, but does not discontinue or reverse that same conduct. Pl. Law Br. § 4.9.2. Starr's position defies common sense. In EESA, Congress recognized and ratified the Board of Governors' conclusion that a section 13(3) loan can be properly conditioned on an equity term. *See* Def. Law Br. at 89-92.

Next, Starr argues that, because Congress purportedly limited the Treasury Department's authority to purchase equity under the TARP to warrants, Congress could not have ratified the Federal Reserve's authority to require the preferred shares as part of the AIG loan. Pl. Law Br. at 26-27. This argument lacks merit. Far from a limitation, EESA permitted the Secretary of the Treasury to purchase and hold *any financial instrument* – including common stock – from any

---

[2] Contrary to Starr's assertion, Pl. Law Br. § 4.9.2, the relevant provisions of EESA and Dodd-Frank applied not just to future section 13(3) loans but also to all outstanding loans, including the AIG loan. *See* 12 U.S.C. § 5235(d) ("The provisions of this section shall be in force for all uses of the authority provided under section 13 of the Federal Reserve Act occurring during the period beginning on March 1, 2008 and ending on the after [*sic*] October 3, 2008 . . . ."); 12 U.S.C. § 343(3)(C)(ii) (2010) (requiring reporting "with respect to any *outstanding* loan") (emphasis added).

financial institution.[3]  Indeed, EESA required that taxpayers receive an equity participation when firms received public assistance.  As a condition of any purchase of any troubled asset from a financial institution, Congress *required* that the Secretary *also* obtain warrants or their equivalent so that taxpayers would participate in any upside of the rescue.  *See* EESA Section 113(d), 12 U.S.C. § 5223(d).  Thus, Section 113(d)'s requirement that warrants be obtained as additional consideration when purchasing financial instruments did not limit the Treasury Department's authority to acquire any kind of assets authorized under EESA's sections 101 and 3(9).  Indeed, more generally, Section 113(d) confirms Congress's view that the Government, in undertaking rescue assistance to private enterprises, may properly condition its emergency lending on equity participation in the company receiving assistance.

Additionally, in section 129 of EESA, Congress implicitly ratified that a section 13(3) loan could be granted in return for "warrants or other potential equity" by providing only that the Federal Reserve submit reports about those forms of equity consideration.  12 U.S.C. § 5235(a).  That statutory language plainly embraced AIG's contractual promise to issue equity.  Congress also made clear in EESA section 135 that, with the exception of a section concerning the use of the Exchange Stabilization Fund for future guarantees of domestic money market funds, "nothing in this Act may be construed to limit the authority of the Secretary or the Board under any other provision of law."  12 U.S.C. § 5240.  Taken together, these provisions demonstrate Congress's ratification of the Federal Reserve's September 2008 interpretation of the scope of its

---

[3] EESA Section 101, 12 U.S.C. § 5211, authorizes the Secretary of the Treasury to purchase troubled assets from any financial institution, including either "(A) residential or commercial mortgages, and any securities, obligations or other instruments that are based on or related to such mortgages," or "(B) any other financial instrument that the Secretary . . . determines the purchase of which is necessary to promote financial market stability. . . ."  EESA Section 3(9). 12 U.S.C. § 5202(9).

authority. *See Jama*, 543 U.S. at 341 ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Finally, Starr reaches back to 1932, when Congress enacted section 13(3), and argues that Congress' original intent concerning the scope of section 13(3) lending was murky. Of course, the absence of any clearly expressed Congressional intent to limit the Board's authority simply confirms that Congress intended the Federal Reserve to exercise discretion in its interpretation and implementation of the statute. Indeed, Starr offers no legislative history to support its argument that Congress, at the same time it afforded broad, discretionary lending authority to the Federal Reserve, simultaneously frustrated the Government's ability to include terms in its emergency lending that it considered to be necessary and appropriate under the circumstances.

When FRBNY sought equity as a condition of the AIG rescue loan, the Federal Reserve acted within the scope of its statutory authority.

**E.     In Any Event, Starr's Illegal Exaction Claim Fails Because Section 13(3) Is Not Money-Mandating**

Starr also failed to establish that section 13(3) meets the "money mandating" requirement for an illegal exaction claim. Def. Law. Br. § 2.C. As the Federal Circuit has explained, "The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citations omitted) (*en banc* with respect to cited portion). The "absence of a money-mandating source" is "fatal to the court's jurisdiction under the Tucker Act." *Id.* at 1173.

"A statutory or regulatory provision that grants a government official or agency substantial discretion to decide whether and how to expend government funds in a particular way is not considered money-mandating and does not create a cause of action that can be prosecuted under the [Tucker Act]." *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed Cir. 2012). Courts presume that statutes using the word "may" are not money mandating, unless other indicia show that Congress intended payment to be mandatory. *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed. Cir. 2002). The Federal Circuit has, therefore, held that discretionary statutes may be considered money-mandating "when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies the 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citations omitted).

Section 13(3) does not satisfy any of the *Doe* factors. Nothing in the statute's text or legislative history limits the Board of Governors' discretion or requires the Board of Governors to approve a loan or a Federal Reserve bank to grant one. *See supra* § 1.A. Instead, the statute is expressly discretionary. This view was proffered both by Chairman Bernanke, Tr. 2168, Lines 3-13, and by plaintiffs' expert, Dr. Cragg, Tr. 5164 Line 25-Tr. 5165 Line 5 (Q: If the minimum requirements of 13(3) are met, 13(3) does not say that lending has to take place. Do you agree? A. Right. That's correct.").[4]

---

[4] In its decision on the United States' Motion for Reconsideration of its motion to dismiss, the Court stated that "at this stage Starr is entitled to the inference that Section 13(3) is indeed money-mandating." *Starr v. United States*, 107 Fed. Cl. at 378. Now that the trial has concluded, it is clear that Starr is no longer entitled to that inference.

Because section 13(3) provides the Board of Governors with discretion as to whether to authorize a loan, the section cannot be money mandating. Thus, Starr's exaction claims fails.

## II. Unable To Establish That The Federal Reserve Exceeded Its Authority, Starr Asserts Irrelevant And Incorrect Arguments To Support Its Illegal Exaction Claim

Unable to prove the necessary statutory violation, Starr raises a host of issues that cannot support its claim.

### A. Starr's Arguments Regarding Authority To *Hold* Equity And Attacks On The Trust Are Irrelevant And Incorrect

The Court should reject Starr's claim that FRBNY lacked legal authority to *hold* AIG's equity. Holding AIG preferred shares would have been a valid exercise of FRBNY's incidental powers, just as FRBNY's holding equity obtained by foreclosure following a default, or equity provided in satisfaction of an antecedent debt have long been recognized to be within a reserve bank's power. Moreover, Starr offers no connection between the holder of AIG's shares and the harm Starr alleges; accordingly, Starr lacks standing to challenge the Trust. *See* Def. Law Br. at 92-93. Quite simply, if the Federal Reserve had the authority to seek equity as compensation for the rescue loan (and it did), it was of no legal consequence to Starr what entity held or received the benefit from the preferred shares.

Starr's attacks on the Trust also lack merit. FRBNY created the Trust to hold the Series C preferred shares for genuine policy reasons. In any event, Starr has not undermined the Trust's validity, regardless of the reasons for its creation.

### 1. Neither FRBNY Nor Treasury Ever Held The Series C Preferred Shares, Nor Would Any Law Have Prevented Them From Holding Equity

The Court should reject Starr's argument that FRBNY "initially acquired" the Series C preferred shares and that such acquisition was illegal. Pls. Corrected Post-Trial Proposed Findings of Fact (Pl. PFOF) ¶ 25.1. FRBNY's role as settlor, Pl. PFOF ¶ 25.1.1, simply meant

that it "set[] up a trust," Black's Law Dictionary (8th ed. 2004) ("settlor"), which it did by placing one dollar into the Trust. JX-172 at 5 (Trust Agreement § 1.02). Because AIG issued the Series C preferred shares directly to the Trust, neither FRBNY nor the Treasury ever owned the preferred stock. *See* JX-185 at 2 (Series C Stock Purchase Agreement § 2.1).

But even if FRBNY had received AIG's preferred shares, Starr fails to identify any legal prohibition against FRBNY's ownership of equity obtained as loan consideration. *California National Bank v. Kennedy* 167 U.S. 362 (1897), on which Starr relies, Pl. Law Br. § 4.5.5, does not prohibit holding equity, but only "dealing in" stock – that is, speculative buying and trading of stock for profit. *See* Def. Law Br. at 93-94. FRBNY did not "deal in" stock when it loaned money to AIG. Rather, FRBNY obtained stock as part of the consideration for a loan. *See* Def. Law Br. at 87-89. As the Court explained in *Starr Int'l Co. v. Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202 (S.D.N.Y. 2012), "*Kennedy* held that national banks could not engage in the *speculative purchase* of stock. But it absolutely did not hold that such banks were prohibited from *holding* stock at all. . . . [A] bank's incidental powers 'necessary to carry on the business of banking' . . . have been defined expressly to include the receipt of equity in the borrower as part of the consideration for a loan." *Id.* at 241-42 (quoting 12 U.S.C. § 24) (emphases in original).

The Government has repeatedly identified authorities permitting national banks to condition lending on the conveyance of equity, *see* Def. PCOL ¶ 138, *see also* Def. Law Br. at 85, 87-89, 94-95, but Starr's submission does not address those authorities. Instead, Starr argues that national banks have greater power to obtain equity consideration for the benefit of their shareholders than FRBNY has for the benefit of taxpayers. Pl. Law Br. § 4.5.5. Starr characterizes the "public purpose" of section 13(3) lending as the protection of borrowers and their shareholders, even at the expense of taxpayers and the economy. Starr cites to no legal

support for its position; to the contrary, authorities have uniformly recognized that Congress enacted section 13(3) to protect the public interest in the economy and the Federal Reserve system, not to benefit individual borrowers or their shareholders. *See* Def. Law Br. at 105-06.

The Government Corporation Control Act (GCCA) also would not have prohibited FRBNY or the Treasury Department from holding the equity, nor does that Act "reinforce[]" any lack of authority. *See* Pl. Law Br. § 4.3. The GCCA prevents the Government from turning a private corporation into a Government agency. 31 U.S.C. § 9102; *see also* Pl. Law Br. § 4.3(a). Even with the equity term, AIG never acted as a Government agency, and never performed any governmental function or statutory mission. *See OLC Applicability of Gov't Corp. Control Act to Gain Sharing Benefit Agreement*, 2000 WL 34545092, at *6 (U.S.A.G. Sept. 18, 2000) (a company acts as an agency if it is "deliberately used to accomplish [governmental] objectives") (citation omitted); *id.* at *7 (a company acts as an agency if it is "vested, by law, with the authority to act on behalf of the United States, or to fulfill some statutory mission of the federal government") (citation and internal quotation marks omitted). Therefore, Starr's citation to the GCCA fails to support Starr's argument.[5]

---

[5] Starr has cited a September 17, 2008 internal email sent by Randall Guynn of Davis Polk stating that "the govt is on thin ice and they know it" in support of Starr's claim that the Government "understood" that section 13(3) did not authorize the Federal Reserve to acquire or hold equity as consideration for a 13(3) loan. Pl. PFOF ¶ 23.1(d) (quoting PTX-3263 at 1). It is clear from the face of Mr. Guynn's email that he was writing about whether Treasury had authority "to own the company," not whether FRBNY had authority to acquire or hold equity. PTX-3263 at 1. Starr ignores an email from the very next day in which Mr. Guynn states his position on FRBNY authority, namely, that "FRBNY has the power to take equity securities as an incident to the 13(3) power," DX-3102 at 1. He conveyed that same view to FRBNY and Treasury lawyers, reasoning that taking equity was "incidental to that express power." PTX-148 at 1.

### 2. The Credit Agreement Used An Independent Trust To Address Policy Considerations

The Federal Reserve placed the AIG equity interest in the Trust to address policy concerns associated with the prospect of directly owning a majority voting interest in AIG. *See* Def. PFOF § III.C. Citing out-of-context, partial quotes from emails and trial testimony, Starr argues that the Federal Reserve created the Trust because FRBNY "knew that it did not have the authority to acquire, or hold, equity." Pl. Law Br. § 13.3.2. The facts contradict Starr's position. As laid out in the record, Mr. Baxter concluded that FRBNY had statutory authority not only (1) to condition lending on a borrower's agreement to provide equity, but also (2) to hold that equity when authorized by the Board of Governors. *See* Def. PFOF ¶¶ 194-200; Baxter, Tr. 944, Lines 8-15 ("I believe that under the Federal Reserve Act we had full statutory authority to own the equity and hold it."); Tr. 805, Lines 6-9 ("In my view, there was no question that the Federal Reserve Bank of New York had the authority to receive equity as consideration for a section 13(3) lending."). However, Mr. Baxter believed that Mr. Alvarez – consistent with Mr. Alvarez's strongly expressed policy and prudential concerns, Def. PFOF ¶¶ 224-26, 238 – had not reached a view that the Board of Governors' authorization in its September 16 resolution encompassed FRBNY ownership of the AIG equity. Baxter, Tr. 802, Line 22-Tr. 803, Line 12.

Mr. Alvarez, like Mr. Baxter, had no doubt that FRBNY could lawfully condition lending on AIG's conveyance of equity, as memorialized in contemporaneous written analysis. *See* Def. PFOF ¶¶ 203-09; DX-484 (Sept. 17, 2008 Alvarez memorandum); Alvarez Tr. 449, Lines 12-17. Mr. Alvarez had not reached a conclusion as to whether FRBNY could hold a majority voting interest in AIG over an extended period. Alvarez, Tr. 556, Line 10-Tr. 557, Line 5; *see* Def. PFOF ¶¶ 246-48; Alvarez, Tr. 271, Lines 16-19. Having the Trust hold the equity interest

resolved policy concerns and obviated the need for Mr. Alvarez to resolve his long-term authority-to-hold question.

Contrary to Starr's assertion, there is no inconsistency between Mr. Alvarez's testimony (that he had not reached a conclusion as to FRBNY's statutory authority to hold equity over a long term), and Mr. Baxter's testimony (that although he believed the FRA authorized an equity provision, he understood Mr. Alvarez to have not reached a view that the Board of Governors had authorized FRBNY to hold the AIG equity interest). Mr. Alvarez was the gate-keeper in determining whether the final loan terms to AIG were within the Board of Governors' authorization to FRBNY; if Mr. Alvarez did not accept the proposed final equity provisions for either legal or policy reasons, he would find them to be beyond the scope of the Board of Governors' September 16 authorization.

Starr claims – but offers no evidence – that Mr. Baxter's testimony regarding the reasons the Trust was created were "pretextual." *See* Pl. PFOF ¶ 25.4.1. Indeed, contemporaneous documents and the testimony of Messrs. Alvarez, Geithner, and Huebner support Mr. Baxter's explanation. *See e.g.,* JX-172 at 5 (Trust Agreement); Alvarez, Tr. 553, Lines 15-24; Geithner, Tr. 1686, Line 23-Tr. 1687, Line 9; Huebner, Tr. 6114, Lines 4-19.

Starr contends that the Board of Governors and FRBNY believed they lacked authority to obtain equity consideration for the AIG loan, but Starr's argument fails because the Federal Reserve concluded that it had this authority, both before anyone even contemplated the AIG transaction, and again in connection with the approval process for the AIG loan. Def. PFOF ¶¶ 186-209. Before it voted on September 16, Mr. Alvarez advised the Board of Governors that the proposed AIG loan terms were legal. Def. PFOF ¶ 205. Starr does not undermine that evidence by citing (1) Federal Reserve documents declaring that FRBNY had no authority to

make equity investments (a very different transaction from receiving equity as part of the consideration for a loan), Def. PFOF ¶¶ 196-213, (2) documents and drafts authored by subordinate staff that did not accurately represent Mr. Baxter's or Mr. Alvarez's views as the chief legal officers of FRBNY and the Board of Governors regarding FRBNY's authority, Def. PFOF ¶¶ 247-48, (3) documents authored by outsiders unfamiliar with the Federal Reserve's legal analysis of its authority, Def. PFOF ¶ 248 n.26, and (4) other documents that Starr has misinterpreted or misconstrued. *See generally* Def. PFOF § III.B.3.

Starr's arguments cannot be reconciled with the evidence. Mr. Baxter's and Mr. Alvarez's testimony, as well as their contemporaneous written notes and memoranda, demonstrate their reasonable belief that the Federal Reserve could condition a section 13(3) loan on the borrower's agreement to convey equity as part of the loan consideration, and in particular that the AIG loan was within the Federal Reserve's authority. *See* Def. PFOF § III.B.

### 3. The Trust Was A Valid And Appropriate Owner of AIG's Equity

Starr argues that the Trust was a sham with no separate identity from FRBNY. Pl. PFOF ¶¶ 25.3-25.7. Starr is wrong. We have explained why this issue is not relevant to the Court's decision, but even if it were, the Trust was a valid and appropriate owner of AIG's equity, and was independent from FRBNY.

Even if Starr were correct that FRBNY or the Treasury Department could not hold equity – and it is not – that would not make the equity transfer Starr has challenged illegal, because neither FRBNY nor Treasury ever acquired an equity interest in AIG. Def. Law Br. at 95-98. FRBNY created the Trust to be independent from FRBNY and the Government; the Trust, in turn, properly exercised its independence. Although Starr asserts that FRBNY and the Government "managed the Trust and exercised the Trust's ownership rights in AIG,"

Pl. PFOF ¶ 25.6.3, Starr produces no support for its claim. Extensive negotiations by the Trustees with FRBNY over the Trust and with all parties in the 2011 recapitalization show the Trust's independence. The Trustees also testified as to their independence of judgment; Starr has not identified a single Trustee decision that contradicts that testimony. *See generally* Def. PFOF ¶¶ 273-302 (discussing the Trustees' independent exercise of their duties).

Starr's distorted reading of the Trust Agreement does not support a conclusion that the Trust and the Trustees lacked a separate identity from FRBNY and the Treasury Department. Although Section 2.04(d) of the Agreement sets forth FRBNY's views on the merits of AIG's paying back its support while not disrupting financial markets, this non-binding guidance could not impair the Trustees' independence. Def. PFOF ¶¶ 276-80. Similarly, Section 3.03(a), which provided indemnification rights so long as the Trustees did not undermine the taxpayers' interests, could not have affected the Trustees' role; the taxpayers were the Trust's beneficiaries, and the Trustees already owed the taxpayers a fiduciary duty. *See* Def. PFOF ¶¶ 286-88, 294-95. Starr has cited no provision of the Trust Agreement that: (1) directed the Trustees' decision on any action they took that Starr seeks to challenge; (2) prevented the Trustees from exercising their independent judgment; or (3) undermined the Trust's status as a separate juridical entity.

The Trust enabled the Federal Reserve to require equity as partial consideration for the AIG rescue loan without activating the legitimate policy concerns associated with having FRBNY hold the shares. The Trust was not a "sham," and it accomplished its purposes.

**B.      Starr's Claim That The Board Of Governors Did Not "Approve" The Credit Agreement Misapprehends The Requirements Of Section 13(3)**

Starr's claim that the Board of Governors did not "approve" the Credit Agreement, Pl. PFOF ¶ 18.7, Pl. Law Br. ¶ 5.0, misapprehends both the scope of the Board of Governors' authorization and, more broadly, the different roles filled by the Board and the reserve banks.

The Board of Governors does not "approve" section 13(3) loans, but rather authorizes reserve banks to extend loans subject to the limitations and restrictions the Board of Governors chooses to impose. *See* 12 U.S.C. § 343 (2008); Def. PFOF ¶ 254 n.27. The Board of Governors did not delegate to FRBNY its statutory authority to authorize lending, as Starr claims. *See* Pl. Law Br. ¶ 5.2. Rather, the Board authorized FRBNY to exercise judgment, within identified bounds, in reaching final loan terms that were consistent with the authority conveyed. *See* 12 U.S.C. § 343 (2008); Def. PFOF ¶¶ 254-60. Because the Credit Agreement as ultimately executed was within the scope of the Board of Governors' existing September 16, 2008 authorization, the agreement was authorized without the need for further formal Board action. *See* Def. PFOF ¶¶ 254-66.

Starr does not dispute that the term sheet presented to the Board of Governors on September 16, 2008, was labeled "Preliminary Draft" and left some terms blank or in brackets. Def. PFOF ¶ 255. Starr also does not dispute that the Board of Governors, recognizing that loan terms might change before a final agreement was executed, approved the proposed interest rate but otherwise authorized FRBNY to "impose conditions *such as* those described in the proposed lending facility term sheet, on its extension of credit to AIG." Def. PFOF ¶ 258. This language authorized FRBNY to change the terms, within the resolution's scope, without the need for a further Board of Governors vote.

In the days after September 16, 2008, Mr. Alvarez considered whether the evolving transaction terms, including the form of equity, fell within the authorization provided by the Board of Governors' September 16 resolution. During those days, he initially indicated that certain forms of the proposed equity ownership "will not work for the Fed." *See*, *e.g.*, PTX-183 at 1. When it was decided that the equity would be in the form of voting preferred shares held by a trust for the benefit of taxpayers, Chairman Bernanke and Vice Chairman Kohn – in

consultation with Mr. Alvarez – concluded that the final form of equity fell within the authorization of the September 16 resolution.  Def. PFOF ¶¶ 263-65.

Although Starr disagrees with this view, the decision-makers' interpretation of their own actions should be conclusive.  It makes no sense to suggest, as Starr does, that all five members of the Board of Governors had to vote on whether the loan's final terms differed so much from the preliminary, draft term sheet that they fell outside the original authorization.  Boards have gatekeepers who make threshold determinations whether a vote is required in specific circumstances.  Boards do not and should not generally require the inefficient and incongruous step of voting on the threshold question of whether an action falls within prior authorization. Here, Chairman Bernanke and Vice Chairman Kohn, in consultation with Mr. Alvarez, concluded that the Credit Agreement's terms fell within the original resolution.  This conclusion was procedurally appropriate and analytically sensible; it cannot support Starr's claims.

Even if a second formal vote by the full Board of Governors had been necessary to authorize the Credit Agreement, and it was not, the failure to hold such a vote would not present a viable basis for Starr's exaction claim.  Starr has not established how the existence of such a vote would have affected the resulting Credit Agreement or why AIG shareholders should receive a windfall of tens of billions of dollars based on what was, at most, a procedural misstep. *See Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed Cir. 1997) ("The primary intent of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation.").

### C.       The AIG Loan's Interest Rate Satisfied Section 13(3)

Starr's arguments regarding section 14(d), 12 U.S.C. § 357, misunderstand that provision and improperly attempt to use a provision about *interest rates* to prop up its claims about the *equity* term.  Starr argues that the rates set under section 14(d) must accommodate the borrower*;*

this misreads the statute, which directs the Federal Reserve instead to "accommodat[e] commerce and business" generally.  12 U.S.C. § 357.  Starr, moreover, has never sought compensation on the theory that the AIG loan's interest rate violated section 14(d); certainly, Starr did not present any evidence of such injury at trial.  If Starr now claims that AIG's interest rate was not set in accordance with section 14(d), then the Court should reject this newfound argument.

Section 14(d), a broad and general directive, instructs that "rates of discount" (that is, interest rates) be established "subject to review and determination by the Board of Governors" and "with a view to accommodating *commerce and business.*"  *Id.* (emphasis added); Def. Law Br. at 101-03.  At its September 16 meeting, the Board of Governors met this requirement by approving the interest rate proposed by FRBNY.   JX-63 at 4.  The Board of Governors provided this approval after determining that lending at that rate would accommodate commerce and business by avoiding the market disruptions that could result from AIG's failure – the same standard the Board of Governors applied when approving rates for other individual lending facilities.  *See* Def. PFOF ¶ 193 n.20; Def. Law Br. at 101-03; Alvarez, Tr. 387, Lines 16-21.[6]

Starr's invocation of section 14(d) in support of its assertion that "Federal Reserve extensions of credit 'are made not for profit but for a public purpose,'" *see* Pl. Law Br. § 4.5.5; *see also id.* § 4.10, fundamentally misunderstands the "public purpose" that section 13(3) lending

---

[6] Charging higher interest rates on the AIG loan than on other section 13(3) loans was consistent with section 14(d), which has long been interpreted to permit different rates for different section 13(3) borrowers.  *See* PTX-2826 at 2 (July 17, 1970 Hackley memorandum); *id.* at 8 ("[T]he Board has established different rates, under the same statutory authorization, for advances to different types of borrowers even though the paper taken as collateral was of precisely the same nature."); PTX-742 at 191-92 (Hackley, "Lending Functions of the Federal Reserve Banks:  a History") ("[T]here may be different rates according to the nature of the borrower.").

serves. Emergency lending furthers the broad public interest in stabilizing and protecting the

financial system for the benefit of the public generally, *see* 12 U.S.C. § 343 (2008); 12 C.F.R.

§ 201.4(d), not to benefit and subsidize shareholders' risk taking.[7]  Lending for a public purpose,

however, does not prohibit the Federal Reserve from profiting on a loan.  Even under Starr's

incorrect reading of the FRA to limit consideration to interest, if a borrower properly repays a

section 13(3) loan, the lending bank would make a profit by recouping both the principal and

interest.

Nor can Starr plausibly argue that the AIG rescue loan's *equity term* violated section

14(d).  That statutory provision's requirement that interest rates be set in a particular manner has

nothing to do with, and does not by its terms prohibit, other forms of consideration *in addition to*

interest.  *See* 12 U.S.C. § 357; Def. Law Br. at 101-02.

### D. Starr's Arguments Concerning "Punishment" Are Irrelevant And Incorrect Because The Terms Of The Loan Were Not Punishment For Wrongdoing

Starr's arguments about "punishment" simply restate its already dismissed claim that

AIG was punished without due process of law.  *Starr*, 106 Fed. Cl. at 61; Def. Law Br.

§ II.A.4.a.  Moreover, Starr's insistence that the Federal Reserve "punished" AIG, Pl. Law Br.

§§ 6.2, 12.13, Pl. PFOF ¶ 26.2, is contrary to fact.  Starr cannot alter the fundamental economic

---

[7] Congress did not enact section 13(3) to ensure that borrowers or shareholders would be
insulated against all financial risk; to the contrary, such persons are ordinarily (and properly) left
to the discipline of the market.  *See* Def. Law Br. at 105-06; *Starr v. Fed. Reserve Bank of New
York*, 742 F.3d 37, 42 (2d Cir. 2014) (section 13(3) loans do not encompass a duty to advance the
interests of borrowers or their shareholders); *Corbin v. Fed. Reserve Bank of New York*, 475 F.
Supp. 1060, 1068 (S.D.N.Y. 1979), *aff'd*, 629 F.2d 233 (2d Cir. 1980) ("Loans made by the
Federal Reserve are made for a public purpose, they are not intended to serve private
interests[.]"); *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 210, 217-19 (E.D.N.Y. 1979)
(Federal Reserve lending is intended "to preserve the stability of the banking system, to
minimize the losses to the public, and to reduce the possibility of grave national and international
financial repercussions").

reality that the rescue loan provided a substantial benefit to AIG and its shareholders compared to their position in the absence of a loan. The notion that the United States "punished" AIG by extending a loan that saved it – and all of its shareholders – from the devastating consequences of bankruptcy is not only at odds with the evidence presented at trial, but defies all common sense.

Indeed, President Geithner and Chairman Bernanke testified without contradiction: (1) that the terms of AIG's rescue loan reflected their judgments about the unprecedented risks and policy implications of lending to AIG, rather than a desire to punish AIG for wrongful conduct; (2) that the Federal Reserve borrowed the loan's equity terms from provisions that private sector bankers themselves had proposed, but ultimately determined were still too risky; and (3) that, in the financial world, the term "punitive" is widely understood to mean merely "harsh" or "expensive," such that any reference to a "punitive" loan term is best understood not to reflect a subject motivation to inflict punishment, but rather an objective intent to reconcile a loan's terms with the poor condition of the borrower and the heightened level of risk involved. *See* Def. PFOF ¶¶ 181-84; Def. Law Br. at 99-100.

Starr's argument fails for the additional reason that the Federal Reserve had no means by which it could "impose punishment" on AIG. *See* Pl. Law Br. § 12.13. As this Court has correctly observed, "[I]f AIG had refused the conditions of the loan agreement, AIG would not have been subject to any ongoing [regulatory] restrictions; AIG simply would not have obtained the loan." *Starr*, 106 Fed. Cl. at 82-83. AIG was under no compulsion to accept the Government's offer. Instead, AIG's board voluntarily accepted the rescue loan because it was vastly preferable to AIG's alternative option of bankruptcy, which would have wiped out shareholders. *See* Def. PFOF § II. Offering AIG's shareholders a rescue that partially insulated

them from the consequences of the company's business decisions, to which they already were fully exposed in the absence of that rescue, simply does not amount to "punishment." *See* Def. Law Br. at 100. Certainly, the 100,000 businesses that went bankrupt in 2008 and 2009 in the absence of Government assistance would have welcomed the "punishment" that AIG itself freely accepted.

E.     **The Loan Terms Were Justified, And The Equity Term Was Not An Extraneous Demand**

Starr suggests that because the Federal Reserve's loan was at all times "fully secured," Pl. PFOF ¶ 21.0, the Federal Reserve must have required the equity term simply to "pick[] up a few dollars for the public treasury," unrelated to and beyond the scope of section 13(3)'s authority. *See* Pl. Law Br. § 2.3 (b) (quoting *Suwannee S.S. Co. v. United States*, 279 F.2d 874, 877 (Ct. Cl. 1960)). As we have demonstrated, however, the equity term was not beyond the scope of the Federal Reserve's statutory authority. The Federal Reserve, therefore, was free to condition the AIG loan on the equity term. *See* Pl. Law Br. § 2.4.[8] In addition, the factual premises of Starr's argument are incorrect: (1) the loan terms were directly related to the substantial risks and policy considerations that the Board of Governors identified; and (2) contrary to Starr's assertions, the loan was, in fact, very risky, even with AIG's collateral.

1.     **The Challenged Loan Terms Were Directly Related To The Risks And Policy Implications Of Lending To AIG**

Starr cites cases in which the conditions placed on the provision of discretionary benefits bore no relationship to those benefits. Here, however, the AIG loan's terms and conditions,

---

[8] To the extent that Starr relies upon unconstitutional conditions cases to argue that the equity term is an illegal exaction, Pl. Law Br. § 2.4.1, Starr conflates an alleged lack of *statutory* authority (creating a potential *illegal exaction*) with a condition that is purportedly *unconstitutional* because it violates the *takings* clause. We therefore address Starr's unconstitutional conditions arguments in our takings section below.

including the 79.9 percent equity term, directly related to the risks and policy implications of lending to AIG.

For example, in *Suwannee Steamship Co. v. United States*, the Court determined that a fee, demanded in exchange for the Government's regulatory approval of the sale of a ship to a foreign purchaser, did not bear even "the remotest relation" to "whether the transfer would be compatible with national interests." 279 F.2d at 876-77. "The vice of the [fee was] its irrelevance." *Id.* By contrast, the AIG loan terms, including the equity term, were relevant (1) to compensating taxpayers for the unprecedented scale and risks of the loan; and (2) to mitigating policy concerns such as the windfall AIG and its shareholders received from being rescued, and the moral hazard associated with rescuing AIG. Those considerations clearly related to the Federal Reserve's determinations whether and on what terms to lend. *See* Def. PFOF § III.A.

The Federal Reserve's loan terms were based on and consistent with the terms private sector lenders had sought to develop but had found insufficient to entice the market to lend to AIG, further demonstrating these terms' relevance and appropriateness. *See id.* at § III.A.1. Starr has not offered any explanation why it could possibly be unjustified for the Government to offer AIG a loan on essentially the same commercial terms (including a 79.9 percent equity participation) that a consortium of private lenders considered, but ultimately rejected.

Beyond the loan's riskiness, the equity term was independently justified based on policy grounds. As President Geithner and Chairman Bernanke testified, the equity term reduced the windfall that AIG and its shareholders enjoyed by being rescued from a value-destroying bankruptcy and reduced the unfairness of using taxpayer funds to rescue AIG while other institutions failed and their shareholders were wiped out. *See* Def. PFOF ¶¶ 130-35. Also, the AIG loan raised exceptional moral hazard, which, alone, could have been a basis for denying the

loan to AIG.  The Federal Reserve properly considered these policy issues when deciding whether and on what terms to make the loan; the equity term addressed and mitigated those concerns.

Starr is left to argue about the alternative manner in which the Federal Reserve might have addressed the moral hazard concerns.  Starr argues that the Federal Reserve addressed moral hazard differently in its other lending facilities, without conditioning lending on the conveyance of equity.  *See* Pl. PFOF ¶¶ 32.2.5, 32.2.7, 32.2.12.  Starr's policy critique of the Federal Reserve's balancing of various policy considerations ignores the reasons why different lending programs had different terms and, in any event, is not a viable legal basis for Starr's claims.  *See* Def. PFOF § III.F; Def. Law Br. at 100-01.

### 2. The Evidence Contradicts Starr's Assertion That The AIG Loan Was Not Risky

Neither the evidence nor common sense support Starr's assertion that the collateral securing the Federal Reserve's $85 billion loan to AIG eliminated the loan's risk.  As recorded in contemporaneous documents, President Geithner and others recognized that the AIG loan carried enormous risk despite being "secured" within the meaning of the statute.  *See* Def. PFOF ¶¶ 148-50; JX-82 at 1 (Sept. 16, 2008 Alvarez handwritten notes) (although the FRBNY loan was secured, Geithner believed there remained "risk of loss"); DX-421 at FRBNY-STARR(CFC)-0445444 (Sept. 16, 2008 McConnell handwritten notes) ("Significant risk that you won't recover princip[al] and interest on this loan."); Geithner, Tr. 1759, Lines 10-21 (Geithner recognized that FRBNY might lose "billions of dollars, if not tens of billions of dollars"); JX-129 at 2 (Oct. 8, 2008 letter from Paulson to Geithner acknowledging that taxpayers bore the risk of loss on the AIG loan).  Starr cites to after-the-fact statements about the loan's riskiness and expressions of hope that the rescue ultimately would succeed.  Pl. PFOF ¶¶ 21.2, 21.7.  Those statements,

however, do not refute the written evidence as well as the decision-makers' testimony about the Federal Reserve's contemporaneous understanding of the riskiness of the loan. As Chairman Bernanke testified, lending $85 billion "in the middle of a financial crisis, to a company which can't get credit elsewhere, that you don't know too much about because it's an insurance company, where the collateral is the assets of the firm, which are very hard to value and are certainly not marketable or saleable . . . [and] not independent of the value of the firm . . . no reasonable person could conclude that it was anything other than a risky loan." Def. PFOF ¶ 152.

Of course, if anyone truly viewed the AIG loan as low-risk, then the private sector would have provided the funding without the need for Government support. The market's contemporaneous conduct belies Starr's litigation position. Hours before FRBNY offered the loan, Goldman Sachs and JP Morgan walked away from the opportunity to syndicate a private loan on terms including a 79.9 percent equity interest – and from the fees such a loan would produce – because they did not believe any private investors would be willing to assume the enormous risk inherent in any attempt to bring AIG back from the brink of bankruptcy. *See* Def. PFOF ¶¶ 42, 45-47.[9]

Contrary to Starr's assertions, the collateral securing the AIG loan – ownership interests in AIG's regulated insurance subsidiaries – was different from and uniquely risky compared to any other collateral ever accepted by FRBNY. This equity collateral (1) lacked a readily determinable market price, (2) was not readily saleable, (3) faced declines in value over time

---

[9] Mr. Willumstad had reported on September 15, 2008, to AIG's board of directors that, for a credit facility of $50 to $75 billion, "the expectation is that the banks will ultimately be paid in some form of equity." JX-74 at 2; *see also* Def. PFOF ¶ 46; Def. Law Br. at 23 & n.3.

with no capacity on AIG's part to provide additional collateral, and (4) was expected to drop dramatically in value upon AIG's failure or bankruptcy. *See* Def. PFOF ¶¶ 153-165.

As its primary support for the conclusion that the AIG loan was not risky, Starr relies on its assessment of AIG's valuation as a going concern. Pl. PFOF ¶ 21.6. This supposed valuation, however, ignores the universal consensus, shared by the Federal Reserve, AIG, and all of their respective advisors, that if AIG went bankrupt the collateral's value would drop immediately and dramatically. See Def. PFOF ¶¶ 163-65, 350-66; Geithner, Tr. 1757, Lines 8-12 ("Q. [W]hat was your analysis of what would have happened to the value of the collateral AIG was proffering if AIG ended up in bankruptcy? A. [O]ur judgment was that the risk is it would decline sharply in value."); Tr. 1812, Lines 13-23; Bernanke, Tr. 2237, Lines 12-15 ("[T]he collateral taken on this loan was not independent of the firm itself, and the collapse of the firm would have destroyed much of the collateral."). Thus, AIG's collateral would melt away under the very circumstance in which the Federal Reserve would need to turn to that collateral for repayment.

Market indicators corroborated the conclusion that the loan to AIG was risky. In September 2008, these indicators reflected both (1) the likelihood of an AIG bankruptcy, and (2) that, in the event of bankruptcy, AIG's assets would not have been valuable enough to repay even its previously outstanding obligations, let alone an additional $85 billion credit facility. *See* Def. PFOF ¶¶ 167-71 (the market viewed an AIG default as highly likely and, in the event of bankruptcy, valued AIG's assets below AIG's already-existing obligations).

Contrary to Starr's assertion, because AIG did not have any secured debt at the time of the AIG rescue, AIG's unsecured debt properly reflected the risk of lending to the company. *See* Pl. PFOF ¶ 21.8. As Dr. Mordecai explained, "once the revolving credit facility is put in place, it

basically takes the place of those senior unsecured debt claims in the capital structure . . . . [T]he revolving credit facility has the same seniority that the previous senior unsecured debt claims have. It's also backed by the same sources of repayment from the same assets as the senior unsecured debt claims . . . ." Mordecai, Tr. 7536, Lines 3-19 (discussing DX-2618). Market indicators showed that AIG's assets would have been insufficient to fully repay unsecured creditors in the event of the company's bankruptcy, confirming the substantial risk that the Federal Reserve faced in lending against those same assets. *See* Saunders, Tr. 8210, Lines 17-20 ("with the collateral being mostly illiquid, nontraded equity interest in the subsidiaries, . . . the loan was similar to an uncollateralized loan").

### F. Starr's Equal Protection Claim Already Has Been Dismissed, And Section 13(3) Does Not Require Lending On Uniform Terms And Conditions

The Court should reject Starr's improper effort to resuscitate its dismissed equal protection claim, which asserts that the Federal Reserve was required to lend to all institutions on identical terms. Pl. Law Br. §§ 7.0, 12.14. This previously dismissed claim continues to lack any legal basis and improperly invites the Court to enter the policy and economic thickets of how to properly price and structure emergency financial assistance in an economic crisis. *See* 12 U.S.C. § 343 (2008). As already explained, the FRA authorizes the Federal Reserve to set the terms and conditions of individual section 13(3) rescue loans based on discretionary policy judgments that may vary from one loan to another, as well as on the individual circumstances and characteristics of the borrower and the proposed loan. *See* Def. PFOF ¶¶ 118-19; Def. Law Br. at 79-80.

By comparing section 13(3) lending to section 10B discount window lending, Starr argues that AIG should have received the same terms as all other entities receiving 13(3) loans. *See* Pl. Law Br. § 7.4. But Starr's argument rests on Dr. Cragg's opinion that the Federal

Reserve should blind itself to "the actual circumstances of [the] particular borrower" when lending through the discount window – a nonsensical approach that Dr. Cragg likened to obscuring policymakers' vision with "frosted glass."  Cragg, Tr. 5467, Lines 5-19; Tr. 5526, Line 11-Tr. 5527, Line 4; *see* Pl. PFOF ¶ 7.4(b).  Discount window lending, however, is not done through a "frosted glass."  The lending reserve bank always knows to whom it lends, and different borrowers are subject to different loan terms depending on their characteristics.  *Cf.* 12 C.F.R. § 201.4 (distinguishing among primary, secondary, and seasonal credit).  Even in section 10B discount window lending, the Federal Reserve charges a different rate to depository institutions judged to be in less satisfactory financial condition.  12 C.F.R. § 201.4(a), (b); Baxter, Tr. 846, Line 18-Tr. 847, Line 7.

In any event, by statute, section 13(3) lending fundamentally differs from section 10B discount window lending.  Entities receiving 10B discount window loans are depository institutions that must comply with pre-existing regulations and limitations.  No such restrictions apply to potential section 13(3) borrowers.  Geithner, Tr. 1709, Line 25-Tr. 1710, Line 17; Tr. 1765, Lines 16-22.  Congress, moreover, expressly limited section 13(3) lending to "unusual and exigent circumstances."  Those loans, particularly loans to individual institutions, are anything but routine.  Under section 13(3), the Federal Reserve's decision to lend requires assessing the individual circumstances of the non-bank institutions seeking loans, the policies and purposes underlying specific loan decisions, and the loan's likely impact on the marketplace.  *See* 12 U.S.C. § 343 (2008).  Starr provided no reason in law, policy, or economics why the terms of every rescue loan transaction must be exactly the same no matter the borrower's condition; to the contrary, the reasons for permitting the Federal Reserve to tailor the terms of a rescue to the relevant circumstances of each borrower are both intuitive and compelling.

**III.    The *Penn Central* Analysis Applies To Starr's Takings Claim**

Starr's takings theory cannot survive the analysis of *any* takings framework because the loan was voluntary and did not harm Starr.  Nevertheless, the Court should analyze Starr's takings claim under the *Penn Central* balancing test.  Although Starr attempts to characterize its claim as a physical taking, it is not.

In addition, although Starr urges the Court to apply the unconstitutional conditions doctrine, that analysis does not support Starr's claim.  That doctrine applies to takings claims only as the "rough proportionality" test established in *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and the Court has already rejected such an approach.  Even if that test did apply, the Government did not impose any unconstitutional condition on AIG or its shareholders.

**A.    Starr Cannot Claim A Physical Taking Because Starr Has No Property That Was Physically Taken**

The parties agree that there are two broad categories of takings: physical takings and regulatory takings.  Pl. Law Br. § 11.1.1 (citing *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 48 Fed. Cl. 137, 141 (2000)).  The regulatory category sweeps in all takings claims that are not physical, and thus (contrary to its name) is not reserved for claims based on regulations. *See, e.g., A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1151 (Fed. Cir. 2014).  Starr disclaims a regulatory taking and argues that the United States' $85 billion loan to AIG constituted a physical taking.  *See* Pl. Law Br. §§ 11.2.2-3; Def. Law Br. § 1.A & at 62.  Starr misunderstands, and misapplies, takings jurisprudence.

Starr's allegations at best fit into the regulatory taking framework.  As this Court described Starr's pleadings, "'The right to recover is not premised on the *physical* expropriation of a shareholder's stock; instead, it is premised on the theory that the corporation, by issuing additional stock for inadequate consideration, made the complaining stockholder's investment

less valuable.'"  Pl. Law Br. § 10.6.1 (emphasis in original) (quoting *Starr*, 106 Fed. Cl. at 74) (additional citations and quotation marks omitted).

A physical taking occurs when the Government seizes, physically invades, or directly appropriates the property owner's property.  Pl. Law Br. § 11.3.1 (quoting *Casa de Cambio*, 48 Fed. Cl. at 141, and *Casita Mun. Water Dist. v. United States*, 556 F.3d 1329, 1332 (Fed. Cir. 2009)).  The owner's "right to possession, use, and disposal of the property" is "destroy[ed]."  *Id.* § 11.3 (quoting *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002)).  By contrast, a regulatory taking occurs when "Government action . . . does not directly appropriate or invade, physically destroy, or oust an owner from property but is overly burdensome."  *A & D Auto Sales*, 748 F.3d at 1151; *see also Americopters, LLC v. United States*, 95 Fed. Cl. 224, 229 (2010) (regulatory taking occurs when "government regulations unduly burden private property to the point of diminishing its utility or value") (citing *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008)).

Starr does not dispute that it held the same number of shares or stock certificates both before and after AIG entered into the Credit Agreement, Pl. Law Br. § 10.6.1, but nonetheless argues that the Government still effected a "partial [physical] taking of property."  *Id.* § 11.3.2 (citing *Ga. Pac. Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980)).  Starr's argument misunderstands what it means to take part of an owner's property in the context of a physical taking.  In *Georgia Pacific*, the Government took part of the owner's plot of land; this constituted a physical taking because, although the owner retained some of its property, a portion of it was completely taken.  *See generally Ga. Pac. Corp.*, 640 F.2d 328.  The parallel situation in this case would be if the Government had directly seized some number of Starr's shares,

leaving Starr without title or ownership to that taken stock. But it is undisputed that this did not happen. Starr and all the common shareholders retained the exact same number of shares before and after the alleged taking. For each of those shares, Starr still possessed that stock, still could use and vote that stock, and still could dispose or sell that stock. Therefore, no physical taking could have occurred. *Boise Cascade*, 296 F.3d at 1353 (physical taking "destroys owner's right to possession, use, and disposal of the property").[10] Indeed, Starr fails to cite a single case to support the illogical notion that a Government action that affects the value of a plaintiff's stock, without actually transferring the stock, could constitute a physical appropriation.

Thus, Starr alleges a regulatory – not physical – taking. *See A & D Auto Sales*, 748 F.3d at 1157 ("In order to establish a regulatory taking, a plaintiff must show that his property suffered a diminution in value or a deprivation of economically beneficial use.") (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), and *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).[11] The Court, therefore, should apply a regulatory taking analysis.

---

[10] Contrary to Starr's characterization, the Government has never conceded that "to the extent a taking took place, it involved a direct appropriation of property – not a regulatory taking." *See* Pl. Law Br. § 11.2.2. From the beginning of this case, the Government has argued that Starr has not successfully alleged either a regulatory taking or a *per se* taking. The Government's position remained the same after trial. Earlier in this litigation, the Government argued that Starr did not suffer a regulatory taking because no regulations affecting AIG burdened its shareholders' property interests. *See* Def. Memo in Support of Motion to Dismiss, at 26. It remains true that Starr cannot establish a regulatory taking for that reason and for the additional reasons discussed in the Government's opening post-trial brief. *See* Def. Law Br. § I.E. Similarly, the Government has been equally clear throughout this litigation that Starr cannot establish that it suffered a *per se* (physical) taking. *See* Def. Reply Memo in Support of Motion to Dismiss, at 24; Def. Law Br. § I.A..

[11] Of course, "not every government action that reduces a property's value is a regulatory taking." *Reoforce, Inc. v. United States*, 118 Fed. Cl. 632, 666 (2014).

**B.      Starr Cannot Establish An "Unconstitutional Conditions" Taking**

Starr argues that an unconstitutional condition is a coercive act indicative of duress.  Pl. Law Br. § 12.10.  The Court should not permit Starr to smuggle its dismissed, unconstitutional conditions claim into the duress/coercion standard.

First, courts use *Dolan*'s rough proportionality test to analyze unconstitutional conditions claims based on the Fifth Amendment's takings clause.  This Court properly dismissed Starr's takings claim based upon the *Dolan* analysis, because *Dolan* claims only apply to land use regulation cases.  *Starr*, 106 Fed. Cl. at 83.  Second, even if that analysis did apply outside the context of land use regulations, Starr's claim fails because the Government and FRBNY did not threaten to impose any regulatory or police power restrictions on AIG's or AIG's shareholders' property if AIG did not accept the allegedly unconstitutional condition.  *Id.*  Last, even if Starr's unconstitutional conditions claim did not require the Government to threaten penalties or restrictions on AIG's property, the equity term is not an unconstitutional condition because it satisfies *Dolan*'s rough proportionality test.

**1.      The Court Dismissed Starr's Unconstitutional Conditions Claim**

The Court long ago rejected as legally unsustainable Starr's "unconstitutional conditions" claim that Starr had been wronged because "the Government's conditions under the loan agreement were disproportionate to the benefits."  *See Starr*, 106 Fed Cl. at 81.  The Court correctly concluded that Starr could not invoke *Dolan*'s "rough proportionality" test because that test applies only to land use exactions.  *Id.* at 82-83.  Starr cannot revive its dismissed claims by citing *Koontz v. St. Johns River Water Mgmt. Dist.,* 133 S. Ct. 2586 (2013), in place of *Dolan,* Pl. Law Br. §§ 2.4, 12.10; *Koontz* relies on the same "rough proportionality" test the Court has already rejected.

Undeterred, Starr cites to several unconstitutional conditions cases in which the Government improperly attempted to condition a benefit on a plaintiff giving up rights to free speech or interstate travel. Pl. Law Br. § 12.10.3(a) (citing a string of cases cited in *Koontz*, 133 S. Ct. at 2596). Those cases are inapposite because the framework for analyzing whether the Government has placed an unconstitutional condition on a benefit depends on what part of the Constitution the Government allegedly violated. In the context of First and Fourteenth Amendment rights, the Government's ability to condition a benefit is relatively narrow; the Government categorically "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Starr does not allege that the Government denied its First or Fourteenth Amendment rights; therefore, this test does not apply.

In the context of the takings clause, however, determining whether a condition is unconstitutional generally requires nothing more than applying the usual analyses for takings claims. For regulatory takings, that is the *Penn Central* analysis. *Penn Central* and other takings analyses already incorporate an analysis of whether a benefit or compensation provided by the Government to the property owner adequately compensates the property owner for the allegedly taken property. *See, e.g.*, *Bauman v. Ross*, 167 U.S. 548, 574 (1897) (The "incidental injury or benefit to the part [of an owner's property] not taken is also to be considered. . . . When . . . the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened."); *Bassett, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 75 (2002); *Hendler v. United States*, 38 Fed. Cl. 611, 617 (1997).

The Supreme Court has recognized just one type of takings case that requires a separate unconstitutional condition analysis:  governmental conditions arising "when owners apply for land-use permits."  *Koontz*, 133 S. Ct. at 2594 (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 547 (2005); *Dolan*, 512 U.S. at 385)).[12]  This case is not a land-use case; as the Court previously held, an unconstitutional conditions/rough proportionality test does not apply.

> 2.   **Even If The *Nollan/Dolan* Test Applied Outside Of The Land-Use Context, Starr's Claim Fails Because The Government's Actions Did Not Impose Any Regulatory Or Police Power Restrictions That Would Affect AIG's Voluntary Choice**

Even if the unconstitutional conditions doctrine did apply, Starr has not alleged the regulatory, police power interference with Starr's property that is necessary for an unconstitutional condition to exist.  As the Court previously explained:

> Even if the *Nollan/Dolan* test were to be applied outside the context of land use exactions, the factual predicate for using the test is not alleged here. . . . Here, in placing certain conditions on AIG's receipt of the $85 billion loan, the Government was not exercising preexisting regulatory authority, or anything akin to a state or locality's police powers.  In *Nollan* and *Dolan*, the landowners were restricted from building on their land, and the localities would lift those restrictions only if the landowners agreed to certain conditions.  By contrast, here, if AIG had refused the conditions of the loan agreement, AIG would not have been subject to any ongoing restrictions; AIG simply would not have obtained the loan.  In this way, the Government was not in a position to exploit any existing regulatory

---

[12] Starr cites to *Janowsky v. United States*, 133 F.3d 888 (Fed. Cir. 1998), presumably to argue that the case supports applying *Dolan* outside the land-use context.  Pl. Law Br. §§ 12.10(a), 12.10.3(c) (citing *Janowsky* quoting *Dolan*).  First, although the *Janowsky* court cited *Dolan*, it never applied the *Dolan* test or held that the test would apply outside the context of land-use or real property.  The Court merely held that, when reviewing allegations in the light most favorable to the plaintiff at the motion-to-dismiss stage (which the Court had converted to a motion for summary judgment), the plaintiff had sufficiently alleged coercion.  Second, *Janowsky* involved radically different facts:  the plaintiff alleged that the FBI had compromised Mr. Janowsky's cover during an investigation, which placed Mr. Janowsky in physical danger, then threatened to *remove* protection unless Mr. Janowsky agreed to let the FBI take over his property and business.  133 F.3d at 892.  Those allegations are vastly different from a "take it or leave it" offer, as Starr itself characterizes FRBNY's proposed loan.  Pl. PFOF ¶ 13.3.

> power to induce the loan transaction. Because Starr has not alleged the
> occasion for coercion that was present in *Nollan* and *Dolan*, the Court
> finds the test articulated in those cases inapplicable here.

*Starr*, 106 Fed. Cl. at 82-83.

The other case on which Starr relies, *Union Pacific Railroad Co. v. Public Service Commission of Missouri*, 248 U.S. 67 (1918), supports the conclusion that the unconstitutional conditions doctrine only applies when the Government exercises its police power or threatens to burden a plaintiff's rights if its condition is not met. That case – which concerned neither a taking nor an illegal exaction – involved a plaintiff's application for a certificate authorizing the plaintiff to issue bonds secured by a mortgage. *Id.* at 68. Without the certificate, the state would impose "severe penalties" and invalidate the bonds. The Public Service Commission of Missouri granted the certificate for a fee; the plaintiff paid the fee but protested in writing, saying that it was paying under duress and that the fee was an unconstitutional interference with interstate commerce. *Id.* The Supreme Court declined to address whether the fee was, in fact, unconstitutional, but ruled that the plaintiff had paid under duress. *Id.* at 70. The Court explained: "Were it otherwise, as conduct under duress involves a choice, it always would be possible for a State to impose an unconstitutional burden by the threat of penalties worse than it in case of a failure to accept it, and then to declare the acceptance voluntary." *Id.*

Here, by contrast, neither the Government nor FRBNY threatened penalties if AIG refused FRBNY's loan. *Starr*, 106 Fed. Cl. at 82-83. Just as the Government was under no obligation to offer any rescue loan to AIG, AIG was under no obligation from the Government to accept its offer. Indeed, the evidence showed that if AIG had refused the loan, AIG would have been in the same position after its refusal as it was before FRBNY offered the loan: the precipice

of bankruptcy. Thus, the equity term could not be an "unconstitutional condition" that would constitute a wrongful or coercive act under the duress standard. *See* Pl. Law Br. § 12.10.

Indeed, the Government's contract with a corporation, voluntarily undertaken by both parties, cannot be second-guessed at the invitation of disappointed shareholders on the theory that the Government's failure to offer more favorable terms constituted an "unconstitutional condition." If Starr's theory were to be accepted, the United States would face takings liability to corporate shareholders every time the Government (1) provided any benefit to a corporation for a fee, or (2) contracted to buy a company's products or services. The Court should reject Starr's legally unsupported invitation to reverse its prior decision and exceed well-established precedent.

### 3. Even If The "Unconstitutional Conditions" Doctrine Applied, The Equity Term Was Not An Unconstitutional Condition

Even if the Court were to apply an unconstitutional conditions test to the equity term, Starr's claim would fail because the equity term was directly related to the benefit AIG sought. When a plaintiff claims that the Government "has forced her to choose between [a benefit] and her right under the Fifth Amendment to just compensation," *Dolan*, 512 U.S. at 385-86, the plaintiff must prove that the Government required property "in exchange for a discretionary benefit conferred by the government where the benefit sought has *little or no relationship to the property*." *Id.* at 385 (emphasis added). To determine whether a Government-imposed condition is an unconstitutional condition to give up just compensation for property, the Court "must first determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city." *Dolan*, 512 U.S. at 386 (quoting *Nollan*, 483 U.S. at 837). If a nexus exists, the Court must then determine whether there is "rough proportionality" between the benefit conferred and the condition required – that is, the Government "must make

some sort of individualized determination that the required [condition] is related both in nature and extent to the impact of the [benefit sought]." *Id.* at 391.

Here, the equity term shares an "essential nexus" with the Government's legitimate interest. The $85 billion loan increased the value of AIG's existing equity by preventing AIG from going bankrupt; the equity term moderated that windfall by having AIG pay equity as consideration for the loan's benefit. Def. PFOF ¶¶ 130-35. The equity term also helped compensate for the risk of the Federal Reserve's loan, and mitigated moral hazard concerns – that is, the concern that a loan to AIG on overly favorable terms might encourage other industry participants to engage in risky decision making or to pass up potential private sector solutions in hopes of a favorable Government rescue. Def. PFOF ¶¶ 136-38. The equity term, therefore, directly related to the Federal Reserve's legitimate interests in extending a rescue loan to AIG.

The equity term also satisfies the rough proportionality test. The Federal Reserve made the "individualized determination" that the equity term was appropriate and "related both in nature and extent to the impact of the" loan's benefit. *Dolan*, 512 U.S. at 391. The Federal Reserve considered the policy reasons for offering the rescue loan and determined that conditioning the loan on a 79.9 percent equity stake, as the potential private sector deal would have done, was both critical and closely related to the Federal Reserve's legitimate concerns about (1) compensating the taxpayers for the risks of providing the largest Government loan in history to a company that had managed itself to the brink of bankruptcy; (2) mitigating the risk of this loan; (3) reducing the windfall to AIG's shareholders; and (4) addressing moral hazard. *See, e.g.*, Def. PFOF ¶ 135 (JX-172 at 4 (AIG Credit Facility Trust Agreement)); *id.* ¶ 136 (JX-129 at 2 (Oct. 8, 2008 letter from Paulson to Geithner acknowledging that taxpayers were bearing the risk of loss on FRBNY's loan)); *id.* ¶ 136 (describing conversation and notes from

September 16, 2008, explaining that, even with AIG's collateral, a loan would be risky); *see also generally id.* § III.A. That analysis would fully satisfy the rough proportionality test, as "[n]o precise mathematical calculation is required." *Dolan*, 512 U.S. at 391.

The private market's use of equity in commercial loans confirms the existence of an "essential nexus" and "rough proportionality" between the AIG loan's equity term and the benefit conferred by the Government. Equity kickers are common in lending to distressed entities because the entities cannot, otherwise, adequately compensate the lender for the loan's risks. Def. PFOF ¶ 209, 413. Indeed, the private sector consortium that considered lending to AIG on September 15, 2008, included a 79.9 percent equity term in their proposed term sheet. Def. PFOF ¶ 46. The Government's adoption of a similar equity term in making an even larger loan to AIG was not "disproportionate."

Thus, even if the unconstitutional conditions doctrine applied in this case – which it does not – the equity term satisfied this test and cannot serve as a basis for compensating Starr.

Finally, to the extent Starr claims that the "unconstitutional condition" stems from FRBNY's alleged lack of authority to condition a section 13(3) loan on an equity provision, Starr simply restates its illegal exaction claim, which fails for the reasons discussed above and in our opening brief. *See* Pl. Law Br. § 12.10.3(c) (citing *Suwannee*, 279 F.2d 874, an illegal exaction case, in its argument entitled "Defendant acts wrongfully and coercively when, as here, it conditions the provision of a discretionary benefit on the forfeiture of constitutional rights"). The Court should dispose of Starr's illegal exaction claim in the context of that claim, not in the context of an allegedly unconstitutional condition violating the Takings Clause of the Fifth Amendment; if the equity term constitutes an illegal exaction, it cannot also be a taking. *Compare Alves v. United States*, 133 F.3d 1454, 1456-58 (Fed. Cir. 1998) (taking must be based

on authorized Governmental action) *with Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003) (If the Government action complained of is unauthorized, "plaintiff's takings claim would fail on that basis.").

## IV. No Taking Or Exaction Occurred Because AIG Acted Voluntarily And Without Duress

AIG voluntarily accepted the rescue's equity term; this precludes Starr's equity claims under both taking and illegal exaction theories. Def. Law Br. §§ I.B, II.B; *see Starr*, 106 Fed. Cl. at 77-78. Nothing in Starr's 700 pages of briefing alters that reality.

First, the evidence established that AIG's board voluntarily accepted the rescue. Starr presented no evidence that the Government acted coercively in offering to rescue AIG. Second, AIG voluntarily agreed to the equity term on September 16, 2008, and the terms of the September 22, 2008 Credit Agreement were consistent with that agreement. Third, the Court should apply the traditional standard for duress, not Starr's invented-for-litigation "effective economic control" standard. Further, Starr's argument is internally inconsistent: Starr argues that the Government gained control of AIG on September 16, 2008, but that AIG remained independent and without any obligation to issue equity until the September 22, 2008 Credit Agreement. Fourth, Starr errs in asserting that the Credit Agreement deprived the common shareholders of a right to vote on the rescue's equity term. The shareholders had no such right, and, thus, they did not lose this phantom property interest. Last, the AIG board's voluntary agreement also vitiates Starr's illegal exaction claim.

### A. AIG's Board Voluntarily Accepted The Rescue, And The Government Did Not Act Wrongfully Or Coercively

To establish that the AIG board did not voluntarily accept FRBNY's rescue offer, Starr needs to prove three separate elements: that AIG's board "involuntarily accepted" FRBNY's terms; that "the circumstances permitted no other alternative"; and that those circumstances

"'were a result of coercive acts of' the other party." Def. Law Br. § I.B.1; *Starr*, 106 Fed. Cl. at

77 (quoting *Fruhauf Sw. Garment Co. v. United States*, 111 F. Supp. 945, 951 (Ct. Cl. 1953)).

We explained in our opening brief why Starr has failed to establish the three elements of

*Fruhauf*'s duress standard. Def. Law Br. §§ I.B.2, I.B.3.b. Sidestepping the first two prongs,

Starr argues, without legal support, that the third prong of the *Fruhauf* test, by itself, can prove

duress. Pl. Law Br. §§ 12.6-12.15. According to Starr, the Government's allegedly wrongful

conduct, along with the fact that AIG was facing bankruptcy on September 16, 2008, proves

AIG's involuntary acceptance. Pl. Law Br. § 12.4. This argument fails because: (1) proving

duress requires establishing all three *Fruhauf* prongs, *see Bergman v. United States*, 28 Fed. Cl.

580, 585-86 (1993); and (2) the Government did not act coercively.

### 1. The Unrebutted Testimony Of The Allegedly Coerced Individuals Refutes Starr's Argument That AIG's Board Was Coerced

Starr called no AIG witness to support Starr's claim of coercion and control. Instead,

Starr relies entirely on speculation and conjecture by its experts to the effect that coercion

somehow must have existed. Direct testimony from the board members, however, must trump

the self-serving theories plied by Starr's experts. Accordingly, the Court should reject Starr's

coercion claim. *See Sys. Tech. Assoc., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed. Cir.

1983).

AIG's board members – the decisionmakers who agreed to the loan, both on September

16, 2008, and September 21, 2008 – testified that, when the loan terms were accepted, they and

the rest of the board acted voluntarily and in the best interests of AIG and its shareholders. Def.

PFOF ¶¶ 67, 77, 78, 99. The board members explained, and the contemporaneous documents

corroborate, that bankruptcy was always an option, but that FRBNY's loan was a better

alternative. Def. PFOF ¶¶ 72, 103. AIG's board members also testified – again, without

contradiction – that there was no coercion.  AIG's request for admission responses confirm the company's voluntary agreement to provide equity.  *See* AIG Resp. to RFA No. 15 (Pl. Post-Trial App'x at 595) (admitting that the AIG board concluded that accepting the terms of the FRBNY loan on September 16 was in the best interest of AIG); Resp. to RFA No. 7 (Pl. Post-Trial App'x at 596) (admitting that AIG's board understood on September 16, 2008, that the equity it would provide would be "[e]quity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis," with the "[f]orm" of the equity participation "to be determined."); Resp. to RFA No. 18 (Pl. Post-Trial App'x at 597) (admitting that the AIG board approved the September 22, 2008 Credit Agreement because it concluded it was in the best interest of AIG); Resp. to RFA No. 19 (Pl. Post-Trial App'x at 597) (admitting that on September 16, 2008, the AIG board was not directed, instructed, or otherwise required to vote in favor of the September 16, 2008 term sheet by the United States).

### 2.    The Government Did Not Act Wrongfully Or Coercively

Without any direct evidence of coercion, Starr argues that there was something inherently wrongful about FRBNY's negotiation of the equity term because of the Federal Reserve's position as a lender of last resort.  These arguments fail.  The Government and FRBNY did not act wrongfully or coercively when FRBNY offered AIG a take-it-or-leave-it loan.  Voluntariness ceases to be a defense only when it is undermined by a threat of Government penalty or interference with property rights if the plaintiff did not assent.  There was no such threat here. Instead, the evidence shows that, had AIG decided not to accept the AIG loan, AIG would have faced no adverse action from the Government whatsoever, and would have been free to pursue bankruptcy.

Starr contends that, if the equity term was illegal, the deal was inherently coercive.  Pl. Law Br. 12.6.  But Starr misapplies the case it relies upon.  In *Robertson v. Frank Bros Co.*, 132

U.S. 17 (1889), the Government officials required an illegal payment *or they would impose a penalty* on the plaintiffs. *Id.* at 18, 22-23. It was the threat that created the coercion.

Starr next argues that, even if not illegal, the Government's conduct was wrongful because of "threats that would breach a duty of good faith and fair dealing under a contract." *See* Pl. Law Br. § 12.7. But Starr has identified no threats from either the Government or FRBNY. Instead, after careful deliberations, FRBNY merely offered a loan on specific terms.[13]

Starr also attacks the structure of section 13(3), which – according to Starr – "by definition, ma[d]e the existence of duress more likely." *Id.* at § 12.9. To support this argument, Starr notes that section 13(3) only authorizes the Federal Reserve to lend under "unusual and exigent circumstances" and when no private loan is available. *Id.* at §§ 12.9.4-12.9.5. This argument does not demonstrate any actual coercion or wrongful Government "exploitation of temporary monopolies" in this case; indeed, Starr seeks to label all "lender of last resort" loans legally suspect. *See id.* at §§ 12.9.4-12.9.5 (citing *Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.*, 238 F.3d 897, 900 (7th Cir. 2001)). The Court should reject Starr's invitation to presume every section 13(3) loan coercive. Indeed, Starr's theory, were it actually adopted as a legal principle, would discourage the Government from engaging in future rescue lending to corporations, even those that desperately seek the Government's assistance, for fear of incurring astronomical liability at the demand of shareholders who second guess their company's actions.

---

[13] In addition, Starr cannot conjure a threat from any action seeking to secure payment of what was owed to FRBNY or the Government, because action seeking to secure repayment of a loan from the Government is not the kind of sovereign regulatory action supporting a taking or exaction claim. *See A & D Auto Sales*, 748 F.3d at 1156-57 (noting whether "the government's actions were regulatory in nature or were designed to protect the government's financial interest in repayment," as repayment "could be viewed as non-regulatory").

Starr also asserts that the Government discouraged private lending. Pl. Law Br. § 12.11. It did not.[14]  Def. Law Br. at 30 & n.5.  Nor was the deadline of the evening of September 16, 2008, a coercive tactic by the Government, *see* Pl. Law Br. § 12.12.  Rather, the commercial realities of AIG's impending bankruptcy required a quick decision.  Def. Law Br. at 31; Def. PFOF ¶ 71 & n.8.  Indeed, given AIG's condition on September 16, 2008, Starr does not argue that it would have been feasible to have afforded the company days or weeks to consider the Government's bailout offer.

Nor, as discussed above and in our opening briefs, was the loan punitive or discriminatory.  *See* Def. PFOF ¶¶ 181-84, 347-372; *see also supra* § 2.D.

### 3. Starr Offers No Evidence That An "Arm's Length" Transaction Would Have Taken Place On Different Terms

Starr also erroneously contends that the FRBNY's loan to AIG does not reflect an "arm's length" deal because:  (1) the United States controlled AIG; (2) the United States was "the monopoly supplier of credit" to AIG; and (3) "the process" by which AIG entered into the Credit Agreement was allegedly flawed.  *See* Pl. Law Br. ¶¶ 12.1.2, 12.2.4-12.2.7.  The United States did not control AIG on either September 16 or 21, 2008, Def. Law Br. §§ I.B.2, I.B.3.b, nor did AIG improperly or involuntarily enter into the Credit Agreement, Def. Law Br. §§ I.B.3.a-b.  In addition, a lender's status as the only entity willing to lend to a borrower is irrelevant to whether the parties negotiate at arm's length.

---

[14] Starr contends in its proposed findings of fact that "Defendant Directly Discouraged Sovereign Wealth Funds from Providing Liquidity to AIG."  Pl. PFOF § 11.12.  Yet, none of the cites identified by Starr actually support this proposed finding and, as discussed in our opening brief, there is no evidence that any Government official took any actions to discourage any sovereign wealth fund from investing in AIG.  Def. PFOF ¶¶ 51-54.

But even if Starr were correct in its allegations, Starr's reaches a faulty conclusion. Contrary to Starr's argument, FRBNY's loan terms are both the result of and fully consistent with an arm's length negotiation in which both sides were free to exercise their independent judgment as to whether or not to enter into the proposed agreement. FRBNY's loan to AIG was based in large part upon terms designed by *the private sector*. Def. PFOF ¶¶ 120-128. The potential private sector loan would have been, presumptively, an arm's-length transaction, and it would have included a 79.9 percent equity term. *Id.* ¶ 46. AIG received a loan that was *better* than an arm's-length private sector transaction because no private actor was willing to lend to AIG at that time even with an equity term.

### 4. Starr's Failure To Timely Challenge The AIG's Board's Agreement Precludes A Finding Of Duress

The Court should also reject Starr's duress claim because Starr failed to timely challenge AIG's entry into the Credit Agreement. Starr fails to explain why it did not challenge the legality of FRBNY's loan at its earliest opportunity – a legally required element for a claim of duress. Rather, Starr sat on its hands for years, while benefitting from the United States' and FRBNY's enormous assistance to AIG. *Id.* ¶ 483. Accordingly, the Court should preclude Starr from bringing a claim of duress.

Contrary to Starr's assertions, Pl. Law Br § 15.2.6, Starr's failure to bring its claims until years after it had fully enjoyed AIG's rescue also precludes Starr's exaction claim. *See* Def. Law Br. § II.F; *cf. AT&T Co. v. United States*, 307 F.3d 1374, 1381 (Fed. Cir. 2002) ("In short, the proper time for AT&T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. . . . [E]ven were AT&T to have stated a valid claim . . . this court's case law would require a finding that AT&T waived that claim."). The untenable alternative would be that whenever the Government's contracting counterparty

identified a potentially illegal term, the counterparty could enjoy the contract's benefits and then sue to avoid its own, promised performance. The Court should reject the erroneous and unfair rule Starr hopes to graft onto contract law.

**B.** **AIG Voluntarily Promised Equity Equivalent To Common Stock On September 16, 2008, And Implemented That Promise Through The Credit Agreement**

Starr has not presented any evidence to counter the fact that AIG agreed to the terms of the rescue deal – including the equity term – on September 16, 2008. In lieu of such evidence, Starr trumpets the alleged import of a preliminary draft term sheet for warrants that FRBNY never provided to AIG, and claims that the terms of the Credit Agreement were "materially worse" than the terms of the September 16 rescue. *See* Pl. PFOF § 12.0; *id.* § 14.0 (asserting that AIG's September 16, 2008 resolution was not a real obligation with regard to the equity term); *id.* § 17.0 (asserting that Credit Agreement terms were "materially worse" than the terms FRBNY had offered on September 16, 2008).

These arguments fail because: (1) AIG's agreement on September 16, 2008, obligated AIG to convey equity equivalent to 79.9 percent of its common stock, in a form to be determined; and (2) the Credit Agreement implemented, rather than materially changed, the September 16, 2008 agreement.

**1.** **On September 16, 2008, FRBNY And AIG's Board Agreed To Equity In A Form To Be Determined, Not Warrants**

On September 16, 2008, FRBNY's offer and the AIG board's resolution created an agreement for an $85 billion loan in exchange for, among other things, AIG's promise to convey equity equivalent to 79.9 percent of its common stock. The AIG board's meeting minutes and resolution from that day recognized that the approved loan included "equity participation equivalent to 79.9 percent of the common stock of the Corporation." Def. PFOF ¶¶ 73, 84.

Similarly, the Board of Governors did not approve a specific term sheet for warrants. *See* Pl. PFOF ¶ 12.2. Rather, the Board of Governors authorized the loan conditioned on terms "such as" those in the term sheet FRBNY had provided to the Board of Governors on the afternoon of September 16, 2008. Def. PFOF ¶¶ 58, 60-61. The documentation, therefore, does not support the warrants agreement alleged by Starr.

Starr's observation that Mr. Baxter and Chairman Bernanke understood what warrants are in the context of the description in the draft term sheet presented to the Board of Governors, *see* Pl. PFOF ¶¶ 12.2.3-4, does not narrow the scope of authority conferred by the Board of Governors' resolution. Nor is it remarkable or relevant that, as the parties developed the Credit Agreement and the specific terms for the equity, some people working for the Federal Reserve thought that the equity would ultimately take the form of warrants. *See* Pl. PFOF ¶ 12.3.[15]

Moreover, Starr presented no evidence that anyone from FRBNY or the Government ever offered AIG a loan based upon warrants. Instead, before AIG's September 16, 2008 board meeting, FRBNY gave AIG's advisors a term sheet that included the requirement that AIG transfer 79.9 percent of its equity in a form to be determined. *See* Def. PFOF ¶¶ 62-63. Starr seeks to manufacture an issue out of whether AIG's board actually saw the "to-be-determined" term sheet, Pl. PFOF ¶ 14.2, but this is a red herring; the evidence establishes that the terms to

---

[15] To argue that the Federal Reserve understood the equity term to be for warrants, Starr inappropriately relies on PTX-2736 to assert that Federal Reserve staff believed in the evening of September 16 that the equity would be warrants. *See* Pl. PFOF ¶ 12.2.2 n.17. That exhibit was admitted only for the purposes of Rule 703, and the Court should not admit – and we request the Court strike Starr's briefing relying upon – the unadmitted double hearsay within that document as evidence of what unnamed staff members believed. In any event, what the press understood of staff members' beliefs is irrelevant. The decisionmakers' actual decision is what matters.

which AIG's board agreed included equity equivalent to 79.9 percent of AIG's stock but did not resolve the equity's form.[16]

Starr's "evidence" to support its argument that the September 16 agreement was for warrants is incorrect, in any event. First, the AIG board's discussion of what would happen "*if* the equity interest took the form of warrants," Def. PFOF ¶ 84, only underscored the board's understanding that the equity's form had not yet been determined. Pl. PFOF ¶¶ 12.4.3, 12.5, 12.6. Second, AIG mistakenly filed an 8-K suggesting that a warrant had already been issued, but AIG immediately corrected this error the following day. *Id.* ¶ 12.6.2.

Starr also seems to argue that, because FRBNY immediately began lending to AIG pursuant to demand notes, AIG did not actually agree to the equity term on September 16, 2008. *See* Pl. PFOF ¶¶ 14.0(a) & n.25, 14.1. This argument is baseless. The demand notes were part of the $85 billion section 13(3) loan. FRBNY would not have lent $37 billion to AIG between September 16 and September 21, 2008, without the understanding that AIG had agreed to the loan terms as preliminarily defined by the parties on September 16, 2008. Indeed, the demand notes were a way to lend to AIG immediately before full "definitive documentation" of the Credit Facility existed. Def. PFOF ¶ 85. The notes could not reflect separate, unrelated

---

[16] The September 16, 2008 term sheet was not itself the complete September 16, 2008 agreement between FRBNY and AIG. For example: (1) FRBNY discussed the terms orally with Mr. Willumstad during a break in the September 16 AIG board meeting, Def. PFOF ¶ 79; (2) Mr. Willumstad's resignation was a condition of the loan not in the written terms but orally conveyed to the AIG board during the September 16 board meeting, Def. PFOF ¶ 64; and (3) AIG conveyed its acceptance to FRBNY orally as well as in writing, Def. PFOF ¶ 74. Therefore, Starr's proposed findings about the term sheet itself – that the term sheet contained language that it was not legally binding and that no version of the September 16, 2008 term sheet was signed by both parties, Pl. PFOF ¶¶ 14.3, 14.4 – do not mean that AIG lacked an obligation on September 16 to provide 79.9 percent of its equity in return for FRBNY's agreement to provide up to $85 billion in financial assistance.

agreements to lend $37 billion outside the Board of Governors' authorization for a section 13(3) loan conditioned on an equity term.

### 2. The Credit Agreement Implemented The September 16, 2008 Agreement

The Credit Agreement implemented the September 16, 2008 agreement between AIG and FRBNY; under the Credit Agreement, the previously promised 79.9 percent equity interest took the form of preferred shares. Starr argues that the Credit Agreement's terms were "materially worse" than the terms FRBNY offered on September 16, 2008. Pl. PFOF ¶ 17.0. This argument relies on the false premise that, on September 16, 2008, FRBNY offered to make the loan specifically in return for warrants. Although at least some AIG board members and advisors apparently had initially anticipated that the equity would be in the form of warrants, they also understood that the original agreement was not for warrants. *See* Def. PFOF ¶¶ 112-13. In fact, AIG's September 21, 2008 board meeting minutes expressly acknowledge that the preferred shares were consistent with the board's authorization on September 16, 2008. *See* Def. PFOF ¶ 113.

### C. It Is Contrary To Precedent And Logic For Starr To Argue That The Government Controlled AIG After AIG's September 16 Resolution But That The Resolution Did Not Create An Obligation For Equity

Starr argues for a new legal standard to govern its claim, in which a taking could be found if the Government gained "effective economic control" of AIG – a standard that neither this Court nor any other has recognized as sufficient to establish involuntariness for purposes of a takings or exaction claim. *See* Def. Law Br. § I.B.1. Starr's "effective economic control" argument collides with both well-established precedent, and basic logic. Starr asserts that the Government gained effective economic control of AIG on September 16, 2008, but without any promise by AIG of a controlling share of its equity.

As the Court noted before trial, "it is unclear why, if Starr's position is to be believed, the [September 16] term sheet was binding as to control but not as to the transfer of the 79.9% interest in AIG (or why the former was not simply the result of the latter)." *Starr*, 106 Fed. Cl. at 64. After trial, that question remains unanswered.

AIG's board was unquestionably independent from the Government and FRBNY on September 16. AIG's board, moreover, exercised independent judgment when it accepted the Credit Agreement. *See* Def. PFOF ¶ 100; Offit, Tr. 7904, Line 18-Tr. 7906, Line 5; Def. Law Br. § I.B.3.b.i.1. Thus, if the September 16 agreement was *not* binding, AIG had no obligation to accept the Credit Agreement on September 21, 2008, and therefore, there is no basis to question the voluntariness of its acceptance. On the other hand, if the September 16 agreement *was* binding, then the AIG board's vote on September 21 merely finalized the September 16 agreement, and the vote on September 21 is legally irrelevant to this case.

Nevertheless, even with a binding agreement on September 16, 2008, the Government did not control AIG when the board voted on September 21, 2008; it is undisputed the AIG board remained independent on that date, and neither FRBNY nor the Government nor the Trust had actual voting control on that date. *See Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055-56 (Del. Ch. 1984) ("[I]t may be said that [a company engaged in taking over another] used its right to future control as leverage to fashion a merger agreement more to its benefit . . . [b]ut its status, however enhanced, remained that of an outsider, free to bargain but not to dictate terms" to management) (emphasis in original).

Starr's argument is also factually flawed. Starr argues that, when the AIG board approved the loan on September 16, 2008, the Government "assumed control of AIG." Pl. PFOF § 15.0. Starr then provides a laundry list of "evidence" of this control. First, many of these

proffered examples are, on their face, unrelated to control of the AIG board's decisions (for example, that FRBNY hired firms that also worked with AIG, Pl. PFOF § 15.9). Ultimately, Starr's assertion that the Government assumed control of AIG on September 16, 2008, boils down to one fact: that as a condition of the rescue, the Government required that Edward Liddy become the company's Chairman and CEO. *See* Pl. PFOF §§ 15.0-15.13. Yet, a lender's inclusion of a change of leadership as a condition to an emergency loan agreement is not an agreement to transfer control to the lender. In fact, the AIG board conducted its own diligence on Mr. Liddy's qualifications and independently voted to approve him as Chairman and CEO on September 18. Def. PFOF ¶ 100 n.10. And Mr. Liddy's testimony confirmed his independence. *See* Def. PFOF ¶ 106.[17]

In short, control that negates a board's decision requires the actual exercise of control over that particular decision. In its extensive allegations as to how the Government "assumed control" of AIG, Starr fails to address, much less prove, how the Government overcame the AIG

---

[17] Although we do not agree with Starr's characterizations of many of these facts, we do not address them in detail in this reply because we have previously demonstrated that Starr's control allegations are irrelevant and incorrect. Def. PFOF § II (AIG acted voluntarily), Def. Law Br. § I.B.1 (Starr's theory of effective economic control is not the correct legal standard to analyze duress). For example, facts about who paid for FRBNY's expenses in administering the loan, Pl. PFOF ¶ 15.10, or FRBNY's review of AIG's SEC filings about the loan, Pl. PFOF ¶ 15.11, are irrelevant to AIG's independence and voluntariness when it accepted the September 16 deal. Similarly, the Court should reject Starr's suggestion that the Government and FRBNY acted improperly between September 16 and September 21, 2008 (and beyond). On September 16, 2008, FRBNY agreed to extend the largest loan in human history to AIG. The bank prudently established a monitoring team and hired highly knowledgeable consultants. After AIG filed incorrect information about FRBNY's loan with the SEC, FRBNY reviewed AIG's statements about the loan and the Government's involvement.

Starr also implies that Mr. Liddy knew that Goldman Sachs was going to become a bank holding company and therefore should have worked to get AIG that status. Pl. PFOF ¶ 15.7. AIG, however, never applied to become a bank holding company and would not have been able to borrow more money if it did, and Starr has never established that AIG could have met the requirements for becoming a bank holding company, even if it had applied. Def. PFOF ¶ 315.

board's ability to independently and voluntarily decide whether to accept a rescue loan in return for an equity interest.

### D.     The AIG Shareholders' Consent To The Equity Term Was Not Required

Without evidence that AIG's board involuntarily agreed to the rescue, Starr argues that implementing the September 16, 2008 agreement with preferred shares deprived the AIG shareholders "of an opportunity to vote on the Credit Agreement." Pl. PFOF § 28.0. Because the shareholders had no right to vote on the Credit Agreement, the board's consent to the rescue cannot constitute a taking of the shareholders' property rights.

Starr and the other common shareholders were never entitled to vote on the Credit Agreement or the equity term. Therefore, nothing relating to such a vote could have been "taken" from them. AIG's charter authorized its board to issue "blank check preferred shares"; Delaware law permitted AIG's board to authorize and implement the Credit Agreement's equity term without a common shareholder vote. *See* Def. Law Br. § I.B.5. Corporate boards – not individual shareholders – act on the company's behalf. Delaware law does not promise shareholders a vote on corporate decisions to contract with or borrow from another party. *Id.* Although certain actions, such as increasing the number of authorized common shares, may require the shareholders' approval, boards are not obligated to structure the company's lending agreements with third parties to provide the shareholders a separate vote.

In any event, Starr has no evidentiary basis for its implausible, hypothetical warrants agreement. According to Starr, this agreement would have had the Government pay more than the market value of *100 percent* of AIG common stock on September 16, 2008, to exercise

warrants for *80 percent* of AIG common stock.[18]  Starr's presumption that FRBNY or the

Government would have had to pay additional value to exercise warrants ignores Delaware law,

which gives corporate boards exclusive power to determine the form and value of consideration

paid for stock, including "any tangible or intangible property or any benefit to the corporation."

8 Del. Code § 152.  Thus, had the form of equity been warrants, the Credit Agreement could

have required the AIG board to determine that the exercise price of those warrants was fully

satisfied by the value of the revolving credit facility, with no additional payment needed.

Indeed, if AIG had ever believed that the Government would pay an additional $30

billion for exercising warrants, there would have been evidence of that understanding in AIG's

securities filings disclosing the material facts of the September 16, 2008 agreement.  No such

filing, or indeed any public or private statement or action by *any party* indicated that AIG

understood FRBNY's offer to include billions in cash in addition to the credit facility.  Not even

the mistaken 8-K that stated that AIG had already issued a warrant to the Board of Governors

indicated that AIG anticipated such a payment.  *See* JX-96 at 2.  Starr also has not presented a

single analyst report or public comment on the rescue that described the agreement reached

between the parties as having contemplated an additional $30 billion payment to AIG.  This idea

exists solely in the minds of Starr's litigators.

Starr also argues that there was "no legitimate basis" for AIG asking to waive the New

York Stock Exchange (NYSE) rule that shareholders vote whenever a company issues equity

---

[18] In fact, the evidence suggests to the contrary that FRBNY at a minimum would have required additional compensation for any loan where the equity term was warrants for common stock.  For example, the only term sheets that included warrants for common stock (the preliminary term sheets on September 16, 2008 that FRBNY never provided to AIG) included a material "ticking fee" for every quarter that the shareholders did not approve the necessary changes in authorized shares and par value of common stock.  Huebner, Tr. 6004, Line 5-Tr. 6005, Line 2; JX-63 at 6.

worth more than 20 percent of its voting rights.  Pl. PFOF ¶ 28.2.5.  That argument, however, disregards the urgency that was required to provide funds to AIG so as to avoid an immediate bankruptcy filing.  The NYSE's approval of AIG's request further demonstrates the "legitimate basis" for the request.  *See* Def. PFOF ¶ 105.  Moreover, Starr has not alleged, nor can it establish, that NYSE rules create shareholder rights.  Rather, NYSE rules define the conditions for a stock's listing on that exchange.  Had the NYSE not allowed AIG to invoke the exigent circumstances exception, and had the shareholders voted against the issuance of preferred stock, AIG still could have issued the preferred stock to the Government; shareholders would have had no legal ability to block that issuance, and the NYSE would have delisted common stock to Starr's detriment.  *See id.* at 104-05; JX-240 at 93-97.

Because AIG's board had the authority to consent to the rescue, the AIG Board's voluntary decision to issue a new equity stake in the company to the Government could not have been a taking.  *See A & D Auto Sales*, 748 F.3d at 1154 (where the alleged deprivation of the plaintiff's property right by a third party was a "direct and intended result of the government's actions," the Government may still only be liable for a taking "if the third party is acting as the government's agent or the government's influence over the third party was coercive"); *Texas State Bank v. United States*, 423 F.3d 1370, 1377 (Fed. Cir. 2005) (noting that there is "no potential taking" of a plaintiff's property right if "the third party has exercised its own discretion" in agreeing to deprive the plaintiff of its property).  Indeed, regardless whether AIG's board was authorized to consent to the rescue, its voluntary decision could not have resulted in a taking.  *See*, *e.g.*, *B&G Enters., Ltd. v. United States*, 220 F.3d 1318 (Fed. Cir. 2000) (analysis of the United States' liability for a taking turned only on whether the United States coerced

California into enacting legislation that allegedly constituted taking, and not on whether California had improperly deprived the plaintiff of its property).

In short, AIG's board exercised its authority to voluntarily agree to a rescue package that saved AIG and provided equity to the Government. No taking can occur under such circumstances.

### E. The AIG Board's Voluntary Agreement Vitiates Starr's Illegal Exaction Claim

The AIG board's voluntary agreement to the terms of FRBNY's rescue loan also forecloses Starr's illegal exaction claim. Binding Supreme Court and Federal Circuit precedent clearly establishes that voluntariness vitiates a claim of illegal exaction, unless the violated statutory provision was enacted for the benefit and protection of the party claiming injury. *See* Def. Law Br. § II.B; *Am. Smelting & Refining Co. v. United States*, 259 U.S. 75, 78-79 (1922) (rejecting an illegal exaction claim when "the statutory requirements [allegedly violated] were for the protection of the United States" rather than the plaintiff).

Starr's proposed conclusions of law do not mention the voluntary payment doctrine or the Federal Circuit precedent applying it to exaction cases. Instead, Starr cites decisions in which courts permitted recovery because the particular statutory provisions at issue were for the benefit of the plaintiffs. *See, e.g.*, *Alyeska Pipeline Serv. Co. v. United States*, 624 F.2d 1005, 1017-18 (Ct. Cl. 1980); *Finn v. United States*, 428 F.2d 828, 831 (Ct. Cl. 1970); *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317-18 (Ct. Cl. 1970); *Rough Diamond Co. v. United States*, 351 F.2d 636, 639-40 (Ct. Cl. 1965) (explaining that the statutory provision at issue in *Suwannee S.S. Co. v. United States*, *Sprague S.S. Co. v. United States*, and *Clapp v. United States* "was evidently for the benefit of" the plaintiffs).

Those cases do not apply here, because Congress did not enact section 13(3) "for the benefit" of a borrower's shareholders. In *Lucas v. Fed. Reserve Bank of Richmond,* 59 F.2d 617, 621 (4th Cir. 1932), the court held that a private party could not challenge a lending decision as beyond the Federal Reserve's authority because "no one can complain of such action except the government, the sovereign which created and limited its powers." Starr, thus, cannot establish that any allegedly violated portions of section 13(3) were enacted to protect borrowers from being asked to provide equity as consideration for receiving taxpayer-backed rescue loans. To the contrary, courts have repeatedly recognized that Congress allowed section 13(3) lending for the benefit of the public interest and to protect the economy and financial system, not the private interests of borrowers, much less their shareholders. *See* Def. Law Br. § II.B. Congress's attitude toward individual borrowers seeking a Government loan can be gleaned from the statutory conditions that must be met *before* a section 13(3) loan can be made and the discretion conferred upon the Federal Reserve to determine whether to lend. Like Lehman Brothers, and thousands of other businesses, most would-be borrowers must face the discipline of the markets, however painful that may be to them. In sum, section 13(3) does not afford a distressed corporation's shareholders an entitlement to any rescue at all, let alone a rescue on the windfall terms that Starr has demanded in this litigation.

Starr asserts that after the Supreme Court's decision in *United States v. Edmonston*, 181 U.S. 500, 511 (1901),[19] several courts found illegal exactions where money was voluntarily paid as a result of an unauthorized Government demand. Pl. Law Br. §§ 8.1-8.2. These cases, however cannot support Starr's position, because they are far afield from the circumstances here,

---

[19] *Edmonston*, and additional Supreme Court and other authorities holding that voluntariness vitiates a claim of illegality, are discussed in further detail in our opening brief. *See* Def. Law Br. § II.B.

where (1) a company received a commercial offer from the Government which the company was free to reject, and (2) the company voluntarily accepted the offer.

Starr's citation of *American Airlines, Inc. v. United States*, 551 F.3d 1294 (Fed. Cir. 2008), illustrates our point. That case turned upon statutes requiring persons entering the United States to pay fees to the Government; the Government compelled airlines to pay such fees that they failed to collect. *Id.* at 1296, 1299. The airlines were offered no choice but to pay, and they paid. The court held that the Government misinterpreted the statutes to impose liability on the airlines for the uncollected fees; accordingly, the already-paid fees were returned to the airlines. *Id.* at 1303. Here, in contrast, AIG was not obligated to deal with the Government at all, and certainly was not required to provide equity because of the Government's misapplication of a statute that required such payments. Instead, AIG requested a loan from FRBNY; AIG had no entitlement to any loan, let alone a loan offered on more generous terms; and AIG had the ability to decline to accept the loan that it was offered. Further, the Federal Reserve had unfettered discretion to refuse to extend a loan to AIG, or anyone else. Consequently, AIG was not required to pay the Government as a condition of operating its business, as would be necessary to establish an exaction like the one found in *American Airlines*. Plaintiffs cannot recover for an illegal exaction when the underlying transaction was voluntary. Def. Law Br. at 104 (citing maxim *volenti non fit injuria* and related cases). AIG's voluntary acceptance of a benefit it was not required to accept waived any claim of alleged illegality.

The remaining cases Starr cites, Pl. Law Br. § 8.2, similarly fail to establish that an illegal exaction claim can survive voluntary acceptance. Starr's cases do not support its claim because none of them involved a voluntary acceptance of an offer that was not required to be made at some other price. Instead, Starr cites cases where (1) statutes or regulations entitled plaintiffs not

to pay money that the Government required them to pay;[20] or (2) the Government and plaintiff

have an existing contractual relationship from which a dispute arose.[21] Because AIG chose to

request and accept a rescue offer that the Government had the discretion but not the obligation to

provide, the United States cannot be held liable for an "exaction" that Starr now claims was

illegal.

## V. Starr's Failure To Demonstrate Economic Loss Is Fatal To Both Its Takings And Exaction Claims

Starr's takings and exaction claims for the equity term fail for the independent reason that

Starr has provided no evidence that the class members suffered any economic loss as a result of

the Government's actions. The Fifth Amendment provides no recovery where there has been no

loss. *See* Def. Law Br. § I.C.1; *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 237 (2003) (if

the claimant's "net loss was zero, the compensation that is due is also zero"). To prove

economic loss, Starr bears the burden of establishing "what use or value its property would have

---

[20] *Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967) (vessel owner required to pay fee in exchange for approval); *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996) (airlines required to pay certain fees to house, sustain, and guard aliens seeking political asylum); *Continental Airlines, Inc. v. United States*, 77 Fed. Cl. 482 (2007) (same situation as *American Airlines*); *United States v. Best Foods, Inc.*, 47 C.C.P.A. 163 (Cust. & Pat. App. 1960) (importer required to pay tariffs imposed by Presidential proclamation); *Eversharp, Inc. v. United States*, 125 F. Supp. 244 (Ct. Cl. 1954) (profits required to be paid by War Contracts Price Adjustment Board); *O'Bryan v. United States*, 93 Fed. Cl. 57 (permittee required to pay rent pursuant to permit); *Bautista-Perez v. Mukasey*, No. C07-4192, 2008 WL 314486 (N.D. Cal. Feb. 4, 2008) (fingerprinting fee required to maintain immigration status); *PSI Energy, Inc. v. United States*, 411 F.3d 1347 (Fed. Cir. 2005) (utilities required to pay special assessment tax on spent nuclear fuel); *Lancashire Shipping Co. v. United States*, 4 F. Supp. 544 (S.D.N.Y. 1933) (vessel required to post bond before disembarking and make penalty payment); and *Star Motor Co. of Cal. v. United States*, 41 F.2d 901 (Ct. Cl. 1930) (manufacturer required to pay additional excise tax);

[21] *James Shewan & Sons, Inc. v. United States*, 73 Ct. Cl. 49 (1931) (Navy breached by cancelling contract and requiring waiver of outstanding invoices before remitting payment for agreed-upon invoices).

had but for the government action." *A & D Auto Sales*, 748 F.3d at 1157; *see also Brown*, 538 U.S. at 240-41.

Starr makes no attempt to satisfy this requirement, and the evidence does not support the existence of economic harm. Absent the rescue, AIG would have collapsed into bankruptcy, rendering Starr's shares worthless. *See* Def. PFOF ¶¶ 350-72. Rather than attempting to prove economic loss, Starr seeks to evade the requirement by (1) arguing that it has a physical taking claim, and (according to Starr) the requirement to show economic loss does not apply to physical takings claims, (2) recharacterizing its disappointment in not being awarded more of the value created by the rescue as "economic loss," (3) contending that the "but for" standard of economic loss is inapplicable to its illegal exaction claim, and (4) seeking to shift the burden to the Government to establish the absence of economic loss. Each of Starr's arguments is legally and factually deficient.

A.    **Regardless Of How Starr Characterizes Its Takings Claim, Starr Must Demonstrate That The Class's Shares Would Have Had Greater Value In The Absence Of Any Government Rescue**

The Court should reject as untenable Starr's argument that it has no need to prove economic loss because its claim is a physical, rather than regulatory, taking. *See* Pl. Law Br. § 19.1. Indeed, Starr's reliance on this argument only underscores the fact that the challenged transaction benefitted AIG's shareholders.

First, Starr did not suffer a physical taking. The United States did not cause a change in the number of AIG shares each shareholder had throughout the Credit Agreement Class period. *See* Def. Law Br. § I.A.

Second, the Fifth Amendment requires a showing of net economic loss regardless of whether the claim is a regulatory taking or a direct appropriation. *See Brown*, 538 U.S. at 240-41 (holding in *per se* taking case that there was no violation of the just compensation clause when

the owner's "pecuniary loss" was zero); *A & D Auto Sales*, 748 F.3d at 1157 (holding in a regulatory taking case that plaintiff must show value "but for the government action"). Starr's argument that there is a "different analysis" for regulatory takings as opposed to physical takings, *see* Pl. Law Br. §§ 19.1-19.4, collapses under established precedent. Although a regulatory takings analysis does include some unique factors (such as whether the Government conduct affected investment-backed expectations, *see* Def. Law Br. § II.E), the need to establish economic loss is not one of these. Whether the requirement is phrased as a need to prove "pecuniary loss," *Brown*, 538 U.S. at 240, "net loss," *id.* at 240 n.11, "economic loss," *A & D Auto Sales*, 748 F.3d at 1157, or "a diminution in value," *id.*, a takings plaintiff can only ask "to be put in as good a position pecuniarily as if his property had not been taken." *Brown*, 538 U.S. at 236 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). Accordingly, plaintiffs must "show what use or value its property would have but for the government action." *A & D Auto Sales*, 748 F.3d at 1157. Although *A & D Auto Sales* was a regulatory takings case, the Federal Circuit relied on *Brown*, a *per se* taking case, in its analysis of economic impact for the proposition that "just compensation for a net loss of zero is zero." 748 F.3d at 1157 (quoting *Brown*, 538 U.S. at 240 n.11).

Third, case law offers no support for Starr's attempt to limit *Brown* to situations "where the Government has not itself received the property taken." Pl. Law Br. § 19.1.5(e). In *Brown,* the Supreme Court did not tie the plaintiffs' obligation of proving economic loss to the fact that a charity designated by the Government, rather than the Government itself, had received the plaintiffs' property. *See Brown*, 538 U.S. at 235-37. Rather, the basis for the Court's decision was clear: even when the Government directly appropriates property, the Fifth Amendment mandates compensation only to the extent necessary to place the property owner in the position

he would have been in "if his property had not been taken." *Id.* at 236. Where the plaintiff

cannot prove any value that it would have retained but for the Government's actions, no recovery

is possible. *Id.* at 240 n.11; *see also Texas State Bank*, 423 F.3d at 1375 (*Brown* "hold[s] that

transfer of interest earned in IOLTA accounts to pay for legal services for the poor constituted a

*per se* taking, but that no compensation was due because there was no net loss to the clients who

owned the principal").

Attempting to distinguish *Brown*, Starr mistakenly focuses on the value the Government

received, rather than Starr's loss. Black-letter law, however, provides that a plaintiff can only

recover for its own loss, and not for the Government's gain. *See, e.g.*, *Brown*. 538 U.S. at 235-

36; *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949); Def. Law Br. § I.C.1. Like the

plaintiff in *Brown*, Starr has no evidence of any value *it* would have retained but for the

Government's actions. Without such a loss, Starr's claim for the value created by the

Government must fail.

### B. AIG's Post-Rescue Stock Price Does Not Reflect What Was Taken Or Exacted Because It Does Not Measure Any Loss Experienced By The Class Members

Unable to show economic loss as required by *Brown* and *A & D Auto Sales*, Starr seeks to

redefine "economic loss" to include Starr's disappointment in not receiving an even greater share

of the rescue's benefits. Starr's attempted recharacterization relies on the following flawed

arguments: (1) Starr's belief that it was entitled to a rescue without an equity term, (2) "just

compensation" should be increased to capture any benefit the Government received for providing

the rescue, (3) AIG's value – and Starr's economic loss – should be assessed based on some

subjective "intrinsic" value rather than the real-world, market value of its assets in the actual

marketplace, and (4) the provision of liquidity that saved AIG should be treated as distinct from

the Government's receipt of equity in AIG. Starr's arguments fail first and foremost because the

71

recharacterization does not satisfy the economic loss requirement of *Brown* and *A & D Auto Sales*. Nevertheless, each of Starr's arguments fail for the additional reasons discussed below.

### 1. Starr Had No Property Interest In A Rescue Without An Equity Term

Starr's use of AIG's post-rescue share prices to calculate the claimed compensation violates the principle that Starr can recover only for the taking or exaction of a property interest that it possessed. *See, e.g.*, *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *Texas State Bank*, 423 F.3d at 1380-81. "[A] taking claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed." *Rogers Truck Line, Inc. v. United States*, 14 Cl. Ct. 108, 114 (1987). Failure to identify a property interest cognizable under the Fifth Amendment "is fatal not only to [plaintiff's] takings claim, but also to its illegal exaction and due process claims." *Texas State Bank*, 423 F.3d at 1380.

Starr had no property interest in, and has no right to recover, the value its shares hypothetically might have had if FRBNY had agreed to lend to AIG without the equity term. Neither Starr nor AIG had a right to any rescue at all, let alone a windfall rescue containing no equity term whatsoever. *See* Def. Law Br. § I.D.2. Certainly, common stock in AIG did not come with a property interest entitling its holder to a Government rescue. Section 13(3) did not obligate FRBNY to loan to AIG to prevent the company's failure; indeed, the vast majority of troubled companies in 2008 and 2009 did not receive Government assistance. The decision to provide a rescue loan under section 13(3) was entirely discretionary, as were the terms on which the loan could be conditioned. *See* Def. Law Br. § II.A.1. These decisions belonged solely to the Board of Governors and to FRBNY. Starr cannot recover as "loss" the hypothetical value that might have been created by an alternative rescue; Starr never possessed or had a right to that

hypothetical value.[22]  *See United States v. Rands*, 389 U.S. 121, 124-25 (1967) ("[I]f the owner

of the fast lands can demand port site value as part of his compensation, he gets value of a right

that the Government . . . can grant or withhold as it chooses.") (internal quotation marks

omitted).  Starr's expert improperly calculated Starr's "loss" based on post-rescue (September

24, 2008) stock prices, which is equivalent to "asserting ownership in a property interest that is

different and more expansive than the one actually possessed" by Starr.  *See Rogers*, 14 Cl. Ct. at

114.

### 2.     Starr Is Not Entitled To A Recovery Reflecting Value Created By The Rescue

Starr also cannot be compensated for value that the Government created.  *See* Def. Law

Br. § I.C.1.a.  It is beyond dispute that the rescue loan increased the value of Starr's shares.  *See*

Def. PFOF ¶¶ 347-61.  Long standing precedent, moreover, establishes that the Government "in

fairness should not be required to pay" value that "the government itself created."  *United States*

*v. Cors*, 337 U.S. 325, 333-35 (1949).  Indeed, the cases on which Starr relies only confirm this

well-established rule.  *See*, *e.g.*, *Almota Farmers Elevator & Warehouse Co. v. United States*,

409 U.S. 470, 476 n.3 (1973) (reasoning that "action by the Government" did not "contribut[e]

any element of value" to the property found to be taken); *United States v. Reynolds*, 397 U.S. 14,

17-18 (1970) ("The owners ought not to gain by speculating on probable increase in value due to

the Government's activities."); *United States v. Fuller*, 409 U.S. 488, 498 (1973) ("[T]he

Government as condemnor may not be required to compensate a condemnee for elements of

value that the Government has created.").  Additionally, courts will not calculate "just

---

[22] In any event, such a measure of economic harm would compensate Starr for value created by the Government's action, rather than for the value of its shares preceding any such action.  *See infra*, § VI.B.

compensation" in a manner that would result in "manifest injustice" to the "public that must pay the bill." *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950). Using the market value of AIG's post-rescue stock in the manner Starr advocates would result in a "manifest injustice" to the public by delivering to common shareholders all of the value created by the taxpayer-funded, Government rescue.[23]

> **3.** **Starr Cannot Recover Value Created By The Government By Arguing That The Rescue Merely "Restored" AIG's "Intrinsic Value"**

Starr argues that AIG's September 16, 2008 share price should not be used to measure harm because it did not reflect AIG's "intrinsic enterprise value." Starr's position is economically, factually, and legally unsound.

First, the Court should reject Starr's argument that the value of AIG's stock after September 15 was not attributable to the Government's assistance, but instead reflected the stock's "restored" or "intrinsic" value rebounding after a "temporary" liquidity crisis. By September 24, 2008, AIG's market capitalization was $47.6 billion, a $42.6 billion increase over AIG's market capitalization before the rescue. *See* DX-2747. That $42.6 billion increase, along with the $5.0 billion of pre-rescue shareholder value that would have been lost had AIG filed for bankruptcy, reflects the value created by FRBNY's loan.

Second, Starr's assertion that AIG's stock price on September 16, 2008, was below its "intrinsic value" reflects an after-the-fact disagreement with the investors who set the stock price

---

[23] The American taxpayers ultimately received a modest 5.7 percent annualized return on the enormous risks of lending to AIG. *See* Mordecai, Tr. 7540, Line 15-Tr. 7541, Line 21; DX-2619 (Mordecai Demonstrative). If Starr's position is accepted, taxpayers would instead suffer a significant loss for their efforts. Indeed, Starr's apparent assumption that a corporation's shareholders should be entitled to all of the rewards of a Government rescue loan, while participating in none of its risks, would only discourage the Government from future rescue lending, as rescue loans made on the lopsided terms that Starr now demands would more frequently result in substantial losses to taxpayers.

on that day by trading millions of AIG shares. As Starr's experts have acknowledged, AIG's shares were actively traded on September 16, 2008, in an efficient market. Accordingly, each trade reflected the value that individual buyers and sellers assigned to each share. In the aggregate, those trades reflected AIG's market value, including the company's substantial liquidity risks.[24] Starr's disagreement with the market's real-time analysis cannot change the fact that – had Starr sought to sell its shares on September 16 – it would have received the market value of those shares, not some alleged "intrinsic value."

The near-zero price on September 16 reflected the market's recognition (1) that AIG shares likely would be worthless in a bankruptcy, but (2) that the shares retained some minimal "option value" because of the possibility of a rescue. *See* Def. PFOF ¶ 369. Indeed, Starr's experts agreed that AIG's near-zero share price on September 16, 2008, reflected AIG's value given the company's substantial liquidity needs. *See* Kothari, Tr. 4898, Line 23-Tr. 4899 Line 6; Cragg, Tr. 8755, Line 21-Tr. 8756, Line 6.

Next, Starr attributes the decline in AIG's market price on September 16, 2008, to generalized market conditions. This analysis is twice flawed. First, comparisons of AIG with other institutions that were exposed to the same market conditions (including a comparison done by Starr's own expert) strongly indicate that factors specific to AIG account for the dramatic drop in AIG's stock price before September 16, 2008. *See* Def. PFOF ¶ 399. Second, even if

---

[24] Starr's effort to point to certain individuals who believed that AIG's stock was trading below its intrinsic value, *see, e.g.*, Pl. PFOF ¶ 37.5.5, does not vitiate the reliability of the market price set by the more than one billion shares actually traded on September 16, 2008, as the core measure of equity value. Necessarily, in any market, some people believe that future prices will rise and others think prices will fall – otherwise no one would buy or sell. If, on September 16, 2008, Starr truly believed AIG was trading below some knowable, intrinsic value, one would have expected Starr to acquire enormous holdings in the lower-than-intrinsic value shares – Starr's failure to make such an investment undermines its after-the-fact claims.

general market conditions affected AIG, those conditions are not irrelevant to the value of AIG's stock. *See* Pl. Law Br. § 19.6; Pl. PFOF ¶¶ 2.2-2.7, 7.0, 37.5.4-37.5.7. All property is ultimately valued based upon the interests of potential buyers and sellers in the market. There is, therefore, no economic basis for valuing Starr's shares above the market price. *See United States v. Miller*, 317 U.S. 369, 374 (1943); *see also* Pl. Law. Br § 18.0.

Starr's "intrinsic value" analysis also finds no support in the law. Takings claims are properly valued at the time of the taking using objective, market-based values. Case law provides no support for Starr's demand for use of a subjective valuation method selecting a date well before the alleged taking of their property. *See Miller*, 317 U.S. at 374. To hold otherwise would present the Government with the impossible task of deciding whether to take property without the ability to measure the property's value.

Finally, Starr's "intrinsic value" argument conflicts with the evidence. By claiming that AIG's September 16 stock price was artificially low, Starr argues that the post-rescue increase in AIG's stock price "restored" value that was always present. But the facts do not support Starr's efforts to portray AIG as a healthy, solvent company before the rescue. *See, e.g.*, DX-130, DX-434 at 2 (letters from Starr's CEO to AIG's board highlighting the "persistent and seemingly endless destruction of value at AIG" prior to the rescue); Lee, Tr. 7074, Line 7-Tr. 7075, Line 17, DX-382 (JPMorgan concluded on September 15, 2008, that AIG had a liquidity need of $50-$60 billion). It cannot be disputed that AIG faced increasingly dire financial difficulties in the months preceding the rescue, and that the company itself acknowledged that it faced imminent failure several days before Lehman weekend. *See* Def. PFOF ¶¶ 25-54.[25]

---

[25] Further, the Credit Agreement Class's assertion that AIG did not engage in "irresponsible ex ante risk-taking," Pl. Fact Br. ¶ 32.1, is contradicted by the claims of AIG

The depth and persistence of AIG's financial problems after the $85 billion rescue loan further demonstrate the severity of the company's financial problems before September 16. *See*, *e.g.*, Def. PFOF ¶¶ 172-80; 487-9 (AIG required tens of billions of dollars of additional support just *weeks* after FRBNY made an $85 billion credit facility available to AIG).[26]  Contrary to Starr's claim, AIG faced much more than one bad weekend, and its price on September 16, 2008, reflected that fact.

    **4.**    **Starr Cannot Recover The Value Created By The Rescue By Treating The Provision Of Liquidity That Saved AIG As Distinct From The Government's Receipt Of Equity In AIG**

The record does not support Starr's attempt to isolate the equity term from the rest of the rescue transaction.  It is not the case, as Starr appears to argue, that (1) on September 16, 2008, the Government agreed to provide AIG an $85 billion rescue loan, and then (2) a week later, in

---

shareholders in a class action concerning alleged Federal securities laws violations relating to AIG's CDS and securities lending practices in 2008.  *See* Compl., *In re AIG 2008 Sec. Litig.*, No. 08-CV-4772 (S.D.N.Y.), Dkt. 95 (S.D.N.Y. May 6, 2009) (*In re AIG*).  Last week, the district court approved the settlement of these claims for $970.5 million, including $960 million from AIG.  *See* Judgment and Order, *In re AIG*, Dkt. 518 (Mar. 20, 2015); *see also* Stipulation and Agreement of Settlement, *In re AIG*, Dkt. 445 (Sept. 12, 2014), at 8, 13, 16.  The *In re AIG* class consists of purchasers of AIG common stock from March 16, 2006 to September 16, 2008.  *See* Dkt. 445 at 16-17.  Although Starr was exempted from that class due to a prior settlement with AIG, the class undoubtedly includes numerous other members of the Credit Agreement Class.  We request that the Court take judicial notice of the AIG shareholders' claims and recovery of a settlement upon claims that they suffered losses attributable to the CDS and securities lending practices that brought AIG to the brink of bankruptcy, when at the same time, many of those shareholders are suing the United States for rescuing AIG from the very same conditions.  Fed. R. Evid. 201.

[26]  The record offers no support for Starr's effort to dismiss all subsequent extensions of additional assistance as a result of the initial credit facility's onerous terms.  For example, the assistance provided in October and November 2008 was structured to eliminate the financial burdens of the two lines of business that caused the most significant problems – securities lending and AIGFP's CDS portfolio.  These problems existed long before the Government rescued AIG, and were the chief reasons AIG needed a rescue loan in the first place.  *See* Def. PFOF ¶¶ 4-17, 172-77.

an unrelated decision, FRBNY demanded 79.9 percent of AIG's equity. *See Miller*, 317 U.S. at 376-77. As made plain by all of the testimony and contemporaneous documents, Government officials, AIG management and directors, and market participants, all understood that as a condition of the Government's provision of liquidity on September 16, 2008, the Government would receive an equity stake in AIG "equivalent to 79.9 percent of the common stock of [AIG]." *See* JX-74 at 13; Def. PFOF ¶¶ 73-74, 79, 84-86; Def. Law Br. 40-42.

In any event, the Supreme Court has held that if a Government project is completed in steps, but was intended from the beginning to affect certain property, the owner of property affected in later stages of the project may not be compensated for any increases in value to his property due to the Government's earlier action under the same transaction. *See United States v. Reynolds*, 397 U.S. 14, 17 (1970); *Miller*, 317 U.S. at 376-77; *United States v. Land*, 213 F.3d 830, 834-35 (5th Cir. 2000); *see also Carolina Plating Works, Inc. v. United States*, 102 Fed. Cl. 555, 561 n.5 (2011) (describing the "*Miller* Doctrine" as the proposition that plaintiffs are "not entitled to any enhancement in value associated with an action that would not have occurred but for the taking"). Faced with a clearly integrated transaction, Starr cannot select whichever date it wants to act as the valuation date. Rather, the Court should measure the alleged harm by the date of the project's initial authorization, *Miller*, 317 U.S. at 377, which in this case was September 16, 2008.

C.     **Starr's Failure To Prove Its Shares Would Have Had Value In The Absence Of The Government Rescue Defeats Its Exaction Claim As Well**

Starr argues that illegal exaction claims are not subject to a "but for" requirement for showing economic loss. *See* Pl. Law Br. § 19.5. This position misconstrues exaction law. Because illegal exaction cases are "those in which 'the Government has the citizen's money in its pocket,'" *Eastport*, 372 F.2d at 1008 (citations omitted), the essence of recovery for any

illegal exaction is the return of property exacted by the Government. Because Starr cannot demonstrate that *its* pre-rescue property ended up "in the Government's pocket," Starr's exaction claims must fail. Instead, Starr seeks an award based upon the value created by the Government's discretionary choice to provide liquidity to AIG. Starr, however, never had this property – this value – in its pocket, and the Government could not have exacted from Starr what it never had.

Starr argues that using a "but-for" analysis in the illegal exaction context would "effectively eliminate a claim for illegal exaction . . . when an agency ties obtaining a benefit from the Government to an illegal condition" because the benefit received "would always exceed the cost of the illegal condition." *See* Pl. Law Br. §§ 19.5.3-19.5.4. Starr's argument fundamentally misapprehends but-for analysis, which examines not the value of the exchanged benefit but the value of the exacted property before any Government action. For example, the property exacted from the ship owner in *Suwannee* was the $20,000 unauthorized fee the Government demanded. In the absence of any Government action, that property would still have had a value of $20,000 – but that money would have remained in the ship owner's "pocket" instead of the Government's. *Suwannee*, 279 F.2d at 877 (concluding that "the Government has in its treasury $20,000 which belongs to the plaintiff, and that the plaintiff is entitled to a judgment for that sum").[27]

Moreover, "the doctrine of illegal exaction requires compensation for actual payments of money and has never . . . been applied to compensate a plaintiff for lost opportunities to make money." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (Fed. Cl. 2002).

---

[27] Of course, the ship owner in *Suwannee* was entitled to sell its property without the unauthorized fee, but AIG's shareholders were not entitled to a Government rescue.

Certainly, the evidence demonstrated that FRBNY would not have loaned money to AIG without the equity term, which the Federal Reserve's leaders viewed as vital to addressing the risks and policy concerns of lending. *See*; Def. Law Br. § II.E.1; Def. PFOF ¶¶ 79-83, 389-92. It cannot, therefore, be said that the rescue put into the Government's pockets any money that Starr had in its pockets. To the contrary, the Government simply retained for the benefit of the taxpayers value created by the Government rescue.

Ultimately, Starr demands that the Court now rewrite the agreement between AIG and FRBNY, on the basis that one of the contract's terms purportedly was unauthorized. Of course, Starr has no standing to complain about AIG's contract, and appellate precedent commands the rejection of such an attempt to recover as if the parties had agreed to different terms. In *AT&T*, 307 F.3d at 1380, AT&T, after having agreed to a fixed-price contract with the Government, later claimed that the Government lawfully could only have entered into a cost-reimbursement contract. The Federal Circuit, however, refused to alter the parties' agreement, because the plaintiff had not established that the Government would have contracted with it in the absence of the contract term it challenged as illegal. That is, the plaintiff failed to establish that it would have had the right to any payment but-for the Government's allegedly unlawful conduct. *See id.* at 1380-81; *see also Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 43-44 (Fed. Cl. 2000) (refusing to alter a contract's agreed-upon terms because doing so would confer "a windfall to which [plaintiff] is not entitled" but "[e]nforcement as written, regardless of the illegality, brings no unjust result"). Likewise, Starr cannot recover upon a claim that the Federal Circuit would reject had it been brought by AIG, the actual party to the transaction. The Court should reject Starr's attempt to circumvent settled law to seek a belated rewriting of AIG's contract.

### D. Starr Cannot Shift Its Burden Of Proving That The Rescue Loan Harmed The Class

Rather than proving economic loss, Starr attempts to shift the burden to the Government of establishing an absence of economic loss. *See* Pl. Law Br. § 19.2. Starr contends that even if the "but for economic loss test" applied to its claims, the Government "has not carried its burden of proving offsetting benefits." *Id.* But the burden to establish economic loss falls squarely on Starr. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Brown*, 538 U.S. at 235 (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (2003)). In other words, the concept of liability and damages are so intertwined in the takings context that there can be no liability for a taking unless the taking itself resulted in economic loss. *See* Def. Law Br. § I.C.2. In its discussion of *Brown,* Starr recognized this point, noting that "the Court did not end its analysis at whether there was, in fact, a taking because it still needed to determine whether any 'just compensation' was due." Pl. Law Br. § 19.1.5(d).

Nor can Starr shift the burden of providing evidence of economic loss to the Government by reference to "offsetting benefits." Although the Government can establish "offsetting benefits" to mitigate evidence of economic harm in a regulatory taking case, such a showing would only occur "[o]nce [Starr] came forward with evidence of an economic impact" in the first instance. *See CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011). Here, Starr failed to satisfy this threshold showing.

In any event, the "benefits" provided by the Federal Reserve's loan are so obvious as to require little discussion. Because of FRBNY's rescue loan, AIG did not enter bankruptcy, but rather had its liquidity restored and, eventually, returned to profitability. In turn, Starr and other

AIG shareholders saw an immediate and sustained increase in their share value. It is absurd to suggest, as Starr does, that these benefits should in no way factor into the analysis of harm.

In sum, Starr was not entitled to a Government rescue, and but for the Government's action, AIG would have faced imminent collapse into bankruptcy that would have made Starr's shares worthless. Starr's property thus suffered no economic loss relative to what it would have had but for the Government's action. *See Brown*, 538 U.S. at 240-41; *A & D Auto Sales*, 748 F.3d at 1157. Because the evidence unequivocally shows that AIG and its shareholders received a benefit, rather than any economic loss, from the Government's rescue action, the Court should reject Starr's taking and exaction claims.

## VI. Starr Has Failed To Provide The Evidence Identified By The Court As Necessary To Support Standing To Bring A Direct Claim

Starr has failed to provide the evidence identified by the Court as necessary to support standing to bring a direct claim, and has failed to provide the evidence necessary to allocate damages between its purported direct claims and the previously dismissed, derivative claims. For each of these reasons, Starr's direct claim fails.

In connection with the Government's motion to dismiss Starr's direct claim, we explained that the Credit Agreement Class's claims are wholly derivative, and that the injury allegedly suffered by AIG shareholders was wholly derivative of an injury to AIG. The Court recognized that "corporate overpayment" claims "premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable" are "normally regarded as exclusively derivative." *Starr*, 106 Fed. Cl. at 62 (quoting *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007), *aff'd* 951 A.2d 727 (Del. 2008)).

The Court held, however, that it could not "decide[ ] definitively" on the pleadings whether this case fell within "'a species of corporate overpayment claim' that is 'both derivative and direct in character.'" *Starr*, 106 Fed. Cl. at 62, 64. The Court explained that this exception to the general rule arises only where a controlling shareholder causes a corporation "to issue 'excessive' shares of its stock in exchange for assets . . . that have a lesser value," resulting in "an increase in the percentage of the outstanding shares held by the controlling shareholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id. at* 64; *see also id.* at 62 (quoting *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006)). The Court reasoned that it was "unclear" why even under Starr's theory of the case "the [September 16] term sheet was binding as to control but not as to the transfer of the 79.9% interest in AIG," but held that it had to "accept as true Starr's position" for the purpose of the Government's motion to dismiss. *Id.* at 64-65. The Court now has a full evidentiary record before it, and that record is devoid of support for Starr's direct claim.

### A.    Starr Has Failed to Show That Its Claim Is Not Derivative

Starr has failed to meet its burden of proving that its claims are anything other than wholly derivative claims — claims for injury to AIG rather than an injury to Starr or some other subset of shareholders.[28] Starr has not proven that the Government "used its control of AIG to expropriate the economic and voting interests of the then-existing common stock shareholders."

---

[28] In litigation against the United States, claims of economic harm that apply ratably to all shareholders of a corporation, share for share, are derivative claims that must be brought, if at all, in the name of the corporation itself. *See, e.g.*, *Hometown Fin. Inc. v. United States*, 56 Fed. Cl. 477, 486 (2003) (noting that "courts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends" that is shared equally). That is precisely the sort of economic harm that Starr claims that it, along with every other AIG shareholder, suffered.

*Starr Int'l Co. v. United States*, 112 Fed. Cl. 601, 605 (2013) (*Starr III*).  In setting forth what

Starr had to prove to support this element of a direct claim, the Court framed the issue in terms of

when the contractual right to equity and control arose.  *Starr*, 106 Fed. Cl. at 64-65.  The Court

explained that if the AIG board's acceptance of the Government's rescue offer on September 16,

2008, gave the Government a contractual right to a 79.9 percent equity stake, then Starr lacked

standing to bring a direct claim.  *Id.* (holding that Starr's direct claim may proceed only "insofar

as Starr claims that the Government first acquired control of AIG (on September 16, 2008) and

then used that control to expropriate a 79.9% interest in AIG from the minority shareholders").

As we have shown, the AIG board's voluntary acceptance of the rescue offer on

September 16, 2008, provided the Government a contractual right to equity participation

equivalent to 79.9 percent of AIG's common stock.  Def. Law Br. § I.B.3.a.  The Government

did not – could not – control the AIG board's decision to accept the loan offer.  Def. Law Br.

§ I.B.2.a-b; Def. PFOF ¶¶ 67-83; Pl. PFOF ¶ 15.0 (conceding that the Government did not

control the AIG board's vote to accept the rescue facility on September 16, 2008).

But, even if the Court were to conclude that the Government's contractual right to the

equity did not arise until the Credit Agreement was executed, Starr still has failed to establish a

direct claim because it has not proved that the Government controlled the AIG board's approval

of the Credit Agreement.  *See* Def. Law Br. § I.B.3.b; Def. PFOF ¶¶ 99, 114.  Regardless,

because the equity term in the Credit Agreement was entirely consistent with the equity term

AIG's board of directors accepted on September 16, the issue of Government control on

September 21 is a red herring.  Def. PFOF ¶¶ 111-114; Def. Law Br. §§ I.B.3-3.a.  A non-

controlled board agreed on September 16 to provide "equity participation equivalent to 79.9

percent of [AIG's] common stock," Def. PFOF ¶¶ 71-74, which accurately described the equity

stake executed in the Credit Agreement. Even if the Government "controlled" AIG when AIG's board approved the Credit Agreement (which it did not), that control made no difference: the Credit Agreement promised no more economic value and voting interests than AIG's board had already promised on September 16, 2008, when the board was indisputably independent. Starr has thus failed to prove that the Government "caused the shareholders to suffer the alleged harm" by "us[ing] its control" over the AIG board to obtain that equity stake. *Starr III*, 112 Fed. Cl. at 605.

### B. Even If Starr's Claim Is Both Derivative And Direct, Starr Has Failed To Allocate Economic Harm To The Claim's Direct Aspect

Even if Starr's claim is "both derivative and direct," *Starr*, 106 Fed. Cl. at 62, derivative and direct claims have distinct harms. Recognizing this, Starr represented to the Court in Starr's motion for class certification on December 3, 2012, that "AIG and its shareholders each suffered distinct injuries, and the allocation of damages for these injuries will be based on data disclosed during discovery and expert testimony." Pl. Mem. in Supp. of Mot. for Class Certification (Dec. 3, 2012) (Dkt. 81) at 13.[29]

Starr failed to deliver on that promise. Neither Starr's proposed factual findings, nor its proposed legal conclusions, nor any testimony or documentary evidence, address an injury to AIG's shareholders separate and distinct from an injury to AIG. Indeed, Starr's expert testified that he did not analyze that distinction. Def. PFOF ¶ 346.

---

[29] Similarly, in asking AIG's board to allow Starr to pursue a derivative claim on AIG's behalf, Starr represented that it could not "at this point say the direct claim is X percent and the derivative claim is Y percent" but that "it is clear that both are significant" and that "the division is something that would have to be supervised by the court." Dkt. 87-26 at 34 (AIG Bd. Mtg. Tr. 129:10-16). Starr was clear: "you have to take that and you have to allocate it." *Id.* at 35 (AIG Bd. Mtg. Tr. 131:9-10).

Because Starr has failed to show what harm shareholders suffered distinct from any harm incurred by AIG, the Court should reject all of Starr's claims. *See* Def. Law. Br. at 118-120.

## VII.    Starr Has Failed To Establish Its Reverse Stock Split Claim

Starr's claim with respect to the reverse stock split fails because (1) Starr has not identified a property right that was taken or exacted, Def. Law Br. §§ IV.A, IV.D, (2) Starr's claim that the reverse stock split was engineered by the Government is not supported by the evidence, Def. Law Br. § IV.B, and (3) the reverse stock split caused no economic harm. Def. Law Br. § IV.C. Starr's briefing fails to cure these deficiencies.

### A.    Neither Delaware Law Nor The *Walker* Order Granted AIG's Common Shareholders The Right To Avoid Dilution Of Their Shares

Starr argues that section 242(b)(2) of the Delaware Code and the Delaware Chancery Court's order in *Walker v. AIG, Inc.*, No. 4142-CC (Del. Ch. 2009), provided AIG's common shareholders with the right to reject any dilution of their shares. *See* Pl. Law Br. §§ 14.7. & 14.8. Starr's arguments misstate relevant Delaware law, mischaracterize the scope of the *Walker* order, are not supported by the evidence, and ignore the common shareholders' vote in favor of the stock split.

#### 1.    Section 242(b)(2) Grants The Right To A Class Vote In Limited Circumstances And Confers No General Right To Avoid Dilution

Starr contends that section 242(b)(2) of the Delaware Code gave common shareholders a right to a separate class vote on any action that could dilute their common-stock-percentage, ownership interests. Pl. Law Br. § 14.7. That section, however, requires a separate class vote to "increase or decrease the aggregate number of authorized shares of such class, [or] increase or decrease the par value of the shares of such class." 8 Del. Code Ann. § 242(b)(2). Section 242(b)(2) confers class voting rights only in these two enumerated circumstances. Nothing in the section or in any case identified by Starr provides the sort of all-encompassing anti-dilution

protection that Starr claims. *See Feldman v. Cutaia*, 956 A.2d 644, 656 (Del. Ch. 2007) *aff'd*

951 A.2d 727 (Del. 2008) (quoting *Oliver v. Boston Univ.*, No. Civ A. 16570-NC, 2006 WL

1064169, at *17 (Del. Ch. Apr. 14, 2006)) ("Clearly a corporation is free to enter into . . .

numerous transactions, all of which may result legitimately in the dilution [of present equity

holders]. Such a dilution is a natural and necessary consequence of investing in a corporation.").

Indeed, Starr fails to identify statutory or case law to support its position.

　　　Starr's reliance on Delaware cases protecting voting rights, Pl. Law Br. ¶ 14.8.9, is

mistakenly circular, incorrectly assuming the existence of the alleged rights at the center of

Starr's reverse stock split claims. Starr contends that section 242(b)(2) "would effectively be

rendered meaningless" if "a controlling entity could use a reverse stock split to bypass [its]

shareholder voting requirement." Pl. Law Br. § 14.7.2. This argument is factually and legally

baseless. First, Starr offers no evidence supporting Starr's claim that the reverse stock split was

intended to "bypass" section 242(b)(2) (as discussed in Section VII.A.3 below). Second, Starr's

argument is contrary to Delaware's "formal and technical approach" to "evaluating claimed

violations" of Delaware corporate law. *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d

155, 201 (Del. Ch. 2014), *reconsideration denied*, 2014 WL 5465535 (Del. Ch. Oct. 28, 2014).

Starr's incorrect claim that section 242(b)(2) requires a class vote not only under the

circumstances expressly described in section 242(b)(2), but also in *all other circumstances* that

arguably would accomplish the same or a similar end, ignores the bedrock doctrine of Delaware

law known as the doctrine of independent legal significance: actions valid under one provision

of Delaware corporation law must be respected as valid "even though the end result may be the

same" as proceeding under a different provision with different requirements. *See id.* (quoting

*Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963)).

### 2.  The *Walker* Order Did Not Grant Common Shareholders The Right To A Separate Class Vote on Dilutive Transactions

Starr admits, as it must, that its asserted right "to exclude at least the holders of the Series C Preferred Stock from diluting their shares of common stock," Pl. Law Br. § 14.8.8, can be found nowhere in the language of the *Walker* order; Starr thus asks this Court to read that order inconsistently with the order's plain language.  *See* Pl. Law Br. § 14.8.7 n.5 (recognizing that the *Walker* order "required a separate class vote to *increase* the number of *authorized* common shares, but not to *decrease* the number of *issued* shares, which is what happened here") (citations omitted) (emphasis in original).  But the *Walker* order did not and could not have granted any right beyond its four corners.  *See* Def. Law Br. § IV.A.1.b.

Although Starr insists that the *Walker* order must be read in light of a representation by AIG to the Delaware Court of Chancery, *see* Pl. Law Br. §§ 14.8.1-.8, that representation was no broader than the order itself.  AIG represented only that "any amendment to [its] certificate of incorporation to increase the number of authorized shares of common stock or to change the par value of that stock" would require a separate class vote.  *See* Def. PFOF ¶ 441 (quoting JX-143 at 7).  This narrow and precise representation – and the correspondingly narrow and precise language of the *Walker* order – did not confer a broad and ill-defined protection against all actions that could dilute common shareholders' ownership interests through the issuance of additional stock.  Starr asks the Court to read far more into the *Walker* order than the Delaware Chancery Court actually placed in that document.[30]

---

[30] Starr's contention that the Court should read broad terms into the *Walker* order because "the lawsuit also requested appropriate relief based upon the common shareholders' right to reject the dilution of their shares," Pl. Law Br. § 14.8.7 n. 5 (quoting *Starr*, 106 Fed. Cl. at 73), and that the Stock Split Class "had a right to exclude at least the holders of the Series C Preferred Stock from diluting their shares of common stock," *id.* § 14.8.8 (internal quotation marks and citation omitted), has no merit.  No such relief was granted, and Ms. Walker's unfounded claim

### 3. Starr Has Not Presented Any Evidence That The Reverse Stock Split Was Designed To Evade Common Shareholders' Rights

Failing to establish a blanket shareholder right to vote on any dilutive action, Starr argues that AIG's reverse stock split wrongfully circumvented the more limited rights common shareholders did possess under Delaware law. *See* Pl. PFOF ¶ 36.4. Starr, however, has presented no evidence supporting its assertion that the June 2009 reverse stock split was "engineered" to facilitate the January 2011 recapitalization. Indeed, after the close of testimony, Starr admitted that it "ha[d] not yet identified any document showing when it was first proposed to use the reverse stock split to avoid a class vote of common shareholders;" Starr has not, since, remedied that failing. *See* Pl. Memo. in Support of Req. to Keep the Record Open for a Limited Time and Purpose After Plaintiffs' Rebuttal Case (Dkt. 373) at 8 (Nov. 24, 2014). Because Starr has failed to prove the assertion at the heart of its stock split claim, that claim fails.

According to Starr, the Government's discussion of alternatives to monetize the Series C evidences that the reverse stock split was developed to circumvent a shareholder vote. *See* Pl. PFOF ¶ 36.4.2. The discussion of alternative methods of monetization, of course, suggests exactly the opposite. The other options for monetizing the Series C stock undercuts Starr's theory that the Government orchestrated the reverse split to monetize its shares.

In the face of uniform evidence to the contrary, Starr's allegation that the reverse stock split was "engineered" to "bypass a shareholder vote" relies solely on speculation by Starr's expert witness, Dr. Zingales. Pl. PFOF ¶¶ 36.4.3(c), 36.6(e). But as an expert "in the field of economics and corporate governance" (Zingales, Tr. 3796, Lines 6-8; *see* Tr. 3799 Lines 18-19),

_____

that shareholders had a right to vote on any dilution was dismissed after her claim seeking a separate vote on any increase in the number of authorized shares of common stock or decrease in their par value had been mooted. Def. PFOF ¶ 444 (citing JX-176). Starr presents no legal support for its assertion that dismissed claims can create a property right, nor could it.

Dr. Zingales was not qualified to opine on motives in this situation, much less to conjure an imaginary phone conversation in which AIG and the Government "resolve a way to bypass a shareholders vote."  Pl. PFOF ¶ 36.6(e).  Regardless, the Court should give Dr. Zingales's opinion regarding motive no weight because it is unsupported by the factual record – including the uniform sworn testimony of the individuals involved in designing and proposing the stock split.  *See*, *e.g.*, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Similarly, the Court should reject Dr. Zingales's insistence that the structure of the reverse stock split demonstrated an intent to "bypass a [separate vote] by common shareholders." (Pl. PFOF ¶ 36.5.2.3(i)).  Prof. Daines explained that in 2009 a number of companies addressed the risk of delisting with reverse stock splits and that it was not unusual for companies to apply reverse stock splits only to issued and not authorized shares.  *See* Def. PFOF ¶ 425.  Thus, nothing nefarious could be inferred from the stock split's structure.  Accordingly, the Court should reject Starr's invitation to displace uncontroverted facts regarding the purpose of the reverse stock split with Dr. Zingales's unfounded speculation.

Starr also argues that the "effect" of the reverse stock split was to allow the recapitalization to occur 18 months later, but Starr has presented no contemporaneous evidence that the reverse stock split was intended to facilitate the exchange.  *See* Pl. PFOF ¶ 36.4.[31]  To the contrary, an exchange of preferred stock for common shares was first contemplated in 2010,

---

[31] Nor could the reverse stock split have been intended to facilitate conversion, because it did not solve the need to reduce the per share par value.  *See* Def. PFOF ¶ 446.

at least six months after the reverse stock split vote and more than a year after AIG first began planning the reverse stock split. *See* Def. PFOF ¶ 447 (testimony of Brandow and Shannon).

In any event, Starr's contentions regarding the eventual effect of the reverse stock split are legally insufficient to establish liability for a taking or unlawful exaction. *See* Def. Law Br. at 138; *Norman v. United States*, 429 F.3d 1081, 1088, 1096 (Fed. Cir. 2005) (finding no takings or illegal exaction when the "causal relationship" between governmental conduct and the asserted harm was "too attenuated").

**B.      Starr's Invocation Of Entire Fairness Review Under Delaware Law Is Erroneous**

Starr contends that the reverse stock split is governed by the entire fairness test of Delaware fiduciary duty law. *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442 (Del. Ch. 2011). Pl. Law Br. ¶¶ 12.2.6, 14.3, 14.7.2(a). But Starr's reliance on that test is entirely misplaced. A taking occurs only when (1) "the claimant has identified a cognizable Fifth Amendment property interest" and (2) "the government's action amounted to a compensable taking of that property interest." *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011).

To the extent Starr suggests that the "cognizable Fifth Amendment property interest" was the shareholders' right to bring a breach-of-fiduciary-duty claim, that property interest was not taken. No Government action deprived Starr or any other common shareholder of its right to file suit to block any transaction and argue for an entire fairness standard of review within the applicable statute of limitations period.

To the extent Starr suggests that Delaware's entire fairness standard of review governs the second question in *Klamath*, whether "the government's action amount[s] to a compensable taking of that property interest," Starr is wrong. The question of "what constitutes a 'taking' is a

'federal question' governed entirely by federal law." *Bartz v. United States*, 633 F.2d 571, 577 (Ct. Cl. 1980); *Klamath*, 635 F.3d at 520 (determination whether cognizable property interest has been taken "will turn on existing takings law," not state law).

C. **Starr Has Failed To Prove Its Allegation That The Government "Engineered" The Reverse Stock Split**

Starr has failed to prove that the Government was involved in proposing the reverse stock split. In the absence of such proof, Starr contends that the Government's alleged voting control of AIG equates to legal responsibility for AIG's independent actions. Because Government action is a necessary element of either a taking or an illegal exaction, Starr's claims fail.

Starr has failed to identify a single piece of evidence that the Government was involved in suggesting, seeking, or shaping the reverse stock split proposal. *See* Starr Second Amended Verified Class Action Complaint (Dkt. 101) at ¶ 112 (Mar. 11, 2013); Pl. PFOF ¶¶ 36.4-36.6. Starr's allegations contrast with the uniform evidence that AIG's management and board of directors developed the reverse stock split because they believed that the reverse stock split would prevent delisting, and thereby serve the best interests of the company and its shareholders. *See* Def. PFOF ¶¶ 421-428.[32]

Lacking any evidence of Government involvement, Starr now presents a new theory that the Government's "ownership of, and resulting control over, AIG" transforms AIG's stated – and reasonable – motives into Government action designed to thwart an alleged shareholder right. Pl. Law Br. §§ 14.0, 14.9.3.

---

[32] Starr challenges Mr. Herzog's testimony that he proposed the reverse stock split. *See* Pl. PFOF ¶ 36.5.1(a) n.124. No evidence, however, contradicts this testimony. Def. PFOF ¶ 424. The fact that Mr. Herzog did not, ultimately, design the transaction's structure does not undermine his credibility.

As demonstrated in our opening brief, however, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [Government] responsible for those initiatives." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982) (discussing Fourteenth Amendment rights). Similarly, the Government's "cooperation" with a private party cannot make the Government responsible for the private party's actions. *Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 758 (Fed. Cir. 2013). Additionally, Delaware law requires a party alleging control over a corporation's conduct to demonstrate the *actual direction* of corporate conduct; the potential ability to do so is insufficient as a matter of law. *See* Def. Law Br. at 14-15. The Trust's ownership of a majority voting interest in AIG is legally insufficient to hold the Government liable for AIG's independent conduct. Starr's failure to present any evidence of Government involvement in suggesting or shaping the terms of the reverse stock split is, as a matter of law, fatal to its claim.[33]

### D. Starr Failed To Demonstrate Economic Harm From The Reverse Stock Split

The Court should reject the Stock Split Class's claims because Starr has not demonstrated that the reverse stock split caused class members any economic loss. *See* Def. PFOF. § VII; Def. Law Br. § IV.C; *Brown*, 538 U.S. at 240 n.11. It is undisputed that the majority of AIG's common shareholders, including Starr itself, voted in favor of the split. Indeed, common

---

[33] Similarly, the Trust's vote in favor of the reverse stock split cannot turn the reverse stock split into a taking or unlawful exaction. As a threshold matter, the Trust's vote is not Government action. The Trustees had complete independence in voting the Trust's stock and were not controlled by the Government. *See* Def. PFOF ¶¶ 275-278. Regardless, as discussed above, the reverse stock split served AIG's express purpose of raising the market price of AIG shares, which benefited the company and its common shareholders by preventing delisting and attracting institutional investors. *See* Def. PFOF ¶¶ 445-47, 452-54. That the Trust voted for these benefits is neither surprising nor controversial given the Trust's mandate, and, instead, demonstrates only that the Trust agreed with a majority of AIG's common shareholders that the reverse stock split was in AIG's best interests.

shareholders voted for the transaction with full knowledge that the reverse stock split would have the effect of enabling the future issuance of additional common shares. *See* Def. PFOF ¶¶ 430-34, 449-50; JX-221 at 70; DX-814-A at 1. Thus, the reverse stock split did not deprive shareholders of the separate class vote that Starr claims as an entitlement.[34]

In any event, as discussed at length in our opening briefs, the trial record demonstrates that common shareholders had the same percentage ownership, with the same value and voting rights, before and after the reverse stock split. *See* Def. PFOF § VII.B. Indeed, the reverse stock split benefitted common shareholders, who would have lost substantial value had AIG been delisted from the NYSE. *See id.* § VII.A. On these grounds alone, there can be no finding of economic harm from the reverse stock split.

Similarly, Starr's attempt to measure damages based on the 2011 recapitalization fails as a matter of law and fact. As discussed at length in our opening briefs, (1) Stock Split Class members cannot have lost more than the value of their shares on June 30, 2009 (Def. PFOF § VII.D.1); (2) common shareholders in June 2009 had no property rights affected by the 2011 recapitalization (Def. Law Br. § IV.A.3; Def. PFOF § VII.D.2);[35] (3) shareholders in January

---

[34] Starr argues that the reverse stock split was "coercive" because it applied only to issued but not authorized shares. Pl. PFOF ¶ 36.5. Starr, however, has not presented any evidence that the Government was responsible for this feature of the reverse stock split. To the contrary, both testimony and documents from AIG demonstrate that the structure of the reverse stock split, including the exchange ratio, was developed by AIG with the assistance of D.F. King, an outside consultant. *See* Def. PFOF ¶ 427; Shannon, Tr. 3709, Line 24-Tr. 3710, Line 15. Dr. Zingales's uninformed speculation that this structure was only explainable as the product of Government "control," Pl. PFOF ¶ 36.5.2.3(i), ignores that numerous other companies addressed the risk of delisting in 2009 through reverse stock splits that similarly applied only to issued and not authorized shares. *See* Def. PFOF ¶ 425.

[35] In fact, Starr concedes that stockholders in June 2009 and January 2011 were drastically different. *See* Pl. PFOF ¶ 30.2.6(c) (noting that "many" members of the Stock Split Class had "likely sold their AIG holdings prior to January 2011"). As discussed in our opening

2011 did not suffer any economic loss as a result of the recapitalization, which was a negotiated and fair transaction (Def. Law Br. § IV.C.3; Def. PFOF § VII.D.4); and (4) shareholders had no ability to recover "hold up" value related to the exchange of the Series C shares because the Trust had alternatives for the monetization of its Series C shares.  (Def. Law Br. § IV.C.3; Def. PFOF § VII.D.3).

## VIII.  Starr's Contentions Regarding Maiden Lane III Are Irrelevant And Incorrect

The November 2008 Maiden Lane III transaction has no bearing upon Starr's claims that the September 2008 rescue or the June 2009 reverse stock split were takings or unlawful exactions.  Accordingly, Starr's various contentions regarding the Maiden Lane III transaction are misplaced.  Moreover, Starr's Maiden Lane III arguments are also incorrect; the evidence at trial unequivocally showed that AIG's board independently and voluntarily authorized AIG's entry into Maiden Lane III because that transaction was a vital component of additional support that unquestionably benefitted AIG and its shareholders.  *See* Def. PFOF ¶¶ 492-93; JX-144 at 8 (Nov. 9, 2008 AIG board minutes) ("[t]he proposed arrangements seem indisputably to provide the highest value under the circumstances"); Liddy, Tr. 3236, Lines 3-21; Tr. 3235, Line 24-Tr. 3236, Line 11 ("Q. To your knowledge, did anyone coerce you into voting in favor of these resolutions?  A. No. Q.  To your knowledge, did anyone coerce the board into voting in favor of these resolutions?  A. No.").

In particular, Starr asserts that AIG did not know total payments to its CDS counterparties would be at par.  Pl. PFOF ¶ 34.5.  The testimony of Dr. Zingales (an expert, and Starr's only witness on an historical factual question) was both wholly uninformed by and

brief, the Stock Split Class may not recover damages based on alleged dilution suffered by different shareholders on a later date.  Def. Law Br. § IV.A.3.

contrary to the evidence. *See* Def. PFOF ¶¶ 501-02; DX-2131 at AIGFIN010227727 (Nov. 8, 2008 email informing AIG's general counsel, outside counsel, and business leaders that "no concession[s]" were available and total payments would be at par); Zingales, Tr. 4015, Line 17-Tr. 4019, Line 5 (admitting that he had not reviewed DX-2131 prior to testifying). Similarly, Starr relies on Dr. Zingales's speculation that FRBNY caused AIG to enter into broad mutual releases with its counterparties. Pl. PFOF ¶¶ 34.6.3-34.6.5. The evidence, however – from AIG and others – demonstrated that AIG's outside counsel was responsible for the releases. *See* Def. PFOF ¶¶ 503-04; DX-666; Zingales Tr. 4010, Lines 8-22 (Dr. Zingales could not identify a single document supporting his testimony).[36]

Starr's various contentions concerning AIG's "maximum exposure" on its CDS contracts, that the values of the CDOs underlying those CDSs could eventually have recovered over time, or that Maiden Lane III "crystallized" losses on those CDSs, Pl. PFOF ¶ 34.4, miss the point: if AIG's exposure to its CDS obligations had not been removed from the company's balance sheet, the ratings agencies would have further downgraded AIG, pushing it into default and bankruptcy; it simply was not an option for AIG to retain its CDS positions on its books. *See* Def. PFOF ¶¶ 487-491; Liddy, Tr. 3230, Line 20-Tr. 3231, Line 5 (it was vital for AIG to "remove that cash drain and liability off of [its] balance sheet"). Starr's further assertion that FRBNY should have implemented solutions other than Maiden Lane III that Starr contends could also have alleviated

---

[36] Other contentions are similarly incorrect or misleading. For example, Starr asserts that three counterparties "offered or accepted" concessions, but the sources it cites indicate instead that only UBS offered a small, two-percent concession, conditioned on all the other counterparties doing the same; not a single counterparty "accepted" concessions as Starr claims. *See* Pl. PFOF ¶ 34.5.4(f) n.113. Similarly, Starr's claim that FRBNY sought concessions from only eight of sixteen counterparties, *id.* ¶¶ 34.5.4, 34.5.5(b) n.114, ignores that the terms of Maiden Lane III were negotiated with the eight largest counterparties prior to the rating agencies' November 10, 2008 deadline, and then extended to the other eight afterwards. *See* PTX-549 at 19-23.

AIG's collateral posting obligations, Pl. PFOF ¶ 34.2, is entirely irrelevant to Starr's claims that the September 2008 rescue or the June 2009 reverse stock split were takings or unlawful exactions.[37]

## IX.    Starr Is Not Entitled To Attorney Fees, Expert Witness Fees, And Disbursements For An Illegal Exaction

Starr appears not to claim an entitlement to attorney fees, expert witness fees or disbursements for its illegal exaction claims. *Compare* Pl. Law Br. § 21.1 *with id.* § 21.2.  If Starr meant to claim such fees, it is not entitled to recover them.  42 U.S.C. § 4654(c) awards "reasonable costs, disbursements, and expenses, including reasonable attorney . . . fees" only when a party prevails on a *takings* claim, not an illegal exaction claim.  The Court should not apply section 4654(c) beyond its terms because the Supreme Court has made it abundantly clear that "[a]ttorneys' fees and expenses are not embraced within just compensation."  *United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979) (*per curiam*) (quoting *Dohany v. Rogers*, 281 U.S. 362, 368 (1930)).[38]  Nor would an award pursuant to 28 U.S.C. § 2412(a)(1) encompass attorney fees, expert witness fees, or disbursements; by its terms, that statute permits awarding costs to prevailing parties but explicitly excludes fees.

---

[37] Contrary to Starr's assertions, a guarantee of AIG's CDS obligations also was not viable.  Starr's repeated suggestion that the Federal Reserve simply could have provided funding whenever counterparties demanded collateral ignores the fact that, because AIG did not own the CDOs underlying its CDS obligations, AIG did not have the additional collateral necessary to secure any such hypothetical lending.  By contrast, the backstop lending made available to Citigroup was secured by a pool of assets owned by Citigroup.

[38] In addition, "just compensation" is not part of a due process illegal exaction claim in any case.  *See U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1384-85 (Fed. Cir. 2002) (declining to "import the [Supreme] Court's interpretation of 'Compensation' . . . where the word 'compensation' does not appear.").

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:                    /s/ Kenneth M. Dintzer
SCOTT D. AUSTIN                KENNETH M. DINTZER
CLAUDIA BURKE                  Deputy Director
JOSHUA E. GARDNER
Assistant Directors
                               /s/ Brian A. Mizoguchi
                               BRIAN A. MIZOGUCHI
JOHN ROBERSON                  Assistant Director
JOHN J. TODOR                  Commercial Litigation Branch
Senior Trial Counsels          Civil Division
                               Department of Justice
                               P.O. Box 480
RENEE GERBER                   Ben Franklin Station
MATTHEW F. SCARLATO            Washington, D.C. 20044
MARIANA T. ACEVEDO             Tele: (202) 305-3319
DAVID D'ALESSANDRIS            Fax: (202) 514-7969
VINCENT D. PHILLIPS            Email: brian.mizoguchi@usdoj.gov
ZACHARY J. SULLIVAN
Trial Attorneys


March 23, 2015                 Attorneys for Defendant