IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STARR INTERNATIONAL COMPANY, INC., on its behalf and on behalf of a class of others similarly situated,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

No. 11-00779C (TCW)

**PLAINTIFFS' RESPONSE TO DEFENDANT'S POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BOIES, SCHILLER & FLEXNER LLP
Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Julia C. Hamilton
Laura Harris
Ilana Miller
John Nicolaou
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
Abby Dennis
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

March 23, 2015

BOIES, SCHILLER & FLEXNER LLP
David Boies
Attorney of Record
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Fax: (914) 749-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
John L. Gardiner
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000

R. Ryan Stoll
Gregory Bailey
155 N. Wacker Drive
Chicago, IL  60606
Telephone:  (312) 407-0700

*Attorneys for Starr International Company, Inc. and for the Plaintiff Classes*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS..................................................................... 5

I. STANDING ...................................................................................... 8

    **A. DEFENDANT'S ARGUMENT THAT PLAINTIFFS HAVE NO
LEGALLY COGNIZABLE PROPERTY INTEREST IN THE EQUITY
INTEREST AND VOTING CONTROL ASSOCIATED WITH THEIR
STOCK IS CONTRARY TO SETTLED DELAWARE LAW AND FOUR
DECISIONS BY THIS COURT.** .................................................. 8

        1. Plaintiffs Were Specifically Targeted by Defendant. ...................... 8

        2. This Court Has Ruled on Four Separate Occasions that Plaintiffs Have
Standing Based on Cognizable Property Rights (*see Starr*, 106 Fed. Cl. at
62; *Starr*, 107 Fed. Cl. at 377; *Starr*, 111 Fed. Cl. at 481; *Starr*, 112 Fed.
Cl. at 604)............................................................................................ 9

        3. This Court's Rulings Are Based on Settled Delaware Law............................ 10

        4. In Rearguing That Defendant Had No Duty to Plaintiffs Because
Defendant Was Not Yet a Shareholder When It Exacted/Took Plaintiffs'
Equity and Voting Power, Defendant Ignores Its Fifth Amendment Duties
and Disregards the Admonition of Delaware Courts to Focus on the
Substance – Not the Form – of a Transaction........................................ 12

            a. The Government had a Fifth Amendment duty to Plaintiffs
regardless of duties flowing from control.................................. 12

            b. In any event, the relevant date is September 22 when the
exaction/taking took place (PFOF § 14.0) and Defendant clearly
controlled AIG on that date (PFOF §§ 15.0, 19.0). ................. 13

        5. Defendant's Reliance on the Business Judgment Rule Is Misplaced
Where, As Here, Plaintiffs' Claim Is Against Defendant and Not the AIG
Board and Defendant Was in a Controlling Position............................ 15

    **B. DEFENDANT'S ARGUMENT THAT THIS COURT LACKS
JURISDICTION OVER PLAINTIFFS' ILLEGAL EXACTION CLAIM
IGNORES CONTROLLING PRECEDENT AND THIS COURT'S PRIOR
RULINGS.** ................................................................................. 16

II. AUTHORITY ................................................................................. 17

**A.  DEFENDANT'S ARGUMENT THAT IT WAS AUTHORIZED TO DEMAND 79.9% OF PLAINTIFFS' EQUITY AND VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN IS CONTRARY TO THE PLAIN LANGUAGE OF THE STATUTE, THIS COURT'S PRIOR RULINGS, THE STATUTE'S CONTEXT AND LEGISLATIVE HISTORY, AND DEFENDANT'S OWN PRIOR INTERPRETATION AND IMPLEMENTATION OF 13(3).** ................................................................. **17**

    1.  Defendant's Papers Ignore the Plain Language of the Federal Reserve Act Which Limits the Consideration for a 13(3) Loan to an Interest Rate........... 17

    2.  Defendant's Papers Ignore This Court's Prior Ruling That the Only Consideration for a 13(3) Loan is an Interest Rate. ............................................... 18

    3.  Defendant's Papers Ignore the Legislative History of the Relevant Statutes. ................................................................................................................. 18

    4.  Defendant's Papers Misstate Its Prior Interpretation of 13(3) and Ignore Its Actual Statements Concerning, and Implementations of, 13(3)........... 18

    5.  Defendant's Concession in Its Post-Trial Submissions that "FRBNY Cannot Invest in a Distressed Company by Injecting New Equity Capital Through the Purchase of Stock" (DFOF ¶ 211) Is Dispositive. ........................... 21

**B.  DEFENDANT'S CONSTANTLY SHIFTING ARGUMENTS FOR THE AUTHORITY TO DEMAND EQUITY ARE INTERNALLY INCONSISTENT AND, AGAIN, CONTRARY TO THE STATUTE'S PLAIN LANGUAGE, THIS COURT'S RULINGS, THE STATUTE'S CONTEXT AND LEGISLATIVE HISTORY, AND DEFENDANT'S OWN PRIOR ACTS AND STATEMENTS.** ................................................................. **21**

    1.  Defendant's Initial Argument Was That Authority to Demand Equity Was an Incidental Power. ..................................................................................... 21

        a.  "Incidental" powers cannot add new powers. ...................................... 22

        b.  The National Bank Act and precedents under it refute rather than support Defendant's incidental powers analysis. .............................. 22

    2.  In Its August 2012 Motion for Reconsideration, Defendant Argued for the First Time That the Reference to "Limitations" and "Restrictions" in 13(3) Was an Express Authorization to Demand Equity. ..................................... 25

        a.  Defendant's novel assertion that its demand for 79.9% equity and voting control was a "limitation" or "restriction" on the interest rate charged is contrary to the plain language of the statute. ........ 25

b.   Defendant's "limitations" and "restrictions" argument is also inconsistent with Defendant's uniform prior interpretation and implementation of 13(3). ........................... 26

c.   Defendant's argument that Plaintiffs' reading of Section 13(3) would render the final sentence of Section 13(3) "meaningless" (DCOL at 80-81) is wrong. ...................... 26

d.   In fact, it is Defendant's argument that, if accepted, would render provisions of 13(3) meaningless. ................................. 27

e.   Defendant's argument requires a rewriting of the statute. ................. 27

3.   Defendant Now Argues That a Previously Unknown and Still Undefined "Congressional Policy" Authorizes It to Demand Equity.  That Argument Is Contrary to 13(3)'s Plain Language and Consistent Interpretation. ...................... 29

4.   The Harsh Terms of the AIG Loan Were Adopted to Punish AIG and Its Shareholders (*See* PFOF § 26.2), Not For Any Other Reason ........................ 30

5.   There Is No Possible Policy Basis for Imposing Punitive and Discriminatory Terms Without Any Investigation, Analysis, or Findings. .......... 31

6.   Defendant's Asserted "Moral Hazard" Policy Is Foreign To The Statute, Unmentioned In The Board Of Governors Minutes, and Is Simply a Rephrasing of Defendant's Punitive Policy. ...................... 33

a.   Defendant's claim that it needed to address moral hazard concerns is contradicted by prior statements of Defendant's top policymakers. ........................... 33

b.   Moreover, Defendant's claim that the equity term was necessary to address moral hazard does not make economic sense ......... 34

c.   Singling out AIG for punishment was inconsistent with how Defendant treated other firms and does not reflect a reasoned policy judgment. ..................... 35

7.   Defendant's Assertion that the Risk of the Credit Facility Was High Is Irrelevant and Contradicts Defendant's Contemporaneous Analysis and Sworn Testimony. ................................. 37

a.   The risk of the AIG loan is irrelevant to the exaction/taking of equity ......................................................................... 37

b.   Defendant's Assertion That the Credit Facility Was "Enormously Risky" (DFOF ¶ 139) Is Contrary to the Testimony of Its Senior Officials................................................................ 37

c.   Defendant's Assertion that the Credit Facility Was "Enormously Risky" (DFOF ¶139) Is Contrary to Its Lending Authority Under Section 13(3). ................................................. 37

d.   Defendant's Assertion That AIG's Collateral Was "Highly Unusual" Is Contrary to the Testimony of Its Senior Officials. ............... 38

e.   Defendant incorrectly asserts that "President Geithner made clear to Congress, long after FRBNY had extended the AIG loan, his continuing belief that the Federal Reserve was taking substantial risk in lending to AIG."  DFOF ¶ 150 (citing PTX 564 at 28, 42, 125). ......................................................................... 39

f.   Defendant incorrectly asserts (DFOF ¶ 143) that a September 16th analysis of the value of AIG's equity (DX 415) – which was never pledged as collateral (JX 95 at 1) – has bearing on the risk of the Credit Facility, which was secured by AIG's underlying assets......... 39

g.   Defendant incorrectly asserts (DFOF ¶ 160) that the valuations it relied upon "assumed that AIG would not lose significant business despite AIG's financial decline." ................................. 40

h.   Defendant fails to mention that its proffered "market indicators" (DFOF ¶¶ 167-171) relate to the perceived risk of AIG's unsecured debt before AIG received liquidity from Defendant in the form of secured debt...................................... 40

8.  All of Defendant's "Policy" Arguments Ignore that Defendant Had No Authority to Demand Any Compensation for a 13(3) Loan Other Than an Interest Rate, or to Fix That Interest Rate for Any Purpose Other Than "Accommodating Commerce and Business" (12 U.S.C. § 357). ......................... 41

9.  Defendant's Papers Ignore that FRBNY Lacked Authority to Change the Terms Approved by the Federal Reserve Board of Governors....................... 41

10. Subsequent Acts of Congress Did Not "Ratify" Defendant's Interpretation of 13(3)........................................................................ 43

11. Holding the Shares in a Trust Did Not Cure Defendant's Lack of Authority............................................................................................. 43

a.   First, Defendant cannot use a trust to accomplish indirectly what Congress did not authorize it to do directly. ..................................... 43

b.   Second, regardless of whether the Trust held the preferred stock for a time, Defendant both initially acquired and ultimately sold the equity interest. .............................................................. 44

c.   Third, the Trust violated New York law. ............................................. 44

d.   Fourth, the Trust was an instrumentality of the Defendant. ............... 45

**III. DEFENDANT'S AGREEMENT DEFENSE** ..................................................................... 45

**A.  A PLAINTIFF'S AGREEMENT TO PROVIDE PROPERTY DEMANDED BY THE GOVERNMENT IS NOT A DEFENSE TO AN ILLEGAL EXACTION CLAIM.** ................................................................. 45

1.   In General a Plaintiff's Voluntary Agreement Is Not a Defense to an Illegal Exaction Claim. ........................................................................ 45

2.   As the Court in *Alyeska* Notes, the Only Cases in Which "Voluntariness" Has Been Allowed as a Defense Are Certain Overpayment Cases. ........................................................................ 47

3.   Defendant's Argument That Plaintiffs' Illegal Exaction Claim Is Barred Because 13(3) Was Not "Intended to Benefit" Borrowers Is Wrong Both as a Matter of Illegal Exaction Law and as an Understanding of 13(3). ............................................................................................... 47

a.   The "intended to benefit" rule is just one way in which a voluntary agreement defense can be inconsistent with the Congressional intent underlying a statutory provision. ........................... 48

b.   In any event, Section 13(3) was enacted to benefit solvent corporations, partnerships, and individuals who were experiencing liquidity shortfalls during a financial crisis. ............................................ 49

4.   Defendant Cannot Distinguish *Suwannee* and Similar Cases. ........................ 51

a.   Defendant's argument that *Suwannee* is distinguishable because the plaintiff there was already subject to the Government's regulatory powers (DCOL at 106-07) fails both on the law and the facts. ...................................................................................... 51

b.   Defendant's second basis for distinguishing *Suwannee*, that the statute at issue provided no discretion to the government officials as to whether to award the benefit (DCOL at 107) misstates *Suwannee* and the underlying statute. ...................................................... 51

**B.  IN ANY EVENT, PLAINTIFFS DID NOT "VOLUNTARILY" AGREE TO THE EXACTION/TAKING OF THEIR EQUITY AND VOTING CONTROL.** ................................................................................ **52**

    1.  Both *Edmonston* and *Rough Diamond* Make Clear That Only "Purely Voluntary" Agreement Can Ever Bar Recovery.  *Edmonston*, 181 U.S. at 515 ............................................................................................. 52

    2.  AIG's Undisputed Need for the Liquidity with Respect to Which Defendant Had a Monopoly, by Itself Makes *Edmonston* and *Rough Diamond* Inapplicable. .................................................. 52

**C.  PLAINTIFFS DID NOT "VOLUNTARILY" AGREE TO THE EXACTION OR TAKING OF THEIR EQUITY AND VOTING CONTROL BECAUSE THEY WERE NOT PARTIES TO THE CREDIT AGREEMENT.** ............................................................................... **52**

**D.  THERE WAS NO VOLUNTARY AGREEMENT BECAUSE AIG WAS UNDER DURESS.** ............................................................... **53**

    1.  The Standard for Duress. ..................................................... 53

    2.  AIG Had No Realistic Choice ............................................... 56

    3.  Defendant Contributed to AIG's Distress by Defendant's Threats and Change of Position on September 22 ..................................... 56

    4.  Defendant Contributed to AIG's Distress by Taking Punitive Action Without Due Process and Discriminating Against AIG for Political Purposes. ............................................................................. 57

    5.  Defendant Contributed to AIG's Distress by Abusing Its Monopoly Power to Obtain a Benefit to Which It Is Not Entitled. ..................... 57

    6.  The *A&D* Case Supports a Finding of Duress. ......................... 60

**E.  THERE WAS ALSO NO VOLUNTARY AGREEMENT BECAUSE DEFENDANT CONTROLLED THE TRANSACTION.** ............................ **60**

    1.  The Relevant Date Is September 22, the Date of the Credit Agreement. ....... 60

    2.  The Fact That the September 16 Term Sheet Expressly Provides It Is Not Legally Binding Is Dispositive That the Taking Did Not Occur Then. ......... 61

    3.  Prior to the Execution of the Credit Agreement, Defendant Loaned Money to AIG Pursuant to Collateralized Demand Notes, Not a Term Sheet ................................................................................ 63

4.   There Was No "Meeting of the Minds" on September 16, 2008 as to the Material Terms of Defendant's Loan to AIG.................................................. 63

a.   Neither the Board of Governors Nor AIG's Board Ever Saw or Approved the Version of the Term Sheet Defendant Claims Was Binding..................................................................................... 64

b.   Both Parties Believed The Form of Equity Would Be Warrants on September 16, 2008. .......................................................... 65

5.   Defendant Contemporaneously Recognized That There Was No Binding Agreement on September 16.................................................. 66

6.   Defendant Was Firmly in Control of AIG on September 22. ........................ 67

**IV. DAMAGES.......................................................................................................... 67**

**A.  BOTH PLAINTIFFS' AND DEFENDANT'S EXPERTS AGREE THAT THE 79.9% EQUITY INTEREST ACQUIRED BY DEFENDANT HAD A FAIR MARKET VALUE OF AT LEAST BETWEEN $23 BILLION AND $58.7 BILLION DEPENDING ON THE DATE SELECTED. ............................... 67**

1.   Plaintiffs Are Entitled to the Fair Market Value of What Defendant Took/Exacted Measured at the Time of the Taking/Exaction. ............................ 67

2.   Defendant's Experts Testified That AIG's Market Capitalization on a Fully Diluted Basis Based on NYSE Prices Represented Its Fair Market Value. ...................................................................................................... 67

3.   Based on NYSE Prices, the 79.9% Equity Interest Had a Value of Between $26.7 Billion and $58.7 Billion Depending on the Date Selected Between September 17 and September 24............................................ 67

4.   Defendant, AIG, and Their Advisors Contemporaneously Calculated the Value of the 79.9% Equity Interest as of September 16 and 17 at Between $23 Billion and $42 Billion.  (*See* PFOF § 37.2).................................. 68

5.   Because of the "Unusual and Exigent" Circumstances During September 2008, NYSE Prices Actually Understated the Fair Market Value of AIG...................................................................................................... 69

a.   Defendant's expert admitted that stock market prices only reflect fair market value in "a fair and efficient market with all information available." (Saunders: Tr. 8416:14-15; *id.* 8415:25–8416:13). ....................................................................................... 69

b.   As Dr. Saunders admitted, a "fair market price" of equity is a price that "reflects its underlying fundamental intrinsic value" (Tr.

8416:8-11). Stock market prices only reflect fair market value in a "fair and efficient market with all information available" (Tr. 8416:14-15). ........................................................................................... 69

c.   Defendant's experts also admitted that they did nothing to calculate the fair market value of the 79.9% equity interest except to look at NYSE prices.  (Saunders: Tr. 8416:17 – 8417:14; *see also* DFOF ¶ 401). ................................................................. 69

**B.  THERE IS NO LEGAL OR FACTUAL BASIS FOR DEFENDANT'S ASSERTION THAT PLAINTIFFS ARE NOT ENTITLED TO RECOVER THE FAIR MARKET VALUE OF WHAT DEFENDANT TOOK/EXACTED. ............................................................................................ 70**

1.   Defendant's Damages Argument That It Can Deduct from Plaintiffs' Damages the Benefits Created by the 13(3) Loan Depends on the False Legal Premise That It Was Entitled to Demand Equity as Compensation for the 13(3) Loan. ............................................................................... 70

2.   Nor Is There Any Basis in Determining Just Compensation for an Actual Taking to Reduce the Value of Property Taken by the Government (in this Case, the 79.9% Equity Interest) Based on the Benefit to the Plaintiff of Other Government Actions (in this Case, the 13(3) Loan). ............... 71

a.   Regulatory takings cases are irrelevant for this purpose. .................. 71

b.   "Hold-up" cases are irrelevant. ........................................... 72

c.   *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003) is similarly irrelevant ................................................... 73

3.   It is Undisputed That Even If Defendant Had Been Authorized to Exact/Take Equity as Compensation for a 13(3) Loan, Plaintiffs Would Suffer Direct Economic Loss If The Series C Preferred Was Issued for Less Than Fair Value. ............................................................................ 74

4.   Because AIG Already Paid (or Even Overpaid) Fair Value for the Credit Facility Through Its Secured Promise and Ultimate Repayment of All Borrowings Plus 14% Interest and Fees (PFOF § 37.7), Plaintiffs Did Not Receive Compensation for the 79.9% Equity and Voting Interests Taken by Defendant (PFOF §§ 37.4, 37.6). ........................................ 74

5.   Defendant's Damages Argument Also Improperly Assumes That AIG's Opening Stock Price on September 16 Represented Its Intrinsic or Fair Market Value. .......................................................................... 77

6.   Defendant Waived Its Argument for Off-Setting Benefits Because Such Benefits Are An Affirmative Defense that Must Be Pled in Physical Takings Cases. ................................................. 80

7.   Even if Defendant Were Legally Entitled to Reduce the Value of the Equity Exacted/Taken by Off-Setting Benefits, Defendant Has Failed to Establish These Benefits. ................................... 80

a.   Defendant bears the burden of proving how much Plaintiffs' property would have been affected in its hypothetical but-for world. ...................................................... 80

b.   Defendant's off-set hypothetical rests on the incorrect assumption that AIG would have filed for bankruptcy if Defendant had not taken Plaintiffs' property.  DFOF ¶ 350. .................... 80

c.   Defendant also cites no reliable evidence concerning the value of Plaintiffs' property in its hypothetical bankruptcy world and ignores contrary evidence. ........................................ 81

**C.  DEFENDANT'S PLEAS FOR A NEW EXCEPTION TO ILLEGAL EXACTIONS/TAKINGS LIABILITY BASED ON ITS INTENT NOT TO PAY JUST COMPENSATION SHOULD BE DENIED.............................................. 84**

1.   Defendant's Contractual Intent Cannot Bind Plaintiffs. ................................ 84

2.   Defendant Cites No Authority Supporting Its Position That Its or AIG's Intent Can Justify an Illegal Exaction/Taking. .......................... 84

3.   Defendant's Intent Cannot Permit It To Do What Congress Has Not Authorized............................................................................................ 84

4.   Although Irrelevant to This Proceeding, Any Claim Defendant May Have Against Non-Party AIG Under Section 8.12 Is Likely to Fail. .................. 85

**D.  PLAINTIFFS CORRECTLY CALCULATE PREJUDGMENT INTEREST. ............................................................................................ 85**

**V. REVERSE STOCK SPLIT ................................................................... 87**

**A.  THE STOCK SPLIT CLASS HAD A COGNIZABLE PROPERTY INTEREST IN THE RIGHT TO PREVENT DEFENDANT'S FURTHER DILUTION OF THEIR SHARES OF AIG COMMON STOCK. ............................ 87**

1.   Both Delaware Law and the *Walker* Consent Order Establish the Stock Split Class's Property Interest in Preventing Dilution of Their Shares. ............... 87

x

2.   The *Walker* Representations and Consent Order Also Establish Plaintiffs' Property Interest in the Right to Prevent Further Dilution. ................. 88

3.   Delaware's Doctrine of Independent Legal Significance Does Not Undermine Plaintiffs' Property Interests. ................................................................ 90

**B.  THE RSS CONSTITUTED A TAKING OF PLAINTIFFS' PROPERTY INTERESTS. ................................................................................................ 91**

1.   Defendant Structured the Reverse Stock Split to Monetize Its Preferred Stock Without A Class Vote of Common Shareholders. ...................................... 91

2.   AIG's Delisting Threat Cannot Explain The Decision To Structure The Reverse Stock Split To Reduce Only Issued, But Not Authorized, Shares By A Ratio Of 20:1. ................................................................................................ 93

3.   Defendant's Control Of AIG During 2009-2011 Is Independently Sufficient To Characterize The RSS As A Government Act Requiring The Payment Of Just Compensation.  *See* PCOL § 14.9. ............................................ 94

**C.  DEFENDANT'S RSS CONSTITUTED AN ILLEGAL EXACTION. ................. 96**

**D.  PLAINTIFFS HAVE ESTABLISHED DAMAGES RESULTING FROM THE REVERSE STOCK SPLIT .............................................................................. 97**

# TABLE OF AUTHORITIES

## Cases

*A&D Auto Sales*,
  748 F.3d at 1151 ............................................................................................... 59, 71
*ABF Freight Sys., Inc. v. NLRB*,
  510 U.S. 317 (1994)................................................................................................ 30
*Accord Auto Club Ins. Ass'n v. United States*,
  103 Fed. Cl. 268 (Fed. Cl. 2012) .......................................................................... 16
*Adlerstein v. Wertheimer*,
  2002 WL 205684 (Del. Ch. Jan. 25, 2002)........................................................... 12
*Aircraft Associates & Manufacturing Co. v. United States*,
  357 F.2d 373 (Ct. Cl. 1966).................................................................................... 54
*Aksman v. Xiongwei Ju*,
  21 A.D.3d 260 (N.Y. App. Div. 2005) ................................................................... 60
*Ala. Dep't of Revenue v. CSX Transp., Inc.*,
  135 S. Ct. 1136 (2015)............................................................................................ 25
*Albrecht v. United States*,
  329 U.S. 599 (1947)................................................................................................ 66
*Allen v. El Paso Pipeline GP Co.*,
  90 A.3d 1097 (Del. Ch. 2014)................................................................................. 11
*Almota Farmers Elevator & Warehouse Co. v. United States*,
  409 U.S. 470 at 473 (1973)..................................................................................... 66
*American Airlines, Inc. v. United States*,
  551 F.3d 1294 (Fed. Cir. 2008).......................................................................... 45, 48
*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
  884 F.2d 69 (2d Cir. 1989)..................................................................................... 61
*ATP Tour, Inc. v. Deutscher Tennis Bund*,
  91 A.3d 554 (Del. 2014) ........................................................................................ 89
*Bakerman v. Sidney Frank Importing Co.*,
  2006 WL 3927242 (Del. Ch. Oct. 16, 2006) ........................................................ 13
*Bassett, N.M. LLC v. United States*,
  55 Fed. Cl. 63 (2002) ............................................................................................. 83
*Bayer AG v. Housey Pharms., Inc.*,
  340 F.3d 1367 (Fed. Cir. 2003).............................................................................. 18
*Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*,
  474 U.S. 361 (1986)................................................................................................ 28

*Bd. of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972) ................................................................................ 88
*Benham v. eCommission Solutions, LLC,*
    118 A.D.3d 605 (N.Y. App. Div. 2014) ................................................. 65
*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ................................................................................ 95
*Bowman v. United States,*
    35 Fed. Cl. 397 (1996) ............................................................................ 16
*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
    531 U.S. 288 (2001) ................................................................................ 94
*Brody v. Zaucha,*
    697 A.2d 749 (Del. 1997) ........................................................................ 89
*California National Bank v. Kennedy,*
    167 U.S. 362 (1897) ................................................................................ 23
*Canada S. Oils, Ltd. v. Manabi Exploration Co.,*
    96 A.2d 810 (Del. Ch. 1953) ................................................................... 12
*Cargill, Inc. v. JWH Special Circumstances LLC,*
    959 A.2d 1096 (Del. Ch. 2008) ............................................................... 13
*Carsanaro v. Bloodhound Tech., Inc.,*
    65 A.3d 618 (Del. Ch. 2013) ................................................................... 86
*Casitas Mun. Water Dist. v. United States,*
    708 F.3d 1340 (Fed. Cir. 2013) ............................................................... 71
*CCA Assocs. v. United States,*
    667 F.3d 1239 (Fed. Cir. 2011) ............................................................... 80
*Certain Underwriters at Lloyd's v. Sinkovich,*
    232 F.3d 200 (4th Cir. 2000) ................................................................... 81
*CFTC v. Schor,*
    478 U.S. 833 (1986) ........................................................................... 30, 43
*Chevron USA, Inc. v. NRDC,*
    467 U.S. 837(1984) ................................................................................. 29
*Chi. & Nw. Ry. Co. v. United States,*
    104 U.S. 680 (1881) ................................................................................ 46
*Chris Berg, Inc. v. United States,*
    426 F.2d 314 (Ct. Cl. 1970) ............................................................... 48, 50
*Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320 (2d Cir. 1997) ................... 60
*Cienega Gardens v. United States,*
    503 F.3d 1266 (Fed. Cir. 2007) ........................................................... 71, 73
*Citron v. Fairchild Camera & Instrument Corp.,*
    569 A.2d 53 (Del. 1989) .......................................................................... 16

*Clapp v. United States,*
  117 F. Supp. 576 (Ct. Cl. 1954) ................................................................... 70

*Clearview Apartment Assocs., LP v. Ocasio,* 798 N.Y.S.2d 343 (N.Y. Civ. Ct. 2004) *aff'd,* 844
  N.Y.S.2d 558 (N.Y. App. Div. 2007) ............................................................ 84

*Cohen v. Lehman Bros. Bank,*
  273 F. Supp. 2d 524 (S.D.N.Y. 2003) ......................................................... 61

*Collins v. United States,*
  67 F.3d 284 (Fed. Cir. 1995) ....................................................................... 17

*Commc'ns Workers of Am. v. Beck,*
  487 U.S. 735 (1988) ..................................................................................... 32

*Condec Corp. v. Lunkenheimer Co.,*
  230 A.2d 769 (1967) ............................................................................. 11, 12

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ..................................................................................... 28

*Cuyahoga Metro. Hous. Auth. v. United States,*
  60 Fed. Cl. 481 (2004) ................................................................................. 81

*Cyprus Amax Coal Co. v. United States,*
  205 F.3d 1369 (Fed. Cir. 2000) ................................................................... 17

*Dole Food Co. v. Patrickson,*
  538 U.S. 468 (2003) ..................................................................................... 52

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,* 132 S. Ct. 1204, (2012) ........................ 30

*Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.,*
  68 A.3d 197 (Del. Ch. 2013) ....................................................................... 15

*EEOC v. Waffle House, Inc.,*
  534 U.S. 279 (2002) ..................................................................................... 83

*Eisenberg v. Chi. Milwaukee Corp.,*
  537 A.2d 1051 (Del. Ch. 1987) .................................................................... 97

*Eurodif S.A. v. United States,*
  423 F.3d 1275 (Fed. Cir. 2005) ................................................................... 29

*Eversharp, Inc. v. United States,*
  125 F. Supp. 244 (Ct. Cl. 1954) .................................................................. 16

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.,*
  715 N.E. 2d 1050 (N.Y. 1999) ..................................................................... 63

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..................................................................................... 43

*Feeley v. NHAOCG, LLC,*
  62 A.3d 649 (Del. Ch. 2012) ....................................................................... 13

*Feldman v. Cutaia,*
  956 A.2d 644 (Del. Ch. 2007) ..................................................................... 14

*Feldman v. Cutaia,*

951 A.2d 727 (Del. 2008) ……………………………………………………………………...9

*Finn v. United States*,
428 F. 2d 828 (Ct. Cl. 1970) ................................................................................ 70

*Fireman v. United States*,
44 Fed. Cl. 528 (1999) ......................................................................................... 45

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ........................................................................... 17

*Fuentes v. Shevin*,
407 U.S. 67 (1972) ................................................................................................ 97

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009) ..................................................................................... 97

*Gatz v. Ponsoldt*,
925 A.2d 1265 (Del. 2007) ................................................... 10, 12, 13, 14, 86

*Gentile v. Rossette*,
906 A.2d 91 (Del. 2006) ..................................................... 10, 12, 13, 14

*Gilbert v. El Paso Co.*,
490 A.2d 1050 (Del. 1984) ........................................................................... 15, 65

*Gilmartin v. Adobe Res. Corp.*,
1992 WL 71510 (Del. Ch. April 6, 1992) .............................................................. 97

*GMO Niehaus & Co. v. United States*,
153 F. Supp. 428 (Ct. Cl. 1957) .......................................................................... 16

*Gomez v. Bicknell*,
302 A.D.2d 107 (N.Y. App. Div. 2002) .............................................................. 65

*Hamlet v. United States*,
873 F.2d 1414 (Fed. Cir. 1989) ........................................................................... 17

*Henderson Cnty. Drainage Dist. No. 3 v. United States*,
53 Fed. Cl. 48 (2002) ........................................................................................... 53

*In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014) ............. 14, 15

*In re Primedia Inc. Deriv. Litig.*,
910 A.2d 248 (Del. Ch. 2006) ....................................................................... 13, 15

*In re Pure Res., Inc., S'holders Litig.*,
808 A.2d 421 (Del. Ch. 2002) .............................................................................. 87

*In re USACafes, L.P. Litig.*,
600 A.2d 43 (Del. Ch. 1991) ............................................................................... 13

*Ingrum v. United States*,
560 F.3d 1311 (Fed. Cir. 2009) ........................................................................... 60

*Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc.*, 869 F.2d 96 (2d Cir. 1989) ................................ 60

*James Shewan & Sons v. United States*,
73 Ct. Cl. 49 (1931) ............................................................................................. 58

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951) ............................................................................................ 32
*Kahn v. Lynch Commc'n Sys., Inc.*,
  638 A.2d 1110 (Del. 1994) ................................................................................. 14
*Kahn v. M&F Worldwide Corp.*,
  88 A.3d 635 (Del. 2014) ..................................................................................... 15
*Keller v. City of Fremont*,
  719 F.3d 931 (8th Cir. 2013) ................................................................................ 9
*Klaassen v. Allegro Dev. Corp.*,
  106 A.3d 1035 (Del. 2014) ................................................................................. 97
*Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586 (2013) ............................ 57, 58, 69
*Kreiss v. McCown DeLeeuw & Co.*,
  37 F. Supp. 2d 294 (S.D.N.Y. 1999) ............................................................... 61, 62
*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ...................................... 45
*Londoner v. City & Cnty. of Denver*,
  210 U.S. 373 (1908) ............................................................................................ 32
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................. 9
*Malik v. Nihar*,
  856 N.Y.S.2d 499 (N.Y. App. Div. 2008) ........................................................... 84
*Mallow v. United States*,
  161 Ct. Cl. 446 (1963) ........................................................................................ 16
*Marvin M. Brandt Revocable Trust v. United States*,
  134 S. Ct. 1257 (2014) ........................................................................................ 43
*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ....................................................................................... 31, 32
*Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1 (1978) ................................ 32
*MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118 (Del. 2003) ....................... 89
*Murphy v. United States*,
  69 Fed. Cl. 593 (2006) ........................................................................................ 53
*Nat'l Austl. Bank v. United States*,
  452 F.3d 1321 (Fed. Cir. 2006) ........................................................................... 84
*Nat'l Bd. of YMCA v. United States*,
  395 U.S. 85 (1969) .............................................................................................. 92
*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
  861 F. Supp. 2d 344 (S.D.N.Y. 2012) ................................................................. 62
*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
  513 U.S. 251 (1995) ............................................................................................ 30
*Nikolouzakis v. Exinda Corp.*,
  2012 WL 3239853 (D. Del. Aug. 7, 2012) .......................................................... 10

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009)................................................................... 30

*Norfolk Dredging Co. v. United States*,
    375 F.3d 1106 (Fed. Cir. 2004)................................................................... 17

*Norman v. United States*,
    429 F.3d 1081 (Fed. Cir. 2005)................................................................... 17

*North Starr Steel Co. v. United States*,
    477 F.3d 1324 (Fed. Cir. 2007)................................................................... 61

*O'Bryan v. United States*,
    93 Fed. Cl. 57 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011) ............... 16

*Olson v. United States*,
    292 U.S. 246 (1934)................................................................................... 72

*OTK Assocs., LLC v. Friedman*,
    85 A.3d 696 (Del. Ch. 2014)...................................................................... 14

*Packer v. Yampol*,
    1986 WL 4748 (Del. Ch. Apr. 18, 1986) .................................................. 11

*Panhandle Eastern Pipe Line Co. v. United States*,
    408 F.2d 690 (Ct. Cl. 1969) ...................................................................... 79

*Paramount Commc'ns Inc. v. QVC Network Inc.*,
    637 A.2d 34 (Del. 1993) ............................................................................ 15

*Petrick v. United States*,
    12 Ct. Cl. 700 (1987) ................................................................................ 55

*Pew Forest Prods. v. United States*,
    105 Fed. Cl. 59 (2012) .............................................................................. 53

*Phillips v. Insituform of N. Am., Inc.*,
    1987 WL 16285 (Del. Ch. Aug. 27, 1987) ............................................... 12

*Plechner v. Widener College, Inc.*,
    569 F.2d 1250 (3d Cir. 1977) .................................................................... 53

*Principal Life Insurance v. United States*,
    76 Fed. Cl. 326 (2007) .............................................................................. 79

*Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.*,
    238 F.3d 897 (7th Cir. 2001) ............................................................... 53, 57

*Prospect St. Ventures I, LLC v. Eclipsys Solutions Corp.*,
    23 A.D.3d 213 (N.Y. App. Div. 2005) ..................................................... 61

*Rasmussen v. United States*,
    543 F.2d 134 (Ct. Cl. 1976) ...................................................................... 56

*Red Lion Broadcasting Co. v. FCC*,
    395 U.S. 367 (1969)................................................................................... 43

*Reis v. Hazelett Strip-Casting Corp.*,
    28 A.3d 442 (Del. Ch. 2011)...................................................................... 87

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir. 1984), *cert. denied* 469 U.S. 828 (1984) ...................................................................................................................................... 61

*Rhodes v. Silkroad Equity, LLC*,
2007 WL 2058736 (Del. Ch. July 11, 2007)............................................................... 10

*Richbell Info. Sys., Inc. v. Jupiter Partners, L.P.*,
309 A.D.2d 288 (N.Y. App. Div. 2003) ...................................................................... 61

*Robertson v. Frank Brothers Co.*,
132 U.S. 17 (1889)........................................................................................................ 58

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)...................................................................................................... 88

*S. Pac. Co. v. Bogert*,
250 U.S. 483 (1919)...................................................................................................... 13

*Scheck v. Francis*,
26 N.Y.2d 466 (1970) ................................................................................................... 62

*Schultz v. U.S. Navy*,
810 F.2d 1133 (Fed. Cir. 1987).................................................................................... 53

*Shamrock Holdings, Inc. v. Arenson*,
456 F. Supp. 2d 599 (D. Del. 2006)............................................................................. 10

*Shann v. Dunk*,
84 F.3d 73 (2d Cir. 1996) ............................................................................................. 61

*Sinclair v. United States*,
66 Fed. Cl. 487 (2005) ............................................................................................ 15, 53

*Singer v. Xipto, Inc.*,
852 F. Supp. 2d 416 (S.D.N.Y. 2012)........................................................................... 62

*Slamow v. Del Col*,
79 N.Y.2d 1016 (1992) ................................................................................................. 60

*Sprague Steamship Co. v. United States*,
172 F.Supp. 674 (Ct. Cl. 1959)............................................................................... 47, 70

*Starr v. United States*,
106 Fed. Cl. 50 (2012) ........................................................................................... passim

*Stroud v. Grace*,
606 A.2d 75 (Del. 1992) ............................................................................................... 89

*Suwannee S.S. Co. v. United States*,
279 F.2d 874 (Ct. Cl. 1960) ......................................................................................... 16

*Sys. Tech. Assocs., Inc. v. United States*,
699 F.2d 1383 (Fed. Cir. 1983).................................................................................... 53

*Taylor v. Hayes*,
418 U.S. 488 (1974)...................................................................................................... 31

*Teen–Ed, Inc. v. Kimball Int'l, Inc.*,
620 F.2d 399 (3d Cir. 1980).......................................................................................... 81

*Terban v. Dep't of Energy*,
  216 F.3d 1021 (Fed. Cir. 2000)......................................................................53

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)........................................................................................30

*Todd Constr., L.P. v. United States*,
  656 F.3d 1306 (Fed. Cir. 2011)......................................................................49

*Tulare Lake Basin Water Storage Dist. v. United States*,
  61 Fed. Cl. 624 (2004)....................................................................................85

*Turney v. United States*,
  115 F. Supp. 457 (Ct. Cl. 1953)......................................................................58

*Uni-Marts, Inc. v. Stein*,
  1996 WL 466961 (Del. Ch. Aug. 12, 1996) ..................................................90

*United States v. Bd. of Gov. of Sheffield, Ala.*,
  435 U.S. 110 (1978)........................................................................................43

*United States v. Cors*,
  337 U.S. 325 (1949)........................................................................................72

*United States v. Miller*,
  317 U.S. 369 (1943)........................................................................................72

*United States v. Va. Elec. & Power Co.*,
  365 U.S. 624 (1961)........................................................................................72

*Urban Plumbing & Heating Co. v. United States*,
  408 F.2d 382 (Ct. Cl. 1969) .....................................................................54, 58

*Volunteer Fleet v. United States*,
  282 U.S. 481 (1931)........................................................................................16

*Wallace v. Wood*,
  752 A.2d 1175 (Del. Ch. 1999).......................................................................13

*Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*,
  583 A.2d 962 (Del. Ch. 1989).........................................................................87

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001)........................................................................................28

*Winston v. Mediafare Entm't Corp.*,
  777 F.2d 78 (2d Cir. 1985)..............................................................................61

*Wolff v. McDonnell*,
  418 U.S. 539 (1974)........................................................................................31

*Yuba Natural Res., Inc. v. United States*,
  904 F.2d 1577 (Fed. Cir. 1990).......................................................................66

## Statutes

12 U.S.C. § 24.................................................................................................22

12 U.S.C. § 248(k) ..........................................................................................42

12 U.S.C. § 341 ................................................................................................ 22

12 U.S.C. § 343 (2006) ............................................................... 17, 29, 35, 36

12 U.S.C. §§ 343, 357 .............................................................................. 28, 32

18 Del. Code § 5001 ....................................................................................... 14

8 Del. C. § 242(b)(2) ...................................................................................... 86

8 Del. Code § 203(c)(4) .................................................................................. 14

## Regulations

12 C.F.R. § 201.4 ...................................................................................... 20, 26

12 C.F.R. § 7.1006 ......................................................................................... 24

## Other Authorities

7A Fed. Proc., L. Ed. § 19:170 (2015) ........................................................... 16

H.R. Doc. No. 72-360, at 3 (1932) ................................................................. 27

H.R. Rep. No. 72-1760 (1932) .................................................................. 27, 49

H.R. Rep. No. 72-1777, at 7 (1932) ............................................................... 28

OCC Inter. Ltr. No. 992,
    2004 WL 1563358 (May 10, 2004) ......................................................... 24

OCC Inter. Ltr.,
    1992 WL 486905 (July 15, 1992) ............................................................ 24

Reciprocity Act, 28 U.S.C. § 2502 ................................................................ 16

## PRELIMINARY STATEMENT

At bottom this case is not about AIG, or even about the 2008-2009 "bailouts". At bottom this case is about whether an agency may, without any limit or review, use the discretionary power Congress has given it to force citizens dependent on that discretion to surrender property Congress has not given the agency authority to demand.

Despite the many contested issues at trial, the central issue in this case is: was Defendant authorized to demand 79.9% of the AIG shareholders' equity and voting control as "additional compensation" for a 13(3) loan?[1] The answer to that question is critical in itself. It also affects the answer to every important issue in this case.

Defendant's lack of authorization to demand equity and voting control as "additional compensation" for a 13(3) loan is clear from the plain language of Section 13(3) (PCOL § 4.1), this Court's prior rulings (PCOL § 4.1.1), and Defendant's own statements (and consistent actions) prior to this litigation (PCOL §§ 4.2, 4.6; PFOF §§ 23.0, 25.3.2). Moreover, even if it were assumed that Defendant were authorized under some circumstances to acquire equity and voting control as compensation for a 13(3) loan, it was not authorized to do so for a punitive political purpose, or in a discriminatory manner, without any justifying investigation, analysis, or findings (PCOL §§ 6.0-7.0; PFOF §§ 26.0-27.0, 29.0, 31.0-32.0).

Defendant's unauthorized demand for, and receipt of, Plaintiffs' equity and voting control as "additional compensation" for a 13(3) loan represents an Illegal Exaction because Defendant has exacted property it was not authorized to demand in return for the doing of an act committed to

---

[1] Defendant asserts that it demanded and received 79.9% of the AIG shareholders' equity and voting control as "additional compensation" for its loan to AIG. PTX 339 at 7; PTX 449 at 50; PTX 564 at 190-91; PTX 587 at 54 n.1; *see also* PFOF § 27.7. (As used herein, Plaintiffs' Proposed Findings of Fact, Plaintiffs' Proposed Conclusions of Law, Defendant's Proposed Findings of Fact, and Defendant's Proposed Conclusions of Law are cited as PFOF, PCOL, DFOF, and DCOL respectively. Cites to "Tr." are cites to the trial transcript.)

Defendant's discretion (PCOL §§ 2.1-2.4), an act which, it is worth noting, the Government had determined was in the public interest (PFOF § 9.0).

Alternatively, Defendant's acquisition is an uncompensated Taking because Defendant took 79.9% of Plaintiffs' equity and voting control without just compensation (PCOL §§ 9.0-12.0, 18.0; PFOF § 37.6). Defendant concedes that the $500,000 it paid as the "purchase price" of the preferred was not just compensation. JX 185 at 2; DFOF at 191 n.40. Defendant's argument that the preferred stock was justified as "additional compensation" for the 13(3) loan fails for three independent reasons: (a) Defendant was not authorized to demand the preferred stock as compensation for a 13(3) loan, (b) Defendant has admitted that the purpose of taking Plaintiffs' equity was not to compensate Defendant, but simply to deprive Plaintiffs of the value of the equity (PTX 4002), and (c) Defendant was already fully compensated for its "fully secured" (PFOF § 21.1(b)-(m)), "over collateralized" (PFOF § 21.1(a)) loan by its unprecedentedly high interest rate and fees (PTX 3228 at 1; *infra* § II.B.7).

Defendant's primary defense is that because AIG agreed to the exaction/taking, the transfer of equity and voting control was "voluntary", and Plaintiffs cannot recover. Numerous cases provide recoveries for illegal exactions to which the plaintiff agreed in order to secure government agency actions (PCOL § 8.2). Indeed, in every case where a citizen has surrendered property that the Government is not authorized to demand as compensation for Government action the citizen needed, the citizen by definition agreed to do so to obtain the benefit of the Government action. Because by definition the desired government action is more valuable than what the citizen surrenders, any other rule would enable agencies to ignore Congressional limits on their authority and leave citizens without a remedy for illegal conduct (PCOL § 8.4).

Defendant's voluntary agreement defense fails for three additional independent reasons.

First, the agreement by AIG's Board does not bind Plaintiffs, particularly where, as here, the exaction/taking was expressly designed to take away Plaintiffs' rights (PFOF §§ 17.6-17.9, 26.2-26.3, 28.0; *see infra* § II.B.4), where AIG was acting to protect the interests of stakeholders other than shareholders (PFOF §§ 20.1.1, 20.2(b)), and where Defendant with the Board's concurrence intentionally prevented Plaintiffs from having an opportunity to vote on the exaction/taking (PFOF §§ 17.7-17.8, 28.0).

Second, it is now undisputed that the AIG Board had no realistic alternative to agreeing to Defendant's demand for equity and voting control (PFOF § 20.0).  Defendant materially and wrongfully contributed to AIG's duress, including by using its monopoly power to improperly and discriminatorily demand equity and voting control as a condition of a 13(3) loan (PFOF §§ 22.0-23.0, 32.0), by discouraging alternative sources of liquidity (PFOF § 11.0), and by initially offering credit in exchange for non-voting warrants and then threatening to call demand notes and force AIG into bankruptcy unless the Board agreed to substitute voting preferred stock (PFOF §§ 12.0, 16.0, 19.0-20.0).  Such conduct was "wrongful", violated "notions of fair dealing", and constituted the use of "a temporary monopoly power . . . to obtain a benefit to which it is not entitled" (PCOL §§ 12.7, 12.9.4).

Third, as the plain language of the Term Sheet makes clear (PFOF § 14.3), and as the general counsels of both the Board of Governors and FRBNY admitted (PFOF §§ 14.0, 14.0(a)), there was no legal obligation to provide equity or voting control to Defendant until the September 22 Credit Agreement – at which time Defendant was firmly in control of AIG (PFOF § 15.0).

Defendant's argument that Plaintiffs do not have legally cognizable rights in their equity and voting control or standing to recover for the harm done them is contrary to settled Delaware law (PCOL §§ 10.0), and this Court's prior rulings (PCOL §§ 10.4.3, 10.6-10.7).  Plaintiffs also

have standing because Defendant's exaction/taking of the Series C Preferred was directly targeted at Plaintiffs and expressly designed to take from Plaintiffs their voting rights and the ability to benefit from AIG's recovery (PFOF §§ 17.6-17.9, 26.2, 26.3, 28.0; *see also infra* §§ I.A.1, II.B.4).

It is now undisputed that the Series C Preferred stock that Defendant exacted/took had a fair market value of at least $23 billion to $58.7 billion depending on when the exaction/taking is found to have occurred (PFOF § 37.4; *infra* § IV). However, Defendant argues that to the extent the value of the preferred stock was based on the liquidity provided AIG in the Credit Agreement, Defendant was entitled to exact/take such value without Congressional authorization. With respect to Plaintiffs' Illegal Exaction claim there is no precedential or policy support for such an argument (PCOL § 19.5; *infra* § IV.B.1), and Defendant provides none. With respect to Plaintiffs' Takings claim, there is no precedential or policy support (PCOL § 19.1), and the cases Defendant relies on are wholly inapposite (*see infra* § IV.B.2).

Moreover, since Defendant was not entitled to demand and receive the Series C Preferred as consideration for a 13(3) loan, Defendant cannot take that consideration indirectly by offsetting its value against what the government illegally exacted/took (*infra* § VI.B.1).

After taking control of AIG in September 2008, Defendant used that control to engineer the reverse stock split of AIG's common stock in June 2009, thereby taking from Plaintiffs their valuable right to block further dilution of their equity interests (*infra* § V.B). As a result of the reverse stock split, Defendant was later able to exchange its less valuable preferred stock for more valuable common stock (*infra* § V.E).

Plaintiffs seek over $40 billion in compensation for the damages they suffered as a result of the two takings/exactions: $35.4 billion for the Credit Agreement Class and $4.67 billion for the Stock Split Class (*infra* §§ IV.A, V.E). In addition, Plaintiffs seek pre-judgment interest to restore

them to the position they would have been in if they had been paid on the dates of the takings.

## STATEMENT OF FACTS

The factual record is set out in some detail in PFOF and will not be repeated here.  It may be useful, however, to note a few significant areas of agreement.

With the collapse of the financial markets following Lehman Brothers' bankruptcy filing on September 15, 2008, AIG's only source of needed liquidity was Defendant (DFOF § I.C.5, ¶ 56).  As a condition of supplying that liquidity Defendant demanded 79.9% of AIG's shareholders' equity and voting control (*id.* ¶ 44).  This resulted in "a nearly 80 percent dilution in the AIG common shareholders' overall ownership of the company" (*id.* ¶ 373).  The terms of the loan to AIG were non-negotiable and Geithner knew that "AIG was facing a deadline" (*id.* ¶¶ 390-91).  Defendant understood that its authority to take equity was limited.  "FRBNY thought there was no legal authority for FRBNY to provide equity funding because it was not incidental to FRBNY's lending powers" (*id.* ¶ 196).  "Mr. Baxter understood that Mr. Alvarez did not view the terms of the Board of Governors' loan authorization as permitting FRBNY to own AIG's equity, if that equity came with a majority voting interest" (*id.* ¶ 232).

The Board of Governors ("BOG") approved a loan based on a term sheet provided by FRBNY that stated that the form of equity would be warrants, *id.* ¶¶ 60, 256, and that it was "not intended to be legally binding", *id.* ¶ 94.

FRBNY was not free to change the terms approved by the BOG.  "The Board of Governors had to approve the proposed loan before it could be offered to AIG."  *Id.* ¶ 60.  "President Geithner believed he needed the support of the Board of Governors (legally) and Secretary Paulson (politically); consequently, President Geithner needed to make sure the rescue conditions were consistent with what they had agreed to, and 'did not believe there was any prospect that they would be open to modifying those terms in any way.'"  *Id.* ¶ 390.  "Cutting off or imposing more

onerous terms on Morgan Stanley's expanded PDCF borrowing in September 2008 would have had significant policy implications and **required a revised authorization from the Board of Governors to change the PDCF's existing terms**." *Id.* ¶ 337 (emphasis added).  Similarly, any revised terms for the AIG loan would have required the "formal authorization by at least five governors – a unanimous vote in 2008, when the Federal Reserve had only five governors." *Id.* ¶¶ 117, 388.  However, FRBNY never went back to the Board of Governors to seek approval for the revised terms of the loan, which not only included a change in the form of equity from warrants to preferred stock but also involved FRBNY's creation of a Trust to own the preferred stock.

When a draft of the Credit Agreement was first presented to AIG's board on September 21, 2008, Defendant had unilaterally changed the form of equity from warrants to preferred stock. *Id.* ¶¶ 231-52.  Unlike warrants, preferred stock had voting rights and did not require payment of a strike price. *Id.* ¶¶ 219-22, ¶ 113 n.12.

"At the time the Credit Agreement was entered into, AIG did not have enough  authorized common shares with a low enough par value to permit the full conversion of the Trust's preferred shares into common shares.  If the Series C preferred stock were to be converted to common shares, AIG's charter would have to be amended (1) to increase the number of authorized but unissued common shares, and (2) to reduce the par value of AIG's common stock from $2.50 to a value suitable for conversion.  Under Delaware law, both of these amendments would require a separate class vote of common shareholders."  DFOF ¶ 435.  "The Credit Agreement contemplated that AIG would call a shareholder meeting to  vote on the amendments necessary to facilitate the conversion of the Trust's shares." *Id.* ¶ 436.

Defendant decided not to include the proposal necessary to convert the Series C Preferred into common stock in AIG's 2009 proxy because "the outcome of the vote was uncertain" (*id.* ¶

448).  The RSS ultimately rendered the shareholder vote unnecessary by creating "sufficient

authorized common shares" for it to exchange its preferred shares for AIG Common Stock.  *Id.* ¶

438.[2]

There are of course areas of disagreement.  Several legal disagreements result from

Defendant's failure to address this Court's prior holdings, including, for example, that "the 'only

consideration for a loan prescribed by' Section 13(3) 'is an interest rate subject to the determination

of the Board of Governors'" (*Starr v. United States*, 106 Fed. Cl. 50, 85 (2012); 107 Fed. Cl. 374,

378 (2012)), that Plaintiffs have direct claims (106 Fed. Cl. at 61-65; 107 Fed. Cl. at 377; 111 Fed.

Cl. at 481-83; 112 Fed. Cl. at 604-06); that Plaintiffs have a property interest in their equity and

voting rights (106 Fed. Cl. at 71-75; 107 Fed. Cl. at 379), that Defendant has Fifth Amendment

duties to  Plaintiffs independent of its duties as a controlling party (106 Fed. Cl. at 65), that

Plaintiffs' illegal exaction claims do not require a specific money mandating statute (107 Fed. Cl.

at 378), and that the Stock Split Class had a property interest in the right to prevent further dilution

(106 Fed. Cl. at 73-74).

Several factual disagreements result from Defendant's effort to create a version of history

for this case that is at odds with its contemporaneous statements and documents, including for

example that it lacked authority to take or hold equity as compensation for a 13(3) loan (PFOF §§

23.0-24.0); that the loan was "fully secured" (*id.* § 21.1(b)-(m)), and in fact was "over

collateralized" (*id.* § 21.1(a)) and Defendant "did not run the risk of losing money" (*id.* § 21.1(a));

---

[2] Defendant misstates Plaintiffs' Memorandum in Support of Request to Keep the Record Open
when it asserts that "Starr has 'not yet identified any document' supporting its claim that the
reverse stock split was 'proposed . . . to avoid a class vote of common shareholders'".  DFOF ¶
445.  Plaintiffs' filing actually states only that: "Plaintiffs have not yet identified any document
showing when it was **first proposed** to use the reverse stock split to avoid a class vote of common
shareholders."  Pls.' Mem. in Support of Request (Nov. 24, 2014) (Dkt. 373) at 8 (emphasis
added).  Indeed, Plaintiffs have presented significant evidence that the reverse stock split was
proposed to avoid a class vote of common shareholders.  *See* PFOF § 36.0; *see also infra* § V.B.

that Defendant concluded that it "could not let AIG fail" (Paulson: Tr. 1207:2-9; PFOF §§ 9.1-9.2);

that despite the pressures of the financial crisis "had Lehman not filed for bankruptcy, private

sector financing for AIG could have been secured" (PFOF § 6.4); that the exaction/taking of

Plaintiffs' equity was expressly intended to "punish" Plaintiffs (PFOF §§ 22.0, 26.0; *see infra* §

II.B.4); that "the Trustees should not care about the minority shareholders" (PTX 3286 at 1; PFOF

§ 25.5.3); and that the value of the 79.9% equity interest exacted/taken by Defendant was $23

billion on September 16, 2008 (PTX 375 at 3; *infra* § IV.A.4) and $38.7 billion on the day after the

Credit Agreement was signed (DX 2747; *infra* § IV.A.3).

# I. <u>STANDING</u>

### A.   DEFENDANT'S ARGUMENT THAT PLAINTIFFS HAVE NO LEGALLY COGNIZABLE PROPERTY INTEREST IN THE EQUITY INTEREST AND VOTING CONTROL ASSOCIATED WITH THEIR STOCK IS CONTRARY TO SETTLED DELAWARE LAW AND FOUR DECISIONS BY THIS COURT.

#### 1.   Plaintiffs Were Specifically Targeted by Defendant.

Defendant's exaction/taking of equity was expressly designed to punish Plaintiffs (*see infra*

§ II.B.4).  Similarly, Defendant's exaction/taking of Plaintiffs' voting control was expressly

designed to deprive Plaintiffs of votes which would have enabled them to prevent the issuance of

AIG common stock to Defendant.[3]  As a general matter, "standing depends considerably upon

whether the plaintiff is himself an object of the action (or foregone action) at issue.  If he is, there is

---

[3] *See, e.g.*, PTX 349 at 1 (Treasury counsel Stephen Albrecht: "We originally pushed for voting rights to help fend off the shareholder attempts to 'reclaim' the company."); PTX 3249 at 1 (Huebner: "I would give a lot to find a way to take the stock before the shareholder war machine moves."); PTX 154 at 1 (Huebner: "I don't see how we can leave this asset at risk of minority shareholder takeover."); PTX 3278 at 1 ("We think voting control from day 1 is extremely important."); PTX 98-U at 4 ("Warrant confers no governance rights or vote – a third party could try to accumulate existing common and hold up the vote to authorize additional common, perhaps demanding compensation or concessions in exchange for the vote."); PTX 3277 at 1 ("we want to make sure that the CA leaves the company no choice but to issue the equity, even (especially) in the face of concerted efforts to prevent that issuance."); *see generally* PFOF §§ 17.6-17.8, 28.1.

ordinarily little question that the action or inaction has caused him injury". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).  "When government action is challenged by a party who is a target or object of that action there is ordinarily little question that the action has caused him injury." *Keller v. City of Fremont*, 719 F.3d 931, 947-48 (8th Cir. 2013) (quotation and ellipses omitted).

### 2.   This Court Has Ruled on Four Separate Occasions that Plaintiffs Have Standing Based on Cognizable Property Rights (*see Starr*, 106 Fed. Cl. at 62; *Starr*, 107 Fed. Cl. at 377; *Starr*, 111 Fed. Cl. at 481; *Starr*, 112 Fed. Cl. at 604).

As this Court previously held in denying Defendant's motion to dismiss, the "economic and voting power embodied" in a shareholder's equity constitutes protected property under the Fifth Amendment.  *Starr*, 106 Fed. Cl. at 74.  Ignoring this ruling, Defendant argues that Plaintiffs held the same shares of AIG common stock "before and after" the Taking, (DCOL at 2-3), and "that a shareholder does not possess the right to exclude others from shares he or she does not own" (*id.* at 66).  Defendant's framework is simply wrong.  Plaintiffs' "right to recover is not premised on the *physical* expropriation of a shareholder's stock; instead, it is 'premised on the theory that the corporation, by issuing additional stock for inadequate consideration, made the complaining stockholder's investment less valuable.'"  *Starr*, 106 Fed. Cl. at 74 (quoting *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008)).  Therefore, the question whether Plaintiffs held the same shares of stock before and after September 22 is legally irrelevant.  Whether Defendant seized 79.9% of Plaintiffs' stock certificates or took enough additional stock to dilute Plaintiffs by 79.9%, the effect is the same.

Defendant's unlawful acquisition of 79.9% of the economic value and voting power represented by Plaintiffs' equity "uniquely and individually" harmed Plaintiffs' protected property interests.  *Starr*, 106 Fed. Cl. at 64-65; *Starr*, 107 Fed. Cl. at 377; *Starr*, 111 Fed. Cl. at 481; *Starr*, 112 Fed. Cl. at 604.  It was the Plaintiffs "'who suffered the alleged harm'" and "who would

receive the benefit from any recovery", *Starr*, 112 Fed. Cl. at 604 (quoting *Tooley v. Donaldson*,

845 A.2d 1031, 1033 (Del. 2004)), because the damages are measured by the harm to Plaintiffs'

equity and voting interests.

### 3.   This Court's Rulings Are Based on Settled Delaware Law

In recognition of the property interest that shareholders have in the economic and voting

power of their shares, the Delaware Supreme Court has held that shareholders have a cause of

action where, as here, a controlling party extracts or expropriates shareholder equity and voting

control and redistributes such equity and voting control to itself.

> "In *Tri-Star*, this Court articulated the harm to the minority in terms of a 'dilution'
> of the economic value and voting power of the stock held by the minority. In this
> case, we adopt a more blunt characterization – extraction or expropriation –
> because that terminology describes more accurately the real-world impact of the
> transaction upon the shareholder value and voting power . . . and the uniqueness
> of the resulting harm to the minority shareholders individually".   *Gentile v.*
> *Rossette*, 906 A.2d 91, 102 n.26 (Del. 2006).

*See also Gatz v. Ponsoldt*, 925 A.2d 1265, 1274 (Del. 2007); *Rhodes v. Silkroad Equity, LLC*, 2007

WL 2058736, at *5 (Del. Ch. July 11, 2007) (defendants "caused a direct harm to the Plaintiffs by

the 'extraction' of economic value and residual voting power and a 'redistribution' of the economic

value and voting power to themselves as controlling shareholders"); *Nikolouzakis v. Exinda Corp.*,

2012 WL 3239853, at *8 (D. Del. Aug. 7, 2012) (plaintiff shareholders "suffered harm" where

conduct resulted in "Plaintiffs' ownership interest being diluted"); *Shamrock Holdings, Inc. v.*

*Arenson*, 456 F. Supp. 2d 599, 607-08 (D. Del. 2006) (upholding claim that transaction that

"wrongfully reduced the cash-value and the voting power of the . . . minority interest") (quoting

*Rossette*, 906 A.2d at 92) (ellipsis in original).

Defendant received "shares having more value than what the corporation received in

exchange." *Gatz*, 925 A.2d at 1274.  The "purchase price" for Defendant's 79.9% equity interest in

AIG was only $500,000 of loan forgiveness (PFOF § 37.6).  Defendant's argument that the equity

was justified as "additional compensation" for the 13(3) loan fails because Defendant was not authorized to demand such consideration for a 13(3) loan.  In addition, no additional compensation was needed since the principal of the loan to AIG was fully secured, including by AIG's valuable insurance assets (PFOF § 21.9; *infra* § II.B.7), that Defendant was already fully compensated for the loan by its unprecedentedly high interest payments and other fees (PFOF §§27.4.5, 37.7; *infra* § IV.B.4); and the equity compensation was not needed to compensate Defendant but was intended, not to compensate Defendant but, to deprive Plaintiffs of a "windfall" (PTX 4002; PFOF §§ 26.2, 26.3; *infra* § II.B.4).

Delaware courts have also recognized that shareholders have direct standing where, as here, shares were issued for the improper purpose of depriving them of their voting control.  *See* PFOF §§ 17.6-17.8, 28.0.  For example, in *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (1967), the court allowed the plaintiff, a shareholder, to assert a direct claim for injunctive relief against both the corporation and a shareholder to which stock was issued.  The challenge to the stock issuance did not require "proving corporate injury as has been held to be the case when a stockholder attacks derivatively the spending of corporate funds for the purchase of his corporation's own stock . . . . This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. Manipulation of this type is not permissible."  *Id.* at 777 (citation omitted).  The court cancelled 75,000 shares issued for the purpose of depriving plaintiff shareholder of control.  *Id.*; *see also Packer v. Yampol*, 1986 WL 4748, *13 (Del. Ch. Apr. 18, 1986); *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1105-06 (Del. Ch. 2014).[4]

---

[4] While Defendant is correct that "no shareholder approval was required before AIG could agree" to some form of credit facility (DCOL at 55 (citing *Starr*, 106 Fed. Cl. at 76)), the actual Credit Agreement did require Plaintiffs' shareholder approval.  Whatever general powers AIG may have

**4.    In Rearguing That Defendant Had No Duty to Plaintiffs Because Defendant Was Not Yet a Shareholder When It Exacted/Took Plaintiffs' Equity and Voting Power, Defendant Ignores Its Fifth Amendment Duties and Disregards the Admonition of Delaware Courts to Focus on the Substance – Not the Form – of a Transaction.**

**a.    The Government had a Fifth Amendment duty to Plaintiffs regardless of duties flowing from control.**  As this Court previously noted, the "linkage of equity dilution claims to a controlling shareholder grows out of the principle that a controlling shareholder owes fiduciary duties to the shareholders of the corporation she controls." *Starr*, 106 Fed. Cl. at 65 (citing *Dubroff v. Wren Holdings*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009)).  However, as this Court also previously held, "the Government has a preexisting duty under the Fifth Amendment not to take private property for public use without paying just compensation. As in *Gatz* and *Rossette*, the Government had an obligation not to appropriate the minority shareholders' property interests without just compensation – irrespective of whether the Government was a shareholder when the purported dilution occurred." *Starr*, 106 Fed. Cl. at 65.  Similarly, Defendant violated its Fifth Amendment duty not to subject a person to a deprivation of property without due process when it illegally exacted Plaintiffs' equity without any statutory authority to require any consideration other than interest for a loan under Section 13(3).  *See id.* at 61 ("An illegal exaction also may be conceptualized as 'a deprivation of property without due process of law.'").

---

had to issue blank check preferred under Delaware law, AIG lacked the authority to use such powers for the improper purpose of depriving shareholders of their equity and voting rights.  *See* PFOF § 28; PCOL § 14.8.9; *Canada S. Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810, 812-13 (Del. Ch. 1953) ("if the primary purpose of the sale was to deprive plaintiff of its voting position then the action was improper"); *Condec Corp.*, 230 A.2d at 775 ("shares may not be issued for an improper purpose such as a take-over of voting control from others"); *Adlerstein v. Wertheimer*, 2002 WL 205684, at *11 n.35 (Del. Ch. Jan. 25, 2002) ("an action taken primarily to divest a stockholder of control and transfer that control to another would also seem afoul of 'the norm of loyalty'"); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, 8 (Del. Ch. Aug. 27, 1987) (issuance of shares "was an invalid attempt to deprive a shareholder of the benefits of stock ownership").

In addition, the Series C Preferred could not be converted to common without shareholder approval. *See* PFOF §§ 35.2 – 35.3.

**b.   In any event, the relevant date is September 22 when the exaction/taking took place (PFOF § 14.0) and Defendant clearly controlled AIG on that date  (PFOF §§ 15.0, 19.0).**

Defendant's attempt to limit the scope of *Gatz* and *Rossette* only to situations where the controlling party is already a shareholder is the type of hyper-technical argument that Delaware courts have rejected in protecting shareholders from the dilution of their economic and voting power.[5]  What is relevant is the fact of control, not how that control is achieved.  *S. Pac. Co. v. Bogert*, 250 U.S. 483, 492 (1919) ("It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.").  Delaware cases apply to a "controlling entity **or** stockholder".  *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 260 (Del. Ch. 2006) (emphasis added); *see also* PCOL §§ 12.1.1-12.2.3.

Defendant's contention that Delaware law would recognize Plaintiffs' claim only if Defendant were already a "controlling shareholder" when it took Plaintiffs' equity is also inconsistent with Delaware law that recognizes not only *de jure*, but also *de facto*, control.  *See Gatz,* 925 A.2d at 1277 (holding that a direct claim could be brought by minority shareholders against actions taken by the "*de facto* controlling shareholder"); *OTK Assocs., LLC v. Friedman*, 85

---

[5] In applying fiduciary duties to a controlling entity, Delaware courts have repeatedly rejected defenses based on corporate formalities, looking instead to whether the Defendant exercised effective control over the entity.  *See, e.g.*, *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 668-71 (Del. Ch. 2012) ("Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers."); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 49 (Del. Ch. 1991) (holding that where corporation controlled general partner of a limited partnership, corporation owed a duty of loyalty to the partnership and the limited partners); *accord Wallace v. Wood*, 752 A.2d 1175, 1182 (Del. Ch. 1999); *Cargill, Inc. v. JWH Special Circumstances LLC*, 959 A.2d 1096, 1121 (Del. Ch. 2008) (extending *USACafes* to hold parties that controlled trustee "had a duty not to use their control over the Trust or its property to advantage" themselves "at the expense of the Trust"); *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 16, 2006) (holding LLC member had standing to bring direct claim where defendant controlling managers deprived plaintiff "of his voting rights under the LLC's Operating Agreement").

A.3d 696, 724 (Del. Ch. 2014) ("If a challenged transaction would confer a unique benefit on a party exercising *de facto* control, then entire fairness is the standard of review.").  In *Feldman v. Cutaia*, the only case Defendant relies on in support of its argument that Plaintiffs' claim is derivative (DCOL at 124-25), the court held that because plaintiff had failed to allege plausibly that the corporations' directors, each of whom owned shares that amounted to less than a majority stake, acted in concert, their shares could not be **aggregated** into a controlling position.  956 A.2d at 657-58.  However, contrary to Defendant's suggestion, the court did not hold that **other forms of control would not suffice**.  *Id.* at 657 (noting that the Court in *Gatz* deconstructed "the substance of the deal from its form").  Delaware cases subsequent to *Feldman* have explained that:

> *Rossette*'s "holding does not necessarily warrant the interpretation that, by affording dispositive weight to the Supreme Court's discussion of the facts before it, forecloses direct standing for an expropriation claim absent a controlling stockholder.  In other words, that a controlling stockholder's conduct may be challenged through an expropriation claim that is both direct and derivative under Gentile II does not mean that an expropriation claim that is both direct and derivative may only be asserted against a controlling stockholder."  *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *27 (Del. Ch. Sept. 4, 2014) (citing *Rossette*, 906 A.2d at 99).

Under Delaware law, "control" is "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise."  8 Del. Code § 203(c)(4); 18 Del. Code § 5001; *see also* PCOL § 12.2.  Accordingly, Delaware courts focus on whether there was a party that "directly or indirectly" controlled the transaction and dictated its terms such that the company's Board of Directors did not have "real bargaining power".  *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994).  Here, Plaintiffs proved that Defendant used its monopoly position as the lender of last resort to control the transaction and extract Plaintiffs' equity.  PFOF §§ 15.0-20.0.

The cases Defendant relies on for its argument that it did not control AIG are inapposite. In those cases, the corporation remained free to bargain because the terms were not dictated by a controlling party.[6]  In *Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.*, 68 A.3d 197 (Del. Ch. 2013), cited by Defendant, the court considered multiple factors in deciding whether a private equity firm had *de facto* control over a debtor.  While the court in *Edgewater* concluded, based on its consideration of multiple factors, that *de facto* control did not exist, a review of the factors considered and a comparison of the evidence in that case (*id*. at 215, 231-33) with the evidence Plaintiffs presented at trial shows that the factors that were not present in *Edgewater* and resulted in a finding of no *de facto* control were all present at the time of the Credit Agreement transaction.  Specifically, in sharp contrast to *Edgewater*, the evidence at trial demonstrated that: Defendant here declined to extend the demand notes (JX 103 at 4; PTX 195 at 3); refused to negotiate (PFOF § 20.3); refused a fiduciary out provision (Baxter: Tr. 911:20-912:10; JX 52-U at 20); assumed control of AIG (PFOF § 15.0); and discouraged others from providing liquidity to AIG (PFOF §§ 11.12, 11.13).

### 5.   Defendant's Reliance on the Business Judgment Rule Is Misplaced Where, As Here, Plaintiffs' Claim Is Against Defendant and Not the AIG Board and Defendant Was in a Controlling Position.

Delaware law is clear that when, as here, "a controlling entity or stockholder causes a corporation to enter into a self-dealing transaction and controls the terms of the transaction, the business judgment rule is inapplicable".  *Primedia*, 910 A.2d at 260 (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971)); *see also In re Nine Sys.*, 2014 WL 4383127, at *33 n.306; *Paramount Commnc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42-44 (Del. 1993); *Citron v.*

---

[6] *See, e.g.*, *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1056 (Del. 1984) (holding that party's position "remained that of an outsider" as "illustrated by its frustration in attempting to block" the corporation's attempt "to sell certain of its assets"); *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644-45 (Del. 2014) (finding no control where independent committee of board was able to "**bargain for the best price**" (emphasis in original)).

*Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989)).

The issue is not whether AIG's Board was itself disinterested.  The issue is whether Defendant controlled the transaction.  *See* PCOL § 12.2.3.  Given Defendant's control over the Credit Agreement transaction, AIG's Board was given "no choice" but to accept Defendant's terms.  *See* PFOF § 20.3.  The AIG Board understood that Defendant's terms were "nonnegotiable" (Offit: Tr. 7395:10-21) and as AIG's Vice-Chairman stated, Defendant "stole at a gunpoint 80 percent of the company."  PTX 228 at 1.

### B.   DEFENDANT'S ARGUMENT THAT THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' ILLEGAL EXACTION CLAIM IGNORES CONTROLLING PRECEDENT AND THIS COURT'S PRIOR RULINGS.[7]

In illegal exaction cases, it is settled that "jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language."  *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996).[8]  Defendant ignores these cases and this Court's ruling that

> "'In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-

---

[7] Defendant's argument that foreign nationals must satisfy the Reciprocity Act, 28 U.S.C. § 2502, goes only to whether certain plaintiffs were entitled to opt in.  It is also incorrect.  *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491-92 (1931) ("The Fifth Amendment gives to each owner of property his individual right . . . . As alien friends are embraced within the terms of the Fifth Amendment, it cannot be said that their property is subject to confiscation here because the property of our citizens may be confiscated in the alien's country.").  "Actions in the court involving the alleged taking of aliens' property by the federal government and the right of just compensation are not subject to the requirement of reciprocity".  *See* 7A Fed. Proc., L. Ed. § 19:170 (2015).

[8] *Accord Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273 (Fed. Cl. 2012) (where an illegal exaction is alleged, the Tucker Act "enables suit even in the absence of a money-mandating statute") and *O'Bryan v. United States*, 93 Fed. Cl. 57, 66 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011); *Mallow v. United States*, 161 Ct. Cl. 446, 454 (1963); *Suwannee S.S. Co. v. United States*, 279 F.2d 874, 877 (Ct. Cl. 1960); *GMO Niehaus & Co. v. United States*, 153 F. Supp. 428, 431-32 (Ct. Cl. 1957); *Eversharp, Inc. v. United States*, 125 F. Supp. 244, 247 (Ct. Cl. 1954) (all upholding right to recover funds paid to the Government that the Government lacked legal authority to obtain without requiring a showing of a money-mandating statute).

mandating language.'"  *Starr*, 107 Fed. Cl. at 378 (quoting *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006)).

Defendant continues to rely primarily on *Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) and *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed. Cir. 2000) (DCOL at 108-09), neither of which is applicable here.[9]  In *Norman*, the plaintiffs had not paid money or given property to the Government that the Government lacked legal authority to obtain and the plaintiffs did not establish that the Government's purported violation of an appropriations statute had a "direct and substantial impact" on them.  429 F.3d at 1096.  In *Cyprus*, the plaintiff did not claim that the Government had illegally exacted money from it in violation of the Due Process Clause but instead that taxes paid violated the Constitution's Export Clause.  205 F.3d at 1373 ("This appeal therefore turns on whether the *Export Clause*, when fairly interpreted, affords an *independent* cause of action for monetary remedies." (emphasis added)).

## II. <u>AUTHORITY</u>

### A.   DEFENDANT'S ARGUMENT THAT IT WAS AUTHORIZED TO DEMAND 79.9% OF PLAINTIFFS' EQUITY AND VOTING CONTROL AS CONSIDERATION FOR A 13(3) LOAN IS CONTRARY TO THE PLAIN LANGUAGE OF THE STATUTE, THIS COURT'S PRIOR RULINGS, THE STATUTE'S CONTEXT AND LEGISLATIVE HISTORY, AND DEFENDANT'S OWN PRIOR INTERPRETATION AND IMPLEMENTATION OF 13(3).

### 1.   Defendant's Papers Ignore the Plain Language of the Federal Reserve Act Which Limits the Consideration for a 13(3) Loan to an Interest Rate.

"Statutory interpretation begins with the language of the statute", and "the plain meaning of the statute generally will be regarded as conclusive."  *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004).  The plain language of Section 13(3) unambiguously provides

---

[9] The other "money-mandating" cases Defendant cites likewise fail to establish a money-mandating requirement because they do not involve money paid to or property taken by the Government.  *See Fisher v. United States*, 402 F.3d 1167, 1171 (Fed. Cir. 2005); *Collins v. United States*, 67 F.3d 284, 285-86 (Fed. Cir. 1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989).

what consideration can be received for a Section 13(3) loan:  "rates established in accordance with the provisions of section 357 of this title".  12 U.S.C. § 343 (2006).  Despite the emphasis this plain language has been given throughout this litigation by Plaintiffs, and by the Court, Defendant simply ignores this language in its post-trial submissions.

### 2.   Defendant's Papers Ignore This Court's Prior Ruling That the Only Consideration for a 13(3) Loan is an Interest Rate.

In denying Defendant's motion to dismiss over two years ago, this Court held that "the 'only consideration for a loan prescribed by' Section 13(3) 'is an interest rate subject to the determination of the Board of Governors.'"  *Starr*, 107 Fed. Cl. at 378 (quoting *Starr*, 106 Fed. Cl. at 85).  Defendant does not address, in fact never mentions, this critical ruling in its proposed conclusions of law.

### 3.   Defendant's Papers Ignore the Legislative History of the Relevant Statutes.

Although the statute's plain language is dispositive, the legislative history of the Federal Reserve Act and Section 13(3) confirms Defendant's lack of authority to exact equity as compensation for a 13(3) loan.  Defendant does not cite any legislative history that would support its claimed authority.  *See Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1376 (Fed. Cir. 2003) ("In the face of silence in the legislative history, . . . courts are reluctant to broadly interpret the legislation."); PTX 2737 at 6.

On the contrary, as the legislative history of Section 13(3) demonstrates, Congress enacted very specific and detailed requirements as to when, to whom, how, and at what interest rates extensions of credit may be made under Section 13(3), rejecting blank check lending authority.  PCOL § 7.5.4; *infra* § II.B.2.e.

### 4.   Defendant's Papers Misstate Its Prior Interpretation of 13(3) and Ignore Its Actual Statements Concerning, and Implementations of, 13(3).

Defendant repeatedly asserts, *without any cited support*, that "FRBNY and the Board of

Governors had concluded months before ever contemplating a loan to AIG that requiring a borrower to convey equity as part of the consideration for a 13(3) loan would be a valid exercise of their authority – a conclusion they reaffirmed in the particular context of the AIG loan." DFOF ¶ 185; *see also id.* ¶¶ 116, 187; DCOL at 79-80.  That assertion is not accurate.

For 75 years, Defendant's interpretation of 13(3) recognized that Defendant lacked the authority under Section 13(3) to acquire equity.  Except for AIG, *none* of the several hundred 13(3) borrowers were required to surrender either equity or voting control (PFOF § 22.0). Geithner: "Under section 13(3) of the Federal Reserve Act, the Fed is prohibited from taking equity or unsecured debt positions in a firm" (PTX 409 at 177); Bernanke: "The Federal Reserve is authorized under the Federal Reserve Act to extend credit in various forms, but is not authorized to purchase equity securities of financial institutions" (PTX 363 at 2); Bernanke: "we had only one tool, and that tool was the ability of the Federal Reserve under 13(3) authority to lend money against collateral." (PTX 548 at 28).  The General Counsel of FRBNY, upon whose trial testimony Defendant relies to claim legal authority, recognized in 2008 that his statutory construction was "loophole lawyering" that went beyond the Board of Governors' interpretations of the law (DX 118 at -015), and contemporaneously told Congress that "neither the Treasury nor the Federal Reserve had the authority to own these shares"– an admission that, despite Defendant's assertion that it "did not accurately reflect Mr. Baxter's view" (DFOF ¶ 248 n.26), is repeated in two documents (PTX 589 at 72 n.265; PTX 2211 at 10) and is consistent with the other contemporaneous statements of Mr. Baxter and his colleagues.

As Defendant's counsel at Davis Polk clearly stated on September 17, 2008:

"There is no express authority, which is one of the reasons Treasury and the Fed discussed their actions with congressional leaders of both parties. Maybe it's an implied power of setting the conditions for lending money under 13(3) of the federal reserve act, but the govt is on thin ice and they know it. But who's going

to challenge them on this ground?"  PTX 3283 at 1; PFOF § 23.1.

Even at trial Chairman Bernanke testified that the "rate" that Section 13(3) provided as the

consideration for a 13(3) loan referred to a rate of interest (Bernanke: Tr. 2005:3-19).  The

evidence at trial also showed that Defendant, recognizing that it had no authority to acquire equity,

proposed amending 13(3) to create the authority it would need to receive equity as consideration

for a 13(3) loan (PFOF § 23.3).

Moreover, the Federal Reserve's publications and regulations consistently recognized that

13(3) did not authorize it to acquire equity as consideration for a 13(3) loan.  As this Court

recognized in denying Defendant's motion to dismiss:

> "One such circular states that 'bank discounts as commonly understood do not
> apply to a bank's acquisition through purchase of other assets, securities or
> obligations, such as, for example, corporate stocks, bonds or debentures.'  Bd. of
> Governovers of the Fed. Reserve Sys., 44 Fed. Reserve Bulletin 241, 269 (Mar.
> 1958) (internal quotation omitted).  Another states that '[s]uch discounts may be
> made only at rates established by the Federal Reserve banks, subject to review
> and determination by the Board of Governors of the Federal Reserve System.
> 1936 Circular, 22 Fed. Reserve Bulletin at 123; 1932 Circular, 18 Fed. Reserve
> Bulletin at 518; *see also* 12 U.S.C. § 357 (2006)."  *Starr*, 106 Fed. Cl. at 85-86;
> *see also* PFOF § 23.1.[10]

Significantly, the regulation governing "terms of credit" for 13(3) loans in place in

September 2008 authorized only the charging of interest and did not authorize the Federal Reserve

to acquire equity or seek other consideration.  12 C.F.R. § 201.4.

---

[10] Defendant contends in its papers that Plaintiffs have previously "implied" "that the proper
meaning of 'limitations, restrictions, and regulations' embraces only those set forth in Federal
Reserve bulletins circulated in the 1930s" (DCOL at 81-82) .  Plaintiffs have never taken that
position; Regulation A is obviously another example that Plaintiffs cited in their prior submissions
(Pls. Pretrial COL § 64).  What Plaintiffs have argued, and continue to argue, is that in none of
these documents—the bulletins, Regulation A, or anywhere else—did the Federal Reserve ever
interpret "limitations" and "restrictions" as allowing it to expand the scope of the permissible
consideration for a 13(3) loan to include acquiring equity.

**5.    Defendant's Concession in Its Post-Trial Submissions that "FRBNY Cannot Invest in a Distressed Company by Injecting New Equity Capital Through the Purchase of Stock" (DFOF ¶ 211) Is Dispositive.**

In its most recent submissions, Defendant attempts to distinguish between providing "equity financing" (which it now agrees it cannot do) and providing "debt financing" in exchange for equity (which it now asserts it can do).  Defendant's argument fails for two fundamental reasons.  First, as discussed above and in prior submissions (PCOL § 4.0; PFOF §§ 22.0, 23.0), Defendant is not authorized to acquire equity, and there is no exception based on whether it characterizes the money given to acquire it as "debt" or "equity" financing.

Second, Defendant's purported distinction is irrelevant from an economic standpoint. Whether Defendant has a right to be repaid, what security Defendant has to ensure repayment, and what the guaranteed interest rate or dividend rate should be can each be addressed whether or not the funding is called equity or debt.  If Defendant provides money and receives equity for it, the fact of the matter is that capital is being injected in exchange for equity, and it is irrelevant from an economic, policy, and legal standpoint whether the transaction is characterized as "injecting new equity capital" or as injecting debt capital in exchange for equity.  What matters is whether Defendant keeps the equity when it is repaid.  If not, the equity is merely collateral for the funding, which is permissible.  However, if after being repaid Defendant keeps the equity it has received, it has purchased that equity, which is not permissible.

**B.    DEFENDANT'S CONSTANTLY SHIFTING ARGUMENTS FOR THE AUTHORITY TO DEMAND EQUITY ARE INTERNALLY INCONSISTENT AND, AGAIN, CONTRARY TO THE STATUTE'S PLAIN LANGUAGE, THIS COURT'S RULINGS, THE STATUTE'S CONTEXT AND LEGISLATIVE HISTORY, AND DEFENDANT'S OWN PRIOR ACTS AND STATEMENTS.**

**1.    Defendant's Initial Argument Was That Authority to Demand Equity Was an Incidental Power.**

When Defendant first moved to dismiss in this case, its only argument that it was

authorized to demand equity was based on FRBNY's incidental powers.  *See* Def. Reply Br. in

Support of Mot. to Dismiss [Dkt. 46] at 29-33 (Apr. 26, 2012).

     **a.   "Incidental" powers cannot add new powers.**  This Court rejected Defendant's

"incidental powers" argument noting that "because the FRA only permits the Board to demand

consideration in the form of interest rates, the Board did not have implied authority to demand the

transfer of equity as consideration for the loan to AIG."  *Starr*, 107 Fed. Cl. at 378.  And it's clear

that a federal agency's incidental powers cannot be greater than the powers conferred by Congress

(PCOL § 4.5).

     **b.   The National Bank Act and precedents under it refute rather than support**

**Defendant's incidental powers analysis.**  Relying primarily on commentary addressing the scope

of the incidental authority of national banks under the National Bank Act, and without discussing

the differences between the language of the National Bank Act and the Federal Reserve Act,

Defendant argues that requiring shareholder equity and voting control as compensation for a 13(3)

loan was within FRBNY's incidental powers because national banks may be entitled to take

"equity kickers" in connection with commercial loans (DCOL at 88).

     First, Defendant's argument ignores the important differences between the National Bank

Act and the Federal Reserve Act.  While the Federal Reserve Act expressly prescribes the form of

consideration that is permissible for a 13(3) loan, the National Bank Act does not specifically

prescribe limitations on a national bank's lending authority.  *See* PCOL § 4.5.5.  Moreover,

Congress granted national banks "all such incidental powers as shall be necessary to carry on the

business of banking" (12 U.S.C. § 24), but Congress only granted Federal Reserve banks "such

incidental powers as shall be necessary to carry on the business of banking *within the limitations*

*prescribed by this chapter*."  12 U.S.C. § 341 (emphasis added).

Indeed, the Board of Governors' legal staff has long recognized that the incidental powers of Reserve banks are <u>not</u> determined by cases construing the incidental powers of national banks (PTX 2738 at 13-14; JX 13 at 16; DX 161 at -395; PTX 651 at 38), and that the difference in language in the incidental power provision of the Federal Reserve Act "suggests a scope more restricted than the comparable National Bank Act provision" (PTX 2738 at 13).  The only document (DX 484) Defendant relies on to support its authority to acquire AIG preferred stock is (a) a 2 ½ page conclusory memo written on September 17 to try to support the deal after, Defendant says, it was done (b) is limited to warrants, (c) merely asserts that there is a "reasonable argument" that Defendant could condition a loan on receiving warrants (*id*. at -070), and (d) does not address acquiring a majority of a borrower's equity and voting control as opposed to a small "equity kicker".

Second, Defendant misstates the Supreme Court's holding in *California National Bank v. Kennedy*, 167 U.S. 362 (1897).  According to Defendant, the *Kennedy* Court "said nothing about whether conditioning lending on the provision of equity as part of a loan's consideration – as opposed to acquiring equity through speculative stock trading, as the national bank in *Kennedy* had done – should properly be viewed as incidental to the business of banking."  (DCOL at 88).

However, the question the Court addressed in *Kennedy* was actually whether national banks were prohibited from "purchasing or subscribing to the stock of another corporation".  167 U.S. at 366.  In response the Court held that while a national bank could "accept stock of another corporation as collateral".  *Id.* at 367:[11]

---

[11] Defendant cites to the decision in *Starr v. FRBNY*, 906 F. Supp. 2d 240 (S.D.N.Y. 2012) (DCOL at 93), in support of its argument that Defendant has authority to require equity as consideration for a 13(3) loan.  The court did say that *Kennedy* "absolutely did not hold that such banks were prohibited from *holding* stock at all."  *Starr*, 906 F. Supp. 2d at 241.  Significantly, however, the court did not distinguish between taking equity as collateral and taking equity as consideration for

> "The power to purchase **or** deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred." (*Id.* at 369 (emphasis added)).

In the present case, of course, it is undisputed that "FRBNY purchased, rather than merely took a security interest in the preferred shares." *Starr*, 106 Fed. Cl. at 85. And, as this Court held, reserve banks do not have the incidental power to "purchase **or** deal in stock of another corporation." *Starr*, 106 Fed. Cl. at 86-87 (emphasis added).

Third, in citing regulations and OCC interpretive decisions to argue that national banks may accept equity kickers, Defendant's post-trial submissions omit critical language in those opinions making clear that even under those expansive interpretations, national banks may only acquire warrants so long as they do not exercise them. Otherwise, the OCC treats equity acquired by national banks as consideration for a loan as a prohibited purchase. *See* 12 C.F.R. § 7.1006 ("A national bank also may take as consideration for a loan a stock warrant issued by a business enterprise of a borrower, *provided that the bank does not exercise the warrant*.") (emphasis added); OCC Inter. Ltr., 1992 WL 486905, at *2 (July 15, 1992) ("Further, in keeping with the provisions of 12 U.S.C. §§ 24(7) and 29, *a national bank can have no possessory or ownership interest in a borrower's business or real estate*.") (emphasis added); OCC Inter. Ltr. No. 992, 2004 WL 1563358, at *2 (May 10, 2004) ("*The OCC has prohibited banks from exercising such warrants – and thereby converting them into shares of the borrower's stock – on the theory that doing so would be tantamount to a purchase of stock for its own account*." (emphasis added)). Under no

---

a loan. *Compare id.*, *with Starr*, 106 Fed. Cl. at 85 ("the preferred shares do not appear to have secured the Government's loan to AIG as collateral because the Government retains the stock even if AIG pays off the loan with interest" (quotations and brackets omitted)). In addition, while the court cited portions of the regulation and the OCC interpretive letters that national banks can take equity kickers, it did not reach the portion of the regulation and interpretive letters making clear that even if a national bank can receive and hold warrants, it is prohibited from exercising them. *See Starr*, 906 F. Supp. 2d at 242. Finally, the court did not address the differences between national and Federal reserve banks. *See, e.g.*, PCOL § 4.5.5.

interpretation of the National Bank Act, or any commentary, does a national bank, let alone the Federal Reserve, have the power to take a 79.9% equity interest in the form of voting preferred stock.

### 2.   In Its August 2012 Motion for Reconsideration, Defendant Argued for the First Time That the Reference to "Limitations" and "Restrictions" in 13(3) Was an Express Authorization to Demand Equity.

From the 1930s onward Defendant consistently recognized that 13(3) did not expressly authorize Defendant to acquire equity (PFOF §§ 23.1-23.3; PCOL §§ 4.2, 4.6); this was true even after the AIG loan.  *See, e.g.*, PTX 336 (Nov. 1, 2008) at 1: "No provision of the Federal Reserve Act expressly authorizes the Federal Reserve to acquire the equity of any entity."  Consistent with its prior positions, Defendant made no attempt in its March 2012 motion to dismiss to argue that Section 13(3) expressly authorized a demand for equity.

It was not until after this Court denied Defendant's motion to dismiss that Defendant first advanced the position that the final sentence of Section 13(3) expressly confers upon the Federal Reserve Board of Governors broad discretionary authority to charge any form of consideration for a Section 13(3) loan.  That sentence states: "All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe."  It is undisputed that "discounts" in this context refers to interest rates (PCOL § 4.1.4; DCOL at 79 n.19).

### a.   Defendant's novel assertion that its demand for 79.9% equity and voting control was a "limitation" or "restriction" on the interest rate charged is contrary to the plain language of the statute.  In no normal use of the English language would "additional compensation" in the form of equity and voting control be characterized as a "limitation" or "restriction" on the interest rate charged.  *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct.

1136, 1139 (2015) (rejecting interpretation of statutory term that "does not accord with ordinary English usage").

**b.   Defendant's "limitations" and "restrictions" argument is also inconsistent with Defendant's uniform prior interpretation and implementation of 13(3).**  Except for AIG, Defendant never demanded equity or voting control as consideration for a 13(3) loan.  Even when Defendant made its AIG loan there was no mention or suggestion that the demand for equity was intended as a "limitation" or "restriction."  Indeed, prior to this litigation Defendant's interpretation of the "limitations" and "restrictions" clause had been consistent with the plain language of the statute.  For example, the version of Regulation A that was in effect shortly before the financial crisis provided, in part concerning interest rates:

> (a)     "If the collateral used to secure emergency credit consists of assets other than obligations of, or fully guaranteed as to principal and interest by, the United States or an agency thereof, credit must be in the form of a discount and five or more members of the Board of Governors must affirmatively vote to authorize the discount prior to the extension of credit."  12 C.F.R. § 201.4(d) (2007).

> (b)     "Emergency credit will be extended at a rate above the highest rate in effect for advances to depository institutions."  12 C.F.R. § 201.4(d) (2007).

Never in Regulation A, or at any other time, did the Board of Governors publish any regulation suggesting that it was permissible to demand equity as compensation for a 13(3) loan.

**c.   Defendant's argument that Plaintiffs' reading of Section 13(3) would render the final sentence of Section 13(3) "meaningless" (DCOL at 80-81) is wrong.**  Plaintiffs have never contended that the final sentence provides the Board with no authority – only that it does not vest the Board of Governors with discretionary authority to demand consideration for a 13(3) loan that is inconsistent with 13(3)'s express provisions.  As the Board's exercise of its authority prior to the loan to AIG demonstrates, the Board has authority to prescribe "limitations" and "restrictions" relating to how interest rates are approved, how interest rates are calculated, and other issues

26

related to the "discounts" it is authorized to charge for a 13(3) loan.  What the final sentence of 13(3) does not authorize, however, is for the Federal Reserve to demand "additional compensation" that exceeds what Congress prescribed as the consideration for a 13(3) loan—*i.e.*, "rates established in accordance with the provisions of section 357 of this title".

     **d.   In fact, it is Defendant's argument that, if accepted, would render provisions of 13(3) meaningless.**  If, as Defendant argues, the last sentence of 13(3) authorizes the Federal Reserve to require whatever consideration it decides is appropriate for a 13(3) loan, the express authorization to charge an interest rate would be meaningless (certainly if the last sentence authorizes a requirement for equity and voting control it would authorize an interest rate)—and the command that the interest rate be subject to the review and determination of the Board of Governors and fixed with a view of accommodating commerce and business would be bizarre (why in the world would an interest rate be subject to these qualifications but not the much more unusual and burdensome requirement for 79.9% of equity and voting control).

     **e.   Defendant's argument requires a rewriting of the statute.**  Defendant argues, without any cited support, that the final sentence of 13(3) "unambiguously grants to the Board of Governors the authority to set *terms and conditions* on individual rescue loans" (DCOL at 79 (emphasis added)).  Nowhere in the statute is there such a provision.  Section 13(3) was enacted as part of the Emergency Relief and Construction Act of 1932.  The original version of that act passed by Congress gave the Reconstruction Finance Corporation the power "to make loans, upon such *terms and conditions* not inconsistent with this act as it may determine," with no limits on that authority other than the requirement that the borrower be "unable to obtain funds upon reasonable terms through banking channels".  H.R. Rep. No. 72-1760, at 3 (1932) (emphasis added).  President Hoover vetoed that act, however, because it gave the RFC such unlimited discretion that

the legislation in effect "would place the Government in private business."  H.R. Doc. No. 72-360, at 3-4 (1932).  Congress then revised the bill, moving the power to make relief loans to the Federal Reserve and providing clear limits on those loans: that the loans be made only in "unusual and exigent circumstances," on a fully secured basis, where the borrower could not secure adequate credit from other sources, and that the consideration for the loans would be limited to an interest rate "fixed with a view of accommodating commerce and business."  12 U.S.C. §§ 343, 357; H.R. Rep. No. 72-1777, at 7, 19-20 (1932); PCOL §§ 1.2-1.4; 4.7.

If Congress intended the final version of 13(3) to authorize Defendant to set the "terms and conditions" for "loans," it could have said so.  Instead, it replaced broad "terms and conditions" authorization with the more limited authority to make loans at "rates established in accordance with the provisions of section 357 of this title".  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Defendant has no power to replace the enacted version of 13(3) with its vetoed predecessor.  "The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer."  *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986).

Moreover, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 468 (2001).  In *Suwannee Steamship Co. v. United States*, 279 F.2d 874, 876 (Ct. Cl. 1960) the court rejected the argument that language in Shipping Act that gave the Commission power to approve sales of ships "either absolutely or upon such conditions as the Commission (Administration) prescribes" gave the Maritime Administration

"complete freedom to impose conditions" upon its permission to sell a ship.  If Congress intended

Federal Reserve banks to have the significant power to require the surrender of shareholder equity

and voting control as consideration for a 13(3) loan, it would have specifically and explicitly

conferred that power rather than supposedly hiding it in the ancillary reference to "limitations,

restrictions, and regulations" in the final sentence of the statute.

> **3.  Defendant Now Argues That a Previously Unknown and Still Undefined "Congressional Policy" Authorizes It to Demand Equity.  That Argument Is Contrary to 13(3)'s Plain Language and Consistent Interpretation.**

Defendant asserts that it was authorized to demand equity and voting control as "additional

compensation" for a 13(3) loan because "Congress vested the Board of Governors with broad

discretionary authority to tailor rescue loans based on policy judgments about the public interest."

(DCOL at 79; *see also id.* at 86, 89, 101; DFOF ¶¶ 303, 305, 306).  Defendant does not, and

cannot, point to any statutory language, or even any legislative history that suggests Congress

intended to give Defendant any discretion, let alone "broad discretion," to determine the form of

consideration appropriate for a 13(3) loan.  On the contrary, Congress determined that the

consideration charged for a 13(3) loan should be "rates established in accordance with the

provisions of section 357 of this title".  12 U.S.C. § 343.

This does not mean that Defendant does not have discretion; it only means Defendant does

not have discretion to exceed its authorization.  Where, as here, "Congress has directly spoken to

the precise question at issue," the Board of Governors is not entitled to deference.  "If the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect

to the unambiguously expressed intent of Congress."  *Chevron USA, Inc. v. NRDC*, 467 U.S. 837,

842-43 (1984); *accord Eurodif S.A. v. United States*, 423 F.3d 1275, 1277 (Fed. Cir. 2005) ("if we

determine that the statute is unambiguous on the precise question at issue, we do not defer to the

agency's interpretation, regardless of whether that interpretation is grounded in a reasonable policy

choice.").

Defendant fails to cite any cases that support deference for its *ad hoc* decision conditioning the loan to AIG – and only AIG among all 13(3) borrowers in history – on the surrender of 79.9% of its shareholders' equity and voting control.  In *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), cited by Defendant, the Supreme Court applied *Chevron* deference to an opinion letter by the Comptroller of the Currency addressing the authority of national banks *generally* to act as agents for their customers in the purchase and sale of various financial instruments, including annuities.[12]

Defendant's decision to take equity cannot be justified on policy grounds for the simple reason that Congress relieved Defendant of the right to make that decision by prohibiting the taking of equity (or any consideration beyond an interest rate approved by the Board of Governors).  *See* PCOL §§ 1.4, 4.0; *see infra* II.B.5-6.  Defendant cannot plausibly argue that this Court should defer to an unprecedented, *ad hoc*, and unreasoned decision that exceeds its statutory authority.  *See Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) ("If the intent of Congress is clear, that is the end of the matter"); *see also* PCOL § 4.8.

### 4.    The Harsh Terms of the AIG Loan Were Adopted to Punish AIG and Its Shareholders (*See* PFOF § 26.2), Not For Any Other Reason.

Never before or after the AIG loan did Defendant ever receive equity as compensation for a 13(3) loan.  Defendant's Rule 30(b)(6) witness Millstein admitted that the sole reason to take away

---

[12] The other cases Defendant cites likewise present circumstances different than those present in this case because they involved: (a) deference to an agency's interpretation of its *own* regulations (*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); (b) deference to a decision falling within Congress' "express delegation" of authority to an agency (*ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994)); (c) deference to an agency position consistent with its "long-held" position *and* within the scope of its delegated authority (*CFTC v. Schor*, 478 U.S. 833, 844 (1986)); and (d) a holding that where an agency approves of a state action as being consistent with federal law, the proper challenge to that approval is a lawsuit under the Administrative Procedure Act, not under the Supremacy Clause (*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1210 (2012)).

Plaintiffs' equity was to deprive them of a "windfall" (PTX 4002). Earlier Mr. Millstein had been more blunt: taking equity was designed "to penalize the shareholders of the company" (PTX 587 at 205, 212). Geithner said the same: "We forced losses on shareholders proportionate to the mistakes of the firm" (PTX 648 at 8). Secretary Paulson was even more candid: Defendant was "punitive," even "too punitive" (Tr. 1230:25 – 1231:6); it "basically killed the shareholders" (PTX 706 at 316); AIG was "a political scapegoat" and "it was important to be seen as being harsh and punitive to the AIG shareholders in order to quell possible political opposition to TARP and other further assistance." (Tr. 1254:22 – 1255:2, 1255:20 – 1256:3). *See* PFOF §§ 22.0, 26.0, 37.0.

### 5. There Is No Possible Policy Basis for Imposing Punitive and Discriminatory Terms Without Any Investigation, Analysis, or Findings.

The law is clear that there must be a written policy, regulation, or findings sufficient to justify imposing punitive conditions on an individual or entity. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). In order for "the minimum requirements of procedural due process . . . to be satisfied", there must be "advanced written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff v. McDonnell*, 418 U.S. 539, 563 (1974). "Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact." *Id.* at 564; *see also Taylor v. Hayes*, 418 U.S. 488, 498 (1974) ("We have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are basic in our system of jurisprudence." (quotations omitted)).

In September 2008, the Federal Reserve did not have any regulatory or internal guidelines for pricing a 13(3) loan (*see* PFOF § 29.1.1), AIG and its shareholders did not have any notice of

any charges or the opportunity to be heard.  There was no attempt at analysis or fact-finding.  *See*

PFOF § 29.0.  The complete absence of any contemporaneous basis for exacting 79.9% of AIG

shareholders' voting and equity rights is fatal to Defendant's attempt to frame its punitive terms as

a policy judgment worthy of deference.

No agency has authority to punish an individual or institution without providing notice of

the intent to impose a penalty and an opportunity to be heard.  *See Londoner v. City & Cnty. of*

*Denver*, 210 U.S. 373, 385-86 (1908); *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341

U.S. 123, 168 (1951) (Frankfurter, J., concurring) ("the right to be heard before being condemned

to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a

criminal conviction, is a principle basic to our society.").  Here, Defendant did not undertake any

investigation or analysis, make any findings, or hold any hearings concerning whether AIG or its

shareholders should be penalized and, if so, how.  *See* PFOF § 29.0.[13]

Section 13(3) provides none of the procedural safeguards that would be necessary if

Defendant were allowed to arbitrarily demand punitive consideration beyond an interest rate fixed

with the goal of "accommodating commerce and business".  12 U.S.C. §§ 343, 357.  Nothing in

the Federal Reserve Act provides Defendant with the appropriate adjudicatory or regulatory

functions to provide individuals and entities with an opportunity to be heard and permit Defendant

to review information and administer any punishment in an objective manner coinciding with due

process.  *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 16-18 (1978); *Mathews*, 424

U.S. at 332-35.  Congress therefore could not have intended to confer upon Defendant the power to

---

[13] Contrary to Defendant's claims (*see* DCOL at 77, 100), Plaintiffs' are not pursuing a standalone
Due Process claim.  Rather, Plaintiffs point to the absence of procedural protections in Section
13(3) as additional evidence that Defendant was not authorized to demand Plaintiffs' equity.  A
potential Due Process violation is further relevant as "evidence of the wrongful conduct which
vitiates any voluntariness defense."  PCOL § 12.13.6.

selectively punish in the absence of procedures for determining who should be punished or by how much, given the significant due process, equal protection, and delegation concerns that would result from such unconstrained authority.  *See Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988) ("federal statutes are to be construed so as to avoid serious doubts as to their constitutionality").

### 6.   Defendant's Asserted "Moral Hazard" Policy Is Foreign To The Statute, Unmentioned In The Board Of Governors Minutes, and Is Simply a Rephrasing of Defendant's Punitive Policy.

Although Defendant now relies extensively on "moral hazard" concerns to justify its unauthorized conduct, there is no discussion of moral hazard in the minutes of the September 16, 2008 Board of Governors meeting where the Federal Reserve approved lending to AIG.  *See* JX 63; *see also* PFOF § 29.2.  By contrast, numerous documents reflect Defendant's desire to take voting equity: (1) to punish AIG and its shareholders; (2) for political reasons (including to ensure the passage of TARP); and (3) to allow Defendant to obtain immediate control of AIG.  *See* PFOF §§ 17.6-17.8, 26.2.  Also, Defendant has repeatedly said the equity component was "additional compensation" for Defendant's admittedly fully secured, high-interest loan, not as a moral hazard deterrent (*see supra* at 1, n.1; PFOF §§ 21.0, 27.7).

**a.   Defendant's claim that it needed to address moral hazard concerns is contradicted by prior statements of Defendant's top policymakers.**  The very officials who decided the terms of the AIG loan have previously stated that government assistance during a financial crisis should **not** be designed to address so-called moral hazard concerns unrelated to mitigating the effects of the panic.  "The public will want Old Testament justice, punishment for the venal.  The moral hazard fundamentalists will want to send a message that irresponsible behavior will not be rewarded.  If policymakers listen, they will court disaster." (Geithner: PTX 709 at 542).  During a financial crisis, efforts at "avoiding moral hazard … only make the crisis worse" (PTX 709 at 533).

Instead, during the financial crisis, the Fed utilized "the Bagehot principle that providing liquidity to firms that are suffering from loss of funding is the best way to calm a panic" (Bernanke: PTX 708 at 84), and followed Bagehot's advice by "lending freely against sound collateral" at rates "attractive relative to rates available (or nominally available) in illiquid, dysfunctional markets" (Bernanke: PTX 650 at 14-15).  Thus, the very policymakers Defendant now claims were focused on avoiding moral hazard have vehemently – and, consistent with economic theory, appropriately – contemporaneously rejected any such focus.

   **b.   Moreover, Defendant's claim that the equity term was necessary to address moral hazard does not make economic sense.**  As an initial matter, "by March of 2008, the government had already announced that they were seeking alternative regulatory regimes, so to draw any inference from the treatment of AIG at the height of the crisis that it was going to affect future behavior some way, it just – from a policy perspective, everybody knew that the tables were going to have changed and there would be a different regime that was put in place."  Cragg: Tr. 5113:20 – 5114:3.  Consequently, participants in future regulatory regimes would not be guided by the treatment of AIG in a superseded regime.  Similarly, mere hours after Lehman's failure on September 15, 2008, it defies belief that Defendant was concerned that other institutions would "take undue risk counting on a Government rescue" (DFOF at 3).

   Most critically, for every other 13(3) borrower both before and after AIG, Defendant determined that an interest rate slightly above the prime rate, without any form of equity (let alone a controlling 79.9% stake), was sufficient to address moral hazard concerns.  *See* PFOF §§ 27.2-27.3; *see generally* PFOF § 32.2.  "The fact that no other 13(3) borrowers have been required to surrender equity demonstrates that requiring equity is not necessary to address moral hazard concerns.  It also means that one isolated example of requiring the surrender of equity cannot

reasonably be expected to change companies' future conduct."  PTX 5376 (Cragg demonstrative); *see also* Cragg Tr. 5113:4-8 ("for people to be able to infer something about the Federal Reserve that would make sense, there would have to be a consistency of behavior over the period.  And as we've seen, that just doesn't exist").[14]

### c.  Singling out AIG for punishment was inconsistent with how Defendant treated other firms and does not reflect a reasoned policy judgment.

Defendant's argument that "policy" concerns necessitated the confiscatory loan terms demanded of AIG is inconsistent with the fact that Defendant did not demand similar terms from any other firm that received 13(3) assistance.  Defendant proffered no contemporaneous documents that suggest any reason for distinguishing between AIG and other borrowers; the only explanation offered at trial was that AIG was an insurance company.[15]

Chairman Bernanke admitted at trial that the shareholders of each of the many other

---

[14] In its proposed findings of fact, Defendant—without citation—falsely claims that Dr. Cragg endorses a "bad policy" that would require the Federal Reserve "to lend to any and all solvent institutions, on terms more favorable than those available in the private markets".  DFOF ¶ 312. However, Dr. Cragg in fact testified that the Federal Reserve has "discretion" as to when to offer a 13(3) loan (*see* DFOF ¶ 306), but that when the Federal Reserve does decide to lend, the accepted economic practice, in keeping with the Bagehot principle, is to "charge a penalty rate that's slightly above the normal rate".  Cragg: Tr. 5079:22 – 5080:7; *see also* DFOF ¶ 307.  This was what Defendant's own witnesses said.  *See* PCOL § 1.7; PFOF § 32.2.1.

Defendant notes that "over the more than seventy years following the Great Depression" the "Federal Reserve never extended a single section 13(3) loan, due to the extraordinary policy implications of doing so."  DFOF ¶ 310.  Defendant, however, neglects to mention that in the 1930s it made numerous 13(3) loans to a broad range of companies (PTX 2816 at 7); that in 1966 and 1969 it authorized the extension of 13(3) credit to the thrift industry (PTX 2814 at 1), that in 1970 "the third paragraph of § 13 of the Federal Reserve Act permits the extension of Federal Reserve credit to the transportation company", Penn Central (PTX 2814 at 2), or that it lent "freely" to a broad range of institutions during the financial crisis, and that all of those institutions (besides AIG) were charged non-punitive rates (PFOF § 32.2), and none of those institutions (besides AIG) were required to surrender either equity or voting control (PFOF § 22.0).

[15] The fact that AIG was and is an insurance company is irrelevant because it is exactly the type of "individual, partnership, or corporation" to which Section 13(3) loans have been provided since their inception.  *See* 12 U.S.C. § 343; PCOL §§ 1.1, 1.2, 1.5, 1.6, 1.7.

institutions who received 13(3) assistance acquired a "windfall".  Bernanke: Tr. 1990:2 – 1991:11.

Secretary Paulson testified at trial that although the individual assistance provided to Citigroup

resulted in moral hazard, Defendant chose not to punish Citigroup's shareholders.  Paulson: Tr.

1252:22 – 1253:8.  For every firm except AIG, Defendant ignored the alleged policy concerns that

Defendant claims – in retrospect – animated its loan terms to AIG.

Defendant now argues that "policy concerns" "made the equity provision an essential

condition for the loan" to AIG (DFOF at 6, § III.A.4).  But Defendant fails to explain how this

could possibly be true in light of the fact that AIG was the **only** company forced to transfer equity

to Defendant as a condition for a 13(3) loan.  Unable to provide a coherent explanation for this

disparity, Defendant instead points to a purported distinction between broad-based lending and

lending to an individual institution.  DFOF ¶¶ 322-29.[16]  But Section 13(3) did not draw such a

distinction (*see* 12 U.S.C. § 343; Bernanke: Tr. 2275:7-11), all of the more than 100 13(3) loans in

the 1930s (and several in 2008-2009) were to individual borrowers, and Defendant never explains

why AIG was the only individual 13(3) borrower required to forfeit equity.

Defendant's inconsistent treatment of 13(3) borrowers thus belies Defendant's pretextual

claim that the terms of the AIG loan reflected careful policy determinations.  *See* Cragg: Tr.

5113:17-19 ("it doesn't make sense to then isolate AIG as, you know, requiring some special

treatment for either a penalty or moral hazard reason").  Singling out AIG, while providing far

more generous terms to every other borrower, could not prevent moral hazard.  *See* Cragg: Tr.

5112:24 – 5513:3 (in order for a moral hazard justification "to make sense, it would have to

---

[16] Similarly, in response to substantial evidence that access to a non-punitive facility, such as the PDCF, would have mitigated AIG's liquidity needs (*see* PFOF § 11.2), Defendant claims that it made a "policy decision" to make certain lending, including the PDCF, available only to primary dealers.  DFOF ¶¶ 318-321.  However, in September 2008, Defendant lent tens of billions of dollars through the PDCF to foreign subsidiaries of Goldman Sachs, Morgan Stanley, and Merrill Lynch that were not primary dealers.  *See* PFOF § 11.3.

concord with all of the other actions you've done, and there isn't that concordance between the treatment of the primary dealers, AIG and then the treatment of others in the past").

**7.     Defendant's Assertion that the Risk of the Credit Facility Was High Is Irrelevant and Contradicts Defendant's Contemporaneous Analysis and Sworn Testimony.**

**a.    The risk of the AIG loan is irrelevant to the exaction/taking of equity.**  As Mr. Alvarez admitted, if Defendant's security interest in AIG's assets was insufficient, AIG's equity would be worthless.  Tr. 613:7 – 614:12.  Also, risk would not provide statutory authorization to take equity, particularly where Congress expressly dealt with the issue of risk by forbidding unsecured loans.

**b.    Defendant's Assertion That the Credit Facility Was "Enormously Risky" (DFOF ¶ 139) Is Contrary to the Testimony of Its Senior Officials.**  Defendant's senior officials contemporaneously and repeatedly confirmed that the Credit Facility was "fully secured" (PFOF § 21.1(b)-(m)) and, indeed, "overcollateralized" (PFOF §§ 21.1(a), 21.3 – 21.6) and that Defendant did "not run the risk of losing money," (PFOF § 21.1(a)).  These conclusions were amply supported by Defendant's conservative valuation of AIG's collateral, (PFOF §§ 21.5.3–21.6).  In light of this evidence, Defendant's admission that "FRBNY believed that repayment was reasonably likely" (DFOF § III.A.3(a)) is a considerable understatement.

**c.    Defendant's Assertion that the Credit Facility Was "Enormously Risky" (DFOF ¶139) Is Contrary to Its Lending Authority Under Section 13(3).**  As Defendant has long understood, "a consistent principle has required that the Reserve Bank must expect that the borrower's obligation <u>will be</u> fully liquidated in due course (although not necessarily the stated maturity), either from sources available to the borrower or by recourse to indorsements **or** collateral security supporting its note" (PTX 2814 at 5) (first emphasis in original).  Defendant's assertion that credit provided by the lender of last resort "would be characterized as equity risk by a

banker" (DFOF ¶ 121) is inconsistent with this principle and with Defendant's admission that the

Federal Reserve is "not empowered to make any type of investments or equity injections."  PTX

545 at 82:14-16; *see also* PFOF § 23.1.[17]

     **d.   Defendant's Assertion That AIG's Collateral Was "Highly Unusual" Is Contrary**

**to the Testimony of Its Senior Officials.**  Defendant's contention that AIG's collateral was

"highly unusual" (DFOF ¶ 144) and "susceptible to an enormous loss in value in the event of

default" (DFOF § III.A.3.(c).iii) is contrary to the contemporaneous documents and sworn

testimony of its senior officials that AIG's collateral was "high quality" (Geithner: PTX 2206 at

176; Baxter and Dahlgren: PTX 587 at 55) and "the kind of collateral that the Federal Reserve was

looking for" (Paulson: Tr. 1226:13-15), and evidence that AIG's insurance subsidiaries that were

pledged as security "had hugely profitable, pretty stable earnings power" (Geithner: PTX 668 at

47), "viable and profitable" (Bernanke: PTX 616 at 15), "very well capitalized" with "a lot of

potential buyers" (Bernanke: Tr. 2257:11-14), and "very strong" (Liddy: Tr. 3184:23-3185:10; *see*

PFOF § 21, particularly §§ 21.4-21.7).[18]  Moreover, to protect against potential declines in the

---

[17] Defendant wrongly asserts that the 79.9% equity stake would provide a "cushion" against
Defendant's risk of loss.  DFOF ¶ 121.  However, Defendant recognizes that "if the parent
company didn't have the resources to pay back the loan, common shares in the parent company
would not have value."  Alvarez: Tr. 613:7 – 614:12.  As such, taking the shares could not have
provided a "cushion" for the Credit Facility.

[18] Defendant's assertion, without support or explanation, that equity in AIG's subsidiaries were not
tradable (DFOF ¶ 327 n.35), ignores that AIG did in fact sell equity in its subsidiaries to repay
Defendant's loan.  *See, e.g.*, Schreiber: Tr. 6802:14 – 6803:6.  Moreover, as Dr. Bernanke
acknowledged, the "marketable" securities accepted at the PDCF, including asset-backed securities
and real estate interests that are not traded on exchanges, were not actually trading in functional
markets in September 2008, and thus there could not have been "observable market prices" that
reflected value and risk.  Bernanke: Tr. 2278:19 – 2279:18.

value, Defendant applied a 25% haircut to AIG's collateral – a far higher haircut than it applied to any other collateral accepted at other 13(3) facilities.  PFOF § 21.5.5; McLaughlin: Tr. 2448:1-9.[19]

**e.   Defendant incorrectly asserts that "President Geithner made clear to Congress, long after FRBNY had extended the AIG loan, his continuing belief that the Federal Reserve was taking substantial risk in lending to AIG."  DFOF ¶ 150 (citing PTX 564 at 28, 42, 125).**

In fact, Geithner testified to Congress: "We are confident that the FRBNY Credit Facility, its loans to Maiden Lane II and Maiden Lane III, and its preferred interests in certain of AIG's subsidiaries will be fully repaid, and FRBNY should earn a profit on its financial support of AIG." PTX 564 at 42.  Defendant misleadingly quotes Geithner's expressions of concerns regarding Defendant's "overall exposure to AIG" and "its investment in AIG" as evidence of concerns regarding the Credit Facility, but Geithner made clear that his only concern related to Defendant's TARP investment.  *See* PTX 564 at 28, 42.

**f.   Defendant incorrectly asserts (DFOF ¶ 143) that a September 16th analysis of the value of AIG's equity (DX 415) – which was never pledged as collateral (JX 95 at 1) – has bearing on the risk of the Credit Facility, which was secured by AIG's underlying assets.**  As Defendant's own documents show, "for loans to AIG made September 16 through September 19," FRBNY "staff valued various pledged entities using a market value approach suggested by Morgan Stanley advisors to the Bank on the night of the first loan."  JX 111 at 2.  Not only is there no evidence that Defendant ever relied on DX 415, but the document does not even mention, much less discuss, the market value of any pledged entities.  If anything, DX 415, which values AIG's equity at between $35 billion and $107.6 billion as of September 16, confirms that market prices of

---

[19] Defendant inexplicably relies on the September 16 AIG Board minutes as evidence concerning the quality of AIG's collateral.  DFOF ¶ 165.  The minutes do not support Defendant's argument. In fact, AIG always believed it had sufficient assets to fully repay the Credit Facility.  Liddy: Tr. 3021:6 – 3023:23; PFOF § 21.3.1.

AIG's equity on September 16 did not reflect AIG's intrinsic value.  DX 415 at -1469; *see infra* §
IV.B.5.

**g.   Defendant incorrectly asserts (DFOF ¶ 160) that the valuations it relied upon
"assumed that AIG would not lose significant business despite AIG's financial decline."**  In
fact, Ernst & Young's analysis assumed that AIG's domestic P&C and foreign general subsidiaries
would suffer a "50% decrease in new written premium" and that "the value of new business"
written by AIG's life insurance companies would be "zero" (JX 105 at 7-8).  Additionally, Ernst &
Young used high present value discounts on AIG's insurance companies of between 9% and 15%
(JX 105 at 8).  On top of that, Defendant applied a 25% haircut to Ernst & Young's final valuation.
PTX 1636 at 1; McLaughlin: Tr. 2422:13 – 2423:23.[20]

**h.   Defendant fails to mention that its proffered "market indicators" (DFOF ¶¶ 167-
171) relate to the perceived risk of AIG's unsecured debt before AIG received liquidity from
Defendant in the form of secured debt.**  Defendant's reliance on asserted unsecured debt "market
indicators" is flawed because secured debt is less risky than unsecured debt (*see* PFOF § 21.8.2),
because Defendant's proffered market indicators were "biased" during 2008 due to market-wide
illiquidity (Saunders: Tr. 8311:3-23), and because Defendant's proffered market indicators do not
reflect AIG's risk of default after AIG received liquidity from Defendant.  *See* PTX 3267 at 7 ("in
considering the value of AIG's assets supporting the existing and new lines of credit, FRBNY
could take into account any increase in the value of AIG's assets that is expected to occur because
of the new extension of credit").

---

[20] Defendant attempts to makes much of JP Morgan's valuation (DFOF ¶ 143), which was based on
a single day of work.  The contemporaneous valuations that Defendant actually used in making
their collateral assessments, however, are far more reliable evidence of Defendant's understanding
of the riskiness of the Credit Facility.

**8.   All of Defendant's "Policy" Arguments Ignore that Defendant Had No Authority to Demand Any Compensation for a 13(3) Loan Other Than an Interest Rate, or to Fix That Interest Rate for Any Purpose Other Than "Accommodating Commerce and Business" (12 U.S.C. § 357).**

Under Section 13(3) Defendant was authorized solely to receive consideration in the form of an interest rate "fixed with a view of accommodating commerce and business."  12 U.S.C. § 357; *see supra* §§ II.A.1-3.  Nothing in the text or history of the Federal Reserve Act supports a power to require the surrender of equity and voting control to eliminate a supposed "windfall", to address "moral hazard", or to impose punitive terms because, as Secretary Paulson believed, AIG was "a political scapegoat" and "it was important to be seen as being harsh and punitive to the AIG shareholders in order to quell possible political opposition to TARP and other future assistance" (Tr. 1254:22 – 1256:16).

**9.   Defendant's Papers Ignore that FRBNY Lacked Authority to Change the Terms Approved by the Federal Reserve Board of Governors.**

Even if 13(3) could be construed as authorizing the Board to demand equity—which it cannot—it is undisputed that 13(3) "grants *to the Board of Governors* the authority to set terms and conditions on individual rescue loans" (DCOL at 79 (emphasis added)).  Here, FRBNY, not the Board of Governors, established the terms of the extension of credit to AIG, in violation of Section 13(3).

The only version of the term sheet ever considered by the Board of Governors stated that Defendant would receive "*Warrants* for the purchase of common stock of AIG representing 79.9% of the common stock of AIG on a fully-diluted basis" (PFOF §§ 12.1-12.2.2 (emphasis added)).  These warrants did not provide for immediate voting rights, were subject to shareholder approval, and required the payment of an exercise price (PFOF §§ 12.2.2-12.2.4).  FRBNY, however, changed the terms of the equity consideration demanded from AIG as a condition of a 13(3) loan from non-voting warrants to voting preferred stock; the voting preferred stock provided for

immediate voting control on all issues except amendments to the AIG Charter, did not require

shareholder approval, and did not require the payment of any exercise price (PFOF §§ 17.3-17.4,

17.6-17.9).  They represented a material change to the terms presented to the AIG Board on

September 16, 2008 (PCOL § 5.4; PFOF §§ 17.0(a)-(b), 17.2, 17.5).

Defendant argues that the change from warrants to voting preferred stock was within the

scope of the Board of Governors' authorization to FRBNY because the September 16, 2008 Board

Minutes approved of an extension of credit to AIG on terms "such as" those in the term sheet

providing for warrants and delegated to FRBNY "flexibility" in the final terms (DFOF ¶¶ 254-56).

However, Defendant's repeated argument that its unprecedented demand for Plaintiffs' equity

represented a "policy" judgment by the Board of Governors (DCOL at 78-79) also shows that the

form of the equity *could not* be delegated.  12 U.S.C. § 248(k).  Even if such a delegation were

possible, the Board can delegate its non-policymaking authority only by "published order or rule".

12 U.S.C. § 248(k).  No published order or rule delegates to FRBNY the authority to determine the

form of consideration received for 13(3) extensions of credit (PCOL § 5.2).  Because the change

from warrants to preferred stock was never approved by "the affirmative vote of not less than five

members" of the Board of Governors, Defendant's exaction/taking of voting preferred stock was

unauthorized and illegal.

Curiously, Defendant elsewhere appears to agree.  Any revised terms would have required

the "formal authorization by at least five governors – a unanimous vote in 2008, when the Federal

Reserve had only five governors" (DFOF ¶ 117).  There would have been a need for a "revised

authorization from the Board of Governors" before "imposing more onerous terms on Morgan

Stanley's expanded PDCF borrowing" (*id.* ¶ 337).  A "rescue loan required the unanimous approval

of all five members of the Board of Governors at the time, necessarily implicating the policy-based

judgments of each Governor" (*id*. ¶ 388).

Moreover, Defendant's decisions relating to the AIG loan's terms are not entitled to *Chevron* deference because FRBNY, a governmental instrumentality, not the Board of Governors, determined the form of equity received by Defendant.  PCOL §§ 4.8.4, 5.1, 5.2.

**10.  Subsequent Acts of Congress Did Not "Ratify" Defendant's Interpretation of 13(3).**

As Plaintiffs have previously explained, neither through its enactment of TARP nor Dodd-Frank did Congress "confirm" or "ratify" Defendant's unprecedented interpretation of Section 13(3) (PCOL § 4.9).  The cases Defendant cites in support of its ratification argument confirm that ratification has only been found where there exists an agency's longstanding interpretation of the scope of its authority or implementing regulations followed by a clear and direct congressional action in response to that interpretation.[21]  The opposite is present here.

Moreover, none of the subsequent legislation authorized government acquisition of 79.9% of the equity and voting control.  For example, TARP equity was limited to a minority interest in warrants and nonvoting shares (PCOL § 4.9.2).

**11.  Holding the Shares in a Trust Did Not Cure Defendant's Lack of Authority.**

**a.  First, Defendant cannot use a trust to accomplish indirectly what Congress did not authorize it to do directly.**  Moreover, Defendant's lack of authority to condition a 13(3) loan on an equity term establishes an illegal exaction (*see supra* § II.A; DCOL at 92-93).  The fact that Defendant chose to use a Trust as its vehicle to hold, for a time, the proceeds of its illicit act is irrelevant. Defendant admits that it lacks the express authority to hold equity (PTX 368 at 3); but argues that "Creating the Trust to hold that equity was within FRBNY's incidental powers granted

---

[21] *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 143-44 (2000); *CFTC v. Schor*, 478 U.S. 833, 844 (1986); *United States v. Bd. of Gov. of Sheffield, Ala*., 435 U.S. 110, 134-35 (1978); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380 (1969). As the Supreme Court recently held, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Marvin M. Brandt Revocable Trust v. United States*, 134 S. Ct. 1257, 1268 (2014).

by section 4(4) because doing so enabled FRBNY to 'carry into effect those powers which are granted.'"   DCOL at 96.  However, if, as conceded, there is no incidental power for FRBNY to hold equity, where could the incidental power to have a trust hold equity for FRBNY come from? *See* PTX 368 at 3, 5-6 (noting FRBNY did not have incidental power to pay Trust expenses because it was not "reasonably necessary to effectuate an express power in the Act").

**b.   Second, regardless of whether the Trust held the preferred stock for a time, Defendant both initially acquired and ultimately sold the equity interest.**  FRBNY was the settlor of the Trust, providing the Series C Preferred Stock to the Trust (PFOF § 25.1).  Defendant acquired its equity interest and became AIG's controlling shareholder on September 22, 2008 months before the Trust was created on January 16, 2009, and the preferred stock was transferred to the Trust in March 2009 (PFOF §§ 25.1, 25.6.1).  Defendant received AIG common stock and sold its equity stake in AIG only after the Trust was dissolved (PFOF §§ 25.6.1, 37.8).

**c.   Third, the Trust violated New York law.**  Defendant contends that the Trust was legal because New York law permits the creation of a trust "for any lawful purpose" (DCOL at 96).  Defendant ignores, however, that under New York law, a trust may not be created "to evade or violate the law" or to "violate public policy" (PCOL § 13.3.3).  The evidence at trial was consistent with this Court's observation at the outset of the case that the Trust for created for no reason other than to "circumvent the Supreme Court's holding in *California National*".  *Starr*, 106 Fed. Cl. at 87; PCOL § 13.3.2; PFOF § 25.3.  Indeed, as Defendant's Rule 30(b)(6) witness admitted, the shares were transferred to the Trust "because the Federal Reserve Bank of New York could not hold equity" (PTX 4005; *accord* PTX 3217 at 1 (FRBNY Assistant General Counsel Stephanie Heller: "One of the reasons we set up that the shares would be issued to the trust was an authority concern.")).

44

**d.  Fourth, the Trust was an instrumentality of the Defendant.**  Defendant argues that Plaintiffs lack "standing to challenge the Trust's operation."  DCOL at 97.  But Plaintiffs do not challenge the Trust's operation.

Prior to this litigation, Defendant admitted that the Trust was an instrumentality of Defendant.  *See e.g.*, PTX 427 at 2 (letter from FRBNY asserting federal preemption on behalf of the Trust); JX 183 at 1 (letter from NAIC acknowledging FRBNY's position that trust was "an instrumentality of the United States exempt from State law"); PFOF § 25.7.1.  Ignoring that the Trust was a federal instrumentality (PCOL § 13.4), Defendant now argues that Plaintiffs "failed to demonstrate the 'complete domination' necessary to treat the Trust as legally indistinguishable from FRBNY" (DCOL at 98 (citing to *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1364-65 (Fed. Cir. 2013)).  But *Hall* – a case about whether a corporate officer was the "alter ego" of his corporation such that he could be held personally liable for the corporation's patent infringement, 705 F.3d at 1364-65, has no bearing on whether the Trust was a federal instrumentality.  *Cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397-398 (1995).  As this Court has held, there was "no meaningful legal distinction between FRBNY and Trust ownership of the Series C Preferred Stock" (*Starr*, 106 Fed. Cl. at 87) and the Trust was an instrumentality of Defendant (PCOL § 13.4).

## III. <u>DEFENDANT'S AGREEMENT DEFENSE</u>

### A.    A PLAINTIFF'S AGREEMENT TO PROVIDE PROPERTY DEMANDED BY THE GOVERNMENT IS NOT A DEFENSE TO AN ILLEGAL EXACTION CLAIM.

#### 1.   In General a Plaintiff's Voluntary Agreement Is Not a Defense to an Illegal Exaction Claim.

In *Suwannee*, the Government had demanded, and the plaintiff had agreed to pay, a $20,000 fee as a condition of the Government's approval of plaintiff's sale of a ship to a foreign

owner.  The Government defended on the ground that plaintiff had voluntarily agreed to pay the fee and had obtained the benefit of selling the ship to the foreign owner.  The court rejected the Government's defense, holding that "the doctrine of voluntary payment should not be applied", and that "officials have no authority to add to their function of determining the compatibility of the application with the public interest, the supererogatory function of picking up a few dollars for the public treasury" (279 F.2d at 877).

As the Federal Circuit held in *American Airlines, Inc. v. United States*, 551 F.3d 1294, 1302 (Fed. Cir. 2008): "Failure to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation".  Similarly in *Fireman v. United States*, 44 Fed. Cl. 528 (1999), the court expressly rejected the argument that the involuntary conveyance of property through coercion is an element of illegal exaction claims.  In that case, the plaintiffs sought return of money they contributed to a presidential campaign that had been turned over to the Federal Election Commission.  *Id*. at 530.  The Commission argued that because plaintiffs had voluntarily given the money to the campaign, which then turned it over to the Commission, plaintiffs failed to state an illegal exaction claim.  *Id*. at 534-35.  The court held that "government 'coercion' is not required" to establish an illegal exaction claim.  *Id*. at 536.

In *United States v. Edmonston*, 181 U.S. 500 (1901), the Court rejected a plaintiff's attempt to recover an overpayment made for land purchased from the Government.  The Court noted that the Government was authorized to sell the land for $1.25 per acre, that plaintiff paid $2.50 per acre as a result of "a mistake on his part", and that "the transaction was purely voluntary".  *Id*. at 502, 515.

From the more than 100 years after *Edmonston*, Defendant only cites a single illegal exaction case, *Rough Diamond Co. v. United States*, 351 F.2d 636 (Ct. Cl. 1965), where recovery

was barred because of a plaintiff's agreement to the exaction.[22]  Similarly, in *Alyeska Pipeline Service Co. v. United States*, the court identified numerous examples of illegal exaction cases since *Edmonston* in which "this court has found the Edmonston doctrine inapplicable" and only one case (*Rough Diamond*) where the court "followed Edmonston and barred recovery of overpayments to the government".  624 F.2d 1005, 1017 (Ct. Cl. 1980); s*ee* PCOL § 8.2.

**2.   As the Court in *Alyeska* Notes, the Only Cases in Which "Voluntariness" Has Been Allowed as a Defense Are Certain Overpayment Cases.**

In *Alyeska* the court describes *Edmonston* as barring "recovery of overpayments".  624 F.2d at 1017.  *Rough Diamond*, the only post-*Edmonston* illegal exaction case referred to in *Alyeska* or cited by Defendants as allowing a defense of voluntariness was also an overpayment case.  *See Rough Diamond*, 351 F.2d at 638.  Overpayment cases, where the government is authorized to sell assets for a certain type of consideration, and where the only claim is that a mistake was made in the calculation of the amount of money due, are fundamentally different from cases where an agency demands consideration that it is not authorized to demand in order to take some action (*e.g.*, approve the transfer of a ship, make a loan, approve pipeline plans).

As *Edmonston* and the cases subsequent to it demonstrate, voluntary agreement is a possible defense to an illegal exaction claim only in a narrow set of cases where there is a mistake concerning how much of – not whether – a type of consideration the Government is authorized to demand, **and** no Congressional purpose would be frustrated by barring the claim.

**3.   Defendant's Argument That Plaintiffs' Illegal Exaction Claim Is Barred Because 13(3) Was Not "Intended to Benefit" Borrowers Is Wrong Both as a Matter of Illegal Exaction Law and as an Understanding of 13(3).**

---

[22] With respect to what it calls the "voluntary payment doctrine", Defendant asserts that "the Supreme Court has routinely cited this maxim in its illegal exaction jurisprudence" (DCOL at 104), but Defendant cites only *Edmonston* and two cases from the 1880s, one of which is not even an illegal exaction case.  *See Chi. & Nw. Ry. Co. v. United States*, 104 U.S. 680 (1881) (breach of contract case in which the Postmaster General argued that a new law reformed the price for the shipment of mail in his contract).

**a.   The "intended to benefit" rule is just one way in which a voluntary agreement defense can be inconsistent with the Congressional intent underlying a statutory provision.**

In *Sprague Steamship Co. v. United States*, the court distinguished *Edmonston* on the basis that "In the Edmonston case the Supreme Court did not find a Congressional purpose that land should be sold at the prices fixed by statute sufficiently strong to overcome the general legal doctrine relating to voluntary payments made under mistake of law." 172 F. Supp. 674, 676 (Ct. Cl. 1959).  The *Sprague* court found that barring plaintiff's claim based on plaintiff's voluntary agreement to the exaction at issue would be inconsistent with the Congressional purpose of the law at issue in *Sprague*, without any analysis of whom the law intended to benefit.

Similarly, in *Rough Diamond*, the court explained that "the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny." 351 F.2d at 640.  In that case the court held that the statute in question "was designed to benefit American farmers, not cotton exporters or merchants (like plaintiffs)", and that as "persons outside the circle of beneficiaries Congress drew for Section 203, purchasers of CCC cotton are bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law." *Id*. at 640, 642.  Thus the "intended to benefit" test was used as one means of analyzing congressional intent.  *See Alyeska*, 624 F.2d at 1017-18.

Apart from the overpayment case of *Rough Diamond*, the "intended to benefit" test has never been a bar to recovery in an illegal exaction case.  Thus, courts have routinely ruled for plaintiffs who made voluntary payments, without regard to the intend-to-benefit rule, when the illegal exaction claim involves whether the Government had authority to take a form of consideration and the dispute was not limited to the amount Defendant demanded.  *See, e.g.,*

*American Airlines*, 551 F.3d at 1302 (holding that fees paid by airline that were supposed to be paid by its passengers were recoverable as an illegal exaction although the fees had been paid over several years without protest); *see also Alyeska*, 624 F.2d at 1017 (collecting cases); PCOL § 8.2. *Rough Diamond* is perhaps better understood as reflecting the principle, most recently articulated in *A&D Auto Sales*, that "in some circumstances, government action directed to a third party does not give rise to a taking if its effects on the plaintiff are merely unintended or collateral." 748 F.3d at 1153.  In *Rough Diamond,* the effect on plaintiffs were "unintended and collateral," whereas the effects on plaintiffs in cases where recovery was permitted despite their voluntary agreement was more direct.  It is hard to imagine a case where the effect on Plaintiffs is more intended and direct than the present case (*see, e.g., supra* § II.B.4; *see also* §§ II.A.1, IV.A.1-4).

**b.   In any event, Section 13(3) was enacted to benefit solvent corporations, partnerships, and individuals who were experiencing liquidity shortfalls during a financial crisis.**  Where a statutory provision or regulation "appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons."  *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970).  Section 13(3) identifies such a class of persons: solvent businesses experiencing a liquidity crisis during unusual and exigent circumstances who are able to provide security for a loan (*see* PCOL § 1.3).  Indeed, the Federal Reserve itself was aware that Section 13(3) was intended to benefit qualified borrowers, noting in a 1970 memo: "The purpose of this addition to the law, which was passed during the depression, was to permit borrowing from Federal Reserve Banks by individuals and businesses when they were unable to secure adequate credit accommodations from other banking institutions."  PTX 2816 at 3-4.

Defendant argues that Plaintiffs were not intended to benefit from 13(3) because the provision is intended "to protect the public interest in the integrity and soundness of the economy

and the Federal Reserve System."  DCOL at 105-06.  There is no dispute that 13(3), like every statute, including every statute at issue in every illegal exaction case, serves a public purpose.  But it is also clear that "it is possible for a regulation or law to benefit both the government and a class of private parties."  *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1314 (Fed. Cir. 2011); *see also* Cragg: Tr. 5465:20 – 5466:7 ("it's a self-reinforcing policy in the sense that you're correcting the impact of crisis on specific firms, but at the same time it's doing that, that reinforces the broader objective of mitigating the overall crisis.  So, it's a cycle – it's a policy that is self-reinforcing").

The Congressional purpose of assisting businesses suffering from a financial crisis is also apparent from the title of the Act that enacted 13(3), "The Emergency Relief and Construction Act of 1932," and the Act's stated purpose: "To relieve destitution" (Pub. L. No. 72-302, 47 Stat. 709, 709).  The legislative history likewise makes clear that it was intended: "To aid in financing agriculture, commerce, industry, and housing" (H.R. Rep. No. 72-1760, at 3).

The more than one hundred Section 13(3) loans made from 1932 to 1935 to a broad range of individual businesses confirm the extent to which 13(3) was intended to assist, and was understood by the Federal Reserve as being intended to assist, individual businesses – including, for example, to a typewriter company, a vegetable grower, a beverage company, and a marble company (PTX 2816 at 5-6; *see also* PFOF § 21.8.1 n.55).

In addition, Congress' limitation on the consideration for a 13(3) loan to an interest rate fixed with a view to accommodating commerce and business necessarily evidenced Congressional intent that borrowers should not be charged "additional compensation."  This is particularly so in view of Congress's long-standing and repeated antipathy to Government ownership of public corporations (*see* PCOL § 4.3; 31 U.S.C. § 9102; PCOL § 4.9.2-4.9.3; 12 U.S.C. §§ 5223, 5235).

**4.   Defendant Cannot Distinguish *Suwannee* and Similar Cases.**

Defendant's efforts to distinguish *Suwannee*, a case closely analogous to Defendant's illegal exaction here, fail.  In *Suwannee*, as here, the Government conditioned providing a benefit on a demand for money or property that the Government was not authorized to exact (s*ee* PCOL §§ 2.3, 8.0).

**a.   Defendant's argument that *Suwannee* is distinguishable because the plaintiff there was already subject to the Government's regulatory powers (DCOL at 106-07) fails both on the law and the facts.**  On the facts, Defendant as the sole provider of credit during a financial crisis had at least as much power over AIG as the Government had over Suwannee.  As Defendant's expert Professor Daines explained, "as a lender of last resort to AIG, the government was a monopolist regarding the terms of the loan".  Daines: Tr. 8470:1-8; *see also* Geithner: Tr. 1444:15-20 ("the Federal Reserve was the only fire station in town that you could turn to when things fell apart for liquidity"); PFOF § 20.4; PCOL § 12.9.

On the law, any Government regulatory power over Suwannee was irrelevant to the decision, and not mentioned by the *Suwannee* court.  In *Chris Berg*, the court, rejecting a voluntariness defense, said: "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest."  426 F.2d at 317.  The lack of a pre-existing regulatory framework was irrelevant to the court's analysis of the Government's voluntariness defense.

**b.   Defendant's second basis for distinguishing *Suwannee*, that the statute at issue provided no discretion to the government officials as to whether to award the benefit (DCOL at 107) misstates *Suwannee* and the underlying statute.**  The language Defendant quotes from *Suwannee*, that the Government officials "concluded, as they must have done, that the transfer would be consistent with the public interest" (DCOL at 107), does not suggest a lack of statutory

discretion; it merely reflects the fact that the officials must have come to that conclusion because they approved the transfer.  The statute in question makes clear that approval of transfers are in the Administrator's discretion.  *See* Shipping Act of 1916 §§ 7-9, Pub. L. No. 64-260, 39 Stat. 730-31; *see also* 46 U.S.C. § 808 (1958).  In *Suwannee*, the Administrator had discretion whether to approve a transfer, but not whether to demand unauthorized compensation.  279 F.2d at 876-77.  Here the Federal Reserve had discretion whether to make a 13(3) loan, but not whether to demand unauthorized consideration.

> **B.      IN ANY EVENT, PLAINTIFFS DID NOT "VOLUNTARILY" AGREE TO THE EXACTION/TAKING OF THEIR EQUITY AND VOTING CONTROL.**

**1.    Both *Edmonston* and *Rough Diamond* Make Clear That Only "Purely Voluntary" Agreement Can Ever Bar Recovery.  *Edmonston*, 181 U.S. at 515.**

In *Edmonston* the Court emphasized that plaintiff's agreement was "purely voluntary" and there was no indication that the plaintiff had any particular need or urgency to acquire the land in question.  Similarly, in *Rough Diamond*, the court emphasized that the plaintiffs were simply exchanging diamonds for cotton that they planned to resell, 351 F.2d at 642, and that they had the choice to exchange their diamonds for other agricultural commodities.  *Id*. at 643.  In both cases the overpayment resulted from a mistake, not an attempt by an agency to take property it was not authorized to take as compensation for Government assistance.

**2.    AIG's Undisputed Need for the Liquidity with Respect to Which Defendant Had a Monopoly, by Itself Makes *Edmonston* and *Rough Diamond* Inapplicable.  *See* PFOF §§ 4.0, 13.0, 20.3-20.4; *infra* § III.D-E.**

> **C.      PLAINTIFFS DID NOT "VOLUNTARILY" AGREE TO THE EXACTION OR TAKING OF THEIR EQUITY AND VOTING CONTROL BECAUSE THEY WERE NOT PARTIES TO THE CREDIT AGREEMENT.**

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  Plaintiffs were not

52

parties to the Credit Agreement, and did not agree to Defendant's acquisition of their equity (PCOL § 12.1; PFOF § 35.0).  Defendant's argument that AIG's Board spoke for the Plaintiffs (DCOL at 55-57) is simply an attempt to reargue its position that Plaintiffs should not have direct claims (*see supra* § I).

Moreover, Defendant took deliberate and affirmative steps to prevent Plaintiffs – the very parties against whom Defendant is asserting a voluntary agreement – from having the opportunity to make any decision with respect to the Credit Agreement terms.  Defendant intentionally refused Greenberg and Starr a "seat at the table" during the negotiations leading up to the September 16 term sheet, and excluded them from the drafting process of the Credit Agreement (PFOF § 11.10(d)-(e)).  Defendant also sought to conceal the terms of the agreement from shareholders so that they did not learn Defendant intended, as early as September 19, 2008, to obtain shareholder equity without a shareholder vote (PFOF §§ 17.8, 20.7; PTX 3242 at 1 ("ideally we should have the pref issued before they realize that we are going to do it w/out a SH vote")).

When shareholders did learn the proposed terms of the agreement, shareholders did object (PFOF §§ 17.8, 35.3; *see also* Offit: Tr. 7954:22 – 7955:7), including in the *Walker* lawsuit (*see infra* § V.A).

## D.     THERE WAS NO VOLUNTARY AGREEMENT BECAUSE AIG WAS UNDER DURESS.

### 1.   The Standard for Duress.

As this Court previously stated:  "To establish coercion or duress, a plaintiff must show that:  (1) it 'involuntarily accepted' the other party's terms; (2) 'circumstances permitted no other alternative'; and (3) 'said circumstances were the result of coercive acts of' the other party."  *Starr*, 106 Fed. Cl. at 77 (quoting *Fruhauf Sw. Garment Co. v. United States*, 126 Ct. Cl. 51, 62 (1953)); *accord Pew Forest Prods. v. United States*, 105 Fed. Cl. 59, 67 (2012); *see also* PCOL § 12.5.  As

another court described it: "Duress, understood most concretely, is the situation in which one person obtains a temporary monopoly that it tries to use to obtain a benefit to which it is not entitled." *Prof'l Serv. Network, Inc. v. Am. Alliance Holding Co.*, 238 F.3d 897, 900 (7th Cir. 2001).

The "involuntarily accepted" element is established by proof of the other two elements. *Starr*, 106 Fed. Cl. at 77-78. Thus in *Sinclair v. United States*, 66 Fed. Cl. 487 (2005), relied on by Defendant, the court held: "Even though Plaintiff has failed to establish that he involuntarily accepted Defendant's terms, Plaintiff can still prevail on this element of duress if he can show that the government's action against him was wrongful, that the government failed to follow its procedures, or that the government took adverse action against him when it lacked reasonable grounds." *Id.* at 493.[23]

As this Court has held, the "no other alternative" requirement is met if plaintiff has no realistic alternative. *Starr*, 106 Fed. Cl. at 77-78. And coercive acts include acts that are "wrongful', but need not be illegal" or an act which "'violates notions of fair dealing.'" *Id.* at 77.

Defendant's argument that if "not a single board member testified that their free will was overcome" that "alone defeats Starr's claim of coercion" (DCOL at 22) is thus incorrect as a matter of law because it disregards the law that what matters is not whether a party made an intentional, or even rational choice; what matters is whether the party had a realistic choice.[24]

---

[23] *Accord Murphy v. United States*, 69 Fed. Cl. 593, 605-06 (2006); *Terban v. Dep't of Energy*, 216 F.3d 1021, 1026 (Fed. Cir. 2000); *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136-37 (Fed. Cir. 1987); *see also* PCOL § 12.4. No wrongful conduct was found in *Plechner v. Widener College, Inc.*, 569 F.2d 1250 (3d Cir. 1977), *Henderson Cnty. Drainage Dist. No. 3 v. United States*, 53 Fed. Cl. 48 (2002), or *Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1388-90 (Fed. Cir. 1983), cited by Defendant.

[24] Defendant also claims that Professor Zingales cannot show that the AIG Board "was coerced or compelled to accept FRBNY's loan offer or the Credit Agreement," based solely on the fact that Zingales testified that he did not assess the independence or judgment of the individual AIG Board

In *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382 (Ct. Cl. 1969) the court observed that financial disaster does not constitute duress when the "Government is in no way responsible" for the plaintiff's financial condition "at the time an agreement is signed". *Id*. at 390. However, the court held that where the Government is in some way responsible for the plaintiff's financial condition, financial disaster does constitute duress. *See id*. at 388-90 (duress existed where the Government's delay caused plaintiff's predicament).

For duress to exist, the Government need not be the exclusive cause of a plaintiff's precarious financial condition. In *Aircraft Associates & Manufacturing Co. v. United States*, 357 F.2d 373 (Ct. Cl. 1966), for example, the court concluded the plaintiff's duress was caused by three factors – (1) "a drop in the aluminum market"; (2) plaintiff's "highly optimistic guess as to the amount of aluminum that could be obtained from the carcasses" of the aircraft; and (3) "the removal by personnel of defendant of a substantial number of parts from the aircraft between the time the invitation for bids was issued and before title passed to plaintiff", *id.* at 889 – only one of which was attributable to the Government. The court nevertheless concluded that a release signed by the plaintiff was obtained through duress, emphasizing the plaintiff's fear of "economic disaster" as a result of the Government's taking of equipment and preventing of the plaintiff from performing the contract as well as the contracting officer's demand that the settlement be signed within two or three days. *Id*. at 894-98.

Cases cited by Defendant where the Government did not materially contribute to plaintiff's distress are inapposite. *See, e.g.*, *Petrick v. United States*, 12 Cl. Ct. 700, 702 (1987) ("Subjective

---

members. DFOF ¶ 114 n.13. Defendant misunderstands Zingales' analysis. As Zingales explained, the issue of board independence or judgment is "not relevant" "to the question of effective economic control" (Zingales: Tr. 4102:4 – 4103:5); rather, he demonstrated that the AIG Board was controlled by Defendant and forced to accept the terms of the Credit Agreement because Defendant, the lender of last resort, was functioning as a monopolist lender at the time. PFOF § 20.4 & n.45.

feelings of duress on the part of the plaintiff *absent government action*, are not relevant to a determination of voluntariness." (emphasis added)).

### 2.  AIG Had No Realistic Choice.

While under some circumstances bankruptcy might be a realistic option, the evidence is clear that it was not for AIG in September 2008.  The Board believed that the Defendant's "take-it-or-leave it" terms were "onerous" and "exorbitant" (PFOF §§ 13.3, 20.3.1), but felt they "don't have choice" (*id.* § 20.3) and that the Board's approval of the Credit Agreement "should not be confused with approval of the robbery – the government stole at gunpoint 80 percent of the company" (*id.* § 20.4(a)).  Bankruptcy "may have been a legal option," but "it was not a realistic or viable option" (*id*. § 20.4).  The limited Board member testimony at trial is not surprising since the Government has taken the position that AIG is required to indemnify the Government in the event that Plaintiffs prevail in this case.  Def. Br. Summ. J. [Dkt. 246] at 39.  Documents reflecting Board members' contemporaneous reactions to the Credit Agreement terms reliably reflect how Board members felt.  Moreover, there is no dispute that there was "not a realistic or viable option."

### 3.  Defendant Contributed to AIG's Distress by Defendant's Threats and Change of Position on September 22.

In the days between September 16 and September 22, Defendant put AIG into an even more vulnerable financial position.  After leading the AIG Board to believe that the equity would be non-voting warrants requiring shareholder approval and requiring Defendant to pay an exercise price (PFOF § 17.9), denying AIG the ability to look for other credit through a fiduciary out provision (Baxter: Tr. 911:20 – 912:10), and discouraging other sources of liquidity (PFOF §§ 11.9-11.13), Defendant at the last minute changed the form of equity to convertible preferred stock (PFOF § 16.6(d)).  Defendant also informed the Board that if AIG did not agree that evening, Defendant would demand immediate repayment of secured short-term loans it made pursuant to

demand notes in the aftermath of Lehman's collapse.  JX 103 at 4; PTX 195 at 3; PFOF § 19.0.  In

these circumstances, the AIG Board was advised by its outside counsel that bankruptcy was no

longer an alternative protected by the business judgment rule.  JX 103 at 5-6.[25]

### 4.   Defendant Contributed to AIG's Distress by Taking Punitive Action Without Due Process and Discriminating Against AIG for Political Purposes.

Defendant has not contested that discrimination against AIG for political purposes or the

imposition of punitive provisions without any investigation, analysis, or findings would be

wrongful.  Instead, Defendant argues that no due process claim can be asserted (DCOL at 77).  But

this misunderstands the relevance of Defendant's conduct.  Defendant's decision to impose

punishment on AIG without being notified of the offense or given an opportunity to be heard does

violate the Due Process Clause (*see supra* § II.B.5).  However, the relevance of the conduct is that

it demonstrates wrongfulness, not that it is a separate basis for recovery.  In fact, even if such

conduct did not rise to the level of a technical due process violation, it still would be wrongful for

purposes of proving duress.

Similarly, while Congress intended that the Federal Reserve not discriminate amongst

borrowers, favoring the politically powerful and abandoning the politically weak,[26] the

discrimination against AIG is clear (PFOF §§ 22.0, 26.2, 26.3, 31.0, 32.0).

### 5.   Defendant Contributed to AIG's Distress by Abusing Its Monopoly Power to Obtain a Benefit to Which It Is Not Entitled.

---

[25] Defendant tries to recast Rodgin Cohen's statement as advice that "the Credit Agreement was so plainly in the best interests of AIG and its shareholders that it seemed uncertain whether a contrary judgment could be reached in good faith".  DCOL at 47 & n.9.  In making this assertion, Defendant points to its own proffer of what it *expected* Cohen's testimony to be.  *Id.*  That proffer, however, is not a part of the record.  *Rasmussen v. United States*, 543 F.2d 134, 140 (Ct. Cl. 1976) (noting that reliance on evidence outside of the record is procedural error).

[26] PCOL § 7.5; S. Rep. No. 63-133, Pt. 2, at 106 (1913) ("We condemn the present methods of depositing Government funds in a few favored banks, largely situated in or controlled by Wall Street, in return for political favors, and we pledge our party to provide by law for their deposit by competitive bidding in the banking institutions of the country, national and State, without discrimination as to locality, upon approved securities and subject to call by the Government.").

Defendant seems to recognize that "the Government has market power that allowed it to insist on certain terms of the rescue package" (DCOL at 11-12, 17-20), but not to understand its significance.  In fact: "Duress, understood most concretely, is the situation in which one person obtains a temporary monopoly that it tries to use to obtain a benefit to which it is not entitled." *Prof'l Serv. Network*, 238 F.3d at 900; *accord Trompler, Inc. v. NLRB*, 338 F.3d 747, 751 (7th Cir. 2003) (citing *Alaska Packers Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902); *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971) ("The existence of economic or business compulsion is demonstrated by proof that immediate possession of needful goods is threatened." (quotations omitted)); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586, 2598 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing.").

As lender of last resort, Defendant used its temporary monopoly over credit during the financial crisis to obtain benefits and terms from AIG and its shareholders to which it was not entitled.  Because the Government often finds itself in a monopoly position as the only party that can provide a particular benefit, "Settlements and payments exacted by officials of the Government without lawful authority and in arbitrary fashion, to which parties have yielded sometimes under and sometimes without protest to escape onerous penalties and financial disaster, have been set aside innumerable times by the Supreme Court." *James Shewan & Sons v. United States*, 73 Ct. Cl. 49, 93-96 (1931) (collecting cases).

As the Supreme Court has explained, "When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required".  *Robertson v. Frank Brothers Co.*, 132 U.S. 17, 23 (1889); *see also Urban Plumbing*,

408 F.2d at 391 (quoting *Robertson*); *Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953) (Government took plaintiff's property in violation of the Fifth Amendment where it used its influence to convince Philippine Government to place an export embargo on radar equipment the plaintiff was in negotiations to sell).

It is not Defendant's monopoly over credit, but rather its misuse of that power to discriminate and obtain benefits to which it was not entitled, that gave rise to conditions of duress. The Supreme Court recently reiterated in *Koontz* that the Government cannot abuse its power— even where that power is discretionary—to force someone to accede to an illegal condition and surrender property to the Government.  133 S. Ct. at 2596 ("we have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights.").  This misuse distinguishes this case from the examples involving the Government being "a monopoly seller of wireless spectrum" (DCOL at 18), or a "monopoly buyer of aircraft carriers" (*id*. at 19) that Defendant cites.   In both the wireless spectrum and aircraft carrier examples, there are bidding and other contracting procedures in place to ensure that Defendant allocates resources or contracts in a fair and equitable manner and does not unilaterally impose terms on a single recipient of wireless spectrum or entity that contracts with the Government for the provision of aircraft carriers whereby it extracts benefits to which it is not entitled.[27]

By contrast, in exercising its role as lender of last resort during the financial crisis, Defendant freely provided loans to hundreds of institutions in need of credit, without imposing any

---

[27] With respect to the wireless spectrum example, *see* 79 Fed. Reg. 48442-01 at ¶ 263 (Aug. 15, 2014) and 29 FCC Rcd. 8386 (July 23, 2014).  With respect to the aircraft carrier example, *see* 48 C.F.R. § 214.201-6; 48 C.F.R. § 215.371-3.  Moreover, government contractors have the right to challenge the decisions of contracting offices and appeal their decisions to judicial authorities.  *See* 41 U.S.C. § 7101 *et seq.*

punitive conditions on these institutions or its shareholders.  *See* PCOL § 6.2.2; PFOF §§ 11.0,

32.2.  But, when it came to AIG, Defendant used its monopoly power to single out AIG and its

shareholders for punishment; as Secretary Paulson explained:  AIG "was certainly a scapegoat for .

. . Wall Street and all the bad practices that people were angry about."  (Paulson:  Tr. 1254:22 –

1255:2); *see also supra* § II.B.4.

### 6.    The *A&D* Case Supports a Finding of Duress.

Defendant contends that in *A&D Auto Sales Inc. v. United States*, the Federal Circuit

"reaffirmed the high bar necessary to prevail on a duress claim" (DCOL at 12); to the contrary, the

court there held:

> "The circumstances relevant to the issue of coercion include but are not limited to
> whether the government insisted on the terminations, whether the terminations
> would have occurred in any event absent government action, whether the
> government financing was essential to the companies, whether the government
> had any role in creating the economic circumstances alleged to give rise to
> coercion, and whether the government targeted the dealers for termination."  748
> F.3d 1142, 1155 (Fed. Cir. 2014).

With respect to AIG not just one, but almost all, of these factors are present:

(a)  "the government insisted" on what was taken (PFOF §§ 13.0, 16.0, 17.1, 17.6-17.9)

(b)  "government financing was essential" (PFOF §§ 7.0, 9.0, 20.1-20.4)

(c)  the government had a "role in creating the economic circumstances alleged to give rise to
    coercion" (PFOF §§ 10.0-11.0, 15.12, 17.0, 19.0)

(d)  "the government targeted" plaintiffs (PFOF §§ 22.0, 26.0, 31.0-32.0)

### E.    THERE WAS ALSO NO VOLUNTARY AGREEMENT BECAUSE DEFENDANT CONTROLLED THE TRANSACTION.

### 1.    The Relevant Date Is September 22, the Date of the Credit Agreement.

As a matter of law, there can be no takings claim prior to the date property is actually taken.

*See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("a claim alleging a Fifth

Amendment taking accrues when the act that constitutes the taking occurs").

**2.   The Fact That the September 16 Term Sheet Expressly Provides It Is Not Legally Binding Is Dispositive That the Taking Did Not Occur Then.**

Each version of the term sheet expressly states that it "is not intended to be legally binding on any person or entity," and contemplates the future execution "by the applicable parties" of "appropriate documentation" that would operate as a "binding agreement" (JX 63 at 5; JX 64-A at 3; DX 437 at -031).[28]

"The best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992); *Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc.*, 869 F.2d 96, 99 (2d Cir. 1989).   A writing that states that it will be replaced by a fully executed contract "at a later date", affirmatively states that it is not legally binding, and "nowhere states that" the parties "intend to be legally bound until such future agreement is reached", is not an enforceable contract. *Aksman v. Xiongwei Ju*, 21 A.D.3d 260, 261 (N.Y. App. Div. 2005); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261-62 (2d Cir. 1984), *cert. denied* 469 U.S. 828 (1984).[29]   A term sheet is a "classic example of an unenforceable 'mere agreement to agree'", *Richbell Info. Sys., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297 (N.Y. App. Div. 2003), particularly where, as here, its execution is "expressly conditioned on the 'execution of a definitive agreement satisfactory in form and substance' to both sides". *Prospect St. Ventures I, LLC v.*

---

[28] Indeed, further language indicating that no offer or agreement had been concluded was added to the version of the term sheet Defendant asserts is "final" (DFOF ¶ 65) which states, "This Summary of Terms shall not constitute an offer to sell, nor the solicitation of an offer to buy, any security or instrument referred to herein".   DX 437 at -024, -31.

The inclusion of a merger clause in the Credit Agreement also clearly establishes the parties' intent not to be bound by a term sheet. *See* JX 107 at 110 ("This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.").   "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir. 1997).

[29] The case law on which Defendant relies asserts the very same proposition: unless the parties have agreed on all material terms and evidenced an intention to be bound, "preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations."   *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996); DCOL at 43.

*Eclipsys Solutions Corp.*, 23 A.D.3d 213, 213 (N.Y. App. Div. 2005).[30]

An agreement that clearly states parties' intent not to be bound, includes "open terms", and anticipates "future preparation and execution of contract documents" is not binding as a matter of law. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989); *accord Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (if "either party communicates an intent not to be bound until a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract"); *Cohen v. Lehman Bros. Bank*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) ("if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further"); *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) ("This unambiguous expression of the parties' intent not to be bound establishes that, as a matter of law, the Term Sheet was not binding.").

Moreover, no version of a term sheet was executed by both parties (PFOF § 14.4), and the term sheet itself makes clear that the parties did not intend to be bound unless and until "appropriate documentation" was "executed by the applicable parties" (PFOF § 14.3). *See Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970) ("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed.").[31]

---

[30] Although the term sheets are governed by New York law (*see* DX 437 at -035), Defendant turns instead to Federal Circuit law to interpret its provisions. That precedent is equally unfavorable to Defendant's litigation position, however. By Defendant's own admission, its cases at most stand for the proposition that "agreements to agree" obligate the parties to negotiate in good faith. *See* DCOL at 42 (*citing North Starr Steel Co. v. United States*, 477 F.3d 1324, 1332 (Fed. Cir. 2007)). A requirement to negotiate in good faith does not bind the parties to achieve the contract's objective. *See North Star Steel*, 477 F.3d at 1333.

[31] Defendant's reliance (*see* DCOL at 42-43) on *Singer v. Xipto, Inc.*, 852 F. Supp. 2d 416, 424 (S.D.N.Y. 2012) (Karas, J.) ignores the many factual differences between that case and this one.

**3.   Prior to the Execution of the Credit Agreement, Defendant Loaned Money to AIG Pursuant to Collateralized Demand Notes, Not a Term Sheet.**

Defendant argues that extensions of credit to AIG between September 16 and 19 constituted partial performance of the term sheet.  That is legally irrelevant[32] and factually wrong. Between September 16 and 19, 2008, Defendant disbursed $37 billion to AIG pursuant to demand notes (PTX 339 at 4).  The demand notes were "separate and distinct legal documentation from the legal documentation that was executed on September 22" (Baxter: Tr. 741:21-22).  AIG's borrowing against those notes was fully secured pursuant to yet another, separate contract, the Amended and Restated Pledge Agreement, under which AIG pledged equity interests in five subsidiaries (JX 92 at 1, 13).  Neither the Pledge Agreement nor the demand notes required AIG to transfer equity to Defendant.  (*See* JX 92; JX 84; PFOF § 16.1).  Indeed, Defendant's threat to call in the demand notes in the event that the AIG Board did not approve the Credit Agreement manifested its own contemporaneous belief that no binding agreement existed as of September 16, 2008 (JX 103 at 4).

**4.   There Was No "Meeting of the Minds" on September 16, 2008 as to the Material Terms of Defendant's Loan to AIG.**

There can be no contract without the parties' "meeting of minds" concerning all material terms.  *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E. 2d 1050, 1053 (N.Y. 1999) ("To create a binding contract, there must be a manifestation of mutual assent

---

Significantly, the *Singer* court has since ruled that an agreement expressly stating that the parties would not be bound unless and until the document was executed had no binding effect, notwithstanding the parties' years of performance.  *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2012) (Karas, J.).

[32] Even if the Court deems Defendant's lending between September 16 and 22, 2008 to be partial performance, as a matter of law that performance cannot overcome the plain language of the term sheet, which expressly sets forth the parties' intent not to be bound.  *See Arcadian Phosphates*, 884 F.2d at 73 (where the parties' intent not to be bound is expressly stated on the face of the writing, even "considerable partial performance" will not overcome that stated intent at summary judgment); *Kreiss*, 37 F. Supp. 2d at 300 ("Plaintiffs' contention that the substantial performance by both sides demonstrates that the parties intended the Term Sheet to be binding is to no avail.").

sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."). One of these terms was the form of equity. *See, e.g*., Daines: Tr. 8544:1-4 ("preferred stock is materially different from the warrants that AIG could issue on September 16"). The equity component was a "most important" part of the Credit Agreement to AIG (PTX 182 at 1; PFOF § 17.2-17.5; Farnan: Tr. 4404:1-5). Defendant also considered preferred stock with immediate voting rights, as compared to non-voting warrants, to be very important (PFOF §§ 17.6-17.9; DFOF § III.C.1). Either the agreement reached on September 16 was premised on material terms (warrants) that were different than those included in the September 22 Credit Agreement (preferred stock), or there was no meeting of the minds on September 16. Either way there was no agreement on the form of equity before September 22.

### a. Neither the Board of Governors Nor AIG's Board Ever Saw or Approved the Version of the Term Sheet Defendant Claims Was Binding.

None of the parties to the purported term sheet (much less AIG's shareholders whose property was affected by the agreement) actually reviewed, executed, and approved the version of the term sheet that Defendant claims is definitive (DX 437). As a result, none can be bound by its terms.

Defendant contends that the operative term sheet provides that Defendant would receive an equity interest in a "Form to be determined" (*see* DFOF § II.A.1). It is undisputed that the Board of Governors never reviewed, approved, or executed a term sheet containing that language.

Similarly, as was made clear at trial, no one from AIG's Board was shown any term sheet during the September 16, 2008 AIG Board meeting at which it approved negotiations of a Credit Agreement (PFOF § 14.2). Moreover, it is undisputed that the only term sheet Willumstad reviewed was never produced in this litigation (*see* PFOF § 14.2.2).

**b.   Both Parties Believed The Form of Equity Would Be Warrants on September 16, 2008.**  On September 16, the Board of Governors believed that the form of equity would be warrants (*see* DFOF ¶¶ 57-62; PFOF § 12.2).  AIG also believed that the form of equity would be warrants (PFOF §§ 12.4, 17.1; Liddy: Tr. 3135:14 – 3136:11 (as of September 16, 2008, "the clear expectation of AIG management was that there would be warrants with no vote"); Offit: Tr. 7931:5-9 (at the September 16, 2008 AIG Board meeting, Offit's "understanding at that time was that the form of equity was going to be warrants"); JX 63 at 6, 10).  As discussed above, warrants would have provided Defendant with a fundamentally different interest than it ultimately obtained.  Thus, to the extent any agreement existed on September 16, it was that AIG would provide warrants as the form of equity.

Until shortly before the September 21 AIG Board meeting, Defendant did not inform AIG that it had revised the terms to specify that the form of equity would be voting convertible preferred stock rather than warrants (*see* PFOF § 16.5).  Absent knowledge and approval of those terms, there could be no "meeting of the minds" and thus no binding agreement.

The record is clear that the AIG Board expected and "had originally been led to believe that the form of equity participation . . . would be warrants" (JX 103 at 3).  However, even if the Court were to credit Defendant's assertion that AIG understood that the form of the equity it was to provide was yet "to be determined", there still would be no evidence of a "meeting of the minds".

First, since the key term of the form of equity had yet to be decided and cannot be retroactively imputed to have been agreed as of September 16, 2008, there was no contract.  *See Benham v. eCommission Solutions, LLC*, 118 A.D.3d 605, 607 (N.Y. App. Div. 2014) ("The failure of the parties to agree on the precise form of the equity stake causes plaintiff's contract claim to fail for lack of definiteness in the material terms of her equity compensation."); *Gomez v. Bicknell*, 302

65

A.D.2d 107, 117 (N.Y. App. Div. 2002) (affirming dismissal of plaintiff's claim for a 50% equity interest in a business because "There were numerous open conditions [regarding the equity interest] on which agreement had not been reached.").[33]

Second, the Board of Governors indisputably approved warrants as the form of equity to be provided (*see* JX 63 at 5, 6), and as discussed above (*see supra* II.B.9) FRBNY had no authority to change the form.

### 5.   Defendant Contemporaneously Recognized That There Was No Binding Agreement on September 16.

As the general counsels of both FRBNY and the Board of Governors confirmed, Defendant took the Credit Agreement Class's equity and voting rights on September 22.  PFOF §§ 14.0-14.4, 37.3.1, 37.5.1.  Indeed, Dr. Mordecai admitted he had no basis for disagreeing with this testimony (Mordecai: Tr. 7754:1-14).

---

[33] Defendant contends that "the Court has already concluded that the voluntariness of AIG's agreement to the rescue loan turns on AIG's decision on September 16, 2008" (DCOL at 37 (*citing Starr*, 106 Fed. Cl. at 78)).  At the motion to dismiss phase, the Court questioned how the "'the term sheet was binding as to control but not as to the transfer of the 79.9% interest in AIG (or why the former was not simply the result of the latter.)'", 106 Fed. Cl. at 64, and stated that if "AIG voluntarily agreed to the terms offered on September 16, 2008, giving the Government control of AIG, it is untenable to maintain that the Government's use of that control rendered AIG's subsequent actions involuntary", *id*. at 78.

The Court is correct that it is questionable that the term sheet could be binding as to control but not as to the provision of equity.  However, the evidence at trial has now shown that it was binding as to neither and that there was no contractual right either to equity or control.  Defendant's control came from its monopoly power as the lender of last resort, its power as a controlling lender (on September 21-22) holding $37 billion of demand notes, and the Board's actions (*e.g.*, accepting Liddy as CEO) in anticipation of, and in order to secure, a binding Credit Agreement.  Moreover, it is now clear that even if "AIG voluntarily agreed to the terms offered on September 16", the final Credit Agreement terms were materially different.

Defendant's reliance upon *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055-56 (Del. 1984), does not alter this analysis.  DCOL at 38 ("a '*right* to future control' does not constitute actual control in the present").  In *Gilbert*, the court found that the company seeking to take over El Paso had not exhibited "actual control" prior to the merger because El Paso was still able to frustrate the company's attempts to engage in actions adverse to El Paso.  *Gilbert*, 490 A.2d at 1055-57.  By contrast, Plaintiffs in this case have demonstrated that Defendant did not remain an "outsider" prior to the execution of the Credit Agreement but rather engaged in actual control, including by unilaterally selecting the company's CEO.  *See* PFOF §§ 15.0, 16.2-16.8, 28.1-28.2.

**6.    Defendant Was Firmly in Control of AIG on September 22.**  *See* PFOF §§ 15.0, 19.0, 20.0.

## IV. <u>DAMAGES</u>

### A.    BOTH PLAINTIFFS' AND DEFENDANT'S EXPERTS AGREE THAT THE 79.9% EQUITY INTEREST ACQUIRED BY DEFENDANT HAD A FAIR MARKET VALUE OF AT LEAST BETWEEN $23 BILLION AND $58.7 BILLION DEPENDING ON THE DATE SELECTED.

**1.    Plaintiffs Are Entitled to the Fair Market Value of What Defendant Took/Exacted Measured at the Time of the Taking/Exaction.**

Defendant must pay "just compensation" equal to the "fair market value of" Plaintiffs' "property at the time of the taking." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 at 473-74 (1973); *see also Albrecht v. United States*, 329 U.S. 599, 602 (1947); *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1580 (Fed. Cir. 1990).

Fair market value reflects the property's intrinsic value and not an artificially distressed value.  *See* PCOL § 18.1.2, 18.2.  Defendant's own expert agrees.  Saunders: Tr. 8416:8-11 ("the fair market price" of equity is a price that "reflects its underlying fundamental intrinsic value.").

**2.    Defendant's Experts Testified That AIG's Market Capitalization on a Fully Diluted Basis Based on NYSE Prices Represented Its Fair Market Value.**

Both Defendant's experts Dr. Saunders (*see, e.g.*, DX 2745, DX 2747) and Dr. Mordecai (*see, e.g.*, DX 2608 and DX 2609, particularly column E) used NYSE prices to calculate the fully diluted market value of AIG's equity, including the equity acquired by Defendant.  In fact, Dr. Saunders testified that "the stock market price" was the only basis for his analysis of "the true value or fair market value of AIG's stock" (Tr. 8417:10-14) and Dr. Mordecai testified such NYSE prices were "the most reliable indicators of value we have" (Tr. 7463:6-12).

**3.    Based on NYSE Prices, the 79.9% Equity Interest Had a Value of Between $26.7 Billion and $58.7 Billion Depending on the Date Selected Between September 17 and September 24.**

Based on AIG's closing price on September 24, 2008 (the first day the final terms of the Credit Agreement were public), Defendant's expert Dr. Saunders calculates the value of the 79.9% equity interest at $38.7 billion (DX 2747) – essentially the same as the $38.9 billion value calculated by Plaintiffs' expert Dr. Kothari for the same date (PTX 5205).  (Of this $38.9 billion, $35.4 billion represented dilution of Plaintiffs' rights and the remainder represented the dilution of the equity unit holders (Kothari: Tr. 4573:13-17; PTX 5211)).

On the same basis, Dr. Saunders calculates the value of the 79.9% equity interest at $26.7 billion based on opening prices on September 17 (the first trading after the September 16 term sheet was accepted by AIG's Board) (DX 2745).  The same method calculates Series C Preferred valuations based on NYSE closing prices of $24.1 billion for September 17, $45.2 billion for September 19 (the last trading before the Credit Agreement was agreed to by the AIG Board), $55.4 billion for September 22 (the effective date of the Credit Agreement and the first trading day after AIG Board approval of the Agreement), and $58.7 billion for September 23 (the day Credit Agreement was signed) (PTX 5205; PFOF §§ 37.3, 37.4).  (PTX 5206 shows the portion of these amounts resulting from dilution of Plaintiffs as opposed to the holders of AIG's Equity Units).

**4.   Defendant, AIG, and Their Advisors Contemporaneously Calculated the Value of the 79.9% Equity Interest as of September 16 and 17 at Between $23 Billion and $42 Billion. (*See* PFOF § 37.2).**

AIG's consultant KPMG valued Defendant's 79.9% equity interest as of September 16 at $23 billion (PTX 375 at 3, 21).  AIG in its third quarter 2008 10-Q SEC filing reported a "fair value" of the 79.9% equity interest of $23 billion (JX 150 at 28); FRBNY viewed this valuation process as "reasonable" and "appropriate" (PTX 364 at 1; Dahlgren: Tr. 2707:15 – 2708:24; 2710:14 – 2711:6; Farnan: Tr. 4170:15 – 4173:13).

The Federal Reserve's auditor Deloitte calculated the value of Defendant's 79.9% equity interest as $24.478 billion as of September 17 (JX 385 at 1-2).  AIG's independent auditor valued

that interest at "amounts between 28 and 42 billion dollars" using the Black-Scholes option model (Farnan: Tr. 4168:19 – 4170:1, 4170:10-14).

**5.   Because of the "Unusual and Exigent" Circumstances During September 2008, NYSE Prices Actually Understated the Fair Market Value of AIG.**

**a.   Defendant's expert admitted that stock market prices only reflect fair market value in "a fair and efficient market with all information available." (Saunders: Tr. 8416:14-15; *id.* 8415:25–8416:13).**  As Dr. Saunders admitted, a "fair market price" of equity is a price that "reflects its underlying fundamental intrinsic value" (Tr. 8416:8-11). Stock market prices only reflect fair market value in a "fair and efficient market with all information available" (Tr. 8416:14-15)**.**

**b.   Defendant's experts also admitted that they did nothing to calculate the fair market value of the 79.9% equity interest except to look at NYSE prices.  (Saunders: Tr. 8416:17 – 8417:14; *see also* DFOF ¶ 401).**  Despite the admitted turmoil, panic, lack of reliable information, and uncertainty in financial markets in September 2008 (PFOF §§ 1.0–2.0, 4.0, 7.2.1., 32.1.3), particularly on September 16, the day after Lehman filed for bankruptcy (PFOF §§ 4.7, 37.5.6), Defendant's experts did nothing to analyze whether stock market prices reflected intrinsic value.  For example, Dr. Saunders testified:

> "Q. Other than looking at the stock price, did you undertake any investigation or analysis to determine what you believed the true value or fair market value of AIG's stock was?
>
> A. Other than stock market price, no."  (Tr. 8417:10-14; *see also* Tr. 8416:12 – 8417:9).

Because Plaintiffs' damage claim uses valuations of the 79.9% equity interest based on NYSE prices, it is not necessary to determine how much the "unusual and exigent" circumstances in September 2008 reduced those prices below fair market value (*see infra* pp. XX).  However, it is clear those valuations represent the lower bound of Plaintiffs' damages.

**B.      THERE IS NO LEGAL OR FACTUAL BASIS FOR DEFENDANT'S ASSERTION THAT PLAINTIFFS ARE NOT ENTITLED TO RECOVER THE FAIR MARKET VALUE OF WHAT DEFENDANT TOOK/EXACTED.**

**1.    Defendant's Damages Argument That It Can Deduct from Plaintiffs' Damages the Benefits Created by the 13(3) Loan Depends on the False Legal Premise That It Was Entitled to Demand Equity as Compensation for the 13(3) Loan.**

Defendant argues that Plaintiffs are entitled to no damages because the benefits of the 13(3) loan were greater than the value of what Defendant took/exacted.  *See, e.g.*, DCOL at 60-61; DFOF ¶ 375.  In support of this argument, Defendant asserts that in the absence of a 13(3) loan AIG would have been forced to file for bankruptcy and Plaintiffs would have lost even more than what Defendant took/exacted.

But if Defendant was not authorized to tie a demand for equity and voting control to a 13(3) loan, in assessing the damage to Plaintiff of the exaction/taking of that equity it is irrelevant what the benefit of that loan was.  *See Koontz*, 133 S. Ct. at 2596 ("Virtually all of our unconstitutional conditions cases involve a gratuitous governmental benefit of some kind.  Yet we have repeatedly rejected the argument that if the government need not confer a benefit at all it can withhold the benefit because someone refuses to give up constitutional rights. . . . Even if respondent would have been entirely within its rights in denying the permit for some other reason, that greater authority does not imply a lesser power to condition permit approval on petitioner's forfeiture of his constitutional rights.").  Put differently, Defendant argues that the benefits of the 13(3) loan must be included in any analysis of the exaction of equity because equity was part of the compensation for the loan.  But that necessarily assumes that the exaction of equity was permissible compensation for the loan.

An illegal exaction occurs in the context of this case when an agency requires property the agency is not authorized to demand as consideration for taking an action committed to the agency's discretion  (PCOL §§ 2.1–2.3).  By definition, the agency is able to exact unauthorized

consideration because the value of the agency's discretionary action exceeds (usually by a very large margin) the value of what is exacted (PCOL § 19.5). It would therefore virtually eliminate the law of illegal exaction in such cases if Defendant were permitted to bar recovery for such an exaction if the Government benefit used to lever the exaction was netted against the value of what was exacted. If accepted, Defendant's argument would mean that agencies could at will and with impunity ignore congressional limits on their authority and that citizens harmed thereby would be without a remedy.

Consequently, no case has ever reduced a plaintiff's damages for illegal exaction by the amount of the government benefit used to lever the exaction. For example, the court in *Suwannee* ordered full repayment of unauthorized compensation imposed by the Maritime Commission as a condition of its approval of plaintiff's sale of ships to a foreign entity, without reducing the Commission's repayment by the benefit plaintiff received from that approval. 279 F.2d at 877; *accord Alyeska Pipeline*, 624 F. 2d at 1007; *Sprague*, 172 F. Supp. at 676; *Clapp v. United States*, 117 F. Supp. 576 (Ct. Cl. 1954); *Finn v. United States*, 428 F. 2d 828 (Ct. Cl. 1970).

**2. Nor Is There Any Basis in Determining Just Compensation for an Actual Taking to Reduce the Value of Property Taken by the Government (in this Case, the 79.9% Equity Interest) Based on the Benefit to the Plaintiff of Other Government Actions (in this Case, the 13(3) Loan).**

Defendant cites no case where the value of property physically acquired by the Government was reduced for damages purposes by the benefits of other Government action.

**a. Regulatory takings cases are irrelevant for this purpose.** As the Federal Circuit and Supreme Court have made clear, the "'longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa.'" *Cienega Gardens v. United*

71

*States*, 503 F.3d 1266, 1282 (Fed. Cir. 2007) (quoting *Tahoe-Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002)).  The reason for this distinction is that regulatory takings often "lack the typically obvious and undisputed predicate of physical invasion or appropriation of private property by the government." *Cienega Gardens*, 503 F.3d at 1282; *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1345 n.3 (Fed. Cir. 2013).  In regulatory cases, an analysis of the overall effect of the single government action is necessary in order to determine whether the action is sufficiently burdensome so as to constitute a regulatory taking.

Here, there was an "obvious and undisputed . . . appropriation" of the 79.9% equity interest.  Regulatory cases relied on by Defendant themselves emphasize the distinction between government actions which "directly appropriate" property (as is the case of the 79.9% equity interest) and regulatory takings cases which must determine whether the regulation as a whole is "overly burdensome".  *A&D Auto Sales*, 748 F.3d at 1151.

In the present case with the single exception of Plaintiffs, the government has never linked the benefit of a 13(3) loan to the surrender of equity – and, indeed, such linkage is without statutory authorization.  Under such circumstances, Defendant's cases, where the harm and benefits are necessarily linked would have no relevance even if they applied to a case where, as here, the Government did "directly appropriate" property.

**b.  "Hold-up" cases are irrelevant.**  Defendant's argument that Plaintiffs are "not entitled to value created by" the Credit Facility (*see* DCOL § I.C.1) cites *United States v. Cors*, 337 U.S. 325 (1949); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624 (1961); *United States v. Miller*, 317 U.S. 369 (1943)); *Olson v. United States*, 292 U.S. 246 (1934).  However, these cases actually deal with an unrelated proposition: that where Defendant's special need for the property causes the

market price of the property to increase, the increase attributable to that special need (*i.e.* the "hold-up value") should be disregarded.[34]

Plaintiffs do not seek hold-up value; indeed, Defendant's actions suppressed the value of the company (PFOF § 37.9).  Instead, Plaintiffs simply seek the value of their property as of the time of the taking and at a fair market price.  Even Defendant does not argue that any government need for the AIG equity drove up its price; according to Defendant, it was the benefit from the 13(3) loan that increased the value of AIG stock.  Nothing in the authorities cited by Defendant permits it to take Plaintiffs' property as additional compensation when no further compensation was necessary to make Defendant whole.  *See infra* § IV.B.4.

    **c.**  ***Brown v. Legal Foundation of Washington***, **538 U.S. 216 (2003) is similarly irrelevant.**  Relying on *Brown*, Defendant argues that a "but for economic loss" test must be applied and that such a test requires reducing the value of the equity exacted by the benefit of the loan.  (DCOL at 57-58).  However, in *Brown*, as the Court emphasized, plaintiffs suffered no harm from the government action complained of because what was "taken" had no value to plaintiffs.  *See* PCOL § 19.1.5.  By contrast, the 79.9% equity interest taken here represented marketable securities with billions of dollars of value to whoever owned them.  Even Defendant's expert Dr. Saunders recognized that if Defendant had "not required the 79.9 percent of the equity," the entire value represented by the Series C preferred "would be captured by the common shareholders" (Tr. 8260:11-17).  As Dr. Kothari testified, prior to the Taking the common shareholders would claim

---

[34] *Cors*, 337 U.S. at 333 ("It is not fair that the government be required to pay the enhanced price which its demand alone has created."); *Va. Elec.*, 365 U.S. at 636 ("The value of the easement must be neither enhanced nor diminished by the special need which the Government had for it."); *Miller*, 317 U.S. at 377 ("If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation."); *Olson*, 292 U.S. at 261 ("petitioners were not entitled to elements of value arising from the prospect that the Government would acquire the flowage easements.").

100% of the value of AIG, but "four-fifths of that claim was taken away by the government" (Tr.

4640:23 – 4641:7).

Moreover, *Brown* specifically said it was not measuring just compensation based on a but-

for world.  *See Brown*, 538 U.S. at 238 n.10 ("Justice SCALIA is mistaken in stating that we hold

that just compensation is measured by the amount of interest 'petitioners *would have earned* had

their funds been deposited in *non-IOLTA* accounts.'").  Nothing in *Brown* suggests that where there

is an "appropriation of private property" by the government (*Cienega Gardens*, 503 F.3d at 1282)

just compensation can be anything less than the fair market value of what is appropriated.

**3.   It is Undisputed That Even If Defendant Had Been Authorized to Exact/Take Equity as Compensation for a 13(3) Loan, Plaintiffs Would Suffer Direct Economic Loss If The Series C Preferred Was Issued for Less Than Fair Value.**

Defendant's expert Dr. Saunders agreed that if AIG issued "new shares without receiving

fair value in return" then there would be "separate and distinct harm to shareholders" (DFOF ¶

342); *see also* DX 1882 ¶ 82 (Saunders report: "economic dilution or lost value occurs when shares

are issued to a new shareholder for less than reasonably equivalent value"); Tr. 8200:17-20

(economic dilution occurs "when new shares are issued in a transaction for less than reasonably

equivalent value").

**4.   Because AIG Already Paid (or Even Overpaid) Fair Value for the Credit Facility Through Its Secured Promise and Ultimate Repayment of All Borrowings Plus 14% Interest and Fees (PFOF § 37.7), Plaintiffs Did Not Receive Compensation for the 79.9% Equity and Voting Interests Taken by Defendant (PFOF §§ 37.4, 37.6).**

Dr. Kothari calculated the present value of AIG's secured obligations of repayment,

interest, and fees using the same framework as Defendant's own expert, Dr. Mordecai.  The only

meaningful difference between their analyses is that Dr. Kothari valued the promise as of

September 22, whereas Dr. Mordecai incorrectly valued it as of September 16 – six days before

AIG actually made the promise.  *Compare* PTX 2853 at 6-13, 45 *with* DX 2616, DX 2617, DFOF

¶ 171.  As explained above, September 22, not September 16, is the proper valuation date.  *See*

*supra* § III.E; Mordecai: Tr. 7754:1-14 (admitting that he had no basis for disagreeing with

Alvarez's sworn testimony that AIG did not have an obligation to abide by the terms of the Credit

Facility until September 22).[35]  Accordingly, as Dr. Kothari testified, AIG's secured promise to

repay all borrowings with high interest fully compensated Defendant for the credit provided.

(Kothari: Tr. 4876:19 – 4878:24).

Defendant's assertion that the equity issued to Defendant was necessary to compensate

Defendant for the Credit Agreement (DCOL at 122-124), also fails to address its contemporaneous

admissions that the interest rate on the Credit Facility was already "crazily high" (PTX 318 at 1)

and "loan sharky" (PTX 279 at 1), and that the Credit Facility was "minimal risk, huge reward."

PTX 119 at 1.

From the outset, Defendant expected significant profits from AIG's promised interest

payments alone.  On the day the Credit Agreement was executed, Defendant's lead outside counsel

advised FRBNY's general counsel that the Credit Facility would produce "$10 + + +" billion "in

interest and fees" alone and that the 79.9% equity stake taken by Defendant would produce

additional "tens of billions" in profit for Defendant.  PTX 3228 at 1.  Defendant points to no case

(nor can it) where plaintiffs fully compensated the government for the benefit, yet the government

would still be entitled to an offset.

Instead of addressing its own statements and beliefs or Dr. Kothari's present value analysis,

---

[35] Defendant also asserts that "AIG's accounting for the rescue loan further demonstrates that AIG received value from the FRBNY loan at least equal to the value of the shares it issued." DCOL at 123; DFOF ¶¶ 384-85.  However, the accounting entry is simply a way of balancing the books that assumes the value of what comes in is the same as what goes out.  Kothari: Tr. 4700:17-18 ("this is nothing but debits have to equal credits").  Assuming the entry correctly valued AIG's equity – which it does not – Defendant still paid only $500,000 for $23 billion in equity.  As Dr. Kothari explained, the accounting entry relied on by Defendant actually means that AIG "received no cash, nothing" for the $23 billion in equity they recorded.  Kothari: Tr. 4701:25 – 4702:6.

Defendant suggests private parties like JP Morgan Chase's James Lee doubted the profitability of the Credit Facility based on his views of different private proposals.[36]  DFOF ¶¶ 46-47, 120-21, 124.  That suggestion is belied by the fact that Lee himself sought to participate in the Credit Facility almost immediately after its execution.  PTX 3227 at 3 (Huebner on September 25, 2008: "Jimmy Lee called last week to ask whether we would be interested in syndicating."); PTX 3152 at 1 (notes to a September 18, 2008 "Call with Marshall Huebner/Jeremiah Norton": "Jimmy Lee – partially syndicated – mkt appetite").

Other private parties also believed that the Credit Facility would be profitable.  *See e.g.*, JX 78 at 1 (KKR believed the Credit Facility would "be money good" and that it "could be a very profitable trade for taxpayers"); PTX 129 at 2 (September 17 email outlining private sector proposal to "purchase about $40 billion of the loan that is being provided to AIG"); PTX 1665 at 3 (UBS: "We think the agreement will be profitable for the U.S. government.  The government stands to earn at least $9 billion in interest and commitment fees."); PTX 1655 at 1 (Societe Generale: "we think that AIG may not have to use the full $85bn loan and that full dilution may not take place (the state might not exercise its warrants), as taxpayers will already benefit from the high interest rate on the loan").  "AIG fully compensated the government for the provision of liquidity.  The 80 percent taking was over and above the full compensation for liquidity provision" (Kothari: Tr. 4641:15-18).

In any event, Defendant is not a private enterprise and has statutory duties different from profit maximization (*see* PCOL § 4.10).  Defendant's analysis completely ignores the distinction

---

[36] First, Defendant recognized that the interest rate for the Credit Facility was "substantially higher" (Geithner: Tr. 1772:23-25) and "substantially more expensive" (PTX 715 at 10) than the interest rates considered by JP Morgan.  Second, neither JP Morgan nor Goldman Sachs, whom Defendant selected to create a private consortium deal, attempted to find private participants (Lee: Tr. 7076:14-17).

between Federal Reserve credit and credit provided by the private sector.   Defendant's experts admitted they "did not study 13(3) lending at all."  Mordecai: Tr. 7848:20 – 7849:12; *see also* Saunders: Tr. 8352:7-9.

### 5.   Defendant's Damages Argument Also Improperly Assumes That AIG's Opening Stock Price on September 16 Represented Its Intrinsic or Fair Market Value.

Defendant argues that the increase in AIG's stock price compared to its price on the opening of September 16 "means that the value AIG received through access to FRBNY's credit facility exceeded the value conveyed by AIG through the issuance of the shares" (DCOL at 122; *see also* DFOF ¶ 381).  As just discussed, that is legally irrelevant because it assumes Defendant was authorized to demand equity as "additional compensation" for the benefits of a 13(3) loan.  It also ignores the fact that the price of AIG's shares on September 16 did not reflect their intrinsic value.

Lehman's bankruptcy filing was "the most destabilizing financial event since the bank runs of the Depression" (Geithner: PTX 709 at 228).  The next day, September 16, financial markets "really froze" (Paulson: Tr. 1203:23–1204:2), "were in a crisis condition and essentially not functioning" (Herzog: Tr. 7032:20-25), and were "in free fall" (Geithner: Tr. 1421:16-19); it was "a class financial panic" (Bernanke: PTX 708 at 78), the "worst financial crisis since the Great Depression" (Geithner: PTX 709 at 10), "the worst financial crisis in global history" (Bernanke: PTX 548 at 24), "the most wrenching financial crisis since the Great Depression" (Paulson: Tr. 1200:25 – 1201:4); "everything is accelerating in a vicious downward spiral" (Baxter: Tr. 861:13-19); "short term financing – whether secured by collateral or not – was vanishing . . . there was simply no liquidity in the system" (Geithner: PTX 709 at 211-12).

Consequently, everyone, including Defendant in 2008 and its fact witnesses at trial, recognized that stock prices on September 16 did not represent intrinsic or fair market values.

Former AIG CEO Willumstad testified that even on September 8, 2008 AIG's stock price was "trading meaningfully below its intrinsic value" (Tr. 6498:13-21). The next day, Citibank said the same thing (PTX 40 at 1). AIG's market capitalization was $67 billion on September 8 and $53.4 billion on September 9, compared to $5 billion at the September 16 opening. (PTX 5217; PTX 40 at 1; DX 2744). Despite the dramatic decline in the market price of AIG's stock after Lehman's failure, AIG management and others continued to value AIG's equity at $67 billion. *See* DX 1450 at 1, 3 (AIG valuing AIG's equity at $67.6 billion as of September 16); PTX 1665 at 4 (September 26 UBS report: AIG's market capitalization "will exceed $67 billion").

Geithner recognized that because of the crisis asset prices did not reflect "their true underlying value" (PTX 709 at 222). On September 18, the SEC expressed concern about possible "artificial price movements based on unfounded rumors" and "sudden and unexplained declines in the prices of securities" (PTX 152 at 1). The next day the SEC reported "sudden price declines in the securities of financial institutions unrelated to true price valuation" (PTX 168 at 1; *see also* PTX 3209 at 3; PFOF § 37.5.6).

Defendant in its post-trial submissions, like its experts in their trial testimony, ignores this evidence in favor of conclusory assertions that NYSE prices "arose from millions of investors trading AIG shares" (DFOF ¶ 401; *see also* DFOF ¶ 399). Of course they did. But that has nothing to do with the recognition by Mr. Willumstad, Mr. Geithner, Citibank, the SEC, and others that panic, uncertainty, and lack of reliable information had driven those prices far below intrinsic, or fair market, values. Nevertheless, it is the opening price on September 16, and an intra-day low, on which Defendant's experts (and Defendant in its post-trial submissions) rely for their damages

arguments.[37]

For example, Defendant argues that because AIG's market capitalization increased sharply after September 16 when it appeared AIG's liquidity crisis would be resolved, that increase represented a "windfall" for AIG's stockholders (DFOF ¶¶ 369-72).  In fact, after September 16, AIG's stock price and market capitalization merely rebounded to what it had been immediately before Lehman's failure (PFOF § 37.4.2) – which itself was already recognized by AIG's CEO (Willumstad: Tr. 6498:13-21), Citibank (PTX 40 at 1), and others (PFOF § 37.5.6), as below intrinsic value.

As Dr. Cragg explained, "When the confidence returned, so did its market cap, reflecting that over this period, the intrinsic value of AIG didn't change or the intrinsic value of its assets didn't change, but rather, the stock price reflected a crisis of confidence which was then corrected." Cragg: Tr. 8725:2-13.  Dr. Kothari likewise explained that the "point to recognize is, the valuation on September 16 was depressed or adversely affected by lack of liquidity, so the intrinsic value of AIG is the September 11, and provision of liquidity enabled AIG to bring its value back to its intrinsic level."  Kothari: Tr. 4676:22 – 4677:7.[38]

Moreover, September 16 was not the date of the taking/exaction.  In addition, on September 16, 2008 the terms of the credit facility were not yet agreed upon or announced and the

---

[37] That is, to the extent they did anything at all.  Dr. Mordecai "did not make any attempt to estimate or calculate a value for the Series C preferred stock" (Tr. 8028:13-23) and "did not investigate or analyze at all how much adding a 79.9 percent equity participation to the revolving credit facility cost the AIG shareholders" (Tr. 7809:13-17).

[38] Defendant misleadingly asserts that "Dr. Kothari, acknowledged that it 'is exactly right' that 20 percent of AIG on September 24, 2008 was worth more than 100 percent of AIG on September 16, 2008" (DFOF ¶ 379).  Dr. Kothari actually testified that Defendant's assertion was arithmetically accurate but irrelevant because the relevant comparison is between AIG's stock price as of September 24, 2008 and AIG's stock price on September 11, 2008, before the dramatic but temporary worsening of the liquidity crisis as a result of Lehman's failure, and that Defendant's assertion that there was no damage is "simply not true" (Kothari: Tr. 4770:20 – 4771:5).

market therefore could not have incorporated those terms into AIG's stock price.  PFOF § 37.3.3.[39]

### 6.   Defendant Waived Its Argument for Off-Setting Benefits Because Such Benefits Are An Affirmative Defense that Must Be Pled in Physical Takings Cases.

Defendant has waived its offset argument by failing to plead it.  *See Principal Life Insurance v. United States*, 76 Fed. Cl. 326, 328 (2007); *Panhandle Eastern Pipe Line Co. v. United States*, 408 F.2d 690, 719 (Ct. Cl. 1969).  Defendant was well aware of its obligation to plead any alleged offset based on the value of the Credit Facility, as evidenced by the fact that it did plead offset based on certain tax credits AIG allegedly received.  Def. Answer to Pls. Second Amended Complaint, Dkt No. 143, ¶¶ 258-63.

### 7.   Even if Defendant Were Legally Entitled to Reduce the Value of the Equity Exacted/Taken by Off-Setting Benefits, Defendant Has Failed to Establish These Benefits.

#### a.   Defendant bears the burden of proving how much Plaintiffs' property would have been affected in its hypothetical but-for world.

Even in those cases where off-setting benefits can be considered, "Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case" and plaintiffs have no obligation to "identify and come forward with evidence rebutting economic harm".  *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011).  Offsetting benefits are taken into account only if Defendant establishes such benefits with concrete and non-speculative proof.  Defendant's speculation, without quantification, is insufficient to mitigate Plaintiffs' proof of economic harm.  PCOL § 19.2.2.

#### b.   Defendant's off-set hypothetical rests on the incorrect assumption that AIG would have filed for bankruptcy if Defendant had not taken Plaintiffs' property.  DFOF ¶ 350.

Defendant's present assertion that unless it received 79.9% of Plaintiffs' equity and voting

---

[39] Defendant suggests that the September 23, 2008 announcement of the form of the equity and the actual interest rate and fees associated with the Credit Facility may not have been "important to AIG shareholders in pricing their investments".  DFOF ¶ 409.  However, Dr. Kothari's event study and contemporaneous evidence of the market's reaction confirm that market actors believed the newly announced terms were important.  PFOF §§ 37.3.4, 37.3.5.

control it would have forced AIG to file for bankruptcy (DCOL at 113) is contradicted by the

consistent contemporaneous evidence (PFOF § 9.2).  Defendant extended credit under Section

13(3) to every other institution at lower costs without requiring the surrender of equity.  *See* PFOF

§§ 22.0, 27.3, 32.2.  Moreover, Defendant could have provided AIG with alternative sources of

liquidity by allowing AIG to become a bank holding company, by allowing AIG to access the

PDCF, or by providing AIG with a guarantee (PFOF §§ 11.1-11.8).[40]  Defendant could also have

facilitated, rather than interfered with AIG's ability to access liquidity from other sources,

including from sovereign wealth funds, AIG's own insurance subsidiaries, and other private actors

(PFOF §§ 11.9-11.13).

**c.   Defendant also cites no reliable evidence concerning the value of Plaintiffs' property in its hypothetical bankruptcy world and ignores contrary evidence.**  Defendant did

not call a bankruptcy or insurance expert.  *See* Mordecai: Tr. 7445:13-16; Saunders: Tr. 8067:19-20

(offering neither as an expert in bankruptcy, restructuring, or insurance).  Moreover, Defendant

produced no evidence tending to show that AIG was similarly situated to any of the companies

---

[40] Defendant's contrary assertion (DFOF ¶ 313) notwithstanding, AIG did not have to become a primary dealer to access the PDCF.  In September 2008, Defendant allowed the foreign subsidiaries of Merrill Lynch, Morgan Stanley, and Goldman Sachs to access the PDCF even though they were not primary dealers.  PFOF § 11.3.  Defendant's suggestion that AIG did not have sufficient assets to obtain substantial liquidity from the PDCF (DFOF ¶ 314) is also incorrect.  Even prior to the September 14, 2008 expansion of eligible collateral, AIG estimated it had $11 - $21 billion of eligible collateral.  *See* JX 42 at 2.  In addition, Defendant's own expert conceded that access to the PDCF by AIG's insurance subsidiaries alone would have "solved their securities lending problem," which would have saved AIG from downstreaming $12 billion in September 2008 and more thereafter.  Saunders: Tr. 8336:16 – 8337:2; *see also* PFOF § 11.2.  Whether the PDCF alone would have solved all of AIG's liquidity needs over the course of the entire financial crisis is beside the point.  Many PDCF borrowers, including Morgan Stanley, Merrill Lynch (later acquired by Bank of America), and Citigroup ultimately required additional assistance in the form of TARP injections, TSLF loans, and credit from other special facilities or guarantees to survive, yet none of them had to surrender shareholder equity without just compensation.  PFOF § 32.2; PTX 422 at 14 (identifying recipients of TARP funding from the Capital Purchase Program).

81

captured by the bankruptcy data proffered through Mordecai.  Defendant also did not attempt to

quantify the value of AIG's assets or the scope of AIG's liabilities in a hypothetical bankruptcy.

Instead of proffering qualified expert opinion in support of its hypothetical, Defendant

inappropriately relies upon speculation from various fact witnesses and rejects contemporaneous

evidence that AIG would have been valuable in bankruptcy.[41]  Defendant's witnesses conceded

their testimony on AIG's hypothetical bankruptcy was speculative.  For example:

- Herzog:  "What would have happened I don't know.  It would be speculation on my part what various regulators, state regulators or regulators around the world, might have done" (Tr. 6986:10-13). Herzog is not an expert in bankruptcy or insurance regulation, lacked an understanding as to "precisely what" rehabilitation of an insurance company "involves", and had no experience with an insurance holding company bankruptcy (Tr. 7029:6 – 7031:4).

- Studzinski: "we did very little formal work around filing of bankruptcy" (Tr. 7122:11- 16).  "I have never dealt with a situation like this before.  It is unique.  I never dealt with the situation where you have a bankruptcy of the holding company and overcapitalization of insurance companies" (Tr. 7120:13-16; *see also id.* at 7119:8-15).

- Huebner: "not being an expert in insurance law, . . . I would prefer not to run the risk of giving sworn testimony about what an insurance seizure really entails" (Tr. 6133:22– 6134:3).

By contrast, the contemporaneous statements of FRBNY staff demonstrate an expectation

by Defendant that AIG would have had substantial value in a hypothetical bankruptcy.  For

example, "Problem is that bankruptcy option is very attractive for the firm Very Solvent lots of

capital but no liquidity . . . would emerge with more value than implied by dilution in likely private

---

[41] *See Cuyahoga Metro. Hous. Auth. v. United States*, 60 Fed. Cl. 481, 481-84 (2004) (striking fact witness's affidavit concerning damages calculation because the analysis contained therein was not based on "first-hand personal knowledge", involved analysis of how "characteristics are viewed in a given market", and "effectively answers hypothetical questions" which are "generally reserved for experts qualified under Rule 702"); *Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 203-04 (4th Cir. 2000) (court erred in permitting lay witness to testify in form of responses to hypothetical or like questions that required specialized knowledge to answer); *Teen–Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 404 (3d Cir. 1980) ("essential difference" between lay witness testifying under Fed. R. Evid. 701 and qualified expert testifying under Fed. R. Evid. 702 is that "qualified expert may answer hypothetical questions").

equity offers" (PTX 60); "I don't think that you can rely on CH11 as a guaranteed value-destroyer" (PTX 1760 at 1); "Least-cost resolution for AIG.  I don't think that the argument against Chapter 11 is clear-cut; indeed one can argue for Chapter 11" (PTX 1760 at 7); "Solid P&C companies with sufficient capital which would be walled off from the insolvency proceedings.  The companies can continue to run, plenty of money to pay claims since the NYSID feels comfortable with the current level of surplus" (PTX 1553 at 1).

Defendant's criticism that Plaintiffs "did not call a single insurance regulator to ask what they would have done if AIG filed for bankruptcy" (DFOF ¶ 364, n.37) ignores the undisputed record evidence concerning state regulators' actual beliefs and imputes to Plaintiffs a burden that Defendant must carry.  When Conseco, another large insurance holding company, filed for bankruptcy, its insurance subsidiaries continued to operate (Colannino: Tr. 5776:2-15).  AIG's insurance regulators (New York, Texas, and Pennsylvania) provided the Congressional Oversight Panel with "Conseco Inc. as an example of an insurance holding company bankruptcy (Chapter 11) that did not require the insurance regulators to seize the insurance subsidiaries (who remained solvent before and after the holding company filed)."  PTX 589 at 79, n.290; *see also* PTX 589 at 262-63, n. 898; PTX 628 at 8 ("Texas believes the securities lending problem could have been resolved without receivership.  No one suspected any of the life insurance companies would be insolvent, even under a worst-case scenario."); PTX 2762 at 1 (September 16, 2008 National Association of Insurance Commissioners press release: "We have a very strong message for consumers.  If you have a policy with an AIG insurance company, they are solvent and have the capability to pay claims.").  Thus, historical precedent and the conclusions of state insurance regulators undercut Defendant's assumed "spiraling effect" of an AIG parent company bankruptcy (DFOF ¶ 361).  The point, of course, is not that bankruptcy would have been desirable, or anything

short of a catastrophe, but that it would not have, and certainly Defendant never proved it would have, destroyed all value.

Based on the trial record the Court has no way of deciding how, if at all, to quantify the effects of a hypothetical AIG bankruptcy.  Defendant failed to carry its burden of proof of offset at trial.  *See, e.g.*, *Bassett, N.M. LLC v. United States*, 55 Fed. Cl. 63, 76 (2002) ("Even if the Court accepted the United States' argument that the removal action benefits the Property's value, the United States failed to include any evidence in the trial record regarding the amount by which said benefit increases the Property's value.  Thus, we cannot offset compensable damages for the benefits allegedly conferred by the removal action.").

### C.   DEFENDANT'S PLEAS FOR A NEW EXCEPTION TO ILLEGAL EXACTIONS/TAKINGS LIABILITY BASED ON ITS INTENT NOT TO PAY JUST COMPENSATION SHOULD BE DENIED.

#### 1.   Defendant's Contractual Intent Cannot Bind Plaintiffs.

Plaintiffs were neither parties to nor third party beneficiaries of the Credit Agreement (DFOF ¶ 436).  As the Court said in *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002): "It goes without saying that a contract cannot bind a nonparty".  *See also* PCOL § 15.5.

#### 2.   Defendant Cites No Authority Supporting Its Position That Its or AIG's Intent Can Justify an Illegal Exaction/Taking.

As the sole support for its contention that this Court cannot "excise allegedly illegal terms from a bilateral agreement if doing so would conflict with the parties' intent in entering the bargain", Defendant cites two cases involving contract not takings or illegal exactions claims. DCOL at 111-112 (citing *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20 (2000); *AT&T v. United States*, 307 F.3d 1374 (Fed. Cir. 2002)).  The allegedly illegal provisions in these cases did not exact any property at all; instead, they provided for fixed-price compensation for services.

#### 3.   Defendant's Intent Cannot Permit It To Do What Congress Has Not Authorized.

Defendant's argument is that its intent, rather than Congress's intent, controls.  The law is to the contrary (PCOL §§ 2.0, 4.0, 9.0).

### 4.    Although Irrelevant to This Proceeding, Any Claim Defendant May Have Against Non-Party AIG Under Section 8.12 Is Likely to Fail.

Section 8.12 says only that AIG and Defendant will "endeavor in good-faith negotiations" to agree to a valid term with economic effect "as close as possible" to a stricken illegal term.  JX 107 at 62.  The provision does not enable Defendant to require AIG to agree to anything, and Defendant cites no case where such a provision was enforced.  Defendant cannot use contract reformation theory to remedy an illegal term that it insisted upon.  *See Clearview Apartment Assocs., LP v. Ocasio*, 798 N.Y.S.2d 343 (N.Y. Civ. Ct. 2004) *aff'd*, 844 N.Y.S.2d 558 (N.Y. App. Div. 2007) ("It is well settled that the court will refuse affirmative aid to a litigant who comes into Court with unclean hands such as where the litigant seeks affirmative relief based on an illegal contract"); *Malik v. Nihar*, 856 N.Y.S.2d 499 (N.Y. App. Div. 2008) ("a party to an illegal contract cannot ask a court of law to help him carry out his illegal object").

Moreover, Defendant would have had to prove by "clear and convincing evidence," *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006), what an alternative agreement would look like and that it would have been amenable to AIG.  Defendant did not.

### D.    PLAINTIFFS CORRECTLY CALCULATE PREJUDGMENT INTEREST.

The law is clear.  To arrive at an appropriate rate for prejudgment interest, courts rely on the "prudent investor rule," which asks "how a reasonably prudent person would have invested the funds to produce a reasonable return while maintaining safety of principal." *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004) (quotations omitted); *see also* PCOL § 20.7.  Following this rule, Plaintiffs' expert determined that the appropriate prejudgment interest rate is based on a synthetic portfolio of Dow Jones indices representative of AIG's

operations.  PFOF § 41.2.  That rate is conservative, because it is at or near the bottom of the rates

of the four synthetic portfolios analyzed (PFOF § 41.2.4(a)).

Defendant ignores these basic principles and attempts to apply a different standard, arguing

for the one-year Treasury bill rate (DFOF ¶ 525), even though "the real rate of return on a one-year

Treasury bill has been negative since 2009" (Neuberger: Tr. 5632:3-8).  No rational (much less

prudent) investor seeking to replicate an equity investment would provide a loan at the one-year

Treasury bill rate.  PFOF §§ 41.2.1(d) n.148, 41.5(d).  Defendant offers the alternative of using a

rate derived from five-year TIPS, an index of debt instruments (DFOF ¶ 529), but (a) the TIPS rate

is not an equity measure and (b) it understates Plaintiffs' inflation risk because there has already

been a delay of almost seven years between the taking and judgment, and the rate only reflects a

five-year delay (Neuberger: Tr. 5625:21 – 5626:24, 5630:11 – 5631:8).

Defendant's assertion that Plaintiffs' proposed rate is not applicable class-wide (DCOL at

156-158) is wrong.  The *Tulare Lake* "prudent investor rule", which asks "how a reasonably

prudent person would have invested the funds" (61 Fed. Cl. at 627; PCOL §§ 20.7–20.8) is an

objective, not a subjective standard; the result of a "reasonable prudent investor" calculation is

applicable to all class members.  Even Defendant's expert agrees:  "do I think every investor in the

class or every member of the class would have invested in one-year T-bills? No, of course not"

(Neuberger: Tr. 5605:3-18).[42]

---

[42] Defendant criticizes Plaintiffs' prejudgment interest calculation on the basis that in cases where
the stock market went down between the time of the taking and the time of the award, the
methodology could provide a negative prejudgment interest result.  DFOF ¶¶ 519-521; DCOL at
157-158.  Leaving aside the fact that Defendant's one-year Treasury bill rate actually produces a
negative result when adjusted for inflation, Defendant's criticism is misplaced for two key reasons:
(1) the rate used by Plaintiffs does not produce a negative result and in fact tracks similar
investments over the same period of time; and (2) there is no law that states that a particular
methodology for calculating prejudgment interest must be applicable in all situations, only that it

# V. REVERSE STOCK SPLIT

## A.    THE STOCK SPLIT CLASS HAD A COGNIZABLE PROPERTY INTEREST IN THE RIGHT TO PREVENT DEFENDANT'S FURTHER DILUTION OF THEIR SHARES OF AIG COMMON STOCK.

### 1.    Both Delaware Law and the *Walker* Consent Order Establish the Stock Split Class's Property Interest in Preventing Dilution of Their Shares.

Delaware law establishes that voting is a fundamental shareholder right which constitutes a cognizable property interest. *Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013); PCOL §§ 10.6-10.7; *see* § I.A.2 above. Based on Delaware law, this Court previously rejected Defendant's argument that AIG's common stockholders had no cognizable property interest in the right to prevent the dilution of their stock through a separate class vote. *Starr*, 106 Fed. Cl. at 75. Ignoring this Court's prior rulings, Defendant simply repeats its argument (DCOL at 127-28) that it did not violate any shareholder right recognized under Delaware law because the RSS, which applied only to issued shares, technically complied with 8 Del. C. § 242(b)(2). But Delaware law requires a court "to look beyond form to the substance of an agreement" (*Gatz*, 925 A.2d at 1280) by prohibiting the use of stratagems to circumvent shareholder vote requirements (PCOL § 14.8.9; *supra* § I.A.3), and the entire fairness standard applies to transactions when, as here, a controlling entity is involved. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011). If Delaware law were to permit controlling entities like Defendant to structure transactions to circumvent shareholder protections, then those protections would be rendered virtually meaningless.[43] PCOL § 14.7.2. Delaware law thus prohibits corporate manipulations

---

fit the case in which it is being applied. Defendant's argument is simply an inapplicable hypothetical.

Defendant also continues to ignore (DCOL at 157) that the Declaration of Takings Act does not apply (PCOL § 20.8(a) n.8).

[43] *First*, the RSS gave Defendant what it had wanted from the beginning, replacement of its Series C, E, and F preferred stock for common stock worth tens of billions of dollars more. *Second*, Plaintiffs had no opportunity to negotiate concessions because they had no seat at the bargaining

such as the RSS that, while technically conforming to Delaware law, are carried out for the purpose of depriving shareholders of the rights granted to them under the corporate charter and Delaware law. *See* PCOL §§ 14.1-14.4; *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) (Defendant is not immunized from "inequitable actions in technical conformity with statutory law").[44]

### 2. The *Walker* Representations and Consent Order Also Establish Plaintiffs' Property Interest in the Right to Prevent Further Dilution.

This Court has also recognized that the *Walker* Consent Order confirmed Plaintiffs' right to exclude, which is "'perhaps the most fundamental of all property interests,'" when it sought "to protect the common shareholders from the dilution of their shares generally," and that Defendant "appears to have violated the spirit, if not the letter, of the order by not holding a common shareholder vote on the reverse stock split". *Starr*, 106 Fed. Cl. at 73-74.

Defendant ignores Delaware law and this Court's rulings, and simply repeats its conclusory assertion that the *Walker* Consent Order should be read narrowly to require a separate class vote of common shareholders only in the case of "any amendment to the Restated Certificate of

---

table. *Third*, the subsequent exchange was not an arms-length transaction because AIG itself was, at the time, under Defendant's control. PFOF §§ 33.0, 38.0. *Fourth*, Defendant identifies no "additional compensation" obtained as a result of supposed exchange "negotiations" apart from $1 billion in warrants, but those warrants did not begin to compensate Plaintiffs either for the loss of their blocking rights in the RSS or for the further dilution of their equity and voting rights in the exchange. *See infra* § V.D; *see also* PFOF § 38.3. Moreover, as Defendant concedes, there was substantial turnover in shareholders between June 30, 2009 and January 2011, so the shareholders that received access to the warrants were not necessarily the same as those that were harmed by Defendant's acts. DCOL at 138.

[44] The only case Defendant cites for the purported "long held" principle that "a corporation may validly accomplish a transaction in a way that does not require a separate vote of a class of shareholders even if another means of accomplishing the same result would have required such a vote", does not even address a transaction alleged to have been structured to circumvent voting requirements. DCOL at 137 (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962 (Del. Ch. 1989)). The court in *Warner* simply interpreted the specific voting rights in a corporation's charter and concluded that they were not intended to apply to a proposed merger; there was no allegation that defendants had proposed or structured the merger in order to circumvent a shareholder vote. 583 A.2d at 1182.

Incorporation to increase the number of authorized common shares or to decrease the par value of the common shares". (DCOL at 130). But property interests are not limited to rights enforceable under the "four corners" of a court order, but "are created and their dimensions are defined by existing rules or understandings." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972) (property interests "may take many forms" and are defined by "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits"). This Court has already found that the Order "should be read in light of the fact that the lawsuit also requested appropriate relief based upon the common shareholders' right to reject the dilution of their shares". *Starr*, 106 Fed. Cl. at 73.

AIG, with Defendant's knowledge and approval, represented to the *Walker* court that "if there is going to be an increase in the number of authorized shares . . . there will be a class vote" (JX 143 at 11:18-22). Everyone understood that the context was that without an increase in the number of authorized shares there were not enough authorized but unissued common shares to permit Defendant to replace its preferred with common.

By reverse splitting issued but not authorized shares 20:1, the effect was the same as increasing authorized shares 20 times, which permitted Defendant to replace its preferred shares with common, but without the promised class vote. Doing so was contrary to the substance of the *Walker* representation and Consent Order as well as Delaware law. *See Starr,* 106 Fed. Cl. at 74.

Defendant's after-the-fact efforts to distance itself from the RSS are unavailing. It was, after all, Defendant who had been obsessed with replacing its preferred shares with common (PFOF § 17.8), who was concerned about losing a class vote (§ 35.4), who convinced AIG to delay a class vote (§ 35.4.1), who participated in the *Walker* lawsuit (§ 35.3.1), who discussed AIG's representation to the *Walker* court (Brandow: Tr. 5856:25 – 5857:23), who two days later

negotiated the November 9, 2008 amendment to the Credit Agreement (Brandow: Tr. 5862:5-11),

who believed the purpose of the amendment's requirement for a class vote "as soon as practicable

after issuance of the preferred stock" was "to implement the representation that had been made to

the Delaware court two days earlier" (Brandow: Tr. 5862:12-23).

These representations are not, as Defendant argues, a "modification" of the *Walker* Order

(DCOL at 131-32) but simply show the contemporaneous understanding of Plaintiffs' property

rights.  *See Ruckelshaus*, 467 U.S. at 1001; *see also* Feldberg: Tr. 3383:11-15.

### 3.   Delaware's Doctrine of Independent Legal Significance Does Not Undermine Plaintiffs' Property Interests.

Defendant's reliance on the doctrine of independent legal significance (DCOL at 136-37) is

misplaced both because what Defendant did violated Delaware law and because "inequitable

action does not become permissible simply because it is legally possible."  *ATP Tour, Inc. v.

Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014) (quotations omitted); *see also Brody v.

Zaucha*, 697 A.2d 749, 755 (Del. 1997); *Stroud v. Grace*, 606 A.2d 75, 91 (Del. 1992) ("Almost all

of the post-*Schnell* decisions involved situations where boards of directors deliberately employed

legal strategies either to frustrate or completely disenfranchise a shareholder vote. . . . There can be

no dispute that such conduct violates Delaware law."); *MM Companies, Inc. v. Liquid Audio, Inc.*,

813 A.2d 1118, 1132 (Del. 2003) ("inequitable purposes, contrary to established principles of

corporate democracy . . . and may not be permitted to stand."); PCOL § 14.8.9.  In particular,

Delaware circumscribes the invocation of the doctrine when litigants "properly invoke the

equitable obligation of corporate fiduciaries".  *Uni-Marts, Inc. v. Stein*, 1996 WL 466961, *10

(Del. Ch. Aug. 12, 1996); *see also* PCOL § 14.5.  Here, the RSS and exchange violated the entire

fairness rule, which applies because Defendant was in control of AIG throughout the period in

question, *Reis*, 28 A.3d at 460, and Defendant improperly used a stratagem to circumvent the Stock

90

Split Class's right to prevent the dilution of their shares, *Paramount*, 637 A.2d at 42, n.11 (measure undertaken by corporate fiduciaries to deprive shareholders of their voting rights subject to "enhanced scrutiny" and thus "not entitled to protection under the doctrine of independent legal significance").

### B.   THE RSS CONSTITUTED A TAKING OF PLAINTIFFS' PROPERTY INTERESTS.

#### 1.   Defendant Structured the Reverse Stock Split to Monetize Its Preferred Stock Without A Class Vote of Common Shareholders.

Defendant understood from the Bear Stearns transaction that the common shareholders' blocking rights had real value and, as a result, was obsessed with avoiding an AIG shareholder vote from the very beginning of the transaction (PFOF § 17.8). Defendant knew there was a danger of shareholders "demanding compensation or concessions in exchange for the vote" on the Charter amendments, and Defendant knew that there "May be no viable remedy for failure to get the shareholder vote." PTX 98-U at 4; *see also* Baxter: Tr. 781:19-25; PFOF § 17.8.

Initially, Defendant believed that it could use its 79.9% voting power to authorize the additional common shares necessary to convert its preferred stock to common stock (PFOF § 36.4.1). Once Defendant realized as a result of the *Walker* lawsuit that it could not, it began to search for alternatives to avoid the shareholder vote, ultimately settling on the RSS. *See* PFOF §§ 28.2, 35.3, 36.3-36.4; DFOF ¶ 105. In the months following the *Walker* Consent Order, Defendant, believing the outcome of a class vote was uncertain (PFOF §§ 35.3-35.4; DFOF ¶ 448),[45] repeatedly delayed the shareholder vote it knew was required and continued to represent that it

---

[45] The fact that a proposal to amend the AIG Charter to increase the authorized shares to 9.225 billion did not pass at the June 30, 2009 shareholder meeting (Feldberg: Tr. 3368:4-20; PTX 2108 at 1) confirmed that a proposal to increase the number of authorized shares to approximately 15 billion common shares (the amount necessary to convert the Series C into common shares) would also have failed.

planned a special shareholder meeting, even after deciding to table a separate shareholder vote. *See* JX 181 at 6; PFOF §§ 35.4.1, 36.1-36.2; *see also id.* § 35.2.  Defendant and AIG heeded Davis Polk's "favored approach" of delaying the proposal.  PTX 3342 at 1; PFOF § 35.4; *see also* PTX 503 at 1-2.  AIG began to discuss the reverse stock split at the very same time that Defendant turned its focus to finding new ways to avoid the shareholder vote.  *See* DFOF ¶ 426.  The December 2008 draft reverse stock split proposal contemplated a 10-to-1 split and stood alongside a separate proposal to amend the AIG Charter to issue additional authorized shares and reduce the par value of AIG Common Stock to permit the conversion of Defendant's preferred stock.  JX 164 at 4.[46]  By the time of the June 2009 proxy, however, the RSS had turned into a 20-to-1 split, and Defendant had led AIG to remove the proposal for a separate class vote on the conversion amendments.  *See* PTX 420 at 1; *see also* Def. Resp. to 1st RFAs No. 32.4.

At the time of the RSS, Defendant was firmly in control of AIG (PFOF § 33.0).  The RSS could not have been passed, or even submitted to shareholders, without Defendant's agreement.  As Defendant was well aware, the RSS accomplished indirectly what the *Walker* court had been told would not be done – effectively increase authorized shares so that dilution could be accomplished without a class vote (*see supra* § V.A.2).

Following the RSS, Defendant's discussion of a common shareholder vote ceased, since Defendant knew it was then able to design at its own pace a recapitalization plan free from any

---

[46] Defendant conflates Plaintiffs' explanation that the record does not establish that the December 2008 draft proxy was the first time the RSS was proposed with a "failure to find a single document" in support of Plaintiffs' reverse stock split claim.  DCOL at 141; DFOF ¶¶ 425-28.  As Plaintiffs have demonstrated, the record is replete with evidence of Defendant's single-minded purpose in avoiding a separate class vote of the common shareholders at the same time that the reverse stock split was structured to achieve that exact result.  PFOF § 36.0; *see infra* V.B.2.

concern about common shareholder rights.[47]

Such involvement easily "is sufficiently direct and substantial to require compensation under the Fifth Amendment." *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 93 (1969).

**2.   AIG's Delisting Threat Cannot Explain The Decision To Structure The Reverse Stock Split To Reduce Only Issued, But Not Authorized, Shares By A Ratio Of 20:1.**

Defendant never explains why the RSS was structured in ways that only make sense as an attempt to avoid the shareholder vote necessary for conversion of Defendant's preferred stock. *See* PFOF § 36.5.  Defendant admits that the goal of avoiding delisting "could have been accomplished by a reverse stock split that applied to all shares".  Def. Resp. to Pls. 1st RFAs No. 32.9.  Indeed, AIG's proxy advisors, Glass Lewis, indicated on June 18, 2009 that it would have preferred such a structure.  PTX 528 at 67.  Not a single witness at trial could explain why the reverse stock split applied to only issued shares.[48]

Similarly, the ratio 20-to-1 far exceeded what was necessary to avoid delisting, but provided sufficient authorized shares for Defendant to exchange its preferred for common. *See* PFOF § 36.5.2.2-36.5.2.3.  The reverse stock split was formally proposed to AIG's shareholders only after Defendant declined to pursue less desirable alternatives for monetizing the preferred stock.  PFOF §§ 36.3 n.123, 36.4.2-36.4.3.

As Prof. Zingales concluded, the only possible explanation for the reverse stock split, as

---

[47] Defendant's argument that the RSS did not enable conversion because it would also have required a separate class vote to lower the par value of AIG's Common Stock, DFOF ¶ 446, again misrepresents the Stock Split Class's claims.  Plaintiffs do not argue that the RSS enabled the *conversion* of Defendant's preferred stock, but rather that it enabled Defendant to circumvent Plaintiffs' right to block a conversion through an exchange. PFOF § 36.7; PCOL §§ 14.1, 14.4, 14.8.6-14.8.10.

[48] While Daines indicated that he had identified companies which had structured reverse stock splits to apply only to issued shares and not authorized shares, he could not explain why such a structure had been adopted either in those cases or for AIG's June 30, 2009 proxy because, as he admitted, he did not consider the evidence. *See* DCOL at 143-44; Daines: Tr. 8504:5-15, 8510:13-19, 8484:22 – 8487:2; DX 2818.

structured, was that "the Government wanted to bypass" a separate class vote.  Zingales: Tr.

3801:3-13.  Defendant's witness conveniently did not "look into the origins of the reverse stock

split" (Daines: Tr. 8504:10-15) and did not investigate background information, such as the *Walker*

litigation, because it was "not relevant to my opinions" (Tr. 8510:13-22).  Indeed, in response to

this Court's inquiry about whether Plaintiffs' explanation for the RSS was correct, Daines admitted

that he had not "looked at the evidence to try to see whether that's consistent with the evidence. . .

. A reverse stock split of this kind would certainly give AIG enough shares in reserve to facilitate a

conversion, but as to whether or not it was, I don't know."  Daines: Tr. 8491:5-13.

Additionally, no witnesses could offer any reason for the ratio of the RSS or its application

to only issued shares.  *See* PFOF § 36.5.2.2 n.125.  Defendant argues that Herzog "developed the

idea of a reverse stock split to increase the trading price of AIG common stock, and thereby

prevent delisting" (DFOF ¶ 424) but by his own admission at trial, Herzog had no role in designing

the structure of the RSS, setting the 20:1 ratio, or deciding to split only issued shares.  *See* Herzog:

Tr. 7023:10 – 7024:6; *see also* PFOF § 36.5.1(a) n.124.

### 3.  Defendant's Control Of AIG During 2009-2011 Is Independently Sufficient To Characterize The RSS As A Government Act Requiring The Payment Of Just Compensation.  *See* PCOL § 14.9.

This is not remotely a case where, according to Defendant, the "mere approval of or

acquiescence in the initiatives of a private party is not sufficient to justify holding the Government

responsible for those initiatives" (DCOL at 142).  The record is clear that Defendant sought and

secured control over AIG (PFOF §§ 15.0-17.0, 33.0-34.0); even Defendant admits that it demanded

voting preferred stock to "ensure control over the conduct of the borrower" (DFOF ¶ 200).

Both the legal relationships between AIG and Defendant and Defendant's actions

independently establish control.  *See* PCOL § 14.9.  As the Supreme Court explained in *Brentwood*

*Academy v. Tennessee Secondary School Athletic Association*:

a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents." We have treated a nominally private party as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies," or when government is "entwined in its management or control."  531 U.S. 288, 296 (2001) (citations and brackets omitted).

The extent of Defendant's control over AIG is set forth in PFOF §§ 15, 33-34, including its participation in board meetings, in the drafting and issuing of proxy statements, and in AIG's day-to-day affairs.  Defendant made the decision not to have AIG issue the Series C Preferred Stock until March 2009, to have the Trust (and not AIG) control when and how the shareholder vote would be held, to review AIG draft proxies, to design and implement ML III,[49] to deal with the

---

[49] Defendant argues that Plaintiffs' contentions regarding Maiden Lane III ("ML III")  are "irrelevant and incorrect" (DFOF ¶ 486), unsuccessfully attempting to downplay the significance of ML III by mischaracterizing the vehicle, Defendant's role in the transaction, and its impact on AIG and its shareholders.  *See id.* ¶¶ 486-508.  ML III is an example of how Defendant wielded extensive control over AIG and used that control to benefit itself at the expense of AIG and its shareholders.  *See, e.g.,* PFOF §§ 34.1-34.2, 34.4-34.5, 34.7-34.8.

Defendant contends that the terms of the ML III transaction, including the payment of par value, were knowingly and voluntarily approved by an independent AIG Board and that the ML III terms were in the best interests of AIG and its shareholders.  *See* DFOF ¶¶ 492-493.  The overwhelming weight of the evidence stands to the contrary.  The AIG Board meeting minutes demonstrate that AIG fully expected that Defendant would negotiate concessions.  The Board resolution indicates that counterparties will be paid par value minus "the amount of any concession deducted".  JX 144 at 45; *id.* at 52 (indicating that the purchase price will be "[9_]% of CDO Pool par value"); *id.* at 53 (counterparty payments will be "subject to certain adjustments").  Moreover, the testimony at trial was clear that "When the board approved the Maiden Lane III transaction on November 9," it was "expected that the Federal Reserve would continue to try to negotiate concessions below par with respect to the CDSs that were the subject of Maiden Lane III".  Liddy: Tr. 3113:21 – 3114:3; *see also* PFOF § 34.5.3.

Defendant relies on DX 2131 – an email on November 8, 2008, the day before the AIG Board voted to approve ML III.  DFOF ¶ 501.  But DX 2131 simply circulates what appears to be one of several revised draft ML III agreements.  The exhibit does not state that "no concessions were available", but rather that the attached "draft" reflects "no concession".  DX 2131 at -727 to -728.  Most importantly, DX 2131 was an email that **did not go to anyone on AIG's Board** – *i.e.,* those who actually voted on ML III the next day.  Similarly, Defendant selectively relies on a passage from the SIGTARP report to claim that it had "no leverage to seek concessions" (DFOF ¶ 500 (citing PTX 549 at 22-23)), but ignores other parts of the SIGTARP report which conclude that FRBNY had "considerable leverage" that it refused to use and that this refusal – not a lack of any

*Walker* Complaint and resulting SEC disclosures and Credit Agreement amendments, and to demand that the Series E and F shares be exchanged for their liquidation value rather than market value (*id.*; *see also* PFOF §§ 33.9.4, 35.3, 36.1(f), 36.2(g)-(k), 40.2.1; *see also* DFOF ¶ 421 n.45). These actions go far beyond "cooperation" and directly inject Defendant into AIG's decision making, causing AIG to be "entwined with governmental policies." *Brentwood*, 531 U.S. at 296. They are different from the state defendant's actions in *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982), where the defendant had no control over the private hospital's decision to transfer a patient to a different medical facility, but only adjusted the patient's Medicaid benefits as a result of the transfer.

## C.  DEFENDANT'S RSS CONSTITUTED AN ILLEGAL EXACTION.

The RSS was also an illegal exaction because Defendant had no legal authority to deal in stock or take ownership of a private corporation and use it for a public purpose. *See* PCOL § 14.6. The RSS was done in contravention of the Federal Reserve Act and the Government Corporation Control Act. *See* PCOL §§ 4.0-7.0. In addition, to the extent the June 2009 proxy was misleading, through its control of AIG Defendant induced AIG to submit a fraudulent and misleading proxy, which also violates various federal laws.

Defendant exacted property from the Stock Split Class when it exacted Plaintiffs' blocking rights for itself, enabling it thereafter to use the preferred stock's voting power to exchange its

---

leverage – "made the possibility of obtaining concessions from the counterparties extremely remote." PTX 549 at 33; *see also* PFOF §§ 34.5.4, 34.5.5.

Finally, Defendant states that the reason for the "two-thirds/one-third split of the value of the residual assets owned by Maiden Lane III" was so that "AIG would not have to consolidate Maiden Lane III LLC onto its balance sheet". DFOF ¶ 506. This disregards evidence presented at trial and made clear in the GAO Report that: "Based on our reviews, we noted that FRBNY asked BlackRock to see how much the ML III residuals could be stretched prior to breaching consolidation issues. BlackRock came back with a 55%/45% (Fed/AIG) split. Why did FRBNY choose the 67%/33% split, when there was the other split presented?" PTX 3362 at 3; *see also* PFOF § 34.10.2.

preferred for common shares.  Plaintiffs' claims do not fail because Defendant waited until 2011 to finally complete its objective of monetizing the preferred stock at the expense of the common shareholders' voting rights.  "The reverse stock split on June 30, 2009 is the wellspring of the putative class members' claims."  *Starr*, 109 Fed. Cl. at 634 (quotations omitted).

### D. PLAINTIFFS HAVE ESTABLISHED DAMAGES RESULTING FROM THE REVERSE STOCK SPLIT

Defendant argues (DCOL at 137-39) that the RSS did not harm Plaintiffs because the January 2011 exchange, in which Defendant acquired AIG common stock, occurred 18 months later.  Defendant mischaracterizes the property interest at issue by confusing the taking in 2009 of the Stock Split Class's property interests – the right to vote to control whether their equity and voting rights were further diluted – with Defendant's subsequent exploitation in 2011 of the rights taken.

Defendant also argues (DCOL at 145-46) that no harm occurred to the Stock Split Class because, even if Plaintiffs had been permitted to vote as a separate class, a majority of the class members still voted in favor of the RSS.  This argument fails to address the fact that class members knew their vote was irrelevant given Defendant's control of the vote and, hence, had less incentive to oppose; that the proxy falsely represented both that AIG had no plans for those shares and that, as Defendant acknowledges; "the reverse split would not change their current percentage ownership of AIG common stock" (DFOF ¶ 431); and that the proxy was also coercive because the RSS was tied to a delisting threat while being structured in ways unnecessary to address the delisting threat  (*e.g.*, reverse splitting both authorized and issued shares).  *See* PFOF §§ 36.5-36.6. Defendant intensified the coercive nature of the RSS by repeatedly delaying the proxy (PFOF § 33.9.4), leaving insufficient time for proposing alternatives such as a proposal to apply the split to authorized as well as issued shares, or to do the split at a ratio low enough that it would not have

the side-effect of enabling the conversion.  How Plaintiffs voted on this misleading and coercive reverse stock split thus sheds no light on how Plaintiffs would have voted in a counter-factual world of an informed, uncoerced class only vote.  *See Gantler v. Stephens*, 965 A.2d 695, 714 (Del. 2009) (shareholder ratification doctrine does not apply if the vote is not fully informed); *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510, *9 (Del. Ch. April 6, 1992) (shareholders' consent is "dispositive only if their vote was fully informed"); *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1056 (Del. Ch. 1987) (transactions "may be voluntary in appearance and form but involuntary as a matter of reality and substance" due to materially false or misleading disclosures).

For the same reasons, Plaintiffs cannot be said to have "acquiesced" in the RSS or to be "estopped" from challenging it.  Defendant's estoppel argument also fails because it relies exclusively on Delaware law which holds that a plaintiff's "conscious intent to approve the act is not required", *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014),  contrary to controlling federal law, which Defendant does not address, and provides that any "waiver of constitutional rights in any context must, at the very least, be clear", *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972), or that equitable defenses like estoppel do not apply where, as here, Defendant's own hands are unclean.  PCOL § 15.4.

Plaintiffs' damages expert Dr. Kothari does not contend, as Defendant mistakenly argues, that the taking actually occurred in January 2011 or that the Class should consist of the common shareholders at the time of the exchange and not the reverse stock split.  *See* DCOL at 137-39, 144-45.  Instead, Dr. Kothari valued the rights that were taken at the time of the reverse stock split based on "the payment that the Government would have made to AIG shareholders to increase the number of authorized shares, which is in turn based on the value of the benefit that the Government would receive from converting its illiquid Series C Preferred Stock into more liquid AIG common

98

stock" (PTX 2852 ¶ 124; *see also* PFOF § 39.1), and the difference in the fair value of the Series E and Series F Preferred Stock and of the more valuable common stock for which that preferred stock was exchanged, a transaction that would not have been possible if the reverse stock split had not eviscerated Plaintiffs' rights to refuse to amend AIG's Charter to create the necessary authorized but unissued common stock, *see* PFOF § 40.0.  This calculation measures the value of what was taken from Plaintiffs, not what Defendant gained.  *See* DCOL at 148-49 (citing cases).

Defendant's argument that Dr. Kothari's damages calculation "exceeds the total value of AIG's common shares at the time" (DFOF ¶ 456) misconstrues Dr. Kothari's entire analysis.  In 2009, the value of AIG's stock was depressed by the Government's control (PFOF § 37.9).  At the same time, the common shareholders' right to a class vote limited what the Government could do.  The RSS took away that right, which enabled the Government (among other things) to exchange E and F preferred stock having "almost no value in the marketplace" (Schreiber: Tr. 6736:6-10; PFOF §§ 38, 40) and valued by the Government itself at no more than $26.1 billion as of September 30, 2010 (PTX 622 at 19) for common stock worth $49.1 billion (PTX 2248 at 7; Zingales: Tr. 8611:16 – 8612:3).  That $23 billion of value could not be captured by either the Government or Plaintiffs alone as long as Plaintiffs had their blocking rights.  It was the ability of Plaintiffs to block the capture of that $23 billion in value that was worth $4.329 billion (PFOF § 40).

Defendant also incorrectly assumes that the increase in stock price following the announcement and final agreement on the recapitalization reflects the market's view that the transaction "was viewed as beneficial rather than harmful to common shareholders", DFOF ¶ 477, ignoring that these events signaled to market participants a plan to end Defendant's harmful control of AIG.  *See* PTX 2248 at 35-36.  Moreover, the increase in stock price could not have reflected

that the transaction was beneficial to common shareholders because the news of the

recapitalization was not a surprise: the details of the exchange had already been announced and

AIG already had sufficient authorized common shares for the exchange as a result of the reverse

stock split and "neither the Government nor AIG gave any indication that the Government would

receive anything less than the amount that it invested in AIG, regardless of the value of its

securities."  PTX 2853 at 24 (Kothari Rebuttal Report).

Defendant also incorrectly describes the recapitalization as a negotiated exchange.  *See*

DFOF ¶¶ 462, 464–65.  As explained above, however, Defendant controlled AIG through the time

of the recapitalization (*see, e.g.*, PFOF §§ 33.8-33.9; PCOL § 13.4).  While "in an arm's length

transaction you will only receive fair value" (Kothari: Tr. 4604:15-19), in the recapitalization,

Defendant received common shares worth $49.1 billion in exchange for E and F preferred worth

somewhere between "almost no value in the marketplace" (Schreiber: 6693:3-6) and $26.1 billion

as of September 30, 2010.  (PTX 622 at 19).[50]  Finally, if Defendant's alternatives were actually

viable, Defendant would presumably have utilized them, or at least realistically explored them.

Defendant's failure to do so speaks volumes as to whether viable alternatives were actually

available.

Dated:  March 23, 2015
      Armonk, New York

                                Respectfully submitted,
                                BOIES, SCHILLER & FLEXNER LLP

                 By  /s/ David Boies
                     David Boies
                     Attorney of Record

---

[50] Defendant's unsupported claim that AIG's shareholders benefited from the RSS by avoiding delisting and from the resulting enhanced liquidity of AIG's stock, DFOF ¶ 454, should be rejected both because it is an unsubstantiated claim of an offsetting benefit, *see supra* §§ IV.6-IV.7, and because it ignores that the RSS could have been structured in ways that obtained those benefits for shareholders without taking their blocking rights.

333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Fax: (914) 794-8300
Email: dboies@bsfllp.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000

R. Ryan Stoll
Gregory Bailey
155 N. Wacker Drive
Chicago, IL  60606
Telephone:  (312) 407-0700

BOIES, SCHILLER & FLEXNER LLP

Robert B. Silver
Robert J. Dwyer
Alanna C. Rutherford
Julia C. Hamilton
Laura Harris
Ilana Miller
John Nicolaou
Matthew R. Shahabian
David L. Simons
Craig Wenner
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300

Amy J. Mauser
Abby Dennis
William Bloom
James A. Kraehenbuehl
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727

*Counsel for Plaintiff Starr International Company,
Inc. and for the Plaintiff Classes*

101