# In the United States Court of Federal Claims

No. 11-779C

(Filed: June 15, 2015)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| STARR INTERNATIONAL COMPANY, INC., in its own right and on behalf of two classes of others similarly situated, | * * * * * | Government's Financial Rescue and Takeover of American International Group (AIG); Fifth Amendment Taking and Illegal Exaction Claims; Shareholder Class Action; Demand for Corporate Equity and Voting Control as Consideration for Loan; Section 13(3), Federal Reserve Act; Effect of AIG Board's Approval of Terms; Damages; Economic Loss Analysis. |
| Plaintiff, | * * | |
| v. | * * | |
| THE UNITED STATES, | * * * | |
| Defendant. | * * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*David Boies,* with whom were *Robert B. Silver, Robert J. Dwyer, Alanna C. Rutherford, Amy J. Mauser, Abby Dennis, Julia C. Hamilton, Laura Harris, Ilana Miller, John Nicolaou, Matthew R. Shahabian, David L. Simons, Craig Wenner, William Bloom,* and *James A. Kraehenbuehl,* Boies, Schiller & Flexner LLP, Armonk, New York, and *John L. Gardiner, R. Ryan Stoll,* and *Gregory Bailey,* Skadden, Arps, Slate, Meagher & Flom LLP, New York City, New York, for Plaintiff.

*Brian A. Mizoguchi,* Assistant Director, with whom were *Benjamin C. Mizer,* Acting Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, *Kenneth M. Dintzer,* Deputy Director, *Scott D. Austin, Claudia Burke,* and *Joshua E. Gardner,* Assistant Directors, *John Roberson* and *John J. Todor,* Senior Trial Counsel, *Renee Gerber, Matthew F. Scarlato, Mariana T. Acevedo, David D'Alessandris, Vincent D. Phillips*, and *Zachary J. Sullivan*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiff Starr International Company, Inc. ("Starr") commenced this lawsuit against the United States on November 21, 2011. Starr challenges the Government's financial rescue and takeover of American International Group, Inc. ("AIG") that began

on September 16, 2008.  Before the takeover, Starr was one of the largest shareholders of AIG common stock.  Starr alleges in its own right and on behalf of other AIG shareholders that the Government's actions in acquiring control of AIG constituted a taking without just compensation and an illegal exaction, both in violation of the Fifth Amendment to the U.S. Constitution.  The controlling shareholder of Starr is Maurice R. Greenberg, formerly AIG's Chief Executive Officer until 2005, and one of the key architects of AIG's international insurance business.  Starr claims damages in excess of $40 billion.

On the weekend of September 13-14, 2008, known in the financial world as "Lehman Weekend" because of the impending failure of Lehman Brothers, U.S. Government officials feared that the nation's and the world's economies were on the brink of a monumental collapse even larger than the Great Depression of the 1930s.  While the Government frantically kept abreast of economic indicators on all fronts, the leaders at the Federal Reserve Board, the Federal Reserve Bank of New York, and the U.S. Treasury Department began focusing in particular on AIG's quickly deteriorating liquidity condition.  AIG had grown to become a gigantic world insurance conglomerate, and its Financial Products Division was tied through transactions with most of the leading global financial institutions.  The prognosis on Lehman Weekend was that AIG, without an immediate and massive cash infusion, would face bankruptcy by the following Tuesday, September 16, 2008.  AIG's failure likely would have caused a rapid and catastrophic domino effect on a worldwide scale.

On that following Tuesday, after AIG and the Government had explored other possible avenues of assistance, the Federal Reserve Board of Governors formally approved a "term sheet" that would provide an $85 billion loan facility to AIG.  This sizable loan would keep AIG afloat and avoid bankruptcy, but the punitive terms of the loan were unprecedented and triggered this lawsuit.  Operating as a monopolistic lender of last resort, the Board of Governors imposed a 12 percent interest rate on AIG, much higher than the 3.25 to 3.5 percent interest rates offered to other troubled financial institutions such as Citibank and Morgan Stanley.  Moreover, the Board of Governors imposed a draconian requirement to take 79.9 percent equity ownership in AIG as a condition of the loan.  Although it is common in corporate lending for a borrower to post its assets as collateral for a loan, here, the 79.9 percent equity taking of AIG ownership was much different.  More than just collateral, the Government would retain its ownership interest in AIG even after AIG had repaid the loan.

The term sheet approved by the Board of Governors contained other harsh terms.  AIG's Chief Executive Officer, Robert Willumstad, would be forced to resign, and he would be replaced with a new CEO of the Government's choosing.  The term sheet included other fees in addition to the 12 percent interest rate, such as a 2 percent

commitment fee payable at closing, an 8 percent undrawn fee payable on the unused amount of the credit facility, and a 2.5 percent periodic commitment fee payable every three months after closing. Immediately after AIG began receiving financial aid from the Government on September 16, 2008, teams of personnel from the Federal Reserve Bank of New York and its advisers from Morgan Stanley, Ernst & Young, and Davis Polk & Wardwell, descended upon AIG to oversee AIG's business operations. The Government's hand-picked CEO, Mr. Edward Liddy, assumed his position on September 18, 2008. Although the AIG Board of Directors approved the Government's harsh terms because the only other choice would have been bankruptcy, the Government usurped control of AIG without ever allowing a vote of AIG's common stock shareholders.

Out of this nationalization of AIG, Starr has identified two classes of common stock shareholders that were affected by the Government's actions: (1) a class comprised of AIG shareholders who held common stock during September 16-22, 2008 when the Government took 79.9 percent ownership of AIG in exchange for the $85 billion loan; and (2) a reverse stock split class comprised of AIG shareholders who held common stock on June 30, 2009 when the government-controlled board engineered a twenty-for-one reverse stock split to reduce the number of AIG's issued shares, but left the number of authorized shares the same. The Court formally certified these two classes of shareholders as plaintiffs on March 11, 2013. See Starr Int'l Co. v. United States, 109 Fed. Cl. 628 (2013). Under the Court's Rule 23 "opt in" procedure to join in a class action, 274,991 AIG shareholders have become class plaintiffs in this case.

The main issues in the case are: (1) whether the Federal Reserve Bank of New York possessed the legal authority to acquire a borrower's equity when making a loan under Section 13(3) of the Federal Reserve Act, 12 U.S.C. § 343 (2006); and (2) whether there could legally be a taking without just compensation of AIG's equity under the Fifth Amendment where AIG's Board of Directors voted on September 16, 2008 to accept the Government's proposed terms. If Starr prevails on either or both of these questions of liability, the Court must also determine what damages should be awarded to the plaintiff shareholders. Other subsidiary issues exist in varying degrees of importance, but the two issues stated above are the focus of the case.

The Court conducted a 37-day trial in Washington, D.C. spanning from September 29 through November 24, 2014. The Court heard the testimony of 36 witnesses, 21 for Plaintiff's case, and 15 for Defendant's case. Plaintiff's fact witnesses were, in the order presented: Scott Alvarez, Thomas Baxter, Patricia Mosser, Henry Paulson, Timothy Geithner, Ben Bernanke, Alejandro LaTorre, Susan McLaughlin, Margaret McConnell, Sarah Dahlgren, Edward Liddy, Chester Feldberg, Douglas Foshee, Mark Symons, Kathleen Shannon, James Head, and Donald Farnan. Plaintiff's four expert witnesses were: Luigi Zingales, Paul Wazzan, S.P. Kothari, and Michael Cragg. Defendant's fact

witnesses were, in the order presented:   Andrew Colaninno, John Brandow, Marshall Huebner, Robert Willumstad, Brian Schreiber, Robert Reeder, David Herzog, James Lee, Peter Langerman, Morris Offit, and Howard Smith.   Defendant's four expert witnesses were:  Jonathan Neuberger, David Mordecai, Anthony Saunders, and Robert Daines.   The Court also received the video deposition testimony of John Studzinski, a witness who lives abroad.   The trial record consists of 8,812 transcript pages and more than 1,600 exhibits. [1]

Certain waivers of the attorney-client privilege occurred during the course of the proceedings.   In the discovery phase, due to the Government's assertion of a defense that the Federal Reserve Bank's taking of a borrower's equity under Section 13(3) of the Federal Reserve Act was legal, the Court ruled that any privileged communications among the Department of the Treasury, the Federal Reserve Board, the Federal Reserve Bank of New York ("FRBNY"), and their counsel relating to the issue of legality must be produced.  See Discovery Order No. 6, Nov. 6, 2013, at 2-3, Dkt. No. 182.   During trial, the Court expanded this ruling to include the production of prior legal memoranda relied upon or relating to the propriety and legal limits of agency action under Section 13(3) of the Federal Reserve Act.  See Tr. 1950-55.[2]   The Court made this ruling upon learning of the existence of an FRBNY "Doomsday Book" that contains guidance on the range of permissible government actions in a time of crisis.   The Court required FRBNY to produce these additional documents during trial, and the FRBNY complied.   See Boies, Tr. 3548 ("Treasury has now provided all documents, broadly defined, which concern the authority of the Federal Reserve or Treasury to acquire or hold equity in connection with a 13(3) loan.").

Other waivers of the attorney-client privilege resulted from Defendant's counsel calling two Davis Polk & Wardwell lawyers to testify, John Brandow and Marshall Huebner, and asking them about legal advice they provided to FRBNY and the Department of Treasury.   See, e.g., Tr. 5801 (Mr. Scarlato: "[D]id you think that disclosing the [New York Stock Exchange] ten-day rule would, in fact, provide a roadmap to shareholders to seek an injunction?"  Mr. Brandow: "No, because there was no basis for an injunction. . . . [W]ith respect to Delaware law, there was no basis for the shareholders to have a vote."); Tr. 5851 (Mr. Scarlato: Did you "provide[] legal advice to

---

[1]  The Court has included a description of the relevant entities and persons in an Appendix to this opinion.

[2]  The Court will cite to the evidentiary record as follows:  August 6, 2014 Stipulations – Stip. ¶ __; Trial Testimony – Witness name, Tr. page; Joint Exhibits – JX __ at page;  Plaintiff's Exhibits – PTX __ at page;  Defendant's Exhibits – DX at page.   Some of the exhibits have a "U" in the exhibit number to indicate that, although the documents were originally offered with redactions to protect privileged material, they were later admitted in unredacted form due to Defendant's waivers of the attorney-client privilege, explained below.

the New York Fed or Treasury in connection with the exchange transaction?"); Tr. 6061-62 (Mr. Gardner: "Why did Davis Polk advise that option B was the best yet identified option?"); Tr. 6130 (Mr. Gardner: What was your "understanding as to why you were being asked to consider the consequences of an AIG bankruptcy after September 16, 2008?"); Tr. 6135 (Mr. Gardner: "[W]hat advice, if any, did you provide on how derivative counterparties would respond to a bankruptcy filing by AIG?"); Tr. 6139 (Mr. Gardner: "[W]hat advice did you provide to the New York Fed or Treasury on the likelihood that the New York Fed would be fully repaid in the event of a bankruptcy?"); Tr. 6141 (Mr. Gardner: What was the advice you provided "to the New York Fed and Treasury after September 2008 regarding the likelihood of policyholder cancellations if AIG filed for bankruptcy?").

Defendant's waiver of the attorney-client privilege was so broad and covered so many subjects that the Court found a waiver as to any previously privileged documents relating to the Government's economic rescue of AIG. Tr. 6249 (Court: "I have the impression that any communication involving the law firm of Davis Polk & Wardwell relating to AIG, that the privilege has been waived."); Tr. 6251-52 (Court: "I think at this point anything [relating to] AIG has been waived involving Davis Polk."). The Court's ruling required Defendant to produce documents previously claimed to be privileged, and to uncover redactions from documents offered into evidence. Significantly, the Court also required the Davis Polk & Wardwell law firm to produce expeditiously internal and client communications relating to the financial rescue of AIG. Tr. 7224-41 (discussing the Davis Polk privilege issue and adopting the proposal of a law firm representative, Ms. Francis Bivens, for the production of internal Davis Polk documents). Davis Polk complied with the Court's request using reasonable time and search parameters, but the documents produced were so extensive that Plaintiff could not review all of them prior to the close of trial. Accordingly, the Court granted Plaintiff's post-trial motion to supplement the evidentiary record with 133 additional exhibits. Order, Jan. 6, 2015, Dkt. No. 417.

Defendant planned to call as witnesses three other law firm lawyers who served as outside counsel to AIG. These lawyers were Robert Reeder and Rodgin Cohen from Sullivan & Cromwell, and Joseph Allerhand from Weil, Gotshal & Manges. Due to the unequivocal position of AIG to preserve its attorney-client privilege under any circumstances, tr. 7736-37 (Mr. Carangelo: "AIG's position has been consistent throughout this proceeding and throughout discovery to not waive the privilege"), the Court ruled that these lawyers should not testify. Tr. 7738-39 (Court: "I give paramount importance to the privilege concerns of AIG . . . I'm not going to hear testimony in open court from any of these lawyers. So, that includes Mr. Cohen, Mr. Reeder, and Mr. Allerhand."). The Court reasoned that the relevant testimony of these persons could only relate to the professional legal services they furnished to AIG, and therefore presented too

5

great a risk that AIG's privilege might be violated.  Mr. Reeder had provided preliminary testimony in the trial, but the Court's ruling obviated his need to appear further.  In the Court's view, a stark contrast existed between Defendant's conscious decision to waive its own federal agency privilege, and calling AIG lawyers as witnesses that would imperil AIG's privilege.  See Tr. 7054-55.

Following the completion of trial, the Court received post-trial briefs from the parties on February 19, 2015, and post-trial response briefs on March 23, 2015.  The Court heard closing arguments from counsel on April 22, 2015.

The weight of the evidence demonstrates that the Government treated AIG much more harshly than other institutions in need of financial assistance.  In September 2008, AIG's international insurance subsidiaries were thriving and profitable, but its Financial Products Division experienced a severe liquidity shortage due to the collapse of the housing market.  Other major institutions, such as Morgan Stanley, Goldman Sachs, and Bank of America, encountered similar liquidity shortages.  Thus, while the Government publicly singled out AIG as the poster child for causing the September 2008 economic crisis (Paulson, Tr. 1254-55), the evidence supports a conclusion that AIG actually was *less* responsible for the crisis than other major institutions.  The notorious credit default swap transactions were very low risk in a thriving housing market, but they quickly became very high risk when the bottom fell out of this market.  Many entities engaged in these transactions, not just AIG.  The Government's justification for taking control of AIG's ownership and running its business operations appears to have been entirely misplaced.  The Government did not demand shareholder equity, high interest rates, or voting control of any entity except AIG.  Indeed, with the exception of AIG, the Government has never demanded equity ownership from a borrower in the 75-year history of Section 13(3) of the Federal Reserve Act.  Paulson, Tr. 1235-36; Bernanke, Tr. 1989-90.

The Government did realize a significant benefit in nationalizing AIG.  Since most of the other financial institutions experiencing a liquidity crisis were counterparties to AIG transactions, the Government was able to minimize the ripple effect of an AIG failure by using AIG's assets to make sure the counterparties were paid in full on these transactions.[3]  What is clear from the evidence is that the Government carefully orchestrated its takeover of AIG in a way that would avoid any shareholder vote, and maximize the benefits to the Government and to the taxpaying public, eventually

---

[3]  According to a chart available to the Government on September 16, 2008, the following financial institutions were among those with significant economic exposure to AIG:  ABN AMRO, Banco Santander, Bank of America, Barclays, BNP, Calyon, Citigroup, Credit Suisse, Danske Bank, Deutsche Bank, Goldman Sachs, HSBC, ING, JP Morgan, Merrill Lynch, Morgan Stanley, Rabobank, Société Générale, and UBS.  JX 60 at 3.

resulting in a profit of $22.7 billion to the U.S. Treasury.  PTX 658.  AIG's benefit was to avoid bankruptcy, and to "live to fight another day."  PTX 195 at 8; see also testimony of AIG Board member Morris Offit, Tr. 7392 ("we were giving AIG the opportunity to, in effect, live, that the shareholder would still have a 20 percent interest rather than being wiped out by a bankruptcy.").

The Government's unduly harsh treatment of AIG in comparison to other institutions seemingly was misguided and had no legitimate purpose, even considering concerns about "moral hazard."[4]  The question is not whether this treatment was inequitable or unfair, but whether the Government's actions created a legal right of recovery for AIG's shareholders.

Having considered the entire record, the Court finds in Starr's favor on the illegal exaction claim.  With the approval of the Board of Governors, the Federal Reserve Bank of New York had the authority to serve as a lender of last resort under Section 13(3) of the Federal Reserve Act in a time of "unusual and exigent circumstances," 12 U.S.C. § 343 (2006), and to establish an interest rate "fixed with a view of accommodating commerce and business," 12 U.S.C. § 357.  However, Section 13(3) did not authorize the Federal Reserve Bank to acquire a borrower's equity as consideration for the loan. Although the Bank may exercise "all powers specifically granted by the provisions of this chapter and such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter," 12 U.S.C. § 341, this language does not authorize the taking of equity.  The Court will not read into this incidental powers clause a right that would be inconsistent with other limitations in the statute. Long ago, the Supreme Court held that a federal entity's incidental powers cannot be greater than the powers otherwise delegated to it by Congress.  See Fed. Res. Bank of Richmond v. Malloy, 264 U.S. 160, 167 (1924) ("[A]uthority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized – not to do another and separate thing, since that would be, not to carry the authority granted into effect, but to add an authority beyond the terms of the grant."); see also First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 659 (1924) ("Certainly, an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted."); Suwannee S.S. Co. v. United States, 150 Ct. Cl. 331, 336, 279 F.2d 874, 876 (1960) ("No statute should be read as subjecting citizens to the uncontrolled caprice of officials.").

---

[4]  "Moral hazard" refers to the Government's concern that the availability of Federal Reserve bailout loans might motivate private companies to accept risky propositions, knowing that the Government will extend credit to them if they fail.  The Government's policy is to discourage such corporate thinking.  Geithner, Tr. 1763-64; Bernanke, Tr. 2215-16.

Moreover, there is nothing in the Federal Reserve Act or in any other federal statute that would permit a Federal Reserve Bank to take over a private corporation and run its business as if the Government were the owner.  Yet, that is precisely what FRBNY did.  It is one thing for FRBNY to have made an $85 billion loan to AIG at exorbitant interest rates under Section 13(3), but it is quite another to direct the replacement of AIG's Chief Executive Officer, and to take control of AIG's business operations.  A Federal Reserve Bank has no right to control and run a company to whom it has made a sizable loan.  As FRBNY's outside counsel from Davis Polk & Wardwell observed on September 17, 2008 in the midst of the AIG takeover, "the [government] is on thin ice and they know it.  But who's going to challenge them on this ground?"  PTX 3283, Davis Polk email.  Answering this question, the "challenge" has come from the AIG shareholders, whom the Government intentionally excluded from the takeover process.

A ruling in Starr's favor on the illegal exaction claim, finding that the Government's takeover of AIG was unauthorized, means that Starr's Fifth Amendment taking claim necessarily must fail.  If the Government's actions were not authorized, there can be no Fifth Amendment taking claim.  See Alves v. United States, 133 F.3d 1454, 1456-58 (Fed. Cir. 1998) (Taking must be based on authorized government action); Figueroa v. United States, 57 Fed. Cl. 488, 496 (2003) (If the government action complained of is unauthorized, "plaintiff's takings claim would fail on that basis."); see also Short v. United States, 50 F.3d 994, 1000 (Fed. Cir. 1995) (same).  Thus, a claim cannot be both an illegal exaction (based upon unauthorized action), and a taking (based upon authorized action).

The Government defends on the basis that AIG voluntarily accepted the terms of the proposed rescue, which it says would defeat Starr's claim regardless of whether the challenged actions were authorized or unauthorized.  While it is true that AIG's Board of Directors voted to accept the Government's proposed terms on September 16, 2008 to avoid bankruptcy, the board's decision resulted from a complete mismatch of negotiating leverage in which the Government could and did force AIG to accept whatever punitive terms were proposed.  No matter how rationally AIG's Board addressed its alternatives that night, and notwithstanding that AIG had a team of outstanding professional advisers, the fact remains that AIG was at the Government's mercy.  Case law is divided on whether the death knell of bankruptcy represents a real board of directors' choice in such circumstances.  Compare Swift & Courtney & Beecher Co. v. United States, 111 U.S. 22, 28-29 (1884) ("The parties were not on equal terms. . . . The only alternative was to submit to an illegal exaction or discontinue its business.") and In re Consolidated Pretrial Proceedings in Air West Securities Litig., 436 F. Supp. 1281, 1290 (N.D. Cal. 1977) ("[D]efendants' claim that Trustees should be denied recovery . . . because they had an alternative source of recovery (bankruptcy) has never been held to be an adequate alternative under the law of business compulsion.") with Starr Int'l Co. v. Fed. Reserve

Bank of N.Y., 906 F. Supp. 2d 202, 219 n.13 (S.D.N.Y. 2012) ("Even a choice between a rock and a hard place is still a choice.") and FDIC v. Linn, 671 F. Supp. 547, 560 (N.D. Ill. 1987) ("Threatened bankruptcy is insufficient to create economic duress."). Voluntary acceptance, however, is not a defense to an illegal exaction claim. See the "Legal Analysis" section, "Illegal Exaction Claim," below.

With regard to Starr's reverse stock split claim, the evidence supports a conclusion that the primary motivation for the split was to ensure AIG was not delisted from the New York Stock Exchange ("NYSE"). In June 2009, AIG was in jeopardy of having its stock delisted because the stock value was teetering at or below $1.00 per share. The NYSE will not list stocks that are valued at less than $1.00 per share. Indeed, Starr voted its shares in favor of the reverse stock split resolution. Although it might be logical to conclude that the twenty-for-one decrease in the number of issued shares, with no change in the authorized shares, was designed to allow the Government's preferred stock to be exchanged for common stock, there is no evidence that this was the case. The Court concludes that the motivation for the reverse stock split was to assure the continued listing of AIG stock on the NYSE. Accordingly, Starr's reverse stock split claim is denied.

Turning to the issue of damages, there are a few relevant data points that should be noted. First, the Government profited from the shares of stock that it illegally took from AIG and then sold on the open market. One could assert that the revenue from these unauthorized transactions, approximately $22.7 billion, should be returned to the rightful owners, the AIG shareholders. Starr's claim, however, is not based upon any disgorgement of illegally obtained revenue. Instead, Starr's claim for shareholder loss is premised upon AIG's stock price on September 24, 2008, which is the first stock trading day when the public learned all of the material terms of the FRBNY/AIG Credit Agreement. The September 24, 2008 closing price of $3.31 per share also is a conservative choice because it represents the lowest AIG stock price during the period September 22-24, 2008. Yet, this stock price irrefutably is influenced by the $85 billion cash infusion made possible by the Government's credit facility. To award damages on this basis would be to force the Government to pay on a propped-up stock price that it helped create with an $85 billion loan. See United States v. Cors, 337 U.S. 325, 334 (1949) ("[V]alue which the government itself created" is a value it "in fairness should not be required to pay.").

In the end, the Achilles' heel of Starr's case is that, if not for the Government's intervention, AIG would have filed for bankruptcy. In a bankruptcy proceeding, AIG's shareholders would most likely have lost 100 percent of their stock value. DX 2615 (chart showing that equity claimants typically have recovered zero in large U.S. bankruptcies). Particularly in the case of a corporate conglomerate largely composed of

insurance subsidiaries, the assets of such subsidiaries would have been seized by state or national governmental authorities to preserve value for insurance policyholders. Davis Polk's lawyer, Mr. Huebner, testified that it would have been a "very hard landing" for AIG, like cascading champagne glasses where secured creditors are at the top with their glasses filled first, then spilling over to the glasses of other creditors, and finally to the glasses of equity shareholders where there would be nothing left. Huebner, Tr. 5926, 5930-31; see also Offit, Tr. 7370 (In a bankruptcy filing, the shareholders are "last in line" and in most cases their interests are "wiped out.").

A popular phrase coined by financial adviser John Studzinski, in counseling AIG's Board on September 21, 2008 is that "twenty percent of something [is] better than 100 percent of nothing." Studzinski, Tr. 6936-37. Others, such as Mr. Liddy and Mr. Offit, also embraced this philosophy, believing the top priority was for AIG to live to fight another day. If the Government had done nothing, the shareholders would have been left with 100 percent of nothing. In closing arguments, responding to Starr's allegation that FRBNY imposed punitive terms on AIG (which it did), Defendant's counsel Mr. Dintzer observed, "[i]f the Fed had wanted to harm AIG in some way, all it had to do was nothing." Dintzer, Closing Arg., Tr. 151.

The Federal Circuit's guidance in a case of this type requires that Starr show its economic loss. "[P]roving economic loss requires a plaintiff to show what use or value its property would have but for the government action." A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014). The analysis here leads to the conclusion that, if the Government had done nothing to rescue AIG, the company would have gone bankrupt, and the shareholders' equity interest would have been worthless. Accordingly, the Court finds that the first plaintiff class prevails on liability because of the Government's illegal exaction, but recovers zero damages. The Court finds that the second plaintiff class, basing its claim on the reverse stock split, is not entitled to recovery for either liability or damages.

As the Court noted during closing arguments, a troubling feature of this outcome is that the Government is able to avoid any damages notwithstanding its plain violations of the Federal Reserve Act. Closing Arg., Tr. 69-70. Any time the Government saves a private enterprise from bankruptcy through an emergency loan, as here, it can essentially impose whatever terms it wishes without fear of reprisal. Simply put, the Government often may ignore the conditions and restrictions of Section 13(3) knowing that it will never be ordered to pay damages. With some reluctance, the Court must leave that question for another day. The end point for this case is that, however harshly or improperly the Government acted in nationalizing AIG, it saved AIG from bankruptcy. Therefore, application of the economic loss doctrine results in damages to the shareholders of zero.

Findings of Fact

A.  The September 2008 Financial Crisis

In September 2008, the American economy faced the worst financial crisis since the Great Depression in the 1930s.  Bernanke, Tr. 1958 ("[T]he country at that time was in the most severe financial crisis since the Great Depression."); PTX 548 at 24 (Bernanke).  The crisis that began in August 2007 had the world "at the edge of the abyss."  "It was the worst financial shock in more than a century."  In the United States, the initial loss to household wealth was five times as severe as compared to the initial loss of wealth during the Great Depression.  PTX 671 at 2 (Geithner).

This crisis was so widespread that it affected the viability of nearly every financial firm, including institutions that were solvent at the time.  PTX 663 at 11; Geithner, Tr. 1445, 1556 (noting that a solvent company may fail if it becomes illiquid).  During a panic, liquidity freezes up and firms are forced to sell off assets in a fire sale, which "bring[s] asset prices down below their long-run value, which then harms everybody else's ability to borrow against assets."  This condition creates a vicious cycle where people with liquid assets no longer extend liquidity to others, and it causes a significant contraction to the financial markets, affecting even solvent institutions.  Cragg, Tr. 5424-25; PTX 663 at 11 (Geithner: If a solvent entity becomes "caught up in the run, even the strongest will not survive.").  Officials in Government and private enterprise were working around the clock.  Baxter, Tr. 840 ("I can't tell you which day it was, Mr. Boies, because I was pretty much working 24/7 at that time.  The days were nights; the nights were days.").

The crisis that would come to a head in September 2008 "arrived in force on August 9, 2007."  PTX 706 at 78 (Paulson).  Foreclosures in the housing market began to rise, credit spreads widened, and the amount of liquidity available to firms decreased substantially.  PTX 709 at 156.  By March 2008, the Federal Reserve found there were "unusual and exigent circumstances" sufficient for it to lend outside the banking system.  Baxter, Tr. 656-57, 659.  On March 14, 2008, the Federal Reserve authorized an emergency loan to Bear Stearns under its Federal Reserve Act Section 13(3) authority.  PTX 1201 at 2-3.  On March 16, 2008, the Federal Reserve created the Primary Dealer Credit Facility ("PDCF") for primary dealers to obtain overnight liquidity.  Stip. ¶ 51 (the PDCF loaned as much as $40 billion a night); PTX 728 at 1-2.  Between March and September 2008, the financial markets continued to deteriorate.  Alvarez, Tr. 136-37

(stating that "[l]iquidity was becoming difficult to get with any kind of haircut on a secured basis, and unsecured credit was becoming all but unavailable.").[5]

By September 2008, panic among financial institutions had caused the private market to freeze and stop functioning altogether.  This panic also led to a run on money market funds that, in turn, began to dump commercial paper, and the "commercial paper market went into shock."  PTX 708 at 90 (Bernanke).  Financial institutions stopped lending to each other and every financial institution faced enormous pressure and strain.  Offit, Tr. 7920, 7927.  Of the thirteen most important financial institutions in the United States, twelve "had either failed or were at risk of failure."  Bernanke, Tr. 1960.

There were five major causes of the September 2008 financial crisis: (1) the so-called "housing bubble"; (2) the floating interest rates of subprime mortgages; (3) the rating agencies' misrepresentations of the riskiness of certain securities such as collateralized debt obligations ("CDOs"); (4) the "originate-to-distribute" business model; and (5) the collapse of the alternative banking system.  The "housing bubble" was caused by low interest rates and poor lending practices by mortgage originators and banking and financial institutions.  Following September 11, 2001, the Government kept interest rates artificially low to encourage home buying.  Saunders, Tr. 8379 (The roots of the financial crisis are traceable to "when interest rates were lowered after 9/11 and then there was a buildup of subprime mortgages.").  The low interest rates in turn over-stimulated the housing market and resulted in the over extension of credit.  In addition to the artificially low interest rates, banks and financial institutions had adopted poor lending practices extending mortgages to borrowers for housing that they could not actually afford.  These mortgages, especially the subprime mortgages, included floating interest rates.  When interest rates began to rise during 2006 and home prices began to drop, many low income homeowners could no longer meet their mortgage commitments and either became delinquent or defaulted on their loans.  Saunders, Tr. 8380; PTX 599 at 5 (Bernanke).

Another major cause of the financial crisis was the "originate-to-distribute" business model developed by financial institutions.  Under the "originate-to-distribute" model, "originators would transfer mortgages to other entities instead of holding them to maturity."  PTX 624 at 117-19, 130-54.  Mortgage originators would first transfer or sell mortgages to a special purpose vehicle ("SPV").  This process would then lead to the creation of CDOs, which are securities or tranches representing tiered rights to be paid from the revenue of the pool.  The originator of the SPV then either marketed the CDOs

---

[5]  A "haircut" in the financial industry is a percentage discount applied to the market value of a security or the face value of a bond to account for the risk of loss that an investment in the security or bond poses.  See Alvarez, Tr. 130-32; PTX 2856 at 171 (Cragg Expert Report).

to investors or retained them on the balance sheet.  Cragg, Tr. 4952-55.  Between 2004 and 2007, "nearly all of the adjustable rate subprime mortgages written were packaged into residential mortgage-backed securities ("RMBS") and a large share of these subprime RMBS were purchased by managers of CDOs of asset backed securities."  Stip. ¶ 37; PTX 11 at 10; PTX 583 at 8 (by 2006, subprime mortgages accounted for 20 percent of the total mortgages on the market whereas in 1994, they only accounted for five percent of the total market).  This "originate-to-distribute" model increased the amount of money available for housing loans and resulted in mortgage originators paying less attention to a borrower's credit and making loans without "sufficient documentation or care in underwriting" because the risk of non-payment had been transferred to others. PTX 607 at 11 (Bernanke).  Rating agencies downplayed the riskiness of the CDOs and related securities, and the Government later charged some of these agencies with fraud for their misrepresentations regarding the safety of CDOs and related securities.  PTX 661 at 2-3.

Finally, the alternative or "shadow" banking system collapsed, further worsening the September 2008 financial crisis.  The alternative banking system had developed as a way to provide trillions of dollars of short-term liquidity to financial firms.  Between 2003 and 2006, the alternative banking system grew at an exponential rate and by the time the housing bubble burst in 2006, it was larger in size than the traditional banking sector.  Cragg, Tr. 4942, 4945.  At its peak, the size of the shadow banking system was approximately $13 trillion.  Cragg, Tr. 4943; PTX 5302.  But the shadow banking system was not regulated in the same way that traditional banks are regulated.  Instead, this alternative system consisted primarily of investment banks and broker dealers that extended credit in competition with traditional banks.  These investment banks and broker dealers originated loans, packaged those loans into securities, and created institutions that would buy those securities and distribute them to investors.  Cragg, Tr. 4941-43.  In this "shadow" system, "what was most important was the ability to do deals, because it was fees that generated profits."  Cragg, Tr. 4947.  By contrast, in the traditional banking system, most of the income comes from what is called spread income. Spread income is "the difference between the cost of money coming into the bank versus . . . the interest that [the bank is] able to charge on mortgages and other loans."  Cragg, Tr. 4946-47.

Significantly, the alternative system also included the "repo" market which provided short-term funding for companies by "funding through repurchase agreements where the investment banks would put out assets overnight and use that as collateral." PTX 548 at 13 (Bernanke).  The repo market was particularly important to the broker dealers of the alternative banking system because "half of their balance sheet was supported by repo."  Cragg, Tr. 5005-06.  Before the crisis began, bankers considered repos safe.  But starting in 2007, the repo lenders grew concerned they would receive

collateral instead of cash and these lenders responded by imposing higher haircuts or pulling away and causing some borrowers to lose access to repo entirely.  PTX 650 at 12-13 (Bernanke).  Repo financing was particularly susceptible to a financial crisis because it was overnight financing which had to be renewed every day.  PTX 706 at 115-16 (Paulson) ("Most of this money was lent overnight.").  By September 2008, the size of the repo market had dropped precipitously, falling from $4.5 trillion in March 2008 to $3.5 trillion, a decrease of 20 percent.  Cragg, Tr. 5006.

B. AIG's Financial Condition in 2008

The bursting of the housing bubble and the collapse of the alternative or shadow banking system exposed nearly every major financial institution to significant liquidity risks beginning in 2007 and into September 2008.  Cragg, Tr. 5031-32 ("Lehman, Morgan Stanley, Goldman Sachs, Merrill Lynch . . . were all, you know, in fear of failure, because of liquidity.").  Financial institutions such as AIG, Lehman, Morgan Stanley, Goldman Sachs, and Merrill Lynch faced these liquidity risks due, in part, to their massive CDO and CDS[6] portfolios.  See Cragg, Tr. 4987-89; Saunders, Tr. 8074-75, DX 1356 at 28; DX 1883 at 23 ("[AIG's] super senior CDS portfolio began in 1998 and had a total net exposure of $465 billion at June 30, 2007.").  Though AIG, unlike other major financial firms, had "stop[ped] writing credit protection on multi-sector CDOs" in 2005, stip. ¶ 42, its securities lending program in its Financial Products Division ("AIGFP") still faced substantial risks from its existing CDS portfolio.[7]  First, AIG's CDS agreements contained substitution provisions which allowed CDO managers to swap pre-2006 RMBS with "more suspect" 2006 and 2007 subprime RMBS that presented "more problematic credit issues."  Cragg, Tr. 5304, 5307.  Second, AIG had failed to hedge against the risk it faced from its multi-sector CDS contracts.  Schreiber, Tr. 6541-44; Saunders, Tr. 8086.  Starr itself concluded that a significant portion of AIG's 2008 liquidity problems was the result of its failures in risk management.  Smith, Tr. 7687-90; DX 211 at -10576.

---

[6]  A CDS is a "credit default swap contract" and is akin to financial insurance, whereby the CDS seller collects premium payments in exchange for guaranteeing the performance of a debt obligation.  Cragg, Tr. 4964; PTX 549 at 7; Saunders, Tr. 8071-72.

[7]  At a time when AIG was exiting the CDO market, other financial firms such as Goldman Sachs, Citigroup, and Merrill Lynch were dramatically increasing their CDO transactions.  From 2005 to 2006, Goldman Sachs' CDO transactions doubled, going from $12.6 billion to $25.4 billion.  Merrill Lynch *tripled* the size of its CDO transactions from 2005 to 2006, issuing approximately $14 billion in 2005 to $40.9 billion in 2006.  Citigroup more than doubled the size of its CDO transactions going from $11.1 billion in 2005 to $28.3 billion by 2007.  Cragg, Tr. 4987-89.  As evidenced by a May 17, 2007 speech at the Federal Reserve Bank of Chicago, Mr. Bernanke had a favorable view of the home mortgage market two years after AIG had stopped accepting additional CDO risk.  PTX 1041 at 6; Bernanke, Tr. 2142-43.

AIG began to face liquidity issues from both its CDS portfolio and securities lending program starting in 2007. The CDS contracts "carried substantial liquidity risks for AIG" because they required AIG to post cash collateral in three circumstances: (1) a default in a covered CDO; (2) a decline in the CDOs' market value; (3) a downgrade of an individual CDO tranche; or (4) a rating downgrade for AIG itself. Saunders, Tr. 8072-73. If AIG's credit rating declined, AIG would be forced to post billions of dollars in collateral due to the terms of its CDS contracts. Cragg, Tr. 5036-37 (noting that "[e]ventually the credit rating agencies [got] concerned about AIG's liquidity" which led to more liquidity problems and then the run on AIG).

Under AIG's securities lending program, AIG could borrow money by lending securities to third parties in exchange for cash collateral. This program created a liquidity risk by allowing borrowers to return the borrowed securities and demand the return of their cash collateral in as little as a few days, whereas the average maturity of the RMBS investments or assets that AIG purchased with the security borrowers' cash collateral was about five years. Saunders, Tr. 8145-46; Cragg, Tr. 5287-90. If securities borrowers did not roll over their existing borrowings, AIG would have to respond to securities returns by either selling the investments it had purchased or providing cash from other sources. Saunders, Tr. 8147. AIG continued to expand this program in 2006 and 2007, investing the cash collateral in risky subprime and alternative "Alt-A" RMBS. Saunders, Tr. 8097-98; Kothari, Tr. 4870. By September 2008, 84 percent of the collateral obtained through the securities lending program had been invested in either subprime mortgages or Alt-A mortgages. Saunders, Tr. 8099-8100.

In order for AIG to manage its liquidity needs from the CDS portfolio and the securities lending program, the company, starting in 2007, created a Liquidity Risk Committee to "measure, monitor, control and aggregate liquidity risks across AIG" and began to build liquidity. Willumstad, Tr. 6477; DX 939 at 99. To build liquidity, AIG decided to raise additional capital from the market. In May 2008, AIG raised "$20 billion in new capital by issuing a mix of common stock, equity units, and junior subordinated debentures," which was the largest private capital raise in history at that time. Stip. ¶ 56; PTX 587 at 13-14; Willumstad, Tr. 6481. AIG continued to try to strengthen its balance sheet, raising another $3.25 billion in capital in August 2008. JX 188 at 3; Stip. ¶ 66; Offit, Tr. 7917 ("I had made a statement to the board and I said I didn't know whether we were the most overcapitalized company in this country or the most undercapitalized. I said it all depends on housing prices. And that was really the variable."). To conserve cash, AIG also halted merger discussions with a number of entities that it had been contemplating acquiring. Willumstad, Tr. 6483. In addition, "AIG hired JP Morgan Chase to help develop funding options" and "approached Berkshire Hathaway about providing a $5 billion backstop to AIG's guaranteed

investment contracts." Stip. ¶¶ 67, 69. As of August 2008, AIG's outside auditors from PricewaterhouseCoopers ("PWC") concluded that AIG's liquidity needs did not rise "to the level of concern that required disclosure." Farnan, Tr. 4243; DX 175 at 233 (as of June 30, 2008, AIG's cash and short-term investments totaled $82.2 billion). By September 2008, AIG had reduced its securities lending balance by 25 percent from its peak. PTX 625 at 4.

Despite the capital raises and AIG's other efforts to conserve cash, AIG's liquidity problems continued in August and September 2008 due to the further deteriorating condition of the financial markets, the lack of available liquidity, and similar difficulties facing other financial institutions. See Offit, Tr. 7920, 7928; Bernanke, Tr. 1960; Cragg, Tr. 4942, 4945; Liddy, Tr. 3183-84 ("I thought the company faced a very complex liquidity squeeze, in line with that which was affecting many other financial institutions."). Many market participants such as AIG also "found it difficult to derive fair market values for their securities based on market transactions." PTX 221 at 4; see also Willumstad, Tr. 6484-86. Accordingly, AIG was forced to post collateral to its counterparties that "way exceeded any reasonable estimate of the actual risk of nonpayment on the CDS contracts" and this circumstance further strained AIG's liquidity. Cragg, Tr. 5016-17.

C. September 13-14, 2008 – "Lehman Weekend"

In the weeks leading up to "Lehman Weekend," FRBNY's Mr. Geithner met twice with AIG's Chief Executive Officer, Mr. Willumstad. On July 8, 2008, Mr. Geithner held a meeting as a courtesy because Mr. Willumstad had just become AIG's new CEO, and on July 29, 2008, they met again at Mr. Willumstad's request. Mr. Willumstad did not indicate in either of these meetings that AIG was facing significant liquidity issues, and he did not request any FRBNY assistance. Geithner, Tr. 1720-21; PTX 715 at 1. Mr. Willumstad asked during the July 29 meeting if AIG might borrow from FRBNY if the need arose in the future. Willumstad, Tr. 6342-44; Geithner, Tr. 1721. In response, Mr. Geithner explained that providing AIG with access to FRBNY lending facilities would be unlikely for "moral hazard" reasons because AIG was an insurance company, not a bank. Geithner, Tr. 1721-22. "Moral hazard" refers to the concern that Federal Reserve loans might encourage companies to assume undue risk in the hope of receiving government support on favorable terms if they fail. Geithner, Tr. 1763-64; Bernanke, Tr. 2215-16 (when deciding whether to authorize FRBNY to offer a rescue loan to AIG, the Board of Governors discussed the "moral hazard . . . that would attend such a loan."). The Federal Reserve began to monitor AIG more closely in August 2008. PTX 24, 26, 27, 29, 30, 33.

Mr. Geithner and Mr. Willumstad met a third time on Tuesday, September 9, 2008, where Mr. Willumstad raised AIG's interest in becoming a primary dealer to gain

access to FRBNY's Primary Dealer Credit Facility ("PDCF").  Willumstad, Tr. 6370-71; Geithner, Tr. 1722-24.  Mr. Willumstad was aware that the process for becoming a primary dealer would require at least two months for AIG to establish a primary dealer affiliate.  Willumstad, Tr. 6359-61; JX 43 at 3 (Sept. 5, 2008 AIG Board minutes). Ultimately, AIG did not apply to become a primary dealer.  Willumstad, Tr. 6373.

In August 2008, AIG learned that credit rating agencies were considering downgrading AIG because of continued earnings volatility and financial deterioration. DX 178 at -1005 (Fitch Ratings).  AIG retained JP Morgan as a financial adviser to develop funding options and strategic alternatives.  Willumstad, Tr. 6350.  In early September 2008, AIG's management remained optimistic about raising up to $20 billion in capital to address liquidity needs, and considered using asset sales and a dividend cut to increase available funds even more.  Willumstad, Tr. 6360; JX 43 at 3.  Mr. Willumstad met with credit rating agencies during the week of September 8-12, 2008 "with the hope and expectation that they would wait until the end of September" before deciding to downgrade AIG.  Willumstad, Tr. 6366-67; DX 227 at -5283.  During this one-week period, AIG's stock price fell from $22.76 to $12.14 per share.  Willumstad, Tr. 6369; JX 188 at 4 (AIG 2008 Form 10-K).

By Friday, September 12, 2008, AIG was caught in a "downward spiral" due to its likely credit rating downgrades, increased CDS collateral calls, the decline of its mortgage-related assets, the absence of market liquidity, and the decline of its stock price. Mr. Willumstad spoke to Mr. Geithner on Friday morning, September 12, indicating that AIG had urgent and severe liquidity needs in the range of $13 to $18 billion to meet its collateral demands.  Geithner, Tr. 1726-27; Willumstad, Tr. 6374-75.  As a result of an afternoon meeting with AIG representatives on September 12, FRBNY reported that "AIG is facing serious liquidity issues that threaten its survival viability."  Mosser, Tr. 1292; PTX 42 at 1.

Upon learning of AIG's liquidity needs on September 12, 2008, the Federal Reserve encouraged AIG and other private-market participants to pursue a private solution over the coming weekend.  During September 13-14, 2008, FRBNY and Board of Governors representatives met or spoke repeatedly with AIG and its representatives to understand AIG's needs and to explore potential options to address the financial pressures.  Mr. Geithner commissioned teams of FRBNY staff to study AIG's financial profile and assess AIG's financial condition and needs.  Over this weekend, the role of these teams expanded to include consideration of the pros and cons of lending to AIG, analysis of the consequences of an AIG bankruptcy, and an overall evaluation of AIG's importance to the national and world economies.  Geithner, Tr. 1729; Mosser, Tr. 1334; LaTorre, Tr. 2300-01; DX 307 at -6652-53; DX 398 at -9979.

In meetings and other communications with AIG, FRBNY and Board of Governors representatives encouraged AIG's efforts to borrow money or raise capital from the private sector. Geithner, Tr. 1730 ("[T]he purpose of those meetings [was] for [AIG] to give us a better feel for the nature of their financial difficulties, the scale of the assistance they may need, and to lay out for us or provide a report on progress they were making or not making in their efforts to raise private assistance."); Bernanke, Tr. 2203 ("I understood that there were some private sector negotiations going on with at least one and maybe more private equity firms.").

The meetings on Saturday, September 13, 2008 also included discussions of possibly freeing up collateral held by AIG's New York insurance subsidiaries to provide liquidity to the parent company. Willumstad, Tr. 6380-81. On Saturday evening, Mr. Geithner and Secretary of the Treasury Henry Paulson met with Mr. Willumstad and other AIG executives and advisers for an update on AIG's private sector efforts. Mr. Willumstad explained that AIG was pursuing possible commercial deals, but he thought some liquidity support from the Treasury Department or the Federal Reserve might be necessary to assist AIG in achieving a private sector solution. Willumstad, Tr. 6380-82; Geithner, Tr. 1730-31.

During the weekend of September 13-14, 2008, AIG increased its estimate of how much money it needed to survive. The increasing AIG projections raised concerns about whether it was possible to pinpoint AIG's actual needs and exposure. AIG's initial $18 billion liquidity projection increased to $45 billion on Sunday (DX 1882 at 106-07), and to at least $75 billion on Monday (JX 74 at 21).

On Sunday, September 14, 2008, Mr. Willumstad reported to government officials that AIG's efforts to secure private sector funding had been unsuccessful. Willumstad, Tr. 6389-90. AIG had not found any private firm or sovereign wealth fund that was willing to provide sufficient financing to stabilize the company, and in time to meet AIG's needs. AIG's Chief Financial Officer, David Herzog, testified "[w]hatever ideas [investment bank consultants] came up with just simply weren't executable." Herzog, Tr. 6957.

In the early hours of Monday, September 15, 2008, Lehman Brothers filed for bankruptcy. Stip. ¶ 93; Willumstad, Tr. 6390-91; Alvarez, Tr. 493. Before its bankruptcy, Lehman Brothers had been a prominent investment bank and a primary dealer. Baxter, Tr. 1101-02; LaTorre, Tr. 2312. Mr. Paulson agreed that, "right after Lehman failed, the country was plunged into . . . the most wrenching financial crisis since the Great Depression." Paulson, Tr. 1200-01. The Lehman Brothers' bankruptcy made AIG's financial crisis much worse. The marketplace reacted to the Lehman announcement by tightening liquidity, which made conventional financing sources more

difficult to access.   AIG's counterparties began withholding payments to AIG and refusing to transact with AIG even on a secured, short-term basis.  Willumstad, Tr. 6396-97; JX 188 at 4.

By Monday, September 15, 2008, FRBNY concluded that AIG could not raise private capital.  Mr. Geithner asked JP Morgan and Goldman Sachs to organize a private consortium of lenders to try to rescue AIG.  Mr. Willumstad recommended these two entities because they were most knowledgeable about AIG, and best suited to arrange a syndicated rescue loan.  Geithner, Tr. 1744 ("I asked two banks, after consulting with Mr. Willumstad, to undergo an effort to assess whether they could arrange a substantial source of private financing.").

During Monday and early Tuesday, September 15-16, 2008, senior bankers from Goldman Sachs and JP Morgan consulted with other banks, including Morgan Stanley, to assess AIG's immediate liquidity needs and economic value.  Lee, Tr. 7073; Head, Tr. 3768-69.   JP Morgan's James Lee was one of the country's leading arrangers of syndicated loans.  Lee, Tr. 7078.  A group from Goldman Sachs and JP Morgan worked through the night to develop terms that might be attractive to other banks.   Mr. Willumstad kept AIG's Board apprised of these efforts, including an "expectation that banks [would] ultimately be paid in some form of equity."  JX 74 at 2.  These efforts proved unsuccessful principally because of the perception that AIG's borrowing needs exceeded AIG's value by tens of billions of dollars.  Lee, Tr. 7075.

During the lead-up to "Lehman Weekend" and the following Monday, government officials were not prepared to let AIG file for bankruptcy because of the catastrophic consequences an AIG bankruptcy would have had on other financial institutions and the economy.  Def.'s Resp. to Pl.'s 2nd RFAs No. 206 ("The failure of AIG could easily have led to a worldwide banking run and a severe financial meltdown, devastating millions of people financially along the way."); Id. No. 233 ("The Federal Reserve made its decision to lend based on a judgment that a failure of AIG would cause dramatically negative consequences for the financial system and the economy, consequences worse than what occurred in the aftermath of the failure of Lehman Brothers."); Baxter, Tr. 676 (On September 16, Messrs. Bernanke, Geithner, and Paulson "all concluded that if AIG filed for bankruptcy, that would have catastrophic effects for financial markets.").

Further on this point, in his book *"Stress Test,"* Mr. Geithner observed:

> The U.S. financial system seemed even more exposed to AIG than it had been to Lehman.  Europe and Asia were also more exposed to AIG.  And not only was AIG larger than Lehman, with a more complex derivatives book, its decline had been

much swifter, which would be even scarier to markets. "If they default, you'll see default probabilities explode on all financial firms," I said. In other words, mass panic on a global scale.

PTX 709 at 208.

Mr. Bernanke also shared these views. PTX 599 at 77 ("AIG's demise would be a catastrophe."); PTX 708 at 92, Collection of Mr. Bernanke's Lectures in *"The Federal Reserve and The Financial Crisis,"* ("In our estimation, the failure of AIG would have been basically the end. It was interacting with so many different firms. It was so interconnected with both the U.S. and the European financial systems and global banks."); Bernanke, Tr. 1970 (AIG was "a case where action was necessary.").

Mr. Paulson concurred with his colleagues. PTX 564 at 142 (AIG's collapse "would have buckled our financial system and wrought economic havoc on the lives of millions of our citizens."); Id. at 141 ("An AIG failure would have been devastating to the financial system and to the economy."); Paulson, Tr. 1206 ("[I]t would be catastrophic if AIG filed for bankruptcy." While "the system could withstand a Lehman failure, if AIG went down, the country faced a real disaster.").

D. September 16, 2008 Loan and Term Sheet

Once the Federal Reserve concluded that it could not allow AIG to file for bankruptcy, it drafted a term sheet for the Board of Governors' approval. The Board of Governors convened a meeting on September 16, 2008 to approve the term sheet as required under Section 13(3) of the Federal Reserve Act. Alvarez, Tr. 509-10. This meeting was the only one that the Board of Governors held before the AIG Credit Agreement was executed. Bernanke, Tr. 1974-75.

The term sheet approved by the Board of Governors is included in the record as JX 63. Alvarez, Tr. 188; Bernanke, Tr. 1974. This term sheet expressly stated that the form of equity would be "[w]arrants for the purchase of common stock of AIG representing 79.9% of the common stock of AIG on a fully-diluted basis." JX 63 at 6.[8]

---

[8] The objective of the Board of Governors in setting a 79.9 percent rate was to keep the Government's equity ownership of AIG below 80 percent, because at an 80 percent or higher level, the Federal Reserve or the Treasury Department would be considered the controlling owner of AIG. See Alvarez, Tr. 515-16. At an ownership level above 80 percent, principles of "push down" accounting would have likely required FRBNY to recognize AIG's assets and liabilities on its own books and records. JX 146 at 23-28 (PwC analysis, Nov. 9, 2008); Farnan, Tr. 4408-13.

Warrants are a "contract by which the corporation gives an irrevocable option to the holder to purchase authorized corporate stock within a period of time at a price and upon terms specified in the contract." Tribble v. J.W. Greer Co., 83 F. Supp. 1015, 1022 (D. Mass. 1949). For the AIG term sheet presented to the Board of Governors, the members understood that the warrants would be non-voting until they were exercised, would have an exercise price, and required shareholder approval[9] before the warrants could be issued. Bernanke, Tr. 1975; Baxter, Tr. 816; see also JX 63 at 10. Other key provisions of the term sheet voted on by the Board of Governors included a drawn interest rate of 12 percent (3.5 percent London InterBank Offered Rate[10] ("Libor") floor + 850 basis points), an undrawn fee of 8.5 percent, meaning that any amount not drawn by AIG would be charged an interest rate of 8.5 percent, a commitment fee of 3 percent of the total facility, and a periodic commitment fee of 2.5 percent "payable in kind every [three] months after closing." JX 63 at 6. The five Board of Governors members unanimously voted to approve the term sheet. JX 63 at 4. This was the only term sheet the Board of Governors ever saw or approved. Alvarez, Tr. 188.

Following the Board of Governors meeting on September 16, 2008, the Davis Polk lawyers began to circulate a term sheet time-stamped 1:44 PM to FRBNY and Treasury officials. PTX 86 at 1. This term sheet, like the one presented to the Board of Governors, stated that warrants would be the form of equity granted to the Federal Reserve. Id. at 4. At 2:15 PM that day, Mr. Baxter sent Mr. Alvarez a term sheet providing for "Warrants for the purchase of common stock of AIG representing 79.9% of the common stock of AIG on a fully-diluted basis." JX 64-A at 1; Alvarez, Tr. 262; Baxter, Tr. 695. Later, at 3:21 PM, a black-lined term sheet was distributed, showing changes from earlier drafts. However, the warrants provision in the term sheet remained unchanged. JX 378 at 1, 8-12.

In the afternoon of September 16, 2008, Mr. Geithner called Mr. Willumstad to tell him that FRBNY would be sending him a term sheet and that he had two hours to convince AIG's Board of Directors to accept. PTX 673 at 24 (Geithner: "[W]e're going

---

[9]  Under New York Stock Exchange Listed Company Manual Rule 312.03, "shareholder approval is required prior to the issuance of warrants exercisable into twenty percent or more of the voting power of a corporation's common stock unless a company invokes an exception to Rule 312.03 that waives the requirement of a shareholder vote when (1) the delay in securing shareholder approval would seriously jeopardize the financial viability of the Corporation's enterprise and (2) reliance by the Corporation on such exception is expressly approved by the Audit Committee of the Board." JX 75 at 2. On September 16, 2008, the AIG Audit Committee approved the issuance of warrants without shareholder approval, invoking Rule 312.03. Id. at 3.

[10]  LIBOR is an interest rate benchmark that has been called "the world's most important number." In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 676 (S.D.N.Y. 2013).

to send you a term sheet, you're not going to like it, but you have an hour to get your Board to approve it, two hours, we gave them a deadline, and you are not going to be running the company."). According to Mr. Baxter, the Federal Reserve's offer to AIG was "take it or leave it. Nothing could be negotiated." PTX 126; see also Liddy, Tr. 3200 ("The only game in town was the Federal Reserve."); Paulson, Tr. 1444 ("Federal Reserve was the only fire station in town."). The AIG Board meeting to discuss the proposed Federal Reserve loan commenced at approximately 5:00 PM that day. JX 74 at 1. At the start of the meeting, Mr. Richard Beattie of Simpson Thacher & Bartlett informed the directors about key aspects of the $85 billion credit facility. Id. at 3. Mr. Willumstad also relayed to the Board of Directors what Mr. Geithner had said: that as one of the conditions to accepting the Federal Reserve's loan facility, he would be replaced as CEO of AIG. Id. at 3-4.

The law firms of Simpson Thacher & Bartlett, Sullivan & Cromwell, and Weil Gotshal then gave the AIG directors comprehensive legal advice on whether they should accept the loan or file for bankruptcy. Id. at 4-5; Offit, Tr. 7349-50, 7373. After hearing from these advisers and engaging in a lengthy discussion regarding the pros and cons of filing for bankruptcy, the AIG Board of Directors decided that accepting the loan was a better alternative than bankruptcy. JX 74 at 9-11 (Offit: "AIG, as a financial institution based on trust, cannot survive in bankruptcy;" Sutton: "[t]he risks of bankruptcy are simply too high and there is too great a likelihood that the value of AIG would drop very quickly, hurting all the constituencies about whom the Board must be concerned."); Offit, Tr. 7392 ("[B]y accepting the terms . . . shareholder[s] would still have a 20 percent interest rather than being wiped out by a bankruptcy, and . . . one day [AIG] could again be a very vibrant company."). Of the twelve AIG board members, all but Mr. Bollenbach voted in favor of the Federal Reserve loan. JX 74 at 14. The AIG directors believed doing so was in the best interests of AIG and its shareholders and that it was a better alternative to bankruptcy. Willumstad, Tr. 6432; Offit, Tr. 7402-03; JX 74 at 11. AIG's directors were independent of FRBNY and the Government, with no affiliation with or dependence on FRBNY or the Government for their livelihood. Willumstad, Tr. 6435-36.

Before the conclusion of the board meeting on September 16, 2008, the AIG Board of Directors adopted two resolutions. The first authorized AIG "to enter into a transaction with the Federal Reserve Bank of New York (the 'Lender') to provide a revolving credit facility of up to $85 billion on terms consistent with those described at this meeting, including equity participation equivalent to 79.9 percent of the common stock of the Corporation on a fully-diluted basis." The second resolution authorized AIG "to enter into a $14 billion demand note with the Lender" and to "enter into such additional demand notes . . . as any Authorized Officer determines is necessary or appropriate to meet the liquidity needs of the Corporation prior to the execution of the

definitive documentation of the Credit Facility." JX 74 at 13-14. After the Board of Directors approved the loan facility, FRBNY immediately advanced funds to AIG. Offit, Tr. 7938.

Someone presented a two-page term sheet to Mr. Willumstad prior to the AIG Board meeting. It is unclear from the evidence exactly what version of the term sheet he saw. Willumstad, Tr. 6515. Mr. Huebner testified that Mr. Wiseman of Sullivan & Cromwell handed out hard copies of a term sheet to AIG's Board members, stating the form of equity would be "79.9 percent equity equivalent to common stock, *form to be determined*." Huebner, Tr. 5945-46 (emphasis added). However, this evidence contradicts the testimony of Mr. Willumstad and Mr. Offit who both testified that they did not see a term sheet during the September 16, 2008 board meeting. JX 76 at 1; Willumstad, Tr. 6515; Offit, Tr. 7936. The Court cannot determine what version of the term sheet Mr. Willumstad actually received or whether any hard copies, much less what version, of the term sheet were shown to AIG's Board of Directors. All the term sheets circulated on September 16, 2008 did state, however, that "[t]his Summary of Terms is not intended to be legally binding on any person or entity." JX 63 at 5 (time-stamped 7:42:23 AM); JX 64-A at 3 (time-stamped 3:50:06 AM); JX 64-A at 9 (time-stamped 1:54:10 PM); JX 71 at 2.

According to various press releases issued on the night of September 16, 2008 or the following day, the public would have understood that the form of equity to be acquired by the Federal Reserve would be common stock warrants. PTX 2736 at 1 (New York Times press release) ("Fed Staffers, who briefed reporters at 9:15 tonight, don't even want us to say the government will control AIG. The government will name new management, and will have veto power over all important decisions. And it will have a *warrant* allowing it to take 79.9 percent of the stock whenever it wants."); PTX 131 at 3 (New York Times) ("Under the plan, the Fed will make a two-year loan to AIG of up to $85 billion and, in return, will receive *warrants* that can be converted into common stock giving the government nearly 80 percent ownership of the insurer, if the existing shareholders approve."); PTX 1593 at 3 (A.M. Best) ("Current AIG shareholders will see their equity diluted 79.9% by the issuance of *warrants* to the federal government."). Though some press releases issued on September 16-17, 2008 stated the Government would receive a 79.9 percent equity interest in AIG without stating the form of equity, "no published report prior to the evening of September 23, 2008, explicitly stated that the Government would receive voting preferred stock." See PTX 234 at 1; DX 419 at -1425; JX 79 at 2.

After the board meeting concluded on September 16, 2008, Mr. Willumstad signed a single signature page that had nothing attached. JX 76 at 1-2; Willumstad Tr. 6438-39, 6441-42. An AIG representative faxed a copy of the signature page to FRBNY's Mr.

Baxter at 8:44 PM.  PTX 94 at 1-2.  The final version of the term sheet was sent at 8:51 PM after the Government received the signed signature page.  Def.'s Resp. to Pl.'s 3rd Interrog. No. 2 (identifying DX 437 as the final version).  The key terms included in the final version of the term sheet were nearly identical to those approved by the Board of Governors except that the equity term stated "[e]quity participation equivalent to 79.9% of the common stock of AIG on a fully-diluted basis.  Form to be determined."  DX 437 at -025.

E. <u>Development of the September 22, 2008 Credit Agreement</u>

During September 16-19, 2008, the Government lent significant funds to AIG pursuant to fully secured demand notes.  These demand notes were separate agreements and they were cancelled on September 23, 2008 after the execution of the Credit Agreement.  JX 84 (demand notes); JX 107 at 12, 23, 38-39, 74-75; Baxter, Tr. 761; Liddy, Tr. 3044.  Under the demand notes, AIG was obligated to pay the principal, fees and interest on the demand of FRBNY or on September 23, 2008, whichever came earlier.  Stip. ¶ 150.

FRBNY representatives, with the assistance of their outside counsel, Davis Polk, drafted the Credit Agreement.  Brandow, Tr. 5887; Baxter, Tr. 935-36.  At AIG's September 18, 2008 board meeting, "Mr. Litsky [Vice President of Corporate Governance] noted that a number of directors had raised questions regarding the process by which the various agreements with the Federal Reserve and Treasury would be approved.  Mr. Wiseman [Sullivan & Cromwell] explained the process in detail, and noted that the documents were still being drafted by counsel for the Federal Reserve and that counsel for the Corporation hoped to receive them shortly."  JX 94 at 6.

During September 17-21, 2008, discussions occurred between FRBNY and AIG representatives, but the Government unilaterally imposed the key terms of the Credit Agreement on AIG.  None of the key terms were subject to negotiations.  Liddy, Tr. 3293-94 (AIG had several discussions about the terms with Sarah Dahlgren, but was told "there was not going to be any change."); Dahlgren, Tr. 2779-80 (Mr. Liddy "expressed unhappiness with respect to the equity piece of the deal between September 16th and September 21st.").  AIG's September 21, 2008 board minutes state that "[c]oncern was raised about the Corporation's inability to conduct further negotiations with the Bank." JX 103 at 6; <u>see also</u> PTX 195 at 7 (handwritten note) ("Fed gets it both ways not purely negotiated.").

The Government changed some of the key terms of the Credit Agreement from those that the Federal Reserve's Board of Governors had approved on September 16, 2008.  The September 21, 2008 AIG board minutes state:  Although "the Board had

originally been led to believe that the form of equity participation by the Treasury Department would be warrants, the form of equity participation to be issued in connection with the Credit Agreement is now proposed to be convertible preferred stock, the terms of which were reflected in a term sheet delivered to Board members prior to the meeting." JX 103 at 3. Mr. Liddy confirmed "[w]e had been anticipating that it would be warrants. It was, in fact, preferred stock. So, it was a change from what was anticipated." Liddy, Tr. 3129-30; see also Liddy, Tr. 3136 ("the clear expectation of AIG management was that there would be warrants with no vote" but the final Credit Agreement "provided preferred stock with a 79.9 percent vote.").

There are two major differences between warrants and convertible preferred voting stock. First, with convertible preferred voting stock, the Government would acquire voting rights from the moment the preferred stock was issued. Warrants would have voting rights only after the warrants were exercised. Geithner, Tr. 1492-93; Alvarez, Tr. 261. Second, in order to exercise the warrants, the Government must pay a strike price. Zingales, Tr. 3826-27; Kothari, Tr. 4824. The strike price to exercise warrants in this instance would have been approximately $30 billion, calculated at 12 billion shares times the par value of $2.50 per share. Zingales, Tr. 3827-28; Cragg, Tr. 5107-08. The Government avoided the $30 billion strike price payment and obtained immediate voting control of AIG through the issuance of convertible preferred voting stock.

FRBNY first presented a proposal for convertible preferred voting stock to AIG at 6:31 PM on September 21, 2008, prior to an AIG Board meeting to be held that night. PTX 196 at 1. The summary of terms described the form of equity as "Convertible Participating Serial Preferred Stock" that "will vote with the common stock on all matters submitted to AIG's stockholders" and will be entitled to control "79.9%" of the vote. Id. at 3. The document available at the board meeting was a term sheet, not a draft of the complete Credit Agreement. JX 103 at 2 ("Mr. Reeder reviewed a summary of the principal terms of the facility that had been prepared for review by the members."); Offit, Tr. 7965-66 (Mr. Offit never saw anything but the term sheet).

Between the evening of September 21st and the morning of September 23rd, more changes were made to the Credit Agreement. Brandow, Tr. 5878. On September 22, 2008 at 9:37 PM, Davis Polk sent a draft of the Credit Agreement "requesting that all parties review and sign off within the hour." PTX 1645 at 2. This version added to Section 5.11, "Trust Equity," the following language: "The Borrower shall use best efforts to cause the composition of the board of directors of the Borrower to be, on or prior to the date that is 10 days after the formation of the Trust, satisfactory to the Trust in its sole discretion." Id. at 49-50.

Changing the form of equity from warrants to voting convertible preferred stock in the Credit Agreement yielded important benefits to the Government.   Avoiding a shareholder vote was a key government objective.  PTX 3272 (Sept. 17, 2008 Davis Polk email: "avoiding a SH vote we don't control is a primary goal."); PTX 3129 at 7 (Nov. 5, 2008 Davis Polk email: "We succeeded in finding a structure that allows the trust to gain control of the company without a shareholder vote."); PTX 349 (Treasury counsel Stephen Albrecht, discussing need to "fend off the shareholder attempts to 'reclaim' the company.").

The Federal Reserve's Board of Governors did not consider or approve any of the changes that FRBNY made to the Credit Agreement.   The Board of Governors had approved the term sheet on September 16, 2008 that contemplated an equity component of non-voting warrants with a strike price (exercise price).  JX 63 at 10.  The Chairman of the Board of Governors "understood that the warrants would not have a vote until they had been exercised."  Bernanke, Tr. 1975.  There also was no mention of creating a trust during the Board of Governors meeting.  Bernanke, Tr. 2028 ("[T]he provision for a trust" was never "presented to the Board of Governors for approval.").   The Board of Governors never voted to approve the Credit Agreement.  Bernanke, Tr. 2025.

On September 21, 2008, AIG's Board, without shareholder vote or approval, passed a resolution authorizing the execution of the Credit Agreement.  JX 103 at 1, 7. The key players in the Credit Agreement events immediately understood the effect of this agreement.  On September 23, 2008, Davis Polk's Mr. Huebner observed to FRBNY's Mr. Baxter "[t]he real joy comes when we get back the $85 [billion], with $10 +++ in fees and interest, and make the [T]reasury tens of billions it deserves (and needs!) on the equity."  PTX 3228 at 1.  On September 22, 2008, AIG's Dr. Jacob Frenkel stated to a colleague, Oakley Johnson, "the [G]overnment stole at gunpoint 80 percent of the company."  PTX 228 at 1.

## F.   The Government's Control of AIG

When the Government began lending money to AIG on September 16, 2008, it promptly took control of the company.  Offit, Tr. 7938, 7964-65, 7968.  FRBNY's Sarah Dahlgren prepared "an immediate punch list for taking control of AIG."  Dahlgren, Tr. 2640-41.   On September 17, 2008, Ms. Dahlgren told a group of high-level AIG executives, we "are here, you're going to cooperate."  PTX 581 at 2; Dahlgren, Tr. 2817-18.  Mr. Paulson testified that the Government in effect nationalized AIG.  Paulson, Tr. 1445.

On September 16, 2008, prior to any discussions with the AIG Board, the Government terminated Mr. Willumstad as AIG's Chief Executive Officer, and replaced

him with a new CEO of the Government's choosing.  Secretary of the Treasury, Henry Paulson, "worked on finding a new CEO for the company.  We had less than a day to do it – AIG's balances were draining by the second.  I asked Ken Wilson [Treasury] to drop everything and help.  Within three hours he had pinpointed Ed Liddy, the retired CEO of Allstate."  Mr. Paulson "called Ed Liddy and offered him the position of AIG chief on the spot."  Paulson, Tr. 1227-28; PTX 706 at 263.  The Treasury's Dan Jester told Ms. Dahlgren that Mr. Liddy is "the person who is going to be the new CEO of AIG."  Dahlgren, Tr. 2639.  Mr. Liddy accepted the position, and at his request, Ms. Dahlgren "prepared some bullet points that we thought he should focus on in his initial interactions with the company."  Dahlgren, Tr. 2645, 2917-18.

On the morning of September 17, 2008, Mr. Liddy met with Ms. Dahlgren, and other AIG senior managers, "including the CFO, the chief risk officer, [and] the general counsel."  Dahlgren, Tr. 2641-42.  Mr. Liddy "was clearly the one in charge" during that meeting.  Dahlgren, Tr. 2643.  Mr. Liddy and Ms. Dahlgren conveyed the message to AIG senior managers that "[t]he Fed is coming in and now we are going to talk about what we are going to do."  Dahlgren, Tr. 2644.  AIG senior managers at this meeting were "shell-shocked and at other times terrified."  Id.

The AIG Board convened a meeting on September 18, 2008.  The Government informed key Board members, Mr. Bollenbach and Mr. Offit, that Mr. Liddy would fill the dual role of Chairman and CEO of AIG.  Liddy, Tr. 3040-41; Offit, Tr. 7930.  At the board meeting, the board's counsel, Mr. Beattie, explained that "these are uncharted waters for any board, but that Mr. Liddy was accepted as Chief Executive Officer as part of the agreement to accept government financing on September 16 and that the board was acting in accordance with its duties to formally implement that agreement by appointing Mr. Liddy as Chief Executive Officer."  JX 94 at 2; Offit, Tr. 7929-30.  Mr. Paulson "assumed the board would approve" Mr. Liddy's installation.  Paulson, Tr. 1228.

Beginning on September 16, 2008, "the government in the form of the Federal Reserve, working with the Treasury, became very deeply involved in the overall strategy" of AIG.  PTX 449 at 15-16.  When Mr. Geithner appointed Ms. Dahlgren to head the AIG monitoring team, he told her "[y]ou're going to take on AIG, we are going to make them a loan, and you are going to run it."  Dahlgren, Tr. 2601; Geithner, Tr. 1565-66.  According to FRBNY's counsel, Mr. Baxter, "we had a team that we sent to AIG to monitor AIG on a continuous basis."  Baxter, Tr. 935.  This team spent "an enormous amount of time over at AIG," including "people who spent much of their time at AIG [Financial Products] up in Connecticut."  Dahlgren, Tr. 2602.  Ms. Dahlgren "spent at least part of every day at AIG" during the early stages of the Federal Reserve's monitoring of AIG.  Dahlgren, Tr. 2603.  By October 2008, Ms. Dahlgren was leading an effort to replace current AIG board members with new members of the Government's

choice.  PTX 310 (Oct. 19, 2008 email, Dahlgren to Geithner, recommending new board members, and stating "Morris Offit is prepared to hand his resignation to Ed [Liddy] when he asks.").  Even at earlier stages, FRBNY's plan was to replace all of AIG's Board members.  PTX 3248 at 2 (Sept. 20, 2008 Davis Polk email:  "We plan to take out the board and insert our own people. . . ."); PTX 3290 (Sept. 16, 2008 Davis Polk email: "The Fed wants the entire board to resign and be replaced.").

The AIG monitoring team consisted of hundreds of government officials and outside advisers.  Dahlgren, Tr. 2605.  The monitoring team included professionals "from Ernst & Young, from Morgan Stanley, and from Davis Polk."  Dahlgren, Tr. 2603-04; PTX 524 (containing a "working group list" of team members from FRBNY, Morgan Stanley, Davis Polk, Blackstone, and Ernst & Young).  Morgan Stanley had approximately "[one] hundred individuals throughout the firm in different disciplines" who worked on the AIG engagement "on behalf of" FRBNY.  Head, Tr. 3722.  Morgan Stanley's scope of work was very broad, and encompassed virtually every important decision and activity.  JX 222 at 3-4; PTX 303 at 1, 8.  Ernst & Young also had "upwards of [one] hundred people" assisting on the monitoring team.  Dahlgren, Tr. 2605.  Blackrock worked to value AIG's assets (JX 379 at 2) and to devise, structure, and manage Maiden Lane II and Maiden Lane III (explained in section J below).  Dahlgren, Tr. 2647; Head, Tr. 3743-44; JX 382 at 1, 25.  Approximately ten to twenty Davis Polk lawyers were working with Ms. Dahlgren on AIG.  Dahlgren, Tr. 2606.

AIG was required to reimburse FRBNY for all expenses incurred by FRBNY's advisers.  Dahlgren, Tr. 2606-08; JX 251 at 316-17 (AIG 2009 10-K Report acknowledging AIG's obligation to reimburse FRBNY for the monitoring team expenses).  There was no budget for all of the persons and firms helping the Federal Reserve, but it was "very expensive."  Geithner, Tr. 1569.

Based upon statements made by government officials, there can be little doubt that the Government controlled AIG.  Mr. Bernanke testified before Congress on March 23, 2009 that "AIG is effectively under our control."  PTX 447 at 50.  Donald Kohn, Vice Chair of the Federal Reserve, stated on September 23, 2008 that the Fed is "definitely acting like we own the company [AIG].  Will need to consolidate on our balance sheet." PTX 233.  Ms. Dahlgren told Standard & Poor's on October 1, 2008 that she was speaking on behalf of the "largest creditor and 80% equity holder of the company [AIG]."  PTX 270 at 2; Dahlgren, Tr. 2676.  Ms. McConnell's handwritten notes from September 15, 2008 state "loan comes with conditions, plan to run the company [AIG]." PTX 68 at 14.  On September 16, 2008, FRBNY's Christopher Calabria stated in an email "We own [AIG], essentially.  I can't believe it."  PTX 97.  On September 17, 2008, FRBNY's Michael Silva, Chief of Mr. Geithner's staff, wrote in an email that Mr.

Greenberg "should have said he WAS one of the largest shareholders in the company [AIG]. The Federal Reserve is now the largest shareholder in the company." PTX 109.

On September 19, 2008, prior to executing the Credit Agreement, FRBNY's Joseph Sommer recommended that Ms. Dahlgren attend the National Association of Insurance Commissioners Conference, "[n]ow that you are the proud new owner of an insurance company." PTX 1607-U at 1; Dahlgren, Tr. 2789 (Ms. Dahlgren attended the conference).

### G. The Creation of a Trust

In mid-September 2008, the Government recognized that the Treasury and FRBNY might not have the legal authority to take the Series C Preferred stock given to the Treasury under the terms of the September 22, 2008 Credit Agreement. See, e.g., PTX 320-U at 1 ("we agree that there is no power" for the Federal Reserve to "hold AIG shares."); PTX 370 at 3 ("Treasury lacks the legal authority to hold directly voting stock of AIG."); PTX 409 at 177 (Geithner: "Under section 13(3) of the Federal Reserve Act, the Fed is prohibited from taking equity or unsecured debt positions in a firm."); PTX 443 at 1 ("Nice try on the preferred stock investments! We still don't have that authority."). Thus, government officials began to look for ways to avoid the legal restriction preventing the U.S. Treasury and FRBNY from holding AIG's voting preferred stock.

During the period September 16-20, 2008, Mr. Baxter conceived of the idea of putting the Series C Preferred stock in a trust as a way to circumvent FRBNY's and the Treasury's lack of authority to own AIG shares directly. Baxter, Tr. 791; PTX 580 at 3 (Baxter); see also JX 90. Mr. Baxter asked Davis Polk to consider various options to avoid direct ownership by FRBNY and Treasury of a majority voting interest in AIG, including "warrants that are exercisable upon sale" and "holding shares in a voting trust." JX 90.

Davis Polk developed two proposals, Options A and B. Option A contemplated a combination of preferred shares with limited voting rights and warrants exercisable only on transfer to a third party. Option B consisted of preferred shares with full voting rights to be held by an independent trust. PTX 159-U at 6-7. The Government ultimately selected Option B and began to draft a term sheet to reflect that the form of equity would now be voting preferred stock, as opposed to the warrants originally approved by the Board of Governors. See PTX 183 at 3-4; JX 63 at 6. On September 21, 2008, during a noon conference call, the Government formally decided to issue the Series C Preferred Stock to an AIG Credit Facility Trust, established for the benefit of the Treasury. JX 101 at 1-3; JX 107 at 137 (stating the AIG Credit Facility Trust was "established for the

benefit of the United States Treasury" and changing the "purchaser" of the stock from FRBNY to the Trust).

To administer the trust, FRBNY, in consultation with the Treasury, selected three trustees who had close ties to the Federal Reserve System.  Baxter, Tr. 986.  Chester Feldberg worked at FRBNY for 36 years and "had a close relationship with many Federal Reserve employees and officials."  Feldberg, Tr. 3334-35.  Jill Considine "had chaired the audit and risk committee of the board of directors of the Federal Reserve Bank" and had previously served a six-year term as a member of the board of the FRBNY.  Baxter, Tr. 988-89; Def.'s Resp. to Pl.'s 2nd RFAs No. 770.  Douglas Foshee was the chair of the Board of Directors of the Federal Reserve Bank of Dallas, Houston Branch, and Central Houston, Inc. during the time he served as trustee.  Foshee, Tr. 3453; Def.'s Resp. to Pl.'s 2nd RFAs No. 772.

Ms. Dahlgren and the trustees signed the final AIG Credit Facility Trust Agreement on January 16, 2009 and the Trust received the Series C Convertible Preferred Stock in March 2009.  JX 172 at 1, 25; JX 191 at 2.  There were at least eight key provisions of the Trust Agreement.  First, the trust was established for the "sole benefit of the Treasury."  JX 172 at 5.  Second, FRBNY had the power to appoint the trustees.  Id. Third, only the Board of Governors could terminate the trust or amend its authorization. Id. at 6.  Fourth, the trustees, in exercising their discretion with the trust stock, were advised they were to "maximize[e] the Company's (AIG's) ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department."  Id. at 10.  Fifth, FRBNY was to control the defense of "any actual or threatened suit or litigation of any character involving the Trust" and the trustees could not make "any admissions of liability . . . or agree to any settlement without the written consent of the FRBNY."  Id. at 13.  Sixth, FRBNY, in consultation with the Treasury, had the power to remove a trustee.  The trustees also could only be removed in exceptional circumstances such as those involving dishonesty, untrustworthiness, or dereliction of duty.  Id. at 14.  Seventh, the trustees were required to act "in or not opposed to the best interests of the Treasury."  Id. at 15 (providing indemnification rights to the trustees).  Last, the Trustees were to ask FRBNY for clarification regarding the Trust Agreement and the Government had the right to seek specific performance from the Trustees for compliance with their obligations.  Id. at 19-20, 23.  AIG representatives had no involvement in the preparation or approval of the Trust Agreement, and no participation in any trustee meetings.  PTX 435 at 8-9 (lack of any notice to AIG); Dahlgren, Tr. 2760-64 (no AIG involvement in trustees' meetings).

In their capacity as trustees, Mr. Feldberg, Ms. Considine, and Mr. Foshee understood they had fiduciary duties to the Treasury, and not to AIG's common stock shareholders.  Feldberg, Tr. 3442; Huebner, Tr. 6272-73; PTX 372 at 1; PTX 3286 at 1.

The trustees also knew they could not sell or dispose of the trust stock unless FRBNY approved, and they questioned their level of independence. Feldberg, Tr. 3442; 3566-7l; DX 630 at -312 to -313. On October 30, 2008, the trustees sent a memorandum to Mr. Baxter seeking to clarify their level of independence. DX 630 at -312-13. The trustees were concerned with Section 2.04(d) of the Trust Agreement which set forth two potentially conflicting goals for the trustees to consider when exercising their discretion. First, the trustees were to maximize AIG's ability to repay advances under the Credit Agreement. Second, the trustees were to manage AIG so as not to disrupt financial market conditions as it was in the "best interests of the stockholders of the Company [AIG]." Id. The Government never removed Section 2.04(d) from the Trust Agreement, but did specify the two goals were "non-binding" on the trustees' discretionary power to vote the trust stock. JX 172 at 10. This position satisfied the trustees that they would be independent in performing their fiduciary duties as trustees. Feldberg, Tr. 3407.

During their time as trustees, Mr. Feldberg, Ms. Considine, and Mr. Foshee received information about AIG through FRBNY representatives, because the trustees did not attend AIG's board or committee meetings. Baxter, Tr. 1006; PTX 516 at 49-50. The trustees engaged Spencer Stuart, an executive recruitment firm, to assist in identifying potential new candidates for AIG's board of directors. In June 2009, at the annual shareholder meeting, the trustees proposed the candidates for election. Feldberg, Tr. 3419-26; Foshee, Tr. 3521, 3524-26. Before voting on matters and selecting the board of directors for AIG, however, the trustees consulted with FRBNY. Baxter, Tr. 842-43. The trustees also did not participate in matters affecting the Trust's ownership rights, including the reverse stock split. Feldberg, Tr. 3364, 3373-74.

H.   The Restructuring of AIG's Loan in November 2008

After FRBNY and AIG entered into the September 22, 2008 Credit Agreement, AIG needed more liquidity support. Geithner, Tr. 1761 ("Over the course of the succeeding weeks, really almost immediately, AIG was . . . facing escalating losses and a dramatic escalation in their needs for liquidity."). Ultimately, AIG received nearly $100 billion in additional support, including nearly $50 billion in new capital. On October 6, 2008, the Federal Reserve created an additional $37.8 billion lending facility to address liquidity pressures AIG was facing from its securities lending program. PTX 696 at 16-18.

Officials at FRBNY and AIG recognized that a restructuring of the Credit Agreement would be necessary. Dahlgren, Tr. 2772-73 ("[T]he terms of the AIG Credit Facility were viewed by the ratings agencies and ultimately by [Dahlgren] as being too onerous and counterproductive."). On October 4, 2008, the Treasury Department's Dan Jester asked FRBNY to "rethink the terms of the deal; deal was onerous." PTX 279 at 2.

31

On October 15, 2008, representatives of FRBNY and the Board of Governors met to discuss the "need[] to press forward" with regard to restructuring the AIG deal.  PTX 297 at 1.

From as early as September 16, 2008, many officials within the Government recognized that the interest rate charged to AIG on FRBNY's rescue loan was too high.  PTX 2211 at 10 (Mr. Baxter thought the interest rate assessed against AIG was "[m]ore of a loan shark" rate.); PTX 318 (Ms. McConnell expressed dismay to Mr. Geithner regarding the "crazily high" interest rate forced on FRBNY.); PTX 145 (Ms. McLaughlin stated in a September 18, 2008 email that "[w]e should have been charging 3.5% . . . not 12% . . . it is wrong that this was done w/o [FRBNY's] input.").  Financial analysts at UBS felt that the terms for AIG were harsh.  PTX 1665 at 3 (Sept. 25, 2008 report:  "If the [G]overnment wanted to help existing AIG shareholders, the terms of the [C]redit [F]acility [A]greement would have been less onerous and dilutive in the first place.").  Morgan Stanley made similar observations.  PTX 246 at 1 (Sept. 24, 2008 report:  "terms are even more punitive than we originally expected, making us question the risk-reward profile of the company.").  Mr. Geithner, recalling the AIG events in 2012, observed:  "We replaced the management and the boards of directors.  We forced losses on shareholders proportionate to the mistakes of the firm."  PTX 648 at 8.

Despite the initial $85 billion rescue loan and the October 2008 $37.8 billion securities lending facility, AIG's financial condition worsened.  In November 2008, the ratings agencies again threatened to downgrade AIG due to an expected $24.5 billion quarterly loss.  Baxter, Tr. 1016.  AIG filed its SEC Form 8-K/A on November 10, 2008, announcing a $24.47 billion loss for the third quarter of 2008.  JX 149 at 4.  That same day, the Federal Reserve and the Treasury Department announced a restructuring of the credit facility, and provided a package of new assistance to stabilize AIG.  Id. at 16-18.

The restructuring package contained elements intended to avert an AIG downgrade and bankruptcy, including:  (a) $40 billion of TARP ("Troubled Asset Relief Program")[11] capital support; (b) modifications to the original loan terms including a reduction in interest rate by 5.5 percent, a reduction in the undrawn funds interest rate to 0.75 percent, and an extension of the loan term from two years to five years; (c) transfer of AIG's RMBS investments from its securities lending portfolio to a newly created special purpose vehicle called Maiden Lane II; and (d) creation of another special purpose vehicle called Maiden Lane III to eliminate AIG's CDS posting obligations and CDS-related liquidity risks.  JX 147 at 2; JX 149 at 16-18; PTX 5362 (Cragg chart).

---

[11]  TARP was a program authorized under the Emergency Economic Stabilization Act of 2008 ("EESA") that permitted the Treasury Department to, among other things, purchase equity investments in troubled companies.  See 12 U.S.C. §5211(a)(1) (2008); see also Alvarez, Tr. 162-63.

With the $40 billion in TARP assistance, the Treasury Department purchased AIG's Series D Preferred Stock, a newly created class of stock that had terms more onerous than other TARP equity purchased by Treasury.  JX 158 at 2.  The Series D Preferred Stock had an annual dividend rate to the Government of 10 percent.  Id. at 10.  In contrast, the $125 billion in preferred stock purchased by Treasury under the Capital Purchase Program from "eight of the country's largest financial institutions" had an annual dividend rate of 5 percent.  PTX 622 at 30; see also PTX 422 at 57-59.  The $40 billion purchase price paid by Treasury under the Capital Purchase Program was immediately "used to pay down the current outstandings on the Fed loan," also reducing the maximum borrowing limit from $85 billion to $60 billion.  Dahlgren, Tr. 2875-76; PTX 622 at 34; PTX 5200.

I.   The *Walker* Lawsuit

On November 4, 2008, a group of AIG shareholders filed a lawsuit in the Delaware Chancery Court complaining that the Government's Series C Preferred Stock should not be converted into AIG common stock without a shareholder vote.  Walker v. AIG, Inc., Case No. 4142-CC (Del. Ch., Nov. 4, 2008).  On November 5, 2008, Michael Leahey, Associate General Counsel at AIG, forwarded the *Walker* complaint to AIG General Counsel Stasia Kelly and to AIG's outside counsel at Weil Gotshal, stating, "[h]ere is a copy of the new shareholder complaint filed last night in Delaware seeking, among other things, an order declaring that the Super Voting Preferred is not convertible into common stock absent a class vote by the common stock to increase the number of authorized shares."  PTX 3259 at 1.

Less than 20 minutes later, Davis Polk received the *Walker* complaint.  Mr. Huebner of Davis Polk observed "this is potentially serious."  PTX 3259 at 1.  Within the next 30 minutes, Ms. Beamon of Davis Polk notified FRBNY's Ms. Dahlgren and Mr. Baxter, "[p]lease find attached a new complaint filed last night against AIG that has some potentially serious ramifications."  PTX 343 at 1.  Defendant monitored the *Walker* lawsuit and received updates from AIG's outside counsel, Weil Gotshal, on the status of the *Walker* lawsuit.  PTX 377 at 1-2; PTX 3164 at 1-2; PTX 3302 at 1; PTX 3316 at 1-2; PTX 3223 at 1-3.

On November 6, 2008, the Board of Governors legal staff prepared a memorandum analyzing the *Walker* lawsuit and whether Delaware law would require AIG to hold a separate class vote on the charter amendments.  PTX 3221.  The memorandum concluded that "[t]he face of the Delaware statute cited above seems to indicate that common shareholders would have the right to vote separately from the

33

preferred shareholders both to increase the number of common shares and to decrease the common shares' par value." Id. at 3.

Defendant made suggestions to AIG on how to litigate the *Walker* case. Davis Polk's Mr. Huebner stated on November 7, 2008: "I asked them to – if they think it logical – point out to the plaintiffs that the lien claim is likely equally frivolous and should be dropped from any amended complaint." PTX 3164 at 2. AIG counsel consulted with Defendant's counsel about settling the lawsuit on November 20, 2008: "Plaintiff is prepared to drop the lawsuit, but we may have a fight with respect to legal fees. We would like to discuss with you before responding." PTX 3223 at 1-2. Mr. Huebner then forwarded the settlement proposal to Mr. Baxter. Id. at 1; see also PTX 376 at 1; Baxter, Tr. 1132-33.

Defendant provided approval to AIG to pay the *Walker* plaintiffs' attorneys' fees: "The original 'ask' by the plaintiffs was $350,000, which has since been reduced to $175,000. Weil believes that AIG should pay this amount, and that it would cost more to litigate the issue further. They said that they plan to do so 'unless the Fed objects.' We haven't previously to my recollection, been asked to sign off on settlements of this nature, but I think that, given the circumstances, Weil wants us to run this past you." PTX 3128, Beamon to FRBNY, at 2. Mr. Baxter responded: "No objection to the compromise on [attorneys'] fees." Id. at 1.

AIG, with Defendant's agreement, represented to the Delaware Court on November 7, 2008 that "there's no dispute between the parties" on the question of whether a separate class vote of the common stock shareholders would be required to amend the certificate of incorporation to increase the number of authorized shares or to change the stock's par value (JX 143 at 7), which was reflected in the Consent Order issued by the court (JX 176 at 2). Also on November 7, 2008, counsel for AIG informed the Delaware Court that: "It is AIG's position that any amendment to its certificate of incorporation to increase the number of authorized shares of common stock or to change the par value of that stock requires a class vote of holders of record of a majority of the shares of common stock outstanding on the record date for that vote. . . . I think in view of that representation, there's no dispute between the parties." JX 143 at 7.

On February 5, 2009, the Delaware Chancery Court entered a Consent Order which included the following findings:

> WHEREAS, during a conference with the Court on November 7, 2008, AIG's counsel stated that any amendment to the Restated Certificate of Incorporation to increase the number of authorized common shares or to decrease the par

34

> value of the common shares would be the subject of a class
> vote by the holders of the common stock, and, based on this
> representation, plaintiff's counsel agreed that the plaintiff's
> request for an order granting this relief is moot;
>
> WHEREAS, AIG publicly disclosed on November 10, 2008,
> in its Form 10Q filing for the third quarter of 2008, that the
> holders of the common stock will be entitled to vote as a class
> separate from the holders of the Series C Preferred Stock on
> any amendment to AIG's Restated Certificate of
> Incorporation that increases the number of authorized
> common shares and decreases the par value of the common
> shares.

JX 176 at 2-4.  Kathleen Shannon, AIG's Senior Vice President, Secretary, and Deputy General Counsel, submitted an affidavit to the Delaware Chancery Court in February 2009 confirming AIG's position from as early as September 2008 that a class vote of common shareholders was required under Delaware law to increase the number of authorized shares or to decrease the par value of common stock shares.  JX 181.

On November 9, 2008, as a result of the *Walker* lawsuit, Defendant amended the Credit Agreement to note that "common stockholders voting as a separate class" will vote on "amendments to AIG's certificate of incorporation to (a) reduce the par value of AIG's common stock to $0.000001 per share and (b) increase the number of authorized shares of common stock to 19 billion.  JX 147 at 9; JX 150 at 193.  This amendment to the Credit Agreement was intended "to implement the representation that had been made to the Delaware court two days earlier."  Brandow, Tr. 5861-62.

Despite the representations to the Delaware Court, the entry of the Consent Order, and the amendment to the Credit Agreement, there never was a shareholders' meeting at which the AIG common stockholders, voting as a class, had an opportunity to vote on whether to reduce the par value of AIG's common stock or to increase the number of AIG's authorized shares.  Liddy, Tr. 3163-64.

J.  Maiden Lane II and III

Soon after AIG and FRBNY executed the Credit Agreement on September 22, 2008, AIG began seeking concessions from various counterparties to unwind and terminate the CDS transactions that were causing many of AIG's liquidity issues.  These attempts generally were unsuccessful, and FRBNY representatives stepped in to take over the negotiations with counterparties on behalf of AIG.  PTX 333 at 1 (FRBNY asked

Elias Habayeb of AIG to "stand down on all discussions with counterparties on tearing up/unwinding CDS trades on the CDO portfolio."); see also Dahlgren, Tr. 2994-95; Herzog, Tr. 6998-7002.  FRBNY's short-lived attempts to negotiate concessions from AIG's counterparties also proved unsuccessful.  Alvarez, Tr. 354-55; Baxter Tr. 1028.

FRBNY informed AIG of its unsuccessful negotiations with counterparties on November 8, 2008, telling AIG and its outside counsel, Weil Gotshal, that the counterparties would receive full par value.  DX 2131 at -7727.  AIG's counterparties also received complete releases from AIG for all legal action, including any potential fraud or misrepresentation claims.  Baxter, Tr. 1071 (the deal "negotiated by representatives of the New York Fed with the counterparties" "involved 100 percent par, plus the releases.").  In this way, FRBNY was able to assure that the major financial institutions would be made whole and would not suffer any losses from their transactions with AIG.

On November 10, 2008, some leading credit rating agencies informed AIG that they expected to downgrade the company unless AIG presented a solution to stabilize the company and improve its financial condition.  Baxter, Tr. 1028; LaTorre, Tr. 2323, 2331.  A downgrade of AIG's rating would have triggered additional collateral calls on AIG's CDS portfolio.  To avoid a ratings downgrade, AIG asked the Government for additional assistance.  Liddy, Tr. 3222-25, 3231.  AIG's Board of Directors approved a new Government proposal on November 9, 2008.  JX 144 at 9-13.  The Government's proposal included the creation of a new entity known as "Maiden Lane III."  Id. at 11, 53-54; Liddy, Tr. 3235-36.[12]

Under the terms of Maiden Lane III, FRBNY loaned $30 billion and AIG contributed $5 billion to have Maiden Lane III purchase certain multi-sector CDOs underlying CDSs written by AIGFP.  Baxter, Tr. 1020; DX 664 at -18; JX 149 at 17.  Using Maiden Lane III, FRBNY and AIG were able to terminate the CDSs, and thereby remove AIG's exposure to collateral calls from its CDS portfolio.  Liddy, Tr. 3230-31 (Maiden Lane III "remove[d] that cash drain and liability off of [AIG's] balance sheet."); Schreiber, Tr. 6623 (Maiden Lane III eliminated the "volatility and ongoing liquidity drain" from AIG's CDS exposures).  FRBNY's loan to Maiden Lane III was senior to AIG's contribution and was to be repaid in full before AIG received any payment on its $5 billion contribution.  PTX 2800 at 34-35.  After the amounts were repaid in full, FRBNY received 67 percent and AIG received 33 percent of any additional Maiden Lane III net proceeds.  Id.

---

[12]  The "Maiden Lane" entities are named for the street in New York City that runs behind FRBNY's office building.  Baxter, Tr. 889-90.

Between November 25 and December 31, 2008, Maiden Lane III purchased $62.1 billion in par amount of CDO securities from AIGFP's counterparties and terminated the associated CDSs. JX 188 at 41. By June 2012, AIG completely repaid the Government's Maiden Lane III loan with interest. By July 2012, AIG received repayment of its Maiden Lane III contribution with interest. CDOs purchased by Maiden Lane III were then sold through a series of auctions, culminating on August 23, 2012. PTX 2540 at 1. This process resulted in a net gain to the Government of approximately $6.6 billion with $737 million in interest. Id.; DX 1883 at App'x C ¶ 29.

In addition to Maiden Lane III, the Government used another special purpose vehicle, Maiden Lane II, to purchase AIG's RMBS for $19.8 billion. JX 188 at 41, 250; PTX 2800 at 34 (stating that the "nonagency RMBS . . . had an approximate fair value of $20.8 billion."). Under the terms of Maiden Lane II, the Government's loan would be repaid first, including accrued interest, and then any net proceeds from the transaction would be divided: FRBNY was to receive five-sixths while AIG's subsidiaries would receive one-sixth. PTX 2800 at 34. In March 2011, the Government announced that it would begin selling the securities in the Maiden Lane II portfolio. The sales of all the securities as well as the cash flow they generated while held in Maiden Lane II created a net gain of approximately $2.8 billion to FRBNY for the benefit of U.S. taxpayers. PTX 2539 at 1; see also DX 1883, Saunders Report, App'x C, ¶ 28.

Ultimately, as a result of Maiden Lane II and Maiden Lane III, AIG's counterparties received tens of billions of dollars in Government assistance. PTX 549 at 34 ("there is no question that the effect of FRBNY's decisions . . . was that tens of billions of dollars of Government money was funneled inexorably and directly to AIG's counterparties."); Cragg, Tr. 5097-98 (noting $29 billion in payments to AIG's counterparties). Although AIG had offered to buy back the CDOs underlying Maiden Lane II and III as part of a 2010 restructuring, Defendant refused to authorize this action, despite the fact it would still make a profit on the transaction. See JX 324 at 3, 7 ("If the FRBNY accepts this offer, the loans that the FRBNY made to Maiden Lane II will be repaid in full, with interest, and the FRBNY will realize a profit of approximately $1.5 billion on its residual equity interest in Maiden Lane II."); see also PTX 3366 at 1, 4.

K. Reverse Stock Split

During the weeks following the Credit Agreement, AIG's stock continued to trade at a low price. Herzog, Tr. 7011 ("the stock price had fallen below a dollar for a period of time."); JX 221 at 70 ("The share price of AIG Common Stock has declined significantly since the third quarter of 2008, and, during February and March 2009, and occasionally since then, it has closed below $1.00 per share."). On October 14, 2008, the NYSE sent a letter to Mr. Liddy warning that AIG was at risk of being delisted under

37

NYSE rules.  DX 601 (NYSE requires its listed companies to have an "[a]verage closing share price of not less than $1.00 over a 30 trading day period.").  In response, Mr. Liddy requested AIG management to develop a plan to keep AIG's common stock from being delisted.  Liddy, Tr. 3264.

Mr. Herzog testified that he first proposed the idea of a reverse stock split to increase the trading price of AIG common stock.  Herzog, Tr. 7012-13.  In December 2008, AIG's outside counsel, Sullivan & Cromwell, drafted a proxy statement proposing the reverse stock split.  JX 164 at 26-28.  After consultation with D.F. King, an independent proxy solicitor, regarding the terms of the contemplated reverse stock split, AIG proposed a reverse stock split at a twenty-to-one ratio.  JX 178 at 7; Liddy, Tr. 3280-81.  On May 20, 2009, AIG's Board of Directors unanimously voted to include the reverse stock split in the 2009 proxy statement.  JX 218 at 4; Liddy, Tr. 3267-68.

On June 30, 2009,[13] at AIG's annual shareholder meeting, AIG included on its proxy statement the resolution to amend AIG's certificate of incorporation to effect a reverse stock split of issued shares at a ratio of twenty-to-one.  JX 221 at 2, 69-73 (Proposal Four).  At the shareholder meeting, the preferred shareholders and 85 percent of the voting common shareholders, including Starr, voted to approve the reverse stock split.  JX 226 at 6; DX 814-A at 1.  Starr and other common stock shareholders knew that by approving the reverse stock split, it would make almost five billion shares of common stock available for future issuance.  JX 221 at 68.  AIG's proxy statement also disclosed that the shares "may be issued by AIG's Board of Directors in its sole discretion.  Any future issuance will have the effect of diluting the percentage of stock ownership and voting rights of the present holders of AIG Common Stock."  Id. at 70.

Plaintiff contends that the reverse stock split was proposed with a preferred-to-common stock exchange in mind as a way to avoid a separate class vote of the common stockholders, but there is insufficient evidence in the record to support Plaintiff's claims.  Starr presented little evidence showing that the idea for the exchange preceded the reverse stock split, or that the Government proposed the reverse stock split to avoid a separate class vote of the common shareholders.  Every witness at trial testified unequivocally that Starr and AIG's other shareholders voted for the twenty-to-one reverse stock split to avoid a delisting on the NYSE.  See, e.g., Liddy, Tr. 3267 ("It gave us the best chance of keeping the stock listed on the New York Stock Exchange."); Herzog, Tr. 7014 ("Well, I know why I suggested it, and that was because I was concerned about the delisting of the stock, and that's why I suggested it to Morris [Offit]."); Smith, 7711-12 (supported the one-for-twenty stock split "[s]olely for the reason that it addressed the delisting issue.").  The proxy statement AIG filed with the

---

[13] June 30, 2009 was also the day the NYSE suspension of its minimum price for listing expired.  JX 221 at 2, 70 (day AIG's stock would be delisted).

Securities and Exchange Commission confirmed that the "primary purpose of the reverse stock split [was] to increase the per share trading price of AIG Common Stock." JX 221 at 69.

The first time FRBNY and the Treasury contemplated the idea of an exchange was in 2010 when AIG began to explore various ways to end the Government's involvement in AIG's affairs. Shannon, Tr. 3701-02 (Q: "[W]hen was the first consideration that you're aware of exchanging [the Series C preferred stock] for common shares?" A: "In connection with the . . . recapitalization . . . in the fall of 2010."). AIG wanted to improve its credit rating and gain access to private capital and credit markets that were unavailable while it had existing obligations to the Government. PTX 2248 at 28; Langerman, Tr. 7165; PTX 609 at 16; JX 271 at 7. To achieve that goal, AIG along with Treasury, the trustees, and FRBNY, began to negotiate a comprehensive plan that would allow AIG to exit the Credit Facility and repay its outstanding debt. JX 271 at 26; PTX 578; Schreiber, Tr. 6667-68; Langerman, Tr. 7164-65, 7170-71. Both AIG and the Trust engaged advisers to assist with the negotiations. Feldberg, Tr. 3393; Schreiber, Tr. 6727; PTX 2249 at 2-3 (listing advisers present at the September 29, 2010 AIG Board meeting). During the negotiations, the idea of exchanging the preferred shares for common stock was developed, which would legally allow the Government to avoid a separate class vote of the common shareholders.[14] Brandow, Tr. 5854.

On September 30, 2010, following extensive negotiations, the Government and AIG signed a term sheet setting forth the terms of the recapitalization transaction. JX 285; JX 306 (parties signed a Master Transaction Agreement on December 8, 2010 which implemented the September 30, 2010 term sheet). The exchange was facilitated by the twenty-to-one reverse stock split which had increased the number of authorized but unissued shares. Zingales, Tr. 3850-51; Brandow, Tr. 5852. As a result of the reverse stock split, the Government could exchange its preferred shares for common shares without a separate class vote of the common shareholders. JX 302 at 8; Brandow, Tr. 5852.

There were three series of preferred stock (Series C, Series E, and Series F) that were exchanged for common stock in the 2011 restructuring agreement. Each series of preferred stock that was exchanged for common stock in 2011 is defined below, including the Series D stock acquired under TARP that had already been exchanged for Series E preferred stock prior to the 2011 restructuring agreement:

---

[14] Under Delaware law, the exchange did not require a separate class vote of the common shareholders. A separate class vote is only required if "the amendment would increase or decrease the aggregate number of authorized shares of such class" or "increase or decrease the par value of the shares of such class." 8 Del. C. § 242(b)(2) (2014).

**Series C Preferred Stock**: convertible stock issued to the Government on September 22, 2008 under the $85 billion Credit Agreement, which provided the Government with 79.9 percent equity and voting control in AIG. PTX 196 at 3; JX 110 at 1, 3, 66. The stock was later placed into a trust on January 16, 2009. Def.'s Resp. to Pl.'s 2nd RFAs No. 726.

**Series D Preferred Stock:** stock purchased by Treasury for $40 billion on November 25, 2008 under TARP. JX 158 at 2. The Series D Preferred Stock had an annual dividend rate to the Government of 10 percent and the dividends owed were cumulative, meaning that dividends owed under the stock accumulated until AIG made the payment. Id. at 10-11.

**Series E Preferred Stock:** stock acquired by the Government on April 17, 2009 as part of a March 2009 restructuring agreement that allowed the Government to exchange its Series D Preferred Stock for Series E. The Series E was noncumulative, and as such, was looked upon more favorably by the credit agencies. Like the Series D Preferred Stock, it also had a dividend rate of 10 percent per year. PTX 589 at 96 n.362 (noncumulative stock more closely resembles common stock); JX 208 at 3 (reporting AIG's issuance of the Series E Preferred Stock).

**Series F Preferred Stock:** stock issued to Treasury on April 17, 2009 under a credit facility where Treasury agreed to provide $30 billion to AIG in exchange for the preferred stock. The Series F Preferred Stock was noncumulative and had a dividend rate of 10 percent. JX 209 at 3 (reporting AIG's issuance of the Series F Preferred Stock).

The September 30, 2010 term sheet took effect on January 14, 2011 and terminated the Credit Facility. AIG paid FRBNY $21 billion in cash, which represented "complete repayment of all amounts owing under the Credit Agreement." JX 314 at 2. The Government earned a profit of $6.7 billion on the Credit Facility. Alvarez, Tr. 611-12 ($6.7 billion represented interest and fees). As part of the Recapitalization Plan, the Government also acquired 92.1 percent of AIG's common stock through an exchange of its preferred shares. Stip. ¶ 212. To acquire 92.1 percent of the common stock, the Treasury exchanged its Series C preferred stock for 562.9 million shares of common stock and exchanged the Series E and Series F preferred stock for 1.09 billion shares of common stock. Id. AIG also issued ten-year warrants to existing shareholders with a strike price of $45 on January 19, 2011. JX 285 at 9-10; JX 311 at 3; PTX 609 at 58 ("Exchange price of $45.00 per AIG common share, a 26.2% premium to market"). The number of warrants received was equal to the number of shares held as of the Record

Date ("the date on which one must be registered as a stockholder on the stock book of a company in order to receive a dividend declared by the company") multiplied by 0.533933.  JX 311 at 3; Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 732 F.2d 859, 861 (11th Cir. 1984) (defining record date).

L.  The Government's Common Stock

From May 24, 2011 through December 14, 2012, the Government sold 1,655,037,962 shares of AIG common stock at prices ranging from $29 to $32.50 per share for a total of $51,610,497,475.  PTX 2852 at 65 n.197.  Assuming that the common shares received in exchange for Series C Preferred Stock are treated as being sold pro rata with common shares received in exchange for Series E and F Preferred Stock, the amount received for the Series C Preferred Stock would be $17.6 billion.  Id.

Defendant's only payment to AIG for the Series C Preferred Stock was $500,000 in loan forgiveness that FRBNY provided to AIG in September 2008.  JX 107 at 37-38 (§ 402(e)); JX 185 at 2.  AIG recorded the fair value for the Series C Preferred Stock as $23 billion.  JX 188 at 293-94; Kothari, Tr. 4700.  Ultimately, the Government received $22.7 billion in profit on the sale of all AIG stock it had acquired.  PTX 658; see also Bernanke, Tr. 2014 (return to the Government "on all of the assistance that was given to AIG, whether it was from the Federal Reserve or TARP or some other place," was $23 billion.); Schreiber, Tr. 6684-85 (stating the Government received "all of the money they put into AIG back plus a profit of approximately $23 billion.").

M.  Treatment of Other Distressed Financial Entities

During the financial crisis, many financial institutions engaged in much riskier and more culpable conduct than AIG, but received much more favorable loan treatment from the Government.  In fact, financial institutions that originated and marketed subprime mortgage-backed securities made representations and disclosures that the Government later concluded were false and misleading.  There was fraud in the underwriting process. Cragg, Tr. 4996; PTX 5321 (summarizing the results of government litigation against Bank of America, Citigroup, JP Morgan, Merrill Lynch, and Countrywide).  The Department of Justice charged many firms with fraud related to the financial crisis.  DOJ press releases, PTX 2734 (Bank of America), PTX 2527 (Citigroup), PTX 2473 (JP Morgan), PTX 2872 (Merrill Lynch and Countrywide).

**Citigroup.**  The DOJ "has brought claims against a number of companies, including Citi, alleging that these companies had engaged in fraudulent conduct that caused the financial crisis."  Paulson, Tr. 1236.  In July 2014, the Government announced that "after collecting nearly 25 million documents relating to every residential mortgage

backed security issued or underwritten by Citigroup in 2006 and 2007, our teams found that the misconduct in Citigroup's deals devastated the nation and the world's economies, touching everyone." PTX 2527 at 2. Mr. Geithner concluded that Citigroup had taken excessive risks. Geithner, Tr. 1675.

**Bank of America.** In March 2014, Bank of America agreed to pay $9.3 billion to settle claims brought by the Federal Housing Finance Agency under its statutory mandate to recover losses incurred by Fannie Mae and Freddie Mac accusing the Bank, and subsidiaries Merrill Lynch and Countrywide Financial, of "misrepresenting the quality of loans underlying residential mortgage-backed securities purchased by the two mortgage finance companies between 2005 and 2007." PTX 2504 at 1. In August 2014, Bank of America paid $16.65 billion, approximately 10 percent of its market capitalization, to settle a Department of Justice probe related to the Bank's misconduct in originating mortgage securities. The settlement was "the largest civil settlement with a single entity in American history," and Bank of America "acknowledged that it sold billions of dollars of RMBS without disclosing to investors key facts about the quality of the securitized loans. . . . The bank has also conceded that it originated risky mortgage loans and made misrepresentations about the quality of those loans." PTX 2734 at 1. The U.S. District Court for the Southern District of New York held in a case brought by the United States that Countrywide Financial engaged in conduct that "was from start to finish the vehicle for a brazen fraud by the defendants, driven by a hunger for profits and oblivious to the harms thereby visited, not just on the immediate victims but also on the financial system as a whole." United States ex. rel. O'Donnell v. Countrywide Home Loans, Inc., 33 F. Supp. 3d 494, 503 (S.D.N.Y. 2014). According to then-Attorney General Eric Holder, Merrill Lynch and Countrywide "knowingly, routinely, falsely, and fraudulently [marketed] and sold these loans as sound and reliable investments." PTX 2872 at 1.

**Goldman Sachs.** In July 2010, Goldman Sachs settled with the SEC, "paying a record $550 million fine. Goldman 'acknowledge[d] that the marketing materials for the ABACUS 2007-AC1 transaction contained incomplete information. In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was "selected by" ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.'" PTX 624 at 221.

**JP Morgan.** In November 2013, the Department of Justice announced a $13 billion settlement of claims brought by the United States "in which JP Morgan acknowledges that it regularly represented to RMBS investors that the mortgage loans in various securities complied with underwriting guidelines. Contrary to those representations, as the statement of facts explains, on a number of different occasions, JP Morgan employees knew that the loans in question did not comply with those guidelines

and were not otherwise appropriate for securitization, but they allowed the loans to be securitized – and those securities to be sold – without disclosing this information to investors.  This conduct, along with similar conduct by other banks that bundled toxic loans into securities and misled investors who purchased those securities, contributed to the financial crisis."  PTX 2473 at 1.

**Morgan Stanley.**  In February 2014, Morgan Stanley "agreed to pay $1.25 billion to the Federal Housing Finance Agency to resolve claims that it sold shoddy mortgage securities to Fannie Mae and Freddie Mac."  "According to the agency's lawsuit, Morgan Stanley sold $10.58 billion in mortgage-backed securities to Fannie and Freddie during the credit boom, while presenting 'a false picture' of the riskiness of the loans."  "Many of the loans involved were originated by subprime lenders, like NewCentury and IndyMac, bundled into bonds and sold to Fannie and Freddie.  One group of loans had default and delinquency rates as high as 70 percent, according to the lawsuit."  PTX 2485 at 1.  Mr. Geithner concluded that Morgan Stanley had taken excessive risks.  Geithner, Tr. 1675.

In contrast to the wrongful conduct of the above entities, no claims of fraud or misconduct have been brought by the Department of Justice against AIG for any of AIG's actions in the years leading up to or during the financial crisis.  Paulson, Tr. 1236.

The Federal Reserve, following the Bagehot Principle,[15] used Section 13(3) of the Federal Reserve Act a number of times in 2008 to lend to institutions in need of liquidity.  Mr. Bernanke explained the Federal Reserve's approach to lending in 2008:

> During the financial crisis, the Federal Reserve provided two basic types of liquidity support under section 13(3) – broad-based credit programs aimed at addressing strains affecting groups of financial institutions or key financial markets, and credit directed to particular systematically-important institutions in order to avoid a disorderly failure of those institutions.  In both cases the purpose of the credit was to mitigate possible adverse effects on the broader financial sector and the economy.  Liquidity facilities of the first type included the Primary Dealer Credit Facility (PDCF), the Term Securities Lending Facility (TSLF), the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity

---

[15] Bagehot's Principle, first enunciated in Walter Bagehot's 1873 book, "Lombard Street," is that in a time of financial crisis or panic, the central bank should freely lend to entities or persons in need of cash liquidity if they have adequate collateral to post for the loan.

Facility (AMLF), the Commercial Paper Funding Facility (CPFF), the Money Market Investors Funding Facility (MMIFF), and the Term Asset-Backed Securities Loan Facility (TALF). Liquidity support provided to particular institutions to avert a disorderly failure included credit provided through Maiden Lane LLC to facilitate the acquisition of Bear Stearns by J.P. Morgan Chase, and credit provided to American International Group (AIG) through a revolving credit line and through Maiden Lane II LLC and Maiden Lane III LLC. The Federal Reserve, acting with the U.S. Treasury and FDIC, also agreed to provide loss protection and liquidity support to Citigroup and Bank of America on designated pools of assets utilizing authority provided under section 13(3), but ultimately did not extend any credit to either of these institutions.

PTX 616 at 10 (Bernanke).

On March 16, 2008, the Federal Reserve authorized FRBNY to establish the PDCF to provide a source of liquidity to primary dealers, including Goldman Sachs, Morgan Stanley, Bear Stearns, and Lehman Brothers. PTX 12 at 3-4; PTX 1202 at 1; PTX 693 at 4-5; Alvarez, Tr. 83. The terms of the PDCF included an interest rate at the primary credit rate with very small fees. The primary credit rate was "somewhere on the order of 2-1/2 to 3 percent." Bernanke, Tr. 1995-97. The Government did not demand any equity in exchange for PDCF lending. PTX 12 at 3-4; Baxter, Tr. 1085. The Federal Reserve provided assistance to primary dealers without monitoring the way the primary dealers were managed. Baxter, Tr. 1093.

There were 20 firms that were eligible to use the PDCF. Cragg, Tr. 5051; PTX 5348. Countrywide continued to be a primary dealer despite the fact that it was in "significant financial trouble." Baxter, Tr. 1101. "Lehman Brothers continued to be a primary dealer until after the parent had gone into bankruptcy." Baxter, Tr. 1101-02.

In September 2008, the Federal Reserve expanded the range of collateral that borrowers could pledge at the PDCF. PTX 59 at 2-3; PTX 696 at 2-3. Borrowers could post non-investment grade bonds and equities. Paulson, Tr. 1234-35. The collateral included "mortgage-backed securities and asset-backed securities," and there "wasn't very much trading" in either at that time. Bernanke, Tr. 2278-79. On September 21, 2008, FRBNY expanded the range of collateral that Morgan Stanley, Goldman Sachs, and Merrill Lynch could pledge at the PDCF to include foreign currency denominated

securities.   McLaughlin, Tr. 2411-12.   The expanded collateral "had more risk." McLaughlin, Tr. 2445.

By September 29, 2008, the Federal Reserve had loaned $155.7682 billion through the PDCF, including $15 billion to Barclay's Capital, $10 billion to Goldman Sachs, $5 billion to Goldman Sachs' London branch, $29.694 billion to Merrill Lynch, $6.589 billion to Merrill Lynch's London branch, $40.0621 billion to Morgan Stanley, and $21.23 billion to Morgan Stanley's London branch.   PTX 728 at 11.   Although FRBNY provided Section 13(3) loans to many institutions in 2008 and 2009, FRBNY did not take an equity stake in any of those institutions, including Citigroup, Bank of America, Bear Stearns, JP Morgan, Morgan Stanley, or Goldman Sachs.   Baxter, Tr. 1083-85; Bernanke, Tr. 1989-90 (only AIG was required to provide its equity as compensation); Geithner Tr. 1396-97.   The shareholders of Citibank, Goldman Sachs, Bear Stearns, and all the firms that had access to the PDCF got "a windfall as a result of government assistance." Geithner, Tr. 1903.   On September 21, 2008, the Federal Reserve Board of Governors permitted Morgan Stanley and Goldman Sachs to become bank holding companies while waiving the normal five-day antitrust waiting period for such an application.   PTX 200, 201, 220; Bernanke, Tr. 2116-17.

The following chart shows a comparison of the Federal Reserve's financial assistance to AIG and Morgan Stanley during September 16-30, 2008:

| Date | AIG | | Morgan Stanley | |
|------|-----|--|----------------|--|
| Sept.16, 2008 | $14B loan | 12% Interest Rate | $16.5B loan | 2.25% - 3% Interest Rate |
| Sept. 22, 2008 | $37B loan | 12% Interest Rate<br><br>2% Commitment Fee<br><br>8.5% Undrawn Amounts Fee | $60.6B loan | 2.25% - 3% Interest Rate<br><br>No Commitment Fee<br><br>No Undrawn Amounts Fee |
| Sept. 29, 2008 | $55B loan | 79.9% Equity<br><br>$85 Billion Commitment Ceiling<br><br>25% Collateral Haircut | $97.3B loan | No Equity<br><br>No Commitment Ceiling<br><br>6-10% Collateral Haircut |

PTX 5356 (Cragg chart, citing source exhibits, PTX 728, 2565, 2857 at 152-171; JX 107, 108).

N. Expert Testimony

Plaintiff and Defendant offered the testimony of four experts each during the trial. The Court summarizes below the main points of each expert's testimony.

Plaintiff's experts:

**Dr. Michael Cragg.**  The Court accepted Dr. Cragg as an expert in "economics and financial markets."  Cragg, Tr. 4928; 4934.  Dr. Cragg summarized his testimony in five main points.  First, Dr. Cragg assessed AIG's financial condition.  He asserted that "[t]he liquidity crisis at AIG was caused by the same market forces that affected every major financial institution during one of the worst financial panics in world history."  Dr. Cragg then explained the Federal Reserve's role as lender of last resort.  According to Dr. Cragg, "[t]he punitive terms imposed by the Federal Reserve on AIG's shareholders, including the onerous interest rate and equity taking, were inconsistent both with (1) the Federal Reserve's central banking function of lender of last resort, and (2) the manner in which the Federal Reserve exercised its lender of last resort powers with respect to other institutions."  Moreover, "[t]he Federal Reserve was able to impose punitive terms on AIG's shareholders by misusing its monopoly position as lender of last resort to expropriate AIG shareholder equity in a manner entirely inconsistent with any legitimate economic policy or rationale."  Dr. Cragg addressed the explanations given for the Government's treatment of AIG.  Dr. Cragg asserted that the "Government's alleged justifications for treating AIG in this manner, *i.e.*, punishment, addressing moral hazard, preventing a windfall, and compensating for credit risk, [were] not economically supportable."  Finally, if "there [were] an economically rational explanation for the Government's abuse of power, it [was] one of political expediency: AIG was a political scapegoat."  PTX 5300 at 1; see also Cragg, Tr. 4935-37.

**Dr. S.P. Kothari.**  The Court accepted Dr. Kothari as an expert in "accounting and finance."  Kothari, Tr. 4525-26; 4529.  Dr. Kothari was a damages expert for Plaintiff.  During the trial, Dr. Kothari provided the Court with his valuations of the Credit Agreement Class and the Reverse Stock Split Class takings.  Dr. Kothari valued the 79.9 percent equity and voting interest (Credit Agreement Class) acquired by the Defendant at $35.4 billion or $13.16 a share using a market-based approach.  A "market-based approach" is an assessment of the fair market value of equity as of a given date.  Kothari, Tr. 4543-44; PTX 5202; PTX 2852 at 21.  For the Reverse Stock Split Class, Dr. Kothari valued the Series E and F Preferred stock at $4.33 billion or $1.61 per share and the Series C Preferred Stock at $0.34 billion or $0.13 per share as of June 30, 2009.  Dr.

Kothari also valued the Government's return on all the liquidity and financing it provided to AIG as of January 14, 2011, stating that the Government earned a total return of $37.5 billion.

**Dr. Christopher Paul Wazzan.** The Court accepted Dr. Wazzan as an expert in prejudgment interest. Wazzan, Tr. 4416, 4420. At trial, Dr. Wazzan testified that the appropriate prejudgment interest rate would be best determined by looking at a rate of return on a synthetic portfolio comprised of competitors of AIG. Wazzan, Tr. 4423-26. Looking at such a portfolio, the appropriate prejudgment interest rate to compensate Plaintiff would be 7.0 percent for the Credit Agreement Class and 20.1 percent for the Reverse Stock Split Class. Wazzan, Tr. 4428; see also PTX 2841.

**Professor Luigi Zingales.** The Court accepted Professor Zingales as an expert in "economics and corporate governance." Zingales, Tr. 3796; 3799. Professor Zingales offered expert testimony on Defendant's effective economic control of AIG, asserting that Defendant took "effective economic control" on September 16, 2008, which continued well beyond July 1, 2009. The effective economic control Defendant took over AIG was evidenced by the Government's equity ownership, ability to select directors, its direct and indirect control or influence over management, and its monopoly position as the lender of last resort. PTX 5045 (noting only one of these factors is necessary to find control). "Direct or indirect control is shown by hiring, firing, and compensating executive officers;" "engaging in new business lines;" "making substantial changes in operations;" "raising additional debt or equity capital;" "merging and consolidating;" and "selling, transferring, or disposing of material subsidiaries or major assets." PTX 5046. The trust created to hold AIG's assets did not remove the Government's effective economic control over AIG, as it was established for the sole benefit of the Treasury, the trustees were required to act in the best interests of the Treasury, and Defendant appointed the trustees and had the power to replace them. PTX 5059.

Defendant's Experts

**Professor Robert Daines.** The Court accepted Professor Daines as an expert in "corporate governance, corporate finance, and the economic analysis of corporate control." Daines, Tr. 8432-33. Professor Daines summarized his testimony into three main points. First, he critiqued Professor Zingales's analysis of effective economic control. Daines, Tr. 8436. Professor Daines testified that Professor Zingales's analysis was fundamentally flawed for three reasons: (1) the board's incentives were aligned with AIG's shareholders; (2) effective economic control does not explain whether the AIG board acted in the shareholders' interests; and (3) "[e]ffective economic control [did] not mean that the Government's conditions made AIG worse off." DX 2801; DX 2802.

Second, Professor Daines explained the difference between warrants and preferred stock. According to Professor Daines, the "equity participation terms of the September 22, 2008 Credit Agreement were not materially different from the terms approved by AIG's board on September 16, 2008." DX 2801; see also Daines, Tr. 8436. Professor Daines critiqued Professor Zingales's analysis of the reverse stock split. He testified that Professor Zingales's analysis of the reverse stock split was fundamentally flawed because the primary purpose of the stock split was to increase AIG's trading price, many companies also conducted reverse stock splits that did not reduce the number of authorized shares, and common shareholders, including at least some of whom were the plaintiff shareholders, voted for the reverse stock split. DX 2801; DX 2816; see also Daines, Tr. 8436.

**Dr. Jonathan Neuberger.** The Court accepted Dr. Neuberger as an expert in "financial economics, the quantification of economic harm, and the determination of prejudgment interest rates." Neuberger, Tr. 5557-59. Dr. Neuberger offered testimony on prejudgment interest. He asserted that if prejudgment interest is awarded, it should be at a rate equal to a risk free rate of return since Plaintiff should not be compensated for risks it did not bear. DX 2403; DX 2407. A good proxy for a risk free rate of return would be government securities such as one-year Treasury bills or the five year Treasury Inflation Protected Securities ("TIPS") rate. Using Treasury bills or the TIPS rate as proxies would yield interest rates of 0.5 and 0.3 percent or 2.9 and 3.2 percent to compensate Plaintiff for the two alleged takings.

**Dr. David K. A. Mordecai.** The Court accepted Dr. Mordecai as an expert in "financial economics, fixed income and credit markets, credit default swap markets, and distressed lending." Mordecai, Tr. 7445, 7457. Dr. Mordecai was a damages expert for Defendant. At trial, Dr. Mordecai summarized his testimony into four main points. First, he provided an opinion on the initial rescue, asserting that it "did not result in an economic loss to AIG's shareholders." Second, Dr. Mordecai addressed the need for the Government to obtain an equity component in AIG. Dr. Mordecai opined that "[w]ithout the equity component, the Revolving Credit Facility ("RCF") [would] not [have] provide[d] a return to adequately compensate for the significant risk of lending to AIG." He critiqued Dr. Kothari's estimate of the alleged harm suffered by both the Credit Agreement Class and the Reverse Stock Split Class as being fundamentally flawed. DX 2601. According to Dr. Mordecai, Dr. Kothari's estimates of the alleged harm suffered by both classes was flawed because share dilution does not equal economic loss, Dr. Kothari ignored that AIG's stock price actually increased as a result of the initial rescue, and Dr. Kothari did not estimate a value for the losses to shareholders.

**Professor Anthony Saunders.** The Court accepted Professor Saunders as an expert in "financial economics." Saunders, Tr. 8067-68. Professor Saunders summarized

his testimony in eight main points.   First, Professor Saunders addressed AIG and its financial condition.   He asserted that "AIGFP's un-hedged Multi-Sector CDS portfolio exposed AIG to significant liquidity risk."   Further, the "deterioration in AIG's financial condition and risk profile were primarily caused by factors unique to AIG, not market-wide forces as Dr. Cragg claim[ed]."   Professor Saunders testified that the "ex-ante risk of lending to AIG was extremely high as of September 16, 2008."   Next, he addressed whether AIG could have become a primary dealer.   According to Professor Saunders, AIG did not meet the requirements to become a primary dealer and, "in any event, access to the PDCF would not have solved AIG's liquidity crisis."   Professor Saunders critiqued Dr. Kothari's valuations of the Credit Agreement Class and the Reverse Stock Split Class.   He claimed that Dr. Kothari's valuation of the Credit Agreement Class claims as being worth $35.4 billion or $13.16 per share did not make economic sense as AIG's "stock price did not approach the value Dr. Kothari claims was lost under his 'bounce back' theory."   Similarly, Dr. Kothari's valuation of the Reverse Stock Split Class claims as of June 30, 2009 did not make economic sense because there was no economic loss to the shareholders as a result of increasing the number of unissued authorized shares.   DX 2701-02, 2753; see also Saunders, Tr. 8069-71.

  O.   AIG Epilogue

  AIG survived the 2008 economic crisis.   AIG repaid all loan amounts to the U.S. Government, although it sold valuable insurance assets worth billions of dollars to achieve this objective.   PTX 5371 (Cragg chart).   The Government's extension of the loan term from two years to five years was critical to AIG's survival.   Schreiber, Tr. 6627 (Extension of the loan term "was the most important asset we had.   It avoided a rapid-fire sale of our businesses.").   AIG did not file for bankruptcy protection, and it continues today as a publicly-traded company on the New York Stock Exchange.

History of Proceedings

  The Court's docket sheet for this case, currently containing 442 docket entries, provides a detailed chronological history of every judicial filing.   With few exceptions, all of the filings are available to the public.   The proceedings began with Starr's filing of the original complaint on November 21, 2011.

  The Court has issued seven published decisions thus far in this case.   On February 10, 2012, the Court added AIG as a nominal defendant for Starr's shareholder derivative claims.   Starr Int'l Co. v. United States, 103 Fed. Cl. 287 (2012).   On July 2, 2012, the Court granted in part and denied in part Defendant's motion to dismiss, allowing most of Starr's causes of action to proceed.   Starr Int'l Co. v. United States, 106 Fed. Cl. 50 (2012).   On September 17, 2012, the Court denied Defendant's motion for

reconsideration of the July 2, 2012 ruling.  <u>Starr Int'l Co. v. United States</u>, 107 Fed. Cl. 374 (2012).  On March 11, 2013, the Court certified two classes of plaintiff shareholders who could proceed with this action under Rule 23:  (a) the Credit Agreement Class, consisting of persons or entities who owned shares of AIG common stock during September 16-22, 2008, excluding Defendant and the named trustees; and (b) the Stock Split Class, consisting of persons or entities who owned shares of AIG common stock on June 30, 2009, AIG's annual shareholder meeting date, excluding Defendant and the named trustees.  <u>Starr Int'l Co. v. United States</u>, 109 Fed. Cl. 628 (2013).  On June 26, 2013, the Court granted AIG's and the Government's motions to dismiss Starr's shareholder derivative claims, and denied the Government's motion to dismiss Starr's direct claims.  The Court also dismissed AIG as a party to this action.  <u>Starr Int'l Co. v. United States</u>, 111 Fed. Cl. 459 (2013).  On July 29, 2013, the Court authorized Plaintiff to take the deposition of Ben S. Bernanke.  <u>Starr Int'l Co. v. United States</u>, 112 Fed. Cl. 56 (2013).  On September 27, 2013, the Court denied Defendant's motion to certify the Court's June 26, 2013 ruling for interlocutory review.  <u>Starr Int'l Co. v. United States</u>, 112 Fed. Cl. 601 (2013).

The Court also has issued various unpublished rulings and orders, including a denial of Defendant's motion for summary judgment (Dkt. No. 282, issued Aug. 25, 2014), and Discovery Orders No. 1-11.  Of these, Discovery Order No. 6 perhaps is the most significant, where the Court ruled upon multiple claims of the attorney-client privilege and the deliberative process privilege.  Dkt. No. 182, issued Nov. 6, 2013.

<u>Jurisdiction – Section 13(3) of the Federal Reserve Act</u>

As noted above, the Court has addressed a number of jurisdictional and standing questions at earlier stages of this case.  The Court dismissed some of Starr's allegations in the amended complaints, and dismissed AIG as a nominal defendant, but ruled that the two classes of shareholders could proceed to trial on the taking and illegal exaction claims under the Fifth Amendment to the U.S. Constitution.  The Court's earlier rulings on these issues need not be repeated here.  However, there is one jurisdictional issue where the Court previously granted an inference in Starr's favor, but which now requires further analysis.  <u>See</u> <u>Starr Int'l Co.</u>, 107 Fed. Cl. at 378 (deferring ruling on whether a money-mandating statute is required for an illegal exaction claim).

The Government contends that the Court lacks jurisdiction over Starr's illegal exaction claim because Section 13(3) of the Federal Reserve Act is not a money-mandating source of law.  The general rule is that the Court of Federal Claims possesses jurisdiction under the Tucker Act, 28 U.S.C. § 1491, of claims based upon a constitutional provision, statute, or regulation when "the constitutional provision, statute, or regulation is one that is money-mandating."  Def.'s Post-Trial Concl. of Law at 108

(citing Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc)).  While Fifth Amendment taking claims are based upon the money-mandating language "nor shall private property be taken for public use without just compensation," illegal exaction claims are based upon the Due Process Clause of the Fifth Amendment.  See, e.g., Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1363 (Fed. Cir. 2002).  The Due Process Clause does not contain a money-mandating provision, and therefore an illegal exaction claim requires reference to another statute or regulation to create jurisdiction in this Court.  See Hamlet v. United States, 873 F.2d 1414, 1416-17 (Fed. Cir. 1989) (this Court can adjudicate constitutional claims if they are made in conjunction with a money-mandating source of law).

This Court ordinarily lacks jurisdiction of due process claims under the Tucker Act, but possesses jurisdiction of illegal exaction claims "when the exaction is based on an asserted statutory power."  Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1995).  As defined, an illegal exaction claim involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1007 (1967).  Illegal exaction claims often arise in tax disputes.  A classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the Government.  See, e.g., City of Alexandria v. United States, 737 F.2d 1022, 1028 (Fed. Cir. 1984).  However, illegal exaction claims arise in many other contexts as well, such as the AIG shareholders' lawsuit here.

Fifth Amendment taking claims and illegal exaction claims are two sides of the same coin: taking claims are based upon authorized actions by government officials, whereas illegal exaction claims are based upon unauthorized actions of government officials.  See Aerolineas Argentinas, 77 F.3d at 1579 (Nies, J., concurring):

> As recognized in United States v. Testan, 424 U.S. 392, 401-402, 96 S. Ct. 948, 954-55, 47 L. Ed. 2d 114 (1976), a Tucker Act claim for damages against the United States based upon a statute may take one of two forms: a claim under a money-mandating statute or a claim for money improperly exacted or retained.  A claimant must rely either on a statute that mandates payment of money from the government to the claimant or on an illegal exaction, that is, a payment to the government by the claimant that is obtained without statutory authority.  See Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576 (1954).  The first is founded on statutory authorization; the second on the absence of statutory authorization.  One is the flip side of the other.

Id.   Intuitively, taking claims and illegal exaction claims ought to be on equal jurisdictional footing in this Court, but a problem is created because taking claims stem from explicit money-mandating language in the Fifth Amendment, while illegal exaction claims do not.

In addressing this jurisdictional problem for illegal exaction claims, some decisions have dispensed with the requirement for a money-mandating statute, seemingly embracing the concept that the Government should not escape responsibility for its unauthorized actions based on a jurisdictional loophole.  See Figueroa v. United States, 57 Fed. Cl. 488, 495-96 (2003) ("In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language."); Bowman v. United States, 35 Fed. Cl. 397, 401 (1996) ("In illegal exaction cases, in contrast to other actions for money damages, jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language."); Aerolineas Argentinas, 77 F.3d at 1573 ("[A]n illegal exaction has occurred when 'the Government has the citizen's money in its pocket.' Suit can then be maintained under the Tucker Act to recover the money exacted.") (quoting Clapp, 127 Ct. Cl. at 513, 117 F. Supp. at 580); Auto. Club Ins. Ass'n v. United States, 103 Fed. Cl. 268, 273 (2012) (Where an illegal exaction is alleged, the Tucker Act "enables suit even in the absence of a money-mandating statute.").

Other decisions have espoused a slightly tighter standard, but one that is still broader than simply requiring a "money-mandating" source of law.  The lead case in this category is Norman v. United States, 429 F.3d 1081 (Fed. Cir. 2005), which states:

> An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution.  See, e.g., Casa de Cambio Comdiv, 291 F.3d at 1363. . . . To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money unlawfully exacted." Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (concluding that the Tucker Act provided jurisdiction over an illegal exaction claim based upon the Export Clause of the Constitution because the language of that clause "leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy").

<u>Id.</u> at 1095 (emphasis added).

Even under the more demanding test of <u>Norman</u>, the words "by necessary implication" would lead to a finding of jurisdiction in this case. Certainly, where the Government has imposed unlawful conditions in connection with an emergency loan under Section 13(3) of the Federal Reserve Act, the Government should not be permitted to insulate itself from liability by arguing that Section 13(3) is not "money-mandating." If this were true, the Government could nationalize a private corporation, as it did to AIG, without fear of any claims or reprisals. Section 13(3) does not contain express "money-mandating" language, but "by necessary implication," the statute should be read to allow the shareholders' cause of action here. By taking 79.9 percent equity and voting control of AIG, the Government exacted the shareholders' property interests. The two certified classes of AIG common stock shareholders were the parties directly affected by the Government's unlawful action, and "by necessary implication," they should be permitted to maintain their lawsuit.

The Government also argues that Section 13(3) of the Federal Reserve Act is a discretionary statute and cannot be money-mandating because of the language stating "the Board of Governors . . . may authorize" a loan, (citing <u>Doe v. United States</u>, 463 F.3d 1314, 1324 (Fed. Cir. 2006)). Def.'s Post-Trial Resp. Br. at 20-21. However, in the case of Section 13(3), the discretionary part of the statute is in allowing the Government to consider whether it would extend an emergency rescue loan to AIG. Section 13(3) did not *require* the Government to make an emergency loan to any entity, including AIG. Once it decided to make an emergency loan to AIG, the Government's discretion ended. At that point, the Government had to abide by the restrictions of Section 13(3), which did not include the steps it took in taking 79.9 percent equity and acquiring voting control to nationalize AIG. Further, <u>Doe</u> is an overtime pay case, not an illegal exaction case, and does not apply in the circumstances presented here.

Last, the Government argues that even if Section 13(3) of the Federal Reserve Act were money-mandating, Starr could not recover because it is not an intended beneficiary of Section 13(3). Def.'s Post-Trial Concl. of Law at 109. Rather, the Government says that "[S]ection 13(3) exists for the benefit of the financial system." <u>Id.</u> If the Government means that "financial system" includes only the Federal Reserve System and the Department of Treasury, this assertion is incorrect.

Starr is entitled to sue for the return of its money or property because it is an intended beneficiary under the Federal Reserve Act. <u>See</u> 12 U.S.C. § 343; <u>see also</u> <u>Alyeska Pipeline Serv. Corp. v. United States</u>, 224 Ct. Cl. 240, 261-62, 624 F.2d 1005, 1018 (1980) ("Where the payments were exacted in violation of a statute intended to

benefit the person seeking recovery, it is immaterial that the person failed to protest when making the payment.").  The Court declines to read Section 13(3) in a way that limits its benefits to only the governmental side of the financial system, and not to the individual businesses, corporations, partnerships or investors that comprise the entire financial system.  Such a reading would allow the Federal Reserve Board to impose any conditions it desired on a Section 13(3) loan and avoid any judicial complaint of its unauthorized acts.  The remedies for the financial system must be available to all who comprise it, including the common stock shareholders of a nationalized AIG.

<u>Legal Analysis</u>

A.  <u>The Illegal Exaction Claim</u>

Upon a full consideration of the record and the arguments of counsel, the Court finds that FRBNY's taking of 79.9 percent equity ownership and voting control of AIG constituted an illegal exaction under the Fifth Amendment.  The Board of Governors and the Federal Reserve Banks possessed the authority in a time of crisis to make emergency loans to distressed entities such as AIG, but they did not have the legal right to become the owner of AIG.  In the Federal Reserve's history of making hundreds of emergency loans to commercial entities, the loan to AIG represents the only instance in which the Federal Reserve has demanded equity ownership and voting control.  There is no law permitting the Federal Reserve to take over a company and run its business in the commercial world as consideration for a loan.

Prior to 1932, the Federal Reserve Banks generally could lend only to banks that were members of the Federal Reserve System.  PTX 742 at 135.  In 1932, Congress recognized that, in a financial crisis, solvent but illiquid companies may require emergency assistance.  Congress enacted Section 13(3) of the Federal Reserve Act, which authorized the Federal Reserve to issue loans to any "individual, partnership, or corporation" in the "unusual and exigent circumstances" where the borrower was unable to secure adequate credit from private sources, but had sufficient assets to secure the loan.  Emergency Relief and Construction Act of 1932, Pub. L. No. 72-302 § 210, 47 Stat. 709, 715.

The text of Section 13(3) of the Federal Reserve Act provides:

> In unusual and exigent circumstances, the Board of Governors of the Federal Reserve System, by the affirmative vote of not less than five members, may authorize any Federal reserve bank, during such periods as the said board may determine, at rates established in accordance with the

> provisions of section 357 of this title, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank: *Provided,* That before discounting any such note, draft, or bill of exchange for an individual or a partnership or corporation the Federal reserve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions. All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe.

12 U.S.C. § 343 (2006). Four requirements must be met in order for Section 13(3) to apply: (1) unusual and exigent circumstances; (2) the loan must be authorized by an affirmative vote of not less than five members of the Board of Governors; (3) the loan must be secured to the satisfaction of the lending Federal reserve bank; and (4) the borrower must be unable to secure adequate credit accommodations from other banking institutions. Id. In Section 14(d) of the Federal Reserve Act, Congress also provided that the consideration for a Section 13(3) loan must be an interest rate "subject to review and determination of the Board of Governors" and "fixed with a view of accommodating commerce and business." 12 U.S.C. § 357.

Section 13(3) achieves the purpose of assisting a broad range of entities and persons during a time of economic crisis. PTX 708 at 14 (Bernanke); see also PTX 682 at 6. Long ago, Walter Bagehot described the responsibility of central banks in financial crises in his book "Lombard Street," published in 1873. The Bagehot Principle is that, during a panic, central banks should lend freely to whomever comes to the door; "as long as they have collateral, give them money." PTX 708 at 14. The Bagehot Principle is widely accepted in the financial world, and is endorsed by the Federal Reserve and its officials. PTX 709 at 126 (Geithner) ('Lombard Street' is the "bible of central banking."); PTX 708 at 14 (Bernanke) ("If a central bank follows Bagehot's rule, it can stop financial panics."); see also Cragg, Tr. 5421-22; Zingales, Tr. 4126-27.

Since its enactment in 1932, the Federal Reserve has used Section 13(3) to assist individual, non-bank institutions. From 1932 to 1936, the Federal Reserve made 123 loans under Section 13(3) to various individual, non-bank institutions for non-marketable collateral. PTX 2816 at 4 ("During this period, the Board authorized the Federal Reserve

Banks to make discounts only for individuals and nonbank entities."). Examples of the loans made in the early years of Section 13(3) are:

> 1932 – A $300,000 loan to Smith-Corona Company, a typewriter company.
>
> 1932 – A $250,000 loan to Miller Cummings Company, a vegetable grower.
>
> 1933 – A $25,000 loan to L.N. Renault and Sons secured by 5,000 shares of common stock in a brewing company and certificates representing ten barrels of brandy and 89 barrels of rum to pay farmers for grapes.
>
> 1936 – A $13,060.73 loan to Phenix Marble Company secured by shipments of marble products.

Id. at 5-6. In 1966 and 1969, the Federal Reserve authorized extensions of credit to institutions in the thrift industry, although no credit was actually extended. PTX 2814 at 1. The Federal Reserve then utilized Section 13(3) again in 2008 in the billion dollar transactions described in this opinion.

An illegal exaction occurs when the Government requires a citizen to surrender property the Government is not authorized to demand as consideration for action the Government is authorized to take. Aerolineas Argentinas, 77 F.3d at 1572-73 (Illegal exaction occurs when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."); see also Trayco, Inc. v. United States, 994 F.2d 832, 837-38 (Fed. Cir. 1993); Eastport S.S. Corp., 178 Ct. Cl. at 605, 372 F.2d at 1007-08.

In Suwannee S.S. Co. v. United States, 150 Ct. Cl. 331, 279 F.2d 874 (1960), for example, the Government, through the Maritime Administrator, required a citizen to surrender $20,000 it was not authorized to demand as a condition for receiving the Government's approval to sell two of its ships to a foreign purchaser. Id. at 875-76. Under the Shipping Act, the plaintiff could not sell the ships without the Administrator's permission. Id. at 874. The Administrator agreed to the sale on the condition that the plaintiff pay $20,000 to the Government. Id. at 875. The plaintiff accepted the terms proposed by the Administrator, paid the $20,000, and later sued the United States claiming that the "Maritime had no legal authority to condition its approval of the requested transfer upon the payment of $20,000." Id. at 875-76.

In response to the plaintiff's claim in <u>Suwannee</u>, the Government argued that it "had the power to deny the plaintiff permission to make the desired transfer" and that under the statute, it had "complete freedom to impose conditions upon any permission granted." <u>Id.</u> at 876. The Court rejected the Government's argument, stating:

> *We suggest that no statute should be read as subjecting citizens to the uncontrolled caprice of officials,* unless the statute has to do with the powers of the President in dealing with foreign relations, the powers of a military commander in the field, or some comparable situation. . . . The vice of the $20,000 is its irrelevance. There can hardly be a more serious defect in the carrying on of government than allowing matters which have nothing to do with the case to be dragged in, and to affect decisions. If the Government has valuable privileges to award, and if it desires to get money for them, it should, as it does in many situations, invite bids or negotiation. If it does not, its *officials have no authority to add to their function of determining the compatibility of the application with the public interest, the supererogatory function of picking up a few dollars for the public treasury.*

<u>Id.</u> at 876-77 (emphasis added); <u>see also</u> <u>Clapp v. United States</u>, 127 Ct. Cl. at 514, 117 F. Supp. at 581 (Shipping Act did not authorize the Government to condition sale on the payment of a fee because, if the provision were read to permit such a condition, "[t]aken literally that section would permit the Administration to impose any condition whatever, however irrelevant.").

When the Government has no obligation to confer a benefit, as in the case of a Section 13(3) loan under the Federal Reserve Act, if it decides in its discretion to provide the benefit, the Government cannot demand the surrender of rights it lacks authority to demand. <u>Koontz v. St. Johns River Water Mgmt. Dist.</u>, 133 S. Ct. 2586, 2596 (2013) ("[W]e have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights."); <u>United States v. Chicago, M., St. P. R. Co.</u>, 282 U.S. 311, 328-29 (1931) ("[T]he right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution."); <u>Frost v. R.R. Comm'n of State of Cal.</u>, 271 U.S. 583, 594 (1926) ("If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender

of all.  It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.").

The Government's inability to require forfeiture of rights and property in exchange for discretionary benefits is unchanged during times of crisis, when the rule of law is maintained by requiring that government acts be authorized by statute and the Constitution.  Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 425-26 (1934) ("Emergency does not create power.  Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . . 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.'") (quoting Wilson v. New, 243 U.S. 332, 348 (1917)); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 653 (1952) (Jackson, J., concurring) ("In view of the ease, expedition and safety with which Congress can grant and has granted large emergency powers, certainly ample to embrace this crisis, I am quite unimpressed with the argument that we should affirm possession of them without statute.  Such power either has no beginning or it has no end.").

In the present case, it is undisputed that the Government required from AIG the surrender of 79.9 percent of Plaintiff's equity and voting control, as consideration for a Section 13(3) loan under the Federal Reserve Act.  There is nothing in the Federal Reserve Act that authorized the Government to demand equity or voting control as consideration for a Section 13(3) loan.  As the Court previously has held in this case, "the only consideration for a loan prescribed by 'Section 13(3) is an interest rate subject to the determination of the Board of Governors.'"  Starr Int'l Co., 107 Fed. Cl. at 378 (quoting Starr Int'l Co., 106 Fed. Cl. at 85).

Defendant contends that the terms imposed upon AIG and its shareholders are authorized by the language in Section 13(3) stating that the Federal Reserve loans are "subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe."  12 U.S.C. § 343 (2006).  Section 4 of the Federal Reserve Act grants to the reserve banks "all powers specifically granted by the provisions of this chapter and such incidental powers as shall be necessary to carry on the business of banking *within the limitations prescribed by this chapter."*  12 U.S.C. § 341 (emphasis added).

A federal entity's incidental powers cannot be greater than the powers otherwise delegated to it by Congress.  Federal Reserve Bank of Richmond v. Malloy, 264 U.S. 160, 167 (1924) ("[A]uthority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized – not to do another and separate thing, since that would be, not to carry the authority granted into effect, but

to add an authority beyond the terms of the grant."); First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 659 (1924) ("Certainly an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted."); California Nat'l Bank v. Kennedy, 167 U.S. 362, 369 (1897) ("The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred."). Thus, because there is no express power to demand consideration for a Section 13(3) loan beyond an interest rate fixed with a view of accommodating commerce and business, the acquisition of equity and voting control of AIG was not incidental to any Federal Reserve power.

Defendant's reliance on Lucas v. Federal Reserve Bank of Richmond, 59 F.2d 617 (4th Cir. 1932), is misplaced. Lucas stands for the proposition that a reserve bank can accept collateral as additional security for a loan, to be released after the loan is repaid. Id. at 620. Here, the AIG equity and voting control were not returned after the loan was paid off. Defendant retained and profited from its sale of this property, even after the loan amounts had been repaid.

The Court's interpretation of Section 13(3) of the Federal Reserve Act is buttressed by Congress's passage in 1945 of the Government Corporation Control Act, 31 U.S.C. § 9102, which prohibits government entities from acquiring a controlling stake in a corporation so as to make the corporation an agency of the Government without express congressional authorization. The Court's interpretation also is consistent with Federal Reserve Circulars published after the passage of Section 13(3). Bd. of Governors of the Fed. Reserve Sys., 44 Fed. Reserve Bulletin 241, 269 (Mar. 1958) ("[B]ank discounts as commonly understood do not apply to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures."); 1936 Circular, 22 Fed. Reserve Bulletin 71, 123 (Feb. 1936) ("[D]iscounts may be made only at rates established by the Federal Reserve banks, subject to review and determination by the Board of Governors of the Federal Reserve System.").

Defendant and its outside counsel from Davis Polk & Wardwell performed legal analysis of the Federal Reserve's authority under Section 13(3), and concluded that the Federal Reserve most likely lacked authority to demand equity and voting control from AIG. PTX 3283 at 1 (Davis Polk email, Sept. 17, 2008) ("There is no express authority, which is one of the reasons Treasury and the Fed discussed their actions with congressional leaders of both parties. Maybe it's an implied power of setting the conditions for lending money under 13(3) of the [F]ederal [R]eserve [A]ct, but the [Government] is on thin ice and they know it. But who's going to challenge them on this ground?"); see also PTX 336 at 1 (Board of Governors Legal Division memorandum,

Nov. 1, 2008) ("No provision of the Federal Reserve Act expressly authorizes the Federal Reserve to acquire the equity of any entity."); JX 386 at 3 (FRBNY's independent auditor, Deloitte) (FRBNY "is prohibited by law from holding equity securities in a commercial enterprise.").

The legal staffs of FRBNY and the Federal Reserve acknowledged that they could not obtain or hold equity, or acquire voting control, of a commercial entity. FRBNY's General Counsel, Mr. Baxter, noted during an interview on May 11, 2010:

> Neither the Fed nor the [T]reasury had authority to hold the shares. When we saw equity on term sheet – problem of legal ownership and the conflict. Maybe strike that and not take equity. But then thought of taxpayer. Create a trust, put shares in trust. For benefit of American people. We had to decide that right away.

PTX 2211 at 10. Mr. Baxter notified the Board of Governors' counsel, Mr. Alvarez, on October 23, 2008, "we agree that there is no power" for the Federal Reserve "to hold AIG shares." PTX 320-U at 1. Mr. Alvarez's notes of a September 18, 2008 conference call among FRNBY, the Board of Governors, Treasury, and Davis Polk, attribute to Mr. Baxter the following comments: "signif issues w/Fed controlling AIG;" "legal, conflicts, regulatory, etc.;" "don't have statutory authority to control." PTX 148 at 1. Legal Division of Board of Governors, November 1, 2008: The Fed "[c]an't acquire equity." PTX 336 at 2. The Federal Reserve is "prohibited from acquiring and holding stock as an equity kicker in connection with a loan by the Bank, as are commercial banks." PTX 370-A at 2 (Nov. 2008). Mr. Alvarez to Mr. Baxter on September 21, 2008: "Just to confirm, ownership of stock along the lines in this term sheet will not work for the Fed – trust or no trust. It's fine if Treasury takes the stock, which I thought from the discussion last week was foreclosed." PTX 183 at 1; see also DX 118 (Mr. Baxter's email to Mr. Geithner referring to the need for "loophole lawyering" in operating under a 75-year old statute).

Mr. Alvarez testified in detail about FRBNY's conflict of interest problem. He stated "I was concerned about the conflicts that would arise if we were viewed as both the lender and as the owner of AIG. The owner and the lender don't always have the same interests, and that can create a conflict internally." Alvarez, Tr. 553. Mr. Alvarez further testified:

> I also was concerned that the Federal Reserve has access to substantial amounts of confidential information about a variety of financial institutions and that there would be the

perception that AIG would have – if the Federal Reserve were
the owner for an extended period of time, that the – that AIG
would have access to that information or the New York
Reserve Bank would use that information to benefit AIG.  So,
I was concerned about the public perception that AIG was in
a privileged place.

Id.  Mr. Alvarez also believed that the Federal Reserve should not be "running AIG and .
. . responsible for its decisions."  Alvarez, Tr. 554.  He also was concerned that, if the
Federal Reserve owned AIG, the accountants "would consolidate the balance sheet of
AIG onto the balance sheet of the Federal Reserve."  Id.  Such a consolidation of two
trillion dollar entities would "double the size of the Federal Reserve's balance sheet."  Id.

It is debatable whether the vote of the AIG Board of Directors on September 16,
2008 was voluntary, or whether acceptance of the Government's terms was the only
realistic choice.  However, as a matter of law, the vote of AIG's Board to accept the term
sheet offered by the Government does not constitute a defense to an illegal exaction
claim.  A person or entity cannot ratify an illegal government action.  Many cases have
found illegal exactions where citizens have voluntarily paid money to the Government as
a result of a demand that the Government was not authorized to make.  American
Airlines, Inc. v. United States, 551 F.3d 1294, 1302 (Fed. Cir. 2008) (user fees charged to
airline were an illegal exaction despite airline's failure to protest initial payments of the
fee, because "failure to challenge an improper agency action does not ratify such actions
or insulate [Government] from later objections and litigation."); Alyeska Pipeline, 224
Ct. Cl. at 248, 624 F.2d at 1010 (unauthorized fee imposed on, and paid by, plaintiff as a
condition of obtaining a right-of-way agreement for a pipeline was an illegal exaction);
Finn v. United States, 192 Ct. Cl. 814, 820, 428 F.2d 828, 831 (1970) (wage
garnishments made to recover moving costs of former FBI agent under a contract were an
illegal exaction because "[i]f officials of the Government make a contract they are not
authorized to make, the other party is not bound by estoppel or acquiescence or even
failing to protest."); Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 183, 426 F.2d 314,
317 (1970) (same holding involving Government's refusal to consider errors made in
plaintiff's contract bid); Eastport S.S., 178 Ct. Cl. at 603-04, 372 F.2d at 1006
(imposition of a fee charged to, and paid by, plaintiff to obtain the legally required
permission to sell two ships to a foreign purchaser was an illegal exaction even though
the payment was made without protest.).[16]

---

[16]  Other cases rejecting a voluntariness defense to an illegal exaction claim are:  O'Bryan v. United
States, 93 Fed. Cl. 57 (2010); Bautista-Perez v. Mukasey, No. C 07-4192 TEH, 2008 WL 314486 (N.D.
Cal. Feb. 4, 2008); Continental Airlines, Inc. v. United States, 77 Fed. Cl. 482 (2007); PSI Energy Inc. v.
United States, 411 F.3d 1347 (Fed. Cir. 2005); Aerolineas Argentinas, 77 F.3d at 1564; United States v.
Best Foods, Inc., 47 C.C.P.A. 163, 170 (1960); Suwannee S.S. Co., 279 F.2d at 877; Sprague S.S. Co. v.

In arguing that voluntariness is a defense, Defendant chiefly relies on the Supreme Court's decision in United States v. Edmonston, 181 U.S. 500 (1901). Edmonston establishes voluntariness as a defense only in the narrow circumstances where there is a mutual mistake of law regarding the calculation of how much – not whether – the Government is entitled to charge or take, and where there is no clear congressional purpose that would be defeated by the assertion of such a defense. In Edmonston, the plaintiff paid the United States $2.50 per acre of land even though the statutory sale price was $1.25 per acre. The Supreme Court held that the plaintiff was not entitled to the amount of overpayment because "the transaction was purely voluntary on [the plaintiff's] part, and that while there was a mistake it was mutual and one of law, a mistake on his part not induced by any attempt to deceive or misrepresentation by the government officials." Id. at 515. In the present case, the Government's actions were not mistaken, but were deliberate.

Similarly, the Government's creation of a trust to hold the shares of AIG stock does not cure the illegal exaction. FRBNY's counsel, Mr. Baxter, developed the idea of a trust during September 16-22, 2008 as a way to circumvent the Federal Reserve's lack of authority to hold equity. Baxter, Tr. 791; see also PTX 368 at 3 (Alvarez) ("The creation of the Trust is necessary . . . because neither the Reserve Bank nor the Treasury Department has the legal authority to hold the equity in the form of preferred or common stock directly."). In an April 30, 2010 interview, Mr. Baxter stated: "We didn't have the legal authority to own shares, we didn't want to control the company. That's why the credit facility trust and the equity participation went to trust – legal ownership was in the trust, which has three independent trustees, so there's no control in Treasury or the Fed." PTX 580 at 3. The trust was not executed until January 16, 2009, four months after the Government took control of AIG.

The creation of the trust in an attempt to circumvent the legal restriction on holding corporate equity is a classic elevation of form over substance. The three appointed trustees had lengthy historical ties to the Federal Reserve. The trust was created "for the sole benefit of the Treasury." JX 172 at 5, § 1.01 (Trust Agreement). FRBNY, in consultation with Treasury, had the power to appoint the trustees. Id. at § 1.02. The trust was revocable only by the Federal Reserve Board of Governors. Id. at § 1.03. FRBNY, in consultation with Treasury, had the power to remove a trustee. Id. at § 3.02(d). The trustees' standard of care was to act "in or not opposed to the best interests

---

United States, 145 Ct. Cl. 642, 172 F. Supp. 674 (1959); Eversharp Inc. v. United States, 129 Ct. Cl. 772, 125 F. Supp. 244 (1954); Clapp, 127 Ct. Cl. at 515, 117 F. Supp. at 582; Lancashire Shipping Co. v. United States, 4 F. Supp. 544 (S.D.N.Y. 1933); James Shewan & Sons v. United States, 73 Ct. Cl. 49 (1931); Star Motor Co. of Cal. v. United States, 71 Ct. Cl. 348, 41 F.2d 901 (1930).

of the Treasury." Id. at § 3.03(a)(i).  The trustees were the "protectors of the Federal equity stake in AIG" and "should not care about the AIG minority shareholders."  PTX 3286 at 1 (Baxter); see also Huebner, Tr. 6272-73 (trustees had no "separate duties to the common shareholders.").  The manner in which FRBNY controlled AIG with its hand-picked CEO, carefully selected board members, and its hundreds of on-premises advisers belies any conclusion that the operations of the trust were independent.

B.  The Fifth Amendment Taking Claim

As the Court indicated at the beginning of closing arguments on April 22, 2015, Starr's illegal exaction and taking claims under the Fifth Amendment actually are asserted in the alternative.  An illegal exaction claim "by its name suggests an illegal action," whereas a Fifth Amendment taking "has to be by a legal action."  Closing Arg., Tr. 8.  Starr's counsel, Mr. Boies, agreed with this assertion, and confirmed that Starr "only need[ed] one" of those claims in order to prevail.  Id. at 8, 10.  Since the Court has ruled in Starr's favor on the illegal exaction claim, the Court does not need to consider Starr's Fifth Amendment taking claim.  This ruling is in line with applicable case law, holding that the same government action cannot be both an unauthorized illegal exaction and an authorized taking.  See Alves v. United States, 133 F.3d 1454, 1456-58 (Fed. Cir. 1998) (taking must be based on authorized government action); Figueroa, 57 Fed. Cl. at 496 (If the government action complained of is unauthorized, "plaintiff's takings claim would fail on that basis."); see also Short v. United States, 50 F.3d 994, 1000 (Fed. Cir. 1995) (same).

Damages

A.  Summary of Starr's Damages Claim

Starr asserts that, in an illegal exaction case, the plaintiff's damages recovery should be the return of the monetary value of property seized or obtained by the Government.  Casa de Cambio Comdiv S.A. de C.V. v. United States, 48 Fed. Cl. 137, 145 (2000), aff'd, 291 F.3d 1356 (Fed. Cir. 2002); see also Bowman v. United States, 35 Fed. Cl. 397, 401 (1996) ("Were an illegal exaction to be found, Plaintiff could receive the value of his forfeited property.").

For the Credit Agreement Class, Starr contends that the fair value of the seized property should be calculated as of September 22, 2008, the effective date of the Credit Agreement.  Prior to that date, no legally binding agreement existed between AIG and FRBNY entitling the Government to an equity interest and voting control of AIG.  The only document existing before the Credit Agreement was the September 16, 2008 term sheet, which on its face was legally nonbinding and unenforceable.  The term sheet states

that "it is not intended to be legally binding on any person or entity."  JX 63 at 5; see, e.g. Richbell Info. Sys., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 297 (N.Y. App. Div. 2003) (explaining that a term sheet is a "classic example of an unenforceable 'mere agreement to agree,'" and holding that "we recognize that term sheets, such as those used here, will not support a claim of breach of contract or of the duty of good faith.").  All versions of the term sheet in this case state that the term sheet will be governed by New York law.

According to Starr, the fair market value of the Series C Preferred shares acquired by the Government is best determined by referring to the New York Stock Exchange per share price of AIG's common stock on September 22, 2008.  The Series C Preferred Stock was economically equivalent to AIG's common stock, which was actively traded on the New York Stock Exchange.  The market value per share of AIG's common stock represented the best independent valuation available for valuing the Government's beneficial interest in the Trust.  Def.'s Resp. to Pl.'s 3rd Interrog. No. 18; Kothari, Tr. 4543-44.

Defendant paid only $500,000 into the Trust to obtain 79.9 percent of AIG's common stock equity.  Plaintiff's expert, Dr. Kothari, placed a value of $35.378 billion on the Government's 79.9 percent equity ownership. PTX 5212.  Dr. Kothari begins with a per share value of $3.31 as of the market's closing on September 24, 2008.  The $3.31 per share price was the lowest price for AIG common stock during the three-day period of September 22-24, 2008, and thus is conservatively based.  PTX 5209.  He then multiplies the per share price by 14.691 billion outstanding shares, yielding a total of $48.626 billion for all of AIG's common stock. PTX 5212.  As the next step, Dr. Kothari adjusts the total for the 79.9 percent of equity owned by the Government ($38.852 billion), and then reduces the amount by another 8.9 percent to exclude certain equity units.  Id.  The total value in this calculation is $35.378 billion.  Id.  To determine the damages award for each class member, the calculation would be $35.378 billion times the shares held by the class member, divided by the 14.691 billion outstanding common shares.  PTX 5202; see also PTX 5212.

The record contains other valuations of the Government's 79.9 percent equity stake in AIG.  The other valuations relied upon the AIG per share stock price for September 16, 2008, the date of the term sheet, but otherwise were very similar to Dr. Kothari's analysis.  Deloitte, serving as FRBNY's auditor, used a stock price of $2.29 per share, and valued the Government's equity at $24.5 billion.  PTX 5204; JX 385 at 1-2. KPMG, serving as AIG's valuation consultant, used a stock price of $2.05 per share, and valued the Government's equity at $23 billion.  PTX 5203, 5204; PTX 375 at 21.  AIG in its own behalf, used a stock price of $2.05 per share, and valued the Government's equity at $23 billion.  PTX 5203, 5204; JX 137 at 2, 7.

B. Economic Loss Analysis

Common sense suggests that the Government should return to AIG's shareholders the $22.7 billion in revenue it received from selling the AIG common stock it illegally exacted from the shareholders for virtually nothing.  However, case law construing "just compensation" under the Fifth Amendment holds that the Court must look to the property owner's loss, not to the Government's gain.  Brown v. Legal Found. of Wash., 538 U.S. 216, 235-36 (2003) (The "'just compensation' required by the Fifth Amendment is measured by the property owner's loss rather than the [G]overnment's gain."); Kimball Laundry Co. v. United States, 338 U.S. 1, 5 (1949) ("Because gain to the taker . . . may be wholly unrelated to the deprivation imposed upon the owner, it must also be rejected as a measure of public obligation to requite for that deprivation."); United States v. Miller, 317 U.S. 369, 375 (1943) ("Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker."); Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195 (1910) (Holmes, J.) ("And the question is, What has the owner lost?  not, What has the taker gained?").

Ultimately, Starr must prove that it suffered some economic harm from the Government's taking or illegal exaction.  In applying this standard, the Court must consider the value of the Plaintiff's property but for the challenged government actions.  In other words, what would the value of Plaintiff's property have been if the Government had done nothing?  Brown, 538 U.S. at 240-41 (plaintiffs had lost nothing because they would not have received any interest even in the absence of a challenged government program).

A closely analogous case is A&D Auto Sales, Inc. v. United States, 748 F.3d 1142 (Fed. Cir. 2014).  At the trial court level, former owners of Chrysler and General Motors car dealerships alleged an uncompensated taking of their property from the Government's Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  Plaintiffs alleged that the takings occurred when the Government required Chrysler and General Motors to terminate dealerships as a condition of obtaining financial assistance.  The property rights in question were franchise contracts, ongoing automobile businesses, and automobile dealer rights under state law.  The Court denied the Government's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.  Colonial Chevrolet Co. v. United States, 103 Fed. Cl. 570 (2012); Alley's of Kingsport, Inc. v. United States, 103 Fed. Cl. 449 (2012) (Hodges, J.).  The Court, however, granted Defendant's motion to certify for interlocutory appeal the issue of whether a plaintiff must plead a known, specific takings theory to survive a dispositive motion on the pleadings.  Alley's of Kingsport v. United States, 106 Fed. Cl. 762 (2012); Colonial Chevrolet v. United States, 106 Fed. Cl. 619 (2012).

On appeal, the Federal Circuit consolidated the cases for review, and styled the appeal as A&D Auto Sales, Inc.  The Federal Circuit held that the car dealers' complaints failed to state a takings claim without "allegations regarding the but-for economic loss of value of the plaintiffs' franchises."  748 F.3d at 1158.  The Federal Circuit reasoned:

> Absent an allegation that GM and Chrysler would have avoided bankruptcy but for the Government's intervention and that the franchises would have had value in that scenario, or that such bankruptcies would have preserved some value for the plaintiffs' franchises, the terminations actually had no net negative economic impact on the plaintiffs because their franchises would have lost all value regardless of the government action.

Id.  Since the cases were at the motion to dismiss stage, before any trial on the merits, the Federal Circuit permitted plaintiffs the opportunity to amend their complaints to include the necessary factual allegations.

Applying the reasoning of A&D Auto Sales, the Court must examine what would have happened to AIG if the Government had not intervened.  The inescapable conclusion is that AIG would have filed for bankruptcy, most likely during the week of September 15-19, 2008.  In that event, the value of the shareholders common stock would have been zero.  By loaning AIG $85 billion under the September 22, 2008 Credit Agreement, the Government significantly enhanced the value of the AIG shareholders' stock.  While the taking of 79.9 percent equity ownership and the running of AIG's business were not permitted under the Federal Reserve Act, the Government did not cause any economic loss to AIG's shareholders, because as Mr. Studzinski said, "[twenty] percent of something [is] better than [100] percent of nothing."  Studzinski, Tr. 6937.  Under the economic loss analysis, the Credit Agreement Class is entitled to zero damages.

### Defendant's Procedural Defense of Waiver

The Government contends that Starr waived its illegal exaction claim by accepting the terms of FRBNY's rescue, and failing to allege the illegality of the credit agreement or the reverse stock split until after Starr had received the full benefits of the rescue between September 2008 and January 2011.  Def.'s Post-Trial Concl. of Law at 116-17.  The Government asserts that this decision precludes Starr from now seeking to undo AIG's September 2008 agreement.  Id.

The statute of limitations for Starr's action is "six years after such claim first accrues." 28 U.S.C. § 2501. By filing suit in November 2011, Starr is well within the six-year range of operative events that began in September 2008. As this opinion demonstrates, the circumstances relating to the Government's rescue and takeover of AIG continued to evolve through 2011, and the Government did not complete its sale of AIG common stock on the open market until December 2012. Starr and its counsel acted reasonably in filing suit when it did. Although the media reported much of the information about AIG during the years in question, Starr's Mr. Greenberg was not privy to any of the significant FRBNY, Treasury, or AIG Board of Directors meetings.

The record supports a conclusion that FRBNY, Treasury, and their outside counsel from Davis Polk & Wardwell carefully orchestrated the AIG takeover so that shareholders would be excluded from the process. These entities avoided at all cost the opportunity for any shareholder vote. Having intentionally kept the shareholders in the dark as much as possible, it rings hollow for Defendant to contend that the shareholders waived the right to sue by failing to object.

Case law strongly supports this conclusion. In <u>American Airlines</u>, 551 F.3d at 1302, the Federal Circuit observed that "[f]ailure to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation." The Federal Circuit saw no reason to disturb the trial court's holding. <u>Id.</u> Similarly, in <u>Clapp</u>, 127 Ct. Cl. at 515, 117 F. Supp. at 582, the Court of Claims ruled "[w]e find it hard to imagine a case where the Government can take a citizen's money, by refusing him something to which he is entitled, and then keep the money on the ground of estoppel. This defense is beneath the dignity of the Government." <u>Id.</u>

Accordingly, Defendant's waiver argument is without merit.

### Conclusion

Based upon the foregoing, the Court concludes that the Credit Agreement Shareholder Class shall prevail on liability due to the Government's illegal exaction, but shall recover zero damages, and that the Reverse Stock Split Shareholder Class shall not prevail on liability or damages. The Clerk is directed to issue final judgment consistent with this opinion.

The parties are invited to brief the issues relating to costs and attorneys' fees in accordance with the Court's rules and applicable law.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

APPENDIX OF RELEVANT ENTITIES AND PERSONS

Plaintiff and the Plaintiff Classes

Plaintiff Starr International Company, Inc. ("***Starr International***") is a privately held Panama corporation with its principal place of business in Switzerland. ***Maurice R. "Hank" Greenberg*** is the Chairman of Starr International. Until 2005, ***Howard Smith*** was chief financial officer and chief administrative officer of AIG. He now serves as vice chairman of finance of C.V. Starr and as a director of Starr International. Smith, Tr. 7673-74.

The "***Credit Agreement Class***" is the class of persons and entities allegedly injured by the Fifth Amendment taking or illegal exaction of a 79.9 percent equity interest in AIG pursuant to the Credit Agreement. The "Credit Agreement Class" consists of "All persons or entities who held shares of AIG common stock on or before September 16, 2008 and who owned those shares as of September 22, 2008, excluding Defendant, any directors, officers, political appointees, and affiliates thereof, as well as members of the immediate families of Jill M. Considine, Chester B. Feldberg, Douglas L. Foshee, and Peter A. Langerman." Opinion and Order Regarding Class Certification, Starr Int'l Co. v. United States, 109 Fed. Cl. 628, 636-37 (2013).

The "***Reverse Stock Split Class***" is the class of persons and entities allegedly injured by the events and actions resulting in the reverse stock split. The Reverse Stock Split Class consists of "All persons or entities who held shares of AIG common stock on June 30, 2009 and were eligible to vote those shares at the annual shareholder meeting held on that date, excluding Defendant, any directors, officers, political appointees, and affiliates thereof, as well as members of the immediate families of Jill M. Considine, Chester B. Feldberg, Douglas L. Foshee, and Peter A. Langerman." Id. at 637.

American International Group, Inc. ("AIG")

***AIG*** was incorporated as a holding company for various general and life insurance businesses in 1967. Stip. ¶ 22. At all relevant times, AIG has been a Delaware corporation with its principal executive offices located in New York City. Stip. ¶ 20. In 2008, ***AIG Financial Products ("AIGFP")*** was a separate wholly-owned subsidiary of the AIG parent company. Stip. ¶ 49. AIG guaranteed all of AIGFP's obligations, and prior to March 2005, AIGFP benefited from AIG's AAA rating. Stip. ¶ 41.

From 2004 to 2009, ***Jacob Frenkel*** was AIG's Vice Chairman and Vice Chairman of AIG's Global Economic Strategies Group. Bernanke, Tr. 2189; JX 188 at 20.

From July 2005 through October 2008, **David Herzog** served as Senior Vice President and Comptroller of AIG.  Since October 2008, Mr. Herzog has been the Chief Financial Officer of AIG.  Herzog, Tr. 6953-55.

In 2008, **Anastasia "Stasia" Kelly** served as General Counsel and Vice Chairman of AIG.  Huebner, Tr. 6115; JX 188 at 20.  Ms. Kelly left AIG on December 30, 2009.  JX 251 at 523-28.

During the relevant period, **Paula Reynolds** served as Vice Chairman and Chief Restructuring Officer of AIG.  Liddy, Tr. 3250; Herzog, Tr. 7036; JX 188 at 20.

In 2008, **Brian Schreiber** served as Senior Vice President for Strategic Planning at AIG.  Mr. Schreiber currently serves as AIG's Deputy Chief Investment Officer.  Schreiber, Tr. 6533.

In 2008 and 2009, **Kathleen Shannon** served as Deputy General Counsel, Senior Vice President and Corporate Secretary for AIG.  As Deputy General Counsel, Ms. Shannon was the senior securities and corporate finance lawyer at AIG.  Shannon, Tr. 3646.

During the relevant period, **Anthony Valoroso** served as head of accounting policy for AIG.  Farnan, Tr. 4165.

 On June 15, 2008, **Robert Willumstad** replaced Martin Sullivan as AIG's Chief Executive Officer.  Mr. Willumstad served as AIG's CEO until September 16, 2008.  PTX 589 at 59, 72.  From December 2006 until September 16, 2008, Mr. Willumstad was Chairman of the AIG Board of Directors.  Willumstad, Tr. 6328-29.

On September 22, 2008, **AIG's Board of Directors** consisted of the following members:  Stephen F. Bollenbach, Martin S. Feldstein, Suzanne Nora Johnson, Fred H. Langhammer, Edward M. Liddy, George L. Miles, Jr., Morris W. Offit, James F. Orr III, Virginia M. Rometty, Michael H. Sutton, and Edmund S.W. Tse.  JX 103 at 1.

**Edward Liddy** joined AIG's Board of Directors after September 18, 2008 upon being named Chairman and CEO.  JX 94 at 2-3.  Mr. Liddy was recruited for this position by Christopher Cole, then Chairman of Goldman Sachs' investment banking division, and by Ken Wilson, a former Goldman Sachs banker who then worked for Mr. Paulson at the U.S. Treasury Department.  Liddy, Tr. 3024-27.

AIG's Consultants and Advisers

***BlackRock*** served as an outside financial adviser for AIG.   AIG retained BlackRock in June 2008 to value its credit default swap portfolio.   In October 2008, FRBNY engaged BlackRock to evaluate various issues relating to AIG's credit default swap exposure.   Stip. ¶¶ 57, 156, 157.

***Blackstone Advisory Partners LLP*** was hired as AIG's adviser the weekend prior to September 12, 2008.   Blackstone remained as AIG's adviser when AIG's Board discussed the credit agreement proposed by FRBNY.   Studzinski, Tr. 4500.   John Studzinski led Blackstone's work for AIG in September 2008.   JX 74 at 17.

***KPMG*** was retained by AIG in October 2008 to conduct a valuation of the Series C Preferred Stock.   PTX 375 at 3.

***JP Morgan Chase & Co.*** is a large financial institution that provides commercial and investment banking services.   AIG hired JP Morgan to help develop funding options in late August 2008.   Stip. ¶ 67.   Mr. Geithner later requested JP Morgan (along with Goldman Sachs) to explore a private sector solution for AIG during the weekend of September 13-14, 2008, and continuing into the first part of the following week.   PTX 709 at 208.   ***James Lee*** is JP Morgan's senior investment banker who headed this effort for Mr. Geithner.   Lee, Tr. 7067-69.

***PricewaterhouseCoopers ("PwC")*** has served as AIG's independent auditors for several decades.   Farnan, Tr. 4160.   During the relevant time period, ***Donald Farnan*** was the primary accountant on the PwC team serving AIG.   Farnan, Tr. 4298.

***Simpson, Thacher & Bartlett LLP*** served as outside counsel to AIG's Board of Directors in 2008.   Stip. ¶ 31.   Lawyers ***Richard Beattie*** and ***James Gamble*** of Simpson Thacher advised AIG's Board of Directors during the time periods relevant to this case. JX 94 at 1.

***Sullivan & Cromwell LLP*** served as outside counsel to AIG in 2008.   JX 74 at 1. ***Rodgin Cohen***, Chairman of Sullivan & Cromwell, advised not only AIG, but also "just about every other firm that got in trouble during the crisis," including Fannie Mae, Lehman Brothers, and Bear Stearns.   PTX 709 at 163.   Lawyers ***Michael Wiseman*** and ***Robert Reeder*** of Sullivan & Cromwell also advised AIG during the periods relevant to this case.   JX 74 at 1; Reeder, Tr. 6851.

*Weil, Gotshal & Manges LLP* served as one of AIG's outside counsel, including from 2008 through the present.  Stip. ¶ 30.  *Joseph Allerhand* of Weil Gotshal advised AIG during the periods relevant to this case.  JX 74 at 1-2.

<u>The Federal Government and its Agents</u>

The **Department of the Treasury** is an executive agency of the United States.  The Secretary of the Treasury is appointed by the President and is an official of the U.S. Government.  Def.'s Resp. to Pl.'s 2nd RFAs Nos. 1-3.

From July 10, 2006 until January 20, 2009, **Henry "Hank" Paulson** was the Secretary of the Treasury.  Prior to becoming Secretary of the Treasury, Mr. Paulson worked at Goldman Sachs for more than 20 years, serving as CEO from 1999 until May 2006.  Def.'s Resp. to Pl.'s 2nd RFAs Nos. 45, 47.  In August 2008, Mr. Paulson recruited Dan Jester, a former Goldman Sachs executive, to join the Treasury Department as a contractor.  PTX 706 at 190-91.

From January 26, 2009 through January 25, 2013, **Timothy F. Geithner** was Secretary of the Treasury.  Prior to being Secretary of the Treasury, Mr. Geithner served as President of the Federal Reserve Bank of New York.  Def.'s Resp. to Pl.'s 2nd RFAs Nos. 46, 56.

The **Federal Reserve System** is the central bank of the United States, established by Congress in 1913.  The Federal Reserve System is comprised of the Board of Governors and twelve regional Federal Reserve Banks.  Stip. ¶ 1.

The **Board of Governors** of the Federal Reserve System is an agency of the United States.  The Board of Governors supervises and regulates the operations of the Federal Reserve Banks.  Stip. ¶ 2.  The Board of Governors is responsible for, among other things, regulating and supervising banks that are members of the Federal Reserve System, bank holding companies, and international banking facilities in the United States.  Stip. ¶ 11.

The Board of Governors is comprised of up to seven members, called "Governors."  Governors are appointed by the President and confirmed by the U.S. Senate.  The Chairman and Vice Chairman of the Board of Governors also are appointed by the President and confirmed by the Senate.  The nominees to these posts must already be members of the Board or must be simultaneously appointed to the Board.  The terms for these positions are four years.  Members of the Board of Governors are officials of the United States.  Stip. ¶ 3.

The **Federal Open Markets Committee ("FOMC")** is responsible for conducting open market operations – the purchase and sale of securities by the central bank.   The Federal Reserve uses open market operations to adjust the supply of reserve balances to manage the federal funds rate (the rate at which banks lend reserve balances overnight).   The FOMC consists of the members of the Board of Governors, the President of the Federal Reserve Bank of New York, and four of the remaining Reserve Bank presidents, who rotate through one-year terms.   Stip. ¶ 13.

From February 1, 2006 through January 31, 2014, **Ben Bernanke** was the Chairman of the Federal Reserve System.   Def.'s Resp. to Pl.'s 2nd RFAs No. 53.

From June 23, 2006 through June 23, 2010, **Donald Kohn** was Vice Chairman of the Federal Reserve System.   Def.'s Resp. to Pl.'s 2nd RFAs No. 54.

During the relevant period, **Mr. Bernanke, Mr. Kohn, Elizabeth Duke, Randall Kroszner,** and **Kevin Warsh** were members of the Board of Governors.   JX 63 at 1; Alvarez, Tr. 510.

The members of the Board of Governors are in continual contact with other policy makers in government.   The Board has regular contact with members of the President's Council of Economic Advisers and other key economic officials.   The Chairman also meets from time to time with the President and has regular meetings with the Secretary of the Treasury.   Stip. ¶ 4.   The Federal Reserve Banks operate under the general supervision of the Board of Governors.   Stip. ¶ 7.

Since 2004, **Scott Alvarez** has been the General Counsel for the Federal Reserve.   Alvarez, Tr. 79-80.   During the relevant period, **Richard Ashton** was deputy general counsel in the Legal Division for the Federal Reserve.   Alvarez, Tr. 300.

The **Federal Reserve Bank of New York ("FRBNY")** is one of the twelve regional Federal Reserve Banks.   Among other functions, FRBNY performs fiscal agency functions for the U.S. Treasury, certain federal agencies, and other entities.   Def.'s Resp. to Pl.'s 2nd RFAs Nos. 28-29.   FRBNY and other Federal Reserve Banks process federal payments and deposits to Treasury's account and service Treasury securities.   Def.'s Resp. to Pl.'s 2nd RFAs No. 35.

**Thomas Baxter** has served as General Counsel of FRBNY for nearly 20 years.   Baxter, Tr. 796.

In 2008, *Alejandro LaTorre* was an Assistant Vice President working on FRBNY's Open Market Desk, the monetary policy implementing arm of the Federal Reserve System. LaTorre, Tr. 2080-82.

From July 2007 to 2011, *Margaret McConnell* was the FRBNY Deputy Chief of Staff for Policy. McConnell, Tr. 2506-07.

In September 2008, *Susan McLaughlin* was the senior officer with oversight responsibility for the discount window, leading a function that was called "financial management and discount window." McLaughlin, Tr. 2394.

From December 2006 through 2008, *Patricia Mosser* was a Senior Vice President in the Markets Group at FRBNY. Mosser, Tr. 1159-60; Def.'s Resp. to Pl.'s 2nd RFAs No. 62.

On September 17, 2008, FRBNY established an on-site team at AIG led by FRBNY employee *Sarah Dahlgren* to help FRBNY understand and monitor the company. Def.'s Resp. to Pl.'s 2nd RFAs No. 416. The monitoring team represented the interests of the Federal Reserve as the lender to AIG, to ensure compliance with the terms of the Credit Agreement, and to supervise the company's decision-making. PTX 516 at 50.

On January 16, 2009, *Jill M. Considine, Chester B. Feldberg,* and *Douglas Foshee* became trustees for the AIG Credit Facility Trust Agreement, creating the AIG Credit Facility Trust. JX 172 at 4. *Peter Langerman* became a trustee on February 26, 2010 following Mr. Foshee's departure. Langerman, Tr. 7158; Foshee, Tr. 3453; DX 843 at -567.

Beginning on September 16, 2008, *Davis Polk & Wardwell LLP* served as legal counsel to Defendant in connection with the drafting and execution of the terms of the AIG Credit Agreement and the related agreements, including the AIG Credit Facility Trust Agreement and Stock Purchase Agreement. Stip. ¶¶ 109, 110. Davis Polk also provided advice and counsel to FRBNY and the Treasury Department concerning a variety of issues relating to AIG. Def.'s Resp. to Pl.'s 3rd Interrog. No. 25. Lawyers from Davis Polk who advised Defendant included partners *John Huebner, John Brandow*, and *Ethan James*. Brandow, Tr. 5790, 5869-69; Huebner, Tr. 5933.

On September 19, 2008, FRBNY retained *Ernst & Young ("E&Y")* to perform services for FRBNY in connection with Defendant's loan to AIG. Def.'s Resp. to Pl.'s 3rd Interrog. No. 25. *Mark Symons* was E&Y's engagement partner in connection with its retention by FRBNY. Symons, Tr. 3588.

**Morgan Stanley** began advising FRBNY on the morning of September 15, 2008 regarding AIG.  Head, Tr. 3714.  Morgan Stanley also provided advice to FRBNY in connection with the drafting of the terms of the Credit Agreement.  Stip. ¶ 35.  FRBNY formally engaged Morgan Stanley in October 2008 to provide assistance with "strategic alternatives" for AIG.  PTX 303 at 1; Head, Tr. 3720-21.  **James Head** has worked at Morgan Stanley for 20 years in mergers and acquisitions and was a member of the Morgan Stanley team advising Defendant on matters relating to AIG.  Head, Tr. 3713-14.

**Goldman Sachs Group, Inc.** is a large financial institution with a significant investment banking business.  PTX 706 at 392.  Goldman Sachs was involved in exploring a private solution for AIG during September 13-15, 2008, and in selecting a new Chief Executive Officer for AIG, Mr. Edward Liddy, at the request of government officials.

**Wachtell, Lipton, Rosen & Katz** provided legal services to the Treasury Department relating to AIG, including assisting Treasury in drafting the terms of Defendant's loan to AIG, beginning on or around September 14, 2008 through September 19-20, 2008.  The United States did not memorialize its retention of the Wachtell law firm for services rendered regarding AIG, and Wachtell did not seek compensation for such services.  Def.'s Resp. to Pl.'s 3rd Interrog. No. 25; PTX 98-U at 1-3; JX 85 at 1; JX 376-U at 1, 3-7; Alvarez, Tr. 290.  In September 2008, Wachtell represented Morgan Stanley in its successful efforts to become approved by the Federal Reserve as a bank holding company.  JX 377 at 1-2.